**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, AMERICAN INVESTMENT COUNCIL, and LONGVIEW CHAMBER OF COMMERCE, | Civil Action No. 6:25-cv-009 |
| *Plaintiffs*, | |
| v. | |
| FEDERAL TRADE COMMISSION and LINA KHAN, in her official capacity, | |
| *Defendants*. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

PARTIES ........................................................................................................................... 8

JURISDICTION AND VENUE ........................................................................................ 12

BACKGROUND ............................................................................................................... 14

    A.  The Hart-Scott-Rodino Act's Premerger Notification Requirement ...................... 14

    B.  The Premerger Notification Regime From 1977 To 2024 ......................................... 19

        1.  The Original HSR Form ....................................................................................19

        2.  The Original Form's Performance.....................................................................21

        3.  Congress's Amendments To The HSR Act ......................................................27

THE FTC'S RULEMAKING ............................................................................................ 29

    A.  The Proposed Rule ..................................................................................................... 29

    B.  Commenters Raise Grave Concerns .......................................................................... 36

    C.  The Final Rule ............................................................................................................ 39

        1.  Three Categories of Transactions ...................................................................40

        2.  The New Requirements .....................................................................................41

        3.  Responses to Comments...................................................................................48

THE RULE VIOLATES THE APA ................................................................................... 51

    A.  The Rule Exceeds The FTC's Statutory Authority.................................................... 51

        1.  The FTC Did Not Recognize Or Adhere To The Limits On Its Authority To Require Information And Documents .......................................51

        2.  The FTC Lacks Authority To Require Disclosure Of Officers And Directors .........................................................................................56

        3.  The FTC Lacks Authority To Require Filing Parties To Submit Substantive Antitrust Analysis....................................................................58

B. The Rule's Overall Benefits Do Not Reasonably Outweigh Its Costs..................... 61

    1. The FTC Discounted Significant Costs ....................................................61

    2. The FTC Significantly Overstated Benefits............................................66

C. Evaluated Individually, Many Of The Rule's New Requirements Do Not
Pass Any Reasonable Cost-Benefit Analysis ............................................. 71

D. The FTC Failed To Adequately Justify Its Departure From
The 1978-2024 Status Quo............................................................................. 78

    1. The FTC Lacks Hard Evidence Of A Significant Problem ...............................79

    2. The FTC's Bare Reliance On Unspecified "Experience"
Is Insufficient And Unreasonable..........................................................82

E. The FTC Did Not Rationally Explain Why It Cannot Sufficiently
Plug Any Information Gaps Through Other Means ................................... 84

    1. The Agencies Have Many Ways To Acquire Information In
The First Statutory Waiting Period........................................................85

    2. The FTC's Explanations For Not Using These Tools Are
Unreasonable And Contrary To The Evidence......................................87

    3. The FTC Did Not Reasonably Explain Why It Cannot Make
Better Use Of Second Requests ............................................................89

CLAIMS FOR RELIEF ....................................................................... 91

PRAYER FOR RELIEF ..................................................................... 103

Plaintiffs the Chamber of Commerce of the United States of America, Business Roundtable, American Investment Council, and Longview Chamber of Commerce, by and through undersigned counsel, bring this complaint for declaratory and injunctive relief against Defendants Federal Trade Commission and Lina Khan in her official capacity as Chair of the Commission, alleging as follows:

## INTRODUCTION

1.      In 1977, Thomas Bertram Lance, former director of the Office of Management and Budget, shared his motto for good government with the U.S. Chamber of Commerce newsletter Nation's Business:  "If it ain't broke, don't fix it."  As Lance saw it, that was "the trouble with government:  Fixing things that aren't broken and not fixing things that are broken."  Nearly five decades later, the Federal Trade Commission's recent premerger-notification rulemaking shows that nothing has changed.

2.      The FTC administers the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act), which requires companies to file a "premerger notification" alerting the FTC and Department of Justice of mergers, acquisitions, and similar transactions above a certain size.  15 U.S.C. § 18a.  The companies must then generally wait 30 days after filing to close.  The Act gives the two antitrust agencies the chance to investigate and, if necessary, sue to block a transaction before the parties have integrated their assets and management, at which point "'unscrambling' the merger, and restoring the acquired firm to its status as an independent competitor," can be difficult.  H.R. Rep. No. 94-1373, at 8 (1976).

3. The HSR Act authorizes the FTC to design the "form" of the premerger notification and establish the "documentary material and information" that the merging companies must provide. 15 U.S.C. § 18a(d)(1). For the last 45 years, the FTC has required more or less the same basic kinds of information and documents—enough for the reviewing antitrust agency to make a preliminary assessment of the transaction and determine whether further review is necessary. Then, if that initial screen suggests some cause for concern, the agency can issue what is known as a Second Request: a required "submission of additional information or documentary material relevant to the proposed acquisition." *Id.* § 18(e)(1)(A). A Second Request extends the waiting period, generally requiring the merging companies not to close until 30 days after they have submitted the additional requested information. *Id.* § 18a(e)(2).

4. Recently, the FTC finalized a new rule that massively expands the amount of documentary material and information that must be included in the initial premerger notification form for all HSR-reportable transactions. *Premerger Notification; Reporting and Waiting Period Requirements*, 89 Fed. Reg. 89,216 (Nov. 12, 2024). By the agency's own lowball estimate, the Rule's changes to the notification form will *more than quadruple* the average time and expense of preparing an HSR filing for thousands of reportable transactions each year. With that kind of dramatic change, one would expect that the previous notification form was failing to achieve its basic task: enabling the antitrust agencies to identify the handful of mergers that present potential antitrust concerns and thus require their further attention.

5.      Yet the FTC has zero evidence of that.  Indeed, despite repeated challenges to do so, the agency has never identified a single transaction that it missed because of gaps in the requirements of the previous premerger form.  Since the Act was enacted, the FTC has never made more than small tweaks to the content of what that form first required in 1978.  Moreover, until the FTC began this process, there was widespread consensus that the premerger-notification process was working well.  Even the FTC's own introductory guide to premerger review proclaimed as recently as July 2024 that the HSR "Program has been a success," and "has minimized the number of post-merger challenges the enforcement agencies have had to pursue."  FTC, *What is the Premerger Notification Program? An Overview* 2 (Mar. 2009), http://web.archive.org/ web/20240612020736/https://www.ftc.gov/sites/default/files/attachments/premerger-introductory-guides/guide1.pdf (2009 FTC Guide).  The FTC conveniently deleted that language from the guide just before it finalized the new Rule.  FTC, *What is the Premerger Notification Program? An Overview* (Aug. 2024), https://www.ftc.gov/ sites/default/files/attachments/premerger-introductory-guides/guide1.pdf (2024 FTC Guide).  And Congress itself has made only minor adjustments to the HSR Act—including just two years ago—that have generally made the premerger process *less* burdensome for filers, not more.

6.      The FTC's dramatic expansion of the premerger notification form is not simply a bad idea, though it is that.  It is also unlawful.

7.      *First*, the Rule exceeds the constraints imposed by the HSR Act on the kinds of information and documents that the FTC may demand in the initial premerger

notification.   Most importantly, the statute authorizes the FTC to require only the information and documents that are "*necessary and appropriate* to enable the [FTC and DOJ] to determine whether [the proposed] acquisition may, if consummated, violate the antitrust laws."  15 U.S.C § 18a(d)(1) (emphasis added).  That language limits the FTC to requiring information and materials that are (i) truly needed to determine whether a Second Request is warranted and (ii) do not impose a higher cost to compile and submit than they are worth in help to the agencies during their initial screen.   In a Second Request, by contrast, the agencies may demand any "information or documentary material relevant to [the] proposed acquisition."  *Id.* § 18a(e)(1)(A).  Congress created that two-step process to avoid pointlessly burdening the vast majority of mergers and acquisitions that obviously pose no antitrust problem with expensive, time-consuming filings.  Yet in the Rule, the FTC rejected the existence of these constraints, and thus never determined that the benefits of the Rule's many new information and document mandates are worth their costs.  The Rule is thus fundamentally "incompatible with the" two-step "statutory scheme" Congress established in the HSR Act.  *Sierra Club* v. *EPA*, 294 F.3d 155, 162 (D.C. Cir. 2002).

8.     *Second*, and in any event, no rational cost-benefit analysis could have concluded that the Rule's additions to the premerger notification form are worth the candle.  As noted, the FTC itself estimated that the Rule will more than quadruple the amount of time and expense it takes to prepare the form for thousands of HSR-reportable transactions a year.  Even that assessment is far too low.  And it ignores the fact that, as commenters from every corner of industry explained, the additional expense and delays

that the Rule inflicts on every HSR-reportable transaction will deter and even prevent the consummation of many transactions that would have brought significant value to consumers and the larger economy.  Against those costs—most of which will fall on the 85% of HSR-reportable transactions that get nothing more than a cursory glance, because they are obviously lawful—the Rule offers trivial benefits at best.  The evidence shows that the antitrust agencies are already able to effectively detect transactions that might ultimately violate the antitrust laws.  The flood of new information and documents required by the Rule cannot meaningfully improve on that excellent track record.  All it will do—assuming the agencies even review it—is slow down their analysis.

9.    *Third*, even if the Rule as a whole could pass a cost-benefit analysis, many of the new categories of information and documents that the Rule adds to the HSR form cannot survive cost-benefit scrutiny when evaluated on an individual basis.  At a minimum, those particularly burdensome additions to the premerger notification form are beyond the FTC's authority.

10.    *Fourth*, the Rule does not adequately explain why the FTC needed to embark on this unprecedented expansion of the form.  As the Rule itself notes, the version of the form that was in effect before this rulemaking was "very similar to the original 1978 version in its scope and content."  89 Fed. Reg. at 89,257.  The balance that version struck between costs and benefits worked well by all accounts.  To toss aside that version and replace it with a far more burdensome one, the FTC needed actual proof that the current form has meaningful shortcomings that will be fixed by the Rule.  That mandate flows from the HSR Act's requirement that the information sought be "necessary," 15 U.S.C.

§ 18a(d)(1), from the general requirement of the Administrative Procedure Act that the benefits of any rule be "adequately substantiated," *Chamber of Commerce of United States* v. *SEC*, 85 F.4th 760, 778 (5th Cir. 2023), and from the related requirement that "when an agency changes its existing position," it must "show that there are good reasons for the new policy," *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 221 (2016).  If the FTC has such proof, the Rule does not point to it.

11.    *Finally*, even if the Rule had adequately established the existence of "a genuine problem" with the current form, *Chamber of Commerce*, 85 F.4th at 778, the Rule is arbitrary and capricious because it lacks a "reasoned explanation for its rejection" of the far less burdensome alternatives available for addressing that problem, *Farmers Union Cent. Exch., Inc.* v. *FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984).  As many commenters pointed out, if the antitrust agencies need to learn more about a proposed transaction during the initial 30-day window, they have many means at their disposal: voluntary requests to the parties (who are strongly incentivized to cooperate), outreach to competitors and customers (who are strongly incentivized to bring up antitrust concerns if they exist), and even compulsory process in the form of civil investigative demands.  Or the agencies could make better use of Second Requests.  The Rule offers no good reason for rejecting the option of improving and expanding the use of these much more targeted tools, and instead choosing to dramatically expand the information that *all* filers must provide, at great cost, for *every* HSR-reportable transaction.

*      *      *

12.     In July 2023, just one month after issuing the proposed version of the Rule, FTC Chair Lina Khan responded to a question about the "perception" that the FTC had become overly hostile to merger activity.  Chair Khan responded:  "Just to put things in context, any given year the antitrust agencies get anywhere between 1,500 and 3,000 merger filings. Of that number, 98 percent go through without even second questions being asked by the agencies, so around two percent of all deals even get what's known as a Second Request . . . .  And an even smaller fraction ultimately results in a legal challenge. So the vast majority of deals [are] still going through. . . .  It's really an issue on the margins."  Remarks of FTC Chair Lina M. Khan, Economic Club of New York, Interview by Peter Orszag (July 24, 2023), available at https://www.youtube.com/ watch?v=X7u3JwSfHZY.

13.     Chair Khan was correct.  The "vast majority" of mergers and acquisitions are not only obviously lawful, but critical for sustaining a dynamic modern economy. Congress designed the HSR Act's two-step process to avoid undue interference with that engine of economic growth.  The FTC's unprecedented revisions to the premerger notification form disregard that core feature of the statutory framework and will impose alarming and unprecedented new burdens on *all* HSR-reportable transactions—not just those "on the margins"—without any good reason.  As a result, the Rule adopting those revisions exceeds the FTC's authority and violates the APA's prohibition on arbitrary and capricious decisionmaking.  This Court should therefore set aside the Rule.

## PARTIES

14.     Plaintiff Chamber of Commerce of the United States of America (U.S. Chamber) is the world's largest business federation, with over 300,000 members, including members in the Eastern District of Texas. A 501(c)(6) nonprofit headquartered in Washington, D.C., the U.S. Chamber represents more than three million companies and professional organizations of every size, in every industry sector, and from every region in the United States. An important function of the U.S. Chamber is to represent the interests of its members before Congress, the Executive Branch, and the courts in conjunction with its mission to advocate for policies designed to help businesses create jobs and grow the national economy. The U.S. Chamber has many members that regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR Act and thus will be subject to the requirements of the Rule, including members for which frequent merger-and-acquisition (M&A) activity is a regular and consistent feature of their business model.

15.     To further its core purposes, the U.S. Chamber has challenged actions and rulemaking by federal agencies. *See, e.g., Chamber of Commerce* v. *EPA*, 24-1051 (D.C. Cir. 2024); *Ryan LLC* v. *FTC*, 24-10951 (5th Cir. 2024); *Chamber of Commerce* v. *SEC*, No. 23-5409 (6th Cir. 2024); *Chamber of Commerce* v. *U.S. Dep't of Labor*, 5:17-cv-00009 (W.D. Okla. 2024); *Chamber of Commerce* v. *EPA*, 3:23-cv-00007 (E.D. Ky. 2023).

16.     Plaintiff Business Roundtable is a 501(c)(6) nonprofit association of chief executive officers of America's leading companies representing every sector of the U.S. economy. These companies have employees in every state, including Texas. Business

Roundtable works to promote a thriving United States economy and economic opportunity for all Americans by advocating for sound public policies.  Business Roundtable is headquartered in Washington, D.C.  Many of the members of Business Roundtable are CEOs of companies that regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR Act and thus will be subject to the requirements of the Rule, including members for which frequent M&A activity is a regular and consistent feature of their business model.

17.    Plaintiff the American Investment Council (AIC) is a 501(c)(6) nonprofit association of private equity and private credit firms.  AIC's members have offices and portfolio companies in every state in America.  In Texas alone, there are over a thousand private equity firms and over a million employees at private equity-backed companies. AIC works to develop and provide information about the private investment industry and its contribution to the long-term growth of the U.S. economy and security of American workers.  Private equity fuels thousands of small businesses that are the lifeblood of local communities.  In 2022, 85% of all private equity investments went to support small businesses with fewer than 500 employees.  These investments help local companies hire new employees, improve their operations, and grow.  Mergers and acquisitions are a regular and consistent feature of the private equity business model, with many transactions representing investment in small businesses.  As such, AIC has many members that regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR

Act and thus will be subject to the requirements of the Rule, including members for which frequent M&A activity is a regular and consistent feature of their business model.

18.    Plaintiff the Longview Chamber of Commerce represents Longview area businesses, including over 1,000 businesses and professional organizations in Gregg County and 11 adjacent counties.  The Longview Chamber of Commerce maintains its principal place of business at 410 N. Center St., Longview, Texas 75601.  The Longview Chamber has members that regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR Act, including members for which frequent M&A activity is a regular and consistent feature of their business model.

19.    Plaintiffs bring this action on behalf of their members to advance their interests as well as the interests of the entire American business community.  As part of advocating for their members, Plaintiffs are committed to ensuring that businesses are able to compete, gain scale, and innovate through deals that do not pose competitive concern.

20.    The FTC's massive expansion of the information and material required in the premerger notification form, which both the buyer and seller in virtually every reportable transaction must file, will make it far more costly for businesses, including Plaintiffs' members, to consummate such deals.  In the final rule, the FTC itself estimates that the average time for all filers to complete the revised premerger notification form will nearly triple, from 37 hours to complete the existing form to 105 hours to complete the new form.  89 Fed. Reg. at 89,332.  For half of all reportable transactions, the FTC

estimates that the time for the buyer to complete the form will increase to 158 hours, a 427% increase over the status quo.  *Id.*  These estimates, moreover, are much too low.

21.     Beyond these direct compliance costs, the Rule inflicts significant indirect costs for the filing parties as well.  For example, the need to collect, review, analyze, and prepare the additional information required by the Rule will significantly extend and delay deal timelines.  Such delays may hamper the transacting parties' ability to obtain financing, increase the risk that news of a non-public deal will leak, and generally impede if not prevent consummation of the transaction.  The Rule also imposes a significant opportunity cost to businesses, which must divert valuable director, officer, and employee time to preparing the premerger notification form instead of running the company.

22.     All of these costs will directly harm Plaintiffs' members when they enter into HSR-reportable transactions.  These costs are also likely to prevent consummation of at least some value-creating deals that would otherwise occur.  The Rule will therefore also likely deprive Plaintiffs' members of the additional resources, talent, efficiencies, and economies of scale that are gained through productive M&A activity.  The Rule will also limit the ability of Plaintiffs' members to bring new and better products to more consumers and more markets.

23.     Applied across the economy as a whole, the FTC's expansion of the premerger notification form will inflict significant harm.  Larger businesses utilize M&A to unlock efficiencies, enhance innovation, and expand operations.  Smaller companies, entrepreneurs, and early-stage investors benefit from opportunities for capital formation, liquidity, and growth, as well as the possibility of a future exit.  This system benefits not

only the transacting parties, but also the American consumers whom the antitrust laws are designed to protect.

24.     For all of these reasons, Plaintiffs the U.S. Chamber, AIC, and Business Roundtable filed comment letters strongly opposing the FTC's proposed revisions to the premerger notification form and urging the agency to withdraw the proposed rule.  *See, e.g.*, U.S. Chamber Comment (Sept. 27, 2023), https://www.regulations.gov/comment/ FTC-2023-0040-0684; AIC Comment (Sept. 27, 2023), https://www.regulations.gov/ comment/FTC-2023-0040-0705; Business Roundtable Comment (Sept. 27, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0718.

25.     Defendant Federal Trade Commission is a federal government agency headquartered in Washington, D.C.  The FTC is subject to the Administrative Procedure Act pursuant to 5 U.S.C. § 551(1).

26.     Defendant Lina M. Khan is the Chair of the FTC.  She is sued in her official capacity and is also subject to the APA pursuant to 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

27.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

28.     Plaintiffs have associational standing to bring this suit on behalf of their members.  Many of Plaintiffs' members are directly harmed by the Rule's significant expansion of the information and documentary material required by the premerger notification form, and accordingly have standing to sue in their own right.  Specifically,

many of Plaintiffs' members regularly enter into transactions that must be reported under the HSR Act. These members also plan to engage in such transactions in the future, as evidenced by their stated intentions, the nature of their businesses, and/or their consistent and established track records of frequent M&A activity. Once the Rule goes into effect, it will apply to these members when they enter into these HSR-reportable transactions. The Rule will adversely affect these members by requiring them to collect, analyze, and submit significant new amounts of documentary material and information in their HSR filings beyond what regulations currently require, at significant cost. As discussed above, the Rule will also adversely affect these members by preventing the consummation of transactions that would otherwise allow them to better compete, innovate, and expand.

29.     The interests Plaintiffs seek to protect are germane to their purposes. Each Plaintiff is committed to protecting the interests of its members, as well as of the broader business community in this district and across the Nation. Plaintiffs also regularly advocate for reforms that would reduce unjustified regulatory burdens on its members. Both of these core purposes converge here. The Rule represents a particularly egregious example of an unjustified burden inflicted indiscriminately on businesses large and small, directly harming both those businesses and the larger local and national economies in which they operate. That is why Plaintiffs filed lengthy comment letters urging the FTC to withdraw the Rule.

30.     Finally, neither the claims asserted nor the declaratory and injunctive relief requested requires an individual member to participate in the suit. *See Association of*

*Am. Physicians & Surgeons, Inc.* v. *Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

31.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because it is an action against an agency and officer of the United States, no real property is involved, and Plaintiff Longview Chamber resides in this district.   Plaintiff Longview Chamber resides in this division.

## BACKGROUND

### A.    The Hart-Scott-Rodino Act's Premerger Notification Requirement

32.    In 1976, Congress enacted and President Ford signed into law the Hart-Scott-Rodino Antitrust Improvements Act.  The HSR Act was intended to solve the so-called "midnight merger" problem.  H.R. Rep. No. 94-1373, at 11; S. Rep. 94-803, at 64-65 (1976).  Companies concerned about the antitrust implications of a transaction would often merge quickly and in secret, preventing the antitrust enforcement agencies from learning about the transaction until it had already closed.  Companies took this approach because, "after consummation occurs, many large mergers become almost unchallengeable."  H.R. Rep. No. 94-1373 at 8.  As the House Report explained, on many occasions, "[d]uring the course of the post-merger litigation," merging firms would become "in effect, irreversibly 'scrambled' together," such that "restoring the acquired firm to its former status as an independent competitor" would be "difficult at best, and frequently impossible."  *Id.*

33.    To address that dynamic, the HSR Act generally requires all companies that intend to enter into a merger, acquisition, or similar transaction over a certain size to file a "premerger notification" with the FTC and DOJ.  15 U.S.C. § 18a.   Whether a

14

transaction must be reported depends on the value of the acquisition and, in some circumstances, the size of the buyer and seller.  Today, most mergers and acquisitions valued at more than $119.5 million (subject to further annual adjustment, 15 U.S.C. § 18a(a)(2)) must be reported.  *See* 89 Fed. Reg. 7,708.  If a transaction is "HSR reportable," the buyer and, in almost all cases, the seller must each file their own notifications.  The merging companies are then prohibited from closing the transaction pending the expiration of one or more statutory "waiting periods," during which the agencies can investigate the transaction and, if they wish, seek a preliminary injunction to prevent it.

34.     Congress recognized that this sweeping new premerger notification regime was a blunt and potentially costly instrument.  Nearly all mergers and acquisitions pose no antitrust risk, and lawful M&A activity is a critical engine of economic growth.  Of necessity, however, the premerger filing requirement would have to be applied to those transactions.  Congress thus recognized the need to design the premerger review system so that it would "neither deter nor impede consummation of the vast majority of mergers and acquisitions."  S. Rep. No. 94-803, at 66.  Congress achieved that by dividing the antitrust agencies' premerger screening process into two distinct components:  the initial screen and the so-called "Second Request."

35.     First, to facilitate the initial screen, all parties to a reportable transaction must submit the "premerger notification."  15 U.S.C. § 18a.  The FTC may specify the "documentary material and information" that must be submitted in that "notification."  *Id.* § 18a(d)(1).  But the agency may not require any and all information that is relevant to a

potential antitrust analysis.  Instead, the information must be "necessary and appropriate to enable the [FTC and DOJ] to determine whether [the proposed] acquisition may, if consummated, violate the antitrust laws."  *Id.*

36.     Then, if the FTC or DOJ determines that further scrutiny is warranted based on its initial review, it may issue what is known as a Second Request.  15 U.S.C. § 18a(e).  In a Second Request, the requesting agency is not limited to demanding information that is "necessary and appropriate," but instead may require "information or documentary material relevant to [the] proposed acquisition."  *Id.* § 18a(e)(1)(A).  A Second Request extends the waiting period, typically for an additional 30 days after the investigating agency receives the additional information.  *Id.* § 18a(e)(2).

37.     The statutory language and two-step structure make clear that in the initial HSR submission, the FTC may only require "a basic amount of information" that allows the antitrust agencies to "make a preliminary assessment of the transaction and determine whether further review is necessary."  William Baer, *Reflections on 20 Years of Merger Enforcement under the Hart-Scott-Rodino Act* (Oct. 31, 1996).  For one thing, the statute refers to the premerger document that must be filed as a "notification," not a petition, application, or request.  In ordinary usage, a "notification" merely provides pertinent information, but does not provide any and all information the recipient might find helpful or relevant.

38.     In addition, Congress's use of the phrase "necessary and appropriate" to limit the material the FTC may demand ensures that providing such information and documents is both (i) truly needed for the initial screen and (ii) does not unduly burden

the filing parties by imposing a higher cost than it returns in benefit to the antitrust agencies. The Supreme Court has held that "[n]o regulation is 'appropriate' if it does significantly more harm than good." *Michigan* v. *EPA*, 576 U.S. 743, 752 (2015) (interpreting statute requiring regulation to be "appropriate and necessary"). Likewise, the Fifth Circuit has held that the phrase "necessary and appropriate" "at a minimum requires that [a rule's] benefits reasonably outweigh its costs." *Mexican Gulf Fishing Co.* v. *Department of Com.*, 60 F.4th 956, 965 (5th Cir. 2023). By using that language in the HSR Act, Congress prohibited the FTC from demanding information that will be more costly for filing parties to produce than it will be beneficial to the evaluation of the transaction.

39. This bifurcated statutory design accommodates "the need to detect and prevent illegal mergers and acquisitions prior to consummation without unduly burdening business with unnecessary paperwork or delays." S. Rep. No. 94-803, at 65. For the initial "notification," which must be submitted by the buyer and seller for almost every reportable transaction, the antitrust agencies may demand only the information that is "necessary and appropriate" for them to perform an initial antitrust screen. The antitrust agencies have at most 30 days to perform this first step, so it is inevitably abbreviated and preliminary. Then, *if* the initial review reveals a potential concern, the agencies may come back and seek a broader universe of material: information "relevant to [the] proposed acquisition," without the "necessary and appropriate" limit. 15 U.S.C. § 18a(e)(1)(A). This two-step approach avoids needlessly burdening the thousands of annually reported transactions that do not pose any plausible competitive concern. It also ensures that the

17

agencies "efficiently allocate their finite resources to those transactions that truly deserve antitrust scrutiny."  145 Cong. Rec. S13974 (Nov. 4, 1999) (statement of Sen. Hatch) (discussing 2000 amendments to the HSR Act).

40.    When drafting the HSR Act, Congress considered and specifically rejected a more intrusive premerger clearance or approval regime, like those that have since been adopted in other jurisdictions such as the European Union.  One proposal would have granted the Commission the authority to obtain a court order temporarily restraining any merger subject to the premerger filing requirement.  *See* 122 Cong. Rec. 68 (1976) (statement of Sen. Byrd).  The burden of proof would then shift to the merging parties, which could proceed with the transaction only if they could show the merger was unlikely to violate the antitrust laws.  Even the FTC recognized that such a process would deter many valuable mergers, and Congress rejected it to avoid that "severe disincentive to mergers generally."  S. Rep. No. 94-803, at 213.

41.    As one DOJ official who was "deeply involved with the negotiations and deliberations on HSR" later summarized, Congress's objective in passing the HSR Act was to provide "advance notice to the agencies" along with the "production of a minimal amount of easily retrievable information."  Joe Sims & Deborah P. Herman, *The Effect of Twenty Years of Hart-Scott-Rodino on Merger Practice*, 65 Antitrust L.J. 865 (1997).  By pairing that kind of limited notification with a statutory waiting period, the Act eliminated the midnight-merger problem.  Congress understood that the system it was creating would not catch everything—that some "illegal mergers m[ight] still be consummated, despite passage of" the Act.  H.R. Rep. No. 94-1373, at 11.  But that tradeoff was worth it

18

to ensure that the Act "neither deter[red] nor impede[d] consummation of the vast majority of mergers and acquisitions" that do not pose any apparent competitive concern, S. Rep. No. 94-803, at 65.

### B.    The Premerger Notification Regime From 1977 To 2024

#### 1.    The Original HSR Form

42.    From the outset, the FTC understood that its statutory authority to require certain "documentary material and information" in the premerger notification was limited.  In its first report to Congress regarding the Act, the agency explained that drafting the initial form required the FTC to "strike what is often a difficult balance between the need of the enforcement agencies" for information "and the cost to the persons who must provide such information."  FTC, HSR Report, Annual Report to Congress for Fiscal Year 1977 at 3.

43.    Several months later, the FTC issued a rule publishing the "notification and report form" required by the HSR Act.  *Premerger Notification; Reporting and Waiting-Period Requirements*, 43 Fed. Reg. 33,450, 33,519 (July 31, 1978).  The agency explained that it had designed the form to provide it "with the information necessary and appropriate for an initial evaluation of the potential anticompetitive impact of an acquisition," and that the form was "not intended to elicit all potentially relevant information relating to an acquisition."  *Id.* at 33,520.

44.    Still, the 1978 premerger notification form required a substantial amount of documentary material and information.  The FTC rejected a request from some commenters to limit the form to "a perfunctory notification."  43 Fed. Reg. at 33,520.

Such a limited submission, the agency explained, would not contain enough information to allow the agencies to "make even a tentative determination of whether a transaction may violate the antitrust laws." *Id.*

45.    At a high level, the 1978 form required the filing parties to:

- identify the persons involved and type of transaction;

- identify the assets or securities to be acquired and the amount of control that would result;

- submit various documents, including certain SEC filings and "all studies, surveys, analyses and reports which were prepared by or for any officer(s) or director(s) . . . for the purpose of evaluating or analyzing the acquisition with respect to . . . competition, competitors, markets, [and] potential for sales growth or expansion into product or geographic markets," 43 Fed. Reg. at 33,255;

- provide revenues broken down by industry, product class, and product;

- provide certain information about subsidiaries and shareholders;

- identify the geographic areas in which the filer derives revenues in the same industry as the other party;

- disclose whether the parties have a supply relationship (*i.e.*, a vertical relationship) and list any relevant products; and

- report any acquisitions by the buyer in the prior ten years in industries in which both parties derive significant revenue.

46.    For the next 46 years, although the FTC would periodically tweak the form or the filing instructions at the margins, the required information and documentary material "largely stayed the same." Statement of Chair Lina M. Khan, Comm'r Rebecca Kelly Slaughter, and Comm'r Alvaro M. Bedoya Regarding Proposed Amendments to the Premerger Notification Form and the Hart-Scott-Rodino Rules at 3 (June 27, 2023). As a result, prior to the rulemaking at issue here, the form was "very similar to the original

20

1978 version in its scope and content."  89 Fed. Reg. at 89,257.  Indeed, as the FTC noted in the Rule, its minor changes over the years "frequently reduced the burdens associated with submitting an HSR form."  *Id.*

### 2.    The Original Form's Performance

47.    That longstanding version of the HSR premerger notification form achieved Congress's twin goals.  From the information and documentary material required by the form, the FTC and DOJ were able to conduct an effective premerger screening program that reliably identified potentially problematic transactions.  And although preparing the form could be costly, "with some hard work and the assistance of experienced HSR counsel," the form could "generally be completed without" inflicting unduly burdensome costs and without "jeopardizing the timing or success of the transaction."   Foley & Lardner LLP Comment at 3 (Sept. 21, 2023).  To the extent the premerger notification program was amended over time, the changes were generally designed to decrease the compliance burden in response to constant arguments that costs were excessive.

48.    *The Form's Effectiveness.*   For decades, the antitrust bar, the business community, and even the antitrust agencies themselves all repeatedly stated that the existing reporting scheme facilitated effective premerger review.

49.    In 1988, on the tenth anniversary of the HSR form's going into effect, the Associate Director of the FTC Bureau of Competition remarked that "the premerger notification program ha[d] done all that could have been expected of it," and that the FTC could "ask nothing more or less than that [the program] continue to function as it has in the past."  James W. Mullenix, *The Premerger Notification Program at the Federal*

*Trade Commission*, 57 Antitrust L.J. 125, 125, 131 (1988).  A decade later, a director of that same Bureau called the premerger program "highly successful," remarking that it "gave the antitrust agencies the tools they need[ed]" and "provided adequate notice of proposed mergers."  Baer, *Reflections*, *supra*.  Another FTC official similarly described the HSR process as "hugely successful in achieving its statutory objectives," David A. Balto, *Antitrust Enforcement in the Clinton Administration*, 9 Cornell J.L. & Pub. Pol'y 61, 118 (1999), while several practitioners described it as "generally enjoy[ing] the support of the antitrust bar and the business community."  William J. Kolasky, Jr. & James W. Lowe, *The Merger Review Process at the Federal Trade Commission: Administrative Efficiency and the Rule of Law*, 49 Admin. L. Rev. 889, 897 (1997).

50.     In 1997, Attorney General Janet Reno and Assistant Attorney General for Antitrust Joel Klein formed the International Competition Policy Advisory Committee to evaluate, among other things, the different approaches to merger review taken by different countries.  *See* International Competition Policy Advisory Committee, Final Report to the Attorney General and Assistant Attorney General for Antitrust (2000) (ICPAC Report).  The final report relayed that the "business and bar association representatives who appeared before the Advisory Committee [had] emphasized" that the U.S. premerger "review process [was] 'fundamentally sound.'" *Id.* at 140 n.127.

51.     In 2001, the FTC and DOJ submitted a report to Congress in which they summarized their "ongoing reassessment of the effects of the premerger notification program."  FTC and DOJ, HSR Report, Annual Report to Congress for Fiscal Year 2001 at 28.  The agencies explained that "the HSR Act is doing what Congress intended" and

had been "highly effective" in "giving the government the opportunity to investigate and challenge mergers . . . *before* injury can arise." *Id.*

52. In 2002, Congress created a bipartisan commission to report on which aspects of antitrust law required modification, including the HSR reporting system. Antitrust Modernization Commission Act of 2002, Pub. L. No. 107-273, 116 Stat. 1758 (2002). The members of the Commission were appointed by the President and congressional leaders with the goal of ensuring "fair and equitable representation of various points of view." *Id.* § 11054(h). Among them were outside and in-house antitrust counsel, agency officials, and academics. In its 2007 report, the Commission concluded that "the existing pre-merger review system under the HSR Act [was] achieving its intended objectives," and recommended no changes to "the initial filing requirements." Anti-trust Modernization Comm'n, *Report and Recommendations* 158-159 (2007) (AMC Report). The report found that the existing process was "widely recognized as having made merger enforcement far more effective." *Id.* at 151. In particular, the Commission stated, the premerger regime "ensure[d] that the agencies are aware of nearly every transaction that has potential to cause competitive harm," *id.* at 152, and effectively "facilitate[d] review of" reported transactions, *id.* at 160.

53. The FTC itself continued to echo that conclusion to Congress in its annual budget requests up until quite recently. The agency explained that "[i]n the majority of cases, [it] can make a reasonable judgment *within a few days* about whether a merger is potentially anticompetitive based on information provided in the HSR filing." FTC, Congressional Budget Justification Fiscal Year 2024 at 55 (emphasis added). That left

plenty of time in the 30-day waiting period for the FTC to "consider which matters require further action," including the possible issuance of a Second Request. *Id.* at 56. The FTC included the same language in each budget request going back to at least 2013. *See, e.g.*, FTC, Congressional Budget Justification Fiscal Year 2021 at 136; FTC, Congressional Budget Justification Fiscal Year 2013 at 107.

54.    As recently as August 2024, the FTC's own introductory guide to the premerger review process—available on its website—proclaimed that the HSR "Program has been a success." 2009 FTC Guide 2. The guide explained:

> Compliance with the Act's notification requirements has been excellent, and has minimized the number of post-merger challenges the enforcement agencies have had to pursue. In addition, although the agencies retain the power to challenge mergers post-consummation, and will do so under appropriate circumstances, the fact that they rarely do has led many members of the private bar to view the Program as a helpful tool in advising their clients about particular acquisition proposals.

The FTC deleted that language in August 2024, presumably because commenters had pointed it out in comments urging the agency to withdraw the Rule.

55.    Comprehensive data on the operation of the premerger notification program confirm its effectiveness. From 2001 to 2020, there were 31,530 transactions reported to the antitrust agencies. Logan Billman & Steven C. Salop, *Merger Enforcement Statistics: 2001-2020*, 85 Antitrust L.J. 1, 10 (2023). The agencies issued a Second Request for only 3.1% of those transactions. *Id.* Of those 969 transactions, roughly 7 in 10 were abandoned, resulted in a consent decree, or went to trial. *Id.* at 6.

56.     The premerger program also yielded vanishingly few cases that the antitrust agencies viewed as false negatives—that is, transactions that did not receive a Second Request, but that the agencies later saw the need to challenge at some point after the transaction had closed.  Plaintiffs are aware of only five HSR-reportable transactions dating back to the year 2000 that fit that description, out of 39,962 total reported deals.  *See* Foley Lardner Comment at 3.  At most, then, the antitrust agencies' false-negative rate for the past two decades was .01 percent, or a single miss every 4.5 years on average.  And there are good reasons to conclude that four of those five transactions would have slipped through regardless of the content of the premerger notification form.  *See id.*

57.     *Concerns About Cost.*   Given the exceptional performance of the prior premerger notification form in facilitating effective screening, it should not be surprising that many observers considered the form already too burdensome.

58.     As noted above, despite its relatively targeted nature, the prior version of the form still required a substantial amount of time and effort for many filers.  In 2011, the FTC estimated that completing the premerger notification form required, on average, approximately 37 hours per filing.  76 Fed. Reg. 42,471, 42,479 (July 19, 2011).  A 2023 survey of 70 antitrust practitioners put the number at more than twice that.  The survey found that, on average, company personnel spent an estimated 30.4 hours and outside counsel an estimated 54.3 hours to prepare the prior form, for a total of 84.7 hours.  U.S. Chamber of Commerce, HSR/Merger Guides Practitioner Survey (Sep. 2023) (U.S. Chamber Practitioner Survey), https://www.uschamber.com/antitrust/antitrust-experts-reject-ftc-doj-changes-to-merger-process.  Those practitioners also reported an average

25

amount of time to prepare the HSR filing of 10.7 days.  And these are just averages; preparing the filings for each side of a transaction would often take much longer, sometimes into the hundreds of hours.  *See* Foley Lardner Comment at 3.  That would be true, for example, of "a company with multiple product lines, subsidiaries or affiliates." ICPAC Report at 118.

59.    Even assuming the Congress that wrote the HSR Act intended something like that amount of effort, it plainly did not anticipate how broadly that burden would fall. The Congress that wrote the HSR Act expected that the premerger notification requirements would "appl[y] only to approximately the largest 150 mergers annually." H.R. Rep. No. 94-1373 at 11.  Legislators on all sides agreed that if the Act's "requirements were imposed on every merger, the resulting added reporting burdens might more than offset the decrease in burdensome divestiture trials" the statute was designed to prevent.  *Id.*  The Senate Report was even firmer.  It stated that requiring submissions from "the bulk of the approximately 3,000 mergers that ha[d] occurred annually in the course of the past several years would," "in the [Judiciary] Committee's judgment, impose an undue and unnecessary burden on business."  S. Rep. No. 94-803, at 66.

60.    Within a decade, however, a combination of inflation, growth in deal sizes, and growth in M&A activity led to that exact scenario—thousands of transactions a year above the fixed dollar reporting thresholds that the HSR Act had originally set.  In 1987, there were 2,533 transactions reported under the HSR Act.  FTC, HSR Report, Annual Report to Congress for Fiscal Year 1987 at 23.  Eleven years later, in 1998, there were

4,728.  FTC, HSR Report, Annual Report to Congress for Fiscal Year 1998 at 3.  Although the FTC frequently tweaked the form in ways that slightly "lessen[ed] the burden of complying," FTC, HSR Report, Annual Report to Congress for Fiscal Year 2001 at 4, it never promulgated the kind of major revisions that would have been necessary to realign the burden to what Congress originally had anticipated.

61.     As a result, the substantial burden of completing the HSR premerger notification now fell indiscriminately on thousands of transactions, the vast majority of which obviously posed no antitrust problem and only a handful of which ever received any real scrutiny from the antitrust agencies.  As noted above, only 3% of reported transactions from 2001 to 2020 received a Second Request.  That percentage was similar going back to 1990 and even earlier years.  FTC, HSR Report, Annual Report to Congress for Fiscal Year 1999 at 6.  Only 15.3% of transactions from 2001 to 2020 even triggered what is known as agency "clearance," the formal first step that allows either DOJ or the FTC to begin looking into the merger further.  Billman & Salop, *supra*, at 12; AMC Report at 156.  Year after year, thousands of buyers and sellers spent significant time and money preparing an HSR filing that did not get much more than a cursory glance.

### 3.     Congress's Amendments To The HSR Act

62.     In 2000, a bipartisan Congress stepped in to "provide[] significant regulatory and financial relief for businesses."  146 Cong. Rec. 24253 (Nov. 4, 1999) (statement of Sen. Hatch).  The 2000 amendments to the HSR Act were the only

significant changes that Congress has made to the statute to date. Pub. L. No. 106-553 § 630, 114 Stat. 2762. The legislation made three basic amendments.

63.    First, Congress raised the thresholds for filing a premerger notification and indexed them to growth in gross national product. *See* 15 U.S.C. § 18a(a)(2).

64.    Second, Congress created additional protections for filers in connection with Second Requests. Most notably, it required that the investigating agency appoint a disinterested official to "hear any petition" from a Second Request recipient arguing that such request was "unreasonably cumulative, unduly burdensome, or duplicative." 15 U.S.C. § 18a(e)(1)(B)(i).

65.    Third, Congress instructed both DOJ and the FTC to examine other parts of the premerger process, including the premerger notification form, and to "implement reforms . . . in order to eliminate unnecessary burden, remove costly duplication, and eliminate undue delay, in order to achieve a more effective and more efficient merger review process." Pub. L. No. 106-553 § 630(c).

66.    In response, the FTC made what it called "several relatively minor, but welcomed, improvements to . . . the filing form" to "make it more user-friendly," "eliminat[e] unnecessary items," and "clarify[] the instructions." 2001 HSR Report at 8, 10. The agency removed only one category of information that it had required in the original form: "information about any vendor-vendee relationship between the reporting parties during the most recent year with respect to any manufactured product." 66 Fed. Reg. 8,680, 8,686 (Feb. 1, 2001). Such information was originally "intended to alert the enforcement agencies to the potential risks of vertical foreclosure or increased vertical

integration," but "the agencies ha[d] found that they ha[d] not needed to rely on [the requested information] to learn about transactions that present vertical concerns." *Id.* The FTC also noted that providing the vendor-vendee information placed a particular burden on "large diversified persons that may purchase from other" parties to the transaction "a wide variety of manufactured products through numerous subsidiaries and divisions." *Id.*

67.    Congress did not amend the HSR Act again until 2023 with the Merger Filing Fee Modernization Act, which made two notable, minor changes. *See* Pub. L. 117-328 Div. GG § 101, 136 Stat. 4459 (2022).  First, Congress reduced the filing fees for smaller transactions and raised them for the very large ones.  *Id.*  According to its sponsors, that change was intended to "incentiviz[e] mergers between small and medium-sized enterprises" and help them "grow and compete against large companies."  168 Cong. Rec. H8264 (Sept. 29, 2022) (statement of Rep. Jackson Lee).  Second, Congress directed the FTC to add a new requirement to the premerger form requiring disclosure of any subsidy that any party to the transaction had received from certain designated foreign nations and entities.  Pub. L. 117-328 Div. GG § 202.

## THE FTC'S RULEMAKING

### A.    The Proposed Rule

68.    On June 27, 2023, the FTC issued a Notice of Proposed Rulemaking to amend the HSR premerger notification form.  *See Proposed Rulemaking, Premerger Notification; Reporting and Waiting Period Requirements*, 88 Fed. Reg. 42,178 (published June 29, 2023) (NPRM).

69.     In the NPRM, the FTC stated that its "proposed changes would result in a redesign of the premerger notification process through both a reorganization of the information currently required and the addition of new information and document requirements." 88 Fed. Reg. at 42,178.  The FTC also proposed changes to implement the recent Merger Filing Fee Modernization Act.  The agency "note[d] that since the implementation of the Act and Rules in the late 1970s, there has never been a large-scale reorganization of the information required in an HSR Filing," and explained that it was now "proposing a comprehensive redesign of the premerger notification process."  *Id.* at 42,180.

70.     That was, somehow, an understatement.  The NPRM proposed dozens of major and unprecedented changes to the premerger notification form.  Those proposals included, by the FTC's own count, no fewer than 34 "proposed new requirements and categories of information," 88 Fed. Reg. at 42,185-42,186, virtually all of which the FTC had never previously required as part of the initial HSR filing.  The FTC also proposed to add a new "certification" requiring the filer to swear under penalty of perjury that it had "taken the necessary steps to prevent the destruction of documents and information related to the transaction."  *Id.* at 42,206, 42,218.  The purpose of this new provision was to effectively create a litigation-style document hold for every HSR-reportable transaction.

71.     *Proposed Additions to the HSR Form.*   Among others, the proposed additions included requiring each filer to submit:  several "narratives" describing and analyzing the competitive impacts of the transaction; detailed information on existing and planned products and services; details (including contact information) on customers and

suppliers; all drafts of transaction-related documents that went to various important persons within the filing entity; numerous types of ordinary-course (that is, not transaction-related) documents analyzing various aspects of the filer's business going back one year; information on employees and their commuting areas; a list of past workplace safety or labor violations; a list of all officers, directors, and board observers at every subsidiary along with detailed information about each of those individuals; "doing business as" names going back three years for all controlled entities within the filer; the names of all holders of more than 5% of each of those entities, including limited partners; information on creditors and other supposed "interest holders that may exert influence," 88 Fed. Reg. at 42,189; detailed organizational charts and diagrams of the transaction; and a list of all communications systems used by either party to transmit business-related information.

72.    In more detail, the NRPM proposed to require all filing parties to:

- Provide "a narrative that would identify and explain each strategic rationale for the transaction," 88 Fed. Reg. at 42,191;

- Provide a "Horizontal Overlap Narrative" that would "list each current or known planned product or service that competes with (or could compete with) a current or known planned product of the other filer," 88 Fed. Reg. at 42,196;

- Provide "sales, customer information (including contacts), a description of any licensing arrangements, and any non-compete or non-solicitation agreements applicable to employees or business units" related to any identified "overlapping" product, 88 Fed. Reg. at 42,196;

- Provide a "narrative" to explain the supply relationships between the filing parties in the last two fiscal years, including information on the filer's sales or purchases of "each product, service, or asset (including data)" to or from the other party and "any other business that, to the filing person's

31

knowledge or belief, uses its product" to compete or as an input, 88 Fed. Reg. at 42,214;

- Provide a list of the "top 10 customers" or "top 10 suppliers" of those products, services, or assets and their "contact information (including title, phone, and email)," 88 Fed. Reg. at 42,215;

- Submit *all* drafts of any required transaction-related document—including "studies, surveys, analyses, and reports" which were "prepared by or for any officer(s) or director(s) . . . for the purpose of evaluating or analyzing the acquisition"—that were "sent to an officer, director, or supervisory deal team lead(s)," 88 Fed. Reg. at 42,214;

- Submit so-called "periodic plans and reports" that were not created in contemplation of the transaction, including all "semi-annual and quarterly plans and reports that discuss market shares, competition, competitors, or markets of any product or service that is provided by both" the buyer and seller that were "shared with a chief executive," "certain individuals who report directly to a chief executive," or the board of directors (or similar body or persons), within one year of filing, 88 Fed. Reg. at 42,195;

- Provide a list of all NAICS (North American Industry Classification System) codes for all products "that are under development or pre-revenue and anticipated to have annual revenue totaling more than $1 million within the following two years," 88 Fed. Reg. at 42,199;

- Provide the aggregate number of the filer's employees in each of the five largest Department of Labor occupational categories, indicate each "commuting zone in which both parties employ workers" in any such category, and "provide the aggregate number of [such] employees in each" category, 88 Fed. Reg. at 42,215;

- Identify "any penalties or findings issued against" the filer by the Department of Labor, National Labor Relations Board, or Occupational Safety and Health Administration in the last five years, as well as any such pending matters, 88 Fed. Reg. at 42,215;

- Submit "all agreements" between the filing parties and any of their subsidiaries "in effect at the time of filing or within the year prior to the date of filing," regardless of their relationship to the transaction, 88 Fed. Reg. at 42,193;

- Name all "officers, directors, and board observers" (or those "exercising similar functions") for the filing entity and all subsidiaries over the past two years, 88 Fed. Reg. at 42,212;

- List "all other entities for which" every identified "individual serves, or has served within the last two years, as an officer, director, or board observer," 88 Fed. Reg. at 42,212;

- Identify all entities that, in relation to the transaction, would "(i) provide credit" "totaling 10% or more of the value of the entity in question"; (ii) "hold non-voting securities, options, or warrants" above the same 10% convertible value; (iii) serve as "board members or board observers, or have nomination rights for board members or board observers"; or (iv) "have agreements to manage entities related to the transaction," 88 Fed. Reg. at 42,189;

- Disclose and provide certain information about all prior acquisitions above a certain size within the past 10 years of entities that either earned revenue in any NAICS category overlapping with the buyer or seller or produced a product described in the "Horizontal Overlap Narrative," 88 Fed. Reg. at 42,217;

- Submit "a diagram of the transaction and provide a chart explaining the relationship between all entities and/or natural persons involved in the transaction," 88 Fed. Reg. at 42,213;

- Create and submit organizational charts identifying the authors of all submitted documents and noting all individuals who were "searched for responsive documents," 88 Fed. Reg. at 42,195, 42,214;

- For transactions where a fund or master limited partnership is the ultimate parent entity, create and file an "organizational chart sufficient to identify and show the relationship of all entities that are affiliates or associates," 88 Fed. Reg. at 42,211;

- Provide the current "doing business as" names of all entities within the filer with at least $10 million of assets, as well as all such names used within the past three years, 88 Fed. Reg. at 42,211;

- Provide the names of all holders of more than 5% interest in any entity that controls the filer or is controlled by the filer, and earns revenue in the same industry code as the other party. This would include limited partners in a limited partnership. 88 Fed. Reg. at 42,188, 42,211-42,212;

- List "all communications systems or messaging applications on any device used" by either merging party that "could be used to store or transmit information" related to their businesses, 88 Fed. Reg. at 42,217; and

- Certify under penalty of perjury that the merging parties had taken all necessary steps to prevent the destruction of any documents or information relating to the transaction, 88 Fed. Reg. at 42,206, 42,218.

73.    It is no exaggeration to say that the NPRM contemplated converting every premerger notification form into a slightly less burdensome version of a Second Request, even though the vast majority of HSR-reportable transactions pose no antitrust risk.

74.    *Discussion Of Cost.*  The FTC recognized that, if adopted, the proposed changes to the HSR premerger notification form would significantly increase the time and cost of preparing the form for every reportable transaction.  88 Fed. Reg. at 42,207.  The NPRM reported that the FTC had "canvassed current Agency staff who had previously prepared HSR filings while in private practice to estimate the projected change in burden." *Id.*  The FTC's cost analysis thus consisted of asking its own lawyers to estimate how much more time per filing the proposed rule would impose.

75.    Even that unscientific approach produced eye-opening numbers.  The FTC's staff "estimated that the proposed changes would result in approximately 12 to 222 *additional* hours per filing"—or up to a seven-fold increase over the agency's "current estimate" of 37 hours to prepare the existing form.  88 Fed. Reg. at 42,208 (emphasis added).  The FTC projected that the average increase in preparation time for the average transaction would be 107 hours.  *Id.*  But it acknowledged that the 222-hour estimate would likely apply to as many as 45% of all filings:  the proportion that would have

"reported overlaps" between the buyer and seller that would require significant additional work in response to the new document and information requests. *Id.*

76.    To calculate the additional dollar cost, the FTC assumed an "hourly wage of $460 for executive and attorney compensation" for these additional hours and multiplied that figure by the average of 107 additional hours. 88 Fed. Reg. at 42,208. Those very low estimates still led to a projected total cost of the NPRM of $350 million per year, assuming roughly 3,500 annual HSR-reportable transactions (and thus roughly 7,000 filings). *Id.*

77.    *Need For The Rule.* The NPRM asserted "that the information currently reported in an HSR filing is insufficient." 88 Fed. Reg. at 42,179. According to the FTC, the "current Form does not provide [its] staff with complete information," including on "the full range of potential competitive implications of the transaction." *Id.* at 42,180. These "shortcomings" required Agency staff to "often rely on voluntary cooperation from third parties—customers and competitors of the merging parties—during the initial waiting period," and to "conduct independent research using publicly available information." *Id.* "Neither of these," the NPRM claimed, was "reliable as a substitute for information provided by the parties themselves." *Id.*

78.    The agency posited that "several factors" had caused "the challenges of premerger review [to] expand[] considerably over time." 88 Fed. Reg. at 42,179. First, "there has been tremendous growth in sectors of the economy that rely on technology and digital platforms, where "mergers and acquisitions . . . present a unique challenge." *Id.* Second, "the very nature of HSR-reportable transactions has become more complex over

time." *Id.*  Third, "most international jurisdictions have merger filing forms that ask filers to provide significantly more information" than the original and pre-amendment HSR form required. *Id.* at 42,180.  Finally, the FTC cited President Biden's "Executive Order on Promoting Competition" and explained that it has "stepped up efforts to review transactions for *all* their potential competitive effects," "responding to evidence that the U.S. economy is becoming increasingly concentrated overall." *Id.* at 42,179.

79.    All told, the FTC claimed, its proposed "reorganization and collection of additional information in HSR Filings" was "necessary and appropriate in order for the Agencies to vigorously enforce the nation's antitrust laws." 88 Fed. Reg. at 42,180.

## B.    Commenters Raise Grave Concerns

80.    The NPRM generated a substantial outcry, with hundreds of commenters urging the FTC to withdraw or substantially revise the proposed changes to the premerger notification form.  These commenters included many members of the antitrust bar and representatives from all corners of American industry.  Among others, the FTC received critical comments from many law firms; the In-House Competition Lawyers Association; the American Bar Association's Antitrust Law Section; the International Bar Association's Antitrust Section; major trade associations representing business, technology, healthcare, manufacturing, retail, telecommunications, investment managers, private equity, and venture capital; and numerous think tanks and academics.

81.    These commenters made many of the same points.  They argued that the FTC's proposed "comprehensive redesign" of the premerger form went far beyond the agency's statutory authority to require only information that is "necessary and

appropriate to enable" the FTC and DOJ to perform an initial antitrust screen.  15 U.S.C. § 18a(d)(1).  They explained that the FTC had massively underestimated the direct costs (and ignored the indirect costs) of collecting, analyzing, and submitting the new information and documentary material required by the NPRM.  They reiterated what had been the five-decade consensus that "[e]xisting HSR reporting requirements appropriately balance the need for antitrust review and the benefits of economic activity." National Retail Federation (NRF) Comment at 2 (Sept. 27, 2023).  And they noted that, in light of that consensus, the agency had not come close to justifying the imposition of a massive new burden on *every* HSR-reportable transaction, most of which are clearly lawful.  *Id.* at 2-3.

82.    Commenters also asserted that the FTC did not appear to recognize the real limits that the HSR Act places on its authority to request information.   AIC Comment at 5-7; U.S. Chamber Comment at 7.  In the NPRM, the FTC had claimed that its additions to the premerger form were "necessary and appropriate in order for the Agencies to vigorously enforce the nation's antitrust laws."  88 Fed. Reg. at 42,180.  But that "is not the statutory test."  AIC Comment at 7.  Rather, the FTC may require information if "relevant to *a proposed acquisition,*" to "determine whether *such acquisition* may, if consummated, violate the antitrust laws."   15 U.S.C. § 18a(d)(1) (emphasis added).

83.    Many commenters also argued that the NPRM would require submission of documents and information that did not satisfy the HSR Act's "necessary and appropriate" test.  Commenters maintained that much of the newly requested information

was in no way "necessary" to enable an initial assessment of the legality of the proposed transaction, and that requiring such information was not "appropriate" because it would impose a significant cost on all filing parties in return for little if any benefit to the antitrust agencies.  AIC Comment at 5-7; U.S. Chamber Comment at 48-49; Business Roundtable Comment at 3; Wachtell, Lipton, Rosen, and Katz Comment at 3 (Sept. 26, 2023).

84.     Commenters also asserted that certain discrete proposals exceeded the FTC's authority for other reasons.  For example, several maintained that requiring filers to prepare "narrative" responses containing legal arguments that might be contested by the agencies went beyond the concept of a "premerger *notification*."   15 U.S.C. § 18a (emphasis added); U.S. Chamber Comment at 29-30; In-House Competition Lawyers Association (ICLA) Comment at 22-23 (Sept. 27, 2023); Wachtell Comment at 14-16.  They also argued that the FTC had no authority to compel information on boards of directors. AIC Comment at 13-14; Wachtell Comment at 17-18.

85.     Many commenters separately noted that the FTC had not conducted any meaningful cost-benefit analysis of either the NPRM as a whole or on an individual level for the many new categories of information and documents required.  AIC Comment at 24-25; Business Roundtable Comment at 7-8; U.S. Chamber Comment at 20-21; Wachtell Comment at 3, 18-21.  Commenters also asserted that any serious analysis would show that the costs far outstripped the benefits.

86.     The U.S. Chamber's comment explained that it had engaged Professor S.P. Kothari of the MIT Sloan School of Management, former Chief Economist of the

Securities and Exchange Commission, to analyze "the burdens the proposed changes would impose on filing parties." U.S. Chamber Comment at 2. The U.S. Chamber also conducted a survey of antitrust practitioners. Both the survey responses and Professor Kothari's analysis indicated that "the FTC ha[d] vastly underestimated the burdens associated with the NPRM," *id.*, because of the "many notable deficiencies" in the FTC's informal approach of merely surveying its own staff, Kothari Report ¶ 36. Professor Kothari concluded that the average amount of time to prepare the revised premerger form would be 326 hours, not 144 hours as the FTC had estimated. *Id.* ¶ 45. He also estimated that the average hourly cost would be $936, more than double the FTC's estimate. *Id.* ¶ 46.

87.    Putting it all together, Professor Kothari projected an *average* additional cost *per transaction* of $437,314—nearly seven times the FTC's estimate of $66,240. Kothari Report ¶ 51. Assuming the same 3,500 or so HSR-reportable transactions per year, that meant an annual cost of over $2.3 billion, "even before consideration of indirect costs" that the NPRM would impose on "innovation and entrepreneurial activity" by "dissuad[ing] potential transactions from occurring." *Id.* ¶¶ 52, 55.

**C.    The Final Rule**

88.    On October 10, 2024, the FTC voted to finalize the proposed rule. *See Premerger Notification; Reporting and Waiting Period Requirements*, 89 Fed. Reg. at 89,216 (published Nov. 12, 2024) (Final Rule).

89.    Although the FTC made certain modifications to decrease the burden on filers relative to the NPRM, it still candidly described the Rule as "reset[ting] the

39

baseline requirements for all filers." 89 Fed. Reg. at 89,260. And it recognized—albeit with studied understatement—that the "incremental costs associated with this rulemaking are more material than its prior rulemakings, which frequently reduced the burdens associated with submitting an HSR Form." *Id.* at 89,257.

### 1.    Three Categories of Transactions

90.    The Final Rule created three new categories of premerger filings each subject to a progressively more burdensome version of the notification form. The three categories, in ascending order of burden, are: "(1) select 801.30 transactions, (2) those transactions that will have no NAICS or described overlaps or supply relationships, and (3) transactions that report a NAICS or a described overlap, or a supply relationship." 89 Fed. Reg. at 89,263.

91.    The first category of "select 801.30 transactions" covers "transactions that do not result in the acquisition of control" and "where there is no agreement or contemplated agreement between any entity within" the buyer and seller. 89 Fed. Reg. at 89,278. Examples include "a traditional executive compensation arrangement where the executive exercises contractual benefits . . . to acquire voting securities and nothing more." *Id.* Under the Rule, select 801.30 transactions have only "minimal reporting requirements." *Id.* at 89,261. But the FTC estimates that only 8% of reportable transactions qualify. *Id.* at 89,333.

92.    The second category covers all transactions that are neither overlap transactions nor select 801.30 transactions. 89 Fed. Reg. at 89262, 89264. The FTC estimates this category will include 47% of HSR filings. *Id.* at 89,333.

93.    The third, "overlap transaction" category covers all transactions in which the parties have identified any horizontal overlap (whether based on NAICS industry codes or the parties' descriptive narratives) or supply relationship between (i) the buyer, any entity controlled by the buyer, and any entity in which the buyer holds between 5% and 50% of the voting securities; and (ii) the seller, any entity controlled by the seller, and any entity in which the seller holds between 5% and 50% of the voting securities.  89 Fed. Reg. at 89,376.  Parties to overlap transactions face the heaviest burden in completing the new premerger form.  In the Rule, the FTC estimated that the overlap category would include 45% of HSR filings.  *Id.* at 89333.  Thus, although the Rule touted the creation of separate transaction categories as "the primary means of mitigating the costs of reporting certain new information," *id.* at 89,261, the most heavily burdened category still amounts to just under half of all reported transactions—or at least 1,000 per year at current levels of M&A activity.

### 2.    The New Requirements

94.    Depending on how one counts, the FTC retained with some modification at least 20 of the 34 additions to the premerger notification form the agency had originally proposed.  *See* 89 Fed. Reg. at 89,264.  The Final Rule also kept many of the most burdensome additions with minimal, if any, modifications.

95.    *Transaction Rationale.*  The Final Rule retained without any change the requirement that filers submit a narrative response "describ[ing] all strategic rationales for the transaction."  89 Fed. Reg. at 89,299.  That requirement also mandates that filers "identify which documents submitted with the HSR Filing support the rationale(s)

described in the narrative." *Id.* The Final Rule states that "if documents provide inconsistent rationales, filers should address these inconsistencies." *Id.*

96.  *Ordinary Course Documents (Periodic Plans and Reports).* The Final Rule retained with a very small change the NPRM's creation of a new category of "plans and reports" generated by the filer's business but not "created specifically for analyzing the filed-for transaction." 89 Fed. Reg. at 89,303. Thus, all filers must submit, going back one year, "all regularly prepared plans and reports that were provided" to the CEO or board of directors of the filer (or the CEO or board of any entity the filer controls or is controlled by), if those documents "analyze market shares, competition, competitors, or markets pertaining to any product or service" that the other party "also produced, sold," or is "known to be" developing. *Id.* at 89,371, 89,386.

97.  The FTC made one tweak to this requirement as compared to the NPRM: it "dropp[ed] the need to collect and produce documents from any person who reports directly to the relevant CEO." 89 Fed. Reg. at 89,304. That way, the Final Rule explained, only the CEO and entire board of directors of each party to the transaction—as well as the CEO and directors of all entities that control or are controlled by each party—will need to be "custodians" when the parties to the transaction use "forensic document technology" to comply with this requirement. *Id.* The FTC stated that it considered that "reduced" burden more "manageable." *Id.*

98.  *Drafts of Transaction-Related Documents.* Although the Final Rule purported to remove the NPRM's requirement that filers provide all draft versions of transaction-related documents, the Rule effectively took back much of that concession. It

"clarifies that any" transaction-related document that "was shared with any member of the board of directors (or similar body)" "should not be considered a draft" but rather "a final version," and therefore should be "submitted with the HSR Filing."  89 Fed. Reg. at 89,303.  Thus, filers must provide all earlier draft versions of any covered document shared with any board member or member of a "similar body," even if the actual final version is already being included in the HSR filing.

99.    "Transaction-Related Documents" include:

- any "studies, surveys, analyses, and reports" prepared "for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion," prepared by or for any officer, director, or "supervisory deal team lead";

- similar documents prepared by "third party advisors" going back one year;

- "confidential information memoranda prepared by or for any officer(s) or director(s)" of the buyer "that specifically relate to the sale of the target," or, if no such document exists, "any document(s) given to any officer(s) or director(s) . . . meant to serve th[at] function"; and

- all "studies, surveys, analyses, and reports evaluating or analyzing synergies, and/or efficiencies prepared by or for any officer(s) or director(s) . . . for the purpose of evaluating or analyzing the acquisition."

89 Fed. Reg. at 89,370-89,371, 89,386-89,387.

100.    Although the Final Rule did not expand the required Transaction-Related Documents, its redefinition of the concept of a "draft" significantly expanded the volume of such documents that must be provided with the premerger form.  It also massively increased the burden for all filers of finding, compiling, reviewing, and ultimately submitting those documents as part of preparing the HSR submission.

101.    *D/B/A Names and Minority Interest Holders*.  The Final Rule adopted the proposal to require additional information about related entities and minority holders with some modifications.  The Rule retained the requirement to provide "doing business as" names for all entities within both filers with assets over $10 million, but eliminated the requirement to also provide such names going back three years.  89 Fed. Reg. at 89,292. The Rule also mandates disclosure of holders of over 5% of any entity controlled by, or that controls, the filer, if that entity overlaps with the other party—including, if applicable, limited partners in a limited partnership.  *Id.* at 89,288.  The Rule did modify that limited-partner obligation so that it applies only to limited partners with the right to serve as, nominate, appoint, veto, or approve board members or their equivalent.  *Id.* at 89,384.  Nevertheless, the Final Rule is still a major expansion over the prior form, which always required limited partnerships to disclose at most their general partners.  *Id.* at 89,288.

102.    The Final Rule recognized that these changes to the form would be particularly burdensome for private equity funds and other similar investment vehicles, as well as large conglomerates, but concluded that the FTC "need[s] to know about" any investor who either "holds a small but significant stake (five percent or more) or plays a role" in the filer's decisionmaking.  89 Fed. Reg. at 89,267.

103.    *Overlap Description*.  The Final Rule also retained with minor changes the new requirement that filers list and describe "each of the current or known planned products or services . . . that competes with (or could compete with) a current or known planned product or service of" the other party.  89 Fed. Reg. at 89,371, 89,387.  In

transactions involving large companies, the Overlap Description might "identif[y] hundreds of products or services." *Id.* at 89,311. For *each* "product or service listed," the filer must then provide:

- the "sales (in dollars) for the most recent year" or, if pre-revenue, projections;

- a "description of all categories of customers of the [filer] that purchase or use the product or service (e.g., retailer, distributor, broker, government, military, educational, national account, local account, commercial, residential, or institutional)," or detailed information on the product or service's development stage;

- the "top 10 customers in the most recent year (as measured in dollars)"; and

- the "top 10 customers for each customer category identified."

*Id.* at 89,371-89,372, 89,387.

104.    The Final Rule claimed to have "made significant modifications to the Overlap Description to reduce the cost to filers," 89 Fed. Reg. at 89,315, but that again overstates things. The FTC touted the fact that, compared to the NPRM, the Final Rule limits reporting from "the two most recent fiscal years" to "the most recent fiscal year," allows sales information to be reported in "only dollars" rather than "in units," and "eliminate[s] the requirement[s]" to "provide individual contact information for customers," "describe licensing agreements and non-compete or non-solicitation agreements," and "provide an estimate of how much of the product or service each customer category purchased or used monthly for the last fiscal year." *Id.* Even with those modest changes, the Overlap Description will be very burdensome for filers.

105.    *Supply Relationships Description.* The Final Rule also kept the new mandate that "each filing person . . . provide information about existing or potential

45

purchase or supply relationships between the filing persons." 89 Fed. Reg. at 89,317. Specifically, that new category requires the filer to describe "each product, service, or asset" that the buyer has "sold, licensed, or otherwise supplied" at over $10 million in revenue in the most recent year to either (i) the other party, or (ii) any other business that uses the filer's products or services as an input to compete against the other party. *Id.* at 89,372, 89,387.  For each such product, the filer must then provide:

- The sales (in dollars) for the most recent year, or projections if applicable;

- A description of "all categories of customers of the target that purchase or use the product or service," or detailed information on the product or service's development stage;

- the "top 10 customers in the most recent year (as measured in dollars)"; and

- the "top 10 customers for each customer category identified."

*Id.* at 89,372, 89,387.

106.    The filer must also provide what is essentially the flip side of the coin, if applicable:  a description of all products, services, or assets that the filer uses as an input in its own business and has purchased from either (i) the other party, or (ii) any other business that competes with the other party as a supplier of the relevant input.  89 Fed. Reg. 89,372, 89,388.  And then again, for each such product, regardless of whether either party has any appreciable market position, the filer must provide:

- "The purchased amount (in dollars)"; and

- The top 10 suppliers for the relevant product, service, or asset, "and a description of" the terms on which the filer obtains that input.

*Id.* at 89,372, 89,388.

107.    The Final Rule made similar marginal modifications to the NPRM's version of the Supply Relationships Description as it had made to the Overlap Description—eliminating the requirement to provide contact information of customers or suppliers, reducing the relevant period from two years to one year, and requiring reporting "only in dollars, not also in units."  89 Fed. Reg. at 89,319.  The Final Rule also added the $10 million threshold.  *Id.*

108.    *Officers and Directors*.  The Final Rule retained the requirement to identify certain officers and directors, with a few modifications.  Unlike the NPRM, the Final Rule does not mandate any disclosure of board observers.  89 Fed. Reg. at 89,294.  And unlike the NPRM, the Rule requires only the buyer—not the seller—to identify certain officers and directors.  *Id.*  Still, the Final Rule requires the buyer to identify all officers or directors of both the buyer itself and its subsidiaries who hold a similar role at (i) the seller company; (ii) any of the seller's subsidiaries; or (iii) any other entities "that are in the same industry as the [seller]."  *Id.*  The buyer must also identify any officers and directors in the same industry as the seller who also serve in similar roles at related "entities within" the buyer.  *Id.*  Any time the buyer identifies an officer or director who must be reported, the buyer must also name the other entity involved.

109.    It appears to be up to the buyer to seek out and disclose the officers and directors covered by the Final Rule, regardless of whether that information is readily available to the buyer.  89 Fed. Reg. at 89,294; *see id.* at 89,297 ("[T]he acquiring person must determine whether" its own pertinent officers and directors "also serve as an officer

or director . . . of another entity that derives revenue in the same NAICS codes as the target.").

### 3.    Responses to Comments

110.    The Final Rule discussed the FTC's purported justifications for the many new additions to the HSR premerger notification form.    Where relevant, those justifications are discussed below.  The Final Rule also offered several responses to the many negative comments the FTC had received during the rulemaking process.

111.    First, the Rule noted that the FTC "disagrees that avoiding potential cost or delay to those involved in dealmaking is the primary focus of the HSR Act."  89 Fed. Reg. at 89,238.   Instead, according to the FTC, Congress's "overarching" goal was "promoting vigorous and effective enforcement of the antitrust laws." *Id.*

112.    Next, the Rule addressed the many comments arguing that the FTC had "not provided any evidence that current information requirements are insufficient, or identified transactions [the antitrust agencies] did not challenge due to shortcomings in the current premerger review process."  89 Fed. Reg. at 89,222.  Like the NPRM, the Final Rule does not cite even one such transaction.  The agency claimed in a footnote that "it is not practical for [the FTC or DOJ] to identify specific illegal transactions that they 'missed' during their premerger review" using the old premerger form, because that "would require a redirection of resources to investigate consummated mergers and away from resources devoted to premerger review."  *Id.* at 89,219 n.14.

113.    The Rule also explained that the FTC was "not convinced that Congress intended the words 'necessary and appropriate' to require a cost-benefit analysis in this

context." 89 Fed. Reg. at 89,236.  Nevertheless, the Rule stated that the FTC "considered the reasonableness of requiring additional information . . . including the costs and the benefits of the final rule."  *Id.*  The Rule then discussed both those costs and benefits at greater length than it had in the NPRM.

114.    In discussing costs and benefits, however, the Rule did not assert that the benefits of greatly expanding the information and documents required by the premerger notification form outweigh the costs, either overall or with respect to any of the specific individual items that the Rule adds to the form.  Instead, the Rule repeatedly states that the FTC sought the "information that [was] necessary and appropriate" in its view, and then tried to "minimize where possible the costs to filers."  89 Fed. Reg. at 89,217; *see, e.g.*, *id.* at 89,237 ("[T]he final rule will facilitate the provision of relevant documentary materials and information . . . while minimizing the cost and burden of producing such materials as much as practicable."); *id.* at 89,259 ("[T]he final rule limits the incremental costs for filers as much as practicable while still generating additional information.").

115.    The Rule identifies three kinds of benefits that the FTC believed would "accrue to the American public" from expanding the information required by the premerger form:  (1) the detection of additional harmful mergers; (2) the fact that DOJ and the FTC will "not need to spend as much time and resources" acquiring information that is now mandated for all transactions; and (3) decreased "burdens and costs for the parties and third parties who respond to staff inquiries designed to collect" that information.  89 Fed. Reg. at 89,251, 89,353-89,354.

116.    On costs, the FTC explained that it was "persuaded by commenters" who had asserted that its analysis at the NPRM stage "underestimated the extent of the cost and delay that would be imposed if the Commission adopted the proposed rule."  89 Fed. Reg. at 89,331.  The Final Rule therefore revised those estimates after conducting a "new survey of Agency staff."  *Id.* at 89,332.

117.    Based on those results, the Rule estimates that "the average number of *additional* hours required to prepare an HSR filing with the changes outlined in the Final Rule is 68 hours, with an average low of 10 hours for select 801.30 transaction filings by the acquired person and an average high of 121 hours for filings from acquiring person in a transaction with overlaps or supply relationships."  89 Fed. Reg. at 89,333 (emphasis added).  The latter category, again, covers a projected "45 percent" of all HSR filings—or at least 1,000 per year in a down year for M&A activity.  *Id.*  Compared to the FTC's estimate of the burden of the current form of just 37 hours on average, 88 Fed. Reg. at 42,208, an additional preparation time of 121 hours would be a more than four-fold increase on all those filers.

118.    The Rule also adopted a revised blended hourly rate prediction of $583 per hour—far less than the $936 per hour suggested by the Kothari Report and the survey of antitrust practitioners prepared by the U.S. Chamber.  89 Fed. Reg. at 89,334.  Among other reasons for the large difference, those commenters had accounted for additional costs of engaging "economic consultants, investment bankers, and data vendors."  Kothari Report ¶ 49.  The FTC responded that, in its judgment, those third-party services would never be necessary.  89 Fed. Reg. at 89,334.

119.    The Final Rule is currently set to go into effect on February 10, 2025.  After that date, all HSR-reportable transactions must use the new, far more expansive and expensive premerger notification form.

## THE RULE VIOLATES THE APA

120.    The Final Rule should be set aside under the APA for at least five reasons. First, the Rule contravenes the limits Congress placed on the FTC's authority to design the premerger notification form in multiple, independent ways.  Second, the agency did not and could not have rationally concluded that the benefits of obtaining all the new material required by the Rule come close to outweighing the significant costs, both to filers and to the overall economy.  Third, many of the specific new categories of information added by the Rule, evaluated individually, also do not pass even a rough cost-benefit analysis.  Fourth, the FTC failed to adequately justify the need for its unprecedented and massive expansion of the form and thus violated the HSR Act itself, basic tenets of reasoned decisionmaking, and *FCC* v. *Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).  Finally, even if the FTC had demonstrated serious deficiencies in the premerger screening program, the agency did not reasonably explain why it chose to revolutionize the HSR form instead of adopting the obvious alternative:  making better use of its existing information-gathering tools, including Second Requests.

### A.    The Rule Exceeds The FTC's Statutory Authority.

#### 1.    The FTC Did Not Recognize Or Adhere To The Limits On Its Authority To Require Information And Documents.

121.    Although the HSR Act authorizes the FTC to specify the content of the premerger notification form, it places significant limits on that grant of authority.  The

statute provides that the FTC may require "such documentary material and information relevant to a proposed acquisition *as is necessary and appropriate* to enable the [Agencies] to determine whether such acquisition may, if consummated, violate the antitrust laws."   15 U.S.C. § 18a(d)(1) (emphasis added).   As set forth above, that language, especially when read in light of the two-step review process created by the HSR Act, places critical limits on the FTC's authority to require particular "documentary material" or "information" in the premerger notification form.

122.   Two such limits are relevant here.   First, the information or documents must actually be "necessary" to enable the FTC or DOJ to reach a preliminary determination about whether to issue a Second Request.   The Agencies are not entitled to all information that could theoretically be relevant or useful to making a final decision on behalf of the government.   Second, requiring the information cannot impose significant costs on filing parties if it does comparatively little to enable that initial assessment.   In *Michigan* v. *EPA*, the Supreme Court held that effectively the same language—the statute there permitted only regulation that was "appropriate and necessary"—"*plainly* subsumes consideration of cost."   576 U.S. at 756 (emphasis added).   As the Court explained, that result follows from the plain meaning of the word "appropriate," since "[n]o regulation is 'appropriate' if it does significantly more harm than good."   *Id.* at 752.

123.   Likewise, the Fifth Circuit has held in multiple cases that the phrase "necessary and appropriate" functions as a "limit" on "the authorization contained in" a statutory provision, and "at a minimum requires that [a rule's] benefits reasonably outweigh its costs."   *Mexican Gulf*, 60 F.4th at 965; *see National Grain & Feed Ass'n*

v. *OSHA*, 866 F.2d 717, 733 (5th Cir. 1988) (interpreting "reasonably necessary and appropriate" standard to require agency to point to "a benefit the costs of which are not unreasonable").

124.    That conclusion also follows from the structure of the HSR Act, which establishes the two-step scheme for premerger review precisely to avoid inflicting undue costs on *all* transactions, the vast majority of which do not pose any competitive concern.

125.    Congress is also presumed to have "legislated against the backdrop of [pertinent] case law," *EPA* v. *Mink*, 410 U.S. 73, 89 (1973), and to have been "aware of" and "adopt[ed]" a "judicial interpretation" when it "re-enacts a statute without change," *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978), or "amend[s] [it] without altering the [relevant] text," *Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230, 244 n.11 (2009). Congress amended the HSR Act to change the filing fees and require disclosure of foreign subsidiaries in 2022; indeed, the Rule implements that very limited additional requirement, which Plaintiffs do not challenge. That amendment post-dated the Supreme Court's decision in *Michigan* v. *EPA*, which interpreted substantively identical language to the HSR Act's key phrase "necessary and appropriate." Yet not only did Congress not touch that language—it added that phrase to a different part of the Act. Pub. L. 117-328 Div. GG § 202, 136 Stat. 4459 (2022).

126.    Other parts of the HSR Act confirm Congress's paramount concern with avoiding unjustified costs in the premerger form. In the 2000 amendments to the Act, Congress required the FTC and DOJ to appoint a disinterested official to "hear any petition" from any recipient of a Second Request arguing that the Request "is unduly

burdensome." 15 U.S.C. § 18a(e)(1)(B)(i). Congress was thus concerned with the burden of Second Requests on businesses—a burden felt in only 3% of transactions. It would be particularly anomalous then to think that Congress could have authorized the FTC to make the *initial* HSR notification far more onerous and unduly burdensome than it had been since the HSR Act's enactment.

127. In the Final Rule, the FTC rejected the existence of these significant limits on its authority to require information in the premerger form. The agency "disagree[d] that avoiding potential cost or delay to those involved in dealmaking is the primary focus of the HSR Act." 89 Fed. Reg. at 89,238. And it asserted that Congress did *not* "intend[] the words 'necessary and appropriate' to require a cost-benefit analysis" of any kind. 89 Fed. Reg. at 89,236. As a consequence, the FTC has created a version of the HSR notification form that is fundamentally "incompatible with the . . . statutory scheme" for premerger review. *Sierra Club*, 294 F.3d at 162. Indeed, "not only does the [Rule] diverge from Congress's original intent to limit the burden of the HSR Form to the transactions most likely to raise concerns"—it departs so dramatically, and at such a significant economic cost, as to "encroach upon Congress's exclusive legislative power" and implicate the major-questions doctrine. *See* U.S. Chamber Comment at 50-51.

128. To be sure, in the Final Rule the FTC claimed that it "considered . . . the costs and the benefits of the final rule." 89 Fed. Reg. at 89,236. But on closer inspection, the FTC never determined that the benefits of obtaining the new information and documentary material—either category-by-category or on the whole—are worth the significant burden inflicted on thousands of HSR filers each year. Instead, the agency

repeatedly said that it had adopted changes it thought warranted "while minimizing the cost and burden of producing [the required] materials *as much as practicable*." *Id.* at 89,237 (emphasis added); *see, e.g.*, *id.* at 89,319 ("while minimizing the cost as much as practicable"); *id.* at 89,217 ("the Commission has substantially modified its proposals to minimize *where possible* the costs to filers and third parties, yet still provide the Agencies with information that is necessary and appropriate") (emphasis added); *id.* at 89,259 (the "rule limits the incremental costs for filers as much as practicable while still generating additional information"); *id.* at 89,260 ("To the extent possible, the Commission has imposed as few additional requirements as is practicable in light of the benefits derived from more effective premerger review.").

129.    "Reduc[ing] the cost and delay for filers as much as practicable," 89 Fed. Reg. at 89,273, is *not* the same thing as finding that the benefits of the information outweigh the costs, as required by the HSR Act.  Under the former approach, the FTC has already decided what information it will seek, and then tries to reduce the costs of that requirement to some extent.  Under the latter, required approach, the FTC may not require any piece of information in the first place unless it has found that doing so is more beneficial than it is costly.  The distinction is subtle, but it makes all the difference to the agency's authority.  *See Entergy Corp.* v. *Riverkeeper, Inc.*, 556 U.S. 208, 217 (2009) (discussing difference between a regulatory regime that "compares the costs and benefits of various ends and chooses the end with the best net benefits" versus one that pursues "a specified level of benefit at the lowest cost").

2.      **The FTC Lacks Authority To Require Disclosure Of Officers And Directors.**

130.    In addition to misinterpreting the phrase "necessary and appropriate," the FTC separately exceeded its statutory authority by requiring filers to disclose the officers and directors of entities related to the transaction in certain circumstances.  The Final Rule asserts that information on certain officers and directors is necessary for the antitrust agencies to screen both for "a violation of section 8" and whether a "transaction would violate section 7," both of the Clayton Act.  89 Fed. Reg. at 89,295.  Section 8 prohibits so-called "interlocking directorates and officers," stating that "[n]o person shall, at the same time, serve as a director or officer in any two corporations" that have a competitive relationship.  15 U.S.C. § 19(a)(1).  Section 7 is the typical provision at issue in merger cases, as it prohibits acquisitions "the effect of [which] may be to substantially lessen competition, or to tend to create a monopoly."  *Id.* § 18.

131.    Contrary to the Final Rule, the HSR Act is not designed to help the antitrust agencies enforce Section 8.  The Act permits the FTC to "require" that the premerger notification form "contain such . . . information relevant to a proposed *acquisition* as is necessary and appropriate to enable the [antitrust agencies] to determine whether such *acquisition* may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1) (emphases added).  Accordingly, the FTC may only demand information that concerns the legality of the proposed acquisition itself.

132.    Whether a proposed merger or acquisition will result in competing companies having overlapping officers or directors is irrelevant to whether the

transaction *itself* will violate the antitrust laws.  By its terms, Section 8 has nothing to do with transactions.  *See* 15 U.S.C. § 19(a)(1) ("No person shall, at the same time, serve as a director or officer" in two competing corporations.).  Although an acquisition can *lead* to a prohibited board or officer interlock, it is not the acquisition itself that "violate[s] the antitrust laws."  15 U.S.C. § 18a(d)(1).  The FTC and DOJ thus lack authority to use the HSR process to enforce Section 8 of the Clayton Act.

133.    That makes sense.  Interlocking directorates do not pose the unscrambling problem that motivated the creation of the premerger notification program in the first place.  The appropriate remedy for a Section 8 violation is not to prevent an acquisition; it is to have the offending officer or director resign, which can be achieved just as easily post-transaction as pre-transaction.  Indeed, Section 8 expressly provides for a grace period of one year to allow for resignations if an interlock develops, including as the result of a transaction.  15 U.S.C. § 19(b).  For all these reasons, it is not surprising that the FTC had never required information on officers or directors until this rulemaking.

134.    Nor is such information otherwise "*necessary*" to an initial screen for Section 7 problems with the proposed transaction.  15 U.S.C. § 18a(d)(1).  The Rule asserts that the "the same competitive concerns that underpin [S]ection 8 are also relevant to whether a transaction would violate [S]ection 7."  89 Fed. Reg. at 89,295.  According to the FTC, overlapping directors or officers might have "opportunities or incentives to coordinate competitive decisionmaking."  *Id.*  But that generalized concern is why Section 8 exists, and has nothing do with the *transaction*'s legality.  The agency also states that it is "concern[ed] about premature coordination between merging firms,"

which it calls "gun jumping," in violation of the HSR Act's waiting period.  *Id.* at 89,295-89,295 n.345.  But again, whether parties that have submitted an HSR form have engaged in gun jumping has nothing to do with whether the "proposed acquisition" might be unlawful.

135.    Finally, even if the FTC could use the premerger form to screen for potential violations of Section 8, the Rule still exceeds the agency's statutory authority insofar as it requires disclosure of persons who "serve similar functions" to a board of directors or corporate officer in "unincorporated entities." 89 Fed. Reg. at 89,297.  In the NPRM, the FTC recognized that "Section 8 does not technically apply to unincorporated entities," 88 Fed. Reg. at 42189 n.34, because its text refers only to a person "serv[ing] as a director or officer in any two *corporations*" that compete.  15 U.S.C. § 19(a)(1) (emphasis added).

### 3.    The FTC Lacks Authority To Require Filing Parties To Submit Substantive Antitrust Analysis.

136.    The Final Rule exceeds the FTC's statutory authority in a third way.  The Rule creates several new sections of the premerger notification form that require the filer to provide substantive legal analysis or otherwise take and defend positions on a legal issue.  Among others, filers must:

- Provide a "Transaction Rationale" in which they "identify and explain each strategic rationale for the transaction discussed or contemplated," cite filed documents to support each rationale, and "address" any "inconsistencies" between any documents and the stated rationales, 89 Fed. Reg. at 89,300, 89370;

- Provide an "Overlap Description" in which they identify and describe all of their "current and known planned products or services" that "compete (or

could compete) with" those of the other party, 89 Fed. Reg. at 89,345, 89,356; and

- Provide a "Supply Relationships Description" concerning products, services, or assets that any other party "uses . . . to compete with" the filer or the other party to the transaction. 89 Fed. Reg. at 89,372, 89,387.

137. These requirements each demand that filers adopt, support with citations, and even preemptively defend various legal positions on questions that could end up being litigated before a federal court. Disputes regarding the merging parties' reasons for entering a transaction are often at the center of litigation over whether the transaction will be procompetitive. So are disagreements over whether two products or services compete with one another within a properly defined geographic or product market. Indeed, answering those kinds of questions can and usually does require expert analysis in the form of both detailed reports and lengthy testimony.

138. Requiring these kinds of submissions has no basis in the HSR Act. For one thing, it is hardly "appropriate" to require filers to make and *certify* potentially contestable legal claims "under penalty of perjury." 89 Fed. Reg. at 89,350. For another, the statute calls the required premerger form a "notification" of the transaction, which carries a strong connotation that the form will not demand a justification or legal analysis. In the legislative debates over the HSR Act, Congressman Rodino explained that *even a Second Request* would involve only "the very data that is already available to the merging parties and has already been assembled and analyzed by them," 122 Cong. Rec. 30,877 (1976) (statement of Rep. Rodino), rather than require the parties to provide an analysis

of the legal implications of the transaction.  It follows *a fortiori* that Congress did not authorize the FTC to require legal analysis in the initial premerger filing.

139.    More fundamentally, the HSR premerger regime is a notification program, not a pre-approval program like those administered by some foreign jurisdictions.  The filers do not need to persuade the agencies to bless their proposed merger or acquisition. Nor was the HSR Act intended to "ease in any way the traditional burden of proof that must be borne by the government" if it chooses to challenge the merger based on its investigation.  H.R. Rep. No. 94-1373, at 8.  As one commenter put it, "requiring certified statements by filing parties at the outset of an investigation that go to the core of what the agencies must prove if they sought to challenge a transaction goes far beyond the statutory scope of the HSR Act."  Wachtell Comment at 15.

140.    In addition, the HSR Act's 30-day waiting period starts only when the DOJ and FTC receive a "completed notification," 15 U.S.C. § 18a(b)(1)(A)(i), giving the agencies the power to effectively restart the clock by bouncing a filing they deem incomplete.  It does not make sense to require filers to submit subjective, disputable legal argument as part of the "information" required by the form, because the agencies' determination of completeness will then become equally subjective and indeterminate.  It cannot be that the clock starts only if the agency agrees with the legal positions the filer has taken, or concludes that the filer's claims are adequately supported by the submitted documents.

### B.    The Rule's Overall Benefits Do Not Reasonably Outweigh Its Costs.

141.    As set forth above, Congress's use of the phrase "necessary and appropriate" limits the FTC to requiring in the premerger notification form only information and documentary material that does not unduly burden the filing parties by imposing a higher cost to compile and produce than it returns in benefit to the public.  *See Mexican Gulf*, 60 F.4th at 965 (such language "at a minimum requires that [a rule's] benefits reasonably outweigh its costs").

142.    Even if the FTC had recognized that statutory limit on its authority and performed the required analysis, it could not have rationally concluded that the benefits of obtaining all the new information and material required by the Rule is worth the costs imposed.  The FTC has not shown that the Rule will produce anything more than trivial benefits, if that, whereas both the direct and indirect costs are extraordinary.  The Rule's contrary assessments of each half of the cost-benefit equation do not withstand meaningful scrutiny.

### 1.    The FTC Discounted Significant Costs.

143.    Start with the direct compliance costs.  Even under the FTC's estimate, it will take the acquirer on average 158 hours to complete the new form, compared to 37 hours currently, in nearly half of all reportable transactions ("overlap" transactions).  89 Fed. Reg. at 89,332.    That is a greater than four-fold increase for thousands of transactions every year.  The FTC estimates that the new average time for *all* filers will increase by 68 hours to 105 hours total, roughly tripling the agency's estimate of the

current burden.  *Id.* at 89,332-89,333.  That overall average includes the select 801.30 filings that will take only 10 additional hours on average.  *Id.* at 89,332.

144.    As the FTC itself recognizes, those additional burdens and costs are substantial on their own terms.  Using Professor Kothari's estimate of $936 per hour rather than the FTC's $583, times a rough annual average of 2,000 HSR-reportable transactions a year (resulting in roughly 4,000 filings), the total direct compliance costs of the Rule alone for American businesses will be $250 million annually, even assuming the agency has properly estimated the additional compliance times.  Meeting in the middle at $759 per hour, the Rule would still cost $200 million every year.  The vast majority of that expenditure will be a complete waste, as everyone agrees that most HSR-reportable transactions pose no competitive problems.

145.    In addition, there is every reason to suspect that the Final Rule significantly underestimates the additional time burden of preparing the new premerger form.  As noted, the Rule admits that the FTC's original estimate of burden in the NPRM was flawed and thus "underestimated the time and expense associated with the proposed rule."  89 Fed. Reg. at 89,331.  The Rule claims that the FTC's "new survey of Agency staff" made "improvements to its methodology" and led to results "generally consistent with" the U.S. Chamber survey of antitrust practitioners "relied on in the Kothari Report."  89 Fed. Reg. at 89,332-89,333.  But the Chamber survey had found that the NPRM's changes to the premerger form would have added 241 hours for the average transaction, whereas the Final Rule projects an average increase of just 68 hours.

146.    The differences between the amount of information sought by the NPRM and the Final Rule cannot account for much of that gap.  It is facially implausible that the Final Rule imposes only 28% (68/241) of the additional burden that the NPRM would have imposed.  The Final Rule scales back on the NPRM, but not to that extent.  Appearing to recognize as much, the Rule tries to explain some of the delta by claiming that the U.S. Chamber survey "may have included costs related to advocacy about whether a transaction violates an antitrust law, rather than only costs related to collection and submission of information required by the [HSR] Form" itself.  89 Fed. Reg. at 89,333. But that speculation has no basis.  The survey questions that the U.S. Chamber asked are public, and those questions asked respondents to estimate the time "spen[t] preparing a submission for a transaction as part of an initial filing," not the time spent advocating against a Second Request or anything else.  U.S. Chamber Practitioner Survey at 3.

147.    In any event, the Rule will have serious indirect impacts as well. Commenters from every corner of American industry explained as much.    Most importantly, the additional work needed to compile, analyze, and prepare the additional information required by the Rule will "add significantly . . . to a company's filing preparation time, which would have the effect of extending closing dates."  Business Roundtable Comment at 5.  The U.S. Chamber survey of antitrust practitioners found that the NPRM, if adopted in full, would have tripled the average time to prepare a filing from 10.7 days to 32.7 days.  U.S. Chamber Practitioner Survey at 3; *see* TechNet Comment at 3 (Sept. 27, 2023).  Although the Final Rule requires fewer documents and less information than the NPRM, it stands to reason that the average filing time under

the Final Rule will still at least double if not increase even more, especially for overlap transactions.

148.    "These delays represent a significant cost increase" of their own.  National Association of Manufacturers (NAM) Comment at 4 (Sept. 27, 2023).  As the ICPAC Report put it (at 93), "Mergers are almost always time sensitive; delays may prove fatal to a transaction."  Extensions to the closing date can "threaten the underlying economics of the deal itself," NAM Comment at 4, especially for "deals with financing contingencies that need to be satisfied in a limited time period," ICLA Comment at 10.  For early-stage growth companies, "delays of even a day or two can cause significant issues, and delays of several weeks can result in a business failing" as it fails to make payroll.  National Venture Capital Association (NVCA) Comment at 5 (Sept. 27, 2023).  Extending deal timelines increases the risk of the deal "becoming public against the parties' wishes," which can cause significant harm to the parties' businesses.  Business Roundtable Comment at 14.  And it can generally increase *ex ante* uncertainty about the deal, which has its own deterrent effect.  Kothari Report ¶ 55; Business Roundtable Comment at 14.

149.    What is worse, even though "large established businesses can potentially bear . . . an increased financial and administrative burden, this will have an outsized effect on smaller businesses with more limited resources."  NVCA Comment at 8.  And small businesses need access to private capital far more than large businesses, which typically have access to the public securities and debt markets.  Dechert LLP Comment at 14 (Sept. 25, 2023).  Congress recently recognized these points when it amended the HSR Act to lower the fees for transactions involving small businesses.  *See* Pub. L. 117-328 Div.

GG § 101, 136 Stat. 4459 (2022).  Yet even using the FTC's lowball estimate of direct compliance costs, the Rule will more than double the effective fee for filers proposing transactions in the lowest tier.

150.    The Rule also creates a different potential source of delay to transactions: the delay that will occur if the FTC or DOJ rejects an HSR filing as incomplete and thereby restarts the 30-day clock.  As noted above, that is a significant risk created by the Rule's new demand for narratives and substantive legal positions, which "may generate disagreements between agency personnel and the merging parties regarding the accuracy or completeness of the information provided."  ICLA Comment at 10.  "Such a determination would prevent the 30-day review clock from starting, leading to an indeterminate period of back-and-forth between the filers and the Agencies before the filings are deemed to be satisfactorily complete." NAM Comment at 5.  If the initial lengthening of the deal timeline attributable to the expansion of the premerger form did not scuttle an otherwise valuable transaction, this sort of additional delay very well might.  Yet the Rule says nothing in response to the comments flagging this injection of subjectivity into the process as an additional cost worth considering.

151.    In the Final Rule, the FTC "disagree[d] that any delays and incremental costs associated with an HSR Filing could have a significant impact on overall M&A activity" while barely engaging with any of the above submissions from commenters. 89 Fed. Reg. at 89,257.  The agency responded that "deal volumes fluctuate . . . from year to year" and that "these fluctuations are attributable to many economic factors."  *Id.* at 89,258.  That is irrelevant.  The question is the impact of the Rule *holding everything else*

*equal*, including the other "economic factors" that affect the number of deals.  It is self-evident that tripling or quadrupling the compliance costs and significantly lengthening the timelines associated with completing a deal will adversely affect deal activity.

152.    In addition, the Final Rule expresses some doubt that most "M&A activity is beneficial to the economy."  89 Fed. Reg. at 89,258 (arguing that the Kothari Report lacked persuasive "empirical evidence about the benefits of M&A").  But it is basic economics that voluntary transactions, including between companies, contribute to economic growth because they allow market actors to "put assets to their highest and best use."  Business Roundtable Comment at 18.  More importantly, that is a core assumption of the HSR Act, which Congress designed to avoid even "*deter[ring]* . . . the vast majority of mergers and acquisitions."  S. Rep. No. 94-803, at 66 (emphasis added).  Of course, some mergers and acquisitions have the potential to harm competition, but when they do not, they usually *improve* competition by "generat[ing] significant efficiencies and thus enhanc[ing] the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products."  *St. Alphonsus Med. Ctr.– Nampa* v. *St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 789 (9th Cir. 2015).  Even the "possibility of being acquired" also provides an "important incentive for innovative startup companies and the firms that financially support them."  Business Roundtable Comment at 18.

### 2.    The FTC Significantly Overstated Benefits.

153.    Against all these costs of the Final Rule, the FTC does not show that there are remotely commensurate benefits that would "accrue to the American public" from

expanding the information and documentary material required by the premerger notification form. 89 Fed. Reg. at 89,251. The agency identified three categories of benefits: (1) the detection and prevention of additional unlawful mergers; (2) the fact that DOJ and the FTC will "not need to spend as much time and resources" acquiring information that is now mandated for all transactions, *id.* at 89,254; and (3) decreased "burdens and costs for the parties and third parties who respond to staff inquiries designed to collect" that information, *id.* at 89,253. None of these purported benefits amounts to much of anything, and even if they did, they would not remotely match the extensive costs that the Rule will place almost entirely on completely harmless transactions and the larger economy.

154.    *Detecting And Preventing More Unlawful Mergers.* The Rule first invokes both the "annual estimated consumer savings" and "less quantifiable harms that are avoided" by blocking anticompetitive transactions through its overall merger-enforcement program. 89 Fed. Reg. at 89,252. By providing the antitrust agencies the "enhanced ability" to detect even more "illegal mergers," the Rule will purportedly "result in similar benefits to additional consumers and other market participants." *Id.*

155.    While preventing unlawful mergers may benefit the public, the Rule's assessment of that benefit *as a result of the Rule* is massively overstated. Indeed, the benefit from the Rule approaches zero. As discussed in more detail below, the FTC simply has no evidence that HSR-reportable transactions have gone unblocked because the FTC and DOJ lacked the information or material the new Rule would require. That lack of evidence is particularly noteworthy since the consensus before this rulemaking,

backed by extensive data, was that the current premerger notification form was in fact highly effective at facilitating the detection and prevention of unlawful transactions. Even the FTC itself has stated repeatedly in recent years that in "the majority of cases, [it] can make a reasonable judgment *within a few days* about whether a merger is potentially anticompetitive based on information provided in the [prior version of the] HSR filing." FTC, Congressional Budget Justification Fiscal Year 2024 at 55 (emphasis added).

156.    As the Final Rule recognizes, even under the existing regime, both DOJ and the FTC are already "forced to make difficult triage decisions and forgo potentially worthy investigations" because their "headcount[s] remain[] well below what is needed in light of the volume and complexity of proposed deals." 89 Fed. Reg. at 89,247; *see* AIC Comment at 30, Kothari Report ¶ 54. In other words, the agencies are already pursuing the maximum amount of Second Requests and enforcement actions that they can given their resources. Nor has Congress seen fit to remedy this supposed resource shortfall. When the FTC requested a $160 million increase in appropriations for Fiscal Year 2024 (from $430 to $590 million)—including $70 million to add staff to help with HSR review, among other things—Congress responded by *decreasing* the annual appropriation to $425.7 million. *See* FTC, Congressional Budget Justification Fiscal Year 2024 at 9; Further Consolidated Appropriations Act 2024, Pub. L. No. 118-47, 138 Stat. 552.

157.    As a result, all the additional materials required by the Rule are unlikely "to ever be reviewed" in the first place. Kothari Report ¶ 28. Moreover, even if they are, and even if the new information helps flag some additional potentially problematic transactions, the agencies will be forced to let other transactions go through to free up

resources to pursue the new ones. There will therefore be little if any *net* enforcement benefit attributable to the Rule. Instead, there will just be an exchange of some blocked transactions for other blocked transactions. And it is unlikely that these new transactions will be worth stopping in exchange for the old ones. The old ones were likely more clearly anticompetitive, since the agencies were able to catch them using the old HSR form.

158.    *Saving Agency Time.* The FTC next claims that the Rule will make "the work of Agency staff . . . more efficient and effective as they will be able to more readily and accurately identify those transactions that pose a risk that they may violate the antitrust laws." 89 Fed. Reg. at 89,253-89,254. That is because the "additional information required by the final rule would result in an overall reduction in the number of staff hours spent collecting additional information from all sources" in addition to "a reduction in associated burdens of reviewing and processing that information." *Id.* at 89,253.

159.    This argument is both irrational and contrary to the basic two-step structure of the HSR Act. As the NPRM points out, beyond basic searching of publicly available sources, most of the "staff hours spent collecting additional information from all sources" occurs only *after* "one Agency has granted clearance to the other to conduct an initial investigation of the transaction." 88 Fed. Reg. at 42,196. In-house attorneys' "experience . . . confirms" this. ICLA Comment at 23. But such clearance occurs at most for roughly 15% of all HSR-reportable transactions; in 2021 it was 8%. Billman & Salop, *supra*, at 10; FTC, HSR Report, Annual Report to Congress for Fiscal Year 2021 Ex. A, T1. The Rule thus demands information from *all* filers to save the agencies the burden of

asking for that information from a small minority.  And it demands that information up front in lieu of waiting to do so until the staff have reviewed the specifics.  That is not a rational trade.  Nor does it make sense to count as a benefit the "reduction in associated burdens of reviewing and processing that information," 89 Fed. Reg. at 89,253, since the staff will have to review and process the information either way.

160.    More broadly, the FTC cannot justify demanding information from the parties to thousands of obviously harmless transactions by arguing that it will free up the agency's time to investigate other transactions.  That reasoning ignores the constraints of the statute, which limits the agency to requiring what is "necessary and appropriate to enable" a determination of whether the "*proposed acquisition*" is unlawful.  15 U.S.C. § 18a(d)(1) (emphasis added).  By the FTC's logic, it would be "appropriate" to demand that all filers submit all possible information that might be relevant, because that would enhance the agencies' enforcement capabilities.  Congress made the considered decision not to require everything up front in the HSR Act because of the burdens that would place on filers generally—burdens that the FTC has now imposed in contradiction to that legislative choice.

161.    *Saving Third Parties' Time*.  Lastly, the Final Rule claims a similar efficiency benefit on behalf of third parties who may be affected by a proposed transaction—customers, competitors, and the like.  The Rule explains that after the agencies open an investigation, the staff sometimes "contact[] at least one third party" to learn more about the transaction's potential effects.  89 Fed. Reg. at 89,253.  The FTC argues that it is "appropriate to shift some of th[e] information-gathering burden to the

merging parties and away from other market participants . . . who currently absorb this burden." *Id.*

162.    As above, the trade underlying this supposed benefit is nonsensical.  The Final Rule greatly increases the burden on the parties to thousands of harmless transactions in order to save a few other parties the time of responding to inquiries concerning transactions that have already raised a red flag in an initial agency review.  Worse still, these requests to third parties are typically voluntary.  If the third party does not want to respond, it need not do so.  And if it does take the time to engage, that is probably because it sees the engagement as a *positive*—as a chance to make the case to the agency that the transaction will be anticompetitive and should be blocked.  It is therefore irrational to treat that engagement as a burden or cost to those third parties.

163.    The Rule also never explains why "shift[ing]" any of the "information-gathering burden" from third parties onto the filing parties is "appropriate" within the meaning of the HSR Act.  It is not.  As set forth above, Congress designed the two-step premerger review program and put in place other protections for filers so that the scheme would "neither deter nor impede consummation of the vast majority of mergers and acquisitions."  S. Rep. No. 94-803, at 66.  Burdening the parties to the transaction is what deters or impedes consummation.  Burdening third parties does not.

### C.    Evaluated Individually, Many Of The Rule's New Requirements Do Not Pass Any Reasonable Cost-Benefit Analysis.

164.    Even if the benefits of the Rule outweigh its costs as a whole, a number of the specific new categories of information or documents the Rule adds to the premerger

notification form will impose far more in compliance costs than they will return in enforcement benefit for the FTC and DOJ.

165.    *Drafts Of Transaction-Related Documents.* The Final Rule "clarifies that any" transaction-related document that "was shared with any member of the board of directors (or similar body)" of the filer "should not be considered a draft," "even if in draft form," and therefore "should be submitted with the HSR Filing." 89 Fed. Reg. at 89,303. That requirement would be enormously burdensome even if it just applied to the members of a traditional corporate board. In practice, however, it will sweep even more broadly. It is not uncommon for a CEO to sit on the board of the company, or for a hedge fund or private equity firm to have their own personnel do the same. Under the Rule, *all* transaction-related documents sent to such individuals would need to be submitted, regardless of their relevance or finality. The Rule also appears to treat an investment committee at a private equity firm or hedge fund as a "similar body" to a board of directors, consistent with prior FTC guidance. *See* American Bar Association Comment at 15 (Sept. 13, 2023). That means that *all* transaction-related documents sent to any investment committee member—which can include many of a firm's partners—must also be submitted.

166.    The drafts requirement will thus create enormous practical difficulties and costs for many filing parties, which the FTC recognized may "have to use e-discovery or forensic collection tools to capture all drafts," 89 Fed. Reg. at 89,302, and which will likely then have to spin up a litigation-style review process to screen for privilege, responsiveness, and so on. Congress never contemplated anything like that kind of

process for all HSR-reportable transactions.  In addition, the drafts requirement may change disclosure practices within companies and funds, leading to less-informed boards and investment committees and thus "lower-quality decision-making on matters of significant business consequence." *See* Foley Lardner Comment at 12.

167.    Nevertheless, the Final Rule appears to conclude that these costs are worth the benefit to the agencies in avoiding any possibility that they "are receiving documents edited to remove candid assessments." 89 Fed. Reg. at 89,303.  But requiring intensive document collection and review for thousands of reportable transactions imposes costs that are grossly disproportionate to that hypothetical benefit.  It is entirely unrealistic to expect that DOJ and the FTC will be combing through every draft version of every transaction-related document in an effort to find the "candid" needle in the haystack. That sort of intensive scrutiny of a proposed transaction is only practically possible at the Second Request stage, as has been the case for decades.

168.    *Ordinary-Course Documents (Periodic Plans And Reports).*  Under the Rule, all filers must now gather, analyze, and submit "*all* regularly prepared plans and reports that were provided" to the CEO or Board of Directors of the filer (or the CEO or Board of any entity the filer controls or is controlled by), if those documents "analyze market shares, competition, competitors, or markets pertaining to any product or service" that the other party "also produced, sold," or is "known to be" developing. 89 Fed. Reg. at 89,371, 89,386 (emphasis added).   Given the wide variety of potentially responsive documents, commenters pointed out that this requirement too will require the use of "e-discovery and other forensic discovery tools." *Id.* at 89,304.

169.    The FTC justifies this requirement on the ground that it will "reveal additional information about how each filer views the competitive landscape more broadly."  89 Fed. Reg. at 89,233.  The Rule explains that such documents are "highly relevant to staff's analysis of the nature and scope of product or service markets, geographic markets, competitors and competitive dynamics in the industry, [and] new or potential entrants that could mitigate competition concerns, among other key considerations."  *Id.* at 89,304.  That does not answer the question of whether they are *necessary* or worth the significant additional compliance costs.  After all, in nearly all cases they are likely to be cumulative.  The HSR form has always required certain SEC filings (*e.g.*, Form 10-Ks) and numerous documents used by the key decisionmakers for analyzing the transaction.  Requiring the ordinary-course documents on which the already-covered documents are based will almost never add anything meaningful, and certainly not with the frequency that would justify the increased burden on all filers.

170.    *Supply-Relationships Description*.  The Final Rule requires significant and detailed information about products or services that either party buys or sells that could conceivably give rise to concerns that the acquisition will allow either party to corner the market on a given input or set of customers, often referred to as "vertical foreclosure."  This information is plainly not necessary for the agencies' initial antitrust screen, and even if it were, it would be far more costly for the filing parties to compile than helpful to have in the premerger notification form.

171.    As the Rule acknowledges, the form used to ask for certain information about any "vendor-vendee relationship between reporting parties" with this very concern

74

in mind.  66 Fed. Reg. at 8,686.  But the FTC removed that requirement after concluding that it had "not needed to rely on" that information "to learn about transactions that present vertical concerns."  *Id.*

172.    The current FTC responds that it has designed a more "specifically targeted" form of the requirement that is "more relevant to the Agencies' screening." 89 Fed. Reg. at 89,229.  As an initial matter, that "targeted" requirement seeks more information than the previous vendor-vendee disclosure requirement did.  In any event, the Rule never explains why the FTC now believes that such information is *"necessary"* when it previously concluded the precise opposite—that it had "not needed to rely" on it in looking for potential vertical concerns.  Nor does the FTC contradict its 2001 conclusion that providing supply information places a particular burden on "large diversified persons that may purchase from other filing persons a wide variety of manufactured products through numerous subsidiaries and divisions."  66 Fed. Reg. at 8,686.

173.    While it is easy to see how, in theory, the merger of two companies that operate in the same market—that is, horizontally—can negatively affect competition, it is very uncommon for a transaction involving parties that do not operate on the same level to have that effect.  Thus, "[v]iable non-horizontal theories of harm" such as vertical foreclosure "are notably rare under Section 7" of the Clayton Act.  Wachtell Comment at 16.  Among other reasons, proving vertical foreclosure requires that at least one party has "substantial market power" in at least "one product or distribution level" implicated by the transaction.  *See, e.g., Auburn News Co.* v. *Providence Journal Co.*, 659 F.2d 273, 278 (1st Cir. 1981).  Few transactions involve the creation or perpetuation of such market

power.  And for those that do, the agency is surely already looking at them closely.
Moreover, even if the agency somehow misses the vertical relationships at play, "[v]ertical
mergers that have a significant potential for being anticompetitive . . . will necessarily
stimulate complaints by competitors and customers at one or both levels."  David T.
Scheffman & Richard S. Higgins, *Vertical Mergers: Theory and Policy*, 12 Geo. Mason L.
Rev. 967, 973 (2004).

174.    *Potential Competition*.  The Final Rule attempts to defend a number of
additional information and document demands on the grounds that it needs to "identify[]
potential law violations involving innovation effects, future market entry, or nascent
competitive threats."  89 Fed. Reg. 89,230.  That justification underlies the Rule's
expansion of information on prior acquisitions; demand for ordinary-course business
documents; demand for information about products currently in development; the new
"Transaction Rationale"; and more.  *Id.* at 89,230-89,231.

175.    Like vertical foreclosure, this "nascent competition" theory of antitrust
harm comes up rarely, at best, and often requires one of the parties to have substantial
market power, if not outright monopoly power.  The Final Rule recognizes that, noting
that the FTC is concerned with "markets where concentration is already great or
trending in that direction."  89 Fed. Reg. at 89,230.  And with respect to concerns about
serial acquisitions (or "roll ups") in particular, the Final Rule admits that they often
involve "transactions that were not reportable under the HSR Act" because of their small
size.  *Id.* at 89,233.  In short, the antitrust enforcement benefits conferred by demanding
all of this new information are slight compared to the significant costs.  The requirements

to disclose and analyze pipeline products and provide long lists of prior acquisitions will be especially burdensome on certain kinds of filers, including those in the private equity, technology, pharmaceutical, and biotechnology sectors, as the Rule itself acknowledges. 89 Fed. Reg. at 89,267 (citing comments); *see, e.g.*, Biotechnology Innovation Organization (BIO) Comment at 4, 8 (Sept. 27, 2023).

176.     *Global Overlaps.*     In responding to comments, the FTC expressly "decline[d] to limit" the Overlap Description, which entails compiling information on top customer lists and sales numbers, to "U.S. sales information." 89 Fed. Reg. at 89,316.  In other words, the requirement applies on a *global* basis.  Requiring filers to submit global information is not justified by the costs and burdens placed on filers to compile this information.  Even in the rare circumstance that the relevant geographic market for antitrust purposes is larger than the United States, this new requirement will lead to the production of significant amounts of irrelevant information.

177.     *Officers And Directors.*     As set forth above, the FTC does not have authority to require filers to identify officers and directors because that information has no legal relevance to whether the proposed transaction itself may violate the antitrust laws.  But even if the agency has such authority, "receiving lists of dozens, if not hundreds," of officers and directors, "especially across larger or more diffuse organizations with many subsidiaries . . . to screen for the possibility of current interlocking directorate violations under Clayton Act § 8 could impose substantial burdens and provide little practical utility." American Bar Association Comment at 8.  The Final Rule recognizes that complying with the Rule will "impose a higher cost to large

companies with many competitively relevant business lines." 89 Fed. Reg. at 89,297. The same is true for private equity firms, which will likely need to review the potential conflicts across a vast number—perhaps thousands—of portfolio companies.

### D. The FTC Failed To Adequately Justify Its Departure From The 1978-2024 Status Quo.

178.    As discussed above, even by the FTC's own estimates, the Final Rule nearly triples the average HSR compliance burden and more than quadruples it for half of all transactions. Although the Final Rule omits the language from the NPRM in which it called this rulemaking a "comprehensive redesign" and "large-scale reorganization" of the HSR premerger notification form, the Rule still recognizes that it "reset[s] the baseline requirements for all filers." 89 Fed. Reg. at 89,260. If such major, baseline revisions to the HSR form are truly "necessary," as required by the HSR Act, surely there must be major problems with the current HSR regime. Yet the Final Rule cites *zero* actual evidence to support that claim.

179.    The Rule is therefore arbitrary and capricious in at least three different ways. First, to the extent the FTC even concluded that the information and documents it newly requires are "necessary" for an effective initial antitrust screen, 15 U.S.C. § 18a(d)(1), that decision "runs counter to the evidence" and is not "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Assn. of U.S.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983).

180.    Second, even if the HSR Act did not require the information and documents mandated in the premerger form to be "necessary," the "costs and benefits associated

78

with the [Rule]" would still be an "important aspect of the problem" under *State Farm*. *See Chamber of Commerce*, 85 F.4th at 777.  And while the Rule's "purported benefits may be more than purely hypothetical," they are not "adequately substantiated" because the FTC has failed to show that the Rule addresses "a genuine problem." *Id.*

181.    Third, the Rule departs from the FTC's "longstanding polic[y]" without "show[ing] that there are good reasons for the new policy." *Encino Motorcars,* 579 U.S. at 222-223; *see Fox*, 556 U.S. at 515.  For nearly fifty years, the FTC has required roughly the same amount of information and documents, but now has demanded a far greater amount of material that will at least triple the time it takes to collect and submit on average.  That is a massive change in policy for which the Rule fails to give good reasons.

## 1.    The FTC Lacks Hard Evidence Of A Significant Problem.

182.    Most striking, despite being challenged to do so by many commenters, the Final Rule never identifies a single transaction that the FTC now thinks it might have stopped, or at least investigated further, with the new information the Rule adds to the premerger notification form.  The Rule acknowledges that failure, but responds that it is not "practical" for the FTC to identify such transactions, because it would "require a redirection of resources to investigate consummated mergers and away from resources devoted to premerger review." 89 Fed. Reg. at 89,219.  To the contrary, it should require no "redirection of resources" at all.  If there are indeed real problems with the HSR form such that the major surgery of the Rule is "necessary," the FTC should not have to conduct any new investigation to uncover examples of those problems.

183.    Grasping for anything it can call hard evidence, the Rule cites only one study that the FTC claims revealed the "consequences of inadequate detection":  a study of the effects of hospital mergers.  89 Fed. Reg. at 89,221; *see id.* at 89,244.  But as the U.S. Chamber explained in its comment, that study concludes that "agencies were successful (on average) in identifying in the preliminary phase of the investigation which mergers were most likely to be anticompetitive—and issued Second Requests in those cases."  Brand et al., *In the Shadow of Antitrust Enforcement: Price Effects of Hospital Mergers from 2009–2016* at 31 (Feb. 24, 2023).

184.    Even if this one hospital study supported the FTC, it would not rationally justify the Final Rule.  For one thing, the Rule concedes that "the study was not designed to test the impact of this rulemaking."  89 Fed. Reg. at 89,221.  The study essentially concluded that the antitrust agencies may not have been properly assessing the competitive effects of hospital mergers—an entirely different point than whether the agencies had sufficient information to make the assessment from the HSR notification form.  *See* Brand et al., *supra*, at 35 ("[T]he empirical tools that the FTC has applied recently are not capturing all of the important factors driving the price effects of hospital mergers.").  In addition, any shortcoming of the premerger form in the specific context of hospital mergers does not necessarily mean that the form is inadequate in any other context.  As the FTC knows, it has the power to tailor the HSR form to different industries if it is warranted.  *See Pharmaceutical Rsch. & Mfrs. of Am.* v. *FTC*, 790 F.3d 198, 206 (D.C. Cir. 2015) (rejecting argument that the HSR Act "compel[s] the FTC to issue only rules of general applicability across industries").

185.    As a final piece of "evidence," the Final Rule quotes dozens of "supportive comments" it had received during the rulemaking describing the commenters' "own experiences in the aftermath of mergers."  89 Fed. Reg. at 89,221-89,222.  But of the few comments that even mention particular transactions, none offers any specifics regarding the role the premerger review process played—including whether the transaction was even HSR-reportable.  And of course, anecdotes are no substitute for actual data.

186.    The FTC's inability to come up with any hard evidence for the need to greatly increase the burden of the premerger process is particularly noteworthy in light of the prior consensus and objective proof that the previous form worked quite well while staying about the same over nearly five decades.  The Final Rule declines to acknowledge the many statements over the course of those years, including from the FTC and DOJ and from a bipartisan expert commission, that the form has been "highly effective" and the overall premerger program a "success."  Instead, the FTC opted to stealthily delete the latter claim from its online guide to the premerger process just two months before finalizing the Rule.

187.    On the data, the Final Rule recognizes the "relatively low number of challenges to consummated mergers."  89 Fed. Reg. at 89,239.  It responds that the number "does not indicate that the current information requirements for premerger screening are sufficient to detect illegal deals," given both "the limited resources the [FTC and DOJ] have to devote to merger enforcement" and the "frequent lack of information about the effects of consummated mergers."  *Id.*  But if the agency usually "lack[s] . . . information about the effects of consummated mergers," it is hard to see how

it has any basis to claim that the form is not working as designed. And as discussed above, the fact that the antitrust agencies already faced serious resource constraints prior to the Rule and continue to face those restraints is a major reason why the Rule is unlikely to lead to any net improvement in merger enforcement.

188. The Rule similarly asserts that "the low percentage of transactions that have received Second Requests is not a reliable indicator that the [FTC and DOJ] have achieved the goals of mandatory premerger review or that the current process is efficient in identifying problematic transactions." 89 Fed. Reg. at 89,242-89,243. But the Rule does not explain why that figure is "not instructive." *Id.* at 89,243. As noted above, nearly 70% of Second Requests from 2001 to 2020 resulted in the proposed transaction either not going through or being significantly restructured to prevent antitrust concerns. Billman & Salop, *supra*, at 6. These figures suggest that the agencies can use the current notification form to home in on the most concerning transactions, especially when combined with the vanishingly low number of post-merger challenges to transactions that did not receive a Second Request over the same period.

## 2. The FTC's Bare Reliance On Unspecified "Experience" Is Insufficient And Unreasonable.

189. Lacking a good answer to the evidence showing that the prior premerger form is effective, the Rule invokes the FTC's "experience collecting and reviewing data and documents during antitrust investigations." 89 Fed. Reg. at 89,217. Based on that experience, the agency argues that "changing market dynamics" have created or exposed "information gaps and asymmetries that have grown over time," *id.* at 89,220, to which the

FTC must respond by seeking more information from filers.  The agency points to five different kinds of changes that have purportedly made "the economy of 2024" "different than it was in 1978 or 2000, 89 Fed. Reg. at 89,216:

- "Changes in the investment landscape" as "the role of private investors, including private equity, has become more pronounced," and "complex investment structures" or "ownership structures" have become more common, 89 Fed. Reg. at 89,223-89,226.

- The antitrust agencies' "increasing[]" recognition of "the importance of evaluating the effects of mergers and acquisitions on labor markets," 89 Fed. Reg. at 89,226;

- The possibility that "an acquisition may violate the law if it creates opportunities for post-merger foreclosure of rivals arising from vertical or non-horizontal relationships," 89 Fed. Reg. at 89,228;

- Growth in specific sectors in which "acquisition strategies" are important to "success as well as market growth," "such as pharmaceutical, medical device, and digital markets," and the resulting possibility that acquisitions can "eliminate areas of emerging or potential competition," 89 Fed. Reg. at 89,230-89,231; and

- "The rise of serial acquirers": "firms that engage in strategic acquisitions in the same industry."  89 Fed. Reg. at 89,234.

190.    The FTC claims that it is responding to *changes* as a justification for departing from the longstanding and effective status quo.  But nearly all the developments it focuses on are either not recent or not even changes at all.  For example, in discussing changes in the investment landscape, the Rule includes a chart showing that "acquisitions involving funds and limited partnerships" comprised roughly 25% of all HSR filings beginning in 2004, with that percentage holding at between 30% and 38% for each of the past 15 years.  89 Fed. Reg. at 89,224.  The increased role of more complex vehicles in many transactions is not a new phenomenon.

191.    Indeed, the Rule does not actually claim that the FTC and DOJ's new focus on labor markets, vertical foreclosure, and "potential competition" are "changing *commercial* realities," 89 Fed. Reg. at 89,221 (emphasis added), or changes to the "nature of competition," *id.* at 89,217.  With good reason.  These are (controversial) *legal* theories that have been around for decades and have come in and out of favor with the antitrust agencies since the late 1970s.

192.    Moreover, as discussed above, not even the FTC asserts that mergers and acquisitions presenting labor-market, vertical, or serial-acquisition concerns will be anything other than a small slice of potentially anticompetitive transactions.  And many of the new information and document requirements adopted by the Final Rule have no meaningful connection to such concerns.

### E.    The FTC Did Not Rationally Explain Why It Cannot Sufficiently Plug Any Information Gaps Through Other Means.

193.    Even if the FTC had demonstrated current problems with the antitrust agencies' ability to effectively screen transactions comparable in magnitude to the additional burden the Final Rule would place on thousands of transactions, the agency separately failed in its APA duty to meaningfully "consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Farmers Union*, 734 F.2d at 1511.  The Final Rule does not reasonably explain why the blunt instrument of the Rule is preferable to a far more targeted, less burdensome approach:  simply increasing the FTC and DOJ's use of their myriad other tools for collecting the information and documents they purportedly need.

1.      **The Agencies Have Many Ways To Acquire Information In The First Statutory Waiting Period.**

194.    To the extent that DOJ and the FTC believe that they need some additional information during their initial review of a transaction, they have a number of ways to acquire that information.

195.    First, once the agencies are notified of the basics of a proposed transaction, agency staff have access to a "wealth of online materials that were not easily available when the HSR Act was passed (*i.e.*, trade publications, SEC filings and shareholder presentations, and consumer- or trade partner-facing websites)" to learn more about the competitive dynamics at play.  Business Roundtable Comment at 10.  Indeed, that has been the case for decades.  In its 2000 report, the International Competition Policy Advisory Committee quoted "one antitrust official" who "noted the relative ease with which competition authorities may now monitor pending transactions."  ICPAC Report 129 n.104.  That official noted "the proliferation of media outlets" that "report hints of merger talks" in addition to "old reliables . . . like the Financial Times and the Wall Street Journal," and explained that the "agencies pay attention to these reports and may seek to substantiate them by calls to the companies or to their counselors."  *Id.*  If those conditions of "relative ease" have changed since 2000, the Rule does not say why.

196.    The FTC and DOJ also have several other more concrete mechanisms for obtaining information from particular persons or entities—all of which the agencies have learned how to effectively use over the past five decades.  *See* U.S. Chamber Comment at 3, Business Roundtable Comment at 10-11.

197.    First, as the Rule discusses, the agencies can and do contact third parties on a voluntary basis, including customers and competitors, who are not only likely to have relevant information, but also strongly incentivized to share it if they have competitive concerns about a transaction.

198.    Second, on occasion, the agencies can and do reach out to the filers or their counsel both informally (including by phone) and via the more formalized "voluntary access letters" (also called "voluntary request letters").  *See* FTC, *Guidance for Voluntary Submission of Documents During the Initial Waiting Period* (FTC Voluntary Guidance),        https://www.ftc.gov/enforcement/premerger-notification-program/hsr-resources/guidance-voluntary-submission-documents; Department of Justice, *Frequently Asked Questions on Voluntary Requests and Timing Agreements* (Nov. 2018), https://www.justice.gov/atr/page/file/1111331/dl (DOJ Voluntary Requests FAQ).  The ICPAC Report explains (at 119) that, in the rare circumstances where the agencies do need more information to determine whether a Second Request is warranted, they "have been able to use" the voluntary access letter process "to identify and often resolve the antitrust issues within the initial review period."

199.    Indeed, as commenters pointed out, much of the information that the Final Rule newly requires of *all* filers used to be commonly sought in voluntary access letters. ICLA Comment at 23-24; U.S. Chamber Comment at 3.  The FTC's webpage on voluntary submissions even has a list of eight items it encourages parties to compile "in anticipation of" a voluntary access letter.  *See* FTC Voluntary Guidance.  Seven of those eight were

among the many proposed additions to the premerger form in the NPRM, and nearly all of them survived in some form to the Final Rule.

200.    Third, both agencies have authority to issue compulsory "civil investigative demand[s]," or CIDs.  *See* 15 U.S.C. § 57b–1 (FTC); *id.* § 1312 (DOJ); U.S. Chamber Comment at 3.  DOJ's voluntary requests FAQ notes that it "will issue" a CID in the initial 30-day window for merger responses.  DOJ Voluntary Requests FAQ.

201.    Finally, to the extent that either agency concludes that it needs more than the initial 30-day waiting period to gather or analyze information, it can suggest that the filer "pull and refile" its HSR notification to restart the statutory clock.  In response to such suggestions, parties often do pull and refile their notifications in order to give the agency more time.  As the Rule discusses, the FTC has even formalized that option by adopting a rule that "offers filers the option to withdraw and refile their filings without [even] paying an additional filing fee."  89 Fed. Reg. at 89,244.

## 2. The FTC's Explanations For Not Using These Tools Are Unreasonable And Contrary To The Evidence.

202.    The Final Rule offered three basic responses to the comments urging the FTC to make better use of these tools in lieu of expanding the premerger form for all filers.  Each is irrational, plainly contrary to the evidence, or both.

203.    First, the FTC argues that "requiring voluntary submissions from even more filers" "would impose unnecessary burden and delay on filings that are not currently flagged for follow up."  89 Fed. Reg. 89,429.  That makes no sense.  The Rule quadruples the mandatory filing burden on thousands of transactions and triples it on hundreds if not

thousands more, all of which pose no antitrust issue.  It is irrational to do that to spare a few hundred (at most) transactions that the agencies presumably would have selected for follow-up for some good reason, based on having quickly reviewed the premerger form. Moreover, voluntary access letters might well require less work from recipients than the Final Rule requires of all transactions, since the letter would be targeted to particular problem areas identified by that initial review.  *See* Wachtell Comment at 13.

204.   Second, the Final Rule notes that "a filer's submission of any additional information beyond what is required for an HSR filing is voluntary," such that the agencies "have no ability to demand compliance" and filers have no incentive to "supply[] the necessary information in an objective and neutral manner."  89 Fed. Reg. at 89,244.

205.   That response has several obvious holes.  It ignores the option to use compulsory CIDs, which the Rule says nothing about.  It also disregards commenters' point that, most of the time, the filing parties have every incentive to cooperate with a voluntary access letter or other voluntary request (including to pull and refile) to avoid a burdensome Second Request.   U.S. Chamber Comment at 13-14; Axinn, Veltrop & Harkrider LLP Comment at 5 (Sept. 27, 2023); Wachtell Comment at 13 & n.60. Finally, the concern that filers are incentivized to paint the transaction in a flattering light applies equally when they fill out the initial form.  Filing parties and their counsel are generally not going to make false or misleading statements to a federal agency, and if they are inclined to, there is no reason to trust their initial responses either.

206.   Third and finally, the Final Rule argues that the antitrust agencies would "lack a basis to identify the need for additional" information without the expanded

premerger form.  89 Fed. Reg. at 89,249; *see id.* at 89,247 ("[W]ithout the additional information required by the final rule, the Agencies would continue to struggle to uncover key facts necessary to determine" whether to investigate further.).  But if the agencies have been consistently missing problematic transactions based on "unknown unknowns" of this kind, the FTC should by this point have at least one example to cite.  It does not because the problem is illusory.  As a former antitrust official explained almost 30 years ago:

> We do not find it plausible that any truly significant transaction will escape detection in these days of intense media scrutiny and strategic complaints by competitors.  In addition to competitors, customers of merging firms have also become quite comfortable with reporting their concerns to an antitrust agency.  Indeed, if a transaction completely escapes media attention and generates no competitor or customer complaints, one might ask why it deserves the attention of federal enforcement officials.

Sims & Herman, *supra*, at 892.

### 3.    The FTC Did Not Reasonably Explain Why It Cannot Make Better Use Of Second Requests.

207.    The Final Rule also offers no reasonable explanation for why the agencies cannot make better use of the most potent tool that Congress gave them:  the Second Request.  The Final Rule gave two answers.  The first is the same "unknown unknown" point just discussed, 89 Fed. Reg. at 89,247, to which the response is the same.

208.    The second response the FTC offers is that "issuing more Second Requests is an extremely costly alternative to the final rule," because as currently practiced, Second Requests increase the time for premerger review by months and cost on average $4.3 million per Request.  89 Fed. Reg. at 89,247.  But the relevant comparison is not between

the cost of a Second Request and the cost of filling out the premerger form for any given, single transaction. The comparison is between (i) imposing an additional large burden on a handful of potentially problematic transactions and (ii) quadrupling the filing burden on thousands of obviously harmless transactions. Even if the costs in time and money between those two alternatives were equivalent, it would obviously be better to require that effort for transactions for which there is already some reason to think there may be an antitrust problem.

209. In any event, even the agency's (seriously understated) cost estimates show that the alternatives are not equivalent. The Rule estimates an additional cost per year from the changes to the premerger form of $139.3 million: 68 additional hours on average to complete the form times a blended hourly rate of $583. 89 Fed. Reg. at 89,334. Meanwhile, the antitrust agencies averaged 48 Second Requests per year from 2001 to 2020. Billman & Salop, *supra*, at 3. Assuming an average cost of $4.3 million, the antitrust agencies could nearly double the amount of Second Requests at the same "price" they are inflicting by expanding the premerger form. So "issuing more Second Requests is" *not* "an extremely costly alternative to the final rule," 89 Fed. Reg. at 89,247—it is a cheaper and more effective one, even taking everything else the FTC says at face value.

210. In addition, the Final Rule simply assumed that the antitrust agencies' current costly approach to Second Requests must be held constant. That was irrational, since the entire point of the Rule was to *not* hold constant the amount of information required by the premerger form after five decades of doing just that. There is no reason why the FTC and DOJ cannot alter their Second Request procedures—which have

become exceedingly burdensome over time, notwithstanding Congress's 2000 amendments—to reduce some costs at least some of the time.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (Not In Accordance With Law And In Excess Of Statutory Authority — Unlawful Interpretation Of "Necessary And Appropriate")
### 5 U.S.C. § 706

211.    Plaintiffs repeat and incorporate by reference all the above allegations.

212.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside" final agency action found to be "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory . . . authority," *id.* § 706(2)(C).

213.    The HSR Act authorizes the FTC to "require that the" "premerger notification" mandated by the Act "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. §18a(d)(1).

214.    That language limits the FTC to requiring information that (i) is truly "necessary" to facilitate an initial antitrust screen of the proposed transaction and (ii) will not impose a higher cost to compile and produce than it reasonably returns in benefit to the antitrust agencies or the public.

215.    In the Final Rule, the FTC rejected these critical constraints on its authority to require information and documentary material in the HSR notification form.

*E.g.*, 89 Fed. Reg. at 89,236 (stating that Congress did not "intend[] the words 'necessary and appropriate' to require a cost-benefit analysis").  The Final Rule is premised on that erroneous interpretive conclusion.  As a result, the Rule as adopted is fundamentally "incompatible with the . . . statutory scheme" of the HSR Act and thus not in accordance with law and in excess of the FTC's statutory authority.  *See Sierra Club*, 294 F.3d at 162.

216.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Final Rule should be held unlawful and set aside.

## COUNT II
### Administrative Procedure Act
### (Not In Accordance With Law And In Excess Of Statutory Authority — Requirement To Disclose Officers And Directors)
### 5 U.S.C. § 706

217.    Plaintiffs repeat and incorporate by reference all the above allegations.

218.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside" final agency action found to be "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory . . . authority," *id.* § 706(2)(C).

219.    The Final Rule requires certain buyers filing a premerger notification form to identify certain officers and directors of the buyer and its subsidiaries. 89 Fed. Reg. at 89,294.

220.    Under the HSR Act, the FTC may only request information that is "relevant to *a proposed acquisition*" to "determine whether *such acquisition* may, if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1) (emphasis added).  The fact that a board or officer interlock may result from a proposed acquisition does not render the *acquisition* a violation of the antitrust laws.  If an acquisition does create a

prohibited interlock, Section 8 would provide the offending person(s) a one-year grace period to remedy the interlock by resigning.  Accordingly, the FTC lacks statutory authority to use the HSR premerger notification form to screen a transaction for interlocks prohibited by Section 8.

221.    The Final Rule also requires disclosure of individuals who "serve similar functions" to a director or officer in an unincorporated entity.  89 Fed. Reg. at 89,287.  But by its terms, Section 8 does not apply to unincorporated entities.

222.    Nor is the identity of any officer or director or any potential personal conflict related to the proposed acquisition information that is "necessary and appropriate" to the antitrust agencies' initial HSR screen.

223.    For these reasons, the Final Rule's requirement to disclose the identities of certain officers and directors or individuals who "serve similar functions" exceeds the FTC's statutory authority and is not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule's requirements regarding disclosures of officers and directors should be held unlawful and set aside.

### COUNT III
### Administrative Procedure Act
### (Not In Accordance With Law And In Excess Of Statutory Authority —
### Requirement Of Substantive Antitrust Analysis)
### 5 U.S.C. § 706

224.    Plaintiffs repeat and incorporate by reference all the above allegations.

225.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside" final agency action found to be "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory . . . authority," *id.* § 706(2)(C).

226.    The Final Rule adds to the premerger notification form several requests for information that in practice will require the filer to take legal positions and otherwise provide substantive antitrust analysis.

227.    The text, structure, and purposes of the HSR Act make clear that the statute does not permit the FTC to require substantive legal analysis as part of the "information" that must be submitted in the "premerger notification."    15 U.S.C. § 18a(d)(1).  The HSR premerger notification process is not a pre-approval regime like the ones in force in various other jurisdictions, such as the European Union.

228.    For these reasons, each of the Rule's new demands for information and documentary material that in practice will require the parties to provide substantive legal analysis—including but not limited to the Transaction Rationale, Overlap Description, and Supply-Relationships Description requirements in whole or in part—exceed the FTC's statutory authority and are not in accordance with law.

229.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and each of the Rule's new demands for information and documentary material that in practice will require the parties to provide substantive legal analysis should be held unlawful and set aside.

## COUNT IV
### Administrative Procedure Act
### (Arbitrary And Capricious — Deficient Cost-Benefit Analysis For Rule)
5 U.S.C. § 706

230.    Plaintiffs repeat and incorporate by reference all the above allegations.

231.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

232.    The HSR Act authorizes the FTC to "require that the" "premerger notification" mandated by the Act "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1).  That language limits the FTC to requiring information that will not impose a higher cost to compile and produce than it reasonably returns in benefit to the antitrust agencies or the public.

233.    Independent of the statutory language, a regulation is arbitrary and capricious if the agency "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.  "This includes, of course, considering the costs and benefits associated with the regulation." *Mexican Gulf*, 60 F.4th at 973.  If the "benefits" of a regulation "do not bear a rational relationship to the serious . . . costs imposed" by the regulation, then the regulation is arbitrary and capricious.  *Id.*  Moreover, even in the "absence of a statutory duty" to perform a cost-benefit analysis, "when an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable" under the APA.  *National Ass'n of Homebuilders* v. *EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012).

234.    Although the Final Rule purports to have "consider[ed] . . . the costs and benefits" of the Rule as a whole, 89 Fed. Reg. at 89,237, the FTC never concluded that the benefits of the Rule actually outweigh its costs.  Instead, it chose to require production of the information and documentary material it deems "necessary and appropriate" and then sought to "minimize *where possible* the costs to filers."  *E.g.*, *id.* at 89,217 (emphasis added).  "Reduc[ing] the cost and delay for filers as much as practicable," *id.* at 89,273, is not the same thing as finding that the benefits of the information outweigh the costs, as required by the statute.  It is instead akin to starting with the desired regulatory imposition, then simply trying to reduce the costs of that regulation to some extent.

235.    At any rate, the FTC could not have rationally concluded that the benefits of requiring all the information and documentary material newly demanded by the Rule "reasonably outweigh [the] costs" of doing so.  *Mexican Gulf*, 60 F.4th at 965.  Among other reasons, the Rule entirely discounts the important indirect costs to businesses and the American economy from extending deal timelines and increasing uncertainty, which will prevent and deter value-creating M&A activity and affect small business especially severely.  *See* 89 Fed. Reg. at 89,257-89,258.  It substantially overstates the marginal benefit to the prevention of anticompetitive mergers.  It irrationally triples and in many cases quadruples the HSR filing burden for transactions, nearly all of which pose no antitrust concern, to avoid the need to follow up on the small minority of transactions that have already been identified as potentially problematic.  And it improperly concludes that it is "appropriate" to impose a much greater mandatory burden on all filers than to occasionally seek information on a voluntary basis from third parties.

236.    For these reasons, the FTC's adoption of the Final Rule was arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Final Rule should be held unlawful and set aside.

**COUNT V**
**Administrative Procedure Act**
**(Arbitrary And Capricious — Deficient Cost-Benefit Analysis Of**
**Certain Individual Requirements)**
5 U.S.C. § 706

237.    Plaintiffs repeat and incorporate by reference all the above allegations.

238.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

239.    The HSR Act authorizes the FTC to "require that the" "premerger notification" mandated by the Act "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. §18a(d)(1).  That language limits the FTC to requiring information that will not impose a higher cost to compile and produce than it reasonably returns in benefit to the antitrust agencies or the public.  Independent of the statutory language, if the "benefits" of a regulation "do not bear a rational relationship to the serious . . . costs imposed" by the regulation, then the regulation is arbitrary and capricious.  *Mexican Gulf*, 60 F.4th at 965.

240.    Even if the Final Rule as a whole passes the requisite cost-benefit analysis, under the plain text of the HSR Act, each piece of "information relevant to [the] proposed

97

acquisition" must be "necessary and appropriate" before the FTC may require it as part of the premerger notification form.

241.    The Final Rule adopts many specific requirements for information and/or documentary material that impose serious costs in return for little if any enforcement benefit.  The Final Rule does not and could not have reasonably concluded otherwise. These requirements include, but are not limited to:  (i) all drafts "shared with any member of the board of directors (or similar body)," 89 Fed. Reg. at 89,303; (ii) certain ordinary-course plans and reports provided to the CEO or board of directors, *id.* at 89,371, 89,376; (iii) detailed information about "existing or potential purchase or supply relationships between the filing persons," *id.* at 89,317; (iv) information relevant to concerns about potential competition, *id.* at 89,230-89,231; (v) information on sales and customers outside the United States, *id.* at 89,316; and (vi) information on officers and directors, *id.* at 89,294.

242.    For these reasons, the Final Rule's addition of new categories of information or documentary material to the premerger notification form that are more costly to compile and submit than they are beneficial to the antitrust agencies and the public (including but not limited to those just identified) is arbitrary and capricious.

243.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Final Rule should be held unlawful and set aside to the extent it requires such information or documentary material.

## COUNT VI
### Administrative Procedure Act
### (Arbitrary and Capricious — Failure to Adequately Explain
### Why Rule Is "Necessary")
### 5 U.S.C. § 706

244.    Plaintiffs repeat and incorporate by reference all the above allegations.

245.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

246.    The HSR Act authorizes the FTC to require that the "premerger notification" mandated by the Act "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. §18a(d)(1).  As relevant here, that language limits the FTC to requiring information that is truly "necessary" to facilitate an initial antitrust screen of the proposed transaction.

247.    To the extent the FTC found that the Rule is "necessary" as required by the HSR Act, that decision "runs counter to the evidence" and is not "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 43, 52.  The Rule offers no hard evidence of any real problem in the form of anticompetitive mergers slipping through the HSR premerger notification process, nor does the Rule give any good reason to think that having the new information and documents it requires will meaningfully improve the antitrust agencies' prevention of such transactions.

248.     Even if the HSR Act did not require the FTC to reasonably conclude that the information and documents the Rule adds to the premerger form are "necessary," the APA imposes the same requirement.   The APA requires an agency to rationally "consider[] the costs and benefits associated with [a proposed] regulation." *Mexican Gulf*, 60 F.4th at 973.  An agency violates that obligation if it adopts a rule imposing significant costs without "adequately substantiat[ing]" that the rule responds to "a genuine problem." *Chamber of Commerce*, 85 F.4th at 777-778.  That perfectly describes what the FTC has done here.

249.     For these reasons, the FTC's adoption of the Final Rule was arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Final Rule should be held unlawful and set aside.

**COUNT VII**
**Administrative Procedure Act**
**(Arbitrary and Capricious — Failure to Adequately Justify**
**Change In Policy)**
5 U.S.C. § 706

250.     Plaintiffs repeat and incorporate by reference all the above allegations.

251.     Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

252.     When an agency changes its position, reasoned decisionmaking requires it to "show that there are good reasons for the new policy" approach.  *Fox*, 556 U.S. at 515. Particularly when departing from a "longstanding polic[y]," the agency must give a

"reasoned explanation . . . for disregarding facts and circumstances that underlay" the prior policy. *Encino Motorcars*, 579 U.S. at 222.

253.    As the Final Rule notes, the premerger notification form prior to the Rule's amendments was "very similar to the original 1978 version in its scope and content." 89 Fed. Reg. at 89,257.  When the FTC has amended the form in the past, such changes have been minor and "frequently reduced the burdens associated with submitting" the form.  *Id*.  Moreover, there was widespread agreement among the antitrust agencies, bar, and business community that the longstanding, stable design of the form effectively facilitated the agencies' initial screen of HSR-reportable transactions.  Objective data backed up that assessment.  The FTC itself repeated it to Congress and in public-facing documents.  This "longstanding policy" struck the overall cost-benefit balance in a far less burdensome way.

254.    The Rule departs from this longstanding approach by expanding the premerger notification form to such an extent that, by the FTC's own dubious estimate, the time necessary to prepare the form will triple for the average filing.  By failing to adequately establish a problem with the current premerger form that is even remotely commensurate, the Rule falls short of offering a "reasoned explanation," *Encino Motorcars*, 579 U.S. at 222, for that significant change in policy direction.

255.    The Rule also does not show that there are good reasons for the FTC to reverse its earlier determination that the agency did "not need[] to rely" on a more limited set of "vendor-vendee" information to effectively screen for the rare transaction that presents vertical-foreclosure concerns.  66 Fed. Reg. at 8,686.

256.    For these reasons, the FTC's adoption of the Final Rule was arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Final Rule should be held unlawful and set aside.

## COUNT VIII
### Administrative Procedure Act
### (Arbitrary and Capricious — Failure to Rationally Analyze
### Less Burdensome Alternatives)
### 5 U.S.C. § 706

257.    Plaintiffs repeat and incorporate by reference all the above allegations.

258.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

259.    Under the APA, "an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Farmers Union*, 734 F.2d at 1511; *see Louisiana* v. *United States Dep't of Energy*, 90 F.4th 461, 476 (5th Cir. 2024) (agency is "required to 'consider the alternatives' that are 'within the ambit of existing policy'") (quoting *DHS* v. *Regents*, 591 U.S. 1, 30 (2020)).

260.    Here, even assuming the FTC adequately demonstrated serious shortcomings with the longstanding version of the premerger form, the Final Rule did not give a "reasoned explanation" for its choice to address those shortcomings by tripling or quadrupling the filing burden on all HSR-reportable transactions, rather than making better and/or increased use of the antitrust agencies' existing, more targeted tools. Among other reasons, the Final Rule's explanations for not increasing or improving the

agencies' use of voluntary access letters, CIDs, and voluntary third-party outreach are irrational on their own terms.   And the Rule's rejection of expanded use of Second Requests unreasonably assumes that the agencies' existing practices cannot change, even as the Rule drastically changes the premerger form itself.

261.   For these reasons, the FTC's adoption of the Final Rule was arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Final Rule should be held unlawful and set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and provide the following relief:

(i)    A declaratory judgment that the Final Rule is in excess of statutory authority, arbitrary, capricious, or otherwise contrary to law either in whole or in part, *see* 5 U.S.C. § 706(2)(A), 28 U.S.C. § 2201;

(ii)    An order setting aside the Final Rule in its entirety or insofar as the Court finds it in excess of statutory authority, arbitrary, capricious, or otherwise contrary to law, *see* 5 U.S.C. § 706(2);

(iii)    An order enjoining the FTC from enforcing the Final Rule or any requirement therein found to be in excess of statutory authority, arbitrary, capricious, or otherwise contrary to law;

(iv)    An order awarding Plaintiffs their reasonable costs, including attorney's fees, incurred in bringing this action; and

(v)    Such other and further relief that this Court deems just and equitable.

Dated:  January 10, 2025


Jordan L. Von Bokern*
Tyler S. Badgley*
Audrey Beck*
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, DC  20062
Tel:  (202) 463-5337
jvonbokern@uschamber.com
tbadgley@uschamber.com
abeck@uschamber.com


*  *Pro hac vice pending*

/s/ *Michael E. Jones*
Michael E. Jones
(Texas Bar No.: 10929400)
Shaun W. Hassett
(Texas Bar No.: 24074372)
POTTER MINTON, PC
102 North College Avenue
Suite 900
Tyler, TX  75702
Tel:  (903) 597-8311
mikejones@potterminton.com
shaunhassett@potterminton.com


Jeffrey B. Wall*
Judson O. Littleton*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, DC  20006
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com


Maxwell F. Gottschall*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000
gottschallm@sullcrom.com


*Counsel for Plaintiffs Chamber of
Commerce of the United States of
America, Business Roundtable,
American Investment Council, and
Longview Chamber of Commerce*

104