**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et
al.*,

                    Plaintiffs,

        v.

FEDERAL TRADE COMMISSION, *et
al.*,

                    Defendants.

Case No. 6:25-cv-00009-JDK

**DEFENDANTS FEDERAL TRADE COMMISSION ET AL.'S MOTION TO
DISMISS AND TRANSFER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ................................................................................ 1

BACKGROUND .................................................................................. 3

I.  Congress Enacted the HSR Act, and Authorized HSR
    Rulemaking, to Allow for Effective Premerger Review. .................. 3

II. The Commission Issued the Rule to Enable Effective
    and Efficient Premerger Review. ...................................... 8

STATEMENT OF ISSUES ................................................................ 11

LEGAL STANDARD .......................................................................... 11

ARGUMENT .................................................................................... 12

I.  Plaintiff Longview Chamber of Commerce Fails to
    Plead Allegations Sufficient to Establish Subject-
    Matter Jurisdiction over Its Claim. ................................. 12

II. Because Plaintiff Longview Chamber of Commerce
    Lacks Standing, Venue Is Improper. ............................... 23

CONCLUSION ................................................................................ 28

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner,*
   387 U.S. 136 (1967)...............................................................23

*Am. Newspaper Publishers Ass'ns v. U.S. Postal*
   *Serv.,*
   789 F.2d 1090 (5th Cir. 1986)...............................................25

*Associated Gen. Contractors v. Fed. Acquisition*
   *Regul. Council,*
   720 F. Supp. 3d 461 (W.D. La. 2024) ..................................25

*Blacklands R.R. v. Ne. Tex. Rural Rail Transp.*
   *Dist.,*
   No. 1:19-cv-250, 2019 WL 3613071 (E.D. Tex.
   Aug. 5, 2019).........................................................................11

*Brown Shoe Co. v. United* States,
   370 U.S. 294................................................................... 3, 4

*Career Colleges & Sch. of Tex. v. U.S. Dep't of*
   *Educ.,*
   No. 4:23-CV-0206-P, 2023 WL 2975164 (N.D.
   Tex. Apr. 17, 2023)...............................................................25

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)...........................................12, 15, 17, 18

*Cornerstone Christian Sch. v. Univ.*
   *Interscholastic League,*
   563 F.3d 127 (5th Cir. 2009) ...............................................11

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006)...............................................................11

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024)........................................................17, 21

*Fla. Audubon Soc. v. Bentsen,*
   94 F.3d 658 (D.C. Cir. 1996) ...............................................18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.,*
   528 U.S. 167 (2000)...............................................................12

*Ga. Republican Party v. SEC,*
    888 F.3d 1198 (11th Cir. 2018) ............................................................. 25

*Gulf Oil Corp. v. Gilbert,*
    330 U.S. 501 (1947) ............................................................................. 28

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ............................................................ 13, 16, 19, 20

*Immigrant Assistance Project v. INS,*
    306 F.3d 842 (9th Cir. 2002) ............................................................... 25

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................... 12, 16, 17

*Miller v. Albright,*
    523 U.S. 420 (1998) ............................................................................. 13

*Missouri v. U.S. Dep't of Educ.,*
    No. 24-cv-103, 2024 WL 4374124 (S.D. Ga. Oct.
    2, 2024) ........................................................................................ 13, 26

*Nat'l Infusion Ctr. Ass'n v. Becerra,*
    116 F.4th 488 (5th Cir. 2024) ............................................................. 16

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ............................................................................. 22

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw,*
    719 F.3d 338 (5th Cir. 2013) ............................................................... 26

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ............................................................................. 23

*Plains Com. Bank v. Long Fam. Land & Cattle
    Co.,*
    554 U.S. 316 (2008) ............................................................................. 20

*Reuben H. Donnelley Corp. v. FTC,*
    580 F.2d 264 (7th Cir. 1978) ............................................................... 24

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ............................................................................. 12

*St. Joseph Abbey v. Castille,*
    700 F.3d 154 (5th Cir. 2012) ............................................................... 26

*Students for Fair Admissions, Inc. v. President &*
    *Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ................................................................ 12

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................... 14, 15, 16

*Tenth St. Residential Ass'n v. City of Dallas,*
    *Texas,*
    968 F.3d 492 (5th Cir. 2020) ................................................. 12

*United Food & Com. Workers Union Loc. 751 v.*
    *Brown Grp., Inc.,*
    517 U.S. 544 (1996) ................................................................ 28

## STATUTES

11 U.S.C. § 363 .......................................................................... 5

15 U.S.C. § 1 .............................................................................. 4

15 U.S.C. § 15a .......................................................................... 4

15 U.S.C. § 18 ............................................................................ 4

15 U.S.C. § 18a ....................................................... 5, 6, 7, 9, 21

15 U.S.C. § 18b .......................................................................... 9

15 U.S.C. § 21 ............................................................................ 4

15 U.S.C. § 41 ............................................................................ 4

15 U.S.C. §2 .............................................................................. 4

28 U.S.C. § 1391 ........................................................... 23, 24, 26

28 U.S.C. § 1404 ............................................................... 26, 28

28 U.S.C. § 1406 ...................................................................... 11

## OTHER AUTHORITIES

16 C.F.R. Part 801 (1978) ........................................................ 7

16 C.F.R. Part 802 (1978) ............................................... 6, 7, 21

16 C.F.R. Part 803 (1978) .................................................................. 7

Fed. R. Civ. P. 12 ...................................................................... 11, 26

Fed. R. Civ. P. 17 .......................................................................... 22

Fed. R. Civ. P. 23 .......................................................................... 21

Premerger Notification; Reporting and Waiting
Period Requirements,
88 Fed. Reg. 42,178 (June 29, 2023) ...................................... 8

Premerger Notification; Reporting and Waiting
Period Requirements,
89 Fed. Reg. 89,216 (Nov. 12, 2024)...................... 2, 4, 6, 7, 8, 9, 17, 19

Revised Jurisdictional Thresholds for Section 7A
of the Clayton Act,
90 Fed. Reg. 7,697 (Jan. 22, 2025) ........................................ 5

## OTHER AUTHORITIES

122 Cong. Rec. 25051 (1976).................................................... 4

14D Charles Alan Wright & Arthur R. Miller,
Federal Practice & Procedure § 3815 (4th ed.)................... 25

*Early Termination Notices*,
Federal Trade Commission (May 22, 2025),
https://www.ftc.gov/legal-library/browse/early-
termination-notices.................................................. 9

*Frequently Asked Questions*,
Longview Chamber of Commerce (May 23,
2025), https://tinyurl.com/ms7tys8c................................ 28

H.R. Rep. 94-1373 (1976)........................................................ 4, 5

Michael T. Morley & F. Andrew Hessick, *Against
Associational Standing*,
91 U. Chi. L. Rev. 1539, 1583 (2024)............................... 22

*To File or Not to File*,
    Federal Trade Commission (Sept. 2008),
    https://www.ftc.gov/sites/default/files/attachme
    nts/premerger-introductory-guides/guide2.pdf....................................21

## INTRODUCTION

The Hart-Scott-Rodino Act (HSR Act) requires parties to very large merger and acquisition (M&A) transactions to notify the Federal Trade Commission and the Department of Justice, Antitrust Division (collectively, the antitrust agencies) of the proposed transaction before consummation. The HSR Act gives the antitrust agencies a short period (typically 30 days) to review information from the parties and identify those transactions that require a closer look to determine whether they may violate U.S. antitrust laws. If the agencies believe a proposed transaction may be anticompetitive, they can launch a more extensive investigation to determine whether to seek an injunction to remedy or prevent the transaction before consummation and the resulting harm to consumers and competition. The agencies rely on information in the initial notification, known as the HSR Form (or just "the Form"), to conduct this initial, premerger antitrust risk assessment and to identify transactions that require additional investigation.

By design, mandatory premerger review affects only a small subset of M&A transactions, and only a fraction of businesses in the United States even engage in any M&A activity at all in any given year. The statute also has numerous exemptions. As a result, fewer than 200 transactions are reported each month on average.

In October 2024, all five FTC Commissioners, Democrats and Republicans, unanimously voted to amend and reorganize the nearly 50-year-old HSR Form to ensure that the antitrust agencies can effectively and efficiently detect illegal M&A transactions in light of changes in the economy that have affected their premerger review. *See* Premerger Notification; Reporting and Waiting Period Requirements, 89

Fed. Reg. 89,216, 89,216-17 (Nov. 12, 2024) ("the Rule"). The Rule updates the HSR Form and draws on the antitrust agencies' four decades of "experience implementing HSR," which "has taught the Commission which information is most important to fulfilling Congress's mandate to conduct premerger review." *Id.* at 89,408 (Concurring Statement of Commissioner Andrew N. Ferguson) ("Ferguson Concurrence").

The Rule responds both to changes in corporate structure and dealmaking, and to new market realities that "were rare in 1978" and have changed the way businesses compete. *Id.* These profound changes had created gaps between the information collected on the prior form and the "information [the antitrust agencies] need[] to fulfill Congress's intention" of determining whether proposed transactions, if consummated, may violate the antitrust laws. *Id.* The Rule "achieves the benefits associated with mandatory premerger review with an overall burden that is reasonable and consistent with the legislative purpose of the HSR Act." *Id.* at 89,218 (Statement of Basis and Purpose); *see also id.* at 89,414 (Ferguson Concurrence) (concluding that the Rule's "benefits are many, and, by comparison, the added burdens are reasonable"). The Rule was published in November 2024 and went into effect in February 2025. Hundreds of parties have already submitted the updated forms for their proposed transactions, and the antitrust agencies are using those submissions to conduct the statutorily required premerger review.

Plaintiffs—one local chamber of commerce and several national organizations (the U.S. Chamber of Commerce and trade associations representing CEOs and the private equity industry)—claim that the Rule violates the Administrative Procedure

Act (APA). But before the case can proceed to the merits, the Court must first verify its subject-matter jurisdiction and determine whether venue is proper in this District. Nearly all plaintiffs reside in Washington, D.C., as do all defendants. Plaintiffs' sole basis for suing in the Eastern District of Texas, Tyler Division, is that Plaintiff Longview Chamber of Commerce resides here. But Longview Chamber does not have standing, as it has not adequately pleaded that any member has certainly impending—that is, non-speculative—plans to be one of the small fraction of companies nationwide to file an HSR form. This Court therefore lacks subject-matter jurisdiction over Longview Chamber's claims. And without Longview Chamber, venue is improper. Indeed, even with Longview Chamber, venue would be improper because Plaintiffs have not identified any Longview Chamber member who has allegedly suffered an Article III injury and resides in the Eastern District of Texas, Tyler Division. Thus, the Court should transfer this case to the U.S. District Court for the District of Columbia or, in the alternative, dismiss the case.

## BACKGROUND

I.  **Congress Enacted the HSR Act, and Authorized HSR Rulemaking, to Allow for Effective Premerger Review of the Most Significant Transactions.**

The HSR Act, and the rules that implement it, reflect the deliberate judgment of Congress that more rigorous and effective antitrust review was necessary following decades of difficulties preventing monopolies and consolidated corporate power.

Concerned with "the rising tide of economic concentration," *Brown Shoe Co. v. United* States, 370 U.S. 294, 317, Congress passed the Clayton Act in 1914 to prohibit "acquisition[s]" whose "effect … may be substantially to lessen competition, or tend

to create a monopoly." 15 U.S.C. § 18. The purpose of that Act was to "curb[]" anticompetitive mergers "in their incipiency." *Brown Shoe*, 370 U.S. at 317. Congress "intended to halt monopolies and restraints of trade in their initial stages, before they ripen into full-scale Sherman Act violations." H.R. Rep. 94-1373, at 5 (1976); *see* 15 U.S.C. §§ 1, 2. And just before passing the Clayton Act, Congress also passed the FTC Act, which created the Commission as an expert body that would prevent unfair methods of competition, study industries and business practices, and help enforce the antitrust laws. *See* 15 U.S.C. § 41 *et seq.* Today, both the Department of Justice's Antitrust Division and the FTC may sue to enforce the Clayton Act and prevent anticompetitive mergers. *See* 15 U.S.C. § 15a (DOJ), § 21 (FTC).

Enforcement of the Clayton Act proved difficult, however, and the antitrust agencies were rarely able to block illegal mergers before they were consummated. Post-consummation enforcement was both lengthy and costly, and it was often ineffective at restoring competition because unwinding a merger post-consummation—after assets have been comingled, confidential business information has been shared, and personnel have been integrated—was "like trying to unscramble an omelet." 89 Fed. Reg. at 89,237 (citing 122 Cong. Rec. 25051 (1976)). As a congressional commission later explained, post-consummation enforcement "could neither fully compensate society for the interim loss of competition, nor fully restore a competitive market structure, particularly if the companies had already integrated their productive assets." *Id.* at 89,238 (quoting Antitrust Modernization Comm'n, Rep. & Recommendations 155 & n.21 (2007), https://perma.cc/MH2Z-AS93).

To address this recurring problem, Congress passed the HSR Act in 1976. The goal of the Act is to give the antitrust agencies "a fair and reasonable opportunity to detect and investigate large mergers of questionable legality before they are consummated." H.R. Rep. 94-1373, at 5. To achieve that outcome, the HSR Act prevents certain transactions from closing unless the parties first notify the antitrust agencies of the transaction and, generally, wait at least 30 days.[1] 15 U.S.C. § 18a(a). This premerger notification requirement allows the antitrust agencies to investigate and "determine whether such acquisition may, if consummated, violate the antitrust laws," and to file actions to stop anticompetitive transactions before they occur. *Id.* § 18a(d)(1).

The Act's notification requirement applies only to the largest parties and transactions. In general, the requirement applies only if, in 2025: (1) the transaction is valued at $126.4 million or more, and (2) one party has sales or assets of $252.9 million or more, while the other party has sales or assets of $25.3 million or more. *See* 15 U.S.C. § 18a(a); *see also* Revised Jurisdictional Thresholds for Section 7A of the Clayton Act, 90 Fed. Reg. 7,697 (Jan. 22, 2025) (setting 2025 thresholds).[2] The Act

---

[1] The waiting period is 15 days for cash tender offers and certain bankruptcies. *See* 15 U.S.C. § 18a(a); 11 U.S.C. § 363(b)(2). In some cases, the agencies may terminate their review early and allow the parties to close before the statutory waiting period expires. 15 U.S.C. § 18a(b)(2).

[2] Transactions valued at more than $505.8 million are also reportable, absent an exemption, regardless of the size of the parties. 15 U.S.C. § 18a(a)(2); *see also* 90 Fed. Reg. 7,697. The size-of-transaction and size-of-party thresholds are adjusted annually based on changes in gross national product. 15 U.S.C. § 18a(a). The numbers above are for 2025.

also exempts twelve different categories of transactions from the notification requirement altogether, regardless of size. 15 U.S.C. § 18a(c); *see also* 16 C.F.R. Part 802 (1978) (implementing the statutory exemptions). Because of these statutory limitations on the notification requirement, typically fewer than 20% of M&A transactions that occur each year are reported under the HSR Act. 89 Fed. Reg. at 89,219.

## II.    The Antitrust Agencies Have Carried Out Congress's Mandate to Implement the HSR Act Via Rulemaking.

Congress required the antitrust agencies to conduct this premerger review, and the statute grants the agencies considerable discretion to determine the information they need to conduct their premerger review. The HSR Act provides that the FTC, with concurrence from DOJ's Antitrust Division, "shall require" by rule that the premerger filing notification "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate … to determine whether such acquisition, if consummated, may violate the antitrust laws." 15 U.S.C. § 18a(d)(1). Congress also authorized the antitrust agencies to "define the terms used in [the HSR Act]" and "prescribe such other rules as may be necessary and appropriate to carry out the purposes of [the Act]." *Id.* § 18a(d)(2).

Congress directed the antitrust agencies to create, by a rule, a form fit for the critical task of mandatory premerger view. 15 U.S.C. § 18a(d). The Form is a vital piece to Congress's regulatory scheme because the agencies must decide whether to investigate problematic transactions in tight timeframes of 15-30 days. The agencies

rely on the information in the Form to screen reportable transactions and identify those that might violate the antitrust laws, in light of the need to efficiently allocate their limited investigative resources.

The FTC promulgated the first set of HSR regulations in 1978. *See* 16 C.F.R. Parts 801-803 (1978); 89 Fed. Reg. at 89,249 n.248. From the beginning, the antitrust agencies have required parties to use a form that contains certain information and documentary material necessary and appropriate for the agencies to conduct their preliminary antitrust assessment. *Id.* The Commission has adjusted the Form over the years via rulemaking, but the Form has not seen an overhaul in the nearly five decades since its inception. 89 Fed. Reg. at 89,217; *see also id.* at 89,408 (Ferguson Concurrence) ("The current HSR instructions did not always ensure that the [antitrust agencies] had the information they needed to fulfill Congress's intention."). For this most recent update that is now at issue in this case, therefore, the agencies conducted a comprehensive review of the premerger notification process to address the cumulative effects of market changes in the decades since the Form's inception. *Id.*

Before the most recent updates, the limited information in the outdated Form often proved inadequate and forced the agencies to seek additional information from the merging firms—including by issuing "Second Requests"—or from third parties unconnected to the transaction. *See* 15 U.S.C. § 18a(e); 89 Fed. Reg. at 89,244. The in-depth Second Request process, which can involve millions of documents and terabytes of data, is thus a time-consuming and resource-intensive process for both

the agencies and the parties to the transaction, and the associated investigation imposes costs on third parties. *See, e.g.*, 89 Fed. Reg. at 89,244, 89,246.

## III. The Commission Issued the Rule to Enable Effective and Efficient Premerger Review.

To ensure that the antitrust agencies "have access to documents that reflect pre-transaction assessments of business realities," the FTC in 2023 issued a notice of proposed rulemaking to update the HSR Form. Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42,178, 42,194 (June 29, 2023) (proposed rule). During the 3-month comment period, the Commission received 721 comments; most supported the proposed rule and the effort to collect more information in the HSR Form to help prevent harmful mergers. 89 Fed. Reg. at 89,217. Others opposed certain aspects of the proposed rule. *Id.*

After careful consideration of the comments, the Commission issued the Rule in November 2024 following a unanimous, bipartisan vote. *See* 89 Fed. Reg. at 89,216. The Rule is substantially narrower than the proposed rule. *See* 89 Fed. Reg. at 89,412-14 (Ferguson Concurrence) (explaining the many differences between the proposed rule and the Rule). As then-Commissioner and now Chairman Ferguson explained, the Rule "dramatically curtail[ed]" the proposed rule in part because of the arrival of Commissioners Ferguson and Holyoak. 89 Fed. Reg. at 89,412. The Rule makes several commonsense updates to the HSR Form so that the antitrust agencies can better carry out their statutory duty of determining whether reported transactions, "if consummated," may "violate antitrust laws," within the HSR Act's short

8

timeframes. 15 U.S.C. § 18a(d)(1); *see* 89 Fed. Reg. at 89,399, 89,408.[3] The antitrust agencies determined, in light of the comments received, that the modest reforms reflected in the Rule were necessary and appropriate—and also sufficient—to enable the agencies to detect transactions that may violate the law and to identify potentially unlawful transactions more quickly and with greater accuracy. *Id.* at 89,217. This greater efficacy will also narrow the scope of the agencies' investigations in some cases; in others, it will avoid the need to initiate a more burdensome investigation with Second Requests. *Id.*

The Rule was posted on the FTC's website in October 2024[4] and was published in the Federal Register on November 12, 2024. The Rule went into effect on February 10, 2025. 89 Fed. Reg. at 89,216. Already, hundreds of parties have submitted the updated Form and many of these reported deals have already been consummated after the statutory waiting periods. Other deals have been granted early termination of the waiting period—one source of efficiencies the Rule has generated. *See Early Termination Notices*, Federal Trade Commission (May 22, 2025), https://www.ftc.gov/legal-library/browse/early-termination-notices (listing more than 40 transactions granted early termination since the Rule's promulgation); *see also* 89 Fed. Reg. at 89,400 (Holyoak Concurrence) ("One of the virtues of the Final Rule is

---

[3] The Rule also implements the 2022 Merger Fee Modernization Act, which requires HSR filers to report any subsidy from a "foreign entity of concern." 15 U.S.C. § 18b.

[4] FTC Finalizes Changes to Premerger Notification Form (Oct. 10, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/10/ftc-finalizes-changes-premerger-notification-form.

that certain provisions will allow staff to more quickly identify which mergers should receive early termination, a significant benefit to both staff and merging parties."); *see also* 89 Fed. Reg. at 89221 n.22, 89412 (Ferguson Concurrence) (explaining that early termination was paused in 2020 and resumed following the finalized updated Rule).

Plaintiffs filed this lawsuit challenging the Rule on January 10, 2025. Compl., Dkt. 1. The Complaint alleged that the Rule violates the Administrative Procedure Act, primarily on the theory that the Rule's costs outweigh its benefits. Plaintiffs seek to set aside and enjoin the updated Form. *Id.* at 103 (Prayer for Relief).

The Commission moved to transfer or dismiss the case on April 10, 2025. Dkt. 23. As the Commission explained, Plaintiffs' sole basis for bringing suit in the Eastern District of Texas, Tyler Division is that one of the plaintiffs—the Longview Chamber of Commerce—is located here. *Id.* at 20. But Longview Chamber failed to plead that any member faced an imminent, certainly impending injury because of the Rule as is necessary to establish standing under Article III. Absent a member with standing, Longview Chamber lacked associational standing. *Id.* at 12-14. And absent Longview Chamber, there was no basis for venue in this Court, and the case belonged in the District Court for the District of Columbia, where the remaining plaintiffs and the defendants all reside.

Rather than opposing the motion to transfer or dismiss, Plaintiffs filed an amended complaint that added limited information about five unidentified Longview Chamber members. *See* Dkt. 27 at 11 (¶ 23). Plaintiffs also added short, vague

allegations about their memberships' general interest in this case. *Id.* at 15 (¶ 34). This motion followed.

## STATEMENT OF ISSUES

1) Whether Longview Chamber has adequately pleaded associational standing.

2) Whether this Court should transfer this case to the U.S. District Court for the District of Columbia, or dismiss.

## LEGAL STANDARD

Defendants move to dismiss Longview Chamber and then transfer this case to a proper venue or dismiss for lack of venue. Fed. R. Civ. P. 12(b)(1), (3). "When an objection to venue is raised, the plaintiff bears the burden of demonstrating that venue is proper in the selected forum." *Blacklands R.R. v. Ne. Tex. Rural Rail Transp. Dist.*, No. 1:19-cv-250, 2019 WL 3613071, at *2 (E.D. Tex. Aug. 5, 2019) (cleaned up). If the district court concludes that venue is improper, it can either dismiss the case under Rule 12(b)(3) or, in the interest of justice, transfer the case to a district where venue is proper. 28 U.S.C. § 1406(a).

Similarly, it is "presume[d] that federal courts lack jurisdiction," and therefore plaintiffs "carry the burden of establishing" jurisdiction, including the elements of Article III standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 & n.3 (2006). "[O]n a motion to dismiss, plaintiffs must allege facts that give rise to a plausible claim of [their] standing." *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009).

11

## ARGUMENT

I. **Plaintiff Longview Chamber of Commerce Fails to Plead Allegations Sufficient to Establish Subject-Matter Jurisdiction.**

As with any other claim, a plaintiff bringing an APA challenge to an agency rulemaking must demonstrate that it has Article III standing and that its claim is ripe. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180 (2000). To establish an "imminent" injury, a plaintiff must establish that the injury is "*certainly* impending" and thus "not too speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Organizations may demonstrate standing "in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted). The former is often referred to as "organizational standing" and the latter as "associational standing." *See Tenth St. Residential Ass'n v. City of Dallas, Texas*, 968 F.3d 492, 500 (5th Cir. 2020). This case concerns associational standing, which requires an organization to demonstrate that "(a) its members would otherwise

have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Longview Chamber's claim fails each of the three *Hunt* prongs for associational standing, creates tension with other areas of law, and is unripe. Assessing Longview Chamber's standing at this early juncture is critical because its claim is the only basis for venue in this Court. If Longview Chamber lacks standing, then this Court "cannot provide the proper venue for suit because a plaintiff that lacks standing cannot create venue where it would not otherwise exist." *Missouri v. U.S. Dep't of Educ.*, No. 24-cv-103, 2024 WL 4374124, at *4 (S.D. Ga. Oct. 2, 2024); *see also Miller v. Albright*, 523 U.S. 420, 427 (1998) (explaining that lawsuit against federal government was transferred from the Eastern District of Texas to Washington, D.C. "[b]ecause venue in Texas was … improper" after dismissal for lack of standing of sole Texas-based plaintiff).[5]

**1.** Here, Longview Chamber asserts only associational standing, i.e., standing to sue as representative of its members. Am. Compl. at 15 (¶ 33). But among other failings, Longview Chamber has not identified a member with standing. *See Hunt*, 432 U.S. at 343.

An association must "make specific allegations establishing that at least

---

[5] Defendants focus here on only Longview Chamber's standing because it is the sole basis for Plaintiffs to assert venue in this Court. The remaining plaintiffs will be required to demonstrate their standing in an appropriate venue.

one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Mere likelihood of future injury is not enough. "Th[e] requirement of naming the affected members has never been dispensed with in light of statistical probabilities" that an association has members who might be injured, except "where *all* the members of the organization are affected by the challenged activity." *Id.* at 498-99. Longview Chamber does not contend (nor could it) that *all* its members will imminently file the new HSR Form. Thus, for Longview Chamber to represent its members here, it must plead that it has at least one member engaged in an actual or "certainly impending" transaction subject to HSR notification.

Despite amending its complaint, Longview Chamber fails to make the necessary showing. Plaintiffs allege that Longview Chamber "represents over 1,000 businesses and professional organizations," including some unidentified "members" who it says engage in frequent M&A activity and "regularly" enter into transactions that meet the HSR size thresholds. *See* Am. Compl. at 10-11 (¶¶ 21-22). Longview Chamber also pseudonymously identifies five members and offers a brief description of each. *Id.* at 11 (¶ 23). Critically, however, Longview Chamber does not allege that any of these five members is presently engaged in an HSR-reportable transaction. Instead, Longview Chamber relies on vague and generalized allegations, such as two members that have "engaged in multiple HSR-reportable transactions over the past ten years," *id.* (Member A and Member C), or two other members that "regularly" engage in HSR-reportable transactions "as part of [their] business model." *Id.* at 11-12 (¶ 23) (Members B and D). Some of these members "plan[]" to engage in similar

14

transactions at some point "this year and in future years." *Id.* at 11 (¶ 23). Longview Chamber also points to a final member that "provides lending and other services in connection with HSR-reportable transactions and plans to continue" doing so. *Id.* at 12 (¶ 23) (Member E). That member "expects that the Rule will affect its business by deterring M&A activity that would have otherwise taken place." *Id.*

These allegations are insufficient to demonstrate an Article III injury. Longview Chamber is, apparently, unable to plead that any member is presently engaged in an HSR-reportable transaction such that the Rule actually applies to that member and requires that member to comply with any regulatory requirement. Instead, Longview Chamber embraces the "statistical probability" theory of standing, which the Supreme Court has rejected because it would "make a mockery" of cases requiring that an "organization" make "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 497-98. That some Longview Chamber members have sometimes—over ten years—engaged in conduct subject to the Rule does not establish an Article III injury, nor is it sufficient that some members "regularly engage" in that conduct and "plan[]" to do so again. Am. Compl. at 11 (¶ 23). Plaintiffs cannot satisfy Article III's injury requirement with allegations that "relate[] to past injury rather than imminent future injury." *Summers*, 555 U.S. at 495. Nor can they ask the Court to assume that they will engage in this conduct again just because they identify vague plans. *Id.* at 497-98; *Clapper*, 568 U.S. at 401 (holding that plaintiffs cannot rely on "an objectively reasonable likelihood" that their conduct will be regulated "at some point in the

future"). That assumption is especially improper in this case, where Plaintiffs have no way to predict whether any future transactions will be HSR-reportable. Recall that these filings are rare events because of the HSR Act's high thresholds and many exemptions. *Supra* 5-6. That a few acquisitions in the past ten years have triggered the statute and regulatory requirements is no guarantee that the next acquisition will too.

The Supreme Court has squarely rejected the idea that a party can demonstrate imminence based on "an intent, some day" to engage in conduct that would cause their injury. *Lujan,* 504 U.S. at 564 n.2; *see also id.* (no standing where plaintiff "allege[d] only an injury at some indefinite future time"). The Court likewise has held that past conduct—even accompanied by an expressed "intent" to engage in that conduct again—"is simply not enough" to demonstrate injury. *Id.* at 564. What is required instead is a "description of concrete plans, or indeed even any specification of *when* the some day will be." *Id.* Longview Chamber pleads neither. Because it has failed to plead that any member will be imminently subject to the Rule's requirements, Longview Chamber lacks standing. *Hunt*, 432 U.S. at 343.[6]

Moreover, the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact and that allegations of

---

[6] The Fifth Circuit recently held that associational plaintiffs must allege only "that a specific member exists," and not necessarily name that member. *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024). Defendants preserve the argument that *National Infusion Center* is wrongly decided because the Supreme Court has plainly "require[d]" plaintiffs to "nam[e] the affected members" absent an exception not relevant here. *Summers*, 555 U.S. at 498. Plaintiffs have not done so.

*possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (cleaned up) (emphasis in original). Allegations about "an injury at some indefinite future time" do not satisfy Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992). Instead, courts must "insist[] that the injury proceed with a high degree of immediacy." *Id*. Thus, it is not enough that that two members "plan[] to engage in at least one HSR-reportable transaction in the foreseeable future." Am. Compl. 11-12 (¶ 23). To demonstrate standing, Longview Chamber must plead that one of its members will certainly and imminently enter into an HSR-reportable transaction. *Clapper*, 568 U.S. at 409.

Longview Chamber apparently cannot satisfy this clear jurisdictional requirement despite amending the complaint following the Commission's motion to dismiss the Longview Chamber for this exact reason. The Rule has been effective since February 10, 2025, *see* 89 Fed. Reg. 89216, and hundreds of parties have already filed the new Form—but apparently no members of the Longview Chamber. Longview Chamber cannot hide behind vague allegations about the "foreseeable future" rather than concrete allegations about certain, imminent transactions. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must have already occurred or be likely to soon."); *see also Faculty, Alumni, & Students Opposed to Racial Preferences v. N.Y.U.*, 11 F.4th 68, 76 (2d Cir. 2021) (faulting associational plaintiff for failing to explain "when" its members planned to engage in conduct that would lead to injury).

Allegations about "Member E" of Longview Chamber suffer from these same

17

flaws and more. *See* Am. Compl. at 11-12 (¶ 23). That member, in addition to its vague plans to engage in HSR-reportable transactions in the future, also alleges that it provides "lending and other services in connection with HSR-reportable transactions and plans to continue to do so." *Id*. Member E asserts, without any supporting factual allegations, that the Rule "will affect its business by deterring M&A activity that would have otherwise taken place." *Id*. These allegations depend on the actions of third parties and are too speculative to satisfy the causation and traceability elements of standing.

The causation "requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383; *see also Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) ("[W]e routinely refuse to permit such predictive assumptions to establish standing."). And an injury must be traceable to the defendants' conduct. Here, Longview Chamber's speculative theory, based on unfounded assumptions about the likely behavior of third parties, fails to demonstrate that any future reduction in future M&A activity would be due to the changes in the Form. *Cf. Clapper*, 568 U.S. at 410-414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").

Longview Chamber provides no basis for Member E's self-serving assumption that parties will suddenly be less likely to enter into transactions that, by definition, are worth over $100 million dollars merely because they now must fill out a more

substantive notification form.[7] In any event, Longview Chamber does not allege that Member E's business has already suffered any effects from the Rule or that it is imminently about to do so. The additional allegations about Member E therefore do not cure the complaint's shortcomings.

**2.** The amended complaint also fails to satisfy the second and third prongs of *Hunt*. Associational standing requires a showing that the interests at stake in the litigation align with the group's purpose, and that the litigation does not require participation of individual members. Longview Chamber shows neither here.

Longview Chamber has not shown that "the interests" it "seeks to protect" through this litigation "are germane to the organization's purpose." *Hunt*, 432 U.S. at 343. The amended complaint says that "[e]ach Plaintiff is committed to protecting the interests of its members, as well as of the broader business community in this district and across the Nation." Am. Compl. at 15 (¶ 34). But the "broader business community" has varied interests. Plaintiffs have also added an allegation that "[e]ach Plaintiff has extensively consulted with its members to confirm that this suit furthers those members' interests." Am. Compl. at 15 (¶ 33). But the amended complaint does not explain how many members were consulted, and it represents only that "this suit furthers" the "interests" of the members with whom Plaintiffs consulted. *Id*. That

---

[7] Indeed, parties may become *likelier* to enter into such transactions because the Rule provides the antitrust agencies with the information necessary to quickly determine whether the transaction is one that requires a closer look. 89 Fed. Reg. at 89217. As explained above, *supra* 7-8, that process is time-consuming and costly. The new Form also gave the Commission confidence to reinstate the early termination process, *see supra* 9-10, which also incentivizes dealmaking.

deficiency is particularly problematic in this case because some members of the business community, including members of Longview Chamber, may *oppose* this litigation. Already hundreds of parties to proposed transactions have spent the time and resources necessary to prepare the new Form and seek clearance by the antitrust agencies, and hundreds more are likely actively preparing the Form and hoping to secure clearance for a planned transaction. Some of these parties would likely prefer that the Rule remains in place given the time and resources they have spent to comply with it. They also may prefer the higher likelihood of a quick evaluation of their proposed transaction. And third parties who deal with merging companies would also likely prefer efficient and effective antitrust review of proposed acquisitions. Litigation that runs contrary to the likely interests of members of the Longview Chamber and the broader community it purports to represent cannot possibly be "germane to [Longview Chamber's] purpose." *Hunt*, 432 U.S. at 343.

Longview Chamber also fails to plead associational standing because both "the claim asserted" and the "relief requested require[] the participation of individual members." *Id*. The claim asserted requires individual participation because, as explained above (at 5-6), the Rule applies to a small set of transactions involving only those businesses engaged in an HSR reportable transaction, and it has many exemptions. The Court cannot satisfy its "independent obligation to assure [itself] of [its] jurisdiction," without knowing details about individual members and their proposed transactions. *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 324 (2008). Nor can Defendants probe the interests at stake for these individual

members or whether relief could or would be available to them without more information about their identity and their proposed transactions. As just one example, whether an HSR filing is necessary depends on the size of the proposed transaction and, in some cases, the size of the parties (i.e., of each "person" proposing the transaction). *See* 15 U.S.C. § 18a(a)(2)(B). The size of the person, in turn, is a fact-dependent inquiry. *See To File or Not to File*, Federal Trade Commission at 4-15 (Sept. 2008), https://www.ftc.gov/sites/default/files/attachments/premerger-introductory-guides/guide2.pdf. And of course, the statutory exemptions require knowledge of the specific details of a proposed transaction and the parties involved. *See* 15 U.S.C. § 18a(c); 16 C.F.R. Part 802. In short, participation of an individual member is necessary for the Court and Defendants to ensure that the litigants are even subject to the Rule.

**3.** Beyond its failure to satisfy the *Hunt* factors, Longview Chamber's claim also creates "tension" with "other areas of law." *All. for Hippocratic Med.*, 602 U.S. at 402 (Thomas, J., concurring). Like many assertions of associational standing, Longview Chamber is trying to "subvert[] the class-action mechanism." *Id.* Longview Chamber says that it "represents … over 1,000 businesses and professional organizations," Compl. ¶ 18, and it seemingly seeks relief on behalf of all of them without making any effort to show numerosity, commonality, typicality, or adequacy of representation. *See* Fed. R. Civ. P. 23(a).

Longview Chamber's inability to identify any member with a certain and imminent HSR-reportable transaction is also inconsistent with Rule 17's real-party-

in-interest requirement. *See* Fed. R. Civ. P. 17; *see also* Michael T. Morley & F. Andrew Hessick, *Against Associational Standing*, 91 U. Chi. L. Rev. 1539, 1583 (2024). Rule 17 provides that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). Yet here, Longview Chamber does not allege that it plans to engage in any HSR-eligible transactions. Nor does Longview Chamber identify any members with certain and imminent transactions. There are thus insufficient allegations that there is any real party in interest. *See* Morley & Hessick, *supra*, 91 U. Chi. L. Rev. at 1583.

4. Longview Chamber's claim is unripe for many of the same reasons that Longview Chamber lacks standing. The Supreme Court has explained that "[a]bsent a statutory provision providing for immediate judicial review"—which does not exist here—"a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review … until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The Rule is not within "[t]he major exception" to this principle because it is not "a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately." *Id.* (internal quotation omitted). Unlike a typical regulation that requires regulated entities to immediately take some affirmative step to comply (*e.g.*, start making required disclosures, stop using a certain ingredient, etc.), the HSR Rule does not impose any immediate obligations or require businesses generally to

change any ongoing commercial practice. To trigger the Rule's requirements, M&A parties must be engaged in an uncommonly large M&A transaction that is not within the HSR Act's many exemptions. Here, Longview Chamber does not allege that any of its members are presently involved in such a transaction, or that any member currently or imminently must fill out the new Form. In short, the Rule's "effects" have not yet been "felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-149 (1967)). Once a Longview Chamber member is actually engaged in an HSR-reportable transaction, that member will have a ripe APA claim. Until then, Longview Chamber's speculative challenge is not ripe.

## II.    Venue in This District Is Improper.

Plaintiffs rely solely on Longview Chamber to establish venue in this district; all other plaintiffs are in Washington, D.C., as are the Defendants. Thus, because Longview Chamber lacks standing, the Court should either transfer this case to the U.S. District Court for the District of Columbia or dismiss. In fact, the Court should transfer this case there even if Longview Chamber could demonstrate standing because the amended complaint does not allege that any of the members on whose behalf Longview Chamber is asserting standing are located in this District.

**1.** Where a plaintiff sues an officer or agency of the United States, venue is proper "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1).

A plaintiff corporation or association resides in the district where it "maintains its principal place of business." 28 U.S.C. § 1391(c)(2).

Plaintiffs claim venue in the Eastern District of Texas based solely on Longview Chamber's principal place of business in Longview, Texas. *See* Compl. ¶ 18, ¶ 31. All the other Plaintiffs appear to reside in Washington, D.C. The U.S. Chamber and Business Roundtable are headquartered there. Am. Compl. ¶¶ 14, 17. The amended complaint does not state where AIC is headquartered, but AIC's website lists a Washington, D.C. address. AIC, https://www.investmentcouncil.org/ (last visited Feb. 27, 2025). Defendants FTC and the Chairman of the FTC also reside in D.C. Am. Compl. ¶¶ 30-31; *see Reuben H. Donnelley Corp. v. FTC*, 580 F.2d 264, 266-67 & n.3 (7th Cir. 1978) (holding that the FTC's residence is in Washington, D.C., where it performs its official duties).

The amended complaint's allegations about the other plaintiffs' connections to Texas do not demonstrate that those plaintiffs *reside* in the Eastern District of Texas. These plaintiffs allege that some of their members have offices or employees in Texas. Am. Compl. ¶¶ 14-19. Business Roundtable, an association of CEOs, alleges that its CEO members lead companies that "have employees in every state, including Texas." Compl. ¶ 17. AIC, an association of private equity and private credit firms, says it has members with "offices and portfolio companies in every state in America," including Texas. Am. Compl. ¶ 19. U.S. Chamber claims it has "members in the Eastern District of Texas." *See* Am. Compl. ¶ 14. But the Fifth Circuit has long rejected the proposition that "the location of a trade association member may be

imputed to the association for venue purposes." *Am. Newspaper Publishers Ass'ns v. U.S. Postal Serv.*, 789 F.2d 1090, 1092 (5th Cir. 1986). The amended complaint's allegations thus do not establish that these organizations have their principal place of business in Texas, let alone in the Eastern District specifically, and they are insufficient to show that venue is proper in this Court.[8] *See Am. Newspaper Publishers Ass'ns*, 79 F.2d at 1092.

Because Longview Chamber lacks standing, there is no basis for venue in this district. *See Immigrant Assistance Project v. INS*, 306 F.3d 842, 867 n.20 (9th Cir. 2002) (holding that the standing of one plaintiff was "important because it is the only plaintiff … who is a resident of Washington and on whom, therefore, venue in the Western District of Washington could be based"); 14D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3815 (4th ed.) ("[V]enue cannot be based on the joinder of a plaintiff" that has been added "for the purpose of creating venue in the district."). When, as here, the party on whom plaintiffs rely for venue lacks standing, courts often transfer the case to a proper venue. *See, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1205 (11th Cir. 2018) (transferring case where only

---

[8] To the extent Plaintiffs try to switch theories and claim venue in this district based on § 1391(e)(1)(B) rather than (C), the possibility that a rulemaking may affect an associational plaintiff's members in a particular district is legally insufficient to establish that "a substantial part of the events or omissions giving rise to the claim occurred" in that district, where, as here, those members are not themselves parties to the case. *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, No. 4:23-CV-0206-P, 2023 WL 2975164, at *3 (N.D. Tex. Apr. 17, 2023); *see also Associated Gen. Contractors v. Fed. Acquisition Regul. Council*, 720 F. Supp. 3d 461, 473 (W.D. La. 2024) (in case challenging a rulemaking that would be enforced nationwide, the events giving rise to the rule took place in Washington, D.C., where the rule was drafted, and venue was thus improper in the Western District of Louisiana).

party that satisfied venue failed to establish standing); *Missouri*, No. 24-cv-103, 2024 WL 4374124, at *4 (same). Accordingly, the Court should transfer this case to the U.S. District Court for the District of Columbia, where all other plaintiffs appear to reside, where Defendants reside, and where the challenged Rule was promulgated. Alternatively, the Court should dismiss for lack of venue. *See* Fed. R. Civ. P. 12(b)(3).

**3.** Finally, this Court can alternatively transfer the case "in the interest of justice" and for "the convenience of parties and witnesses," 28 U.S.C. § 1404(a), even without dismissing the Longview Chamber. Venue is indisputably proper in the United States District Court for the District of Columbia because the "defendant[s] in the action reside[]" there. 28 U.S.C. § 1391(e)(1). It is also a convenient venue for three of the four plaintiffs, who all appear to reside in Washington, D.C. This Court could thus transfer this case to that venue without addressing the many objections to the justiciability of Longview Chamber's claims. Such a transfer would allow the Court to "avoid deciding [the] constitutional issue" that Longview Chamber's alleged standing raises. *St. Joseph Abbey v. Castille*, 700 F.3d 154, 165 (5th Cir. 2012); *see also Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (courts have "license to *avoid* complex questions of standing in cases where the standing of others makes a case justiciable").

Such a transfer would be especially appropriate here because the Amended Complaint makes plain that this case has no legitimate connection to the Eastern District of Texas, Tyler Division. While Longview Chamber describes five of its members, and uses their membership as a basis for standing, the description of each

member conspicuously never says that *any* of the five members are located here. Instead, the members' descriptions read similarly to those of the other plaintiffs' members—Member A apparently is not located in the Eastern District; the amended complaint says only that Member A has previously engaged in "transactions involving companies with a presence in the Longview Trade Area and the surrounding economic region." Am. Compl. at 11 (¶ 23). Member B has employees and customers somewhere in Texas, *id.*, while Member C "has an office in Dallas" and has also transacted with "companies with a presence in Texas." *Id.* Member D has "operations in Texas," while Member E has "a number of business locations in Texas," *id.*, although the amended complaint does not say where in Texas. If any of these members resided in this District, the Amended Complaint would say so. But it does not.

This is textbook forum shopping, and the Court should not countenance it. All across the country, parties to proposed transactions have already filed the updated HSR Form, and many more are preparing to do so. Any one of these parties could challenge the Rule in the district where they reside. In fact, some of these parties are likely members of the other plaintiff associations *in this case*, so those same plaintiffs could bring this same lawsuit in a different, more appropriate venue. Yet Plaintiffs brought this suit in the Eastern District of Texas, Tyler Division, even though there does not appear to be a single member of any plaintiff organization that resides here and has standing to sue.

27

If accepted, Plaintiffs' approach would enable any company, anywhere in the country, to pay the Longview Chamber's membership fee and sue in this District.[9] Under Plaintiffs' apparent view of associational standing and venue, any company anywhere in this country can pick its venue for myriad suits against the government by merely joining the local chamber of commerce in its desired forum. That view creates all the harms attendant to allowing litigants to cherry-pick courts, *see Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947), without regard for any factual connection between the case and the forum. It also conflicts with the basic premise of associational standing as a form of "representational standing." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). Longview Chamber is not suing because it has suffered any injury itself; it is suing because of an alleged injury to its members. But if those members could not have asserted venue in this Court in their own suit, there is no reason that Longview Chamber should be able to do so in a purported representational capacity.

For these reasons, the Court should transfer this case to the District of Columbia in the interest of justice. *See* 28 U.S.C. § 1404(a).

## CONCLUSION

The Court should dismiss Plaintiff Longview Chamber's claims for lack of subject-matter jurisdiction. The Court should then transfer this case to the United

---

[9] Indeed, Longview Chamber appears to accept membership from any business, anywhere. *See Frequently Asked Questions*, Longview Chamber of Commerce (May 23, 2025), https://tinyurl.com/ms7tys8c ("There are no city limits or regional boundaries that exclude any business which [might] want to join the Longview Chamber of Commerce.").

States District Court for the District of Columbia, which it should do even if

Longview Chamber does have standing. Alternatively, the Court should dismiss the

case for lack of venue.

Respectfully submitted,

LUCAS CROSLOW
    *General Counsel*

H. THOMAS BYRON III
    *Deputy General Counsel*

MARIEL GOETZ
BENJAMIN F. AIKEN
    *Attorneys*

May 23, 2025

/s/    Benjamin F. Aiken

D.C. Bar No. 1046730
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
T: (202) 326-2151
baiken@ftc.gov
