**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, AMERICAN INVESTMENT COUNCIL, and LONGVIEW CHAMBER OF COMMERCE, <br><br> *Plaintiffs*, <br> v. <br><br> FEDERAL TRADE COMMISSION and ANDREW N. FERGUSON, in his official capacity, <br><br> *Defendants*. | Case No. 6:25-cv-00009-JDK |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

*Page*

INTRODUCTION ..................................................................................................................1

STATEMENT OF THE ISSUES............................................................................................2

STATEMENT OF UNDISPUTED MATERIAL FACTS .....................................................2

    A.    The HSR Act ..........................................................................................................2

    B.    The Premerger Regime From 1978-2024........................................................3

    C.    The FTC Rulemaking ............................................................................................5

STANDARD OF REVIEW ....................................................................................................8

ARGUMENT ..........................................................................................................................8

I.       THE LONGVIEW CHAMBER HAS STANDING TO CHALLENGE THE RULE ........8

II.      THE HSR RULE EXCEEDS THE FTC'S STATUTORY AUTHORITY ......................11

    A.    The Rule Misinterpreted The Scope Of The FTC's Authority To
Determine The Content Of The HSR Form ........................................................12

    B.    At A Minimum, Several New Requirements Exceed The FTC's Authority .........17

III.    THE HSR RULE IS THE RESULT OF ARBITRARY DECISIONMAKING...............19

    A.    The FTC Failed To Show That The Rule's Benefits Are Worth The
Immense New Costs Imposed On Every HSR Filer ...........................................20

          1.    The FTC unreasonably understated the costs of the Rule.........................20

          2.    The FTC unreasonably overstated the benefits of the Rule......................23

    B.    The FTC Gave No Reasoned Explanation For Rejecting Less Burdensome
Alternatives ........................................................................................................27

CONCLUSION......................................................................................................................30

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Arcia* v. *Florida Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) ............................................................................9

*Babbitt* v. *United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ............................................................................................9

*Chamber of Com. of U.S.* v. *CFPB*,
  691 F. Supp. 3d 730 (E.D. Tex. 2023) ...............................................................10

*Chamber of Com. of U.S.* v. *SEC*,
  85 F.4th 760 (5th Cir. 2023) ...............................................................20, 24, 25

*Citizens to Preserve Overton Park, Inc.* v. *Volpe*,
  401 U.S. 402 (1971) ..........................................................................................12

*Clapper* v. *Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................9

*Consumers' Rsch.* v. *CSPC*,
  592 F. Supp. 3d 568 (E.D. Tex. 2022) ...............................................................10

*Crawford* v. *Hinds Cnty. Bd. of Supervisors*,
  1 F.4th 371 (5th Cir. 2021) .............................................................................9, 11

*El Paso Elec. Co.* v. *FERC*,
  76 F.4th 352 (5th Cir. 2023) ..............................................................................25

*Farmers Union Cent. Exch., Inc.* v. *FERC*,
  734 F.2d 1486 (D.C. Cir. 1984) .........................................................................27

*FCC* v. *Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..........................................................................................26

*Florida Gas Transmission Co.* v. *FERC*,
  876 F.2d 42 (5th Cir. 1989) ...............................................................................20

*Frame* v. *City of Arlington*,
  657 F.3d 215 (5th Cir. 2011) ...............................................................................9

*Girling Health Care, Inc.* v. *Shalala*,
  85 F.3d 211 (5th Cir. 1996) .................................................................................8

*Hunt* v. *Washington State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................................8

*Illumina Inc.* v. *FTC*,
   88 F.4th 1036 (5th Cir. 2023) ..........................................................19

*Jibril* v. *Mayorkas*,
   20 F.4th 804 (D.C. Cir. 2021) ..........................................................10

*Louisiana ex rel. Landry* v. *Biden*,
   64 F.4th 674 (5th Cir. 2023) ............................................................20

*Loper Bright Enterprises* v. *Raimondo*,
   603 U.S. 369 (2024) ..........................................................................15

*Lorillard* v. *Pons*,
   434 U.S. 575 (1978) ..........................................................................15

*Lujan* v. *Defenders of Wildlife*,
   504 U.S. 555 (1992) ....................................................................10, 11

*McCardell* v. *HUD*,
   794 F.3d 510 (5th Cir. 2015) ............................................................11

*Mexican Gulf Fishing Company* v. *U.S. Department of Commerce*,
   60 F.4th 956 (5th Cir. 2023) ......................................................13, 16

*Michigan* v. *EPA*,
   576 U.S. 743 (2015) ....................................................................13, 16

*Motor Vehicle Manufacturers Ass'n of U.S., Inc.* v. *State Farm
   Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ......................................................................24, 25

*National Grain & Feed Ass'n* v. *OSHA*,
   866 F.2d 717 (5th Cir. 1988) ............................................................13

*National Infusion Ctr. Ass'n* v. *Becerra*,
   116 F.4th 488 (5th Cir. 2024) ..........................................................10

*In re Navy Chaplaincy*,
   697 F.3d 1171 (D.C. Cir. 2012) ........................................................11

*Stringer* v. *Whitley*,
   942 F.3d 715 (5th Cir. 2019) ........................................................9, 11

*United Mine Workers of Am.* v. *Dole*,
   870 F.3d 662 (D.C. Cir. 1989) ..........................................................12

**STATUTES**

5 U.S.C. § 706 ..................................................................................................8

15 U.S.C. § 18a .......................................................................................... *passim*

15 U.S.C. § 19 .............................................................................................17, 18

15 U.S.C. § 57b-1 ............................................................................................28

Pub. L. No. 117-328, 136 Stat. 4459 (2022) ..................................................15

Pub. L. No. 106-553, 114 Stat. 2762 (2000) .............................................5, 30

**REGULATIONS**

*Revised Jurisdictional Thresholds for Section 7A of the Clayton Act*,
    90 Fed. Reg. 7,697 (Jan. 22, 2025) ............................................................2

*Premerger Notification; Reporting and Waiting Period Requirements*,
    89 Fed. Reg. 89,216 (Nov. 12, 2024) ................................................. *passim*

*Premerger Notification; Reporting and Waiting Period Requirements*,
    88 Fed. Reg. 42,178 (June 29, 2023) ................................................. *passim*

*Premerger Notification; Reporting and Waiting Period Requirements*,
    43 Fed. Reg. 33,450 (July 31, 1978) ..........................................................3

**OTHER AUTHORITIES**

H.R. Rep. No. 94-1373 (1976) ...................................................2, 5, 19, 24

S. Rep. No. 94-803 (1976) ............................................................... *passim*

122 Cong. Rec. 68 (1976) (statement of Sen. Byrd) ..................................19

146 Cong. Rec. 24253 (2000) (statement of Sen. Hatch) ............................5

Antitrust Modernization Comm'n, Report and Recommendations (Apr. 2007) ............................4

Billman & Salop, *Merger Enforcement Statistics: 2001-2020*,
    85 Antitrust L.J. 1 (2023) ...........................................................................4

FTC, HSR Report, Annual Report to Congress for Fiscal Year 1977 .........................................15

FTC and DOJ, HSR Report, Annual Report to Congress for Fiscal Year 2001 ............................4

FTC and DOJ, HSR Report, Annual Report to Congress for Fiscal Year 2021 ..........................27

FTC, What is the Premerger Notification Program? An Overview (Mar. 2009) ......................1, 26

Sims & Herman, *The Effect of Twenty Years of Hart-Scott-Rodino on
    Merger Practice*,
    65 Antitrust L.J. 865 (1997) ...................................................................................................29

## INTRODUCTION

This case concerns the FTC's decision to completely overhaul a federal merger-review process that has worked well for half a century—for no apparent good reason.  The Hart-Scott-Rodino (HSR) Antitrust Improvements Act of 1976 requires thousands of parties to mergers and acquisitions each year to file a "premerger notification" (the HSR Form, or Form) with the FTC and Department of Justice.  15 U.S.C. § 18a.  Congress envisioned that the HSR Form would facilitate the detection of "illegal mergers and acquisitions prior to consummation without unduly burdening business with unnecessary paperwork or delays."  S. Rep. No. 94-803, at 65 (1976).  Consistent with that mandate, for 50 years, the Form has required essentially the same limited information and documents:  enough for the reviewing agency to determine whether to investigate further, but not so much that the burden of completing the Form would significantly "impede consummation of the vast majority of mergers and acquisitions" that are obviously lawful at a glance.  *Id.* at 66.  By all accounts, that version of the Form did its job.  Just ask the FTC, which as recently as August 2024 proclaimed that the Form "ha[d] been a success" and "ha[d] minimized the number of post-merger challenges the enforcement agencies have had to pursue."  FTC, What is the Premerger Notification Program? An Overview 2 (Mar. 2009) (2009 FTC Guide), Ex. 19.[1]

Two months after deleting that language, the FTC adopted a new rule that completely rewrites the HSR Form by massively expanding the amount of material parties must provide, including roughly 20 brand new categories of documents or information.  *Premerger Notification; Reporting and Waiting Period Requirements*, 89 Fed. Reg. 89,216 (Nov. 12, 2024) (Rule).  By the FTC's own lowball estimate, the Rule's changes will *more than  quadruple* the average time and expense of preparing an HSR filing for thousands of transactions each year.  With such an

---

[1]    Exhibit numbers refer to exhibits to the Declaration of Judson O. Littleton, attached to this Motion as Exhibit E.

enormous expansion, one would expect that the prior version of the HSR Form suffered from serious defects.  But the FTC has no evidence of any such deficiencies.  In fact, the FTC has never identified a *single* transaction that it claims to have missed due to gaps in the HSR Form over the previous decades.  Yet the agency chose to drastically increase the filing burden on *all* HSR-reportable transactions, the vast majority of which indisputably pose zero antitrust risk.  That tradeoff is not only irrational, but inconsistent with the limits Congress placed on the FTC's authority.  Because the Rule exceeds the FTC's statutory authority and reflects arbitrary and capricious decisionmaking several times over, this Court should enter judgment setting it aside.

## STATEMENT OF THE ISSUES

1.      Whether the Rule exceeds the FTC's statutory authority under the HSR Act.

2.      Whether the Rule is arbitrary and capricious in violation of the APA.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      The HSR Act

Congress enacted the HSR Act in 1976 to put a stop to "'midnight' mergers," in which companies would merge quickly and in secret before antitrust agencies could even learn about—let alone analyze and then move to block—the transaction.  See H.R. Rep. No. 94-1373, at 11 (1976); S. Rep. No. 94-803, at 64-65.  The Act imposes a mandatory notification and 30-day waiting period before any merger, acquisition, or similar transaction of a certain size may be finalized.  15 U.S.C. § 18a.  For covered transactions, the buyer and (in almost all cases) the seller must each file a "premerger notification" with the FTC and DOJ.  *Id.*  Today, most deals valued at more than $126.4 million (adjusted annually, *id.* § 18a(a)(2)) must be reported.  *See Revised Jurisdictional Thresholds for Section 7A of the Clayton Act*, 90 Fed. Reg. 7,697, 7,697 (Jan. 22, 2025).  Several thousand transactions surpass that threshold each year.  *See* 89 Fed. Reg. at 89,219.

2

To "balanc[e]" the "need to detect and prevent illegal mergers and acquisitions prior to consummation" with the imperative to avoid "unduly burdening business[es] with unnecessary paperwork or delays," S. Rep. No. 94-803, at 65, Congress divided the HSR process into two steps: the initial screen and the "Second Request."  The initial screen relies on the "premerger notification" that parties to every reportable transaction must file.  15 U.S.C. § 18a(a).  The Act authorizes the FTC to specify the "documentary material and information" that must be submitted in that "notification."  *Id.* § 18a(d)(1).  But Congress placed limits on what the agency may demand as part of the screen:  only "such documentary material and information . . . as is necessary and appropriate to enable the [FTC and DOJ] to determine whether [the proposed] acquisition may, if consummated, violate the antitrust laws."  *Id.*  Then, if an agency determines during the 30-day waiting period that a particular transaction requires further scrutiny, it may issue a much broader Second Request to the parties.  *Id.* § 18a(e).  That two-step design ensures that only the handful of transactions that pose a potential antitrust concern are subjected to the more intrusive Second Request process, not the 97% of transactions that sail through.

### B.    The Premerger Regime From 1978-2024

The FTC published the first version of the HSR Form in 1978.  *See Premerger Notification; Reporting and Waiting Period Requirements*, 43 Fed. Reg. 33,450, 33,519 (July 31, 1978).  That original Form required a substantial amount of information about the filing party and proposed transaction at issue, including (i) various internal documents about the transaction; (ii) information about the assets or securities to be acquired; (iii) revenues broken down by industry, product class, and product; (iv) geographic areas in which the filer earned revenue in the same industry category as the other party; and (v) other information relevant to the competitive effects of the transaction, such as supply relationships between the parties.  *See id.* at 33,520.  The FTC explained that these

requests were not "intended to elicit all potentially relevant information," but only those materials necessary for its "initial evaluation of the potential anticompetitive impact of" the transaction. *Id.*

That already robust version of the HSR Form remained in effect with only minor tweaks for the next 46 years. 89 Fed. Reg. at 89,257. That is because the Form enabled the antitrust agencies to reliably identify *ex ante* transactions that raised antitrust concerns. *See* Am. Compl. ¶¶ 52-58 (collecting statements to that effect). In 2007, a bipartisan expert commission unanimously concluded that "the existing pre-merger review system under the HSR Act [was] achieving its intended objectives," including by "ensur[ing] that the agencies [were] aware of nearly every transaction that ha[d] potential to cause competitive harm." Antitrust Modernization Comm'n, Report and Recommendations 152, 158 (2007), Ex. 15. The FTC and DOJ repeatedly agreed, explaining that the HSR Form had been "highly effective" in "giving the government the opportunity to investigate and challenge mergers." FTC and DOJ, HSR Report, Annual Report to Congress for Fiscal Year 2001 at 28 (2001 HSR Report), Ex. 17; *see* Am. Compl. ¶¶ 55-59. Decades of enforcement data prove that consensus. From 2001 to 2020, only about 3% of HSR-reportable transactions triggered a Second Request. *See* Billman & Salop, *Merger Enforcement Statistics: 2001-2020*, 85 Antitrust L.J. 1, 10 (2023). And there were remarkably few false negatives—that is, transactions that did not receive a Second Request that the agencies later sought to unwind. One law-firm commenter put that number at just seven of the nearly 40,000 reported transactions this millennium. Foley Lardner Comment at 2-3 (Sept. 21, 2023), Ex. 9.

Reflecting its already substantial demands, the prior Form also "prompted expressions of concern from the business and legal communities that the program may [have been] overreaching," imposing excessive burdens both on individual filers and the overall economy. 2001 HSR Report at 28, *see* Am. Compl. ¶¶ 63-66 (collecting such statements). Completing the Form would often

4

take hundreds of hours of attorney and executive time, cost hundreds of thousands of dollars, and extend deal timelines by several weeks. *See* Foley Lardner Comment at 3; Am. Compl. ¶ 63. Congress never intended such costs to fall on thousands of mergers, almost all plainly lawful. The 1976 Congress had expected the Act to cover only "the largest 150 mergers annually," and had recognized that if filing "requirements were imposed on every merger, the resulting added reporting burdens might more than offset" the statute's upside, H.R. Rep. No. 94-1373, at 11; *see* S. Rep. No. 94-803, at 66 (agreeing that requiring filings for thousands of mergers annually would "impose an undue and unnecessary burden on business"). To address these unanticipated costs and "provide[] significant regulatory and financial relief for business," 146 Cong. Rec. 24253 (2000) (statement of Sen. Hatch), Congress amended the Act in 2000. Those amendments raised the dollar thresholds for filing and indexed them to economic growth. Pub. L. No. 106-553, § 630, 114 Stat. 2762 (2000). They also added protections for filers who receive a Second Request, requiring the agencies to "hear any petition" arguing that aspects of such a Request are "unreasonably cumulative, unduly burdensome, or duplicative." 15 U.S.C. § 18a(e)(1)(B)(i).

### C.    The FTC Rulemaking

*The Proposed Rule.*  In June 2023, the FTC issued a notice of proposed rulemaking (NPRM) announcing its intent to launch a "comprehensive redesign of the premerger notification process." *Premerger Notification; Reporting and Waiting Period Requirements*, 88 Fed. Reg. 42,178, 42,180 (June 29, 2023). The FTC proposed to drastically expand the HSR Form, adding— by the FTC's count—34 "new requirements and categories of information." *Id.* at 42,185-42,186. *See* Am. Compl. ¶ 77 (full list of proposed new requirements).

*The Outcry*.  Unsurprisingly, hundreds of commenters from the business community and antitrust bar urged the FTC to withdraw the NPRM or at least rewrite it. Many argued that the NPRM exceeded the FTC's statutory authority to require only information that is "necessary and

appropriate" for the initial antitrust screen.  Commenters also reiterated that "[e]xisting HSR reporting requirements appropriately balance the need for antitrust review and the benefits of economic activity."  National Retail Federation Comment at 2 (Sept. 27, 2023), Ex. 12.  And they noted that the FTC had not justified imposing massive new burdens on *every* HSR-reportable transaction.  Indeed, as commenters pointed out, the NPRM did not point to a single deal that the FTC believed it or DOJ had missed due to gaps in the longstanding Form.  Commenters also explained that the FTC's estimate of the costs of the proposed revolution in HSR practice— conducted by simply asking its own staff—was far too low.  *See, e.g.*, U.S. Chamber of Commerce Comment at 1-2 (Sept. 27, 2023), Ex. 5.  Plaintiff U.S. Chamber commissioned its own survey of antitrust practitioners, which predicted an annual cost of over $2.3 *billion*, "even before consideration of indirect costs" caused by "dissuad[ing] potential transactions from occurring." S.P. Kothari, The US Antitrust Agencies' NPRM re Additional Information Requirements for HSR Filings (Kothari Report) ¶¶ 43, 52, 55 (Sept. 26, 2023), Ex. 6.

*The Final Rule.*  On October 10, 2024, the FTC finalized its revisions to the HSR Form. 89 Fed. Reg. at 89,394.  Although the FTC pared back some of the most egregious proposals, it retained many of the most burdensome.  The FTC candidly described the rule as "reset[ting] the baseline requirements for all filers," noting—with studied understatement—that its "incremental costs" would be "more material" than prior HSR rulemakings, "which frequently *reduced* the burdens associated with submitting an HSR Form."  *Id.* at 89,257, 89,260 (emphasis added).

The Rule creates three new categories of reportable transactions, subjecting each tier to increasingly burdensome requirements.  The first category, "select 801.30 transactions," are "transactions that do not result in the acquisition of control," such as certain executive-compensation arrangements.  89 Fed. Reg. at 89,278.  Those transactions are subject to only a "few

of the new . . . requirements," *id.* at 89,261, but will make up only 8% or so of reportable transactions. *Id.* at 89,333. The second category includes transactions that are neither select 801.30 transactions nor "overlap transactions," discussed next. *Id.* at 89,263-89,264. The Rule exempts filers in this category from some but not all of the new requirements. *Id.* at 89,264. The FTC estimated that this category will include 47% of transactions. *Id.* at 89,333. The third category, "overlap transactions," includes the remaining 45%, in which the filing parties have identified any competitive overlap or supply relationship between the buyer and seller or their affiliates. 89 Fed. Reg. at 89,263, 89,376. Deals in this category face the heaviest filing burden.

Depending on how one counts, the FTC retained with some modifications roughly 20 of the 34 new information and document mandates proposed in the NPRM. *See* 89 Fed. Reg. at 89,264. The Rule requires, for example, that every HSR filer submit (i) a narrative describing the rationale for the transaction; (ii) certain plans and reports produced in the ordinary course of business and shared with a CEO or any board member; (iii) drafts of all transaction-related documents that were shared with any board member; (iv) a description of all products or services that overlap with the other party; (v) a description of the filer's relationships with certain suppliers; and (vi) for the buyer, information regarding certain officers and directors at the filing entity and at certain subsidiaries. Each of these new requirements makes sweeping and onerous demands for information and documents.[2] *See* Am. Compl. ¶¶ 99-114 (detailing final requirements).

---

[2]    As just one illustrative example, the new "supply relationships description" requirement instructs the filer to describe "each product, service, or asset" that the filer has "sold, licensed, or otherwise supplied" at over $10 million in revenue in the last year to either the other party or to "any other business" that "uses" those products or services "to compete with" the other party's "products or services, or as an input for a product or service that competes or is intended to compete with" the other party's "products or services." 89 Fed. Reg. at 89,372, 89,387. For each such product or service, the filer must provide: (i) "the sales (in dollars)"; (ii) the "top 10 customers"; and (iii) a description of those ten arrangements. *Id.* at 89,372, 89,387-89,388. The filer must then

The Rule also explains that the FTC had conducted "a new survey of Agency staff" and revised its cost estimates.  89 Fed. Reg. at 89,332.  The FTC had estimated that the longstanding prior version of the Form had taken 37 hours on average to complete.  88 Fed. Reg. at 42,208.  According to the Rule, the new version would now on average take 105 hours, nearly triple the burden of the prior Form.  *Id.* at 89,332.  Worse yet, the average filing in the overlap-transaction category—which covers nearly half of all filings—would now take 158 hours, more than *four times* the prior burden.  *Id.*  The Rule itself thus estimates that the new Form more than quadruples the burden on half of all filings and thus thousands of transactions every year.  As discussed below, even that eye-popping figure is at best an extremely conservative estimate.

## STANDARD OF REVIEW

Challenges to final agency action under the APA are generally resolved on summary judgment.  *See Girling Health Care, Inc.* v. *Shalala*, 85 F.3d 211, 214-215 (5th Cir. 1996).  The APA requires that a court "hold unlawful and set aside agency action" that is "not in accordance with law" or represents "arbitrary [and] capricious" decisionmaking.  5 U.S.C. § 706(2).

## ARGUMENT

## I.    THE LONGVIEW CHAMBER HAS STANDING TO CHALLENGE THE RULE.

As amply demonstrated by the attached declarations, all Plaintiffs have Article III standing to challenge the Rule under the three-prong test for associational standing established by *Hunt* v. *Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  *See* Declaration of Sean Heather, Ex. A; Declaration of Elizabeth Dougherty, Ex. B; Declaration of Rebekah Goshorn

---

provide the reverse:  a description of all products, services, or assets that the filer uses as an input and has obtained from (i) the other party or (ii) any other business that competes with the other party.  *Id.* at 89,372, 89,388.  Again, for each such product, the filer must provide: (i) the "purchased amount (in dollars)"; (ii) "the top 10 suppliers"; and (iii) "a description of" each purchasing agreement.  *Id.*  And that is all for just *one* of the 20 new additions to the HSR Form.

Jurata, Ex. C; Declaration of Kelly Hall, Ex. D.  In its motion to dismiss or transfer, the FTC has contested the Article III standing of only Plaintiff Longview Chamber.  *See* Dkt. 30.  The FTC principally argues that the Longview Chamber has not sufficiently alleged that at least one of its members would "have standing to sue in [its] own right," as required under the first *Hunt* prong. *See* Dkt. 30 at 12-19.  The FTC claims that the Longview Chamber cannot establish standing unless it identifies a member that is "presently engaged in an HSR-reportable transaction," *id.* at 15, or at least about to enter into a "certain, imminent transaction," *id.* at 17.

As Plaintiffs have explained, that argument is legally wrong.  *See* Dkt. 35 at 16-25 (opposition to motion to dismiss).  "For a threatened future injury"—here, application of the Rule to a Longview Chamber member that submits an HSR Form—"to satisfy the imminence requirement" for standing, "there must be at least a 'substantial risk' that the injury will occur." *Stringer* v. *Whitley*, 942 F.3d 715, 721 (5th Cir. 2019).  It does not defeat standing if a plaintiff "cannot say with certainty when, precisely," the injury will take place, as "'imminence' is an 'elastic concept' that can accommodate that uncertainty."  *Crawford* v. *Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021) (finding imminence where injury was "fairly likely" to occur in the future).  The critical question is not whether the plaintiff has provided a precise date on which the harm will occur, but whether the "alleged injury is . . . too speculative" to justify the exercise of federal jurisdiction.  *See Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013) ("substantial risk" does not require that the threatened injury be "literally certain").[3]

---

[3]    *See also Babbitt* v. *United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (requiring that the plaintiff "demonstrate a realistic danger of sustaining a direct injury"); *Frame* v. *City of Arlington*, 657 F.3d 215, 235 (5th Cir. 2011) ("a sufficiently high degree of likelihood"); *Arcia* v. *Florida Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("a realistic probability").

Here, there is nothing speculative about whether multiple members of the Longview Chamber will be harmed by the Rule in the near future.  For starters, the declaration of Kelly Hall, President and CEO of the Longview Chamber, identifies two members who directly state that they have "concrete plans" to engage in HSR-reportable transactions and offer a "specification of *when* [that] will be." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 564 (1992).  Member C is a "private capital firm" that "expects to enter into several HSR-reportable transactions in the next 12 months" and "at least one by the end of 2025."  Hall Decl. ¶ 9.  Member A similarly "intends to engage in at least one more HSR reportable transaction this year" in addition to the "at least one" such transaction this year in which it has already engaged.  *Id.* ¶ 7.[4]  Injury within the next five months is plenty imminent for purposes of Article III.  *See National Infusion Ctr. Ass'n* v. *Becerra*, 116 F.4th 488, 498 n.7 (5th Cir. 2024) (finding standing based on likelihood of injury during "first four years of the [challenged] program"); *Jibril* v. *Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (same for injury "within the next year or two").

In addition, the fact that multiple Longview Chamber members "habitually engag[e] in the regulated conduct at issue" itself "demonstrates the concrete plans necessary to establish an injury in fact." *Consumers' Rsch.* v. *CSPC*, 592 F. Supp. 3d 568, 578 (E.D. Tex. 2022), *rev'd on other grounds*, 91 F.4th 342 (5th Cir. 2024).  In other words, Longview Chamber members have "demonstrate[d] a substantial risk" that they will be subject to the new HSR Form because they

---

[4]     Ms. Hall's declaration does not name these members or provide exact figures because the members asked her "not to reveal their identities and to avoid providing unnecessary details that could be used to identify them."  Hall Decl. ¶ 6; *see Chamber of Com. of U.S.* v. *CFPB*, 691 F. Supp. 3d 730, 738-739 (E.D. Tex. 2023) (holding that plaintiffs may establish injury to members using "pseudonyms").  As Ms. Hall explains, the members "are concerned that being identified in this suit could result in additional and unwarranted regulatory scrutiny" from the federal government and that any disclosure or public awareness of their "near- and medium-term plans to engage in HSR-reportable activity could" harm their businesses.  Hall Decl. ¶ 6.

(i) have entered reportable transactions "in the past" and (ii) "intend[] to take [such] action again." *Stringer*, 942 F.3d at 722.  Members A, D, and E all "often" or "regularly engage[] in M&A activity" and "plan[] to continue to engage in HSR-reportable transactions in the foreseeable future."  Hall Decl. ¶¶ 7, 10-11.  Member B "has engaged in more than 25 HSR-reportable transactions" in the last 10 years and "plans to continue" at that level.  *Id.* ¶ 8.  Similarly, Member C "has engaged in 19 HSR-reportable transactions" in the last five years and "plans to continue . . . in a similar level."  *Id.* ¶ 9.  Each member's established track record corroborates its present intention to enter into HSR-reportable transactions in the near future, making "[t]he prospect of future injury . . . significantly less speculative."  *In re Navy Chaplaincy*, 697 F.3d 1171, 1176-1177 (D.C. Cir. 2012); *see McCardell* v. *HUD*, 794 F.3d 510, 520-521 (5th Cir. 2015) (finding imminence where plaintiffs' theory of harm involved "no unfounded assumptions"); *see, e.g.*, *Crawford*, 1 F.4th at 376 (finding plaintiff had established "substantial risk of being called for jury duty" because he had been called four times over seven-year period).

In sum, the facts adduced in the Hall Declaration plainly establish imminence as a matter of law, and the FTC cannot controvert those facts and create any genuine issue of material fact regarding whether at least one individual member of the Longview Chamber would have standing to challenge the Rule.  *See Lujan*, 504 U.S. at 561.

## II.    THE HSR RULE EXCEEDS THE FTC'S STATUTORY AUTHORITY.

The FTC's complete overhaul of the longstanding HSR Form goes well beyond the agency's statutory authority to design the content of the Form.  Most fundamentally, the HSR Act forbids the FTC from demanding materials that would impose substantially more costs on filing parties to compile and produce than are justified by any benefit to the antitrust agencies' initial evaluation of the transaction.  The FTC, however, rejected that limitation on its authority and never performed the required cost-benefit analysis.  That legal error dooms the entire Rule.  And even if

it did not, several of the Rule's new requirements also contravene separate, distinct statutory limitations on the FTC's authority.

A.  **The Rule Misinterpreted The Scope Of The FTC's Authority To Determine The Content Of The HSR Form.**

1.  Under the HSR Act, the FTC may require in the initial "premerger notification" only "such documentary material and information relevant to a proposed acquisition *as is necessary and appropriate* to enable the [agencies] to determine whether such acquisition may, if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1) (emphasis added).  In the Rule, the FTC squarely rejected commenters' arguments that "Congress intended the words 'necessary and appropriate' to require a cost-benefit analysis in this context."  89 Fed. Reg. at 89,236.  The agency argued that "[h]ad Congress intended to require the Commission to consider costs and benefits, it could easily have done so."  *Id.*  Instead, the agency maintained that the statute's "necessary and appropriate" language has a *broadening* effect on the FTC's authority, providing the agency additional "flexibility" in the information and documents it may require.  *Id.*

That position misunderstands the FTC's authority to design the HSR Form.  *See Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 415-416 (1971) (agency's failure to "properly construe [its own] authority" renders the resulting regulation unlawful); *United Mine Workers of Am.* v. *Dole*, 870 F.3d 662, 673 (D.C. Cir. 1989) (finding regulation unlawful because "the Secretary simply failed to take account of [a] statutory limitation on her authority").  The HSR Act's "necessary and appropriate" language does not broaden but rather *constrains* the FTC's authority, prohibiting it from demanding certain documents or information from all HSR filers if doing so would impose significant costs while doing comparatively little to enable the agency to determine whether to issue a Second Request.

That construction follows from the Supreme Court's decision in *Michigan* v. *EPA*, which concerned a statute authorizing EPA to issue certain rules "only if . . . [it] finds regulation 'appropriate and necessary.'" 576 U.S. 743, 752 (2015). Like the FTC here, EPA "chose to read [that language] to mean that cost makes no difference to the initial decision to regulate." *Id.* at 751. The Court found that in doing so, EPA had "strayed far beyond [its] bounds" and "interpreted [its authority] unreasonably." *Id.* at 751, 760. The Court explained that the phrase "appropriate and necessary" "plainly subsumes consideration of cost," as "[n]o regulation is 'appropriate' if it does significantly more harm than good." *Id.* at 752, 756.

Several years later, in *Mexican Gulf Fishing Company* v. *U.S. Department of Commerce*, the Fifth Circuit considered a federal rule requiring charter-boat owners to install GPS monitoring systems at their own expense. 60 F.4th 956, 961 (5th Cir. 2023). The government argued that the rule was permitted by a statute authorizing "management measures" "necessary and appropriate for the conservation and management of the fishery." *Id.* at 965 (citation omitted). Citing *Michigan*, the court easily rejected that argument and found that the agency had failed to "operate within the bounds of reasonable interpretation." *Id.* at 966. The court "stress[ed] that the adjectives *necessary* and *appropriate* limit the authorization" to regulate, and "at a minimum require[] that [the rule's] benefits reasonably outweigh its costs." *Id.* at 965; *see National Grain & Feed Ass'n* v. *OSHA*, 866 F.2d 717, 733 (5th Cir. 1988) ("reasonably necessary or appropriate" standard requires a "specie of cost-benefit justification," such that the "expected costs of" the regulation are "reasonably related to the expected benefits"). That is equally true here: the FTC may require information and documents in the initial HSR Form only if the benefits for the agency's threshold screen for antitrust concerns "reasonably outweigh [the] costs" to the filing parties of compiling and submitting those materials. *Mexican Gulf*, 60 F.4th at 965.

The structure and purpose of the HSR Act confirm that interpretation. The buyer and seller for virtually *all* HSR-reportable transactions must file the initial "premerger notification." 15 U.S.C. § 18a. The antitrust agencies have at most 30 days to screen several thousand such transactions, 15 U.S.C. § 18a(b)(1), so their review is inevitably abbreviated and preliminary. Only if that review reveals a potential concern may the agencies issue a Second Request, which permits them to demand a broader universe of documents and information: instead of materials that are "necessary and appropriate" to the agency's initial screen, the agency may seek materials that are "relevant to the proposed acquisition." *See* 15 U.S.C. § 18a(e)(1)(A). The obvious inference is that Congress intended the "necessary and appropriate" language to meaningfully limit what the FTC may demand in the initial Form, ensuring that the greatest compliance costs fall only on those transactions for which the agency has already identified red flags that warrant further review. That is how Congress ensured that the Act "neither deter[s] nor impede[s] consummation of the vast majority of mergers and acquisitions." S. Rep. No. 94-803, at 66. And if more were needed, Congress later required the FTC and DOJ to "hear any petition" from any recipient of a Second Request arguing that the Request is "unduly burdensome." 15 U.S.C. § 18a(e)(1)(B)(i). If Congress was that concerned about unduly burdensome *Second Requests*, it follows *a fortiori* that Congress was particularly concerned about "undue" costs associated with the initial HSR Form, which every HSR filer must complete.

The actions of both Congress and the FTC since the HSR Act's enactment also confirm that the statute requires the FTC to expressly justify making the HSR Form more burdensome on all filers in terms of benefits to the initial screen. In 1977, the FTC explained that the Act required it to "strike what is often a difficult balance between the need of the enforcement agencies" for information "and the cost to the persons who must provide such information." FTC, HSR Report,

Annual Report to Congress for Fiscal Year 1977, at 3, Ex. 16.  That initial view of the agency's statutory authority is persuasive, as it was "issued roughly contemporaneously with enactment of the statute and remained consistent over time."  *Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369, 386 (2024); *see* 2001 HSR Report at 29 (recognizing FTC's obligation to "make [the Form] as minimally burdensome as possible without compromising the agencies' ability to investigate and interdict proposed transactions").  Congress then retained the key "necessary and appropriate" language when it amended the HSR Act in 2000, and again in 2022, *see* Pub. L. No. 117-328, Div. GG § 202, 136 Stat. 4459 (2022)—well after the Supreme Court's decision in *Michigan* v. *EPA* explained that the phrase "necessary and appropriate" requires a cost-benefit analysis.  Congress is presumed to have been "aware of" and "adopt[ed]" such a "judicial interpretation" when it "re-enacts a statute without change."  *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978).

2.    To be sure, despite disavowing any statutory obligation to do so, the FTC still claimed to have "considered . . . the costs and the benefits of the final rule."  89 Fed. Reg. at 89,236.  But the FTC never determined, prior to creating any of the Rule's 20 new categories of information and documents, that obtaining the newly mandated materials would be helpful enough to the decision to issue a Second Request that they *were worth the additional burden* on thousands of annual HSR filers.  Instead, the FTC simply decreed that it desired those 20 new categories, then explained that it had made some tweaks to "minimiz[e] the cost and burden of producing such materials as much as practicable."  *Id.* at 89,237; *see, e.g.*, *id.* at 89,217 (FTC "modified its proposals to *minimize where possible the costs* to filers and third parties") (emphasis added); *see also* Am. Compl. ¶ 133 (citing similar language elsewhere in the Rule).

Seeking to "reduce the cost and delay" associated with a new Form category, 89 Fed. Reg. at 89,273, is not the same thing as deciding to create that new category in the first place only after

15

determining that its benefits outweigh the costs.  Congress's instruction that the FTC may demand only "such documentary material and information . . . as is necessary and appropriate," 15 U.S.C. § 18a(d)(1), constrains the agency's "initial decision to regulate."  *Michigan*, 576 U.S. at 751; *see Mexican Gulf*, 60 F.4th at 965 ("the rule is authorized . . . *only if* it is necessary and appropriate") (emphasis added).  The Act thus requires the FTC to refrain from demanding new information from all HSR filers unless that information is useful enough to the agency's initial screen that it is worth the additional cost for all filers.  If the FTC's version of considering costs were correct, it could in theory add an unlimited number of new categories of information and documents to the HSR Form, then adjust them "where practicable" to lower their costs.  That would undermine Congress's intent by providing no real constraint on the scope of the Form.

Take the Rule's new mandate that the buyer in all HSR-reportable transactions must identify all officers and directors of both the buyer and any of its subsidiaries who hold a similar role at (i) the seller company; (ii) any of the seller's subsidiaries; or (iii) any other entities "that are in the same industry as the [seller]."  89 Fed. Reg. at 89,294.  As many commenters pointed out, requiring filing parties to compile such "lists of dozens, if not hundreds," of officers and directors, "especially across larger or more diffuse organizations with many subsidiaries," will not only "impose substantial burdens," but also "provide little practical utility" for the reviewing agency's decision whether to issue a Second Request for the proposed transaction.  *E.g.*, American Bar Association Comment at 8 (Sept. 13, 2023), Ex. 3.  In response to those comments, the Rule stated that the FTC had tweaked the officers-and-directors requirement to "reduce the cost of reporting as much as practicable."  89 Fed. Reg. at 89,298.  But nowhere did the FTC apply the required analysis:  a determination that these significant costs, which will fall on every HSR-

reportable transaction, can be justified in light of the marginal (if any) use in deciding whether there is a need to further investigate the transaction before it is allowed to close.[5]

### B.     At A Minimum, Several New Requirements Exceed The FTC's Authority.

Certain of the Rule's new information and document requirements also exceed the FTC's statutory authority for other reasons.

1.     First, the Rule's mandate that the buyer in many transactions must identify certain "officers and directors" exceeds the FTC's authority in the HSR Act.  The Rule asserts that the FTC may demand this information to enable the antitrust agencies to screen for potential violations of Section 8 of the Clayton Act.  89 Fed. Reg. at 89,295; *see* 15 U.S.C. § 19.  Section 8 prohibits so-called "interlocking directorates and officers," stating that "[n]o person shall, at the same time, serve as a director or officer in any two corporations" that have a competitive relationship. 15 U.S.C. § 19(a)(1).  But Section 8 is irrelevant to premerger review under the HSR Act, so the FTC cannot point to Section 8 concerns to justify any request in the initial HSR Form.  The Act authorizes the FTC to require "information relevant to a proposed *acquisition*" in order "to determine whether such *acquisition* may, if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1) (emphasis added).  Information about officers and directors of related companies is not information relevant to the legality of the "acquisition."  Although an acquisition can lead to a

---

[5]     Further examples are discussed at paragraphs 170-181 of the Amended Complaint.  As just one, the Rule newly mandates that all filers collect, analyze, and submit "*all* regularly prepared plans and reports that were provided" to the CEO or Board of Directors of the filer (or the CEO or board of any entity the filer controls or is controlled by) within one year of filing, if those documents "analyze market shares, competition, competitors, or markets pertaining to any product or service" that the other party "also produced, sold," or is "known to be" developing. 89 Fed. Reg. at 89,371, 89,386 (emphasis added).  Given the wide variety of potentially responsive documents, commenters pointed out that this requirement will require filers to use "forensic discovery tools." *Id.* at 89,304.  The Rule never stated that the benefits of requiring such effort from thousands of HSR filers each year will be worth the enormous associated costs.  Nor could it, since under the prior Form, the antitrust agencies already received "all" internal documents prepared for officers and directors "for the purpose of evaluating or analyzing the acquisition."  88 Fed. Reg. at 42,194.

prohibited board or officer interlock, such an interlock does not cause the "acquisition" itself to "violate the antitrust laws."  15 U.S.C. § 18a(d)(1).  If a transaction would result in an unlawful interlocking directorate, the answer is not to prevent the acquisition; it is to have the offending officer or director resign.  Indeed, Section 8 expressly provides for a grace period of one year to allow for resignations if an interlock develops, including as the result of a transaction.  15 U.S.C. § 19(b).  Potential interlocking directorates do not pose the "unscramble the egg" problem that motivated Congress to create the premerger notification process in the first place.

Seeking a foothold other than Section 8, the Rule briefly argues that information about officer and director relationships would "assist the Agencies" in policing what is known as gun-jumping:  "improperly shar[ing] confidential information or integrat[ing]" the merging firms during the 30-day waiting period.  89 Fed. Reg. at 89,295.  But that does not work either.  Such gun-jumping would be a procedural violation of the HSR Act itself; it has nothing to do with whether the "proposed acquisition may, if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1).  The FTC may use other investigative powers to police gun-jumping, but it cannot use the HSR Form to do so.

2.    The Rule also exceeds the FTC's authority by obligating filers to provide substantive legal analysis.  In particular, filers must provide a "transaction rationale" that "explain[s] each strategic rationale for the transaction discussed or contemplated"; an "overlap description" of how any of their "current or known planned products or services" "compete[] with (or could compete with)" those of the other party; and a "supply relationships description" of how their products might compete with those of the other party.  89 Fed. Reg. at 89,370-89,372.

Nothing in the HSR Act authorizes the FTC to demand this kind of substantive legal analysis.  The Act refers to the premerger form as a "notification."  15 U.S.C. § 18a(d)(1).  Had

Congress intended filers to provide legal analysis or advocacy—as occurs in pre-approval regimes in other jurisdictions, such as the European Union—it would have described the required HSR filing as an "application," "petition," "request," or the like. Instead, Congress intentionally decided *not* to create such a regime. It considered a proposal that would have granted the FTC the power to temporarily restrain any merger subject to the notification requirement, and then shifted the burden of proof to the merging parties to convince a court that the merger was unlikely to violate the antitrust laws. *See* 122 Cong. Rec. 68 (1976) (statement of Sen. Byrd). But Congress rejected that design to avoid the "severe disincentive to mergers generally" that would have followed. S. Rep. No. 94-803, at 213. As the House Report explained, the Act did not "ease in any way the traditional burden of proof that must be borne by the government" in a merger challenge, H.R. Rep. No. 94-1373, at 8; it is merely an advance "notification" of the deal.

Requiring substantive legal analysis impermissibly recreates core aspects of that rejected pre-approval regime. For example, the "overlap description" and "supply relationships description" require parties to take positions on the definition of the relevant market and the current and potential competitiveness of their products. But those are key points that the *antitrust agencies* must establish to successfully challenge a transaction. *Illumina Inc.* v. *FTC*, 88 F.4th 1036, 1048-1051 (5th Cir. 2023). Likewise, disputes over the "transaction rationale"—that is, whether the parties have an eye toward harming competition—are often central to litigation. Requiring such statements in the HSR Form, when they "go to the core of what the agencies must prove if they sought to challenge a transaction," effectively shifts the burden of proof and "goes far beyond the statutory scope of the HSR Act." Wachtell Lipton Comment at 15 (Sept. 26, 2023), Ex. 14.

## III.    THE HSR RULE IS THE RESULT OF ARBITRARY DECISIONMAKING.

Even if the FTC acted within its statutory authority in adopting the Rule, it is arbitrary and capricious for two separate reasons. First, the Rule both drastically underestimates the costs of

adding 20 novel requirements to the HSR Form and fails to substantiate the existence of any "genuine problem"—let alone a problem of commensurate degree—with the prior version of the HSR Form. *Chamber of Com. of U.S.* v. *SEC*, 85 F.4th 760, 778 (5th Cir. 2023). Second, even if there had been a significant problem, the Rule contains no "reasoned explanation" for the FTC's rejection of more targeted, less burdensome solutions. *Florida Gas Transmission Co.* v. *FERC*, 876 F.2d 42, 45 (5th Cir. 1989).

### A. The FTC Failed To Show That The Rule's Benefits Are Worth The Immense New Costs Imposed On Every HSR Filer.

#### 1. The FTC unreasonably understated the costs of the Rule.

a. *Direct Costs.* To start, the Rule's efforts to assess the increased compliance costs could only generously be described as half-hearted. *See Louisiana ex rel. Landry* v. *Biden*, 64 F.4th 674, 678 n.10 (5th Cir. 2023) (holding that "serious flaw" in cost-benefit analysis "render[s] [a] rule unreasonable"). All the FTC did was conduct a survey *of its own staff. See* 89 Fed. Reg. at 89,332. The staff estimated that, as a result of the new HSR Form, the average time to complete the filing would triple, from 37 hours to 105 hours. *Id.* at 89,332-89,333. That average is pulled down by the less burdensome categories of "select 801.30" transactions and mergers where the parties, their subsidiaries, and their suppliers have no industry overlap whatsoever. For the other half of HSR-reportable transactions—the thousands each year with at least *some* kind of market or supplier overlap—the FTC itself estimates that average preparation time will increase to 158 hours per filer, a more than *four-fold* increase from the longstanding Form. *Id.* at 89,332.

Even that is surely an underestimate. Again, whereas the FTC's projection relied on surveying its own staff, the U.S. Chamber conducted an exhaustive survey of antitrust practitioners in connection with the Chamber's comments on the NPRM. Those practitioners estimated the NPRM would have added 241 hours for the average transaction, well over twice the FTC's

estimate of 107 hours for the NPRM.  *See* U.S. Chamber Practitioner Survey at 2-3, Ex. 7; Kothari Report ¶ 45; 88 Fed. Reg. at 42,208.  Remarkably, the Rule concedes that the Chamber's estimate of the NPRM's impact is more accurate than that of the FTC staff, which had "underestimated the time and expense associated with the proposed rule."  89 Fed. Reg. at 89,331.

Nevertheless, the FTC claims to have used an "improve[d] . . . methodology"—essentially, this time the agency had surveyed staff who had not worked on drafting the Rule—which provided an estimate for the final version of the Rule that the FTC claimed was "generally consistent with" that of the surveyed practitioners. 89 Fed. Reg. at 89,332-89,333.  But while the Chamber's survey had found that the NPRM's changes would have added an estimated 241 hours for the average transaction, the Rule projected an average increase of just 68 hours.  Although the Rule cut back to some degree on the NPRM, the differences cannot explain that massive gap.  *See* Am. Compl. ¶ 151.  Tacitly conceding as much, the Rule tries to explain the delta by claiming that the U.S. Chamber survey "may have included costs related to advocacy about whether a transaction violates an antitrust law, rather than only costs related to collection and submission of information required by the [HSR] Form" itself.  89 Fed. Reg. at 89,333.  That is wrong:  The (public) survey asked respondents to estimate only the time "spen[t] preparing a submission for a transaction as part of an initial filing."  Chamber Survey at 3.

b.    *Indirect Costs*.  The FTC's cost projection, moreover, considers only the direct compliance costs of the Rule.  But the Rule has substantial indirect costs as well.  *See Michigan*, 576 U.S. at 752 ("'[C]ost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost.").  By substantially increasing the costs associated with any given HSR-reportable transaction, the Rule "dissuade[s] potential transactions from occurring," imposing a significant drag on "innovation and entrepreneurial activity."  Kothari Report ¶ 55.

Moreover, preparing all of the newly required materials will "very likely add significantly . . . to a company's filing preparation time, which would have the effect of extending closing dates." Business Roundtable (BRT) Comment at 5 (Sept. 27, 2023), Ex. 4; *see* Chamber Survey at 3 (estimating that the NPRM would have caused the average preparation time to *triple* from 10 days to 32 days). Extending deal timelines "represent[s] a significant cost increase" of its own. National Association of Manufacturers Comment at 4 (Sept. 27, 2023), Ex. 11. Most importantly, additional delays can "threaten the underlying economics of the deal itself." *Id.*; In-House Competition Lawyers Association (ICLA) Comment at 10 (Sept. 27, 2023), Ex. 10. Delays "have an outsized effect on smaller businesses," which are generally reliant on private capital raised through the very transactions burdened by the Rule. National Venture Capital Association Comment at 8 (Sept. 27, 2023), Ex. 13; *see* Dechert LLP Comment at 14 (Sept. 25, 2023), Ex. 8. And even if delays do not blow up a deal, they increase the risk that the agreement will "becom[e] public against the parties' wishes," which can cause significant harm to the underlying negotiations and the parties' commercial and employee relationships. BRT Comment at 14-15.

The Rule says almost nothing about any of this, reflecting the FTC's failure to grapple with the serious impacts of its drastic expansion of the HSR Form. Without addressing the above comments, the FTC merely expressed skepticism that "delays" of a few weeks to deal timelines "can influence pending mergers." 89 Fed. Reg. at 89,257. And the agency simply asserted that it did not expect a "significant impact on overall M&A activity" from "any delays and incremental costs associated with an HSR Filing," since "[d]eal volumes fluctuate . . . from year to year" due to many unrelated "economic factors." *Id.* That is a total non-sequitur. Of course variations in macroeconomic conditions affect the amount of M&A activity. The relevant question is the impact the Rule will have on such activity *holding all else equal*. The Rule offers no explanation, let

alone a reasoned one, why commenters from across the business community and antitrust bar were wrong that the impact would in fact be significant.

Indeed, the Rule strongly hints at one reason for discounting its harmful effects on both HSR filers and the larger HSR-transaction ecosystem: the FTC's newfound skepticism that "M&A activity is beneficial to the economy" in the first place. *Id.* at 89,258 (arguing that the Kothari Report lacked persuasive "empirical evidence about the benefits of M&A"). That sentiment conflicts with the core goal of the HSR Act, which Congress designed to avoid "deter[ring] . . . the vast majority of mergers and acquisitions." S. Rep. No. 94-803, at 66 (emphasis added).

**2.    The FTC unreasonably overstated the benefits of the Rule.**

As against the Rule's substantial costs, the FTC came nowhere close to pointing to commensurate benefits for the 30-day screen of reported transactions. The Rule identifies three categories of putative benefits: (i) prevention of more unlawful mergers; (ii) savings in "time and resources" at the antitrust agencies; and (iii) decreased "burdens and costs for the parties and third parties who respond to staff inquiries" about certain transactions during the initial HSR waiting period. *Id.* at 89,251-89,253. But none of these claimed benefits withstands rudimentary scrutiny.

a.    *Detecting And Preventing More Unlawful Mergers*. The FTC's main justification is that the revised HSR Form will allow it to detect and prevent more unlawful mergers. 89 Fed. Reg. at 89,251-89,252. That would surely be a benefit, but there is no reason to think the Rule will provide it. To establish that the new Form would facilitate detection of more harmful mergers, the FTC had to show that the original version of the HSR Form had meaningful gaps. After all, if the prior version was already enabling the antitrust agencies to detect and prevent nearly all potentially harmful transactions, the Rule's massive expansion of the Form logically could not improve on that record. Put another way, absent a "genuine problem" with the longstanding HSR

Form, any "purported benefits" of the Rule's revisions would not be "adequately substantiated." *Chamber of Commerce*, 85 F.4th at 777 (finding rule arbitrary and capricious for that reason).

The FTC entirely failed to show any such "genuine problem." Despite challenges from the many commenters who explained that the prior Form worked exceptionally well, the FTC never identified a single past HSR-reported merger with anticompetitive effects that either antitrust agency missed at the time but would have detected with the new version of the HSR Form. That silence is telling. Again, commenters on the NPRM identified only *seven* HSR-reportable transactions since the year 2000—out of nearly 40,000—that were challenged by the antitrust agencies after the waiting period had expired. Foley Lardner Comment at 2-3. Even assuming there were 50 such deals over the past quarter-century, it is irrational to quadruple the burden on thousands of HSR-reportable transactions every year in exchange for that meager benefit. *See* H.R. Rep. No. 94-1373, at 11 (recognizing that "illegal mergers m[ight] still be consummated").

The Rule offers no good explanation for its failure to substantiate the problem it is purportedly designed to solve. The FTC merely claimed that it was not "practical" for the agency to spend time identifying missed harmful transactions, because that would "require a redirection of resources to investigate consummated mergers and away from resources devoted to premerger review." 89 Fed. Reg. at 89,219 n.14. As an initial matter, the APA requires agencies to "justif[y]" a proposed "change[] in current policy" in "the rulemaking record," regardless of the "expenditures and other costs" of doing so. *Motor Vehicle Manufacturers Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). More fundamentally, the Rule undermines its own justification:  if there were in fact serious problems with the prior Form, no "resources" should have been needed to uncover concrete evidence—it should have been staring the FTC in the face. At a minimum, the FTC could have said *something* about commenters' assertion that only seven

24

post-waiting period challenges have been brought against HSR-reported transactions in the past 25 years, but it did not.  The agency was not permitted to simply "ignore already existing data it did not want to consider."  *Chamber of Commerce*, 85 F.4th at 776.

The Rule claims that the "relatively low number of challenges to consummated mergers" does not prove that the 50-year HSR Form was working, since it could reflect the fact that the antitrust agencies have "limited resources" and "frequent[ly] lack . . . information about the effects of consummated mergers."  89 Fed. Reg. at 89,239.  That point also cuts the other way.  If the agencies are seriously resource-constrained, then it is hard to understand how a massive expansion in the amount of documentary material they receive from every HSR-reportable transaction will improve antitrust enforcement at all.  The Rule candidly admits that the agencies are *already* "forced to make difficult triage decisions *and forgo potentially worthy investigations*" because their "headcount[s] remain[] well below what is needed." 89 Fed. Reg. at 89,246 (emphasis added). At a minimum, the FTC needed to explain why it makes sense to demand a mountain of additional information that it may never even review.  A huge front-end cost with little or no back-end benefit is the definition of arbitrary decisionmaking.  It is difficult to avoid the conclusion that the FTC simply does not mind—or even welcomes—the spillover harms on lawful M&A activity.

Lacking any hard data or excuse for its absence, the Rule falls back on the FTC's "experience collecting and reviewing data and documents," which it claims has revealed "information deficiencies" in the longstanding Form.  89 Fed. Reg. at 89,217.  But such bare invocations of expertise are insufficient if they "run[] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.  Courts also discount claims that are "at unexplained odds with" the agency's views as "of yesterday."  *El Paso Elec. Co.* v. *FERC*, 76 F.4th 352, 364 (5th Cir. 2023). Here that principle applies almost literally.  Until as recently as August 2024, the FTC's own online

guide to the HSR program declared that the "Program ha[d] been a success," and "ha[d] minimized the number of post-merger challenges the enforcement agencies have had to pursue."  2009 FTC Guide at 2.  And that echoed similar statements going back decades.  *See supra*, pp. 1, 4.

Given those pronouncements, the FTC must point to concrete evidence to "show that there are good reasons for the new policy" beyond its unsubstantiated say-so.  *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The closest it could come up with was a discussion of "several factors" that supposedly "make today's economic reality more challenging for conducting a premerger assessment with the limited information required by the current rules."  89 Fed. Reg. at 89,216.  But most of these "changing commercial realities" are not factual changes in "economic reality" at all.  *Id.* at 89,216, 89,220.  Rather, the Rule simply marches through various theories of antitrust harm that it admits have been extant for "many years."  *Id.* at 89,231 (scrutiny of threats to nascent competition); *see, e.g.*, *id.* at 89,229 (vertical foreclosure); *id.* at 89,234 ("Serial acquisition strategies have been subject to antitrust scrutiny for over 100 years"); *see also* Am. Compl. ¶¶ 195-197.  But as the Rule acknowledges, the FTC and DOJ have often sought to block transactions based on such theories, *id.* at 89,229-89,234, and there is no apparent reason why those theories are more difficult to apply today than they were several years or decades ago.

b.      *Saving Agency Time.*  Next, the FTC claimed that the Rule would benefit the public by reducing agency "staff hours spent collecting additional information" needed to screen a proposed transaction in the initial 30-day window.  89 Fed. Reg. at 89,253-89,254.  That rationale too falls apart under scrutiny.  The agency admitted in the NPRM that the vast majority of the "staff hours spent collecting additional information" are spent only after "one Agency has granted clearance to the other to conduct an initial investigation of the transaction." 88 Fed. Reg. at 42,196; *see* ICLA Comment at 23.  But such "clearance" occurs for only a small fraction of transactions.

In 2021, for example, only 8% of transactions were cleared.  FTC and DOJ, HSR Report, Annual Report to Congress for Fiscal Year 2021 at T1, Ex. 18.  Again, the overwhelming majority of HSR-reportable transactions are obviously lawful at a glance.  The Rule thus indiscriminately demands enormous amounts of additional information from *all* filers to supposedly reduce the time the agencies need to spend asking for such information from a small minority—all of whom, under the old regime, were subjected to that burden precisely because the initial screen provided reason for possible concern.  That is utterly irrational and contrary to the basic design of the HSR Act.

  c. *Saving Third-Party Time.*  Finally, the Rule claims a similar efficiency benefit in the form of time savings for customers, competitors, and other third parties, whom agency staff occasionally contact to learn more information about a proposed transaction.  89 Fed. Reg. at 89,253.  This supposed "benefit" suffers from the same core irrationality: such outreach occurs only after clearance.  Indeed, the irrationality is even more pronounced in this context because third parties' responses to such requests are typically voluntary.  Presumably a competitor or customer of a filing party will spend time providing information to an antitrust agency only if that third party thinks doing so is in its interest.  There is thus no reason to treat that engagement as a cost to those third parties that the Rule somehow alleviates.

**B. The FTC Gave No Reasoned Explanation For Rejecting Less Burdensome Alternatives.**

  Even if the FTC had shown real gaps in the HSR Form, the Rule would still be unlawful because it does not reasonably explain why the blunderbuss solution of massively expanding the Form for all filers is preferable to the obvious alternative:  making greater use of the agencies' more targeted tools.  The FTC thus failed to discharge its APA obligation to "consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Farmers Union Cent. Exch., Inc.* v. *FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984).

1.     The FTC and DOJ have many ways of acquiring more information about a proposed transaction if they deem it necessary during their initial 30-day review.  As mentioned, the agencies can contact customers and competitors of the filers, who are particularly incentivized to share relevant information if they have concerns.  The agencies also commonly send "voluntary access letters" to filers, requesting "information that may assist" them to "quickly and efficiently evaluate[] whether the proposed transaction raises competitive concerns."  *See* FTC, *Guidance for Voluntary Submission of Documents During the Initial Waiting Period*, https://www.ftc. gov/enforcement/premerger-notification-program/hsr-resources/guidance-voluntary-submission-documents (last visited July 30, 2025), Ex. 20.  Filing parties have strong incentives to comply with these requests to avoid a possible burdensome Second Request.  *See* Am. Compl. ¶ 210 (collecting comments from antitrust practitioners explaining those incentives).  For even stronger medicine, both agencies may issue a compulsory civil investigative demand (CID).  *See* 15 U.S.C. § 57b-1 (FTC); *id.* § 1312(a) (DOJ).  Finally, if either agency needs more than the 30-day waiting period to gather or analyze this additional information, it can suggest that the parties "pull and refile" their HSR Forms to restart the clock.  The pull-and-refile maneuver is "so common, and understood to be in the parties' benefit," BRT Comment at 9, that between 2018 and 2022, "parties withdrew their HSR filing and refiled in a total of 546 transactions," 89 Fed. Reg. at 89,244.

2.     Commenters urged the FTC to expand the antitrust agencies' use of these more targeted, transaction-specific tools instead of broadly burdening all HSR filers.  The agency offered three responses in the Rule, each of which is irrational, contrary to the evidence, or both.

First, the FTC argued that the agencies cannot accurately determine which transactions warrant such targeted follow-up unless they receive the newly required information and documents in every initial HSR filing.  89 Fed. Reg. at 89,247, 89,249.  But again, the FTC has nothing to

substantiate the claim that problematic transactions are flying under its radar.  If such transactions really have been slipping past the agencies, they should have at least *one* example.  But as a former antitrust official explained almost 30 years ago—even before the internet—it is simply not "plausible that any truly significant transaction will escape detection in these days of intense media scrutiny and strategic complaints by competitors. . . .  Indeed, if a transaction completely escapes media attention and generates no competitor or customer complaints, one might ask why it deserves the attention of federal enforcement officials."  Sims & Herman, *The Effect of Twenty Years of Hart-Scott-Rodino on Merger Practice*, 65 Antitrust L.J. 865, 892 (1997).

Second, although the FTC acknowledged that filers have an incentive to comply with voluntary access letters and pull-and-refile requests, it contended that filers are also incentivized "to prioritize the collection and submission of information suggesting that there is no competitive problem, rather than supplying the necessary information in an objective and neutral manner." 89 Fed. Reg. at 89,244.  That concern surely is overstated given the high number of obviously lawful transactions.  But regardless, it applies equally to responses to the HSR Form itself, and thus offers no reason to favor using the Form over voluntary access letters or CIDs.

Finally, the Rule argues that "requiring voluntary submissions from even more filers . . . would impose unnecessary burden and delay on filings that are not currently flagged for follow up." 89 Fed. Reg. 89,249.  That argument makes no sense.  The Rule at least triples the mandatory filing burden on virtually *all* reportable transactions and quadruples it on almost half—the vast majority of which will never be "flagged for follow up" regardless.  It is irrational to impose that indiscriminate burden to spare something like 8% of transactions from a voluntary request, especially when such requests are "typically much narrower and less burdensome" than the requirements added by the Rule.  Wachtell Comment at 13.

3.    Although the tools just discussed allow the agencies to further investigate transactions during the initial HSR waiting period, commenters noted another obvious alternative for obtaining more information about transactions:  Second Requests.  To that point, the Rule explained that the FTC preferred to expand the initial HSR Form because "issuing more Second Requests [would be] an extremely costly alternative."  89 Fed. Reg. at 89,247.  The FTC was presumably comparing the cost of responding to a Second Request to the cost of completing its revised version of the HSR Form.  But the actual tradeoff is between (i) imposing an additional burden on a handful of potentially problematic transactions and (ii) massively increasing the filing burden on thousands of obviously harmless transactions.  Even using the FTC's own cost estimates, the agencies could nearly double the amount of Second Requests they have historically issued at the same aggregate cost that the Rule inflicts on all transactions.  *See* Am. Compl. ¶ 214. And those dollars would have been spent entirely in connection with transactions that have been flagged for specific reasons, rather than being spread indiscriminately across every HSR-reportable deal.  That approach is plainly much more consistent with the legislative design.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment and set aside the Rule.

---

[6]    Moreover, the Rule inexplicably assumes that Second Requests must be "extremely costly" because that is the way the FTC has long conducted them.  *See* 89 Fed. Reg. at 89,247.  But that is not a given.  The Rule purports to be the culmination of a "comprehensive redesign of the premerger notification process," 88 Fed. Reg. at 42,180, and that project could surely have involved examining the agencies' Second Request procedures to reduce some costs at least some of the time.  Indeed, the FTC was arguably under a Congressional command to do so per the 2000 amendments to the HSR Act.  *See* Pub. L. No. 106-553 § 630(c) (instructing FTC to "implement reforms . . . in order to eliminate unnecessary burden, remove costly duplication, and eliminate undue delay, in order to achieve a more effective and more efficient merger review process").

August 1, 2025

Jordan L. Von Bokern*
Audrey Dos Santos*
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC  20062
Tel:  (202) 463-5337
jvonbokern@uschamber.com
adossantos@uschamber.com

Respectfully submitted,

/s/ *Shaun W. Hassett*
Shaun W. Hassett
(Texas Bar No.: 24074372)
Michael E. Jones
(Texas Bar No.: 10929400)
POTTER MINTON, PC
102 North College Avenue
Suite 900
Tyler, TX  75702
Tel:  (903) 597-8311
mikejones@potterminton.com
shaunhassett@potterminton.com

Jeffrey B. Wall*
Judson O. Littleton*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, DC  20006
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com

Maxwell F. Gottschall*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000
gottschallm@sullcrom.com

*Counsel for Plaintiffs Chamber of Commerce of the United States of America, Business Roundtable, American Investment Council, and Longview Chamber of Commerce*

* *Pro hac vice*