# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, AMERICAN INVESTMENT COUNCIL, and LONGVIEW CHAMBER OF COMMERCE, <br><br> *Plaintiffs*, <br><br> v. <br><br> FEDERAL TRADE COMMISSION and ANDREW N. FERGUSON, in his official capacity, <br><br> *Defendants*. | Case No. 6:25-cv-00009-JDK |

**DECLARATION OF SEAN HEATHER, SENIOR VICE PRESIDENT, INTERNATIONAL REGULATORY AFFAIRS & ANTITRUST, U.S. CHAMBER OF COMMERCE**

Pursuant to 28 U.S.C. § 1746, I, Sean Heather, hereby declare as follows:

1. I am Senior Vice President for International Regulatory Affairs and Antitrust at the U.S. Chamber of Commerce. In that capacity, among other things, I oversee the U.S. Chamber's antitrust policy on behalf of its members. My business address is 1615 H Street, NW, Washington, DC 20062.

2. I am over 18 years old. This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of the U.S. Chamber. If called as a witness, I could and would testify competently thereto.

3. The U.S. Chamber is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing an underlying membership of more than three million U.S. businesses and professional organizations of every size and in every economic sector and geographic region of the country, including the Eastern District of Texas.

4. The U.S. Chamber's mission is to advocate for policies that will help businesses create jobs and grow the national economy. As part of advancing that mission, the U.S. Chamber seeks to ensure that the federal antitrust laws promote healthy competition without imposing unnecessary regulatory burdens that divert productive capital into compliance costs and harm American companies' ability to grow, create jobs, and innovate, including by entering into value-creating, pro-competitive mergers and acquisitions. As economists have shown empirically, a vibrant and free market for M&A activity helps direct assets to higher valued uses and is thus vital for a healthy and dynamic economy. By the same token, overzealous and unnecessary antitrust enforcement and regulation can create

the sorts of harms to competition and to consumers that the antitrust laws are designed to prevent.

5. An important function of the U.S. Chamber is to represent the interests of its members and advance its view of public policy before Congress, the Executive Branch, and the courts. The U.S. Chamber regularly challenges agency actions, including rulemakings, that in its view will interfere with those goals. *See, e.g.*, *Chamber of Commerce* v. *EPA*, No. 24-1051 (D.C. Cir. 2024); *Ryan LLC* v. *FTC*, No. 24-10951 (5th Cir. 2024); *Chamber of Commerce* v. *SEC*, No. 23-5409 (6th Cir. 2024); *Chamber of Commerce* v. *U.S. Dep't of Labor*, No. 5:17-cv-00009 (W.D. Okla. 2024); *Chamber of Commerce* v. *EPA*, No. 3:23-cv-00007 (E.D. Ky. 2023).

6. On November 12, 2024, the Federal Trade Commission adopted a rule that amends the premerger notification form required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act), 15 U.S.C. § 18a. *Premerger Notification; Reporting and Waiting Period Requirements*, 89 Fed. Reg. at 89,216 (Nov. 12, 2024). The Rule massively expands the amount of documentary material and information that must be included in the initial premerger notification form for all HSR-reportable transactions. Even under the agency's conservative estimate, the Rule's changes to the notification form will more than quadruple the average time and expense of preparing an HSR filing.

7. As Senior Vice President for International Regulatory Affairs and Antitrust at the U.S. Chamber, I have worked with many U.S. Chamber members to understand how the new HSR Form will affect our members. Unsurprisingly, the U.S. Chamber has many members that regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR Act and thus will be subject to the requirements of the Rule, including members for which frequent

2

M&A activity is a regular and consistent feature of their business model. Consistent with their past levels of deal activity, members of the U.S. Chamber plan to engage in HSR-reportable transactions in the forthcoming months. Indeed, U.S. Chamber members have already engaged in HSR-reportable transactions this year that were subject to the Rule's requirements. These members have been or will be subject to the requirements of the Rule, and thus have incurred or will incur the substantially increased burden and expense necessary to complete the revised HSR notification form.

8.     Information about our members' HSR-reportable activity is highly sensitive. Public disclosure of members' near- and medium-term plans to engage in HSR-reportable activity could have a significant impact on the members' businesses, on potential transactions they are considering, and in some cases on public securities markets. Moreover, our members deal frequently with federal regulators, including the FTC in the context of HSR review, and are concerned that being identified in this suit could result in greater regulatory scrutiny. Accordingly, our members have asked me not to reveal their identities and to avoid providing unnecessary details that could be used to identify them. Nevertheless, certain members have authorized disclosure of the following information to demonstrate that they will enter into HSR-reportable transactions and thus be harmed by the Rule.

9.     Member A is a healthcare company with over 2,300 employees in Texas. Member A regularly engages in M&A transactions, including HSR-reportable transactions, as part of its business model. Over the past 10 years, Member A has engaged in more than 25 HSR-reportable transactions as well as other transactions below the HSR reporting threshold. Consistent with its business model and historic level of activity, Member A plans to continue to engage in HSR-reportable transactions in the foreseeable future.

10. Member B is a transportation company with over 10,000 employees in Texas. Member B has engaged in several HSR-reportable transactions, as part of its business model, over the last 10 years. Consistent with its business model and historic level of activity, Member B plans to continue to engage in HSR-reportable transactions in the foreseeable future.

11. Member C is a large company with significant operations in Texas and often engages in HSR-reportable transactions. Consistent with its historic level of activity, Member C plans to continue to engage in HSR-reportable transactions in the foreseeable future.

12. These and other U.S. Chamber members are harmed by the Rule, and that harm would be redressed by an order vacating the Rule and/or enjoining the FTC from requiring parties to HSR-reportable transactions to comply with it. The FTC's massive expansion of the information and material required in the premerger notification form, which both the buyer and seller in virtually every HSR-reportable transaction must file, will make it far more costly for U.S. Chamber members to consummate such deals. The FTC itself estimates that the average time for all filers to complete the revised premerger notification form will nearly triple, from 37 hours to complete the existing form to 105 hours to complete the new form. 89 Fed. Reg. at 89,332. For half of all reportable transactions, the FTC estimates that the time for the buyer to complete the form will increase to 158 hours, a 427% increase over the status quo. *Id*. When U.S. Chamber members enter into HSR-reportable transactions, they will experience these increased costs as a result of being subject to the Rule.

13. On behalf of the U.S. Chamber, I filed a comment letter during the rulemaking strongly opposing the FTC's proposed revisions to the HSR Form and urging the agency to withdraw the Rule. *See* U.S. Chamber Comment (Sept. 27, 2023),

4

https://www.regulations.gov/comment/FTC-2023-0040-0684. In that comment letter, I attached a study of the NPRM conducted by Professor S.P. Kothari of MIT, whom the Chamber engaged to analyze the NPRM. The U.S. Chamber also conducted a survey of 70 antitrust practitioners to solicit their views of the NPRM and to better understand its costs. Incorporating the results of that survey, Professor Kothari concluded that the FTC's NPRM underestimated the *average* additional cost of the proposed rule to filing parties by a factor of seven. In other words, the average HSR filing would be seven times more expensive for the filing parties to complete than the FTC was estimating. And many filings would of course be far more time-consuming and expensive than the average.

14. In the Final Rule, the FTC admitted that Professor Kothari's cost estimates were more accurate than the agency's estimates in the NPRM. 89 Fed. Reg. at 89,331. The FTC claimed to have improved its methodology and argued that its new estimates of the cost of the Final Rule are "generally consistent with" the results of the U.S. Chamber's practitioner survey and the Kothari Report. *Id.* at 89,332-89,333. Based on my conversations with U.S. Chamber members and antitrust practitioners, I do not agree with that statement. The FTC may no longer be off by a factor of seven, but its cost estimates are still far too low. In any case, even the FTC concluded that the Final Rule triples the costs of completing the HSR Form for the average transaction and quadruples it for so-called "overlap" transactions, which are half of all HSR-reported transactions. Even those (understated) impacts remain massive increases in direct compliance costs that are attributable to the Rule.

15. Beyond these direct compliance costs, the Rule inflicts significant indirect costs on U.S. Chamber members who enter into, or are even considering entering into, HSR-reportable transactions. For example, the need to collect, review, analyze, and prepare the

5

additional information required by the Rule will significantly extend and delay deal timelines. Such delays may hamper the transacting parties' ability to obtain financing, increase the risk that news of a non-public deal will leak, and generally impede if not prevent consummation of the transaction. The Rule also imposes a significant opportunity cost to businesses, which must divert valuable director, officer, and employee time to preparing the premerger notification form instead of running the company. The Rule will therefore likely deprive certain U.S. Chamber members of the additional resources, talent, efficiencies, and economies of scale that are gained through productive M&A activity. As a result, the Rule will also limit the ability of certain U.S. Chamber members to bring new and better products to more consumers and more markets.

16. In light of the above harmful effects of the Rule, and based on consultation with the members of the U.S. Chamber, the Chamber directly advances its mission and the interests of its members by bringing this lawsuit to challenge the Rule.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 30, 2025, at 1615 H Street, NW, Washington, DC 20062.

_____

Sean Heather

7