# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, AMERICAN INVESTMENT COUNCIL, and LONGVIEW CHAMBER OF COMMERCE,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION and ANDREW N. FERGUSON, in his official capacity,<br><br>*Defendants*. | Case No. 6:25-cv-00009-JDK |

**DECLARATION OF REBEKAH GOSHORN JURATA,
GENERAL COUNSEL FOR PLAINTIFF
AMERICAN INVESTMENT COUNCIL**

Pursuant to 28 U.S.C. § 1746, I, *R. G. Jwata*, hereby declare as follows:

1. I am the General Counsel of the American Investment Council (AIC). My business address is 815 Connecticut Ave NW Suite 620, Washington, DC 20006.

2. I am over 18 years old. This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of AIC. If called as a witness, I could and would testify competently thereto.

3. AIC is a 501(c)(6) nonprofit association of private equity and private credit firms. AIC is the premier trade association for the private investment industry. AIC's mission is to develop and provide information about the private investment industry and its contribution to the long-term growth of the U.S. economy and retirement security of American workers. As part of its mission, AIC advocates on behalf of its members and the overall private investment industry before Congress, the Executive Branch, and the courts, to ensure the best possible regulatory environment for the industry to continue successfully investing in and across America.

4. Private equity firms invest capital in companies that are perceived to have growth potential and then work with those companies to expand or grow the business. The capital is contributed by large institutional investors and organized into funds. The fund managers will typically use the capital in those funds to buy companies, work with them for a period of three to seven years to improve their operations and profitability, and then take the companies public or sell them at a higher valuation, returning the profits to investors. Because buying and selling companies is inherent in the private equity model, private equity firms are frequent participants in merger-and-acquisition (M&A) transactions.

1

5. Many of the country's leading private equity firms are members of AIC. Our members have offices and portfolio companies in every state in America. In Texas alone, there are hundreds of private equity firms and over 1,000 private equity-backed companies, including companies operating in the Eastern District of Texas.

6. Investment from AIC's member firms fuels thousands of small businesses that are the lifeblood of local communities. In 2024, 85% of all private equity investments went to small businesses with fewer than 500 employees. That capital, financing, and expertise helps companies of all shapes and sizes develop new and better goods and service, increase productivity, hire new employees, improve their operations, and ultimately, compete more effectively with entrenched incumbents. And the returns flow to the 34 million public sector workers and retirees whose pensions are invested in private equity vehicles.

7. On November 12, 2024, the Federal Trade Commission adopted a rule that amends the premerger notification form required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act), 15 U.S.C. § 18a. *Premerger Notification; Reporting and Waiting Period Requirements*, 89 Fed. Reg. at 89,216 (Nov. 12, 2024). The Rule massively expands the amount of documentary material and information that must be included in the initial premerger notification form for all HSR-reportable M&A transactions. Even under the agency's conservative estimate, the Rule's changes to the notification form will more than quadruple the average time and expense of preparing an HSR filing.

8.  The Rule will have a direct and acute impact on AIC's membership. As noted above, M&A is a necessary component and consistent feature of the private equity business model. Such transactions are the way that private equity firms generally provide capital and financing to their portfolio companies, and are a common mechanism by which firms exit successful investments to realize returns for their investors. According to public data, from 2011 to 2024, there were over 83,000 acquisitions involving private equity firms. Over 24,000 of those were deals valued at over $100 million and thus above the applicable HSR reporting threshold, which is adjusted every year for inflation and crossed the $100 million threshold only in 2022. In the most recent year, 2024, there were over 8,000 acquisitions involving private equity firms and over 1,500 private equity exits. Over 2,300 acquisitions were valued at over $100 million; the HSR reporting threshold was $119.5 million.

9.  Consistent with these figures and given their business models, virtually all of AIC's private equity firm members regularly enter into merger, acquisition, or other transactions that meet or exceed the size thresholds for filing a premerger notification form under the HSR Act. Thus, virtually all of AIC's private equity firm members routinely file the HSR premerger notification form. Indeed, many of AIC's members have already engaged in HSR-reportable transactions this year that were subject to the Rule's requirements. AIC's members are thus subject to the requirements of the Rule, and have consequently incurred or will incur the substantially increased burden and expense necessary to complete the revised HSR notification form.

10. Indeed, it is entirely unsurprising that the Rule so substantially impacts AIC's membership because the Rule expressly targets the private equity industry. In the

Rule, the FTC claims that one of the major reasons for its complete redesign of the HSR Form is the fact that "[p]rivate equity has accounted for an increasing share of all merger activity over time," leading to a "recent estimate[]" that "private equity deal-making [now] account[s] for 40% or more of domestic M&A activity." 89 Fed. Reg. at 89223 & n.48. The Rule also points to "private equity buyers" to justify the HSR Form's new focus on serial acquisitions, 89 Fed. Reg. at 89,234, its new requirement that filers must provide additional information about minority interest holders and related entities, 89 Fed. Reg. at 89,288, and other requirements. In fact, the phrase "private equity" appears in the Rule no fewer than 44 separate times. Again, the Rule's consistent focus on the private-investment industry make sense, since few if any sectors of the economy are more directly and concretely affected by a regulation that drastically increases the costs associated with M&A activity.

11. Information about our members' HSR-reportable activity is highly sensitive. Public disclosure of members' near- and medium-term plans to engage in HSR-reportable activity could have a significant impact on the members' businesses, on potential transactions they are considering, and in some cases on public securities markets. Moreover, our members deal frequently with federal regulators, including the FTC in the context of HSR review, and are concerned that being identified in this suit could result in additional and unwarranted regulatory scrutiny. Accordingly, our members have asked me not to reveal their identities and to avoid providing unnecessary details that could be used to identify them, which I understand is not required under applicable law.

12. Nevertheless, one member has authorized disclosure of the following information to demonstrate that they will enter into HSR-reportable transactions and thus

4

be harmed by the Rule, as a representative example. Member A is a firm that engages in regular M&A activity as part of its business model. Since 2020, Member A has engaged in over 15 HSR-reportable transactions. Going forward, Member A plans to continue to engage in a similar level of HSR-reportable activity and expects to enter into several HSR-reportable transactions in the next 12 months.

13. Given the nature of their business, virtually all of AIC's private equity members could demonstrate that the Rule harms them in the same or similar ways as Member A. That harm would be redressed by an order vacating the Rule and/or enjoining the FTC from requiring parties to HSR-reportable transactions to comply with it. The FTC's massive expansion of the information and material required in the premerger notification form, which both the buyer and seller in virtually every HSR-reportable transaction must file, will make it far more costly for AIC members to consummate such deals. The FTC itself estimates that the average time for all filers to complete the revised premerger notification form will nearly triple, from 37 hours to complete the existing form to 105 hours to complete the new form. 89 Fed. Reg. at 89,332. For half of all reportable transactions, the FTC estimates that the time for the buyer to complete the form will increase to 158 hours, a 427% increase over the status quo. *Id.* When AIC members enter into HSR-reportable transactions, they will experience these increased costs as a result of being subject to the Rule.

14. Beyond these direct compliance costs, the Rule inflicts significant indirect costs on AIC members who enter into, or are even considering entering into, HSR-reportable transactions. For example, the need to collect, review, analyze, and prepare the

additional information required by the Rule will significantly extend and delay deal timelines. Such delays may hamper the transacting parties' ability to obtain financing, increase the risk that news of a non-public deal will leak, and generally impede if not prevent consummation of the transaction. By imposing all of these new direct and indirect costs, the Rule is likely to prevent consummation of at least some HSR-reportable transactions that AIC members would otherwise have entered.

15. In light of the above effects of the Rule, and based on consultation with the members of AIC, AIC directly advances its mission and the interests of our members by bringing this lawsuit to challenge the Rule. Indeed, AIC filed a comment letter strongly opposing the FTC's proposed revisions to the HSR Form during the rulemaking and urged the agency to withdraw the Rule. *See* AIC Comment (Sept. 27, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0705.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 30, 2025, at 815 Connecticut Ave NW Suite 620, Washington, DC 20006.

_____
Rebekah Goshorn Jurata