# Exhibit 1

## FEDERAL TRADE COMMISSION

**16 CFR Parts 801 and 803**

**RIN 3084–AB46**

## Premerger Notification; Reporting and Waiting Period Requirements

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** The Federal Trade Commission ("FTC" or "Commission"), with the concurrence of the Assistant Attorney General, Antitrust Division, Department of Justice ("Assistant Attorney General" or "Antitrust Division") (together the "Agencies"), is issuing this final rule and Statement of Basis and Purpose ("SBP") to amend the Premerger Notification Rules (the "Rules") that implement the Hart-Scott-Rodino Antitrust Improvement Act ("the HSR Act" or "HSR"), including the Premerger Notification and Report Form for Certain Mergers and Acquisitions ("Form") and Instructions to the Notification and Report Form for Certain Mergers and Acquisitions ("Instructions"). The final rule requires parties to transactions that are reportable under the HSR Act to provide documentary material and information that are necessary and appropriate for the Agencies to efficiently and effectively conduct an initial assessment to determine whether the transaction may violate the antitrust laws and whether to issue a Request for Additional Information ("Second Request") as provided by the HSR Act. In addition, the final rule implements certain requirements of the Merger Filing Fee Modernization Act of 2022 ("Merger Modernization Act") and ministerial changes to the Rules as well as the necessary amendments to the Instructions to effect the final changes.

**DATES:** This rule is effective on February 10, 2025.

**FOR FURTHER INFORMATION CONTACT:** Robert Jones, Assistant Director, Premerger Notification Office, Bureau of Competition, Federal Trade Commission, 400 7th Street SW, Washington, DC 20024, or by telephone at (202) 326–3100.

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

The Commission is amending and reorganizing the documentary material and information requirements for premerger notification required by the HSR Act, 15 U.S.C. 18a, ("notification" or "HSR Filing" or "Filing") to improve the efficiency and effectiveness of premerger review and to implement changes mandated by the Merger Modernization Act, 15 U.S.C. 18b. The Act and the Rules require parties to certain mergers and acquisitions to submit a notification to the Agencies and to wait a short period of time before consummating the reported transaction. The reporting and waiting period requirements of the HSR Act are intended to enable the Agencies to determine whether a proposed merger or acquisition may violate the antitrust laws, including section 7 of the Clayton Act, 15 U.S.C. 18, if consummated and, when appropriate, to take appropriate law enforcement action prior to consummation to prevent a violation of the antitrust laws.

To advance the Clayton Act's goal of preventing undue consolidation or stopping it in its incipiency,[1] Congress passed the HSR Act to require mandatory premerger notification of some acquisitions. In particular, it charged the Agencies with reviewing the details of those proposed transactions in advance of consummation. The Agencies rely on information submitted in an HSR Filing to conduct a premerger antitrust risk assessment and to identify those transactions that require additional investigation to determine if they may harm competition, and thus violate the antitrust laws if consummated. The HSR Act requires that the parties not consummate their planned transaction while the Agencies conduct this assessment until the expiration of the statutory waiting period, which for most transactions is 30 days (15 days in the case of a cash tender offer or certain bankruptcy sales). During that short period of time, referred to as the initial waiting period, the Agencies review the information submitted in the parties' HSR Filings to identify those transactions that require a closer look, including through the collection of additional information from the acquiring and acquired persons or from third parties. If either agency determines during the initial waiting period to conduct an in-depth investigation of the transaction, section 7A(e) of the Clayton Act, 15 U.S.C. 18a(e), authorizes the Agencies to request additional information or documents from each party, which is referred to as a Second Request.[2] Issuing Second Requests

extends the waiting period under the HSR Act for another 30 days (ten days in the case of a cash tender offer or certain bankruptcy sales) after the parties have substantially complied with the Second Requests. During this second waiting period, if the reviewing agency believes that a proposed transaction may violate the antitrust laws, it may seek an injunction in Federal district court to prohibit consummation of the transaction.

The Commission has administered the HSR Act's premerger notification program for over forty-five years, issuing an initial set of HSR Rules that took effect on September 5, 1978.[3] Since then, it has regularly updated these rules, with the concurrence of the Assistant Attorney General, pursuant to its mandate under 15 U.S.C. 18a(d), to require a premerger notification for each reportable acquisition that contains documentary material and information necessary and appropriate to enable the Agencies to determine whether the transaction is one that may violate the antitrust laws and proceed to an in-depth investigation through the issuance of Second Requests. In this rulemaking, the Commission is responding to several factors that make today's economic reality more challenging for conducting a premerger assessment with the limited information required by the current rules. Simply put, the economy of 2024 is different than it was in 1978 or 2000 and, in the Agencies' experience, the HSR Form has not kept pace with the realities of how businesses compete today. There is a higher degree of interconnectivity of businesses along the supply chain as well as with other companies that provide ancillary services. The focus of competitive interaction is not as obvious when companies that supply goods or services also generate revenues from other sources, such as data sales, and when even businesses in traditional sectors such as manufacturing generate significant revenues from the sale of associated services. The changing nature of competition makes it more difficult for the Agencies to identify existing business relationships that might be affected by the acquisition, including through non-price effects such as innovation competition, and that are not

---

[1] *See, e.g., Brown Shoe Co.* v. *United States,* 370 U.S. 294, 318 n.32 (1962).

[2] The FTC and DOJ share responsibility to enforce the antitrust laws and have established a protocol to clear the investigation of a transaction to one agency to avoid confusion and conserve public resources. The agency that receives clearance conducts the investigation and determines whether to issue Second Requests.

[3] The Commission commenced notice-and-comment rulemaking soon after the passage of the HSR Act and made extensive revisions to its proposed rules before issuing a final rule nearly two years later. *See* 41 FR 55488 (Dec. 20, 1976), 42 FR 39040 (Aug. 1, 1977), 43 FR 33450 (July 31, 1978), 43 FR 34443 (Aug. 4, 1978), 43 FR 36053 (Aug. 15, 1978). *See* Fed. Trade Comm'n & U.S. Dep't of Justice, Second Hart-Scott-Rodino Annual Report (FY 1978).

apparent from simply focusing on sales in output markets. In addition, changes in mergers and acquisition ("M&A") activity, corporate structures, and investment strategies have rendered the current Form's focus on traditional corporate structures outdated, and often the Agencies are unable to determine which entities or individuals will be making competitive decisions post-merger.

These profound changes that have occurred over time have created or exposed significant gaps in the information generated for premerger review under the current HSR Rules. These gaps curtail the Agencies' ability to efficiently and effectively detect transactions that may violate the antitrust laws. To fill in these gaps and to directly respond to the passage of the Merger Modernization Act, the Commission relied on its experience and expertise to identify specific information that is necessary and appropriate to conduct effective premerger screening.

To initiate this rulemaking, the Agencies conducted a comprehensive review of the premerger notification process, relied on their experience collecting and reviewing data and documents during antitrust investigations, and considered the cumulative effects of changes in deal structure, investment strategies, and the competitive dynamics of the modern economy explained in more detail below. From this review, the Commission identified several information deficiencies in the current HSR Filing that prevent the Agencies from efficiently and effectively conducting a premerger assessment of reportable transactions to identify which ones may violate the antitrust laws. The Agencies compared documentary material and information they have received over the years during in-depth merger investigations with the information collected in HSR Filings and assessed whether having certain types of documentary material and information at the beginning of an investigation would have changed the Agencies' decision whether and how to investigate reportable transactions. These specific categories of information and documents, which are readily available to the merging parties, are not required by the current Rules, but would be highly probative to the initial antitrust screening of a transaction during the initial waiting period and thus are necessary and appropriate for that review. The information identified and required by this final rule will enable the Agencies to detect transactions that may violate the law in

light of modern commercial realities and in furtherance of the statutory mandate to arrest trends toward concentration in their incipiency. The final rule also will allow the Agencies to identify potentially unlawful transactions more quickly and with greater accuracy, narrowing the scope of their investigations in some cases, and in others, reducing the need to conduct a more burdensome in-depth investigation by issuing Second Requests.

In June 2023, the Commission proposed amendments to address the information deficiencies under the existing HSR Rules in a Notice of Proposed Rulemaking ("NPRM").[4] The Commission received approximately 721 comments.[5] The majority of commenters were individuals who expressed general support for the rulemaking or for more vigorous antitrust enforcement more broadly. Others opposed certain aspects of the proposed rule and some questioned the Commission's authority to make any adjustments. After careful consideration of the comments and as discussed in more detail below, the Commission has substantially narrowed the information requirements proposed in the NPRM. In the final rule, the Commission is not adopting several proposed requirements outright, including those related to:

• a timeline of key dates for closing the proposed transaction;
• creating organization charts for the purpose of filing a notification;
• information about other interest holders;
• drafts of submitted documents;
• information about employees;
• information about board observers;
• geolocation information;
• prior acquisitions involving entities with less than $10 million in sales or revenues, or consummated more than 5 years prior to filing; and

• information about steps taken to preserve documents or use of messaging systems.

For other proposals, the Commission has substantially modified its proposals to minimize where possible the costs to filers and third parties, yet still provide the Agencies with information that is necessary and appropriate for effective and efficient premerger review. Overall, these modifications significantly reduce the effort required to comply with the final rule as compared to the proposed rule and include:

• Creating a new category of "select 801.30 transactions" for which the cost of complying with the information requirements has been limited because of the low risk that the transaction may violate the antitrust laws;
• Eliminating several document requirements to reduce costs;
• Limiting some requirements to materials that already exist;
• Excusing the seller[6] from certain information requests if it would be duplicative of information received from the buyer;
• Limiting some requirements to cover only recent information;
• Providing definitions or clarifications to reduce uncertainty and improve filer compliance;
• Creating *de minimis* exceptions to reduce the costs of generating information that has little economic impact; and
• Making the provision of certain information contingent on the identification of a significant business relationship between the filing persons that is critical to assessing whether the transaction may violate the antitrust laws.

As modified, the final rule introduces necessary and appropriate updates to HSR information requirements to allow the Agencies to understand the reported transaction and conduct an initial antitrust assessment within the statutory timeframe and does so in a manner that aligns the associated costs with the likelihood that the transaction is one that presents antitrust risk. With more complete information that is targeted to disclose existing business relationships between the parties, the Agencies can determine whether and how to deploy their resources to further investigate potentially anticompetitive acquisitions prior to consummation. The final rule will also provide transparency for those contemplating a reportable transaction by describing the information the

---

[4] On June 29, 2023, the Commission published a Notice of Proposed Rulemaking, Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 (June 29, 2023) (hereinafter NPRM). On August 10, 2023, the Commission extended the comment period to receive public comments through September 27, 2023. 88 FR 54256. The comments on the NPRM (Doc. No. FTC–2023–0040) are available at *https://www.regulations.gov/docket/FTC-2023-0040/comments.*

[5] The Commission does not rely on any particular individual comment submission for its findings, but rather provides here (and throughout this final rule) examples of comments that were illustrative of themes that spanned many comments. The Commission's findings are based on consideration of the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise and experience in identifying mergers that violate the antitrust laws.

[6] References to "seller" throughout refer to the acquired person, as defined in 16 CFR 801.2, regardless of whether or not the acquired person is actually a party to the transaction.

Agencies rely on to conduct their initial assessment of whether a transaction may violate the antitrust laws. The amendments will also reduce the current burden on third parties (such as customers and competitors of the merging parties) on whom the Agencies often rely to fill in many of the information gaps during the initial review period because of inadequacies in the current Rules.

With this rulemaking the Commission has closely tailored the burden of complying with the HSR Act to align as much as practicable with the risks of a law violation presented by the particular transaction. This alignment is consistent with the statutory purpose of premerger review, which is for the Agencies to determine which reported transactions may violate the antitrust laws during the brief period provided by the Act for an initial antitrust assessment. As a result, the final rule achieves the benefits associated with mandatory premerger review with an overall burden that is reasonable and consistent with the legislative purpose of the HSR Act.

## II. Background

### A. Premerger Review and the Implications for Merger Enforcement

Section 7 of the Clayton Act is, by its terms, forward-looking and predictive, focused on acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly." [7] To better effectuate the Clayton Act's goal of preventing undue consolidation or stopping it in its incipiency, Congress passed the HSR Act to require mandatory premerger notification of some acquisitions, and charged the Agencies with reviewing the details of those proposed transactions in advance of consummation to determine whether

they may violate the antitrust laws. In doing so, Congress fundamentally changed the way the Agencies enforce the nation's antitrust laws to prevent harmful consolidation.[8]

Congress specifically charged that the Commission engage in rulemaking to require information in the HSR Filing that is necessary and appropriate to detect acquisitions that may violate the antitrust laws. Section 18a(d)(1) of the HSR Act states that the Commission, by rule and in accordance with the Administrative Procedures Act, shall require that the notification contain such documentary material and information to determine whether the acquisition may, if consummated, violate the antitrust laws.[9] Relying on this explicit rulemaking authority, the Commission has adjusted those requirements over time to carry out the purposes of the Act.

In passing the HSR Act, Congress imposed mandatory premerger review only for certain large transactions, in part to "improve and modernize antitrust investigation and enforcement mechanisms," [10] "ease burdens on the courts by forestalling interminable post-consummation divestiture trials . . . [, and] advance the legitimate interests of the business community in planning and predictability." [11] The robust legislative history of the HSR Act makes plain that premerger review should focus on the likelihood that a reported transaction may violate the antitrust

laws and that the Commission shall collect information to make that determination prior to consummation.[12] Consistent with Congressional mandate, the Agencies rely on notifications under the HSR Act to target their enforcement efforts to their best use in preventing undue consolidation by seeking to prohibit the consummation of acquisitions that violate the antitrust laws.

To focus the Agencies' screening and potential enforcement efforts on the mergers that are most likely to harm competition and consumers, Congress required notice in advance for the largest mergers and tasked the Agencies with conducting an assessment of the risk that the proposed acquisition may violate the antitrust laws. To perform this task, the Agencies must review thousands of filings each year and identify which ones should be targeted for an intensive investigation of their potential to violate the antitrust laws. This is a fact-intensive endeavor that requires a deep understanding of precedent and economic analysis. The Agencies employ lawyers, economists, technologists, accountants, and support staff to conduct premerger analyses of reported transactions in order to perform this critical task on behalf of the American public.

Nonetheless, transactions reported under the HSR Act are a small fraction of the total number of mergers and acquisitions that occur each year in the United States. Relying on commercial data on M&A activity and data from the Agencies' annual HSR reports, Table 1 shows that during the five-year period of FY 2018 to 2022, HSR filings represented a small percentage of overall deal activity in the United States, on average 16.5 percent a year.[13]

---

[7] 15 U.S.C. 18. *See Brown Shoe* v. *United States*, 370 U.S. 294, 317–18 (1962) (Congress provided authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency and assure courts had the power to brake the process of concentration at its outset and before it gathered momentum).

[8] *See* Peter W. Rodino, Jr., Statement on the 25th Anniversary of Hart-Scott-Rodino (2001), *https://www.ftc.gov/enforcement/premerger-notification-program/hsr-resources/pno-news-archive/statement-peter-w-rodino* ("Hart-Scott-Rodino was intended to give the anti-trust agencies two things: critical information about a proposed merger and time to analyze that information and prepare a case, if necessary. From what I hear, the legislation absolutely has transformed merger enforcement. Competition, as well as the consumer, has benefitted.").

[9] 15 U.S.C. 18a(d)(1).

[10] S. Rep. No. 94–803, at 1 (1976).

[11] H.R. Rep. No. 94–1373, at 11 (1976). The HSR Act applies to acquisitions that met the statutory thresholds whether they are properly styled "mergers" and even if they do not result in a change of control. The terms "mergers," "acquisitions," and "transactions" are used interchangeably to refer to transactions for which an HSR filing is required.

[12] 15 U.S.C. 18a(d)(1).

[13] Using different commercially available data, the U.S. Government Accountability Office recently estimated that HSR filings during this same time frame averaged 15 percent of overall M&A activity. *See* U.S. Gov't Accountability Office, Defense Industrial Base: DOD Needs Better Insight into Risks from Mergers and Acquisitions 8 Fig. 1 (Oct. 2023) (GAO–24–106129), *https://www.gao.gov/assets/d24106129.pdf* (using Bloomberg data).

## Table 1: M&A Transactions 2018 - 2022

|  | 2018 | 2019 | 2020 | 2021 | 2022 | **Average** |
|---|---|---|---|---|---|---|
| Total Number of Transactions[a] | 13,366 | 13,696 | 12,828 | 19,099 | 15,734 | **14,945** |
| Number of Reported Transactions[b] | 2,111 | 2,089 | 1,637 | 3,520 | 3,152 | **2,502** |
| Percentage | 15.8% | 15.3% | 12.8% | 18.4% | 20.0% | **16.5%** |

[a] Source: MergerStat Fact Set Review: M&A Announcements.
[b] Source: HSR Annual Reports for Fiscal Years 2018 - 2022, Figure 1.

While the Agencies investigate and ultimately seek to block only a small subset of reportable mergers each year, the challenges of administering mandatory premerger review have expanded and accelerated over time due to the changes in the nature of M&A activity discussed in detail below.

### Figure 1: HSR Merger Transactions Reported Fiscal Years 2014 - 2023



As depicted in Figure 1, there was a recent spike in HSR-reportable transactions: in FY 2021, the Agencies reviewed HSR Filings for 3,520 transactions, over twice the number of the prior year's filings. In FY 2022, the Agencies reviewed 3,152 transactions. Although the pace of HSR Filings has recently moderated somewhat, the recent period of intense merger activity highlighted significant inefficiencies and deficiencies in current notification requirements that must be addressed so that the Agencies can direct their scarce resources to prevent those acquisitions most likely to cause widespread harm.[14]

The Commission is mindful of recent economic research that underscores the importance of adequate detection for effective merger enforcement. For instance, researchers posit that some firms appear to be employing strategies to avoid antitrust scrutiny of their anticompetitive deals, deliberately negotiating and structuring their deals to avoid premerger review (so-called

---

[14] Contrary to suggestions from some commenters, it is not practical for the Agencies to identify specific illegal transactions that they "missed" during their premerger review, nor is the Commission required to establish that as a predicate for invoking its statutory rulemaking authority under the HSR Act. *See Pharm. Rsch. & Mfrs. Am.* v. *FTC*, 790 F.3d 198, 199, 206 (D.C. Cir. 2015) (hereinafter *PhRMA*). Doing so would require a redirection of resources to investigate consummated mergers and away from resources devoted to premerger review. Instead, it is imperative that the Agencies ensure that they have the right information to address deficiencies that have emerged to undermine premerger review as an effective tool for detecting which transactions may violate the nation's antitrust laws.

stealth acquisitions),[15] or identifying acquisition targets at a nascent stage to buy them before they are valuable enough to require premerger review, sometimes solely for the purpose of preempting future competition (so-called "killer acquisitions").[16] One researcher concludes that merger enforcement falls by about 90 percent when transactions are not subject to premerger review.[17] Because most mergers are not subjected to premerger review, these strategies have contributed to a rise in aggregate concentration by stimulating mergers between competitors, with attendant negative effects on markups, private investment, and the share of output going toward profits.[18]

These studies support Congress' determination that premerger review is essential to effective enforcement of the antitrust laws and that without effective premerger review, there is inadequate detection of mergers that violate the law and cause harm.[19] While the Agencies can and do challenge acquisitions that are not reported under the HSR Act as well as consummated reported mergers that have caused harm, unwinding an illegal merger post-consummation still requires a significant investment of time and resources, and results in significant harm to market participants until unwound.[20] Even after the Agency

succeeds in establishing a law violation, it may be difficult or impossible to restore the premerger state of competition, especially if the parties have commingled, sold, or closed assets, shared confidential information, or terminated key employees.[21] Moreover, the decision to pursue these time-consuming investigations involves opportunity costs, pitting the costs and benefits of challenging a consummated merger against devoting those enforcement resources to investigations into other potential antitrust violations, including investigations that may arise from HSR Filings.

To fulfill the Agencies' mandate to conduct quick yet effective premerger review of reported transactions, the Commission must make the best use of the tools Congress gave the Agencies to detect and prevent harmful acquisitions, including by requiring that the notification contain the documents and information that are necessary and appropriate for screening reportable mergers prior to consummation. Because premerger review is critically important to effective merger enforcement, the information contained in an HSR Filing must be fit for the purpose of determining whether a reported transaction may violate the antitrust laws in light of current market realities. Having the information necessary to make that assessment allows the Agencies to decide when and how to expend public resources to investigate and potentially challenge mergers. The final rule will enable the Agencies to engage in efficient and effective detection of illegal mergers that are subject to the HSR Act and thus is

a reasonable exercise of the Commission's rulemaking authority under the HSR Act.

*B. The Need for the Final Rule*

The purpose of this rulemaking is to modernize the premerger review process in light of changing market dynamics, making adjustments that are necessary and appropriate to allow the Agencies to detect and prevent illegal mergers prior to consummation. The final rule also makes the process more efficient for filers, third parties, and the Agencies, shifting some of the burden of information collection and reporting to the merging parties (and away from third parties) and requiring the information needed for a preliminary antitrust assessment to be contained in the HSR Filing so that the Agencies have the full statutory review period to assess and confirm the information. Overall, the final rule addresses significant information gaps and asymmetries that have grown over time and undermined the Agencies' ability to conduct premerger review. In addition, this rulemaking implements requirements Congress imposed by passing the Merger Modernization Act, which broadened the scope of information the Agencies must collect as part of premerger review, including by requiring the collection of information about subsidies from foreign entities and governments of concern.

Due to changing commercial realities referenced above, the existing requirements for an HSR Filing leave significant gaps in the information available to the Agencies for conducting this assessment. Many of these gaps can be filled by information that the filing parties already have and often use in their own assessment of the transaction. Certain deficiencies in the existing reporting requirements prevent the Agencies from spotting problem areas that would justify a more in-depth investigation or, alternatively, from readily obtaining the facts needed to conclude that the transaction does not merit in-depth review prior to consummation. The rulemaking addresses these problems as well.

Based on the Agencies' extensive experience reviewing HSR Filings, transactions that present certain attributes are more likely to violate the antitrust laws and deserve further investigation. For instance, a merger of two firms that compete (or will soon compete) to provide goods or services to

[15] John Kepler et al., "Stealth Acquisitions and Product Market Competition," 78 J. Fin. 2837 (2023); John M. Barrios & Thomas G. Wollmann, "A New Era of Midnight Mergers: Antitrust Risk and Investor Disclosures" (Nat'l Bureau of Econ. Rsch., Working Paper No. 29655, Jan. 2022), *https://www.nber.org/papers/w29655*; *see also* Colleen Cunningham et al., "Killer acquisitions," 129 J. Political Econ. 649, 653 (2021) (killer acquisitions of overlapping targets bunch just below HSR threshold while there is no such pattern for non-overlapping acquisitions).

[16] Cunningham et al., *supra* note 15, at 653.

[17] *See* Comment of Thomas Wollmann, Doc. No. FTC–2023–0040–0680 at 1 n.2 (citing to Thomas G. Wollmann, "Stealth Consolidation: Evidence from an Amendment to the Hart-Scott-Rodino Act," 1 a.m. Econ. Rev.: Insights 77–94 (2019) and Thomas G. Wollman, "How to Get Away with Merger: Stealth Consolidation and Its Real Effects on US Healthcare" (Nat'l Bureau of Econ. Rsch., Working Paper No. 27274, 2021)).

[18] Thomas G. Wollmann, "Stealth Consolidation: Evidence from an Amendment to the Hart-Scott-Rodino Act," 1 a.m. Econ. Rev.: Insights 77–78 (2019) (hereinafter "Stealth Consolidation").

[19] *See id.* at 77 (post-2000, enforcement against newly exempt transactions dropped to nearly zero while mergers between competitors rose sharply, reflecting an endogenous response to reduced premerger scrutiny).

[20] In a recent example, the Commission ordered the unwinding of an illegal merger three years and two months after consummation. In December 2020, the Commission approved Otto Bock's divestiture of the assets of Freedom Innovations to another company to resurrect competition in the market for

microprocessor prosthetic knees. *In re Otto Bock HealthCare N. Am., Inc.,* No. 9378 (F.T.C. Dec. 1, 2020). The Commission's effort to unwind Polypore's illegal acquisition of rival battery separator manufacturer Microporous required five years, during which an Eleventh Circuit decision upheld the Commission's divestiture order. *See* Press Release, Fed. Trade Comm'n, "FTC Approves Polypore International's Application to Sell Microporous to Seven Mile Capital Partners; Sale Will Unwind Illegal 2008 Acquisition" (Dec. 18, 2013), *https://www.ftc.gov/news-events/news/press-releases/2013/12/ftc-approves-polypore-internationals-application-sell-microporous-seven-mile-capital-partners-sale. See also* Debbie Feinstein, "Un-consummated merger," Fed. Trade Comm'n Competition Matters blog (Dec. 18, 2013), *https://www.ftc.gov/enforcement/competition-matters/2013/12/un-consummated-merger.*

[21] Fed. Trade Comm'n, The FTC's Merger Remedies 2006–2012, 18–19 (2017) (report of the Bureaus of Competition and Economics) (less than one-quarter of consummated merger remedies successfully restored competition), *https://www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf.*

the same set of customers, or a merger involving a manufacturer and its main distributor that also distributes the products of competing manufacturers, may warrant closer scrutiny. On the other hand, if the Agencies can determine from review of an HSR Filing that a transaction does not present such attributes, the Agencies can more quickly and confidently determine that the transaction does not require a more in-depth review and may proceed to consummation.[22] However, the Agencies cannot make these determinations with confidence in the initial 15- or 30-day waiting period when the HSR Filings lack sufficient information about relevant premerger competitive relationships between the parties. By requiring the submission of such information, the final rule enables effective Agency decision-making during the initial 15- or 30-day waiting period.[23] The intention of the final rule is to make it possible for the Agencies to identify the most concerning transactions for more in-depth review, including through the issuance of Second Requests, and also to more quickly and confidently complete the review of those transactions that do not merit additional investigation and can proceed to closing at the end of the statutory waiting period.

The consequences of inadequate detection are revealed in a recent analysis of hospital mergers that were reported to the Agencies for premerger review co-authored by two economists from the Commission's Bureau of Economics.[24] The paper examined a set of consummated hospital mergers and measured the effect of each merger on prices. The study concluded that mergers not reportable under the HSR Act did not result in larger price increases than reportable mergers. In contrast, the authors found different outcomes among mergers that were subject to premerger review based on how much review the transaction received. Of the mergers reported to the Agencies, the largest average percentage price increase occurred for those mergers that received early termination of the initial waiting period. This suggests that the HSR Filings failed to provide sufficient information to trigger additional investigations that could have blocked these harmful mergers before they were consummated; instead, the filings resulted in early termination of the waiting period. While the study was not designed to test the impact of this rulemaking, the study supports the Commission's belief that there are information deficiencies with the current HSR Rules that prevent the Agencies from identifying mergers that may violate the antitrust laws.[25]

Hundreds of individuals submitted public comments to describe their own experiences in the aftermath of mergers and urge the antitrust agencies to do more to prevent the harmful effects of consolidation, including collecting more information in the HSR Filing. Examples of supportive comments from these individuals include the following:

• I was an employee at a mobile gaming company. . . . We went through acquisition after acquisition, to finally end up in a subsidiary of a big gaming multinational company. . . . There was a hiring freeze, there were layoffs in another subsidiary we had been affiliated with and then a month ago they cancelled our project and laid off all California employees. . . . Before the final acquisition, our company had 2 profitable games and was developing a third. After the acquisition there were harsh [Key Performance Indicators] for the new game and investment was cut back. Had our company been able to resist the wave of subsequent acquisitions, it is likely we would still be employed in a profitable and vibrant company that was able to compete on the marketplace.[26]

• I am a General Partner at a small Venture Capital firm. I support this proposal as I believe it will lead to increased transparency which benefits us all. . . . We are facing an oligopoly/monopoly crisis in this country/the world and it's important we strive for real competition. I believe this proposal will provide the government more information with which it can make sure our industries thrive.[27]

• As a retired person, I have noticed prices going up much more where a small group of suppliers have most of the market share. I see companies using near-monopoly power to stop employees from having unions. The only way the antitrust laws can be adequately enforced, is to insist that anyone proposing a merger provide full accurate information on what they are doing.[28]

• I work as a cybersecurity engineer. Leaving aside the economic concerns of monopolies, I want to bring up the security concerns of allowing unchecked mergers. Haphazard, rushed mergers increase the security risk across companies, as the engineering teams must stitch together the environments for disparate organizations quickly. . . . I look forward to these reporting requirements and I hope they cause companies to slow down and think of the knock-on effects of the mergers beyond the influx of cash and increased market power.[29]

• As an investor and financial advisor, I approve of the changes requiring more disclosure about the nature of mergers. The impacts of industry consolidation are important. . . . A thorough understanding of the purpose of mergers should help ensure that deals are not anti-competitive.[30]

• As a retired CPA and former business professor, I support these proposed changes to the HSR form. The government needs the additional information and greater clarity in order to carry out its responsibility to oversee and evaluate proposed mergers and acquisitions with a view to protecting

---

[22] Until 2020, the Agencies routinely granted early termination of the initial waiting period for certain transactions that did not warrant further action pursuant to 15 U.S.C. 18a(b)(2). In March 2020, in order to transition filers to an e-filing system that permitted the Agencies to continue to process filings during the COVID–19 pandemic, the Agencies temporarily suspended the discretionary granting of early termination. In February 2021, the Agencies once again suspended the granting of early termination in response to an unprecedented volume of transactions. *See* Press Release, Fed. Trade Comm'n, "FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination" (Feb. 4, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-doj-temporarily-suspend-discretionary-practice-early-termination.*

[23] The HSR Act provides for a shortened 15-day initial waiting period for reportable acquisitions by means of a cash tender offer or acquisitions subject to certain Federal bankruptcy provisions. 15 U.S.C. 18a(b)(1)(B); 11 U.S.C. 363(b)(2), as amended (1994). For these transactions, the second waiting period is also shorter, 10 days (as compared to 30 days for most transactions) after appropriate certification of substantial compliance with the Second Request. 15 U.S.C. 18a(e)(2). For convenience, this rulemaking refers to the standard 30-day initial waiting period that applies to most transactions even though the Agencies have even less time to review information provided in the HSR Filing for cash tender or certain bankruptcy transactions.

[24] Keith Brand et al., "In the Shadow of Antitrust Enforcement: Price Effects of Hospital Mergers from 2009–2016," 66 J. L. Econ. 639 (2023).

[25] One commenter suggests that this study proves the opposite and provides evidence that the current HSR Form provides Agency staff with sufficient information to identify potentially anticompetitive mergers. *See* Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684 at 14 n.32. The Commission disagrees with this assessment of the results. Indeed, in their study, the authors suggested that their results should encourage further study of the process of granting early termination to better illuminate why mergers that receive truncated review had higher price effects than those that received a preliminary review but not a Second Request. *See* Brand et al., *supra* note 24, at 663–64.

[26] Anonymous Comment, Doc. No. FTC–2023–0040–0134.

[27] Anonymous Comment, Doc. No. FTC–2023–0040–0203.

[28] Comment of Joan Friedman, Doc. No. FTC–2023–0040–0237.

[29] Comment of Cybersecurity Engineer, Doc. No. FTC–2023–0040–0238.

[30] Comment of Joseph Cook, Doc. No. FTC–2023–0040–0244.

the common good and promoting competition within and across industries.[31]

• Capitalism can only work with a robust system of competition, and we are lo[]sing that at an ever-increasing rate. I am in an agricultural business. There is virtually no competition for the dollars I spend, and an equal lack of competition for what I produce. This is stunningly true when looked at over the 40 years I have been in business.[32]

• Businesses certainly have a right to pursue mergers and acquisitions as a means of improving their market positions, but the public also has a right to know the "five W's" driving these decisions: Who is funding the HSR Action; What are the specifics of the proposed action; When are the HSR Actions taking place; Where are the affected communities/localities; and Why are the stakeholders pursuing the HSR Action (or, what is their business goal)? Another key piece of information that the public has a right to know, is WHO will be affected by the proposed merger or acquisition? The issues at stake here are National Security, fair market competition, supply chain disruptions, and negative impacts on labor markets. . . . I hope the FTC sticks to their plan and implements these common-sense and much needed reporting requirements.[33]

• I am a 25-year veteran in an industry (publishing) that has seen both jobs and innovation suffer due to unchecked consolidation by large players. It is very possible some of this consolidation might have been prevented, or at least steered in a direction that encouraged innovation and growth, if regulators had this kind of information available beforehand.[34]

• I am a private, sole-practitioner entrepreneur with a vested interest in a diversified economic ecology that supports and sustains vibrant, fair competition. . . . From my perspective, the requirements for getting approval for large mergers should include gathering enough information about the companies involved that the FTC can make a best and rational assessment of the effects of the maneuver on the industries, labor markets, consumer pricing, industry trends, trading

markets, etc, that they (mergers) will potentially affect.[35]

On the other hand, several commenters stated that the Agencies have not provided any evidence that current information requirements are insufficient, or identified transactions they did not challenge due to shortcomings in the current premerger review process. One commenter suggested that if the Commission intends to expand the information requirements for the HSR Filing, it should lay a stronger legal and evidentiary foundation that would justify its need for the additional information. Another commenter urged the Commission to consider how best to balance the need to determine whether further investigation is warranted against the burden to filing parties.

In response to the comments and to explain further the need for this rulemaking, the Commission discusses below the gaps that exist in current HSR information requirements relating directly to potential violations of the antitrust laws, and identifies the new information requirements in the final rule that will provide a factual basis for the Agencies to determine whether to conduct a more searching review of a transaction based on these concerns. The gaps described below are intended to be illustrative and not exhaustive.

### 1. Disclosure of Entities and Individuals Within the Acquiring Person

In reviewing a transaction filed under the HSR Act, the Agencies must quickly understand the scope and nature of the buyer's business and business relationships to determine whether the acquisition may harm competition and thus violate the antitrust laws,[36] which include section 7 of the Clayton Act. The scope of section 7 is broad: it prohibits any acquisition whose effect may be substantially to lessen competition or to tend to create a monopoly, including those that result in a small ownership stake.[37] In many acquisitions, the buyer gains control of the acquired entities or assets and directs the decision-making at the combined firm post-merger. In addition, if the buyer has a complex corporate or governance structure, an acquisition can bring together individuals or investors

within the buyer that control or influence decision-making at a competitively significant business, such as a competitor of the target[38] of the filed-for transaction.[39] Indeed, holdings of entities within the acquiring person that do not result in control under the HSR Rules nevertheless can result in the ability to influence competitively important decisions of the acquiring entity, and thus affect the analysis of whether the acquisition of the target may harm competition.[40]

The HSR Act states that, unless exempt, no person shall acquire, directly or indirectly, any voting securities or assets of any other person without first filing a notification with the Agencies and waiting for the statutory period to expire.[41] The HSR Rules require notification of the transaction from the entity that, pursuant to the Rules, controls the buyer (or seller), which the Commission has defined as the Ultimate Parent Entity or "UPE." [42] But to determine

---

[31] Comment of Sue Ravenscroft, Doc. No. FTC–2023–0040–0259.

[32] Comment of Jeffrey Bender, Doc. No. FTC–2023–0040–0267.

[33] Comment of Thomas Newman, Doc. No. FTC–2023–0040–0325.

[34] Anonymous Comment, Doc. No. FTC–2023–0040–0332.

[35] Comment of Marla McFadin, Doc. No. FTC–2023–0040–0377.

[36] 15 U.S.C. 12(a).

[37] 15 U.S.C. 18. *See United States* v. *E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 592 (1957) (any acquisition is within the reach of section 7 whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or the creation of a monopoly in any line of commerce).

[38] To aid the clarity of the Form and Instructions, the Commission defines "target" in the Instructions to include all entities and assets to be acquired by the acquiring person from the acquired person in the reported transaction. *See* section VI.A.1.h.

[39] *See, e.g., In re Red Ventures Holdco, LP,* No. C–4627 (F.T.C. Nov. 2, 2017) (complaint) (overlapping limited partnership holdings violated section 7); *In re TC Group, L.L.C.,* No. C–4183 (F.T.C. Mar. 16, 2006) (complaint) (acquisition involving minority stake giving two private equity investors seats on the boards of competitors); *In re Dan L. Duncan,* No. C–4173 (F.T.C. Aug. 18, 2006) (complaint) (acquisition combined general partners of competing energy storage companies under common control). Competition concerns about partial stakes can arise between horizontal competitors; *United States* v. *Dairy Farmers of Am.,* 426 F.3d 850, 860 (6th Cir. 2005), or a supply relationship, *du Pont,* 353 U.S. at 602–604 (23% interest in General Motors, a key supplier, and a shared board member). Section 7 does not apply to buyers making an acquisition solely for the purpose of investment when the buyer does not intend to use its position to bring about or attempt to bring about a substantial lessening of competition. *United States* v. *Tracinda Inv. Corp.,* 477 F. Supp. 1093, 1100 (C.D. Cal. 1979).

[40] *See du Pont,* 353 U.S. at 607 n.36 (finding the influence of du Pont's 23% stock interest to be greater, due to diffusion of remaining shares); *Denver & Rio Grande W. R.R. Co.* v. *United States,* 387 U.S. 485, 504 (1967) (identifying section 7 concerns with a 20% investment). *See also Dairy Farmers of Am., Inc.,* 426 F.3d at 862 (no voting interest but leverage via its position as financier to control or influence competitor's decisions).

[41] 15 U.S.C. 18a(a). Congress rejected a proposal to limit covered acquisitions to those made by corporations, using the term "person" instead because the anticompetitive nature of a merger is not dependent upon the legal form of the acquiring entity. 122 Cong. Rec. 30876 (1976).

[42] One of the many initial challenges that the Commission faced in implementing the HSR Act was how to define "control" for the purposes of determining reportability of transactions. The Commission immediately understood that no set percentage of ownership dictated whether an individual or entity had functional control of or significant influence over a company, which is

whether the transaction may violate the antitrust laws, the Agencies need to understand the nature of the buyer's holdings pre- and post-merger, as well as the identities of others who have holdings in the buyer and thus may have influence, including possible veto power, over the buyer's decision-making, since that ability affects the evaluation of the competitive effects of the acquisition of the target. Increasingly, this includes individuals and entities with significant management rights that give them a "seat at the table" when the buyer is making competitively important decisions.

Today, the mechanisms of influence are not limited to equity stakes; the ability to influence corporate decision-making arises from a variety of interests beyond voting rights.[43] It may arise from sharing key decision-makers, such as executives or members of their respective boards of directors, or from a combination of a significant minority stake and rights to appoint or nominate members of the board.[44] The power of key decision-makers of one competitor to place members on the board of another competitor or veto financial decisions can result in substantial influence over the buyer, and thus the target after the transaction is consummated, rendering an acquisition

of a related target potentially illegal under section 7.[45] A merger might also violate the law if it gives individuals and entities of one competitor access to officers, directors, or employees of another competitor.[46] Similarly, the existence of subsidies, among other means, may subject the buyer to additional pressures from individuals or entities not directly a party to the reportable transaction.[47] Beyond voting rights, these interest holders can have similar influence as holders of minority and non-corporate interests.

a. Trends in Private Investment

Understanding the operations of the buyer has become more challenging due to vast changes in M&A activity since the promulgation of the HSR Rules in 1978. One notable recent trend in M&A activity is that the role of private investors, including private equity, has become more pronounced.[48] In the

Agencies' experience, these private investors often utilize complicated structures of ownership and managerial control. They also frequently take either majority or minority stakes in many different operating companies (which may have competitively significant relationships) and can exercise significant influence over management and strategic decision-making. In particular, the percentage of equity interest is often not a good indicator of the extent to which investors can direct the strategic decisions of the business.[49] Investors can participate in the management of companies by serving on the company's board, selecting or monitoring the management team, having veto rights, acting as sounding boards for CEOs, or stepping into management roles themselves.[50]

When these private investors take active positions in a wide variety of companies, such holdings can create direct links between competitors or other competitively relevant firms, such as critical suppliers or distributors. Economic research has shown that transactions that lead to cross-ownership of horizontal competitors or other firms in a competitively significant business relationship can create similar incentives and cause similar anticompetitive effects as a full merger.[51] But when these relationships are not well known or easy to identify, the risk that anticompetitive harm from an unlawful acquisition will go

---

critical to the analysis of the competitive effects of a transaction. In 1976, the Commission originally proposed that "control" would include not only ownership of 50% or more of the voting securities of an entity, but also the power to influence through a minority stake. 41 FR 55488, 55490 (Dec. 20, 1976). Commenters objected to such a subjective test for control. *See* 42 FR 39040, 39043 (Aug. 1, 1977). So, the Commission proposed to include the contractual power to designate a majority of the directors or trustees of an entity. *Id.* This proposal was also criticized for being overly broad and subjective. In the end, in setting up the premerger notification program, the Commission adopted the simple 50% or more threshold for control to give prospective filers certainty as to their reporting obligations. But in doing so, the Commission did not dismiss the significance of understanding who has actual or working control of the filing parties. 43 FR 33450, 33457–58 (July 31, 1978). This definition limited the number of transactions subject to the filing requirements of the HSR Act, but the Commission did not minimize the importance of examining who may have significant influence over the acquiring person while assessing antitrust risk arising from the transaction.

[43] Gabriel V. Rauterberg, "The Separation of Voting and Control: The Role of Contract in Corporate Governance," 38 Yale J. Reg. 1124, 1148–54 (2021) (documenting trend of public companies being subject to stockholder agreements that provide various species of control rights to favored investors); Jill E. Fisch, "Stealth Governance: Shareholder Agreements and Private Ordering," 99 Wash. U. L. Rev. 913, 930–33, 946–53 (2021) (discussing similar trend in private companies).

[44] *E.g., United States* v. *U.S. West, Inc.,* No. 96–002529, 1997 WL 269482 (D.D.C. Feb. 28, 1997) (acquired firm had 20% stake plus board seats in a competitor of acquiring firm).

[45] *E.g., United States* v. *Univision Commc'ns., Inc.,* No. 1:03–cv–00758, 2003 WL 23192527 (D.D.C. Dec. 22, 2003) (buyer held substantial equity stake plus ability to influence certain strategic decisions through issuance of equity or debt or veto of future acquisitions). *See also Dairy Farmers of Am.,* 426 F.3d at 862 (buyer had influence due to role as financier, so that acquired firm is "locked in" to a relationship with the buyer, which could lead to anticompetitive effects).

[46] *E.g., In re Time Warner Inc.,* No. C–3709 (F.T.C. Sept. 12, 1996) (analysis to aid public comment) (walling off two individuals and one entity to prevent them from influencing officer, directors, and employees of competitor and its day-to-day operations).

[47] As discussed elsewhere, Congress has directed the Commission to require the reporting of subsidies received from foreign countries or foreign entities of concern due to concerns that these entanglements can distort the competitive process by enabling the subsidized firm to submit a bid higher than other firms in the market, or otherwise change the incentives of the firm in ways that undermine competition following an acquisition. Merger Filing Fee Modernization Act of 2022, 15 U.S.C. 18b. Congress also enacted the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA) to expand the jurisdiction of the Committee on Foreign Investment in the United States (CFIUS) over certain non-controlling investments and real estate transactions involving foreign persons that may be a threat to national security. Public Law 115–232, 132 Stat. 2173, Title XVII, Subtitle A (2018). For certain foreign investments in U.S. businesses operating critical technologies or infrastructure, or that collect sensitive personal data of U.S. citizens, FIRRMA regulations require notification of non-controlling investments, direct or indirect, that afford the foreign investor (1) access to material non-public technical information; (2) membership or observer rights on the board directors (or similar) or the right to nominate an individual to that board; or (3) any involvement, other than through voting of shares, in substantive decision-making of the U.S. business. 31 CFR 800.211. Such relationships are deemed a non-controlling interest in a U.S. business that afford a foreign investor access to information or involvement in substantive decision-making. *See* 85 FR 3112 (Jan. 17, 2020).

[48] Elisabeth de Fontenay, "The Deregulation of Private Capital and the Decline of the Public Company," 68 Hastings L. J. 445, 447 (2017). Private

equity has accounted for an increasing share of all merger activity over time, although private equity activity is highly cyclical. *See* Michael Mauboussin & Dan Callahan, "Public to Private Equity in the United States: A Long-Term Look," Morgan Stanley Inv. Mgmt., Counterpoint Global Insights 1 (Aug. 2, 2020), *https://www.morganstanley.com/im/publication/insights/articles/articles_publictoprivateequityintheusalongtermlook_us.pdf.* Recent estimates suggest that private equity firms managed about 20% of U.S. corporate equity and that private equity deal-making has accounted for 40% or more of domestic M&A activity. Rogé Karma, "The Secretive Industry Devouring the U.S. Economy," Atlantic (Oct. 30, 2023). *See also* Steven A. Cohen, et al., "Private Equity in 2023—A Year (Not) to Remember," Harv. L. Sch. Forum on Corp. Governance (Jan. 13, 2024), *https://corpgov.law.harvard.edu/2024/01/13/private-equity-in-2023-a-year-not-to-remember/* (private equity deal volume declined in 2023 and increasingly focused on smaller deals and minority investments).

[49] *See generally* Bob Zider, "How Venture Capital Works," Harv. Bus. Rev. (Nov.–Dec. 1998), *https://hbr.org/1998/11/how-venture-capital-works*; Thomas Hellman, "The allocation of control rights in venture capital contracts," 29 RAND J. Econ. 57 (1998).

[50] *See, e.g.,* Sec. Exch. Comm'n, "Private Equity Funds," *Investor.gov* (last visited Sept. 10, 2024), *https://www.investor.gov/introduction-investing/investing-basics/investment-products/private-investment-funds/private-equity.*

[51] Timothy Bresnahan & Steven C. Salop, "Quantifying the competitive effects of production joint ventures," 4 Int'l J. Indus. Org. 155 (1986).



undetected is greatly increased.[52] This includes the risk of collusive[53] or coordinated behavior,[54] or the risk that cross-ownership of the combined firm will lead to foreclosure of rivals.[55]

The increasing role of private capital is reflected in the shifting mix of reportable transactions. Using data from the Agencies' Annual HSR Reports for the past 20 years, Figure 2 shows that the number of transactions for which the name of the Ultimate Parent Entity of the acquiring person included "fund" or some variation of "L.P." has increased from approximately ten percent to nearly 40 percent of all reportable transactions.[56] The acquiring person for these transactions can be shell companies that have been created by an investment group in order to make a particular acquisition, or an entity that owns a variety of other operating entities (often referred to as "portfolio companies"). In either scenario, the entity is part of the structure of a larger investment company or group.



**Figure 2: Acquisitions Involving Funds and Limited Partnerships**

Note: Private Investment refers to the percentage of HSR Reportable Transactions with "Fund" or variation of "L.P." in the name of the UPE of the acquiring person.

Since the beginning of the premerger program, the Commission has required filers to report certain entities that hold minority interests in the filing parties to alert the Agencies to situations in which the potential antitrust impact of the reported transaction does not result solely or directly from the acquisition, but may arise from direct or indirect shareholder relationships between the parties to the transaction.[57] As explained in the NPRM, reporting requirements regarding the identification of certain minority holders of the filing persons have been adjusted over time to reflect market realities, including changes in investment activity and the growing role of these intermediaries.[58] Nonetheless, changes in the investment landscape discussed above have created meaningful gaps in the reporting requirements for a growing number and type of minority holders that have the ability to influence competitive decision-making and to harm competition via acquisitions that violate the antitrust laws.

b. Corporate Structure Changes

Several commenters supported the need for additional information that would identify entities holding minority

---

[52] Daniel P. O'Brien & Steven C. Salop, "Competitive Effects of Partial Ownership: Financial Interest and Corporate Control," 67 Antitrust L. J. 559, 570 (1999) (overview of the complex corporate financial and governance structures of modern corporations, including different types of shareholding and the relationships to the boards of directors).

[53] Robert J. Reynolds & Bruce R. Snapp, "The competitive effects of partial equity interests and joint ventures," 4 Int'l J. Indus. Org. 141 (1986); David Flath, "When is it rational for firms to acquire silent interests in rivals?," 9 Int'l J. Indus. Org. 573 (1991); David Reitman, "Partial Ownership Arrangements and the Potential for Collusion," 42 J. Indus. Econ. 313 (1994); Sandro Shelegia & Yossi Spiegel, "Bertrand competition when firms hold passive ownership stakes in one another," 114 Econ. Letters 136 (2012).

[54] Rune Stenbacka & Geert Van Moer, "Cross ownership and divestment incentives," 201 Econ. Letters 109748 (2021).

[55] Nadav Levy et al., "Partial Vertical Integration, Ownership Structure, and Foreclosure," 10 a.m. Econ. J.: Microeconomics 132 (2018).

[56] See Fed. Trade Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report, Fiscal Year 2010 appendix A (FY 2010) (reporting Adjusted Transactions in which a Second Request could have been issued from years 2001–2010); Fed. Trade Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report, Fiscal Year 2013 appendix A (FY 2013) (reporting Adjusted Transactions in which a Second Request could have been issued from years 2004–2013); Fed. Trade Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report, Fiscal Year 2022 appendix A (FY 2022) (reporting Adjusted Transactions in which a Second Request could have been issued from years 2013–2022). See also Fed. Trade Comm'n Annual Reports to Congress Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, *https:// www.ftc.gov/policy/reports/annual-competition- reports* (collecting reports). The Total Number of Adjusted Transactions omits from the total number of transactions reported all transactions for which the agencies were not authorized to request additional information. These include (1) incomplete transactions (only one party filed a complete notification); (2) transactions reported pursuant to the exemption provisions of sections 7A(c)(6) and 7A(c)(8) of the Act; (3) transactions which were found to be non-reportable; and (4) transactions withdrawn before the waiting period began. In addition, where a party filed more than one notification in the same year to acquire voting securities of the same corporation, e.g., filing for one threshold and later filing for a higher threshold, only a single consolidated transaction has been counted because as a practical matter the agencies do not issue more than one Second Request in such a case. These statistics also omit from the total number of transactions reported secondary acquisitions filed pursuant to § 801.4 of the Premerger Notification rules. Secondary acquisitions have been deducted in order to be consistent with the statistics presented in most of the prior annual reports.

[57] 43 FR 33450, 33531 (July 31, 1978).

[58] NPRM at 42188.

positions. One commenter stated that investors have shifted strategies since the 1980s, when portfolios consisted of unrelated companies and investors mainly focused on optimizing capital structures and improving corporate governance.[59] Another commenter stated that without a full picture of the entire corporate structure of the merging parties, it can be difficult or impossible to untangle or understand the potential anticompetitive impacts of a transaction. Several commenters supported the need to adjust information requirements to have a broader view that reflects how firms are organized today. One commenter supported the collection of more comprehensive information related to the merging entities, arguing that a more holistic and systems-level approach would examine the networks of firms involved in a market, which could expose companies that can operate as bottlenecks or supply key resources to other market participants. A group of State antitrust enforcers supported the collection of more information related to corporate control or the degree of financial interest so the Agencies can quickly assess how the resulting ownership structure may change the parties' incentives to compete, enhance the acquirer's ability to influence decision-making through changes in voting interests or governance rights, or facilitate the sharing of competitively sensitive information between rivals.

Another development that has caused the Commission to reassess its rules is that the particular corporate structure of an entity is now less indicative of its market behavior, and thus distinctions made on that basis may no longer be sound. The decision to form as a corporation, limited liability company, or limited partnership is often influenced more by risk, liability, and tax considerations than by the entity's business operations. Now more than ever, distinctions made on corporate form have little impact on an assessment of whether and how firms compete. Moreover, corporate governance literature highlights the changing nature of decision-making within even standard organizational structures, such as corporations. Corporate law provides sufficient

flexibility to alter traditional roles, including the rights of shareholders and the scope of director liability, by contract[60] or through modification of bylaws or certificates of incorporation.[61] The rise of shareholder agreements—private contracts by and among shareholders—has affected who has the ability to direct decisions of the company, separating voting and control, especially for those given veto rights via contract.[62] These forms of 'stealth governance' have implications for how decisions are made within the firm, making it difficult for investors to know who is exercising control within the company.[63]

After careful consideration of these points and others raised by commenters, the Commission has determined that the requirements of the current Form and Instructions have not kept pace with market realities and the accompanying changes in ownership structures. In light of these shifts in corporate formation and governance, the current requirements do not provide the Agencies with sufficient information that allow them to understand how decisions are made at the respective companies, let alone whether the acquiring person may have competitively relevant premerger entanglements with the target's industry and minority holders that may have significant rights to direct the acquiring entity's actions.

To keep pace with prior changes in corporate form, the Commission has adjusted the disclosure requirements for minority investors over time and in light of its experience reviewing thousands of filings each year, balancing the need to surface competitively relevant relationships without burdening filers to provide information that would not change the Agencies' premerger screening decisions. Under the current rules, it has become increasingly difficult to screen transactions because deal structures often have minority investors with significant rights that are not disclosed. See Figures 4 through 8

below, section VI.D.1.d.ii. This includes situations where an investor group is, for practical purposes, making the acquisition (or otherwise significantly involved), but the HSR Filing does not alert the Agencies to their role in the acquisition. These relationships are not currently disclosed if the minority investment is not in the UPE or acquiring entity, but rather in an entity (often a shell entity) that sits between these two in the structure of the acquiring person. Even if the minority investment is made in the UPE, if the UPE is an LP, only the name of the general partner is disclosed. For situations where the current information on the HSR Filing is unrelated to the public-facing name of the entity that controls the acquiring person, the HSR Filing does not alert the Agencies to the premerger relationships that exist solely due to that investor's relationship with and role in the buyer.[64]

To close this information gap, the Commission has determined that the Agencies need additional information about entities in between the UPE and the acquiring entity. If any of these entities or individuals has a minority stake or other rights that give them the ability to influence decision-making post-merger, then they are functionally "in the deal" and their existing business relationships are relevant to a thorough premerger antitrust assessment of the transaction. As explained in more detail in section VI.D.1.d.ii.a., this information was required of all corporate entities within the acquiring person prior to a rule change in 2011 that limited the requirement in order to exclude entities not related to the transaction. However, as transaction structures have become more complex, application of the 2011 change has eliminated the requirement to provide information about minority entities that are related to the acquiring entity. The final rule addresses this gap in information so that the Agencies can identify existing relationships among individuals and entities that have interests in (1) the acquiring entity (and any entities it controls or are controlled by it) and (2) other entities within the UPE that have competitive relationships

[59] *See also* Aslihan Asil et al., ''Misaligned Measures of Control: Private Equity's Antitrust Loophole,'' 18 Va. L. & Bus. Rev. 51 (2023). Asil et al. argue that the complicated structure of ownership in the typical private equity acquisition may make some anticompetitive deals technically non-reportable under the HSR act, because the investment structure under-represents the proportion of control actually conferred by the transaction. *Id.* at 53.

[60] *See* Jill E. Fisch, ''Governance by Contract: The Implications for Corporate Bylaws,'' 106 Cal. L. Rev. 373, 379 (2018).

[61] Megan Wischmeier Shaner, ''Interpreting Organizational 'Contracts' and the Private Ordering of Public Company Governance,'' 60 Wm. & Mary L. Rev. 985, 988 (2019) (the charter and bylaws of public corporations are being used as tools for restructuring key aspects of corporate governance).

[62] Rauterberg, *supra* note 43.

[63] Jill E. Fisch, ''Stealth Governance: Shareholder Agreements and Private Ordering,'' 99 Wash. U. L. Rev. 913, 947 (2021) (One investor's capacity to monitor may be limited by an agreement to support director candidates chosen by another investor, or an ownership structure that appears to involve shared power may be undermined by the contractual formation of a control group).

[64] For example, a fund that operates as Alpha Capital Partners could create an entity named 123ABC, LP to effectuate an acquisition. 123ABC, LP could be its own UPE because Alpha Fund I and Alpha Fund II each hold 49.9% of the 123ABC, LP, with the general partner, 123ABC GP, LP, holding 0.2%. Currently, the Form only requires 123ABC, LP to disclose that 123ABC GP, LP is its general partner. The issue is compounded if Alpha Capital Partners is co-investing with Beta Capital Partners and 123ABC, LP is held 49.9% by Alpha and 49.9% by Beta (or if Beta invests in an entity that is not the UPE or acquiring entity). Disclosure of these relationships are not currently required.

with the target. These minority holders are competitively relevant because they may have the ability to influence decision-making and operations of the target post-merger [65] but it is difficult for the Agencies to detect these relationships based on information available the current Form.

As discussed below in section VI.D.1.d. and VI.D.3.c., the final rule requires additional information for Minority Shareholders or Interest Holders as well as Officers and Directors from the acquiring person. Information about other individuals or entities holding a minority position or rights to serve or appoint members of the governing board will fill an existing gap that has created a blind spot for the Agencies that prevents a thorough premerger screening, especially for transactions involving complex corporate structures and investment vehicles. This information is most relevant from the entity that will be making decisions post-consummation, and so the final rule does not seek this information from the seller, other than the identification of minority interest holders that will "roll over" their investments post-consummation.[66] This information is necessary to identify additional areas of competitive concern created by minority stakeholders or other influential decision-makers (*i.e.*, officers and directors) that may have a relationship with entities related to the target of the acquisition.

However, in light of concerns raised by commenters about the burden and relevancy of providing this information with respect to limited partners, the Commission has modified these requirements to focus only on those limited partners that also have management rights, such as the right to appoint members to the board. Moreover, the final rule does not adopt certain proposed requirements to identify board observers, or creditors, holders of non-voting securities, or entities with management agreements. The Commission has determined not to require this information at this time but will continue to monitor market activity as it implements the final rule.

Similarly, new document requirements contained in the final rule are aimed at providing a more in-depth understanding of the motivation and purpose of the transaction, and how the combined company will be operated post-consummation. In particular, additional transaction-related documents will provide a more complete picture of the buyer's reason for pursuing the transaction, and for companies with complex investment structures, these documents may reveal whether there are other individuals or entities who will be participating in competitive decisions post-merger. The final rule also requires a small set of business plans and reports shared at the highest level of management that discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and acquired entity. Together, these documents may reveal whether there are significant investors in either party that also have investments in businesses that compete with the target or if there are any other planned investments in competitively relevant businesses, such as competitors or suppliers, that would impact the Agencies' assessment of whether the transaction may violate the antitrust laws.

2. Identifying Potential Labor Market Effects

The Clayton Act's prohibition on acquisitions that may substantially lessen competition or tend to create a monopoly applies to acquisitions that have these effects on competition to purchase inputs that firms use to produce goods and services just as it does to acquisitions that threaten competition in downstream markets for goods and services themselves,[67] and the antitrust laws protect competition in markets for labor services.[68] As

evidence of decreasing competition for labor continues to mount,[69] the Agencies have increasingly recognized the importance of evaluating the effect of mergers and acquisitions on labor markets and have stepped up efforts to identify and investigate potential labor market effects arising from reportable transactions. The Agencies have challenged a few transactions that may result in labor market harms,[70] and consent agreements have included provisions that stop the use of certain non-compete clauses that limit the ability of potential market entrants to hire key employees.[71]

As stated in the NPRM, current notification requirements under the HSR Act do not require any specific information about employees. And yet virtually every firm competes for labor in at least one labor market and, more commonly, in multiple labor markets, and transactions that involve two firms

[65] *See United States* v. *Dairy Farmers of Am., Inc.,* 426 F.3d 850, 860 (6th Cir. 2005) (district court erred in focusing on control which ignored the possibility that there may be a mechanism that causes anticompetitive behavior other than control, such as leveraging position as financier).

[66] In many transactions, the acquired firm ceases to exist post-consummation. Even when some entity continues to generate revenues, possibly in competition with some aspects of the buyer's business, the Commission has determined to collect additional information about entities within the UPE only from the acquiring person at this time.

[67] *See United States* v. *Bertlesmann SE & Co.,* 646 F.Supp.3d 1 (D.D.C. 2022) (violation of section 7 where merger likely to substantially lessen competition in market for publishing rights to anticipated top-selling books due to harm to targeted sellers—authors of top-selling books); *Boardman* v. *Pac. Seafood Grp.,* 822 F.3d 1011, 1022 (9th Cir. 2016) (acquisition may violate section 7 by substantially lessening competition in multiple seafood input markets). *See also Mandeville Island Farms, Inc.,* v. *Am. Crystal Sugar Co.,* 334 U.S. 219, 235–36 (1948) (antitrust laws protects not just consumers, purchasers, competitors or sellers but all victims of illegal practices); *Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.,* 549 U.S. 312, 321–22 (2007); *United States* v. *Syufy Enterprises,* 903 F.2d 659, 663 n.4 (9th Cir. 1990); *In re Grifols, S.A.,* No. C–4654 (F.T.C. Aug. 1, 2018) (order requiring divestitures to prevent monopsony in three local markets for the collection of plasma).

[68] *NCAA* v. *Alston,* 594 U.S. 69, 86–87 (2021) (plaintiff student-athletes need not show harm in seller-side market as well as buyer-side labor

market); *Anderson* v. *Shipowners Ass'n of the Pac. Coast,* 272 U.S. 359, 365 (1926) (Sherman Act protects competition for labor).

[69] *See e.g.,* Anna Stansbury & Lawrence H. Summers, "The Declining Worker Power Hypothesis: An Explanation for the Recent Evolution of the American Economy" (Nat'l Bureau of Econ. Rsch., Working Paper No. 27193, 2020), *https://www.nber.org/papers/w27193*; Orley Ashenfelter et al., "Labor Market Monopsony," 28 J. Lab. Econ. 203 (2010); V. Bhaskar et al., "Oligopsony and Monopsonistic Competition in Labor Markets," 16 J. Econ. Perspectives 155 (2002); William M. Boal & Michael R. Ransom, "Monopsony in the Labor Market," 35 J. Econ. Lit. 86 (1997); Alan B. Krueger, Luncheon Address at Kansas City Federal Reserve Bank, Reflections on Dwindling Worker Bargaining Power and Monetary Policy (Aug. 24, 2018), *https://www.kansascityfed.org/documents/6984/Lunch_JH2018.pdf*; Brianna L. Alderman et al., "Monopsony, wage discrimination, and public policy," 61 Econ. Inquiry 112 (2022); David Berger et al., "Labor Market Power," 112 a.m. Econ. Rev. 1147 (2022); Chen Yeh et al., "Monopsony in the US Labor Market," 112 a.m. Econ. Rev. 2099 (2022); José Azar et al., "Labor Market Concentration," 57 J. Hum. Resources S167 (2022).

[70] Press Release, Fed. Trade Comm'n, "FTC Challenges Kroger's Acquisition of Albertsons" (Feb. 26, 2024), *https://www.ftc.gov/news-events/news/press-releases/2024/02/ftc-challenges-krogers-acquisition-albertsons*; *United States* v. *Anthem* et al., 1:16–cv–01493 ¶ 71 (D.D.C. filed July 21, 2016) (complaint); *United States* v. *Aetna,* et al., 3–99–CV 1398 ¶ 27 (N.D. Tex. filed June 21, 1999) (complaint). *See also* Concurring Statement of Commissioner Slaughter and Chair Khan Regarding FTC and State of Rhode Island v. Lifespan Corporation and Care New England 1–2 (Feb. 17, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/public_statement_of_commr_slaughter_chair_khan_re_lifespan-cne_redacted.pdf* (recommending including a count in the complaint that the proposed merger would have violated section 7 of the Clayton Act in a relevant labor market).

[71] Press Release, Fed. Trade Comm'n, "FTC Imposes Strict Limits on DaVita, Inc.'s Future Mergers Following Proposed Acquisition of Utah Dialysis Clinics" (Oct. 25, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-imposes-strict-limits-davita-incs-future-mergers-following-proposed-acquisition-utah-dialysis*.

that purchase labor from the same labor market(s) may substantially lessen competition between employers for labor services. Merging parties may compete in the same labor market even when they do not compete in the same product market.

The Commission received hundreds of comments from individuals, many of whom are in the entertainment industry, who supported the need for the Agencies to conduct a robust search for potential labor market effects before the acquisition is consummated. Several dozen recounted the effects that prior mergers have had on them. Examples of comments supportive of reviewing transactions for labor market effects include the following:

• I'm a working TV writer at the beginning of my career. I'm afraid for the future—the consolidation of the media companies in this town and their vertical integration has made things so much harder and less competitive, even in the time that I've been in LA and worked within the system. Now that there are so few "shops" in town, salaries are depressed and it's become incredibly difficult to not only demand fair pay, but treatment as well. They know that they don't have to negotiate or budge on whatever terms they set because there are increasingly few alternatives to them.[72]

• My background includes Strategy consulting for major transnational Mergers. I think the new rules are very good as they demand greater clarity from the firms before the transaction starts. I have seen a lot of waste and backtracking as executives struggle between their ego and the analytics that do not tell them the story that they want about why the transaction will succeed. And the new labor and financing provisions offer much needed transparency—layoffs are a knee jerk habit and are not really helpful for the firm or the industry.[73]

• Please collect data on labor markets. I've been affected by the monopolies in the entertainment industry and likely will lose my livelihood as well as that of my staff due to unchecked mergers within the next month. After starting a successful business 23 years ago, it's heartbreaking to lose it and will be costly to our economy as more and more of us lose our businesses due to these unchecked mergers and the power they wield to save them money.[74]

• I work in a small accounting firm and I have seen the effects of mergers on consumer satisfaction and worker wellbeing personally. . . . [M]any of the job-searching or hiring firms we'd contract with to seek additional workers are worried about raising the ire of the large firm in the region, as it comprises so much of their client base now[.] . . . As a result, we're forced to go with larger, national firms for hiring, and become part of the problem of sectoral concentration.[75]

• As a lifelong union member I also believe the requirement for detailing merger effects on workers and unions to be a vital necessity. Those of us outside the C suites, boardrooms and stockholder meetings are stakeholders too, and our livelihoods and well being should be considerations.[76]

• I personally know many folks in entertainment (writers, crew, actors, etc.) who have had such a difficult time surviving in Hollywood that they've simply had to quit or move home. And, frankly, folks who specifically represent cultures that are least visible in society are often the first to go—because they don't necessarily have the resources or didn't face as many obstacles as other artists. It's a terrible cycle, magnified greatly by vertical mergers.[77]

Numerous commenters, including State antitrust enforcers and members of Congress, expressed general support for an increasing focus on labor market competition in merger analysis and requiring additional labor market information in the Form to screen for such issues. Some commenters highlighted potential efficiencies in the merger review process from providing the Agencies with labor market information in the earlier stages of review, including a more uniform process that could result in the termination of more merger reviews within the 30-day waiting period and a more efficient use of Agency resources where no labor market issues exist.

The Commission disagrees with a commenter who stated that the analysis under the Clayton Act requires consideration of competition issues, but not labor. Antitrust law, including the Clayton Act, has always been concerned with workers and labor markets.[78] As noted by the State antitrust enforcers, in the congressional debates on the Clayton Act in 1914, legislators

expressed concerns regarding the monopsonist's power to dictate to its labor the wage it will pay for the only commodity labor has to sell.[79] As recently as 2021, a unanimous Supreme Court in *NCAA* v. *Alston* affirmed that the antitrust laws are designed to prevent harm to competition in labor markets.[80] As noted in the concurring opinion: "Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work."[81] And there is bipartisan agreement among current Federal enforcers and their predecessors that the Agencies are empowered to enforce the Clayton Act to prevent competitive harms in labor markets caused by mergers.[82] Moreover, recent empirical work demonstrates the impact that mergers have on competition in labor markets.[83]

One commenter stated that requiring merging parties to provide labor and employment information is at odds with the consumer welfare standard. This is not correct. Judge Easterbrook, writing for the Seventh Circuit, recently rejected an employer's argument that restrictions on the movement of employees could be justified because it expanded the output of consumer products: "One problem with this approach is that it treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing). That's not right; it

---

[72] Anonymous Comment, Doc. No. FTC–2023–0040–0511.

[73] Comment of Punya Upadhyaya, Doc. No. FTC–2023–0040–0283.

[74] Comment of Karen Wood, Doc. No. FTC–2023–0040–0271.

[75] Comment of John Kurpierz, Doc. No. FTC–2023–0040–0462.

[76] Comment of Chas McClelland, Doc. No. FTC–2023–0040–0273.

[77] Comment of Alice Stanley, Doc. No. FTC–2023–0040–0508.

[78] *Anderson* v. *Shipowners Ass'n of the Pac. Coast,* 272 U.S. 359, 365 (1926).

[79] Comment of State Atty's Gen., Doc. No. FTC–2023–0040–0695 at 21 n.123 (citing 51 Cong. Rec. 9184 (1914) (statement of Rep. Guy Helvering)). *See also* 21 Cong. Rec. 2457 (1890) (statement of Sen. Sherman asserting trusts command the price of labor).

[80] *NCAA* v. *Alston,* 594 U.S. 69 (2021). The Agencies' approach to evaluating the potential labor market effects of mergers is set forth in the Merger Guidelines. U.S. Dep't of Justice & Fed Trade Comm'n, Merger Guidelines 2.10 (2023).

[81] *Alston,* 594 U.S. at 109–110 (Kavanaugh, J., concurring).

[82] *See generally* FTC Chairman Joseph J. Simons, Prepared Keynote Address at American University Washington College of Law Conference on Themes of Professor Jonathan Baker's New Book, *The Antitrust Paradigm: Restoring a Competitive Economy* 9 (Mar. 8, 2019), *https://www.ftc.gov/system/files/documents/public_statements/1515179/simons_-_jon_baker_speech_3-8-19.pdf*; Assistant Attorney General Makan Delrahim, Remarks at the Public Workshop on Competition in Labor Markets 3 (Sept. 23, 2019), *https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-public-workshop-competition*.

[83] *See* Elena Prager & Matt Schmitt, "Employer Consolidation and Wages: Evidence from Hospitals," 111 a.m. Econ. Rev. 397 (2021); David Arnold, "Mergers and Acquisitions, Local Labor Market Concentration, and Worker Outcomes" (Working Paper, Oct. 27, 2019), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3476369.*

**89228** **Federal Register**/Vol. 89, No. 218/Tuesday, November 12, 2024/Rules and Regulations

is equivalent to saying that antitrust is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise.''[84] There is a clear consensus that the consumer welfare standard is sufficiently flexible to encompass antitrust enforcement to prevent competitive harms to labor markets.[85] Because section 7 reaches these concerns, it is appropriate for the Agencies to collect information to determine if the transaction may violate the antitrust laws by substantially lessening competition in any market for labor. The fact that the Commission has not previously required this information to be reported in HSR filings does not mean that the information is not necessary and appropriate to enable the Agencies to determine whether an acquisition, if consummated, may violate the antitrust laws. While not every negative impact on workers reflects a harm to competition, growing evidence about the potential for mergers to cause harm in input markets for labor in violation of the antitrust laws shows that the Agencies have a sound basis to review transactions for potential competitive impacts on labor markets.

As discussed below in section VI.I.3., the final rule does not require filers to submit specific information about their employees as suggested in the proposed rule. Instead, the Agencies will rely on other information and documentary materials required in the final rule to conduct a preliminary assessment of whether the transaction may violate the antitrust laws with respect to any affected labor market. The Agencies have been gaining experience analyzing information about employees during ongoing merger reviews and other investigations of conduct that may harm competition for workers, and the Commission relies on this experience to determine which documents and information have been most useful in identifying those transactions that warrant an in-depth review of potential

labor market effects through the issuance of Second Requests.

As discussed below in section VI.I.3., the Commission will rely on information contained in the new Overlap and Supply Relationships Descriptions, as well as additional documents required by the final rule to conduct a preliminary assessment of potential labor market effects. In the Agencies' experience, those transactions that are flagged for closer review due to concerns about effects in output markets may also require a closer look at potential impacts in input markets, including labor markets. Because the final rule will allow the Agencies to conduct a more robust screening for potential effects in output markets, it will also permit more robust screening for potential effects in input markets, including those related to labor services. In addition, the final rule requires the submission of certain plans and reports shared at the highest level of management that discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and acquired entity. These documents may also indicate whether the parties view themselves as employing similar categories of employees or competing for certain types of labor services. As a result, the final rule will enhance the Agencies' ability to conduct a premerger assessment to determine if the transaction may violate the antitrust laws with respect to competition for labor. Although the Commission has determined not to require specific information about workers or workplace safety information in the HSR Filing at this time, as the Agencies acquire more experience with conducting competition analyses of labor markets, the Commission may revisit the issue in future rulemakings.

3. Identifying Acquisitions That Create a Risk of Foreclosure

Mergers between firms that are not direct competitors can still violate the antitrust laws. As stated in the NPRM, an acquisition may violate the law if it creates opportunities for post-merger foreclosure of rivals arising from vertical or non-horizontal relationships.[86] The nature and scope of potential non-horizontal competitive concerns can often be complex and unique. To fully account for all the ways in which a proposed transaction may violate the antitrust laws, the Agencies need information to determine whether there are any existing or emerging business relationships between the merging

parties that would allow the merged firm to limit access to products or services that its rivals use to compete, referred to as ''foreclosure.''[87] Current information requirements in the Rules do not reveal these existing relationships, which are well known to the parties. Even more than in horizontal mergers, which require an assessment of whether the merger may eliminate existing competition between rivals whose products are viewed as substitutes, non-horizontal concerns arise from distinct facts and industry structure that are not readily available to the Agencies from other sources.

Various commenters, including members of Congress, supported new information requirements targeting non-horizontal competitive issues. A comment from State antitrust enforcers underscored the concern about foreclosure, noting that because mergers may change the firms' incentives or ability to disadvantage or eliminate rivals at one or more levels of their supply chains, one of the anticompetitive harms that may result from a merger—particularly non-horizontal mergers—is the risk of foreclosure. The comments from a farmer-led advocacy organization warned that dominant firms have expanded across product markets—primarily through product-extension and conglomerate mergers—to insulate against cross-industry competition or to develop product-tying and other capacities for entrenchment and exclusion.

Other commenters maintained that vertical merger challenges are uncommon and that antitrust precedent does not sufficiently support non-horizontal theories of competitive harm to warrant the new information requirements. For example, commenters stated that the Agencies challenge very few vertical transactions, and the courts generally have not been receptive to those challenges. One commenter stated that an assessment of potential future competitors goes well beyond what is typically relevant because non-horizontal theories of harm are rare under section 7. The same commenter reasoned that when challenging a vertical merger the antitrust agency must prove that one party has substantial market power and that information regarding the vendor-vendee relationship is not required to assess this threshold question. A tech industry trade association stated that

---

[84] *Deslandes* v. *McDonald's USA, LLC,* 81 F.4th 699, 703–04 (7th Cir. 2023).

[85] *See* Herbert Hovenkamp, ''Is Antitrust's Consumer Welfare Principle Imperiled?,'' 45 J. Corp. L. 65, 78 (2019) (injury that results from the exercise of monopsony power is technically similar to the injury caused by monopoly; in both cases the defendant reduces output); Delrahim, *supra* note 82, at 3–4 (consumer welfare standard is flexible enough to take into account harm to competition that is localized in an upstream labor market, not just a downstream product market); FTC Commissioner Christine S. Wilson, Keynote Address: Welfare Standards Underlying Antitrust Enforcement: What You Measure Is What You Get 7 (Feb. 15, 2019), *https://www.ftc.gov/system/files/documents/public_statements/1455663/welfare_standard_speech_-_cmr-wilson.pdf* (consumer welfare standard does address possible monopsony concerns, and the agencies apply the consumer welfare standard to labor markets).

[86] NPRM at 42179.

[87] *See Illumina, Inc.* v. *FTC,* 88 F.4th 1036, 1055 (5th Cir. 2023) (violation of section 7 where merger will result in the potential foreclosure of key input by the sole supplier). *See also Ford Motor Co.* v. *United States,* 405 U.S. 562 (1972).

most vertical mergers promote competition, so filers should not need to answer detailed questions about vertical relationships.

While in the past non-horizontal challenges were less common than those involving direct competitors, in recent years the Agencies have brought a significant number of non-horizontal merger enforcement actions that have resulted in merger abandonment and ordered divestitures,[88] and other mergers were abandoned or restructured prior to legal action.[89] The Commission also disagrees that potential harm from foreclosure is uncommon or does not warrant robust scrutiny. Empirical economic studies of vertical mergers find no basis to assume that they are either procompetitive or anticompetitive in general. Instead, each transaction must be examined on its facts and in the context of the markets served by the merging parties. A review of twenty-nine recent studies of vertical integration reports that fourteen studies found some evidence of competitive harm, while fourteen found some evidence of benefits.[90] The same review also evaluated two frequently cited surveys of vertical integration and found that the subjects and methods used limit any conclusions that can be drawn for antitrust policy purposes.[91]

The Agencies have an obligation to screen transactions for non-horizontal effects, including the risk of post-merger foreclosure, because the law clearly requires it. In 1950, Congress amended section 7 of the Clayton Act to expressly reach non-horizontal transactions to combat "the rising tide of economic concentration . . . [providing] authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." [92] The Supreme Court subsequently set forth frameworks for analyzing vertical [93] and other non-horizontal [94] mergers to address concerns about foreclosure.[95] Relying on these precedents, the Agencies bring enforcement actions against transactions that create a risk that the merger will create a firm that may limit access to products or services rivals use to compete.[96] Several of these enforcement actions resulted in the parties abandoning their merger plans in the face of litigation. Just recently, the U.S. Court of Appeals for the Fifth Circuit upheld the Commission's finding that Complaint Counsel carried their initial burden of showing that Illumina's acquisition of Grail was likely to substantially lessen competition in the U.S. market for research and development of multi-cancer early detection tests and that Illumina failed to establish cognizable efficiencies.[97] The decision is significant for its

application of vertical theories of harm, as well as its inclusion of products in the relevant market based on precommercial activity.

In the Agencies' experience, it can be difficult to detect whether current or potential rivals of one merging party are dependent on the other merging party for a key product, service, or route to market necessary to compete. The Agencies currently do not receive sufficient information in the HSR Filing to identify candidate "related products" nor to assess the degree to which rivals may be dependent on the related product.[98] Accordingly, the Agencies are not well positioned to conduct a robust initial screen for this significant mechanism of competitive harm. Being able to quickly assess whether the transaction presents a risk of foreclosure would permit the Agencies to target their investigative resources most efficiently on those transactions that are most likely to raise this competitive concern.

As discussed in more detail below, the Commission has determined that information that reveals existing supply relationships between the merging parties or their rivals is necessary to fully account for the potential that the transaction may create a firm that could limit rivals' access to key products or services they need to compete in violation of the antitrust laws. The Commission previously required information about vendor-vendee relationships, but eliminated this requirement when the reported information did not provide a sufficient basis for that analysis such that the benefit to the Agencies did not outweigh the burden of providing it.[99] The Supply Relationships Description in the final rule requires information that is specifically targeted to identifying whether rivals may be dependent on the merged firm for key inputs post-merger. Thus, the information is more relevant to the Agencies' screening for such risks than prior vendor-vendee information.

Additionally, the final rule also contains new document requirements that are intended to reveal any existing or future non-horizontal business relationships that could give rise to risks from foreclosure of rivals. For example, the buyer must indicate whether it has existing contracts with the seller in broad categories that are relevant to an initial antitrust assessment, such as leases, licensing agreements, master service agreements, operating agreements or supply agreements, or

[88] *Illumina*, 88 F.4th at 1048, 1059; *FTC* v. *Tempur Sealy Int'l, Inc.*, 4:24–cv–02508 (S.D. Tex. filed July 2, 2024) (complaint); *In re Lockheed Martin Corp.*, No. 9405 (F.T.C. Jan. 25, 2022) (complaint alleging merger would enable missile systems manufacturer to use control over missile propulsion systems to harm rival defense prime contractors) (transaction abandoned); *In re Nvidia Corp.*, No. 9404 (F.T.C. Dec. 2, 2021) (complaint alleging merger would give chip manufacturer the ability and incentive to use control over microprocessor design technology to undermine competitors) (transaction abandoned). For a compilation of the Agencies' enforcement actions involving vertical mergers, see Steven C. Salop & Daniel P. Culley, "Vertical Merger Enforcement Actions: 1994–April 2020" (Geo. L. Faculty Pub. & Other Works No. 1529, 2020), *https://scholarship.law.georgetown.edu/facpub/1529/* (reporting 66 vertical matters over 26 years).

[89] *See, e.g.*, Press Release, U.S. Dep't of Justice, "Antitrust AAG Kanter Statement After Adobe and Figma Abandon Merger" (Dec. 18, 2023), *https://www.justice.gov/opa/pr/antitrust-aag-kanter-statement-after-adobe-and-figma-abandon-merger*; Cat Zakrzewski, "Amazon ends $1.7B iRobot acquisition in rare victory for tech regulators," Wash. Post (Jan. 29, 2024), *https://www.washingtonpost.com/technology/2024/01/29/amazon-irobot-antitrust-europe/*.

[90] Marissa Beck & Fiona Scott Morton, "Evaluating the Evidence on Vertical Mergers," 59 Rev. Indus. Org. 273, 274 (2021) (explaining many of the studies reviewed were not designed to assess the net effect of vertical integration on welfare).

[91] *Id.*

[92] *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 317 (1962); Celler-Kefauver Antimerger Act of 1950, Pub. L. 81–899, 64 Stat. 1125 (1950).

[93] *Brown Shoe*, 370 U.S. 294 (vertical merger violated section 7); *see also Ford Motor Co.* v. *United States*, 405 U.S. 562 (1972) (same).

[94] *See FTC* v. *Procter & Gamble Co.*, 386 U.S. 568, 577–578 (1967) (product-extension merger violated section 7). *See also Fruehauf Corp.* v. *FTC*, 603 F.2d 345 (2d Cir. 1979); *U.S. Steel Corp.* v. *FTC*, 426 F.2d 592, 599 (6th Cir. 1970).

[95] The Agencies' analyses of how vertical and other non-horizontal transactions may harm competition are set forth in detail in the recently revised Merger Guidelines. U.S. Dep't of Justice & Fed Trade Comm'n, Merger Guidelines 5 (2023).

[96] *See, e.g., FTC* v. *Tempur Sealy Int'l, Inc.*, 4:24–cv–02508 (S.D. Tex. filed July 2, 2024) (complaint); *In re Amgen, Inc.* No. 9414 (F.T.C. Dec. 13, 2023) (consent order settling charges that the acquisition would enable Amgen to leverage its large portfolio of drugs to pressure insurance companies and PBMs into favoring Horizon's monopoly products or disadvantaging rivals); *In re Lockheed Martin Corp.*, No. 9405 (F.T.C. Jan. 25, 2022) (complaint alleging merger would enable missile systems manufacturer to use control over missile propulsion systems to harm rival defense prime contractors) (transaction abandoned); *In re Nvidia Corp.*, No. 9404 (F.T.C. Dec. 2, 2021) (complaint alleging merger would give chip manufacturer the ability and incentive to use control over microprocessor design technology to undermine competitors) (transaction abandoned); *In re Microsoft Corp.*, No. 9412 (F.T.C. Dec. 8, 2022) (complaint).

[97] *Illumina, Inc.* v. *FTC*, 88 F.4th 1036, 1048, 1059 (5th Cir. 2023) (remanding to Commission to consider whether supply agreement offered to rivals sufficiently mitigated merger's effect). *See also United States* v. *AT&T, Inc.*, 916 F.3d 1029, 1045 (D.C. Cir. 2019) (vertical mergers can create harms beyond higher prices for consumers, including decreased product quality and reduced innovation).

[98] *See* U.S. Dep't of Justice & Fed Trade Comm'n, Merger Guidelines 2.5 (2023).

[99] NPRM at 42196–97.

any noncompete or non-solicitation agreements that might be affecting current levels of competition. Filers with an existing business relationship also will submit one year's worth of plans and reports provided to a Chief Executive Officer or the Board of Directors that analyze markets and competition pertaining to any product or service both parties supply (including products or services in development). Based on the Agencies' experience, these types of high-level business documents can reveal whether and how the parties interact in the market today to understand how the merger may affect market conditions more broadly, including any risk of foreclosure that could harm other market participants as well as competition overall. Finally, the expanded set of transaction-related documents ensure that the Agencies receive key documents that have been collected for the purposes of the deal but have not yet been shared with the board of directors. In the Agencies' experience, when there is an existing non-horizontal business relationship between the parties, these documents often reference that relationship and how it might be affected by the transaction, including whether the parties believe that there are synergies or efficiencies that may be gained.

4. Identifying Potential Law Violations Involving Innovation Effects, Future Market Entry, or Nascent Competitive Threats

In markets where concentration is already great or trending in that direction, a merger may be illegal if it eliminates ongoing innovation efforts or the possibility that entry or expansion by one or both firms would have resulted in new or increased competition.[100] Relatedly, the acquisition of a firm that represents a nascent competitive threat—namely, a firm that could grow into a significant rival, facilitate other rivals' growth, or otherwise spur more robust competition in the future—may violate the antitrust laws.[101] Concerns that a transaction may

violate the antitrust laws by reducing innovation efforts[102] or eliminating a future competitor[103] are core to section 7's purpose to arrest the anticompetitive effects of market power in their incipiency. Established incumbents may seek to acquire a potential entrant or a nascent competitive threat in order to eliminate beneficial future competition, especially at critical junctures when the acquired firm is poised to introduce a disruptive product.[104]

As noted in the NPRM, there has been tremendous growth in sectors of the economy that rely on technology, such as pharmaceutical, medical device, and digital markets. Given the dynamic nature of these markets and the importance of acquisition strategies to success as well as market growth and penetration, mergers and acquisitions in these markets present a unique challenge for the Agencies. In particular, the Agencies must closely examine mergers in these and other rapidly evolving markets to account for the possibility that the merger may violate the antitrust laws by eliminating a nascent competitor or potential entrant, including the acquisition's effects on ongoing innovation competition.[105]

Competition policy debates in Congress have increasingly focused on markets that lack sufficient competition, especially in critical technology sectors.[106] Concerns about the role of

certain dominant companies have caused the Agencies to deploy additional resources to counter the economic power of these firms, including through costly and resource-intensive monopolization suits, some of which focus on the harmful effects of their prior acquisitions.[107] Both Agencies have hired technologists and other experts to build their in-house capacity to keep pace with developments in dynamic markets that are reliant on emerging technology.[108] The Agencies have also invested in better understanding how dominant firms can use strategic acquisitions as part of an interrelated course of monopolistic conduct. For example, the Agencies have brought challenges alleging that firms have engaged in "buy-or-bury" strategies against actual or potential rivals.[109] The Agencies have also alleged that firms have attempted to buy or exercise control of adjacent products or services that might be used to steer customers to their other products or exclude competing platforms.[110] These strategies can be very hard to detect because merger activity in these sectors increasingly involves firms in business lines that currently may not be related in a clearly horizontal or vertical way. Without information that identifies products in development and the firms' assessments of where potential competitive threats are likely to emerge in the future, the Agencies have no basis to identify whether a transaction may eliminate ongoing innovation competition, a potential entrant, or a nascent competitive threat.[111]

When transactions involve firms whose premerger relationship is not yet well established in the marketplace and is occurring outside the public eye through ongoing product development efforts, the Agencies cannot rely on the reporting of current overlapping revenues to spot transactions that may

---

[100] *United States* v. *Marine Bancorp, Inc.,* 418 U.S. 602, 630 (1974).

[101] *See FTC* v. *Procter & Gamble,* 386 U.S. 568, 577–78 (1967). *See also United States* v. *El Paso Nat. Gas Co.,* 376 U.S. 651 (1964); *Polypore Int'l* v. *FTC,* 686 F.3d 1208 (11th Cir. 2012) (acquisitions that eliminate competitive threats violate section 7). Like the Clayton Act, the Sherman Act bars a firm from gaining or maintaining a monopoly position through anticompetitive conduct, including acquisitions that exclude nascent or potential threats to its dominance. *See, e.g., United States* v. *Grinnell Corp.,* 384 U.S. 563 (1966) (acquisitions are among the types of conduct that may violate the Sherman Act). Acquisitions by monopolists of nascent competitive threats violate section 2 of the Sherman Act because they are reasonably capable

of contributing significantly to the defendant's monopoly power. *United States* v. *Microsoft Corp.,* 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc) (per curiam) (Sherman Act does not allow monopolists free reign to squash nascent, albeit unproven, competitors at will).

[102] For a discussion of how mergers may violate section 7 by eliminating on-going innovation competition, see Note by the United States to the OECD, The Role of Innovation in Enforcement Cases (Dec. 5, 2023) (DAF/COMP/WD(2023)84), *https://one.oecd.org/document/DAF/COMP/WD(2023)84/en/pdf.*

[103] *See United States* v. *Falstaff Brewing Corp.,* 410 U.S. 526, 561–62 (1973) (Marshall, J, concurring). *See also United States* v. *Continental Can Co.,* 378 U.S. 441, 465 (1964) (fact that merging parties were not direct competitors for all end uses at the time of the merger may actually enhance the long-run tendency of the merger to lessen competition).

[104] *See United States* v. *Visa Inc.,* No. 3:20–cv–07810 (N.D. Cal. Nov. 5, 2020) (complaint) (transaction abandoned and case dismissed) and Assoc. Attorney General Vanita Gupta, Remarks at Georgetown Law's 15th Annual Global Antitrust Enforcement Symposium (Sept. 14, 2021), *https://www.justice.gov/opa/speech/associate-attorney-general-vanita-gupta-delivers-remarks-georgetown-law-s-15th-annual. See also supra* note 15 (collecting studies).

[105] *FTC* v. *PPG Indus., Inc.,* 798 F.2d 1500, 1505–06 (D.C. Cir. 1986) (Bork, J.).

[106] Majority Staff of H.R. Subcomm. on Antitrust, Com. & Admin L. of the Comm. On the Judiciary, 116th Cong., Majority Staff Rep. & Recommendations, Investigation of Competition in Digital Mkts. 38 (2020), *https://democrats-judiciary.house.gov/uploadedfiles/competition_in_*

*digital_markets.pdf* (hereinafter "Investigation of Competition in Digital Markets").

[107] *FTC* v. *Facebook, Inc.,* 581 F. Supp. 3d 34, 40–42 (D.D.C. 2022); *United States* v. *Google LLC,* No. 1:23–cv–00108 at 31–35, 65–68 (E.D. Va. filed Jan. 24, 2023) (complaint); *United States* v. *Live Nation Entertainment, Inc.,* No. 1:24–cv–03973 (S.D.N.Y. filed May 23, 2024); *see also Klein* v. *Meta Platforms, Inc.,* No. 3:20–cv–8570 (N.D. Cal. filed Dec. 3, 2020).

[108] *See* Note by the United States to the OECD, Theories of Harm for Digital Mergers (June 16, 2023) (DAF/COMP/WD(2023)50), *https://one.oecd.org/document/DAF/COMP/WD(2023)50/en/pdf.*

[109] *FTC* v. *Facebook, Inc.,* 581 F. Supp. 3d at 54.

[110] *United States* v. *Microsoft Corp.,* 253 F.3d 34, 73–74 (D.C. Cir. 2001).

[111] *See United States* v. *Google LLC,* No. 20–cv–3010, 2024 WL 3647498 (D.D.C. Aug. 5, 2024). (loss of nascent competitors is a clear anticompetitive effect).

eliminate areas of emerging or potential competition.[112] The Agencies need a reliable factual basis for identifying transactions that create this risk, which is not provided in the current Form. For instance, the Agencies need information about products in development that are not currently generating revenues, but that the filer expects will soon. Because legal precedent makes clear that a merger that substantially lessens competition for innovation or research and development violates the law,[113] the Agencies need information that will identify areas of pre-revenue investments and competition. The Agencies also need information that reveals the rationale for the transaction, including whether the acquired firm is considered a nascent competitive threat, and documents that reflect each firm's horizon-scanning for potential acquisition targets. This information is known only to the parties and is relevant to an initial assessment of whether the transaction may violate the antitrust laws by eliminating a potential entrant or nascent competitive threat.

Failure to account for the merger's potential impact on ongoing innovation competition can have meaningful implications. Consumers and businesses reap enormous benefits from the efficiency and convenience brought about by significant innovations. According to Nobel Prize winner Robert Solow: "Technological progress, very broadly defined to include improvements in the human factor, was necessary to allow long-run growth in real wages and the standard of living."[114] Courts, academic literature and commenters confirm the importance of innovation to growth in the economy and as a source of dynamism that can shake loose entrenched incumbents.[115] Acquisitions of innovator firms may also deny the public the benefits of those investments

in innovation, including any future competition those investments may have unleashed, if the acquirer does not make use of the discoveries[116] or is able to crowd out nascent competitors by foreclosing access to a key input.[117] The stakes are also high for innovators: startups may find fewer investors and lower acquisition prices in sectors where the expectation is that incumbents will ultimately identify and acquire any promising innovation.[118]

Comments from State antitrust enforcers supported proposals seeking materials and information regarding potential or nascent entrants. However, other commenters stated that the HSR Filing is not an appropriate vehicle for advancing novel legal theories such as nascent competition or research and development competition, and any related revisions should be postponed until those theories are better established in case law.

The Commission disagrees with commenters who suggested that concerns about innovation competition, potential entrants, and nascent threats are not well-grounded in existing law and economic learning. The importance of scrutinizing mergers for potential effects on innovation is well-documented.[119] Economic evidence supports current legal precedent. Research demonstrates a growing phenomenon of dominant firms—buoyed by acquisitions—taking over industries.[120] This is particularly true in the tech industry, where the markets in which digital platforms compete share several characteristics that tend toward a single dominant firm.[121] Sustained high economic profits suggest that dominant firms in these concentrated sectors possess substantial and durable market power.[122] In addition, insufficient competition and entry result in harms to investment and

innovation.[123] For these reasons, economic research supports the current legal framework, and reflects the need to carefully scrutinize proposed transactions involving a dominant incumbent or monopolist seeking to acquire a nascent threat or adjacent complement that could someday challenge the incumbent's position.[124]

Going back many years, the Agencies have successfully challenged several mergers that would have eliminated a potential entrant or nascent competitive threat. These enforcement actions include the acquisition of a pipeline firm or product that, once launched, would compete directly with the incumbent merging party,[125] as well as the acquisition of a firm with products already on the market that, although small, was poised to add features or capabilities in the future that could render it a closer and more formidable competitor than it is today.[126] Other transactions challenged by the Agencies involved the acquisition of a firm whose current market share understated its future competitive significance because it did not account for new innovations, business strategies, or other factors.[127] Mergers that impact future competition between products or services that have not yet been developed can also violate the antitrust laws.[128]

---

[112] *See Illumina, Inc.* v. *FTC,* 88 F.4th 1036, 1049–51 (5th Cir. 2023) (antitrust markets not limited to products that exist but may include those that are anticipated or expected or encompass research, development and commercialization of products in development); *FTC* v. *PPG Indus., Inc.,* 798 F.2d, 1500, 1504 (D.C. Cir. 1986) (merging firms competed in evolving high technology market at the request-for-proposal stage of product development).

[113] *See United States* v. *Anthem, Inc.,* 855 F.3d 345, 361 (D.C. Cir. 2017) (threat to innovation alone is anticompetitive effect from acquisition); *Illumina, Inc.* v. *FTC,* 88 F.4th 1036, 1051 (5th Cir. 2023) ("Antitrust law does not countenance such a cramped view of competition, particularly in a research-and-development market.").

[114] Robert Solow, "Growth Theory and After," 78 Am. Econ. Rev. 307, 313 (1988).

[115] *See* Giulio Federico et al., "Antitrust and Innovation: Welcoming and Protecting Disruption," 20 Innovation Pol'y & Econ. 125, 128–29 (2020); C. Scott Hemphill & Tim Wu, "Nascent Competitors," 168 U. Pa. L. Rev. 1879, 1886 (2020).

[116] *See* Hemphill & Wu, *supra* note 115, at 1893. *See also* Mark Lemley & Andrew McCreary, "Exit Strategy," 101 B.U. L. Rev. 1 (2020).

[117] *See Illumina* v. *FTC,* 88 F.4th at 1053.

[118] Sai Krishna Kamepalli et al., "Kill Zone" (Nat'l Bureau of Econ. Rsch., Working Paper No. 27146, May 2020 rev. June 2022), *https://www.nber.org/papers/w27146.*

[119] *See generally* Carl Shapiro, "Competition and Innovation: Did Arrow Hit the Bull's Eye?," in The Rate and Direction of Econ. Activity Revisited 389–400 (Josh Lerner & Scott Stern eds., 2012).

[120] Carl Shapiro, "Protecting Competition in the American Economy: Merger Control, Tech Titans, Labor Markets," 33 J. Econ. Perspectives 69 (2019).

[121] Stigler Comm. On Digital Platforms, Final Report 7–8 (2019), *https://www.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms-committee-report-stigler-center.pdf* (explaining network effects, returns increasing with scale, low marginal costs, high returns on amassing user data, and low distribution costs underlie trend toward monopoly).

[122] Shapiro, *supra* note 120, at 70.

[123] Stigler Comm. On Digital Platforms, *supra* note 121, at 31.

[124] Cunningham et al., *supra* note 15 (presenting empirical evidence that pipeline drug program is less likely to be developed when acquired by firm with overlapping existing product with significant market power); Stigler Comm. On Digital Platforms, *supra* note 121, at 81, 88; Shapiro, *supra* note 120, at 75; Michael L. Katz, "Big Tech mergers: Innovation, competition for the market, and the acquisition of emerging competitors," 54 Info. Econ. & Policy 100883 (2021).

[125] *See, e.g., In re Sanofi Corp.,* No. 9422 (F.T.C. Dec. 11, 2023) (complaint) (transaction abandoned); *United States* v. *Visa Inc.,* No. 3:20–cv–07810 (N.D. Cal. Nov. 5, 2020) (transaction abandoned); *FTC* v. *Mallinckrodt ARD Inc. (f/k/a Questcor Pharms., Inc.),* No. 1:17–cv–120 (D.D.C. Jan. 30, 2017) (consent decree ordered license and $100 million equitable monetary relief); *United States* v. *Westinghouse Air Brake Techs. Corp.,* No.1:16–cv–02147 (D.D.C. Oct. 26, 2016) (consent decree ordered divestiture); *In re Thoratec Corp.,* No. 9339 (F.T.C. July 28, 2009) (transaction abandoned); *In re Inverness Med. Innovations, Inc.,* No. C–4244 (F.T.C. Dec. 23, 2008) (Commission order requiring divestiture and other conditions).

[126] *FTC* v. *PPG Indus., Inc.,* 798 F.2d 1500, 1505–06 (D.C. Cir. 1986) (Bork, J.). *See also In re Illumina, Inc.,* No. 9387 (F.T.C. Dec. 17, 2019) (complaint) (transaction abandoned).

[127] *United States* v. *Novelis, Inc.,* No. 1:19–cv–02033 (N.D. Ohio Aug. 26, 2020) (arbitration-ordered divestiture); *In re The Procter & Gamble Co.,* No. 9400 (F.T.C. Dec. 8, 2020) (complaint) (transaction abandoned); *In re CDK Global, Inc.,* No. 9382 (F.T.C. Mar. 19, 2018) (complaint) (transaction abandoned).

[128] *See, e.g., PPG Indus., Inc.,* 798 F.2d at 1505–06. *See also United States* v. *Bayer AG,* No. 1:18–
Continued

A number of commenters opposed changes contained in the proposed rule over concerns that they would disproportionally impact small innovation companies and startups, which rely on venture capital and acquisitions to sustain their business model. One commenter stated that preventing such exit strategies would make it difficult for startups to obtain early-stage funding, reducing both the number and vitality of these innovative firms. Several cautioned the Commission to avoid increasing the burden and risk associated with the acquisition of startups, which they stated would damage the dynamic U.S. tech innovation system. Another stated that acquisitions that increase concentration can still be procompetitive and drive dynamic efficiency.

As the discussion above clearly demonstrates, acquisitions involving nascent or potential competitors as well as those that impact innovation competition may violate the antitrust laws. The Commission disagrees with commenters that contend that these types of acquisitions should be subjected to a more permissive standard or that the Agencies are singling them out for closer scrutiny. The Agencies routinely review acquisitions of and by innovative companies and apply the same legal standard to those mergers as any other acquisition. When the Agencies challenge these mergers, they are held to the same liability requirements necessary to establish a violation of section 7. However, as discussed above, there is a gap in the current information requirements that undermines the Agencies' ability to determine whether a transaction would eliminate nascent or future competition. To detect these types of acquisitions and to assess whether they violate the antitrust laws, the Agencies need information regarding these forms of ongoing or emerging competition, even if some commenters disagree with the law as applied by the courts in this area.

The Commission acknowledges that the sale of a business to an incumbent may represent a valuable exit strategy for startups. But when such exits are effectuated by a dominant firm to absorb a future or emerging competitor, the overall effect may be to reduce innovation and violate the law.[129] In fact, antitrust enforcement can drive innovation and growth by ensuring that market outcomes are determined through competition rather than left to the decisions of a dominant incumbent who can on its own determine the fate of innovative companies and the future of competition. The history of U.S. antitrust enforcement contains many examples of how government action was required to unleash the forces of competition and innovation, creating new opportunities for investments and startups.[130] Recent research suggests that existing firms may be acquiring innovative capacity not for the purpose of advancing those discoveries but rather to shelve those discoveries, leading to a reduction in innovative output and eliminating an independent source of future competition.[131] Two individual commenters shared their experiences with acquisitions that have had that effect:

• I work in the software industry and despite the constant talk of "innovation," I have seen many mergers that eliminate new product development. Mergers/acquisitions often consist of a company acquiring a product and immediately discontinuing either the acquired product or their own competing product. Most engineers I know want to develop new products and many mergers stop this from happening.[132]

• I work in the tech industry for a large technology firm. It's disgusting that our philosophy is now to buy other companies and never grow organic products because it is too hard. There's no innovation anymore it is simply make enough money to buy out the actual innovators in an industry. Any new startup is now faced with a massive hill to climb as getting VC money is paramount, but then the moment you do well your VC's will just sell to the highest bidder. This is stagnating tech, and you won't see the effects for some

years down the road when 5 tech companies are left in this country. We need tighter oversight on mergers . . . .[133]

In light of all these considerations, the Commission believes this rulemaking strikes the right balance that permits the Agencies to evaluate transactions for their potential effects on innovation while not standing in the way of acquisitions and other investments that do not present antitrust risks that need to be addressed prior to consummation. The critical task for the Agencies is to identify which transactions may substantially lessen competition or tend to create a monopoly, prior to consummation and before the possibility of future competition is snuffed out.[134] The Commission is not subjecting acquisitions of startups or innovative firms to heightened scrutiny, as some commenters suggest. Rather, the Agencies are modernizing premerger requirements in light of the changes in M&A activity for all transactions that must be reported under the HSR Act, including those involving innovative firms.[135] However, the final rule has been adjusted to lessen the burden on the targets of acquisitions generally. Moreover, many of the new requirements focus on increasing visibility into complex entities and therefore would not be applicable to the relatively straightforward structures of many startup companies.

The Commission notes that many acquisitions of startups and small innovator firms are not reportable and thus are not subject to antitrust scrutiny prior to consummation. In September 2021, the Commission released its findings from an inquiry into past acquisitions by the largest technology platforms that did not require reporting under the HSR Act.[136] Launched in

cv–01241 (D.D.C. Feb. 8, 2019) (consent decree ordered divestiture); Press Release, U.S. Dep't of Justice, "Applied Materials Inc. and Tokyo Electron Ltd. Abandon Merger Plans After Justice Department Rejected Their Proposed Remedy" (Apr. 27, 2015), *https://www.justice.gov/opa/pr/applied-materials-inc-and-tokyo-electron-ltd-abandon-merger-plans-after-justice-department*; *In re Nielsen Holdings N.V.*, No. C–4439 (F.T.C. Feb. 28, 2014) (Commission order requiring divestiture).

[129] *See* Lemley & McCreary, *supra* note 116 (exit by acquisition leads to concentration in the tech industry and short-circuits the development of truly disruptive new technologies that have historically displaced incumbents in innovative industries).

[130] *See* Giovanna Massarotto, "Driving Innovation with Antitrust," Promarket (Apr. 10, 2024) *https://www.promarket.org/2024/04/10/driving-innovation-with-antitrust/*.

[131] *See* Cunningham et al., *supra* note 15. *See also* Florian Szücs, "M&A and R&D: Asymmetric Effects on acquirers and targets?" 43 Rsch. Pol'y 1264 (2014); Carmine Ornaghi, "Mergers and innovation in big pharma," 27 Int'l J. Indus. Org. 70 (2009); Justus Haucap et al., "How mergers affect innovation: Theory and evidence," 63 Int'l J. Indus. Org. 283 (2019) (showing a reduction in innovation competition post-merger).

[132] Comment of Darryl Pretto, Doc. No. FTC–2023–0040–0434.

[133] Anonymous Comment, Doc. No. FTC–2023–0040–0600.

[134] *See* Cristina Caffarra et al., "'How Tech Rolls:' Potential Competition and 'Reverse' Killer Acquisitions," 2 CPI Antitrust Chron. 13, 15 (May 2020).

[135] According to a recent study, investment in U.S. startups continues to grow each year, reaching a combined deal value of $165.8 billion for 12,235 such deals in 2020. *See* Gary Dushnitsky & D. Daniel Sokol, "Mergers, Antitrust, and the Interplay of Entrepreneurial Activity and the Investments That Fund It," 24 Vand. J. Ent. & Tech. L. 255, 271 Table 1 (2022). The authors note that a case-by-case analysis of particular deals allows for a more nuanced approach to address particular potentially problematic deals in such settings. *Id.* at 277–78. *See also* D. Daniel Sokol, "Merger Law for Biotech and Killer Acquisitions," 72 Fla. L. Rev. Forum 1, 8 (2020) (explaining that innovation effect is fact-dependent).

[136] *See* Press Release, Fed. Trade Comm'n, "FTC Staff Presents Report on Nearly a Decade of Unreported Acquisitions by the Biggest Technology Companies" (Sept. 15, 2021), *https://www.ftc.gov/*

February 2020, this inquiry analyzed the terms, scope, structure, and purpose of exempted transactions by five large technology companies: Alphabet, Inc., Amazon.com, Inc., Apple Inc., Facebook, Inc., and Microsoft Corp. The study covered ten years of acquisitions (from January 1, 2010 to December 31, 2019) and found that the companies collectively made 819 acquisitions that were not reported under the HSR Act.[137] None of these acquisitions was filed under HSR, although many of them were concentrated in just a few categories of technology, such as mobility, application software, and internet content and commerce.[138]

This study provided other insights into these companies' practices and acquisition strategies, including how they structured acquisitions and how these acquisitions fit into the companies' overall business strategies.[139] For instance, not only were many of the acquisitions "small" in deal value (*i.e.*, under the various HSR reporting thresholds), they were also "young," with nearly 40 percent of the acquisitions involving target firms that were less than five years old.[140] Most of the acquisitions involved the buyer taking control of the acquired assets or entity, although there were also a significant number of investments that resulted in the large company holding a minority interest in the target firm.[141] Moreover, over three-quarters of the transactions included non-compete clauses for founders and key employees of the acquired entities, with relatively small variation in the percentage of transactions with non-compete clauses across the five respondents.[142] Together, these findings indicate that during the study period, these five companies acquired many small, nascent firms operating in related

business lines and their founders and other key employees agreed to refrain from continuing their own efforts to innovate outside the company for some period of time. While the study focused on transactions that were not reportable under the HSR Act, the information collected from these tech companies provided the Commission with insight into information that is available to parties in all types of acquisitions but that is not required by the current Form and Instructions.

In light of the benefits to the public from preventing mergers that violate the antitrust laws by reducing innovation competition or eliminating a potential entrant or nascent threat, the Commission has determined that the Agencies need certain additional information with the HSR Filing to conduct an initial antitrust assessment prior to consummation. In the Agencies' experience, it is necessary to obtain this type of information directly from the filing parties because typically their plans regarding future products or business lines are not public.

Several new information requirements in the final rule are aimed at providing the Agencies with sufficient information to determine if the transaction is likely to raise concerns about potential, emerging, or nascent competition. For instance, the new Overlap Description and Supply Relationships Description directly address the scope of existing and emerging competition between the parties. In particular, the Overlap Description requires filers to identify their own products and services, including those that are pre-revenue, that compete with the products and services of the other party that are known to the filer.[143] This information will provide a basis for the Agencies to know that there are areas of emerging and direct competition beyond existing products or services, including important ongoing innovation competition. The Overlap Description also requires filers to produce measurement information for products or services not yet generating revenue, or those whose performance is not measured by revenue, such as projected revenue, estimated volume, or any other applicable performance metric. This change recognizes the importance of capturing the competitive significance of nascent or emerging products and services.

The final rule also requires the buyer to indicate whether there are any existing contracts between the parties,

including non-compete, non-solicitation, or licensing agreements, which would alert the Agencies to any limits on future competition that are created by these agreements, especially when the buyer is not acquiring all of the acquired entity. The existence of non-compete or non-solicitation agreements can be especially useful in revealing that the parties consider themselves to be 'in competition' with one another, now or in the future, such that there is value in contracting away the ability to compete for or solicit business or workers. In addition, the Supply Relationships Description requires information for products, services, or assets (including data) that the other party or any other business uses or could use to compete. This forward-looking assessment, based on each filer's business experience, would reveal whether there are future uses of either party's products that could give rise to concerns about non-horizontal effects from the transaction. The inclusion of data as a potentially key asset is purposeful, given the competitive significance of data access for effective competition in so many modern markets.[144]

Similarly, new document requirements contained in the final rule are aimed at revealing each firm's assessment of market conditions and horizon-scanning for competitive threats. For instance, the final rule requires a broader search for documents that evaluate or analyze the transaction to include not only those provided to board members but also to the person who has primary responsibility for supervising the deal. These documents, along with certain ordinary course plans and reports shared at the highest level of management described above and in section VI.G.2., will reveal additional information about how each filer views the competitive landscape more broadly, including in ways that may impact current or future competition. Together, these documents may signal whether either party has identified emerging threats to competition—from the other party or from firms not involved in the transaction—that would impact the Agencies' assessment of whether the transaction may violate the antitrust laws.

As discussed above in section II.B.1., new information contained in the

---

news-events/news/press-releases/2021/09/ftc-staff-presents-report-nearly-decade-unreported-acquisitions-biggest-technology-companies.

[137] See Fed. Trade Comm'n, Non-HSR Reported Acquisitions by Select Technology Platforms, 2010–2019: An FTC Study 10–11 Fig. 1 (2021), *https://www.ftc.gov/system/files/documents/reports/non-hsr-reported-acquisitions-select-technology-platforms-2010-2019-ftc-study/p201201technologyplatformstudy2021.pdf* [hereinafter "Non-HSR Reported Acquisitions"]. Data supplied by commenter Engine confirms that the vast majority of startup acquisitions are valued below $50 million, meaning that they are rarely reported to the Agencies in advance. *See* Comment of Engine, Doc. No. FTC–2023–0040–0681, appendix B at 16.

[138] Non-HSR Reported Acquisitions, *supra* note 137, at 27–35.

[139] Other competition enforcement agencies around the world conducted similar studies involving acquisitions of digital platform companies. *Id.* at 2 n.6.

[140] *Id.* at 23–26.

[141] *Id.* at 15.

[142] *Id.* at 21–22.

[143] As explained in section VI.I., the parties should not exchange information for the purpose of responding to the Competition Descriptions.

[144] See FTC v. IQVIA Holdings Inc., No. 1:23 Civ. 06188 (S.D.N.Y. Dec. 29, 2023) (order granting preliminary injunction on horizontal theories of harm without addressing FTC allegations that the acquisition would allow IQVIA to foreclose other industry participants from accessing its data as a key input for healthcare professional programmatic advertising).

Minority Shareholders or Interest Holders and Officers and Directors sections will provide a basis for the Agencies to identify any existing or potential management relationships between the acquiring person and target, including through entities or individuals who can influence decision-making of the acquiring person post-merger. These relationships can be especially concerning if used to gain access to non-public information about future plans or investments in products-in-development when those same individuals also have interests in competitively relevant businesses.

Finally, the final rule collects additional information about the acquisition rationale of the buyer to assist the Agencies in understanding the purpose of the transaction. For example, the final rule requires the buyer to describe any rationale for the transaction and to indicate any document submitted with the HSR Filing that confirms or discusses that rationale. These answers will provide context for the Agencies' initial antitrust assessment through a deeper understanding of what purpose the buyer has for engaging in a transaction that is large enough to require premerger review. In addition, the final rule for the first time requires the seller to report prior acquisitions in the same or related lines of business, which would provide a basis for the Agencies to better assess whether the transaction implicates emerging, nascent, or potential competition, especially through the combined effects of roll-up or serial acquisition strategies or "killer" acquisitions in which assets were purchased but not used as a means of eliminating a competitor.

### 5. Disclosing Roll-Up or Serial Acquisition Strategies

Another trend in M&A activity has been the rise of serial acquirers, firms that engage in strategic acquisitions in the same industry, often "rolling up" many small competitors in the same or adjacent markets to establish a large, sometimes dominant, position.[145] Serial acquisition strategies have been subject to antitrust scrutiny for over 100 years.[146] In the seminal merger case,

*United States* v. *Philadelphia National Bank,* 374 U.S. 321 (1963), the Supreme Court noted that both the buyer and the seller had previously acquired many other independent banks,[147] driving a trend toward concentration that rendered their merger suspect.[148] Given the popularity and prevalence of these serial acquisition strategies in recent years, especially in healthcare and technology markets, this trend has attracted the attention of academics and policymakers alike.[149] A pattern or strategy of buying up smaller competitors or firms in the same or related lines of business can lead to harm of the same magnitude and type as mergers of larger or established firms, but serial acquisitions are less likely to attract the attention of enforcers until the strategy is identified. A series of small acquisitions can lead to consolidation within an industry, often without ever triggering the obligation to report these acquisitions under the HSR Act. This strategy has been particularly prevalent in healthcare markets involving private equity buyers.[150]

Often the Agencies are not able to detect these strategies until it is too late, after the serial acquirer has established a dominant position and is able to exercise market power to the detriment of market participants. For instance, in September 2023, the FTC charged U.S. Anesthesia Partners, a for-profit corporation, with a multi-year anticompetitive scheme to consolidate anesthesia practices in Texas.[151] This lawsuit, which is pending in Federal court in Texas, alleges that the company acquired over a dozen anesthesiology practices in Texas to eliminate competition and create a single dominant provider with the power to demand higher prices.

The Commission is aware of the impact of serial acquisitions based on its experience with the dialysis industry, which is an area in which economic research has documented adverse effects from serial acquisitions. Throughout the 2000s, the Commission reviewed a series of large acquisitions by DaVita, the largest U.S. provider of life-sustaining treatments for end stage renal disease patients. In 2006, in conjunction with DaVita's $3.1 billion acquisition of rival Gambro Healthcare, Inc., the Commission required DaVita to divest 69 dialysis clinics in 35 markets across the United States to resolve charges that the acquisition violated section 7. In 2011, DaVita sought to acquire rival DSI for $689 million, and the Commission required divestitures to preserve competition for dialysis services in 22 local markets. Then in 2017, the Commission ordered DaVita to divest seven clinics in New Jersey and Dallas to proceed with its $358 million acquisition of Renal Ventures. During roughly the same period, the Commission also reviewed a series of acquisitions by Fresenius, the other leading U.S. provider of dialysis services, and required significant divestitures to maintain competition.[152]

Notwithstanding these enforcement actions, the dialysis industry has experienced growing concentration, mostly as a result of acquisitions that were not reportable under the HSR Act. According to one 2020 study, there were more than 1,200 acquisitions of independent dialysis facilities over a 12-year period, resulting in DaVita and Fresenius operating more than 60 percent of all clinics nationwide.[153] The study concluded that these changes in

[145] NPRM at 42202 n.62 (citing Gerry Hansell et al., "Lessons from Successful Serial Acquirers: Unlocking Acquisitive Growth," Boston Consulting Grp. (Oct. 1, 2014), *https://www.bcg.com/publications/2014/mergers-acquisitions-unlocking-acquisitive-growth*); "Stealth Consolidation," *supra* note 18.

[146] *See, e.g., United States* v. *Grinnell Corp.,* 384 U.S. 563, 576, 578, 580 (1966); *Standard Oil Co.* v. *United States,* 221 U.S. 1, 31–42 (1911); *United States* v. *Am. Tobacco Co.,* 221 U.S. 106, 157–60 (1911). *See also* Note by the United States to the

OECD, Serial Acquisitions and Industry Roll-ups (Dec. 6, 2023) (DAF/COMP/WD(2023)99), *https://one.oecd.org/document/DAF/COMP/WD(2023)99/en/pdf* (discussing the history and roots of antitrust enforcement against anticompetitive serial acquisitions). Serial acquisition strategies may also violate section 2 of the Sherman Act when a firm with monopoly power relies on acquisitions, among other conduct, to acquire or maintain its monopoly. *See Credit Bureau Reps., Inc.* v. *Retail Credit Co.,* 358 F. Supp. 780 (S.D. Tex. 1971), *aff'd,* 476 F.2d 989 (5th Cir. 1973); *United States* v. *Jerrold Elecs. Corp.,* 187 F. Supp. 545 (E.D. Pa. 1960).

[147] *See United States* v. *Phila. Nat'l Bank,* 374 U.S. 321, 331 (1963) (PNB previously acquired nine independent banks while Girard acquired six).

[148] *Id.* at 367 (evidence of several remaining competitors insufficient to rebut inherently anticompetitive tendencies of high post-merger market shares, in light of strong trend toward mergers, including those of the defendants).

[149] *See* Investigation of Competition in Digital Markets, *supra* note 106, at 24–25.

[150] Richard M. Scheffler et al., Am. Antitrust Inst., "Soaring Private Equity Investment in the Healthcare Sector: Consolidation Accelerated, Competition Undermined, and Patients at Risk" 8–16 (May 18, 2021), *https://publichealth.berkeley.edu/wp-content/uploads/2021/05/Private-Equity-I-Healthcare-Report-FINAL.pdf.* The Commission recently hosted a public workshop to discuss the growing body of economic research examining the role of private equity investment in health care markets. Fed. Trade Comm'n, Private Capital, Public Impact: An FTC Workshop on Private Equity in Health Care (Mar. 5, 2024), *https://www.ftc.gov/news-events/events/2024/03/private-capital-public-impact-ftc-workshop-private-equity-health-care.*

[151] *FTC* v. *U.S. Anesthesia Partners, Inc.,* No. 4:23cv3560 (S.D. Tex. Sept. 21, 2023) (complaint).

[152] *See In re Fresenius AG,* No. C–4159 (F.T.C. July 5, 2006) (decision and order requiring divestiture of ninety-one clinics and financial interests in twelve more); *In re Am. Renal Assocs. Inc.,* No. C–4202 (F.T.C. Oct. 23, 2007) (consent order terminating purchase agreement for five clinics and closure of three additional clinics); *In re Fresenius Med. Care AG,* No. C–4348 (F.T.C. May 25, 2012) (decision and order requiring divestiture of sixty dialysis clinics).

[153] Paul J. Eliason et al., "How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry," 135 Q. J. Econ. 221, 222 (2020) (from 1990 to 2020, the share of independent dialysis facilities fell from 86% to 21%).

ownership resulted in higher prices, lower levels of service, and worse outcomes for patients.[154] One commenter stated that, based on his research, merger enforcement against reportable acquisitions prevented illegal consolidation 95 percent of the time, while the many non-reportable acquisitions of dialysis clinics were blocked only 5 percent of the time. He contended that these 'stealth' acquisitions accounted for much of the increase in within-market concentration.[155]

In light of the failure of prior interventions to stem the adverse consequences of roll-up acquisitions in this industry, when DaVita in 2022 sought to buy 18 clinics in a non-HSR-reportable transaction, the Commission unanimously voted to require DaVita not only to divest three clinics but also to obtain prior Commission approval before buying any new ownership interest in dialysis clinics in Utah.[156] The Commission determined that imposing a prior approval obligation was appropriate in light of the company's history of attempting anticompetitive transactions that do not trigger a notification under the HSR Act.[157]

The Commission has also imposed prior notice or prior approval provisions on another serial acquirer, JAB Consumer Partners, a private equity firm that has made several significant acquisitions in the emergency and specialty veterinary services markets across the United States. JAB is the parent company of two large veterinary clinic chains, Compassion-First Pet Hospitals and National Veterinary Associates Inc., that have been built through a series of acquisitions. In 2020, Compassion-First bought NVA for $5 billion, and the Commission required JAB to divest clinics in three local markets.[158] In June 2022, Compassion-First/NVA acquired Sage Veterinary Partners for $1.1 billion, and the

Commission required divestitures in three additional local markets.[159] The Commission also determined that, in light of JAB's ongoing acquisition strategy, it would require prior approval and prior notice requirements on JAB's future acquisitions of specialty and emergency veterinary clinics.[160] Later in 2022, when JAB also sought to acquire another veterinary chain with significant competitive overlap in four geographic markets, the Commission again required divestitures and prior approval requirements in the affected local markets for emergency and specialty veterinary services markets.[161]

But resorting to imposing prior approval obligations after an industry has already experienced significant concentration due to roll-up strategies is suboptimal. A central purpose of the HSR Act is to allow the Agencies to arrest trends toward concentration through effective premerger review. For any reportable transaction under the HSR Act, the Agencies have an obligation to determine whether the transaction is one of a series of acquisitions that could lead to harm in the affected markets. Information about each party's prior acquisitions will provide a basis for the Agencies to assess this risk to competition during their initial antitrust assessment for any reportable transaction.

Several commenters supported the need for more information related to prior acquisitions, including a group of State antitrust enforcers. One commenter noted that the private equity industry pioneered and perfected the serial 'roll-up' acquisitions that were too small to attract antitrust agency attention but nonetheless amassed considerable market power over time. The same commenter pointed out that private equity firms use these add-on buyout deals to purchase multiple competitors of an existing portfolio company or expand their geographic reach to create a much bigger player in an industry—and that this strategy can in aggregate substantially lessen competition or tend to create a monopoly. Another commenter raised similar concerns that the business strategy of making a series of small

acquisitions—whether an intentional tactic to avoid regulatory scrutiny or not—has become concerningly common in recent decades and led to many consolidated industries. An individual commenter shared their experience with the broader impact of rollup acquisitions on local communities:

• As the wife of a small business owner and member of a community, I'm dismayed at seeing how many small local and regional businesses have disappeared after becoming the target of mergers and rollups. Those businesses— funeral homes, hospice care, newspapers, hardware stores, coffee shops, veterinarians—were [] an important part of the community. Now it is nearly impossible to start local businesses in those sectors and turn any sort of profit while competing with PE backed rollups.[162]

Other commenters stated that the proposed changes are unnecessary because they lack sufficient justification, are out of step with their view of case law and market realities, and do not seem to have a strong factual basis. One commenter stated that the proposal to expand the lookback period for prior acquisitions would invite the Agencies to scrutinize long-consummated deals, including those that the HSR Act were never intended to capture. Some raised concerns that the proposed changes will substantially increase the burden of reporting on prior acquisitions beyond what is currently required for the HSR Form. Another stated that the costs of the proposed changes regarding prior acquisitions far outweigh the potential benefit that information about immaterial prior transactions could provide to the evaluation of the transaction. One commenter stated that requiring disclosure of non-reported transactions will reduce investments in startups.

The Commission has determined that, to detect whether serial or roll-up acquisition strategies have changed the market dynamics such that the transaction under review could have widespread harmful effects that will be hard to undo, the Agencies need additional information about prior acquisitions, including from the acquired firm. Knowing each party's record of prior acquisitions in the same business lines will allow the Agencies to understand the long-term competitive strategy for the transaction at issue, including whether it is one in a series of prior or planned acquisitions in the same industry and whether the

---

[154] *Id.* at 223.

[155] *See* Comment of Thomas Wollmann, Doc. No. FTC–2023–0040–0680 at 1 n.2 (citing to Thomas G. Wollmann, ''Stealth Consolidation: Evidence from an Amendment to the Hart-Scott-Rodino Act,'' 1 a.m. Econ. Rev.: Insights 77–94 (2019) and Thomas G. Wollman, ''How to Get Away with Merger: Stealth Consolidation and Its Effects on US Healthcare'' (Nat'l Bureau of Econ. Rsch., Working Paper No. 27274, May 2020 rev. Mar. 2024), *https://www.nber.org/papers/w27274*).

[156] *In re DaVita Inc.*, No. C–4677 (F.T.C. Oct. 25, 2021) (decision).

[157] *See* Fed. Trade Comm'n, Statement of the Commission on Use of Prior Approval Provisions in Merger Orders (Oct. 25, 2021), *https://www.ftc.gov/system/files/documents/public_statements/1597894/p859900priorapprovalstatement.pdf*.

[158] *In re Agnaten SE*, No. C–4707 (F.T.C. Apr. 9, 2020) (decision and order).

[159] *In re JAB Consumer Partners SCA SICAR*, No. C–4766 (F.T.C. Aug. 2, 2022) (decision and order).

[160] The Commission's order requires JAB to obtain prior Commission approval before acquiring a specialty or emergency veterinary clinic within twenty-five miles of any JAB clinic in California or Texas, and prior notice to the Commission thirty days prior to a similar acquisition anywhere in the United States that is not required to be reported under the HSR Act. *Id.* (decision and order).

[161] *In re JAB Consumer Partners SCA SICAR*, No. C–4770 (F.T.C. Oct. 10, 2022) (decision and final order).

[162] Comment of Nora Johnson, Doc. No. FTC–2023–0040–0618.

transaction is a merger of "consolidators." The additional information would also permit the Agencies to better identify transactions whose effects should not be viewed in isolation but rather as a pattern of consolidation.[163]

The Commission has always required information about prior acquisitions in the HSR Filing to help identify strategies aimed at gaining market share through acquisitions rather than internal expansion or more vigorous competition, and the Commission disagrees that it is outside its rulemaking authority under the HSR Act to require filers (including the target) to report prior acquisitions in the same or related business lines even if they were not previously reported to the Agencies for premerger review. The final rule contains modest expansions of this long-standing requirement, to better account for the increased number of firms engaged in roll-up strategies. Nonetheless, the final rule does not contain certain expansions suggested in the proposed rule, such as eliminating the $10 million exception or expanding the lookback period from 5 to 10 years in response to comments that providing this level of information about prior acquisitions would be costly and burdensome. The modest expansion of this information requirement should provide the Agencies with a more complete record of consolidation in the relevant business lines that has been driven by the merging parties in order to identify when a reported transaction is the latest in a series of acquisitions, and thus one that may violate the antitrust laws.

As noted elsewhere, the Agencies remain committed to identifying consummated mergers that have resulted in harm and to take steps to unwind them as resources permit. But regardless of the legality or reportability of any particular prior acquisition, the fact that it occurred and involved the same business lines under review is directly relevant to whether the reported transaction may violate the antitrust laws, including through a series of mergers that "convert an industry from one of intense competition among many enterprises to one in which three or four large concerns produce the entire supply."[164] For these reasons, the Commission has determined there is a need to collect information about prior acquisitions from the seller as well as the buyer. The cost of complying with

this requirement should be minimal except in instances where the seller has made many acquisitions in the same or related business lines, in which case the information may prove highly relevant to Agency review.

Other new requirements in the final rule will also help the Agencies identify these roll-up strategies. In particular, the Overlap Description will provide an alternative basis for identifying product or service market overlaps for which prior acquisitions should be reported. Information about the buyer's acquisition rationale will reveal the purpose of the transaction, including whether is it part of a strategy of pursuing transactions in similar business lines. The new requirement to submit a small set of business plans and reports shared with the highest levels of management that discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and acquired entity may reveal whether there are other acquisition targets identified by either the acquiring or acquired person.

### III. Statutory Authority and Economic Analysis

The HSR Act directs the Commission, with the concurrence of the Assistant Attorney General and consistent with the purposes of the Act, to issue rules requiring the submission of documentary material and information relevant to a proposed acquisition as is "necessary and appropriate to enable [the Agencies] to determine whether such acquisition may, if consummated, violate the antitrust laws."[165] The HSR Act was enacted to assist the Agencies in enforcing other provisions of the Clayton Act, and to give the FTC and the Department of Justice a tool—premerger notification—to identify problematic mergers and acquisitions before they are consummated and a short period of time to complete their analysis.[166] The statute grants the Commission explicit authority to require the submission of documents and information the Agencies determine are necessary and appropriate to identify proposed acquisitions that may result in an antitrust violation.[167]

In the administrative law context, the Supreme Court has held that Congress' use of terms such as "appropriate" or "reasonable" in a statute authorizing agency rulemaking gives the agency

"flexibility" to regulate.[168] As the Supreme Court has explained, "[o]ne does not need to open up a dictionary in order to realize the capaciousness of this phrase. In particular, 'appropriate' is the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors."[169] The phrase "leaves agencies with flexibility," although "an agency may not entirely fail to consider an important aspect of the problem."[170] In at least some contexts, courts have held that "necessary and appropriate" requires consideration of a rule's costs and benefits.[171]

The Commission is not convinced that Congress intended the words "necessary and appropriate" to require a cost-benefit analysis in this context. Had Congress intended to require the Commission to consider costs and benefits, it could easily have done so.[172] Instead, it gave the Commission broad authority to establish requirements it deems necessary and appropriate for determining whether a proposed acquisition may violate the antitrust laws during premerger review, and even gave the Commission express authority to define statutory terms. Nonetheless, in the particular circumstances of this rule, the Commission has considered the reasonableness of requiring additional information in the HSR Filing in light of the statutory scheme established by Congress to more effectively prevent undue consolidation that violates the antitrust laws, including the costs and the benefits of the final rule. The Commission has evaluated, on the one hand, the benefits to the Agencies, the parties, third parties and the public in making premerger review more efficient and effective by obtaining information necessary to properly assess the competitive effects of proposed acquisitions; and on the other hand, the need to reduce unnecessary burden, costs, and delay on filers and the transactions they hope to pursue in a manner consistent with the

---

[163] See Brown Shoe Co. v. United States, 370 U.S. 294, 334 (1962).

[164] Id. (quoting S. Rep. 81–1775, at 5 (1950) and citing H.R. No. Rep. 81–1191, at 8 (1949)).

[165] 15 U.S.C. 18a(d)(1).

[166] PhRMA, 790 F.3d at 199, 206.

[167] Id. at 199, 201, 205.

[168] Loper Bright Enterprises v. Raimondo, 144 S.Ct. 2244 (2024).

[169] Michigan v. EPA, 576 U.S. 743, 752 (2015) (citation and internal quotation marks omitted).

[170] Id. (citation and internal quotation marks omitted).

[171] See id.; Mex. Gulf Fishing Co. v. U.S. Dep't of Commerce, 60 F.4th 956, 965 (5th Cir. 2023) (finding that the necessary and appropriate standard at a minimum requires that a rule's benefits reasonably outweigh its costs).

[172] See Chamber of Com v. Sec. Exch. Comm'n., 412 F.3d 133, 142 (D.C. Cir. 2005) (statute requires SEC to consider whether rule will promote efficiency, competition, and capital formation which requires a consideration of the costs of the conditions imposed by the rule).

mandatory premerger notification regime of the HSR Act.

In determining what information is necessary and appropriate to determine whether a reported transaction merits the issuance of Second Requests, the Commission also draws on the Agencies' decades of experience reviewing filings and responding to informal requests for guidance.[173] This operational experience informs the Commission's assessment of the existing rules' shortcomings and supports its decision that it is necessary and appropriate—and consistent with the text and purpose of the HSR Act—for the Agencies to require the merging parties to provide sufficient information to enable the Agencies to conduct a preliminary assessment of the risk that the filed-for transaction may violate the antitrust laws, particularly where some information is available only from the parties.

After careful consideration of the public comments as well as the costs and benefits of the proposed changes, the Commission has determined to adopt a modified version of the information requirements proposed in the NPRM. As modified, the final rule will facilitate the provision of relevant documentary materials and information that allow the Agencies to assess whether a proposed acquisition may violate the law within the statutory period available for their initial review while minimizing the cost and burden of producing such materials as much as practicable.

The following analysis considers the potential economic effects that may result from the final rule consistent with the Commission's statutory power to obtain information necessary and appropriate to conduct an effective premerger review, including the benefits and costs to market participants. In conducting this assessment, the Commission has identified existing costs to filers, the Agencies, and third parties that could be avoided by adjusting the information requirements for HSR Filings. Avoiding such costs would generate benefits for filers, the Agencies, and third parties in addition to broader public benefits of effective premerger screening to identify potentially unlawful mergers prior to consummation.

The Commission believes that the final rule will improve the efficiency of the premerger review process and help the Agencies identify transactions that

may violate the antitrust laws along all parameters of potential harm, but not all of these benefits can be quantified. Wherever possible, the Commission quantifies the likely economic effects of its final rule. However, some economic effects are inherently less conducive to sound quantification either due to the lack of reliable data or the lack of a well-established economic methodology that would provide estimates or ranges of costs. For example, producing quantitative estimates of certain costs and benefits would require numerous assumptions to generate a behavioral forecast of how parties contemplating an acquisition and other affected third parties would respond to the rule, and how those behavioral responses would in turn affect the overall cost of compliance and the merger review process. In addition, some factors determining certain economic effects of the rule are transaction-, firm- and industry-specific and thus inherently difficult to quantify. Even if it were possible to calculate a range of potential quantitative estimates for these effects, the range would be so wide as to not be informative about the magnitude of the associated benefits or costs. Where sound economic methodology is not available to measure particular benefits or costs, the Commission addresses those qualitatively.[174] In sum, to show the connection between the facts found and the agency's decision, the Commission provides, where feasible and appropriate, a quantified estimate of the economic effects of the final rule, and a qualitative description of the benefits and costs.

*A. Statutory Authority and Congressional Intent*

The HSR Act provides that the Commission "shall require" that

premerger notifications be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Agencies to determine whether such acquisition may, if consummated, violate the antitrust laws.[175] Thus, the HSR Act explicitly requires the Commission, with the concurrence of the Assistant Attorney General, to determine what types of documents and information are required to conduct an initial assessment of antitrust risk. Mandatory premerger review strengthens merger enforcement by giving the Agencies a fair and reasonable opportunity to detect and investigate large mergers before consummation.[176] The ability to spot "problem areas" during the initial screen is the key feature of the HSR Act that converts merger enforcement from ineffective ex-post litigation to expeditious and effective premerger proceedings.[177]

To that end, Congress passed the HSR Act to provide the Agencies with advance notice of planned acquisitions and an opportunity to challenge such acquisitions as unlawful prior to consummation. The overall intent was to avoid lengthy, costly post-consummation enforcement that is ineffective at preventing undue concentration and permits an illegal acquisition to cause harm until unwound:

The problem this bill cures is startlingly simple, but it goes to the very foundations of our merger law. Under present law, companies need not give advance notification of a planned merger to the Federal Trade Commission and the Department of Justice. But if the merger is later judged to be anticompetitive, and divestiture is ordered, that remedy is usually a costly exercise in futility—untangling the merged assets and management of the two firms is like trying to unscramble an omelet.[178]

---

[173] *See PhRMA,* 790 F.3d at 210 (the Commission may provide the factual predicate for a finding through its cumulative experience and resulting expertise).

[174] *See Chamber of Com* v. *Sec. Exch. Comm'n.,* 85 F.4th 760, 768 (5th Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). *See also id.* at 773–74 (explaining that securities law provisions providing rulemaking authority do not require the agency to conduct a quantitative inquiry to ascertain the economic effects of a rule, that the agency could instead rely on a qualitative assessment of the rule's economic implications, and that the agency can determine the analysis that most effectively reflects the economic consequences of its rule) (citation omitted); *All. For Fair Bd. Recruitment* v. *Sec. Exch. Comm'n.,* 85 F.4th 226, 263 (5th Cir. 2023) (agency's analysis of unquantifiable benefits sufficiently supports a rule as long as it provides an adequate explanation for its determination, and agency need not support its analysis with hard data where it reasonably relied on intangible benefits that were difficult to quantify) (citations omitted); *Mex. Gulf Fishing.,* 60 F.4th at 965–66 (a necessary-and-appropriate condition does not require applying a strict cost-benefit analysis but simply a showing that expected benefits are reasonably related to anticipated costs) (citations omitted).

[175] 15 U.S.C. 18a(d)(1).

[176] H.R. Rep. No. 94–1373, at 5 (1976).

[177] *Id.* at 10–11 (chief virtue of the Act is to help eliminate endless post-merger proceedings and replace them with far more expeditious and effective premerger review generating considerable savings; if the initial notification form reveals 'problem areas,' the government can request additional data during the initial 30-day period).

[178] 122 Cong. Rec. 25051 (1976) (remarks of Rep. Rodino). Premerger review was not the only tool given the Agencies to rectify the inadequacy of post-consummation merger enforcement. In 1973, Congress amended the FTC Act to authorize the Commission to seek injunctions in Federal court in recognition of the inadequacy of post-consummation divestitures. *See FTC* v. *H.J. Heinz Co.,* 246 F.3d 708, 726 (D.C. Cir. 2001) (Section 13(b) of the FTC Act reflects congressional recognition that divestiture is an inadequate and unsatisfactory remedy in a merger case, citing 119 Cong. Rec. 36612 (1973)). The inability of the

Continued

As noted by the Antitrust Modernization Commission (AMC)—a special body commissioned by Congress in 2002 to conduct a comprehensive review and make recommendations for revisions to U.S. antitrust laws—the HSR Act addressed the defects of post-consummation merger enforcement, which "could neither fully compensate society for the interim loss of competition, nor fully restore a competitive market structure, particularly if the companies had already integrated their productive assets, or 'scrambled the eggs.' " [179] Congress also intended to avoid deterring or impeding the consummation of the vast majority of acquisitions and therefore fashioned a regime that reflected "a careful balancing of the need to detect and prevent illegal mergers and acquisitions prior to consummation without unduly burdening business with unnecessary paperwork or delays." [180]

The Agencies have administered the premerger notification program required by the HSR Act for more than 45 years, and the Commission has engaged in numerous rulemakings to change the information requirements for premerger notification in response to changes in market realities. Although many commenters object in whole or in part to the proposals contained in the NPRM, several conceded that some updates to the Rules are reasonable or justified by increasingly complex markets. Others commended the Commission for undertaking a periodic review of its rules. Even so, some argue that the Commission lacks the authority to make any changes to its current process that would increase the burden or delay HSR-reportable transactions, asserting that Congress intended to reduce costs and delay and to focus the Agencies'

scrutiny on only the largest corporate transactions. The Commission disagrees with certain commenters that the Commission lacks the authority to adjust information requirements over time to make premerger review efficient and effective for the purpose of detecting potentially illegal mergers in light of changing market conditions.

Given the number of comments that assert that the proposed rule violated the intent of the HSR Act, the Commission responds first to these broad objections. The Commission also responds to assertions that it has failed to properly weigh the benefits and costs of changing the notification requirements in light of the statutory premerger scheme.

As an initial matter, the Commission disagrees that avoiding potential cost or delay to those involved in dealmaking is the primary focus of the HSR Act. The legislative history and plain text of the HSR Act make clear that the goal of establishing a premerger review regime was not to minimize the number of transactions that are reviewed by the Agencies or to reduce the delay for reported transactions below the statutory obligations. [181] In fact, it is clear that Congress explicitly contemplated that a mandatory premerger notification regime would impose burdens on merging parties. Prior to the passage of the HSR Act, parties were free to merge without providing any notification and without any delay, which led to concerns that the Agencies were practically unable to block or unwind illegal transactions. [182] Congress determined that new and meaningful requirements were necessary to achieve the overarching Congressional goal of promoting vigorous and effective enforcement of the antitrust laws:

Amended Section 7 has failed to achieve its objectives—not because of its substantive standards, but because of the lack of an effective mechanism to detect and prevent

illegal mergers prior to consummation. . . . The Committee believes that [premerger notification] represents a careful balancing of the need to detect and prevent illegal mergers and acquisitions prior to consummation without unduly burdening business with unnecessary paperwork or delays . . . Complex mergers or acquisitions of the kind encompassed within this subsection generally require a great deal of prior planning, and this provision will provide the Government appropriate opportunity to evaluate the legality of significant business behavior at the most propitious moment for all parties, with the least possible disaccommodation. [183]

When setting up the premerger notification program, the Commission rejected assertions that the term "notification" implies only a minimal burden for the initial HSR Filing. Some commenters at the time maintained that the initial notification should do little more than inform the Agencies of the participants to the transaction, the projected date of consummation, and other noncontroversial and generally uninformative data, leaving a fuller information demand to the Second Request. The Commission disagreed that the HSR Act should be read this way, stating that this position is contrary to the statutory text and fundamentally misconceives the amount of information necessary to make even a tentative determination whether a transaction may violate the antitrust laws. [184] The Commission explained that the HSR Filing should contain information necessary and appropriate for an effective premerger notification program. [185] The Commission reasoned that requiring perfunctory information in the HSR Filing would not fulfill the statutory provision and would result in more Second Requests that would extend the average waiting period under the HSR Act. [186] Then and now, to fulfill the purpose of premerger review, there must be sufficient information provided in an HSR Filing to determine whether to issue Second Requests and what information those requests would seek. Consistent with Congress' expectations that HSR Filings would consist of data and documents reasonably available to filing companies, such as the information and documents they relied

---

Commission to obtain injunctive relief sooner to prevent widespread harm from mergers was a widely acknowledged shortcoming of its agency design. *See, e.g., FTC* v. *Dean Foods Co.,* 384 U.S. 597, 606 n.5 (1966) (experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture).

[179] Antitrust Modernization Comm'n, Rep. & Recommendations 155 & n.21 (2007), *https:// govinfo.library.unt.edu/amc/report recommendation/toc.htm* (citing H.R. Rep. No. 94–1373 at 7–11) (hereinafter "AMC Report"). The Antitrust Modernization Commission was created pursuant to the Antitrust Modernization Commission Act of 2002, Pub. L. 107–273, 116 Stat. 1856, Div. C., Title I, Subtitle D (2002). The AMC was charged with examining whether there was a need to modernize the antitrust laws and to identify and study related issues; to solicit views; and to evaluate proposals for change. The AMC provided its Report and Recommendations to Congress and the President on April 2, 2007, and was terminated on May 31, 2007, having completed its statutory duties.

[180] S. Rep. No. 94–803, at 65 (1976).

[181] Efforts to require premerger notification date back to 1908. Leading up to the passage of the HSR Act, the Commission regularly urged Congress to pass legislation that would require advance notice for acquisitions. For a short time, the Commission relied on its authority under section 6 of the FTC Act to require merging parties to file special reports 60 days prior to consummation in certain industries, such as food distribution and cement. None of these programs required the parties to stay their merger plans. After passage of the HSR Act, the Commission discontinued reliance on special reports for prior notice of pending mergers. *See* Kelly Signs, "Milestones in FTC History: HSR Act launches effective premerger review," Fed. Trade Comm'n Competition Matters blog (Mar. 16, 2015), *https://www.ftc.gov/enforcement/competition-matters/2015/03/milestones-ftc-history-hsr-act-launches-effective-premerger-review.*

[182] *See* S. Rep. No. 94–803, at 64 (1976).

[183] *Id.* at 63–66. *See also id.* at 9–10.

[184] 43 FR 33450, 33519–20 (July 31, 1978).

[185] *Id.* The Commission also rejected suggestions that it make certain burdensome requests optional for the parties, finding that such an approach would undermine the usefulness of the second request mechanism, hinder the Agencies in their efforts to carry out their congressionally mandated review, and be administratively unworkable. *Id.* at 33520.

[186] *Id.* at 33520. *See also* 42 FR 39040, 39043 (Aug. 1, 1977).

on when contemplating the deal,[187] the final rule seeks information that is readily available to the parties to fill information gaps that the Agencies have identified in the current HSR Form.

As discussed above, information reported in the current HSR Form is not sufficient due to differences in corporate structure and investment activity as well as profound changes in economic activity. In this rulemaking, the Commission is responding to these changes and how they have affected the Agencies' ability to conduct premerger screening in light of today's market realities. The Agencies need information to be able to spot all types of potential harm and the Commission has determined that the information requirements contained in the final rule are necessary and appropriate to conduct effective and efficient premerger screening and avoid even greater costs associated with collecting additional information through issuing more Second Requests. Without sufficient information available in the HSR Filing on the first day of the statutory review period, the Agencies cannot fulfill their mandate to identify and prevent illegal mergers or avoid potentially costly and protracted investigations.

Several commenters suggested that because Congress recently authorized the collection of additional information relating to foreign subsidies, that is the only information the Commission has the authority to collect.[188] The Commission disagrees that in passing this new requirement, Congress intended to repeal or in any way limit the Commission's statutory authority under 15 U.S.C. 18a(d) to impose other reporting requirements that are necessary and appropriate to determine whether the transaction may violate the antitrust laws. Indeed, the Commission is relying on its section 18a(d) authority to require the submission of information related to foreign subsidies in the final rule. The other changes contained in the final rule are a reasonable exercise of the Commission's rulemaking authority to require information that is necessary and appropriate for detecting problematic mergers during the initial waiting period of the HSR Act. The final rule updates the premerger notification regime based on the Agencies' experience in reviewing thousands of HSR Filings each year and in light of observable changes in market dynamics, contemporary investor behavior,

investment arrangements, and acquisition strategies, as discussed in section II.B. above.

Some commenters suggested that the Commission lacks authority to make changes to the notification requirements because doing so increases the likelihood that the Agencies will subject more transactions to close scrutiny or seek to block them as illegal, and that this increased scrutiny will disincentivize dealmaking. This line of argument is contrary to the purpose of the HSR Act and the final rule.

Congress passed the HSR Act to create an effective mechanism to detect, deter, and prevent large transactions that violate the antitrust laws. The inadequacy of current notification requirements may encourage parties to enter into unlawful transactions due to the low risk of premerger detection.[189] One commenter supporting the need for change noted that the gaps created by the existing HSR Form and Instructions make it possible for anticompetitive mergers to go through unnoticed. Parties considering a merger are aware of this, so under the current system, parties are likely more willing to consider or attempt a merger that would be more obviously unlawful under a more rigorous disclosure regime. To the extent that one effect of the final rule would deter unlawful dealmaking, that effect is clearly consistent with Congress' intent that mandatory premerger review more effectively prevent illegal mergers.[190] Filing parties cannot claim an interest in inadequate detection or in avoiding an in-depth antitrust investigation that may lead to a court injunction blocking the merger because these concerns directly contravene U.S. law. Based on statutory text and clear Congressional intent, the Commission must ensure that HSR notification requirements enable the Agencies to detect the potential for harm before the harm occurs; that is the purpose of premerger review. When the Agencies' ability to detect the information is compromised by inadequate disclosures in the HSR Filing, the Commission must use the authority expressly conferred by Congress to adjust the Agencies' detection tools to fulfill the purpose of premerger review.

Other commentors suggested that the Agencies' infrequent challenges to consummated mergers, including those reported but not challenged prior to

consummation, are proof that the Agencies are not "missing deals" that cause harm. But given the significant effort required to unwind completed mergers, the frequent lack of information about the effects of consummated mergers, and the limited resources the Agencies have available to devote to all types of merger enforcement, in addition to their other statutory responsibilities,[191] the relatively low number of challenges to consummated mergers does not indicate that the current information requirements for premerger screening are sufficient to detect illegal deals. The Agencies must make difficult decisions about how to use their resources to address consummated mergers that may be causing real and ongoing harm while also working to fulfill their obligations to conduct a robust premerger screening of reported transactions. The critical task of screening reported transactions for antitrust risks can be especially challenging during times of peak M&A activity. See Figure 1.

According to one commenter whose members have been directly affected by consolidation in the retail food sector, third parties sometimes alert the Agencies to competitive issues, but that may not occur until after the waiting period has expired or the deal has been consummated. This commenter noted that these untimely scenarios are exactly the opposite of the HSR Act's legislative intent and force the Agencies and courts into a precarious position to preserve competition or obtain effective remedies. Congress certainly did not provide immunity for reported mergers that are not challenged prior to consummation (as most jurisdictions do)[192] so it is not a binary choice for the

[187] 122 Cong. Rec. 30877 (1976) (remarks of Rep. Rodino).

[188] See Consolidated Appropriations Act, 2023, Public Law 117–328, 136 Stat. 4459 (2022).

[189] See "Stealth Consolidation," supra note 18.

[190] See S. Rep. No. 94–803, at 65 n.28 (the purposes underlying enactment of section 7 of the Clayton Act could have been accomplished if premerger notification had been enacted when originally proposed, and that if it had the economy would be less concentrated.).

[191] In addition to merger enforcement, both Agencies investigate and challenge anticompetitive conduct that may violate the antitrust laws. The Antitrust Division has sole responsibility to prosecute criminal violations of the antitrust laws, while the Commission has authority under section 5 of the FTC Act (15 U.S.C. 45) to challenge unfair methods of competition beyond the scope of the Sherman or Clayton Acts. In addition, the Commission's budget supports its consumer protection work, which is devoted to stopping unfair or deceptive acts or practices that violate the FTC Act as well as enforcement of more than 80 other statutes. See generally Fed. Trade Comm'n, "Legal Library: Statutes," https://www.ftc.gov/legal-library/browse/statutes.

[192] See The Merger Control Review Preface, x (Ilene Knable Gotts, ed., 14th ed., 2023) (in most jurisdictions, a transaction that is not notified is not subject to review or challenge by the competition authority), https://www.wlrk.com/webdocs/wlrknew/AttorneyPubs/WLRK.28469.24.pdf. Canada recently extended its lookback period from one year to three years for non-notified transactions but left unchanged the one-year limitation to challenge notified transactions. See Competition Bureau Canada, "Guide to the June 2024 amendments to
Continued

Agencies to ''act or stand down'' on a reported merger. But once a merger is consummated (whether reported in advance or not), the Agencies face decisions about the significant costs of mounting a merger challenge to unwind the deal as well as the opportunity costs of doing so. Given the limited resources the Agencies have to devote to merger enforcement, the Agencies will often focus on enforcement of reported mergers due to these opportunity costs.[193]

The legislative record leading to the HSR Act is replete with references to the costs, delays, and ineffectiveness of relying on post-consummation enforcement to interdict mergers that may cause harm in their incipiency.[194] In the Agencies' experience, unwinding illegal consummated mergers continues to be a costly exercise, and there remain significant delays in obtaining effective relief through unwinding. A merged firm has strong incentives to delay the outcome, and Commission orders requiring divestiture of acquired assets are often appealed, further deferring relief.[195] Moreover, smaller or

seemingly inconsequential acquisitions can later be revealed as potentially illegal exclusionary conduct when they are used by firms with dominant market positions to maintain or extend a monopoly in violation of section 2.[196] There are enormous costs and delays associated with prosecuting section 2 cases involving the largest companies in the world to unwind harmful acquisitions.[197]

In mandating government review of acquisitions prior to consummation, Congress intended for the Agencies to avoid these types of protracted antitrust cases when possible. Instead, Congress envisioned that merger enforcement would occur mostly through a system of premerger review, even at the cost of requiring premerger review for many mergers that may not ultimately warrant an in-depth investigation let alone a challenge in court.[198] The Commission

has determined that imposing some limited additional upfront costs on filers so that they submit sufficient information to allow the Agencies to conduct the mandatory initial antitrust review fulfills the Agencies' statutory responsibilities and should be weighed against the benefit of avoiding large expensive antitrust actions required to unwind illegal acquisitions that were not detected at the screening phase. Importantly, the final rule imposes fewer information requirements on transactions that are reportable but have low antitrust risk while seeking the most information from those transactions most likely to require in-depth review at the screening phase. Otherwise, the consequences of poor detection are improperly shifted to those harmed by illegal consummated mergers—which is plainly at odds with the purpose of the HSR Act.

The benefits of stopping an illegal merger before it happens can be significant, especially for those who would bear the consequences of harm induced by the merger. The chart below collects estimates of avoided harm due to likely price changes for affected products or services in cases litigated by the Agencies and accepted by Federal courts as a basis for enjoining illegal mergers in recent years.

the Competition Act'' (June 25, 2024), *https:// competition-bureau.canada.ca/how-we-foster- competition/education-and-outreach/guide-june- 2024-amendments-competition-act.*

[193] *See* Zarek Brot-Goldberg, et al., ''Is There Too Little Antitrust Enforcement in the US Hospital Sector?'' (U. Chi., Becker Friedman Inst. for Econ. Working Paper No. 2024–59, May 2024) (forthcoming, Am. Econ. Rev.: Insights), *https:// bfi.uchicago.edu/working-paper/is-there-too-little- antitrust-enforcement-in-the-us-hospital-sector/* (FTC is intervening in the most anticompetitive transactions but not preventing a significant number of hospital mergers that nonetheless cause harm).

[194] *See* H.R. Rep. No. 94–1373, at 7–10 (1976).

[195] *See, e.g., Illumina, Inc.* v. *FTC,* 88 F.4th 1036 (5th Cir. 2023); *ProMedica Health Sys., Inc.* v. *FTC,* 749 F.3d 559 (6th Cir. 2014), *cert. denied,* 575 U.S. 996 (2015); *Polypore Int'l, Inc.* v. *FTC,* 686 F.3d 1208 (11th Cir. 2012).

[196] *See supra* note 107 (collecting cases).

[197] The Commission filed its monopolization complaint against Facebook (now Meta) on December 9, 2020, and was joined by a coalition of forty-six States, the District of Columbia and Guam. *See* Press Release, Fed. Trade Comm'n, ''FTC Sues Facebook for Illegal Monopolization'' (Dec. 9, 2020), *https://www.ftc.gov/news-events/news/press- releases/2020/12/ftc-sues-facebook-illegal- monopolization.* The FTC is seeking a permanent injunction that would, among other things, require the divestiture of previously acquired assets. As of September 27, 2024, the parties have concluded pretrial discovery; a trial date has not been set.

[198] The Agencies can and do challenge reportable mergers after the expiration of the waiting period. *See, e.g., Chi. Bridge & Iron Co. N.V.* v. *FTC,* 534 F.3d 410 (5th Cir. 2008); *United States.* v. *Parker Hannifin Corp.,* No. 17–cv–01354 (D. Del. Sept. 26, 2017) (complaint). *See also* Note by the United States to the OECD, Investigations of Consummated and Non-Notifiable Mergers (Feb. 25, 2014) (DAF/ COMP/WP3/WD(2014)23), *https://one.oecd.org/ document/DAF/COMP/WP3/WD(2014)23/En/pdf* (discussing Agencies' challenges of consummated mergers); Menesh S. Patel, ''Merger Breakups,'' 2020 Wisc. L. Rev. 975, 990 (2020) (observing that, since 2001, the Agencies have challenged at least

four mergers that previously underwent HSR review). Because of the confidentiality protections afforded HSR filings, market participants are often not aware of the merger or the timing of the expiration of the statutory waiting periods. *See* Comment of Strategic Org. Ctr., Doc. No. FTC– 2023–0040–0708 at 3 (urging public notice of the date of HSR filings and the identity of the filers so that interested and affected parties can contact the Agencies during the initial review period). Many investigations of consummated mergers, including reported but not challenged transactions, are initiated after market participants reach out to the Agencies about the observed effects of the merger.

**Table 2: Estimates of Harm in Blocked Mergers**

| Case | Estimate of Harm |
| --- | --- |
| U.S. v. JetBlue/Spirit Airlines | $1 billion per year[a] |
| FTC v. IQVIA/PMI | Post-merger price increase of 7.4%[b] |
| U.S. v. Bertelsmann SE & Co. | Post-merger decreases in advances range from 4% to 11.5%[c] |
| FTC v. Hackensack | $31 million per year[d] |
| FTC v. Peabody Energy | $1 billion over 10 years[e] |
| FTC v. Wilhelmsen | $14.4 million to $23 million per year[f] |
| FTC v. Sanford | $16 million to $27 million per year[g] |

[a] United States v. JetBlue Airways Corp., No. 1:23–cv–10511 (Dec. 16, 2024) (Findings of Fact and Conclusions of Law) and Plaintiff's Post-Trial Brief at 18–19 (Dec. 13, 2023) (Proposed Acquisition Is Conservatively Projected to Cause Nearly $1 Billion of Harm Each Year to American Consumers in the Relevant Markets).
[b] FTC v. IQVIA Holdings Inc., No. 1:23-cv-06188 at 81-82 (S.D.N.Y. Jan. 8, 2024) (Op. & Order).
[c] United States v. Bertelsmann SE & Co., No. 1:21-cv-2886 at 54 (D.D.C. Nov. 7, 2022) (Mem. Op.).
[d] FTC v. Hackensack Meridian Health, Inc., No. 2:20-cv-18140 at 48-49 & n.26 (D.N.J. Aug. 4, 2021), aff'd, 30 F.4th 160, 174 (3d Cir. 2022).
[e] FTC v. Peabody Energy Corp. 492 F. Supp.3d 865, 906 (E.D. Mo. 2020).
[f] FTC v. Wilh. Wilhelmsen Holding ASA, 341 F. Supp.3d 27, 65 (D.D.C. 2018).
[g] FTC v. Sanford Health, No. 1:17-cv-00133 at 28, 2017 WL 10810016 at *13 (D. N.D. Dec. 15, 2017) (Mem. Decision), aff'd, 926 F.3d 959, (8th Cir. 2019).

In addition to merger-induced price effects, which can vary widely due to differences in the economic size of the relevant markets affected by the merger, there can also be harm to customers from the loss of non-price competition. For example, the court found that JetBlue's anticipated reconfiguration of Spirit's aircraft would result in a decrease in the number of seats available on JetBlue flights of more than 6,100,000 per year.[199] These types of effects reduce output and result in a welfare loss due to the exercise of market power. In a vertical merger context, the Fifth Circuit affirmed the Commission's findings that Illumina's acquisition of Grail lessened competition via a different mechanism: the potential foreclosure of a key input by the sole supplier would lead to chilled investment by firms reliant on those inputs for their own competitive success.[200]

Moreover, merger retrospectives document merger-induced effects such as increased prices and decreased product quality or availability across a range of industries.[201] Given the significant economic costs imposed on market participants harmed by an illegal consummated merger, the Agencies will continue to challenge consummated mergers when practical and as resources permit. But relying on post-consummation merger enforcement to correct for information deficiencies in the HSR Form is contrary to Congressional intent that premerger review be used to stop illegal mergers before they occur.

### 1. Congress Determined Which Acquisitions Must Bear the Costs Associated With Premerger Review

Congress determined that the burden of premerger review should apply, regardless of antitrust risk, to a small subset of mergers where that burden would not be so great in comparison to the size of the deal and the size of the parties involved. Because the final rule does not require reporting for any additional transactions, it maintains the balance struck by Congress that only some mergers be subject to mandatory premerger review.

Congress incorporated several features in the HSR Act to lessen the burden on dealmaking, especially for small business and small transactions.[202] For instance, the HSR Act as first passed in 1976 contained three specific requirements that determined reportability for a planned transaction: the acquiring person is engaged in interstate commerce (the commerce test); one of the parties was worth at least $10 million and the other worth at

---

[199] United States v. JetBlue Airways Corp., No. 1:23–cv–10511 at 43 (D. Mass., Jan. 16, 2024) (Findings of Fact and Conclusions of Law).

[200] Illumina, Inc. v. FTC, 88 F.4th 1036, 1055 (5th Cir. 2023).

[201] See generally Vivek Bhattacharya et al., "Merger Effects and Antitrust Enforcement: Evidence from US Consumer Packaged Goods" (Nat'l Bureau of Econ. Rsch., Working Paper No. 31123, Apr. 2023, rev. June 2024), https://www.nber.org/papers/w31123 (studying fifty mergers in the consumer-packaged goods industry and finding that, on average, these mergers raised prices by 1.5 percent and decreased quantities sold by 2.3 percent); Daniel Hosken et al., "Do Retail Mergers Affect Competition? Evidence from Grocery Retailing," 27 J. Econ. & Mgmt. Strategy 3 (2018) (finding that the majority of grocery mergers in highly concentrated markets resulted in price increases of more than 2 percent); John E. Kwoka, Jr., Mergers, Merger Control, and Remedies: A Retrospective Analysis of U.S. Policy 110–11 (2014) (providing a meta-analysis of retrospective literature, finding that more than 80 percent of mergers resulted in price increases and the mean price increase was 5.88 percent across all studied transactions); Orley C. Ashenfelter et al., "Did Robert Bork Understate the Competitive Impact of Mergers? Evidence from Consummated Mergers," 57 J. L. & Econ. S67 (2014) (reviewing prior retrospectives and concluding that mergers in oligopolistic markets can result in economically meaningful price increases, as 36 of 49 studies surveyed found evidence of merger-induced price increases); Leemore Dafny et al., "Paying a Premium on Your Premium? Consolidation in the US Health Insurance Industry," 102 a.m. Econ. Rev. 1161 (2012) (examining healthcare mergers and finding the mean increase in local market HHI during the studied period raised premiums by roughly 7 percent); Orley Ashenfelter & Daniel Hosken, "The Effect of Mergers on Consumer Prices: Evidence from Five Mergers on the Enforcement Margin," 53 J. L. & Econ. 417 (2010) (examining a set of mergers that were unchallenged by the government and finding that the majority resulted in a significant increase in consumer prices in the short run); Thomas Koch & Shawn W. Ulrick, "Price Effects of a Merger: Evidence from a Physicians' Market," 59 Econ. Inquiry 790 (2021) (concluding that a merger of orthopedic physicians' practices increased prices to some payors by ten to twenty percent while prices in nearby areas not affected by the merger remained unchanged); Zack Cooper et al., "The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured," 134 Q. J. Econ. 51 (2019) (examining 366 hospital mergers and finding that prices increased by over six percent when merging hospitals were geographically close); Prager & Schmitt, supra note 83 (examining hospital mergers and finding reduced wage growth when merger significantly increases concentration).

[202] The Senate version of the premerger notification bill would have given the Commission authority to require reporting from additional "small" mergers, but the House bill and the final law did not include this provision. 122 Cong. Rec. 30877 (1976).

least $100 million (the size-of-person test); and as a result of the transaction, the acquiring person would hold at least 15 percent or $15 million of the acquired entity (the size-of-transaction test). These thresholds were adopted in response to concerns that requiring reporting for all mergers would unduly affect capital markets.[203] The size-of-person test was seen as especially important to limit the impact of premerger reporting on small businesses:

> Approximately the largest 700 U.S. companies meet the $100 million jurisdictional requirement. Although $100 million companies account for roughly 40 percent of mergers and acquisitions, Title V's *dual* requirement of (i) a $100 million acquiring company, and (ii) a $10 million acquired company would have required such 30-day notification, over the past 5 years, in less than 100 acquisitions per annum. With this limitation, the Committee sought to include within the ambit of the premerger notification provision primarily those mergers or acquisitions that were most likely to have a substantial effect on competition. That is not to say that smaller mergers may not run afoul of the Clayton Act. To include the bulk of the approximately 3,000 mergers that would have occurred annually in the course of the past several years would, however, in the Committee's judgement, impose an undue and unnecessary burden on business.[204]

Together, these criteria were designed to focus mandatory premerger review on the largest transactions and limit the number of transactions that would have to be reported to the Agencies. See Table 1 (on average 16.5% of mergers reported during FY 2018 to FY 2022).

During the 1990s, several years of intense M&A activity drove merger filings ever higher, so that by FY 2000, the Agencies reviewed over 4,900 reported transactions.[205] This dramatic increase in HSR filings led to calls for Congress to amend the HSR Act to reduce its broad sweep, and to especially address its impact on small businesses. In response, Congress made several changes in 2000 to reduce the number of transactions subject to reporting: (1) increased the size-of-transaction threshold from $15 million to $50 million and required the Commission, starting in 2005, to adjust the thresholds in the HSR Act annually based on changes in the gross national product; (2) eliminated the 15 percent size-of-transaction threshold, making

$50 million (as adjusted) an absolute floor; and (3) eliminated the size-of-person test for larger transactions, making transactions valued in excess of $200 million (as adjusted) reportable without regard to the size of the parties.[206] Today, as a result of these adjustments and with annual indexing, HSR filings are required for only a small fraction of overall merger activity in the United States. See Table 1.

Many commenters pointed out that the Congress that enacted the HSR Act envisioned the Agencies reviewing only 150 of the largest mergers.[207] In 1976 when the HSR Act was passed, 150 mergers represented approximately 12.8 percent of M&A deal volume, given that there were 1,171 completed acquisitions in 1976.[208] Overall, the burden imposed on M&A activity by the HSR Act is not that different today than in 1976. See Table 1 (HSR reportable mergers on average 16.5 percent of M&A from FY 2018 to 2022). At the same time, the size of the U.S. economy has grown exponentially: in 1976, the seasonally adjusted U.S. Gross Domestic Product was $1.934 trillion; today it is over $28

trillion.[209] From these figures, it appears that M&A activity, and the economy in general, has not been affected by the obligations imposed on those pursuing certain large acquisitions to submit to mandatory premerger review.

Moreover, Congress enacted several explicit statutory exemptions to reduce the burden of reporting,[210] and also authorized the Commission to issue rules exempting persons and acquisitions that it deemed at the time as posing little to no antitrust risk, which eliminated the burden of reporting for many additional transactions.[211] The Commission has also faithfully implemented Congress' mandate to annually index the HSR thresholds, which keeps premerger review limited to those acquisitions Congress wants the Agencies to review prior to consummation.[212]

Some commenters noted that the current process is inefficient because of the over-inclusiveness of HSR reporting standards. They pointed out that of all reported transactions, the Agencies issue Second Requests in only 2 to 3 percent per year, suggesting that this is a reason for the Commission to keep the status quo and not adopt any adjustments to current information requirements.

The Commission believes that the low percentage of transactions that have received Second Requests is not a reliable indicator that the Agencies have achieved the goals of mandatory premerger review or that the current

---

[203] See S. Rep. No. 94–803, at 65–66 (1976).

[204] *Id.* at 66.

[205] Fed. Trade Comm'n & U.S. Dep't of Justice, Annual Report to Congress Pursuant to Subsection (j) of Section 7A of the Clayton Act, Hart-Scott-Rodino Antitrust Improvements Act of 1976 1 (Twenty-Third Report) (FY 2000).

[206] Public Law 106–553, 114 Stat. 2762 (2000) (codified at 15 U.S.C. 18a(a)). *See also* 146 Cong. Rec. S11872 (daily ed. Dec. 15, 2000) (statement of Sen. Kohl) (exempting small transactions from premerger review will significantly lessen regulatory burdens and expenses imposed on small businesses). This legislation also provided the Agencies more time to review materials submitted in response to a Second Request, extending the second waiting period under the HSR Act from 20 to 30 days after substantial compliance. *See* 15 U.S.C. 18a(e)(1)(A). *See* Fed. Trade Comm'n & U.S. Dep't of Justice, Annual Report to Congress Pursuant to Subsection (j) of Section 7A of the Clayton Act, Hart-Scott-Rodino Antitrust Improvements Act of 1976 (Twenty-Fifth Report) appendix A (FY 2002) (from FY 2000 to 2002, reported transactions dropped from 4,926 to 1,187).

[207] The prediction of 150 mergers turned out to be unrealistic from the start. In just the first three months of the premerger program, the Agencies received notifications for 292 transactions, nearly double the expected amount. *See* Fed. Trade Comm'n, Second Annual Report to Congress pursuant to Section 201 of Hart-Scott-Rodino Antitrust Improvements Act of 1976 3 (FY 1978). In the first full year of the HSR program, the Agencies received filings for 814 transactions. Fed. Trade Comm'n, Third Annual Report to Congress pursuant to Section 201 of Hart-Scott-Rodino Antitrust Improvements Act of 1976 3 n.4 (FY 1979). The Commission moved quickly to amend the HSR Rules to exempt additional types of transactions to further reduce the burden of the premerger reporting program. 44 FR 66781 (Nov. 21, 1979). *See also* David A. Balto, "Antitrust Enforcement in the Clinton Administration," 9 Cornell J. L. & Pub. Pol'y 61, 119–20 (1999) (discussing two early HSR exemptions which resulted in approximately 20% and 10% reductions in filings).

[208] *See* Fed. Trade Comm'n, Statistical Report on Mergers and Acquisitions 25 Table 10 (1978), *https://www.ftc.gov/system/files/documents/reports/statistical-report-mergers-acquisitions-1978/statistical_report_on_mergers_aug1980.pdf.* This number does not include partial acquisitions which did not confer control on the buyer.

[209] U.S. Bureau Econ. Analysis, Gross Domestic Product (updated Aug. 29, 2024) (retrieved from FRED, Fed. Reserve Bank of St. Louis), *https://fred.stlouisfed.org/series/GDP.*

[210] *See* 15 U.S.C. 18a(c) and 16 CFR part 802.

[211] *See* 15 U.S.C. 18a(d)(2)(B) and 16 CFR part 802. Several commenters urge the Commission to engage in rulemaking to exempt additional transactions from HSR filing obligations. These suggestions are outside the scope of this rulemaking. Due to deficiencies in the information currently collected in the Form, as explained elsewhere in this document, the Commission is not able to identify any additional types of transactions that could be exempted at this time. Until the Commission has sufficient information to provide a reasonable basis to exempt additional categories of transactions from HSR reporting requirements, the Commission is not in a position to reduce the total number of reported transactions. As discussed in section VI.A.1.f., the Commission is excusing certain types of transactions (select 801.30 transactions) from many requirements of the final rule and has modified the proposed rule in many places to apply only where certain conditions have been met.

[212] To the extent that commenters suggest that the NPRM expands reporting requirements for additional transactions, they are wrong. Nor would changing the information requirements of the HSR Filing affect the obligations of public companies to comply with disclosure requirements of the Securities and Exchange Commission ("SEC"). *See* Comment of Am. Sec. Ass'n, Doc. No. FTC–2023–0040–0682 at 2.

process is efficient in identifying problematic transactions and effective in deterring illegal mergers. As discussed above in section II.B., the Commission has identified significant deficiencies in the information provided in the HSR Filing that prevent the Agencies from assessing the potential harm presented by reportable transactions. In light of these deficiencies, the number of mergers investigated through the issuance of Second Requests is not instructive on whether the Agencies are fulfilling their duty to the American public to screen large mergers in advance of consummation. The Agencies must continue to review reportable transactions to determine which ones warrant the issuance of Second Requests regardless of, and despite, fluctuations in the overall number of filings.

2. Delays Associated With Premerger Review Depend on Antitrust Risk

Congress also determined how much delay would be associated with those transactions subject to mandatory premerger review, and this rulemaking attempts to adjust the information required for premerger screening in light of legislative intent to avoid delays for any deal other than those with the highest antitrust risk. The main statutory feature of the HSR Act is the suspensory waiting period, which requires that the parties not consummate the proposed acquisition until the prescribed waiting period has expired. For all transactions, the statute limits that delay by keeping the waiting period short: 30 days for most transactions and 15 days for those most at risk of not happening at all due to delay, such as cash tenders and acquisitions of assets out of bankruptcy. Congress determined to hold up cash tender offers and the purchase of assets in bankruptcy only briefly due to heightened concerns over timing. For cash tender offers, which do not require consent of the target and can sometimes be actively opposed by the target, Congress shortened the suspensory waiting period to 15 days to balance premerger notice with the intent of the securities laws, specifically the Williams Act, so as not to "tip the balance" in favor of the incumbent management of the target firm.[213] Similarly, for acquisitions of assets subject to bankruptcy proceedings, Congress understood that time is of the essence to prevent liquidation of

productive assets and applied the shortened 15-day initial waiting period to these transactions as well. Congress thus recognized that a particular subset of transactions require especially speedy review.

At the same time, Congress provided that the Agencies can extend the waiting period for any type of reportable acquisition by requiring the submission of additional information or documentary material in response to a Second Request. The decision to issue Second Requests has significant consequences for the transaction because if that happens, the parties cannot consummate the transaction until 30 days after each party has substantially complied with the Second Requests.[214]

The Commission disagrees that the final rule entails any delay beyond that which was expressly contemplated in the HSR Act. First, the final rule does not extend the statutory waiting periods, which are established by Congress.[215] Second, Congress made clear that the initial waiting period will commence once the Agencies have received a completed Form, or a partially completed Form with a specific statement of the reasons for partial non-compliance.[216] Third, Congress directed the Commission to devise and maintain a mandatory notification program that would give the Agencies the information that is necessary and appropriate to conduct an initial

antitrust assessment during the initial 15- or 30-day waiting period.

That said, the Commission does not question the need, when appropriate, to minimize delay for notified transactions, especially for non-problematic deals. In fact, the Commission believes that the final rule may shorten the overall waiting period for a significant number of transactions and perhaps even reduce the overall number of delayed transactions. As discussed above, Congress determined that 30 days was the appropriate delay for the majority of reportable transactions (other than cash tenders and acquisitions in bankruptcy), regardless of their size or economic impact. It is a feature of the HSR Act that an open market stock purchase by an individual can be subject to the same 30-day initial waiting period as a multi-billion-dollar merger of competitors operating in multiple local markets throughout the country. Yet these two transactions present very different antitrust risks.

In order to quickly dispense with those transactions that present low risk of a law violation so as to focus on those with moderate to high risk, the Agencies need more information in the HSR Filing. Any time and effort the Agencies must spend collecting necessary information that is not contained in the HSR Filing is time and effort taken away from quickly determining which deals do not warrant an in-depth investigation. Especially as it relates to cash tender acquisitions—which are among some of the largest deals reviewed by the Agencies over the years and yet are subject to a 15-day initial waiting period—the short time given for the initial antitrust assessment severely strains the Agencies' limited resources, especially during periods of intense M&A activity. See Figure 1. But the statutory time limit is absolute and if the Agencies do not issue Second Requests before the end of the initial waiting period, the parties are free to consummate the transaction.[217] This is as Congress intended, but Congress also gave the Commission the authority to determine the necessary and appropriate information that must be included in HSR Filings to make the

---

[213] 122 Cong. Rec. 30877 (1976) (listing a number of defensive actions the target could take to undermine the offer if it had enough time, effectively denying shareholders of the target firm the choice to accept the offer).

[214] The Agency that issued the Second Requests can grant early termination of the waiting period, permitting the parties to consummate their proposed acquisition, or a Federal court may extend the waiting period if the Agency applies for preliminary relief and the court finds that the party has not substantially complied with the information requirements of the HSR Act. 15 U.S.C. 18a(g)(2).

[215] As discussed in section V.D. below, if the parties have not executed a definitive agreement, the final rule requires that they submit a document with the HSR Filing that contains sufficient details of the transaction they intend to consummate. This may be the executed preliminary agreement, or the agreement may be supplemented by one additional dated document, such as a term sheet or the latest draft agreement. While this new requirement may cause some filers to delay notification compared to the current rules, the Commission believes this change is necessary and the delay is appropriate to avoid wasting the Agencies' time and attention on deals that may never occur or are too hypothetical or lacking material details to assess.

[216] 122 Cong. Rec. 30876 (1976). The Commission does not dispute that the HSR Act allows for substantial compliance with its requirements. In response to such arguments, the sponsors dropped the "automatic stay" provisions and adopted a requirement that filers "substantially comply" with the Second Request so that arguments that the parties had not fully complied could not hold up the deal. Under 15 U.S.C. 18a(g)(2), a district court may extend the statutory waiting periods of the HSR Act if filers fail to substantially comply with the requirements of the HSR Act.

[217] As part of the 2000 amendments to the HSR Act, Congress made plain that if the end of the waiting period falls on a Saturday, Sunday, or legal public holiday, then the waiting period is extended to the next day that is not one of those days. 15 U.S.C. 18a(k). This change was necessary to eliminate gamesmanship by parties who timed their compliance so that the waiting period ended on a weekend or holiday, effectively shortening the waiting period to the previous business day. 146 Cong. Rec. S11872 (daily ed. Dec. 15, 2000) (statement of Sen. Kohl).

statutory scheme work—not for the purpose of minimizing delay but for the purpose of enforcing the antitrust laws for the benefit of the public. That is the problem this rulemaking addresses: by adjusting the amount of information available to the Agencies on the first day of the waiting period, the final rule makes possible quick but thorough premerger review for all reportable transactions.

For many years, and mainly due to the lack of sufficient information contained in HSR Filings, many filers and practitioners have become accustomed to artificially lengthened waiting periods. In 2013, the Commission issued a rule that formalized a previously informal

process that offers filers the option to withdraw and refile their filings without paying an additional filing fee. The option to withdraw-and-refile was intended to benefit both the parties and the Agencies by providing an additional 15- or 30-day waiting period for the Agencies to review the transaction without issuing Second Requests while seeking additional relevant information on a voluntary basis from the merging parties or from third parties.[218]

As shown in Table 3 below, the option to withdraw-and-refile has been used with some frequency by filers to give the Agencies more time to conduct an initial premerger assessment. Based on the Agencies' review of their HSR-related investigations during the five-

year period of FY 2018 to 2022, parties withdrew their HSR filing and refiled in a total of 546 transactions. In the majority of these extended investigations, the Agencies determined not to issue a Second Request: nearly two-thirds of the time, opting to withdraw and refile resulted in the transaction closing at the end of the initial waiting period, thereby avoiding the cost and burden of a Second Request investigation. That is, once the filing parties submitted information beyond what was submitted with the HSR Form, the investigating Agency was able to determine that the transaction did not warrant Second Requests.

### Table 3: Withdrawn & Refiled Transactions Fiscal Years 2018 – 2022

|  | 5 Year Total |
|---|---|
| Transactions | 546 |
| Transactions Not Issued Second Request | 365 |
| Percentage Not Issued Second Request | 67% |

While the parties can rely on the option to withdraw and refile as an ad hoc tactic to avoid the issuance of Second Requests, the Agencies' experience illustrates in a very tangible way the inefficiencies associated with the current HSR Form. Over the five years sampled, an average of 73 transactions each year (546 in total) were delayed by an additional 30 days and filers were burdened by having to submit additional materials on a voluntary basis even though the investigation did not lead to the issuance of Second Requests. These delays impose costs on the parties and the Agencies, as well as third parties contacted during the extended initial review period.

Moreover, getting more time to review the transaction does not address the information deficiencies outlined above and addressed by the final rule. While serving as an existing work-around to give the Agencies more time to collect additional information not contained in the HSR Filing, the option to withdraw-and-refile is a poor substitute for having the necessary information submitted with the HSR Filing for several reasons. First, the current information requirements leave important gaps, as

detailed above in section II.B., leading staff to flag filings for no-action when in fact they may warrant a closer review.[219] In practical terms, the HSR Filing must contain sufficient information from the filers to allow the Agencies to spot transactions that may warrant follow up. Merely adding time on the clock does not fill the information gaps identified above.

Second, withdraw-and-refile is optional for filers and thus is not a tool the Agencies can rely on to collect more information when needed. While parties may decide to delay their transaction to lower the chances of receiving a Second Request, in many instances the parties do not withdraw and refile precisely because they fully expect to receive Second Requests. When the parties do withdraw and refile, the Agencies spend considerable time waiting for answers to key questions; in any event, having more time is not the same as having the information needed to conduct an initial antitrust assessment. The Agencies' experience is that these voluntary submissions are often late or incomplete. When the information arrives near the end of the extended waiting period, there is often not enough time to review and verify the

information. As a result, investigations that are extended through a withdrawal and refile are costly in time and effort for both Agency staff and the parties: extra time does not always translate to collecting the right information to make the initial determination whether the transaction should be fully investigated through the issuance of Second Requests.

Finally and most importantly, a filer's submission of any additional information beyond what is required for an HSR Filing is voluntary. Given that the Agencies have no ability to demand compliance with voluntary requests, there is an overwhelming incentive for filers to prioritize the collection and submission of information suggesting that there is no competitive problem, rather than supplying the necessary information in an objective and neutral manner. Thus, while the agency may receive additional relevant information on a voluntary basis, it remains extremely challenging for the Agencies to both review and verify this information in whatever short period of time is available to decide whether to issue Second Requests.

Expending so many resources on withdraw-and-refile investigations is

[218] 78 FR 10574, 10576 (Feb. 14, 2013).

[219] *See supra* note 24 (citing research finding that consummated hospital mergers that received early

termination resulted in the largest average percentage price increase).

inefficient both for the parties and the Agencies and is a source of undue delays for many deals every year, because having more time is not a substitute for having sufficient and reliable information provided on a mandatory basis on the first day of the waiting period. The Commission believes that requiring more information in the HSR Filing through a final rule that is focused on surfacing competition problem areas will reduce the need for extended withdraw-and-refile investigations for a significant number of transactions that do not require Second Requests.

Expanding the information that filers are required to provide upfront has certain benefits for filers and gives full effect to the purpose of a very short initial waiting period: because the information will be available to the Agencies on the first day of the initial waiting period, this will reduce delays for deals that do not receive Second Requests but nonetheless are delayed because staff must collect information from third parties or public sources, including when the parties withdraw and refile their HSR Filing. In addition, having this information upfront may allow Agency staff to narrow the areas of focus to only those business lines that require further investigation.[220] Based on the Commission's experience, the additional information will allow the Agencies to significantly reduce burdens on filing parties in many circumstances.

Moreover, the additional information required by the final rule addresses the fundamental information asymmetry that currently exists between what the parties know about their business and what information they are required to reveal to the Agencies in the HSR Filing. Shifting the burden of information collection from the Agencies to the filing parties minimizes the burden on Agency staff to collect basic business information about the filers from other sources, such as their customers or other market participants, or from public sources, which may not surface key confidential business information known only to the parties. It also minimizes the burden on those third parties. This basic business information is relevant to the Agencies' antitrust assessment and often comes in late in the initial waiting period close to when the Agencies need to determine whether to issue Second Requests.

Moreover, certain information is most readily and reliably available from the parties to the transaction. Although Agency staff collect relevant information from other sources including third parties during the initial waiting period, the benefit of getting this information from the filing parties is that it is likely more accurate and up-to-date and therefore more reliable for the purpose of quickly conducting a premerger assessment of antitrust risk. Obtaining basic business information about the operations of the filing parties secondhand from third parties and public sources is no substitute for getting that information directly from the parties themselves. The parties will have the most reliable and relevant information necessary to conduct a preliminary assessment of the transaction during the initial waiting period.

Having reliable and accurate information directly from the entity most likely to have it reduces overall information-collection costs and delays. That is just good government, according to some members of Congress: ''Requiring transacting parties to provide regulators with the information necessary to examine a proposed merger is a commonsense way to save taxpayer dollars and enable antitrust enforcers to fulfill their congressional mandate and protect consumers, the economy, and national security.'' [221]

To further reduce delays for transactions that pose little or no antitrust risk based on information contained in the HSR Filing, the statute also provides the Agencies with the discretion to grant an early termination of the initial waiting period, reducing the statutory 15- or 30-day delay to something less.[222] For many years, the Agencies routinely granted early termination to those filers that requested it.[223] Contrary to the assertions of some commenters, the Commission reviews the information provided in *every* filing (typically two filings per transaction) [224] to ensure compliance with the

requirements of the HSR Act and to conduct a preliminary assessment of antitrust risk. The decision to grant discretionary termination of the waiting period prior to the statutory deadline is the result of staff review of the information contained in the HSR Filing, a determination that takes time, knowledge of the HSR Rules, and often additional research from public sources to ensure that there is little to no risk that the transaction requires additional investigation prior to consummation. There is also the additional time spent coordinating both Agencies' conclusions as well as processing the granting of early termination through publication in the **Federal Register**.[225]

Prioritizing staff resources to reduce delays through early termination over the identification of problematic deals became impractical during the latest surge in HSR-reportable transactions, beginning in the fall of 2020 when the Agencies were faced with an unprecedented increase in merger filings.[226] As reflected in Figure 1 above, the number of HSR-reportable transactions spiked in FY 2021, resulting in more than twice the number of filings as compared to the prior year. Given the time and effort required to collect additional information during the initial waiting period—information that is not contained in the current Form but that bears directly on whether the Agencies should conduct a more in-depth investigation or grant early termination—the Agencies temporarily suspended the granting of early termination, first briefly in order to adjust to the challenges of processing premerger filings during the COVID–19 pandemic, and then again due to a surge in merger filings.[227]

As an additional measure, the Commission determined that it would

---

[220] As discussed elsewhere, the Commission did not consider any ''burden'' associated with better detection of illegal mergers. Identifying additional transactions for investigation and possible challenge is a benefit of effective and efficient premerger review.

[221] Comment of Sen. Elizabeth Warren et al., Doc. No. FTC–2023–0040–0711 at 5.

[222] 15 U.S.C. 18a(b)(2).

[223] Not all parties request early termination; whether to request early termination is solely at the discretion of the filing parties. Because the Agencies are required to make public grants of early termination through publication in the **Federal Register**, some filers may prefer not to have their acquisitions made public in this way.

[224] As reflected in appendix A of the Annual HSR Reports, the Agencies typically receive two filings for each transaction, one from the acquiring person and one from the acquired person. In FY 2022, the Agencies reviewed 6,288 filings for 3,152 reported transactions. Fed. Trade Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Report, Fiscal Year 2022 appendix A (FY 2022).

[225] Commission staff take seriously the statutory obligation not to disclose information about an HSR Filing. Because the granting of early termination requires public notice in the **Federal Register** and is often the first indication that a proposed acquisition is in the works, staff must take great care to avoid mistakes when processing these requests.

[226] Fed. Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report, Fiscal Year 2021 appendix B (FY 2021) (reporting monthly HSR filings for FY 2012 to FY 2021). *See* Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter Regarding the FY 2020, Hart-Scott-Rodino Annual Report for Transmittal to Congress (Nov. 8, 2021) (''FY 2020 HSR Statement''), *https://www.ftc.gov/system/files/documents/public_statements/1598131/statement_of_chair_lina_m_khan_joined_by_rks_regarding_fy_2020_hsr_rep_p110014_-_20211101_final_0.pdf.*

[227] *See* Press Release, Fed. Trade Comm'n, ''FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination'' (Feb. 4, 2021), *https://www.ftc.gov/news-events/news-press-releases/2021/02/ftc-doj-temporarily-suspend-discretionary-practice-early-termination.*

provide notice to filers whose deals could not be adequately screened during the initial waiting period, warning them that although the waiting period had expired, the transaction remains subject to antitrust challenge under section 7.[228] In the Commission's view, these pre-consummation warning letters are consistent with the legislative intent that lack of agency action prior to the expiration of the initial 15- or 30-day waiting period does not bar the Agencies (or other enforcers of the Clayton Act such as States or private parties) from later challenging the notified transaction. That is, premerger review provides the Agencies with the opportunity to investigate and challenge suspect transactions as violative of section 7; it does not require nor allow the Agencies to determine that the merger does not or would never violate section 7.

These recent adjustments to the Agencies' premerger review process reflect the burdens on Agency staff to triage filings during the very limited statutory period allowed for the initial review, which underscores the need for additional information at the outset of the initial waiting period. Even for those transactions in which the parties give the Agencies additional time by withdrawing and refiling their notification, relying on voluntary submissions has not been sufficient to overcome the lack of relevant information needed to conduct a robust screening for a significant number of deals.

As several commentators noted, it is appropriate that the Agencies, who have the responsibility to identify which transactions should be challenged, address the significant information asymmetry between the parties and the Agencies by collecting more information from the parties upfront. The Commission agrees. The Commission has determined that the information deficiencies of the current reporting requirements are imposing undue delay on those transactions that the Agencies determine do not require intervention prior to consummation. The final rule addresses these inefficiencies by shifting more of the costs of information acquisition to the merging parties, both because they are the most reliable and ready sources for that information and to reduce the costs and delays associated with information acquisition from other sources, including third parties. The Commission believes that the final rule represents a reasonable adjustment to the information requirements for premerger notification

that will reduce the number of transactions that are delayed beyond the initial review period.

### 3. The Purpose of the HSR Form Versus Second Requests

Several commenters asserted that if the Agencies need more information, they should issue more Second Requests as an alternative to issuing this final rule, because that is the mechanism Congress gave the agencies to collect more information. Commenters also compared the requirements of the proposed rule to those contained in a Second Request, asserting that this rulemaking would inappropriately convert the HSR Filing into the equivalent of a Second Request in terms of scope and burden. As discussed below, the Commission disagrees with these commenters. Congress gave the Agencies a mandate to collect information that is necessary and appropriate in the HSR Filing to determine whether the reported transaction may violate the antitrust laws, which would justify the burden (on both the parties and the Agency) associated with issuing Second Requests. The purpose of requiring an HSR Filing is to give the Agencies time and information to conduct mandatory premerger screening. The purpose of issuing Second Requests is to conduct an in-depth review of other information and documentary materials that would allow the Agency to determine whether to challenge the transaction prior to consummation. The Commission has concluded that the final rule more appropriately reflects the purpose of the statutory scheme, which requires the information from all filers that is necessary for premerger screening but requires extensive information in response to a Second Request (which today, often represents millions of documents and terabytes of data) only from those filers whose transactions warrant an in-depth antitrust investigation. Thus the final rule is a reasonable exercise of the Commission's rulemaking authority to address the information deficiencies identified in section II.B. rather than rely on the extraordinarily costly alternative of using Second Requests to address those deficiencies.

Commenters point to research that indicates there is a high probability that a transaction will be challenged if the Agencies issue Second Requests and suggest that this means that Second Requests are the most reliable tool for the Agencies to identify potentially harmful deals. But a close read of the study cited by commenters reveals that there are reasons to question the

conclusions commenters have drawn from the low number or high through-rates of Second Requests. Billman and Salop examined the Agencies' enforcement record and calculated that for those transactions that receive a Second Request, 28 percent are cleared as proposed.[229] Billman and Salop also report that the percentage of Second Request investigations has fallen over time, from about 3.49 percent in 2001 to 2.92 percent in 2020. These figures are consistent with information reported by the Agencies in annual HSR Reports.[230] In their report, Billman and Salop contend that the reason behind the falling number of Second Requests is limited agency resources, not diminishing antitrust risk due to mergers:

The agencies issue so few second requests because they have been budget constrained during this entire period. Under these circumstances, the agencies must engage in a type of triage process. Being limited in the number of second requests they can issue and cases that they can afford to litigate in court, the agencies target only the limited number of most problematical looking mergers for second requests. Not surprisingly, they generally discover evidence of potential anticompetitive effects. And not surprisingly, the firms generally consider the validity of the concerns, and most are then willing to accept a consent decree or abandon the transaction. Indeed about 26% (*i.e.*, 254/969) of the firms that receive second requests choose to abandon the transaction even *before* a complaint is issued.[231]

The Commission is well aware of the challenges of fulfilling its mission to prevent harmful mergers with existing resources. Fully resourcing the Commission's competition mission—especially merger review—has been an ongoing challenge. For instance, the Commission's headcount remains well below what is needed in light of the volume and complexity of proposed deals. Over the past ten years, the absolute number of HSR filings has nearly doubled, while the number of FTC employees assigned to competition work has remained nearly flat. As a result, the Commission has been forced to make difficult triage decisions and forgo potentially worthy investigations.[232] Moreover, funding

---

[228] *See* FY 2020 HSR Statement, *supra* note 226.

[229] Logan Billman & Steven C. Salop, ''Merger Enforcement Statistics: 2001–2020,'' 85 Antitrust L. J. 1, 6 (2023).

[230] *See* appendix A of HSR Annual Reports, available at Fed. Trade Comm'n, Annual Reports to Congress Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, *supra* note 56.

[231] Billman & Salop, *supra* note 229, at 7.

[232] *See* Statement of Chair Lina M. Khan, joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya Regarding the FY 2022 HSR Annual Report to Congress (Dec. 21,

levels for the antitrust agencies has not kept pace with the impressive growth of the U.S. economy: according to one report, from 2010 to 2019, U.S. GDP increased 37 percent but appropriations for the Antitrust Division and the FTC increased only 3 percent.[233]

Commenters who supported expanded information requirements suggested that limited resources justify this rulemaking, while those opposed claimed that resource limitations are the real source of underenforcement of the antitrust laws, a problem that will not be solved by adding burdensome new information requirements. Whatever the funding levels, the Agencies must deploy their resources to be good stewards of public funds and make resource allocation decisions to pursue their mutual mission to enforce the antitrust laws for the benefit of the public. The Commission has concluded that regardless of resource levels, it is critical to the task of detecting illegal mergers that the HSR Filing contain sufficient information for an effective premerger antitrust assessment of the transaction rather than relying on issuing more Second Requests to compensate for information deficiencies in the HSR Filing.

The Commission has determined there are several reasons why issuing more Second Requests is not a reasonable alternative to address the information gaps discussed in section II.B. above. First, without the additional information required by the final rule, the Agencies would continue to struggle to uncover key facts necessary to determine whether to issue Second Requests for reported transactions that warrant in-depth review. The Agencies are currently making these assessments and relying on Second Requests when necessary, but they are doing so knowing that there are deficiencies in the information currently collected on the HSR Form, resulting in significant extra effort to generate sufficient information to make that determination prior to the expiration of the initial waiting period. In light of the deficiencies in the information currently collected that are discussed in section II.B., the Commission has determined that the status quo does not permit the Agencies to fulfill their statutory mandate to identify those transactions

that warrant the issuance of Second Requests.

Second, issuing more Second Requests is an extremely costly alternative to the final rule. The costs, burdens, and delay associated with Second Requests—for both the parties and the Agencies—are well documented. In 2000, Congress amended the HSR Act to provide for an optional internal review process for Second Request recipients to object to the breadth and cost of complying with those requests [234] and requiring the Agencies to conduct "an internal review and implement reforms of the merger review process in order to eliminate unnecessary burden, remove costly duplication, and eliminate undue delay, in order to achieve a more effective and more efficient merger review process." [235] Yet despite Agency reforms to reduce burdens and costs,[236] the AMC noted the widespread belief that complying with a Second Request imposed significant costs. The AMC cited a survey conducted by the Antitrust Section of the American Bar Association which reported that, on average, investigations during the second waiting period took seven months and resulted in median compliance costs of $3.3 million.[237] A more recent survey conducted in 2014 by the Mergers & Acquisitions Committee of the ABA reported that average cost of compliance with a Second Request was $4.3 million among respondents.[238] Another study shows

that Second Requests impose significant delays and risks, even for deals that are ultimately not challenged by the Agencies, increasing the time required for premerger review from an average of 98 days (3.3 months) for acquisitions that do not receive a Second Requests to 237 days (7.9 months) from announcement to closing.[239]

The Commission has determined that the final rule is a better regulatory alternative than issuing more Second Requests because the final rule provides the Agencies with the information necessary for an efficient and effective premerger assessment and to determine which reportable transactions warrant the issuance of Second Requests. The Commission considers the costs that would be associated with issuing more Second Requests as an alternative to the final rule to be unnecessary and unjustified. By relying on only the information contained in current HSR requirements and issuing more Second Requests, the Agencies would be imposing these significant costs on deals that are even more "on the margin" than the ones that are currently identified for a Second Request investigation. Issuing more Second Requests without adjusting the information in the HSR Filing would most likely result in significant costs for additional transactions and undue delay for even more deals that are not ultimately challenged in court.

More importantly, without addressing the information deficiencies outlined in section II.B., the Agencies would miss certain transactions that warrant further review. For these transactions, which are currently not subject to Second Requests, the costs of complying with the additional information requests for the HSR Filing are justified by the enhanced ability of the Agencies to detect the potential for the transaction to violate the antitrust laws. In other words, the final rule makes it more likely that the transactions that present the most significant risk violating the antitrust laws, and therefore most clearly warrant the costs and delays associated with an in-depth investigation, are those that will receive Second Requests.

As an added benefit, the additional information contained in the HSR Filing will allow the Agencies to focus their investigation on those aspects of the transaction that create antitrust risk, and

---

2023]. *https://www.ftc.gov/system/files/ftc_gov/pdf/StatementofChairKhanJoinedbyComm%27SSlaughterandComm%27rBedoyareFY2022HSRAnnualReport.pdf.*

[233] Michael Kades, "The state of U.S. federal antitrust enforcement," Wash. Ctr. Equitable Growth 22–23 & Fig. 12 (Sept. 17, 2019), *https://equitablegrowth.org/research-paper/the-state-of-u-s-federal-antitrust-enforcement/?longform=true.*

[234] 15 U.S.C. 18a(e)(1)(B).

[235] *Id.* sec. 18a(e)(1)(B)(iii).

[236] *See* Prepared Statement of the Fed. Trade Comm'n Before the Comm. on the Judiciary, Subcomm. on Antitrust, Competition, and Small Bus. and Consumer Rights, United States Senate Concerning An Overview of Fed. Trade Comm'n Antitrust Activities 3 (Sept. 19, 2002), *https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-overview-enforcement-antitrust-laws/020919overviewtestimony.pdf.* In 2002, the Commission's Bureau of Competition issued Guidelines on Merger Investigations, which eliminated some of the more onerous requirements of compliance. *See* Debbie Feinstein, "A fine balance: toward efficient merger review," Fed. Trade Comm'n Competition Matters blog (Aug. 4, 2015), *https://www.ftc.gov/enforcement/competition-matters/2015/08/fine-balance-toward-efficient-merger-review.*

[237] AMC Report, *supra* note 179, at 163. The AMC noted that the survey's value was limited due to reliance on a non-scientific, self-selected sample of only twenty-three responses, and that the median values for most measures of cost were much lower than the means, suggesting the average values were influenced by a few very high observations. *Id.*

[238] Peter Boberg & Andrew Dick, "Findings from the Second Request Compliance Burden Survey," Vol. XIV No. 3 Threshold: Newsletter of the Mergers & Acquisitions Comm. 26, 37 (Summer 2014) (A.B.A. Antitrust L. Sec.). In about one-third of these investigations, parties had withdrawn and refiled their notification, indicating that the strategy

was not always effective in avoiding a Second Request. This is consistent with the Commission's assessment of withdraw and refile data, reflected in Table 3 *supra.*

[239] Jana Fidrmuc et al., "Antitrust merger review costs and acquirer lobbying," 51 J. Corp. Fin. 72, 73 (2018).

minimize "overly broad" Second Requests, which can also impose unnecessary costs and delays. Specifically, the final rule provides the Agencies with the information that is necessary to make the critical decision whether and how to burden the filers and the Agencies with the costs and delays associated with an in-depth investigation of the reported transaction.

Indeed, one goal of this rulemaking is to reduce the number of Second Request investigations that do not lead to an enforcement action. Imposing substantial costs in addition to undue delay on transactions that are unlikely to face a court challenge is the wrong response to the information deficiencies outlined in section II.B. The Commission has determined that imposing minimal additional costs on all filers to properly conduct premerger screening will likely reduce the number of transactions that receive a Second Request but do not face a court challenge, a very significant benefit to filers. The Commission expects that, on balance, the final rule will reduce the number of unnecessary or overly broad Second Requests and that this outcome is consistent with the statutory scheme created by Congress.

Much of the increased cost of a Second Request investigation (for both the parties and the Agencies) is due to the increasing complexity of merger litigation, and including the costs associated with post-complaint discovery. Federal judges overseeing merger trials routinely remark on the scope and effort of proving and refuting the facts needed to assess whether a proposed transaction violates the antitrust laws.[240] The Agencies' costs in litigating these cases have also increased significantly in recent years, especially the cost of hiring outside experts to support the litigation.[241] To a large extent, the scope and burden of a Second Request is driven by the growing need for data and other evidence required to make an informed decision whether to devote scarce resources to a particular case in light of the likelihood that the agency can

establish liability under section 7 of the Clayton Act.

Of the commenters objecting to the proposed rule, some argued that the final rule would collapse the distinction between the notification form and a Second Request. The Second Request is the Congressionally mandated tool for the collection of additional information to determine whether to challenge the transaction prior to consummation. The Commission states that it is not its intention in any way to require in the initial notification all the information that may be necessary to determine whether to file a complaint alleging an antitrust violation. Instead, the final rule ensures that the Agencies have the information necessary to identify those transactions that require the issuance of Second Requests, a decision that must be made prior to the expiration of the statutory waiting period. The Commission disagrees that the final rule requires anything near the amount of data and documents sought in Second Requests, which are tailored for each recipient. For example, the Commission's Model Second Request requires the submission of all documents related to pricing for any relevant product for the last three years[242] and the Department of Justice's Model Second Request requires the submission of each database or data set containing a range of information about the relevant product.[243] That level of detail and analysis is not required by the final rule and is not warranted in an HSR Filing. In the final rule, the Commission has identified the information that the Agencies need to conduct a preliminary screen for antitrust risks. A Second Request represents a whole different level of detail and analysis, one much more aligned with determining whether there are facts sufficient to establish to a court that the merger may substantially lessen competition or tend to create a monopoly.

As discussed in section III.A., the Commission believes that it is consistent with the statutory premerger regime to collect certain critical information directly from those involved in the transaction and to have that information available on the first day of the initial waiting period. The Commission believes that it is well within its statutory authority to require

minimally sufficient information in the HSR Filing that is necessary and appropriate to screen each reported transaction for antitrust risk without resorting to issuing more Second Requests to require information that is not currently submitted with the HSR Form.

Moreover, the Commission believes that Second Requests should continue to be reserved for those transactions more likely to violate the antitrust laws and to result in measurable harm if not blocked prior to consummation. Issuing more Second Requests as a remedy for deficient HSR Filings imposes opportunity costs on the Agencies, diverting resources that could be used to address other potential violations of the antitrust laws. Moreover, as discussed above, one potential benefit of the final rule is that it may reduce the number of Second Requests or limit their scope. Issuing more Second Requests runs counter to that goal and would also impose significant additional costs on the Agencies, the filing parties, and third parties. In the words of one commenter: "These proposed changes exemplify good government. They would save regulators valuable time and resources in evaluating merger proposals, making the agency's processes more efficient."[244]

In sum, in adopting this final rule, the Commission believes that it has identified the specific additional information that, in the Agencies' experience, is most relevant to determining whether to issue Second Requests or narrow their scope. Moreover, as detailed below in sections IV. through VI., the Commission has made significant modifications in the final rule to better balance the need for additional relevant information while avoiding undue delay and cost where the likely benefit to the Agencies is low, especially for those deals that they can quickly determine are not likely to violate the antitrust laws. The Commission believes that the final rule, as modified, would better address the information deficiencies outlined above as compared to other available regulatory options such as relying on more Second Requests.

The Commission has also considered whether to rely on the expanded use of voluntary supplemental submissions from the parties, including as part of a pull-and-refile investigation, as an alternative to the final rule. See section III.A.2. But this alternative does not address the information deficiencies that this rulemaking has identified with

---

[240] *See, e.g., FTC* v. *Peabody Energy Corp.,* 492 F. Supp. 3d 865, 874 (E.D. Mo. 2020); *FTC* v. *Staples, Inc.,* 190 F. Supp. 3d 100, 110 (D.D.C. 2016); *FTC* v. *Sysco Corp.,* 113 F. Supp. 3d 1, 15 (D.D.C. 2015); *United States* v. *JetBlue Airways Corp.,* cv–23– 10511 (D. Mass. Jan. 16, 2024).

[241] *See* Letter from Lina M. Khan, Chair, Fed. Trade Comm'n to Rep. Thomas P. Tiffany 5–6 (Nov. 3, 2023) *https://www.ftc.gov/system/files/ftc_gov/ pdf/2023.11.3_chair_khan_letter_to_rep._tiffany_ re_merger_challenges.pdf* (citing expert witness costs related to merger enforcement in Federal court).

[242] *See* Fed. Trade Comm'n, Bureau of Competition, Model Second Request Specifications 8 (rev. Jan. 2024), *https://www.ftc.gov/system/files/ ftc_gov/pdf/Final-Rev-Model-Second-Request-01- 26-2024.pdf.*

[243] U.S. Dep't of Justice, Model Second Request, Specification 2, *https://www.justice.gov/atr/file/ 706636/dl.*

[244] Comment of SEIU, Doc. No. FTC–2023–0040– 0699 at 2.

the current information requirements. Without the collection of information related to the antitrust risks identified in section II.B., the Agencies lack a basis to identify the need for additional voluntary submissions from the parties. The Agencies are already relying on supplemental submissions from a large number of filers, often resulting in the parties withdrawing and refiling their notification. See Table 3. Routinely requiring voluntary submissions from even more filers as an alternative to obtaining needed information in the HSR Filing would impose unnecessary burden and delay on filings that are not currently flagged for follow up.

Based on the Agencies' experience of conducting premerger review for over four decades, the Commission identified the additional data and documents that, if submitted with the HSR Filing, would reduce delays and burdens associated with information-gathering during the initial waiting period and satisfy the Agencies' mandate to conduct a premerger assessment of each reported transaction. To that end, the final rule targets information that is likely already available to filers, such as documents related to the transaction, as well as historical data and documents about their business, including ordinary course business plans and reports. The final rule marries descriptive responses with documents submitted with the HSR Filing, providing the Agencies with a holistic view of the operations of each party, including any existing business relationships that would be affected by the transaction. Overall, the final rule aligns the information requirements of the HSR Filing with the Agencies' task of identifying transactions that may violate the antitrust laws. For many of the new requirements, parties only have to respond if they identify an existing business relationship (e.g., one party is the other party's competitor or supplier). Based on the Agencies' experience, parties in most cases do their own assessment of the antitrust risk associated with the planned transaction before submitting an HSR Filing and will therefore already have relevant information about any existing business relationship. In short, the Commission has calibrated the HSR Filing's reporting requirements so that the filing contains sufficient information for the Agencies to determine whether the transaction is one that is likely to raise antitrust concerns. The Commission believes that the final rule is well within the authority given to it by Congress to implement a notification scheme that minimizes costs and delays associated with mandatory premerger

review and yet generates the benefits of preventing illegal mergers prior to consummation.

*B. Major Questions Doctrine*

Two commenters suggested that the proposed rule implicates the major questions doctrine.[245] The Commission disagrees. According to the Supreme Court, the major questions doctrine is implicated in "extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." [246]

This rulemaking does not involve a major question as the Supreme Court has used that term. The final rule merely updates the disclosure requirements for acquisitions that already are required to submit to mandatory premerger notification. As reflected in Table 1, transactions reported under the HSR Act constitute only a fraction of the total number of mergers and acquisitions that occur each year in the United States. Congress has determined that most acquisitions should not be subject to premerger review, and this rule does not impact them.

Considerations of history and breadth also demonstrate that the final rule does not involve a major question. The breadth of the Commission's authority here "fits neatly within the language of the statute. . . ." and is well established.[247] The Commission has

---

[245] One commenter also argues that the Commission's rule runs afoul of the non-delegation doctrine. The Commission disagrees. First, the Commission's rule has no bearing on the authority Congress delegated to the Commission when it passed the HSR Act. Second, Congress' delegation of rulemaking authority to the Commission does not run afoul of the non-delegation doctrine. The non-delegation doctrine is based on the Supreme Court's interpretation of Article I, Section 1 of the Constitution, which vests all legislative powers in Congress. The Court has interpreted this clause to mean that Congress cannot delegate its legislative power to another branch of government without supplying an intelligible principle. *See J.W. Hampton, Jr., & Co.* v. *United States,* 276 U.S. 394, 409 (1928); *Gundy* v. *United States,* 139 S. Ct. 2116, 2129 (2019). Congress provided several intelligible principles in the HSR Act to guide the Commission's exercise of authority. For instance, it directed the Commission to require notification in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Agencies to determine whether the acquisition may, if consummated, violate the antitrust laws. Congress also stated that the Commission may define terms and exempt classes of persons, acquisitions, transfers, or transactions not likely to violate the antitrust laws from the reporting requirements.

[246] *West Virginia* v. *EPA,* 597 U.S. 697, 721 (2022) (cleaned up); *see also Biden* v. *Nebraska,* 143 S. Ct. 2355, 2372 (2022).

[247] *Biden* v. *Missouri,* 595 U.S. 87, 93 (2022).

---

clear congressional authorization to issue rules and a long history of exercising its authority to promulgate HSR Rules under section 18a(d). The Commission has made both substantive and ministerial amendments to the rules dozens of times to improve the program's effectiveness and to adjust the reporting requirements to keep pace with market realities.[248] Requiring

---

[248] *See* 43 FR 33450 (July 31, 1978) (publishing final rules for premerger notification); 44 FR 66781 (Nov. 21, 1979) (increasing minimum dollar value exemption contained in 16 CFR 802.20); 45 FR 14205 (Mar. 5, 1980) (replacing requirement that certain revenue data for the year 1972 be provided in the Notification and Report Form with a requirement that comparable data be provided for the year 1977); 48 FR 34427 (July 29, 1983) (amending premerger notification rules to clarify and improve the effectiveness of the rules and of the Form and reduce the burden of filing notification); 50 FR 46633 (Nov. 12, 1985) (revising Form at 16 CFR part 803 appendix); 51 FR 10368 (Mar. 26, 1986) (same); 52 FR 7066 (Mar. 6, 1987) (amending rules to reduce cost of complying with the rules and to improve the program's effectiveness); 52 FR 20058 (May 29, 1987) (amending definition of the term "control" as it applies to partnerships and other entities that do not have outstanding voting securities); 54 FR 21425 (May 18, 1989) (interim rule codifying practices that make public administrative grants of early termination of the waiting period through means other than publication in the **Federal Register**); 55 FR 31371 (Aug. 2, 1990) (revising revenue reporting); 60 FR 40704 (Aug. 9, 1995) (same); 61 FR 13666 (Mar. 28, 1996) (defining or creating exemptions to filing); 63 FR 34592 (June 25, 1998) (exempting divestitures pursuant to consent agreements); 66 FR 8680 (Feb. 1, 2001) (interim rule implementing changes to the HSR Act); 66 FR 23561 (May 9, 2001) (interim rule revising revenue reporting); 66 FR 35541 (July 6, 2001) (implementing May 9, 2001 interim rule with slight changes); 67 FR 11898 (Mar. 18, 2002) (amending certain exemptions); 67 FR 11904 (Mar. 18, 2002) (clarifying); 68 FR 2425 (Jan. 17, 2003) (same); 70 FR 4988 (Jan. 31, 2005) (amending the premerger notification rules to reflect adjustment and publication of reporting thresholds required by the 2000 amendments to section 7A of the Clayton Act, 15 U.S.C. 18a); 70 FR 11502 (Mar. 8, 2005) (amending rules to address treatment of corporations, partnerships, limited liability companies and other types of non-corporate entities and the application of certain exemptions); 70 FR 73369 (Dec. 12, 2005) (amending Form and Instructions to relieve some of the burden of complying with Items 4(a) and (b) and specifying that notifications in certain types of transactions expire after eighteen months if a second request remains outstanding); 70 FR 77312 (Dec. 30, 2005) (requiring that 2002 revenue data, identified by the 2002 NAICS, be provided in response to certain items on the Form); 71 FR 35995 (June 23, 2006) (allowing submission of notification and report forms electronically via the internet); 76 FR 42471 (July 19, 2011) (implementing changes to streamline the Form, adding Items 4(d), 6(c)(ii) and 7(d) to capture additional information that would significantly assist the Agencies in their initial review, addressing omissions from 2005 rulemaking involving unincorporated entities); 78 FR 41293 (July 10, 2013) (setting forth the procedure for voluntarily withdrawing an HSR filing, establishing when an HSR filing will be automatically withdrawn if a filing publicly announcing the termination of a transaction is made with the SEC, and setting forth the procedure for resubmitting a filing after a withdrawal without incurring an

Continued

information necessary and appropriate to determine whether a transaction, if consummated, may violate the antitrust laws is certainly a ''tool'' in the Commission's ''toolbox,'' given the Commission's history of taking action against anticompetitive mergers.[249] Since 1977, the Commission and the Antitrust Division of the Department of Justice have published an annual report outlining their efforts to protect competition by identifying and investigating mergers and acquisitions that may violate the antitrust laws.[250] These reports demonstrate that premerger notification and merger enforcement is an area that falls squarely within the Commission's ''wheelhouse.''[251]

Even if the final rule could be characterized as implicating a major question, the HSR Act provides ''clear congressional authorization'' for the rule.[252] Congress spoke clearly when it granted the Commission authority to determine the form and content of premerger notifications as necessary and appropriate to enable the Agencies to determine whether a proposed acquisition may, if consummated, violate the antitrust laws,[253] and the final rule falls squarely within that delegation of authority. The Commission is asking filers to provide information necessary to evaluate whether a transaction may violate the antitrust laws. This information is missing from the current filings, and it is appropriate that filers, who are in the best position to report basic information about their own businesses, provide that information. The rule updates are necessary and appropriate for the Commission to accomplish the goals Congress set out for it: effective premerger review as a tool to prevent illegal mergers prior to consummation and fully enforce the antitrust laws' proscription against undue concentration. And just recently, Congress increased the requirements of the premerger notification program by requiring the Commission to collect information about foreign subsidies in order to use this data as part of the Agencies' premerger review.[254] Congress has left it to the Commission to ''fill up the details'' based on the many clear principles articulated in the HSR Act[255] and in furtherance of sound and effective enforcement of the U.S. antitrust laws. Accordingly, even if the major questions doctrine applies, the Commission's authority to issue the final rule is clear.

### C. Benefits and Costs of the Final Rule

The final rule is intended to address existing information deficiencies in the current HSR Rules so the Agencies can identify transactions that may violate the antitrust laws during the short period of mandatory premerger review provided in the HSR Act. The Commission has determined that the status quo is insufficient because it leaves information gaps that prevent the Agencies from efficient and effective premerger screening to identify which transactions require in-depth review. The final rule also addresses significant information asymmetries between the parties and the Agencies by shifting more of the costs of information acquisition to the parties, who are most familiar with their business operations and structure and who are pursuing the transaction under review. The Commission has considered alternatives to the final rule that would rely on other regulatory options, including the Short Form Alternative discussed in section III.E., and has determined that those alternatives offer different tradeoffs between benefits and costs. The Commission believes that the final rule has the best balance of benefits and costs within the statutory scheme of the HSR Act because it imposes less delay and is less costly than issuing more Second Requests, and it imposes less delay and provides more certainty regarding the completeness of the information than relying on more extensive voluntary submissions of information. Moreover, the final rule is superior to the short form alternative, an option suggested by commenters and discussed below in section III.E., because the Commission lacks a basis at this time to identify a set of transactions that should be eligible for short form treatment using the current information requirements. Most importantly, none of the other alternatives close the information gaps identified in section II.B. to permit the Agencies to effectively and appropriately identify a subset of filings for which Second Requests are warranted and to make critical resource decisions, preventing the Agencies from fulfilling their mandate to conduct a premerger antitrust assessment of reported transactions.

Given that the final rule is the best of the available alternatives, the Commission now addresses comments on whether it is a reasonable exercise of the Commission's statutory authority to adopt the final rule to enable the Agencies to determine whether an acquisition may, if consummated, violate the antitrust laws in fulfillment of their premerger review obligations under the HSR Act.

### 1. Benefits

The Commission has determined that, due to evolving commercial realities, the current information requirements for the HSR Form and Instructions are not delivering the benefits of mandatory premerger review as contemplated by Congress. As discussed in section II.B., changes in M&A activity, corporate structures, and investment strategies have exposed significant information gaps that undermine the Agencies' ability to efficiently and effectively identify transactions that may violate the antitrust laws during the initial 30-day waiting period based on information contained in the current HSR Form. As a result, the Agencies lack sufficient information about the parties and transaction to conduct an initial antitrust assessment for all types of potential harm that could occur due to the merger. Moreover, these changes have amplified information asymmetries between what the parties know about their business activities and how the Agencies collect the information necessary to decide whether to issue Second Requests. The Commission has determined that to realize the benefit of detecting illegal mergers prior to

---

additional filing fee); 78 FR 68705 (Nov. 15, 2013) (defining and applying the concepts of ''all commercially significant rights,'' ''limited manufacturing rights,'' and ''co-rights'' in determining whether the rights transferred with regard to a patent or a part of a patent in the pharmaceutical industry constitute a potentially reportable asset acquisition under the Act); 81 FR 60257 (Sept. 1, 2016) (allowing DVD submissions and clarifying the Instructions to the Form); 82 FR 3212 (July 12, 2017) (amending the Form); 83 FR 32768 (July 16, 2018) (amending rules for clarity, allowing use of email, and updating Instructions); 84 FR 30595 (June 27, 2019) (requiring use of 10-digit codes based upon the North American Product Classification System in place of the 10-digit codes based upon the North American Industry Classification System); 88 FR 5748 (Jan. 30, 2023) (amending the Rules to conform to the new filing fee tiers enacted by the Merger Filing Fee Modernization Act of 2022, 15 U.S.C. 18b); 89 FR 7609 (Feb. 5, 2024) (amending Parts 801 and 803 of the Rules to make ministerial changes required to reflect the annual adjustment of the filing fee thresholds and amounts required by 2022 Amendments).

[249] *West Virginia* v. *EPA*, 597 U.S. at 730.

[250] *See* Fed. Trade Comm'n Annual Reports to Congress Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, *supra* note 56 (collecting reports).

[251] *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2382 (2023) (Barrett, J., concurring).

[252] *West Virginia* v. *EPA*, 597 U.S. at 723–24.

[253] 15 U.S.C. 18a(d)(1).

[254] *See* Merger Filing Fee Modernization Act of 2022, 15 U.S.C. 18b (requiring the Commission to promulgate a rule requiring HSR filings to include information on subsidies received from certain foreign governments or entities that are identified as foreign entities of concern).

[255] *Gundy* v. *United States*, 139 S. Ct. 2116, 2136 (2019) (Gorsuch, J., dissenting) (quoting *Wayman* v. *Southard*, 23 U.S. 1, 31, 43 (1825)).

consummation through mandatory premerger review, the Agencies need more information relevant to the antitrust risk of reportable acquisitions in the HSR Filing.

The Commission has considered the extent to which the final rule furthers the Congressional goal of preventing illegal mergers prior to consummation through mandatory premerger review. The benefit of having sufficient information in the HSR Filing to screen for all types of antitrust risks derives from several sources:

(1) the non-consummation of harmful mergers that otherwise would not have been caught during premerger screening, whose harm continues unless and until the merger is unwound and competition in the affected market is restored, if it can be restored at all;

(2) the reallocation of staff hours from attempting to collect additional necessary information from the parties on a voluntary basis and reduced uncertainty that delay and insufficiency create for resource allocation decisions;

(3) the reallocation of staff hours from collecting additional necessary information from third parties regarding the parties' business operations;

(4) the reduction in burden required for third parties to respond to the Agencies' outreach to provide information known to the filing parties, but not currently required by the Form;

(5) improvements in premerger screening through

(i) more accurate identification of transactions requiring in-depth review;

(ii) the reduction in the number of HSR Filings withdrawn and refiled for the purpose of allowing Agency staff to collect and review more information from the parties;

(iii) reduction in delays associated with HSR Filings, including those that are withdrawn and refiled but do not receive Second Requests;

(iv) the narrowing of issues required to properly focus any in-depth review, including through the issuance of more targeted and less burdensome Second Requests;

(v) the reduction in the number of Second Request investigations that do not ultimately result in enforcement or voluntary restructuring; and

(6) a more efficient allocation of resources devoted to merger enforcement, including by avoiding expensive and time-consuming litigation to unwind consummated mergers that cause harm but were not identified under the current rules.

Consistent with Congressional intent, all of these benefits accrue to the American public in the form of reductions in the harmful effects of illegal consummated mergers, including price increases or reductions in output, reductions in quality and innovative activity, lower wages, and other effects, and more effective use of public resources devoted to antitrust enforcement. Other market participants that would otherwise be harmed by an illegal merger also benefit from improved detection that leads to enforcement that prevents or neutralizes the harm from that merger.

Many of these benefits cannot be quantified, or quantification cannot be done with a high degree of reliability. Where the Commission is unable to estimate a benefit quantitively, it provides a qualitative description of the benefit using the best available methods,[256] and in light of the purpose of mandatory premerger review. Based on its experience gathered over decades of premerger review of transactions reported under the HSR Act, the Commission considered the following benefits that would derive from the final rule as compared to the status quo.

a. Detecting Additional Harmful Mergers

Section 7 of the Clayton Act prohibits an acquisition where the effect of such acquisition may be to substantially lessen competition or to tend to create a monopoly. Acquisitions that have these effects deprive the public of the benefits of competition, which include lower prices, improved wages and working conditions, higher quality and resiliency in the supply chain, and more innovation and choice, among other benefits. section 7 of the Clayton Act was designed to arrest anticompetitive tendencies in their incipiency,[257] and mandatory premerger review gives the Agencies time and information to assess

whether a reported transaction may violate the antitrust laws and seek to block it in Federal court prior to consummation. While it is difficult to calculate with precision the likely ill effects of an acquisition before it happens, Table 2 above contains estimates of potential harm from mergers in cases that were litigated by the Agencies in recent years, representing a range of outcomes from mergers that were not consummated as a result of premerger review and a subsequent Agency enforcement action. For any particular illegal merger, the potential for harm may be small or large and depends on many factors, including the size of the companies involved, the geographic scope of their operations, the number of customers they serve, and the value of their products. Many of the benefits of competition that may be lost due to a merger are more difficult to quantify, such as the loss of innovation competition or degradation in the quality of products or services offered. Thus, the magnitude of the anticompetitive effect of any particular merger that would have occurred but for the Agencies' intervention is imprecise at best and does not capture the full impact of the loss of dynamic and beneficial competition now and in the future.

In connection with their enforcement and reporting mandates, the Agencies also provide public estimates of the average consumer savings resulting from antitrust enforcement, including mergers that the Agencies challenge in an enforcement action (which include negotiated settlements requiring divestitures or transactions that are restructured prior to consummation). These estimates are contained in each agency's budget justification submitted to Congress.[258] Table 4 below summarizes the Agencies' estimates of harms to consumers and other market participants that would have occurred in the affected markets but for the agency's antitrust enforcement action. These savings reflect all civil antitrust enforcement activities, which include merger enforcement.

[256] See generally Anthony E. Boardman et al., Cost-Benefit Analysis: Concepts and Practice 44 (5th ed. 2018); Office of Management and Budget, Circular A–4 at 5 (Nov. 9, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf.

[257] See, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 318 nn.32–33 (1962); see also United

States v. AT&T, Inc., 916 F.3d 1029, 1032 (D.C. Cir. 2019); Saint Alphonsus Med. Ctr.-Nampa v. St. Luke's, 778 F.3d 775, 783 (9th Cir 2015); Polypore Int'l., Inc. v. FTC, 686 F.3d 1208, 1213–14 (11th Cir. 2012); FTC v. IQVIA Holdings Inc., No. 1:23 Civ. 06188 (S.D.N.Y. Dec. 29, 2023).

[258] The Agencies provide annual budget justifications to Congress which contain these

estimates. See Fed. Trade Comm'n, "Budget, Performance, and Financial Reporting," https://www.ftc.gov/about-ftc/budget-strategy/budget-performance-financial-reporting (collecting reports) and U.S. Dep't of Justice, "Budget and Performance," https://www.justice.gov/doj/budget-and-performance (collecting reports).

## Table 4: Annual Estimated Consumer Savings from Antitrust Enforcement (Millions of Dollars)

| Fiscal Year | FTC | DOJ | Total |
|---|---|---|---|
| 2014 | 1,419 | 3,378 | 4,797 |
| 2015 | 3,400 | 3,387 | 6,787 |
| 2016 | 3,610 | 2,271 | 5,881 |
| 2017 | 3,710 | 1,408 | 5,118 |
| 2018 | 3,760 | 928 | 4,688 |
| 2019 | 4,860 | 3,939 | 8,799 |
| 2020 | 2,681 | 712 | 3,279 |
| 2021 | 2,840 | 1,567 | 4,407 |
| 2022 | 3,190 | 529 | 3,719 |
| 2023 | 3,290 | 1,822 | 5,112 |
| | | **Average Annual Savings** | **5,259** |

The Agencies' estimates of consumer savings in Table 4 are calculated based on the relevant product and geographic markets that were alleged (or would have been alleged) in either a litigation or settlement complaint. However, sometimes litigation or settlements do not address the full scope of the Agencies' competitive concerns. Due to various reasons (resource constraints, investigative efficiency, litigation strategy, etc.), a complaint may, for example, exclude certain markets of concern or theories of harm. When such a merger is blocked or abandoned in its entirety, any expected harm is avoided in all implicated markets and for all theories of harm. In those cases, limiting the calculations to just those markets and theories that would have appeared in a filed complaint further understates the full scope of consumer benefit.[259] These calculations also do not include less quantifiable harms that are avoided through antitrust enforcement, such as reduced innovation or quality.

The Commission believes that the enhanced ability of the Agencies to detect illegal mergers under the final rule will result in similar benefits to additional consumers and other market participants that would have been affected by an illegal merger but for the enhanced detection made possible by the final rule. In addition to these benefits, the final rule permits the Agencies to fulfill their statutory mandate to conduct premerger review for the purpose of preventing illegal mergers prior to consummation, which is a key competition policy directive that undergirds our nation's reliance on open and competitive markets to drive innovation and economic growth.

### b. Avoidable Costs and Delays Arising From Insufficient Information on the HSR Form

To understand the inefficiencies created by inadequate information in the current HSR Filing, the Agencies conducted a review of the effort required to collect additional information beyond what is contained in the HSR Filing for investigations that did not result in an enforcement action.[260] The Agencies examined all HSR Filings in FY 2021, when they received 7,002 HSR Filings for an associated 3,520 transactions.[261] The Agencies identified those transactions for which either Agency opened an investigation that did not result in (1) an action brought in Federal court to block the transaction, (2) a negotiated settlement with divestitures, or (3) the transaction being abandoned or restructured as a result of one agency's antitrust investigation.[262] On the basis of this review, the Agencies determined that they conducted 100 investigations in FY 2021 for which they collected information from non-public sources but that did not result in an enforcement action, referred to here as "no-action investigations."[263] Investigational costs associated with these no-action investigations are one product of inefficiencies created by insufficient information in the HSR Filing because they create unnecessary burdens for the parties, the Agencies, and third parties that could be avoided if the HSR Filing contained sufficient information to determine that the transaction is not one that requires challenge via litigation prior to consummation. In addition to the benefits of improved detection outlined above, these benefits represent opportunity costs for Agency staff (who would spend their time on other tasks if not collecting necessary information for transactions that do not warrant enforcement action prior to

---

[259] Most calculations seek to use quantification tools that align theories of harm being pursued, but not all theories are associated with readily available tools. Thus, for some merger wins, the Agencies' estimates of consumer savings will not reflect the full scope of theories due to the challenges of quantification. This is most relevant for coordinated effects; when a merger raises both unilateral and coordinated effects concerns, the calculations put forward will often reflect only the unilateral concerns (due to the greater availability of unilateral merger simulation tools) but not a robust estimation of additional harm arising from the threat of increased coordination.

[260] The Agencies selected FY 2021 for this effort because of the large number of reportable transactions that year, 3,520, which provided for a robust data set. The Agencies have no basis to believe that the mergers that occurred in that year were different in any material way from the mergers that occurred in other years and so consider them to be representative of HSR-reportable merger activity in general.

[261] Fed. Trade Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report, Fiscal Year 2021 appendix A (FY 2021). As appendix A n.1 notes, there are typically two filings for each transaction, one from the acquiring person and one from the acquired person.

[262] These criteria are the ones used by the Agencies to report publicly on their merger enforcement activities.

[263] In FY 2021, the Agencies took action against 32 transactions. *See* Fed. Trade Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report, Fiscal Year 2021 appendix A (FY 2021) at 2. The Agencies provide data on HSR reportable mergers on a fiscal year basis, but enforcement decisions may occur in a fiscal year after the transaction was first reported. As a result, the number of enforcement actions reported in the annual HSR reports are not necessarily related to the transactions that are reported for that fiscal year. For this exercise, the Agencies tracked the outcomes of transactions that were reported to the Agencies in FY 2021 but decisions about those transactions may have occurred in the following fiscal year.

consummation), as well as burdens and costs for the parties and third parties who respond to staff inquiries designed to collect the information necessary to conduct a premerger assessment of a reported transaction.

In the 100 no-action investigations, staff contacted at least one third party, with an average number of 18 third-party interviews per investigation. Each of these interviews required significant time from these third parties to identify the knowledgeable personnel in the related business operations, and prepare for questions in advance of talking to Agency staff. While some third parties rely on in-house counsel to help prepare for these interviews, some retain outside legal counsel who have experience with antitrust investigations. The Commission lacks a reliable methodology to calculate or estimate the costs borne by third parties to provide necessary information relevant to the Agencies' initial antitrust assessment. The Commission believes that it is appropriate to shift some of this information-gathering burden to the merging parties and away from other market participants—including customers who may suffer harm if the merger is consummated—who currently absorb this burden due to deficiencies in the existing HSR Form. The final rule realigns the burden of providing necessary information toward the parties themselves and away from other third-party companies, including smaller entities who are saddled with unexpected compliance and legal costs solely because they operate in the same or adjacent business lines as the merging parties. As a result, the Commission anticipates a reduction in third parties' costs from adopting the final rule.

Moreover, given the effort that is required to obtain this information from third parties, there is often a delay in collecting critical business facts until late in the initial waiting period, near the time when a decision must be made about issuing Second Requests. As discussed above, additional information from the parties and third parties that is submitted on a voluntary basis often arrives late in the review period. These delays contribute to additional avoidable costs through the issuance of Second Requests that might have been avoided or that were not tailored to areas of competitive concern due to insufficient information in the HSR Filing.[264]

One source of delay is the parties' voluntary decision to withdraw and refile their HSR Filing. In 53 of the 100 no-action investigations, the parties voluntarily withdrew and refiled their HSR Filings, which restarted the initial waiting period and gave Agency staff additional time to conduct the review. As discussed above, the Commission believes that most of the investigations in which the parties withdraw and refile their HSR Filings are the result of the parties' concern that the Agency may issue Second Requests when they are not warranted or that the Agency will issue a Second Request that is too broad. As Table 3 shows, when the parties withdrew and refiled, they avoided Second Requests nearly 70 percent of the time in the period FY 2018 through FY 2022. For the remaining 30 percent, the additional time allowed the parties to engage in additional advocacy to avoid or potentially narrow any Second Requests. For withdraw and refile transactions that avoid Second Requests altogether, there is unnecessary delay and uncertainty that could be avoided if the information required to make a no-action decision was provided sooner, including with the HSR Filing.

But for transactions that receive Second Requests, the delay can be substantial; seventeen of the 100 no-action investigations referenced above involved a Second Request. The decision to issue Second Requests, which requires approval from Agency leaders,[265] has significant consequences. As discussed in section III.A.3., the costs and delays associated with Second Requests are substantial, and for any no-action Second Request investigation, those burdens may be avoided if sufficient information were available at an earlier time in the investigation, including in the HSR Filing. For the Agencies, there are significant consequences as well. A Second Request investigation requires a team of lawyers, economists, and support staff. The broader the scope of the investigation (*e.g.,* covering many different products or many different geographic areas), the more staff must be assigned. As a result, avoiding unnecessary or unfocused Second Requests would provide a benefit to the parties, the Agencies, and any third

parties contacted during the investigation.

Based on this experience, the Commission believes that the final rule will provide a substantial benefit to the Agencies, the parties, and third parties by reducing the number of Second Requests issued or narrowing the scope of any Second Request. A more efficient process that better identifies transactions that do not require additional investigation benefits parties as well.

Many commenters asserted that the Commission failed to take into account the increased burden on staff of reviewing additional information in HSR Filings. Several stated that given the purportedly huge volume of materials generated by the new requirements, especially the expanded document demands, Agency staff would be overwhelmed, thereby undermining effective screening even for deals they could evaluate with current information requirements. One commenter estimates that the proposed rule would result in over 177,000 additional staff hours (100 full-time attorneys) needed to review the information contained in the revised HSR Filing. On the other hand, other commenters asserted that the proposed changes would modernize the premerger process to better account for the evolving complexities of today's mergers and address potential shortcomings of past merger review that have become clearer in retrospect.

Based on its own experience and in light of the significant reductions contained in the final rule as compared to the proposed rule, the Commission believes that the additional information required by the final rule would result in an overall reduction in the number of staff hours spent collecting additional information from all sources, including the parties, as well as a reduction in associated burdens of reviewing and processing that information. For example, while Agency staff may need to review the transaction documents and additional information submitted with an HSR Filing, they would spend less time on more costly and time-consuming tasks such as conducting independent research or outreach to third parties, preparing voluntary information requests, reviewing additional information submitted by the parties, drafting Second Requests, reviewing voluminous submissions from the parties in response to those requests, and preparing internal reports and memoranda for review by managers. The Commission also acknowledges that it may incur minimal additional administrative and support system costs associated with the revised HSR Form,

---

[264] For any investigation that results in Second Requests, staff spends a significant amount of time during the initial 30-day waiting period trying to identify the areas of a potential antitrust violation.

Both Agencies make public their Model Second Requests. *See supra* notes 242–43. Starting from these models, staff customize each request by identifying areas of existing competition and modifying the terms to fit the particular industry dynamics, products and services, or geographic reach.

[265] For the Commission, the Chair issues the Second Requests; for the Antitrust Division, that determination is made by the Assistant Attorney General. 15 U.S.C. 18a(c)(1)(A).

such as technology costs to process and host additional documents and filings. Overall, however, the work of Agency staff will be more efficient and effective as they will be able to more readily and accurately identify those transactions that pose a risk that they may violate the antitrust laws.

In sum, under the existing HSR reporting requirements, inadequate information in the HSR Filing leads to significant time and effort for Agency staff, third parties, and merging parties even for transactions that do not warrant a legal challenge. These costs (and associated delays) represent an opportunity for the Agencies to realize benefits from the enhanced information requirements contained in the final rule by (1) streamlining the Agencies' internal processes and resources devoted to merger review; (2) reducing costly delays for certain parties whose deals are eventually consummated; and (3) reducing the burden on third parties to collect information for premerger screening. By requiring more of the information to be collected upfront from the parties as part of the HSR Filing, the final rule will reduce some of the costs and effort currently associated with premerger review for transactions that the Agencies ultimately determine do not require enforcement action.

The Commission acknowledges that for some filings, Agency staff will still engage in some of these activities to verify the information in the HSR Filing and reach out to stakeholders who may be affected by the transaction. However, the Agencies will not need to spend as much time and resources to acquire the basic business information about the parties and the transaction that is needed to evaluate the antitrust risk, because more of that basic information will now be contained in the HSR Filing. The reduction in those information-acquisition costs will allow resources to be redeployed to other critical tasks of the Agencies, such as investigating other mergers (including consummated mergers) or other antitrust violations. In addition, any reduction in the costs and burdens imposed on third parties during no-action investigations is a direct benefit of the final rule.

### 2. Costs

The Commission anticipates that the incremental costs attributable to the final rule will primarily fall on individuals and companies who must make HSR Filings because they are a party to a reportable transaction. The final rule may have effects on other individuals or companies who are considering a reportable transaction but

do not eventually pursue one, although these costs will be indirect and hard to quantify. This indirect effect does not include those potential deal partners who decide not to pursue an unlawful transaction because the final rule decreases the likelihood that it will go undetected. That is, any improvement in the Agencies' ability to detect potentially illegal mergers is a benefit of the final rule and cannot reasonably be viewed as imposing unnecessary or unreasonable costs on parties contemplating a reportable transaction. The final rule may also impose additional costs on the Agencies to ensure compliance and review additional information contained in the HSR Filing, although these costs will be more than offset by other reductions in costs, as discussed above.

For those individuals and companies that must submit an HSR filing, the burden of complying with the final rule will primarily consist of the additional cost of completing and submitting an HSR Filing to the Agencies. This includes internal costs (for employees tasked with collecting and reviewing relevant information as well as in-house compliance attorneys and other non-legal support staff) and external costs (including outside experts hired to assist in preparing the HSR Filing such as counsel expert in HSR rules or other tasks that filers chose to outsource to a third-party service provider). The majority of filers hire experienced attorneys who are familiar with current HSR Rules. The Commission expects that filers will continue to do so and that those professionals (and other legal and technical support staff) will require some additional time to prepare filings.[266] Current requirements also require knowledgeable personnel from the filing entity to collect and prepare data and documents for the Filing, and the Commission expects that these individuals will expend some additional time and effort to comply with the final rule.

The Commission anticipates that the final rule will result in incrementally higher direct costs for all filers.[267] As discussed above, some of these information acquisition costs are currently borne by third parties and the Agencies and will now be borne directly

by the filers themselves. Incremental direct costs associated with the final rule will be borne primarily by those UPEs (and the entities they control) that must submit an HSR Filing, though some portion of the costs may be borne by officers or directors of entities within the acquiring person that will have to provide information to the acquiring person related to other entities for which they serve as officers and directors to complete the HSR Filing.[268] Direct costs vary depending on a number of factors that are different for each reportable transaction: the type of interest being acquired; the complexity of the transaction; the complexity of the UPE and its related entities and investors; the scope and number of existing business relationships between the merging parties; whether the filer is the acquiring or the acquired person; and the size and scope of each filer's business operations. Generally, costs are lower for simple transactions (such as for open market purchases of stock or conversion of stock options), for acquisitions of non-controlling stakes, and for acquisitions of control where the merging parties do not have an existing business relationship. Costs are highest for strategic acquisitions of a competitor or of a key supplier or customer where the Agencies must engage in a thorough review and are more likely to engage in an in-depth investigation including through the issuance of Second Requests. The key variable that is likely to determine the monetary impact of the final rule on any particular filer is the level of the antitrust risk associated with the reported transaction. The Commission believes that this outcome is consistent with the legislative intent in imposing mandatory premerger review as a means of preventing illegal mergers prior to consummation.

The Commission expects that the incremental increase in costs associated with the final rule will be most significant for the first HSR Filing prepared by a given filer because there will be costs associated with becoming familiar with the new reporting Form and Instructions and to gather the required information about the filer's operations. In addition, the Commission believes that some filers (or their counsel) will find it efficient to

---

[266] The Agencies receive a small number of filings from companies or individuals who do not hire attorneys to prepare their HSR Form.

[267] As compared to the current rules, the proposed rule contained modifications that eliminated certain information requirements that the Commission has determined no longer provide a benefit for premerger screening. These reductions in burden are incorporated in the final rule and are reflected in the analysis of incremental costs associated with the final rule.

[268] Sometimes, the parties will allocate the costs associated with premerger review between them by contract. These provisions are typical for strategic acquisitions where the parties expect some level of antitrust scrutiny and often require the acquiring party to compensate the acquired party for costs related to the HSR Filing as part of the purchase price. In conducting its cost assessment, the Commission has assumed that each filer is responsible for its own costs.

automate some portion of the reporting process, which will increase the burden of the first filing. For any subsequent HSR filing related to another acquisition, these repeat filers will incur lower costs because some of this prior work will not be necessary to the extent that they made investments to put processes in place to maintain or automate the collection of relevant business information. In other words, any estimated incremental costs are expected to decline over time.

Nothing in this rulemaking affects the filing fees for making an HSR Filing, which are mandated by Congress and adjusted by the Commission annually.[269] While the final rule does not alter these HSR-related costs, recent congressional changes in these fees use an approach that takes into account the size of the reportable transaction and the size of the parties involved. Last year, Congress revised the schedule of HSR filing fees, creating a new fee structure with five tiers, which increased fees for some transactions while reducing them for others.[270] Specifically, the new fee structure lowered fees for some mergers valued under $500 million and increased fees for transactions valued at $1 billion and more. Prior to this law, HSR filing fees had a three-tier structure, with thresholds adjusted every year. The purpose of creating a new five-tier fee structure was two-fold: to provide the Agencies with additional resources to review mergers and enforce the antitrust laws, and to better reflect that reviews of larger mergers generally consume more Agency resources.[271] Effective February 28, 2023, the Commission implemented the new fee levels, and on March 6, 2024, the Commission published the adjusted fees for 2024.[272]

## Table 5: HSR Filing Fees

| HSR Fees Effective February 23, 2022 | | HSR Fees Effective March 6, 2024 | |
|---|---|---|---|
| Size of Transaction | Fee | Size of Transaction | Fee |
| $101 million to $202 million | $45,000 | $119.5 million to $173.3 million | $30,000 |
| | | $173.3 million to $536.5 million | $105,000 |
| $202 million to $1.0098 billion | $125,000 | $536.5 million to $1.073 billion | $260,000 |
| | | $1.073 billion to $2.146 billion | $415,000 |
| | | $2.146 billion to $5.365 billion | $830,000 |
| $1.0098 billion or greater | $280,000 | $5.365 billion or greater | $2,335,000 |

The Commission has identified significant deficiencies in existing information requirements, and those gaps are hindering the Agencies' ability to obtain key facts needed for an initial assessment of whether the transaction may violate the antitrust laws and to determine whether to issue a Second Request. See section II.B. Congress authorized the Commission to issue rules to collect information that is necessary and appropriate for the Agencies to conduct premerger review within the statutory time frame. The final rule requires filers to gather information relevant for screening the transaction and results in relatively higher costs for those reported transactions that are more likely to pose competition issues, including transactions with complex party or deal structures, or transactions involving two entities with many overlapping business operations or existing business relationships in the supply chain, or transactions in which the parties have a history of acquisitions in the same business lines. This is consistent with the HSR Act's focus on the largest transactions, which are often the most complex, and the overall intent to reduce cost and delay for reportable transactions other than those that may violate the antitrust laws.

As discussed in more detail in section V.D., the Commission believes that most filers will not experience delays because the final rule requires collection of business information that should be readily available or collected as part of each filer's due diligence efforts related to the transaction. Filers who would prefer to submit a letter of intent or other preliminary agreement that is no longer compliant with the final rule may need to come to an agreement on more details of the planned-for transaction. But the Commission has determined that this represents less than 10 percent of current filers, meaning that most parties are already coming to agreement on the key terms that are required by the final rule even if their transaction documents are referred to as a letter of intent.

a. Calculation of Direct Costs

To estimate the potential increase in direct costs for filers attributable to the changes in the final rule, the Commission calculated the average compliance burden by conducting a survey of experienced HSR attorneys who now work for the Agencies. See section VIII. That survey revealed a range of estimated costs for each new information requirement in the final rule. These estimates include the amount of additional time required from a variety of knowledgeable individuals, including, for example, HSR specialists at law firms hired to prepare the Filing as well as individuals associated with the UPE who collect and verify the business information and responsive documents, as well as costs associated with any outside vendors hired to complete the HSR Filing, such as data vendors.

As explained in section VIII., the Commission estimates that the amendments contained in the final rule would increase the time required for a filer to prepare an HSR Filing, on average, 68 hours, resulting in

---

[269] Each year, the thresholds that determine reportability under the HSR Act are adjusted based on changes in the gross national product, 15 U.S.C. 18a note, while filing fees are adjusted in line with the Consumer Price Index, Public Law 117–328, 136 Stat. 5967–68, Div. GG, Title I, sec. 101.

[270] Public Law 117–328, 136 Stat. 5967, Div. GG, Title I.

[271] H.R. Rep. No. 117–493 pt. 1, at 3–5 (2022).

[272] See Fed. Trade Comm'n, "New HSR thresholds and filing fees for 2024," Fed. Trade Comm'n Competition Matters blog (Feb. 5, 2024), *https://www.ftc.gov/enforcement/competition-matters/2024/02/new-hsr-thresholds-filing-fees-2024.*

additional costs of approximately $39,644 per filing on average.[273] The Commission believes that this level of direct costs is small in relation to other merger costs. Indeed, these total costs are small in relation to the value of the deals that must be reported under the Act. The current minimum size for a reportable transaction is $119.5 million; as outlined in section VIII, for FY 2023, the Commission estimates that the total direct costs associated with the final rule would have been only slightly more than the value of a single reportable transaction. Moreover, the Commission believes that these direct costs may be overstated and should decline over time as parties and their lawyers become more familiar with the requirements of the final rule. Finally, these direct costs do not take account of the substantial benefits to the Agencies, the parties, and third parties generated from a more efficient premerger review process that shifts some of the burden of information collection and reporting away from third parties to merging parties and allows the Agencies to obtain critical business facts earlier in the initial waiting period, which in turn helps mitigate avoidable costs associated with Second Requests that might have been avoided or that were not tailored to areas of competitive concern due to insufficient information in the HSR Filing.

In addition, the costs associated with completing an HSR Filing are often minimal compared to other fees associated with mergers and acquisitions. Based on publicly available data, the 20 largest M&A transactions during 2021 and 2022 ranged in size from $1.44 billion to over $70 billion, with average deal size of $10.6 billion.[274] Using the current Congressionally mandated HSR filing fees associated with deals of this size, the average HSR filing fee for these transactions would be $1,198,500, ranging from $415,000 to $2,335,000. For 18 of these deals, the fees paid by the target to financial advisors are available from public sources. These fees varied considerably, ranging from $800,000 to $96 million. In 14 out of these 18 cases, the fees paid by the targets to just their financial advisors were more than ten times the estimate by one commenter of the average total cost per filing for completing the HSR Form ($437,314)[275] and in five cases, fees to financial advisors were more than 100 times that estimate. In any of these cases, financial adviser fees are several multiples of the estimated average new costs associated with the final rule of $79,288 per transaction ($39,644 + $39,644) based on the Commission's estimates. See section VIII. These advisor fees are instructive in demonstrating that HSR filing fees and HSR-related transaction costs for most transactions do not comprise a significant share of total transaction costs and therefore would have minimal impact on costs of dealmaking across the economy.[276]

Another survey of middle-market investment bankers, brokers and other advisors reports that merger advisory fees for deals valued up to $150 million come in the form of retainers, monthly or hourly charges, or success fees, which are paid if the deal closes.[277] For deals in the $100 to $150 million range, namely those most likely to be reportable under the HSR Act, success fees paid to financial advisors represented 1 to 2 percent of deal value, or $1,500,000 to $3,000,000 for a $150 million deal. As with higher valued transactions, the other merger-related costs for transactions on the lower end of HSR reportability dwarf the costs associated with the final rule.

One commenter commissioned a report ("the Kothari Report") that projected that the direct cost of the proposed changes may be nearly seven times greater than the Commission estimated for the proposed rule, after accounting for both direct monetary costs and further costs to the economy.[278] The Kothari Report critiqued the Commission's methodology of calculating direct costs in the NPRM's PRA analysis in several respects. The Commission considered these comments and those of other commenters and, as discussed in section VIII, made adjustments to its cost estimate methodology for the final rule.

As a result, the Commission disagrees that the final rule will impose the level of costs presented in the Kothari Report for several reasons. First, the Commission made significant modifications to all aspects of the proposed rule in response to concerns raised in this report and in other comments. As a result, the estimates contained in the Kothari Report reflect costs for a very different rule, one that the Commission has determined not to adopt. The Kothari Report relied on a survey of experienced practitioners and so did the Commission. The survey of practitioners relied on in the Kothari Report estimated that the proposed rule would require an additional 242 hours of time from outside counsel and internal personnel. While the Commission's estimate was much lower, that comparison is no longer relevant because the Commission is not adopting the rule it proposed. Instead, the Commission is adopting a rule that is substantially more modest in scope, one that aligns compliance costs as much as practicable with the risk that reported transaction is one that requires a closer look.

Moreover, even if the Commission's estimate of the economic impact of the proposed rule was flawed, the Commission made improvements to the methodology it used to estimate the additional effort that will be required of filers to comply with the final rule. As discussed in section VIII, the Commission has accounted for the same costs in its own estimates, such as the time required from outside counsel, in-house counsel, and business personnel as well as costs associated with other services such as data vendors. The Commission believes that its estimates of the economic impact of the final rule are reliable and sufficient for it to determine that the final rule is a reasonable exercise of its rulemaking authority even if it imposes modest costs on overall dealmaking in light of the benefits of the final rule for efficient and effective detection of illegal mergers via mandatory premerger review.

Much of the difference between the Commission's estimate and the one contained in the Kothari Report is attributable to the higher hourly rate applied to the required hours, which the Kothari Report suggests is more likely

---

[273] As further described in section VIII, the Commission estimates the range at 10 to 121 additional hours, or approximately an additional $5,830 to $70,500 per filing, with the highest costs borne by the acquiring person in a transaction with overlapping products or supply relationships in the target's industry.

[274] See "Deal Analytics," Bloomberg L. (last viewed Apr. 3, 2024) (Prologis Inc.'s June 13, 2022 acquisition of Duke Realty Corp. (advisor fees over $135M); Thermo Fisher's Apr. 15, 2021 purchase of PPD Inc. (advisor fees over $70M); sale of Twitter Apr. 25, 2022 (advisor fees over $50M)). See also Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684 at 20–21 & Fig. 3.

[275] Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684.

[276] In conjunction with the passage of the Merger Modernization Act, the Congressional Budget Office estimated the budgetary impact of changing merger filing fees for transactions reported under the HSR Act. CBO estimated that the bill H.R. 3843 (which reflected fee levels that were eventually enacted) would increase HSR filing fees by $1.4 billion over the 2023–2027 period. Cong. Budget Office, Cost Estimate, H.R. 3843, Merger Filing Fee Modernization Act of 2021 3 (Sept. 27, 2022), https://www.cbo.gov/publication/58527. CBO estimated that the aggregate cost of the private-sector mandate would be about $325 million in each of the first five years. Id.

[277] Firmex, M&A Fee Guide 22/23 (N. Am. ed., 2022–23).

[278] Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684 at 21. Professor Kothari's report is attached as an annex to this comment. See id. at 54–85 (hereinafter "Kothari Report").

$936 per hour, and a category of "other" costs that is nearly one-third of the total projected costs. The Commission believes that its estimates of incremental costs associated with the final rule are more consistent with the range of filings and filers based on its experience receiving thousands of filings every year and the merger investigations conducted by the Agencies. See section VIII. The Commission has no basis to inflate the overall costs associated with the final rule beyond what was estimated by those with experience filling out HSR Forms for a variety of filers and transactions. As with prior rulemakings, if the Commission determines that certain requirements in the final rule are not generating a benefit to the Agencies' preliminary antitrust assessment in light of the associated costs, the Commission can consider adjusting those requirements in future rulemakings.

The Commission acknowledges that the incremental costs associated with this rulemaking are more material than its prior rulemakings, which frequently reduced the burdens associated with submitting an HSR Form. In fact, the current Form is very similar to the original 1978 version in its scope and content. But the cumulative effect of the economy-wide changes described in section I. have seriously undermined the Agencies' ability to engage in extensive fact-gathering to compensate for deficiencies in the HSR Form. The effort required by the Agencies to conduct premerger review in today's economy threatens to render the process ineffective for its specific purpose—detecting and preventing illegal mergers before they cause harm that cannot be undone. The status quo does not allow the Agencies to quickly identify which transactions may violate the antitrust laws, causing them to spend too much time on ones that likely do not while at the same time lacking sufficient information to identify ones that do. With this rulemaking, the Commission is updating the Agencies' tools for detecting illegal mergers during premerger review to match the size and complexity of reportable transactions, restoring rigor and efficiency to the task of premerger review.

The Commission disagrees with other assertions made in the Kothari Report or finds them unpersuasive and not entitled to significant weight. The report focuses on the small number of transactions that receive a Second Request and ignores the benefits to filers from the Agencies reviewing and dispensing with non-problematic transactions with greater efficiency and assurance than before. The Kothari Report also ignores the benefits to the

public from the Agencies' ability to more effectively identify and investigate potentially problematic transactions based on the availability of better initial information about potential competitive harms. The Commission discusses these and other benefits of the final rule in section III.C.1.

**b. Other Costs Not Attributable to the Final Rule**

Commenters raised concerns that the proposed rule would lead to other costs for those seeking to engage in M&A activity. The Kothari Report predicted that the proposed rule would so increase the costs of M&A that it would reduce the number of mergers, including ones that would be beneficial for consumers, innovation, investors, and the economy. Other commenters similarly argued that the Commission's objective is to stop all mergers by making them too costly to pursue. The Commission disavows any intention to stop all mergers by imposing unreasonable costs on those that are subject to premerger review and disagrees that the final rule will have this effect. Moreover, the commenters provided only speculation that the proposed rule would deter or delay some deals merely by increasing the costs associated with making an HSR Filing as compared to other factors that more directly affect M&A activity, such as interest rates. In the absence of actual data from commenters, the Commission must make a predictive judgment based on the evidence available to it.[279] As noted in section III.C.1., the evidence available to the Commission indicates that the Agencies' antitrust enforcement saves consumers and other market participants billions of dollars a year, and in light of known information deficiencies outlined in section II.B., there are strong indications that closing known information gaps will allow the Agencies to better identify additional transactions that may also violate the antitrust laws if consummated. The final rule does not impose new incremental costs that could plausibly deter

beneficial or competitively benign acquisitions, particularly after the additional revisions narrowing the requirements in the final rule are taken into account.

Relatedly, other commenters raised arguments about additional macro impacts of expanding information requirements for HSR Filings, such as concerns about the impact on institutional investors, including retail investors, by indirectly impacting the performance of investment portfolios. Some said they were concerned generally about the chilling effect on M&A. Others raised concerns that changing the status quo would create market uncertainty, citing increased market, labor, and operational volatility. Several of these commenters raised specific concerns that acquisitions in their particular sector were typically not challenged or even reviewed closely by the Agencies. Concerns about disproportionate impact for certain sectors or types of filers are addressed in section III.D. below.

The Kothari Report states that delays caused by the additional time that will be required to prepare a HSR filing could kill deals and lead parties to abandon transactions. It also stated that delay breeds uncertainty in product, labor, and capital markets, enabling competitors to raid customers and staff, and that delay would lead to lost economic efficiencies that are realized through mergers. For these propositions, the Kothari Report cites an advisory committee report by the U.S. Department of Justice issued in 2000. While that committee report explains how delays can influence pending mergers, the cited portion is discussing international jurisdictions that do not impose strict timelines or which have prolonged agency investigations into mergers[280]—this rule does not contemplate either. In addition, as discussed above, the final rule will allow the Agencies to reduce the number of Second Requests or narrow their scope, significantly reducing delays in many instances.

Moreover, the Commission disagrees that any delays and incremental costs associated with an HSR Filing could have a significant impact on overall M&A activity. Deal volumes fluctuate, often substantially, from year to year, and these fluctuations are reflected in the number of HSR Filings received by the Agencies. But these fluctuations are attributable to many economic factors,

---

[279] See, e.g., Huawei Techs. U.S., Inc. v. FCC, 2 F.4th 421, 454 (5th Cir. 2021) ("Huawei does not object to specific cost calculations such as these but to the agency's failure to consider additional, difficult-to-measure costs about which the FCC lacked hard data, such as 'the broader economic costs of depriving Americans of access to Huawei's market-leading technology.' The agency's decision to base its analysis instead on the replacement cost estimates before it does not render its analysis unreasonable."); FCC v. Prometheus Radio Project, 592 U.S. 414, 427 (2021) ("The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies. . . . In the absence of additional data from commenters, the FCC made a reasonable predictive judgment based on the evidence it had.").

[280] Int'l Competition Pol'y Advisory Comm., Final Report to the Attorney General and Assistant Attorney General for Antitrust Ch. 3 (2000), https://www.justice.gov/atr/final-report.

including the cost of capital. Research relied on by one commenter provides evidence that a major driver of uncertainty in M&A activity generally is stock market volatility.[281] This is consistent with the Agencies' experience. Figure 1 reflects the volatility of HSR-reportable transactions, and the Commission believes that much of this volatility is attributable to changes in interest rates and other macro factors that drive M&A activity generally, unrelated to premerger review or the specific information collected in an HSR Filing.

The Kothari Report also asserted that M&A activity is beneficial to the economy, and that any potential delay or chilling of acquisitions due to the final rule would lead to significant loss of value creation. But the evidence cited to support these concerns is inapposite. For instance, a paper cited for support that acquired plants become more productive points to credit spreads and aggregate market valuation as being major drivers for merger activity.[282] Similarly, another source relied on a stylized, theoretical model of mergers that does not provide any empirical evidence about the benefits of M&A, applying the theoretical model to a situation where there is no M&A at all to calculate the benefits of M&A.[283] There is no reason to believe that the final rule will significantly chill M&A activity. Furthermore, in the model, the author finds that preventing a small fraction of deals over $1 billion has little effect on aggregate efficiency, and that due to the inefficiencies in the M&A market, a policy of blocking a fixed number of deals regardless of antitrust concerns can improve aggregate outcomes. Thus, the paper actually demonstrates that preventing some deals can improve economic performance. The paper does not provide a basis for the Commission to conclude that changes of the magnitude contained in the final rule threaten economic efficiencies gained through M&A activity generally.

Another paper cited in the Kothari Report, which purports to support the proposition that any discouragement of pending mergers results in significant

value loss, is not on point.[284] First, this final rule is not intended to and should not discourage mergers—the final rule merely requires companies who are already submitting HSR Filings to submit more information with their filings. In the paper's survey of past empirical assessments of mergers, it highlights evidence that mergers that create market power yield no better performance, and sometimes worse. That assessment is wholly consistent with the Commission's efforts in this final rule: to collect information that better allows Agency staff to identify potentially anticompetitive mergers. The Kothari Report mischaracterizes this study as supporting the value of all mergers. In fact, the author concludes that mergers are not universally accretive in value, stating: "[T]he buyer in M&A transactions must prepare to be disappointed. It is also true that most transactions are associated with results that are hardly consistent with optimistic expectations. Synergies, efficiencies, and value-creating growth seem hard to obtain. It is in this sense that deal doers' reach exceeds their grasp."[285] Last, it should be noted the study is dated 2002, and the latest mergers it analyzes are from 1999, whereas the Commission crafted this final rule to address changes it has observed in more recent transactions that reflect current dealmaking dynamics discussed in section II.B.

Indeed, one goal of this rulemaking is to ensure that any benefits from M&A are realized as quickly as possible and that the costs of anticompetitive mergers do not materialize. The Commission acknowledges that there are benefits generated from M&A activity generally, and that those benefits flow broadly throughout the economy. But the Agencies are not tasked with determining whether an acquisition is "beneficial" in any sense. The challenge given to the Agencies by Congress is to distinguish which acquisitions, among the many thousands they review each year, may violate U.S. antitrust law. For this task, they need certain facts that would reveal potential antitrust risks. For instance, event studies may indicate that M&A can result in significant value creation, but these outcomes may be the result of genuine synergies or they can also occur due to the anticompetitive creation of market power.[286] This

highlights the very purpose of mandatory premerger review: to subject a certain number of larger acquisitions to a quick and thorough antitrust review prior to consummation solely for the purpose of identifying the few that need in-depth investigations. Throughout the history of the HSR Act, the Agencies have investigated just a small fraction of deals through the issuance of Second Requests. The Commission believes that the final rule will render premerger review more effective and efficient in identifying those mergers that may lead to anticompetitive harm, and that the small incremental costs and delays associated with the final rule are necessary and appropriate and consistent with the scheme established by Congress.

Moreover, to the extent these concerns arise from a belief that disclosure of additional relevant information to the Agencies will mean that a reported transaction is more likely to be challenged or investigated, that outcome fulfills the purpose of premerger review. As discussed above, to the extent that the HSR Act itself requires reporting for a large number of transactions that may never violate the antitrust laws, that has always been a feature of HSR premerger notification. Congress recently reaffirmed that particular tradeoff by imposing new disclosure requirements for foreign subsidies on all filers while not adjusting existing filing obligations.

In light of these considerations, the Commission does not believe that the final rule will have an undue effect on dealmaking, including by discouraging transactions that have little or no antitrust risk. The expected costs of this final rule are very small relative to the overall value of reportable transactions, the level of M&A activity in the United States, and the size of the overall economy. The benefits of the final rule are expected to be proportional to reductions in the errors in detection of illegal mergers that this final rule addresses.

Each year, the Agencies review reported transactions with an aggregate dollar value of nearly $2 trillion, on average.[287] Yet this is just a fraction of the level of M&A activity in the United States: as reflected in Table 1, over 80 percent of mergers completed in the United States are not reported to the Agencies. The costs associated with the

---

[281] Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684 (Kothari Report ¶ 57 n.46, citing Vineet Bhagwat et al., "The Real Effects of Uncertainty on Merger Activity," 29 Rev. Fin. Studies 3000–34 (2016)).

[282] Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684 (Kothari Report at 24 n.47, citing Vojislav Maksimovic et al., "Private and Public Merger Waves," 68 J. Fin. 2177–2217 (2013)).

[283] Id. (Kothari Report at 25 n.49, citing Joel M. David, "The Aggregate Implications of Mergers and Acquisition," 88 Rev. Econ. Studies 1796–18 (2021)).

[284] Id. (Kothari Report at 26 n.52, citing Robert F. Bruner, "Does M&A Pay? A Survey of Evidence for the Decision-Maker," J. Applied Fin. 48–68 (Spring/Summer 2002)).

[285] See Bruner, supra note 284, at 65.

[286] W. Kip Viscusi et al., Economics of Regulation and Antitrust 217–18 (5th ed. 2018) (horizontal mergers raise the possibility of creating market

power and the possibility of achieving socially beneficial cost savings).

[287] See HSR Annual Reports for FY 2014 through 2023, available at Fed. Trade Comm'n, Annual Reports to Congress Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, supra note 56.

final rule are very small in comparison to the U.S. economy, which was valued at nearly $28 trillion in 4Q 2023.[288] Any improvement in the Agencies' ability to detect illegal mergers prior to consummation will lead to benefits that will help reduce antitrust harm from illegal mergers and improve the efficiency and effectiveness of premerger review. The greater the improvement in detection and in avoiding the costs and burdens of acquiring information from sources other than the parties, the greater the benefits. The Commission expects that the costs from the final rule will be so small in relation to the total value of reported transactions, to the level of U.S. M&A activity in general, or to the U.S. economy that there will be negligible indirect effects, if any, on dealmaking, innovation, investments, and growth.

Nonetheless, the Commission has narrowed its proposals so that the final rule limits the incremental costs for filers as much as practicable while still generating additional information that is critical for the initial antitrust assessment in light of changes in market realities and information gaps outlined in section II.B. The need to modernize premerger review to adjust to market changes is compelling, and the Commission is acting within its statutory mandate to determine what information is required to conduct premerger screening that is appropriate in the modern economy.

The Kothari Report also commented that there is additional uncertainty for potential filers arising from the Agencies turning away from the decades of practice under the current rules. Any change brings with it some level of uncertainty and will require adjustment by all those involved. As with other adjustments to the HSR rules in the past, the Commission's PNO staff will be providing guidance and assistance to filers who have questions about the final rule. But the Commission believes that the uncertainty related to the new rule is a short-term issue that will be resolved after the final rule goes into effect. The commenters are overstating the effect of uncertainty on the economy. Not only are these concerns temporary; they ignore the greater benefits of a more efficient premerger review process that may result in a *faster* resolution of some deals, including by reducing the number of Second Requests and narrowing others.

The goal of this rulemaking is to provide sufficient information so that the Agencies can quickly and confidently distinguish those transactions that present little or no risk that they may violate the antitrust laws, and identify those transactions that require a more searching investigation. As discussed above, the Commission believes that the final rule will reduce the delays that are attributable to information deficiencies.

Moreover, the Commission disagrees that the final rule will lead to greater uncertainty about the outcome of the Agencies' premerger review. This rulemaking does not (and cannot) affect the ultimate determination of whether a transaction violates the antitrust laws. A Federal court will make that determination for any transaction that the Agencies or others seek to block prior to consummation under prevailing legal standards.[289] Any "uncertainty" about the eventual outcome of premerger review is directly related to whether the merger violates the antitrust laws and whether the Agencies are able to detect that risk when conducting a premerger assessment. Premerger review is simply the tool Congress gave to the Agencies to detect those mergers that may violate the law so that the Agencies can take steps to prevent their consummation. On the margin, the Commission believes that the final rule will reduce uncertainty about the outcome by providing more transparency to the parties (and the public) about the information the Agencies rely on to make their assessment that a transaction may violate the antitrust laws. To the extent that the commenters are concerned that disclosing more information reveals a risk to competition that the current rules do not, that additional "uncertainty" is a benefit of the final rule as a result of improved detection and possibly greater deterrence achieved through more effective premerger review.

It is not feasible to design premerger review requirements to only apply to those mergers that will be found to violate the antitrust laws, because there are too many variables that weigh in that outcome. Establishing that a merger may substantially lessen competition or tend to create a monopoly is highly fact-dependent exercise. The final rule represents a reasonable reflection of the Congressional policy to screen those

mergers in advance to discover the few that may cause lasting harm throughout the economy and that should be blocked prior to consummation. The Commission has determined that the current HSR reporting requirements are not sufficient for the critical task of premerger review in light of changes in the economy and in M&A activity.[290]

Some commenters argued that the proposed rule's expansion of reporting requirements would negatively impact investments in biotech innovation, or deny startups or other innovative companies an exit strategy. Others asserted that the acquisition of a small company by a larger one can create efficiencies by bringing together two entities that specialize in activities in which they have a comparative advantage or provide assistance necessary to bring discoveries to market. One study cited by a commenter estimates that it costs approximately $2.6 billion to develop and bring a new drug to market.[291] Another commenter noted that startups operate on tight budgets and that exits, most often facilitated by an acquisition, provide liquidity, enable capital flows through the startup ecosystem, and give startups incentives to innovate. The Commission recognizes these possible benefits and does not seek to deny them to small companies or others, nor does it believe that the HSR reporting requirements in this final rule will have any of these negative effects on the opportunities for small or startup companies to exit via lawful acquisitions. As noted in section II.B.4., many acquisitions of startups and small innovator firms are not reportable. For those acquisitions that Congress has determined are large enough to be reportable, the long-term benefits, both monetary and non-monetary, well outweigh the incremental costs associated with the final rule. Not surprisingly, acquisitions of this type (and others) declined in 2023 due to higher interest rates. Nonetheless, the Commission does not believe that small companies are so short-sighted that they will forgo benefits of a negotiated exit acquisition where the expected benefits dwarf HSR filing costs.

Moreover, the Commission cannot ignore that certain acquisitions may also reduce innovation and harm

---

[288] U.S. Bureau of Econ. Analysis, Gross Domestic Product (updated Aug. 29, 2024) (Q2 2024 $28,652,337,000,000) (retrieved from FRED, Fed. Reserve Bank of St. Louis), *https:// fred.stlouisfed.org/series/GDP.*

[289] In the Agencies' experience, when faced with an imminent or pending legal challenge to the legality of the transaction, many parties chose to abandon their merger plans rather than incur the additional legal costs associated with defending an injunction action in Federal court. This decision is solely in the discretion of the parties and reflects their assessment of litigation risks.

[290] As discussed in section III.E., other countries have adopted other procedures to review proposed and consummated mergers.

[291] Comment of Biotech. Innovation Org., Doc. No. FTC–2023–0040–0706 at 7 n.16 (citing Joanna Shepherd, "Consolidation and Innovation in the Pharmaceutical Industry: The Role of Mergers and Acquisitions in the Current Innovation Ecosystem," 21 J. Health Care L. & Pol'y 1, 16 (2018)).

competition in violation of the antitrust laws, particularly when dominant firms use acquisitions to acquire nascent threats. One commenter acknowledged that an environment where a few large companies dominate is undesirable, and another noted that smaller companies have flexibility, the ability to pivot in response to new evidence, and a willingness to accept risk that is rare in larger firms. While acquisitions of small firms by large firms can be beneficial, when they substantially lessen competition or tend to create a monopoly, they can be detrimental to innovation and growth. For these reasons, and as discussed in section II.A., Congress tasked the Agencies with carrying out premerger review. The Agencies would be remiss if they did not fulfill that task by ensuring that the HSR reporting requirements are attuned to the risk that large firms are buying up smaller firms in order to eliminate nascent and potential threats. For any negotiated exit acquisition that must be reported under the HSR Act, the incremental costs imposed by the final rule are justified by the benefit to the Agencies and the public of assessing the risk that the acquisition may violate the antitrust laws.

To be clear, not all exit partners are denied to small firms due to antitrust scrutiny; it is only those whose acquisition would violate the antitrust laws. For instance, when a large incumbent seeks to acquire a smaller company that constitutes a nascent threat or an actual or potential competitor, the Agencies may challenge that merger. But in the Agencies' experience, a startup firm deemed valuable by a dominant incumbent also enjoys other exit options. For example, the Commission recently challenged the proposed acquisition of a license to an innovative, early-phase candidate drug treatment for Pompe disease by the company with the only FDA-approved treatments for the disease.[292] The parties abandoned the transaction after the Commission authorized a lawsuit to block the deal; within five months the innovator company had found an alternative partner, negotiated a new agreement, completed antitrust review, and closed the deal. Moreover, the terms of the new deal appear largely equivalent to what the innovator had negotiated with the incumbent.[293] In

other words, if the acquisition of a startup by a dominant incumbent carries a risk that the Agencies may determine that the transaction is one that may violate the antitrust laws, it is likely that there are other buyers that do not create those risks and any of those buyers present a viable exit strategy via acquisition.

The Commission disagrees with the suggestion that incremental changes in the information requirements for HSR Filings could have a chilling effect in sectors that are especially acquisitive. One commenter stated that in 2022 alone, 16,464 U.S.-based VC-backed companies received $240.9 billion in funding, yet when these transactions were reportable they were rarely investigated. Unless the new information requirements in the final rule reveal that a reported transaction may violate the antitrust laws, the Commission expects M&A activity in these sectors to continue to be subject to other economic forces that will determine their viability or profitability.[294] Similarly, claims that an industry or sector is ''unconcentrated'' are unavailing. The Agencies must conduct a fact-specific, case-by-case assessment of market dynamics to determine whether any particular relevant market affected by the merger is concentrated, and that assessment is typically left to an in-depth investigation after the issuance of Second Requests. Although the Agencies routinely decline to investigate transactions where there are many remaining competitors post-merger, this is a decision made after assessing relevant facts about the transaction including those contained in the HSR Filing, and is not based on an

advance determination that certain sectors are ''unconcentrated.''

The Commission has taken into account the additional costs imposed on small and innovative companies, as well as those that operate in sectors where the Agencies have historically not engaged in merger enforcement. As discussed in section II.B.5., the emergence of strategic buyers engaged in serial acquisition strategies raises the possibility that some sectors that were not concentrated in the past are becoming more concentrated, especially through transactions that are not subject to premerger review. Thus, the Agencies should not rely on assumptions about historical levels of concentration when conducting premerger review of a reportable transaction in those sectors. By requiring information about prior acquisitions of both the buyer and target, the Agencies are given better information about the current competitive landscape so that they can make more accurate assessments about the potential effect of the filed-for transaction.

To the extent possible, the Commission has imposed as few additional requirements as is practicable in light of the benefits derived from more effective premerger review. If, based on experience of collecting new information, the Commission finds that some requirements generate less-than-expected benefits to the Agencies, it can eliminate those requirements in future rulemakings. In many prior rulemakings, the Commission adjusted its rules to reduce the burden on filers after experience revealed that the information did not provide the hoped-for benefit to the Agencies sufficient to justify the costs to filers of providing the information.[295]

### 3. Adjustments Made to the Final Rule To Align Costs With Antitrust Risk

Since establishing a premerger notification program pursuant to the HSR Act, the Agencies have relied on information contained in HSR Filings to conduct their initial premerger review. However, in light of the information gaps identified in section II.B., the Commission has determined that the current requirements are not sufficient for that task and determined to reset the baseline requirements for all filers to fill these information gaps. As a result, the final rule eliminates some requirements that are contained in the current Form, and requires each filers to submit some

---

[292] *In re Sanofi Corp.,* No. 9422 (F.T.C. Dec. 11, 2023) (complaint alleging Sanofi's proposed acquisition of an exclusive license to Maze Therapeutics' pipeline Pompe therapy would have eliminated nascent threat to Sanofi's monopoly) (transaction abandoned).

[293] *Compare* Press Release, Maze Therapeutics, ''Maze Therapeutics Announces Exclusive

Worldwide License Agreement with Sanofi for MZE001, an Oral Substrate Reduction Therapy for the Treatment of Pompe Disease'' 1–2 (May 1, 2023), *https://mazetx.com/wp-content/uploads/2023/04/Maze-Therapeutics-Press-release-MZE001-license-Final-.pdf* (proposed license included $150 million upfront cash and equity investment, the possibility of another $600 million in development, regulatory, and commercial milestone payments, plus further royalties), *with* Press Release, Shionogi & Co., ''Shionogi & Co., Ltd. and Maze Therapeutics, Inc. Announce Exclusive Worldwide License Agreement for MZE001, a Novel Therapeutic Candidate for the Treatment of Pompe Disease'' 1 (May 10, 2024), *https://mazetx.com/wp-content/uploads/2024/05/CONFIDENTIAL_Project-Magenta-Press-Release_Final-FINAL.pdf* ($150 million upfront fee, plus development, regulatory, and commercial milestones, plus further royalties).

[294] *See, e.g.,* Press Release, Nat'l Venture Cap. Ass'n, ''NVCA 2024 Yearbook: Charting the New Path Forward for Venture Capital'' (Apr. 9, 2024) (noting that the U.S. venture capital investment ecosystem is still the envy of the world.), *https://nvca.org/press_releases/nvca-2024-yearbook-charting-the-new-path-forward-for-venture-capital/*.

[295] *See, e.g.,* 76 FR 42741 (July 19, 2011) (elimination of requirement to provide Base Year in Item 5); 81 FR 60257 (Sept. 1, 2016) (elimination of requirement to explain valuation of the transaction).

information that is not currently required or certify that the request does not apply to its operations.

After careful consideration of the comments that identified aspects of the proposed rule that would be a source of significant costs for filers if adopted, the Commission made significant modifications to the final rule as compared to the proposed rule. In several instances, the Commission determined that the costs of a particular proposed requirement outweighed the benefits and chose not to adopt those provisions as part of the final rule. For other proposals and where possible, the Commission has tailored each information request contained in the final rule to reduce the cost of compliance for filers yet generate the information that is necessary and appropriate for the Agencies to conduct a premerger assessment of the transaction. See sections IV to VI. Overall, the final rule balances the cost of collecting additional information in the HSR Filing in light of the benefits of obtaining additional information that is relevant to the Agencies' premerger antitrust risk assessment, and aligns those costs in proportion to the antitrust risk associated with the transaction under review. As a result, the final rule is a reasonable exercise of the Commission's authority to require information that is necessary and appropriate to determine whether an acquisition may, if consummated, violate the antitrust laws. The additional information required by the final rule will close information gaps described in section II.B. and address information asymmetries by shifting the burden of collecting necessary information about the transaction and the business of the filers from the Agencies and third parties to filers.

To make these modifications to align costs and benefits, the Commission relied on the following tools and approaches it has used when exercising its HSR rulemaking authority over the last forty-six years and consistent with the statutory scheme. In addition to the features of the HSR Act described in section III.A. above that treat different filers differently (*e.g.*, requiring notification from acquirers but not the acquired person for cash tender offers in order to start the waiting period and exempting certain types of acquisitions entirely), the Commission has administered HSR reporting requirements over the years in a flexible way to minimize the burden on each filer and each type of transaction as much as practicable. Thus, contrary to the assertions of several commenters, the reporting requirements of the HSR

Act have never been a "one-size-fits-all" reporting scheme because different filers face different burdens for complying with applicable reporting requirements. Rather, the HSR Form and Instructions have relied and will continue to rely on an IF/THEN format that excuses certain filers from information requirements based on answers provided to other requirements. For instance, several current information requirements need only be answered if the filer reports that it generates revenues in the same NAICS [296] code as the other party to the transaction. The final rule expands the existing IF/THEN format as the primary means of mitigating the costs of reporting certain new information in a way that, as much as practicable, aligns the information with the antitrust risk associated with the transaction, resulting in higher costs for those transactions most likely to require close scrutiny by the Agencies to determine if they may violate the antitrust laws.

As summarized above in section I. and explained in further detail in section VI., the Commission has also eliminated several information and document requirements and reduced the scope of many others as compared to the proposed rule to align the cost of reporting to the antitrust risk associated with each transaction. First, the Commission has eliminated in toto the proposals that would have imposed significant costs as compared to the benefits, such as those requiring filers to provide employee information, geolocation information, the identity of other interest holders or board observers, or draft versions of submitted documents. Second, the Commission created a new category of filings, select 801.30 transactions, for which the costs of complying with the final rule will be minimal as compared to current requirements. Next, the final rule imposes relatively fewer new reporting requirements on acquired persons, reducing their costs as compared to the acquiring person, which is the party pursuing the transaction that requires HSR reporting, and will operate the acquired interests post-consummation. The Commission has also reduced the burden on filers by limiting the lookback periods for several categories of information and created de minimis exclusions where appropriate. Finally, the Commission will continue to allow

[296] The North American Industry Classification System is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy. *See* U.S. Census Bureau, North American Industry Classification System (rev. Sept. 10, 2024), *https://www.census.gov/naics/*.

filers to rely on good faith estimates or answer in the negative to confirm that certain information does not exist. For instance, for a transaction in which there are no existing overlaps or supply relationships responsive to the final rule, filers can indicate that there are no such overlaps or relationships, although there may be costs for the filer associated with verifying that response.

The Commission also relies on definitions and clarifications to reduce or eliminate filing obligations or to reduce uncertainty regarding compliance. For instance, the Act applies to a wide variety of acquisitions; as a result, the Commission has provided definitions and guidance over the years to maximize compliance. Sometimes this results in certain transactions not being reported or reducing reporting requirements for certain types of transactions. The final rule contains several new definitions that are intended to reduce uncertainty and costs, and improve compliance.

Select 801.30 Transactions

As part of the Commission's effort to reduce the cost of the final rule, the Commission has created a new category of transactions, defined as "select 801.30 transactions," that will have minimal reporting requirements, including a few of the new information requirements required by the final rule. Where the Commission has not excused requirements, it believes that the burden of compliance will be low because parties to select 801.30 transactions generally have less complex internal structures, do not hold significant stakes in similar companies, and have not generated the types of documentation the Form and Instructions generally require. As a result, the Commission expects that responses to the remaining requirements for these types of transactions will generally be short, and may just confirm that the parties do not have responsive material. However, for those transactions in which select 801.30 filers incur additional costs from complying with the final rule, there will be a benefit to the Agencies in learning about potential competitive issues that are not revealed by the current information requirements, especially the new information related to other entities between the UPE and acquiring or acquired person.

For select 801.30 transactions, filers are excused from the following information requirements:
i. Transaction Rationale
ii. Transaction Diagram
iii. Plans and Reports
iv. Transaction Agreements
v. Overlap Description

vi. Supply Relationships Description
vii. Defense and Intelligence Contracts

Additionally, even where select 801.30 transactions are not expressly excused from responding, there are many items for which the Commission believes the response will be "none" because of the nature of the transaction or of the parties.

Less Information From the Acquired Person

The final rule also seeks to reduce costs by tailoring information requests to each party's role in the transaction. Because the buyer (the acquiring person) will have a larger stake in or control of the target (the acquired entity or assets), and often will be operating the assets or business acquired post-consummation, more information is needed from acquiring persons than acquired persons. The acquiring person is more likely to have certain types of information relevant to the Agencies' enforcement analysis, such as the transaction's structure, information about other minority holders who might have managerial control or influence, and overlapping officers and directors who could affect competitive decision-making after consummation. This approach reflects the more limited time the seller has had to consider the implications of the planned transaction, and to a lesser extent, the seller's less-honed strategic assessments of competitive opportunities. In addition, for certain information, such as a transaction diagram, the Agencies only need one response, and it is appropriate to place the cost of providing this information on the acquiring person and not require the acquired person to provide duplicative information.

Consistent with these considerations, the final rule excuses the acquired person from certain additional information requirements that apply to acquiring persons. In the final rule, acquired persons are excused from the following requirements:

i. Minority Shareholders, other than those that will roll over to the acquiring person
ii. Ownership Structure Description and Chart
iii. Reporting of Officers and Directors
iv. Identification of International Antitrust Notification
v. Transaction Diagram
vi. Identification of Other Agreements Between the Parties

Balanced against these reductions in burden, the final rule does require the acquired person to report prior acquisitions for the first time, for the

reasons explained in sections II.B.5. and VI.J.4.

IF/THEN Format

Certain information requirements of the final rule are only applicable to filers who provide a positive response to other information requirements. That is, the final rule reflects an IF/THEN format by requiring some information only if filers have provided other information first. For example, many information requirements do not require a response if the filer indicates that there is no reported overlap or supply relationship between the merging parties. This is a main feature of the current HSR Form, and the Commission expands that approach in the final rule to closely align the information requirements with the risk of a law violation the transaction presents, resulting in an IF/THEN format that adjusts the cost of complying based on the existing competitive relationship of the parties to the transaction.

Importantly, information that is critical to identifying competitive overlaps or areas of premerger competition justifies a higher cost of collection and reporting.[297] Examples include reporting revenues for identified overlaps by geographic location so that the Agencies have some basis to screen overlapping products for local market impacts.[298] Even if there is some additional cost associated with collecting this information, a notification form that does not contain such information would be unreliable for detecting the risk that the transaction would cause harm to competition at the State or local level. Limiting the requirement to provide certain

information only if both parties generate revenues in the same or similar business lines (as reflected in overlapping NAICS code reporting or the descriptive responses) or only if the parties operate in the same areas of the country is a powerful limitation aimed at generating information that bears directly on the question whether the transaction involves direct competitors. For any transaction that does not have these overlaps, there is no burden associated with answering questions that depend on the reporting of such overlaps other than certifying that such overlaps do not exist. In the final rule, the following information requirements are dependent on the identification of an existing overlap or a supply relationship:

i. Overlap Description
ii. Supply Relationships Description
iii. Officers and Directors (acquiring person only)
iv. Plans and Reports
v. Prior Acquisitions
vi. State and Street-Level Reporting of Geographic Market Information
vii. Author information for submitted documents
viii. Defense and Intelligence Contracts

Limited Lookback Periods

The Commission also relies on limited lookback periods to collect the most recent and reliable information and data related to the risk of a law violation. For example, filers are only required to submit the most recent annual reports and annual audit reports. This type of limitation is intended to focus on more recent economic activity and reduce the cost associated with collecting potentially less probative or out-of-date historical data. As discussed below in section VI., the Commission has reduced the lookback periods for some information requirements as compared to the proposed rule to reduce compliance costs and focus the information requirements on the most recent and probative data needed for premerger screening. In other places, the Commission has identified a fixed reporting period to limit the information filers must gather to prepare the HSR Filing and provide certainty for filers about what is required. For example, as compared to the proposed rule, the final rule contains shortened lookback periods for the following information:

i. Overlap Description
ii. Supply Relationships Description
iii. Officers and Directors
iv. Transaction Rationale
v. Minority Shareholders
vi. Prior Acquisitions

---

[297] In the initial rulemaking implementing the HSR premerger program, the Commission proposed to require the reporting of revenues by Standard Industry Classifications (SIC) codes. Many commenters complained about the costs associated with providing this information. But the Agencies needed to establish some system for reporting overlaps. This provides an early example of the Commission determining that, where the information is essential to enforcement of the antitrust laws, the costs associated with collecting and reporting that information is justified by the benefits in light of other available options.

[298] The Agencies rely on analytical tools to identify an area of effective competition, often by defining a relevant antitrust market. A relevant antitrust market comprises both product (or service) and geographic elements. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines 4.3 (2023) (describing the information and analysis used by the Agencies to define markets for the purpose of antitrust analysis). For screening purposes, the Agencies may conclude that the parties to the transaction do not serve the same set(s) of local customers if there is reliable information in the HSR Filing that indicates that they generate revenues in different locales even if they supply the same product or service.

**De Minimis Exclusions**

The Commission also relies on de minimis exclusions to excuse the reporting of otherwise relevant information that might be costly to collect. De minimis exclusions can sometimes require extra effort by filers, because filers must evaluate whether the information is above or below the de minimis threshold. In the Commission's experience, it can sometimes take less time for filers to collect and report all responsive information than to report less information after conducting the assessment required to eliminate de minimis amounts. In deciding whether to add de minimis exclusions, the Commission carefully weighed the additional costs for filers to determine what information falls below the de minimis thresholds and can therefore be excluded, as compared to the costs of collecting all responsive information. The final rule contains new de minimis exclusions for certain information in the following requirements:

i. Supply Relationships Description
ii. Prior Acquisitions
iii. Defense and Intelligence Contracts

**Voluntary Information**

Finally, one new information request is not strictly required by the final rule, but filers may provide it on a voluntary basis. As part of the HSR Form, filers may agree to waive the confidentiality protections of the HSR Act to permit the Agencies to share HSR materials with other enforcers in order to facilitate cooperation during any investigation of the transaction. Such a waiver would be beneficial for the Agencies, and the filer may want to provide it as a way to limit the need to produce multiple or duplicative data sets and documents to other enforcers that are investigating the transaction, thereby reducing its overall regulatory compliance costs. Filers may view this as a benefit and therefore may grant a waiver even though their HSR Filing would be compliant with the final rule without it.

**Non-Compliance Statement**

In addition to these limits, the Act allows for incomplete answers with a statement of the reasons for non-compliance, and the Commission has the discretion to permit filers to rely on good faith estimates or no answer at all. If the filer is unable to answer any question fully, it must provide the information that is available and provide a statement of reasons for non-compliance as required by § 803.3, which is intended to reduce disagreements between filers and PNO staff.[299] Where exact answers cannot be given, filers are allowed to enter best estimates, while indicating the source or basis of the estimate, and marking the information with the notation "est" to any item where data are estimated. Finally, filers already routinely indicate under the current rules that certain required information is not applicable given the type of transaction being reported, and filers will continue to be able to do so under the final rule.

---

[299] The submission of the statement of reasons for noncompliance is not intended to be a substitute for compliance with the notification obligation but it serves two salutary purposes: (1) reducing disagreement between the Agencies and the filer, and (2) providing a basis for any civil penalty proceeding that may be brought under 15 U.S.C. 18a(g)(1). *See* 122 Cong. Rec. 29342 (1976); *see also* 43 FR, 33450, 33508–09 (July 31, 1978).

**Summary of Requirements Based on Transaction Type**

In the final rule, the Commission has employed all of these techniques to align the cost of complying with the final rule in light of the benefit to the Agencies, filers, and the public of the Agencies having the information on the first day of the statutory review period to conduct their preliminary antitrust assessment. The chart below summarizes the different information requirements of the final rule for the acquiring person and the acquired person for three distinct types of transactions: (1) select 801.30 transactions, (2) those transactions that will have no NAICS or described overlaps or supply relationships; and (3) transactions that report a NAICS or a described overlap, or a supply relationship, which includes transactions with significant pre-merger competitive interaction between the filers (for example a company acquiring one of its principal competitors or suppliers).[300] The chart indicates which type of filer will not provide this information because it is not required by the final rule. As depicted in this chart, the final rule creates different information requirements for different types of filers and different types of transactions, resulting in a range of costs associated with filing that are directly proportional to the complexity of the deal, corporate structure, and most importantly the risk of law violation.

---

[300] These three scenarios were used to calculate costs for the Paperwork Reduction Analysis, discussed below in section VIII.

## Figure 3: Applicability of Significant Updated and New Information Requirements By Filer and Transaction Type

| | Select 801.30 | | No Overlap / No Supply Relationship Transaction | | Overlap / Supply Relationship Transaction | |
|---|---|---|---|---|---|---|
| | **A-Side** | **B-Side** | **A-Side** | **B-Side** | **A-Side** | **B-Side** |
| Translations | | | | | | |
| Changes to Identification of Additional Minority Interest Holders | | | | | | |
| Organization of Controlled Entities | ■ | | | | ■ | |
| Description of Ownership Structure | ■ | | | | ■ | |
| Organizational Chart (if exists) | ■ | | | | ■ | |
| Identification of Certain Officers and Directors | | | | | | |
| Description of Business of the Acquiring Person | | | | | | |
| Transactions Subject to International Antitrust Notification | | | | | | |
| Transaction Rationale | ■ | | | | ■ | |
| Transaction Diagram (if one exists) | ■ | | | | ■ | |
| Competition Documents from Supervisory Deal Team Lead | ■ | | | | ■ | |
| Plans and Reports | ■ | | | | ■ | |
| Transaction Agreements | ■ | | | | ■ | |
| Other Agreements Between the Parties | ■ | | | | ■ | |
| Overlap Description | | | | | ■ | |
| Supply Relationships Description | | | | | ■ | |
| Geographic Market Information (new organization, street-level reporting, and reporting of franchisees) | | | | | | |
| Limiting Minority-Held Entity Identification to Overlaps | | | | | | |
| Prior Acquisitions | | | | | | |
| Subsidies from Foreign Entities or Governments of Concern | | | | | | |
| Defense or Intelligence Contracts | ■ | | ■ | | ■ | |

### D. Disproportionate Impact on Certain Sectors

Here the Commission addresses arguments that the final rule would have a disproportionate impact on certain sectors as part of its consideration of how the benefits and costs associated with the final rule are distributed among various groups.[301]

#### Small Businesses

Several commenters are concerned about the additional costs associated with the final rule for small businesses who are parties to a reportable transaction, stating that the proposed rule would disproportionally affect small businesses because they would be less equipped than larger businesses to cover the additional costs. Commenters said that these additional costs would not only deprive small businesses of funds that are needed for operations or innovation, they might also slow or deter dealmaking involving small businesses altogether. On the other hand, an individual commenter explained that the proposed rule would help small businesses who have been affected by mergers.

The Commission addresses concerns about undue costs throughout this final rule, making many adjustments to limit the costs of complying for those filers who do not have complex corporate structures or extensive business lines, including small businesses. In section IX., the Commission certifies that the final rule will not have a significant economic impact on a substantial number of small entities as that term is defined by the Small Business Administration (''SBA''). HSR reporting requirements apply to very few small businesses. Congress adjusted the statute in 2000 to require annual indexing of reporting thresholds so as to minimize the effect of inflation that would otherwise require more reporting for small businesses and small transactions, and nothing in the final rule changes which acquisitions are subject to premerger review. See section III.A.1.

In fact, the Commission believes that many small entities will benefit from the final rule. As noted by one commenter, the goal of antitrust enforcement is to strike the right balance: too little enforcement could allow some companies to gain an unfair advantage, while too much enforcement risks driving up compliance costs and undermining legitimate efforts to compete. The Supreme Court has explained that Congress designed section 7 of the Clayton Act to ''prevent economic concentration in the American economy by keeping a large number of small competitors in business,''[302] and to retain '' 'local control' over industry and the protection of small businesses.''[303] As a result, a merger of two small companies that allows the combined entity to compete more effectively with larger rivals may be unlikely to violate the antitrust laws. In contrast, the legislative history of the Clayton Act reveals Congress was very much concerned with, and sought to prevent, acquisitions involving large companies buying smaller or up-and-coming rivals that would otherwise cease to be independent businesses.[304] By making possible more effective and efficient premerger review of HSR-reportable transactions, the final rule will facilitate effective enforcement of the antitrust laws, which in turn will preserve opportunities for small businesses to thrive in markets that are not dominated by much larger competitors.

In passing the HSR Act, Congress made plain that it was not interested in burdening mergers between two small companies with premerger review, since small businesses generally do not present the same risks of anticompetitive effects as do larger businesses. To that end, the HSR Act specifically exempts certain smaller companies from its reach. But it is not possible to say that all transactions involving small businesses carry little or no antitrust risk, whether they are

---

[301] See generally Boardman et al, supra note 256, at 506; Executive Order 12866 directs agencies when designing regulation to ''consider incentives for innovation, consistency, predictability, the costs of enforcement and compliance (to the government, regulated entities, and the public), flexibility, distributive impacts, and equity.'' E.O. 12866 Sec. 1(b)(5) (1993).

[302] United States v. Von's Grocery Co., 384 U.S. 270, 275–76 (1966) (also noting that undue

concentration drives small businesses out of the market).

[303] Brown Shoe Co. v. United States, 370 U.S. 294, 316 (1962).

[304] United States v. Aluminum Co. of America, 377 U.S. 271, 281 (1964).

reported or not. When they are required to be reported, the Agencies are obligated to conduct a premerger assessment. Therefore, it is appropriate for the Agencies to receive information from even small businesses that are a party to a reportable transaction to determine whether those transactions may violate the antitrust laws.

Based on the Commission's experience, deals of any size can present significant antitrust risk. The American Antitrust Institute analyzed historical data about HSR filings from 1985 to 2020 and prepared a chart that reflects the percentage of Second Request investigations to transactions by deal value.[305] This data shows that while transactions valued at under $100 million rarely receive Second Requests, a not insignificant number of transactions in the $100 to $150 million range do. This confirms the Agencies' experience that although many deals that are subject to an in-depth investigation involve large companies, especially on the buyer side, it is not possible to ignore that some transactions that involve small businesses also violate the antitrust laws.[306] And of course, the Agencies are also attentive to small-value acquisitions that cause harm even if they were not subject to premerger review and seek to unwind them as resources and precedents allow.[307]

As modified, however, the final rule imposes lower costs on transactions involving independent small businesses, as they typically involve fewer business lines and less complex corporate structures. Typically, the

larger the company, the more extensive and complex its business lines. Many of the changes in the final rule are designed to allow the Agencies to quickly understand complicated entities and the businesses that they have connections to. These changes generally will not impact small business. Further, where possible, the final rule imposes less burden on sellers (the acquired person), which tend to be smaller in size than buyers.[308] In effect, the final rule imposes costs on filers that are commensurate with the antitrust risk presented by the transaction: those with low risks (*e.g.,* simple corporate structures, few lines of business or no preexisting commercial relationship with the other party) have the lowest costs. Wherever practicable, the Commission took into account the burden across smaller businesses who may engage in competitively benign transactions and has adjusted the final rule in several significant ways to mitigate this burden. For example, the Commission has excluded select 801.30 transactions from certain requirements, eliminated other proposed requirements, and modified other proposed requirements as described throughout this final rule. The Commission believes that this approach, which is focused on antitrust risk and not necessarily business size, nonetheless minimizes the costs for small businesses involved in transactions subject to mandatory premerger review consistent with the statutory scheme.

Startups

A number of commenters expressed the view that the requirements of the proposed rule would deter innovation by denying startup firms an exit path; they observed that many startups plan for eventual acquisition, and this strategy drives investment that allows the firm to grow. Commenters stated that any change to the status quo will upset this balance. Others observed that acquisitions by large, established firms play a crucial role as an exit strategy for startups securing venture capital, which is an important source of funding in many sectors, including tech. Some of the same commenters, however, acknowledged the valuable role startups play by challenging established incumbents. Various commenters made nonspecific objections to increased burdens imposed upon startups by the proposals in the proposed rule.

Startup companies are not unique to particular industries but represent an important business model throughout the U.S. economy. For any transaction that does not present facts indicating it may violate the antitrust laws—including those involving startups—the minimal additional burden of disclosing more information is justified by the Agencies' need to conduct a thorough review in light of the information gaps discussed in section II.B. Where those facts are absent, there should be no additional delay or additional risk of detection for those transactions. Given the small incremental costs associated with the final rule relative to other M&A costs and the potential magnitude of returns from an exit sale of a successful startup, HSR compliance costs would not plausibly factor into the *ex ante* investment decision. To the extent that the final rule requires additional disclosures regarding the business lines of startups, that burden is not different from those imposed on established businesses in the same sector. Moreover, the Commission has no basis to excuse startup companies from complying with the final rule; it is not the case that they always or mostly present no antitrust risk. See sections II.B.4. and III.C.2.

Private Equity and Other Types of Investments

The Commission received several comments from groups representing investors raising concerns about the burden of gathering the information for the proposed rule as well as the burden of having to disclose the new information. One commenter asserted that certain proposed requirements would be particularly onerous for transactions involving private equity and venture capital, such as the expanded lookback period, information regarding limited partnerships, more information about prior acquisitions, the identities of past and present members of boards of directors, and disclosure of the buyer's prior acquisitions. Another commenter said that the burden of the information requirements would affect the efficiency of transactions and introduce more uncertainty and risk into the deal process, which would adversely impact returns for investors. Another noted that the burden of the proposed information requirements would, among other effects, make capital markets less efficient, resulting in a significant impact on its members and the thousands of pensioned workers, retirees, universities, and other investors who rely upon them. The Commission discusses these concerns elsewhere and has concluded that the incremental costs associated with the

---

[305] *See* Diana L. Moss, Am. Antitrust Inst., "What Does the Billion-Dollar Deal Mean for Stronger Merger Enforcement?" 3 Fig. 2 (Sept. 20, 2022), *https://www.antitrustinstitute.org/wp-content/uploads/2022/09/AAI_Billion-Dollar-Mergers_9.20.22.pdf.*

[306] *See, e.g., United States* v. *Neenah Enterprises, Inc.,* No. 1:21–cv–02701 (D.D.C. Oct. 14, 2021) (complaint) ($110 million asset purchase); *In re Global Partners LP,* No. C–4755 (F.T.C. Mar. 2, 2022) (decision and final order) ($151 million acquisition); *In re ANI Pharmaceuticals, Inc.,* No. C–4754 (F.T.C. Jan. 12, 2022) (decision and final order) ($210 million acquisition); *United States* v. *Grupo Verzatec S.A. de C.V.,* No. 1:22–cv–01401 (N.D. Ill. Mar. 17, 2022) (complaint) ($360 million acquisition). Note that the value of the transaction is considered by some filers to be confidential information and is not always disclosed in public filings. *See FTC* v. *IQVIA Holdings Inc.,* No. 1:23-civ-06188 (S.D.N.Y. Dec. 29, 2023); *In re Lifespan Corp.,* No. C–9406 (F.T.C. Feb. 17, 2022) (complaint).

[1] *See, e.g., In re The Golub Corp.,* No. C–4753 (F.T.C. Jan. 20, 2022) (decision and final order) (divestiture of 12 supermarkets); *United States* v. *B.S.A. S.A.,* No. 1:21–cv–02976 (D.D.C. Mar. 15, 2022) (divesture of two business lines).

[307] *See, e.g., Polypore Int'l, Inc.* v. *FTC,* 686 F.3d 1208 (11th Cir. 2012); *In re Otto Bock HealthCare N. Am., Inc.,* No. 9378 (F.T.C. Dec. 1, 2020).

[308] *See* Fed. Trade Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report, Fiscal Year 2022, Tables VI through IX (FY 2022).

final rule are small relative to the value of the transaction and the costs of other merger-related fees. As noted throughout this final rule, the Commission has taken many steps to reduce the burden on all types of filers as compared to the proposed rule, including investors.

The same commenter who mentioned the effect on capital markets also noted that the HSR-reportable transactions in which its members engage often do not pose competitive risk. These are transactions in which the acquiring persons are investment groups, trusts, or other financial vehicles or are providing securities, commodities contracts, and other financial investments or related advice. According to this commenter, its members rarely, if ever, have horizontal or even vertical relationships with the issuers whose securities they acquire. Rather, the kinds of HSR-reportable transactions in which its members engage are not mergers or acquisitions but the acquisition of minority positions, for instance, when concentrated funds make large purchases due to sizeable investor inflows, when benchmark-relative funds make large purchases due to index rebalancing, or when managers shift portfolios into highly liquid names in anticipation of redemptions or in connection with wind-downs.

This and other comments generally reflect three different types of concerns: potential burdens for investors that must make HSR filings, potential burdens for minority investors in entities that have to make HSR filings (but have no HSR filing obligation themselves), and potential burdens related not to filing out the Form, but to potential enforcement actions to block the transaction that may arise from the Agencies having more complete information. The Commission addresses each below.

As a starting point, the Commission emphasizes that the final rule does not change who must file [309] and the HSR Act and Rules exempt passive investments of 10% or less,[310] or 15% or less for institutional investors.[311] The final rule does not alter the analysis regarding passive investments and therefore the final rule has no impact on investors who hold passive investments [312] unless these investors

acquire more of a company than these significant ''investment only'' exemptions permit and are, as a result, required to report their investments for premerger review. As a result, many of the types of investors discussed in the comments will not have HSR filing obligations for their transactions, and thus would not be required to fill out the Form that is the subject of the final rule.

Some investors will have filing obligations either because they will hold a stake that provides them with the ability to direct or influence the management of the company in which they are investing (*i.e.,* above the 10% and 15% exemptions), or because they do not intend to be merely passive investors. In these instances, the Act treats them as any other acquiring person and the Agencies use the Form to screen for potential competitive effects. Until now, though, the Agencies have received less information about transactions where private equity and other types of investors are involved because the current Form does not require sufficient information to explain the often complex structures and relationships between different entities that are within the acquiring or acquired person. The final rule intends to close these information gaps and focuses on information that should be within the records of the acquiring or acquired person.

Further, the Commission acknowledges that investors can have different motivations in making acquisitions. Some do not seek to control or influence the companies in which they invest, but rather only seek a desired rate of return. In contrast, others seek positions with significant management rights or stakes that result in control of or influence in the target business. The Commission has sought to tailor the requirements of the final rule to illuminate those factors that could give rise to competitive concerns while minimizing additional costs for those investors that do not seek to participate in or influence decision-making of entities related to the acquiring entity or other entities within the buyer that are in the same industry as the target. As a result, the Commission has made significant changes as compared to the proposed rule, declining to adopt many of the proposed changes and significantly tailoring others. The Commission has also introduced the concept of select 801.30 transactions, which it anticipates will capture the

transactions of many investors that do not seek to influence, direct, or manage the companies in which they invest. *See* section VI.A.1.f. The Commission has relieved such transactions from many of the new requirements, which it anticipates will mitigate the potential burden of providing information for many investors who do have to file.

As to investors that do not have HSR filing obligations but hold minority interests in entities that do, the final rule does require additional information about some minority investors if those investments are in entities controlled by the acquiring person that are either related to the transaction or operate in the same industry as the target. However, as described in section VI.D.2.a., the burden of providing this information rests on the acquiring person, not on those minority investors. Their presence as an investor should be known to the filer because the filer controls the entity, and when revealed in the HSR Filing, will provide information that will assist the Agencies in determining whether those investors also hold interests or have relationships with entities related to the target.

Additionally, the Commission modified the proposed rule to scale back requirements that would have broadly required disclosure of the limited partners of certain entities. As discussed below, the Commission has limited the final rule to require identification of only those limited partners that have certain rights related to the board of directors or a similar body. When required, this information is limited to providing the legal and business name of the minority investor, its address, and the percentage the investor holds in the entity controlled by the acquiring person. In most instances, the Commission believes this information should be available in the records of the acquiring person. When it is not, the Commission has explained that the acquiring person can note that the information is not available and why. The final rule does not create an obligation for the acquiring person to request this information from its minority investors. Therefore, the final rule imposes no burden on such minority investors in filling out the revised Form. Investors that do not have HSR Act filing obligations, but hold minority interests in entities that do, will not have any new obligations to either make filings or provide information for the filings of entities in which they have minority holdings.

Several commenters raised concerns that the additional information requirements for funds, especially those managed by activist investors, would

---

[309] One commenter suggests that the proposed rule would result in an increase in filings among investors. Comment of TIAA, Doc. No. FTC–2023–0040–0691 at 3. The Commission disagrees.

[310] 15 U.S.C. 18a(c)(9); 16 CFR 802.9.

[311] 15 U.S.C. 18a(c)(11); 16 CFR 802.64.

[312] Some commenters discussed shareholder engagement encouraged by the SEC. *See, e.g.,* Comment of Managed Funds Ass'n, Doc. No. FTC–

2023–0040–0651 at 8. The Commission notes that the SEC is a different agency with a different law enforcement mission.

have a detrimental impact on these investors as a result of the disclosure of the information itself. They pointed to the disclosure of the interests and rights of limited partners as creating disincentives for shareholder engagement or as undue interference in the market for corporate control. Another commenter stated that disclosure requirements may deter investments in private equity firms, potentially reducing the flow of capital to small- and medium-sized businesses.

The final rule does not target information specific to any type of investor. But if an investor holds a small but significant stake (five percent or more) or plays a role in the acquiring person's decision-making, the Commission believes that disclosure of these interests is justified by the Agencies' need to know about such investments to conduct premerger screening. As discussed in section II.B.1. and section VI.D.1.d.ii, there have been significant changes in the number and breadth of investment companies managing portfolios that include investments in companies with competitively significant relationships. Due to these changes and others, the Commission has determined that the Agencies need more information about minority holders between the UPE and the acquiring person, as well as information about those who serve as officers and directors and who will be involved in decision-making after the transaction is consummated. Many commenters specifically objected to providing any information about limited partners, noting that the existence of significant management rights such as board seats or board approval rights, is "atypical." The final rule has been modified to require disclosure only of these types of limited partner situations, which should mitigate these concerns.

Another commenter said that having to disclose the required information would deter investment in in certain types of investment vehicles because of the exposure of proprietary contractual information and Personally Identifiable Information (PII) about every facet of the M&A process. This commenter noted, for instance, that the requirement to provide a term sheet or draft agreement reflecting sufficient detail about the proposed transaction when filing on the basis of a Preliminary Agreement would expose details about transactions that could undermine competition in the industry and harm returns to LPs. In addition, this commenter stated that the requirement for PE firms to submit a narrative describing the justification for certain transactions would impinge on the proprietary information that PE

firms exchange with target companies and their consultants.

As noted above and elsewhere, the Commission has made significant changes as compared to the proposed rule, and the changes in this final rule should address many of this commenter's concerns. That said, the Commission believes the commenter has overread the Commission's intent. The purpose of the final rule is to provide the Agencies with more information on those factors that could give rise to competitive concerns, not to expose every facet of the M&A process or investor strategy. The required information does not require social security numbers, addresses or other sensitive PII. Moreover, the final rule requires the disclosure of additional information to the Agencies, not to the public or third parties, and the confidentiality of the information provided to the Agencies as part of the HSR filings process is protected by statute, specifically 15 U.S.C. 18a(h).

Finally, as described in section VI, the final rule will provide the Agencies with more transparency into what the acquiring person holds and whether any person or entity that has influence over the acquiring person is also involved in the business of the target. Specifically, the Commission has not limited the information required about the acquiring person even in the case of select 801.30 transactions. As stated in the NPRM and throughout this final rule, the Commission believes this information is critical to the Agencies' initial review and the benefit for robust premerger screening justifies the burden of disclosing the information because it may identify an existing business relationship between the acquiring person and target (via common investors or shared managers) that are otherwise not revealed in the HSR Filing.

The Commission disagrees with comments that identify increased transparency about the filed-for transaction itself (and not the specific burden of collecting and providing the information) as a cognizable burden associated with the final rule. The purpose of the final rule is to require information that allows the Agencies to accomplish the task assigned to them by Congress: to determine whether the acquisition subject to the Act, if consummated, may violate the antitrust laws. Suggestions that increased transparency would endanger certain filed-for transactions implicitly indicate that the current Rules have led to under-enforcement of the antitrust laws. Any burden related to deal uncertainty that might arise from increased transparency is not a burden related to compliance

with the HSR Act and the final rule, but rather is tied to whether the transaction itself may violate the antitrust laws.

Biopharmaceuticals

Two commenters from the biopharmaceutical sector suggested that several requirements of the proposed rule would disproportionately burden biopharmaceutical firms and transactions. They pointed to the burden of identifying information related to products in early stages of clinical development, and stated that, because the Commission's 2013 rule specific to pharmaceutical license agreements increased the universe of reportable transactions, any expansion of the Form disproportionately burdens the pharmaceutical sector. One additionally objected to providing information about employees, and the other asserted disproportionate impact from providing information regarding additional prior acquisitions because of the number of acquisitions in this sector, and from disclosing officers and directors due to biotech firms' dependence "on a small cadre of qualified directors and officers." Both commenters claimed the changes to the HSR Form and Instructions will prolong the time required for HSR filing preparation and agency review, resulting in delayed transactions.

The final rule does not target any information that is unique to biopharmaceutical companies, and the Commission disagrees that the additional information that would be sought from these companies is not relevant. Where the final rule requires additional information from biopharmaceutical companies, the cost of supplying that information is justified by the benefit to the Agencies in having a more complete understanding of the companies' existing business operations and their business strategy, including prior acquisitions involving the same business lines. For instance, many biotech and pharmaceutical companies invest in extensive R&D pipelines, and the Agencies need information about products in development to determine if the companies are current competitors for innovation in a particular space to meet a particular need, or if one or both merging parties are potential competitors for any existing products.[313] As the commenters

---

[313] *See In re Sanofi Corp.,* No. 9422 (F.T.C. Dec. 11, 2023) (complaint alleging Sanofi's proposed acquisition of an exclusive license to Maze Therapeutics' pipeline Pompe therapy would have eliminated nascent threat to Sanofi's monopoly) (transaction abandoned); *FTC v. Mallinckrodt ARD Inc. (f/k/a Questcor Pharms., Inc.),* No. 1:17–cv–120
Continued

acknowledged, mergers, acquisitions, and exclusive licenses are particularly prevalent in the pharmaceutical sector, where the business model for new drug development centers around such transactions. Similarly, the comparatively higher number of transactions occurring in this sector can be expected to trigger a higher number of HSR Filings and could require filers to disclose a greater number of prior acquisitions. Even if biopharmaceutical companies have to report more prior acquisitions, this disclosure is also justified because it is relevant to determining whether there is a pattern of serial acquisitions. The fact that sharing of officers and directors is more common among companies in this sector means there is a greater need for the Agencies to screen for related competitive problems.[314]

On the other hand, other information requirements have been modified to reduce the costs for all types of filers, including those in the biopharmaceutical sectors. For instance, the Commission declined to adopt new information requirements related to employees, which commenters asserted could impose significant costs on those in the biopharmaceutical as well as other sectors. Overall, the impact of the final rule is proportional to the number and characteristics of transactions that occur in any given sector of the economy (including biopharmaceuticals). To the extent that the revised Rules will result in delayed transaction closings, the potential impact of incremental delay is outweighed by the Agencies' statutory mandate to examine each transaction for the potential for that it may violate the antitrust laws. In other instances, the additional information may actually reduce delay by permitting the Agencies to avoid issuing a Second Request or issuing Second Requests that are more tailored to the potential for competitive harm than would have been issued under the existing reporting requirements.

In sum, the Commission has determined that the burden imposed on this sector by the final rule is proportionate to the market realities and complexities of these companies and the likelihood that any transaction may require more in-depth antitrust review.

Hospitals

A national organization representing hospitals and several State hospital associations stated that the proposed rule would have a negative and wholly unnecessary impact on hospitals and health systems. They asserted that the additional information required by the proposed rule would not generate actionable information with respect to hospital mergers. They objected to specific requirements, stating that reporting prior acquisitions has no relevance in the context of hospital mergers, or that it is inconceivable that a hospital-related merger could plausibly harm competition in any labor market without also presenting at least some competitive risk in a downstream market.

The Commission responds that the final rule does not target any information that is unique to hospitals and health systems, and disagrees that the additional information, when sought from hospitals, is not relevant. For example, the commenters' suggestion that the Agencies not screen for hospital labor competition issues is inconsistent with growing empirical evidence of competitive harm to labor markets from consolidation generally and from hospital mergers in particular.[315] Moreover, as discussed above, an empirical assessment of the price effects of consummated hospital mergers reveals that there are meaningful information gaps in the current requirements that led the Commission to grant early termination of the waiting period for hospital mergers that caused significant price increases.[316]

As discussed, the final rule will exclude non-profit entities organized for religious or political purposes from the specific requirement to produce information disclosing officers, directors, and members. This carve-out will likely encompass some healthcare organizations, including certain religious-affiliated hospitals or other provider groups. While these entities will not be required to provide such information as a matter of course in the HSR Filing, it can nonetheless be relevant in any in-depth investigation of

the transaction and may be sought from the parties at a later date.

Given the Commission's significant expertise and interest in preventing hospital mergers that may violate the antitrust laws, the final rule is appropriately focused on transactions that are most likely to present antitrust risk. The Agencies have determined the information sought by the final rule will close the information gaps that now exist with regard to hospital and other healthcare acquisitions. Moreover, because many hospital mergers are not reportable under the HSR Act, several States have enacted premerger notification laws for certain healthcare acquisitions, including those involving hospitals, to prevent consolidation that may affect their citizens directly. In light of all this evidence of a need for robust screening in this critical sector, there is no basis to excuse hospitals or health systems from any of the new requirements of the final rule beyond the modifications that reduce costs on filers overall, including on hospitals.

E. Regulatory Alternatives Considered

In addition to considering the costs and benefits of the final rule as compared to the status quo, the Commission considered other alternatives suggested by commenters.[317] The first alternative is to not finalize any modification to the current HSR Form and Instructions and to issue more Second Requests when the HSR Filing is insufficient to determine whether the proposed acquisition may violate the antitrust laws. Relatedly, commenters suggested that the Commission maintain current reporting requirements and make more extensive use of voluntary submissions from the parties post-filing. These alternatives are discussed above in section III.A.3. Another alternative suggested by commenters is for the Commission to create two separate sets of information requirements, one for acquisitions that present a low risk of a law violation and therefore require less reporting (a ''short form'') that would continue to report the information required by current HSR rules and a second form for acquisitions that cannot be considered low risk and that would contain all of the new information requirements in the final

---

(D.D.C. Jan. 25, 2017) (complaint alleging Questcor's acquisition of rights to pipeline competing drug eliminated nascent threat and protected its monopoly ACTH drug H.P. Acthar Gel) (consent decree ordered license and $100 million equitable monetary relief); *In re Thoratec Corp.*, No. 9339 (F.T.C. July 28, 2009) (complaint alleging Thoratec's proposed acquisition of HeartWare eliminated pipeline threat to Thoratec's left ventricular assist device monopoly) (transaction abandoned).

[314] Mark A. Lemley et al., ''Analysis of Over 2,200 Life Science Companies Reveals a Network of Potentially Illegal Interlocked Boards'' (Stan. L. & Econ. Olin Working Paper No. 578, 2022), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4253144*.

[315] Concurring Statement of Commissioner Rebecca Kelly Slaughter and Chair Lina M. Khan, *supra* note 70, at 2 n.1; *In re Lifespan Corp.*, No. 9406 (F.T.C. Feb. 17, 2022) (complaint).

[316] *See supra* note 24 and related text.

[317] Executive Order 12866 requires an assessment of costs and benefits of potentially effective and reasonably feasible alternatives to the planned regulations and an explanation of why the planned regulatory action is preferable to the potential alternatives. E.O. 12866 sec. 6(a)(3)(C) (1993). As an independent agency, the Commission is not subject to the requirements of this executive order but nonetheless used the principles outlined there to explain why the Agencies' chosen regulatory action is preferable to potential alternatives.

rule. Here the Commission discusses the relative merits of adopting this alternative over the final rule.

Several commenters suggested that the Commission consider creating two separate sets of information requirements for notification, stating that this approach is used by other jurisdictions to alleviate some costs and delays associated with merger notification under their laws. They asserted that it would be suitable for effective and efficient premerger review under U.S. law.

As discussed above, the HSR Form is not "one size fits all" and the costs of making an HSR Filing are unique for each transaction. In this rulemaking, the Commission is publishing, for the first time, separate Forms for the acquiring person and the acquired person. The final rule has materially different requirements for each filing person, and providing separate Forms allows for clearer instructions (avoiding terminology in the proposed rule such as "the acquired person or acquired entity (as applicable)"). The Commission expects that having two separate forms for each side of the transaction will improve compliance and reduce errors for filers.

Moreover, while not styled as a "short" or "long" form, the final rule reflects the Commission's consideration of each requirement and makes clear where there is a need for the information for each type of transaction. In particular, the IF/THEN structure of the information requirements results in some filers responding to only a few information requirements. As a result, in practice, there are "shorter" and "longer" versions of the forms depending on the type of filer and the type of transaction under review. The Commission determined that this approach better reflected the varying information requirements the Agencies need in order to effectively and efficiently analyze the broad spectrum of filers and transactions.

Most importantly, in its review of past filings, the Commission found no set of objective criteria that would appropriately sort transactions into one or more discrete categories for the development of a single short form. Rather, the final rule adopts new information requirements but imposes them differently to reflect each filer's role in the transaction (acquirer versus acquired) and the relative antitrust risk associated with the proposed transaction. Filers with the highest information and document requirements are acquirers pursuing the acquisition of a firm with whom they have extensive existing business relationships or offer

products or services in the same industries that must be assessed prior to consummation.

For one category of transactions, select 801.30 transactions (described in section VI.A.1.f.), the Commission has determined that the Agencies need minimal additional information such that the final rule should impose fewer new requirements. The Commission believes that the few new information requirements for select 801.30 transaction are justified in order to ensure that the Agencies conduct a premerger assessment to determine that even these transactions do not present risk of a law violation. Similarly, the Commission determined that other characteristics justify a different and lighter burden, such as whether the filing person is the buyer or the seller in the transaction. Finally, many requirements are tied to the acquiring and acquired person operating in the same industry or having a business relationship. These questions would be inapplicable to many filers, particularly activist, institutional, and retail investors, which typically do not have controlling stakes in operating companies or do not focus on a particular industry. As a result, the costs of complying with the final rule are tailored to the risk of a law violation associated with each transaction in a way that is similar to, but more flexible than, the "short form" alternative. The size and complexity of each party to the transaction, as well as the size and scope of their respective business, vary widely across filings. As discussed in section II.B., there are specific risks to competition that the current information requirements do not disclose, making the final rule a better alternative to achieve robust premerger screening even for select 801.30 transactions as compared to a short form alternative.

In addition, the short form alternative is likely to create uncertainty for filers that do not qualify for short form treatment but whose deals would suddenly be viewed as "not low risk." Having a bifurcated system that targets some transactions as "low risk" is not consistent with the statutory premerger scheme Congress created when it determined that reporting would be required based on deal value regardless of the risk of a law violation, with additional authority for the Commission to exempt transactions that it has determined to present little to no antitrust risk. At this time, the Commission does not have a basis to conclude that the existing requirements continue to be sufficient for any category of transactions.

The Commission believes that broadening the use of the HSR Form's existing IF/THEN format so that the final rule aligns the cost of complying with the associated antitrust risks of the transaction is the most appropriate way to implement the premerger notification scheme established by Congress. Congress has determined which transactions are subject to premerger review, relying on deal value to determine reportability. This criterion provides administrative clarity and predictability for businesses. Some jurisdictions use market share or revenue ("turnover") thresholds to determine reporting or eligibility for short form treatment. But in doing so, these regimes also typically depend on the competition authorities to provide extensive guidance to business, often prior to formal notification, regarding the proper definition of markets. This may require an in-depth analysis of the potential markets at issue and can delay formal notification.[318] Congress has chosen to rely on an objective and administrable system of reportability based on deal value and revenues for filers. Adopting a different standard for determining eligibility for short form treatment would require the Commission to engage in a separate and challenging rulemaking to seek public comment on what types of thresholds should be adopted that would be consistent with the premerger scheme Congress adopted in the HSR Act. At this time, the Commission has determined that one category of filings, select 801.30 transactions, will have minimal additional information requirements as compared to the current HSR Form and has made other modifications in the final rule to reduce the costs for other types of filers and transactions as well.

Although the short form alternative would save some filers additional direct costs associated with making an HSR, the Commission chose to adopt the final rule with modifications designed to reduce the cost of filing as much as possible for all types of filings, including those transactions that might be eligible for short form treatment. The Commission believes that this approach reflects, to the extent practicable, the antitrust risks associated with a variety

[318] Relying on market share thresholds presents many challenges, and several jurisdictions have replaced them with thresholds that are easier to administer. In the early 2000s, approximately half of the jurisdictions with merger control had subjective notification thresholds such as market share but by 2010 more than forty percent of these jurisdictions had replaced their subjective thresholds with objective, sales- or assets-based thresholds.

of filings, not just ones that could be eligible for short form treatment. A final rule that reasonably balances the benefits to Agencies' premerger review with the costs imposed on filers and others is a reasonable exercise of the Commission's rulemaking authority under the HSR Act and is consistent with the overall mandatory premerger review scheme established by Congress. The Commission believes that the final rule, with its tailored modifications based on the Agencies' experience in reviewing thousands of transactions, will result in minimal additional costs for certain filers and is preferable to adopting and maintaining a short form.

## Final Instructions and Changes From the Proposed Rule

### IV. Part 801

*A. Sections 801.1(d)(2): Ministerial Changes To Reflect Reorganization of Form and Instructions*

While the Commission will continue to use the same mechanism for electronic filing, it has re-organized the Form and Instructions, as discussed below in section VI. As a result, several ministerial changes must be made to § 801.1(d)(2). This section, which defines "Associate" and provides examples, currently refers to item numbers used in the current Form and Instructions. The Commission adopts revisions that align with the Form and Instructions as adopted in this final rule.

Specifically, the definition of "Associate" and the related examples refer to Items 6(c)(i), 6(c)(2), and 7. This information is now required by the Minority-Held Entity Overlaps and Controlled Entity Geographic Overlaps sections, which replace the previous item numbers. The Commission, accordingly, modifies the Rule to reflect these changes.

*B. Section 801.1(r): Definitions of "Foreign Entity or Government of Concern" and "Subsidy"*

On December 29, 2022, the President signed into law the Consolidated Appropriations Act, 2023, which included amendments to the HSR Act in the Merger Modernization Act. 15 U.S.C. 18b. The Merger Modernization Act required the Commission, with concurrence of the Assistant Attorney General, and in consultation with Chairperson of the Committee on Foreign Investment in the United States, the Secretary of Commerce, the Chair of the United States International Trade Commission, the United States Trade Representative, and heads of other appropriate agencies ("Relevant

Agencies"), to promulgate a rule to require persons making an HSR Filing to disclose subsidies received from countries or entities that are strategic or economic threats to the United States.

After conducting its own internal diligence to draft a rule and in consultation with the Relevant Agencies on this topic, the Commission proposed amending § 801.1 to add proposed paragraphs (r)(1) and (2), which define "foreign entity or government of concern" and "subsidy," respectively.

The Commission received no objections to the proposed definitions and received input that they appear to be a reasonable implementation of the Merger Modernization Act. As such, the Commission adopts these definitions as proposed.

## V. Part 803

*A. Sections 803.2, 803.5, and 803.10: Adoption of Electronic Filing*

The Commission proposed amending §§ 803.2(e) and (f); 803.5(a)(1) [319] and (3) and (b); and 803.10(c)(1)(i) and (ii) to eliminate references to paper and DVD filings and delivery to physical offices. The Commission has been successfully accepting filings electronically since March 17, 2020, as a result of the COVID–19 pandemic and resulting closures of Federal office buildings during the COVID emergency. The Commission received only one comment on this proposed change: One commenter noted that electronic filing is generally preferable and less burdensome to filing by paper or DVD. The Commission received no negative comments on the elimination of paper and DVD filings. The Commission adopts this change as proposed, though, as explained below, § 803.2(e) and (f) have been redesignated as (d) and (e), respectively.

Separately, the Commission noted in the NPRM that the Agencies were developing a new e-filing platform that would eventually replace the current mechanism for electronic filing. The same commenter stated that before seeking to impose an e-filing requirement on all parties, the FTC should provide further details regarding the proposed user interface; the ability for users to collaborate on a single filing; the ability of users to save, review, and edit; and how filing persons will receive complete copies of filings as submitted. At this time, no change has been made to the method for accepting filings. While the Form and Instructions have

been updated, filers will continue to use the platform that has been in use since March 2020. The Commission continues to develop a new interface for electronic filing and will, at the appropriate time, issue a rulemaking that provides instructions and access to the new e-filing platform in advance of its effective date.

*B. Sections 803.2(b), (c), and (e); 803.9(c); and 803.12(c): Ministerial Changes To Reflect Reorganization of Form and Instructions and Clarification of Time Zone*

As discussed above in section IV.B., several ministerial changes must be made to the Rules to reflect the new organization of the Form and Instructions. Existing §§ 803.2(b), (c), and (e), and 803.9(c) all currently refer to item numbers used in the current Form and Instructions. The Commission adopts revisions that align the references in the Rules with the headings in the Form and Instructions as adopted in this final rule.

Additionally, existing § 803.2(b) of the Rules currently explains what information needs to be provided by the acquiring and acquired person for Items 5–8 of the current Form. As described below, the Commission adopts separate instructions for the acquiring and acquired person, making existing § 803.2(b) unnecessary. For this reason, existing § 803.2(b) is being removed, and existing § 803.2(c)–(f) are being redesignated as § 803.2(b)–(e), respectively. Further, existing § 803.2(c) and (e) have references to the current Form numbering and are being updated.[320] Similar ministerial changes are being made to §§ 803.9(c) and 803.12(c). Finally, the references to time in, redesignated § 803.2(d) have been updated to specify Eastern Time, consistent with other provisions of the Rules and with longstanding practice.

*C. Section 803.2: Requiring Separate Forms for Acquiring and Acquired Persons*

The Commission proposed amending § 803.2(a) and deleting § 803.2(b)(1)(v) so that filing persons that are both the acquiring and acquired person are

---

[319] In making this change, the Commission also takes the opportunity to correct the capitalization of "act" to lower case to be consistent with the definitions and other usage of the term in the Rules.

[320] For purposes of consistency and clarity, the Commission is also making a ministerial change to § 803.2 to explain that documents must be provided by 5 p.m. Eastern Time. Because electronic filing permits parties to submit documents from different time zones, they will need clarity as to which time zone the Commission is referencing in the rules. The Commission notes that § 803.10 already specifies that Eastern Time should be used when determining the expiration of the waiting period as well as the date of receipt of filings and it has long been the practice of the Commission to use Eastern Time in applying this rule.

required to submit separate Forms in each capacity. The Commission proposed this change because, in its experience, filers that opt to combine the information on a single Form often do not include everything that is required and would be reported if they filed on separate Forms. Such combined filings are also very confusing for the Agencies to review. In contrast, when filers choose to submit two separate Forms for such transactions, the filings provide all the required information and in a much clearer format that allows the Agencies to quickly understand how the transaction might change the operation of the acquiring person post-acquisition.

The Commission received only one comment on this proposal, which expressed support and noted that it will enhance the understanding of the entire transaction. The Commission adopts the change as proposed but replaces the word "should" with "shall."

*D. Section 803.5(b): Requiring Detailed Letters of Intent, Draft Agreements, or Term Sheets*

The Commission proposed amending § 803.5(b) to require filers who have not executed a definitive transaction agreement to submit a draft agreement or term sheet describing the transaction that is the subject of the HSR Filing with sufficient detail to permit accurate analysis.[321] The Commission received numerous comments on this proposal focused on the increased burden and delay for filing parties. The Commission has adopted the proposal in the final rule with modifications that respond to these concerns.

Although filers can currently file on the basis of preliminary agreements, such as an indication of interest, letter of intent, or agreement in principle ("Preliminary Agreements"), in the Commission's experience, a small but significant minority (approximately 10%) of filings made on the basis of Preliminary Agreements do not contain enough information to permit the Agencies to conduct an accurate determination of whether the contemplated acquisition may violate the antitrust laws if consummated.[322] In addition, such filings may be made prior to significant negotiations or due diligence and can be so lacking in

specifics that they could force the Agencies to expend resources on transactions too uncertain to merit review.

As discussed below, the Commission has determined that it is necessary to assure that filings are not made prematurely—before the scope of the transaction has been sufficiently determined and before the parties have engaged in enough diligence such that consummation is not merely hypothetical—and in contravention to the purpose of requiring an affidavit stating that there is a good faith intent to consummate the transaction. However, the final rule will not specifically require term sheets or draft agreements for all transactions where a definitive agreement has not been executed. Rather, the Commission will continue to require filers to submit an executed agreement but, if that agreement does not describe with specificity the scope of the transaction that the parties intend to consummate, filers must also submit an additional dated document, such as a term sheet or draft definitive agreement, that does contain sufficient details about the transaction that the parties intend to consummate. This dated document can also take other forms; the title of the document is not determinative.

One commenter sought clarity on what level of information would constitute sufficient detail as required by the proposed rule, including what types of terms that may still be subject to negotiations would render a term sheet as an insufficient basis to submit an HSR filing. The Commission agrees that the additional clarity suggested by the commenter would be helpful in reducing uncertainty. The Commission revises the Instructions accordingly, as noted in section VI.H.1., to describe what would be sufficient. The Instructions state that the transaction agreement or supplemental document should contain some combination of the following terms: the identity of the parties; the structure of the transaction; the scope of what is being acquired; calculation of the purchase price; an estimated closing timeline; employee retention policies, including with respect to key personnel; post-closing governance; and transaction expenses or other material terms. The Commission notes that these examples are meant to be illustrative and not exhaustive. In contrast, indications of interest or other agreements that merely indicate that the parties will commence negotiations or begin diligence will not be sufficient.[323]

Using the criteria adopted in the final rule, the Commission analyzed all filings that contained Preliminary Agreements submitted in FY 2021 to determine how many transactions would be impacted by the final rule.[324] Of the transactions that were submitted on the basis of a letter of intent, term sheet, or similar document that was not a definitive agreement, less than 10% did not provide the Commission with a sufficient level of detail to assess the transaction. From this data, the Commission believes that filing parties typically reach agreement on key terms prior to filing, and there would be no additional cost to them to comply with the final rule. Of those that do not reach such agreement prior to filing, the Commission believes that antitrust review is not warranted until such time as the parties have resolved key aspects of the transaction, such as those described above, because the transaction may never be consummated, or key terms may change in ways that would affect the Agencies' initial review.

The Commission believes the transaction agreement requirements of the final rule represents a middle ground between a merely conceptual deal and a "ready to close" deal. The Agencies need to know the key terms of the transaction to determine whether it may violate the antitrust laws if consummated. Given the short period of time given to the Agencies to make that determination, it is necessary for the transaction to be one that is likely to close. The Commission acknowledges that even with this modification, the final rule may not permit some parties to make an HSR Filing as early in their deal process as is currently permitted. However, parties will be able to file after they have agreed to material terms of the transaction even if a final agreement has

---

[321] NPRM at 42182.

[322] Some commenters assert that documents such as letters of intent and preliminary agreements give the agencies enough information to identify those transactions that require further scrutiny. Based on its experience over forty-five years of reviewing merger filings that include these Preliminary Agreements, the Commission disagrees that they always provide sufficient information, especially when filings are made prematurely, prior to any significant due diligence.

[323] Here is an example of the type of terms contained in agreements that have been filed with

an HSR Form and conformed to existing requirements, but will no longer be accepted without filing an additional document that provides the key terms of the agreement once the final rule is effective: This letter agreement confirms the good faith intention of Alpha ("Purchaser"), to consummate the acquisition of Target, a corporation, from Beta ("Seller"), for in excess of $119.5 million and less than $235 million, subject to the terms of a definitive agreement to be negotiated and executed by them with respect to such acquisition and the satisfaction of conditions to be set forth therein. This letter agreement is non-binding and subject to satisfactory completion of due diligence, mutually acceptable definitive documentation to be negotiated between Purchaser and Seller. Purchaser will pay all filing fees in connection with all filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

[324] The Commission reviewed transactions filed during FY 2021 due to the large number of filings received by the Agencies during that fiscal year, which made for a robust data sample. *See supra* note 260.

not been executed. The Commission notes that for many filings that do not contain an executed agreement today, the parties continue to negotiate final terms. The Commission expects that after the final rule, parties that have come to an agreement on key terms but have not yet signed a definitive agreement will continue to work to an executed agreement while the Agencies are conducting their antitrust review.

The transaction agreement requirements of the final rule are necessary to address a real shortcoming of allowing notification on Preliminary Agreements. As noted above, currently, some parties submit a "letter of intent" that substantively only states that the two parties have the good faith intent to consummate a transaction. Some documents are labeled an "expression of interest" in a future transaction that is similarly not specific. In the Agencies' experience, such filings are often made prior to any significant due diligence has begun and do not demonstrate that the parties have considered or agreed to key terms that would be required for consummation. Such filings require staff to dedicate time to collect facts and make an initial determination of potential illegality for a transaction that may never occur or without a sufficient basis to know the full scope of what the parties may agree to in the future. As noted in the original Statement of Basis and Purpose from 1978, because of the time and resource constraints upon the agency staff, the Agencies should not expend resources to review transactions so lacking in specifics that they could be considered merely hypothetical.[325]

The Commission has considered the additional effort required to review transactions that are filed with Preliminary Agreements and has determined that permitting filings on barebones agreements lacking sufficient details about key terms is contrary to the overall intent of the HSR Act. When a filing is made, triggering the initial waiting period, staff must start their review of the transaction and decide whether to issue Second Requests within the applicable statutory waiting period (15 or 30 days). If key terms of the transaction have not yet been established, staff may not have sufficient information to assess the potential antitrust risks. Further, if the parties have not yet begun robust negotiations or due diligence, the filing will not contain documents that provide business assessments of the transaction because such assessments have not been made. If the parties have not yet analyzed the impact of the transaction,

it is not appropriate for the Agencies to begin such an assessment. This is particularly true if such assessments or negotiations lead the parties to abandon the transaction. In those cases, the Agencies will have needlessly spent scarce resources and may have burdened third parties investigating the transaction. Even if the parties do not abandon their transaction and the reviewing agency issues Second Requests, these investigations are often unnecessarily slowed down by the uncertainty surrounding the deal terms. The Commission understands that filers are anxious to get their HSR review completed so that it does not delay consummation of the transaction. But putting the burden on the Agencies to conduct antitrust assessments prematurely based on Preliminary Agreements that lack specificity undermines the purposes of the HSR Act. In addition, allowing notifications on mere expressions of interest in a future transaction creates opportunities to file as early as possible knowing that early filings put the Agencies at a disadvantage in conducting a thorough review.

Commenters raised concerns that the delay associated with negotiating additional deal terms would cause filers not to pursue beneficial transactions. One commenter claimed that as time is often of the essence in mergers, the result would be a significant chill on mergers. Another commenter contended that the proposal would deter investment in private equity and would increase costs that would likely be passed down to limited partners. Another commenter claimed that the Agencies failed to consider additional costs resulting from the additional delays in the transaction timeline.

The Commission disagrees that requiring more detail about transactions filed on Preliminary Agreements will chill M&A activity generally or for any particular type of investment. First, based on the Commission's review of filings detailed above, most reported transactions already meet the requirements adopted in the final rule. For those that do not, the Commission has identified a specific need for more detail to ensure that the reported transaction is likely to occur so that it is ripe for antitrust review. In addition, Congress identified those transactions where time is of the essence—namely, those that will be accomplished through a cash tender offer—and provided for a very short 15-day initial waiting period. For these transactions, the acquiring person does not need to file any agreement; it merely attests that its intention to make the tender offer has

been publicly announced.[326] For other transactions, the Agencies need some basis to know that the reported transaction is one that is likely to occur so that they do not begin an antitrust assessment before fully understanding how the transaction will likely change the premerger market dynamics. In the Commission's experience, when parties cannot reach agreement on a few key terms within their desired timeline to consummate the transaction, that is an indication that the deal is one that is not likely to close or is likely to close on terms that are very different from the ones in the Preliminary Agreements. Finally, while the parties have an interest in starting the 30-day review period as soon as possible so that it does not unnecessarily delay their deal, the Commission has an obligation to review the transaction to determine whether it may violate the antitrust laws, and cannot effectively do so prematurely. The Commission believes that any delay associated with filers complying with the transaction agreement requirements of the final rule is necessary and justified by the benefits to the Agencies and the public in avoiding premature review of reported transactions.

Separate from the concerns about delay, one commenter expressed concerns that, as drafted in the NPRM, the Instruction arguably requires the production of the most recent draft agreement, even if a term sheet was also provided. The final rule requires filers to analyze the executed agreement to determine whether it provides sufficient detail about the transaction. If that document does not, then filers must provide one additional dated document that does sufficiently describe the transaction. The same commenter also questioned the value to the Agencies of receiving the most recent draft agreement, which they state is often slanted to reflect the views of the most recent party to circulate a draft and thus is not necessarily representative of what the definitive agreement will ultimately become. If the most recent draft agreement does not reflect the key terms of the transaction, then some other document, such as a term sheet, should be submitted. Otherwise, as described above, the filing may be premature. Further, the Commission acknowledges that certain provisions of a draft agreement that are not strictly necessary to understanding the antitrust implications of a transaction may change, sometimes substantially, and that the final definitive agreement is the most probative. However, the Commission believes that not permitting

[325] 43 FR 33450, 33511 (July 31, 1978).

[326] 16 CFR 803.5(a)(2).

filing until a definitive agreement has been reached is not necessary and could impose too great a cost due to the associated delays. The Agencies have extensive experience with reviewing draft agreements and find that even they can be probative. So long as the draft agreement and the associated executed agreement comply with the transaction agreement requirements of the final rule, the Commission will accept a supplemental document that is in draft form.

The same commenter suggested revising proposed § 803.5 to change "will be consummated" to "the parties intend to consummate." The Commission agrees that this change in wording better captures the requirement for the parties to attest to their good faith intention to proceed with the transaction based on the submitted document and will add the phrase "the parties intend to consummate" to § 803.5. The Commission notes, however, that in order to satisfy the Act, parties must file and observe the waiting period for the transaction that will be consummated. Therefore, if there are material changes to the transaction after filing, the parties must continue to notify the Agencies so that they can determine whether an amended or new filing may be required. The Commission thus adopts the proposed requirement to submit a draft agreement or term sheet with the clarifications noted above.

In sum, the Commission has determined that changes to § 803.5 contained in the final rule are necessary and appropriate to prevent the Agencies from reviewing transactions for which the merging parties have not yet reached agreement on key terms. For premerger review to be timely and effective, the Agencies need some assurance that the transaction is likely to occur and that the scope of the transaction is revealed in the transaction documents submitted with the HSR Filing. The Commission has modified the final rule as compared to the proposal for this requirement to reduce the cost and delay for filers as much as practicable.

*E. Section 803.8: Translation of Documents*

The Commission proposed amending § 803.8 to require submission of English-language translations for all foreign-language documents submitted with the notification. Under § 803.8(a), filers currently do not need to translate these materials for the initial filing, and English-language outlines, summaries, extracts, or verbatim translations need only be provided if they already exist. Section 803.8(b), in contrast, requires that all foreign-language documents

responsive to a Second Request be provided with English translations. The Commission proposed combining § 803.8(a) and (b) so that proposed § 803.8 would therefore be one paragraph requiring that verbatim English translations be provided with all foreign-language materials submitted as part of an HSR Filing or in response to a Second Request. The Commission adopts this proposed change with a revision to reduce potential confusion.

As explained in the proposed rule, when the Agencies receive key documents, such as the transaction agreements, relevant financial analyses or transaction-related assessments required by Item 4(c) with no translation at all or with unhelpful English-language outlines, summaries, or extracts, the Agencies are at a significant disadvantage during the very short period provided for initial review. The Commission received several comments on this proposal, principally regarding the burden and overall need for the proposed translation requirement. One commenter supported the proposed change, noting that with the help of modern software the cost of producing English translations should not be burdensome. The Commission agrees. As stated in the proposed rule, the Commission believes that translation tools available to the parties have become more abundant and these tools provide many options for translation that should significantly reduce the cost of providing translations. Moreover, it is important that the parties themselves provide translations because they created the documents at issue. The parties should ensure that translations are faithful to the original documents, a task that the Agencies are unable to complete, as they do not have the context or background to the transaction or companies that would be necessary to identify material errors. The Commission wants to avoid disputes over translations of these complex business documents that the parties have not reviewed.

The Commission notes that not requiring English-language translations from all entities, including foreign entities, under the current rule puts the Agencies at a disadvantage when reviewing HSR Filings with only foreign-language documents. This also creates an advantage for non-U.S. firms (whose materials are most likely to be in a foreign language). If key documents are not translated, the Agencies cannot give the transaction the same level of rigorous review and scrutiny as they do for transactions where all of the documents can be reviewed starting on the first day of the waiting period.

Translation requires time that should not be taken from the short period available to the Agencies for the initial review. Time spent translating documents reduces the time available for more critical tasks, such as assessing the antitrust risk of filed transactions.

To understand the potential costs associated with requiring submitted documents to be translated, the Commission examined all HSR filings submitted in FY 2021.[327] Of the 7,002 HSR Filings that year, only 40 contained documents submitted in a language other than English and did not provide a translation. This represents fewer than 0.6 percent of filings that year. While the cost of providing translations may increase the cost of making an HSR Filing for these particular filers, the overall impact of this requirement is limited.

Beyond the issue of increased cost, some comments questioned the need to include translations with HSR Filings, especially for transactions that do not raise competitive concerns. The Commission disagrees that translations of submitted documents are not necessary for the Agencies to complete their analysis or that they are useless to the Agencies. The foreign-language versions of the documents are required by the Rules because they are responsive to specific information requests. As stated in the NPRM, the Agencies receive HSR Filings that contain only foreign-language versions of key materials, such as the transaction agreements submitted in response to current Item 3(b) of the Form, the relevant financials submitted in response to current Item 4(b), and the documents submitted in response to current Items 4(c) and 4(d) of the Form. These are the very documents that allow the Agencies to conduct a preliminary review of HSR Filings for compliance with filing requirements and to determine whether the transaction may violate the antitrust laws. Other filers submit these same types of documents in a form that staff can quickly review. Not being able to review these key materials on the first day of the waiting period puts the Agencies at a material disadvantage during their initial review.

After carefully considering the objections in the comments, the Commission continues to believe requiring translations of foreign-

[327] As noted above in footnote 260, the Agencies selected FY 2021 for this effort because of the large number of reportable transactions that year, 3,520, which provided for a robust data set. For these transactions, there were 7,002 filings, roughly two per transaction. *See* Fed. Trade Comm'n & U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report, Fiscal Year 2021 appendix B (FY 2021).

language documents with HSR Filings is necessary and appropriate for the Agencies' premerger assessment, and notes that such translations may be especially important for those transactions that report foreign subsidies.[328] Despite the cost to filing parties, translations permit staff to review transactions and determine whether they require further investigation on the basis of the materials contained in the HSR Filing. With this cost in mind, the Commission invited commenters to suggest other alternatives that might achieve the Commission's goal of being able to understand and assess foreign-language documents while lessening the cost for filing parties and received a range of potential modifications to the proposal. One commented suggested that the requirement to provide verbatim translations should be limited to only final documents, not draft versions. As noted in section VI.G.1.b., the Commission has not adopted the proposal to require drafts, so no translations will be required for such documents in connection with the submission of the Form.

Commenters also proposed requiring only general summaries in English in lieu of verbatim translations, or permitting a filing party to produce a better-quality translation within a reasonable time period if the Agencies request them. The Commission acknowledges these suggestions but does not believe either presents a viable alternative to the version of § 803.8 contained in the final rule. General summaries do not provide the Agencies with a complete, detailed picture of the transaction. The Agencies' preliminary analysis of transactions often relies upon a nuanced and thorough reading of documentary attachments, and general summaries may not include facts or descriptions that the Agencies find relevant. The ability to require a better-quality translation within a reasonable time period after the submission of the HSR Filing will mean the Agencies must depend on filing parties to respond; this would likely delay Agency review within the already time-constrained initial waiting period. The time saved by the parties in preparing a summary in lieu of a translation is outweighed by the benefit to the Agencies of having a version of the underlying document available at the beginning of the waiting period.

Given the importance of having translations of key documents, the Commission adopts the proposed changes to § 803.8 but deletes the reference to "understandable." The Commission believes this word is superfluous when used in conjunction with "accurate and complete" and may introduce confusion. Section 803.8 does not require any particular method of translation but specifies that, whatever translation method the parties choose, all verbatim translations must be readily understood, materially accurate, and complete. One commenter suggested revising the instructions to state explicitly that the submission of machine translations is acceptable. The Commission declines to state this explicitly and notes that in complying with the requirement to provide translations, parties must certify that translations are materially accurate even if they do not identify how they were created.

In sum, the Commission has determined that the translation requirement contained in the final rule is necessary and appropriate to enable the Agencies to quickly review submitted documents with English translations that have been certified as accurate.

### F. Section 803.10: Commencement of Waiting Periods

The Commission proposed amending § 803.10(c)(1)(i) to clarify that filings made electronically are to be credited as received by the Agencies on the date filed if: (i) the electronic submission is complete by 5 p.m. Eastern Time; and (ii) such date is not a Saturday, Sunday, legal public holiday (as defined in 5 U.S.C. 6103(a)), or the observed date of such legal public holiday. This change codifies the current policy, and no comments were received. The Commission adopts this change as proposed.

### G. Section 803.12: Information To Be Updated With Refiling

The Commission proposed amending § 803.12(c) to specify what updates would be required to the acquiring person's filing if the acquiring person chose to withdraw its HSR Filing and refile it. This procedure for voluntary withdrawal and refiling permits the acquiring person to restart the initial waiting period, providing the Agencies an additional 15 or 30 days (depending on the transaction type) to review the transaction without issuing a Second Request, as long as certain conditions are met. Currently, the rules require updates to Items 4(a), 4(b), 4(c), and 4(d). The NPRM proposed changes to § 803.12(c) including: eliminating the requirement to provide updated financials, currently required by Items 4(a) and (b); requiring updated

Transaction-Related Documents with the updated HSR Filing; requiring updated transaction agreements; and requiring updated information about subsidies from Foreign Entities of Concern. The Commission adopts the proposed change with modifications to reflect ministerial changes to the names of sections of the Form.

The Commission received one comment on this proposal that noted that the proposal would impose a significant additional burden on the merging parties by requiring them to conduct a new search for Transaction-Related Documents with an expanded set of custodians. According to this commenter, it would also discourage the parties' use of pulling and refiling, and divert agency resources away from the review of other reported transactions.

Parties who withdraw and refile under § 803.12(c) must already search for new documents responsive to current Items 4(c) and 4(d). The basic requirement to search for new Transaction-Related Documents remains largely the same with the addition of only a single new custodian (the supervisory deal team lead, as defined) and a clarification that versions sent to any member of the board of directors (or similar body for non-corporate entities) are responsive and should not be treated as draft documents. The search required is a limited one, reaching back at most to the 15 or 30 days since the original filing was made. The Commission notes that these newly created documents and updated agreements are material to the Agencies' evaluation of the transaction and the determination of whether to issue a Second Request. Additionally, a change in information about subsidies may also be material and, until the Agencies have more experience with receiving this information, as required by Congress, parties must also provide updates to this item. The Commission therefore adopts the proposal with changes made to the names of the sections in the Form and Instructions.

### VI. Part 803 Appendix A and Appendix B

Below, the Commission describes the changes to the appendices to Part 803, the Form and the Instructions. As discussed in section V.A., the Commission will continue to use the same electronic filing mechanism that has been in place since March 2020. Therefore, the Commission now provides a Form which will be available on the FTC's website in Microsoft Word format to collect the information required by the Instructions. Additionally, as discussed in section V.B., separate forms will be required for

---

[328] NPRM at 42182–83.

parties that are filing both as acquiring and acquired persons for related transactions. As a result, and to aid parties in understanding which provisions are applicable to acquiring persons and which are applicable to acquired persons, the Commission has now provided separate Instructions and Forms for acquiring and acquired persons. This change has also allowed the Commission to simplify the language of some of the instructions, such as by defining ''target'' to include all acquired entities or assets and eliminating use of phrases such as ''acquiring person or acquired entity as appropriate'' that were included in the draft instructions. Other ministerial changes to aid readability of the Instructions are also noted below.

For ease of reference, the Commission includes the following materials regarding the adopted Instructions and Form:

- An outline of the organization of the Form and Instructions,
- A chart that identifies proposed new locations of the current Items of the Form and Instructions, including whether substantive changes are adopted, and
- A chart of the new categories of required information.

These materials appear immediately below.

Instructions Outline

- General Instructions and Information
- Fee Information
- General Information
- Ultimate Parent Entity Information
  ○ UPE Details
- Acquiring Person or Acquired Entity Structure
  ○ Additional Acquiring Person Information (Acquiring Person Only)
- Transaction Information
  ○ Parties
  ○ Transaction Details

  ○ Transaction Description
  ○ Additional Transaction Information
  ○ Joint Ventures (Acquiring Person Only)
  ○ Business Documents
  ○ Agreements (Acquiring Person Only)
- Competition Descriptions
  ○ Overlap Description
  ○ Supply Relationships Description
- Revenues and Overlaps
  ○ NAICS Codes
  ○ Controlled Entity Geographic Overlaps
  ○ Minority-Held Entity Overlaps
  ○ Prior Acquisitions
- Additional Information
  ○ Subsidies from Foreign Entities or Governments of Concern
  ○ Defense or Intelligence Contracts
  ○ Voluntary Waivers
- Certification
- Affidavits

**BILLING CODE 6750-01-P**

## Cross Reference Between Current Form and Final Rule:

| Current Form Item | New Location | Substantive Changes? |
|---|---|---|
| Fee Information | Fee Information | No |
| Corrective Filing | General Information | No |
| Cash Tender Offer | General Information | No |
| Bankruptcy | General Information | No |
| Early Termination | General Information | No |
| Foreign Jurisdictions | Transaction Information/Transactions Subject to International Antitrust Notification | Yes |
| Item 1(a) | Ultimate Parent Entity Information/UPE Details | No |
| Item 1(b) | Separate Forms will Identify Acquiring and Acquired Person, No Combined Form | No |
| Item 1(c) | Ultimate Parent Entity Information/UPE Details | No |
| Item 1(d) | Ultimate Parent Entity Information/UPE Details | No |
| Item 1(e) | Ultimate Parent Entity Information/UPE Details | No |
| Item 1(f) | Transaction Information/Parties | No |
| Item 1(g) | Ultimate Parent Entity Information/UPE Details | No |
| Item 1(h) | Ultimate Parent Entity Information/UPE Details | Yes |
| Item 2(a) | Transaction Information/Parties, Transaction Description | No |
| Item 2(b) | Transaction Information/Transaction Details | No |
| Item 2(c) | Transaction Information/Transaction Details (Acquiring Person Only) | No |
| Item 2(d) | Transaction Information/Transaction Details | No |
| Item 3(a) (Entities) | Transaction Information/Parties | No |
| Item 3(a) (Description) | Transaction Information/Transaction Description | Yes |
| Item 3(b) | Transaction Information/Agreements | Yes |
| Item 4(a) | Ultimate Parent Entity Information/UPE Details, Acquiring Person or Acquired Entity Structure | Yes (Natural Persons) |
| Item 4(b) | Ultimate Parent Entity Information/UPE Details, Acquiring Person or Acquired Entity Structure | Yes (Natural Persons) |
| Item 4(c) | Transaction Information/Business Documents | Yes |
| Item 4(d) | Transaction Information/Business Documents | No |
| Item 5(a) | Revenue and Overlaps/NAICS Codes | Yes |
| Item 5(b) | Transaction Information/Joint Ventures (Acquiring Person Only) | Yes |
| Item 6(a) | Ultimate Parent Entity Information/Acquiring Person or Acquired Entity Structure | Yes |
| Item 6(b) | Ultimate Parent Entity Information/UPE Details | Yes |
| Item 6(c)(i) | Revenue and Overlaps/Minority-Held Entity Overlaps | Yes |
| Item 6(c)(ii) | Revenue and Overlaps/Minority-Held Entity Overlaps (Acquiring Person Only) | Yes |
| Item 7(a)-(d) | Revenue and Overlaps/Controlled Entity Geographic Overlaps | Yes |
| Item 8(a) | Revenue and Overlaps/Prior Acquisitions | Yes |

## New Requirements and Categories of Information:

| New Sections | Location |
|---|---|
| New Definitions | General Instructions and Information |
| Translations | General Instructions and Information |
| Identification of Additional Minority Interest Holders | Ultimate Parent Entity Information/UPE Details |
| Organization of Controlled Entities | Ultimate Parent Entity Information/Acquiring Person or Acquired Entity Structure |
| Identification of d/b/a | Passim |
| Description of Ownership Structure of the Acquiring Entities | Ultimate Parent Entity Information/Additional Acquiring Person Information (Acquiring Person Only) |
| Organizational Chart for Funds and Master Limited Partnerships (If One Exists) | Ultimate Parent Entity Information/Additional Acquiring Person Information (Acquiring Person Only) |
| Identification of Certain Officers and Directors | Ultimate Parent Entity Information/Additional Acquiring Person Information (Acquiring Person Only) |
| Description of the Business of the Acquiring Person | Transaction Information/Transaction Description (Acquiring Person Only) |
| Identification of Related Transactions | Transaction Information/Transaction Description |
| Mandatory Disclosure of International Antitrust Notification | Transaction Information/Transaction Description (Acquiring Person Only) |
| Transaction Rationale | Transaction Information/Additional Transaction Information |
| Diagram of the Transaction (If One Exists) | Transaction Information/Additional Transaction Information (Acquiring Person Only) |
| Production of Certain Documents of the Supervisory Deal Team Lead | Transaction Information/Business Documents |
| Production of Certain Plans and Reports | Transaction Information/Business Documents |
| Expansion of Transaction Agreements to be Produced | Transaction Information/Agreements |
| Identification of Other Agreements Between the Parties | Transaction Information/Agreements (Acquiring Person Only) |
| Description of Overlaps | Competition Descriptions/Overlap Description |
| Description of Supply Relationships | Competition Descriptions/Supply Relationship Description |
| Identification of Franchisees with Revenue Overlaps | Revenue and Overlaps/Controlled Entity Geographic Overlaps |
| Identification of Additional Prior Acquisitions | Revenue and Overlaps/Prior Acquisitions |
| Disclosure of Subsidies from Foreign Entities or Governments of Concern | Additional Information |
| Identification of Certain Defense or Intelligence Contracts | Additional Information |
| Voluntary Waivers for International Competition Authorities | Additional Information |
| Voluntary Waivers for State Attorneys General | Additional Information |
| Statement of Penalties for False Statements | Certification |

BILLING CODE 6750–01–C

*A. General Instructions and Information*

The Commission proposed creating a General Instructions and Information section within the proposed Instructions that largely parallels the General section of the current Instructions but is significantly reorganized and includes a ministerial change to clarify what information is found on the PNO website. Within the proposed General Instructions and Information section, the Commission proposed substantive changes to the following sections:

Definitions, Identification of the Filing Person, Responses, and Translations. As discussed below, the Commission adopts some of the changes as proposed, adopts others with modification, and does not adopt others. In addition, in order to effectuate separate, tailored Forms and Instructions for the acquiring and acquired person, and to enhance clarity, the Commission adopts certain ministerial changes discussed below.

1. Definitions and Explanation of Terms

a. Economic Research Service's Commuting Zones

The Commission proposed adding a definition for Economic Research Service's Commuting Zones to facilitate responses to proposed requirements related to labor markets. The Commission received several comments on the Economic Research Service's Commuting Zones, and all cited the burden of this proposal. Many noted that the U.S. Department of Agriculture

has not updated these metrics since 2012, which makes them unreliable as a basis for determining the geographic scope of labor markets. As the Commission is not adopting the information requirements for employees in the final rule (see section VI.I.3.), the Commission does not adopt this definition.

b. Fee Information

The Commission adopts a ministerial change related to this item. As a result of the new fee structure mandated by Congress in the Merger Modernization Act, the fee information description now refers to the adjusted fees and fee tiers.

c. North American Product Classification System Data

The Commission proposed eliminating the reporting of 10-digit North American Product Classification System ("NAPCS") based codes, and, as a result, proposed deleting the NAPCS definition from the proposed Instructions. The Commission received one comment on the elimination of the NAPCS definition; the comment supported the proposed streamlining of manufacturing revenue reporting. The Commission adopts this change as proposed. See section VI.J.1. for further discussion on the elimination of NAPCS-based codes.

d. Notification Thresholds

The Commission adopts a ministerial change related to this item. Currently, the section entitled "Thresholds" discusses filing fee and notification thresholds as a single item. With the fee changes that were enacted in the Merger Modernization Act, these are now separate thresholds. As discussed in section VI.A.1.b., "Fee Information" discusses the fee tiers. The definition of "Notification Thresholds" now discusses only the notification thresholds that are defined in § 801.1(h).

e. Standard Occupational Classification

The Commission proposed adding a definition for Standard Occupational Classification ("SOC") codes to facilitate responses to proposed requirements related to labor markets. As the Commission is not adopting information requirements for employees in the final rule that would require reporting on this basis (see section VI.I.3.), the Instructions do not contain a definition for SOC codes.

f. Select 801.30 Transactions

As discussed in section III.C., the Commission received many comments that objected to the burden of the new

requirements as proposed. Among the objections were claims that the proposed requirements reached transactions that typically were not investigated by the Agencies, that the burden of the new requirements could slow the pace of some transactions and deter others, and that the burden would fall not just on acquiring persons but on target companies that did not initiate or consent to the transaction. One commenter urged the Commission to exempt from HSR reporting requirements certain transactions that the Agencies rarely challenge, including acquisitions of voting securities that do not transfer control of the target company. The Commission acknowledges these comments, and while it disagrees that there is any category of transaction for which all of the adopted proposals should not apply, it does agree that exempting certain transactions from some of the new requirements will not inhibit the Agencies' ability to understand the transaction and determine that it warrants further investigation. To that end, the Commission limits the amount of information required for the notification of certain transactions subject to § 801.30 that also meet specific conditions.

Section 801.30(a), first promulgated by the Commission in the original rules, defines certain types of transactions in which the consent of the acquired person may not be required.[329] These transactions include acquisitions made on the open market, via tender offers, through the exercise of warrants or options, or through the conversion of non-voting securities. The involvement of the acquired person varies across these transactions. In some instances, such as an investor acquiring voting securities on the open market, the acquired person does not have to agree to the transaction and may not even have knowledge of it. In others, the acquiring and acquired person both assent to the deal. For example, some transactions are effectuated by a tender offer or the acquisition of purchases on the open market or from third parties—making § 801.30 applicable—but are also subject to an agreement between the acquiring and acquired person.

When the agreement of the acquired person is not required in a transaction, the Commission believes that certain requirements of the final rule are unlikely to provide information necessary to determine whether that transaction may violate the antitrust laws. Several commenters agreed that in

[329] 16 CFR 801.30(a); *see also* 43 FR 33450, 33483 (July 31, 1978).

such transactions the target in particular would not be able to provide the new information required in the final rule in the short time they have to make their filing. Further, in such transactions, the acquired person may not know that it has a filing obligation until the acquiring person has filed and will have limited time to prepare its filing. For this select set of transactions, the Commission has determined that it is not necessary to collect certain information, particularly in light of the costs that would be imposed on these types of filings which often carry low antitrust risk. Therefore, the Commission, adapting suggestions from the comments, introduces and defines the term "select 801.30 transactions." Select 801.30 transactions are those transactions that do not result in the acquisition of control to which § 801.30 applies and where there is no agreement or contemplated agreement between any entity within the acquiring and acquired person. An example of a select 801.30 transaction includes an acquisition of voting securities on the open market via a national exchange by an investor that has no other ties to the issuer and which acquisition does not result in the acquisition of control. Additionally, select 801.30 transactions include acquisitions resulting from a traditional executive compensation arrangement where the executive exercises contractual benefits pursuant to a compensation package to acquire voting securities and nothing more.

In addition to excluding transactions in which there is an agreement between the acquiring and acquired person, the definition of "select 801.30 transactions" excludes transactions that would result in the acquiring person obtaining control, as defined by the Rules, of the acquired entity or where the acquiring person has obtained or will obtain certain rights related to the board of directors, general partner, or management company of an entity within the acquired person. These excluded transactions are likely to require a more thorough review for potential antitrust risk, and therefore it is necessary and appropriate for the Agencies to receive some additional information related to them as contemplated in this rulemaking. The Commission uses the term "select 801.30 transaction" throughout the discussion below, and transactions that meet the definition will not be required to respond to certain items as part of the Commission's efforts to limit costs to filing parties in response to the comments. See Figure 3.

**Federal Register**/Vol. 89, No. 218/Tuesday, November 12, 2024/Rules and Regulations **89279**

### g. Supervisory Deal Team Lead

As discussed in section VI.G.1, the Commission proposed that, in addition to requiring documents prepared by or for officers and directors in response to current Item 4(c), filing persons must also submit transaction-related documents prepared by or for supervisory deal team lead(s). This proposal targeted documents authored by or for the person who functionally led the deal team even if not an officer or director. In the Agencies' experience with Second Request responses, these documents often include information that would have been highly relevant to the Agencies' analysis of the transaction during the initial waiting period to determine whether Second Requests should issue and what additional information they should seek. The Commission adopts this definition to limit the proposal to a single individual and provide clarity regarding identification of the appropriate individual.

The proposed rule noted that the identification of any supervisory deal team lead would not be based upon title alone and that this addition would require the filing person to determine the individual or individuals who functionally lead or coordinate the day-to-day process for the transaction at issue. A supervisory deal team lead need not have ultimate decision-making authority but would have responsibility for preparing or supervising the assessment of the transaction and be involved in communicating with the individuals, such as officers or directors, who have the authority to authorize the transaction. In the proposal, any such individual(s) might be the leader(s) of an investment committee, tasked with heading the analysis of mergers and acquisitions, or otherwise given supervisory capacity over the flow of information and documents related to transaction.

The Commission received many comments on its proposal to require current 4(c) documents from the supervisory deal team lead(s). Several comments noted that the proposed Instructions do not offer a definition of supervisory deal team lead(s) and that the proposed rule's description of the term was vague, ambiguous, and subjective, leaving filers uncertain which individuals must be searched in addition to officers and directors. One comment stated that the term was neither defined nor self-explanatory, and the proposal's descriptions of what constitutes a supervisory deal team lead(s) offers two separate standards. Yet another comment noted that the

description could potentially describe a company's entire corporate development team.

Concerns about the meaning of the term "supervisory deal team lead" led a number of commenters to propose a definition. One commenter suggested limiting supervisory deal team lead to the senior most member of the corporate development team responsible for driving the strategic vision and assessment of the deal, who would not otherwise qualify as an officer or director. Another commenter suggested it should be the most senior member of a filing party's deal team responsible for the company's strategic vision and who otherwise would not qualify as a director or officer. Also, another commenter offered that supervisory deal team lead(s) should be expressly defined to mean the individual with primary responsibility for supervising the assessment of the transaction, and that it should only be one person.

The Commission acknowledges that a definition of supervisory deal team lead in the Instructions would help filers accurately identify the appropriate individual to be searched for responsive materials. The Commission notes that many of the comments' proposed definitions provided useful contours to help define the term. As discussed above, certain commenters suggested a definition that the relevant individual have responsibility for business strategy associated with the transaction under review. The Commission agrees that centering the definition on the "primary responsibility" for the strategic assessment of the deal will help identify the correct individual.

The Commission also agrees that the definition should focus on one supervisory deal team lead to mitigate any confusion or uncertainty raised in the comments about having two or three supervisory deal team leads. As discussed in section VI.G.1., several commenters also raised concerns with the burden associated with collecting documents from additional custodians, particularly if multiple individuals fulfilled that role.

The Commission therefore adopts a new definition for "supervisory deal team lead" as the individual who has primary responsibility for supervising the strategic assessment of the deal, and who would not otherwise qualify as a director or officer. This definition focuses on the one person who oversees the strategic assessment of the transaction and it should mitigate the concerns of some commenters that the term is so vague that it might introduce uncertainty as to when the initial HSR waiting period begins. These

commenters explained their concern that Agency staff may become aware of another employee who would better constitute a supervisory deal team lead than the individual selected by the filer and reject the filing. In response to comments that requiring filers to select a supervisory deal team lead will allow the Agencies to reject filings, the Agencies will continue to rely on filers to certify to their good faith belief in completing and certifying to the accuracy of the filing, and the Agencies will continue to rely on that good faith. In the situation where the only individuals supervising the strategic assessment of the deal are already either an officer or director, filers can state that this is the case and identify an officer or director as the supervisory deal team lead.

### h. Target

For additional clarity in the instructions, the Commission introduces and defines the term "Target" as a ministerial change. The target includes all entities and assets to be acquired by the acquiring person from the acquired person and eliminates the need to use the inadvertently confusing phrase "the acquired entity(s) or assets" throughout the Instructions. The Commission notes, however, that the Instructions do continue to use "acquired entity(s)" in certain instances where a question may not be relevant to the acquisition of assets.

### i. Year

As part of the Commission's effort to add more clarity to the Instructions, the Commission makes a ministerial change to the definition of "most recent year" found in the definition of "year" to make clear that the "most recent year" is the most recently completed calendar or fiscal year. This is the current intent of the definition and consistent with the guidance that has been given informally and with how filing persons complete the form and provide information.

### 2. Filing as an Acquiring and Acquired Person

As discussed in section V.C., the Commission adopts the proposed changes to § 803.2 such that filing persons will be required to submit separate forms when filing as an acquiring and acquired person. Additionally, the Commission has created separate, tailored Forms and Instructions for the Acquiring and Acquired Person. Since filers will choose the appropriate Form for the filing, the Commission adopts the ministerial change to eliminate the question, currently Item 1(c), asking the

filing person to identify whether the filing is being made as an acquiring or acquired person.

3. Responses

In the new Responses section, the Commission proposed setting out the specifics of how filers would provide the information responsive to the proposed new questions. The revisions included eliminating instructions regarding filings made on paper or DVD, see above at section IV.A; the Commission adopts these changes as proposed. The proposed responses section also described the information that filing persons would need to provide in a log of responsive documents and descriptive responses to be submitted with an HSR Filing. This information would have generally been the same as the information currently required for documents submitted in response to Items 4(c) and 4(d) of the current Form, with two proposed expansions. The first would have required the filing person to identify the request(s) to which the document would be responsive. The second would have required the identification of the individual within the acquiring or acquired person who supervised the preparation of documents prepared by third parties, or for whom the document was prepared. The Commission adopts the proposal with modifications to reflect the layout of the Form and to reduce the burden for transactions that do not have either a NAICS overlap, see section VI.J., or overlap or supply relationship identified in the Competition Descriptions, see section VI. I.

The Commission received two comments regarding the new Responses section, both of which focused on the proposed requirement for filing persons to provide the name, title, and company of the individuals within the filing person who supervised the preparation of third-party documents or for whom the documents were prepared. One commenter expressed concern that the proposal could put certain fund employees at risk of violating their nondisclosure agreements with target companies. Another commenter noted that there is minimal if any value to the Agencies having this information for every single reportable transaction, but collecting and filing a comprehensive list of all the people who may have supervised the creation of these documents will require many hours of work.

The Commission acknowledges the cost but disagrees that this information is not valuable or informative. In the Agencies' experience, knowing the

authors of documents assists in the evaluation of the documents as well as any subsequent investigation by providing context regarding who was involved in the preparation of the document. Currently, the Agencies do not receive this context for documents prepared by third parties. Therefore, for documents prepared by third parties, such as consultants or bankers, the Commission adopts the proposal for the filing person to identify the individual or individuals who supervised the production of such documents, or for whom the document was prepared. This information will not be required for documents that were provided to the parties without solicitation, or for documents provided to the acquiring or acquired person by the other party.

As part of the Commission's overall effort to reduce the burden on filing parties, the Commission has revised the proposal to only require authors (or the individuals that supervise the creation of documents) for filings in which there are NAICS overlaps, or overlaps or supply relationships identified in the Competition Descriptions. For those transactions where such an overlap or supply relationship has been identified, filers will be required to provide the same author information as is currently required for documents responsive to Items 4(c) and 4(d), as well as the individuals within the filing person who supervised the preparation of third-party documents or for whom the documents were prepared. The Commission notes that these third-party documents are already required. The additional information is related to the identification of the individuals within the acquiring or acquired person, so no new non-disclosure risks should result from the requirement. Finally, because the Form requires identification of the file name for each document submitted, the "Responses" section does not require a document log. A privilege log will still be required.

4. Translations

As noted in section V.E., the Commission amends § 803.8 to require the filing person to submit English translations of all foreign-language documents. The Instructions also reflect this change.

5. Non-Compliance

While the Commission does not make any changes to the explanation of "non-compliance," it does emphasize that if the filer is unable to answer any question fully, it is required to provide the information that is available and provide a statement of reasons for non-compliance consistent with § 803.3 and

as permitted by the HSR Act.[330] Further, where exact answers cannot be given, filers are allowed to enter best estimates, while indicating the source or basis of the estimate and marking the information with the notation "est" for any item where data are estimated. The Commission routinely accepts filings and commences waiting periods for filings that avail themselves of this procedure. For example, publicly traded filers are often unable to identify with certainty their minority shareholders, and instead provide information that has been filed with the SEC. The Commission did not propose any changes to this Instruction and does not change it now.

*B. Fee Information*

Although the Commission proposed moving the filing fee information to the Transaction Information section of the proposed Instructions, in the final Form and Instructions, filing fee information will instead be collected in its own section. The Form also includes new areas for filing persons to indicate whether the fee is being paid by more than one entity, and if so, how much each entity will pay. Additionally, the Commission adopts a ministerial change to eliminate the need to provide Taxpayer Identification or Social Security Numbers and the name of the institution, such as the bank, from which the fee will be paid. The Commission has determined that it no longer needs this information to identify filing fees, and parties therefore no longer need to provide it.

*C. General Information*

The General Information section of the Form and Instructions requires filing persons to indicate whether the transaction is a post-consummation filing, cash tender offer, or bankruptcy, and whether early termination of the transaction is requested—information that is currently collected on the first page of the Form. The Commission did not propose and does not adopt any material changes to these items.

*D. Ultimate Parent Entity Information*

1. UPE Details

The UPE Details section of the Form and Instructions requires information about the UPE of the acquiring or acquired person, including contact information, financial documents, and information about certain minority shareholders or interest holders. Much of this information is currently required by Items 1, 4(a) and (b), and 6(b). The Commission proposed (1) requiring

---

[330] 15 U.S.C. 18a(b)(1)(A)(ii).

contact information for the individual to whom Second Requests should be sent; (2) clarifying the instructions related to the provision of financial documents for natural person UPEs; (3) requiring filers to stipulate that the appropriate size of person threshold is met, if applicable; (4) identifying additional minority holders of entities within the acquiring person; and (5) reducing the types of minority holders of the acquired entity that must be reported. As discussed below, the Commission adopts some of these proposals without change and some with modification.

a. Contact Information

The Commission proposed that all filers, not just foreign filers, must identify the individual to whom Second Requests should be addressed. The Commission received no comments on this change and adopts it as proposed.

b. Annual Report and Audit Reports of the UPEs

This section requires information currently required by Items 4(a) and 4(b) as it pertains to the UPE of the acquiring or acquired person. Annual and audit reports of other entities within the acquiring and acquired person are required by the Acquiring and Acquired Person Structure section, as discussed in section VI.D.2.b. The Commission proposed clarifying the current instructions regarding which annual reports and audit reports are required from natural person UPEs. The Commission makes no change to the instruction that natural person UPEs should not produce any personal balance sheets or tax returns. Since natural persons should not provide personal financial information, no information should be provided in the UPE section. The Commission did not propose and does not make any change to the annual or audit reports required of the UPE of the acquiring or acquired person.

The Commission did propose clarifications regarding what other annual and audit reports entities within the same person as natural person UPEs must provide. This proposed clarification is discussed in section VI.D.2.b.

c. Size of Person Stipulation

The Commission proposed adding an item on the Form that would allow filers to stipulate that the size of person test is met (at the appropriate dollar amount) or indicate that the size of person test is not applicable. The Commission received no comments on this change and adopts it as proposed.

d. Minority Shareholders or Interest Holders

The Commission proposed a Minority Shareholders or Interest Holders section to require identification of minority interest holders of certain entities within the acquiring person and the acquired entities. Currently, Item 6(b) requires acquiring persons to identify minority holders of 5% or more but less than 50% of the acquiring entity and the UPE of the acquiring person (or, for natural person UPEs, the highest-level entities they control). Acquired persons are required to report such minority holders of the acquired entity. For UPEs of the acquiring person, acquiring entities, and acquired entities that are limited partnerships, only disclosure of the general partner is currently required.

The Commission proposed several changes to require additional information about the identity of minority holders, as well as identification of additional minority interest holders by the acquiring person, but potentially fewer by the acquired person. First, the Commission proposed requiring disclosure of the "doing business as" or "street name" of minority investors that are related to a master limited partnership, fund, investment group, or similar entity. Second, the Commission proposed to expand the entities for which the acquiring person must identify certain minority interest holders to include entities related to the acquiring entity. Third, the Commission proposed requiring the identification of certain minority holders of limited partnerships, rather than just the general partner. Finally, the Commission proposed limiting the minority interest holders that acquired persons would need to identify. The Commission adopts the first two proposals without change but modifies the limited partners that need to be identified, as discussed below.

(i) Provision of "Doing Business As" or "Street Names"

First, the Commission proposed that the acquiring person provide the doing business as or "street name" of minority investors that are related to master limited partnerships, funds, or investment groups. The Commission did not receive comments on this specific proposal but did receive comments to similar proposed requirements in other areas of the Instructions. Objections in these other sections generally focused on the lookback period and the burden of searching for all names that were potentially used by a business. In this section, the Commission did not

propose a lookback period, but instead proposed requiring only the current name of the related master limited partnership, fund, investment group, or similar entity.

The Commission continues to believe that this information should not be costly for filers. In many cases, communication between the acquiring person and the investor will include this information. For example, though the minority investor may be RANDOMNAME, LLC, the acquiring person regularly communicates with INVESTMENT GROUP and sends information related to the investment in care of that business. However, if this information is not known to the acquiring person, it can so note in a statement of non-compliance.

The task of screening transactions for potential competitive effects is stymied when filers provide only legal names, which are often unrelated to the name by which the public knows the business. Knowing the d/b/a or street name of the entities involved in the transaction allows staff to use public resources to gather additional information, for example through internet searches or look-ups using commercial services relied on by the Agencies to provide industry data. Because of the value to the screening process, the Commission adopts this requirement as proposed.

(ii) Identification of Additional Minority Investors in the Acquiring Person

The Commission next proposed two changes that could increase the number of minority investors the acquiring person would need to identify: First, it proposed that the acquiring person be required to report holders of 5% or more but less than 50% of (1) the acquiring entity, (2) any entity directly or indirectly controlled by the acquiring entity, (3) any entity that directly or indirectly controls the acquiring entity, and (4) any entity within the acquiring person that has been or will be created in contemplation of, or for the purposes of, effectuating the transaction. Second, it proposed that filing persons report holders of 5% or more but less than 50% of limited partnerships, in addition to the general partner.[331]

Comments on these two proposed changes were similar and often intertwined. One commenter urged the Agencies to collect the proposed new information and stated that the ownership structure resulting from the

[331] This change also relieved natural person UPEs from the obligation to identify minority shareholders of all top-level entities, instead only requiring identification for entities related to the transaction.

transaction may change the parties' incentives to compete, enhance the acquirer's ability to influence decision making through changes in voting interests or governance rights, or facilitate the sharing of competitively sensitive information between rivals. Two others also supported the proposal, with each noting the various potential anticompetitive impacts of minority interests. One commenter stated that these new requirements would address complex corporate structures, which may obscure potentially significant relationships. The other commenter also supported providing more information about shareholders, particularly since the current Form and Instructions can treat portfolio companies of private equity funds as independent from each other and their management companies.

Broadly, critics of these proposed changes expressed concerns about the burden of collecting the requested information. Additional criticisms included objections to the five percent threshold for identification, with commenters stating that the interests of such minority investors may be wholly unrelated to the notified transaction, or less likely to result in a substantial lessening of competition. Concerns were also raised about confidentiality and disclosure, noting the Commission's prior consideration of the fact that the identity and investment level of limited partners is often highly confidential when it decided in 2011 not to require disclosure of limited partners.

Commenters further speculated that requirements to disclose the identity of additional minority investors could create a chilling effect on fundraising and deals. Finally, commenters stated that such a decrease in fundraising and deal volume could affect smaller businesses, pension plans, endowments, charitable foundations, and activist investors, among others. Each of these objections is discussed below.

(a) Identification of Minority Holders of Additional Entities

Regarding the first proposal to expand the entities for which minority holders must be identified, the Commission notes that until 2011 acquiring persons were required to report minority holders of 5% or more for all corporate entities within the acquiring person that had assets of $10 million or greater. As part of the 2011 rulemaking, the Commission determined that this broad requirement, which could reach entities within the acquiring person that had no nexus to the reported transaction, was not essential to an initial review of the transaction.[332] Through this change, the Commission expanded the requirement to include identification of minority holders of non-corporate entities, but it limited the obligation for the acquiring person to the identification of minority holders of only the acquiring UPE and the acquiring entity. As a result, the Agencies receive information about

what entities have a "seat at the table" in the case of very simple corporate structures where the acquiring person UPE directly controls the acquiring entity without any intermediary entities, or where intermediary entities are wholly owned by the acquiring person, without the acquiring person providing information about entities unrelated to the transaction.

Since 2011, however, the Commission has learned through experience that many acquiring persons have more complex structures that include many entities between the UPE and acquiring entity that are not wholly owned but that are related to the acquiring entity. For example, "A" plans to acquire a target and will bring in "B" as a co-investor. The UPE of "A" creates (or already has) a number of intermediary entities within its person to effectuate the transaction. "B" does not invest in either the UPE of "A" or the entity that will make the acquisition, but rather in one of these intermediary entities. Currently, as illustrated in Figures 4 and 5a, when "A" makes its filing, it is not required to disclose the co-investment of "B" so long as the investment is below 50%. The current focus on just the UPE and the acquiring entity deprives the Agencies of key information about individuals and entities that may have influence, or even management or operational oversight, over entities related to the transaction and could make or influence competitively important decisions post-acquisition.

---

[332] 75 FR 57110, 57118 (Sept. 17, 2010); 76 FR 42471, 42472 (July 19, 2011).

# Figure 4: Current Rules Only Requires Disclosure of Minority Holders (or General Partner) of A



## Figure 5a: Current Rules Do Not Require Disclosure of B Fund as a Co-Investor in the Acquisition; No Ability for Agencies to Know to Research B Fund's Other Holdings



As discussed in section II.B.1., and illustrated in Figure 5a, individuals or entities that have significant rights or holdings in entities related to the acquiring entity may also take active positions in or exert control over competitively significant businesses, including competitors, and the disclosure of these relationships could surface antitrust risks that require the Agencies' attention during the initial antitrust review. Because information that reveals whether there are existing investment relationships between the acquiring person and the target is necessary and appropriate for the Agencies' initial antitrust review, the Commission adopts this change as proposed. As a result, as shown in Figure 5b, the Agencies will receive the information necessary to determine whether the acquisition of the target by the acquiring entity may violate the antitrust laws.

Federal Register/Vol. 89, No. 218/Tuesday, November 12, 2024/Rules and Regulations    **89285**

## Figure 5b: Final Rules Require Disclosure of B Fund; Agencies Know to Research B Fund's Other Holdings



In objecting to these proposals, commenters stated that identification of these additional minority holders would be burdensome. The Commission notes that, rather than merely reviving an expansive requirement to disclose all the minority investors of entities within the acquiring person, it proposed a more tailored instruction to require disclosure only of the entities that are related to the transaction. Given this limitation and the information gaps caused by vast changes to the M&A landscape discussed in section II.B.1., the Commission believes that the identification of the minority holders of the entities that are related to the transaction is necessary and appropriate and should be contained in an HSR Filing. Further, if the acquiring person does not have knowledge of the identity of the minority investors, it can so indicate and explain, just as acquiring persons currently do when the minority investors of the UPE or acquiring entity

are unknown.[333] For example, acquiring persons that have publicly traded UPEs routinely note that they do not have information about minority holders beyond what is reported to the SEC.

One commentor stated that the "direct or indirect" and "control or controlled by" language was broad and would require substantial time and resources to navigate. The Commission disagrees and notes that this requirement does not require a broad analysis of various theories of control but rather requires a determination of "control" as defined by § 801.1(b). The proposed instruction stated that the controlling relationship can be either direct or indirect to make clear that the requirement was not limited to entities just one level above or below the acquiring entity. For example, in a common scenario involving multiple shell entities, the acquiring UPE controls an intermediary entity that controls an intermediary entity that controls the acquiring entity,

as shown in Figure 6a below. The Instructions contained in the final rule require disclosure of minority holders of five percent or more of each of those intermediary entities, subject to the limitations on disclosure of limited partners discussed below in section VI.D.1d.ii., as shown in Figure 6b. Control is a long-standing concept in the Rules, and the determination of control in this context is consistent with control determinations that filers need to make for a variety of items currently included in the Form and Instructions.

The Commission received suggestions to change the existing five percent threshold but declines to adopt this change. Because of the complexity of investment structures, minority investors with even low equity stakes can have formal rights to direct or influence the strategic decisions of the company, informal channels to exert influence, or the right to obtain sensitive business information about the entity in which they are invested. Further, as illustrated in Figures 6a and 6b, investment groups may be broken up

---

[333] See also the discussion of non-compliance in section VI.A.5.

**89286**     **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

across multiple entities that are, for HSR purposes, separate persons.[334] These types of organizations can take active positions in multiple companies in the same or related industry, a trend that the Commission and commenters have observed. As a result, the Agencies need to know who these investors are in order to determine whether the acquiring person has connections to the target's business that could have competitive effects.

## Figure 6a: A Single Investment Group May Divide Its Investment; Current Rules Do Not Require Disclosure if Investments Are Not Made in A or Acquiring Entity



[334] In 2020, the Commission proposed changing the HSR Rules to require aggregation of such interests when determining whether a filing must be made. 85 FR 77053 (Dec. 1, 2020). The Commission has not adopted any of those proposals. This more modest proposal to identify minority shareholders does not create any new obligations to file but does provide the Agencies with the identity of funds and other investors that hold, or will hold, interests in entities related to the acquiring entity through multiple HSR persons, allowing for further investigation as warranted.

## Figure 6b: Final Rules Require Disclosure Regardless of the Entity In Which B Fund Invests



The Commission disagrees with the commenters' assertions that this information is not necessary to assess the competitive effects of the filed for transaction and is beyond the authority of the Commission. As discussed in section II.B.1., that analysis requires the Agencies to understand the scope of the acquiring person's involvement in the business of the target. Minority holders of entities within the acquiring person that are related to the acquiring entity may have the ability to influence decision-making of the acquiring entity and target post-acquisition. Therefore, they are functionally ''in the deal'' and their existing business relationships are relevant to a thorough antitrust analysis of the transaction. The increasing complexity of corporate structures and investment vehicles has increased the number of minority interest holders, and the Commission has determined that the Agencies need to update the information requirements to keep pace with these changes.

The Commission finds the additional critiques of the proposal unpersuasive as well. The Commission addresses arguments about chilling deal volume and investment levels in section III.C.2. above. As to commenters opposing this particular change to the Instructions, the Commission is unaware of any evidence that fundraising or deal volume was negatively affected during the period prior to 2011 when HSR rules required broader disclosure of minority investors, nor that such activity increased when the requirement was dropped. Given the many other factors that influence the level of investment and M&A activity generally, the Commission believes it is unlikely that the disclosure of minority holdings in parties involved in reportable transactions has any measurable effect on dealmaking or investment levels.

Further, commenters objecting to the Agencies' need for identification of additional minority interest holders also offered contradictory critiques, with some stating that the Commission did not identify transactions where the minority interest holders were relevant to the competition analysis, and others stating the fact that the Commission offered two examples demonstrated that the current Form and Instructions provided the Agencies with sufficient information. First, cases cited in the NPRM provide examples of enforcement actions brought by the Agencies on various legal theories and fact patterns and do not necessarily reflect cases that were discovered through the HSR process. Second, the need for this information is obvious and its relevance plain: the Agencies need to know who will be making decisions for the combined entity post-acquisition. For example, the hypotheticals discussed above demonstrate that existing information gaps in the current Form leave the Agencies without enough information to even know to ask additional questions about additional individuals and entities within ''A.'' In the hypotheticals above, ''B'' could hold up to a 49.9% stake in an entity related to the transaction and functionally jointly control the acquiring entity along with ''A.'' Or ''B'' could hold only 5% but have ancillary rights or outsized influence over the operations of the acquiring entity (and thus the target after consummation). Or ''B'' could be its own person for HSR purposes, but one of several related entities that each has a minority interest that, when aggregated, account for a significant, or even majority, stake in the acquiring entity. In any of these scenarios, as well as many others, the identity of the minority interest holder would be critical to understanding the competitive implications of the transaction. Though the filing requirement falls on ''A,'' ''B'' has a seat at the table, and the Agencies must be able to investigate whether ''B'' has ties

to the business of the target. If the Agencies are not alerted to the existence of "B" on the Form, there is no ability to screen for potential issues that arise from "B's" involvement in both the acquiring entity and, upon consummation, the target.

Regarding concerns about privacy, the Commission notes that the contents of HSR filings are confidential.[335] Unlike requirements for disclosure made by private parties or government rules promulgated to require public disclosure, information included in HSR filings is protected by statute. Additionally, disclosure of minority investors, other than limited partners, which are discussed below, is already required by the current Form. The proposal to require identification of additional minority investors, including some limited partners, is an incremental expansion of what is currently required (and for corporate entities, less than what was required under the HSR Rules from 1978 to 2011). Additionally, the Agencies often require disclosure of an even broader group of minority investors, including limited partners, in response to a Second Request, as discussed in more detail below. The proposed requirements, therefore, did not introduce any new privacy concerns, and commenters did not offer any evidence that the current disclosure rules have created any substantive issues related to privacy.

The Commission further notes that the proposed requirements do not require the acquiring person to ask the minority investors for any information. Therefore, completion of the Form itself should impose no burden on the minority investors themselves. Only if the identity of the minority investor reveals a competitively relevant connection and an investigation is

opened would the investor potentially have any cost. These costs are not imposed by the information requirements of Form and Instructions but rather by a potential investigation or enforcement action for a violation of the antitrust laws. Disclosure of an existing business or financial relationship in an entity that is engaging in an HSR-reportable transaction is not an improper burden and allows the Agencies to fulfill their statutory mandate to scrutinize every filing to determine whether it may violate the antitrust laws.

(b) Identification of Limited Partners

In addition to increasing the number of entities for which minority shareholders would need to be identified, the Commission also proposed requiring the identification of minority investors of limited partnerships that held 5% or more, in addition to the general partner. Filing persons are currently only required to identify the general partners of limited partnerships, but not limited partners, regardless of the percentage held. After considering the comments received regarding this proposal, the Commission adopts a modified requirement to identify only the general partner and limited partners that have certain rights related to the board of directors (or similar bodies) of entities related to the acquiring entity.

The current requirement to identify only the general partner of limited partnerships, and not its minority investors, was based on the understanding that limited partners had no control over the operations of the fund or portfolio companies.[336] As discussed above and in section II.B.1., the operations and investments of limited partnerships and limited

partners cannot be easily generalized. Though some argue that limited partners may have limited influence over investment or operational decisions, this is not universally true. Limited partnerships often file for acquisition of control of entities. Investment groups, which utilize limited partnerships, often make investments in specific industries, leaving open the possibility that there is a competitive relationship between these investments and the target of the filed-for transaction.

Further, the Commission has learned through its work that limited partnerships are not exclusively used as vehicles for diffuse groups of passive investors to invest their capital. Instead, some limited partnerships function as aggregation vehicles that allow private equity or other investor groups to direct the strategic business decisions of the portfolio companies in which they invest. The decision to organize as a limited partnership rather than an LLC or incorporated entity may be driven not by how the entity will function in the marketplace but by other factors, such as tax and liability.

The scenario in Figure 7a illustrates how the current Form and Instructions' lack of information about limited partnerships can affect a preliminary antitrust assessment. "A" and "B" form a new limited partnership that will be an acquiring person. "A" and "B" will each hold 49.9% of this entity and will have rights related to the board (or similar bodies) of entities related to the transaction. The remaining 0.2% will be held by the general partner. Pursuant to the current Instructions, this newly formed acquiring person would not be required to provide any information other than the name and address of its general partner when making a filing for a reportable transaction.

---

[335] 15 U.S.C. 18a(h).

[336] 75 FR 57110, 57118 (Sept. 17, 2010) (proposed rule), *adopted* 76 FR 42471 (July 19, 2011).

Figure 7a: Current Rules Only Require UPE to Disclose Name and Address of Its General Partner; No Disclosure that A and B are Functional Buyers of Target



Compounding the difficulty in understanding the scope of the acquiring person's relationships, A Investment Group and B Investment Group may have used a code name for the transaction, such as ''Project Alpha,'' and also used that code name to name the newly created entity. In this scenario, the Agencies could receive a filing from Alpha Fund, L.P., that only discloses that it has a general partner, Alpha GP, L.P. There is no requirement that Alpha Fund, L.P. disclose that A Investment Group and B Investment Group each hold nearly 50% and will effectively co-own and manage the target after consummation. A Fund I or B Fund I could be head-to-head competitors of the target (or control competitors of the target) or have some other competitively significant relationship with the target. But the current Form would not make the Agencies aware of their significant stake in Alpha Fund, L.P. As shown in Figure 7b, the final rules address this by requiring the identification of A Fund I and B Fund I (and their affiliations with A Investment Group and B Investment Group, if known to UPE), allowing the Agencies to research whether the transaction may violate the antitrust laws.

Figure 7b: Final Rules Require UPE to Disclose Name and Address of Its General Partner and the Investment of A Fund I and B Fund I; Agencies Know to Research Holdings of A and B



The Commission notes, as did one commenter, that in some instances the Agencies may receive some disclosure through the reporting of associate overlaps in current Items 6(c)(ii) or 7(b)(ii) and 7(d). However, many

investment groups are set up such that the associate definition, which focuses on entities, does not apply, even though the same individuals may be managing multiple funds. The Commission considered changing the definition of associates but determined that, at this time, it would be less complex and less burdensome on filers to merely require the identification of certain limited partners, which the Commission believes will allow the Agencies to use other sources to conduct a preliminary assessment of the competitive implication of these minority holders. If this proves to be insufficient, the Commission may revisit the requirements in future rulemakings.

Despite the need for identification of some limited partners, the Commission understands that there are still many limited partners who are essentially ''silent'' investors that do not participate in management decisions. They hold only financial interests for the purpose of earning a return on their investment and do not hold additional rights or participate in the governance or business operations of the limited partnership or the investments of the limited partnership. Therefore, the Commission adopts an incremental change for the identification of limited partners, implementing in part the suggestion of one commenter to require only limited partners that have certain

rights related to the board of directors or similar bodies of entities related to the acquiring entity.[337] The hypothetical in Figure 8a shows a structure where the UPE of the acquiring person is a limited partnership in which its limited partners do not have any rights related to the board of directors or similar bodies of any of the UPE, Acquiring Entity, or either of the two Controlled entities between them. Additionally, UPE controls a limited partnership in which B Fund, an active co-investor for the transaction, has made its investment. Currently, UPE is only required to disclose its general partner.

Figure 8a: Current Rules Only Require UPE to Disclose the Name and Address of Its General Partner



As shown in Figure 8b, the final rules would not require the disclosure of the ''Outside Investor Limited Partners'' because none has any rights to the board

or similar body of an entity related to the acquiring entity. In contrast, UPE would need to disclose that B Fund is a limited partner of the Controlled

entity as well as the general partners of UPE and Controlled LP.

---

Figure 8b: Final Rules Require UPE to Disclose General Partners and its Active Co-Investor (B Fund) But Not Passive Limited Partners or the Holdings of B Fund



In the Commission's experience, competitive concerns that arise from limited partners holding interests in the acquiring person most frequently stem from those limited partnerships that act as vehicles for investor groups to manage, direct, or influence the portfolio companies in which they invest. The Commission has determined that it is not necessary to know the names of limited partners that do not also have certain management rights and the final rule does not require disclosure of their minority interests.

The Commission expects that this modification will address concerns of commenters that disclosing limited partners would require investment firms to renegotiate agreements with limited partners. As discussed above, there is no restriction on the Agencies' ability to require disclosure of the identity of limited partners today during an in-depth investigation of the transaction. As a result, limited partners should be aware that their holdings may be relevant to an antitrust review of any transaction involving one of their investments. Indeed, the Commission has brought enforcement actions against acquisitions involving minority holdings of limited partners in competing businesses.[338] As the

agencies charged with enforcing the antitrust laws, the Agencies have the authority to investigate the commercial dealings of limited partners for potential law violations regardless of any private agreements that promise non-disclosure. Therefore, any deficiency in agreements to permit disclosure to government agencies already exists. Further, if disclosure is the source of the Agencies' being made aware of a potential competitive concern with the transaction, any cost to the limited partner related to the completion and submission of the HSR Filing is justified because the information is necessary to determine whether the transaction may violate the antitrust laws. Nonetheless, the Commission has modified the requirement to reduce the type of limited partners that must be disclosed, focusing only on those with the ability to participate in management or control. On this basis, filers can exclude limited partners who serve as passive investors, who are essentially the customers of private investment firms, according to one commenter. To the extent that these limited partners do not participate in the management of the filing person, they need not be disclosed as a minority holder.

(iii) Limiting Requirements for Acquired Persons

Finally, the Commission proposed limiting the reporting requirements for the acquired person. Currently, the acquired person must identify the name and headquarters address of all holders of 5% or more but less than 50% of the acquired entity, along with the percentage held. If the acquired entity is a limited partnership, only identification of the general partner and its headquarters address is required. The Commission proposed limiting this requirement to minority holders of the acquired entity that would hold an interest after that consummation or would receive an interest in another entity within the acquiring person as a result of the transaction. However, the proposed requirements to identify certain limited partners also applied to the acquired person, if the minority investors will stay with the target post-acquisition. The Commission adopts this proposal with modification.

The proposed limitation to identify only minority interest holders of the target that will remain invested after consummation is intended to reduce the cost of complying with the final rule for the acquired person. The Commission has determined that the identity of any minority interest holder of the target that will cease to be involved with the target or acquiring person post consummation has limited relevance to understanding who could influence decision-making of the business post-

[338] *See, e.g., In re Red Ventures Holdco, LP,* No. C–4627 (F.T.C. Nov. 3, 2017) (overlapping limited partnership holdings violated section 7); *In re TC Group, L.L.C.,* No. C–4183 (F.T.C. Mar. 16, 2006) (acquisition involving minority stake giving two private equity investors seats on the boards of competitors).

acquisition. The Commission adopts this portion of the proposed rule. It modifies the proposed instruction to reflect the modification it adopts for the identification of limited partners, as described above. Thus, the final rule will require the acquired person to only identify minority holders of 5% or more if such holder will continue to be invested in the target or will acquire an interest in an entity within the acquiring person. If the target is a limited partnership, only limited partners (1) that hold 5% or more in the acquiring entity, (2) will continue to hold an interest in the acquired entity, or acquire an interest in the acquiring person, after the transaction is consummated, and (3) will have that certain rights related to the board of directors or similar bodies of entities related to the acquiring entity will need to be identified. If the acquired person does not have this information, it can so note in an endnote.

The Commission also notes that one commenter focused on the requirement to identify roll-over investors, stating it would be a new burden that would discourage continued post-transaction investment. The Commission disagrees with this assessment. Currently, the acquired person already must identify all 5%–49.9% holders of the acquired entity, including roll-over investors. Further, the Commission once again notes that the amount of information required is limited; only the name of the minority interest holder (and the name of the master limited partnership, fund, or investment group, if applicable), its headquarters address, the name of the acquired entity it holds an interest in, and the percentage held must be disclosed.

### 2. Acquiring Person and Acquired Entity Structure

The Acquiring and Acquired Person Structure sections of the Form and Instructions require the reporting of information currently required by Items 1(f), 4(a) and (b), and Item 6(a). The Commission proposed that filing parties provide more information about the structure of the acquiring person and acquired entity, as well as the names under which they do business. The Commission also proposed a clarification regarding annual reports and audit reports of natural person UPEs. As discussed below, the Commission adopts some of these proposals without change and some with modification.

### a. Entities Within the Acquiring Person and Acquired Entity

This section contains information currently required by Items 1(f) and 6(a) of the current Form. The Commission proposed requiring filing persons to organize the list of controlled entities by operating company or business, and, for each such operating company or business, the Commission proposed that filers identify the name(s) by which the company or business does business, as well as any name(s) by which it formerly did business within the three years prior to filing. The Commission adopts the proposal with modification.

The Commission received several comments opposed to this proposal. One commenter stated that the Agencies do not need to know the relationships between and among all related entities for its initial review of the HSR filing. The commenter asserted that the majority of covered entities will likely have no overlapping activities with the acquired company, and thus learning about them adds no value to the Agencies' initial screen. The Commission disagrees that the Agencies do not need this information and that it adds no value to the initial screen. This is the very information that allows the Agencies to understand what businesses are involved in the reported transaction.

The Commission does, however, make several modifications to these proposals that should reduce the cost of providing this information. The Commission adopts the proposal to require DBA names but does not adopt the proposal to adopt "formerly known as" (FKA) names. One commenter noted the difficulty of providing "doing business as" names for filing parties that do not maintain such records, but the Commission believes these DBA names will be of great value to the Agencies in the initial waiting period. Businesses create (or change) DBA names for a variety of reasons and may be required to register these names with State or local authorities. One commenter objected to the three-year period, and, as part of its overall efforts to reduce costs associated with an HSR Filing, the Commission eliminates this lookback so that filing parties must only provide this information as it stands at the time of filing.

Another commenter recommended that for executive compensation transactions the filing persons be permitted to dispense with the requirement to report "doing business as" names, assuming certain conditions are met. They stated that these transactions are unlikely to generate meaningful antitrust issues but that

requiring prior business names will add materially to the burden on the acquired side without a corresponding benefit. The Commission agrees and, as part of its overall effort to reduce cost, adopts the modification to allow both filing parties in select 801.30 transactions (which include those related to executive compensation) to provide this information as kept in the ordinary course without DBA names.

Finally, one commenter noted that the proposed rule appears to use the terms "operating business," "operating entity," and "operating company" interchangeably. The commenter requested clarification of the definitions or adoption of one term for consistency. The Commission agrees that using these three terms interchangeably is confusing and thus adopts "operating business" to capture entities that comprise distinct operations. Under this modification, filing parties need to organize their response by operating business(es) whether they are corporations, non-corporate entities, or assets that function as an operating business.

In sum, the Commission adopts modifications that require filing persons, except for those in select 801.30 transactions, to organize controlled entities at the time of filing by operating business and, for each such operating business, identify the name(s) by which the operating business does business. For example, a fund must organize its response by portfolio company(s), and a conglomerate must organize its response by business(es).

### b. Annual Report and Audit Reports

Information for this section is currently required by Items 4(a) and (b). The Commission proposed clarifying the current instructions regarding which annual reports and audit reports are required from natural person UPEs. Currently, natural person UPEs, in lieu of personal financial documents, must produce financial documents for the highest-level entity(s) within their person. In addition, natural person UPEs must produce the same additional reports that non-natural person UPEs must produce: for acquiring persons, the reports of the acquiring entity(s) and any entity controlled by the acquiring person whose dollar revenues contribute to an NAICS overlap; and for acquired persons, the reports of the acquired entity(s). The Commission proposed new language to make this requirement clearer and the Commission adopts this change with modification.

The Commission received one comment that supported the proposal. Another commenter suggested two

revisions to the proposed Instructions. This commenter first suggested that for natural person UPEs who filed as acquired persons, the instructions should only require the most recent annual reports for the highest-level entity the Natural Person controls that includes the assets or entities being sold. Second, as a general matter, the commenter stated that persons filing notification should not be required to provide annual reports for entities that have less than $10 million in total assets, unless that entity's revenues contribute to a competitive overlap between the parties.

In considering the two suggested revisions in this comment, the Commission agrees that it is sufficient for the UPE of the acquired person to provide financial reports for only the highest-level entities that control the acquired entity, as appropriate, in lieu of providing personal financial documents. The Commission also has determined that this limitation is appropriate for acquiring persons with natural person UPEs as well. Therefore, the Commission adopts this suggestion, and natural persons, in lieu of providing personal financial statements, will need only provide financial reports for the highest-level entities that control the acquiring entity or acquired entity, as appropriate. The financial information for these highest-level entities should be provided in this section and not the UPE Details section, as discussed in section VI.D.1.

The Commission declines to adopt the suggestion that persons filing notification should not be required to provide annual reports for entities that have less than $10 million in total assets, unless that entity's revenues contribute to a NAICS overlap or any overlap identified in the Overlap Description. "The person filing notification" is a defined term for the purpose of the Instructions and is limited to the UPE. Therefore, other than for natural persons, the proposed Instructions only require reports from the UPE and, for the acquiring person, acquiring entity(s) and entities that contribute to a NAICS overlap, and for the acquired person, the acquired entity(s), which is consistent with the current requirement. The Commission finds these reports valuable, regardless of whether those entities have $10 million in assets.

### 3. Additional Acquiring Person Information

The Commission proposed requiring additional information about the acquiring and acquired person. These proposals included a description of the

ownership structure of the acquiring person and acquiring entity as well as an organizational chart if the acquiring person UPE is a master limited partnership or fund, information about other types of interest holders that may exert influence over the acquiring person, and the identification of officers, directors, and board observers of the acquiring person and acquired entity. As discussed below, the Commission adopts some of the items as proposed, adopts some of the proposals as modified, and does not adopt others.

#### a. Ownership Structure

The Commission proposed that acquiring persons provide a description of the ownership structure of the acquiring entity and, for fund or master limited partnership UPEs, an organizational chart sufficient to identify and show the relationship of all the entities that are affiliates or associates. The Commission also proposed that acquired persons describe the ownership structure of the acquired entity.

The Commission did not receive any comments regarding the requirement to provide a description of the acquiring and acquired entities' ownership structure. The Commission believes that such descriptions will provide information and nuance about ownership structures that may not be clear from a simple list of minority holders. Moreover, descriptive responses allow filers to offer clarification about the structure, including whether the ownership structure is subject to change between filing and consummation of the transaction. As a result, the Commission adopts this item as proposed for the acquiring person. However, this information is less relevant from the acquired entity. As part of its efforts to reduce the cost related to filing where possible, the Commission does not adopt the proposal for the acquired person.

As for the proposed requirement for the acquiring person to provide organizational charts, commenters noted that organizational charts are not always kept in the ordinary course of business, and structures may be so complex that they cannot be synthesized into a chart. The Commission acknowledges that there may be some cost associated with creating organizational charts just for the purpose of making an HSR Filing and modifies this item to require charts that show the relationship of entities that are affiliates or associates if such charts exist, even if they were created for other purposes. The Commission declines to adopt the suggestion to limit

this requirement to transactions where there is an identified NAICS or product or service overlap. These charts are necessary for staff to understand the totality of the transaction, including the role of key decision makers and their responsibilities relative to the business lines under review.

The complex structure of investment entities is not adequately captured by the current Form, and there is often no other source for Agencies to learn of these relationships. Information about the acquiring entity's ownership structure is therefore necessary and appropriate for the Agencies to evaluate the transaction at issue. The Commission has modified the proposal to limit the reporting costs by requiring only the acquiring person to provide a description of its ownership structure and to provide organizational charts only if they exist.

#### b. Other Types of Interest Holders That May Exert Influence

The Commission proposed an Other Types of Interest Holders that May Exert Influence section that would have required the acquiring person to identify certain individuals or entities, beyond those with the minority interests discussed above, that may have material influence on the acquiring entity and entities related to it. These included certain individuals or entities that (i) provide credit; (ii) hold non-voting securities, options, or warrants; (iii) are board members or board observers or have nomination rights for board members or board observers; or (iv) have agreements to manage entities related to the transaction. As discussed below, while understanding these relationships can be very important in assessing the competitive effects of certain transactions, the Commission has elected not to adopt proposals (i), (ii), and (iv) at this time. As discussed in section VI.D.3.c., the Commission adopts with modification the proposal to require identification of officers and directors, which incorporates some of proposal (iii).

The Commission received several comments in support of the proposed change to disclose other types of interest holders. One commenter stated that disclosure of these interest holders would be helpful to close a loophole when the filing parties may have influence or joint profit maximizing incentives with rivals. Another commenter noted that the information would also enable the Agencies to assess conflicts of interest or the potential for inappropriate sharing of competitively sensitive information. Other comments highlighted the

importance of identifying situations in which a single creditor to competing firms could have an incentive to facilitate their coordination or collusion as well as situations in which a private lender may assert control or an investor may have a dual role as private provider of leveraged loans to finance buyouts.

The Commission also received several comments opposed to these proposed changes. Critics noted that some of this information may not be available at the time of filing or would be burdensome to collect and report. Others questioned the utility of the information. Another commenter noted that it will not be readily apparent whether identified entities or individuals have overlaps, supply, or other relationships relevant to the target.

In regards to identifying certain creditors, commenters stated that in the vast majority of credit arrangements, the creditor's rights and financial incentives are distinctly different than those of equity holders and that many creditors are unable to control investment decisions. In addition, one commenter observed that these disclosure requirements could impede access to credit, which would seriously impact private equity as its deals frequently rely on third-party financing. Several commenters also expressed concern about the burden of identifying and describing complex credit arrangements, particularly for infrequent filers.

Regarding the proposed requirement related to non-voting securities, options, or warrants, one commenter questioned the necessity of the information to examine the anticompetitive effects of any proposed transaction, noting that, in exempting acquisitions of non-voting securities from filing, Congress must have concluded, based on the legislative history, that such acquisitions pose no anticompetitive threat. No specific comments were received with respect to the proposed requirement to identify individuals or entities that have agreements to manage entities related to the transaction.

The Commission disagrees with assertions that information about individuals or entities that can influence the acquiring person through mechanisms such as credit relationships, non-voting interests, or management contracts is not relevant to the assessment of the competitive effects of a reported transaction. Further, the Commission notes that the HSR Act specifically defines voting securities as securities which at present or upon conversion entitle the holder the right to vote for the board of directors.[339]

Nevertheless, the Commission acknowledges that the mechanisms of influence or managerial control are often bespoke and vary from entity to entity. The proposed rule was intended to sweep broadly but in a manner that was straightforward and relatively uncomplicated for filers to navigate. The comments raised issues that warrant further consideration. Given the other proposals that the Commission does adopt, particularly identification of additional minority interest holders, information about officers and directors of entities related to the acquiring entity, and the collection of additional documents, the Commission has decided not to adopt the proposals related to credit relationships, non-voting securities, and management agreements at this time. If these additional requirements still leave significant gaps in information that impede the Agencies' ability to screen for transactions that warrant additional investigation, the Commission may revisit these proposals in future rulemakings.

### c. Officers and Directors

The Commission proposed adding a section that would have required the identification of the officers, directors, or board observers (or in the case of unincorporated entities, individuals exercising similar functions) of all entities within the acquiring person and acquired entity. Further, the proposal required for those individuals, the identity of other entities for which those individuals currently serve, or within the two years prior to filing had served, as an officer, director, or board observer (or in the case of unincorporated entities, roles exercising similar functions). After consideration of the comments and in light of the varied roles that religious or political non-profit organizations can play, the Commission has determined to narrow this requirement to (1) eliminate reporting related to board observers; (2) limit reporting to certain entities within the acquiring person (including officers and directors of the acquired entity who will continue to hold one of these positions post-consummation, if the acquiring person has filed for the acquisition of control); (3) only require identification of officers or directors that serve in those roles at the target or entities that are in the same industry as the target; and (4) exempt any non-profit entity organized for a religious or political purpose, even if that entity carries on substantial commerce, as described below.

Several commenters wrote in support of the proposal, recognizing the value to

the Agencies' understanding of the ownership and management structure of companies involved in the transaction. One commenter stated that common board members at intermediate levels of ownership can influence competition directly. Another commenter also noted that private equity minority investment interests can confer rights to appoint board members or allow board observers that create anticompetitive opportunities to exert coordinated market power. This comment further explained that some entities place the same person on several boards to coordinate business strategies across those entities even where they hold only minority positions. The Commission agrees that, due to the influential impact that officers and directors can have on competitive decision-making of entities within the acquiring person, this information is relevant to the Agencies' initial antitrust assessment of the acquiring person's acquisition of interests in the target. The same commenter recommended that the Commission require disclosure of board membership information for any prior acquisitions identified in the HSR Filing. Because this requirement has been designed to identify potential competitive concerns between acquiring person and target at the time of filing and going forward, the Commission declines to expand the final rule to require this historical information.

However, the majority of the comments related to this proposal suggested significant modifications, either by eliminating the requirement in its entirety or acknowledging the relevance of the information but urging revisions to more narrowly tailor the requirements to achieve the Agencies' objectives. Critics across both of these groups raised some common issues.

Some commenters questioned the Commission's authority to require information on common officers and directors in an HSR Filing to enforce section 8 of the Clayton Act, pointing to the absence of any reference to section 8 or interlocking directorates in the HSR Act or in the Commission's original Statement of Basis and Purpose issued with the final HSR rules in 1978. A law firm commenter stated that legislative statements support that Congress disavowed any intention that premerger notification be used to allow the accumulation of information on businesses for general enforcement purposes, and the commenter asserted that the HSR Act is concerned only with potential violations of section 7. Another commenter wrote that even if it was appropriate to enforce section 8 using the HSR Act process, the

---

[339] 15 U.S.C. 18a(b)(3)(A).

proposed instructions went beyond the text of section 8 by requiring information about unincorporated entities as well as historical information.

Additionally, several commenters questioned the Commission's legal basis for the requirement to report officers and directors. For example, one commenter stated that this requirement had no bearing on the antitrust analysis of transactions under section 7 and that the NPRM does not provide evidence that the Agencies have missed anticompetitive interlocks due to lack of information in HSR Forms. One commenter stated that the NPRM does not identify any cases where a court stated that this information has relevance for review under section 7 of the Clayton Act.

The Commission disagrees that the identity of officers and directors is immaterial to an analysis of whether an acquisition may violate section 7. As described in sections II.B.1 and VI.D.1.d.ii, and elsewhere, the structures of entities have become more complex, allowing for the levers of influence and managerial control to be distributed through a variety of mechanisms beyond controlling equity stakes, or even minority equity stakes. The important role of board members in particular has been recognized in court cases and the focus of consent decrees to resolve competitive issues.[340]

Further, contrary to assertions that the HSR Act limits the Agencies to evaluating whether a notified transaction may violate "Section 7," the HSR Act explicitly directs the Agencies to promulgate rules necessary and appropriate to determine whether a notified acquisition may, if consummated, violate the "antitrust laws."[341] The HSR Act amended the Clayton Act, and the term "antitrust laws" is defined in the Clayton Act to include the Sherman Act and the Clayton Act, including section 8's prohibition on interlocking directorates.[342] As discussed in the NPRM, when the Agencies do become aware of existing or potential interlocks

created by a reported transaction, they typically seek to remediate them consistent with the Agencies' enforcement authority and before consummation of the transaction. Counter to suggestions that the proposal sought to create a "dossier" on the filing parties for general enforcement purposes, this information is relevant to enforcing the antitrust laws with respect to the transaction under review.

Moreover, while a notified transaction could create a violation of section 8 as described in the NPRM, the same competitive concerns that underpin section 8 are also relevant to whether a transaction would violate section 7. In fact, as highlighted by some commenters, section 8 does not necessarily cover all officer and director relationships that may give rise to competition issues. But that does not mean that these relationships are benign or that they do not create the same opportunities or incentives to coordinate competitive decision-making, for example, if the CEO or director of the acquiring entity serves as a member of the board of a rival of the target. In this scenario, section 8's thresholds for strict liability may not capture this relationship, but it would be relevant to analysis under section 7, particularly in nascent markets where one of the entities involved does not meet the minimum sales trigger for application of section 8.[343] That risk alone is relevant to the Agencies' assessment of whether the transaction is likely to substantially lessen competition or tend to create a monopoly in violation of section 7, regardless of whether the interlock is of the type that violates section 8. It is in part because the Agencies cannot rely on section 8 compliance to capture all relationships that create interlocks between entities with competitive relationships that the Commission proposed the new section.[344]

Currently, the Agencies cannot screen for these relationships unless they are mentioned in the transaction documents submitted with the HSR Filing, and often they are not. This information is often not publicly available from any source other than the filers. As explained in the NPRM, information on the identity of officers and directors will help the Agencies identify potential anticompetitive harms that may arise from the proposed transaction.

Additionally, identification of these individuals will assist the Agencies in determining whether the filers have had an opportunity to improperly share confidential information or integrate their businesses before the HSR Act's waiting period expires. For the Agencies to conduct a thorough premerger review, the business operations of the two filing entities must maintain their premerger competitive status quo until the HSR waiting period expires. When the Agencies are aware that there are common officers and directors, they may investigate whether there are on-going communications or interactions affecting the premerger competitive status quo, for example, by interfering with the other filer's competitive decision-making or placing executives from one entity into management positions at the other.[345] The Commission believes that information about these relationships is relevant to ensuring that the parties are complying with the requirements of the HSR Act to hold their operations separate and continue to compete until the expiration of the waiting period. This is true regardless of the antitrust risk presented by the transaction or the possibility that these relationships are improper interlocks; parties must wait until the waiting period has expired to begin integrating operations. Violations of the

[340] See, e.g., In re Red Ventures Holdco, LP, No. C–4627 (F.T.C. Nov. 2, 2017) (complaint) (overlapping limited partnership holdings that provided board seats violated section 7); In re TC Group, L.L.C., No. C–4183 (F.T.C. Mar. 16, 2006) (complaint) (acquisition involving minority stake giving two private equity investors seats on the boards of competitors); In re Time Warner Inc., No. C–3709 (F.T.C. Sept. 12, 1996) (analysis to aid public comment) (walling off two individuals and one entity to prevent them from influencing officer, directors, and employees of competitor and its day-to-day operations). See also cases cited in section II.B.1.

[341] See 15 U.S.C. 18a(d)(1).

[342] See 15 U.S.C. 12.

[343] Section 8 of the Clayton Act, 15 U.S.C. 19, prohibits, with certain exceptions, one person from serving as an officer or director of two competing corporations if two thresholds are met. Competitor corporations are covered by section 8 if each one has capital, surplus, and undivided profits aggregating more than $10,000,000 with the exception that no corporation is covered if the competitive sales of either corporation are less than $1,000,000. In accordance with section 8(a)(5), the Commission adjusts these thresholds annually based on changes in gross national product. The thresholds in effect for 2024 are $48,559,000 and $4,855,900 respectively. 89 FR 3926 (Jan. 22, 2024).

[344] Commenter International Bar Association notes that beginning in September 2023, the European Union requires merging parties to provide information on any current interlocking directorships, and that Brazil requires similar information for both fast-track and regular notifications. See Comment of Int'l Bar Ass'n, Doc. No. FTC–2023–0040–0687 at 16–17. While this is

not a basis for the final rule, the Commission notes that this information is relevant to competition issues examined in other jurisdictions.

[345] The Agencies' concern about premature coordination between merging firms, referred to as "gun jumping," dates back many decades, and they have brought enforcement actions for violations of the HSR Act, as well as other antitrust laws that prohibit competitors from acting jointly prior to consummation of any acquisition. See also Note by the United States to the OECD, Suspensory Effects of Merger Notifications and Gun Jumping (Nov. 27, 2018) (DAF/COMP/WD(2018)94), https://www.ftc.gov/system/files/attachments/us-submissions-fjun-2010-present-other-international-competition-fora/gun-jumping_united_states.pdf. For a discussion of cases prior to 1995, see Mary Lou Steptoe, Acting Dir., Bureau of Competition, Fed. Trade Comm'n, Prepared Remarks Before A.B.A. Sec. Antitrust L. Spring Meeting, 1994 WL 642386 (Apr. 7, 1994).

stay provisions of the HSR Act are subject to civil penalties.[346]

Two commenters objected to requiring board observer information as outside the scope of section 8 and not related to the Agencies' antitrust assessment of the transaction. The Commission is aware that board observers do not have the same rights and duties as officers or directors. Comments submitted in response to the Commission's December 2020 Advance Notice of Proposed Rulemaking stated that individuals serving as board observers typically receive the same information as the board of directors but there may be ways to exclude them from reviewing privileged or competitively sensitive information. Consequently, the Commission views the risks of sharing competitively sensitive information or changing competitive decision making via board observers to be lower than the risk present with officers and directors. As a result, the Commission agrees that the need for information about board observers is not as great at this time for the purpose of the Agencies' premerger risk assessment, and the final rule does not require filers to identify individuals who have these rights.

In addition to comments related to the authority [347] and purpose of the proposed rule, several commenters raised concerns about the burden of collecting this information, especially historical information about individuals no longer serving in one of these roles, noting that it has little relevance and would be burdensome to collect. One commenter suggested that the requested information on officers and directors be limited to any positions they currently serve or expect to serve in the future. Another comment agreed, noting that current and expected future overlaps are relevant for assessing interlocking directorships and coordinated effects, but that detailed and historic information across all entities of the company has minimal relevance to the antitrust assessment of a particular transaction. Citing practical concerns, another comment noted that there should be no requirement to collect post-departure information from former personnel.

Other commenters stated that the burden of collecting any information about officers and directors was not justified by the benefit to the Agencies' review of any reported transaction. Some cited the higher burden of this requirement for large companies. For instance, one commenter noted that, in some instances, the individuals that would be identified would not be relevant to the Agencies' premerger review because, for small subsidiaries within a large entity's corporate structure, an officer might be someone who merely drew up the paperwork forming the entity whose role would not be relevant to the Agencies' antitrust assessment. Another suggested limiting this requirement to certain revenue thresholds or entities with overlaps or other relationships.

Additional commenters objected to having to report information regarding any individual's board membership or other association. They raised concern that this requirement could sweep in memberships with religious, political, or other non-commercial groups. One commenter stated that some of these individuals do not want to share information about their membership in certain organizations. The Commission has no intention of forcing disclosure in the HSR Filing of any officers or members of the governing board of non-commercial entities, or other non-profit entities with a religious or political purpose. The Form and Instructions that are part of this final rule counsel filers not to report any individual's role as a director, officer, or member of a non-profit entity organized for a religious or political purpose, even if that entity carries on substantial commerce. Filers who would otherwise be required to report these affiliations are excused from such reporting.

In response to the comments and to better tailor this requirement to the purpose of premerger review, the Commission has further decided to limit this requirement in several ways. First, the Commission has eliminated the requirement to identify officers or directors of acquired entities; the requirements of the final rule related to reporting information for officers and directors will apply to the acquiring person only. Second, the Commission limits the entities within the acquiring person to entities that (1) have responsibility for the development, marketing, or sale of products or services that are reported overlaps identified in the Overlap Description or supply relationships identified in the Supply Relationships Description or (2) directly or indirectly control or are controlled by the acquiring entity. If any of these entities is a non-profit entity organized for a religious or political purpose, even if that entity carries on substantial commerce, no reporting is required for individuals serving as officers or directors. Third, the Commission has limited the lookback periods contained in the proposed rule. For entities in category (1), filers will report officers and directors serving within three months prior to the HSR Filing. For category (2), there is no requirement to lookback to any individual who is no longer serving as an officer or director at the time of the HSR Filing but filers must consider individuals who have not yet officially taken the relevant positions. Fourth, the acquiring person will only be required to report the names of officers and directors of these entities if those individuals also serve as an officer or director of an entity that derives revenue in the same NAICS code (or is in the same industry) as the target at the time of filing and the name of such other entities. This will result in a list of only those individuals with the relevant connection.

As noted elsewhere, the Commission has carefully evaluated each of the requirements of the proposed rule in light of the comments and adjusted the final rule to calibrate information requirements to antitrust risk, burden, and importance to the Agencies' ability to screen for transactions that may violate the antitrust laws. On balance, the Commission has determined that an analysis of the board of the target entities is less probative in analyzing the potential effects of the transaction than is an analysis of certain entities within the acquiring person. Many filings are for acquisitions of control, and therefore the officers or directors of the target often change upon consummation. For those transactions where control is not being acquired, the acquired person may not be a party to the transaction, making the burden of collecting the information in the period of time between when it receives the required notice letter and when its filing is required higher than that of the acquiring person, which generally controls the timing of its filing. As a result, the Commission has not adopted the proposal for the acquired person.

For the acquiring person, as discussed elsewhere, due to the competitive significance of entities with products or services in development that have not

---

[346] 15 U.S.C. 18a(g)(1). *See, e.g., United States* v. *Legends Hospitality Parent Holdings, LLC,* No. 1:24-cv-5927 (S.D.N.Y. filed Aug. 5, 2024) (seeking civil penalties for obtaining beneficial ownership of acquired person prior to expiration of HSR waiting period); *United States* v. *Duke Energy Corp.,* No. 17-cv-00116 (D.D.C. Apr. 7, 2017); *United States* v. *Input/Output, Inc.,* No. 1:99-cv-00912 (D.D.C. May 13, 1999).

[347] Comment of A.B.A. Antitrust L. Sec., Doc. No. FTC-2020-0086-0015 at 10 (board observers generally receive the same information that a director would except when there are conflict-of-interest issues or when the information concerns competitively sensitive topics); Comment of Comput. & Commc'ns Indus. Ass'n, Doc. No. FTC-2020-0086-0002 at 11 (board observers are usually entitled to the same information as board directors although companies have more leeway to exclude observers from privileged or competitively sensitive information).

yet generated any revenue, the Commission declines to adopt a de minimis revenue requirement for this information but agrees that information related to officers and directors is most relevant to the antitrust assessment when the companies have an existing business relationship or are related to the entity making the acquisition. Thus, the Commission modifies this proposal to look only at those entities within the acquiring person that are responsible for the development, marketing, or sale of the products or services identified in the Overlap Description or the Supply Relationships Description, or directly or indirectly control or are controlled by the acquiring entity. This modification addresses commenters' concern about potentially needing to report information on many officers and directors, especially across larger or more diffuse organizations with many subsidiaries irrespective of antitrust risk. So modified, this requirement would focus the Agencies' inquiry on those entities that would be most likely to have a competitively important relationship with the target post-consummation.

The Commission believes that limiting this information requirement to those entities for which the acquiring person and the target have reported overlaps or supply relationships in the same sector as well as the entities that are related to the acquiring entity provides information the Agencies need for premerger screening. As modified, this requirement properly targets the information that reveals any antitrust risk that common officers and directors could act to undermine competition during the waiting period or post-consummation. The Commission acknowledges that there may be other such relationships involving the parties to the transaction that may be relevant to the competition assessment under section 7 or that present section 8 concerns but agrees that the Agencies can continue to collect this information only for those transactions that are flagged for closer review. While the final rule may impose a higher cost to large companies with many competitively relevant business lines, the Commission believes that the benefit to the Agencies is necessary and proportionate: it is more difficult for the Agencies to discover on their own all the individuals who serve in these key roles at different levels of larger companies when those companies have many business lines related to the target.

The Commission has also considered comments related to the proposed lookback period, and, in light of these concerns and to minimize the cost of

collecting historical information about officers and directors, the Commission has modified this requirement to shorten the lookback period to three months before the filing date. The Commission believes providing information about individuals who served in one of these positions recently, but not at the time of the filing, is sufficient to identify those individuals who would have been in a position to share competitively sensitive information during a due diligence or negotiation phase for the transaction. It will also serve as a disincentive for these individuals to step down temporarily to avoid disclosure on the HSR Form.

Once the relevant entities and individuals have been identified (and excepting any non-profit entities organized for religious or political purposes), the acquiring person must determine whether those individuals also serve as an officer or director (or in the case of unincorporated entities, roles that serve similar functions) of another entity that derives revenue in the same NAICS codes as the target. If NAICS codes are unavailable, reporting should be based upon the industry overlaps, to the knowledge and belief of the acquiring person or the officer or director. Only if an individual serves in such capacity does the acquiring person need to provide the name of that individual, along with the name of the entity within the acquiring person they serve as an officer or director, their title at that entity, and the name of the other entity for which they serve as an officer or director (and excepting any non-profit entity organized for religious or political purposes). The Commission believes that these limitations will allow the Agencies to have information about key affiliations with other businesses in competitive overlap relationships while limiting the burden on filing parties and their officers and directors.

Finally, commenters representing the pharmaceutical industry voiced concerns about the applicability and effects of the proposed instruction on reportable transactions in the pharmaceutical and biomedical sectors. For example, one pointed out that biotech firms generally rely on a small cadre of qualified directors and officers who have the appropriate business background and stated that disclosure of these positions in an HSR Filing would discourage highly sought-after experts and specialists from accepting biotech leadership roles. Another explained that many pharmaceutical transactions that trigger HSR Filings involve only the acquisition of exclusive licenses, where the parties remain as independent firms

post-transaction. This commenter also objected to reporting this information for acquisitions of companies with no sales.

The Commission is aware, from its own experience and from research done by others,[348] that there are individuals who serve on the boards of multiple life science companies. The final rule does not impose a disproportionate obligation for companies operating in this sector; these individuals are obligated to comply with the antitrust laws regarding interlocks as much as individuals serving in other sectors. The Commission does not agree that there is a unique risk that disclosure of recent, current, or future leadership positions will limit the number of talented and qualified individuals who are available to serve as officers or directors in the biopharma or life sciences sector beyond whatever limits the antitrust laws impose. Many sectors prefer knowledgeable professionals with distinct credentials and experience to serve as board members. Moreover, the cost of reporting these relationships is directly related to the number of reportable transactions that occur each year in this sector and the number of existing or potential relationships. The Commission does not believe that HSR reporting requirements will improperly deter qualified individuals from serving on the boards of these or any other companies.

The Commission believes that the modifications made to the final rule will ensure that the Agencies receive the information about recent, current, and future officers and directors that may create opportunities for anticompetitive harm under any antitrust law, including section 7 of the Clayton Act, section 1 of the Sherman Act, or the HSR Act itself. The Commission disagrees that the instruction will newly create a chilling effect on lawful and procompetitive activity or board membership. When individuals agree to serve as board members, they take on fiduciary responsibilities that statutory and common law require. Separate from any HSR requirements, these fiduciary duties require directors to, inter alia, act in the best interest of the organization and to ensure that the organization follows applicable laws.[349] Courts have found that directors may breach their duty of loyalty if they do not make a good faith effort to provide adequate

---

[348] *See* Lemley, *supra* note 316.

[349] Jeremy S. Piccini, ''Director Liability, the Duty of Oversight, and the Need to Investigate,'' Bus. L. Today 1 (Feb./Mar. 2011).

oversight and monitoring.[350] A merger or acquisition that requires reporting under the HSR Act is not an insignificant occurrence. When an organization to which an individual owes a fiduciary duty is involved in a reportable transaction, it is reasonable to expect those individuals to exercise their duties of care and loyalty by participating in compliance activities. Moreover, individuals who serve on boards must comply with the prohibitions in the antitrust laws that relate to interlocks and should be aware of how their role in a senior leadership position is relevant to the Agencies' assessment of proposed transactions. These risks exist without regard to the disclosure of their board position in an HSR Filing. Given the responsibilities that board members already carry, the Commission believes that the reporting requirement is reasonable and appropriate, particularly when balanced against the increased transparency and value it provides to the Agencies' premerger antitrust analysis.

In sum, the Commission has determined that the reporting requirements for UPEs contained in the final rule are necessary and appropriate to enable the Agencies to identify transactions that may violate the antitrust laws because the acquiring person and the target have existing business relationships, including through shared individuals or entities, that must be considered as part of that assessment, and that these requirements, as modified, have been tailored to reduce the cost of reporting as much as practicable.

*E. Transaction Information*

This section of the Form and Instructions reorganizes, clarifies, and expands the information required in the initial portion of the current Form as well as in Items 2, 3, and 5. The Commission proposed new sections to facilitate the reorganization, clarification, and expansion of these items and received comments on certain portions of the Transaction Information section. As discussed below, the Commission adopts some of these proposals without change and some with modifications.

1. Parties

This section requires the information currently mandated by Item 3(a). The Commission did not propose and does not adopt any material changes to the information required by this item.

2. Transaction Details

This section requires the information currently mandated by Items 2(b), 2(c) and 2(d). The Commission did not propose and does not adopt any material changes to the information required by these items. The Commission notes that the requirement to indicate the notification threshold in Item 2(c) is not applicable to the acquired person and is therefore excluded from the Form and Instructions for the acquired person. The Commission did not propose and does not adopt any material changes to the information required by this item.

3. Transaction Description

This section requires the information currently mandated by Items 2(a) and Item 3(a). The Commission did not propose and does not adopt any material changes to information required by these items. The Commission also proposed requiring the acquiring person to describe the business operations of all the entities within the acquiring person, which it adopts with modification, as discussed below.

a. Business of the Acquiring Person

The Commission proposed requiring the acquiring person to briefly describe the business operations of all entities within the acquiring person to provide a clear overview of all aspects of the acquiring person's pre-transaction business. The Commission adopts the proposal with modification.

The Commission received two comments expressing general support for the proposal, with one noting that the change is essential to ensuring that the Agencies can meet the statutory deadline. One law firm commenter was critical of the burden that the proposal would impose, stating that companies may have several dozen subsidiaries and written descriptions as to each of the respective business operations is not information readily maintained in the ordinary course of business and could be incredibly burdensome to collate.

The Commission adopts a clarified version of this requirement. The proposal was intended to require a short description of the operating businesses within the acquiring person, not an entity-by-entity description. The Commission understands that a single operating business may comprise

multiple entities, such as shell entities or separate entities for each location of the business. Therefore, the Commission amends the requirement to remove "of all entities within" to make clear that the acquiring person does not need to describe its operations on an entity-by-entity basis.

Understanding the business of the acquiring person is necessary to understanding the potential competitive implications of the transaction. Investment groups often control multiple portfolio companies across many lines of business. Similarly, some corporations also have multiple and varied operations. These other operations may be related to the operations of the target, even if they do not directly overlap with it. Therefore, particularly for acquiring persons with complex structures or many businesses, knowing just the business of the acquiring entity is not sufficient for the Agencies to evaluate the impact of the acquiring person merging with or acquiring an interest in the target. The scope of the acquiring person's holdings is often not publicly available, necessitating the Agencies receiving the information from the acquiring person itself.

b. Business of the Target

This section requires the information currently required by Item 3(a). The Commission did not propose and does not adopt any material changes to the information required by this item.

c. Non-Reportable UPEs

This section requires the listing of non-reportable UPEs, which is currently required by Item 2(a). The Commission did not propose and does not adopt any material changes to the information required by this item.

d. Transaction Description

This section requires the information currently mandated by Item 3(a). The Commission did not propose and does not adopt any material changes to the information required by this item.

e. Related Transactions

This section requires filing persons to identify related transactions, and the Commission proposed a list of common circumstances in which multiple filings are required to guide filing parties in their responses. Although Item 3(a) of the current Form asks parties to indicate whether there are additional filings related to the transaction, filers sometimes overlook this requirement. The Commission received three comments in support of the proposed changes, with one of these commenters

[350] *See Marchand* v. *Barnhill*, 212 A.3d 805, 824 (Del. 2019) (reversing dismissal of stockholder's claims that directors breached their duty of loyalty by failing to establish a reasonable system of controls and reporting regarding food safety in connection with listeria outbreak); *In re Boeing Co. Derivative Litig.*, No. CV 2019–0907–MTZ, 2021 WL 4059934, at *33 (Del. Ch. Sept. 7, 2021) (finding that plaintiffs stated a claim that board breached its duty of oversight by failing to establish a reporting system for airplane safety).

noting that they appear to be reasonably designed to provide potentially helpful clarification. The Commission adopts this requirement as proposed.

f. Transactions Subject to International Antitrust Notification

The Commission proposed creating a Transactions Subject to International Antitrust Notification section that would require parties to identify the jurisdictions where each filing person has already filed or is preparing notifications to be filed as well as a list of the jurisdictions where it has a good faith belief it will file. The Commission adopts this requirement as proposed, but only for the acquiring person.

Although the Form currently asks filing parties to voluntarily identify other jurisdictions in which filings will be made, most filers do not disclose the information even though more and more transactions are subject to review in multiple jurisdictions around the world. As noted in the NPRM, in order to fully benefit from inter-agency consultations, the Agencies need to know as early as possible which foreign jurisdictions may also be evaluating a proposed transaction.

The Commission received two comments in opposition to this proposal. One commenter expressed concern about the effects of inter-agency consultations, and another recommended maintaining the status quo where filers voluntarily identify other jurisdictions where the transaction will trigger premerger notification under the laws of that jurisdiction. Both stated that the proposal would only impact international companies, which might be forced to speculate about potential foreign filings. The Commission acknowledges that the proposed requirement will have a greater impact on companies with operations outside the United States. But the Commission disagrees that it is asking parties to speculate about potential foreign filings; however, it has determined that it is sufficient for the information to be provided only by the acquiring person. As stated in the NPRM, the text of the proposed rule provides flexibility for parties who, at the time of the HSR Filing, may not have yet identified all the other jurisdictions where they will file. Indeed, the final rule specifies that filing parties can respond based on their good faith belief, which provides filing parties with the ability to respond based on their knowledge at the time of filing. Otherwise, the requirement asks for facts that are already known: the jurisdictions where the party has already filed and the ones for which it is preparing a filing. The Form also

affords parties the option to voluntarily make certain waivers related to other jurisdictions, as discussed in section VI.K.3. Accordingly, knowing which other jurisdictions are reviewing the transaction can expedite the waiver process if the parties intend to provide a waiver after filing.

Given the importance of knowing which foreign jurisdictions may also be evaluating a proposed transaction and the benefits to the Agencies and the parties of early case-specific cooperation facilitated by waivers, the Commission adopts this necessary change as proposed for the acquiring person. However, because filing parties often coordinate their notification to other jurisdictions and in order to further reduce the burden on acquired persons, the Commission does not adopt the change for acquired persons because it is sufficient to obtain this information from only one filing party.

4. Additional Transaction Information

a. Transaction Rationale

The Commission proposed that the acquiring and acquired person be required to describe all strategic rationales for the transaction. These rationales would include those related to, for example, competition for current or known planned products or services that would or could compete with a current or known planned product or service of the other reporting person, expansion into new markets, hiring the sellers' employees (so-called acqui-hires), obtaining certain intellectual property, or integrating certain assets into new or existing products, services, or offerings. The Commission also proposed that the filing person identify which documents submitted with the HSR Filing support the rationale(s) described in the narrative. The Commission adopts the requirement as proposed but does not require the information from select 801.30 transactions.

The Commission received several comments supporting disclosure of transaction rationales. Individual commenters described the changes as common-sense requirements and noted the need to ensure each party in the transaction explains the reasoning from their perspective. One commenter stated that mergers may be beneficial to an acquiring company for anticompetitive reasons that might not be immediately apparent from a surface-level analysis of market shares and concentration in a particular market, and that requiring a firm to submit its justification for the strategic wisdom of a particular transaction would help diminish the

role of guesswork in the Agencies' review of a proposed merger.

Commenters opposing disclosure of transaction rationales focused on the evolving nature of the information, which may very well differ across the various personalities and business roles that span an organization and which in some instances may be only discovered in the course of post-signing diligence. The Commission understands that there may be many goals for the transactions and that different perspectives within the filing person may be difficult to resolve. But that is precisely the problem that this requirement is intended to resolve. The Agencies are not in a position to understand which rationales are predominant nor choose among different rationales presented in the other materials submitted with the notification, such as transaction-related documents, without additional context. That is why the Commission believes that requiring filers to point to documents or other materials in the HSR Filing that support the stated rationale would help resolve any uncertainty about which rationale (or rationales) may predominate. The Commission also understands that rationales may change throughout the diligence process. The parties are not required to wait to file their notification until they have settled on a single or predominant rationale.

Others described the request as unfair because in the past the merging parties' strategic rationale for the transaction has only been revealed after the Agencies have sued to block a deal. The Commission disagrees that the parties lack rationales for the transaction until they are before a court defending a lawsuit, or that it is unfair to require them to state each strategic rationale for the transaction known at the time of making an HSR Filing. Indeed, each filer may have different reasons for entering into the transaction. Whatever the reasons for agreeing to the transaction, that is the information the Agencies seek. Knowing why each party sees the transaction as beneficial is highly relevant to the initial antitrust assessment and may cause the Agencies to determine, relying on the documentary support for that rationale, that the transaction does or does not warrant additional investigation.

In addition, commenters noted that a description of transaction rationales would be burdensome to generate and duplicative of other materials submitted in the HSR Filing, particularly documents responsive to current Item 4. The Commission acknowledges that there is some cost to filers to provide a description of strategic rationales but

disagrees that it is duplicative. There is no current requirement that the parties describe the rationale for the transaction, and for many transactions, there are no documents or other information submitted with the HSR Filing that reference a rationale. For these filings, the Agencies do not know what benefits either party hopes to achieve through the transaction. Alternatively, where there are many different rationales discussed in submitted materials, the Agencies lack the context to know which ones predominate or reflect the views of the organization. Requiring each filer to describe each strategic rationale for the transaction provides the Agencies with a starting place to understand the motivation behind the transaction without having to make judgments about which ones are still under consideration. Given the Agencies' experience with asking this question during the initial waiting period or reviewing other white papers that the parties voluntarily provide, the Commission believes that the cost of supplying a transaction rationale will be minimal and, in any event, is necessary for the Agencies to determine whether the transaction may violate the antitrust laws. Filers are invited (but not required) to copy and paste text or provide a summary from documents produced with the HSR Filing and reference the specific portions of those documents where the discussion of that rationale exists. However, if documents provide inconsistent rationales, filers should address these inconsistencies. The Commission believes that relying on statements contained in documents submitted with the HSR Filing will reduce the burden of preparing the filer's description of rationales for the transaction.

One commenter requested clarification as to whether the proposal contemplates a single consistent response submitted by all parties notifying the same transaction (in the context of a simple acquisition, buyer and seller) or whether it contemplates that each notifying party submits a separate narrative, noting that the motivations of buyers and sellers may diverge. The Instructions clarify that each filing party is required to submit a description of its strategic rationales because it is important to have such a description from both sides of a given transaction.

Another commenter suggested that to reduce burden the Commission should only require the acquiring person to submit its transaction rationale, reasoning that the acquiring person's strategy is the most competitively

relevant and that the seller's rationale for a transaction is often no more than obtaining cash to distribute to investors or to use for unrelated business purposes. The same commenter suggested that the instruction be limited to requiring a brief description of the primary strategic rationale for the transaction. For the reasons outlined above, the Commission declines to adopt these suggestions but notes that a brief description of the transaction rationale is sufficient so long as it is accurate and does not conflict without explanation with stated rationales in documents submitted with the HSR Filing.

b. Transaction Diagram

The Commission proposed a new requirement that filing persons provide a diagram of the deal structure along with a corresponding chart that would explain the relevant entities and individuals involved in the transaction. The Commission adopts this proposal with modification.

The Commission received many comments in support of this proposal, all of which noted the value of such materials to the Agencies as they work quickly to assess the transaction. One commenter stated that without a diagram of all the entities and their relationships it can be hard to understand what's going on. Another highlighted that the proposed requirement would leverage documentation that often already exists. Noting that transaction diagrams can sometimes be incomplete or inaccurate, a law firm commenter suggested that this proposed instruction be modified to require the submission of the most recent diagram of the transaction, but only to the extent that such a diagram already exists and is not materially inaccurate. Finally, two commenters expressed general support for the proposal.

Three commenters opposed the proposal on the grounds that it would unnecessarily increase the burden on filing parties. One commenter stated that these materials are often not maintained in the ordinary course of business or created in the course of a deal negotiation. Another noted that deal structure may not be "set in stone" even after signing. In addition, another commenter pointed out that, besides burdening the parties, the proposal would increase the burden on Agency staff reviewing the information, adding that the additional information is not likely to be any more informative to the Agencies than the information already required under the current HSR Form.

Two commenters proposed modifications in light of the fact that many times these charts are drafted by outside tax advisors to show the pre-transaction reorganization needed to achieve the desired tax structure and benefits and that the charts sometimes include detailed tax advice that is protected by the attorney-client privilege or otherwise commercially sensitive. A law firm commenter suggested modifying the instructions to permit parties to redact, omit, or simplify any diagram, to exclude information that relates solely to tax considerations. Another commenter noted that where the details of the pre-transaction reorganization are irrelevant to the antitrust assessment of the transaction, such as where all or a majority of the outstanding equity of a target is being acquired, less detailed diagrams should provide the agencies with the desired information.

The Commission acknowledges the cost of having to create both a diagram along with a corresponding chart explaining the relevant entities and individuals involved in the transaction. Although such information would be materially useful to the Agencies, the Commission adjusts the proposal to require only the acquiring person in non-select 801.30 transactions to provide a diagram of the deal structure and only if one exists. That is, filers are not required to create a diagram or a chart solely for the purposes of submitting an HSR Filing. The Commission believes that such a diagram would be useful even if prepared for other purposes. With regard to privileged materials, HSR Rules already accommodate withholding certain material based on a claim of attorney-client privilege; if such a claim is made with respect to transaction diagrams, the filer can follow those requirements.

In sum, the Commission has determined that the transaction information requirements contained in the final rule are necessary and appropriate to enable the Agencies to fully understand the scope of the transaction being considered and to identify those that may violate the antitrust laws, and that the requirements, as modified, have been tailored to reduce the cost of reporting as much as practicable.

*F. Joint Ventures*

This section requires information currently mandated by Item 5(b) of the Form. As discussed in section VI.J.1.f, the Commission adopts the proposal to eliminate the use of 10-digit NAPCS codes, including in this section. The

Commission did not propose and does not adopt any other material changes to the information required by this item. The Commission notes that no acquired person filings are required for joint ventures, so this section is not included in the Form or Instructions for acquired persons.

*G. Business Documents*

The Commission proposed a Business Documents section that would require the submission of documents currently required by Items 4(c) and 4(d) of the Form as well as additional categories of documents. Specifically, the Commission proposed expanding the current requirement found in Item 4(c) to the ''supervisory deal team lead(s);'' altering the language of current Item 4(d)(ii); requiring the production of certain ordinary course documents; requiring drafts of Transaction Related Documents; and requiring an organizational chart of authors and recipients. As discussed below, the Commission adopts some of these requirements with modification and does not adopt others.

As noted in the proposed rule, the Agencies compared documents they have received over the years in response to Second Requests with those submitted in the HSR Filing and assessed whether having certain types of documents at the beginning of the waiting period would have changed the Agencies' determination of whether and how to move into an in-depth investigation of the transaction. As a result of this review, the Commission identified documents that are not required by the current Form but would have been highly probative to the initial antitrust assessment of the transaction during the initial waiting period.

1. Transaction-Related Documents

a. Competition Documents

In the proposed rule, the Commission proposed expanding the documents currently required by Item 4(c) of the Form, which are prepared by or for officers and directors for the purpose of evaluating or analyzing the transaction. Since the beginning of the premerger notification program, these transaction-related documents have been a key screening tool for the Agencies to determine whether the transaction may violate the antitrust laws because they discuss the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets. The Commission proposed requiring the filing person to submit such documents prepared by or

for supervisors of the team of individuals working to complete the transaction, which the Commission referred to as the supervisory deal team lead(s).

In response to comments that the proposal was not clear about whom the Commission intends for filers to search for responsive documents and information in addition to officers and directors, the Commission has introduced a definition of supervisory deal team lead and limited the term to just one person. As discussed in section VI.A.1.g., the Commission believes these changes will provide clarity for filing parties. The Commission now turns to comments that were not directed at the definition of supervisory deal team lead but concerning the requirement to submit documents prepared by or for someone other than officers and directors.

The Commission received one comment from State antitrust enforcers supporting the proposal, but other commenters expressed concerns about the costs associated with identifying, collecting, and producing documents from the supervisory deal team lead. Certain commenters stated that expanding 4(c) to include documents to and from supervisory deal team lead(s) would create a significant burden to filers that is not justified by any benefit to the Agencies. One commenter said that adding documents from these individuals would not likely generate material that would allow staff to better assess the need for Second Requests.

The Commission disagrees that adding documents prepared by or for the senior leader of the deal team would not likely generate additional key documents to help staff better assess whether to issue Second Requests. Since the beginning of the premerger notification program, 4(c) documents have been a principal source of information that allows the Agencies to identify those transactions that may violate the antitrust laws and that require a more in-depth review through the issuance of Second Requests. Based on documents submitted in response to Second Requests, it is the Agencies' experience that someone other than an officer or director is often in charge of the deal team and this person typically has additional documents that would be responsive to 4(c), but the documents have not been transmitted to an officer or director at the time of the HSR Filing. This is even more likely to be true when the HSR Filing occurs before due diligence is complete or a final agreement is executed. Requiring the submission of transaction-related documents prepared by or for the

supervisory deal team lead would result in the Agencies receiving additional probative documents that speak directly to whether the transaction may or may not violate the antitrust laws even if the document has not been shared with an officer or director prior to filing the notification. Based on the Agencies' experience, the analysis of the transaction's competitive implications contained in these documents is extremely probative.

Certain commenters explained that the addition of the supervisory deal team lead to the existing officer and director custodians, combined with the other new document requirements, would require filers to submit a significantly larger volume of documents. One commenter estimated that adding documents from the supervisory deal team lead(s) as well as draft documents as proposed in the NPRM may increase the number of documents submitted with each filing by tenfold or greater. Another comment pointed out that adding supervisory deal team lead(s) to Item 4(c) could also add a burden related to internal document preservation and retention. The comments did not provide specific estimates of how many additional documents or pages of materials adding a supervisory deal team lead may generate, however.

As discussed throughout this final rule, the Commission has taken steps to lessen the costs identified by commenters. After careful consideration of the comments, the Commission has modified this proposal to reduce the cost associated with requiring 4(c) documents by limiting new custodians to be searched to a single individual, the supervisory deal team lead. This modest expansion of custodians by one individual is necessary because documents responsive to Item 4(c) are some of the most relevant material that staff receives, and based on the Agencies' experience there are also probative documents containing 4(c) content generated by and for the supervisory deal team lead that, if submitted with the HSR Filing, would allow staff to better gauge the competitive implications of the transaction—as understood by the filing person—and conduct a more informed, efficient screening analysis.

Another concern articulated by a small number of commenters was that documents created by or for the supervisory deal team lead may convey information that does not reflect the actual assessment of the proposed merger at senior levels. As one commenter explained, the Agencies may draw conclusions that do not actually

align with the documents provided to or sent by the personnel that can make final decisions for an entity, such as officers and directors. The Commission acknowledges this concern but believes that the exclusion of these documents from HSR Filings is often technical and simply a matter of timing. HSR Rules do not require filers to complete due diligence or sign an executed agreement before filing a notification. Even the modification discussed in section V.D. which requires filing parties to have agreed to key terms of the transaction still allows parties to file prior to the completion of all diligence and negotiation. In the Agencies' experience, staff often receives these 4(c)-type documents in response to a Second Request and finds that the reason they were not submitted with the filing was that they had not been shared with any officer or director at the time of the HSR Filing but were eventually shared with them. Even if such documents were never shared with an officer or director, any document that is responsive to 4(c) and was only shared with the supervisory deal team lead—the person who has primary responsibility for supervising the strategic assessment of the deal—is still highly probative of whether the transaction is likely to violate the antitrust laws.

The Commission believes that by limiting this requirement to the individual who has primary responsibility for supervising the strategic assessment of the deal, and who would not otherwise qualify as a director or officer, it has been tailored to provide a benefit to the Agencies with minimal cost to filers. In the situation where the only individuals supervising the strategic assessment of the deal are already either an officer or director, this requirement will not require searching for responsive documents from anyone new. As discussed above, to the extent that the supervisory deal team lead has responsive documents, it is just often a matter of timing that the document is not submitted with the HSR Filing. Rather than requiring parties to complete their due diligence and provide all responsive transaction assessments provided to key decision makers prior to filing, the Commission has determined that also requiring documents provided to the supervisory deal team lead is the most direct way to obtain these highly relevant assessments of the transaction with the HSR Filing. The cost associated with searching one additional individual for these documents is necessary and appropriate given their importance to the Agencies in quickly identifying those transactions

that warrant a closer look. Thus, the Commission adopts this proposal as modified in the final rule.

b. Drafts

The Commission proposed requiring drafts of responsive transaction-related documents if that draft document were provided to an officer, director, or supervisory deal team lead(s). The Commission does not adopt the proposal at this time.

As explained in the NPRM, filers are currently required to submit draft versions of documents responsive to Items 4(c) or 4(d) only if there is no final version or if the draft was sent to the board of directors. Under this guidance, if a not-final version of a document is sent to the board of directors, it ceases to be a "draft" and must be submitted, even if a final version is also submitted. Based on the Agencies' experience with receiving other drafts of documents during a Second Request investigation, in some cases prior draft versions have been edited to remove candid assessments of factors relevant to competition prior to circulation to officers or directors.

The Commission received numerous comments on this proposal, raising four principal issues: (1) the burden of producing draft transaction-related documents is not justified by the benefit to the Agencies; (2) such drafts do not reflect sufficient deliberation to be probative of antitrust risk; (3) the term "drafts" is not defined in the NPRM and has no common meaning; and (4) requiring the production of drafts would chill internal discussions related to the strategic assessment of the transaction. These concerns are discussed in turn.

First, some commenters emphasized the burden of producing drafts, noting that filing parties will need assistance from counsel and may have to use e-discovery or forensic collection tools to capture all drafts. Requiring drafts, one commenter stated, would significantly increase the volume of documents produced; another commenter noted that it is not uncommon for the authors of these documents to prepare many discrete drafts as part of the drafting process. Some commenters underscored that Agency staff would also face the challenge of reviewing these additional documents. Another commenter pointed out that the proposal would disproportionately affect smaller businesses, which may not have staff lawyers or the ability to incur hundreds of thousands of dollars in legal fees.

In addition, some commenters expressed doubt regarding the probative value of drafts. Drafts may be duplicative, they noted, and often

include boilerplate language that may not be accurate as well as incomplete thoughts, dummy slides, and placeholders. One commenter observed that the Agencies do not typically request drafts during the initial waiting period, and that it is exceedingly rare for Agency staff to use a draft document as a deposition exhibit or in any subsequent litigation.

Commenters also sought guidance from the Agencies regarding what constitutes a "draft" transaction-related document. In the context of a shared document platform, where several contributors may be working on a document simultaneously, one commenter asked if each saved iteration would be considered a draft that must be produced. Another commenter asked whether a document is considered to be "submitted" to an officer, director, or supervisory deal team lead if that individual simply has access to the document via a collaborative drafting tool. As a result of such vagueness, commenters noted, merging parties will face the enormous practical challenge of preserving all versions of documents, even at highly preliminary, incomplete stages. Moreover, such vagueness will lead to arbitrary and capricious enforcement of the requirement to submit drafts if Agency staff later discovers a draft document that they believe should have been submitted with the HSR Filing, according to one commenter.

Finally, some commenters raised concerns about the implications for internal deliberation during the drafting process. One commenter stated that the proposed requirement would chill open discussion "for fear of creating documents that do not reflect the final thoughts of the company." Another commenter warned that it might cause some risk-averse businesses to remove officers, directors, and supervisory deal team leads from the document-drafting process.

Although several commenters recommended eliminating the proposed requirement entirely, the Commission did receive a few suggestions for ways to narrow the proposal. One suggestion was to limit drafts to specific types of documents identified by the Agencies as likely to contain probative information. Another commenter suggested requiring filers to submit the first draft, the last draft, and the final document. Alternatively, one commenter proposed that only the initial draft version submitted to an officer, director, or supervisory deal team lead be produced. None of the commenters supported the alternative proposed in the NPRM, which would require filing parties to

withhold drafts and submit them within 48 hours only if requested to do so by the Agencies.

Having carefully considered the comments, the Commission has decided not to adopt the proposed change to require draft documents at this time.

However, in light of concerns that the Agencies are receiving documents edited to remove candid assessments of the transaction and market competition, the Commission modifies its informal guidance regarding drafts that were shared with the board of directors or similar body. Currently, a document, even in draft form, that is shared with the board of directors (or similar) is responsive and no longer considered a ''draft.'' This distinction is based on the belief that if a document is shared with the board of directors, it is sufficiently reliable to be submitted with the HSR Filing. However, this guidance has sometimes been limited to require that the document be shared with the entire board. The Commission now clarifies that any Transaction Related Document (currently referred to as 4(c) and 4(d) documents) that was shared with any member of the board of directors (or similar body) is responsive and should not be considered a draft; rather, it should be treated as a final version and submitted with the HSR Filing as a Competition Document.

As explained in the NPRM, draft versions of responsive documents can contain highly relevant, probative, or candid statements about the transaction's competitive impact not reflected in the final version of the document, and in some cases, it appears that the final document has been edited to remove candid assessments of factors relevant to competition prior to circulation to officers or directors. The Agencies' experience is buttressed by multiple commenters, who similarly acknowledged that 'sanitizing' these documents in anticipation of antitrust investigation by the Agencies is a legitimate concern. The Commission believes that modifying its informal guidance, as well as obtaining additional documents and information as outlined in this final rule, including those shared with the supervisory deal team lead, will help ensure that the documents the Agencies review contain factual, accurate assessments of the strategic and competitive implications of the transaction.

### c. Confidential Information Memoranda

This section requires information currently collected in by Item 4(d)(i) of the current Instructions. The Commission did not propose and does

not adopt any material changes to the information required by this item.

### d. Third-Party Studies, Surveys, Analyses, and Reports

This section requires information currently required by Item 4(d)(ii) of the current Instructions. The Commission did not propose and does not adopt any material changes to this item.

### e. Synergies and Efficiencies

The Commission proposed a Synergies and Efficiencies section to collect the information currently required by Item 4(d)(iii) of the Instructions, with a proposed modification to clarify that forward-looking analyses are responsive. Although one comment expressed general support, some objected to the proposed modification, noting that it would expose firms' proprietary information. More generally, another commenter expressed concern that the burden of identifying the documents that relate to potential synergies or efficiencies would increase greatly if expanded to include supervisory deal team lead(s) and drafts, because synergy analyses in particular can generate a large number of drafts.

In light of the comments and to reduce the overall cost of the final rule as compared to the benefit this information would provide to the Agencies, the Commission does not adopt the proposed modification. However, the Commission declines to repeal the requirement to provide documents that reflect expected synergies and efficiencies, as the Agencies find these analyses to be relevant to understanding any such expected benefits of the transaction. Parties often provide more information about potential efficiencies than is strictly required by the Rules if they want the Agencies to consider such information during their initial review. Thus, the current language in the Instructions regarding synergies and efficiencies remains in effect as part of the final rule.

### 2. Plans and Reports

The Commission proposed requiring filers to submit two sets of plans and reports not created specifically for analyzing the filed-for transaction. First, it proposed requiring the submission of periodic plans and reports that discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and acquired entity, if those documents were shared with a chief executive officer of an entity involved in the transaction, or with

certain individuals who report directly to such a CEO. Second, the Commission proposed requiring the submission of all plans and reports submitted to the board of directors (or, in the case of unincorporated entities, individuals exercising those functions) that discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and acquired entity. The NPRM called for all such plans and reports that went to the board, not merely those prepared on a periodic basis, because it is the Commission's experience that any report sent to the board reflects market intelligence that is important to the top decision-makers. As proposed, the Commission limited this document requirement to those materials prepared or modified within one year of the filing date of the notification. The Commission adopts the proposal with modifications explained below.

As explained in the NPRM, plans and reports prepared in the ordinary course often contain detailed assessments of core business segments, markets, competitors, other acquisition targets, and projections about future competitive dynamics—insights that have direct bearing on the Agencies' antitrust assessment of the transaction in the initial waiting period. Staff at the Agencies frequently request these documents voluntarily from filing parties early in their review to better understand and analyze the relevant markets at issue.

The Commission received several comments on these proposals. Some comments stated that the proposed requirement was overly broad and would create a significant burden for filers without commensurate benefit to the Agencies. In particular, for example, some comments said that this requirement would mean that filing company personnel must identify, collect, and produce responsive material from several individuals who are not currently searched for documents or materials submitted with an HSR Filing. These comments disagreed with the NPRM's statement that companies frequently collect these documents as part of the due diligence process for transactions. In addition, one commenter stated that, even if such documents were collected, the collection process would not occur in a systematic way to ensure compliance with HSR requirements. In order to effectively collect and produce responsive material, some comments contended that filers would need to use e-discovery and other forensic discovery tools, which are expensive and add

**89304** **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

additional time. Certain comments explained it would be counterproductive and burdensome for the Agencies' staff to review and assess the significant volume of documents this new request will likely yield.

The Commission acknowledges that this proposal would have increased the costs for certain filers and has tailored the final rule to minimize these costs. For instance, commenters suggested that there would be additional costs to collect these types of documents, such as interviewing additional personnel, collecting additional documents for production, and having those documents reviewed by counsel, among other tasks. In response to these concerns, the Commission notes the revised requirement is very targeted: it applies only to documents that already exist and are dated within one year of filing, and that discuss overlapping products and services. But in response to concerns that a search for even this limited set of documents could require forensic document technology or other investments in discovery tools, the Commission modifies this requirement to limit the business executives whose files need to be searched, dropping the need to collect and produce documents from any person who reports directly to the relevant CEO. As a result, this requirement will not require documents from any new custodians. With this modification, the Commission believes that the number of responsive documents will be reduced so that the burden on the parties to submit and the burden on staff to review these documents will be manageable.

The Commission believes that limiting responsive plans and reports to those shared with the CEOs and with the Boards of Directors of the entities involved in the transaction will still provide the Agencies with sufficient context necessary to determine whether the transaction is likely to violate the antitrust laws. Importantly, these individuals are often involved in preparing the HSR Filing and are the same individuals who are searched for other responsive documents, such as Competition Documents. From the Agencies' experience, those that report directly to the CEO typically collect and retain the types of reports that contain important and relevant business facts so that documents provided to the CEO contain important market analyses and facts that are highly relevant to the Agencies' initial antitrust assessment. They can be especially important for determining the scope of any investigation, potentially narrowing the areas of inquiry or identifying areas of emerging competition that are not

otherwise discussed or described in documents generated in connection with evaluating the reported transaction.

The Commission has determined that at this time, requiring reports provided to lower-level executives who report to the CEO, as proposed in the NPRM, would add cost for filers, even those with known overlapping business lines who may expect that the Agencies will be taking a close look at the documents submitted with the HSR Filing.[351] The Commission is also mindful of the burden to the Agencies of receiving HSR Filings with many additional documents that must be reviewed during the initial waiting period. The Commission believes that getting ordinary course plans and reports from the Board of Directors and CEOs should be sufficient to provide staff with important market context for other submitted documents and information, including the Overlap Description, without overwhelming the current level of staffing devoted to premerger review.

In addition to limiting the people who must provide plans and reports, the Commission has also determined that these documents are not required for select 801.30 transactions. As discussed above, select 801.30 transactions are those where the Commission believes that certain requirements of the final rule are unlikely to provide information necessary to determine whether that transaction may violate the antitrust laws. Not requiring plans and reports for HSR Filings of select 801.30 transactions is another way the Commission is lessening cost based on the lower likelihood that the transaction may violate the antitrust laws.

Other commenters mentioned that responsive plans and reports are unlikely to contain any information about the specific products or services offered by the other filers and this

requirement would thus sweep in irrelevant information. One such comment noted that the material received would contain much irrelevant material that would lack sufficient probative value. The Commission disagrees that requiring the plans and reports at issue will generate irrelevant documents. Based on the Agencies' experience, plans and reports, taken as a whole, are highly relevant to staff's analysis of the nature and scope of product or service markets, geographic markets, competitors and competitive dynamics in the industry, new or potential entrants that could mitigate competition concerns, among other key considerations that could determine whether the transaction may violate the antitrust laws. Documents that were created in the ordinary course of business and not solely for the purpose of evaluating the transaction frequently contain important discussions about development efforts for non-commercial products or services or explain competitive dynamics in a broader way that would reveal ways that the transaction could impact non-horizontal competition. In addition, they may identify potential entrants or emerging threats, or discuss other potential acquisition targets. In the Agencies' experience, such plans and reports provide market facts and long-range assessments that bear directly on whether the transaction is one that may violate the antitrust laws in ways described in section II.B.4. Staff has routinely requested that filers provide these documents on a voluntary basis during preliminary-phase investigations, however, because of the voluntary nature of the request there is no requirement that filers produce all or even any of these materials.

Moreover, the modifications the Commission has made to the final rule ensure that the plans and reports are relevant to understanding the nature and extent of existing competition between the merging parties. The only filers who must provide these documents are those involved in transactions in which both parties provide the same types of products or services or that are known to be under development. The Commission acknowledges that these plans are also important to investigate competitive effects in transactions involving supply relationships but has limited this request in the interest of administrability, efficiency, and reducing cost. Transactions between two entities that currently compete (or have pre-revenue products in development that will result in direct

---

[351] In the final rule, the Commission adopts the suggestion of one commenter to limit plans and reports to those provided to the CEO but declines to seek another round of public comment before finalizing this requirement as modified. Another commenter suggested that the Commission only require these documents that were provided to the board and not to the CEOs. The Commission declines to adopt this suggestion because it believes that excluding CEOs would prevent the Agencies from having the type of relevant information that is routinely provided to senior leaders related to markets with overlapping products and services. Based on its cumulative experience in collecting these types of documents during merger investigations, the Commission has determined that it is necessary and appropriate to collect a limited set of plans and reports that were provided to the highest level of decision-makers, including the CEOs, because they contain important context for conducting the Agencies' initial antitrust assessment of the transaction.

competition soon) typically warrant a close look during the initial waiting period. For these transactions, filers need provide only the plans and reports that discuss market shares, competition, competitors, or markets for those overlapping lines of business created within a year of filing. This is exactly the kind of information the Agencies rely on to determine whether to investigate a transaction during the initial waiting period because it provides key information about the competitive landscape at issue in the transaction. While the Commission acknowledges there may be select portions of these responsive documents that do not contain relevant information, it is often the case that responsive documents contain non-responsive portions. Therefore, the Commission adopts this requirement with a clarification that the relevant products and services are those that both the acquiring person and target produce, sell, or are known to be developing.

One commenter explained that this requirement means filers must self-assess the products and services in which they overlap, and filers may disagree on the existence or degree of the overlap. The Commission agrees that this requirement requires a self-assessment by each party and does not expect that the products and services that are identified in the Overlap Description by each filer will always align, since the acquired person may not have complete information about all the products and services that the acquiring person offers or is developing. The Commission expects that the acquiring person, through its normal diligence of the target, will have a more fulsome understanding of the target's products and services, including those under development. However, as discussed in section VI.I.1., filers should not exchange information with each other when responding to the Overlap Description and each filer may refer to any submitted business document that supports the analysis of overlaps contained in the Overlap Description. In this way, the Commission expects that the analysis of markets reflected in the submitted plans and reports will be reflected in each party's assessment of overlaps contained in the Overlap Description. As is currently the case with a filer's identification of overlapping NAICS codes and for the new requirement to provide an Overlap Description, the Commission will rely on the good faith of the filer to provide accurate information.

Another commenter explained that ordinary course documents not

prepared for the transaction are arguably outside the HSR statutory mandate because the Commission had previously declined to adopt a proposal to include such ordinary course documents. The Commission's 1976 proposal had contemplated filers providing, among other items, copies of studies, surveys, analyses, and/or reports prepared by or for the company in the three years before filing, which contain information regarding market shares, competition, competitors, markets and more in relation to any product or service currently made or sold by the other filing party. The Commission states that merely because it declined to require the submission of ordinary course documents with the HSR Filing in the past does not mean it lacks the authority to do so now. The Commission believed that it had the statutory authority to require ordinary course documents in 1976 when it first set up the premerger review program but determined that excluding these types of documents was unlikely to impede effective premerger review.

The Commission believes that it is now necessary and appropriate to require such documents to be submitted with the HSR Filing. As discussed in section II.B., many aspects of the economy, deal structure, and technology have changed dramatically since Congress passed the HSR Act. Based on their experience, the Agencies know that ordinary course documents often contain important horizon-scanning discussions, including market intelligence about other competitors in the market or emerging competitive threats, and that these high-level plans and reports provide important information about the competitive dynamics that may be affected by the transaction. Indeed, these documents often identify other competitors, including their strengths and weaknesses, and this information is highly probative of the competitive assessment of the transaction. Moreover, with the practical limitation to collect and submit only documents that were shared at the highest levels of management—those provided to the CEO or the Board of Directors—the Commission believes the final rule carefully balances the burden of this requirement (for the parties and the Agencies) in light of their clear relevance to the antitrust assessment of the transaction.

One comment noted that requiring plans and reports would be inconsistent with international jurisdictions' merger control regimes. However, the Commission does not find the issue of varying international jurisdictions'

document requirements for government merger review dispositive. Each jurisdiction establishes, for itself, the information needed for the particulars of their laws, economies, and priorities. The Commission relies on its own experience in enforcing the U.S. antitrust laws, in light of binding precedent, to assess the most relevant and probative information to determine whether an acquisition may violate those laws. Based on its own experience and expertise in enforcing the U.S. antitrust laws, the Commission has determined that due to the changes in corporate structure and market dynamics described in section II.B., it is now necessary and appropriate to collect a limited set of plans and reports with the HSR Filing.

A smaller set of comments stated that the terms used in the new proposed requirements were vague and unclear. For example, one comment said that the proposed instructions do not provide a clear definition of "semi-annual and quarterly" or "plans and reports," which creates uncertainty and compliance risks for filers. Another comment said that the expanded requirements will create uncertainty because they do not directly reference the transaction under review or documents shared during the due diligence process, which would lead filers to make subjective determinations as to which materials are responsive.

The Commission disagrees that there is uncertainty or ambiguity about what is responsive. As stated in the NPRM, regularly prepared plans and reports are high-level strategic business documents created not in contemplation of the transaction but in the ordinary course of business within one year of filing and that are prepared at regular intervals. Responsive plans and reports will discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and acquired entity, if those documents were shared with a CEO of an entity involved in the transaction, or of any entity it controls or is controlled by. Targeting documents that discuss market shares, competition, competitors, or markets tracks similar language in Item 4(c) of the current HSR Form, which in the Commission's experience is familiar to many filers and uses phrases that are known to businesspeople. The NPRM references to semi-annual and quarterly rely on standard terms that are routinely used in document requests sent to filers and third parties by the Agencies during their investigations. In the interest of clarity, however, the Commission notes that regularly prepared documents

include those that are produced at regular intervals, such as "annual" (once a year), "semi-annually" (two reports or plans each year), and "quarterly" (once every quarter or every three months). To help resolve any remaining uncertainty, the Commission clarifies that regularly prepared plans and reports are those that are prepared by the filers in the ordinary course and at regular intervals and does not include special reports prepared for a specific purpose. Filers should submit one year's worth of annual, semi-annual, or quarterly plans or reports provided to a CEO but do not need to submit plans or reports that are produced more frequently, such as monthly or weekly. The Commission clarifies that filers should submit all plans and reports provided to the Board of Directors and not only those that are regularly prepared. These documents, which were shared at the highest level of decision-making, may include special reports if they contain responsive material.

Yet other commenters were concerned that requiring plans and reports would raise confidentiality concerns, forcing filers to disclose potential transactions to employees before they are ready to do so. As modified, this requirement alone would not lead other personnel to become aware of the transaction prematurely. The Commission believes that plans and reports can be obtained from these CEOs and Board members in a way that does not necessitate divulging the transaction to other executives and businesspeople who do not otherwise know about the pending transaction. Finally, the Commission notes that plans and reports are also not required in filings for select 801.30 transactions.

Certain comments that opposed the requirement to submit plans and reports also offered suggested modifications. One of these comments recommended that the Commission tailor the requirements to clarify that it is limited only to the filing party's products and services in the United States and that filers need only produce documents, or portions thereof, that discuss specifically identified subject matter. Certain comments agreed that the Commission should allow filers to redact non-responsive materials from these documents. The Commission declines to adopt these suggestions because it finds that allowing filers to redact non-privileged information or information related solely to matters outside the United States on the basis of relevance would introduce too much uncertainty into the value of these documents, leaving Agency staff with incomplete, piecemeal material. Agency

staff is experienced with reviewing documents that contain relevant as well as non-relevant content and the Commission believes it is important for documents to be produced as they were shared with the relevant decision-makers, properly redacted for privilege only.

The Commission also considered alternatives proposed by commenters. One commenter explained that the Agencies could request filers to submit these documents on a voluntary basis, because those requests are narrowly tailored and have historically followed initial substantive discussions between filers and Agency staff. When used in combination with withdrawing and refiling, this process would provide the Agencies, the commenter said, with at least 30 days to review and analyze strategic plans before issuing Second Requests. The Commission disagrees that it is sufficient to continue to obtain plans and reports on a voluntary basis after staff has identified that they are needed because there is no obligation for filers to comply, substantially or minimally, with such a request for information prior to the expiration of the initial waiting period. In the Agencies' experience, even when parties are asked to provide these documents on a voluntary basis, they are often do not provide them prior to the end of the first review period (either 30 or 15 days) and often choose to pull and refile their notification in order to submit these and other materials that were requested on a voluntary basis. Moreover, in the Agencies' experience, these particular documents contain important information that is currently missing from the HSR Filing that would identify the transaction as one that requires a closer look.

Another comment suggested that Agencies could get these documents using Second Requests as they do now. While either Agency can obtain these documents through the issuance of Second Requests, the Commission believes that the probative value of these documents makes them necessary for staff's initial screening assessment, both because they can identify different areas of antitrust risk, including for areas of future competition, and because they may contain additional information about the business lines of interest that may alleviate the need to issue Second Requests or narrow their scope. As discussed above, because issuing Second Requests is time- and resource-intensive for both the parties and the investigating agency, is it not a substitute for having additional information in the HSR Filing that minimizes the need to issue Second

Requests at all. Having additional relevant and targeted information on the front-end benefits both the Agencies and the parties because it allows the Agencies to focus on the most concerning transactions, and allows parties to avoid Second Requests when they are not warranted, and thereby avoid unnecessary expense and delay.

Finally, certain comments discussed earlier also suggested not adopting the proposed requirement at all. In light of the Agencies' experience with the probative value of high-level ordinary course documents and their belief that having them would provide necessary context to other material submitted with an HSR Filing, the Commission declines to dismiss the requirement altogether. The Commission believes this final rule, as modified, reflects a reasonable balancing of the importance of these documents to a premerger assessment and the burden of requiring them for any transaction where filers have overlapping business lines. The Commission has in considered the specific concerns raised by comments and tailored the requirement to preserve the important benefit to the Agencies while mitigating the cost to filers (and to the Agencies).

3. Organizational Chart of Authors

As the final part of its Business Documents section, the Commission proposed requiring an organizational chart(s) that would reflect the position(s) within the filing person's organization held by identified authors and, for privileged documents, recipients of each document submitted with the HSR Filing. The Commission also proposed requiring the filer to identify the individuals searched for responsive documents. The Commission does not adopt this proposal.

The Commission received several comments opposing this proposed instruction, with commenters noting that many companies do not maintain these types of organizational charts in the ordinary course of business, and to the extent they do, such charts are often incomplete or inaccurate. According to one commenter, such charts would need to be prepared solely for the purpose of the HSR Filing, which would be time-consuming. Other commenters pointed out that authors of certain documents may not even be employees of the filing entity, thereby complicating the certification of the filing.

In addition, multiple commenters questioned the Agencies' need for organizational charts to determine whether to issue a Second Request. As one commenter noted, it is unclear why organizational charts will assist staff in

assessing whether a particular transaction merits further review as opposed to their value for identifying potential custodians for a potential Second Request.

As to the proposed requirement to identify the individuals searched for responsive documents, one commenter stated that parties may claim privilege on information regarding whose files were searched. Another commenter observed that, for the majority of HSR filings, documents are identified through targeted self-collection, directed and overseen by legal counsel, rather than running Second Request-style searches through custodial files. The same commenter cautioned that the proposed disclosure requirement would disincentivize companies to err on the side of over-collection so as not to raise a red flag to the Agencies or suggest that the persons searched should be custodians in a Second Request.

Finally, as an alternative to providing an organizational chart, one commenter suggested requiring parties to identify the person who supervised the drafting and the person to whom that drafter directly reports.

After considering the comments and weighing the benefit to the Agencies during the initial waiting period in light of the cost of complying, the Commission does not adopt this proposal. As discussed in section VI.A.3., elsewhere the final rule requires filers to identify authors of documents if the filer has identified a NAICS overlap, product or service overlaps in the Overlap Description, or a supply relationship in the Supply Relationships Description. The Commission has determined that author information is not relevant for all filers and that limiting author information in this way provides sufficient benefit to the Agencies while reducing the cost for filings without such relationships.

In sum, the Commission has determined that the requirements to submit business documents contained in the final rule are necessary and appropriate to enable the Agencies to identify transactions that may violate the antitrust laws and to provide important information about each party's view of market realities and that these requirements, as modified, have been tailored to reduce the cost of submitting responsive documents as much as practicable.

*H. Agreements*

The Commission proposed an Agreements and Timeline section to require filing persons to provide a term sheet or draft agreement that reflects sufficient detail about the proposed transaction to demonstrate the transaction is more than hypothetical, if a definitive agreement has not been executed. In addition, the Commission proposed additional changes to require the submission of the entirety of all agreements related to the transaction and a new requirement to submit other agreements between the filing persons that are not related to the transaction, as well as a timetable for the transaction. As discussed below, the Commission adopts some proposals with modification and does not adopt the requirement to submit a timeline.

1. Transaction-Specific Agreements

The Commission proposed requiring filing persons to produce all documents that constitute the agreement between the acquiring person(s) and the person(s) whose assets, voting securities, or non-corporate interests are to be acquired, inclusive of schedules, exhibits, and the like, that relate to the transaction, regardless of whether both parties to the transaction are signatories. Further, consistent with the proposed changes to § 803.5, the Commission proposed requiring the most recent draft agreement or term sheet, if filers were not submitting a definitive agreement. The Commission adopts the requirements with modification.

Currently, only the production of certain schedules is required, although many filers do provide schedules regardless. As noted in the NPRM, in the Commission's experience, the structure of transactions has become increasingly complex, often comprising not only multiple agreements between the filing persons but also agreements with third parties. Understanding the entirety of the transaction, including but not limited to non-competition and non-solicitation agreements and other agreements negotiated with key employees, suppliers, or customers in conjunction with the transaction, is crucial to determining the totality of the transaction and assessing during the initial waiting period the transaction's potential competitive impact.

The Commission received one comment in support of this proposal. The State antitrust enforcers wrote in support of the request for non-competition agreements, noting that non-compete clauses that bind employees post-employment prevent new businesses from emerging and stifle entrepreneurship and innovation. One commenter opposed the proposal, noting that this requirement will significantly increase the burdens for filers and recommended requiring that notifying parties provide a descriptive index of such agreements from which

investigating staffs could identify specific agreements that they require (with translations if needed). Another commenter expressed the concern that, as written, the proposed instruction would capture clean-team agreements, used by merging parties to reduce the antitrust risk associated with exchanging competitively sensitive information, as well as confidentiality agreements that include similar antitrust safeguards, and that in doing so this proposal might have unintended effects. The commenter cautioned that in response some parties might forgo using clean-team agreements entirely, on the thinking that including a clean-team agreement in the HSR filing would signal a larger competitive concern than actually exists.

The Commission finds that having the complete set of documents that will govern the transaction is necessary to understand the potential effects of "the transaction." Therefore, it does not adopt suggestions to provide an index in lieu of the actual documents that constitute the agreement. In the Commission's experience, voluntary production of documents can delay the review of transactions within the initial waiting period. The Commission does limit the requirement to those agreements that will be in effect on and after closing, with the intention of excluding agreements such as clean team agreements. The Commission also adopts the clarification, discussed in section V.D., that the requirement relates to the transaction that the parties intend to consummate.

The Commission also proposed requiring that, if there is no definitive executed agreement, the filing parties provide a copy of the most recent draft agreement or term sheet that provides sufficient detail about the scope of the entire transaction that the parties intend to consummate. As discussed in section V.D., the Commission is modifying the proposed instructions in response to certain comments that requested clarification. One commenter sought clarity on what constitutes "sufficient detail" about the scope of the transaction, noting that certain transaction details are often not fully determined at the time of signing a definitive agreement or filing HSR, but also may not be necessary to determine whether to issue Second Requests. The same commenter cautioned that the proposed requirement will likely cause undue delays and risk unnecessarily increasing the overall timing to close a transaction especially in instances where parties intend to file on the basis of a letter of intent.

To address this concern, the Commission has revised the Instructions to describe what would be sufficient:

some combination of the following terms: the identity of the parties; the structure of the transaction; the scope of what is being acquired; calculation of the purchase price; an estimated closing timeline; employee retention policies, including with respect to key personnel; post-closing governance; and transaction expenses or other material terms.

The Commission notes that these examples are meant to be illustrative and not exhaustive.

2. Other Agreements Between the Parties

The Commission proposed requiring filing persons to submit all agreements between any entity within the acquiring person and any entity within the acquired person in effect at the time of filing or within the year prior to the date of filing. The Commission adopts the proposal with a significant modification to reduce the burden that would have been associated with producing copies of these agreements with the HSR Filing.

As explained in the NPRM, understanding the scope of any existing contractual relationships between the filers, such as an existing customer-supplier relationship, would materially assist the Agencies' review by revealing any business interactions or relationships that exist prior to the transaction and that may be affecting premerger competition, which is material to assessing how the transaction may affect post-acquisition competition.

The Commission received two comments in support of the proposed requirement. The State antitrust enforcers noted that it would shed light on any licensing or supply agreements, as well as any non-compete agreements, between the parties. A union commenter also supported the request and suggested expanding it for certain non-compete and non-solicitation agreements. The commenter noted that the filing parties might have such agreements related to the products, but these agreements might be with third parties and not between the filing persons. In addition, the same commenter suggested requiring parties to submit copies of collective bargaining agreements, at least with any common unions.

Several commenters, however, objected to the burden the proposed requirement would impose, particularly in industries where companies rely heavily on agreements with other industry participants to do business. One commenter noted that broadband

and telecommunications providers routinely have myriad agreements with each other, covering a wide range of aspects of the services they offer. The commenter stated that many, if not most, of these agreements have little potential to create competition concerns, and in fact many are pro-competitive. Another commenter stated that, in the wireless communications industry, some pairs of wireless carriers might have up to 1,000 agreements to which they are both parties.

A few commenters recommended modifications of the proposed instruction to reduce the burden. One commenter suggested relying on the Competition Descriptions or excluding de minimis agreements and only requiring "Material Other Agreements," which would be defined as exceeding in value some percentage of entity revenues. Another commenter recommended only requiring the production of three categories of pre-existing contracts between the acquiring person and the acquired entity or assets: (i) noncompete agreements in effect within one year of filing, (ii) non-solicitation agreements in effect within one year of filing, and (iii) supply or license agreements that generated annual revenue of $10 million or more within one year of filing. The commenter also suggested clarifying that purchase orders do not need to be produced, nor do contracts that have expired or terminated before the filing date. A third commenter also recommended limiting the requirement to contracts that are material in terms of dollar value. In addition, the commenter proposed that notifying parties be permitted to exclude standard-form agreements that they use with numerous other counterparties.

In light of the comments, the Commission has made significant modifications to this proposal. First, the Commission has determined that only one party need provide this information; in accordance with its general approach, the Commission has determined to require only the acquiring person to indicate if there are existing agreements between the parties. Second, the acquiring person will not be required to provide the agreements, but rather only to answer whether any such contractual agreements exist and, if so, to indicate via checkbox which types. The Commission has identified specific types of agreements that reflect a significant business relationship that is relevant to the premerger assessment: agreements with non-compete or non-solicitation terms; leases, licensing agreements, master service agreements, operating agreements, or supply

agreements. If the there are other types of agreements, the acquiring person should indicate "other." The Commission clarifies that these are agreements that the parties have with one another and which may affect the antitrust assessment of the reported transaction.[352] Third, the Commission has limited the requirement to those agreements that are between the acquiring person and the target, rather than the acquired person. This is the specific relationship that is of interest to the Agencies for the premerger assessment and should limit the information to those agreements most relevant to that analysis. These limitations should provide the Agencies with sufficient information to screen for transactions that may require further review due to existing contractual obligations, while relieving much of the cost associated with the requirement.

3. Timeline

The Commission proposed that filing persons provide a narrative timeline of key dates and conditions for closing. After careful consideration of concerns raised by commenters, the Commission does not adopt this proposal.

In the NPRM, the Commission reasoned that, just as it is critical for the Agencies to understand the totality of the transaction during the initial waiting period, it is critical to understand the timing of key milestones and the conditions to closing, which are often complex and not easily understood from the transaction documents themselves. The Commission suggested that this basic information would help the Agencies understand key deal milestones and better manage the timing and focus of the investigation during the initial waiting period.

The Commission received a few comments expressing general support for the proposal; however, one commenter raised concerns regarding the burden, noting that the proposed

---

[352] For example, a non-compete or non-solicitation agreement between two otherwise independent companies is indicative that the parties may have a competitively significant relationship, and in certain situations, may violate the antitrust laws. *See, e.g., United States* v. *Brown,* 936 F.2d 1042 (9th Cir. 1991). In a merger context, non-compete restrictions can implicate post-merger competition in ways that violate the antitrust laws. *See, e.g., In re ARKO Corp.,* No. C–4773 (F.T.C. Aug. 9, 2022) (final decision and order); *In re DTE Energy Co.,* No. C–4691 (F.T.C. Nov. 24, 2021) (decision and final order). Other agreements between the parties, including those related to distribution or licensing, can limit competition post-merger in ways that may violate section 7, including by increasing the risk of foreclosure. *See, e.g., FTC* v. *Tempur Sealy Int'l, Inc.,* 4:24–cv–02508 (S.D. Tex. filed July 2, 2024) (complaint) (alleging that buyer attempted to use existing distribution relationship to exclude rival mattress brands premerger).

requirement is broader and more onerous than the interrogatory that staff routinely requires during in-depth investigations. The same commenter suggested that this instruction be limited to requiring a brief description of the timetable for the transaction and a brief description of any termination fees, break-up fees, ticking fees, or similar arrangements.

After considering the comments and weighing the benefit to the Agencies of requiring a deal timeline in light of the cost of compliance presented by commenters, the Commission is not adopting this proposal. Even though the Agencies would benefit from knowing the timeline for the transaction to help manage their time and investigative resources during the initial waiting period, the Commission does not adopt the proposed change to require one. In the Agencies' experience, these timelines can change throughout the course of an investigation, although not typically within the initial waiting period. The decision not to require a timeline is one of the ways in which the Commission aims to lessen cost on all filers of preparing an HSR Filing and staff can continue to ask for (or parties can choose to provide) this relevant information when warranted.

In sum, the Commission has determined that requirements for the transaction agreement and information about other types of agreements between the parties contained in the final rule are necessary and appropriate to enable the Agencies to understand the scope of the transaction as well as any existing business relationship that might be affected by the transaction and that these requirements, as modified, have been tailored to reduce the cost of reporting as much as practicable.

*I. Competition Descriptions*

The Commission proposed a new Competition Analysis section in the Instructions to require filers to provide three categories of narrative responses: (1) an Overlap Narrative, (2) a Supply Relationships Narrative, and (3) Information related to Labor Markets. As proposed, filers would provide, among other things, a description of their basic business lines as well as product and service information for all related entities; identify current and potential future overlaps and supply relationships between the filing persons; and provide information about their employees and what services these employees provide in areas where both parties employ the same types of workers. As noted in the NPRM, this information would supply crucial information about existing and future competitive relationships

between the filing parties, which is the starting point for any assessment of whether the transaction may violate the antitrust laws.

As discussed in detail below, in the final rule the Commission does not adopt requirements related to Labor Market Information, and adopts requirements to submit an Overlap Description and a Supply Relationships Description with significant modifications. On the Form, this section is now labeled Competition Descriptions.

The Commission received several comments that supported the introduction of narrative responses. One commenter strongly supported the collection of information in narrative form related to products, services, workers, supply and distribution relationships, licensing, and industry and geographic overlaps, believing that this information is necessary to help the Agencies evaluate the effects of an acquisition more thoroughly and efficiently, and identify potential threats to competition. Another commenter suggested that pre-acquisition disclosure of vertical linkages is necessary for antitrust agencies to effectively assess the potential anticompetitive impact of these non-horizontal acquisitions. Another noted that, while HSR rules have always required parties to identify downstream products and revenues by NAICS and NAPCS codes, they have never required the disclosure of any information at all about input markets, including those for labor. It stated that this lack of information leaves initial filing screeners at a loss to spot these competition issues and potential violations, and further noted that this omission forces investigatory staff scrambling to ask companies to volunteer such critical input market information. The same commenter stated that the proposed rule would help narrow this information asymmetry and empower the Agencies to clearly identify impact in both output and input markets.

The Commission also received several comments that objected to the collection of this information in narrative form. In general, comments asserted that expansive narrative requirements are arbitrary and capricious because they would change HSR notification from an objective task to a subjective task, creating delays, disputes, and uncertainty with no countervailing benefit especially for those deals where no antitrust issues are present. For a number of reasons discussed in detail below, the Commission disagrees, but has nonetheless modified these

requirements as appropriate to tailor them to their relevance in determining whether the transaction may violate the antitrust laws and warrant a Second Request.

Experience With Narratives

The Agencies have extensive experience reviewing narrative responses to requests for voluntary submissions from the filing parties during the initial waiting period (and to other types of investigative demands where responses can be compelled) and are aware of the effort required to produce them. From this experience, the Commission knows that when the parties submit this information on a voluntary basis during the initial waiting period—and it is complete and timely—narratives that discuss existing business relationships between the parties are critically important to determining whether there is a need to issue a Second Request. In the Agencies' experience, voluntary narrative responses are especially helpful in focusing any potential Second Request on the areas of competition most in need of in-depth review but just as often can lead staff to conclude that no Second Request is necessary. As discussed above in section III.A.2., when the Agencies engage with the parties during a withdraw-and-refile investigation, which typically involves the submission of some narrative responses from the parties, the transaction is more likely to proceed without the need for a Second Request.

But voluntary narrative responses often come late in the initial waiting period and are frequently incomplete. More importantly, staff only asks for additional information on a voluntary basis when it has determined, on the basis of other information contained in the HSR Filing, that the transaction may alter existing competitive conditions in a way that may violate the antitrust laws but that more information is needed. As discussed in section II.B., the current information requirements do not surface the facts that would flag transactions for certain types of violations, and for those filings staff has no basis to know that additional information is needed. Where there are deficiencies in the initial information requirements, resorting to collecting information on a voluntary basis does not cure the deficiency because staff will not know that relevant facts exist to flag the transaction for follow up.

The Commission believes that requiring additional information with the HSR Filing that would reliably reveal any existing business relationships between the filers is

necessary and appropriate to enable the Agencies to determine whether an acquisition may, if consummated, violate the antitrust laws. Because the information called for in the Competition Descriptions is provided directly by the parties to the transaction and is reflective of each filer's business operations, it is highly probative and reliable for the purpose of conducting a quick and thorough premerger assessment of existing and future business relationships between them. The information collected on the current Form does not reveal these relationships, yet these are the relationships that are foundational to flagging whether the transaction is one that warrants a closer look. As discussed in sections II.B.3. and 4., the need is especially great for information related to potential non-horizontal concerns because there is currently no information that specifically identifies existing supply relationships. Information about existing supply relationships will fill critical information gap in the current Form and provide a factual basis for the Agencies to screen for potential non-horizontal impacts during the initial waiting period.

Nonetheless, to make clear that the Commission does not require the parties to submit an antitrust analysis akin to a "white paper," or hire counsel or experts simply to create narratives for the purpose of an HSR Filing, the Commission eschews the use of the term "narratives" and instead adopts the term "description" to better reflect the type of answer that is required. Filers should rely on business personnel to describe the products and services they offer (or that are under development) using terms and language that is natural in the marketplace. Given the breadth and tone of the objections to the proposed narratives, the Commission believes that commenters misunderstood what is sought. The Commission intends to collect factual information about overlaps and supply relationships via a written answer (as opposed to documents or data) but is not seeking opinions or arguments about what those facts should imply. While in other contexts a narrative response may contain opinions, tell a story, or take a position, the final rule does not require any of that from filers. Instead, filers should collect and report the type of information it provides to customers, suppliers, investors, or the public for purposes other than an antitrust analysis—to simply describe the products or services it offers for sale. This is the type of basic business

description required by the final rule, and the Commission adopts with terms Overlap Description and Supply Relationships Description to address concerns that the final rule requires something other than that. Moreover, the Instructions ask filers to provide a brief description in an attempt to discourage lengthy responses or unnecessary commentary beyond what is strictly required. [353]

The Overlap Description is a key reform and is motivated by the Commission's experience over time with relying on NAICS codes to identify areas of horizontal competition. Based on its experience reviewing narrative responses submitted on a voluntary basis during the initial waiting period, the Commission has identified problems with relying exclusively on NAICS code overlaps as the basis for screening whether the merging parties are current competitors. While NAICS codes are well suited for reporting in some sectors, the Commission agrees that NAICS codes can be both overinclusive and underinclusive in reflecting whether the parties offer competing products or services to any set of customers. As discussed in section II.B.4., when it comes to certain sectors of the economy that are undergoing technological change or growth, including through the introduction of novel products or services, NAICS codes are especially unhelpful, and have not been updated to reflect current market offerings.

The mismatch between existing NAICS codes and market realities can be most acute in new sectors of the economy, for which there are not many codes. For instance, NAICS code 518210 is for companies that provide computing infrastructure, data processing, web hosting, and related services, which covers businesses as diverse as those providing data entry services, cloud storage services and cryptocurrency mining.[354] Included in this six-digit NAICS code are a whole array of businesses offering complex and

evolving products, some of which may compete for the same customers but some of which surely do not. Adding further complexity, the Census Bureau provides cross-references to fourteen other NAICS codes with related business lines. This single category is very broad, potentially reflecting "competition" between the parties that does not exist in the marketplace. As a result, each filer in a transaction may report revenues in 518210 reflecting an "overlap" in their respective business lines, when in reality they offer very different products or service.

These cross-references create a different but equally vexing problem. For instance, NAICS code 541511 is for companies that offer custom computer programming services to meet the needs of a particular customer while NAICS code 513210 is for companies primarily engaged in software publishing. Here, a company that provides both standard and custom solutions may report revenues only in 513210 even if some of the companies it competes with would only report revenues in 541511, reflecting its focus on custom products. Overall, companies select their own NAICS codes for revenue reporting, introducing discretion into the use of this "objective" system of classification, which was established for a purpose other than identifying companies that offer competing products or services. As a result, companies that may regularly compete against one another may not identify any overlapping NAICS codes.

Despite these shortcomings, the Commission will continue to rely on NAICS code reporting for revenues and the identification of overlaps to give filers some common system of reference and because the identification of horizontal overlaps is a key screening step in the Agencies' initial antitrust assessment. But new sectors have emerged over the years and NAICS codes have not been refined or updated. Accordingly, the Commission has determined that receiving overlap information in description provided by the filer is necessary and appropriate to enable the Agencies to determine whether an acquisition may, if consummated, violate the antitrust laws. The Agencies may also use the Overlap Description to conclude that the parties are not current or future rivals because the exercise provides filers with an opportunity to correct any "false positives" that result from inaccurate reporting of NAICS revenue overlaps. As a result, the Overlap Description may contain a factual basis for the Agencies to determine, solely on the basis of information contained in the HSR Filing, that the transaction is not likely

---

[353] A significant number of filers who report NAICS overlaps initiate contact with the Agencies to provide supplemental information (often in the form of white papers) that supplies context for how they view competition, regardless of NAICS reporting. In the Agencies' experience, these presentations often contain descriptions of the parties' respective business operations as well conclusions that the parties would like the Agencies to reach to dismiss concerns about the transaction. The former is now required by the final rule while the latter is not.

[354] See U.S. Census Bureau, North American Industry Classification System, 518200 Computing Infrastructure Providers, Data Processing, Web Hosting, and Related Services (rev. Sept. 10, 2024), *https://www.census.gov/naics/?input=518210& year=2022&details=518210.*

to violate the antitrust laws at that time. In the Overlap Description, a filer can make clear that further investigation is unnecessary. Allowing the agencies to reach these conclusions at the outset is more efficient than having the parties provide the information at a later stage or requiring the Agencies to discover this information indirectly through document requests.

As the Commission acknowledged in the NPRM, the cost to filers to create these descriptions could be significant, especially for transactions involving close competitors with multiple overlapping product or service lines or those who operate in the same supply chain. But identifying those transactions that present broad and complex competition issues is a critical first step for the Agencies, and information from these descriptions is highly relevant to flagging the transaction as one that may violate the antitrust laws. Thus, the cost of providing these descriptions is proportional to the likelihood that the transaction is one that warrants a close look: the more extensive the existing competitive relationship between the parties, the more relevant these relationships are in identifying the transaction as one that warrants further investigation. It is also possible that these descriptions will provide important context for other information contained in the HSR Filing that would allow the Agencies to narrow any potential investigation to those areas of important existing or future competitive interaction, or to conclude that the transaction is not one that is likely to violate the antitrust laws. Thus, the descriptions are necessary and appropriate for the Agencies to assess the potential for anticompetitive impacts, including some indication of their scope. This information will also permit the Agencies to manage their resources appropriately, increasing overall efficiency. For example, if the Overlap Description identifies hundreds of products or services, the Agencies can devote sufficient staff resources to reviewing those areas of overlap to determine whether any rise to the level of requiring a Second Request investigation. On the other hand, if the notification identifies no areas of overlap, the Agencies may be able to quickly determine whether there are other materials in the filing that would nonetheless raise concerns about the competitive impact of the transaction.

It is appropriate for the filers to bear the burden of providing basic business information that they possess. It is unreasonable and inefficient to require the Agencies, who do not possess basic information about the filers' businesses,

to expend resources gathering the information from outside sources, or to require the Agencies to issue a separate request for this critical information which only delays the review process and in turn the filers' ability to consummate transactions. Yet the status quo requires the Agencies to obtain basic business facts that are needed to evaluate transactions through voluntary requests to the parties or Second Requests. As one commenter noted, the Federal Rules of Civil Procedure encourage Federal courts to order civil discovery based on the obvious principle that the person already in possession of the information is in the best position to provide it, and properly so.[355] This principle is apt here.

The Commission also believes that parties will be able to reduce the cost of creating descriptions by drafting them during the period of due diligence when the companies are learning more about their respective business operations. Discovering the extent of existing business operations is key to the diligence process, and companies often create descriptions of their operations as part of the process.[356]

The Commission has made every effort to calibrate its need for the requested information and the availability of that information from the parties or from others, including the cost to filers associated with collecting information and creating the descriptive responses. For this reason, as discussed below, the Commission has decided to significantly modify certain aspects of the proposed descriptions, for instance when the information is duplicative of other information in the notification or when the information is available from a source other than the parties. In taking this approach, the Commission rejects alternatives suggested by commenters to reduce the cost by excusing transactions below a certain value or without a NAICS overlap, because it has found no basis for doing so. In the Agencies' experience, deal value is not a reliable indicator of the potential for antitrust harm,[357] especially when the

transaction involves multiple business lines or when competition occurs in local markets.[358] Instead, the Commission has determined to excuse select 801.30 transactions from the requirement to provide Competition Descriptions. As discussed in section VI.A.1.f., these transactions rarely involve entities with existing competitive relationships and do not confer control, and thus the Commission has determined not to require these filers to provide descriptions of any existing business relationships, should they exist.

The Commission now turns to a discussion of both the general and specific objections to the Competition Descriptions requirements.

General Objections to the Competition Descriptions

Several commenters questioned the general utility of these requirements. One commenter suggested that burdening all filers with these descriptive requirements is not particularly well targeted to identifying acquisition-related antitrust concerns. Another stated that the information called for is duplicative of documentary materials that are now also required. Two other commenters suggested that the Commission continue to ask for this information on a voluntary basis and only for deals that have been flagged for closer review.

The Commission disagrees that the information required by the Competition Descriptions would be of little use or contain repetitive information. Requiring filers to provide a description of their existing competitive relationships is a key reform of the final rule to make the premerger review process more effective and efficient. Such descriptions should contain a factual summary of the parties' existing business relationships, which is critical information for identifying those transactions that require a closer look. This is information that is known to filers and bears directly on whether the transaction may violate the antitrust laws. The Commission has determined

---

[355] Fed. R. Civ. P. 26(b)(1) advisory committee note (2015) (identifying information asymmetry as a justification for placing a heavier burden on the party who has the information).

[356] When establishing the premerger regime, the Commission acknowledged that requiring information in the notification may actually reduce the cost associated with compiling it. 42 FR 39040, 39043 (Aug. 1, 1977).

[357] See, e.g., United States v. Neenah Enterprises, Inc., No. 1:21–cv–02701 (D.D.C. Oct. 14, 2021) (complaint) ($110 million asset purchase); In re Global Partners LP, No. C–4755 (F.T.C. Mar. 2, 2022) (decision and final order) ($151 million acquisition); In re ANI Pharmaceuticals, Inc., No. C–4754 (F.T.C. Jan. 12, 2022) (decision and final order) ($210 million acquisition); United States v.

*Grupo Verzatec S.A. de C.V.*, No. 1:22–cv–01401 (N.D. Ill. Mar. 17, 2022) (complaint) ($360 million acquisition). Note that the value of the transaction is considered by some filers to be confidential information and is not always disclosed in public filings. *See FTC* v. *IQVIA Holdings Inc.*, No. 1:23–civ–06188 (S.D.N.Y. Dec. 29, 2023); *In re Lifespan Corp.*, No. C–9406 (F.T.C. Feb. 17, 2022) (complaint).

[358] See, e.g., In re The Golub Corp., No. C–4753 (F.T.C. Jan. 20, 2022) (decision and final order) (divestiture of 12 supermarkets); United States v. B.S.A. S.A., No. 1:21–cv–02976 (D.D.C. Mar. 15, 2022) (divestiture of two business lines).

that it is necessary to require this descriptive information from filers because other information in the HSR Filing is not sufficient to screen transactions for all types of potential harm, and, as discussed above, staff cannot rely solely on voluntary collection of this information to flag the transaction for a closer review.

Moreover, as discussed elsewhere, the Commission intends to rely on information in the Competition Descriptions as the basis for determining whether the filer also has to provide other information required by the final rule. The Commission has determined that, for many additional information requirements, these descriptions (in addition to the NAICS code overlap reporting) will determine the scope of most of the other information requirements in the HSR Filing. It is appropriate for the Commission to condition additional information requests on the identification of an existing business relationship as the most effective way to calibrate the cost of reporting the antitrust risk associated with each transaction. In order to reduce the cost for filers whose transactions raise little to no antitrust risk, it is necessary that all filers go through the exercise of determining whether they are in a horizontal or supply relationship with the other party. Those filers who do not have such relationships will so indicate by responding "none" and will be relieved of the obligation to respond to other questions that are conditional on an affirmative response. Relying on this conditional response format is a key feature of the final rule to ensure that filers who do not have an existing business relationship with the other party (*e.g.,* as a competitor or supplier) have a lower cost associated with submitting an HSR Filing.

One commenter stated that because these descriptions are not prepared in the ordinary course, they cannot be required to be submitted with the notification. Further, this commenter stated that Congress only intended the Commission to collect information and documentary materials reasonably available to the reporting companies, suggesting that anything not kept in the ordinary course of business runs afoul of Congressional intent. The Commission disagrees with the commenter's reading of both the statute and the legislative history. The rulemaking provision in 15 U.S.C. 18a(d) contains no ordinary course limitation. To the contrary, it states that HSR filings shall be in such form and contain such documentary material and information relevant to a proposed

acquisition as is necessary and appropriate to enable the Agencies to determine whether an acquisition may, if consummated, violate the antitrust laws. The commenter quotes the Commission's 1977 Notice of Proposed Rulemaking for the premerger notification rules when making this assertion, but in that notice, the Commission did not state that information reasonably available was limited to ordinary course documents.[359] Further, the Competition Narratives as adopted do not require any information that is not kept in the ordinary course of business of the acquiring or acquired person. These descriptions require parties to gather and present this information in a format that will permit the Agencies to understand their lines of business, areas in which the parties offer similar products and services, and relationships in the relevant supply chains.

The Commission also disagrees that businesses do not develop an understanding of their business operations in comparison to those of the other merging party "in the ordinary course." In the Agencies' experience, businesses routinely conduct competitive assessments in which they compare their operations to those of others. These internal assessments of other market participants are often done long before any specific assessment of a particular transaction and may be contained in documents such as plans and reports. In the specific context of a proposed transaction, parties (especially those that are publicly traded) conduct due diligence assessments of prospective targets. These comparative assessments may be done specifically for the purpose of analyzing the filed-for transaction, and the Commission considers those to be in the ordinary course of acquisition planning. The descriptions required by the final rule would summarize these types of assessments and reflect their underlying business facts. In the Commission's view, this is exactly the type of materials the House conferees intended would be submitted with the notification: "the very data that is already available to the merging parties, and has already been assembled and analyzed by them. If the merging parties are prepared to rely on it, all of it should be available to the Government."[360]

Compliance Concerns

Some comments expressed concern that the descriptions would create HSR

[359] 42 FR 39040, 39043 (Aug. 1, 1977).
[360] 122 Cong. Rec. 30877 (1976) (remarks of Rep. Rodino).

Act compliance issues, noting that, because the descriptions require subjective judgments, the Agencies have no objective standards or precedent against which compliance or substantial compliance could be judged. One commenter suggested that each of the descriptions may generate disagreements between the Agencies and the merging parties regarding the accuracy or completeness of the information provided, leading the Agencies to retroactively declare a notification to be incomplete and restarting the initial waiting period. One commenter stated that the descriptive responses will require extensive iterative discussions with PNO to determine compliance, which will delay the start of the waiting period. Others asserted that the Commission could deem a descriptive answer to be incomplete simply because staff disagrees with the assessment, or that the Agencies may be tempted to second-guess or nitpick the parties' responses, leading to uncertainty about deal timelines.

As discussed above, the Agencies have decades of experience with reviewing descriptive responses, including those submitted on a voluntary basis during the initial waiting period and in response to Second Requests. In fact, staff routinely seeks this information as the first supplement to the information contained in the HSR Filing for any transaction that is identified as requiring a closer look. But the current practice of permitting parties to submit descriptive responses on a voluntary basis while the waiting period is underway has encouraged parties to submit incomplete responses or submit them at a time when staff is unable to verify the information before it must make a determination whether to issue Second Requests. Any deficiency in a voluntary descriptive response prevents staff from being able to quickly determine whether the Agency should issue a Second Request to require a more complete narrative answer.

The Commission believes that requiring Competition Descriptions to be submitted with the HSR Filing provides the proper incentive for filers to submit a complete and accurate response, one that is certified by the responsible executive who signs the notification and that is available at a time when the information can be reviewed and assessed by staff. The certification allows the Commission to accept filings containing descriptive responses and to start the waiting period. If, upon reviewing the notification, staff determines that the

descriptive responses are directly contradicted by other information submitted with the notification, staff may request supplementary information to explain the contradictions, which could require a restarting of the waiting period. If the notification contains no such materials that call into question the reliability of the descriptions, any supplementary submissions to clarify or correct them would likely not require a restarting of the waiting period under the Act.

Other comments raised compliance concerns related to who must help prepare the information. Some comments stated that the descriptive responses will require filers to hire expensive antitrust counsel, and possibly an expert economist, to draft the descriptions prior to filing. According to one commenter, filing parties will be forced to engage antitrust counsel, economists, and other professional class consultants on every deal, regardless of its impact on competition. Another commenter suggested that hiring consultants to draft narratives may be prohibitive for some parties that may be most in need of a merger or affiliation. One comment noted that, as a practical matter, the only people who are eligible to certify the notification often lack personal knowledge necessary to opine about things like the relevant product market definition or the competitive effects of a transaction. The Commission disagrees that filers need to hire outside personnel, who do not know the filer's business operations and would need to be given the very information that the Competition Descriptions call for in order to draft them. As noted in the NPRM, those who author the descriptive responses should be the individuals who best know the business of the filing person. The Commission reiterates that the Competition Descriptions should be based on a businessperson's understanding of the filer's business operations and consistent with other business documents and materials submitted with the HSR Filing.

Other comments raised a related point, stating that the type of detailed, competitively sensitive information necessary to draft these narratives is often deliberately kept away from the business executives, which would require certain filing parties to employ antitrust safeguards to collect information without sharing confidential business information with or about one another. Several commenters asserted that providing customer contact information, including identifying specific individuals for Agency outreach, would create

significant uncertainty and further increase the risk that confidential acquisition plans would be known more widely, or increase the risk of insider trading.[361]

As discussed in the section below, the Commission agrees that it is important to reduce the need to share information about the transaction more broadly than is necessary to complete an HSR Filing, but rejects the idea that companies are unfamiliar with managing these risks or that the rule would significantly increase them. Also, complying with securities laws to prevent insider trading in public shares is an obligation of every publicly traded company, and the rule does not increase the risk that those with knowledge of the deal will violate those laws. Nonetheless, in response to these concerns, as discussed below, the Commission has determined to modify certain requirements for the Competition Descriptions in order to reduce the need for filers to share information outside of the company, for instance with customers or suppliers. The Commission agrees that the process required to collect information for the notification should not require information-sharing beyond what is absolutely necessary. Specifically, the Commission has added to the instruction a statement that the parties should not exchange information for the purpose of responding to the Overlap or Supply Relationships Descriptions. The acquiring and acquired persons should each respond on the basis of information known to them in the ordinary course of their business or through normal transaction diligence. The Commission understands that, unlike the NAICS overlap identification, the filings may not identify the same products and services in the Competition Descriptions. This may require those contemplating a transaction to plan for limits on the flow of information about the deal, including "clean teams" and data rooms with limited access, but the Commission

believes filers have experience with managing these risks and employ protections to prevent the sharing of information or disclosing knowledge of the deal beyond these limits. The Commission has determined that the requirement to prepare descriptive responses does not increase the risk that those protections will be breached or that filers will be required to change their approach to comply with the final rule. To the extent that this process reveals existing business relationships of which either or both parties were not aware, this is an appropriate outcome of requiring this analysis to be done prior to filing.

Another group of comments raised compliance concerns related to taking an affirmative position on specific elements of an antitrust violation, such as the definition of relevant markets and any competitive effects, impermissibly shifting the burden of proving such elements of an antitrust violation to the parties. For instance, one commenter read the rule as not requiring filers to define a relevant market or provide market shares but nonetheless objected that filers lack the benefit of established competition law principles to guide the scope of their responses. Others suggested that the Commission adopt the practice of the European Union and other regimes and make available written decisions about market definitions.

As stated in the NPRM, the Commission does not intend for the Competition Descriptions to contain an assessment of relevant markets or reference any "market." The Commission understands that the determination of a relevant antitrust market is a fact-bound process that is the result of extensive information gathering, including from third parties (who may be other participants in the "market"). Information contained in the notification has never been, and never could be, sufficient to determine whether a relevant antitrust market exists in which the transaction could potentially cause harm. Rather, the Commission intends the identification of competing products or supply relationships to be a statement of business fact, not a conclusion that there is a relevant antitrust market that comprises an area of effective competition.[362] The Agencies recently

---

[361] Commenter American Securities Association states that certain aspects of the proposed rule would require public companies to announce and file details with the SEC about signed deals, "creating additional hurdles that will test investor confidence." Comment of Am. Sec. Ass'n, Doc. No. FTC–2023–0040–0682 at 2. Because the final rule does not change who is required to file notification under the Act, there are no new obligations to disclose transactions nor to make statements to the SEC. To the extent that this comment is based on a concern that the Agencies may flag additional deals as requiring Second Requests because they may determine that a particular transaction may violate the antitrust laws, that is the intention of the final rule and well within the Commission's authority under the Act, regardless of filers' obligations to make statements required by the securities laws.

[362] A party responding to an interrogatory under Rule 33 of the Federal Rules of Civil Procedure "must furnish information that is available to it and that can be given without undue labor and expense," and a party must "provide relevant facts reasonably available to it but should not be required to enter upon independent research in order to
Continued

released updated Merger Guidelines that contain a detailed discussion of how and why the Agencies undertake the exercise of defining markets.[363] Thus, the Commission disagrees that filers are unable to understand how information about whether and to what extent the merging parties are direct competitors factors into the Agencies' initial antitrust assessment.

Comparison to Other Jurisdictions

Some comments suggested that the Commission is improperly attempting to model the U.S. premerger notification regimes on those from other jurisdictions. The Commission rejects this suggestion. The purpose of this rulemaking is to maintain a premerger notification regime that fulfills the Agencies' congressional mandate to vigorously enforce the U.S. antitrust laws and prevent undue concentration in its incipiency. As the Commission noted in the NPRM, many other jurisdictions rely on submissions from the parties that contain basic information about business lines or company operations, and several require the parties to self-report overlaps.[364] The Commission expects that the burden on filers (or their counsel) with experience drafting these submissions for other jurisdictions will be comparatively low because of their familiarity with such drafting. This does not mean that the Commission is relying on the experience of other jurisdictions in enforcing their laws. Rather, the Commission is simply noting that the prevalence of descriptive requirements among other competition enforcers supports its belief that, for some filers, preparing descriptive responses is not a new exercise or overly burdensome. The Commission further notes that other businesses might be familiar with preparing a business plan or conducting a market research and competitive analyses, which would contain much of the same information as is required in the narratives.[365]

One commenter stated that pharmaceutical transactions are not acquisitions of other companies but instead involve exclusive licenses, which are not reportable in other jurisdictions. As a result, according to this commenter, the descriptive requirements introduce an entirely new and significant burden that will fall disproportionately on parties to pharmaceutical transactions. The Commission disagrees that there will be a measurably different impact on pharmaceutical companies. As discussed above, the requirement to submit Competition Descriptions is not dependent on having prepared similar materials for other jurisdictions, and there are many kinds of transactions that are not reportable in other jurisdictions for which the parties will now be required to submit a descriptive response. In addition, the Commission has no reason to exempt pharmaceutical licensing deals from any requirements of the Act because these transactions, like other reportable transactions, can raise antitrust concerns.[366] As the D.C. Circuit found when it upheld the Commission's authority to require the reporting of pharmaceutical licensing transactions, the Act does not prevent the Commission from adopting rules of general applicability and the Commission can rely on its experience in reviewing HSR Filings to adjust the HSR rules.[367] Certain sectors have more reportable transactions, but the Commission is not imposing different requirements on any sector. Nor should it remove information reporting requirements for those sectors where there are more reportable transactions merely because more companies are in those sectors are involved in reportable transactions. Moreover, the Commission believes that complying with the Competition Description requirements for transactions involving licensing agreements will be less costly than for other types of transactions because those transactions are fairly limited in purpose as they relate to uses for the licensed technology.

After careful consideration of the comments raising general objections to requiring descriptions of existing business operations of the merging parties, the Commission has determined to require Competition Descriptions in the final rule due to the benefit they would provide to the Agencies. These

responses will provide the Agencies with key information that is necessary to determine whether an acquisition, if consummated, may violate the antitrust laws. It is appropriate for filers to provide this information because they are in the best position to do so. Competition Descriptions will allow the Agencies to conduct a fact-based assessment of the antitrust risks posed by each transaction, rather than expend time and resources issuing voluntary access letters and Second Requests for information that bears directly on the determination that further investigation is warranted. Nonetheless, in light of the concerns expressed by commenters, the Commission has made significant modifications to these requirements to better calibrate the information that would be most beneficial to the Agencies while reducing the cost as much as practical, including excusing select 801.30 transactions from these requirements.

1. Overlap Description

The Commission proposed a new Overlap Narrative section that would require each filing person to provide an overview of its principal categories of products or services (current and planned) as well as information on whether it currently competes with the other filing person. The Commission further proposed that each filing person would describe its current and planned principal categories of products and services in a way that those business lines are referred to in the company's day-to-day operations, and identify any documents submitted with the HSR Filing that support information contained in the narrative. For each identified overlapping product or service, the Commission proposed that the filing person would also provide sales, customer information (including contacts), a description of any licensing arrangements, and a description of any non-compete or non-solicitation agreements applicable to the employees or business units related to the product or service.[368]

The Commission received numerous comments on this requirement. As one commenter noted, the Commission's original proposal in 1977 would have required a filer to identify its top five most significant competitors for overlapping operations. The Commission did not adopt this proposal, as well as other proposals, not because they were improper, as suggested by this commenter, but because the Commission determined at the time that it was important to reduce

---

acquire information merely to answer interrogatories." *Lynn* v. *Monarch Recovery Mgmt., Inc.,* 285 FRD. 350, 357 (D. Md. 2012) (citation and internal quotations omitted). Filers should take a similar approach to providing business facts here.

[363] *See* Dep't of Justice & Fed Trade Comm'n, Merger Guidelines 4.3 (2023).

[364] NPRM at 42180.

[365] The Small Business Administration provides guidance for how to conduct market research and find a competitive advantage, including links to free government databases and resources to help with that assessment. *See* U.S. Small Bus. Admin, "SBA Business Guide, Market research and competitive analysis" (last updated May 31, 2024), *https://www.sba.gov/business-guide/plan-your-business/market-research-competitive-analysis#id-use-market-research-to-find-customers.*

[366] *See, e.g., In re Sanofi Corp.,* No. 9422 (F.T.C. Dec. 11, 2023) (complaint) (transaction abandoned); *FTC* v. *Mallinckrodt ARD Inc. (f/k/a Questcor Pharms., Inc.),* No. 1:17–cv–120 (D.D.C. Jan. 30, 2017) (stipulated order for permanent injunction and equitable monetary relief).

[367] *PhRMA,* 790 F.3d at 201.

[368] NPRM at 42196.

the overall burden of complying with notification requirements,[369] which were unfamiliar to the M&A business community at that time. After forty-five years of experience with reviewing thousands of transactions each year, the Agencies are now well aware of the importance of understanding who the parties view as their competitors, especially if that group includes the other merging party, because it is relevant to whether the transaction may violate the antitrust laws.[370] The need for this self-identification of competitors has grown over time as NAICS codes and other information do not always provide a consistent and reliable benchmark for filers, resulting in over- or under-reporting of competitive overlaps. In this rule, filers are merely required to describe each of the principal categories of products and services they offer, and list and describe each product or service that they both provide to the market. The Commission believes that in light of the shortcomings of other more objective reference points, it is necessary to require filers to identify whether they offer products or service that compete with the other filing party.

Several comments pointed to the burden of providing an Overlap Description for all filings. For instance, one commenter stated that the proposal lacks a relevance test or de minimis threshold so that companies will be required to delve deep into complex corporate structures to identify individual products and services offered by their subsidiaries. Another raised concerns that providing a detailed analysis of competitive dynamics in each of these theoretical segments, particularly in transactions that are occurring in manifestly competitive environments, is wasteful and unduly burdensome.

As discussed above, in light of concerns about the cost this requirement places on all filers, the Commission has modified its proposal in several ways to reduce the cost on filer. First, it has decided to limit the requirement to report planned or future products to those referenced in another document submitted with the HSR Filing. The Commission has also eliminated the requirement to provide an estimate of how much of the product or service each customer category purchased or used monthly for the last fiscal year. And rather than require reporting for the two most recent fiscal years, the Commission has limited reporting to the most recent fiscal year. In addition, the Commission has decided not to require sales information in units—only dollars. It has also eliminated the requirement to provide individual contact information for customers. Additionally, the Commission has eliminated the requirement to describe licensing agreements and non-compete or non-solicitation agreements in this section. These changes are discussed in greater detail in the sections that follow. Finally, the Commission has decided not to require Overlap Descriptions for select 801.30 transactions. In the Commission's experience, these filings almost never report overlaps on the basis of NAICS codes and there is no reason to think that requiring this class of filers to provide a descriptive confirmation would provide a benefit to the Agencies that would enhance premerger screening of this particular set of transactions.

At this time, the Commission lacks a basis to excuse other categories of filings either on the basis of complexity of the filer's corporate structure or the general robustness of competition in the markets in which the filers compete. In fact, complex corporate structures can make it much harder for the Agencies to discover competing lines of business from any source other than the filers. When information in the HSR Filing is inconclusive, staff often must try to discover these existing relationships based on imperfect information from public sources, the parties' submitted documents, and other sources of market information, such as third parties. Requiring filers to provide a description of any overlap is a much more direct, efficient, and reliable way to get this critical information because it will be coming from the parties. If the parties are aware of other companies that also provide products or services that compete, they can (but are not required to) provide that information as part of their descriptive response. If this requirement creates a significant cost to filers, it is due to their significant pre-acquisition business relationships, meaning that the effort to provide the description is directly proportional to the risk that the transaction may violate the antitrust laws.

After careful consideration of the comments, the Commission has made significant modifications to the Overlap Description to reduce the cost to filers while also providing a factual basis for identifying whether the filing parties are actual or potential competitors. This information will improve Agency decision-making during the initial waiting period. Modifications reflected in the final rule are discussed below.

a. Identification of Current or Future Overlaps

The Commission proposed that each filing person provide a brief overview of its principal categories of products and services (current and planned) as well as information on whether it currently competes with the other filing person. As noted in the NPRM and discussed above, such information is core to the Agencies' substantive antitrust analysis during the initial waiting period and is not readily accessible from sources other than the filers themselves.[371] A comment from State antitrust enforcers supported the requirement for additional information about present and potential horizontal competitive overlaps, noting that State antitrust enforcers are particularly concerned with acquisitions of potential or nascent competitors and the protection of rivalrous innovation. As fellow enforcers of the Federal antitrust laws, they noted that most research and development ("R&D") pipelines are known only to the companies and that disclosing current or known plans, including R&D efforts, up front would ensure effective deal reviews. They noted that, at times, deals that appear benign may mask significant anticompetitive effects lurking below the surface. Sophisticated incumbent companies have a greater incentive and more developed means to detect industry developments—and a correspondingly far-reaching ability to curb competition in ways that harm consumers.

As discussed in section II.B.4., the Agencies currently lack a sufficient basis from information in the notification to determine if the transaction is likely to violate the antitrust laws by eliminating on-going innovation competition, a potential competitor, or a nascent competitive threat that has yet to make sales. Without information that indicates there are known areas of competition based on expected revenues, this will continue to be a blind spot that results in less-than-optimal enforcement on this basis. Because these areas of potential or emerging competition are typically not well-known to others uninvolved in the transaction, the Agencies do not have a source for this information other than the filing parties.

The need for information related to planned products and services is especially important for transactions in which one (or both) filers already have

---

[369] *See* 42 FR 39040, 39043 (Aug. 1, 1977).

[370] *See, e.g., Illumina, Inc.* v. *FTC,* 88 F.4th 1036, 1049 (5th Cir. 2023); *FTC* v. *Whole Foods Market, Inc.,* 548 F.3d 1028, 1045 (D.C. Cir. 2008) (Tatel, J., concurring in judgment).

[371] NPRM at 42196.

a dominant position and the other party has planned products that could soon be introduced to the market to provide some level of competition to the dominant player. According to the State antitrust enforcers, acquisitions of potential or nascent entrants may empower already dominant incumbents to discontinue either the target firm's or its own innovation, thereby eliminating existing and future competition between the merging parties and information supplied by the Overlap Description is critical for the Agencies to analyze acquisitions affecting potential competition or present rivalrous innovation.

Other commenters object to the requirement to identify overlaps based on planned products or services under development by the other party. One pointed out that many companies have a pipeline of product ideas that may or may not result in an actual product sold to customers. Others indicated that in the pharmaceutical and biotechnical sectors, this information would be speculative at best for many ongoing R&D initiatives. The Commission acknowledges that the assessment of when a planned product or service will start generating revenues is likely imprecise, and that products in development often do not meet important deadlines for commercial release. But the Commission disagrees that companies with extensive R&D pipelines are unfamiliar with these drawbacks or that imprecision prevents them from having target launch dates based on their best information. In the Agencies' experience, companies with ongoing product development efforts routinely adjust expected timelines to commercialization based on new information. In particular, as part of preparing for the transaction, many of these companies prepare an assessment of the target's products, including products in development. Products in development can compete with other products in various stages of commercialization, forming the basis for antitrust liability in certain circumstances.[372]

Nonetheless, to provide an objective reference point that would determine whether a filer would need to include a product in development as part of its descriptive response, the Commission modifies this requirement to limit the reporting of current or known planned products or services to those that are reflected in documents submitted with the filing. This limitation should serve to reduce the cost and increase the certainty that the planned product or

service is likely to be introduced. In particular, plans and reports provided to the CEOs and Boards of Directors and submitted with the HSR Filing would likely provide a solid reference point for filers to determine if the planned product is sufficiently likely to meet targets for commercial introduction because it is discussed in these high-level reports shared with key decision-makers.

In addition to the objections discussed above, several commenters objected to the specific requirements of identifying overlaps or customers based on sales information, which might include sales generated in markets outside the United States. One commenter stated that the requirement to provide historical information should be limited to sales and customers from U.S. operations and should be further limited to sales information based solely on sales by dollars, not additionally by units. The Commission declines to limit the Overlap Description to U.S. sales information. Many transactions every year involve industries whose companies compete on a global basis such that the relevant antitrust markets in which they compete are broader than the United States or involve facilities or customers that are located outside the United States.[373] Having this information is critical to the Agencies' assessment during the initial waiting period.

The Commission agrees with the other modification suggested by one commenter to limit this requirement by reporting revenues only based on sales by dollars and not also by units. As the commenter notes, in many service sectors such as healthcare or professional services, the concept of ''units'' is arbitrary and estimates would be both burdensome and unreliable. The Commission believes that it is less costly for filers to rely on only one measure of sales and that reporting by other measures in addition to sales often does not lead to different results. Thus, the Commission does not adopt the requirement to report sales based on units in addition to dollars and limits

the reporting of sales and customer information only to dollar sales.

To further reduce the cost of collecting data to support the Overlap Description, the final rule requires the reporting of sales data only for the most recent fiscal year, down from the last two years as proposed. This limitation parallels other reporting requirements that are similarly limited to the most recent fiscal year.

The commenter also suggested that, in order to prevent the sharing of information between existing competitors that would inadvertently increase the risk of anticompetitive coordination, the information required by the Overlap Description be limited to information within the knowledge, information, or belief of the person filing. The Commission confirms that filers should prepare the Overlap Description based on the knowledge and belief of the filing person.

b. Customer Information

The Commission proposed that, for each principal category of products and services and each overlapping product or service, filers (a) describe all categories of customers, including an estimate of monthly sales or purchases in each category; (b) contact information (including the individual's names, title, phone, and email) for the top 10 customers (based on units and sales) for the last year, and the top 10 customers in each customer category.

Some individual commenters supported this proposal, urging the Agencies to take steps to better understand the impact of acquisitions on those most affected by them, including customers. Other comments raised concerns about the type and amount of information collected about customers, as well as the risks associated with identifying them in an HSR Filing, including providing individual contact information. One commenter asserted that the Agencies' stated intention to contact customers during the initial waiting period raises serious confidentiality concerns and places a transaction at considerable risk. Another commented that there may be legitimate business justifications for not disclosing a potential transaction internally or to commercial partners at the time of filing, and requiring specific contact information practically necessitates such disclosures to maintain employee and customer relations. According to another commenter, for the vast majority of transactions, customer information is not required to make an assessment that the transaction requires Second Requests, and thus the Agencies should

---

[372] *See, e.g., Illumina* v. *FTC,* 88 F.4th at 1050.

[373] *See, e.g., Polypore Int'l, Inc.* v. *FTC,* 686 F.3d 1208 (11th Cir. 2012); *FTC* v. *Wilh. Wilhelmsen Holding ASA,* 341 F. Supp. 3d 27 (D.D.C. 2018); *FTC* v. *Tronox Ltd.,* 332 F.Supp.3d 187 (D.D.C. 2018); *In re Nvidia Corp.,* No. 9404 (F.T.C. Dec. 2, 2021) (complaint); *United States* v. *ZF Friedrichshafen A.G.,* No. 1:20–cv–00182 (D.D.C. Jan. 23, 2020) (complaint); *United States* v. *United Techs. Corp.,* No 1:18–cv–02279 (D.D.C. Oct. 1, 2018) (complaint); *United States* v. *Novelis, Inc.,* No. 1:19–cv–02033 (N.D. Ohio Sept. 4, 2019) (complaint); *In re Corpus Christi Polymers LLC,* No. C–4672 (F.T.C. Feb. 20, 2019) (decision and final order): *In re Quaker Chem. Corp.,* No. C–4681 (F.T.C. Sept. 9, 2019) (decision and final order).

continue to ask for customer contact information on a voluntary basis only when it may be necessary.

After considering these comments and others, the Commission modifies the amount of information required in the Overlap Description related to customers but has determined that some information related to customers is important for the initial antitrust assessment of the transaction. The Agencies will continue to reach out to customers in order to get their input and reactions to reportable transactions as time and resources allow during the initial waiting period regardless of whether they are referenced in the notification. Contacting customers to learn about the business lines of the filing parties is often the very first thing staff does to begin the investigation of a potentially problematic transaction. As discussed in section III.C.1., the Agencies routinely contact many customers of the filing parties, often without the filing parties' knowledge, during the course of an investigation, especially if the initial waiting period is prolonged by a withdrawal and refile.

There is nothing improper about the Agencies' contacts with third parties to learn facts about the industry or the operations of the filing parties. The HSR Act contains strict limits on the disclosure of information submitted or collected during an investigation,[374] and unauthorized disclosure carries criminal penalties.[375] At all times during the investigation, Agency staff comply with these requirements. For example, when contacting customers or other market participants, Agency staff may disclose that the agency is conducting a nonpublic investigation of the proposed transaction, but Agency staff will not disclose any information contained in an HSR Filing without a waiver.

Although collecting more information from filers in the HSR Filing should reduce the Agencies' reliance on contacting third parties to learn basic business facts about the merging parties, conducting outreach with third parties is an essential task of premerger screening to ensure that the Agencies' antitrust assessment fully considers any potential impact of the transaction on other market participants.[376] Because transactions may not have been publicly disclosed, it is imperative that the Agencies initiate contact with third parties and not wait for them to reach out. The Agencies routinely conduct

public research to learn about customers for potential outreach, regardless of whether the filing parties have provided their contact information. Moreover, customer information is typically in the agency's first request to filers to submit additional information on a voluntary basis during the initial waiting period. At times, filers have anticipated this voluntary request and provide this information quickly, sometimes the same day. However, this is not universally true and any delay in obtaining this information about top customers is inefficient and undermines the Agencies' ability to conduct third-party outreach. While the Agencies may be able, on their own, to identify some customers of the filing parties, it is important that such third-party outreach also include those customers most affected by the transaction, that is, those customers who are most reliant on the filing parties to conduct their own business.

Nonetheless, in light of concerns about identifying particular individuals as customer contacts, the Commission does not adopt that requirement as proposed. Instead, the Commission modifies the requirement so that filers must identify customers by company name without providing contact information for any individual employed by the company. The Commission believes that company contact information has value even without knowing the name or title of the individual at the customer business that is most knowledgeable about the existing business relationship with the filer. Moreover, knowing which companies are top customers provides important context to determining whether any particular customer may be affected by the elimination of competition between the parties and is additional information beyond knowing what the overlapping product or service is.

To further reduce the cost of providing information related to customers, the Commission has modified this requirement so that filers do not have to estimate monthly purchases or sales by customer category as proposed. Filers will be required to describe all categories of customers without providing specific sales or purchase estimates by category. Simply describing categories of customers will enable the Agencies to determine if there are unique end-uses for the product, possibly reflecting some degree of non-uniform demand that would indicate limits on substitutability across different customers. Qualitative descriptions of customer categories are sufficient for the Agencies to determine,

at a preliminary stage, whether demand is segmented, a fact that is important for gauging potential competitive effects of the transaction. Relatedly, this additional information may help eliminate or reduce antitrust concerns if the parties serve very different customers or customer categories.

With these significant modifications, the Commission adopts the requirement that filers providing an Overlap Description also include some information about customers for those products or services.

*c. Descriptions of Agreements With the Other Filing Party*

The Commission proposed that as part of the Overlap Description, for each overlap product or service identified, filers would provide a description of certain competitively significant agreements between the filing parties, such as licensing arrangements and any non-compete or non-solicitation agreements applicable to employees or business units related to the product or service.[377]

One commenter supported the collection of information related to existing agreements between the filing parties because it may be relevant to an assessment of whether something short of a full merger may be sufficient to enable the parties to realize the potential procompetitive benefits of a transaction without potential competitive harm. No commenter specifically objected to this particular requirement of the Overlap Description. However, in light of objections to the overall cost of the final rule, the Commission does not adopt this proposal at this time. Instead, the Commission believes that the requirement, discussed in section VI.I.1, to indicate via check boxes whether certain types of agreements exist between the acquiring person and target will alert the Agencies to transactions that may require further investigation.

*2. Supply Relationships Description*

The Commission proposed to require each filing person to provide information about existing or potential purchase or supply relationships between the filing persons. This description would require filers to describe each product, service or asset (including data) that the filer sold, licensed or otherwise supplied, to the other party or to any other business that, to the filer's knowledge or belief, uses its product, service, or asset to compete with the other party's products or services, or as an input for a product or

[374] 15 U.S.C. 18a(h).
[375] *See* 18 U.S.C. 1905, 15 U.S.C. 50.
[376] Some commenters believe that the Agencies have been insufficiently attentive in the past to those most affected by harmful consolidation.

[377] NPRM at 42196.

service that competes with the other party's products or services.[378] Similar information is required for purchases from the other party. According to the NPRM, this information would allow the Agencies to identify whether the transaction would create opportunities for post-acquisition foreclosure of rivals arising from vertical or diagonal relationships.[379] As discussed in section II.B.3., current information requirements do not provide a factual basis to alert the Agencies that there is an existing supply relationship that might require a closer look to determine whether the transaction is likely to violate the antitrust laws.

As noted in the NPRM, in the past the Commission had required filers to provide similar information about vertical vendor-vendee relationships, but the requirement was eliminated in 2001; since that time, filers have provided no specific information related to existing vertical or other supply relationships. Several commenters objected to including this information again, noting that vertical concerns will not be a feature of most transactions, and information related to these issues is more appropriate for a Second Request once the Agencies have determined that the transaction genuinely raises vertical foreclosure concerns. One commenter stated that information about sales to and purchases from non-transacting parties has limited, if any, relevance to the transaction and is thus outside the scope of the Act. Another noted that concerns about unwinding already-consummated transactions that motivated the Act are not present in non-horizontal transactions, and urged the Agencies to exempt purely non-horizontal transactions from the reporting requirements of the Act on that basis.

Other commenters supported the reintroduction of the requirement to report information related to key supply relationships, suggesting that descriptive responses should provide a more accurate and complete basis for screening transactions. One commenter commended the Commission for recognizing the need to request information about input markets and noted the historical lack of such information has resulted in an information asymmetry between the Agencies and filing parties. Others identified industry-specific concerns related to non-horizontal implications of acquisitions. One commenter cited the

example of the seed industry, commenting that to understand market power in that industry the Agencies must have information regarding the unique supply, distribution, and licensing dynamics that are present. Another commenter discussed the proposal's impact on private equity firms, claiming it is common for firms to have portfolios that include upstream and downstream segments, a structure that can incentivize preferential treatment between portfolio companies in ways that disadvantage rivals.

State antitrust enforcers also supported the need to better understand any supply relationships, including through the collection of information regarding data assets. They explained that the merger of two firms' complementary data sets can create, augment, and maintain market power. As antitrust enforcers, they stated that they also seek to understand how the target's data can be combined with the buyer's, and whether the combined data can be used to leverage power into further applications. To fully account for the potential that the combination of the buyer's and seller's data could be leveraged into additional applications, the State antitrust enforcers recommended the Commission consider whether these requests should be expanded beyond the related purchases and related sales narrative.

After considering the concerns raised by commenters on both sides, the Commission has determined that the final rule will require, once again, the submission of information related to supply relationships. Contrary to assertions that the Agencies rarely challenge, and even more rarely prevail against, non-horizontal acquisitions, the Agencies have blocked several non-horizontal mergers since 2021 and have another challenge pending review.[380] The Commission specifically rejects the suggestion that the final rule exempt non-horizontal mergers from the

reporting requirements of the Act. Such an exemption would abrogate the Agencies' direct Congressional mandate not to ignore mergers that do not involve horizontal competitors. With the 1950 amendments to the Clayton Act, Congress made clear that section 7 applies not only to mergers between actual competitors but also to vertical and conglomerate mergers.[381]

The Commission observes that mergers that create a risk of non-horizontal concerns are more varied in their effects, with the over-arching concern being the risk that the transaction provides the merged firm with the ability and incentive to foreclose rivals. According to controlling precedent, there are myriad ways in which the merged firm could engage in foreclosing behavior, such as by making late deliveries or subtly reducing the level of support services.[382] In light of that variety of potential mechanisms, it is important to have some basis to assess whether the transaction creates a risk that the merged firm may limit access to products or services that its rivals use to compete.[383]

Some commenters questioned whether, as a practical matter, filers will be able to gather the information required by the Supply Relationships Description. For instance, one commenter stated that providing this information would require filers to create a new tool for tracking related sales and purchases, while another noted that, especially for retailers who are often "price takers," there may be no need internally for conducting this type of analysis, meaning it would be undertaken solely to comply with the Act for reporting transactions. Two other commenters stated that this narrative is duplicative of document requests and thus should be eliminated.

The Commission disagrees that the new Supply Relationships Description requires special reporting tools or is duplicative of document requests. In the Agencies' experience, documents submitted with the HSR Filing often do not contain references to key suppliers or purchasers, or the documents do not

---

[378] *Id.* at 42196–97.

[379] *See* Dep't of Justice & Fed Trade Comm'n, Merger Guidelines 2.5 (2023).

[380] *See* Press Release, Fed. Trade Comm'n, "Statement Regarding Illumina's Decision to Divest Grail" (Dec. 18, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/12/statement-regarding-illuminas-decision-divest-grail; In re Lockheed Martin Corp.,* No. 9405 (F.T.C. Jan. 25, 2022) (complaint alleging merger would enable missile systems manufacturer to use control over missile propulsion systems to harm rival defense prime contractors) (transaction abandoned); *In re Nvidia Corporation,* No. 9404 (F.T.C. Dec. 2, 2021) (complaint alleging merger would give chip manufacturer the ability and incentive to use control over microprocessor design technology to undermine competitors) (transaction abandoned); *In re Microsoft Corp.,* No. 9412 (F.T.C. Dec. 8, 2022) (complaint). *See also FTC* v. *Procter & Gamble Co.,* 386 U.S. 568, 577 (1967) (whether classified as horizontal, vertical, conglomerate or other, all mergers tested by the same standard under section 7).

[381] *Brown Shoe Co.* v. *United States,* 370 U.S. 294, 317 (1962) (explaining that by the deletion of the acquiring-acquired language in the original statutory text, Congress hoped to make plain that section 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country). *See also* H.R. Rep. No. 1191, at 11 (1949).

[382] *See Illumina, Inc.* v. *FTC,* 88 F.4th 1036, 1053 (5th Cir. 2023).

[383] *See* Dep't of Justice & Fed Trade Comm'n, Merger Guidelines 2.5 (2023).

provide sufficient context to understand whether the merged firm will have the ability to foreclose key inputs in violation of the antitrust laws. Nor does the Commission agree that companies are unaware that they are in an existing supply relationship or that there would be no records for a company to determine that it has purchases from or sales to another company. As with the Overlap Description, requiring filers to provide a brief description of any sales or purchase relationship is a much more direct, efficient, and reliable way to get this critical information because it will be coming from the parties and does not require staff to interpret references in documents to these types of relationships. Even given the expansion of document requirements in the final rule, this specific information that describes an existing business relationship in the same supply chain is unlikely to be revealed in transaction-specific documents or those generated in the ordinary course. This is especially true because the Supply Relationships Description requires each filer to identify whether it supplies not just the other party but a different company that competes with the other party.

Two commenters urged the Commission to narrow the scope of the required information by adopting a limitation for de minimis levels of related sales or related purchases, for example by restricting requirements to those related sales or purchases generating over $10 million in U.S. revenue in the past fiscal year. One commenter noted that the pre-2001 reporting for vendor-vendee information was limited to transactions between the parties and to purchases or sales over $1 million, and stressed the need for the Agencies to establish a similar objective criteria to guide filers and avoid reporting thousands of routine or competitively benign purchases. Another commenter questioned the need for the Commission to revive a request that it deemed insufficient as a screen for potential non-horizontal relationships.

After careful consideration of these comments, and in light of the Commission's intention to reduce cost wherever practical, the Commission has made several modifications to the Supply Relationships Description. As with the Overlap Description, the Commission declines to exclude information related to sales outside the United States. Here too, such an exclusion is not justified for the significant number of transactions for which sales occur outside the United States and yet the transaction has

sufficient nexus to the United States to require reporting. Nonetheless, the Commission has determined that the rule should include a de minimis exclusion to reduce the cost of collecting information related to competitively insignificant sales or purchases. The final rule excludes reporting unless the product, service, or asset (including data) represented at least $10 million in revenue. In order to ensure that the de minimis exclusion does not cause filers to underrepresent their own production or capacity to supply the market, the de minimis amount is inclusive of internal transfers within the filing person. That means that when applying the de minimis exclusion, the filer should include the value of the product that it supplies to itself because that reflects the filer's ability to meet the demand for the product. For example, if the acquiring firm sells Product X to the target, when calculating the total revenue for Product X to determine whether Product X represents at least $10 million in revenue, the filer must include its own consumption of Product X and sales of Product X to anyone else. If all of the filer's sales (including internal sales) of Product X represent less than $10 million in revenue, the filer does not need to respond to the Supply Relationships Description for sales of Product X.

As with the Overlap Description, several commenters objected to the Supply Relationships Description on the grounds that it is subjective and burdensome and that it would require premature disclosure of the deal or improperly shift the burden of proving an antitrust violation from the Agencies to the filing parties. Accordingly, the Commission has determined to make similar modifications to the Supply Relationships Description as it did for the Overlap Description, in order to reduce the cost of reporting. Specifically, the final rule limits the reporting period to the most recent fiscal year and requires reporting for sales only in dollars, not also in units. It also eliminates the requirement for contact information for individuals at customers or suppliers, requiring only the identity of the company to limit the risk of inadvertent disclosure. With these modifications, the Supply Relationships Description will provide a factual basis to determine whether the transaction requires a closer look to assess the risk of foreclosure, while minimizing the cost as much as practicable.

3. Labor Markets Information

The Commission proposed creating a new Labor Markets Information section within the Instructions that would require each filing person to provide certain information about its workers in order to screen for potential labor market effects arising from the transaction. As noted in the NPRM, the Agencies have increasingly recognized the importance of evaluating the effect of mergers and acquisitions on labor markets.[384] Yet, as noted in section II.B.2., the Agencies' HSR Form does not collect information from filers about their employees or the type of work that their employees do that would allow the Agencies to identify the parties as competitors for certain labor services, raising challenges for the effective enforcement of section 7 to protect competition that benefits workers.[385]

Within the Labor Markets section, the Commission proposed requiring each filing person to (1) provide the aggregate number of employees for each of the five largest 6-digit Standard Occupational Classification (SOC) codes; (2) identify the top five largest 6-digit SOC codes in which both parties employ workers, and for each of these SOCs, list the overlapping ERS-defined commuting zones and the total number of employees within each commuting zone; and (3) identify any penalties or findings that were issued against the acquiring person or acquired entity by the DOL's Wage and Hour Division, NLRB, or OSHA during the five-year period before the filing.[386]

The Commission received many comments focused on the labor market proposals. Several commenters, including hundreds of individual commenters, supported the Agencies' attention to the potential for merger-induced harm in labor markets and the requirement that parties submit information about their employees for premerger screening. Supportive commenters stated that filers have sophisticated legal and accounting personnel and systems to minimize the burden on the companies of collecting and reporting employee information. Other commenters asserted that requesting labor market information in the earlier stages of merger review would lead to a more efficient and uniform process that could result in the Agencies' termination of the HSR waiting period prior to the end of the initial 15 or 30 days in a greater number of mergers where no labor market issues exist.

---

[384] NPRM at 42197.
[385] 15 U.S.C. 18.
[386] NPRM at 42197–42198.

Other commenters, including law firms, private equity and venture capital groups, and industry groups, raised broad objections to the Commission's proposal to collect labor market information in the HSR Form. These organizations argued that the effort required by the Labor Markets section would be significant and would greatly increase costs for companies wishing to engage in reportable transactions. Moreover, they argued that this increased burden was not justified by the utility of the employee information required by the proposed rule for antitrust screening. Some commenters stated that the increased burden of complying with these reporting requirements would have a chilling effect on transactions.

In light of the comments, as well as the Agencies' recent experience in identifying and investigating transactions that may harm competition for workers, the Commission has determined not to require specific information about employees at this time. After considering several options to collect worker information that would be specific enough to allow the Agencies to screen for potential labor market effects without unduly burdening filers, the Commission has determined that the Agencies will rely on other information required by the final rule to identify transactions that require an in-depth investigation for potential labor market effects. This includes the new Competition Descriptions, which together will provide the Agencies with a better understanding of the premerger competition between the merging parties. The Commission believes that this information is likely to reveal those transactions where the filers are likely to compete for workers that do the same or similar types of jobs because they supply similar or related products or services. In addition, the new document requirements, including plans and reports and additional transaction-related documents, should reveal whether the parties view themselves as competing for labor services. From these documents, as well as a description of the rationale for the transaction from the buyer, the HSR Filing should reveal whether the buyer anticipates any impact on workers or labor costs as a result of the transaction.

The Commission acknowledges the need to obtain detailed information about employees for some transactions during the merger review process and will continue to consider whether it is appropriate, on a case-by-case basis, to require the production of such information in a Second Request.

a. Worker and Workplace Safety Information

The Commission proposed to create a Worker and Workplace Safety Information section that would require filing persons to identify any penalties or findings that were issued against the acquiring person or acquired entity by the U.S. Department of Labor's Wage and Hour Division, the National Labor Relations Board, or the Occupational Safety and Health Administration during the five-year period before the filing. Several commenters supported the inclusion of the Worker and Workplace Safety Information, noting that the information could prove indicative of a concentrated labor market and market power. One commenter stated that it had previously alleged that repeated and widespread labor law violations constituted direct evidence of labor market dominance that could be relevant to merger analysis. Others noted that this information is often known to the filers and may be indicative of a concentrated labor market.

Some commenters urged the Commission not to require the submission information about past workplace violations due to the lack of a clear nexus between labor law violations and merger analysis. Other commenters stated that labor law violations may be tied to issues that are irrelevant to market power, such as the presence of an organized labor group that is more inclined to report potential violations, and the requirement should be limited to the industries where violations are more prevalent. Some stated that the existence of labor law violations was government data that was already available to the Agencies without placing the obligation on parties to report such violations.

The Commission acknowledges that information regarding some of these violations may be publicly available or otherwise available to the Agencies. The U.S. Department of Labor and the National Labor Relations Board maintain public accessible databases containing labor enforcement case information on their respective websites.[387] In addition, the Agencies have each established Memoranda of Understanding (MOUs) with the Department of Labor and the National Labor Relations Board that would allow for the Agencies to obtain relevant non-public information regarding labor law

violations.[388] Accordingly, when the Agencies identify potential harms to labor market competition through information contained in the HSR Filing or through other means, they can seek information on labor violations from publicly available sources, from the Department of Labor and the National Labor Relations Board under their respective MOUs, and when appropriate, from the filers on a voluntary basis or in response to Second Requests. Because this information may be available to the Agencies through means that would not require filers to provide this information in the HSR Filing, the Commission does not adopt the requirement for filers to submit information on worker and workplace safety, and it is not required by the final rule.

b. Requests To Expand Requirements for Information Related to Labor Markets

Some commenters encouraged the Commission to request more information about employees, including the merging companies' histories of labor law violations dating back ten years rather than only five years; information about their remote, temporary, or contract workers; and the merging companies' union avoidance activities and expenditures. Certain commenters encouraged the Agencies to consider the role of unions and collective bargaining to accurately assess employer market or monopsony power. In particular, commenters suggested that the Agencies could collect the following information to animate such an analysis: (1) a list of unions at controlled entities, associates, and franchisee/cooperatives; (2) copies of collective bargaining agreements, at least with any common unions; and (3) a narrative describing any opposition to

[387] *See* U.S. Dep't of Labor, "Enforcement Data," *https://enforcedata.dol.gov/Enfdata/search.php*; Nat'l Labor Relations Bd., "Case Search," *https://www.nlrb.gov/search/case*.

[388] *See* Press Release, Fed. Trade Comm'n, "FTC, Department of Labor Partner to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices" (Sept. 21, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/09/ftc-department-labor-partner-protect-workers-anticompetitive-unfair-deceptive-practices*; Press Release, Fed. Trade Comm'n, "Federal Trade Commission, National Labor Relations Board Forge New Partnership to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices" (July 19, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/07/federal-trade-commission-national-labor-relations-board-forge-new-partnership-protect-workers*; Press Release, U.S. Dep't of Justice, "Justice Department and National Labor Relations Board Announce Partnership to Protect Workers" (July 26, 2022), *https://www.justice.gov/opa/pr/justice-department-and-national-labor-relations-board-announce-partnership-protect-workers*; Press Release, U.S. Dep't of Justice, "Departments of Justice and Labor Strengthen Partnership to Protect Workers" (Mar. 10, 2022), *https://www.justice.gov/opa/pr/departments-justice-and-labor-strengthen-partnership-protect-workers*.

efforts to unionize, including union avoidance activities and expenditures. The Commission acknowledges the utility of collecting this information for some transactions during the merger review process but does not believe that this information is necessary for all filings at the screening stage. As a result, the Commission has not included requirements for this information in the final rule but will continue to consider whether it is appropriate, on a case-by-case basis, to request such information during the investigation of the transaction.

In sum, the Commission has determined that the requirements of the final rule to provide descriptions of areas of competitive interaction between the parties are necessary and appropriate to enable the Agencies to identify transactions that may violate the antitrust laws and that the requirements, as modified, have been tailored to reduce the cost of reporting as much as practicable.

*J. Revenues and Overlaps*

The Commission proposed a Revenues and Overlaps section to collect information currently required by Items 5(a), 6(c), 7, and 8, subject to proposed modifications. The Commission proposed substantive changes to the reporting of revenue by NAICS code, how NAICS overlaps of controlled entities are reported, which minority-held entities must be reported, and which prior acquisitions must be reported. As discussed below, the Commission adopts some of the changes as proposed, adopts others with modifications, and does not adopt others.

1. NAICS Codes

In the NPRM, the Commission proposed several changes related to revenue reporting. One of the changes was ministerial in nature—adopting the 2022 version of the NAICS codes. This proposal received no comments, and the Commission adopts it as proposed.

The Commission proposed other, non-ministerial changes to revenue reporting that reflect a substantively different approach to revenue information by: (1) eliminating the requirement that filing persons provide the precise amount of revenue attributed to each NAICS code and instead report revenues within ranges; (2) reporting NAICS codes on a descriptive basis through engagement with the business operations of each operating company and providing additional information if more than one code would be appropriate; (3) requiring acquiring persons and acquired entities

with more than one operating company or unit to identify which entity(s) derives revenue in each code; (4) requiring acquiring and acquired persons to report NAICS codes for certain pipeline or pre-revenue products; (5) clarifying that the acquired person must report the NAICS codes relevant to the acquired entity(s) at the time of closing; and (6) eliminating the requirement for filing persons engaged in manufacturing to provide revenue by NAPCS-based codes. As discussed below the Commission adopts some of these changes, adopts a modified version of others, and does not adopt certain of these proposed changes.

a. Reporting Revenues in Ranges

The Commission received several comments in support of the proposal to eliminate the requirement that filing persons provide the precise amount of revenue attributed to each NAICS code and instead report revenues within one of five ranges. One commenter stated that the introduction of levels proposed in the NPRM will simplify compliance with the NAICS allocation requirement. Two other commenters expressed general support for the proposed set of reorganized revenue information. The Commission did not receive any comments opposed to this change and adopts it as proposed.

b. Reporting Revenues on a Descriptive Basis

Regarding the proposal to report NAICS codes on a descriptive basis through engagement with individuals familiar with the business operations of each operating company and provide additional information if more than one code would be appropriate, two commenters objected on the grounds that it would be overly burdensome. One commenter noted that many NAICS codes are broad and disconnected from the modern economy, making it difficult to determine whether a particular code applies. The other commenter objected to the proposal to list all the codes that describe the products or services offered, explaining that it would be extremely difficult to comply with when relying on personnel at various operating companies that have varying familiarity with the NAICS system. The same commenter noted that if the Agencies are concerned about missing potential overlaps, the Overlap Description is a more effective way to address that concern.

The Commission acknowledges the concerns about cost and adopts this proposal with modifications. As noted in the proposed rule, in the Commission's experience, reliance on

financial records often results in under-reporting or reporting revenues in codes that may not actually be descriptive of the products or services provided. Having knowledgeable business personnel select the appropriate NAICS codes that best describe the filer's business lines is the best way to ensure that the NAICS code revenues contained in the HSR Filing reflect the full range of products and services offered from a business perspective. However, the Commission will not require a particular methodology to collect NAICS codes and notes that the intent of this change is to have filers report codes that descriptively represent their revenues, and not need to rely on how they are captured in financial systems.

c. Identifying Entities That Derive Revenues in Each Code

Two commenters objected to the proposed requirement to report NAICS information separately by operating entity. Each of the commenters asserted that this additional requirement would likely create significant new burdens, in particular for larger companies with numerous subsidiaries. While this type of reporting may be more difficult for those with numerous subsidiaries, these are exactly the filings for which the Agencies cannot determine which entities generate revenues that are related to those of the other party. When parties report revenues by entity, the Agencies can quickly home in on which business lines are competitively relevant. The Commission notes that some filers already provide revenues in this way and it is extremely useful to the Agencies when they do. Although the Commission acknowledges that this proposal may be more difficult for some filers, it is necessary for the Agencies to have at the outset a clear picture of how revenues are generated within the filing person. The Commission adopts this change as proposed.

d. Reporting Revenues for Pre-Revenue Products or Services

The Commission received several comments regarding the proposal to require acquiring and acquired persons to report NAICS codes for certain pipeline or pre-revenue products. A group of State antitrust enforcers supported the proposal, noting that they are particularly concerned with acquisitions of potential or nascent competitors and the protection of rivalrous innovation. Critics of the proposed requirement expressed concerns about compliance. One commenter pointed out that the Commission did not provide a clear standard for what "under development"

means or what information the acquiring person must have to "know" about the target's product pipeline. Other commenters noted that classifying pre-revenue products or products under development is inherently speculative and that the NAICS classifications sometimes lag changes in technology and business.

The Commission acknowledges the potential challenges in complying with this change and believes it is sufficient for the Agencies to rely on the Competition Descriptions section for information related to pre-revenue products or services. In the Overlap Description, filers are required to list and briefly describe each current or known planned products or services that compete or could compete with those of the other party. As a result, similar information related to potential NAICS code revenues would be largely duplicative. Given the Commission's interest in reducing the cost of complying with the final rule where the additional information provides little benefit to the Agencies, the Commission does not adopt this proposal.

e. Overlap Reporting Revenues as of Time of Closing

Regarding the proposal to clarify that the acquired person must report the NAICS codes relevant to the acquired entity(s) at the time of closing, the Commission did not receive any comments. The Commission adopts this item as proposed.

f. Eliminating Reporting by NAPCS Codes

Regarding the proposal to eliminate the requirement for filing persons engaged in manufacturing to provide revenue by NAPCS-based code, the Commission did not receive any comments. The Commission adopts this item as proposed.

2. Controlled Entity Geographic Overlaps

Information about the geographic areas related to overlapping products and services is currently required by Item 7. The Commission proposed modifying these requirements to: (i) add a requirement to provide the name(s) by which entities have done business within the last three years, (ii) require the filing person to identify the overlapping entity within its own person, rather than the other filing person, (iii) update the NAICS codes that require geographic reporting at the street address level, (iv) require the identification of locations of franchisees for certain NAICS codes, and (v) add a requirement to provide geolocation data.

As discussed below, the Commission adopts the some of the proposals as proposed, some with modification, and does not adopt others.

a. NAICS Overlaps of Controlled Entities

The Commission proposed several changes to the information concerning NAICS overlaps of controlled entities. First, the Commission proposed requiring the acquiring person to identify the entity(s) within its own person that has operations in the same NAICS code as the acquired entity(s), and the acquired person to identify the entity(s) within the acquired entity(s) that has operations in the same NAICS codes as the acquiring person. Second, it proposed requiring the identification of "doing business as" or "formerly known as" names used within the last three years by entities with U.S. operations in overlapping NAICS codes. Finally, the Commission proposed that filing persons be required to identify the entity(s) that have U.S. operations in the overlapping NAICS code(s).

Regarding the proposal to require the identification of "doing business as" or "formerly known as" names used within the last three years by entities with U.S. operations in overlapping NAICS codes, the Commission received two comments. One commenter expressed support for the proposal, noting that information regarding how private equity portfolio companies are commonly known in the marketplace is necessary for the Agencies to assess potential anticompetitive overlaps. Another commenter, however, stated that the new requirement may be difficult for filing parties to meet if they do not maintain such records, meaning they would need to recreate the information for the HSR filing. The same commenter questioned the value of the information for entities beyond those that either (i) generate revenue that results in a NAICS overlap or (ii) are parties to Material Other Agreements.

The Commission believes "doing business as" names will be of great value to the Agencies in the initial waiting period and thus adopts the proposal to require filing parties to identify names by which entities do business at the time of filing. However, as part of its overall efforts to lessen costs, the Commission does not adopt the proposal to require "formerly known as" names.

Regarding the proposal to have each filing person only report entities within its own person that derive revenue in the overlapping NAICS codes, the Commission did not receive any

comments. The Commission adopts this change as proposed.

Finally, regarding the proposal to require filing persons to identify the entity(s) that have U.S. operations in the overlapping NAICS codes, the Commission did not receive any comments. The Commission adopts this change as proposed.

In addition, one commenter suggested that the Commission require identification of overlaps at the 3-digit, rather than 6-digit level, stating that 6-digit NAICS codes are too narrow. While the Commission agrees that some 6-digit NAICS codes are too narrow to identify products or services that effectively compete in the market, it also finds that other codes are overly broad. Further, identification of overlaps also triggers the reporting of additional information, including geographic information, identification of authors of documents, production of certain annual reports, information about certain officers and directors, identification of certain prior acquisitions, and certain defense and intelligence contracts. Thus, the Commission declines to adopt this suggestion but notes that this final rule includes a Competition Descriptions section, as discussed in section VI.I, to address the shortcomings of revenue reporting by NAICS codes.

b. Geographic Market Information

The Commission proposed two changes related to geographic markets. First, the Commission proposed updating the list of NAICS codes for which locations need only be identified at the State level and NAICS codes for which street-level information would be required. These adjustments reflect the Commission's periodic review of which NAICS codes need more granular street, city, and State address information, and which NAICS codes need only be reported at the State level. Information about where each filer generates revenues is important to determining whether the parties sell or supply products or services in the same local markets. Geographic market information often provides a factual basis for the Agencies to conclude that the merging parties do not sell the same products in the same local areas. Keeping this information up-to-date allows the Agencies to rely on geographic market information to conclude that the transaction does not warrant the issuance of Second Requests.

The Commission received two comments regarding this requirement, one in support of it and one opposed. The supportive comment emphasized the need for street-level information in

the agriculture industry, where the relevant markets for evaluating competition tend to be local and regional due to the perishable nature of agricultural products. The Commission agrees that street-level information is key in local and regional markets and articulated this as the basis for the expansion of the requirement in the NPRM.

The comment in opposition to the proposal stated that it would impose additional costs on filing parties given the wide range of industries for which street-level information would be required. The Commission acknowledges the cost, but for the reasons discussed above, believes that street-level geographic information is necessary to the Agencies' ability to conduct appropriate premerger screening of transactions that are most likely to affect competition at a local level. The Commission adopts this change as proposed.

The Commission also proposed requiring filers to list locations where franchisees of the acquiring or acquired person (as appropriate) generate revenue in overlapping NAICS codes that require street-level reporting. The Commission did not receive any comments on this change and adopts it as proposed.

c. Geolocation

The Commission also proposed requiring filers to report latitude and longitude information for street addresses. The Commission received comments both in support and in opposition to this requirement. The supportive comment stated that many companies already keep lists of latitude/longitude waypoints, while the comment opposed stated that exceedingly few businesses maintain geolocation data in the ordinary course of business.

As helpful as this information would be to the Agencies, especially during the initial waiting period when the Agencies need to determine whether there are any geographic markets in which the parties compete, in its overall effort to reduce costs to filing parties, the Commission does not adopt this proposal. Agency staff can continue to pursue sources for this information when necessary and as time permits during the initial waiting period.

3. Minority-Held Entity Overlaps

The Commission proposed creating a Minority-Held Overlaps section to collect information related to minority holdings that is currently required by Item 6(c). Item 6(c) requires the identification of holdings of the acquiring person and its associates or

the acquired entity (as appropriate) of greater than 5% but less than 50% if such holdings derive revenue in any of the same 6-digit NAICS codes (or industries) as the other party. In the NPRM, the Commission proposed eliminating the option to list all the minority-held entities, rather than just those that are in overlapping NAICS codes or industries. The Commission also proposed requiring filers to provide the names by which the listed entities do business, if known. The Commission adopts these changes as proposed.

Regarding the proposal to eliminate the option to list all minority-held entities, the Commission received three comments, one comment in support of the proposed change and two comments opposed to it. The supporter of the proposal stated that it is critical to understand a company's minority holdings, which may allow it to exercise a level of competitive control in a market. One commenter questioned the probative value of information about minority interests generally but did not address this specific proposal. Another commenter expressed concern that the proposal could lead to greater scrutiny of "growth equity" firms that primarily take minority stakes in companies, and asserted that it could have a chilling effect on certain investments.

The Commission addresses concerns that increased transparency may lead to more enforcement actions in section III.C.1. and states that the identification of overlapping minority holdings is a key reform of the final rule because where these relationships exist, the Agencies should scrutinize them as part of their premerger review. The Commission also emphasizes that filers are currently required to identify overlapping minority holdings. However, the current Instructions allow filers to identify all minority holdings rather than only those that overlap. The Commission has found that lists not limited to the overlapping entities hinder efficient screening for transactions that may require further investigation, resulting in extra effort even when it would not be required if the overlaps were known as well as not surfacing transactions that do have such overlaps. In contrast, when filers submit a list of only those minority-held entities that derive revenue in the same NAICS code, or are in the same industry as the other party, the Agencies can quickly focus in on holdings that could create a competitive concern. Additionally, as minority interest holders, the filers are in a better position than the Agencies to identify which, if any, of their holdings operate in the same space as the other party. Given the

importance of this information to the Agencies, the Commission adopts this change as proposed.

Regarding the proposal to require filers to provide the names by which the listed entities do business, if known, one commenter supported the proposal while another stated that it may be difficult for filing parties to comply with if they do not maintain such records. As discussed in sections VI.D.1.d.(i) and (iii) and VI.D.2.a., the legal names of entities are not always directly related to the name by which the entity is known to the marketplace. Knowing the public-facing names of entities facilitates efficient review of transactions by the Agencies because those names may be better known to other market participants. For investors of 5% or more, the Commission believes this information should be readily available to filers. However, if this information is not known, a statement of non-compliance can be submitted with the filing, as discussed in section VI.A.5. Accordingly, the Commission adopts this requirement as proposed.

In sum, the Commission has determined that the reporting requirements for revenues and overlaps contained in the final rule are necessary and appropriate to enable the Agencies to identify transactions that may violate the antitrust laws in any line of commerce or section of the country and that the requirement, as modified, has been tailored to reduce the cost of reporting as much as practicable.

4. Prior Acquisitions

The Commission proposed creating a Prior Acquisitions section within the Instructions to collect information required by Item 8 of the current Form, as well as additional information. First, the Commission proposed requiring both the acquiring person and the acquired entity to provide information about prior acquisitions, expanding the current requirement that is limited to the acquiring person. Second, the Commission proposed extending the time frame to report prior acquisitions from five years to ten years. Third, the Commission proposed eliminating the dollar threshold for listing prior acquisitions, which currently limits reporting to only acquisitions of entities with annual net sales or total assets greater than $10 million in the year prior to the acquisition. Fourth, the Commission proposed treating asset transactions involving the prior acquisition of substantially all of the assets of a business in the same manner as prior acquisitions of voting securities or non-corporate interests. The Commission also proposed requiring

filers to report whether all or substantially all of the acquired voting securities, non-corporate interests, or assets are still held at the time of filing. As discussed below the Commission declines to adopt several of these proposals and modifies others.

As noted in the NPRM, information about prior acquisitions has always been important for the Agencies, allowing them to identify strategies to gain market share through acquisitions rather than internal expansion or more vigorous competition. Filers have been required to provide information about prior acquisitions from the beginning of the premerger notification program. As discussed in section II.B.5., the Commission believes that additional information about prior acquisitions will reveal roll-up or serial acquisition strategies that have become increasingly prevalent in certain sectors as well as among certain investors and acquirors, and that have been an effective strategy for increasing concentration. A history of prior acquisitions in the same sector can provide an independent basis for the Agencies to take a closer look at the filed-for transaction to ensure that merger enforcement takes place at a time when it can be effective in preventing undue levels of market concentration.

Several comments provided general support for the Commission's efforts to expand this item. According to a group of State antitrust enforcers, details about a filing entity's prior acquisitions are vital for evaluating mergers and industry concentration trends. They contend that, in an era of so-called "stealth acquisitions," premerger tools used by antitrust enforcers require sharpening. Another commenter also expressed this concern, observing a rise in serial acquisition strategies that are potentially aimed at sidestepping regulatory scrutiny.

Other commenters provided research supporting the proposed expansion of information about prior acquisitions. One commenter offered that his research supports claims made in the NPRM that prior acquisitions have important consequences for competition. He explained that even minor deals can produce major changes in market structure, firm behavior, and consumer welfare. Other commenters described their research or experience with roll-up acquisitions that have occurred in various sectors of the economy, explaining that more expansive disclosures of prior acquisitions will allow the Agencies to better identify serial acquisitions and their potentially anticompetitive effects.

But several comments raised broad objections to the Commission's proposal to collect additional information on prior acquisitions. Several comments broadly asserted that the burden of providing this additional information about prior acquisitions would be too high. One commenter asserted that expanding the information required would create a chilling effect that could discourage acquisitions of startups, as many potential acquirers of startups are likely to have made several small acquisitions in the technology sector. Similarly, some comments explained that the expansion of information related to prior acquisitions would have particular impact on specific industries or financial sectors, including pharmaceuticals, technology, agriculture, and private equity. Other commenters said that providing more complete information about prior acquisitions would reduce investments in startup companies. Finally, certain comments suggested that the proposed changes would adversely affect venture capital and funding acquisitions.

The Commission has addressed some of these general concerns in section III.C., as well as more detailed concerns about the cost to complete this requirement, below. It believes that many of these broad concerns are either not directly relevant to this rulemaking or otherwise in tension with historical reporting practice.[389] Nonetheless, the Commission has determined not to adopt most of the expansions contained in the proposed rule, including the extension of the lookback period from five to ten years or the elimination of the $10 million exception. Instead, the Commission adopts modest adjustments to the current requirements and extends the reporting requirement to prior acquisitions of the target. The adopted adjustments contained in the final rule include: (1) the elimination of the $1 million threshold for revenue when determining which overlapping NAICS codes are relevant; (2) the requirement to include prior acquisitions of assets or entities that also provide competing products or services listed in the filing person's Overlap Description; and (3) the proposal to treat prior acquisitions of substantially all of the assets of a business in the same manner as prior acquisitions of voting securities or non-corporate interests.

---

This information related to prior acquisitions will better reflect current market dynamics in the very lines of business that will be the focus of the Agencies' premerger assessment. The final rule does not require reporting on all prior acquisitions, only those in in business lines which the parties have identified as areas of overlapping current or future competition, either on the basis of NAICS code reporting or in the Overlap Description. This limitation focuses the required information on the specific antitrust risk that one or both parties have a pattern or strategy of rolling up competitors. It also alerts the agencies to potential changes in the competitive environment that may not be publicly available, which is valuable information in assessing whether or not the filed for transaction may violate the antitrust laws. In addition, parties are required to report only those acquisitions of U.S. entities or assets and foreign entities or assets with U.S. sales, thus targeting acquisitions that are likely to affect local markets within the United States. With these limitations, information collected about prior acquisitions is properly focused on the antitrust risk that the merging parties are pursuing a roll up strategy that is harming or could harm competition in the United States in violation of the antitrust laws.

As discussed in section II.B.5., the antitrust laws have always applied to anticompetitive serial acquisitions. In light of the increased use of these strategies and evidence of their harmful effects in certain sectors, there is a clear benefit to antitrust enforcement from disclosing prior acquisitions that may reveal a pattern or strategy of rolling up competitors in violation of the antitrust laws. This risk can be especially acute when the transaction involves a merger between 'consolidators,' with both firms having many prior acquisitions in the same lines of business. The final rule is properly tailored to focus on the risk that the transaction is part of such a strategy. Information about prior acquisitions need only be submitted for business lines that the parties have identified as areas of current or future competition. Moreover, any burden imposed by the additional reporting requirements would be limited. Based on the Agencies' experience, information about prior acquisitions is well-known to companies that are parties to an acquisition agreement, as this information is often collected as part of the due diligence process for the pending transaction. Other companies, even relatively small companies, routinely provide this information to the

Agencies in response to a Second Request.

The Commission acknowledges that this requirement imposes a new obligation on acquired companies but believes this information is necessary and appropriate for the Agencies to conduct their premerger review. Information about prior acquisitions is specifically targeted to uncover prior acquisitions where the parties have existing or emerging overlaps; if the acquired person completed many acquisitions over the past five years in these overlapping business lines, that information would be highly relevant to assessing the transaction's likely effect on future competition in those overlap sectors. Moreover, serial acquisition strategies may be going on simultaneously in a particular business line, and the acquired person's history would reveal whether the acquiring person is acquiring a firm that was also pursuing such a strategy.

The benefit to the Agencies from collecting this information from both parties is directly related to the number of prior acquisitions in the same business lines: the more acquisitions recorded during the prior five years, the more relevant is the information about them. Both the acquiring person and the acquired entity can and do make acquisitions that have an impact on the relevant competitive landscape. In addition, requiring this information from both filers may help deter acquisition strategies whereby a target buys several related companies that fall under the HSR thresholds and then the acquiring person purchases the target; the current rule does not reveal this history of prior acquisitions in the same business lines. Being able to clearly understand this history from the time a filing is made assists the Agencies in identifying a potential pattern of acquisitions in a particular industry that has contributed to a trend toward concentration or vertical integration that affects the competitive dynamics for the parties to the transaction, as well as the commercial realities of post-merger competition. One commenter suggested that parties report prior acquisitions only from the point in time when the current UPE acquired control of the acquiring or acquired entity, but this would limit the Agencies' ability to fully understand patterns and current competition. Thus, the Commission declines to further limit the requirement in this way.

The Commission also proposed expanding the time frame for reporting prior acquisitions from five to ten years to allow the Agencies to have a more complete understanding of how past acquisitions in the affected business lines affect the competitive landscape of the current transaction under review. Even though the Commission has required ten years of prior acquisition information on the HSR Form in the past, commenters questioned the expansion of the requirement now. Some comments focused on the added burden, noting that individuals who have institutional knowledge of past acquisitions may no longer be employed by the filing entity. Another comment pointed out that the Commission previously recognized that a ten-year lookback period was unduly burdensome when it reduced the information request from ten years to five years in 1987. The Commission acknowledges the cost associated with reporting many prior acquisitions, and after careful consideration of the comments, has determined not to require reporting for prior acquisitions occurring more than 5 years prior to filing.

But the Commission disagrees that concerns about roll-up strategies are not well-grounded in antitrust law. As discussed in section II.B.5., U.S. antitrust law clearly addresses concerns about the acquisition or maintenance of market power through serial acquisitions. As stated above, it is precisely this information that allows the Agencies to fairly measure the competitive landscape and on-going trends toward concentration in certain business lines, making the information relevant to the Agencies' initial antitrust assessment of the transaction. The Commission also disagrees that the HSR Act does not permit the Agencies to use section 7 of the Clayton Act to challenge serial acquisitions. Section 7 clearly prohibits acquisitions that were preceded by a series of acquisitions that rendered the market(s) under review concentrated,[390] and it is not improper for the Commission to require the reporting of prior acquisitions to better detect a pattern of acquisitions that may also violate other antitrust statutes, such as section 2 of the Sherman Act or section 5 of the FTC Act. Although the Commission agrees that the information submitted with the HSR Form must be used to examine the potential competitive impact of the filed-for transaction, it disagrees that the scope of section 7 is so limited as to prevent the Agencies (or other enforcers of the Federal antitrust laws) from alleging harm that derives from a cumulation of

similar acquisitions in the same market.[391]

The Commission also proposed eliminating the $10 million threshold for identifying prior acquisitions and received several comments on this point. One comment urged the Commission to keep the existing limitation that requires reporting only those acquisitions of more than $10 million in total assets and annual net sales in the year prior to the acquisition as a way to eliminate the burden of reporting a large number of extremely small transactions that are competitively insignificant. One comment suggested maintaining the current $10 million threshold for prior acquisitions but exempting certain, specified NAICS codes related to emerging technology sectors from the threshold.

Yet another commenter suggested the Commission broaden its proposed rule to include prior acquisitions based on three-digit NAICS codes, rather than relying on six-digit NAICS code overlaps, which the commenter found to be often too narrow or imprecisely defined. The Commission acknowledges that three-digit NAICS codes would include more prior acquisitions and present a broader picture of the competitive landscape. But because prior acquisitions also include products or services described in the Overlap Description, which in some instances may encompass a broader set of acquisitions than reliance on NAICS codes alone, the Commission declines to use three-digit NAICS codes as the standard.

In sum, the Commission has determined that the reporting requirements for prior acquisitions contained in the final rule are necessary and appropriate to enable the Agencies to identify transactions in which the merging parties are engaged in a pattern or strategy of roll-up acquisitions and that the requirement, as modified, has been tailored to reduce the cost of reporting as much as practicable.

*K. Additional Information*

1. Subsidies From Foreign Entities or Governments of Concern

While the Commission did not receive any comments objecting to the proposed new defined terms ''foreign entity or

---

[390] *See United States* v. *Phila. Nat'l Bank,* 374 U.S. at 367. *See also Credit Bureau Reps., Inc.,* v. *Retail Credit Co.,* 358 F. Supp. 780, 794 (S.D. Tex. 1971), aff'd, 476 F.2d 989 (5th Cir. 1973).

[391] *See Brown Shoe Co.* v. *United States,* 370 U.S. 294, 334 (1962) (citing S. Rep. No. 81–1775, at 5 (1950) and H.R. Rep. No. 81–1191, at 8 (1949)). In particular, S. Rep. No. 81–1775, at 5 noted that where several large enterprises are extending their power by successive small acquisitions, the cumulative effect of their purchases may be to convert an industry from one of intense competition among many enterprises to one in which only a few large concerns supply the market.

government of concern'' and ''subsidy'' discussed in section IV.B., it did receive several comments about the reporting requirements included in the proposed Instructions. One commenter objected that the Committee on Foreign Investment in the US (''CFIUS'') already is tasked with the review of certain transactions involving foreign investment in the United States and that requiring information about foreign subsidiaries in the HSR form would add to the burden of notifying parties (and the Agencies) without providing concurrent value for the substantive antitrust analysis. In response to this comment, the Commission notes that it must defer to Congress in implementing the requirement to report information about foreign subsidies in the HSR Form.

Another commenter suggested introducing a de minimis threshold so that the reporting obligation is limited to only those subsidiaries from foreign governments and entities of sufficiently large amounts to potentially distort the competitive process in markets in the United States in which the merging parties compete. Citing the EU Foreign Subsidies Regulation as an example, this commenter claimed that such a threshold would save merging parties the burden of compiling small subsidy amounts that could not be expected to result in competition concerns. The Commission acknowledges that a de minimis requirement may indeed make sense as part of the information required, but Congress did not provide for a de minimis threshold, and the Commission does not yet have sufficient data to make that determination or establish an amount at this time. Once the Agencies have begun to receive information about foreign subsidies, the Commission can revisit this issue, if warranted.

Finally, a comment from a senator and a representative noted that information about the financing activities of merging parties would also be useful in addressing a host of national security challenges and encouraged the Agencies to share such information with other governmental bodies, including Congressional committees. The Commission agrees the Agencies should facilitate this kind of information sharing to the extent permitted by current law, regulations, guidelines, and practices governing information sharing within the Federal government.

### 2. Defense or Intelligence Contracts

The Commission proposed creating a Defense or Intelligence Contracts section that would require filing persons to

report information related to certain contracts with defense or intelligence agencies to speed up outreach to those agencies related to the reported transaction. As proposed, both the acquiring and acquired person would have been required to identify whether they have existing or pending procurement contracts with the Department of Defense (''DoD'') or Intelligence Community (''IC''), as defined by 10 U.S.C. 101(a)(6) and 50 U.S.C. 3003(4), valued at $10 million or more, and provide identifying information about the award and relevant DoD or IC personnel. The Commission reasoned that for filings from companies that supply DoD or IC with products or services, this information would greatly enhance the Agencies' ability during the initial waiting period to identify and contact appropriate stakeholders within DoD or IC to seek their input as customers that might be impacted by the proposed transaction and to speak to knowledgeable experts about the products or services provided to the government by the parties. As discussed below and in response to concerns raised in public comments, the Commission adopts the proposal with modification.

The Commission received several comments on this proposal. One commenter stated that the Commission provides limited explanation of its authority or justification for this proposed requirement and that it does not explain its focus on these agencies. The Commission responds that it proposed special reporting requirements for the defense and intelligence agencies because they are often the only customer for products and services offered by defense companies, and a thorough review of these transactions is a priority for the Agencies. Products and services sold to DoD or the IC are often unique and not sold to any other customer. As noted in the NPRM, the Agencies regularly review filings from companies that supply the DoD or the IC with products or services, and it is important for them to be able to quickly contact DoD and IC staff to collect key insights and information to prevent mergers that may have an anticompetitive impact. A recent study by the General Accountability Office highlights the importance of DoD's input to the Agencies regarding potential competition risks to the defense industrial base and DoD programs.[392] The Agencies have relied

on interactions with DoD personnel, and to a lesser extent IC personnel, to investigate and challenge defense mergers over the years. Without information about specific DoD or IC contracts or knowledge of which unit handles that contract, the Agencies often face difficulty and delay in identifying appropriate relevant personnel or stakeholders with knowledge of the contracts, programs, or products or services at issue.

Any delay in identifying the right DoD or IC personnel with deep knowledge of complex and highly sensitive programs hinders the Agencies' ability to identify and fully assess competition issues in the reported transaction that would impact DoD or IC programs or budget. The Commission has determined that to be fully proactive about these concerns, and to seek DoD or IC input at an early stage of the inquiry, parties with certain pending or current DoD or IC contracts need to provide that information with their notification. Although the Agencies are also attentive to any merger that may affect purchases by other parts of the government, these transactions involve products and services that are also sold to commercial customers and can be investigated using our standard approach.

Beyond this comment on the general focus of the requirement, commenters addressed three primary areas of concern: vagueness, confidentiality, and the burden of compliance. First, commenters expressed concern about the lack of clarity in the proposed rule, for instance pointing out that neither the NPRM nor the cited statutes define what constitutes a ''pending'' procurement contract. This commenter suggested that, to avoid this ambiguity, the new rule should apply only to active procurement contracts, not pending contracts. The Commission agrees there is a need to clarify which contracts should be reported and modifies the Final Rule to require reporting for (1) pending proposals submitted to the U.S. Department of Defense or any member of the U.S. intelligence community, as defined by 10 U.S.C. 101(a)(6) or 50 U.S.C. 3003(4), and (2) awarded procurement contracts with the U.S. Department of Defense or any member of the U.S. intelligence community, as defined by 10 U.S.C. 101(a)(6) or 50 U.S.C. 3003(4). The Commission declines to limit the reporting requirement to active contracts only. Submission of a proposal indicates that the filer is a competitor, regardless of

---

[392] *See* U.S. Gov't Accountability Office, Defense Industrial Base: DOD Needs Better Insight into

Risks from Mergers and Acquisitions 28 (Oct. 2023) (GAO–24–106129).

whether it is ultimately awarded the contract. The Commission believes that these changes address some of the ambiguities raised by commenters.

According to one commenter, it is not clear what method of valuation should be used to determine if a contract is valued at $10 million or more, particularly for open-ended supply contracts. First, as discussed below, the Commission increases the threshold to $100 million. Second, the Commission clarifies that filers should use the maximum estimated quantity or value in their proposed or awarded prices to determine the estimated value of the contract. Otherwise, filers should use reasonable judgment in determining how to value their contracts and may explain the method of valuation used.

With respect to confidentiality concerns, one commenter stated that it is not clear how a company may provide this information without violating Federal laws and regulations restricting the dissemination of such sensitive information. Commenters proposed suggestions to avoid such conflicts. For instance, one suggested that the proposed instruction should be clarified to exclude any contracts that are classified or otherwise subject to a government-imposed duty of confidentiality. Another recommended that the Agencies consider the appropriateness and potential applicability of a national security exception to certain requirements within this proposed rule.

As an initial matter, the Commission notes that there is nothing in the HSR Act that overrides the protections due classified information, and the Commission specifically intends to not require the submission of classified information. To alleviate concerns about the sensitivity of the information related to these contracts, the Commission revises the Instructions to expressly state that parties should not include classified information but that they should note when responsive information is withheld on that basis. The Commission believes that this modification addresses the concerns raised in the comments and preserves protections for classified information. The Commission declines to adopt the proposal to exclude any contracts that are classified or otherwise subject to a government-imposed duty of confidentiality. The fact that the parties have submitted a proposal in response to a request from DoD or the IC or have an existing contract is not classified information. Such an exclusion is overbroad and would not allow the Agencies the benefit of reviewing non-classified information related to these

pending proposals or active contracts. The Commission believes that the revision stating that parties should not include classified information in their submissions addresses this issue. For the same reason, the Commission declines to adopt the proposal to create a national security exception to the rule. The confidentiality provisions of the Act provide sufficient protection for any confidential but unclassified information about these documents. The Commission additionally notes that many of the products and services the Agencies investigate have similar national security implications even if they involve customers other than DoD or the IC.

As to the burden of complying with this requirement, one commenter noted that the requested information is often not maintained in the ordinary course of business, nor is it created in the course of a deal negotiation, and that due to confidentiality concerns, these data are often not centrally maintained and may not be known, even among senior leadership. To limit the burden, one commenter recommended that the requested information be limited to those DoD or IC contracts with a primary NAICS code for which the filing parties have identified NAICS overlaps or that the Agencies obtain this information from the Federal Procurement Data System.

To reduce the cost of complying with this request, and in light of the general concern that classified materials are not widely known or shared, the Commission makes two significant modifications to limit the scope of this requirement. In line with the proposal above, the Commission limits the set of responsive contracts to those involving a 6-digit NAICS industry code overlap or a product or service described in the Overlap Description or the Supply Relationships Description. The Agencies' need for information about pending or active DoD or IC contracts is directly related to the specific antitrust risks associated with the transaction, and limiting this information in this way targets the most relevant contracts, if they exist. In addition, in response to concerns that the $10 million de minimis level will require reporting for purchases by DoD or the IC of mundane products and services, rather than critical defense purchases, the Commission has determined to increase the de minimis threshold for these contracts from $10 million to $100 million. The Commission believes that this is the appropriate threshold for limiting this request to products that are uniquely sold to the DoD or the IC. The Commission declines to make any

modification in response to the suggestion that the Agencies get this information from the Federal Procurement Data System. It is not feasible for the Agencies to rely on discovering critical DoD or IC proposals or contracts from this database for the purpose of identifying key personnel at those agencies and obtaining information about complex products and services during the initial waiting period. This information is known by the parties and easy to verify, especially with the limitation that the contracts be worth more than $100 million annually. Contracts or commitments of this size are likely subject to close monitoring.

In addition, to further reduce the burden of this requirement, the Commission excuses select 801.30 transactions from reporting information related to DoD or IC proposals or contracts. These transactions do not involve an agreement between the parties.

Finally, two commenters noted a typographical error in the proposed Instructions: the reference to 50 U.S.C. 3033(4) should refer to 50 U.S.C. 3003(4). The Commission revises the instructions to correct the typographical error noted by the commenters.

In sum, the Commission has determined that the reporting requirements for pending proposals and active contracts with DoD or the IC contained in the final rule are necessary to provide the Agencies with the ability to identify transactions in which the merging parties are providing critical products or services to the government and to quickly reach out to those agencies for their input. The requirement, as modified, has been appropriately tailored to reduce the cost of reporting as much as practicable.

3. Voluntary Waivers

The Commission proposed amending the Instructions to allow filing persons to waive the confidentiality provision contained in the Act, 15 U.S.C. 18a(h), for any non-U.S. competition authorities or State Attorneys General they identify. As stated in the NPRM, allowing filers to waive the confidentiality protections in the HSR Filing would provide an efficient mechanism for filers to consent to limited waivers of confidentiality at the outset of any agency review to facilitate early cooperation among competition enforcers. The proposed voluntary waivers would allow the Agencies to disclose the existence of an HSR Filing and the information contained in the HSR Filing, but only for those non-U.S. competition authorities or State Attorneys General identified by the filing person. The

Commission also proposed modifying the language that would inform filers about potential disclosures based on the waivers to track the language of the Act more closely. As discussed below, the Commission adopts this proposed change with modifications.

The Commission received three comments addressing this proposal. A group of State Attorneys General, who would be the recipients of HSR-related information if filers granted access on a voluntary basis, encouraged the Commission to consider three changes. First, they proposed requiring filing persons to identify the relevant States where the parties do business, regardless of whether they opt to provide waivers or check the box. Second, they encouraged the Agencies to, by default, disclose to the public the fact of filing and the expiration date of the waiting period. They argued that nothing in the HSR Act requires that the fact of filing and the waiting period be kept confidential and that this information should not be treated as such. The comment urged the Agencies to exercise their authority to disclose this information to the public or to the States. They recommended that to avoid disclosure, the parties should have to provide a basis for keeping the fact and timing of the filing confidential. If the Agencies adopted the second proposal, they also encouraged the Agencies to include a check box to allow parties to waive confidentiality of the information and documents filed with the notification so that these materials could be shared with affected States. Third, if the Agencies chose not to adopt the above recommendation regarding public disclosure, the State antitrust enforcers suggested disaggregating the check box into two separate boxes, one to allow disclosure of the fact of filing and the associated waiting period and another to allow sharing of the information and documents in the filing with affected State Attorneys General. They stated that disaggregating the check box increases the likelihood that States at least receive notification of the transaction.

The Agencies have historically not publicly disclosed or provided to the States or international enforcers information regarding HSR filings, including the fact that a filing was made and the waiting period, in the absence of a waiver from the parties. Without weighing on the merits of the States' legal arguments regarding the scope of the HSR Act's confidentiality protections, the Commission at this time believes it is appropriate to maintain its prior practice. The Commission does

adopt the States' suggestion to disaggregate the waiver check boxes, which would allow for greater flexibility in providing the Agencies consent to disclose and provide filers with the option to disclose some information but not all information contained in the HSR Filing.[393] The waiver would apply only to those non-U.S. competition authorities or State Attorneys General selected by the filing person. The Commission declines to adopt the proposal by the State antitrust enforcers to require parties to identify the relevant States where they do business, regardless of whether they waive confidentiality. The Commission will likely receive much of this information through the new requirements contained in the final rule.

The Commission received two other comments on this proposal. One commenter expressed concern about confidential information becoming publicly known once it is shared more widely due to the increased risk of leaks. On this point, the Commission notes that these waivers are voluntary. The parties can decide not to waive confidentiality if they have concerns about confidentiality. Further, the Agencies take seriously the confidentiality requirements of the Act and require law enforcement colleagues to abide by these protections. In the many decades of case cooperation pursuant to voluntary waivers, these protections have worked to prevent improper disclosures. The Commission believes that concerns about an increased risk of leaking due to the option to waive confidentiality at the time of filing are unfounded.

Finally, according to one commenter, the proposed rule appears to contemplate a single check box that does not permit notifying parties to communicate their willingness to waive confidentiality as to some international competition authorities but not as to others. The Commission notes that this commenter misunderstands the requirement and clarifies that the voluntary waiver will only apply to those jurisdictions that the party affirmatively indicates in the HSR Filing. In addition, failure to check either box or indication of only a few jurisdictions for waivers does not prevent the parties from providing these waivers or adding jurisdictions later.

---

[393] The Commission's implementation of this suggestion differs from the text proposed by the States. The Commission does not adopt the States' suggestion, with respect to the fact of filing and the waiting period, that, in order to prevent disclosure, the parties be required to affirmatively check a box and provide a basis for keeping the information confidential.

The inclusion of these waiver options in the Form is simply meant to serve as an efficient mechanism for filers to provide their clear consent at the outset even if only on a limited basis.

The Commission did not receive any comments regarding the proposal to modify the language informing filers about potential disclosures based on the waivers to track the language of the Act more closely. Thus, the Commission adopts this change as proposed.

In sum, the Commission has determined that offering the option for parties to waive the confidentiality provisions of the Act to allow for the sharing of HSR materials with non-U.S. jurisdictions or State enforcers in the final rule will provide a benefit to the Agencies in facilitating case cooperation at an early stage in the Agencies' assessment of antitrust risk. The option, as modified, has been tailored to provide a clear choice for filers who wish to facilitate the sharing of information by providing a waiver.

### 4. Identification of Communications and Messaging Systems

In conjunction with the proposed requirement that filing persons certify they have taken steps to prevent destruction of relevant information, as discussed in section VI.L., the Commission also proposed that filers identify and list all communications systems or messaging applications on any device used by the filing person that could be used to store or transmit information or documents related to its business operations. The Commission does not adopt this proposal.

In the proposed rule, the Commission reasoned that, as companies have increasingly been relying on new forms of communication to do business and make key operational decisions, these communications systems have become an important part of the Agencies' investigations. In the Agencies' experience, these systems contain highly relevant information on the transaction itself, as well as on topics that are critical for the Agencies' assessment of the transaction such as competition, competitors, markets, customers, and industry characteristics. Nevertheless, many parties do not appear to fully understand or comply with document preservation obligations for these new modalities.

The Commission received several comments on this proposal, mainly regarding the burden of the request and its utility in screening for anticompetitive transactions during the initial waiting period. Multiple commenters expressed doubt about the Commission's assertion that this

information is readily available to the filing person and that identifying these systems would impose minimal burden. One association of antitrust practitioners noted that because there is no limitation on the requirement, large or diffuse organizations may have hundreds of communications systems that would require identification but are unknown or unused by the filing person's employees who are involved in preparing the HSR filing. One commenter also flagged the inevitable complications caused by, for example, special IT systems, legacy IT systems, and individual employees who do not follow corporate IT policies. According to another, the process of gathering this information often requires the expertise of counsel and entails interviews of key employees as well as a careful review of company practices and policies. As a result, this commenter stated that the burdens associated with the additional requirements would fall more harshly on small companies that are not equipped to navigate the regulatory process. In addition, comments also objected that the information requested would not assist the Agencies in determining whether to issue a Second Request. They noted that the identification of these systems is best reserved for the transactions that are investigated as is the Commission's current practice when issuing Second Requests.

After carefully considering these comments, and as part of its overall effort to reduce burden on filing parties, the Commission does not adopt this proposal. The Commission notes, however, that the Agencies have taken steps to update their guidance related to obligations to preserve ephemeral messages and similar communications systems, and have provided language in the Model Second Request to reflect document production and retention obligations for these communication systems.[394] Based on this guidance, companies that take steps to preserve information related to these communications systems may reduce the likelihood that they will face

consequences for non-compliance with a Second Request.

*L. Certification*

Each HSR Filing is accompanied by a notarized certification, signed by the person preparing or supervising the preparation of the filing. The person signing the certification attests to the veracity of the information submitted in the filing. The Commission proposed amending this certification to require filers to affirm that they have taken the steps necessary to prevent the destruction of documents and information relevant to the transaction. The Commission also proposed adding language to the Instructions to remind filers that criminal statutes prohibit practices that impede or frustrate functions of government agencies, such as submitting false information. This proposal would require most HSR filers to establish new document retention policies or revise existing policies prior to filing. As explained in the NPRM, the deletion of information or documents that could be called for in a Second Request could lead to a loss of information critical to the Agency's ability to conduct an in-depth investigation.

The Commission received approximately ten comments on this proposal. Some commenters noted that the proposed rule would expand document preservation beyond current law, which obligates parties to preserve documents and information related to an ongoing or anticipated government investigation[395] or if they have a reasonable anticipation of litigation.[396] Commenters noted that very few filers have an obligation to preserve information about the transaction since they are not yet under investigation and do not have a reasonable anticipation of litigation.

Commenters also described the burden, particularly the cost, associated with document preservation obligations. Several commenters explained that litigation holds are expensive and difficult to design and implement, especially concerning the breadth of documents and information that would

be subject to a hold. One commenter noted that a document hold does not simply encompass the suspension of auto-delete policies, can be difficult and expensive to implement with precision, and typically extends to individuals, databases, communication systems, and materials beyond the scope of the transaction. Another pointed out that data is expensive to store and that filers would be required to retain documents that cover large components of their day-to-day operations. According to one commenter, at the time of filing, the notifying party may not know enough about what issues will be of interest to the Agencies to identify a set of custodians who are likely to have information related to the proposed transaction.

After carefully considering the comments, the Commission has determined not to adopt this proposal. The Commission notes that, under current law, when litigation is reasonably foreseeable, parties have an obligation to preserve documents relating to the proposed transaction. This obligation could arise before or after HSR filing. In addition, it is a Federal crime for any person to knowingly alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence an ongoing or anticipated Federal investigation.[397]

The Commission also received a few comments on the addition of language reminding the filer of potential criminal liability under other Federal statutes that prohibit various deceptive practices aimed at frustrating or impeding the legitimate functions of government departments or agencies. Commenters raised general concerns about how this language could alter how filers prepared their notification. One commenter stated that when read together with the requirement to preserve documents, the reminder of criminal penalties would prevent filers from instituting a tailored legal hold. Another stated that it seems to suggest that filers should fully expect a harsh and punitive response to filing errors. Commenters primarily noted that the added language merely restated existing law. Given that the proposed certification on criminal liability does not increase the burden or cost of filing and may have a benefit of putting some unaware filers on notice of possible criminal penalties, the Commission adopts this proposal as a simple restatement of existing penalties.

---

[394] *See* Press Release, U.S. Dep't of Justice, ''Justice Department and FTC Update Guidance that Reinforces Parties' Preservation Obligations for Collaboration Tools and Ephemeral Messaging'' (Jan. 26, 2024), *https://www.justice.gov/opa/pr/justice-department-and-ftc-update-guidance-reinforces-parties-preservation-obligations. See also* Fed. Trade Comm'n, ''Slack, Google Chats, and other Collaborative Messaging Platforms Have Always Been and Will Continue to be Subject to Document Requests,'' Fed. Trade Comm'n Competition Matters blog (Jan. 26, 2024), *https://www.ftc.gov/enforcement/competition-matters/2024/01/slack-google-chats-other-collaborative-messaging-platforms-have-always-been-will-continue-be-subject.*

[395] Federal law provides serious criminal penalties, including up to twenty years imprisonment, for any person who knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence an ongoing or anticipated Federal investigation. *See, e.g.,* 18 U.S.C. 1519.

[396] *Zubulake* v. *UBS Warburg LLC,* 220 FRD. 212, 218 (S.D.N.Y. 2003) (holding that once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents).

[397] *See* 18 U.S.C. 1519.

*M. Affidavit*

As discussed in section V.D., the Commission proposed requiring filings for transactions without definitive agreements to include a term sheet or draft agreement that describes with specificity the scope of the transaction that would be consummated. In conjunction with that proposal, the Commission also proposed that parties making such filings attest in their affidavit that a term sheet or draft agreement that describes with specificity the scope of the transaction that will be consummated has been submitted with the executed letter of intent or agreement in principle.

As described above, the Commission modified the proposal and has made a conforming change to this section of the Instructions as part of the final rule.

**VII. Severability**

In the NPRM, the Commission noted that § 803.90 contains a separability (or severability) provision such that, if any provision of the Rules (including the Form) or the application of any such provision to any person or circumstance is held invalid, the other provisions of the Rules and their application to other persons or circumstances shall be unaffected.

The Commission did not propose any changes to the severability provision in § 803.90 and does not adopt any changes. However, as it did in the NPRM, the Commission confirms its intent that, if a court were to invalidate any provision, any part of any provision, or any application of the final rule, the remainder of the final rule would remain in effect to the greatest extent possible. The Commission's general view is that each substantive requirement of the final rule is severable from each of the others. The Agencies need the information requested by the final rule for the reasons discussed above. Each requirement in the final rule serves an important, related, but distinct purpose and provides a distinct benefit separate from, and in addition to, the benefit provided by other requirements. However, if a court finds that certain provisions are invalid, the following analysis applies.

The Commission notes that some reporting requirements are contingent upon filers reporting overlapping products or services in (1) the Overlap Description; (2) the Supply Relationships Description; and (3) the same NAICS codes. The severability of these reporting requirements are as follows:

Officers and Directors

If product or service overlaps are identified in the Overlap Description or Supply Relationships Description, the final rule requires the acquiring person to list officers and directors (or in the case of unincorporated entities, individuals exercising similar functions), and those who have served in the position within the past three months for each entity within the acquiring person responsible for the development, marketing, or sale of products or services that are identified as overlaps and who have also served in these roles with the target. The Commission does not view this requirement as severable from the Overlap or Supply Relationships Descriptions. However, the Commission's view is that the two other reporting requirements regarding Officers and Directors are severable and would remain if the Overlap or Supply Relationships Descriptions are held invalid. These are the requirements to (1) list all individuals likely to serve as, nominate, or appoint an officer or director of the acquiring entity (and the accompanying requirements); and (2) for each officer and director identified, list all other entities operating in commercial activities in the same NAICS codes reported by the target for which the individual currently serves as an officer or director. The Agencies need the information in the first requirement for the reasons discussed above in sections II.B.1. and VI.D.3.c., and this first requirement would not be affected by invalidation of the Overlap or Supply Relationships Descriptions. With respect to the second requirement, the Commission has long required reporting of NAICS code information, and the reporting of NAICS code information stands independent of, and can operate separately from, the Overlap or Supply Relationships Descriptions. The changes the Commission has finalized here are modest and do not significantly alter the existing requirement to report certain NAICS code information. Accordingly, the Commission believes that the requirement to report certain officer and director information in any identified NAICS code overlap would stand even if either (1) the Overlap or Supply Relationships Descriptions were held invalid, or (2) any of the final rule's changes regarding NAICS code reporting were invalidated.

Prior Acquisitions

Filers (both acquired and acquiring persons) are required to report certain information regarding prior acquisitions

that (1) derived revenue in an identified NAICS code overlap or (2) provided or produced an overlap product or service as described in the Overlap Description. If the Overlap Description is invalidated, the Commission does not view the second part of the Prior Acquisitions reporting requirement as severable from that reporting requirement. However, the first requirement regarding derived revenue in an identified NAICS code overlap would remain in place, for the same reasons discussed previously in connection with the severability of the Officers and Directors requirement.

Defense or Intelligence Contracts

Filers are required to identify (1) proposals submitted to the U.S. Department of Defense or any member of the U.S. intelligence community, and (2) awarded procurement contracts with the U.S. Department of Defense or any member of the U.S. intelligence community, valued at $100 million or more, that (A) are or will be the source of revenues in any identified NAICS code overlap or (B) involve or will involve an overlapping product or service identified in the Overlap Description or the Supply Relationships Description. If the Overlap or Supply Relationships Descriptions are invalidated, the Commission does not view the portion of the Defense or Intelligence Contracts reporting requirement referring to the Overlap or the Supply Relationships Descriptions as severable from those reporting requirements. However, the portion requiring the reporting of certain information in any identified NAICS code overlap would remain in place, for the same reasons discussed previously in connection with the severability of the Officers and Directors requirement.

Annual Reports and Audit Reports for Acquiring Entities

The final rule requires the acquiring entities whose revenues contribute to a NAICS code overlap or any overlap identified in the Overlap Description to provide the most recent annual report or audit report and CIK number if annual reports are filed with the SEC. If the Overlap Description is invalidated, the Commission does not view the portion of the Annual Reports and Audit Reports requirement referring to the Overlap Description as severable from the requirement to provide an Overlap Description. However, the portion requiring annual reports or audit reports relating to NAICS code overlap would stand, for the same reasons discussed previously in connection with the

severability of the Officers and Directors requirement.

Author Information for Business Documents

For Business Documents, if (1) a NAICS code overlap has been identified, (2) an overlap within the Overlap Description has been identified, or (3) a supply relationship within the Supply Relationships Description has been identified, filers must provide certain information about the author of the documents. If the Overlap or Supply Relationships Descriptions are invalidated, the Commission does not view the portions of the Author Information requirement referring to those descriptions as severable from the Overlap and Supply Relationships Descriptions requirements. However, the portion requiring the reporting of author information if a NAICS code overlap has been identified would stand, for the same reasons discussed previously in connection with the severability of the Officers and Directors requirement.

The Commission views all remaining provisions, parts of provisions, and applications of the final rule not specifically identified as non-severable above to be severable. These reporting requirements would have been adopted individually regardless of whether the other reporting requirements were adopted and could function effectively without the other provisions. If a reviewing court were to stay or invalidate any reporting requirement (or part or application thereof) not identified as non-severable above, the Commission states its intent to have adopted the remainder of the final rule.

## VIII. Paperwork Reduction Act

On June 29, 2023, the Commission published its intention to submit the proposed rule and the associated Supporting Statement to OMB for review under the Paperwork Reduction Act of 1995 ("PRA"), 44 U.S.C. 3501 *et seq.*[398] The Commission emphasized that some of the proposed changes were intended to reduce the burden of filing[399] and that other proposed changes offered clarifications to the current rules and were unlikely to change the burden on filers.[400] Further, the Commission highlighted proposed changes that would require a filer to collect and report information kept in the filer's ordinary course of business

[398] 88 FR 42178, 42207–08 (June 29, 2023).

[399] *Id.* at 42,207 (*e.g.*, the proposal to report NAICS codes in ranges rather than by specific dollar amount).

[400] *Id.* (*e.g.*, the proposal to eliminate references to paper and DVD filings).

records, minimizing the burden of new collection requirements.[401] The Commission noted that many of the proposed changes would increase the burden on all filers;[402] the Commission also noted that some of the proposed changes would significantly increase the burden on only certain filers.[403]

In conducting the PRA analysis for the proposed rule, in order to estimate the projected change in burden due to the proposed changes and to provide a baseline for public comment, PNO staff consulted current Agency staff attorneys who had previously prepared HSR filings for clients while in private practice. These experienced attorneys provided estimates of how many hours the proposed changes would require, depending on the complexity of the filing at issue. To estimate an average number of additional hours, the Commission conservatively assumed that 45% of HSR filings would be highly complex and 55% would be less complex. The Commission next multiplied the average estimate of additional hours per filing (107 hours) by the 7,096 non-index HSR filings that the Commission projected it would receive in FY 2023.[404] Finally, the Commission multiplied the total hours by an estimate of the hourly rate for executive and attorney compensation ($460/hour).

The Commission received numerous public comments referencing the NPRM's PRA burden analysis. One commenter supported the analysis, noting that the increase in the estimated time required to prepare an HSR filing is "inconsequential," even "trivial" considering that these reporting requirements only apply to transactions valued at more than the reporting threshold. This commenter further asserted that it is appropriate to shift

[401] *Id.* (*e.g.*, the proposal to require the reporting of minority investors in additional entities related to the filed transaction).

[402] *Id.* (*e.g.*, the proposal to require narratives regarding transaction rationale).

[403] *Id.* (*e.g.*, filers whose businesses have existing horizontal, non-horizontal, or labor market overlaps or relationships).

[404] In January 2023, the Commission requested a three-year extension of its PRA clearance for information collection requirements related to the existing HSR rules, which was approved by OMB on February 23, 2023, through February 28, 2026 (OMB Control Number 3084–0005). *See* 88 FR 3413, 3414 (Jan. 19, 2023). At that time, FTC staff projected an average of 7,096 non-index filings per year for fiscal years 2023–2025. This estimate of 7,096 non-index filings was based on the fact that the FTC received 6,518 non-index filings in fiscal year 2022 and had experienced an average annual increase in filings of 4.3% in the pre-COVID fiscal years 2017–2019. Actual non-index filings in FY 2023 totaled 3,515. *See* Fed. Trade Comm'n & Dep't Just., Hart-Scott-Rodino Annual Report, Fiscal Year 2023 appendix A (FY 2023).

costs from the Agencies to the merging parties.

Some commenters, however, criticized the Commission's analysis for significantly underestimating the extent of the burden, and many raised concerns about the methodology employed by the Commission to calculate such burden. For instance, they raised concerns that the estimates are not based on empirical data or discussions with current practitioners; and that the Commission's methodology is non-verifiable, and thus not subject to empirical validation. They also argued that Agency staff's prior experience in preparing HSR filings is not relevant given the wholly different and new information requested under the proposed rule. One commenter called the Commission's approach biased and inaccurate, stating that there is no indication that Agency staff relied on any data when trying to create an estimate based on memories from past private practice. Additionally, several commenters also criticized the Commission's explanation of its PRA analysis. With respect to the survey of Agency staff, one commenter stated that the Commission failed to provide basic information, such as the number of staff surveyed, who these staff are, their level of experience in preparing HSR filings, when they last prepared HSR filings, and the results of the survey. Another commenter stated that it had no context for what the median might be for filings to better understand whether the low and high ends are outliers or the anticipated typical experience.

The Commission carefully reviewed the comments asserting that its analysis underestimated the extent of the cost and delay that would be imposed if the Commission adopted the proposed rule. The Commission was persuaded by commenters who asserted that the PRA analysis in the NPRM underestimated the time and expense associated with the proposed rule. To address commenters' concerns and recognizing the changes from the proposal discussed above in section II, the estimates are revised as reflected below.

As outlined in section I and discussed more fully in sections IV to VI above, the Commission has not adopted certain requirements in the proposed rule in an effort to reduce compliance costs, and has also modified other proposed requirements in a manner that reduces the burden in certain respects. Specifically, the Commission is not adopting proposals that would have required a timeline of key dates for closing the proposed transaction; organization charts; certain information about other interest holders; drafts of

submitted documents; information about employees; information about board observers; geolocation information; prior acquisitions involving entities with less than $10 million in sales or revenues or consummated more than 5 years prior to filing; and information about steps taken to preserve documents or use of messaging systems. These items were frequently cited by commenters as unduly burdensome. While this information is relevant to the Agencies' premerger assessment, the Commission has determined it can forgo requiring this information at this time. The Commission also has modified, in some instances substantially, many other proposed information requirements, which will reduce the burden on filers to collect and report this information. As a result, the information requirements contained in the final rule are significantly less burdensome than those reflected in the proposed rule, and the costs imposed on filers are thus reduced as compared to the proposed rule.

Before finalizing the changes adopted in the final rule, the Commission undertook a new survey of Agency staff that responds to comments critiquing the estimate in the NPRM and implemented several improvements to its methodology, as explained below. The Commission believes that in light of these improvements, the estimates of the incremental costs associated with the final rule are reliable and consistent with survey techniques used by others to calculate the burden of filling out a form.[405]

The new survey included 15 current FTC and DOJ attorneys who have recent experience preparing HSR filings in private practice. The Commission asked each survey participant to estimate, based on their own experience with preparing HSR Filings, the incremental change in hours that would be required to respond to each of the new and updated items in the final rule. They were also asked to estimate how much time would be saved by no longer having to provide information for current requirements that are not included in the final rule. The survey participants were provided with (1) the current HSR Form and Instructions; (2) the HSR Form and Instructions for both acquiring and acquired persons for the final rule; (3) a spreadsheet listing each of the new, updated, and eliminated items for three categories of

transactions; and (4) instructions regarding how to input their responses.

The survey participants provided estimates for the amount of time required to collect and submit information responsive to each of the new and updated items in the final rule, separately for acquiring and acquired persons, and separately for three types of HSR-reportable transactions that reflect varying levels of complexity and antitrust risk: (1) the new category of select 801.30 transactions; (2) transactions with no reportable competitive overlaps (*e.g.,* where an investment fund is buying or selling a portfolio company with no NAICS or competitive overlap or supply relationship); and (3) transactions where the parties report at least one NAICS code overlap or have an existing overlap or supply relationship (referred to below as "overlap" filings). They were asked to estimate the incremental change in costs of complying with each new and adjusted information requirement contained in the final rule in each of the categories and for each type of filer. Also, for each item, the survey participants were asked to indicate what percentage of the additional time required would be time spent by company personnel as compared to a law firm hired to prepare the HSR Filing or any third parties that would need to be hired to complete the HSR Form (*e.g.,* data vendors).

In generating their estimates, the survey participants were asked to consider all time spent to complete the HSR Form,[406] including time spent reviewing the HSR Instructions; generating and compiling the materials necessary for collection; acquiring, installing, and utilizing any necessary technology or systems; and completing and reviewing the collected information, among other tasks. They were also asked to consider whether filers would need to incur additional costs not necessarily measured in hours, *e.g.,* the costs associated with new IT investments, long-lived facilities or equipment, related one-time expenditures, and other non-labor

expenditures, such as attorney training or general HSR resources.

The Commission took several steps to increase the reliability of its survey. First, to reduce sampling bias as much as possible, the Commission relied on Agency staff who have not been involved in this rulemaking and thus have no more familiarity with the changes to the HSR Form and Instructions than an attorney in private practice would have. As exclusion criteria, the Commission did not survey any staff from the FTC's Premerger Notification Office, nor any staff at either Agency who were part of the core team responsible for drafting the final rule.

Second, the survey participants were asked to provide details about their experience preparing HSR filings in private practice, both in terms of how many years they were in private practice and the number and types of transactions involved. Collectively, the survey participants had experience with each of the three types of HSR-reportable transactions described above. Based on the information provided, the survey participants with the most experience tended to generate a lower estimated number of hours than the average.

The Commission believes that, with these controls, the individuals who provided estimates for the PRA burden assessment had sufficient experience with the current HSR reporting requirements and enough understanding of the HSR Rules and practice to make their estimates of incremental costs reliable.

Based on the survey responses, the Commission finds that the average number of additional hours required to prepare an HSR filing with the changes outlined in the final rule is 68 hours, with an average low of 10 hours for select 801.30 transaction filings by the acquired person and an average high of 121 hours for filings from acquiring person in a transaction with overlaps or supply relationships. As noted, however, the estimate varies significantly based the type of filings, with filings that are more likely to raise antitrust risk requiring higher hours.

To calculate the average number of additional hours, the averages of the estimates provided by respondents were calculated separately for each change for both the acquiring and acquired person within each category of transaction. These averages were then summed by category of transaction and then divided by two to provide category-specific estimated averages for an individual filer to comply with all changes. The overall average estimate for an

---

[405] This same survey technique, asking experienced HSR practitioners to estimate the time required to comply with the new information requirements in addition to other costs, was used in the Kothari Report, discussed below.

[406] The Commission notes that parties to acquisitions, whether HSR-reportable or not, may hire antitrust counsel to assess whether the transaction would violate any of the antitrust laws. This is a different task from evaluating whether a transaction requires notification pursuant to the HSR Act, and if so, how to comply with the Form and Instructions. The final rule does not require any information from attorneys or any other advisors to assess the antitrust risk of the transaction. As a result, any cost related to the assessment of the potential for a substantive antitrust risk, rather than compliance with the information requirements of the Form and Instructions, are not costs attributable to the final rule and are not included in this PRA analysis.

individual filer was calculated as a weighted average of these category-specific estimates for an average filer, using as weights the Agencies' estimate of the fraction of filings that fall into each of the three categories. Specifically, the Commission estimates that 8 percent of filings will meet the definition of a select 801.30 transaction,[407] 45 percent will have a NAICS code overlap or an overlap or supply relationship identified in the Competition Descriptions section, and 47 percent of filings will have no overlaps or supply relationship.

One commenter commissioned a report (the Kothari Report, referenced in section III.C.2.) to estimate the additional monetary costs of the proposed rule and relied on a survey of company and private counsel to estimate the time required to comply with the new requirements of the proposed rule as compared to the current rules.[408] From the responses to this survey, the Kothari Report estimated that the proposed rule as published in the NPRM would have added 101.6 hours of internal personnel time and 140.3 hours of outside counsel time above the current requirements for a total incremental increase of 241.9 hours. Although this estimate is substantially higher than the estimate based on the Commission's new survey, the Kothari Report estimated costs for the proposed rule, and may have included costs related to advocacy about whether a transaction violates an antitrust law, rather than only costs related to collection and submission of information required by the Form and Instruction, as indicated by its inclusion of costs of economic experts. In contrast, the Commission has estimated the additional time attributable to the less burdensome requirements of the final rule and has included in its estimates only that time that is required to complete an HSR Filing that is fully compliant with the Act and the Rules. Given the significant modifications from the proposed rule to the final rule that lessen the estimated burden, the Commission finds the results of its new survey to be generally consistent with

the survey relied on in the Kothari Report.

Several commenters also questioned the hourly rate that the Commission relied on to calculate the estimated cost of compliance. One commenter stated that the Commission's estimate of $460 per hour may underestimate the blended hourly rate applicable to most HSR filings, particularly given attorney billing rates and that such filings often require senior executive participation. Another noted that the rate is below the nationwide average hourly rate for M&A attorneys. Others objected to the lack of support for the previously assumed hourly wage and description of how the Commission calculated the assumed hourly wage. One commenter suggested that a more realistic average rate for outside counsel is $936 per hour; however, no law firm that submitted comments specified a different hourly rate that should be applied.

The Commission has carefully reviewed and considered the comments submitted regarding the hourly rate and has determined to apply a blended hourly rate of $583. To reach this number, the Commission consulted additional resources regarding the rates for outside counsel and in-house personnel. In an effort to make as few assumptions as possible, the Commission used current data from reliable, publicly available sources. Although the actual rates charged by HSR practitioners (and attorneys generally) are not typically publicly available (and no commenter provided actual rates), the Commission reviewed public media and industry reports to determine a range of approximate values that would realistically reflect the costs to prepare an HSR filing.

The ELM Solutions 2023 Real Rate Report published by Wolters Kluwer reports data regarding the 2023 hourly rates charged by corporate M&A attorneys.[409] According to the report, at firms with more than 1,000 lawyers, the nationwide mean rate charged by partners in 2023 was $1,254 per hour and the nationwide mean rate charged by associates in 2023 was $781 per hour. At firms with 501 to 1,000 lawyers, the nationwide mean rate charged by partners was $1,213 per hour and for associates it was $801 per hour.

At firms with 201 to 500 lawyers, the nationwide mean rates were $786 per hour for partners and $519 per hour for associates.

The Commission notes that HSR filings are not typically prepared exclusively by M&A law firm partners or exclusively by M&A associate attorneys. As a result, relying on one mean rate or the other would be inappropriate. The WK 2023 Real Rate Report indicates that with regard to corporate M&A matters from 2020–2023 that resulted in 40–100 total billed hours, approximately 45% of the hours billed were at the partner hourly rate, and approximately 49% of the hours billed were at the associate hourly rate.[410] The report further notes that approximately 7% of the hours billed were at a lower paralegal hourly rate.[411]

The Commission further notes that HSR filings are not prepared exclusively by the largest law firms, nor is it necessary for filers to engage such counsel. To account for filings prepared by small to mid-sized firms, the Commission calculated blended rates for both partners and associates by weighting the nationwide mean rates for firms with more than 1,000 lawyers (67%) and firms with 201 to 500 lawyers (33%). Applying the billing percentages in the WK 2023 Real Rate Report to those blended rates, the Commission calculated a blended rate for outside counsel of approximately $878 per hour.

To generate an overall blended rate, the Commission also accounted for the cost of client time spent preparing the filing, which could include a range of employees depending on the type of business and may include in-house counsel. The Commission has factored in an hourly rate for in-house personnel of approximately $140 per hour, which reflects current wage data reported by the Bureau of Labor Statistics.[412] Additionally, the Commission believes that 60% of the time required to prepare

[407] Estimated based upon a review of HSR Filings from fiscal years 2018 through 2022.

[408] Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684. The Kothari Report reflects the results of a survey of antitrust practitioners conducted by the Chamber of Commerce seeking input on the proposed rule as well as the Agencies' draft merger guidelines. *See* U.S. Chamber of Com., "U.S. Chamber HSR/Merger Guides Practitioner Survey" (Sept. 19, 2023), *https://www.uschamber.com/finance/antitrust/antitrust-experts-reject-ftc-doj-changes-to-merger-process*. The Kothari Report was prepared by Professor S.J. Kothari and is appended to its comment at 54–85.

[409] Wolters Kluwer's ELM Solutions, 2023 Real Rate Report (2023). *See also* Ctr. Ethics & L. Prof. at Geo. L. & Thomson Reuters Inst. 2024 Report on the State of the US Legal Market 11–12 (Jan. 8, 2024) (discussing rise in law firm worked rates over the past five years as well as the counterinfluence of billing realization practices); Andrew Maloney, "Where Are Partner Billing Rates Surging the Most in Big Law?," Am. L. (May 24, 2023) (noting a 2023 median hourly rate for M&A partners of $955 per hour).

[410] Wolters Kluwer's ELM Solutions, *supra* note 410, at 214.

[411] Instead of separately estimating a paralegal hourly rate, the Commission conservatively estimated that the remaining 7% assigned to paralegals in the WK 2023 Real Rate Report would be work performed at the associate's hourly rate.

[412] This assumed hourly rate is based on the median wage for lawyers, which according to the Bureau of Labor Statistics was $70.08 in 2023. *See https://www.bls.gov/ooh/legal/lawyers.htm*. The Commission doubles this number to reflect the lost productivity of the worker. The Commission notes that a company's top executives may also participate in preparing or reviewing the filing; however, since the median wage for top executives was $49.92 in 2023, to be conservative the Commission values top executive time at the same rate as lawyer time. *See https://www.bls.gov/ooh/management/top-executives.htm*.

**89334** **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

the HSR filing is time spent by outside counsel and 40% is time spent by the client. These percentages are supported by survey results from Agency staff and are also consistent with the survey results in the Kothari Report. By weighting the hourly rates for outside counsel and in-house personnel accordingly, the Commission calculates an overall blended rate of $583 per hour. This adjusted hourly rate generally reflects publicly available information; however, it does not reflect real-world factors that would likely drive down the overall cost of preparing an HSR filing under the final rule (*e.g.,* client-negotiated rates, discounts, write-offs, alternative fee agreements, and work shifted to paralegals and other support staff at substantially lower rates).

Multiple commenters cited to the Kothari Report as providing a better estimate of the additional costs of the proposed changes and concluding that the true cost of the proposed rule may be many times greater than the NPRM suggested. But the Commission has accounted for many of the same costs in its own estimates, such as the time required from outside counsel, in-house counsel, and business personnel. Much of the difference in estimates is attributable to the higher hourly rate applied to the required hours, which the Kothari Report suggests is more likely $936 per hour, and a category of "other" costs that is nearly one-third of the total projected costs.[413] These additional costs are attributable to "other external costs" that include economic consultants, investment bankers, and data vendors.

The Commission does not believe that there will be this level of additional costs outside of internal personnel and outside counsel. In particular, completing the new requirements contained in the final rule should not require the services of economic consultants or investment bankers. As described above, the Form and Instructions require information from the parties' own records. The Commission specifically is not seeking an analysis or post-hoc rationales developed by external parties. As for data vendors and similar services for the collection and production of the required information, in its new survey of Agency staff, the Commission asked the survey participants to indicate for

each item the percentage of time that should be allocated to third parties that they did not otherwise attribute to time spent by outside counsel. Only a few of the survey participants indicated any need for third-party involvement—and even for those few, they estimated only a small percentage of time for a limited set of items (*e.g.,* for translations). As a result, there is no basis to further adjust the Commission's estimates to account for "other" external costs.

Commenters also objected that the Commission failed to consider the indirect costs to the economy that would result when parties are discouraged from pursuing clearly nonproblematic deals. The PRA does not require the Commission to consider potential indirect costs to the economy presented by the changes described in the proposed rule. Under the PRA, the term "burden" means time, effort, or financial resources expended by persons to generate, maintain, or provide information to or for a Federal agency, including the resources expended for (A) reviewing instructions; (B) acquiring, installing, and utilizing technology and systems; (C) adjusting the existing ways to comply with any previously applicable instructions and requirements; (D) searching data sources; (E) completing and reviewing the collection of information; and (F) transmitting, or otherwise disclosing the information.[414] Comments related to indirect costs attributable to the final rule are discussed in section III.C.

Despite these points of disagreement, the Commission notes that its estimate for the increase in the average number of hours required to prepare an HSR filing is generally consistent with the estimates put forth by commenters, including in the Kothari Report, which were based on the proposed rule but not the final rule. The Commission believes that the differences in projected total costs are mainly attributable to (1) the significant modifications that were made to the final rule as compared to the proposed rule; (2) the difference in the hourly rates ($583 versus $936); (3) a category of "other" costs that unduly increased total costs by one-third; and (4) use of projected filings for FY 2023 (7,096), which the Commission now replaces in its calculation with the actual number of filings for FY 2023 (3,515). The Commission's PRA

assessment for the final rule addresses concerns raised by the commenters related to the methodology used in the NPRM.

Net Effect

The changes outlined in the final rule only affect non-index filings which, for FY 2023, totaled 3,515. As described above, the Commission estimates that the amendments to the HSR Rules and Notification and Report Form contained in the final rule could increase the time required to prepare responses for non-index filings, with an estimated average increase of 68 hours per filing. Thus, the annual estimated additional hours burden is 239,020 (3,515 non-index filings multiplied by 68 additional hours per filing). Applying the revised estimated hours, 239,020, to the updated hourly rate of $583 for executive and attorney compensation yields approximately $139.3 million in total additional annual costs for a year with that number of filings. The additional per filing cost is estimated at $39,644 (68 hours multiplied by $583 per hour). However, the Commission believes that this PRA cost estimate may overestimate the actual PRA burden. For a variety of reasons, costs for any particular transaction are likely to be different from these estimates. The final rule will result in higher costs for those transactions that present the most antitrust risk, and the PRA estimates do not take account of the substantial benefits to the Agencies, the parties, and third parties generated from a more efficient premerger review process that shifts some of the burden of information collection and reporting away from third parties to the merging parties and allows the Agencies to obtain critical business facts earlier in the initial waiting period, which in turn helps mitigate avoidable costs associated with Second Requests that might have been avoided or that were not tailored to areas of competitive concern due to insufficient information in the HSR Filing. In addition, the annual costs associated with the final rule will be directly related to the number of reportable transactions. See section III.C. Finally, any estimated additional hours burden is expected to decline over time as filers become more familiar with the HSR Form and Instructions.

The amendments are expected to impose either minimal or no additional capital or other non-labor costs, as businesses subject to the HSR Rules generally have or obtain necessary equipment for other business purposes.

---

[413] Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684 at 74–75 (other costs estimated at $102,917, added to external costs of $234,259 for a total of $313,828, with other costs 33% of total).

[414] 44 U.S.C. 3502(2); *see also* 5 CFR 1320.3(b) (defining burden); U.S. General Services Administration & Office of Management and Budget, "A Guide to the Paperwork Reduction Act: Estimating Burden," *https://pra.digital.gov/burden/*.

The Commission believes that the above requirements necessitate ongoing, regular training so that covered entities stay current and have a clear understanding of Federal mandates, but that this would be a small portion of and subsumed within the ordinary training that employees receive apart from that associated with the information collected under the HSR Rules and the corresponding Instructions.

Basis for OMB Assessment

Finally, one commenter stated that the proposed rule provides an insufficient basis for the Office of Management and Budget (OMB) to conduct the informed and accurate assessment required by the PRA. The OMB typically defers its substantive review until the final rule stage and did not provide substantive feedback on the NPRM. However, the Commission disagrees with the commenter and believes that it has provided a sufficient basis for OMB to conduct an informed and accurate PRA assessment. Based on comments it received, the Commission narrowed the information requirements in the final rule, conducted a new survey to estimate costs, and revised its PRA analysis accordingly. The Commission believes that its revised assessment provides a sufficient basis for OMB review under the PRA.

## IX. Regulatory Flexibility Act Certification

The Regulatory Flexibility Act (RFA), 5 U.S.C. 601 through 612, requires that an agency conduct an initial and final regulatory analysis of the anticipated economic impact of the proposed amendments on "small entities," unless the agency certifies that the regulatory action will not have a significant economic impact on a substantial number of small entities.[415] Pursuant to section 605(b) of the Regulatory Flexibility Act, 5 U.S.C. 605(b), the Commission certifies that the final rule will not have a significant economic impact on a substantial number of small entities.

The Commission finds that the final rule will not affect a substantial number of small entities, because small entities will be affected only when they are party to a transaction that exceeds the HSR Act thresholds, and less than 0.02% of the nation's small entities file premerger notifications in any given year. Furthermore, the economic impact on the very few small entities that are required to file is not significant, because smaller businesses generally

have fewer employees, generate fewer documents related to a transaction, and are involved in less complex transactions, all of which will minimize their costs of complying with the final rule. Further, these costs will generally account for a small fraction (less than 0.5%) of the value of the transaction. This document serves as the required notice of this certification to the SBA's Chief Counsel for Advocacy.[416]

The Commission also certified in the NPRM that the changes in the proposed rule would not, if adopted, have a significant economic impact on a substantial number of small entities. Commenters objected to the Commission's reliance on this certification and stated that the Commission failed to use the proper definition of small business or to discuss the proposed rule's impact on them.[417] The Commission responds by providing an assessment of how many small businesses are subject to the reporting requirements of the HSR Act and therefore would be impacted by the final rule. The Commission also notes that the final rule does not change which entities (including which small entities) are required to submit HSR Filings.

Under the RFA, "small entities" are defined as small businesses, not-for-profit organizations that are independently owned and operated and not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.[418] The term "small business" has the same meaning as the term "small business concern" under section 3 of the Small Business Act, meaning that it must be independently owned and operated and not dominant in its field of operation.[419] The Small Business Act permits the Small Business Administration (SBA) to specify size standards by which a business may be determined to be a "small business concern." [420] The SBA

publishes these standards at 13 CFR 121.201.

To determine whether a regulatory action will impact a "substantial number" of small entities, SBA Guidance encourages agencies to examine the number of small businesses affected by a given rule relative to the total number of small businesses in the regulated industry. The regulated industry may include the "entire universe of small businesses" where a rule's reach is economy wide.[421] That is the case here, as the HSR Rules apply broadly to the entire economy, and all persons involved in reportable transactions are required to file an HSR Form, irrespective of industry.

The SBA estimates that, as of March 2023, there were approximately 33.2 million small businesses in the United States.[422] As explained below, due to the filing thresholds Congress established in the HSR Act, the small businesses that would have to report a transaction under the HSR Act represent a tiny fraction of this number. Even under the counterfactual and extreme assumption that all of 6,288 HSR filings received in FY2022 were made by small businesses,[423] less than 0.02% (6,288 divided by 33.2 million) of all small businesses would need to file an HSR Form. Such a de minimis number of small businesses does not qualify as a "substantial number" of small entities under the SBA's Guidance.[424] In an abundance of caution, however, as detailed below, the Commission analyzed a randomized sample of the filings received in FY2022 and further estimates that the final rule will apply to less than 0.0007% of small businesses. Therefore, the final rule will

---

[415] 5 U.S.C. 605(b).

[416] *Id.*

[417] One commentor suggested that the increased information requirements will, on the margin, lead to less investment by private equity in small businesses. Such indirect effects are not the proper subject of RFA analyses. *See, e.g., Cement Kiln Recycling Coalition v. EPA,* 255 F.3d 855, 868 (D.C. Cir. 2001) (rejecting the contention that the RFA applies to small businesses indirectly affected by the regulation of other entities).

[418] 5 U.S.C. 601.

[419] *See id.* at 601(3) (cross-referencing 15 U.S.C. 632).

[420] 15 U.S.C. 632(a)(2)(A). The Commission does not expect that the final rule will impact other types of "small entities" (not-for-profit organizations that are independently owned and operated and not dominant in their fields and governmental jurisdictions with populations of less than 50,000). In the Agencies' experience, governmental jurisdictions are typically not parties to transactions

that would be subject to the HSR Act. As a result, the Commission has focused its analysis on small businesses as defined by the SBA.

[421] U.S. Small Bus. Admin., Office of Advocacy, "How to Comply with the Regulatory Flexibility Act" 21 (Aug. 31, 2017), *https://advocacy.sba.gov/ 2017/08/31/a-guide-for-government-agencies-how-to-comply-with-the-regulatory-flexibility-act/* ("Depending on the rule, the substantiality of the number of small businesses affected should be determined on an industry-specific basis and/or on the number of small businesses overall. For example, the Internal Revenue Service, when changing the tax deposit rules, would examine the entire universe of small businesses to see how many would be affected.").

[422] U.S. Small Bus. Admin., Office of Advocacy, "Frequently Asked Questions" (Mar. 2023), *https:// advocacy.sba.gov/wp-content/uploads/2023/03/ Frequently-Asked-Questions-About-Small-Business-March-2023-508c.pdf.*

[423] Federal Trade Commission, Hart-Scott-Rodino Annual Report Fiscal Year 2022, appendix A.

[424] U.S. Small Bus. Admin., Office of Advocacy, *supra* note 424, at 21 ("The interpretation of the term 'substantial number' is not likely to be five small firms in an industry with more than 1,000 small firms.").

not apply to a substantial number of small businesses.

The SBA regulations define "small business" primarily based on firm revenue or total number of employees, depending on the industry.[425] For industries where the SBA uses revenue to define "small business," the revenue thresholds vary from $2.25 million to $47 million. In other industries, the SBA definition of small is based upon the number of employees. These thresholds range from 100 to 1,500 employees. Finally, certain finance-related industries are defined as small if they have less than $850 million in assets. Each NAICS code has a corresponding SBA threshold to determine whether a business generating revenue in that code is "small."[426] In addition to these thresholds, businesses must also be independently owned and operated and not dominant in their fields on a national basis and satisfy additional criteria to be considered "small."[427]

The calculation of the size of a business must also give present effect to agreements to mergers and acquisitions, including agreements in principle.[428]

To estimate how many small entities so defined might be required to make an HSR filing, the Commission analyzed a randomly selected, statistically significant 10% sample of the filings submitted in FY 2022. Of that sample, the Commission first eliminated filings made by individuals in their individual capacity, and not as the ultimate parent entity of a business, such as for filings resulting from executive compensation. Second, the Commission used NAICS code information and financials reported by the acquiring or acquired person to determine if they qualified as a small business by revenue or assets, as applicable. For NAICS codes with thresholds based upon the number of employees, the Commission used public information or documents submitted by the filing parties to determine if they qualified as a small business based on

the number of employees. For transactions in which the acquiring person filed for control of the acquired entities, the Commission analyzed the acquiring person and acquired entities after giving effect to the change of control.[429] Additionally, because a small business must be independently owned and operated, all filings where an investment group was the ultimate parent entity of the acquiring or acquired person were coded as not small businesses. The Commission does not have information sufficient to determine whether other filers are independently owned and operated, but where the Commission lacked sufficient information to exclude a business on this basis, they were counted as a small business even if they may not truly qualify as one. As a result, the estimates below are likely over-inclusive; that is, it is likely that fewer filers were small than were coded as small in the sample.

**Table 6: Estimated Number of Small Business HSR Filers in Fiscal Year 2022**

| Estimated # of | FY 2022 (Sample x 10) | As % of Small Businesses* | As % of M&A Parties** | As % of # of HSR Filings*** |
|---|---|---|---|---|
| Small Buyers that May Remain Small After Consummation of the Transaction | 40 | 0.00012% | 0.13% | 0.64% |
| Small Targets that May Remain Small After Consummation of the Transaction | 180 | 0.00054% | 0.57% | 2.86% |
| Total # of Filers That May Remain Small After Consummation of the Transaction | 220 | 0.00066% | 0.70% | 3.50% |

\*    Small Businesses in 2022 = 33,200,000

\*\*   M&A Parties in 2022 = 31,468 (15,734 x 2)

\*\*\* Number of Filings FY2022 = 6,288

As shown above in Table 6,[430] the Commission estimates that in FY 2022, it received up to 220 filings from businesses that meet the definition of small (22 found in the 10% sample). Of these, approximately 180 (18 found in the 10% sample) were the targets of the

transaction, and 40 (4 found in the 10% sample) were the buyers. As a result, the Commission estimates than less than 0.0007% of small businesses will be affected by the final rule.[431]

This is consistent with the structure of the HSR Act, which focuses on larger

mergers, as defined by dollar value.[432] The framework of the Act established three tests that together serve to limit the applicability of the Act for small businesses: (1) the Commerce Test; (2) the Size of the Transaction Test; and (3) the Size of the Person Test.[433]

---

[425] 13 CFR 121.201.

[426] *Id.*

[427] 15 U.S.C. 632.

[428] 13 CFR 121.103(d)(1).

[429] The Commission notes that filers must attest (1) to their good faith intent to consummate a transaction, and (2) in all transactions to which 16 CFR 801.30 does not apply, that a contract, agreement in principle or letter of intent to merge or acquire has been executed. *See* 16 CFR 803.5.

[430] *See* Table 1 (showing 15,734 acquisitions in 2022).

[431] Though the SBA regulations give effect to agreements, including agreements in principle, when determining size, the Commission also analyzed whether the sample of filers might meet the thresholds if agreements resulting in a change of control were not considered. Here too, the Commission finds that the final rule does not affect a substantial number of small entities. It estimates that in FY2022 approximately 850 filers may have met the definition of small if the effect of agreements is not considered, representing less than 0.003% of small businesses in the United States,

approximately 2.70% of the estimated number of M&A parties, and 13.52% of FY 2022 HSR filers.

[432] The Commission now provides this information to give context about the reach of the Act and does not rely upon any of the HSR reporting thresholds in this certification, since it has conducted an analysis of the filing parties using the SBA's definitions of small, as described above. Therefore, the Commission does not address comments related to the RFA analysis provided in the NPRM that drew different conclusions from the statutory thresholds.

[433] 15 U.S.C. 18a(a).

## Table 7: Current HSR Form Filing Thresholds

### Size of Transaction (SOT) (as adjusted, as of March 6, 2024)

|  | SOT ≤ $119.5 M | $119.5 M > SOT ≤ $478 M | SOT > $478 M |
|---|---|---|---|
| HSR Filing required? | No | No, unless the Size of Person Test is met. | Yes |

The Commerce Test is met if either party is engaged in commerce or any activity affecting commerce.

Under the Size of the Transaction Test, no filing is required if the transaction is valued at $119.5 million [434] or less. Transactions valued between $119.5 million and $478 million only must be reported if the acquiring and acquired person also meet the Size of the Person Test. Transactions valued at more than $478 million are reportable regardless of the Size of the Person Test.

Where the Size of the Person Test applies, premerger notification is required only if (1) the acquiring person has total assets or annual net sales of $23.9 million (2024 adjusted value) and the acquired person has total assets or annual net sales of $239 million (2024 adjusted value); or (2) the acquiring person has total assets or annual net sales of $239 million (2024 adjusted value) and the acquired person has total assets (or, if it is "engaged in manufacturing," annual net sales) of $23.9 million (2024 adjusted value). If these size thresholds are not met, no filing is required. For example, in 2024, if the size of a transaction were $475 million and the acquiring person had $1 billion in assets and revenue, but the acquired person was not engaged in manufacturing and had $220 million in revenue but only $20 million in assets, no filing would be required.

The final rule also will not have a significant economic impact on small entities that are required to file. An HSR filing is not an ongoing cost for small businesses. Instead, the costs are incurred only when a small business is a party to a reportable transaction. Therefore, the Commission does not expect that the costs of complying with

the final rule will cause a significant impact on affected small businesses.

For the less than 0.0007% of American businesses that will remain small after engaging in an HSR reportable transaction, the impact will be minimal. Even in a case of a complex transaction between two small businesses where the size of the transaction was at the threshold (currently $119.5 million), the Commission estimates that the additional cost imposed by the final rule would be approximately 0.12% of the value of the transaction.[435] For the majority of transactions involving small businesses, actual costs are likely much lower and would represent an even smaller percentage of the proceeds from the transaction. For example, based upon the Commission's review of the sample of FY 2022 transactions, in some transactions involving a presumptively small business, the size of transaction value exceeded $1 billion, resulting in the additional cost of the final rule representing less than 0.015% of the transaction value for even a complex transaction.[436]

Finally, the Commission has no reason to believe that the final rule will have a significant economic impact on any entity, let alone entities that have assets or revenues substantial enough to meet the HSR Act's reporting thresholds but that nevertheless qualify as small businesses. As detailed in the final rule, the Commission estimates that the changes would result in approximately 10 to 121 additional hours per filing, depending on the complexity of the filing at issue. In the Commission's experience, smaller businesses have fewer lines of business and fewer employees, generate fewer documents related to a transaction and maintain fewer ordinary course documents, and

are involved in less complex transactions, all of which will minimize their costs of responding to the document requests contained within the final rule, to the extent their compliance is even triggered under the HSR Act's thresholds.

Accordingly, the Commission hereby certifies that the final rule will not have a significant impact on a substantial number of small entities.

## X. Congressional Review Act

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs has designated this rule as a "major rule," as defined by 5 U.S.C. 804(2).

### List of Subjects

*16 CFR Parts 801 and 803*

Antitrust.

*16 CFR Part 803*

Antitrust, Fees, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, the Federal Trade Commission amends 16 CFR parts 801 and 803 as set forth below:

## PART 801—COVERAGE RULES

■ 1. The authority citation for part 801 is revised as follows:

**Authority:** 15 U.S.C. 18a(d); 15 U.S.C. 18b.

■ 2. Amend § 801.1 by revising examples 1, 4, 5, and 6 in paragraph (d)(2) and by adding paragraph (r) to read as follows:

### § 801.1  Definitions

\*    \*    \*    \*    \*

(d) \*  \*  \*

(2) \*  \*  \*

*Examples:* 1. ABC Investment Group has organized a number of investment partnerships. Each of the partnerships is its own ultimate parent, but ABC makes the investment decisions for all of the partnerships. One of the partnerships intends to make a reportable acquisition. For purposes of the Notification and Report Form, each of the other investment partnerships, and

---

[434] When Congress passed the HSR Act, it created minimum dollar thresholds for mandatory premerger reporting. In 2000, Congress amended the HSR Act to require an annual adjustment of these thresholds based on the change in gross national product. As a result, reportability under the Act changes from year to year as the statutory thresholds adjust. The most recent adjustment became effective March 6, 2024.

[435] Estimated cost for acquiring and acquired persons combined in transactions with overlaps using highest average cost (242 hours × $583) divided by the $119,500,000 threshold.

[436] Estimated cost for acquiring and acquired persons combined in transactions with overlaps using highest average cost (242 hours × $583) divided by $1,000,000,000.

ABC Investment Group itself, are associates of the partnership that is the acquiring person. In the Minority-Held Entity Overlaps section of the Notification and Report Form, the acquiring person will disclose any of its 5 percent or greater minority holdings that generate revenues in any of the same NAICS codes as the acquired entity(s) in the reportable transaction. In this same section, the acquiring person would also report any 5 percent or greater minority holdings of its associates in the acquired entity(s) and in any entities that generate revenues in any of the same NAICS codes as the acquired entity(s). In the Controlled Entity Geographic Overlaps section of the Notification and Report Form, the acquiring person will indicate whether there are any NAICS code overlaps between the acquired entity(s) in the reportable transaction, on the one hand, and the acquiring person and all of its associates, on the other.

*    *    *    *    *

4. CORP1 controls GP1 and GP2, the sole general partners of private equity funds LP1 and LP2 respectively. LP1 controls GP3, the sole general partner of MLP1, a newly formed master limited partnership which is its own ultimate parent entity. LP2 controls GP4, the sole general partner of MLP2, another master limited partnership that is its own ultimate parent entity and which owns and operates a natural gas pipeline. In addition, GP4 holds 25 percent of the voting securities of CORP2, which also owns and operates a natural gas pipeline.

MLP1 is acquiring 100 percent of the membership interests of LLC1, also the owner and operator of a natural gas pipeline. MLP2, CORP2 and LLC1 all derive revenues in the same NAICS code (Pipeline Transportation of Natural Gas). All of the entities under common investment management of CORP1, including GP4 and MLP2, are associates of MLP1, the acquiring person.

In the Controlled Entity Geographic Overlaps section of the Notification and Report Form, MLP1 would identify MLP2 as an associate that has an overlap in pipeline transportation of natural gas with LLC1, the acquired person. Because GP4 does not control CORP2 it would not be listed in this section, however, GP4 would be listed in the Minority-Held Entity Overlaps section of the Notification and Report Form as an associate that holds 25 percent of the voting securities of CORP2. In this example, even though there is no direct overlap between the acquiring person (MLP1) and the acquired person (LLC1), there is an

overlap reported for an associate (MLP2) of the acquiring person in the Controlled Entity Geographic Overlaps section of the Notification and Report Form.

5. LLC is the investment manager for and ultimate parent entity of general partnerships GP1 and GP2. GP1 is the general partner of LP1, a limited partnership that holds 30 percent of the voting securities of CORP1. GP2 is the general partner of LP2, which holds 55 percent of the voting securities of CORP1. GP2 also directly holds 2 percent of the voting securities of CORP1. LP1 is acquiring 100 percent of the voting securities of CORP2. CORP1 and CORP2 both derive revenues in the same NAICS code (Industrial Gas Manufacturing).

All the entities under common investment management of the managing entity LLC, including GP1, GP2, LP2 and CORP1 are associates of LP1. In Minority-Held Entity Overlaps section of the Notification and Report Form, LP1 would report its own holding of 30 percent of the voting securities of CORP1. It would not report the 55 percent holding of LP2 in Minority-Held Entity Overlaps section of the Notification and Report Form because it is greater than 50 percent. It also would not report GP2's 2 percent holding because it is less than 5 percent. In the Controlled Entity Geographic Overlaps section, LP1 would identify both LP2 and CORP1 as associates that derive revenues in the same NAICS code as CORP2.

6. LLC is the investment manager for GP1 and GP2 which are the general partners of limited partnerships LP1 and LP2, respectively. LLC holds no equity interests in either general partnership but manages their investments and the investments of the limited partnerships by contract. LP1 is newly formed and its own ultimate parent entity. It plans to acquire 100 percent of the voting securities of CORP1, which derives revenues in the NAICS code for Consumer Lending. LP2 controls CORP2, which derives revenues in the same NAICS code. All of the entities under the common management of LLC, including LP2 and CORP2, are associates of LP1. For purposes of the Controlled Entity Geographic Overlaps section of the Notification and Report Form, LP1 would report LP2 and CORP2 as associates that derive revenues in the NAICS code that overlaps with CORP1. Even though the investment manager (LLC) holds no equity interest in GP1 or GP2, the contractual arrangement with

them makes them associates of LP1 through common management.

*    *    *    *    *

(r)(1) *Foreign entity or government of concern.* The term *foreign entity or government of concern* means:

(i) An entity that is a foreign entity of concern as that term is defined in section 40207 of the Infrastructure Investment and Jobs Act (42 U.S.C. 18741(a)(5)); or

(ii) A government, or an agency thereof, of a foreign country that is a covered nation as that term is defined in section 40207 of the Infrastructure Investment and Jobs Act (42 U.S.C. 18741(a)(5)(C)).

(2) *Subsidy.* The term *subsidy* has the meaning given to the term in part IV of title VII of the Tariff Act of 1930 (19 U.S.C. 1677(5)(B)).

## PART 803—TRANSMITTAL RULES

■ 3. The authority citation for part 803 is revised to read as follows:

**Authority:** 15 U.S.C. 18a(d); 15 U.S.C. 18b.
■ 4. Amend § 803.2 by:
■ a. Revising paragraph (a);
■ b. Removing paragraph (b) and the undesignated example following paragraph (b);
■ c. Redesignating paragraphs (c), (d), (e), and (f) as paragraphs (b), (c), (d), and (e), respectively; and
■ d. Revising newly redesignated paragraphs (b), (d), and (e). The revisions read as follows:

### §803.2  Instructions applicable to Notification and Report Form.

(a)(1) The notification required by the act shall be filed by the preacquisition ultimate parent entity, or by any entity included within the person authorized by such preacquisition ultimate parent entity to file notification on its behalf. In the case of a natural person required by the act to file notification, such notification may be filed by his or her legal representative: *Provided however,* That notwithstanding §§ 801.1(c)(2) and 801.2 of this chapter, only one notification shall be filed by or on behalf of a natural person, spouse and minor children with respect to an acquisition as a result of which more than one such natural person will hold voting securities of the same issuer.

*Example 1 to paragraph (a)(1).* Jane Doe, her husband, and minor child collectively hold more than 50 percent of the shares of family corporation F. Therefore, Jane Doe (or her husband or minor child) is the ''ultimate parent entity'' of a ''person'' composed to herself (or her husband or minor child) and F; see § 801.1a(3), (b), and (c)(2) of this chapter. If corporation F is to

acquire corporation X, under this paragraph only one notification is to be filed by Jane Doe, her husband, and minor child collectively.

(2) Persons that are both acquiring and acquired persons shall submit separate forms, one as the acquiring person and one as the acquired person, following the appropriate instructions for each.

(b) In response to the Revenue and Overlaps section of the Notification and Report Form, information need not be supplied with respect to assets or voting securities to be acquired, the acquisition of which is exempt from the requirements of the act.

\*    \*    \*    \*    \*

(d) For annual reports and audit reports required by the Notification and Report Form, a person filing the notification may, instead of submitting a document, provide a cite to an operative internet address directly linking to the document, if the linked document is complete and payment is not required to access the document. If an internet address becomes inoperative during the waiting period, or the document is otherwise rendered inaccessible or incomplete, upon notification by the Commission or Assistant Attorney General, the parties must make the document available to the agencies by either referencing an operative internet address where the complete document may be accessed or by providing electronic copies to the agencies as provided in § 803.10(c)(1) by 5 p.m. Eastern Time on the next regular business day. Failure to make the document available, by the internet or by providing electronic copies, by 5 p.m. Eastern Time on the next regular business day, will result in notice of a deficient filing pursuant to § 803.10(c)(2).

(e) Filings must comply with all format requirements set forth at the Premerger Notification Office pages at *https://www.ftc.gov*. The use of any format not specified as acceptable, or any other failure to comply with the applicable format requirements, shall render the entire filing deficient within the meaning of § 803.10(c)(2).

■ 5. Amend § 803.5 by redesignating the paragraph (a)(1) heading as the paragraph (a) heading and republishing it and revising paragraphs (a)(1) introductory text, (a)(3), and (b) to read as follows:

### § 803.5    Affidavits required.

(a) *Section 801.30 acquisitions.* (1) For acquisitions to which § 801.30 of this chapter applies, the notification required by the act from each acquiring person shall contain an affidavit attesting that the issuer or unincorporated entity whose voting securities or non-corporate interests are to be acquired has received written notice delivered to an officer (or a person exercising similar functions in the case of an entity without officers) by email, certified or registered mail, wire, or hand delivery, at its principal executive offices, of:

\*    \*    \*    \*    \*

(3) The affidavit required by this paragraph must have attached to it a copy of the written notice received by the acquired person pursuant to paragraph (a)(1) of this section.

(b) *Non-section 801.30 acquisitions.* For acquisitions to which § 801.30 of this chapter does not apply, the notification required by the act shall contain an affidavit attesting that a contract, agreement in principle, or letter of intent to merge or acquire has been executed, and further attesting to the good faith intention of the person filing notification to complete the transaction. If the executed agreement is not the definitive agreement, the affidavit must attest that a dated document that provides sufficient detail about the scope of the entire transaction that the parties intend to consummate has also been submitted.

■ 6. Revise § 803.8 to read as follows:

### § 803.8    Foreign language documents.

Documentary materials or information in a foreign language required to be submitted at the time of filing a Notification and Report Form and in response to a request for additional information or documentary material must be submitted with verbatim English language translations. All verbatim translations must be accurate and complete.

■ 7. Amend § 803.9 by revising paragraph (c) to read as follows:

### § 803.9    Filing fee.

\*    \*    \*    \*    \*

(c) For a reportable transaction in which the acquiring entity has two ultimate parent entities, both ultimate parent entities are acquiring persons; however, if the responses for both ultimate parent entities would be the same for the NAICS Codes section of the Notification and Report Form, only one filing fee is required in connection with the transaction.

\*    \*    \*    \*    \*

■ 8. Amend § 803.10 by revising paragraphs (c)(1)(i) and (ii) and redesignating the example following paragraph (c)(1)(ii) as Example 1 to paragraph (c)(1).

The revisions read as follows:

### § 803.10    Running of time.

\*    \*    \*    \*    \*

(c) \*    \*    \*

(1) \*    \*    \*

(i) The date of receipt shall be the date of electronic submission if such date is not a Saturday, Sunday, a legal public holiday (as defined in 5 U.S.C. 6103(a)), or a legal public holiday's observed date, and the submission is completed by 5 p.m. Eastern Time. In the event electronic submission is unavailable, the FTC and DOJ may designate procedures for the submission of the filing. Notification of the alternate delivery procedures will normally be made through a press release and, if possible, on the *https://www.ftc.gov* website.

(ii) Delivery effected after 5 p.m. Eastern Time on a business day, or at any time on any day other than a business day, shall be deemed effected on the next following business day. If submission of all required filings is not effected on the same date, the date of receipt shall be the latest of the dates on which submission is effected.

\*    \*    \*    \*    \*

■ 9. Amend § 803.12 by revising paragraph (c)(1)(iii) to read as follows:

### § 803.12    Withdraw and refile notification.

\*    \*    \*    \*    \*

(c) \*    \*    \*

(1) \*    \*    \*

(iii) The resubmitted notification is recertified, and the submission, as it relates to Transaction-Specific Agreements, Transaction-Related Documents, and Subsidies from Foreign Entities of Concern sections of the Notification and Report Form, is updated to the date of the resubmission;

\*    \*    \*    \*    \*

■ 10. Revise appendices A and B to part 803 to read as follows:

### Appendix A to Part 803—*Notification and Report Form for Certain Mergers and Acquisitions*

BILLING CODE 6750–01–P

**89340**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

16 C.F.R. Part 803 – Appendix
## Notification and Report Form for Certain Mergers and Acquisitions

**Acquiring Person**

### FEE INFORMATION

**Total Filing Fee:** Select Filing Fee.    **Paid By:** ☐ Acquiring Person    ☐ Acquired Person    ☐ Both

| Name of Payer | Amount Paid | Check Number | EWT Institution & Confirmation Number |
|---|---|---|---|
| | | | |

### GENERAL INFORMATION

Post-Consummation Filing?    ☐ Yes    ☐ No
Cash Tender Offer?    ☐ Yes    ☐ No
Bankruptcy?    ☐ Yes    ☐ No

**Do you request early termination of the waiting period?**    ☐ Yes    ☐ No
*(Grants of early termination are published in the Federal Register and on the FTC website.)*

### ULTIMATE PARENT ENTITY (UPE) INFORMATION

**▶ UPE Details**

Name: _____

Headquarters Address: _____    Address Line 2: _____

City: _____    State: _____    Zip Code: _____    Country: _____

Website: _____

**Entity Type:** The UPE of the acquiring person is a(n)?
☐ Corporation    ☐ Unincorporated Entity    ☐ Natural Person    ☐ Other (Specify): _____

| FILING MADE ON BEHALF OF THE UPE | Name and address of filing notification entity, if different than UPE (Name, Address, City, State, Zip Code, and Country) |
|---|---|
| ☐ Not Applicable. | |
| ☐ This report is being filed on behalf of the ultimate parent entity by another entity within the same person authorized by it to file pursuant to § 803.2(a). | |
| ☐ This report is being filed on behalf of a foreign person pursuant to § 803.4. | |

| | PRIMARY HSR REPORT CONTACT | SECONDARY HSR REPORT CONTACT | SECOND REQUEST CONTACT |
|---|---|---|---|
| Name: | | | |
| Firm/Company: | | | |
| Address: | | | |
| City, State, Zip Code: | | | |
| Country: | | | |
| Telephone Number: | | | |
| E-Mail Address: | | | |

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations      **89341**

---

Name of Acquiring Person UPE:                                                                    Date:

**UPE ANNUAL REPORTS AND FINANCIAL INFORMATION**

Central Index Key (CIK) Number

Annual/Audit Report Document # or Link

Date of Annual/Audit Report

**Does the person filing notification stipulate that the acquiring person meets the size of person test?** See 15 U.S.C. § 18a(a).

☐ Yes, the lower size of person test         ☐ Yes, the higher size of person test         ☐ N/A

**MINORITY SHAREHOLDERS OR INTEREST HOLDERS**                                                     ☐ None

| Entity | Minority Holder & D/B/A Name | HQ Address | Percent Held |
|--------|------------------------------|------------|--------------|
|        |                              |            |              |

▶ **Acquiring Person Structure**

**ENTITIES WITHIN THE ACQUIRING PERSON**

Company or Operating Business d/b/a Name(s):

| Entity Name | City | State | Zip Code | Country |
|-------------|------|-------|----------|---------|
|             |      |       |          |         |

Company or Operating Business d/b/a Name(s):

| Entity Name | City | State | Zip Code | Country |
|-------------|------|-------|----------|---------|
|             |      |       |          |         |

Company or Operating Business d/b/a Name(s):

| Entity Name | City | State | Zip Code | Country |
|-------------|------|-------|----------|---------|
|             |      |       |          |         |

**ANNUAL REPORTS AND AUDIT REPORTS**

| Acquiring Entity or Overlapping Entity | Central Index Key (CIK) Number | Annual/Audit Report File Name or Link | Date of Annual/Audit Report |
|----------------------------------------|--------------------------------|---------------------------------------|-----------------------------|
|                                        |                                |                                       |                             |

**89342**  **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

---

Name of Acquiring Person UPE:                                                      Date:

▶ **Additional Acquiring Person Information**

OWNERSHIP STRUCTURE

Description of the ownership
structure of the acquiring entity

Document # of organizational
chart for fund or MLP (or N/A)

OFFICERS AND DIRECTORS

| Name of Entity Within Acquiring Person | Name of Officer or Director | Title | List of Other Entities |
|---|---|---|---|
| | | | |

## TRANSACTION INFORMATION

▶ **Parties**

| ACQUIRING UPE(s) | ACQUIRED UPE(s) |
|---|---|
| Name: | Name: |
| Address: | Address: |
| Address Line 2: | Address Line 2: |
| City, State, Zip Code: | City, State, Zip Code: |
| Country: | Country: |
| Website: | Website: |

| ACQUIRING ENTITY(IES) – *(Tab to add additional "Acquiring Entity" entries.)* | TARGET – *(Tab to add additional "Target" entries.)* |
|---|---|
| Name: | Name: |
| Address: | Address: |
| Address Line 2: | Address Line 2: |
| City, State, Zip Code: | City, State, Zip Code: |
| Country: | Country: |
| Website: | Website: |

▶ **Transaction Details** Is this transaction subject to § 801.30?  ☐ Yes, Specify Type(s)        ☐ No

TRANSACTION TYPE

Check all that apply:

☐ Acquisition of voting securities                    ☐ Formation of a joint venture, other corporation, or unincorporated entity
☐ Acquisition of non-corporate interests                  (see §§ 801.40 and 801.50)
☐ Acquisition of assets                              ☐ Acquisition subject to § 801.31
☐ Merger (see § 801.2)                              ☐ Secondary acquisition subject to § 801.4
☐ Consolidation (see § 801.2)                        ☐ Acquisition subject to § 801.2(e)
                                                    ☐ Other, specify _____

Name of Acquiring Person UPE:                                                                Date:

**ACQUISITION DETAILS**

| Percentage of voting securities already held % | Percentage of non-corporate interests already held % | | |
|---|---|---|---|
| Value of voting securities already held ($MM) $ | Value of non-corporate interests already held ($MM) $ | | |
| Total percentage of voting securities to be held as a result of the acquisition % | Total percentage of non-corporate interests to be held as a result of the acquisition % | | |
| Total value of voting securities to be held as a result of the acquisition ($MM) $ | Total value of non-corporate securities to be held as a result of the acquisition ($MM) $ | Total value of assets to be held as a result of the acquisition ($MM) $ | Aggregate total value ($MM) $ 0.00 |

**NOTIFICATION THRESHOLD**

☐ $50 million (as adjusted)    ☐ $100 million (as adjusted)    ☐ $500 million (as adjusted)    ☐ 25%    ☐ 50%    ☐ N/A

**► Transaction Description**

| BUSINESS OF THE ACQUIRING PERSON | |
|---|---|
| BUSINESS OF THE TARGET | |
| NON-REPORTABLE UPE(s) | |
| TRANSACTION DESCRIPTION | |

**RELATED TRANSACTIONS**

Does the transaction that is the subject of this filing have related filings?    ☐ Yes    ☐ No    ☐ Unknown

If the transaction has related filings, indicate whether the related filing(s) (choose all that apply):

☐ Is a principal transaction that triggers one or more shareholder backside transactions
☐ Is a shareholder backside transaction
☐ Has more than one acquiring UPE
☐ Has more than one acquired UPE
☐ Has more than one reportable step

☐ Is a joint venture
☐ Is a consolidation
☐ Is an exchange of assets
☐ Has one or more filings in the alternative
☐ Other, explain:_____

Party Names or Transaction Numbers for Related Transactions:

**► Transactions Subject to International Antitrust Notification**

Has (or will) a non-U.S. antitrust or competition authority been (or be) notified of the transaction?    ☐ No    ☐ Yes (provide details below)

| Jurisdiction | Date Notified |
|---|---|
| | |
| | |

Name of Acquiring Person UPE:                                                   Date:

**▶ Additional Transaction Information**

TRANSACTION RATIONALE
☐ Not applicable, select 801.30 transaction

DOCUMENT NUMBERS RELATED TO
TRANSACTION RATIONALE

DOCUMENT # FOR TRANSACTION DIAGRAM
☐ Not applicable, select 801.30 transaction

**▶ Joint Ventures**

Complete only if acquisition is the formation of a joint venture corporation or unincorporated entity          ☐ Not Applicable

CONTRIBUTIONS TO BE MADE

DESCRIPTION OF CONSIDERATION

DESCRIPTION OF THE BUSINESS OF THE
JOINT VENTURE

JOINT VENTURE NAICS CODES

**6-Digit Code**                                                    **Code Description**

**▶ Business Documents**

TRANSACTION RELATED DOCUMENTS

| Privileged | Document # | Document Title | Estimated Date | Author/Title |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

PLANS AND REPORTS                                        ☐ Not Applicable, Select 801.30 Transaction

| Privileged | Document # | Document Title | Estimated Date | Author/Title |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

**Privilege Log Document #** _____

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations    **89345**

Name of Acquiring Person UPE:                                                  Date:

▶ **Agreements**

**TRANSACTION-SPECIFIC AGREEMENTS**                                            ☐ Not Applicable, 801.30 or Bankruptcy

| Document # | Document Title |
|---|---|
|  |  |

**OTHER AGREEMENTS BETWEEN THE ACQUIRING PERSON AND TARGET**

Does the acquiring person have (or within one year of filing, had) any agreements with the target?

☐ No    ☐ Yes (provide details below)

| Has Type of Agreement | | Type |
|---|---|---|
| ☐ Yes | ☐ No | Agreement with non-compete or non-solicitation terms between the acquiring person and target |
| ☐ Yes | ☐ No | Lease |
| ☐ Yes | ☐ No | Licensing Agreement |
| ☐ Yes | ☐ No | Master Service Agreement |
| ☐ Yes | ☐ No | Operating Agreement |
| ☐ Yes | ☐ No | Supply Agreement |
| ☐ Yes | ☐ No | Other |

## COMPETITION DESCRIPTIONS

☐ Not Applicable, Select 801.30 Transaction

▶ **Overlap Description**

Briefly describe the acquiring person's principal categories of products or services.

List and briefly describe current and known planned products or services that compete (or could compete) with the target. (See Instructions)

**Name of Acquiring Person UPE:**                                                                                      **Date:**

**Competing Product or Service Details**                                                                         ☐ None

    **Product or Service:**    **Sales ($):**

                                      **Categories of Customers:**

                                      **Top 10 Customers Overall:**

                                      **Top 10 Customers by Category:**

    **Product or Service:**    **Sales ($):**

                                      **Categories of Customers:**

                                      **Top 10 Customers Overall:**

                                      **Top 10 Customers by Category:**

    **Product or Service:**    **Sales ($):**

                                      **Categories of Customers:**

                                      **Top 10 Customers Overall:**

                                      **Top 10 Customers by Category:**

► **Supply Relationships Description**

RELATED SALES

List and briefly describe the acquiring person's products, services, or assets that are supplied to the target or a business that competes with the target. (See Instructions)

**Product, Service, or Asset Details**                                                                            ☐ None

    **Product, Service, or Asset:**    **Sales to Target ($):**

                                        **Sales to Target's Competitors ($):**

                                      **Top 10 Customers:**

                                      **Description of Supply or Licensing Agreement:**

    **Product, Service, or Asset:**    **Sales to Target ($):**

                                        **Sales to Target's Competitors ($):**

                                      **Top 10 Customers:**

                                      **Description of Supply or Licensing Agreement:**

    **Product, Service, or Asset:**    **Sales to Target ($):**

                                        **Sales to Target's Competitors ($):**

                                      **Top 10 Customers:**

                                      **Description of Supply or Licensing Agreement:**

**Federal Register**/Vol. 89, No. 218/Tuesday, November 12, 2024/Rules and Regulations    **89347**

Name of Acquiring Person UPE: _____    Date: _____

**RELATED PURCHASES**

List and briefly describe the products, services, or assets that are purchased by the acquiring person from the target or a business that competes with the target. (See Instructions)

Product, Service, or Asset Details                                                                    ☐ None

Product, Service, or Asset: _____    Purchases from Target ($): 
                                        Purchases from Target's Competitors ($): 
                                        Top 10 Suppliers: 
                                        Description of Purchase or Licensing Agreement: 

Product, Service, or Asset: _____    Purchases from Target ($): 
                                        Purchases from Target's Competitors ($): 
                                        Top 10 Suppliers: 
                                        Description of Purchase or Licensing Agreement: 

Product, Service, or Asset: _____    Purchases from Target ($): 
                                        Purchases from Target's Competitors ($): 
                                        Top 10 Suppliers: 
                                        Description of Purchase or Licensing Agreement: 

## REVENUE AND OVERLAPS

Does the acquiring person have US revenue?    ☐ Yes    ☐ No, explain: _____

▶ NAICS Codes

| 6-Digit Code | Code Description | Operating Business | Revenue Range | | | | Overlap |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | <$10MM | $10MM - $100MM | $100MM - $1B | >$1B | |
| | | | | | | | ☐ |
| | | | | | | | ☐ |
| | | | | | | | ☐ |
| | | | | | | | ☐ |
| | | | | | | | ☐ |

▶ Controlled Entity Geographic Overlaps

STATE LEVEL REPORTING                                                                    ☐ None

| NAICS Code | Code Description | Operating Business and D/B/A Name(s) | Person or Associate? | States and Total Number |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |

**89348**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

Name of Acquiring Person UPE:                                    Date:

STREET LEVEL REPORTING                                    ☐ None

NAICS Code and Description:

| Operating Business and D/B/A Name(s) | Person or Associate | State | County | ZIP Code | Street Address |
|---|---|---|---|---|---|
| | | | | | |

NAICS Code and Description:

| Operating Business and D/B/A Name(s) | Person or Associate | State | County | ZIP Code | Street Address |
|---|---|---|---|---|---|
| | | | | | |

NAICS Code and Description:

| Operating Business and D/B/A Name(s) | Person or Associate | State | County | Zip Code | Street Address |
|---|---|---|---|---|---|
| | | | | | |

► **Minority-Held Entity Overlaps**
☐ None

| Entity Held and D/B/A Name(s) | Percentage Held | Held By | Person or Associate? | NAICS Code or Industry Overlap with Target |
|---|---|---|---|---|
| | | | | |

► **Prior Acquisitions**
☐ None

| Overlapping 6-Digit NAICS Code and Description or Overlap Product or Service Description | Acquired Entity and Former HQ Address | Transaction Type | Consummation Date |
|---|---|---|---|
| | | | |

**ADDITIONAL INFORMATION**

► **Subsidies from Foreign Entities or Governments of Concern**

SUBSIDIES                                    ☐ None  ☐ Yes (provide details below)

| Entity or Government | Description |
|---|---|
| | |

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations    **89349**

Name of Acquiring Person UPE:                                                    Date:

**COUNTERVAILING DUTIES IMPOSED**                              ☐ None   ☐ Yes (provide details below)

| Product | Duty Imposed | Jurisdiction |
|---|---|---|
|  |  |  |
|  |  |  |

**COUNTERVAILING DUTY INVESTIGATIONS**                      ☐ None   ☐ Yes (provide details below)

| Product | Jurisdiction Conducting Investigation |
|---|---|
|  |  |
|  |  |

### ▶ Defense or Intelligence Contracts

☐ None  ☐ Not Applicable, Select 801.30 Transaction

| Entity Within Acquiring Person | Contracting Office | Contracting Office ID | Award ID | NAICS Codes |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

### ▶ Voluntary Waivers

**INTERNATIONAL COMPETITION AUTHORITIES (VOLUNTARY)**

The acquiring person agrees to waive the disclosure exemption in the HSR Act for the following competition authorities:                          ☐ None

1. _____    4. _____
2. _____    5. _____
3. _____    6. _____

**STATE ATTORNEYS GENERAL (VOLUNTARY)**

The acquiring person agrees to waive the disclosure exemption in the HSR Act for the following states:                          ☐ None

| State | Permit Disclosure of | |
|---|---|---|
|  | Fact of Notification and Waiting Period | Information and Documents |
|  | ☐ | ☐ |
|  | ☐ | ☐ |
|  | ☐ | ☐ |

### ▶ End Notes

☐ None

| Number | Note |
|---|---|
|  |  |
|  |  |

**89350**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

Name of Acquiring Person UPE:                                                                                    Date:

## CERTIFICATION

**PENALTIES FOR FALSE STATEMENTS**

Federal law provides criminal penalties, including up to twenty years imprisonment, for any person who knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence an ongoing or anticipated federal investigation (see, e.g., Section 1519 of Title 18, United States Code.). It is also a criminal offense to knowingly make a false statement in a federal investigation, obstruct a federal investigation, or conspire to obstruct justice or obstruct or impede the lawful functioning of the government (see, e.g., Sections 371, 1001, and 1505 of Title 18, United States Code).

**CERTIFICATION**

This NOTIFICATION AND REPORT FORM, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Commission. Subject to the recognition that, where so indicated, reasonable estimates have been made because books and records do not provide the required data, the information is, to the best of my knowledge, true, correct, and complete in accordance with the statute and rules.

I acknowledge that the Commission or the Assistant Attorney General of the Antitrust Division of the Department of Justice may, prior to the expiration of the initial waiting period pursuant to 15 U.S.C. § 18a, require the submission of additional information or documentary material relevant to the proposed transaction.

Name (Please Print or Type)                                          Title

Signature                                                            Date

☐ **Sworn under penalty of perjury**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature                                                            Executed Date

☐ **Notarized**

Subscribed and sworn to before me at the:                                      Seal:

_____

City of: _____

State of: _____

This _____ day of _____ the year _____

Signature: _____

My commission expires: _____

**Name of Acquiring Person UPE:** **Date:**

| | |
|---|---|
| **16 C.F.R. Part 803 – Appendix**<br>**NOTIFICATION AND REPORT FORM FOR CERTAIN MERGERS AND ACQUISITIONS** | Approved by OMB 3084-0005 |

**THE INFORMATION REQUIRED TO BE SUPPLIED ON THESE ANSWER SHEETS IS SPECIFIED IN THE INSTRUCTIONS**

THIS FORM IS REQUIRED BY LAW and must be filed separately by each person that, by reason of a merger, consolidation, or acquisition, is subject to § 7A of the Clayton Act, 15 U.S.C. § 18a, and rules promulgated thereunder (hereinafter referred to as "the rules" or by section number). The rules may be found at 16 CFR Parts 801-03. Failure to file this **Notification and Report Form**, and to observe the required waiting period before consummating the acquisition in accordance with the applicable provisions of 15 U.S.C. § 18a and the rules, subjects any "person," as defined in the rules, or any individuals responsible for noncompliance, to liability for a penalty for each day during which such person is in violation of 15 U.S.C. § 18a. The maximum daily civil penalty amount is listed in 16 C.F.R. § 1.98(a).

Pursuant to the Hart-Scott-Rodino Act, information and documentary material filed in or with this Form is confidential. It is exempt from disclosure under the Freedom of Information Act and may be made public only in an administrative or judicial proceeding, or disclosed to Congress or to a duly authorized committee or subcommittee of Congress.

**DISCLOSURE NOTICE** - Public reporting burden for this report is estimated at 105 hours per response, including time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this report, including suggestions for reducing this burden to:

Premerger Notification Office
Federal Trade Commission
400 7th St. SW
Washington, DC 20024

and

Office of Information and Regulatory Affairs
Office of Management and Budget
Washington, DC 20503

Under the **Paperwork Reduction Act**, as amended, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. That number is 3084-0005, which also appears above.

**Privacy Act Statement**--Section 18a(a) of Title 15 of the U.S. Code authorizes the collection of this information. The primary use of information submitted on this Form is to determine whether the reported merger or acquisition may violate the antitrust laws. Taxpayer information is collected, used, and may be shared with other agencies and contractors for payment processing, debt collection and reporting purposes. Furnishing the information on the Form is voluntary. Consummation of an acquisition required to be reported by the statute cited above without having provided this information may, however, render a person liable to civil penalties up to the amount listed in 16 C.F.R. § 1.98(a) per day. We also may be unable to process the Form unless you provide all of the requested information.

**This page may be omitted when submitting the Form.**

**89352**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

16 C.F.R. Part 803 – Appendix
## Notification and Report Form for Certain Mergers and Acquisitions

**Acquired Person**

## FEE INFORMATION

**Total Filing Fee:** Select Filing Fee.    **Paid By:** ☐ Acquiring Person  ☐ Acquired Person  ☐ Both

| Name of Payer | Amount Paid | Check Number | EWT Institution & Confirmation Number |
|---|---|---|---|
| | | | |

## GENERAL INFORMATION

Post-Consummation Filing?    ☐ Yes  ☐ No
Cash Tender Offer?    ☐ Yes  ☐ No
Bankruptcy?    ☐ Yes  ☐ No

Do you request early termination of the waiting period?    ☐ Yes  ☐ No
*(Grants of early termination are published in the Federal Register and on the FTC website.)*

## ULTIMATE PARENT ENTITY (UPE) INFORMATION

▶ **UPE Details**

Name: _____

Headquarters Address: _____    Address Line 2: _____

City: _____    State: _____    Zip Code: _____    Country: _____

Website: _____

**Entity Type:** The UPE of the acquired person is a(n)?
☐ Corporation    ☐ Unincorporated Entity    ☐ Natural Person    ☐ Other (Specify): _____

| FILING MADE ON BEHALF OF THE UPE | Name and address of filing notification entity, if different than UPE (Name, Address, City, State, Zip Code, and Country) |
|---|---|
| ☐ Not Applicable. | |
| ☐ This report is being filed on behalf of the ultimate parent entity by another entity within the same person authorized by it to file pursuant to § 803.2(a). | |
| ☐ This report is being filed on behalf of a foreign person pursuant to § 803.4. | |

| | PRIMARY HSR REPORT CONTACT | SECONDARY HSR REPORT CONTACT | SECOND REQUEST CONTACT |
|---|---|---|---|
| Name: | | | |
| Firm/Company: | | | |
| Address: | | | |
| City, State, Zip Code: | | | |
| Country: | | | |
| Telephone Number: | | | |
| E-Mail Address: | | | |

**Federal Register**/Vol. 89, No. 218/Tuesday, November 12, 2024/Rules and Regulations **89353**

---

**Name of Acquired Person UPE:**                                                                 **Date:**

**UPE ANNUAL REPORTS AND FINANCIAL INFORMATION**
Central Index Key (CIK) Number
Annual/Audit Report Document # or Link
Date of Annual/Audit Report

**Does the person filing notification stipulate that the acquired person meets the size of person test?** See 15 U.S.C. § 18a(a).
☐ Yes, the lower size of person test          ☐ Yes, the higher size of person test          ☐ N/A

**MINORITY SHAREHOLDERS OR INTEREST HOLDERS**                                                              ☐ None

| Entity | Minority Holder & D/B/A Name | HQ Address | Percent Held |
|---|---|---|---|
| | | | |

► **Acquired Entity Structure**

**ENTITIES WITHIN THE ACQUIRED ENTITY(IES)**

Company or Operating Business d/b/a Name(s):

| Entity Name | City | State | Zip Code | Country |
|---|---|---|---|---|
| | | | | |

Company or Operating Business d/b/a Name(s):

| Entity Name | City | State | Zip Code | Country |
|---|---|---|---|---|
| | | | | |

Company or Operating Business d/b/a Name(s):

| Entity Name | City | State | Zip Code | Country |
|---|---|---|---|---|
| | | | | |

**ANNUAL REPORTS AND AUDIT REPORTS**

| Acquired Entity | Central Index Key (CIK) Number | Annual/Audit Report File Name or Link | Date of Annual/Audit Report |
|---|---|---|---|
| | | | |

**89354**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

Name of Acquired Person UPE:                                                          Date:

## TRANSACTION INFORMATION

► **Parties**

| ACQUIRING UPE(s) | ACQUIRED UPE(s) |
|---|---|
| Name: | Name: |
| Address: | Address: |
| Address Line 2: | Address Line 2: |
| City, State, Zip Code: | City, State, Zip Code: |
| Country: | Country: |
| Website: | Website: |

| ACQUIRING ENTITY(IES) – *(Tab to add additional "Acquiring Entity" entries.)* | TARGET(S) – *(Tab to add additional "Target" entries.)* |
|---|---|
| Name: | Name: |
| Address: | Address: |
| Address Line 2: | Address Line 2: |
| City, State, Zip Code: | City, State, Zip Code: |
| Country: | Country: |
| Website: | Website: |

► **Transaction Details**

**Is this transaction subject to § 801.30?**   ☐ Yes, Specify Type(s) _____   ☐ No

**TRANSACTION TYPE**

Check all that apply:

| | |
|---|---|
| ☐ Acquisition of voting securities | ☐ Acquisition subject to § 801.31 |
| ☐ Acquisition of non-corporate Interests | ☐ Secondary acquisition subject to § 801.4 |
| ☐ Acquisition of assets | ☐ Acquisition subject to § 801.2(e) |
| ☐ Merger (see § 801.2) | ☐ Other, specify _____ |
| ☐ Consolidation (see § 801.2) | |

**ACQUISITION DETAILS**

| Percentage of voting securities already held %| Percentage of non-corporate interests already held % | | |
|---|---|---|---|
| Value of voting securities already held ($MM) $ | Value of non-corporate interests already held ($MM) $ | | |
| Total percentage of voting securities to be held as a result of the acquisition % | Total percentage of non-corporate to be held as a result of the acquisition % | | |
| Total value of voting securities to be held as a result of the acquisition ($MM)  $ | Total value of non-corporate securities to be held as a result of the acquisition ($MM)  $ | Total value of assets to be held as a result of the acquisition ($MM)  $ | Aggregate total value ($MM)  $  0.00 |

**Name of Acquired Person UPE:**                                                 **Date:**

▶ **Transaction Description**

| | |
|---|---|
| **BUSINESS OF THE TARGET** | |
| **NON-REPORTABLE UPE(S)** | |
| **TRANSACTION DESCRIPTION** | |

**RELATED TRANSACTIONS**

**Does the transaction that is the subject of this filing have related filings?**    ☐ Yes    ☐ No    ☐ Unknown

**If the transaction has related filings, indicate whether the related filing(s) (choose all that apply):**

☐ Is a principal transaction that triggers one or more shareholder backside transactions    ☐ Is a joint venture
☐ Is a shareholder backside transaction    ☐ Is a consolidation
☐ Has more than one acquiring UPE    ☐ Is an exchange of assets
☐ Has more than one acquired UPE    ☐ Has one or more filings in the alternative
☐ Has more than one reportable step    ☐ Other, explain:_____

**Party Names or Transaction Numbers for Related Transactions:**

| |
|---|
| |

▶ **Additional Transaction Information**

| | |
|---|---|
| **TRANSACTION RATIONALE**<br>☐ Not applicable, select 801.30 transaction | |
| **DOCUMENT NUMBERS RELATED TO TRANSACTION RATIONALE** | |

▶ **Business Documents**

**TRANSACTION RELATED DOCUMENTS**

| Privileged | Document # | Document Title | Estimated Date | Author/Title |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

**PLANS AND REPORTS**                                                    ☐ Not Applicable, Select 801.30 Transaction

| Privileged | Document # | Document Title | Estimated Date | Author/Title |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

**Privilege Log Document #** _____

Name of Acquired Person UPE:                                                              Date:

▶ **Agreements**

**TRANSACTION-SPECIFIC AGREEMENTS**                                   ☐ Not Applicable, 801.30 or Bankruptcy

| Document # | Document Title |
| --- | --- |
| | |
| | |

## COMPETITION DESCRIPTIONS

☐ Not Applicable, Select 801.30 Transaction

▶ **Overlap Description**

Briefly describe the target's principal categories of products or services.

List and briefly describe current and known planned products or services that compete (or could compete) with the acquiring person. (See Instructions)

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations      **89357**

---

**Name of Acquired Person UPE:**                                                    **Date:**

**Competing Product or Service**                                                    ☐ None

    Product or Service:    **Sales ($):**

                         **Categories of Customers:**

                         **Top 10 Customers Overall:**

                         **Top 10 Customers by Category:**

    Product or Service:    **Sales ($):**

                         **Categories of Customers:**

                         **Top 10 Customers Overall:**

                         **Top 10 Customers by Category:**

    Product or Service:    **Sales ($):**

                         **Categories of Customers:**

                         **Top 10 Customers Overall:**

                         **Top 10 Customers by Category:**

**► Supply Relationships Description**

**RELATED SALES**

List and briefly describe the target's products, services, or assets that are supplied to the acquiring person or a business that competes with acquiring person. (See Instructions)

**Product, Service, or Asset Details**                                              ☐ None

    Product, Service, or Asset:    **Sales to Target ($):**

                             **Sales to Target's Competitors ($):**

                             **Top 10 Customers:**

                             **Description of Supply or Licensing Agreement:**

    Product, Service, or Asset:    **Sales to Acquiring Person ($):**

                             **Sales to Acquiring Person's Competitors ($):**

                             **Top 10 Customers:**

                             **Description of Supply or Licensing Agreement:**

    Product, Service, or Asset:    **Sales to Acquiring Person ($):**

                             **Sales to Acquiring Person's Competitors ($):**

                             **Top 10 Customers:**

                             **Description of Supply or Licensing Agreement:**

**89358**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

Name of Acquired Person UPE:                                                          Date:

RELATED PURCHASES

List and briefly describe the products, services, or assets that are purchased by the target from the acquiring person or a business that competes with the acquiring person. (See Instructions)

Product, Service, or Asset Details                                                    ☐ None

Product, Service, or Asset:    Purchases from Acquiring Person ($):

                               Purchases from Acquiring Person's Competitors ($):

                               Top 10 Suppliers:

                               Description of Purchase or Licensing Agreement:

Product, Service, or Asset:    Purchases from Acquiring Person ($):

                               Purchases from Acquiring Person's Competitors ($):

                               Top 10 Suppliers:

                               Description of Purchase or Licensing Agreement:

Product, Service, or Asset:    Purchases from Acquiring Person ($):

                               Purchases from Acquiring Person's Competitors ($):

                               Top 10 Suppliers:

                               Description of Purchase or Licensing Agreement:

## REVENUE AND OVERLAPS

Does the target have US revenue?    ☐ Yes    ☐ No, explain: _____

▶ NAICS Codes

| 6-Digit Code | Code Description | Operating Business | Revenue Range | | | | Overlap |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | <$10MM | $10MM - $100MM | $100MM - $1B | >$1B | |
| | | | | | | | ☐ |
| | | | | | | | ☐ |
| | | | | | | | ☐ |
| | | | | | | | ☐ |
| | | | | | | | ☐ |

▶ Controlled Entity Geographic Overlaps

STATE LEVEL REPORTING                                                                 ☐ None

| NAICS Code | Code Description | Operating Business and D/B/A Name(s) | States and Total Number |
| --- | --- | --- | --- |
| | | | |
| | | | |

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations    **89359**

Name of Acquired Person UPE:                                                                                          Date:

STREET LEVEL REPORTING                                                                                         ☐ None

NAICS Code and Description:

| Operating Business and D/B/A Name(s) | State | County | ZIP Code | Street Address |
|---|---|---|---|---|
| | | | | |

NAICS Code and Description:

| Operating Business and D/B/A Name(s) | State | County | ZIP Code | Street Address |
|---|---|---|---|---|
| | | | | |

NAICS Code and Description:

| Operating Business and D/B/A Name(s) | State | County | ZIP Code | Street Address |
|---|---|---|---|---|
| | | | | |

▶ **Minority-Held Entity Overlaps**

☐ None

| Entity Held and D/B/A Name(s) | Percentage Held | Held By | NAICS Code or Industry Overlap with Acquiring Person |
|---|---|---|---|
| | | | |

▶ **Prior Acquisitions**

☐ None

| Overlapping 6-Digit NAICS Code and Description or Overlap Product or Service Description | Acquired Entity and Former HQ Address | Transaction Type | Consummation Date |
|---|---|---|---|
| | | | |

## ADDITIONAL INFORMATION

▶ **Subsidies from Foreign Entities or Governments of Concern**

SUBSIDIES                                                                          ☐ None  ☐ Yes (provide details below)

| Entity or Government | Description |
|---|---|
| | |

**89360**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

Name of Acquired Person UPE:                                    Date:

**COUNTERVAILING DUTIES IMPOSED**                          ☐ None  ☐ Yes (provide details below)

| Product | Duty Imposed | Jurisdiction |
|---|---|---|
|  |  |  |

**COUNTERVAILING DUTY INVESTIGATIONS**                     ☐ None  ☐ Yes (provide details below)

| Product | Jurisdiction Conducting Investigation |
|---|---|
|  |  |

## ► Defense or Intelligence Contracts

☐ None  ☐ Not Applicable, Select 801.30 Transaction

| Entity Within Target | DOD/IC Contracting Office | Contracting Office ID | Award ID | NAICS Codes |
|---|---|---|---|---|
|  |  |  |  |  |

## ► Voluntary Waivers

**INTERNATIONAL COMPETITION AUTHORITIES (VOLUNTARY)**

The acquired person agrees to waive the disclosure exemption in the HSR Act for the following competition authorities:          ☐ None

1. _____   4. _____
2. _____   5. _____
3. _____   6. _____

**STATE ATTORNEYS GENERAL (VOLUNTARY)**

The acquired person agrees to waive the disclosure exemption in the HSR Act for the following states:          ☐ None

| State | Permit Disclosure of | |
|---|---|---|
|  | Fact of Notification and Waiting Period | Information and Documents |
|  | ☐ | ☐ |
|  | ☐ | ☐ |
|  | ☐ | ☐ |

## ► End Notes

☐ None

| Number | Note |
|---|---|
|  |  |

Name of Acquired Person UPE:                                                    Date:

## CERTIFICATION

**PENALTIES FOR FALSE STATEMENTS**

Federal law provides criminal penalties, including up to twenty years imprisonment, for any person who knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence an ongoing or anticipated federal investigation (see, e.g., Section 1519 of Title 18, United States Code.). It is also a criminal offense to knowingly make a false statement in a federal investigation, obstruct a federal investigation, or conspire to obstruct justice or obstruct or impede the lawful functioning of the government (see, e.g., Sections 371, 1001, and 1505 of Title 18, United States Code).

**CERTIFICATION**

This NOTIFICATION AND REPORT FORM, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Commission. Subject to the recognition that, where so indicated, reasonable estimates have been made because books and records do not provide the required data, the information is, to the best of my knowledge, true, correct, and complete in accordance with the statute and rules.

I acknowledge that the Commission or the Assistant Attorney General of the Antitrust Division of the Department of Justice may, prior to the expiration of the initial waiting period pursuant to 15 U.S.C. § 18a, require the submission of additional information or documentary material relevant to the proposed transaction.

| Name (Please Print or Type) | Title |
|---|---|
| Signature | Date |

☐ **Sworn under penalty of perjury**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| Signature | Executed Date |
|---|---|

☐ **Notarized**

Subscribed and sworn to before me at the:                              Seal:

_____

City of: _____

State of: _____

This _____ day of _____ the year _____

Signature: _____

My commission expires: _____

**Name of Acquired Person UPE:** **Date:**

| 16 C.F.R. Part 803 -- Appendix<br>NOTIFICATION AND REPORT FORM FOR CERTAIN MERGERS AND ACQUISITIONS | Approved by OMB 3084-0005 |
|---|---|

**THE INFORMATION REQUIRED TO BE SUPPLIED ON THESE ANSWER SHEETS IS SPECIFIED IN THE INSTRUCTIONS**

THIS FORM IS REQUIRED BY LAW and must be filed separately by each person that, by reason of a merger, consolidation, or acquisition, is subject to § 7A of the Clayton Act, 15 U.S.C. § 18a, and rules promulgated thereunder (hereinafter referred to as "the rules" or by section number). The rules may be found at 16 CFR Parts 801-03. Failure to file this **Notification and Report Form**, and to observe the required waiting period before consummating the acquisition in accordance with the applicable provisions of 15 U.S.C. § 18a and the rules, subjects any "person," as defined in the rules, or any individuals responsible for noncompliance, to liability for a penalty for each day during which such person is in violation of 15 U.S.C. § 18a. The maximum daily civil penalty amount is listed in 16 C.F.R. § 1.98(a).

Pursuant to the Hart-Scott-Rodino Act, information and documentary material filed in or with this Form is confidential. It is exempt from disclosure under the Freedom of Information Act and may be made public only in an administrative or judicial proceeding, or disclosed to Congress or to a duly authorized committee or subcommittee of Congress.

**DISCLOSURE NOTICE** - Public reporting burden for this report is estimated at 105 hours per response, including time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this report, including suggestions for reducing this burden to:

Premerger Notification Office
Federal Trade Commission
400 7th St. SW
Washington, DC 20024

and

Office of Information and Regulatory Affairs
Office of Management and Budget
Washington, DC 20503

Under the **Paperwork Reduction Act**, as amended, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. That number is 3084-0005, which also appears above.

**Privacy Act Statement**--Section 18a(a) of Title 15 of the U.S. Code authorizes the collection of this information. The primary use of information submitted on this Form is to determine whether the reported merger or acquisition may violate the antitrust laws. Taxpayer information is collected, used, and may be shared with other agencies and contractors for payment processing, debt collection and reporting purposes. Furnishing the information on the Form is voluntary. Consummation of an acquisition required to be reported by the statute cited above without having provided this information may, however, render a person liable to civil penalties up to the amount listed in 16 C.F.R. § 1.98(a) per day. We also may be unable to process the Form unless you provide all of the requested information.

**This page may be omitted when submitting the Form.**

**Appendix B to Part 803—Instructions to the Notification and Report Form for Certain Mergers and Acquisitions**

## Antitrust Improvements Act
## Notification for Certain Mergers and Acquisitions

<div style="text-align:right">**Acquiring Person Instructions**</div>

### GENERAL INSTRUCTIONS AND INFORMATION

These instructions specify the information that must be submitted pursuant to § 803.1(a) of the premerger notification rules, 16 CFR Parts 801-803 ("the Rules"). Submitted materials must be provided to the Federal Trade Commission ("FTC") and to the Antitrust Division of the Department of Justice ("DOJ") (together, "the Agencies").

#### ▶ Information

The central office for information and assistance concerning the Rules is:

Premerger Notification Office
Federal Trade Commission
400 7th Street, S.W.
Washington, D.C. 20024
Phone: (202) 326-3100
E-mail: HSRhelp@ftc.gov for Rules questions
        Premerger@ftc.gov for filing information

Copies of these Instructions, the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("the Act"), the Rules, FTC final rules (including their Statements of Basis and Purpose) published in the Federal Register, as well as information to assist in submitting the required information are available at the FTC's Premerger Notification Office ("PNO") website.

#### ▶ Definitions and Explanation of Terms

Unless otherwise indicated, the definitions provided in the Rules apply to these Instructions.

**Dollar Values**
All financial information should be expressed in millions of dollars rounded to the nearest hundred thousand.

**Fee Information**
The filing fee is based on the aggregate total value of assets, voting securities, and controlling non-corporate interests to be held as a result of the acquisition. Filing fee tiers are adjusted annually pursuant to 15 U.S.C. § 18a note, based on the change in gross national product, in accordance with 15 U.S.C. § 19(a)(5). Filing fees increase annually by the percentage increase, if any, in the consumer price index ("CPI") over the CPI for the fiscal year ending September 30, 2022, pursuant to 15 U.S.C. § 18a note. For current fee information, see the PNO website.

**North American Industry Classification System (NAICS) Data**
When reporting information by 6-digit NAICS code, refer to the North American Industry Classification System - United States, 2022, published by the Executive Office of the President, Office of Management and Budget, available at https://www.census.gov/naics/. This website also provides guidance in choosing the proper code(s).

**Notification Thresholds**
Notification thresholds are adjusted annually based on the change in gross national product, in accordance with 15 U.S.C. § 19(a)(5). See § 801.1(h). The current threshold values can be found at Current Thresholds.

**Person Filing and Filing Person**
The terms "person filing" or "filing person" mean the ultimate parent entity ("UPE"). See § 801.1(a)(3). The terms are used herein interchangeably.

**Select 801.30 Transaction**
A transaction to which § 801.30 applies **and** where (1) the acquisition would not confer control, (2) there is no agreement (or contemplated agreement) between any entity within the acquiring person and any entity within the acquired person governing any aspect of the transaction, and (3) the acquiring person does not have, and will not obtain, the right to serve as, appoint, veto, or approve board members, or members of any similar body, of any entity within the acquired person or the general partner or management company of any entity within the acquired person. Executive compensation transactions also qualify as select 801.30 transactions.

**Supervisory Deal Team Lead**
The individual who has primary responsibility for supervising the strategic assessment of the deal, and who would not otherwise qualify as a director or officer.

**Target**

The target includes all entities and assets to be acquired by the acquiring person from the acquired person in the reported transaction.

**Year**

All references to "year" refer to calendar year. If data are not available on a calendar year basis, supply the requested data for the fiscal year reporting period that most nearly corresponds to the calendar year specified. References to "most recent year" mean the most recently completed calendar or fiscal year for which the requested information is available.

### ► Filing

If the UPE is both an acquiring and acquired person, separate filings must be submitted, one as the acquiring person and one as the acquired person, following the appropriate instructions for each. See § 803.2(a)(2).

Filings should be submitted electronically consistent with the instructions on the PNO website. If the electronic submission platform is unavailable, the Agencies may announce sites for delivery through the media and, if possible, at the PNO website.

### ► Responses

Documents, including the Form, should be produced as (1) a searchable PDF from which text can be copied or (2) an Excel file.

For Business Documents (see below), check the box to indicate whether any part of the document is privileged and then provide the document number, title, and estimated date. If the acquiring person has identified (1) a NAICS overlap, (2) an overlap within the Overlap Description, or (3) a supply relationship within the Supply Relationships Description, also provide the following:
  1. Author(s) (and job title(s)) for documents created by the acquiring person; or
  2. Recipient(s) or supervisor(s) (and job title(s)) of documents created by third parties as part of an engagement with the acquiring person.

If a group of people prepared the document, list all the authors and their titles, identifying the principal authors. Alternatively, it is acceptable to indicate that the document was prepared under the supervision of the lead author and to provide the name and title of that author. Similarly, if the acquiring person engaged a third party to prepare a document, provide the name of the third party, and the name, title, and company name for the individual within the acquiring person who supervised the creation of the document, or for whom the document was prepared. For materials received from a third party that was not engaged by the acquiring person, only the name of the third party is required.

If the acquiring person submits documents in addition to what is required, such documents should be identified as "Voluntary". See § 803.1(b).

Submit only one copy of identical responsive documents.

### ► Privilege

See § 803.3(d). For privileged documents, the filing person must also provide the following in a log:
  1. The privilege type (redacted or withheld);
  2. The privilege claim;
  3. Addressee(s) and all recipients, with company name and title, of the original and any copies;
  4. Subject matter;
  5. Document's present location; and
  6. Who has control over it.

If a privileged document was circulated to a group, such as the board or an investment committee, the name of the group is sufficient, but the filing person should be prepared to disclose the names and titles/positions of the individual group members, if requested.

If the claim of privilege is based on advice from inside and/or outside counsel, the name of the inside and/or outside counsel providing the advice (and the law firm, if applicable) must be provided. If several lawyers participated in providing advice, identifying lead counsel is sufficient. In identifying who controls a document, the name of the law firm is sufficient.

► **Translations**

Materials or information in a language other than English must be translated into English, with the English translation attached to the original version. See § 803.8.

► **Non-Compliance**

If unable to answer any item fully, provide such information as is available and a statement of reasons for non-compliance as required by § 803.3. If exact answers to any item cannot be given, enter best estimates and indicate the source or basis of such estimates. Add an endnote with the notation "est." to any item where data are estimated.

► **Limited Response**

Information need not be supplied regarding assets, voting securities, or non-corporate interests currently being acquired when their acquisition is exempt under the Act or Rules. See § 803.2(c).

### FEE INFORMATION

**Total Expected Filing Fee**
Indicate the value of the total required fee for the transaction.

**Parties Paying the Fee**
Indicate which filing person(s) is paying the filing fee and, if applicable, whether the fee is being paid by multiple entities. For each entity within the acquiring person paying a portion of the fee, provide the name of the payer, the amount paid, the payment method, and the Electronic Wire Transfer (EWT) confirmation number or check number.

**Note on Paying by EWT**
In order for the FTC to track payment, the payer must provide information required by the Fedwire Instructions to the financial institution initiating the EWT. A template of the Fedwire Instructions is available at the PNO website on the Filing Fee Information page.

**Note on Paying by Check**
The FTC strongly discourages check payments because handling a physical check will create a delay in processing the Form. However, if an EWT cannot be arranged, the FTC will accept a check, sent to Financial Operations. Cashiers' or certified checks are preferred. Make the check payable to the Federal Trade Commission and deliver to:

Federal Trade Commission
Financial Operations Division
600 Pennsylvania Ave, Drop H-790
Washington, DC 20580

Please note that the waiting period may be delayed until the fee has been confirmed.

### GENERAL INFORMATION

**Special Filing Types**
Indicate whether the filing is a post-consummation filing, or whether the transaction is a cash tender offer or bankruptcy that is subject to Section 363(b) of the Bankruptcy Code (11 U.S.C. § 363).

**Early Termination**
Indicate whether the acquiring person requests early termination of the waiting period. Notification of each grant of early termination will be published in the Federal Register, as required by 15 U.S.C. § 18a(b)(2), and on the PNO website. Note that if either person in any transaction requests early termination, it may be granted and published.

ULTIMATE PARENT ENTITY (UPE) INFORMATION

► **UPE Details**

**Name**
Provide the name, headquarters address, and website (if one exists) of the person filing notification. The name of the person filing is the name of the UPE of the acquiring person. See § 801.1(a)(3).

**Entity Type**
Specify whether the UPE is a corporation, unincorporated entity, natural person, or other entity type (specify). See § 801.1.

**Filing Made on Behalf of the UPE**
If the filing is being made on behalf of the UPE by another entity within the acquiring person authorized by the UPE to file the notification on its behalf pursuant to § 803.2(a) or filed pursuant to § 803.4 on behalf of a foreign person, provide the name and mailing address of the entity filing the notification on behalf of the UPE.

**Contact Information**
Provide the name, firm/company name, address, telephone number, and e-mail address of two individuals (primary and secondary) to contact regarding the filing. See § 803.20(b)(2)(ii).

Additionally, provide the name, firm/company name, address, telephone number, and e-mail address of an individual located in the United States designated for the limited purpose of receiving notice of the issuance of a request for additional information or documentary material. See § 803.20(b)(2).

**UPE Annual Reports and Financial Information**
- **Central Index Key**
  If the UPE of the acquiring person files annual reports (Form 10-K or Form 20-F) with the United States Securities and Exchange Commission (SEC), provide the Central Index Key (CIK) number.

- **Annual Reports and Audit Reports**
  Provide the most recent annual reports and/or annual audit reports (or, if audited is unavailable, unaudited) of the UPE of the acquiring person.

  Natural person UPEs should not provide personal balance sheets or tax returns. Natural person UPEs should leave this section blank and instead provide the most recent reports for the highest-level entity(ies) that controls the acquiring entity under "UPE Structure."

  The person filing notification may incorporate a document responsive to this item by reference to an internet address directly linking to the document. See § 803.2(e).

- **Date of Report(s)**
  Provide the date of the most recent annual report(s) and/or audit reports (or, if audited is unavailable, unaudited) of the UPE of the acquiring person.

- **Size of Person**
  If applicable, indicate whether the person filing notification stipulates that the acquiring person meets either the higher or lower size of person test. See 15 U.S.C. § 18a(a), § 801.11.

**Minority Shareholders or Interest Holders**
This section requires the acquiring person to report the name, headquarters mailing address, and approximate percentage held by certain minority holders of (1) the acquiring entity, (2) any entity directly or indirectly controlled by the acquiring entity, (3) any entity that directly or indirectly controls the acquiring entity, and (4) any entity within the acquiring person that has been or will be created in contemplation of, or for the purposes of, effectuating the transaction (each a "covered entity").

If a covered entity is not a limited partnership, provide the required information for each individual or entity that currently holds, or will hold as a result of the transaction, 5% or more but less than 50% of the voting securities or non-corporate interests of any covered entity, starting with the UPE.

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations     **89367**

If a covered entity is a limited partnership, provide the required information for its (a) general partner, regardless of the percentage it holds, and (b) limited partners that (i) currently hold, or will hold as a result of the transaction, 5% or more but less than 50% of the non-corporate interests of the covered entity, and (ii) have or will have the right to serve as, nominate, appoint, veto, or approve board members, or individuals with similar responsibilities, of any covered entity, or of the general partner or management company of a covered entity.

If a minority holder is related to a master limited partnership, fund, investment group, or similar entity that does business under a common name, the d/b/a or "street name" of such group should also be listed, if known to the acquiring person.

If the identity of minority investors or percentages to be held of a covered entity is not finalized at the time of filing, provide good faith estimates and explain in an endnote.

#### ► Acquiring Person Structure

**Entities Within the Acquiring Person**
List the name, city, state, zip code, and country of all U.S. entities, and all foreign entities that have sales in or into the United States, that are included within the acquiring person. Entities with total assets of less than $10 million may be omitted. Alternatively, the acquiring person may report all entities within it. The acquiring person must also list all names under which the entities do business (e.g., d/b/a names).

The list of entities should be organized by operating company or operating business ("top-level entity"), if applicable. Filings for select 801.30 transactions need not include d/b/a names and the list of entities can be organized as kept in the ordinary course of business.

**Annual Reports and Audit Reports**
For the acquiring entity(ies) and any entity controlled by the acquiring person whose revenues contribute to a NAICS overlap or any overlap identified in the Overlap Description, provide the CIK number(s) if annual reports (Form 10-K or Form 20-F) are filed with the SEC, and the most recent annual or audit report(s).

Natural person UPEs must also provide the most recent annual report or audit report and CIK number for the highest-level entity that controls the acquiring entity.

#### ► Additional Acquiring Person Information

**Ownership Structure**
Describe the ownership structure of the acquiring entity.

For transactions where a fund or master limited partnership is the UPE, provide any existing organizational chart that shows the relationship of any entities that are affiliates or associates. If such an organizational chart does not exist, there is no requirement to create one.

**Officers and Directors**
For all entities within the acquiring person responsible for the development, marketing, or sale of products or services that are identified as overlaps within the Overlap Description or as supply relationships within the Supply Relationships Description:
- List all current officers and directors (or in the case of unincorporated entities, individuals exercising similar functions) and those who have served in one of these positions within the three months before filing that also serve as an officer or director of another entity that derives revenue in the same NAICS codes reported by the target. For each, provide the name of all such entities. If NAICS codes are unavailable, list all such entities that have operations in the same industry, based on the knowledge or belief of the acquiring person or the identified individual.

For the acquiring entity, entities the acquiring entity directly or indirectly controls, entities that directly or indirectly control the acquiring entity, and entities within the acquiring person that have been or will be created as a result of or as contemplated by the transaction:
- List all current officers and directors (or in the case of unincorporated entities, individuals exercising similar functions) as well as those who are likely to serve in one of these positions that also serve as an officer or director of another entity that derives revenue in the same NAICS codes reported by the target. For each, provide the name of all such entities. If NAICS codes are unavailable, list all such entities that have operations in the same industry, based on the knowledge or belief of the acquiring person or the identified individual. If the identities of the prospective officers or directors are unknown, briefly describe in an endnote who will have the authority to select them.

No filer is required to disclose any individual's role as an officer, director, or member of any non-profit entity organized for a religious or political purpose, even if that entity carries on substantial commerce. Organize the response by entity and include entities that are not yet created but are expected to be created as a result of or as contemplated by the transaction.

**TRANSACTION INFORMATION**

► **Parties**

List the name and mailing address of each acquiring and acquired person and each acquiring and acquired entity. Do not list entities controlled by an acquired entity.

**Acquiring UPE**

Provide the name, headquarters address, and website of the acquiring person.

**Acquiring Entity(ies)**

If an entity other than the acquiring UPE is making the acquisition, provide the name, mailing address, and website of that entity.

**Acquired UPE**

Provide the name, headquarters address, and website of the acquired person.

**Target(s)**

If the assets, voting securities, or non-corporate interests of an entity other than the acquired UPE are being acquired, provide the name, mailing address, and website of that entity.

► **Transaction Details**

**801.30 Transaction**

Indicate whether the transaction is subject to § 801.30 and if so, what type(s), including select 801.30.

**Transaction Type**

Indicate whether the transaction is any of the following (select all that apply):

- Acquisition of voting securities;
- Acquisition of non-corporate interests;
- Acquisition of assets;
- Merger (see § 801.2);
- Consolidation (see § 801.2);
- Formation of a joint venture, other corporation, or unincorporated entity (see §§ 801.40 and 801.50);
- Acquisition subject to § 801.31;
- Secondary acquisition subject to § 801.4;
- Acquisition subject to § 801.2(e); or
- Other (specify)

**Acquisition Details**

Provide the requested information for the value and percentage of assets, voting securities, and non-corporate interests to be acquired. If a combination of assets, voting securities, and/or non-corporate interests is being acquired and allocation is not possible, note such information in an endnote.

For determining the percentage of voting securities, evaluate total voting power per § 801.12. For determining the percentage of non-corporate interests, evaluate the economic interests per § 801.1(b)(1)(ii).

To complete this item:

- State the percentage of voting securities already held by the acquiring person. See § 801.12.
- State the value of voting securities already held by the acquiring person. See § 801.10.
- State the total percentage of voting securities to be held by the acquiring person as a result of the acquisition. See § 801.12.
- State the total value of voting securities to be held by the acquiring person as a result of the acquisition. See § 801.10.
- State the percentage of non-corporate interests already held by the acquiring person. See § 801.1(b)(1)(ii).
- State the value of non-corporate interests already held by the acquiring person. See § 801.10.
- State the total percentage of non-corporate interests to be held by the acquiring person as a result of the acquisition. See §§ 801.10 and 801.1(b)(1)(ii).
- State the total value of non-corporate interests to be held by the acquiring person as a result of the acquisition. See § 801.10.
- State the total value of assets to be held by the acquiring person as a result of the acquisition. See § 801.10.
- State the aggregate total value of assets, voting securities, and non-corporate interests of the acquired person to be held by the acquiring person as a result of the acquisition. See §§ 801.10, 801.12, 801.13 and 801.14.

**Notification Threshold**

This item should only be completed when voting securities are being acquired. If more than voting securities are being acquired, respond to this item only regarding voting securities. Indicate the highest applicable threshold for which notification is being filed. See § 801.1(h).

- $50 million (as adjusted);
- $100 million (as adjusted);
- $500 million (as adjusted);
- 25% (if the value of voting securities to be held is greater than $1 billion, as adjusted);
- 50%; or
- N/A.

Note that the 50% notification threshold is the highest threshold and should be used for any acquisition of 50% or more of the voting securities of an issuer, regardless of the value of the voting securities. For instance, an acquisition of 100% of the voting securities of an issuer valued in excess of $500 million (as adjusted) would cross the 50% notification threshold, not the $500 million (as adjusted) threshold.

▶ **Transaction Description**

**Business of the Acquiring Person**

Describe the business operation(s) of the acquiring person.

**Business of the Target**

Describe the business operation(s) being acquired. If assets, describe the assets and whether they comprise an operating business.

**Non-Reportable UPE(s)**

Provide the names of any UPE that does not have a reporting obligation.

**Transaction Description**

Briefly describe the transaction, indicating whether assets, voting securities, or non-corporate interests (or some combination) are being acquired. Indicate what consideration will be received by each person and the scheduled consummation date of the transaction. Also identify any special circumstances that apply to the filing, such as whether part of the transaction is exempt under one of the exemptions found in Part 802.

If any attached transaction documents use code names to refer to the parties, provide an index identifying the code names.

**Related Transactions**

If the transaction that is the subject of this filing has related filings, indicate whether the related filing(s) (choose all that apply):

- Is a principal transaction that triggers one or more shareholder backside transactions;
- Is a shareholder backside transaction;
- Has more than one acquiring UPE;
- Has more than one acquired UPE;
- Has more than one reportable step;
- Is a joint venture;
- Is a consolidation;
- Is an exchange of assets;
- Has one or more filings in the alternative; or
- Has other circumstances that require more than one filing and if so, explain.

Provide all additional details regarding the related filings(s), including party names and transaction numbers, necessary to identify and connect all related filings.

▶ **Transactions Subject to International Antitrust Notification**

Indicate whether, to the knowledge or belief of the filing person at the time of filing, a non-U.S. antitrust or competition authority has been or will be notified of the transaction.

If yes, list the name of each such authority. Identify, to the knowledge or belief of the filing person at the time of filing, any jurisdiction where (1) a merger notification has been filed, (2) a merger notification is being prepared for filing, or (3) the parties have a good faith belief that a merger notification will be made, along with the dates of the filing or planned filing.

**89370**     **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

► Additional Transaction Information

**Transaction Rationale**

Except for select 801.30 transactions, identify and explain each strategic rationale for the transaction discussed or contemplated by the filing person or any of its officers, directors, or employees. If the rationale of acquiring entity is different from the UPE, submit an explanation for each. Identify each document produced in the filing that confirms or discusses the stated rationale(s). If documents produced in the filing are referenced, identify the specific page(s) that discusses the stated rationale(s).

**Transaction Diagram**

Except for select 801.30 transactions, submit a diagram of the transaction, if one exists. If such a diagram does not exist, there is no requirement to create one.

► Joint Ventures

Complete only if the acquisition is the formation of a joint venture corporation or unincorporated entity. See §§ 801.40 and 801.50.

**Contributions**

List the contributions that each person forming the joint venture corporation or unincorporated entity has agreed to make, specifying when each contribution is to be made and the value of the contribution as agreed by the contributors.

**Consideration**

Describe fully the consideration that each person forming the joint venture corporation or unincorporated entity will receive in exchange for its contribution(s).

**Business Description**

Describe generally the business in which the joint venture corporation or unincorporated entity will engage, including its principal types of products or activities, and the geographic areas in which it will do business.

**NAICS Codes**

Identify each 6-digit NAICS industry code in which the joint venture corporation or unincorporated entity will derive dollar revenues.

► Business Documents

**Transaction-Related Documents**

- **Competition Documents**
  Provide all studies, surveys, analyses, and reports prepared by or for any officer(s), director(s), or supervisory deal team lead for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into product or geographic markets. For unincorporated entities, provide such documents prepared by or for individuals exercising similar functions as officers and directors, as well as the supervisory deal team lead.

- **Confidential Information Memoranda**
  Provide all confidential information memoranda prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) of the UPE of the acquiring or of the acquiring entity(s) that specifically relate to the sale of the target. If no such confidential information memorandum exists, submit any document(s) given to any officer(s) or director(s) of the acquiring person meant to serve the function of a confidential information memorandum. This does not include ordinary course documents and/or financial data shared in the course of due diligence, except to the extent that such materials served the purpose of a confidential information memorandum when no such confidential information memorandum exists. Documents responsive to this item are limited to those produced within one year before the date of filing.

- **Third-Party Studies, Surveys, Analyses, and Reports**
  Provide all studies, surveys, analyses and reports prepared by investment bankers, consultants, or other third-party advisors ("third-party advisors") for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) of the UPE of the acquiring person or of the acquiring entity(s) for the purpose of evaluating or analyzing market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets that specifically relate to the sale of the target. This item requires only materials developed by third party advisors during an engagement or for the purpose of seeking an engagement. Documents responsive to this item are limited to those produced within one year before the date of filing.

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations    **89371**

- **Synergies and Efficiencies**
  Provide all studies, surveys, analyses, and reports evaluating or analyzing synergies, and/or efficiencies prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) for the purpose of evaluating or analyzing the acquisition. Financial models without stated assumptions need not be provided.

**Plans and Reports**
Except for select 801.30 transactions, provide all regularly prepared plans and reports that were provided to the Chief Executive Officer (CEO) of the acquiring entity or any entity that it controls or is controlled by that analyze market shares, competition, competitors, or markets pertaining to any product or service of the acquiring person also produced, sold, or known to be under development by the target, as identified in the Overlap Description. Documents responsive to this item are limited to those prepared or modified within one year of the date of filing.

Except for select 801.30 transactions, provide all plans and reports that were provided to the Board of Directors of the acquiring entity or any entity that it controls or is controlled by that analyze market shares, competition, competitors, or markets pertaining to any product or service of the acquiring person also produced, sold, or known to be under development by the target, as identified in the Overlap Description. Documents responsive to this item are limited to those prepared or modified within one year of the date of filing.

**► Agreements**

**Transaction-Specific Agreements**
Furnish copies of all documents that constitute the agreement(s) related to the transaction, including, but not limited to, exhibits, schedules, side letters, agreements not to compete or solicit, and other agreements negotiated in conjunction with the transaction that the parties intend to consummate, and excluding clean team agreements.

Documents that constitute the agreement(s) (e.g., Agreement and Plan of Merger, Letter of Intent, Purchase and Sale Agreement, Asset Purchase Agreement, Stock/Securities Purchase Agreement) must be executed, while supporting agreements, such as employment agreements and agreements not to compete may be provided in draft form if that is the most recent version.

If the executed agreement is not the definitive agreement, submit a dated document that provides sufficient detail about the scope of the entire transaction that the parties intend to consummate, such as an agreement in principle, or term sheet, or the most recent draft agreement. See § 803.5. Such document should include information regarding some combination of the following terms: the identity of the parties; the structure of the transaction; the scope of what is being acquired; calculation of the purchase price; an estimated closing timeline; employee retention policies, including with respect to key personnel; post-closing governance; and transaction expenses or other material terms.

Note that transactions subject to § 801.30 and bankruptcies under 11 U.S.C. § 363(b) do not require an executed agreement. For bankruptcies, provide the order from the bankruptcy court.

**Other Agreements Between the Acquiring Person and Target**
Indicate whether the acquiring person has, or had within one year of filing, any contractual agreement(s) with the target. If so, indicate which type(s). If an agreement has terms that apply to more than one category, indicate each category that applies.

**COMPETITION DESCRIPTIONS**

This section is not applicable to select 801.30 transactions.

**► Overlap Description**

Briefly describe each of the principal categories of products and services (as reflected in documents created in the ordinary course of business) of the acquiring person.

In addition, list and briefly describe each of the current or known planned products or services of the acquiring person that competes with (or could compete with) a current or known planned product or service of the target, based on documents created in the ordinary course of business. Current or known planned products or services include those that the acquiring person or target researches, develops, manufactures, produces, sells, offers, provides, supplies, or distributes. Known planned products or services may be limited to those referenced in any submitted Business Document and should reflect the acquiring person's existing knowledge of the target's business. The acquiring and acquired person should not exchange information for the purpose of answering this item.

**89372**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

For each such product or service listed, provide:

1. The sales (in dollars) for the most recent year. For those products or services not generating revenue or whose performance is not measured by revenue in the ordinary course of business, provide projected revenue, estimates of the volume of products to be sold, time spent using the service, or any other metric by which the acquiring person measures performance (e.g., daily users, new signups).

2. A description of all categories of customers of the acquiring person that purchase or use the product or service (e.g., retailer, distributor, broker, government, military, educational, national account, local account, commercial, residential, or institutional). If no customers have yet used the product or service, provide the date that development of the product or service began; a description of the current stage in development, including any testing and regulatory approvals and any planned improvements or modifications; the date that development (including testing and regulatory approvals) was or will be completed; and the date that the product or service is expected to be sold or otherwise commercially launched.

3. The top 10 customers in the most recent year (as measured in dollars), and the top 10 customers for each customer category identified.

▶ **Supply Relationships Description**

**Related Sales**
List and briefly describe each product, service, or asset (including data) that the acquiring person has sold, licensed, or otherwise supplied, and which represented at least $10 million in revenue (including internal transfers) in the most recent year (1) to the target, or (2) to any other business that, to the acquiring person's knowledge or belief, uses the acquiring person's product, service, or asset to compete with the target's products or services, or as an input for a product or service that competes or is intended to compete with the target's products or services. Responses to this item should reflect the acquiring person's existing knowledge of the target's business; the acquiring and acquired person should not exchange information for the purpose of answering this item.

For each product, service, or asset listed, for the most recent year, provide:

1. The sales (in dollars) to (1) the target and (2) any other business that, to the acquiring person's knowledge or belief, uses the acquiring person's product, service, or asset to compete with the target's products or services, or as an input for a product or service that competes or is intended to compete with the target's products or services.

2. The top 10 customers (as measured in dollars) of the acquiring person that use the acquiring person's product, service, or asset to compete with the target's products or services, or as an input for a product or service that competes or is intended to compete with the target's products or services. For each such customer, describe the acquiring person's supply or licensing agreement (or other comparable terms of supply).

**Related Purchases**
List and briefly describe each product, service, or asset (including data) that the acquiring person incorporates as an input into any product or service and that the acquiring person has purchased, licensed, or otherwise obtained, and which represented at least $10 million in revenue (including internal transfers), in the most recent year (1) from the target or (2) from any other business that, to the acquiring person's knowledge or belief, competes with the target to provide a substantially similar product, service, or asset. Responses to this item should reflect the acquired person's existing knowledge of the acquiring person's business; the acquiring and acquired person should not exchange information for the purpose of answering this item.

For each product, service, or asset listed, for the most recent year, provide:

1. The purchased amount (in dollars) for (1) the target and (2) any other business that, to the acquiring person's knowledge or belief, competes with the target to provide a substantially similar product, service, or asset.

2. The top 10 suppliers (as measured in dollars) for the associated input product, service, or asset, and a description of the acquiring person's purchase or licensing agreement (or other comparable terms of purchase).

## REVENUES AND OVERLAPS

▶ **NAICS Codes**

This item requests information regarding the industry categories for the acquiring person's products and services that derived revenue in the most recent year.

**No Revenue**
If there is no revenue to report, explain why.

**NAICS Codes Describing U.S. Operations with Estimates of Revenue**
Identify all 6-digit NAICS industry codes that describe the U.S. operations of the acquiring person, inclusive of all entities included within the acquiring person at the time the filing is made.

Responses must be organized by NAICS code in ascending order. For each code, provide the name of the operating business(es) that derive(s) revenue in that code and the estimated revenue range: less than $10 million; $10 million or more but less than $100 million; $100 million or more but less than $1 billion; or $1 billion or more.

Identify each 6-digit NAICS industry code in which both the acquiring person and target derive revenue by checking the overlap box.

For products and services that derived revenue in the most recent year in a non-manufacturing NAICS code, if the revenue is estimated at less than one million dollars, that code may be omitted so long as the code does not overlap with a code in which the target derived revenue from U.S. operations.

► **Controlled Entity Geographic Overlaps**
If, to the knowledge or belief of the person filing notification, the acquiring person, or any associate of the acquiring person (see § 801.1(d)(2)), derived any amount of dollar revenues in the most recent year from operations:
1. In industries within any 6-digit NAICS industry code in which the target also derived any amount of dollar revenues in the most recent year; or
2. In which a joint venture corporation or unincorporated entity will derive dollar revenues;

then for each such 6-digit NAICS industry code follow the instructions below for this section.

Note that if the target is a joint venture, the only overlaps that should be reported are those between the assets to be held by the joint venture and any assets of the acquiring person or its associates not contributed to the joint venture.

**NAICS Overlaps of Controlled Entities**
List each overlapping NAICS code and description. For each, list the name of each operating business within the acquiring person or associate of the acquiring person that has U.S. operations in the same NAICS code as the target and the name(s) under which the operating business does business, whether the listed entity is controlled by the acquiring person or an associate of the acquiring person, and provide the appropriate Geographic Market Information, based upon the NAICS code. Organize responses by NAICS code in ascending order.

**Geographic Market Information**
For each identified overlapping NAICS code, provide geographic information, as described below. Use the 2-digit postal codes for states and territories and provide the total number of states and territories at the end of the response.

Except in the case of those NAICS industries in the sectors, subsectors, and codes that require street-address level reporting, the person filing notification may respond with the word "national" if business is conducted in all 50 states.

- **State-Level Reporting**
  ○ Manufacturing Industries
    For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states in which, to the knowledge or belief of the person filing the notification, the products in that 6-digit NAICS industry code produced by the acquiring person or associate of the acquiring person are sold without a significant change in their form (whether they are sold by the acquiring person or associate of the acquiring person or by others to whom such products have been sold or resold).

    **31**** through 33**** Manufacturing**, *except*:
       3115**    Dairy Product Manufacturing
       311611    Animal (except Poultry) Slaughtering
       311613    Rendering and Meat Byproduct Processing
       311615    Poultry Processing
       31181*    Bread and Bakery Product Manufacturing
       321***    Wood Product Manufacturing
       32221*    Paperboard Container Manufacturing
       324***    Petroleum and Coal Products Manufacturing
       3251**    Basic Chemical Manufacturing

**89374**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

325521  Plastics Materials and Resin Manufacturing
3271**  Clay Product and Refractory Manufacturing
3272**  Glass and Glass Product Manufacturing
3273**  Cement and Concrete Product Manufacturing

○  Wholesale Trade
For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states or, if desired, portions thereof in which the customers of the acquiring person or associate of the acquiring person are located.

**42****      Wholesale Trade**, *except*:
42331*  Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers
42333*  Roofing, Siding, and Insulation Material Merchant Wholesalers
42344*  Other Commercial Equipment Merchant Wholesalers
42345*  Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers
42346*  Ophthalmic Goods Merchant Wholesalers
42349*  Other Professional Equipment and Supplies Merchant Wholesalers
4239**  Miscellaneous Durable Goods Merchant Wholesalers
4241**  Paper and Paper Product Merchant Wholesalers
4242**  Drug and Druggists' Sundries Merchant Wholesalers
42441*  General Line Grocery Merchant Wholesalers
42442*  Packaged Frozen Food Merchant Wholesalers
42451*  Grain and Field Bean Merchant Wholesalers
42452*  Livestock Merchant Wholesalers
4247**  Petroleum and Petroleum Products Merchant Wholesalers
4248**  Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers
42491*  Farm Supplies Merchant Wholesalers
42495*  Paint, Varnish, and Supplies Merchant Wholesalers

○  Insurance Carriers
For the 6-digit NAICS code within the industry subsector listed below, list the state(s) in which the acquiring person or associate of the acquiring person is licensed to write insurance.

**5241**      Insurance Carriers**

○  Other NAICS Sectors
For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states or, if desired, portions thereof in which the acquiring person or associate of the acquiring person conducts such operations.

**11****      Agriculture, Forestry, Fishing, and Hunting**, *except*:
113***  Forestry and Logging

**21****      Mining, Quarrying, and Oil and Gas Extraction**, *except*:
2123**  Nonmetallic Mineral Mining and Quarrying

**2213**      Water, Sewage, and Other Systems**

**23****      Construction**

**44912*      Home Furnishing Retailers**
**4492**      Electronics and Appliance Retailers**

**48**** and 49**** Transportation and Warehousing**, *except*:
493***  Warehousing and Storage

**51****      Information**, *except*:
512***  Motion Picture and Sound Recording Industries

**5222**      Nondepository Credit Intermediation**
**523***      Securities, Commodity Contracts, and Other Financial Investments and Related Activities**
**5242**      Agencies, Brokerages, and Other Insurance Related Activities**
**525***      Funds, Trusts, and Other Financial Vehicles**

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations    **89375**

531***    Real Estate
533***    Lessors of Nonfinancial Intangible Assets (Except Copyrighted Works)

54****    **Professional, Scientific and Technical Services,** *except:*
   54138*    Testing Laboratories and Services
   54194*    Veterinary Services

55****    Management of Companies and Enterprises

561***    Administrative and Support Services

61****    Educational Services

71****    **Arts, Entertainment, and Recreation,** *except:*
   7132**    Gambling Industries
   71394*    Fitness and Recreational Sports Centers

7212**    RV (Recreational Vehicle) Parks and Recreational Camps
7213**    Rooming and Boarding Houses, Dormitories, and Workers' Camps
8114**    Personal and Household Goods Repair and Maintenance
813***    Religious, Grantmaking, Civic, Professional, and Similar Organizations
814***    Private Households

- **Street-Level Reporting**
  For each 6-digit NAICS code within the industry sector, subsector, or code listed below, provide the street address, arranged by state, zip code, county and city or town of each establishment from which dollar revenues were derived (either directly by the acquiring person or associate of the acquiring person or by a franchisee) in the most recent year.

113***    Forestry and Logging
2123**    Nonmetallic Mineral Mining and Quarrying

22****    **Utilities,** *except:*
   2213**    Water, Sewage and Other Systems

3115**    Dairy Product Manufacturing
311611    Animal (except Poultry) Slaughtering
311613    Rendering and Meat Byproduct Processing
311615    Poultry Processing
31181*    Bread and Bakery Product Manufacturing
321***    Wood Product Manufacturing
32221*    Paperboard Container Manufacturing
324***    Petroleum and Coal Products Manufacturing
3251**    Basic Chemical Manufacturing
325521    Plastics Materials and Resin Manufacturing
3271**    Clay Product and Refractory Manufacturing
3272**    Glass and Glass Product Manufacturing
3273**    Cement and Concrete Product Manufacturing
42331*    Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers
42333*    Roofing, Siding, and Insulation Material Merchant Wholesalers
42344*    Other Commercial Equipment Merchant Wholesalers
42345*    Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers
42346*    Ophthalmic Goods Merchant Wholesalers
42349*    Other Professional Equipment and Supplies Merchant Wholesalers
4239**    Miscellaneous Durable Goods Merchant Wholesalers
4241**    Paper and Paper Product Merchant Wholesalers
4242**    Drug and Druggists' Sundries Merchant Wholesalers
42441*    General Line Grocery Merchant Wholesalers
42442*    Packaged Frozen Food Merchant Wholesalers
42451*    Grain and Field Bean Merchant Wholesalers
42452*    Livestock Merchant Wholesalers

4247**    Petroleum and Petroleum Products Merchant Wholesalers
4248**    Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers
42491*    Farm Supplies Merchant Wholesalers
42495*    Paint, Varnish, and Supplies Merchant Wholesalers

**44**** and 45**** Retail Trade**, *except*:
    44912*    Home Furnishings Retailers
    4492**    Electronics and Appliance Retailers

493***    Warehousing and Storage
512***    Motion Picture and Sound Recording Industries
521***    Monetary Authorities-Central Bank
5221**    Depository Credit Intermediation
5223**    Activities Related to Credit Intermediation
532***    Rental and Leasing Services
54138*    Testing Laboratories and Services
54194*    Veterinary Services
562***    Waste Management and Remediation Services
62****    Health Care and Social Assistance
7132**    Gambling Industries
71394*    Fitness and Recreational Sports Centers

**72**** Accommodation and Food Services**, *except*:
    7212**    RV (Recreational Vehicle) Parks and Recreational Camps
    7213**    Rooming and Boarding Houses, Dormitories, and Workers' Camps

811***    Repair and Maintenance, except
8114**    Personal and Household Goods Repair and Maintenance

812***    Personal and Laundry Services

### ► Minority-Held Entity Overlaps

This section requires the disclosure of holdings of the acquiring person and its associates (see § 801.1(d)(2)) of 5% or more but less than 50% of certain entities that derive dollar revenues in any 6-digit NAICS code reported by the target. If NAICS codes are unavailable, holdings in entities that have operations in the same industry as the target, based on the knowledge or belief of the filing person, should be listed. Holdings in those entities that have total assets of less than $10 million may be omitted.

**Minority Holdings of Acquiring Person and Its Associates**
If the acquiring person holds 5% or more but less than 50% of the voting securities of any issuer or non-corporate interests of any unincorporated entity that derived dollar revenues in the most recent year from operations in industries within any 6-digit NAICS code(s) reported by the target, list the name of such entity and d/b/a names (if known), the percentage held, the entity within the acquiring person that holds the minority interests, and the overlapping 6-digit NAICS code(s) or industry(ies).

Additionally, based on the knowledge or belief of the acquiring person, for each associate of the acquiring person holding:
1. 5% or more but less than 50% of the voting securities or non-corporate interests of an acquired entity; and/or
2. 5% or more but less than 50% of the voting securities of any issuer or non-corporate interests of any unincorporated entity that derived dollar revenues in the most recent year from operations in industries within any 6-digit NAICS industry code in which the target also derived dollar revenues in the most recent year,

list the name of such entity and d/b/a names (if known), percentage held, the associate of the acquiring person that holds the minority interests, and the overlapping 6-digit NAICS code(s) or industry(ies).

Responses should be organized alphabetically by the name of the entity in which minority interests are held.
The acquiring person may rely on its regularly prepared financials that list its investments, and those of its associates that list their investments, provided the financials are no more than three months old.

### ► Prior Acquisitions

This item pertains only to prior acquisitions of U.S. entities or assets and foreign entities or assets with sales in or into the U.S. by the acquiring person that in the most recent year (1) derived revenue in an identified 6-digit NAICS industry code overlap, **or** (2) provided or produced a competitive overlap product or service as described in the Overlap Description.

For each such overlap, list all acquisitions of entities or assets deriving dollar revenues in an overlapping 6-digit NAICS industry code or overlapping product or service made by the acquiring person in the five years prior to the date of the instant filing, even if the transaction was non-reportable. List only acquisitions of 50% or more of the voting securities of an issuer, 50% or more of non-corporate interests of an unincorporated entity, or all or substantially all the assets of an operating business if the entity or business had annual net sales or total assets greater than $10 million in the year prior to the acquisition and any acquisitions of assets that did not constitute all or substantially all of an operating business valued at or above the statutory size-of-transaction test at the time of their acquisition.

For each such acquisition, supply:
1. the overlapping 6-digit NAICS code(s) (by number and description) identified above in which the acquired entity or assets derived dollar revenues, or the competitive overlap product(s) or service(s) in the Overlap Description;
2. the name of the entity from which the assets, voting securities, or non-corporate interests were acquired;
3. the headquarters address of that entity prior to the acquisition;
4. whether assets, voting securities, or non-corporate interests were acquired; and
5. the consummation date of the acquisition.

## ADDITIONAL INFORMATION

### ▶ Subsidies from Foreign Entities or Governments of Concern

Indicate whether, to the knowledge or belief of the filing person, within the two years prior to filing, the acquiring person has received any subsidy (or a commitment to provide a subsidy in the future) from any foreign entity or government of concern (see § 801.1(r)). If yes, list each entity or government from which such subsidy was received (or which has made the commitment) and provide a brief description of the subsidy.

Indicate whether, for products the acquiring person produced in whole or in part in a country that is a covered nation under 42 U.S.C. § 18741(a)(5)(C), any product is subject to countervailing duties imposed by any jurisdiction. If yes, list each product, the countervailing duty imposed, and the jurisdiction that imposed the duty.

Indicate whether, to the knowledge or belief of the filing person, for products the acquiring person produced in whole or in part in a country that is a covered nation under 42 U.S.C. § 18741(a)(5)(C), any product is the subject of a current investigation for countervailing duties in any jurisdiction. If yes, list each product and the jurisdiction conducting the investigation.

### ▶ Defense or Intelligence Contracts

Except for select 801.30 transactions, identify (1) pending requests for proposals from the U.S. Department of Defense or any member of the U.S. intelligence community, as defined by 10 U.S.C. § 101(a)(6) or 50 U.S.C. § 3003(4) for which the acquiring person has submitted a proposal and (2) awarded procurement contracts with the U.S. Department of Defense or any member of the U.S. intelligence community, as defined by 10 U.S.C. § 101(a)(6) or 50 U.S.C. § 3003(4) valued at $100 million or more if such pending requests for proposals or such awarded procurement contracts (a) are or will be the source of revenues in any identified 6-digit NAICS industry code overlap; or (b) involve or will involve an overlap product or service as described in the Overlap Description or the Supply Relationships Description. Limit the response to the acquiring entity and any entity within the acquiring person that directly or indirectly controls the acquiring entity. Include (1) the name of the entity within the filing person (2) the contracting office, as defined by 48 C.F.R. § 2.101(b); (3) the Contracting Office ID; (4) the Award ID; and (5) the NAICS code(s), if any, listed in the System for Award Management database. Do not include classified information but note that responsive information was withheld on that basis.

### ▶ Voluntary Waivers

- **HSR Confidentiality Waiver for International Competition Authorities (VOLUNTARY)**
  Indicate whether the acquiring person agrees to waive the disclosure exemption contained in the Act, 15 U.S.C. § 18a(h), to permit the DOJ and FTC to disclose to non-U.S. competition authority/authorities listed by the filing person (1) the fact that a notification was filed, (2) the waiting period associated with the notification, and (3) information and documents filed with the notification. This waiver will not cover materials provided in response to a request for additional information issued pursuant to 15 U.S.C. § 18a(e) and does not preclude the acquiring person from providing a full waiver as provided for under FTC and DOJ practice as reflected in the Model Waiver. The acquiring person should list the jurisdictions to which the waiver applies. This item is voluntary.

- **HSR Confidentiality Waiver for State Attorneys General (VOLUNTARY)**
  Indicate whether the acquiring person agrees to waive any part of the disclosure exemption contained in the Act, 15 U.S.C. § 18a(h). If yes, list the applicable State Attorneys General and whether the acquiring person permits the DOJ and FTC to disclose (1) the fact that a notification was filed and the waiting period associated with the notification, (2) information and documents filed with the notification, or (3) both (1) and (2). This waiver will not cover materials provided in response to a request for additional

issued pursuant to 15 U.S.C. § 18a(e) and does not preclude the acquiring person from providing a full waiver as provided for under FTC and DOJ practice as reflected in the Model Waiver. The acquiring person should list the jurisdictions to which the waiver applies. This item is voluntary.

## CERTIFICATION

See § 803.6 for requirements.

The certification must be notarized or use the language found in 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury. The Form includes the following language:

**Penalties for False Statements**
Federal law provides criminal penalties, including up to twenty years imprisonment, for any person who knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence an ongoing or anticipated federal investigation (see, e.g., Section 1519 of Title 18, United States Code.). It is also a criminal offense to knowingly make a false statement in a federal investigation, obstruct a federal investigation, or conspire to obstruct justice or obstruct or impede the lawful functioning of the government (see, e.g., Sections 371, 1001, and 1505 of Title 18, United States Code).

**CERTIFICATION**
This NOTIFICATION AND REPORT FORM, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Commission. Subject to the recognition that, where so indicated, reasonable estimates have been made because books and records do not provide the required data, the information is, to the best of my knowledge, true, correct, and complete in accordance with the statute and rules.

I acknowledge that the Commission or the Assistant Attorney General of the Antitrust Division of the Department of Justice may, prior to the expiration of the initial waiting period pursuant to 15 U.S.C. § 18a, require the submission of additional information or documentary material relevant to the proposed transaction.

## AFFIDAVITS

Affidavit(s) required by § 803.5 must be notarized or use the language found in 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury. If an entity is filing on behalf of the acquiring person, the affidavit must still attest to the good faith intent of the UPE.

In non-§ 801.30 transactions, the affidavit(s) (submitted by both persons filing) must attest that an agreement to merge or acquire has been executed, and if the executed agreement is not the definitive agreement, that a dated document that provides sufficient detail about the scope of the entire transaction that the parties intend to consummate has been submitted. The affidavit(s) must further attest to the good faith intention of the person filing notification to complete the transaction. See § 803.5(b).

In § 801.30 transactions, the affidavit (submitted only by the acquiring person) must attest:
1. That the issuer whose voting securities or the unincorporated entity whose non-corporate interests are to be acquired has received notice, as described below, from the acquiring person;
2. In the case of a tender offer, that the intention to make the tender offer has been publicly announced; and
3. The good faith intention of the person filing notification to complete the transaction.

Acquiring persons in § 801.30 transactions are also required to submit a copy of the notice received by the acquired person pursuant to § 803.5(a)(3) along with the filing. This notice must include:
1. The identity of the acquiring person and the fact that the acquiring person intends to acquire voting securities of the issuer or non-corporate interests of the unincorporated entity;
2. The specific notification threshold that the acquiring person intends to meet or exceed in an acquisition of voting securities;
3. The fact that the acquisition may be subject to the Act, and that the acquiring person will file notification under the Act;
4. The anticipated date of receipt of such notification by the Agencies; and
5. The fact that the person within which the issuer or unincorporated entity is included may be required to file notification under the Act. See § 803.5(a).

**PRIVACY ACT STATEMENT**

Section 18a(a) of Title 15 of the U.S. Code authorizes the collection of this information. The primary use of information submitted on this Form is to determine whether the reported merger or acquisition may violate the antitrust laws. Taxpayer information is collected, used, and may be shared with other agencies and contractors for payment processing, debt collection and reporting purposes. Furnishing the information on the Form is voluntary. Consummation of an acquisition required to be reported by the statute cited above without having provided this information may, however, render a person liable to civil penalties up to the amount listed in 16 C.F.R. §1.98(a) per day.

We also may be unable to process the Form unless you provide all of the requested information.

**DISCLOSURE NOTICE**

Public reporting burden for this report is estimated to average 105 hours per response, including time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this report, including suggestions for reducing this burden to:

Premerger Notification Office
Federal Trade Commission
400 7th Street, S.W.
Washington, D.C. 20024

and

Office of Information and Regulatory Affairs
Office of Management and Budget
Washington, D.C. 20503

Under the Paperwork Reduction Act, as amended, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The operative OMB control number, 3084-0005, appears within the Notification and Report Form and these Instructions.

**89380**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

---

**Antitrust Improvements Act**
**Notification for Certain Mergers and Acquisitions**

**Acquired Person Instructions**

### GENERAL INSTRUCTIONS AND INFORMATION

These instructions specify the information that must be submitted pursuant to § 803.1(a) of the premerger notification rules, 16 CFR Parts 801-803 ("the Rules"). Submitted materials must be provided to the Federal Trade Commission ("FTC") and to the Antitrust Division of the Department of Justice ("DOJ") (together, "the Agencies").

► **Information**

The central office for information and assistance concerning the Rules is:

Premerger Notification Office
Federal Trade Commission
400 7th Street, S.W.
Washington, D.C. 20024
Phone: (202) 326-3100
E-mail: HSRhelp@ftc.gov for Rules questions
Premerger@ftc.gov for filing information

Copies of these Instructions, the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("the Act"), the Rules, FTC final rules (including their Statements of Basis and Purpose) published in the Federal Register, as well as information to assist in submitting the required information are available at the FTC's Premerger Notification Office ("PNO") website.

► **Definitions and Explanation of Terms**

Unless otherwise indicated, the definitions provided in the Rules apply to these Instructions.

**Dollar Values**
All financial information should be expressed in millions of dollars rounded to the nearest hundred thousand.

**Fee Information**
The filing fee is based on the aggregate total value of assets, voting securities, and controlling non-corporate interests to be held as a result of the acquisition. Filing fee tiers are adjusted annually pursuant to 15 U.S.C. § 18a note, based on the change in gross national product, in accordance with 15 U.S.C. § 19(a)(5). Filing fees increase annually by the percentage increase, if any, in the consumer price index ("CPI") over the CPI for the fiscal year ending September 30, 2022, pursuant to 15 U.S.C. § 18a note. For current fee information, see the PNO website.

**North American Industry Classification System (NAICS) Data**
When reporting information by 6-digit NAICS code, refer to the North American Industry Classification System - United States, 2022, published by the Executive Office of the President, Office of Management and Budget, available at https://www.census.gov/naics/. This website also provides guidance in choosing the proper code(s).

**Notification Thresholds**
Notification thresholds are adjusted annually based on the change in gross national product, in accordance with 15 U.S.C. § 19(a)(5). See § 801.1(h). The current threshold values can be found at Current Thresholds.

**Person Filing and Filing Person**
The terms "person filing" or "filing person" mean the ultimate parent entity ("UPE"). See § 801.1(a)(3). The terms are used herein interchangeably.

**Select 801.30 Transaction**
A transaction to which § 801.30 applies **and** where (1) the acquisition would not confer control, (2) there is no agreement (or contemplated agreement) between any entity within the acquiring person and any entity within the acquired person governing any aspect of the transaction, and (3) the acquiring person does not have, and will not obtain, the right to serve as, appoint, veto, or approve board members, or members of any similar body, of any entity within the acquired person or the general partner or management company of any entity within the acquired person. Executive compensation transactions also qualify as select 801.30 transactions.

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations      **89381**

**Supervisory Deal Team Lead**

The individual who has primary responsibility for supervising the strategic assessment of the deal, and who would not otherwise qualify as a director or officer.

**Target**

The target includes all entities and assets to be acquired by the acquiring person from the acquired person in the reported transaction.

**Year**

All references to "year" refer to calendar year. If data are not available on a calendar year basis, supply the requested data for the fiscal year reporting period that most nearly corresponds to the calendar year specified. References to "most recent year" mean the most recently completed calendar or fiscal year for which the requested information is available.

▶ **Filing**

If the UPE is both an acquiring and acquired person, separate filings must be submitted, one as the acquiring person and one as the acquired person, following the appropriate instructions for each. See § 803.2(a)(2).

Filings should be submitted electronically consistent with the instructions on the PNO website. If the electronic submission platform is unavailable, the Agencies may announce sites for delivery through the media and, if possible, at the PNO website.

▶ **Responses**

Documents, including the Form, should be produced as (1) a searchable PDF format from which text can be copied or (2) an Excel file.

For Business Documents (see below), check the box to indicate whether any part of the document is privileged and then provide the document number, title, and estimated date. If the acquired person has identified (1) a NAICS overlap, (2) an overlap within the Overlap Description, or (3) a supply relationship within the Supply Relationships Description, also provide the following:
1. Author(s) (and job title(s)) for documents created by the acquired person; or
2. Recipient(s) or supervisor(s) (and job title(s)) of documents created by third parties as part of an engagement with the acquired person.

If a group of people prepared the document, list all the authors and their titles, identifying the principal authors. Alternatively, it is acceptable to indicate that the document was prepared under the supervision of the lead author and to provide the name and title of that author. Similarly, if the acquired person engaged a third party to prepare a document, provide the name of the third party, and the name, title, and company name for the individual within the acquired person who supervised the creation of the document, or for whom the document was prepared. For materials received from a third party that was not engaged by the acquired person, only the name of the third party is required.

If the acquired person submits documents in addition to what is required, such documents should be identified as "Voluntary". See § 803.1(b).

Submit only one copy of identical responsive documents.

▶ **Privilege**

See § 803.3(d). For privileged documents, the filing person must also provide the following in a log:
1. The privilege type (redacted or withheld);
2. The privilege claim;
3. Addressee(s) and all recipients, with company name and title, of the original and any copies;
4. Subject matter;
5. Document's present location; and
6. Who has control over it.

If a privileged document was circulated to a group, such as the board or an investment committee, the name of the group is sufficient, but the filing person should be prepared to disclose the names and titles/positions of the individual group members, if requested.

If the claim of privilege is based on advice from inside and/or outside counsel, the name of the inside and/or outside counsel providing the advice (and the law firm, if applicable) must be provided. If several lawyers participated in providing advice, identifying lead counsel is sufficient. In identifying who controls a document, the name of the law firm is sufficient.

► **Translations**

Materials or information in a language other than English must be translated into English, with the English translation attached to the original version. See § 803.8.

► **Non-Compliance**

If unable to answer any item fully, provide such information as is available and a statement of reasons for non-compliance as required by § 803.3. If exact answers to any item cannot be given, enter best estimates and indicate the source or basis of such estimates. Add an endnote with the notation "est." to any item where data are estimated.

► **Limited Response**

Information need not be supplied regarding assets, voting securities, or non-corporate interests currently being acquired when their acquisition is exempt under the Act or Rules. See § 803.2(c).

### FEE INFORMATION

**Total Expected Filing Fee**

Indicate the value of the total required fee for the transaction.

**Parties Paying the Fee**

Indicate which filing person(s) is paying the filing fee and, if applicable, whether the fee is being paid by multiple entities. For each entity within the acquired person paying a portion of the fee, provide the name of the payer, the amount paid, the payment method, and the Electronic Wire Transfer (EWT) confirmation number or check number.

**Note on Paying by EWT**

In order for the FTC to track payment, the payer must provide information required by the Fedwire Instructions to the financial institution initiating the EWT. A template of the Fedwire Instructions is available at the PNO website on the Filing Fee Information page.

**Note on Paying by Check**

The FTC strongly discourages check payments because handling a physical check will create a delay in processing the Form. However, if an EWT cannot be arranged, the FTC will accept a check, sent to Financial Operations. Cashiers' or certified checks are preferred. Make the check payable to the Federal Trade Commission and deliver to:

Federal Trade Commission
Financial Operations Division
600 Pennsylvania Ave, Drop H-790
Washington, DC 20580

Please note that the waiting period may be delayed until the fee has been confirmed.

### GENERAL INFORMATION

**Special Filing Types**

Indicate whether the filing is a post-consummation filing, or whether the transaction is a cash tender offer or bankruptcy that is subject to Section 363(b) of the Bankruptcy Code (11 U.S.C. § 363).

**Early Termination**

Indicate whether the acquired person requests early termination of the waiting period. Notification of each grant of early termination will be published in the Federal Register, as required by 15 U.S.C. § 18a(b)(2), and on the PNO website. Note that if either person in any transaction requests early termination, it may be granted and published.

## ULTIMATE PARENT ENTITY (UPE) INFORMATION

► **UPE Details**

**Name**
Provide the name, headquarters address, and website (if one exists) of the person filing notification. The name of the person filing is the name of the UPE of the acquired person. See § 801.1(a)(3).

**Entity Type**
Specify whether the UPE is a corporation, unincorporated entity, natural person, or other entity type (specify). See § 801.1.

**Filing Made on Behalf of the UPE**
If the filing is being made on behalf of the UPE by another entity within the acquired person authorized by the UPE to file the notification on its behalf pursuant to § 803.2(a) or filed pursuant to § 803.4 on behalf of a foreign person, provide the name and mailing address of the entity filing the notification on behalf of the UPE.

**Contact Information**
Provide the name, firm/company name, address, telephone number, and e-mail address of two individuals (primary and secondary) to contact regarding the filing. See § 803.20(b)(2)(ii).

Additionally, provide the name, firm/company name, address, telephone number, and e-mail address of an individual located in the United States designated for the limited purpose of receiving notice of the issuance of a request for additional information or documentary material. See § 803.20(b)(2).

**UPE Annual Reports and Financial Information**

- **Central Index Key**
  If the UPE of the acquired person files annual reports (Form 10-K or Form 20-F) with the United States Securities and Exchange Commission (SEC), provide the Central Index Key (CIK) number.

- **Annual Reports and Audit Reports**
  Provide the most recent annual reports and/or annual audit reports (or, if audited is unavailable, unaudited) of the UPE of the acquired person.

  Natural person UPEs should not provide personal balance sheets or tax returns. Natural person UPEs should leave this section blank and instead provide the most recent reports for the highest-level entity(ies) that controls the target under "UPE Structure."

  The person filing notification may incorporate a document responsive to this item by reference to an internet address directly linking to the document. See § 803.2(e).

- **Date of Report(s)**
  Provide the date of the most recent annual report(s) and/or audit reports (or, if audited is unavailable, unaudited) of the UPE of the acquired person.

- **Size of Person**
  If applicable, indicate whether the person filing notification stipulates that the acquired person meets either the higher or lower size of person test. See 15 U.S.C. § 18a(a), § 801.11.

**Minority Shareholders or Interest Holders**
This section requires the acquired person to report the name, headquarters mailing address, and approximate percentage held by certain minority holders of (1) the acquired entity and (2) any entity directly or indirectly controlled by the acquired entity, but only if such minority holder will continue to hold an interest (whether voting securities or non-corporate interests) in such entity(ies) or will acquire an interest in any entity within the acquiring person as a result of the transaction.

If the acquired entity or an entity directly or indirectly controlled by the acquired entity is not a limited partnership, provide the required information for each individual or entity that currently holds 5% or more but less than 50% of the voting securities or non-corporate interests of any such entity, starting with the acquired person.

If the acquired entity or an entity directly or indirectly controlled by the acquired entity is a limited partnership, provide the required information for its (a) its general partner, regardless of the percentage it holds, and (b) its limited partners that (i) currently hold 5% or more

but less than 50% of the non-corporate interests of such limited partnership and (ii) have or will have the right to serve as, nominate, appoint, veto, or approve board members, or individuals with similar responsibilities, of (1) the acquiring entity, (2) any entity directly or indirectly controlled by the acquiring entity, (3) any entity that directly or indirectly controls the acquiring entity, and (4) any entity within the acquiring person that has been or will be created in contemplation of, or for the purposes of, effectuating the transaction (each a "covered entity"), or of the general partner or management company of a covered entity.

► **Acquired Entity Structure**

If the acquisition includes only assets that do not comprise substantially all the assets of an operating business, the acquired person should not complete the questions in this section. Otherwise, the acquired person must complete these questions for the portion of the transaction related to the voting securities, non-corporate interests, and assets that comprise substantially all the assets of an operating business.

**Acquired Entity(ies)**

List the name, city, state, zip code, and country of the acquired entity(ies) and all U.S. entities, and all foreign entities that have sales in or into the United States that are included within the acquired entity. Entities with total assets of less than $10 million may be omitted. Alternatively, the acquired entity may report all entities within it. Also list all names under which the entities do business (e.g., d/b/a names).

The list of entities should be organized by operating company or operating business ("top-level entity"), if applicable. Filings for select 801.30 transactions need not include d/b/a names and the list of entities can be organized as kept in the ordinary course of business.

**Annual Reports and Audit Reports**

Provide the CIK number(s), if the acquired entity(ies) file(s) annual reports (Form 10-K or Form 20-F) with the SEC, and the most recent annual or audit report(s) of the acquired entity(ies).

Natural person UPEs must also provide the most recent annual report or audit report and CIK number for the highest-level entity that controls the acquired entity.

## TRANSACTION INFORMATION

► **Parties**

List the name and mailing address of each acquiring and acquired person and each acquiring and acquired entity. Do not list entities controlled by an acquired entity.

**Acquiring UPE**

Provide the name, headquarters address, and website of the acquiring person.

**Acquiring Entity(ies)**

If an entity other than the acquiring UPE is making the acquisition, provide the name, mailing address, and website of that entity.

**Acquired UPE**

Provide the name, headquarters address, and website of the acquired person.

**Target(s)**

If the assets, voting securities, or non-corporate interests of an entity other than the acquired UPE are being acquired, provide the name, mailing address, and website of that entity.

► **Transaction Details**

**801.30 Transaction**

Indicate whether the transaction is subject to § 801.30 and if so, what type(s), including select 801.30.

**Transaction Type**

Indicate whether the transaction is any of the following (select all that apply):

- Acquisition of voting securities;
- Acquisition of non-corporate interests;
- Acquisition of assets;
- Merger (see § 801.2);
- Consolidation (see § 801.2);

- Formation of a joint venture, other corporation, or unincorporated entity (see §§ 801.40 and 801.50);
- Acquisition subject to § 801.31;
- Secondary acquisition subject to § 801.4;
- Acquisition subject to § 801.2(e); or
- Other (specify)

**Acquisition Details**
Provide the requested information for the value and percentage of assets, voting securities, and non-corporate interests to be acquired. If a combination of assets, voting securities, and/or non-corporate interests is being acquired and allocation is not possible, note such information in an endnote.

For determining the percentage of voting securities, evaluate total voting power per § 801.12. For determining the percentage of non-corporate interests, evaluate the economic interests per § 801.1(b)(1)(ii).

To complete this item:
- State the percentage of voting securities already held by the acquiring person. See § 801.12.
- State the value of voting securities already held by the acquiring person. See § 801.10.
- State the total percentage of voting securities to be held by the acquiring person as a result of the acquisition. See § 801.12.
- State the total value of voting securities to be held by the acquiring person as a result of the acquisition. See § 801.10.
- State the percentage of non-corporate interests already held by the acquiring person. See § 801.1(b)(1)(ii).
- State the value of non-corporate interests already held by the acquiring person. See § 801.10.
- State the total percentage of non-corporate interests to be held by the acquiring person as a result of the acquisition. See §§ 801.10 and 801.1(b)(1)(ii).
- State the total value of non-corporate interests to be held by the acquiring person as a result of the acquisition. See § 801.10.
- State the total value of assets to be held by the acquiring person as a result of the acquisition. See § 801.10.
- State the aggregate total value of assets, voting securities, and non-corporate interests of the acquired person to be held by the acquiring person as a result of the acquisition. See §§ 801.10, 801.12, 801.13 and 801.14.

▶ **Transaction Description**

**Business of the Target**
Describe the business operation(s) being acquired. If assets, describe the assets and whether they comprise an operating business.

**Non-Reportable UPE(s)**
Provide the names of any UPE that does not have a reporting obligation.

**Transaction Description**
Briefly describe the transaction, indicating whether assets, voting securities, or non-corporate interests (or some combination) are being acquired. Indicate what consideration will be received by each person and the scheduled consummation date of the transaction. Also identify any special circumstances that apply to the filing, such as whether part of the transaction is exempt under one of the exemptions found in Part 802.

If any attached transaction documents use code names to refer to the parties, provide an index identifying the code names.

**Related Transactions**
If the transaction that is the subject of this filing has related filings, indicate whether the related filing(s) (choose all that apply):
- Is a principal transaction that triggers one or more shareholder backside transactions;
- Is a shareholder backside transaction;
- Has more than one acquiring UPE;
- Has more than one acquired UPE;
- Has more than one reportable step;
- Is a joint venture;
- Is a consolidation;
- Is an exchange of assets;
- Has one or more filings in the alternative; or
- Has other circumstances that require more than one filing and if so, explain.

Provide all additional details regarding the related filings(s), including party names and transaction numbers, necessary to identify and connect all related filings.

▶ **Additional Transaction Information**

**Transaction Rationale**

Except for select 801.30 transactions, identify and explain each strategic rationale for the transaction discussed or contemplated by the filing person or any of its officers, directors, or employees. If the rationale of the target is different from the UPE, submit an explanation for each. Identify each document produced in the filing that confirms or discusses the stated rationale(s). If documents produced in the filing are referenced, identify the specific page(s) that discusses the stated rationale(s).

▶ **Business Documents**

**Transaction-Related Documents**

- **Competition Documents**
  Provide all studies, surveys, analyses, and reports prepared by or for any officer(s), director(s), or supervisory deal team lead for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into product or geographic markets. For unincorporated entities, provide such documents prepared by or for individuals exercising similar functions as officers and directors, as well as the supervisory deal team lead.

- **Confidential Information Memoranda**
  Provide all confidential information memoranda prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) of the UPE of the acquired person or of the target that specifically relate to the sale of the target. If no such confidential information memorandum exists, submit any document(s) given to any officer(s) or director(s) of the acquiring person meant to serve the function of a confidential information memorandum. This does not include ordinary course documents and/or financial data shared in the course of due diligence, except to the extent that such materials served the purpose of a confidential information memorandum when no such confidential information memorandum exists.
  Documents responsive to this item are limited to those produced within one year before the date of filing.

- **Third-Party Studies, Surveys, Analyses, and Reports**
  Provide all studies, surveys, analyses and reports prepared by investment bankers, consultants, or other third-party advisors ("third-party advisors") for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) of the UPE of the acquired person or of the target for the purpose of evaluating or analyzing market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets that specifically relate to the sale of the target. This item requires only materials developed by third party advisors during an engagement or for the purpose of seeking an engagement. Documents responsive to this item are limited to those produced within one year before the date of filing.

- **Synergies and Efficiencies**
  Provide all studies, surveys, analyses, and reports evaluating or analyzing synergies, and/or efficiencies prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) for the purpose of evaluating or analyzing the acquisition. Financial models without stated assumptions need not be provided.

**Plans and Reports**

Except for select 801.30 transactions, provide all regularly prepared plans and reports that were provided to the Chief Executive Officer (CEO) of the target or any entity that it controls or is controlled by that analyze market shares, competition, competitors, or markets pertaining to any product or service of the target also produced, sold, or known to be under development by the acquiring person, as identified in the Overlap Description. Documents responsive to this item are limited to those prepared or modified within one year of the date of filing.

Except for select 801.30 transactions, provide all plans and reports that were provided to the Board of Directors of the target or any entity that it controls or is controlled by that analyze market shares, competition, competitors, or markets pertaining to any product or service of the target also produced, sold, or known to be under development by the acquiring person, as identified in the Overlap Description. Documents responsive to this item are limited to those prepared or modified within one year of the date of filing.

▶ **Agreements**

**Transaction-Specific Agreements**

Furnish copies of all documents that constitute the agreement(s) related to the transaction, including, but not limited to, exhibits, schedules, side letters, agreements not to compete or solicit, and other agreements negotiated in conjunction with the transaction that the parties intend to consummate, and excluding clean team agreements.

Documents that constitute the agreement(s) (e.g., Agreement and Plan of Merger, Letter of Intent, Purchase and Sale Agreement, Asset Purchase Agreement, Stock/Securities Purchase Agreement) must be executed, while supporting agreements, such as employment agreements and agreements not to compete may be provided in draft form if that is the most recent version.

If the executed agreement is not the definitive agreement, submit a dated document that provides sufficient detail about the scope of the entire transaction that the parties intend to consummate, such as an agreement in principle, or term sheet, or the most recent draft agreement. See § 803.5. Such document should include information regarding some combination of the following terms: the identity of the parties; the structure of the transaction; the scope of what is being acquired; calculation of the purchase price; an estimated closing timeline; employee retention policies, including with respect to key personnel; post-closing governance; and transaction expenses or other material terms.

Note that transactions subject to § 801.30 and bankruptcies under 11 U.S.C. § 363(b) do not require an executed agreement. For bankruptcies, provide the order from the bankruptcy court.

## COMPETITION DESCRIPTIONS

**This section is not applicable to select 801.30 transactions.**

### ► Overlap Description

Briefly describe each of the principal categories of products and services (as reflected in documents created in the ordinary course of business) of the target.

In addition, list and briefly describe each of the current or known planned products or services of the target that competes with (or could compete with) a current or known planned product or service of the acquiring person, based on documents created in the ordinary course of business. Current or known planned products or services include those that the acquiring person or target researches, develops, manufactures, produces, sells, offers, provides, supplies, or distributes. Known planned products or services may be limited to those referenced in any submitted Business Document and should reflect the acquired person's existing knowledge of the acquiring person's business. The acquiring and acquired person should not exchange information for the purpose of answering this item.

For each such product or service listed, provide:
1. The sales (in dollars) for the most recent year. For those products or services not generating revenue or whose performance is not measured by revenue in the ordinary course of business, provide projected revenue, estimates of the volume of products to be sold, time spent using the service, or any other metric by which the target measures performance (e.g., daily users, new signups).

2. A description of all categories of customers of the target that purchase or use the product or service (e.g., retailer, distributor, broker, government, military, educational, national account, local account, commercial, residential, or institutional). If no customers have yet used the product or service, provide the date that development of the product or service began; a description of the current stage in development, including any testing and regulatory approvals and any planned improvements or modifications; the date that development (including testing and regulatory approvals) was or will be completed; and the date that the product or service is expected to be sold or otherwise commercially launched.

3. The top 10 customers in the most recent year (as measured in dollars), and the top 10 customers for each customer category identified.

### ► Supply Relationships Description

**Related Sales**

List and briefly describe each product, service, or asset (including data) that the target has sold, licensed, or otherwise supplied, and which represented at least $10 million in revenue (including internal transfers) in the most recent year (1) to the acquiring person, or (2) to any other business that, to the acquiring person's knowledge or belief, uses the target's product, service, or asset to compete with the acquiring person's products or services, or as an input for a product or service that competes with or is intended to compete with the acquiring person's products or services. Responses to this item should reflect the acquired person's existing knowledge of the acquiring person's business; the acquiring and acquired person should not exchange information for the purpose of answering this item.

For each product, service, or asset listed, for the most recent year, provide:
1. The sales (in dollars) to (1) the acquiring person and (2) any other business that, to the acquired person's knowledge or belief, uses the target's product, service, or asset to compete with the acquiring person's products or services, or as an input for a product or service that competes or is intended to compete with the acquiring person's products or services.

**89388**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

2. The top 10 customers (as measured in dollars) of the target that use the target's product, service, or asset to compete with the acquiring person's products or services, or as an input for a product or service that competes or is intended to compete with the acquiring person's products or services. For each such customer, describe the target's supply or licensing agreement (or other comparable terms of supply).

**Related Purchases**

List and briefly describe each product, service, or asset (including data) that the target incorporates as an input into any product or service and that the target has purchased, licensed, or otherwise obtained and which represented at least $10 million in revenue (including internal transfers), in the most recent year (1) from the acquiring person or (2) from any other business that, to the acquired person's knowledge or belief, competes with acquiring person to provide a substantially similar product, service, or asset. Responses to this item should reflect the acquired person's existing knowledge of the acquiring person's business; the acquiring and acquired person should not exchange information for the purpose of answering this item.

For each product, service, or asset listed, for the most recent year, provide:

1. The purchased amount (in dollars) for (1) the acquiring person and (2) any other business that, to the acquired person's knowledge or belief, competes with the acquiring person to provide a substantially similar product, service, or asset.

2. The top 10 suppliers (as measured in dollars) for the associated input product, service, or asset, and a description of the target's purchase or licensing agreement (or other comparable terms of purchase).

## REVENUES AND OVERLAPS

### ► NAICS Codes

This item requests information regarding the industry categories for the target's products and services that derived revenue in the most recent year.

**No Revenue**

If there is no revenue to report, explain why.

**NAICS Codes Describing U.S. Operations with Estimates of Revenue**

Identify all 6-digit NAICS industry codes that describe the U.S. operations of the target, inclusive of all entities and assets anticipated to be included within the target at the time the transaction will be consummated.

Responses must be organized by NAICS code in ascending order. For each code, provide the name of the operating business(es) that derive(s) revenue in that code and the estimated revenue range: less than $10 million; $10 million or more but less than $100 million; $100 million or more, but less than $1 billion; or $1 billion or more.

Identify each 6-digit NAICS industry code in which both the acquiring person and target derive revenue by checking the overlap box.

For products and services that derived revenue in the most recent year in a non-manufacturing NAICS code, if the revenue is estimated at less than one million dollars, that code may be omitted so long as the code does not overlap with a code in which the acquiring person derived revenue from U.S. operations.

### ► Controlled Entity Geographic Overlaps

If, to the knowledge or belief of the person filing notification, the target, derived any amount of dollar revenues in the most recent year from operations in industries within any 6-digit NAICS industry code in which the acquiring person also derived any amount of dollar revenues in the most recent year, then for each such 6-digit NAICS industry code follow the instructions below for this section.

**NAICS Overlaps of Controlled Entities**

List each overlapping NAICS code and description. For each, list the name of each operating business within the target that has U.S. operations in the same NAICS code as the acquiring person and the name(s) under which the operating business does business, and provide the appropriate Geographic Market Information, based upon the NAICS code. Organize responses by NAICS code in ascending order.

**Geographic Market Information**

For each identified overlapping NAICS code, provide geographic information, as described below. Use the 2-digit postal codes for states and territories and provide the total number of states and territories at the end of the response.

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations    **89389**

Except in the case of those NAICS industries in the sectors, subsectors, and codes that require street-address level reporting, the person filing notification may respond with the word "national" if business is conducted in all 50 states.

- **State-Level Reporting**
  - Manufacturing Industries
    For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states in which, to the knowledge or belief of the person filing the notification, the products in that 6-digit NAICS industry code produced by the target are sold without a significant change in their form (whether they are sold by the target or by others to whom such products have been sold or resold).

    **31**** through 33**** Manufacturing**, *except:*
    - 3115** Dairy Product Manufacturing
    - 311611 Animal (except Poultry) Slaughtering
    - 311613 Rendering and Meat Byproduct Processing
    - 311615 Poultry Processing
    - 31181* Bread and Bakery Product Manufacturing
    - 321*** Wood Product Manufacturing
    - 32221* Paperboard Container Manufacturing
    - 324*** Petroleum and Coal Products Manufacturing
    - 3251** Basic Chemical Manufacturing
    - 325521 Plastics Materials and Resin Manufacturing
    - 3271** Clay Product and Refractory Manufacturing
    - 3272** Glass and Glass Product Manufacturing
    - 3273** Cement and Concrete Product Manufacturing

  - Wholesale Trade
    For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states or, if desired, portions thereof in which the customers of target are located.

    **42**** Wholesale Trade**, *except:*
    - 42331* Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers
    - 42333* Roofing, Siding, and Insulation Material Merchant Wholesalers
    - 42344* Other Commercial Equipment Merchant Wholesalers
    - 42345* Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers
    - 42346* Ophthalmic Goods Merchant Wholesalers
    - 42349* Other Professional Equipment and Supplies Merchant Wholesalers
    - 4239** Miscellaneous Durable Goods Merchant Wholesalers
    - 4241** Paper and Paper Product Merchant Wholesalers
    - 4242** Drug and Druggists' Sundries Merchant Wholesalers
    - 42441* General Line Grocery Merchant Wholesalers
    - 42442* Packaged Frozen Food Merchant Wholesalers
    - 42451* Grain and Field Bean Merchant Wholesalers
    - 42452* Livestock Merchant Wholesalers
    - 4247** Petroleum and Petroleum Products Merchant Wholesalers
    - 4248** Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers
    - 42491* Farm Supplies Merchant Wholesalers
    - 42495* Paint, Varnish, and Supplies Merchant Wholesalers

  - Insurance Carriers
    For the 6-digit NAICS code within the industry subsector listed below, list the state(s) in which the target is licensed to write insurance.

    **5241** Insurance Carriers**

  - Other NAICS Sectors
    For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states or, if desired, portions thereof in which the target conducts such operations.

    **11**** Agriculture, Forestry, Fishing, and Hunting**, *except:*
    - 113*** Forestry and Logging

**89390**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

| 21**** | Mining, Quarrying, and Oil and Gas Extraction, *except:* |
|---|---|
| 2123** | Nonmetallic Mineral Mining and Quarrying |

**2213\*\*** Water, Sewage, and Other Systems

**23\*\*\*\*** Construction

**44912\*** Home Furnishing Retailers
**4492\*\*** Electronics and Appliance Retailers

**48\*\*\*\* and 49\*\*\*\*** Transportation and Warehousing, *except:*
493*** Warehousing and Storage

**51\*\*\*\*** Information, *except:*
512*** Motion Picture and Sound Recording Industries

**5222\*\*** Nondepository Credit Intermediation
**523\*\*\*** Securities, Commodity Contracts, and Other Financial Investments and Related Activities
**5242\*\*** Agencies, Brokerages, and Other Insurance Related Activities
**525\*\*\*** Funds, Trusts, and Other Financial Vehicles
**531\*\*\*** Real Estate
**533\*\*\*** Lessors of Nonfinancial Intangible Assets (Except Copyrighted Works)

**54\*\*\*\*** Professional, Scientific and Technical Services, *except:*
54138* Testing Laboratories and Services
54194* Veterinary Services

**55\*\*\*\*** Management of Companies and Enterprises

**561\*\*\*** Administrative and Support Services

**61\*\*\*\*** Educational Services

**71\*\*\*\*** Arts, Entertainment, and Recreation, *except:*
7132** Gambling Industries
71394* Fitness and Recreational Sports Centers

**7212\*\*** RV (Recreational Vehicle) Parks and Recreational Camps
**7213\*\*** Rooming and Boarding Houses, Dormitories, and Workers' Camps
**8114\*\*** Personal and Household Goods Repair and Maintenance
**813\*\*\*** Religious, Grantmaking, Civic, Professional, and Similar Organizations
**814\*\*\*** Private Households

- **Street-Level Reporting**
  For each 6-digit NAICS code within the industry sector, subsector, or code listed below, provide the street address, arranged by state, zip code, county, and city or town, of each establishment from which dollar revenues were derived (either directly by the target or by a franchisee) in the most recent year.

**113\*\*\*** Forestry and Logging
**2123\*\*** Nonmetallic Mineral Mining and Quarrying

**22\*\*\*\*** Utilities, *except:*
2213** Water, Sewage and Other Systems

**3115\*\*** Dairy Product Manufacturing
**311611** Animal (except Poultry) Slaughtering
**311613** Rendering and Meat Byproduct Processing
**311615** Poultry Processing
**31181\*** Bread and Bakery Product Manufacturing

| 321*** | Wood Product Manufacturing |
|---|---|
| 32221* | Paperboard Container Manufacturing |
| 324*** | Petroleum and Coal Products Manufacturing |
| 3251** | Basic Chemical Manufacturing |
| 325521 | Plastics Materials and Resin Manufacturing |
| 3271** | Clay Product and Refractory Manufacturing |
| 3272** | Glass and Glass Product Manufacturing |
| 3273** | Cement and Concrete Product Manufacturing |
| 42331* | Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers |
| 42333* | Roofing, Siding, and Insulation Material Merchant Wholesalers |
| 42344* | Other Commercial Equipment Merchant Wholesalers |
| 42345* | Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers |
| 42346* | Ophthalmic Goods Merchant Wholesalers |
| 42349* | Other Professional Equipment and Supplies Merchant Wholesalers |
| 4239** | Miscellaneous Durable Goods Merchant Wholesalers |
| 4241** | Paper and Paper Product Merchant Wholesalers |
| 4242** | Drug and Druggists' Sundries Merchant Wholesalers |
| 42441* | General Line Grocery Merchant Wholesalers |
| 42442* | Packaged Frozen Food Merchant Wholesalers |
| 42451* | Grain and Field Bean Merchant Wholesalers |
| 42452* | Livestock Merchant Wholesalers |
| 4247** | Petroleum and Petroleum Products Merchant Wholesalers |
| 4248** | Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers |
| 42491* | Farm Supplies Merchant Wholesalers |
| 42495* | Paint, Varnish, and Supplies Merchant Wholesalers |

| 44**** and 45**** Retail Trade, *except:* | | |
|---|---|---|
| | 44912* | Home Furnishings Retailers |
| | 4492** | Electronics and Appliance Retailers |

| 493*** | Warehousing and Storage |
|---|---|
| 512*** | Motion Picture and Sound Recording Industries |
| 521*** | Monetary Authorities-Central Bank |
| 5221** | Depository Credit Intermediation |
| 5223** | Activities Related to Credit Intermediation |
| 532*** | Rental and Leasing Services |
| 54138* | Testing Laboratories and Services |
| 54194* | Veterinary Services |
| 562*** | Waste Management and Remediation Services |
| 62**** | Health Care and Social Assistance |
| 7132** | Gambling Industries |
| 71394* | Fitness and Recreational Sports Centers |

| 72**** | Accommodation and Food Services, *except:* | |
|---|---|---|
| | 7212** | RV (Recreational Vehicle) Parks and Recreational Camps |
| | 7213** | Rooming and Boarding Houses, Dormitories, and Workers' Camps |

| 811*** | Repair and Maintenance, *except* | |
|---|---|---|
| | 8114** | Personal and Household Goods Repair and Maintenance |

| 812*** | Personal and Laundry Services |
|---|---|

▶ **Minority-Held Entity Overlaps**

This section requires the disclosure of holdings of the target of 5% or more but less than 50% of certain entities that derive dollar revenues in any 6-digit NAICS code reported by the acquiring person. If NAICS codes are unavailable, holdings in entities that have operations in the same industry as the acquiring person, based on the knowledge or belief of the filing person, should be listed. Holdings in those entities that have total assets of less than $10 million may be omitted.

**89392**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

**Minority Holdings of the Target**

If the target holds 5% or more but less than 50% of the voting securities of any issuer or non-corporate interests of any unincorporated entity that derived dollar revenues in the most recent year from operations in industries within any 6-digit NAICS code(s) reported by the acquiring person, list the name of such entity and d/b/a names (if known), the percentage held, the entity within the target that holds the minority interests, and the overlapping 6-digit NAICS code(s) or industry(ies).

Responses should be organized alphabetically by the name of the entity in which minority interests are held.

► **Prior Acquisitions**

This item should be completed for the target and pertains only to prior acquisitions of U.S. entities or assets and foreign entities or assets with sales in or into the U.S. that in the most recent year (1) derived revenue in an identified 6-digit NAICS industry code overlap, or (2) provided or produced a competitive overlap product or service as described in the Overlap Description.

For each such overlap, list all acquisitions of entities or assets deriving dollar revenues in an overlapping 6-digit NAICS industry code or overlapping product or service made by the target in the five years prior to the date of the instant filing, even if the transaction was non-reportable. List only acquisitions of 50% or more of the voting securities of an issuer, 50% or more of non-corporate interests of an unincorporated entity, or  all or substantially all the assets of an operating business if the entity or business had annual net sales or total assets greater than $10 million in the year prior to the acquisition and any acquisitions of assets that did not constitute all or substantially all of an operating business valued at or above the statutory size-of-transaction test at the time of their acquisition.

For each such acquisition, supply:
1. the overlapping 6-digit NAICS code(s) (by number and description) identified above in which the acquired entity or assets derived dollar revenues, or the competitive overlap product(s) or service(s) in the Overlap Description;
2. the name of the entity from which the assets, voting securities, or non-corporate interests were acquired;
3. the headquarters address of that entity prior to the acquisition;
4. whether assets, voting securities, or non-corporate interests were acquired; and
5. the consummation date of the acquisition.

## ADDITIONAL INFORMATION

► **Subsidies from Foreign Entities or Governments of Concern**

Indicate whether, to the knowledge or belief of the filing person, within the two years prior to filing, the acquired person has received any subsidy (or a commitment to provide a subsidy in the future) from any foreign entity or government of concern (see § 801.1(r)). If yes, list each entity or government from which such subsidy was received (or which has made the commitment) and provide a brief description of the subsidy.

Indicate whether, for products the acquired person produced in whole or in part in a country that is a covered nation under 42 U.S.C. § 18741(a)(5)(C), any product is subject to countervailing duties imposed by any jurisdiction. If yes, list each product, the countervailing duty imposed, and the jurisdiction that imposed the duty.

Indicate whether, to the knowledge or belief of the filing person, for products the acquired person produced in whole or in part in a country that is a covered nation under 42 U.S.C. § 18741(a)(5)(C), any product is the subject of a current investigation for countervailing duties in any jurisdiction. If yes, list each product and the jurisdiction conducting the investigation.

► **Defense or Intelligence Contracts**

Except for select 801.30 transactions, identify (1) pending requests for proposals from the U.S. Department of Defense or any member of the U.S. intelligence community, as defined by 10 U.S.C. § 101(a)(6) or 50 U.S.C. § 3003(4) for which the target has submitted a proposal and (2) awarded procurement contracts with the U.S. Department of Defense or any member of the U.S. intelligence community, as defined by 10 U.S.C. § 101(a)(6) or 50 U.S.C. § 3003(4); valued at $100 million or more if such pending requests for proposals or such awarded procurement contracts (a) are or will be the source of revenues in any identified 6-digit NAICS industry code overlap; or (b) involve or will involve an overlap product or service as described in the Overlap Description or the Supply Relationships Description. Limit the response to the target. Include (1) the name of the entity within the filing person; (2) the contracting office, as defined by 48 C.F.R. § 2.101(b); (3) the Contracting Office ID; (4) the Award ID; and (5) the NAICS code(s), if any, listed in the System for Award Management database. Do not include classified information but note that responsive information was withheld on that basis.

**Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations    **89393**

▶ **Voluntary Waivers**

- **HSR Confidentiality Waiver for International Competition Authorities (VOLUNTARY)**
  Indicate whether the acquired person agrees to waive the disclosure exemption contained in the Act, 15 U.S.C. § 18a(h), to permit the DOJ and FTC to disclose to non-U.S. competition authority/authorities listed by the filing person (1) the fact that a notification was filed, (2) the waiting period associated with the notification, and (3) information and documents filed with the notification. This waiver will not cover materials provided in response to a request for additional information issued pursuant to 15 U.S.C. § 18a(e) and does not preclude the acquired person from providing a full waiver as provided for under FTC and DOJ practice as reflected in the Model Waiver. The acquired person should list the jurisdictions to which the waiver applies. This item is voluntary.

- **HSR Confidentiality Waiver for State Attorneys General (VOLUNTARY)**
  Indicate whether the acquired person agrees to waive any part of the disclosure exemption contained in the Act, 15 U.S.C. § 18a(h). If yes, list the applicable State Attorneys General and whether the acquired person permits the DOJ and FTC to disclose (1) the fact that a notification was filed and the waiting period associated with the notification, (2) information and documents filed with the notification, or (3) both (1) and (2). This waiver will not cover materials provided in response to a request for additional information issued pursuant to 15 U.S.C. § 18a(e) and does not preclude the acquired person from providing a full waiver as provided for under FTC and DOJ practice as reflected in the Model Waiver. The acquired person should list the jurisdictions to which the waiver applies. This item is voluntary.


## CERTIFICATION

See § 803.6 for requirements.

The certification must be notarized or use the language found in 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury. The Form includes the following language:

**Penalties for False Statements**
Federal law provides criminal penalties, including up to twenty years imprisonment, for any person who knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence an ongoing or anticipated federal investigation (see, e.g., Section 1519 of Title 18, United States Code.). It is also a criminal offense to knowingly make a false statement in a federal investigation, obstruct a federal investigation, or conspire to obstruct justice or obstruct or impede the lawful functioning of the government (see, e.g., Sections 371, 1001, and 1505 of Title 18, United States Code).

**CERTIFICATION**
This NOTIFICATION AND REPORT FORM, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Commission. Subject to the recognition that, where so indicated, reasonable estimates have been made because books and records do not provide the required data, the information is, to the best of my knowledge, true, correct, and complete in accordance with the statute and rules.

I acknowledge that the Commission or the Assistant Attorney General of the Antitrust Division of the Department of Justice may, prior to the expiration of the initial waiting period pursuant to 15 U.S.C. § 18a, require the submission of additional information or documentary material relevant to the proposed transaction.


## AFFIDAVITS

Affidavit(s) required by § 803.5 must be notarized or use the language found in 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury. If an entity is filing on behalf of the acquired person, the affidavit must still attest to the good faith intent of the UPE.

In non-§ 801.30 transactions, the affidavit(s) (submitted by both persons filing) must attest that an agreement to merge or acquire has been executed, and if the executed agreement is not the definitive agreement, that a dated document that provides sufficient detail about the scope of the entire transaction that the parties intend to consummate has been submitted. The affidavit(s) must further attest to the good faith intention of the person filing notification to complete the transaction. See § 803.5(b).

In § 801.30 transactions, the acquired person is not required to submit an affidavit.

**89394**    **Federal Register** / Vol. 89, No. 218 / Tuesday, November 12, 2024 / Rules and Regulations

## PRIVACY ACT STATEMENT

Section 18a(a) of Title 15 of the U.S. Code authorizes the collection of this information. The primary use of information submitted on this Form is to determine whether the reported merger or acquisition may violate the antitrust laws. Taxpayer information is collected, used, and may be shared with other agencies and contractors for payment processing, debt collection and reporting purposes. Furnishing the information on the Form is voluntary. Consummation of an acquisition required to be reported by the statute cited above without having provided this information may, however, render a person liable to civil penalties up to the amount listed in 16 C.F.R. §1.98(a) per day.

We also may be unable to process the Form unless you provide all of the requested information.

## DISCLOSURE NOTICE

Public reporting burden for this report is estimated to average 105 hours per response, including time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this report, including suggestions for reducing this burden to:

Premerger Notification Office
Federal Trade Commission
400 7th Street, S.W.
Washington, D.C. 20024

and

Office of Information and Regulatory Affairs
Office of Management and Budget
Washington, D.C. 20503

Under the Paperwork Reduction Act, as amended, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The operative OMB control number, 3084-0005, appears within the Notification and Report Form and these Instructions.

BILLING CODE 6750–01–C

By the direction of the Commission.

**April J. Tabor,**
*Secretary.*

**Note:** The following statements will not appear in the Code of Federal Regulations.

**Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro Bedoya**

The Federal Trade Commission, with the collaboration and concurrence of the Assistant Attorney General of the Department of Justice's Antitrust Division, has voted unanimously to issue a Final Rule to amend the Hart-Scott-Rodino ("HSR") Form and Instructions. This marks the first time in 46 years that the agencies have undertaken a top-to-bottom review of the form ("HSR Form") that businesses must fill out when pursuing an acquisition that must be notified in accordance with the HSR Act.[1] Alongside this Final Rule, the

[1] Press Release, Fed. Trade Comm'n, FTC Finalizes Changes to Premerger Notification Form (Oct. 10, 2024). *https://www.ftc.gov/news-events/news/press-releases/2024/10/ftc-finalizes-changes-premerger-notification-form.*

Commission voted to submit to Congress its FY2023 Annual Report regarding the Federal Trade Commission and Department of Justice's administration of the HSR Act. This Annual Report highlights the agencies' work investigating and challenging illegal mergers.[2]

Much has changed in the 48 years since the HSR Act was passed. Changes in the economy, corporate structure, and investment strategies have reshaped how businesses compete in today's marketplace. The number of transactions reported to the agencies surged during fiscal years 2021 and 2022 and remains high.[3] And deal valuations have soared. In FY2019, only 13.3% of transactions reported to the agencies exceeded $1 billion.[4] Those high-value transactions now represent nearly a quarter (24%) of all transactions that come before the agencies.[5] Transactions have also become increasingly complex in both structure and potential competitive impact.[6]

The HSR Form, meanwhile, has largely stayed the same. Against the backdrop of vast changes in the structure of business associations and corporate transactions, the information currently collected by the HSR Form is insufficient for our teams to determine, in the initial 30 days provided by the HSR Act, whether a proposed deal may violate the antitrust laws and hence warrant an in-depth investigation. The antitrust agencies are put in the position of expending significant time and effort to develop even a basic understanding of key facts. They must often rely on information provided in third-party interviews that can be challenging to obtain in 30 days. Much of the key information, moreover, is known only to the firms proposing the merger, such as the breadth of their business operations, including any existing relationship with the other party, the deal rationale, and the structure of each relevant entity. Seeking this information on a voluntary basis can leave critical gaps that allow unlawful deals to go undetected.

By reflecting modern day commercial realities, the HSR Form updates in the Final Rule will provide the antitrust agencies with information that is more probative as to whether a proposed deal risks violating the antitrust laws. Several aspects of the Final Rule bear particular mention:

• *Shed light on complex and opaque entities, including private equity and minority holders.* The existing HSR Form did not require information about the entities between the ultimate parent entity and the acquiring entity. Nor did it allow the agencies to determine whether the acquiring person may have competitively relevant premerger entanglements with the target's industry or whether minority holders have significant rights to direct the acquiring entity's actions. To close this gap, the Final Rule requires parties to provide information about the entities and individuals involved in the deal that will have the ability to influence decision-making post-merger.

• *Report vertical and other non-horizontal relationships.* The existing HSR Form failed to provide agencies with meaningful information about non-horizontal relationships. After a decades-long focus primarily on mergers between direct competitors, the antitrust agencies in recent years have reinvigorated merger enforcement against non-horizontal deals that violate the antitrust laws. Since 2021, the FTC has brought six enforcement actions against mergers involving a vertical combination—more than the total number of vertical cases pursued in the last decade overall.[7] The FTC's efforts have already resulted in the government's first litigated victory against a vertical merger in over 50 years.[8] As we continue building on this work, ensuring that the agencies receive information on non-horizontal components of deals is vital. Accordingly, the Final Rule requires filers to report supply relationships to reveal whether the transaction may undermine competition, including through limiting rivals' access to key products or services they need to compete. The Final Rule also contains new document requirements that are intended to reveal any existing or future non-horizontal business relationships that could give rise to competitive risks.

• *Reveal areas of future competition and emerging rivals.* As section 7 instructs us to arrest anticompetitive tendencies in their incipiency, the agencies must scrutinize acquisitions that may eliminate emerging rivals or threaten competition in lines of products that are still in development.[9] The existing HSR form has been particularly ill-suited to this task, as it gives no insight into merging parties' ongoing product development efforts or pipeline projects that could implicate future areas of competition. The Final Rule fixes this problem by requesting key information about products and services under development that are not yet generating revenues. In recent years the FTC pursued an enforcement action involving a pipeline product still in early-stage development, as well as successfully litigated a case involving the market for research and development.[10] The new HSR Form will further bolster these efforts.

• *Identify a greater range of prior acquisitions.* Another notable trend has been the rise of serial acquirers, firms that engage in numerous strategic acquisitions in the same industry and sometimes "roll up" many small competitors in the same or adjacent

---

[2] Press Release, Fed. Trade Comm'n, FTC, DOJ Issue Fiscal Year 2023 Hart-Scott-Rodino Notification Report and Announce Corrected Fiscal Year 2022 Report (Oct. 10, 2024), *https://www.ftc.gov/news-events/news/press-releases/2024/10/ftc-doj-issue-fiscal-year-2023-hsr-report-and-announce-corrected-2022-report.* On July 1, 2024, the Commission and DOJ Antitrust Division submitted to Congress a summary of this Report.

[3] Fed. Trade Comm'n & Dept. of Justice, Hart-Scott-Rodino Annual Report Fiscal Year 2023 (2024) [hereinafter *FY23 Report*] at 20.

[4] Fed. Trade Comm'n & Dept. of Justice, Hart-Scott-Rodino Annual Report Fiscal Year 2019 (2020) at Ex. A, Table I, *https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-bureau-competition-department-justice-antitrust-division-hart-scott-rodino/p110014hsrannualreportfy2019.pdf.*

[5] FY2023 Report at Ex. A, Table I.

[6] *See* Remarks by Chair Lina M. Khan, Private Capital, Public Impact Workshop on Private Equity in Healthcare (March 5, 2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/2024.03.05-chair-khan-remarks-at-the-private-capital-public-impact-workshop-on-private-equity-in-healthcare.pdf;* Statement of Chair Lina M. Khan Joined by Comm'r Rebecca Kelly Slaughter & Comm'r Alvaro Bedoya in the Matter of EQT Corporation (Aug. 16, 2023), *https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-chair-lina-m-khan-joined-commissioner-rebecca-kelly-slaughter-commissioner-alvaro-m-bedoya-4.*

[7] *Illumina, Inc.* v. *FTC,* 88 F.4th 1036 (5th Cir. 2023); *FTC* v. *IQVIA et al,* 710 F.Supp.3d 329 (S.D.N.Y. 2024); *FTC* v. *Tempur Sealy Intern'l, Inc.,* 4:24–cv–02508 (S.D. Tex. July 2, 2024); *In re Lockheed Martin Corp.,* Docket No. 9405 (2022), *https://www.ftc.gov/legal-library/browse/cases-proceedings/211-0052-lockheedaerojet-matter* (alleging that the merger would enable missile systems manufacturer to use control over missile propulsion systems to harm rival defense prime contractors) (transaction abandoned); *In re Nvidia Corp.,* Docket No. 9404 (2021), *https://www.ftc.gov/legal-library/browse/cases-proceedings/2110015-nvidiaarm-matter* (alleging that the merger would give chip manufacturer the ability and incentive to use control over microprocessor design technology to undermine competitors) (transaction abandoned); *In re Intercontinental Exchange, Inc. & Black Knight, Inc.,* Docket No. 9413, *https://www.ftc.gov/legal-library/browse/cases-proceedings/221-0142-intercontinental-exchange-incblack-knight-inc-matter* (2023).

[8] *Illumina, Inc.,* 88 F.4th 1036.

[9] *See Illumina, Inc.* v. *FTC,* 88 F.4th 1036, 1049–51 (2023) (stating that antitrust markets are not limited to products that exist but may include those that are anticipated or expected or encompass research, development and commercialization of products in development); *FTC* v. *PPG Indus., Inc.,* 798 F.2d 1500, 1504 (D.C. Cir. 1986) (noting that merging firms competed in evolving high technology market at the request-for-proposal stage of product development).

[10] *In re Sanofi/Maze Therapeutics,* Docket No. 9422 (2023), *https://www.ftc.gov/legal-library/browse/cases-proceedings/2310091-sanofimaze-therapeutics-inc-matter; Illumina, Inc.,* 88 F.4th 1036.

markets. This strategy can consolidate a market through a series of smaller deals that fly below the radar of antitrust enforcers. Private equity firms and other investors have deployed roll-up strategies across a range of industries, from healthcare to housing—with potentially major ramifications for the public.[11] Indeed, the FTC's lawsuit against U.S. Anesthesia Partners charges the entity with acquiring over a dozen anesthesiology providers across Texas in the span of eight years, a reduction in competition that cost consumers and businesses tens of millions of dollars.[12] The Commission's investigations into acquisitions of veterinary clinics have also revealed roll-up plays.[13] To understand whether a proposed transaction is part of an anticompetitive roll-up scheme, the agencies need insight into what prior acquisitions the entity has made within the same lines of business. While the existing Form required some reporting of these acquisitions, the Final Rule provides a more complete picture of the merging parties' overarching acquisition strategies by requiring that both entities provide information on certain prior acquisitions that closed within the previous five years.

The notice of proposed rulemaking included a requirement that would have aided the agencies' assessment of whether the proposed deal would risk threatening competition in labor markets. This proposal fit within a wider effort at the agencies to correct for antitrust enforcers' decades-long neglect of promoting fair competition in labor markets. As Commissioner Bedoya rightly notes, when antitrust enforcers

did pay attention to workers, it usually involved weaponizing antitrust against them.[14] This disposition had no basis in the law—and, as Commissioner Bedoya notes, directly contravenes the goals Congress sought to advance in passing the antitrust laws. No antitrust law gives primacy to some market participants over others or states that some are entitled to greater protection from unlawful monopolization or mergers; to the contrary, the Clayton Act prohibits mergers that may substantially lessen competition "in any line of commerce."[15] I am pleased that in recent years the FTC has reoriented towards a more faithful application of the law, including—for the first time in our 110-year history—through challenging a transaction on the grounds that it risks undermining competition in labor markets.[16]

While the Final Rule pares back some of the labor market requirements, I believe that the information required by other provisions of the Final Rule will position the agencies to identify transactions that threaten competition in labor markets. In particular, the newly-mandated information on overlap and supply relationship descriptions, as well as new high-level business and transaction-related documents, will enable the agencies to identify whether a proposed deal risks undermining competition for workers. And partnerships with the National Labor Relations Board and the Department of Labor will allow the FTC to continue deepening its expertise in how competition works in labor markets.[17]

The FTC also announced today that, following the Final Rule coming into effect, we will lift the categorical suspension on early termination of filings made under the HSR Act. When the antitrust agencies grant early termination, merging parties can consummate their deal without waiting for the full 30-day period ordinarily required under the law. The Commission initially suspended early termination due to a historic volume of filings amidst the COVID–19 pandemic.[18] But a revisiting of the FTC's early termination policy was overdue. Data reveal that permissively granting early termination led to the consummation of some deals that resulted in significant harm.[19] Moreover, the law makes clear that the granting of early termination is purely a discretionary function.[20] Merging

---

[11] *See, e.g.,* Richard M. Scheffler et al., Am. Antitrust Inst., Soaring Private Equity Investment in the Healthcare Sector: Consolidation Accelerated, Competition Undermined, and Patients at Risk 8–16 (2021), *https://publichealth.berkeley.edu/wp-content/uploads/2021/05/Private-Equity-I-Healthcare-Report-FINAL.pdf*; Atul Gupta, et al., *Does Private Equity Investment in Healthcare Benefit Patients? Evidence from Nursing Homes* (Becker Friedman Inst., Working Paper No. 2021–20, 2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3537612.* The Commission recently hosted a public workshop to discuss the growing body of economic research examining the role of private equity investment in health care markets. Fed. Trade Comm'n, Private Capital, Public Impact: An FTC Workshop on Private Equity in Health Care (Mar. 5, 2024), *https://www.ftc.gov/news-events/events/2024/03/private-capital-public-impact-ftc-workshop-private-equity-health-care.*

[12] Complaint, *FTC* v. *U.S. Anesthesia Partners, Inc., et al.,* No. 4:23–cv–03560 (S.D. Tex. Sept. 21, 2023), *https://www.ftc.gov/legal-library/browse/cases-proceedings/2010031-us-anesthesia-partners-inc-ftc-v.*

[13] *In re JAB Consumer Partners, et al.,* Docket Nos. C–4766 & C–4770 (2022), *https://www.ftc.gov/legal-library/browse/cases-proceedings/2110140-jab-consumer-partnersnational-veterinary-associatessage-veterinary-partners-matter.*

[14] Statement of Comm'r Alvaro M. Bedoya Joined by Comm'r Rebecca Kelly Slaughter & Chair Lina M. Khan in the Matter of Amendments to the Premerger Notification and Report Form and Instructions and the Hart-Scott-Rodino Rule (Oct. 10, 2024).

[15] 15 U.S.C. 18. See also, Statement of Comm'r Alvaro M. Bedoya, *id.*

[16] Press Release, Fed. Trade Comm'n, FTC Challenges Kroger's Acquisition of Albertsons (Feb. 26, 2024), *https://www.ftc.gov/news-events/press-releases/2024/02/ftc-challenges-krogers-acquisition-albertsons*; *see also,* Statement of Comm'r Rebecca Kelly Slaughter & Chair Lina M. Khan Regarding *FTC and State of Rhode Island* v. *Lifespan Corporation and Care New England Health System* (Feb. 17, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/public_statement_of_commr_slaughter_chair_khan_re_lifespan-cne_redacted.pdf.*

[17] Press Release, Fed. Trade Comm'n, FTC, Department of Labor Partner to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices (Sept. 21, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/09/ftc-department-labor-partner-protect-workers-anticompetitive-unfair-deceptive-practices*; Press Release, Fed. Trade Comm'n, FTC, National Labor Relations Board Forge New Partnership to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices (July 19, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/07/federal-trade-commission-national-labor-*

*relations-board-forge-new-partnership-protect-workers.*

[18] Press Release, Fed. Trade Comm'n, FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination," Federal Trade Comm'n (Feb. 4, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-doj-temporarily-suspend-discretionary-practice-early-termination.*

[19] *See* Premerger Notification; Reporting and Waiting Period Requirements, 16 CFR parts 801, 803 (2024) at 17 (The consequences of inadequate detection are revealed in a recent analysis of hospital mergers that were reported to the Agencies for premerger review co-authored by two economists from the Commission's Bureau of Economics. Keith Brand et al., "In the Shadow of Antitrust Enforcement: Price Effects of Hospital Mergers from 2009–2016," 66 J. L. Econ. 639 (2023). The paper examined a set of consummated hospital mergers and measured the effect of each merger on prices. The study concluded that mergers not reportable under the HSR Act did not result in larger price increases than reportable mergers. In contrast, the authors found different outcomes among mergers that were subject to premerger review based on how much review the mergers received. Of the mergers reported to the Agencies, the largest average percentage price increase occurred for those mergers that received early termination of the initial waiting period. This suggests that the HSR Filings failed to provide sufficient information to trigger additional investigations that could have blocked these harmful mergers before they were consummated; instead, the filings resulted in early termination of the waiting period. While the study was not designed to test the impact of this rulemaking, the study supports the Commission's belief that there are information deficiencies with the current HSR Rules that prevent the Agencies from identifying mergers that may violate the antitrust laws.").

[20] Both the Clayton Act and the HSR Act provide for an exception to the waiting period by empowering the FTC and DOJ to grant early terminations "in their discretion."16 CFR 803.11(c) (HSR Act: "The Federal Trade Commission and the Assistant Attorney General may, in their discretion, terminate a waiting period upon the written request of any person filing notification or . . . sua sponte."); 15 U.S.C.A. 18a(2) (Clayton Act: "The Federal Trade Commission and the Assistant Attorney General may, in individual cases, terminate the waiting period specified in paragraph (1) and allow any person to proceed with any acquisition subject to this section, and promptly shall cause to be published in the **Federal Register**

parties are not entitled to early termination, and I question the wisdom of using agency resources on a discretionary function while resource constraints impede our ability to fully execute on our mandatory functions. Because the Final Rule will provide the agencies with additional information necessary to probe the competitive risk that a transaction may pose, we will be better positioned to determine the right set of policies and procedures around early termination, including which subset of deals may receive it and under what circumstances.

The new HSR Form marks a generational upgrade that will sharpen the antitrust agencies' investigations and allow us to more effectively protect against mergers that may substantially lessen competition or tend to create a monopoly. But it is not the only part of the HSR regime that requires upgrading. As I've noted in past years, the HSR Act must be modernized for today's economy.[21] In particular, the statutory timelines laid out in the HSR Act have not kept pace with the surge in deal volume, the complexity of transactions, and the increased burden associated with proving in court a violation of section 7. The HSR Act gives the agencies 30 days to determine whether a deal warrants close investigation, and then another 30 days after parties certify they have "substantially complied" with the inquiry. These timelines were set in an era when document productions were measured in the number of boxes and not the number of terabytes—and when lawmakers expected the agencies would receive around 150 merger notifications per year, rather than 150 notifications per month (as the agencies now routinely receive).[22] While the new HSR Form will bolster the antitrust agencies' ability to adequately screen proposed deals during the initial waiting period, Congress should revisit HSR and appropriately extend these timelines to match today's realities.[23]

Faithfully discharging the Commission's statutory obligations also requires adequate funding. The HSR Annual Report summarizes the agencies' merger enforcement work over FY2023.[24] During that period the FTC's work resulted in challenges to 15 transactions that risked threatening competition.[25] Ten of these challenges resulted in parties abandoning the transactions, nearly double the average annual number of abandonments from the preceding 10 years. Our efforts to keep building on this efficacy, however, will run into major resource constraints. The FTC's enacted budget for fiscal year 2024 represented a one percent reduction from the previous year. Alongside a statutorily mandated five percent pay raise and higher non-pay costs resulting from inflation, the result of this reduction has been significantly fewer resources to support the FTC's mission. While our teams work diligently to faithfully enforce the antitrust laws, resource constraints have meant the FTC has been forced to make difficult triage decisions and forgo meritorious investigations—likely resulting in the public bearing the cost of illegal mergers. Additional resources would better equip the Commission to fully pursue its mandate and protect the public.

Finally, the FTC today is launching a new online portal so that members of the public can directly submit comments on mergers that may threaten competition.[26] This portal is part of the FTC's broader work to ensure we are opening our doors to hear from people across the country on issues of public concern.[27] Whether the antitrust agencies do or do not take action against a merger can be of enormous consequence—determining how much people pay for essential goods and services, how much workers earn on a job, whether independent businesses can keep serving their communities, whether an entrepreneur can bring a breakthrough innovation to market, and whether our supply chains are brittle or resilient. Ensuring the antitrust agencies are positioned to make these high-stakes decision with a full understanding of what may follow from a merger is vital. Well-resourced businesses know best how to inform the agencies' investigations, but one shouldn't need to hire a lawyer to provide public enforcers with relevant information on a merger. This new portal will allow the FTC to systematize the regular gathering of public input on mergers and continue broadening the types of expertise and experience that inform our work.

The Final Rule, HSR Report, and new merger portal reflect tremendous work by teams across the FTC, in particular from the Premerger Notification Office, the Office of Policy and Coordination, and the Office of Policy Planning, as well as from throughout the Bureau of

[21] Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya Regarding the FY2022 HSR Annual Report to Congress (Dec. 21, 2023), *https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-chair-lina-m-khan-joined-commissioner-rebecca-kelly-slaughter-commissioner-alvaro-m-bedoya-5*.

[22] *See id.*

[23] Presently, FTC staff are routinely at the mercy of merging parties granting extensions of the statutory deadline so that staff has the necessary time to review the transaction. But it should not be merging parties that get to determine the amount of time FTC staff has to review mergers and do the work required by law.

[24] Commissioners Holyoak and Ferguson dissent from the issuance of the HSR Annual Report. In particular, Commissioner Holyoak disagrees with the longstanding practice to count abandonments and deals where parties were not required to make an HSR filing. Dissenting Statement of Commissioner Melissa Holyoak, Hart-Scott-Rodino Annual Report, Fiscal Year 2023 (Oct. 10, 2024) at 2. For over a decade, the Report has been clear that it includes certain non-HSR reportable matters. FY23 Report at n.28 ("The cases listed in this section were not necessarily reportable under the premerger notification program. Given the confidentiality of information obtained pursuant to the Act, it would be inappropriate to identify the cases initiated under the program except in those instances in which that information has already been disclosed."); *see also* Fed. Trade Comm'n, *FY 2010 Hart Scott Rodino Annual Report* (2011) at n.18. A proposed merger may be anticompetitive even if it falls below the threshold that would require an HSR filing. As a result, FTC staff may raise concerns regarding certain transactions even where such a filing has not been made. Those matters are part of the FTC's merger enforcement work and including them faithfully represents the Commission's work to Congress. The HSR Annual Report also states plainly that it references certain deals where "the transaction was abandoned or restructured as a result of antitrust concerns raised during the investigation," *id.* at 2, and Commissioner Holyoak does not identify any inconsistency or explain any insufficiency in how the numbers are tabulated here versus how the Commission has historically done so. Commissioner Ferguson in his dissent that the precise timing of HSR reports is not mandated by Congress and has varied in past years, but neglects to mention that timing under prior administrations also varied significantly. Dissenting Statement of Commissioner Andrew N. Ferguson Regarding the FY2023 HSR Annual Report to Congress (Oct. 10, 2024) at 1–2. *See, e.g.*, Fed. Trade Comm'n, Annual Competition Reports (last visited Oct. 9. 2024), *https://www.ftc.gov/policy/reports/annual-competition-reports* (for example, the FY19 Annual HSR Report was released in July of 2020, the FY18 Annual HSR Report was released Sept 2019, the FY17 Annual HSR Report was released Apr. 11, 2018, the FY16 Annual HSR Report was released Oct. 4, 2017. Strangely, Commissioner Ferguson also suggests that the decision to issue this year's report in October is part of some political scheme related to giving the Democratic ticket an advantage in the forthcoming presidential election. I am unaware of any reports, research, or evidence suggesting that the HSR Report has any bearing on voting patterns or electoral outcomes.

[25] One transaction challenged in FY2023 remains in litigation.

[26] *See* Press Release, Fed. Trade Comm'n, FTC Finalizes Changes to Premerger Notification Form (Oct. 10, 2024), *https://www.ftc.gov/news-events/news/press-releases/2024/10/ftc-finalizes-changes-premerger-notification-form*.

[27] When the FTC in recent years has invited public input, we have received thousands—and sometimes tens of thousands—of comments, including on issues relating to merger enforcement. *See, e.g.*, Public Docket FTC–2023–0043, Draft Merger Guidelines for Comment, *Regulations.gov* (Jul. 19, 2023); Public Docket FTC–2024–0028, FTC and DOJ Seek Info on Serial Acquisitions, Roll-Up Strategies Across U.S. Economy, *Regulations.gov* (May 23, 2024).

Competition, the Office of General Counsel, and the Bureau of Economics. I am grateful to this team for their diligent efforts, as well as to the FTC's partners at DOJ for their collaboration, and to my fellow Commissioners for their thoughtful engagement.

### Statement of Commissioner Alvaro M. Bedoya Joined by Chair Lina M. Khan and Commissioner Rebecca Kelly Slaughter

My colleagues Commissioners Ferguson and Holyoak write at some length in support of the Commission's decision not to adopt, at this time, a set of proposed requests for employment information ("the labor screen") that was included in the original notice of proposed rulemaking.[1] Rather than litigating the merits of the labor screen, I write to respond to one of the ideas underlying my colleagues' arguments against it.

The Sherman Act was passed in 1890; the Clayton Act and the Federal Trade Commission Acts were passed in 1914, creating this Commission and empowering it to enforce this newly expanded set of antitrust laws.[2] Yet it was only in 2021 that a Federal antitrust enforcer first stopped a merger because of its impact on competition in the labor market.[3]

My colleagues cite the absence of such merger challenges as a key reason for dropping the labor screen. Both stress the extensive efforts the antitrust agencies have expended to identify such mergers.[4] They argue that, if enforcers have been working for years to identify mergers that harm competition in labor markets and have not brought more challenges, how can we justify requesting additional data to identify those mergers? In fact, Commissioner Holyoak seems to imply that labor monopsony is rare, going so far as to say that the labor screen "was a solution in search of a nonexistent problem."[5]

History tells a different story. While my colleagues suggest that the absence of labor-based merger challenges exists

"not for a lack of trying,"[6] a review of the first hundred years of that history finds dreadfully little trying. Indeed, most of the history of antitrust enforcement has been marked by a clear aversion to protecting labor market competition. This arguably has only been reversed in the last decade.

The historical record reveals several reasons for the lack of labor-based merger challenges, none of which suggest that labor monopsony is rare. The first would be early antitrust enforcers' overt hostility to labor organizing specifically and labor organizations more generally—a position that put them in sharp opposition to the legislators who created American antitrust law.

From the first Senate debates over passage of the law that would come to bear his name, Senator John Sherman made clear he was concerned with combinations of companies that could unilaterally set the price of labor. In denouncing the "trust," he explained that:

"The sole object of such a combination is to make competition impossible. It can control the market, raise or lower prices, as will best promote its selfish interests. . . It dictates the terms to transportation companies, it commands the price of labor without fear of strikes, for in its field it allows no competitors. Such a combination is more dangerous than any heretofore invented. . ."[7]

He wasn't the only legislator who was concerned with labor. The debates in 1890 as well as 1914 were defined by an overriding concern that the laws being considered would be misused to stop labor organizing. Thus, the Sherman Act was amended not once but twice to avoid such a result, ultimately being rewritten nearly in its entirety; sections 6 and 20 of the Clayton Act were enacted for the same reason 24 years later.[8]

Early antitrust enforcers ignored this legislative intent, as did the courts hearing challenges brought under the laws. Prosecutors instead turned the Sherman Act into what Professor Hovenkamp termed a "savage weapon" against labor,[9] using it to break the

strikes of longshoremen in New Orleans and hungry Pullman Palace Car workers in Illinois.[10] The labor protections in the Clayton Act arguably fared worse. Despite the law's clear prohibition against the use of antitrust laws against labor organizing, courts in the 1920s used it to stop 2,100 strikes.[11]

In short, for the first four decades of their existence, the antitrust laws were used as a cudgel against organized labor, not a tool to detect and block mergers that risked harming labor markets. While the law was there to allow for a challenge to a merger based on its impact on labor market competition,[12] the idea that the DOJ or FTC of that era would try to block such mergers finds no basis in reality.

In his treatise exploring the absence of antitrust enforcement targeted at labor markets, Professor Posner presents two other reasons for the lack of labor-based merger challenges, both of which post-date the heyday of the labor injunction in the first half of the 20th century.[13] He argues that, starting in the 1960s, legal scholars began to prevail upon law enforcers to target antitrust enforcement on conduct and combinations that raised the prices on products and services sold to the public—that is, "consumer welfare." More interestingly, he explains that until very recently, most economists assumed labor markets were more or less competitive, and labor market power—the power of employers to set wages below a competitive level—was thus not an important problem for society.[14]

[1] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178, 42197 (June 29, 2023) (to be codified at 16 CFR pts. 801, 803).

[2] 15 U.S.C. 1–38; 15 U.S.C. 12–27; 15 U.S.C. 41–58.

[3] *United States* v. *Bertelsmann SE & Co. KGaA,* 646 F. Supp. 3d 1, 1 (D.D.C. 2022).

[4] Statement of Commissioner Melissa Holyoak, *Final Premerger Notification Form and the Hart-Scott-Rodino Rules,* at 9; Concurring Statement of Commissioner Andrew N. Ferguson, *In the Matter of Amendments to the Premerger Notification and Report Form and Instructions and the Hart-Scott-Rodino Rule,* at 11.

[5] Statement of Commissioner Melissa Holyoak, *Final Premerger Notification Form and the Hart-Scott-Rodino Rules,* at 9.

[6] *Id.; see also* Concurring Statement of Commissioner Andrew N. Ferguson, *In the Matter of Amendments to the Premerger Notification and Report Form and Instructions and the Hart-Scott-Rodino Rule,* at 11 ("It is not for a lack of effort.").

[7] 21 Cong. Rec. 2457 (Mar. 21, 1890) (remarks of Sen. John Sherman of Ohio).

[8] *See* Alvaro M. Bedoya & Bryce Tuttle, "*Aiming at Dollars, Not Men*": *Recovering the Congressional Intent Behind the Labor Exemption to Antitrust Law,*" 85 Antitrust L.J. 805, 809–812 (2024).

[9] Herbert Hovenkamp, *Labor Conspiracies in American Law, 1880–1930,* 66 Tex. L. Rev. 919, 928 (1988).

[10] *See* Bedoya & Tuttle, *supra* note 8, at 811–812; *see also U.S.* v. *Workingmen's Amalgamated Council of New Orleans,* 54 F. 994, 996 (E.D. La. 1893); Melvin I. Urofsky, *Pullman Strike,* Encyc. Britannica (Sept. 2, 2022), *https://www.britannica.com/event/Pullman-Strike.*

[11] *See* William E. Forbath, *Law and the Shaping of the American Labor Movement* 158 (1991).

[12] In 1926, in line with Senator Sherman's intent, the Supreme Court held that antitrust law could be used affirmatively to protect competition in labor markets, allowing a group of sailors to sue shipowners for wage-fixing. *Anderson* v. *Shipowners Ass'n of the Pac. Coast,* 272 U.S. 359, 365 (1926).

[13] *See generally* Eric A. Posner, *How Antitrust Failed Workers* (2021).

[14] *See id* at 4. Professor Posner cites a popular economics textbook from 2005 which declared that "[m]ost labor economists believe there are few monopsonized labor markets in the United States." *Id. citing* Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 108 (2005). *See also* David Card, *Who Set Your Wage?* American Economic Review at 1075 (2022) ("the time has come to recognize that many—or even most—firms have some wage-setting power. Such a shift was made with respect to firm's price-setting power many decades ago[. . .] In the past few years we may have reached a tipping point for a similar transition in labor economics, driven by the combination of new (or at least post-1930) theoretical perspectives, newly available data sources, and accumulating evidence on several

That understanding of labor markets has begun to unravel. New research suggests that the fewer companies in a community competing for workers, the lower the wages.[15] Research also suggests that mergers, specifically, help companies keep wages low.[16] This appears to be a common problem in American society. Professor Posner found it plausible that in many labor markets, workers receive thousands of dollars less than the competitive rate.[17] Two years ago, the Treasury Department estimated that as a result of current employer market concentration as well as how time consuming it is to find, interview for, and accept a job, Americans likely lose out on the equivalent of eight weeks of pay every year. In other words, in a perfectly competitive labor market—in a world where we can easily switch jobs to one of any number of firms, most of us would be about two to four paychecks richer.[18] Few people may know about "labor monopsony," but anyone on a budget knows what they'd do with that money.

In short, my colleagues seem to say that labor monopsony is not a problem even though we've only just started to look for that problem. Then, they wave away tools to help find that problem because we haven't found it yet.[19]

All of this said, a key barrier to any merger challenge, including labor-based challenges, is a lack of time. The changes voted out today will help FTC staff quickly find and focus on the mergers that hurt competition in any market, including labor markets. For this and many other reasons, I am proud to support them.

---

[15] See, *e.g.*, Efraim Benmelech, et al., *Strong Employers and Weak Employees: How Does Employer Concentration Affect Wages*, 57. J. of Hum. Res. S200, S203 (Supplement) (2022).

[16] See Elena Prager & Matt Schmitt, *Employer Consolidation and Wages: Evidence from Hospitals*, 111 Am. Econ. Rev. 397, 397 (2021); Benmelech, supra note 3, at S200 ("instrumenting concentration with merger activity shows that increased concentration decreases wages"); David Arnold, *Mergers and Acquisitions, Local Labor Market Concentration, and Worker Outcomes* (unpublished) (Oct. 29, 2021) ("M&As that increase local labor market concentration have negative impacts on worker earnings with the largest impacts in concentrated markets."), *available at https://sites.google.com/site/davidhallarnold/research.*

[17] *See* Posner, *supra* note 13, at 28.

[18] The report's review of academic studies "places the decrease in wages at roughly 20 percent relative to the level in a fully competitive market." This is a middle estimate from an estimated range of $0.15 to $0.25 cents of lost wages on every dollar. The "eight weeks of pay" figure applies the lower bound of that estimate ($0.15, or 15%) to 52 weeks of pay. *See* U.S. Dep't of Treasury, *The State of Labor Market Competition*, at ii (2022) ("20 percent"); *id.* at 24–25 ("15–25 cents on the dollar").

[19] Commissioner Holyoak states that "[t]he agencies have never made a standalone labor challenge to an acquisition," and Commissioner Ferguson states that the agencies have never made a challenge "based on labor market theories that could have been identified by the proposed requirements." Statement of Commissioner Melissa Holyoak, *First Premerger Notification Form and the Hart-Scott-Rodino Rules*, at 9–10; Concurring Statement of Commissioner Andrew N. Ferguson, *In the Matter of Amendments to the Premerger Notification and Report Form and Instructions and the Hart-Scott-Rodino Rule*, at 11. I evaluate this new era quite differently. In 2021, our colleagues at the Antitrust Division successfully blocked a proposed merger between two of the nation's largest book publishers based on a labor theory that the elimination of competition between the merging publishers likely would have negatively impacted the advances paid to authors for their work. *See United States* v. *Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022). What's more, in addition to Commission staff's challenge of the Kroger/Albertson's merger in part on a labor theory, FTC staff just last month submitted a comment urging the Indiana Department of Health to deny an application that seeks to combine Union Hospital and Terre Haute Regional Hospital, in part because, in staff's view, the proposed merger would likely depress wage growth for hospital employees and exacerbate challenges with recruiting and retaining healthcare professionals. *See* Complaint, *FTC* v. *Kroger Co., and Albertsons Co.*, (D. Or. Feb. 26, 2024); Federal Trade Commission Staff Submission to Indiana Health Department Regarding the Certificate of Public Advantage Application of Union Health and Terra Haute Regional Hospital at 54–63 (Sept. 5, 2024). The Commission unanimously authorized staff to file the comment. Press Release, Fed. Trade Comm'n, *FTC Staff Opposes Proposed Indiana Hospital Merger* (Sept. 5, 2024), *https://www.ftc.gov/news-events/news-press-releases/2024/09/ftc-staff-opposes-proposed-indiana-hospital-merger.* Additionally, in 2018, under Republican leadership, the Commission alleged that Grifols S.A.'s proposed acquisition of Biotest U.S. Corporation would likely have enabled the combined firm to decrease fees paid to blood plasma donors and required Grifols to divest certain assets as a condition of the acquisition. *See* Complaint, *In the Matter of Grifols S.A. and Grifols Shared Services North America, Inc.* (Aug. 1, 2018). Finally, I note that prior to my arrival at the Commission, Chair Khan and Commissioner Slaughter sounded the alarm on labor concerns in the abandoned merger between Lifespan Corporation and Care New England Health System stating that, in addition to allegations contained in staff's complaint, the merger also would have supported an allegation on labor grounds. See Concurring Statement of Commissioner Rebecca Kelly Slaughter and Chair Lina M. Khan Regarding *FTC and State of Rhode Island* v. *Lifespan Corporation and Care New England Health System*, Fed. Trade Comm'n (Feb. 17, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/public_statement_of_commr_slaughter_chair_khan_re_lifespancne_redacted.pdf.*

---

**Statement of Commissioner Melissa Holyoak**

**I. Introduction**

The Commission issued its notice of proposed rulemaking for the Premerger Notification, Reporting and Waiting Period Requirements which implements the Hart-Scott-Rodino Antitrust Improvements Act ("HSR") on June 29, 2023.[1] The contents of the NPRM were harrowing and generated (justifiably) substantial outcry from many commentors. Many of the contemplated filing requirements, if implemented, would have been beyond the Commission's legal authority, arbitrary and capricious, unjustifiably burdensome, and just plain bad policy.[2]

The Commission worked together on the monumental task of modifying the NPRM into the Final Rule,[3] ensuring the Final Rule does not suffer from the many legitimate criticisms raised by the commentors. The Final Rule modifies many provisions in the NPRM while taking great care to avoid unduly burdening merging parties or chilling the many procompetitive transactions that happen each year. To be clear, this Final Rule does not align exactly with my preferences. But I have worked to curb the excesses of the NPRM in meaningful ways that would not have happened absent my support. These significant modifications resulted in a Final Rule that is not only consistent with the agencies' statutory grant of authority but will also close certain informational gaps that affect the agencies' ability to conduct effective premerger screening.

Commissioner Ferguson, in section III of his statement, describes in detail the

---

[1] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 (proposed Jun. 29, 2023) (to be codified at 16 CFR parts 801 and 803) (hereinafter NPRM).

[2] Out of the gate, the NPRM made broad assertions about increasing concentration as a justification for the unprecedented and wide-sweeping proposed changes. NPRM, *supra* note 1, at 42179. The concentration literature upon which it relied, *id.* at 42179 n.7, however, has been heavily criticized and debunked. *See, e.g.*, Chad Syverson, *Macroeconomics and Market Power: Context, Implications, and Open Questions*, 33 J. Econ. Perspectives 23 (2019); Carl Shapiro, *Antitrust in a Time of Populism*, 61 Int'l J. Indus. Org. 714 (2018); Gregory J. Werden & Luke M. Froeb, *Don't Panic: A Guide to Claims of Increasing Concentration*, Antitrust Magazine, Fall 2018. Most notably, the literature cited by the NPRM does not use well-defined antitrust markets in its assessment or conclusions. Further, even if increasing concentration had been a reality, it only has a limited role in analyzing competitive effects. *See infra* note 57.

[3] Fed. Trade Comm'n, Premerger Notification; Reporting and Waiting Period Requirements, Final Rule (Oct. 3, 2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/p110014hsrfinalrule.pdf* (hereinafter Final Rule).

---

different fronts."); *id.* at 1086 ("By insisting that 'markets set wages,' labor economists ceded the field, and had very little to say about questions like the design of online labor markets, or the effects of no-solicitation or no-poaching agreements—other than that they should not matter[. . .] One of the most exciting developments in the field today is the evidence of labor economists taking questions about wage setting seriously[. . .] I also expect this work to lead to some rethinking on policies such as minimum wages, the regulation of trade unions, and anti-Trust").

benefits of certain provisions that the Commission included in the Final Rule. These provisions that he describes fill information gaps in the agencies' current ability to fulfill their missions under the HSR Act. I agree with Commissioner's Fergusson's assessments and applaud the Commission's efforts to include these new requests in the Final Rule.

Simultaneous with today's issuance of the Final Rule, the Commission has also announced that it will lift its suspension of early termination when the Final Rule takes full effect. The suspension itself has been in place for more than three-and-a-half years, even though the suspension was supposed to be "temporary" and "brief."[4] I have been baffled by this unjustified delay and disappointed that it took the promulgation of this Final Rule to lift the suspension of early termination. One of the virtues of the Final Rule is that certain provisions will allow staff to more quickly identify which mergers should receive early termination, a significant benefit to both staff and merging parties. So I guess late is better than never.

For the remainder of my statement, I write to demonstrate the dramatic differences between this Final Rule and the proposed rule set forth in the NPRM, and also to elaborate on some of the changes, in addition to lifting the early termination suspension, that drove my decision to vote in favor of the Final Rule. My overview of the Final Rule is not a substitute to the text of the Final Rule or the analysis in the Statement of Basis and Purpose ("SBP"),[5] both of which should be consulted by all filers.

Of the twenty-nine primary proposals in the NPRM, ten were rejected entirely, including, among others, the request for labor information, the obligation to produce draft transaction documents, and the requirements to create organizational charts. Of the remaining nineteen proposals, the Final Rule includes just two without modification; we have made meaningful changes to the other seventeen requirements.

### TABLE 1—REJECTED PROPOSALS

| NPRM provision | Results in final rule |
|---|---|
| Labor Market/Employee Information | Proposal rejected. |
| Drafts of Transaction-Related Documents | Proposal rejected. |
| Organizational Chart of Authors and Recipients | Proposal rejected. |
| Other Types of Interest Holders that May Exert Influence | Proposal rejected. |
| Expand Current 4(d)(iii) to Include Financial Projections to Synergies and Efficiencies | Proposal rejected. |
| Deal Timeline | Proposal rejected. |
| Provision of Geolocation Information | Proposal rejected. |
| Identification of Messaging Systems | Proposal rejected. |
| Litigation Hold Certification Language | Proposal rejected. |
| Identification of F/K/A Names | Proposal rejected. |

For example, the prior acquisition proposal that called for ten years of prior acquisitions without any size threshold was reversed in the Final Rule to request only five years of acquisitions, and reinstated the $10 million threshold—returning to the time period adopted in 1987[6] and dollar threshold that had existed since the original rules in 1978.[7] The NPRM proposal that would have required the filers to identify and produce all agreements between the merging parties has been modified significantly in the Final Rule to simply require the filers to check boxes to indicate whether they have a few types of agreements between them—nothing has to be produced or described. The Final Rule similarly modifies the NPRM's overlap and supply "narratives" to require only "brief" descriptions instead. And, among other revisions, the Final Rule's overlap and supply descriptions requirement makes clear that antitrust analysis is not required.

Further, many of the modifications exempt "Select 801.30 Transactions" from having to report certain information required by the Final Rule. Select 801.30 Transactions are acquisitions of third parties' voting securities where the acquirer does not gain control, no agreements between the acquiring and acquired person govern the transaction, and the acquiror does not have the ability to appoint or serve on a board.[8] The Final Rule likewise exempts transactions where there is no horizontal overlap or supply relationship from certain information requirements, and sets a *de minimis* threshold to exclude the requirement to describe supply relationships where the sale or purchase of the product, service, or asset represents less than $10 million in revenue in the most recent year. Table 2 highlights some of the main modifications that have been made in the Final Rule (again, this list is not exhaustive and does not substitute for the text of the Final Rule).

---

[4] Press Release, Fed. Trade Comm'n, FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination (Feb. 4, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-doj-temporarily-suspend-discretionary-practice-early-termination.*

[5] Fed. Trade Comm'n, 16 CFR parts 801 and 803, Premerger Notification; Reporting and Waiting Period Requirements, Statement of Basis and Purpose (Oct. 3, 2024) (hereinafter SBP).

[6] 52 FR 7066 at 7078 (Mar. 6, 1987) ("[The Commission] believes that this change can be made without harming the agencies' ability to conduct a thorough antitrust review since an account of the acquiring person's acquisitions over the past five

years will give adequate notice of possible trends toward concentration.").

[7] 43 FR 33450 at 33534 (July 31, 1978) ("The item permits the omission of prior transactions that did not involve the acquisition of more than 50 percent of the voting securities or assets of a person with preacquisition sales or assets of $10 million, since smaller acquisitions are likely to be less significant from an antitrust standpoint."). Unlike prior iterations of the rules, the Final Rule does require the acquired entity to also identify prior acquisitions and clarified that an acquisition of "all or substantially all" of the assets of a business must be reported.

[8] The Final Rule defines Select 801.30 Transactions as "[a] transaction to which § 801.30

applies and where (1) the acquisition would not confer control, (2) there is no agreement (or contemplated agreement) between any entity within the acquiring person and any entity within the acquired person governing any aspect of the transaction, and (3) the acquiring person does not have, and will not obtain, the right to serve as, appoint, veto, or approve board members, or members of any similar body, of any entity within the acquired person or the general partner or management company of any entity within the acquired person. Executive compensation transactions also qualify as select 801.30 transactions." 16 CFR part 803, appendix B at 1.

TABLE 2—SELECT MODIFIED NPRM PROPOSALS

| NPRM provision | Select modification in final rule |
|---|---|
| Prior Acquisitions [9] | Among others, retain the five-year lookback and $10 million sales/assets threshold that existed in prior iterations of the HSR rules. |
| Other Agreements Between the Parties [10] | Among others, filers are not required to produce or describe agreements between the parties; instead, they must only, via checkbox, identify types of agreements between them, if any. |
| Officers, Directors, and Board Observers [11] | Among others, (1) exclude reporting on board observers; (2) limit to acquiring person only; (4) limit to officers/directors of entities in overlap industries as described by the text of the Final Rule. |
| 4(c) Documents by/for Supervisory Deal Team Lead(s) [12] | Limit to only apply to *one* individual (*not* the plural "leads" like in the NPRM) supervisory deal team lead, as defined in the text of the Final Rule. |
| Supply Relationships [13] | Among others, (1) require only "brief" descriptions rather than a narrative; (2) exclude "Select 801.30 Transactions"; (3) impose a *de minimis* threshold and (4) limit descriptions to a business assessment rather than an antitrust analysis (*see* SBP). |
| Overlap Products and Services [14] | Among others, (1) require only "brief" descriptions rather than a narrative; (2) exclude "Select 801.30 Transactions"; and (3) limit description to a business assessment rather than an antitrust analysis (*see* SBP). |
| Ordinary Course Documents (Periodic Plans and Reports) [15] | Among others, limit to exclude "Select 801.30 Transactions" and limited to only require documents provided to Chief Executive Officers. |
| Identification of Limited Partners [16] | Among others, limit disclosure requirements for limited partners who do not have management rights. |
| Description of Entity Structures and Organizational Chart for Funds and MLPs [17]. | Among others, eliminate requirement to create an organizational chart. |
| Transaction Diagram [18] | Among others, exclude "Select 801.30 Transactions" and only necessary if diagrams previously existed (*i.e.,* no need to create diagrams). |
| Mandatory Identification of Foreign Jurisdiction Reporting by Both Parties [19]. | Limit to acquiring person. |
| Requiring a draft agreement or term sheet and transaction specific agreements for filings on non-definitive agreements [20]. | Clarify scope and provide more details about the information required. |
| Transaction Rationale [21] | Among others, exclude "Select 801.30 Transactions." |
| Voluntary Waivers for State AGs and International Enforcers [22] | Allow filers to voluntarily check two separate boxes that would permit certain disclosures. |
| Defense or Intelligence Contracts [23] | Among others, limit to contracts generating $100 million or more of revenue and only if there is an Overlap or Supply Relationship. |
| Document Log Requirements [24] | Among others, limit requirement to identify authors to certain and limited circumstances. |
| Adjustments to NAICS revenue reporting [25] | Modified to limit scope. |

Notably, only two of the main proposals in the NPRM were adopted without modification: the requirements to translate foreign-language documents and to report subsidies from foreign entities of concern, which was mandated by the Merger Filing Fee Modernization Act of 2022.[26] All other proposals were rejected or significantly modified. Taken together, the dramatic revisions to the proposed rule set forth in the NPRM result in a Final Rule that I can support. The decisions made to scale back the proposed requirements in the NPRM will limit burden, aligns the Final Rule with the Commission's legal authority under the HSR Act, and is tailored to address information gaps that have hampered the agencies' premerger review.[27]

Sections II through IV of my statement explain why three proposals in the NPRM were especially problematic to me, and why their elimination or substantial revision was critical to my vote on this Final Rule: (II) Labor Market/Employee Information, (III) Drafts of Transaction-Related Documents, and (IV) Ten Years of Prior Acquisitions Without any Size Thresholds. To be clear, by focusing on these three proposals I do not mean to diminish the importance of the other changes reflected in the Final Rule. Each of the many revisions that scaled back the proposed requirements in the NPRM contributed to my vote to issue the Final Rule. Finally, I discuss in section V some additional considerations that led me to support the Final Rule, including important limitations in the Final Rule that ensure

---

[9] *See* Final Rule, *supra* note 3, Acquiring Person Instructions, at 14–15.

[10] *See id.* at 9.

[11] *See id.* at 5.

[12] *See id.* at 1.

[13] *See id.* at 10.

[14] *See id.* at 9–10.

[15] *See id.* at 9.

[16] *See id.* at 4–5.

[17] *See id.* at 5.

[18] *See id.* at 8.

[19] *Compare id.* at 7 (requiring disclosure for acquiring person) with Final Rule, *supra* note 3, Acquired Person Instructions (not requiring disclosure of transactions subject to international antitrust notification).

[20] *See* Final Rule, *supra* note 3, Acquiring Person Instructions, at 9.

[21] *See id.* at 8.

[22] *See id.* at 15–16.

[23] *See id.* at 15.

[24] *See id.* at 2.

[25] *See id.* at 10–11.

[26] *See* 15 U.S.C. 18b (requiring the Commission to promulgate a rule requiring HSR filings to include information on subsidies received from certain foreign governments or entities that are identified as foreign entities of concern); Consolidated Appropriations Act, 2023, Public Law 117–328 (2023) (reflecting the appropriations bill that included the Merger Filing Fee Modernization Act of 2022).

[27] The incremental burden estimated in the NPRM decreased from 107 hours to only 68 hours in the Final Rule, a result that was critical to my

decision. NPRM, *supra* note 1, at 42208 (reporting 107 incremental hours); SBP, *supra* note 3, at section VIII, 386 of 406 (reporting 68 incremental hours).

the Final Rule will not result in fishing expeditions.

Before proceeding, I want to discuss the Commission's authority to issue today's Final Rule, an issue that is critical to me as a Commissioner.[28] The HSR Act obligates the Commission, "with the concurrence of the Assistant Attorney General," to issue rules that require information to be submitted in HSR filings that will "be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws."[29] While this mandate affords some discretion to the Commission, this discretion is not unbounded. Critically, Congress did not give the Commission authority to promulgate rules to gather information generally, or to merely heap burden upon merging parties in an effort to dissuade acquisitions. Rather, the Act explains that the purpose of HSR filings, and the rules determining the content of filings, is for the agencies "to determine whether such acquisition may, if consummated, violate the antitrust laws."[30] Many proposals in the NPRM—including the three discussed below—have been rejected or substantially modified to ensure the Final Rule includes only new requirements that are consistent with the text and structure of the HSR Act.

## II. Labor Market Information

The NPRM contained many problematic proposals. Chief among them was its proposal to collect information from filers about labor markets.[31] As proposed, filers would report three different types of information related to labor:

• "Largest Employee Classifications[:] Provide the aggregate number of employees . . . for each of the five largest occupational categories" based upon 6-digit SOC classifications;[32]

• "Geographic Market Information for Each Overlapping Employee Classification[:] Indicate the five largest 6-digit SOC codes in

which both parties . . . employ workers [and also provide] each ERS commuting zone in which both parties employ workers with the 6-digit classification and provide the aggregate number of classified employees in each ERS commuting zone; and"[33]

• "Worker and Workplace Safety Information[:] Identify any penalties or findings issued against the filing person by the U.S. Department of Labor's Wage and Hour Division (WHD), the National Labor Relations Board (NLRB), or the Occupational Safety and Health Administration (OSHA) in the last five years and/or any pending WHD, NLRB, or OSHA matters."[34]

All three of these requirements ("Labor Proposal") were completely rejected in the Final Rule. Chair Khan asserts in her statement that "the Final Rule pares back some of the labor market requirements."[35] Despite this confusing statement, the text of the Final Rule makes clear that all (not "some") of the labor requirements have been fully removed (not "pare[d] back"). And for good reason. Despite repeated and extensive efforts to make harm in labor markets a standard component of merger enforcement, no evidence exists to justify including the Labor Proposal in the Final Rule. Accordingly, the Labor Proposal was rightfully excluded from the Final Rule and, absent new evidence, has no place in any future rulemaking that the Commission may contemplate.

To be sure, a merger may theoretically create anticompetitive effects in a relevant labor market.[36] A post-merger entity might, for example, be able to lower wages for workers when the merger eliminates a critical employment option for workers. Such a scenario is more likely when the merger involves specialized workers who may have fewer comparable alternatives than less skilled workers.[37] Theory aside, the Labor Proposal would have asked for information generally unhelpful for determining whether an acquisition violates the antitrust laws.

First, the "worker and workplace safety information" would have provided no measurable benefit to the agency in its initial determination of

whether the proposed merger violates the antitrust laws. To support burdening all filers with providing this information, the NPRM asserted that "[i]f a firm has a history of labor law violations, it may be indicative of a concentrated labor market where workers do not have the ability to easily find another job."[38] No evidence, empirical or otherwise, was presented to support this assertion. And I am not aware of any supportive literature and have never seen a court opinion that suggests such evidence indicates competitive harm from a merger under section 7 of the Clayton Act (or any other antitrust violation under the Sherman Act or otherwise). Instead, this proposal seems like an overt way to harass firms with any workplace failure under the guise of an antitrust investigation. As the Supreme Court observed, "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the [F]ederal antitrust laws; those laws do not create a [F]ederal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.' "[39] We simply do not have authority under the HSR Act to require filers to submit information about workplace safety.

Second, the proposed request for Standard Occupational Classification ("SOC") codes would have been of—at most—limited value because SOC codes by themselves are not sufficient to define a relevant labor market for antitrust purposes.[40] Phrased differently, they are not tethered to the hypothetical monopolist test which has been applied by the agencies and courts in various iterations of the merger guidelines for decades.[41] Depending on the merger, SOC codes may be too broad

---

[28] *See, e.g.,* Dissenting Statement of Commissioner Melissa Holyoak, Joined by Commissioner Andrew N. Ferguson, *In the Matter of the Non-Compete Clause Rule,* Matter Number P201200 (June 28, 2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/2024-6-28-commissioner-holyoak-nc.pdf.*

[29] 15 U.S.C. 18a(d).

[30] *Id.* (emphasis added).

[31] NPRM, *supra* note 1, at 42197.

[32] *Id.* at 42215. SOC codes are "Standard Occupational Classification" codes used by the Bureau of Labor Statistics of the Department of Labor. *See id.* at 42210.

[33] *Id.* at 42215.

[34] *Id.* Filers also had to provide, "[f]or each identified penalty or finding . . . (1) the decision or issuance date, (2) the case number, (3) the JD number (for NLRB only), and (4) a description of the penalty and/or finding." *Id.*

[35] Statement of Chair Lina M. Khan, Regarding The Final Premerger Notification Form and the Hart-Scott-Rodino Rules, Commission File No. P239300, and Regarding the FY2023 HSR Annual Report to Congress Commission File No. P859910 at 5–6 (Oct. 3, 2024) (hereinafter Statement of Chair Khan).

[36] Ioana Marinescu & Herbert J. Hovenkamp, *Anticompetitive Mergers in Labor Markets,* 94 Ind. L.J. 1031, 1032 (2019).

[37] *Id.* at 1038.

[38] NPRM, *supra* note 1, at 42198.

[39] *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225 (1993) (quoting *Hunt* v. *Crumboch,* 325 U.S. 821, 826 (1945)); *cf. Rambus Inc.* v. *FTC,* 522 F.3d 456, 464 (D.C. Cir. 2008) ("Deceptive conduct—like any other kind—must have an anticompetitive effect in order to form the basis of a monopolization claim. 'Even an act of pure malice by one business competitor against another does not, without more, state a claim under the [F]ederal antitrust laws,' without proof of 'a dangerous probability that [the defendant] would monopolize a particular market.' " (alteration in original) (quoting *Brooke Grp.,* 509 U.S. at 225)).

[40] *See Comment of U.S. Chamber of Com.,* Doc. No. FTC–2023–0040–0684 at 34 (hereinafter *U.S. Chamber Comment*) ("The data sought by the proposed rules defines labor markets imprecisely at best.").

[41] *See Fed. Trade Comm'n* v. *Advoc. Health Care Network,* 841 F.3d 460, 468–70 (7th Cir. 2016) (using the hypothetical monopolist test to inform market definition); *Fed. Trade Comm'n* v. *Hackensack Meridian Health, Inc.,* 30 F.4th 160, 167 (3d Cir. 2022) (similar).

to accurately assess labor competition,[42] limiting their predictive value for assessing competitive harm. The NPRM itself appeared to acknowledge the limited value of SOC codes: "[t]he use of [SOC] codes as a screening tool is not intended to endorse their use for any other purpose, such as defining a relevant labor market." [43] In fact, just a few examples demonstrate the limited value SOC codes would provide to the Commission:

Attorneys working across diverse areas of expertise are broken down into attorneys (23–1011 Lawyers) and . . . well, attorneys, although there is a separate category for Judges, Magistrate Judges, and Magistrates (23–1023), who are likely lawyers, too. To paraphrase Shakespeare (or a character in "Henry VI, Part 2"), let's kill all the widgets.

To the best of my recollection, the agencies tend to slice the professional salami a little thinner than that when hiring staff.

Physicians fare a little better, although 10 categories of specialist physicians, plus "family medicine physicians" and "physicians, all other" leave out some specialties (like, say, surgery and ophthalmology) and make no room for subspecialties, which might be of interest if you're hiring a cardiothoracic surgeon to do a quad bypass or an orthopedic surgeon to do a hip replacement (or both, but you care which surgeon does which procedure).[44]

Third, the agencies have not relied upon the Economic Research Service ("ERS") commuting zones to allege a relevant labor market,[45] and based upon this limited experience, they cannot be

considered sufficiently applicable to require all filers to provide the ERS data proposed by the NPRM. Further, the NPRM proposal on ERS commuting zones relied upon data from 2000—yes, 24-year-old data—even though more recent iterations are available.[46] And newer data confirm that the older data fail to reflect current market realities, including the widespread transition to telework.[47] Given that there is no evidence that forcing all filers to provide the proposed labor market information would assist the agencies in determining whether the filed-for acquisition violates the antitrust laws, the Commission lacks authority to request the information under the HSR Act.

Even if one were to assume that the agencies had the authority to request the proposed labor market information, it was nonetheless properly excluded from the Final Rule because it was a solution in search of a nonexistent problem. The agencies have never brought a standalone labor challenge to an acquisition.[48] And this is not for lack of trying. Officials at the Commission,[49] Department of Justice,[50] and State

enforcers [51] have stated their desire to focus on harms to the labor market, especially in mergers, since at least 2018, but the expended resources so far have been to no avail.

Granted, the Commission has included tagalong labor claims in addition to traditional theories of harm.[52] And, in a press release, the Commission has taken credit for protecting against harms in the labor market even though the actual complaint being announced by the press release did not allege harm in a labor market.[53] But these few and obscure outliers do not justify the widespread proposal to include labor market information in the Final Rule, especially information (e.g., SOC codes) that has never been used in any of the agencies' filings (litigated or otherwise).

Moreover, the NPRM did not identify any economics literature that justified the request for labor information.[54] As explained by Albrecht et al.:

[D]espite growing interest in the use of antitrust law to address labor monopsony, such efforts are not supported by empirical and theoretical foundations sufficient to bear the weight of these galvanized efforts . . . .

Empirical data concerning the magnitude and impact of labor monopsonies is

[42] E.g., Jose Azar et al., Concentration in US Labor Markets: Evidence from Online Vacancy Data, 66 Labor Econ. 101886, 5 (2020). ("[T]he 6-digit SOC is too broad of a market according to the [small significant non-transitory reduction in wage test].").

[43] NPRM, supra note 1, at 42197; see Comment of International Center for Law & Economics, Doc. No. FTC–2023–0040–698 at 15 ("Given the systematic misfit between the proposed 'Labor Markets' section and any actual labor markets, given the agencies lack of experience in analyzing the local labor-market effects of proposed mergers, and given the hard questions of when or under what conditions such labor-market effects might be both material and unlikely to covary with product-market effects, we suggest that the screening utility of the new information remains unclear.").

[44] Daniel J. Gilman, Antitrust at the Agencies Roundup: Kill all the Widgets Edition, Truth on the Market (Aug. 4, 2023), https://truthonthe market.com/2023/08/04/antitrust-at-the-agencies-roundup-kill-all-the-widgets-edition/ (ellipses in original).

[45] The Commission did not use SOC codes or ERS commuting zones in their complaint allegations that reference concerns in labor markets in its recent litigations. See Compl., In re Tapestry, Inc., & Capri Holdings Ltd., No. 9429 (F.T.C. Apr. 22, 2024); see Compl., In re The Kroger Co. & Albertsons Cos., Inc., No. D–9428 (F.T.C. Feb. 26, 2024). And the DOJ did not rely upon ERS commuting zones in United States v. Bertelsmann SE & Co. KGaA See Compl., United States v. Bertelsmann SE & Co. KGaA, 646 F. Supp. 3d 1 (D.D.C. 2022); see also infra note 48 (explaining why Bertelsmann is not properly considered a case about harm in a labor market, but rather a monopsony input case).

[46] Comment of Wachtell, Lipton, Rosen & Katz, Doc. No. FTC–2023–0040–0670 at 8.

[47] Id.

[48] Some have considered United States v. Bertelsmann SE & Co. KGaA, 646 F. Supp. 3d 1, 1 (D.D.C. 2022) to be a labor-market case. I disagree. On balance, this was more of a traditional monopsony input case. Id. The primary concern was whether there would be sufficient outlets for best-selling books. Id. I am also unaware of merger challenges by private parties where the plaintiffs alleged harm in a labor market. See Suresh Naidu et al., Antitrust Remedies for Labor Market Power, 132 Harv. L. Rev. 536, 571 (2018) ("[W]e [have not] found a reported case in which a court found that a merger resulted in illegal labor market concentration."). The Commission, as reflected in the SBP, also classifies Bertelsmann as an input monopsony case. SBP, supra note 5, at section II.B.2, 32 of 406.

[49] See Testimony of Fed. Trade Comm'n Chair Joseph Simons, US Congress, Oversight of the Enforcement of the Antitrust Laws, Senate Judiciary Committee, 2018, available at https://www.judiciary.senate.gov/meetings/10/03/2018/oversight-of-the-enforcement-of-the-antitrust-laws (staff instructed to "look for potential effects on the labor market with every merger they review").

[50] Assistant Attorney General Makan Delrahim, Remarks at the Public Workshop on Competition in Labor Markets 3 (Sept. 23, 2019), https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-public-workshop-competition ("With respect to mergers, the Division also has challenged transactions where the merged firm would likely have the ability to depress reimbursement rates to physicians, including the Anthem/Cigna merger challenge."); Counsel to the Assistant Attorney General of the Antitrust Division Doha Mekki Testifies Before House Judiciary Committee on Antitrust and Economic Opportunity: Competition in Labor Markets (Oct. 29, 2019), available at https://www.justice.gov/opa/speech/counsel-assistant-attorney-general-antitrust-division-doha-mekki-testifies-house ("[L]abor competition issues are a

high priority for Assistant Attorney General Delrahim and for the Antitrust Division. We have devoted significant resources to enforcement and advocacy in this area recently."); id. ("The Division has also been busy developing and implementing screens to help agency staff detect mergers that are likely to create or enhance monopsony power in labor markets. Over the last 18 months, the Division has developed important new specifications for Second Requests and Civil Investigative Demands to determine whether a transaction will create or enhance labor monopsony. Moreover, the Division has leveraged improved search and review technology to identify labor competition concerns in merger and non-merger investigations.").

[51] Testimony of Rahul Rao before Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, U.S. Hours of Rep. (Oct. 29, 2019), available at https://www.govinfo.gov/content/pkg/CHRG-116hhrg45126/html/CHRG-116hhrg45126.htm. ("Labor is an input, and it is a critical input. It's one that directly affects people's lives in that, when there's a monopoly power, the effect is increase in prices for consumers. When there is monopsony power of a dominant buyer, it decreases wages for workers.").

[52] See Compl., In re The Kroger Company and Albertsons Companies, Inc., No. D–9428 (F.T.C. Feb. 26, 2024).

[53] See Press Release, Fed. Trade Comm'n, FTC Moves to Block Tempur Sealy's Acquisition of Mattress Firm (Jul. 2, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-moves-block-tempur-sealys-acquisition-mattress-firm (stating that "[t]his deal isn't about creating efficiencies; it's about crippling the competition, which . . . could lead to layoffs for good paying American manufacturing jobs in nearly a dozen States,'' even though nothing in the complaint suggests any harm in the labor markets); see also Compl. In re Tapestry, Inc., and Capri Holdings Limited, No. 9429 (F.T.C. Apr. 22, 2024) (discussing labor issues but not alleging violations of the law based upon harm in labor markets).

[54] See NPRM, supra note 1, at 42197–98.

inconsistent. Evidence on the extent of labor-market power is mixed, with studies reaching divergent conclusions depending on the data, methodology, and markets analyzed.[55]

The NPRM also asserted that alleged increases in concentration justified its proposals, including its proposal for labor information.[56] While concentration levels may have a role in antitrust enforcement (*e.g.,* merger presumptions), general and imprecise observations of increased concentration are a slender reed upon which to base such a significant expansion of HSR authority.[57] These limitations also apply

in the labor context. "Many factors other than concentration can affect wages, such as differences in firm productivity, local labor-market conditions (*e.g.,* urban vs. rural), and institutional factors like unionization rates." [58] Further, as explained by Berry *et al.*:

A main difficulty in [the monopsony power literature] is that most of the existing studies of monopsony and wages follow the structure-conduct-performance paradigm; that is, they argue that greater concentration of employers can be applied to labor markets and then proceed to estimate regressions of wages on measures of concentration. [S]tudies like this may provide some interesting descriptions of concentration and wages but are not ultimately informative about whether monopsony power has grown and is depressing wages.[59]

In short, the economic literature does not provide any conclusive evidence on the viability or likelihood of merger harms in labor markets that would justify the NPRM's proposals regarding labor information.

Finally, the Commission's HSR rulemaking authority does not extend to heaping burdens upon merging parties

as a fishing expedition in the hopes of developing new merger enforcement theories. Instead, if labor market concerns exist, then the Commission should conduct merger retrospectives or utilize its 6(b) authority to investigate the issue. The Commission has done neither, and it cannot rely on the need for general information gathering as a basis for demanding that all merging parties provide this information.

And no doubt, the NPRM's proposal would have come with a substantial and unjustifiable burden upon filers and also the agencies. First, firms do not typically maintain SOC codes in the ordinary course of business.[60] Investing in the expertise to generate and report the codes would have required substantial resources.[61] And smaller businesses who make filings infrequently will be particularly disadvantaged compared to frequent filers. Second, the agencies' staff would have borne the burden of this additional information. Staff have limited experience working with SOC codes, and utilizing the data would have required aid from already extremely overtaxed economist staffers. But shifting resources has an opportunity cost, particularly when Congress has flatlined our budget, significantly limiting staff's capacity to take on new work.[62] Thus it is unclear how the Commission would have found resources to utilize the information. This substantial, unjustified burden to filers and the agencies made it impossible for me to support any rule that included the Labor Proposal.

As a final comment on the Labor Proposal, I recognize that excising it from the Final Rule may not have been the desired outcome for some of my colleagues on the Commission.[63] I

---

[55] Brian C. Albrecht et al., Labor Monopsony and Antitrust Enforcement: A Cautionary Tale, ICLE White Paper No. 2024–05–01 at 1 (2024); *see also* Suresh Naidu et al., *Antitrust Remedies for Labor Market Power,* 132 Harv. L. Rev. 536 (2018) ["[W]e have not found a reported case in which a court found that a merger resulted in illegal labor market concentration."]. I also note that a variety of articles sometimes cited to support increased antitrust scrutiny in labor markets fail to justify imposing a request for labor information in HSR filings—nor does the literature necessarily support broader enforcement of antitrust laws in labor markets. *See* Anna Stansbury & Lawrence H. Summers, "The Declining Worker Power Hypothesis: An Explanation for the Recent Evolution of the American Economy" at 1 (Nat'l Bureau of Econ. Rsch., Working Paper No. 27193, 2020), *https://www.nber.org/papers/w27193* (identifying decreased ability to unionize, *not* monopsony power, as the source of declining labor share of income); David Berger et al., *Labor Market Power,* 112 Am. Econ. Rev. 1147 (2022) (at 1 in SSRN version) ("[We] conclude that changes in labor market concentration are unlikely to have contributed to the declining labor share in the United States."); Chen Yeh at al., *Monopsony in the US Labor Market,* 112 Am. Econ. Rev. 2099, 2099 (2022) ("[T]he growing gap between worker pay and productivity might be more about technological change than about employers' bargaining power— a very different issue than the monopsony problem that antitrust law could (potentially) address."); *id.* ("[T]he correlation between markdowns and employment concentration is quite modest, both cross-sectionally (across local labor markets) and in the aggregate over time."); *id.* at 2125 ("[A]t least within manufacturing—cross-sectional and temporal variation in local employment concentration may not necessarily reflect variation in employer market power as measured by markdowns."); David Arnold, *Mergers and Acquisitions, Local Labor Market Concentration, and Worker Outcomes* at 2 (Oct. 29, 2021) ("The evidence . . . does not support the conclusion that lack of antitrust scrutiny for labor markets has been a major contributor to labor market trends such as the falling labor share or stagnant wage growth. Most mergers do not generate large shifts in concentration and I find no evidence that the number of anticompetitive mergers in labor markets has been increasing over time."); Elena Prager & Matt Schmitt, *Employer Consolidation and Wages: Evidence from Hospitals,* 111 Am. Econ. Rev. 397, 397 (2021) ("For unskilled workers, we do not find evidence of differences in wage growth post-merger, irrespective of the change in employer concentration induced by the merger.").

[56] NPRM, *supra* note 1, at 42179 ("This concentration may reflect decreased competition, which can result in higher prices for consumers, decreased innovation, reduction in output, and *lower wages for workers.*" (emphasis added))

[57] *See* Carl Shapiro, *Protecting Competition in the American Economy: Merger Control, Tech Titans,*

*Labor Markets,* 33 J. Econ. Persp. 69, 75–76 (2019) (increased concentration "does not prove that competition in that market has declined."); Carl Shapiro, *Antitrust in a Time of Populism,* 61 Int'l J. Indus. Org. 714, 722–23 (2018) ("Sheer size and market power are just not the same thing."); Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 268 (4th ed. 2005) ("[P]erhaps the most significant criticism is that concentration itself is determined by the economic conditions of the industry and hence is not an industry characteristic that can be used to explain pricing or other conduct."); Timothy J. Muris, *Improving the Economic Foundations of Competition Policy,* 12 Geo. Mason L. Rev. 1, 10 (2003) ("The [structural] paradigm was overturned because its empirical support evaporated."); Fiona Scott Morton, *Modern U.S. Antitrust Theory and Evidence Amid Rising Concerns of Market Power and Its Effects,* Wash. Ctr. for Equitable Growth at 24 (May 29, 2019) ("[I]t is widely understood that either vigorous competition could cause concentration to increase or increased concentration could reduce competition."); Cristina Caffarra & Serge Moresi, *Issues and Significance Beyond U.S. Enforcement,* Mlex Magazine, Apr.–June 2010, at 41, 42–43 ("Most economists would agree that market shares and the HHI often are poor indicators of market power."); Herbert Hovenkamp, *The Looming Crisis in Antitrust Economics,* 101 Boston U. L. Rev. 489 (2021) ("The pursuit of business concentration or bigness for its own sake will injure consumers far more than it benefits small business, the intended beneficiaries."); Timothy F. Bresnahan & Peter C. Reiss, *Entry and Competition in Concentrated Markets,* 99 J. Pol. Econ. 977, 978 (1991) ("[O]nce a market has between three and five firms, the next entrant has little effect on competitive conduct . . . . These data show that prices fall when the second and third firms enter and then level off."); Albrecht et al, *supra* note 55 at 17 n.76 (providing additional supporting citations).

[58] Albrecht et al., *supra* note 55 at 17.

[59] *Id.* at 18 (quoting Steven Berry, Martin Gaynor, & Fiona Scott Morton, *Do Increasing Markups Matter? Lessons from Empirical Industrial Organization,* 33 J. Econ. Persp. 44, 57 (2019)).

[60] *See, e.g., Comment of Wachtell, Lipton, Rosen & Katz,* Doc. No. FTC–2023–0040–0670 at 8.

[61] Comment of *American Bar Association's Antitrust Law Section,* Doc. No. FTC–2023–0040–0723 at 10–12.

[62] Given current budgetary constraints at the Commission and reduced hiring, this is unlikely to change either. Fed. Trade Comm'n, *FTC Appropriation and Full-Time Equivalent (FTE) History,* available at *https://www.ftc.gov/about-ftc/bureaus-offices/office-executive-director/financial-management-office/ftc-appropriation* (demonstrating that the FTC budget went down from 2023 to 2024); Caroline Nihill, *FTC Modernization, Enforcement Efforts Jeopardized by Cuts, Officials Say.* FedScoop (Jul. 10, 2024) ("Commissioner Rebecca Slaughter noted that proposed fiscal year 2025 budget cuts would result in the agency passing 'up important investigations and enforcement matters' in addition to considering furloughs and workforce reductions."); *see also* Statement of Chair Khan, *supra* note 35, at 5–6.

[63] *See* Statement of Chair Khan, *supra* note 35, at 3–4; *see generally* Statement of Commissioner Alvaro M. Bedoya, Joined by Chair Lina M. Khan and Commissioner Rebecca Kelly Slaughter,

nonetheless commend them for agreeing to this unanimous outcome, and I am equally pleased that the Chair rescinded the most recent Memorandum of Understanding Related to Antitrust Review of Labor Issues in Merger Investigations.[64] These efforts reflect an evolution in thinking by the Commission toward evidence over rhetoric.[65]

### III. Drafts of Transaction-Related Documents

Historically, filers have not been required to provide drafts of transaction-related documents with their filings.[66] The production and review of drafts typically occurs during a full-phase investigation, usually after the reviewing agency issues a second request.[67] The NPRM proposed abandoning this practice and requiring that drafts of responsive documents be produced as well.[68] The NPRM explained that requiring the production of drafts would allow staff to have "documents that reflect pre-transaction assessments of business realities, as opposed to 'sanitized' versions." [69] Many commentors on the NPRM opposed this requirement.[70] The Commission ultimately rejected this proposal, which was critical to my vote.

Simply put, the likely burden of producing drafts would have outweighed any perceived benefit. Depending upon the practice of the

individuals drafting the documents, and how many people are involved in preparing different sections of the documents, there may be "dozens or even hundreds of iterative drafts." [71] No question, filings would be much larger under the proposal.[72] Forensic collections, that is a full collection of an individual's emails or documents, are incredibly burdensome. They not only require resources from a technical team to collect the materials; they also require time from the individual businesspeople and then, in most cases, counsel, to review the collected materials, identify responsive documents, conduct privilege reviews, prepare more expansive privilege logs, and prepare the documents for production. The status quo for HSR filings, where generally only final versions are produced, typically does not require a forensic collection. But if all drafts became a requirement for all transactions, then forensic collections, with all their costs, would become standard practice for almost all HSR filings.[73] The use of online collaborative workspaces further complicates the issue—and adds burden—because when multiple parties simultaneously revise the same document, it becomes difficult to know which versions constitute drafts.[74]

To defend the proposal, the NPRM argued drafts are more likely to contain a "smoking gun." [75] As evidence to support this claim, the NPRM observed the drafts produced during a second request have more salacious content.[76] But receiving all drafts amounts to building a haystack around a needle. Even if some drafts contain some interesting content, that content does not support the NPRM's proposed expansive production obligations for two reasons. First, earlier drafts of transaction documents sometimes contain information that may not have been finalized, may occasionally reflect incorrect assumptions, and in some situations may be based on iterations of the transaction that were not part of the final, executed agreement.[77] Not every change to a draft document is nefarious. Many of the drafts, compared to the

final version, would consist of minor or inconsequential edits, excessive repetition, or incomplete thoughts that will require much effort for staff to review.[78] The dramatic increase in the number of documents associated with each filing would have been sufficiently onerous that staff would be simply unable to scrutinize the differences among drafts as they triage dozens of filings each week.

Second, for each of the alleged "smoking gun" drafts identified in a second request by staff, other information contained in the HSR filings already prompted the staff to issue a second request. Phrased differently, the agencies already had enough information, without the drafts, to decide to issue a second request in each of those cases. And beyond bald assertions, the NPRM did not provide any evidence demonstrating the drafts would have made a difference in the decision whether to issue a second request.

In summary, the extensive burden resulting from the production and review by staff of drafts would have outweighed any benefits of the requirement. I struggle to imagine any circumstance in which all draft documents would become a "necessary and appropriate" input for the agencies' initial review of proposed mergers, and therefore believe the inclusion of this requirement in any future revision would exceed the Commission's rulemaking authority. I could not have supported a Final Rule that required drafts and am heartened by the removal of this provision.

### IV. Prior Acquisitions

The NPRM proposed radical changes to the prior acquisition request in the 2011 Rule. The proposed changes included: (1) expanding the lookback period for reporting prior acquisitions from five years to ten years; (2) eliminating the prior *de minimis* exception that required reporting only for prior acquisitions that "had annual net sales or total assets greater than $10 million"; (3) requiring the acquired entity to also report prior acquisitions; and (4) requiring that acquisitions of substantially all of the assets of a business be treated the same as acquisitions of securities or non-corporate interests.[79] My vote was conditioned on the Commission eliminating the first two of these proposed changes. I write to explain why I believe it was proper to remove those requirements from the Final Rule

---

Regarding Amendments to the Hart-Scott-Rodino Rules and Premerger Notification Form and Instructions (Oct. 10, 2024).

[64] Press Release, Fed. Trade Comm'n, FTC, DOJ Partner with Labor Agencies to Enhance Antitrust Review of Labor Issues in Merger Investigations (Aug. 28, 2024), *https://www.ftc.gov/news-events/news/press-releases/2024/08/ftc-doj-partner-labor-agencies-enhance-antitrust-review-labor-issues-merger-investigations* (discussing Chair Khan's unilateral decision to enter a memorandum of understanding with the Department of Labor, National Labor Relations Board, and the Department of Justice); Press Release, Fed. Trade Comm'n, Statement on Memorandum of Understanding Related to Antitrust Review of Labor Issues in Merger Investigations (Sep. 27, 2024), *https://www.ftc.gov/news-events/news/press-releases/2024/09/statement-memorandum-understanding-related-antitrust-review-labor-issues-merger-investigations* (rescinding the same memorandum of understanding).

[65] Chair Khan and Commissioner Bedoya each write to express continued support for the now jettisoned Labor Proposal. I respect their enthusiasm for the idea. But between the decision to reject the Labor Proposal and rescind the memorandum of understanding, the public should rely more on revealed versus expressed preferences.

[66] NPRM, *supra* note 1, at 42194. One exception has been when a draft was sent to the board of directors. *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *See, e.g., U.S. Chamber Comment, supra* note 40, at 21–22.

[71] Comment of Foley & Lardner LLP, Doc. No. FTC–2023–0040–0653 at 11 (hereinafter *Foley Comment*).

[72] *Id.* ("The proposed instruction could potentially increase the size of at least some HSR filings by a factor of ten or twenty.").

[73] *U.S. Chamber Comment, supra* note 40, at 21–22.

[74] *Id.*

[75] NPRM, *supra* note 1, at 42194.

[76] *Id.*

[77] *See Comment of Wachtell, Lipton, Rosen & Katz,* Doc. No. FTC–2023–0040–0670 at 11–12; *Foley Comment, supra* note 71, at 11–13.

[78] *Id.* at 12.

[79] NPRM, *supra* note 1, at 42203.

and why the Commission should not revisit these proposals in future revisions to the HSR rules.

Prior acquisitions may, in limited circumstances, be relevant to analyzing the filed-for transaction, but consideration of these prior transactions comes with risk of government overreach. A prior acquisition may be relevant to analyzing a filed-for transaction when the competitive effects of the prior acquisition have not yet manifested. For example, if a firm acquired a rival and integration was ongoing or existing contractual terms prevent the effects of the merger from being fully realized, a prior acquisition may help the agencies better understand the dynamics and competitive effects of the filed-for transaction. Once firms have completed integration, realized efficiencies, and implemented any strategies they plan to orchestrate, prior acquisitions provide almost no value[80] to the agencies as they assess the competitive conditions surrounding the filed-for transaction because at that juncture, the condition of the current market will reflect the effects of past transactions.[81]

For the last thirty-seven years, the Commission has determined that five years of prior acquisitions, with a threshold based upon the sales and assets of the entity that was acquired, was justifiable.[82] I do not seek to relitigate thirty-seven years of precedent. The question is whether the rulemaking record contained sufficient evidence to justify the request to reach ten years of prior acquisitions without any size threshold. I conclude that it did not.

The HSR Act limits the information that can be required under the Commission's HSR Rules to ''documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust

laws.''[83] Based upon this text, HSR Rules can seek only the information the agencies need to screen for potential violations of the antitrust laws arising from consummation of the filed-for transaction.[84]

Since 1987, the Commission has required only five years of prior acquisitions.[85] Despite the Commission making no efforts to change this rule for thirty-seven years, the NPRM contended that it needed the additional five years of prior acquisitions ''because the current five-year requirement for prior acquisitions is often insufficient to meaningfully identify patterns of serial acquisitions or a trend toward concentration or vertical integration.''[86] Further, the NPRM alleged that ''changes to the economy and the varied acquisition strategies of filing parties'' justified ''a more detailed consideration of how numerous past acquisitions, including those in related sectors, affect the competitive landscape of the current transaction under review.''[87] The Supreme Court has explained that when an agency ''depart[s] from a prior policy,'' ''the agency must show that there are good reasons for the new policy.''[88] And ''a more detailed justification'' is required when an agency's ''new policy rests upon factual findings that contradict those which underlay its prior policy.''[89] Beyond bald and conclusory assertions, however, neither the NPRM nor the rulemaking record presented ''good reasons'' that justified the production of ten years of prior acquisitions, let alone ''a more detailed justification'' that is required in this circumstance.[90]

Insofar as the NPRM's proposal required the production of information in order to investigate past transactions—*i.e.*, not the filed-for transaction—under theories of serial acquisitions or otherwise,[91] the Commission lacks the authority to gather that information via an HSR filing. Because neither the NPRM nor the rulemaking record provided evidence that ten years would be relevant to analyzing the effects of the filed-for transaction, the NPRM's proposal did nothing more than attempt an end-run around the HSR Act's reportability requirements.[92] Congress already specified which transactions must be reported to the agencies, and the Commission cannot gather information that does not help the agencies analyze the filed-for transaction.[93] Sensibly, the Final Rule does not adopt the proposed changes to the lookback period. In the SBP for the Final Rule, the Commission explains that the information required for prior acquisitions is limited to what the agencies need to analyze the anticompetitive effects of the filed-for transaction.[94]

The proposed removal of the $10 million threshold also suffered deficiencies. The $10 million threshold has been the threshold for prior acquisitions since the original HSR

---

[80] As one exception, the agencies have considered the ability to realize efficiencies in past transactions as evidence of the likelihood of achieving efficiencies in the current transaction. But even that information becomes stale and loses probative value at some point.

[81] Dan O'Brien, *The 2023 Merger Guidelines: A Giant Leap in the Wrong Direction,* Consumer Technology Association (Jun. 2024) (''[T]he acquisition history is irrelevant to the current merger except to the extent it provides information about the current merger's likely competitive effects.''); *see also Brown Shoe Co.* v. *United States,* 370 U.S. 294, 332 (1962) (''[T]he statute prohibits a given merger only if the effect of that merger may be substantially to lessen competition.'').

[82] NPRM, *supra* note 1, at 42203.

[83] 15 U.S.C. 18a(d)(1).

[84] *Id.*

[85] Premerger Notification; Reporting and Waiting Period Requirements, 50 FR 38742, 38759 (Sep. 24, 1985) (to be codified at 16 CFR parts 801, 802, and 803).

[86] NPRM, *supra* note 1, at 42203.

[87] *Id.*

[88] *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (Scalia, J.).

[89] *Id.*; *see also id.* at 537 (Kennedy, J., concurring) (''Where there is a policy change the record may be much more developed because the agency based its prior policy on factual findings. In that instance, an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so. An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.'').

[90] *Id.* at 515. In 1987, when the Commission adopted the rule that required filers to report five years of prior acquisitions, it explained that ''[t]he Commission believes that this change can be made without adversely affecting the agencies' ability to conduct a thorough antitrust review. The Commission believes than an accurate account of the acquiring person's acquisitions over the past five years will adequately put it on notice of

possible trends toward concentration in the affected industry.'' Premerger Notification; Reporting and Waiting Period Requirements, 50 FR 38742, 38769 (Sep. 24, 1985) (to be codified at 16 CFR parts 801, 802, and 803). The simple conclusory statements in the NPRM do not qualify as ''a more detailed justification,'' which is necessary here because the Commission now contradicts its previous factual finding that five years was adequate for review.

[91] *See* NPRM, *supra* note 1, at 42203.

[92] The HSR Act identifies which transactions must be reported—*i.e.*, filed—based upon three tests: the commerce test, size of transaction test, and the size of person test. 15 U.S.C. 18a(a); *see also* Fed. Trade Comm'n, *Steps for Determining Whether an HSR Filing is Required* (last visited Oct. 4, 2024), *https://www.ftc.gov/enforcement/premerger-notification-program/hsr-resources/steps-determining-whether-hsr-filing.*

[93] Under the Administrative Procedure Act, a court reviewing an agency rule can declare it ''unlawful and set aside agency actions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'' 5 U.S.C. 706 (Under the Administrative Procedure Act, a court reviewing an agency rule can deem it ''unlawful and set aside agency actions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right''). ''[N]o matter how important, conspicuous, and controversial the issue, . . . an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress.'' *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 161 (2000).

[94] *See* SBP, *supra* note 5, at section II.B.5, 61 of 406 (explaining focus is on reportable transaction).

Rules in 1978.[95] But the NPRM disregarded this forty-six-year history where the threshold, despite inflation, has been the same. To justify abandoning the threshold, the NPRM pointed to "the Commission's technology acquisition study [that] revealed that between 39.3% and 47.9% of transactions were for target entities that were less than five years old at the time of their acquisition."[96] It then stated, without citation, "[g]iven the relative nascency of these acquired companies, the Commission believes that excluding prior acquisitions of firms that have not yet had the chance to achieve $10 million in net sales or assets does not provide a comprehensive picture of each filer's acquisition strategy."[97] Nothing cited by the NPRM suggests that just because an acquisition target is less than five years old, that its sales will be below $10 million. Moreover, nothing in the NPRM explained why the age of targets in "technology acquisitions" would be relevant to the whole economy, and yet the proposed rule would have applied universally. Indeed, neither the NPRM nor the rulemaking record presented evidence to justify this dramatic expansion, and without evidence, there is no justification to impose such a requirement on filers.

The NPRM's proposal to double the time period and to remove the $10 million threshold would have added substantial burden to filing parties. The NPRM appeared content with the burden because it provided an expanded ability to analyze non-reportable prior acquisitions, including under theories of serial acquisitions.[98] But as explained, this benefit contravenes the Commission's rulemaking authority. Because the Final Rule must be limited to the Commission's authority, the focus must also be limited to how it assists the agencies' assessment of the filed-for transaction during the initial waiting period. As explained above, the NPRM's prior acquisition expansion would have provided almost nothing that would help the agencies to assess filed-for transactions.

## V. Additional Considerations

The changes implemented by the Final Rule request information to analyze only the filed-for transaction. The changes are not to authorize the agencies to engage in general fishing expeditions to analyze non-reportable transactions or other allegedly problematic conduct divorced from the effects of the filed-for transaction. The same could not be said for some of the proposals in the NPRM, and those concerns have been rectified in the Final Rule. I understand potential filers may be skeptical that the information gathered in HSR filings may be collected with an eye toward other purposes. In the Final Rule, each of these provisions is now modified to collect only information that is necessary and appropriate to analyze the filed-for transaction.[99]

The Final Rule requires filers to produce new information about officers and directors within the "stack" of companies. The ultimate rule differs substantially from the NPRM's proposal.[100] Among the key changes, the request only applies to acquiring persons; filers no longer have to provide information about board observers; and the request is limited to only those entities who generate revenue in the same NAICS codes as the target. This information, like all the information requested by the Final Rule, is designed to help staff better analyze the filed-for transaction. The SBP provides a detailed description of why this requested information helps obtain that goal.[101] The purpose of this revision is not a general fishing expedition; it is to illuminate complicated and overlapping management structures that may impact the competitive effects of the filed-for transaction.

The additional information about minority shareholders and limited partners has also raised concern. The Final Rule again reflects key changes to the proposals in the NPRM. In particular, the final version eliminates the requirement to create an organization chart and eliminates the requirement to disclose limited partners that do not also have management rights. The complicated nature of this request, especially as included in the NPRM, raised confusion and concern of the Commission's purpose for this request. The SBP goes to great lengths to describe—and illustrate via helpful

diagrams—why this information will be important to analyzing the filed-for transactions. The purpose is not to pursue or launch general investigations into theories of harm based upon fringe concepts such as common ownership.[102] Nor do I believe it would be possible to construct such theories based upon the information required by the Final Rule. My vote in support of the Final Rule reflects my understanding and belief this information will help the agencies to more quickly understand the competitive dynamics of a filed-for transaction, and nothing more.

## VI. Conclusion

The Final Rule has been scaled back dramatically from the NPRM. And rightly so. I voted in favor of the Final Rule because of the revisions and outright removal of certain proposals in the NPRM. As modified, I believe the Final Rule is consistent with that statutory grant of authority and will help staff analyze the filed-for transaction and protect consumers without unduly burdening the filing parties.

On a going forward basis, the Commission can and should carefully scrutinize the effect of the Final Rule on our enforcement efforts and on the burden it imposes upon filing parties and the agencies' staff. A thoughtful retrospective will allow the Commission to modify the Final Rule, if necessary, in a principled and evidence-based fashion.

## Concurring Statement of Commissioner Andrew N. Ferguson

Today, the Commission updates the Hart-Scott-Rodino Act ("HSR" or "the Act")[1] notification form requirements. It concurrently announces that, after an over three-and-a-half year wait, it will lift its categorical "temporary suspension" of early terminations once the Final Rule goes into effect.[2] Unlike

[95] Premerger Notification; Reporting and Waiting Period Requirements, 43 FR 33450 at 33534 (July 31, 1978).

[96] NPRM, *supra* note 1, at 42203.

[97] *Id.*

[98] The NPRM sought to right the wrongs of the so-called 40 years of failed antitrust enforcement. *See* Exec. Order No. 14,036, Executive Order on Promoting Competition in the American Economy; *see* NPRM, *supra* note 1, at 42203.

[99] To be clear, if a filing demonstrates anticompetitive conduct, such as price fixing, it can prompt another investigation.

[100] *See* app. A.

[101] SBP, *supra* note 5, at section VI.D.3.c., 241–254 of 406.

[102] *See, e.g.,* Einer Elhauge, *Horizontal Shareholding,* 129 Harv. L.R. 1267 (2016). Though beyond the scope of this statement, I do note that no court has endorsed such a theory of harm and it has faced scrutiny in the literature. *See* Matthew Backus, Christopher Conlon & Michael Sinkinson, *The Common Ownership Hypothesis: Theory and Evidence,* Brookings Econ Studies (Jan. 2019), *https://www.brookings.edu/wp-content/uploads/2019/02/ES_20190205_Common-Ownership.pdf*; Keith Glovers & Douglas H. Ginsburg, *Common Sense About Common Ownership,* 2018 Concurrences Rev. 28 (Fall 2018); Thomas A. Lambert & Michael E. Sykuta, *Calm Down About Common Ownership, Regulation* (Fall 2018).

[1] 15 U.S.C. 18a.

[2] Press Release, FTC, FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination (Feb. 4, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-doj-*
Continued

the Commission's recent, doomed effort to ban noncompete agreements,[3] Congress undoubtedly gave us authority to promulgate rules governing HSR notification requirements.[4]

The notice of proposed rulemaking ("NPRM") that launched today's rulemaking would have abused that authority by imposing onerous, unlawful requirements that could not have survived judicial review.[5] But the NPRM also proposed some important, lawful updates to the HSR instructions. Mergers have become increasingly complex since we first adopted an HSR rule nearly five decades ago. The current HSR instructions do not adequately address forms of business association that were rare in 1978. And long experience implementing HSR has taught the Commission which information is most important to fulfilling Congress's mandate to conduct premerger review. The current HSR instructions did not always ensure that the Commission and the Antitrust Division (together, the "Antitrust Agencies") had the information they needed to fulfill Congress's intention.

The NPRM, however, was a nonstarter. My colleagues and I engaged in intense negotiations to separate the lawful wheat from the lawless chaff. Today's Final Rule,[6] and the lifting of the early-termination ban, are the culmination of those negotiations. Were I the lone decision maker, the rule I would have written would be different from today's Final Rule. But it is a lawful improvement over the status quo. And although not required for the Final Rule's lawfulness, the Commission wisely accompanies the Final Rule with a lifting of the ban on early termination. I therefore concur in its promulgation.

*I.* Congress passed HSR in 1976, adding section 7A to the Clayton

Antitrust Act of 1914.[7] It requires merging firms to notify the Antitrust Agencies before consummating large mergers, and forbids them from consummating the merger until some period after notifying the Antitrust Agencies. The purpose of this premerger notify-and-wait requirement was to give the Antitrust Agencies the opportunity to investigate mergers and sue to block them. Premerger review dispenses with "interminable post-consummation divestiture trials . . . [and] advance[s] the legitimate interests of the business community in planning and predictability, by making it more likely that Clayton Act cases will be resolved in a timely and effective fashion."[8]

Obviously, the Antitrust Agencies need information about the proposed transactions to review them. Congress therefore provided that firms seeking to merge must "file notification pursuant to rules under subsection (d)(1)" of the Act.[9] Subsection (d), titled "Commission rules," in turn commands the Commission to, "by rule," "require that [a merging party's] notification . . . contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the [Antitrust Agencies] to determine whether such acquisition may, if consummated, violate the antitrust laws."[10] The Commission may also "prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section."[11] "Taken together, these statutory provisions give the FTC . . . great discretion . . . to promulgate rules to facilitate Government identification of mergers and acquisitions likely to violate [F]ederal antitrust laws before the mergers and acquisitions are consummated."[12]

The Commission has regularly deployed the rulemaking power Congress conferred on it in the Act. The Commission published its first final HSR rule two years after Congress passed the Act.[13] In the intervening decades, the Commission has made dozens of changes to the HSR form and

instructions.[14] Some changes expanded the scope of information requested.[15] Others narrowed it.[16] Only one faced judicial review. In 2013, an industry association challenged a Commission rulemaking that required parties to file HSR notifications when they transferred most, but not all, of their pharmaceutical patent rights. The D.C. Circuit held that the rule was a proper exercise of the Commission's rulemaking authority and reflected reasoned decision-making.[17] The revised HSR rule survived and took effect, as have many HSR form changes beforehand and afterwards.

*II.* The Administrative Procedure Act ("APA")[18] governs our HSR rulemakings.[19] "The APA 'sets forth the procedures by which [F]ederal agencies are accountable to the public and their actions are reviewed by courts.' "[20] First, the Rule must be promulgated in "observance of procedure required by law."[21] For a rule like the Final Rule, section 4 of the APA[22] is the "procedure required by law," and it "prescribes a three-step procedure."[23] "First, the agency must issue a 'general notice of proposed rulemaking,' ordinarily by publication in the **Federal Register**."[24] We published the NPRM for the Final Rule on June 29, 2023.[25] "Second, if 'notice is required,' the agency must give 'interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.' "[26] We received approximately 721 comments during the 90-day comment period.[27] "Third, when

---

*temporarily-suspend-discretionary-practice-early-termination.*

[3] See Dissenting Statement of Comm'r Andrew N. Ferguson, Joined by Comm'r Melissa Holyoak, In the Matter of the Non-Compete Clause Rule, Matter No. P201200 (June 28, 2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-noncompete-dissent.pdf; Ryan LLC v. FTC*, No. 3:24–CV–00986–E, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024) (vacating the Commission's Non-Compete Rule).

[4] See *Pharm. Rsch. & Mfrs. of Am.* v. *FTC*, 790 F.3d 198, 208 (D.C. Cir. 2015) (hereinafter "*PhRMA*") ("There is no doubt that the Commission's action was taken pursuant to express delegations of authority. The Act grants the FTC the authority to act by rulemaking." (citing 15 U.S.C. 18a)).

[5] FTC, Notice of Proposed Rulemaking, Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 (June 29, 2023) (hereinafter "NPRM").

[6] FTC, Premerger Notification; Reporting and Waiting Period Requirements, Final Rule (Oct. 10, 2024) (hereinafter "Final Rule"), *https://www.ftc.gov/system/files/ftc_gov/pdf/p110014hsrfinalrule.pdf.*

[7] 15 U.S.C. 18a(a); see also *PhRMA*, 790 F.3d at 199.

[8] H.R. Rep. No. 94–1373, at 11 (1976).

[9] 15 U.S.C. 18a(a).

[10] 15 U.S.C. 18a(d)(1). If the initial notification reveals a potential competitive problem, the Antitrust Agencies may seek additional information, which delays the proposed transaction until the merging parties have complied. See 15 U.S.C. 18a(e).

[11] 15 U.S.C. 18a(d)(2).

[12] *PhRMA*, 790 F.3d at 205.

[13] See 43 FR 33450 (July 31, 1978) (publishing final rules for premerger notification).

[14] See FTC, 16 CFR parts 801 and 803, Premerger Notification; Reporting and Waiting Period Requirements, Statement of Basis and Purpose, 107, n.248 (Oct. 10, 2024) (hereinafter "SBP"), *https://www.ftc.gov/system/files/ftc_gov/pdf/p110014hsrfinalrule.pdf.*

[15] E.g., 76 FR 42471 (July 19, 2011) (adding Items 4(d), 6(c)(ii) and 7(d) to capture additional information).

[16] E.g., 70 FR 73369 (Dec. 12, 2005) (amending Form and Instructions to reduce the burden of complying with Items 4(a) and (b)).

[17] *PhRMA*, 790 F.3d at, 209–12.

[18] 5 U.S.C. 551 *et seq.*

[19] *PhRMA*, 790 F.3d at 209.

[20] *Dep't of Homeland Security* v. *Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Franklin* v. *Massachusetts*, 505 U.S. 788, 796 (1992)).

[21] 5 U.S.C. 706(2)(D).

[22] *Id.* section 553.

[23] *Perez* v. *Mortgage Bankers Ass'n*, 572 U.S. 92, 96 (2015).

[24] *Ibid.* (quoting 5 U.S.C. 553(b) (cleaned up)).

[25] NPRM, *supra* note 5.

[26] *Perez*, 572 U.S. at 96 (quoting 5 U.S.C. 553(c) (cleaned up)).

[27] SBP, *supra* note 14, at 6, n.4; Press Release, FTC, FTC and DOJ Extend Public Comment Period by 30 Days on Proposed Changes to HSR Form (Aug. 4, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/08/ftc-doj-extend-public-*

the agency promulgates the final rule, it must include in the rule's text a 'concise general statement of its basis and purpose.' " [28] With today's Final Rule the Commission includes a statement of basis and purpose that thoroughly explains its reasoning for each of the changes contained in the Final Rule. The Commission has therefore satisfied the APA's procedural requirements.[29]

APA section 10's standard of judicial review also imposes substantive limits on the exercise of our authority under HSR. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." [30] The APA standard generally requires an agency to show two things. First, that it has a lawful grant of authority from Congress to issue the rule [31]—that is, that Congress enacted a statute conferring on the agency power to issue the rule,[32] and that the statute is consistent with the Constitution.[33] Second, that the agency has exercised that grant of authority in a lawful way.[34]

To be sure, the Commission recently has been all too happy to issue rules without valid grants of authority from Congress.[35] But today's Final Rule is

comment-period-30-days-proposed-changes-hsr-form.

[28] *Perez*, 572 U.S. at 96 (quoting 5 U.S.C. 553(c) (cleaned up)).

[29] See *Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania*, 591 U.S. 657, 685–86 (2020) (explaining that an agency satisfies the procedural requirements of the APA so long as it complies with the "objective criteria" of notice, opportunity to comment, and a concise general statement of basis and purpose).

[30] 5 U.S.C. 706(2)(A), (B), (C).

[31] *NFIB* v. *Dep't of Labor*, 595 U.S. 109, 117 (2022) (per curiam) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

[32] *FEC* v. *Cruz*, 596 U.S. 289, 301 (2022) ("An agency, after all, 'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." (quoting *La. Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 374 (1986))).

[33] *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[N]o matter how important, conspicuous, and controversial the issue, and regardless of how likely the public is to hold the Executive Branch politically accountable, an administrative agency's power to regulate in the public interest must always be grounded in a *valid* grant of authority from Congress." (cleaned up) (emphasis added)).

[34] *Allentown Mack Sales & Serv., Inc.* v. *NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.").

[35] See *Ryan LLC* v. *FTC*, No. 3:24–CV–00986–E, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024) (vacating the Commission's Non-Compete Rule).

plainly authorized by a valid grant of authority from Congress. HSR commands the Commission to issue rules governing the form and contents of premerger-notification filings as it determines are "necessary and appropriate to enable [the Antitrust Agencies] to determine whether" mergers "may, if consummated, violate the antitrust laws." [36] Congress further authorized us to "prescribe such other rules as may be necessary and appropriate to carry out the purposes of" the Act.[37] The text of HSR therefore unambiguously commands the agency to issue rules of the type we today issue.[38] And I am not aware of any serious arguments that this grant of discretion to prescribe the procedures by which firms notify the Commission of a pending merger—distinct from the power to adjudicate merger challenges[39]—violates the Constitution. We therefore have statutory and constitutional authority to issue the Final Rule.[40]

[36] 15 U.S.C. 18a(d)(1).

[37] *Id.* section 18a(d)(2)(C).

[38] *PhRMA*, 790 F.3d at 208 ("There is no doubt that the Commission's action was taken pursuant to express delegations of authority.").

[39] See, *e.g.*, Compl. ¶¶ 45, 55–59, 72–76, *The Kroger Co.* v. *FTC*, No. 1:24–cv–438 (S.D. Ohio Aug. 19, 2024), ECF No. 1 (challenging constitutionality of FTC administrative proceedings as a violation of Article III of the Constitution).

[40] When the judiciary last reviewed one of our HSR rules, it deferred to our interpretation of various undefined terms of the Act under the doctrine announced in *Chevron U.S.A. Inc.* v. *Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1983). See *PhRMA*, 790 F.3d at 204 ("[W]e apply the familiar *Chevron* framework . . ."). The Supreme Court has since overruled *Chevron*, correctly interpreting the APA to require the judiciary to resolve statutory ambiguities without deferring to administrative agencies' views on how to resolve those ambiguities. See *Loper Bright Enter.* v. *Raimondo*, 144 S. Ct. 2244, 2261 (2024) ("On the contrary, by directing courts to 'interpret constitutional and statutory provisions' without differentiating between the two, [the APA] makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference. Under the APA, it thus remains the responsibility of the court to decide whether the law means what the agency says." (cleaned up)). The Court in *Loper Bright* held, however, that "[i]n a case involving an agency, . . . the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 2263. The Court gave as examples statutes that delegate "to an agency the authority to give meaning to a particular statutory term," and "[o]thers" that "empower an agency to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a particular term or phrase that 'leave the agencies with flexibility,' such as 'appropriate' or 'reasonable.' " *Ibid.* (quoting *Wayman* v. *Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825), and *Michigan* v. *EPA*, 576 U.S. 743, 752 (2015)). HSR expressly authorizes the Commission to promulgate rules "defin[ing] the terms used in" the Act, and to issue all rules that are "necessary and appropriate to carry[ing] out the purposes of" the Act. 15 U.S.C. 18a(d)(2)(A), (C); see also *id.* 18a(d)(1) (authorizing the Commission to issue rules that are "necessary

The question, then, is whether the Commission has lawfully exercised the power Congress unambiguously conferred on it. As a general matter, an agency lawfully exercises power conferred on it by "engag[ing] in reasoned decisionmaking," which requires that the "agency['s] action . . . rest[ ] 'on a consideration of the relevant factors.' " [41] We must "examine the relevant data and articulate a satisfactory explanation for [our] action including a 'rational connection between the facts found and the choice made.' " [42] This "standard is deferential" to the agency's policy choices, so long as "the agency has acted within a zone of reasonableness and . . . reasonably considered the relevant issues and reasonably explained the decision." [43]

Importantly, this standard does not change because we are amending an existing rule. The APA does not require that "agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." [44] "The statute makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." [45] When an agency revises an existing regulation, reasoned decision-making "would ordinarily demand that it display awareness that it *is* changing its position," and it must show "that there

and appropriate to enable the [Antitrust Agencies] to determine whether such acquisition may, if consummated, violate the antitrust laws"). HSR thus appears to be the sort of discretion-conferring statute that the *Loper Bright* Court suggested may require some modicum of judicial deference to agency decision making. My vote in favor of the Final Rule, however, does not depend on the Commission receiving any judicial deference. I conclude that the Final Rule properly interprets and implements HSR.

[41] *Michigan*, 576 U.S. at 750 (quoting *Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)); see also *Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (The APA "requires agencies to engage in reasoned decision-making, and directs that agency actions be set aside if they are arbitrary and capricious." (cleaned up)).

[42] *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines* v. *United States*, 371 U.S. 156, 246 (1962)).

[43] *FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 423 (2021); see also *Dep't of Commerce* v. *New York*, 588 U.S. 752, 773 (2019) (Courts "may not substitute [their] judgment for that of the [agency], but instead must confine [them]selves to ensuring that [the agency] remained within the bounds of reasoned decisionmaking." (cleaned up)); *Garland* v. *Ming Dai*, 593 U.S. 357, 369 (2021) ("[A] reviewing court must 'uphold' even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " (quoting *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

[44] *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) (Scalia, J.).

[45] *Id.* at 515.

are good reasons for the new policy." [46] But the APA does not require that the agency show that "the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." [47]

The Final Rule is not perfect, nor is it the rule I would have written if the decision were mine alone. But I believe that it addresses important shortcomings in the current HSR rule, and that it is "necessary and appropriate" to enable the Antitrust Agencies to determine whether proposed mergers may violate the antitrust laws. [48]

*III.* I turn now to the specific provisions of the Final Rule to address whether they are "necessary and appropriate" to executing the premerger-review provisions of HSR. [49]

*A.* The Final Rule requires the disclosure of some information not currently required by the old HSR rule. That information is "necessary and appropriate" to the execution of our premerger-review mandate under the Act, and the burdens the disclosure requirements impose on merging firms are justified by the requirements of effective premerger review.

Mergers and acquisitions have become increasingly complex since 1978. The Antitrust Agencies review a large number of deals involving corporate structures that were rare when we adopted our first HSR rule. For example, twenty years ago, only ten percent of acquiring firms were funds or limited partnerships; now, that figure is close to forty percent. [50] Such firms may be shell companies that disclose little public information about their holdings or operations, and, in many cases, have no other assets. But these deals can still present competitive problems through the acquiring person's relationships with other entities. Minority investors, including limited partners, might pull the strings for the acquiring person. And those minority investors might also control entities that compete with the transaction target, creating potential antitrust concerns. [51] The current rule does not require disclosure of investors

in entities between the parent company and the acquiring person, nor does it require disclosure of any limited partners, even if they have management rights for the acquiring person. The Final Rule addresses this shortcoming. It requires disclosure of investors that own at least a five percent share in certain entities related to the acquiring person; if those entities are limited partnerships, filers must disclose limited partners that have certain management rights, such as a board seat. But unlike the NPRM, the Final Rule sensibly does not require disclosure of limited partner investors without any management rights. [52] The Final Rule's minority investor disclosures are a reasonable way to address what the Antitrust Agencies fairly determined was a shortcoming of the previous rule, and are necessary and appropriate to determining the competitive effects of a transaction involving limited partnerships or complex corporate structures. [53]

The Final Rule also requires merging firms to disclose information about their potential vertical relationships—that is, whether the two merging firms currently interact with each other at different levels of the supply chain. [54] HSR rules long required disclosure of information about vertical relationships, but a 2001 amendment to the HSR rules removed that requirement. [55] Since 2001, however, the Antitrust Agencies under the leadership of both parties have increased their scrutiny of, and rate of enforcement actions against, vertical mergers. During the Trump Administration, the Antitrust Division litigated the first vertical merger challenge in decades. [56] The Antitrust Agencies released the 2020 Vertical Merger Guidelines, the first major revision to agency guidance on vertical mergers since 1984. [57] The Commission

released its 2020 Commentary on Vertical Merger Enforcement, which demonstrated the breadth of Commission investigations and consent agreements involving vertical transactions. [58] And the Commission investigated Illumina's proposed acquisition of Grail, which ultimately led to a successful 2023 Fifth Circuit opinion that effectively blocked the vertical transaction. [59] These efforts continue today. I recently joined a unanimous Commission vote authorizing a complaint to challenge a vertical merger between America's leading mattress supplier and its leading mattress retailer. [60]

Since 2001, however, the Antitrust Agencies have had to rely on limited acquisition-related documents and publicly available information to identify potential vertical-competition concerns. Not every competitive issue shows up in transaction documents or is apparent to Commission staff without experience in the industry. As a result, some anticompetitive transactions have likely slipped through the cracks. The Final Rule will also provide the Antitrust Agencies with other information that they can use to quickly identify (or rule out) potential vertical-competition problems. The new Supply Relationships Description requires filers to identify whether they supply, or are supplied by, the other merging party or its competitors. [61] The buyer must also now indicate whether it has certain types of existing contracts with the seller. [62] This information is "necessary and appropriate" to carrying out Congress's command that the Antitrust Agencies review mergers—including vertical mergers—to determine whether they violate the antitrust laws. [63]

The Final Rule requires the disclosure of additional information that will facilitate effective premerger review. Filers must now provide some regularly prepared plans and reports that analyze market shares or competition. [64] Such information, particularly market-share

---

[46] *Ibid.*

[47] *Ibid* (emphasis in original).

[48] 15 U.S.C. 18a(d)(1).

[49] 15 U.S.C. 18a(d)(1).

[50] See SBP, *supra* note 5, at 25.

[51] See *id.* at 225–27 ("some limited partnerships function as aggregation vehicles that allow private equity or other investor groups to direct the strategic business decisions of the portfolio companies in which they invest.").

[52] See FTC, 16 CFR part 803—appendix B, Notification for Certain Mergers and Acquisitions: Acquiring Person Instructions, 4–5 (Oct. 10, 2024) (hereinafter "Acquiring Person Instructions"); SBP at 226–27.

[53] See SBP at 28–31; 15 U.S.C. 18a(d)(1).

[54] FTC, 16 CFR part 803—appendix A, Notification and Report Form for Certain Mergers and Acquisitions: Acquiring Person, 6–7 (Oct. 10, 2024) (hereinafter "Acquiring Person Form") (requesting "other agreements between the acquiring person and target" and the "supply relationship description").

[55] See SBP at 327 (describing past requests for information on vendor-vendee relationships); 66 FR 8680 (Feb. 1, 2001) (HSR rule amendment removing that request).

[56] See *United States* v. *AT&T Inc.*, 310 F. Supp. 3d 161, 193–94 (D.D.C. 2018) ("the Antitrust Division apparently has not tried a vertical merger case to decision in four decades"), *aff'd* 916 F.3d 1029 (D.C. Cir. 2019).

[57] Press Release, FTC, FTC and DOJ Issue Antitrust Guidelines for Evaluating Vertical Mergers

(June 30, 2020), *https://www.ftc.gov/news-events/news/press-releases/2020/06/ftc-doj-issue-antitrust-guidelines-evaluating-vertical-mergers.*

[58] Press Release, FTC, FTC Issues Commentary on Vertical Merger Enforcement (Dec. 22, 2020), *https://www.ftc.gov/news-events/news/press-releases/2020/12/ftc-issues-commentary-vertical-merger-enforcement.*

[59] *Illumina, Inc.* v. *FTC,* 88 F.4th 1036 (5th Cir. 2023).

[60] Press Release, FTC, FTC Moves to Block Tempur Sealy's Acquisition of Mattress Firm, (July 2, 2024), *https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-moves-block-tempur-sealys-acquisition-mattress-firm.*

[61] See Acquiring Person Instructions at 10.

[62] See Acquiring Person Form at 6.

[63] 15 U.S.C. 18a(d)(1).

[64] See Acquiring Person Instructions at 9.

data, often is not available publicly, nor does it always appear in transaction documents. But market-share data are critical to antitrust enforcement. The Supreme Court many decades ago concluded that mergers of competitors constituting thirty percent or more of the relevant market presumptively violate the Clayton Act.[65] And one of the leading metrics for assessing the competitive effects of a transaction is the Herfindahl-Hirschman Index (HHI),[66] which uses market shares to assess the level of concentration in the relevant market, and the change in concentration that the merger would create.[67] Market-share data therefore are not only "necessary and appropriate to . . . determin[ing] whether [an] acquisition may, if consummated, violate the antitrust laws." [68] They are vital to our enforcement mandate. Requiring the provision of these data also promotes efficiency. If the market shares of the two firms are small, the Antitrust Agencies may swiftly conclude that little further investigation is needed—and, thanks to the concurrent lifting of the unfortunate ban on early termination, may also facilitate the grant of early termination in appropriate cases once the Final Rule becomes effective. And the cost of compliance is modest; parties must collect only documents provided, within the past year, to individuals already subject to other document requests.

In addition, the Overlap Description will require filers to identify whether they compete with the other merging party.[69] Under the current form, parties identify overlaps only through Census Bureau NAICS revenue codes.[70] These codes can be painfully vague or overinclusive, particularly for new sectors. For example, NAICS code 518210 covers "companies that provide computing infrastructure, data processing, web hosting, and related services" such as "data entry services, cloud storage services and cryptocurrency mining." [71] Despite a NAICS overlap, many firms within this broad category undoubtedly do not compete. Many other NAICS codes present similar concerns, flagging overlaps where none truly exist. Misleading or overbroad NAICS code overlaps may lead to unnecessary investigations. The Overlap Description will mitigate this problem by permitting filers to explain misleading NAICS code overlaps up front.[72]

Improving the type of information the Commission receives in an HSR notification is likely to improve the merger-review process for many merging parties. If Commission staff believes that a proposed merger merits investigation beyond the initial HSR filing and publicly available information, it must formally open an investigation and obtain clearance for that investigation from the Antitrust Division. Most such investigations show that the transaction poses little risk of competitive harm and are closed without a second request for additional information.[73] Once the investigation is begun, however, the Antitrust Agencies can fall victim to bureaucratic inertia. We, like all law-enforcement agencies, have limited resources. Commencing an investigation and obtaining clearance eats up some of those resources. Commission leadership may therefore resist recommendations to close an investigation quickly even if the early stages of the investigation demonstrate that the merger presents no competitive concerns. Additionally, even investigations that do not lead to a second request can still involve significant cost and delay for merging parties.[74] The information required by the Final Rule will mitigate the risk of false positives. It can reveal that a merger presents no competitive threat at all, and the Commission can avoid crawling down rabbit holes in unnecessary investigations.

Third parties will benefit, too. Commission staff regularly requests voluntary interviews with the merging parties' customers, suppliers, and competitors following an HSR filing. These third parties often cooperate, at the cost of their senior executives' time and legal fees paid to outside lawyers. As these third parties explain the industry and competitive landscape, the lack of any competitive issues can quickly become apparent. By providing the Antitrust Agencies with greater information upfront, the Final Rule can remove the need to burden third parties with such fruitless engagement.

*B.* The Final Rule must be considered in light of another decision the Commission announces today: the lifting of the suspension on early termination. "Early termination" describes the Commission practice of informing merging parties that the Commission is terminating its investigation into the merger before the conclusion of the statutory waiting period, thereby freeing them to consummate the merger immediately. The benefits of early termination are obvious. It reduces financing costs associated with the delay inherent in premerger review, and it allows companies and consumers to realize the benefits of procompetitive mergers more quickly.

Until 2021, Commission staff routinely granted early termination of the initial HSR review period for acquisitions that obviously presented no competitive issues.[75] In February 2021, however, the then-Acting Chairwoman announced a "temporary suspension" of early termination due to "the confluence of an historically unprecedented volume of filings during a leadership transition amid a pandemic." [76] The Antitrust Agencies announced that they "anticipate[d] the suspension [to] be brief." [77]

The "confluence" has been over for some time. The pandemic long ago subsided. We have had a permanent Chair since June 2021. And merger filings have slowed to about half the

[65] See *United States* v. *Phila. Nat'l Bank,* 374 U.S. 321, 363–65 (1963) ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.").

[66] See *ProMedica Health Sys., Inc.* v. *FTC,* 749 F.3d 559, 568 (6th Cir. 2014) ("Agencies typically use the Herfindahl-Hirschman Index (HHI) to measure market concentration.").

[67] See *FTC* v. *H.J. Heinz Co.,* 246 F.3d 708, 716 (D.C. Cir. 2001) ("Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive.").

[68] 15 U.S.C. 18a(d)(1).

[69] See Acquiring Person Form at 6.

[70] See SBP at 301. Federal statistical agencies use the North American Industry Classification System to classify businesses. See *id.* at 147, n.296 (citing U.S. Census Bureau, North American Industry Classification System (rev. Sept. 10, 2024), *https://www.census.gov/naics/*).

[71] *Id.* at 300.

[72] See *id.* at 301.

[73] In Fiscal Year 2023, the Commission received clearance to investigate 124 transactions but only issued second requests for additional information for 26 transactions. See FTC and DOJ, HSR Annual Report Fiscal Year 2023, at Exhibit A, Table 1, *https://www.ftc.gov/policy/reports/annual-competition-reports.*

[74] See SBP at 89 ("[A]n average of 73 transactions each year . . . were delayed by an additional 30 days and filers were burdened by having to submit additional materials on a voluntary basis even though the investigation did not lead to the issuance of Second Requests. These delays impose costs on the parties and the Agencies, as well as third parties contacted during the extended initial review period.").

[75] See *id.* at 16, n.22, 95; *see also* Statement of Comm'r Noah J. Phillips and Comm'r Christine S. Wilson Regarding the Commission's Indefinite Suspension of Early Terminations, at 2 (Feb. 4, 2021), *https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-commissioners-noah-joshua-phillips-christine-s-wilson-regarding-commissions-indefinite.*

[76] Press Release, FTC, FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination (Feb. 4, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-doj-temporarily-suspend-discretionary-practice-early-termination.*

[77] *Ibid.*

number we saw in 2021 and 2022.[78] Nevertheless, the "temporary suspension" persisted. The Final Rule recognizes that this persistence is no longer tenable: "if the Agencies can determine from review of an HSR Filing that a transaction does not present [competitive concerns], the Agencies can more quickly and confidently determine that the transaction does not require a more in-depth review and may proceed to consummation." [79]

Indeed, maintaining the ban would have been absurd in light of the Final Rule's explicit recognition that many transactions pose no competitive risks. Specifically, the Final Rule takes a tailored approach to identify and reduce compliance costs for transactions with lower risks of harm. The Final Rule creates a new category—"select 801.30 transactions"—for acquisitions that almost never present competitive concerns, such as executive compensation agreements. For these deals, filers are excused from many new requirements, including descriptions and some document requests.[80] The Final Rule also recognizes when enough is enough. It tailors the burdens of acquiring and acquired persons, rather than requiring both sides of a transaction to provide the same information. Accordingly, it significantly pares back the requests for acquired persons.[81] Finally, the Final Rule also employs a conditional-request format—a series of if/then queries—to omit certain requirements for acquisitions that do not involve an overlap or vertical relationship.[82] Again, the burden is reduced commensurate with the lower risk of harm.

I am pleased that today the Commission announces that it will lift the categorical ban on early termination and restore this important feature of the merger-review process once the Final Rule becomes effective. It should have happened earlier. I have objected before to the majority's tendency to use our HSR authority to accomplish political objectives.[83] An indefinite ban on early

termination was just more of the same. Maintaining the ban after the Final Rule's effective date would have undermined the efficiencies that justify the new information that the Final Rule requires. I am glad it is gone.

IV. The Final Rule must stand on its own feet. An arbitrary-and-capricious rule is not lawful merely because it is better than a bad NPRM. And the NPRM with which the Commission launched today's Final Rule was about as bad as it gets. It was indefensible bureaucratic overreach and could not have survived judicial review. It drew no distinctions between merger filings that presented little risk of competitive harm—such as executive compensation agreements—and those that raised potentially serious concerns. Instead, the NPRM applied the same blunderbuss approach to every filing. To make matters worse, the NPRM proposed a deluge of new onerous requirements the benefits of which could never have justified the burdens imposed on merging parties. In fact, several would have added little or no value to the Antitrust Agencies at all during their brief window to identify transactions that warrant further investigation. Had today's Final Rule been identical to the NPRM, I would not have voted for it.

Although today's Final Rule is a logical outgrowth of the NPRM,[84] it dramatically curtails the NPRM's wild overreach. That curtailment unsurprisingly followed the arrival of Republican Commissioners. A Final Rule identical to the NPRM would have been little more than a procedural auxiliary to the majority's general suspicion of mergers and acquisitions.[85] I would not have voted for it. The changes adopted after the arrival of Republicans to the Commission, however, rescued the Final Rule from the NPRM's lawlessness. The Final Rule, unlike the NPRM, is a reasoned

decision about what is "necessary and appropriate" to carrying out Congress's premerger-review mandate. It also reasonably addresses shortcomings in the old HSR rule. It therefore satisfies the requirements of both the HSR and APA. None of this was true about the NPRM.

Although the Final Rule's lawfulness does not turn on how much better it is than the NPRM, the changes from the unlawful NPRM demonstrate that the Final Rule is in fact the product of reasoned decision-making, which required us to respond to valid objections about the NPRM's many problems.[86] The most important climbdown from the NPRM is the abandonment of the proposed Labor Markets section.[87] This section would have forced merging parties to classify their employees by job category codes from the U.S. Bureau of Labor Statistics,[88] even though few companies use such codes in the ordinary course of business. And it would have required filers to classify their employees by the U.S. Department of Agriculture's ERS commuting zones, even though companies do not use them in the ordinary course of business and these zones have not been updated since 2000 and are unreliable. The new burden would have been massive, and commenters understandably objected vociferously.[89]

Beyond the major burden and methodological problems, the NPRM's

---

[78] See FTC and DOJ, HSR Annual Report Fiscal Year 2023, at Appendix A (showing 7,002, 6,288 and 3,515 HSR filings for 2021, 2022, and 2023, respectively), https://www.ftc.gov/policy/reports/annual-competition-reports.

[79] SBP at 16.

[80] See id. at 150–51.

[81] See id. at 152.

[82] See id. at 152–54.

[83] See Dissenting Statement of Comm'r Andrew N. Ferguson, In the Matter of Chevron Corp. and Hess Corp., FTC Matter No. 2410008, at 6 (Sept. 30, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/chevron-hess-ferguson-statement_0930.pdf; Joint Dissenting Statement of Comm'r Melissa Holyoak and Comm'r Andrew N. Ferguson, In re ExxonMobil Corp., FTC Matter No. 2410004 (May 1, 2024),

https://www.ftc.gov/system/files/ftc_gov/pdf/2410004exxonpioneermh-afstmt.pdf.

[84] Mock v. Garland, 75 F.4th 563, 583 (5th Cir. 2023) ("After the required NPRM is published in the **Federal Register**, with either the terms or substance of the proposed rule or a description of the subjects and issues involved, the final rule the agency adopts must be a logical outgrowth of the rule proposed." (cleaned up)); Env't Integrity Project v. EPA, 425 F.3d 992, 996 (D.C. Cir. 2005) ("Given the strictures of notice-and-comment rulemaking, an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former."); see also Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 160 (2007) ("The Courts of Appeals have generally interpreted this to mean that the final rule the agency adopts must be a logical outgrowth of the rule proposed." (cleaned up)).

[85] See infra pp. 11–14; Statement of Comm'r Melissa Holyoak, Final Premerger Notification Form and the Hart-Scott-Rodino Rules, File No. P239300, at 7–19 (Oct. 10, 2024).

[86] See, e.g., Perez, 575 U.S. at 96 ("An agency must consider and respond to significant comments received during the period for public comment."); Chamber of Commerce of the U.S. v. SEC, 85 F.4th 760, 774 (5th Cir. 2023) (An agency must "consider all relevant factors raised by the public comments and provide a response to significant points within. Comments the agency must respond to include those that can be thought to challenge a fundamental premise underlying the proposed agency decision or include points that if true and adopted would require a change in an agency's proposed rule." (cleaned up)); Bloomberg L.P. v. SEC, 45 F.4th 462, 476–77 (D.C. Cir. 2022) ("[A]n agency must respond to comments that can be thought to challenge a fundamental premise underlying the proposed agency decision. Indeed, the requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result and respond to relevant and significant public comments. In sum, an agency's response to public comments must be sufficient to enable the courts to see what major issues of policy were ventilated and why the agency reacted to them as it did." (cleaned up)).

[87] For a fulsome accounting of the economic and legal errors that infected the Labor Markets instruction, see Statement of Comm'r Melissa Holyoak, Final Premerger Notification Form and the Hart-Scott-Rodino Rules, File No. P239300, at 7–13 (Oct. 10, 2024).

[88] NPRM, 88 FR at 42197.

[89] See, e.g., Comment of A.B.A. Antitrust L. Sec., Doc. No. FTC–2023–0040–0723 at 10–12; Comment of Wachtell, Lipton, Rosen & Katz, Doc. No. FTC–2023–0040–0670 at 6–10; Comment of Dechert LLP, FTC–2023–0040–0659 at 3–5.

**Federal Register**/Vol. 89, No. 218/Tuesday, November 12, 2024/Rules and Regulations    **89413**

Labor Markets instructions were a clear abuse of Congress's mandate that the Commission require only information "necessary and appropriate" to identify transactions that "violate the antitrust laws." [90] In the nearly half century since Congress passed HSR, the Antitrust Agencies have never successfully challenged any transactions based on labor market theories that could have been identified by the proposed requirements.[91] Until recently, the Antitrust Agencies had never even tried.[92] It is not for a lack of effort. For years, the Commission and Antitrust Division looked for viable labor market theories when investigating transactions that present other competition concerns. The lack of any success lays bare that the Commission never could have justified the immense cost of requiring every single filer to provide extensive labor-related information. Fortunately, my colleagues on the Commission agreed to jettison the Labor Markets section that likely would have doomed the Final Rule.[93]

The Final Rule also eliminates the NPRM's requirement that merging parties provide all drafts of transaction-related "document[s] that were sent to an officer, director, or supervisory deal team lead(s)." [94] Commenters rightly pointed out that this requirement would have imposed an undue burden on merging parties,[95] with the American Bar Association noting that this provision could have forced filers to use e-discovery tools to capture every draft.[96] The cost of this information demand is high. But the value to the Antitrust Agencies would have been low. Commission staff would have struggled to comb through a dozen versions of the same document. And insofar as the goal was to catch merging parties giving honest appraisals about the anticompetitive effects of mergers, I doubt demanding drafts would have succeeded. Knowing that such drafts would have to be produced, parties would just create methods to avoid exposing their honest thoughts in documents that are guaranteed to wind up in the hands of enforcers. Demanding drafts of documents in every transaction would have likely increased the expense of merging—of great benefit to antitrust lawyers—without giving the Antitrust Agencies the sort of "hot docs" for which they were hoping. The Final Rule appropriately eliminated this requirement for every transaction. The Commission can obtain drafts under the only circumstances it would ever need them—when it opens investigations into those few mergers that the HSR filings

reveal present a genuine risk of anticompetitive effects.

Similarly, the Final Rule curtailed several of the NPRM's other burdensome requirements for merging parties to produce documents. It revises the definition of "supervisory deal team lead" to limit it to a single individual, eliminating the need to review multiple employees' files to fulfill this request for transaction-related documents.[97] The Final Rule also removes the NPRM's demand for ordinary course plans and reports that were shared with senior executives but not the CEO. Commenters rightfully noted that this would have forced filers to search the files of additional custodians, greatly increasing the burden on merging parties.[98] Instead, the Final Rule limits the request to certain plans and reports directly provided to the CEO or board of directors.[99] Lastly, the Final Rule no longer forces merging parties to produce all agreements between them. The NPRM's requirement to produce every single agreement between the parties would have been burdensome and expensive, but likely would have shed little light on the potential competitive effects of the merger. Some agreements between merging parties might shed light on competitive effects, but the vast majority would tell us nothing. The Final Rule acknowledges this mismatch of costs and benefits, and instead requires parties to note only whether they have particular types of agreements.[100]

The Final Rule makes many additional changes to the abusive NPRM. It makes clear that filers do not need to disclose any individual's role in a "non-profit entity organized for a religious or political purpose." [101] This exception is important. Requiring a Catholic hospital, for example, to disclose its membership rolls merely because it wishes to make a reportable acquisition, without regard to the competitive effects of that acquisition, would raise serious First Amendment concerns.[102] The Final Rule also creates

---

[90] 15 U.S.C. 18a(d)(1).

[91] The NPRM identified two successful merger challenges with purported labor theories. See NPRM, 88 FR at 42197, n.47. The first, the Antitrust Division's challenge to Penguin Random House's acquisition of Simon & Schuster, did not involve harm to employees of the merging firms. Instead, the alleged harm was in the market for "publishing rights to anticipated top-selling books." *United States* v. *Bertelsmann SE & Co. KGaA,* 646 F. Supp. 3d 1, 12 (D.D.C. 2022). The second, the Commission's challenge to Lifespan Corporation's acquisition of Care New England, did not include a labor market count in the complaint. See Compl., *In the Matter of Lifespan Corp. and Care New England Health Sys.,* FTC Matter No. 2110031 (Feb. 17, 2022). Commissioner Bedoya identifies another purported merger challenge based on a labor theory, specifically "decrease[d] fees paid to blood plasma donors." Statement of Comm'r Alvaro M. Bedoya, In the Matter of Amendments to the Premerger Notification and Report Form and Instructions and the Hart-Scott-Rodino Rule, File No. P239300, at n.20 (Oct. 10, 2024) ("Statement of Comm'r Bedoya"). But, like the Antitrust Division's *Bertelsmann* challenge, the complaint did not allege harm to the merging parties' employees and therefore could not have been identified by the NPRM's proposed demands for employee information. See Compl., *In the Matter of Grifols S.A. and Grifols Shared Services North America, Inc.,* FTC Matter No. 1810081 (Aug. 1, 2018).

[92] Given the pendency of litigation within the Commission's administrative tribunal, I withhold comment on the strength of the Commission's labor market theory in its challenge to The Kroger Company's acquisition of Albertsons Companies, Inc.

[93] Commissioner Bedoya defends the NPRM's Labor Markets section, reasoning that because the antitrust laws apply to the labor markets, the Commission should screen every single merger subject to HSR for potential labor-competition problems. Statement of Comm'r Bedoya, *supra* n.89, at 2, 4. I do not disagree that the antitrust laws apply to labor markets. But that fact would not have made lawful a rule that was identical to the NPRM. Under ordinary principles of administrative law, the Commission would have to "examine the relevant data and articulate a satisfactory

explanation for its action, including a rational connection between the facts found and the choices made." *State Farm,* 463 U.S. at 43 (cleaned up). That means the Commission would need enough evidence of labor-competition problems in mergers to establish that the labor-markets instruction's onerous costs were reasonable. The evidence marshalled by Commissioner Bedoya—a couple papers and a book—comes nowhere near to clearing that bar. Statement of Comm'r Bedoya at 3. The majority made the same mistake in the Noncompete Rule by relying on sparse social-science research to justify massive regulatory burdens. See Dissenting Statement of Comm'r Andrew N. Ferguson, Joined by Comm'r Melissa Holyoak, In the Matter of the Non-Compete Clause Rule, Matter No. P201200, at 37–45 (June 28, 2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-noncompete-dissent.pdf* ("The handful of academic papers cited in the Final Rule cannot justify its incredible reach and relying on them to prohibit noncompete agreements categorically is a clear error of judgment." (cleaned up)); *Ryan LLC* v. *FTC,* No. 3:24–CV–00986–E, 2024 WL 3879954, at *13–14 (N.D. Tex. Aug. 20, 2024) (finding the Noncompete Rule arbitrary and capricious because "[t]he record does not support the Rule."). Making that mistake here would have been a "clear error of judgment" requiring vacatur under the APA. *Huawei Technologies USA, Inc.* v. *FCC,* 2 F.4th 421, 434 (5th Cir. 2021) (cleaned up).

[94] NPRM, 88 FR at 42214.

[95] SBP at 270–71.

[96] Comment of A.B.A. Antitrust L. Sec., Doc. No. FTC–2023–0040–0723 at 15–16.

[97] *See* SBP at 203–05.

[98] E.g., Comment of U.S. Chamber of Com., Doc. No. FTC–2023–0040–0684 at 22, 24.

[99] *See id.* at 274–77.

[100] *See id.* at 291–93.

[101] *See* Acquiring Person Instructions at 5.

[102] *See, e.g., Americans for Prosperity Found.* v. *Bonta,* 594 U.S. 595, 606 (2021) ("This Court has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.' Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by

Continued

de minimis exclusions, which remove the need for filers to note tiny prior acquisitions, supply relationships, and defense contracts that could not plausibly move the competitive needle.[103] The Final Rule shortens lookback periods for many requests, including prior acquisitions, which limits the burdens associated with digging through dated company records.[104] It removes demands for filers to create some new documents, such as deal timelines and organization charts.[105] And the Final Rule includes other important, burden-reducing changes from the indefensible NPRM, all of which help tailor the Final Rule to only those things that are necessary and appropriate to carry out the requirements of HSR.[106]

I still would prefer a deeper cut. For example, I would not have included the

transaction rationale requirement.[107] Our requests for transaction-related documents already cover the same ground, in the parties' own words. I expect most transaction rationales will be heavily lawyered essays designed to ensure that the rationale matches these transaction documents. Indeed, I cannot imagine any lawyer worth his or her salt ever permitting the rationale to depart meaningfully from other parts of the notification. I therefore doubt that the rationales will provide any valuable information that we could not glean elsewhere. Perhaps in some cases parties may use the transaction rationale to explain why a merger that appears suspect at first blush presents no competitive problems. But on the whole, I doubt the transaction rationale will benefit the Antitrust Agencies in the mine run of cases, and I would not impose the burden on every filer.

This example highlights an important consideration the Commission must bear in mind for the future. If post-promulgation experience teaches us that some parts of the rule are not working well, we can and should get rid of them in subsequent rulemakings. We have done that in the past.[108] If, for example,

my prediction about the value of the transaction rationale proves correct, we can and should jettison it. The same is true of all provisions of the Final Rule. Although we have satisfied the APA's requirement that the Final Rule be the product of reasoned decision making about what is necessary and appropriate to carry the Act into execution, experience almost certainly will reveal that the Final Rule can be improved. The Commission should abandon whatever parts of the Final Rule do not work.

Considered as a whole, however, the additional information sought in the Final Rule is "necessary and appropriate" for the Antitrust Agencies to identify transactions that may violate the antitrust laws.[109] Its benefits are many, and, by comparison, the added burdens are reasonable.

Because the Final Rule represents the Commission's reasoned decision about what is necessary and appropriate to carry into execution the requirements of HSR, and because I believe it lawfully addresses shortcomings in the current HSR rule, I concur in its promulgation.

[FR Doc. 2024–25024 Filed 11–8–24; 8:45 am]

**BILLING CODE 6750–01–P**

---

the majority.' " (quoting *Roberts* v. *U.S. Jaycees*, 468 U.S. 609, 622 (1984)); *id.* at 608 (forbidding mandatory disclosure of donor rolls unless the disclosure requirement is narrowly tailored to vindicate an important government interest); *NAACP* v. *Alabama ex rel. Patterson,* 357 U.S. 449, 462–63 (1958) (holding that mandatory disclosure of membership rolls without a sufficient justification violates the First Amendment).

[103] *See* SBP at 153–54.

[104] *See id.* at 151–52.

[105] *See id.* at 6, 293–95.

[106] *See id.* at 6–8, 147–56.

[107] *See* SBP at 253–56.

[108] E.g., 70 FR 73369 (Dec. 12, 2005) (amending Form and Instructions to reduce the burden of complying with Items 4(a) and (b)); SBP at 107,

n.248 (summarizing numerous changes to HSR Rule since 1978).

[109] 15 U.S.C. 18a(d)(1).