# Exhibit 2

## FEDERAL TRADE COMMISSION

**16 CFR Parts 801 and 803**

**RIN 3084–AB46**

**Premerger Notification; Reporting and Waiting Period Requirements**

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** Pursuant to Section 7A(d) of the Clayton Act, the Federal Trade Commission ("FTC" or "Commission") is proposing amendments to the premerger notification rules ("the Rules") that implement the Hart-Scott-Rodino Antitrust Improvements Act ("the Act" or "HSR") and to the Premerger Notification and Report Form (the "Form") and Instructions ("Instructions"). These proposed changes would result in a redesign of the premerger notification process through both a reorganization of the information currently required and the addition of new information and document requirements. In addition, these changes would implement the Merger Filing Fee Modernization Act of 2022. The proposed amendments would involve changes to both the Rules and the Instructions, and the Commission proposes explanatory and ministerial changes to the Rules as well as necessary amendments to the Instructions to effect the proposed changes.

**DATES:** Comments must be received on or before August 28, 2023.

**ADDRESSES:** Interested parties may file a comment online or on paper, by following the instructions in the Invitation to Comment part of the **SUPPLEMENTARY INFORMATION** section below. Write "16 CFR Parts 801–803— Hart-Scott-Rodino Coverage, Exemption, and Transmittal Rules, Project No. P239300" on your comment. File your comment online at *https:// www.regulations.gov/* by following the instructions on the web-based form. If you prefer to file your comment on paper, mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610, (Annex H), Washington, DC 20580.

**FOR FURTHER INFORMATION CONTACT:** Robert Jones, Assistant Director, Premerger Notification Office, Bureau of Competition, Federal Trade Commission, 400 7th Street SW, Room CC–5301, Washington, DC 20024, or by telephone at (202) 326–3100.

**SUPPLEMENTARY INFORMATION:**

### Overview

The Act and Rules currently require the parties to certain mergers and acquisitions to submit premerger notification filings ("HSR Filings") to the Commission and to the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice ("the Assistant Attorney General") (collectively, "the Agencies"), and to wait a short period of time before consummating such transactions. The reporting and waiting period requirements are intended to enable the Agencies to determine whether a proposed merger or acquisition may violate the antitrust laws, including Section 7 of the Clayton Act, 15 U.S.C. 18, if consummated and, when appropriate, to seek an injunction in federal court in order to enjoin anticompetitive acquisitions prior to consummation.

Section 7A(d)(1) of the Clayton Act, 15 U.S.C. 18a(d)(1), directs the Commission, with the concurrence of the Assistant Attorney General, in accordance with the Administrative Procedure Act, 5 U.S.C. 553, to require that premerger notification be in such form and contain such information and documentary material as may be necessary and appropriate to determine whether the proposed transaction may, if consummated, violate the antitrust laws. In addition, Section 7A(d)(2) of the Clayton Act, 15 U.S.C. 18a(d)(2), grants the Commission, with the concurrence of the Assistant Attorney General, in accordance with 5 U.S.C. 553, the authority to define the terms used in the Act, exempt classes of transactions that are not likely to violate the antitrust laws, and prescribe such other rules as may be necessary and appropriate to carry out the purposes of Section 7A.

In this notice of proposed rulemaking ("NPRM"), the Commission proposes amending the Rules (Part 801 and Part 803 and its appendices), the Form, and the Instructions to reorganize the information currently required with an HSR Filing and to require additional information critical to the Agencies' initial review. These changes would improve the efficiency and effectiveness of that initial review by providing the information the Agencies need to identify during the initial 30-day waiting period any transaction that may pose competition concerns and potentially narrow the scope of any investigation or reduce the need to conduct a more in-depth investigation of the proposed transaction. These amendments also incorporate the changes to implement the collection of information mandated by the Merger Filing Fee Modernization Act of 2022 ("2022 Amendments") contained within the Consolidated Appropriations Act, 2023 (Pub. L. 117–328, 136 Stat. 4459) to Section 7(a) of the Clayton Act, 15 U.S.C. 18a. Finally, the Commission proposes explanatory and ministerial changes to the Rules as well as necessary amendments to the Instructions to effect the proposed changes.

### Background

The premerger notification program is designed to provide the Commission and the Assistant Attorney General with the information and documentary material necessary and appropriate for an initial evaluation of the potential anticompetitive impact of transactions. The HSR premerger notification program is an essential tool for effective and efficient merger enforcement because it enables the Agencies to investigate acquisitions that may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act and to challenge them before they are consummated and the businesses of the two companies are "scrambled" or integrated such that effective post-merger relief is much more difficult. Congress intended that premerger review would "strengthen the enforcement of Section 7 by giving the government antitrust agencies a fair and reasonable opportunity to detect and investigate large mergers of questionable legality before they are consummated." [1] Premerger notification and review, including a mandatory waiting period during which they cannot consummate the transaction, gives the Agencies the procedural tools necessary to seek to prevent mergers in court before they cause harm or the operations of the firms become so integrated that the premerger state of competition cannot be restored.

The HSR Act and Rules specify that transactions subject to the HSR Act cannot be consummated until 30 days for most transactions (cash tender offers and certain types of bankruptcies observe a 15-day waiting period) [2] after the parties submit an HSR Filing to the Agencies. These statutory deadlines for conducting an initial review are extraordinarily short, and the Agencies must work quickly to determine whether to take steps to prevent the consummation of potentially anticompetitive transactions. During the initial waiting period, the FTC's

---

[1] H.R. Rep. No. 94–1373 at 5 (1976).

[2] 15 U.S.C. 18a(b)(1)(B); 11 U.S.C. 363(b)(2).

**Federal Register** / Vol. 88, No. 124 / Thursday, June 29, 2023 / Proposed Rules **42179**

Premerger Notification Office ("PNO") staff must review each HSR Filing to ensure it complies with the HSR Rules. Staff at both Agencies initially review the information and documents for substantive antitrust concerns, identify and assess the relevant facts, conduct a preliminary antitrust analysis, form preliminary recommendations regarding the investigation's direction, and communicate these recommendations within each Agency. As staff formulate recommendations, they must also initiate clearance from the other agency for those transactions that merit collection of additional information to avoid any duplication of effort and ensure that only one agency investigates the transaction. Senior leadership at the investigating agency must review staff's recommendations and determine whether to issue a Request for Additional Information ("Second Request"),[3] which starts the second phase of the agency's merger investigation. If there are other jurisdictions investigating, Agency staff coordinate with relevant state Attorneys General or international counterparts. All of this must happen during the initial waiting period, which is typically 30 days.

Given the large number of HSR Filings submitted each year, the Agencies must use their resources efficiently and effectively to focus primarily on transactions that may harm competition. Information submitted as part of the HSR premerger notification process is a key starting point, and the information contained in the HSR Filing should be sufficient to allow the Agencies to conduct a thorough but quick evaluation of whether the proposed transaction is one that requires more in-depth investigation through the issuance of Second Requests.

However, after a comprehensive review of the premerger notification process and based on the Agencies' experience conducting in-depth investigations of challenged mergers, the Commission believes that the information currently reported in an HSR Filing is insufficient. In fact, the challenges of premerger review have expanded considerably over time as result of several factors. First, there has been tremendous growth in sectors of the economy that rely on technology and digital platforms to conduct business and, given the dynamic nature of these markets and the importance of acquisition strategies to success and market growth, mergers and acquisitions in these sectors present a unique challenge for the Agencies.[4] In these sectors, some transactions involve firms whose premerger relationship is not clearly horizontal or vertical; rather, merger activity in these sectors increasingly involves firms in related business lines where the Agencies must closely examine the potential for direct competition in the future.

In addition, the very nature of HSR-reportable transactions has become more complex over time. Transaction structures have evolved to include not only the Ultimate Parent Entity (UPE) and its acquiring entity,[5] but also other entities within the acquiring person. For instance, there can be numerous entities between the UPE and acquiring entity, and other investors can have a stake in any one of these entities. As a result, these investors could have a direct role in effectuating the transaction. Individuals or entities other than the those directly involved in the transaction may be able to exert influence over the transaction as well. The existence of subsidies or loans, among other means, may subject the buyer to additional pressures from individuals or entities not directly a party to the reportable transaction. Indeed, the use of board observers has become a more frequent way for outside players to gain direct access to company strategy. Each of these factors can affect a transaction's impact on the competitive landscape.

Consistent with this concern, the Commission's NPRM also proposes changes to implement the collection of information about certain subsidies, as mandated by the 2022 Amendments. Congress determined that foreign subsidies can distort the competitive process or otherwise change the incentives of the firm in ways that undermine competition following an acquisition and are particularly problematic when provided by entities or countries that are strategic or economic threats to the United States.[6] The proposed changes require filing parties to provide information about subsidies received from foreign entities of concern, as discussed in more detail below.

Another factor that has an impact on the complexity of premerger review is that consistent with the law and binding judicial precedent, the Agencies have stepped up efforts to review transactions for *all* their potential competitive impacts. The Agencies are responding to evidence that the U.S. economy is becoming increasingly concentrated overall.[7] This concentration may reflect decreased competition, which can result in higher prices for consumers, decreased innovation, reduction in output, and lower wages for workers. For example, economists have estimated that workers' share of national income has fallen sharply since 2000, such that the workers' share of income today is now 6 to 8 percentage points below the 1980 level.[8] These findings reveal that despite the Agencies' efforts to prevent market consolidation through merger enforcement, many markets suffer from a lack of robust competition and mergers continue to cause harm.[9] As President Biden noted in his Executive Order on Promoting Competition, industry consolidation and weakened competition "deny Americans the benefits of an open economy," with "workers, farmers, small businesses, and consumers paying the price." [10]

---

[3] 15 U.S.C. 18a(e).

[4] *See, e.g.*, Fed. Trade Comm'n, Non-HSR Reported Acquisitions by Select Technology Platforms 23–24 (2021).

[5] 16 CFR 801.1(a).

[6] Title II of the Merger Filing Fee Modernization Act of 2022, Public Law 117–329, Div. GG, sec. 201(a)(1) at 3826, 136 Stat. 4459. Congress pointed to remarks of former Commissioner Noah Phillips that "one area where antitrust needs to reckon with the strategic interests of other nations is when we scrutinize mergers or conduct involving state-owned entities . . . companies that are controlled, by varying degrees, by the state . . . [and] often are a government tool for implementing industrial policies or to protect national security." *Id.* at sec. 201(a)(5).

[7] *See, e.g.*, Council of Econ. Advisers Issue Brief, Benefits of Competition and Indicators of Market Power at 4 (Apr. 2016), *https://obamawhitehouse. archives.gov/sites/default/files/page/files/ 20160414_cea_competition_issue_brief.pdf* (noting change in revenue share earned by the 50 largest firms in each sector); David Autor et al., *The Fall of the Labor Share and the Rise of Superstar Firms*, 135 Q.J. Econ. 645 (2020) (finding that the top 4 firms in the top sectors of the economy became steadily and significantly more concentrated); Thomas Philippon, *Causes, Consequences, and Policy Responses to Market Concentration*, in *Aspen Economic Strategy Group, Maintaining the Strength of American Capitalism* (2019) (reviewing literature on concentration in the U.S. economy).

[8] *See, e.g.*, Gene M. Grossman and Ezra Oberfield, *The Elusive Explanation for the Declining Labor Share*, 14:1 Ann. Rev. Econ. 93–124 (2022).

[9] *See, e.g.*, Keith Brand, Chris Garmon, Ted Rosenbaum, *In the Shadow of Antitrust Enforcement: Price Effects of Hospital Mergers from 2009–2016*, (forthcoming in J.L. Econ.); Zack Cooper et al., *The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured*, 134 Q.J. Econ. 51 (2019); Gautam Gowrisankaran, Aviv Nevo, and Robert Town, *Mergers When Prices are Negotiated: Evidence from the Hospital Industry*, 105 Am. Econ. Rev. 172 (2015); Orley Ashenfelter, Daniel Hosken, and Matthew C. Weinberg, *Did Robert Bork Understate the Competitive Impact of Mergers? Evidence from Consummated Mergers*, 57 J.L. & Econ. S67 (2014).

[10] Exec. Order No. 14,036, 86 FR 36,987 (July 14, 2021). *See also* The White House, Fact Sheet: Executive Order on Promoting Competition in the American Economy (July 9, 2021), *https:// www.whitehouse.gov/briefing-room/statements-releases/2021/07/09/fact-sheet-executive-order-onpromoting-competition-in-the-american-*

Continued

Each year, many of the transactions that are investigated by the Agencies are also investigated by another jurisdiction under their laws and procedures and this adds to the complexity of premerger review. Moreover, the Agencies' experience gained while cooperating with international competition agencies that are conducting their own merger investigation reveals that better information can help address the increased complexity of premerger review and improve its efficiency. As compared to the Form, most international jurisdictions have merger filing forms that ask filers to provide significantly more information that their staff considers relevant to the competition analysis, including details about the transaction's structure and rationale, horizontal overlaps, vertical and other relationships, and more detailed sales data. Importantly, many other jurisdictions rely on narrative responses from the parties that contain basic information about business lines or company operations, and several require the parties to self-report overlaps.

For all these reasons, the Commission believes that the information currently collected by the Form is insufficient for the Agencies to conduct an effective and efficient initial evaluation of a transaction's likely competitive impact on all of those who might be affected, including consumers, small businesses, and workers. In the Agencies' experience, the current Form does not provide their staff with complete information, including information about the transaction; the filers' business operations and those of any related entities; the premerger relationship between the acquiring person and the acquired entity; individuals or entities that may have influence over the operation of the relevant business lines; the full range of potential competitive implications of the transaction, including effects on workers; and prior acquisitions.

To supplement the shortcomings of HSR Filings, Agency staff must often rely on voluntary cooperation from third parties—customers and competitors of the merging parties—during the initial waiting period to learn basic information about the parties' business dealings and the markets in which they compete. In addition, staff needs to conduct independent research using publicly available information to supplement the modest amount of

material submitted with the HSR Filing. Neither of these is reliable as a substitute for information provided by the parties themselves and certified as a complete response. Moreover, the additional effort required to discover basic business information about the parties to the transaction and their premerger relationship is inefficient and can result in both too few in-depth investigations when the information collected does not uncover a significant premerger competitive relationship as well as in-depth investigations that are either too broad or too narrow due to the insufficient detail about those relationships that is currently provided in HSR Filings. The information collected by the parties for their own premerger assessment of the transaction is paramount for the Agencies' antitrust assessment and should be collected and submitted with the initial filing.[11] The Commission therefore proposes additional questions and document requests to provide the Agencies with the information necessary to facilitate their initial review, as discussed further in this NPRM.

At the same time, it has become clear to the Commission that certain required information currently submitted in the Form to aid the Agencies' review is not as helpful as originally intended. For instance, as a general screening tool, reporting revenue by specific dollar amounts for specific industry codes, as defined by the North America Industry Classification System ("NAICS"), does not materially assist the Agencies in their initial review. Reporting revenue ranges for the NAICS codes, would sufficiently convey which lines of business of the filing person generate the most revenue. In addition, the requirement to report manufacturing revenues at a granular level has become less helpful to the Agencies during their initial review as a result of changes made by the United States Census Bureau ("Census") to one of its revenue classification systems. Finally, the Commission believes that the identification of minority investors in target entities, other than those that will "roll over" their investments post-consummation, is of limited use. The Commission therefore proposes deleting these requirements, as discussed in further detail below.

The Commission anticipates that the proposed reorganization and collection of additional information in HSR Filings would greatly enhance the Agencies' ability to complete the review of a reportable transaction in a short period of time, and that they are necessary and appropriate in order for the Agencies to vigorously enforce the nation's antitrust laws. The changes would improve the efficiency and effectiveness of the Agencies' initial review process and reduce the need to rely on the voluntary submission of additional information by the parties and third-party industry sources during the initial waiting period.

Finally, the Commission notes that since the implementation of the Act and Rules in the late 1970s, there has never been a large-scale reorganization of the information required in an HSR Filing. As a result, the Commission is proposing a comprehensive redesign of the premerger notification process through both a reorganization of the information currently required and the addition of new information requirements. As the Agencies are currently working to complete an electronic filing ("e-filing") platform, the exact structure of the redesign is unclear at this time. The Commission believes that the development and roll-out of an e-filing platform will mark a significant improvement in the submission and processing of HSR Filings, with benefits for both filers and the Agencies. Thus, in this NPRM, the Commission is providing an overview of the proposed reorganization of the information currently required and the proposed new information requirements. The exact form of the redesign and how filers will submit this information will be more clearly laid out in any Final Rule after the Commission reviews all comments to this NPRM.

## Proposed Changes to the Rules

### I. Proposed Changes to Part 801

*A. Section 801.1: Proposed Definitions of "Foreign Entity or Government of Concern" and "Subsidy"*

On December 29, 2022, the President signed into law the Consolidated Appropriations Act, 2023, which included amendments to the HSR Act in t2022 Amendments. Public Law 117–328, 136 Stat. 4459. Congress found that foreign subsidies, particularly those from "countries or entities that constitute a strategic or economic threat

---

*economy/* (noting that "Economists find that as competition declines, productivity growth slows, business investment and innovation decline, and income, wealth, and racial inequality widen.").

[11] "The House conferees contemplate that, in most cases, the Government will be requesting the very data that is already available to the merging parties, and has already been assembled and analyzed by them. If the merging parties are prepared to rely on it, all of it should be available to the Government." 122 Cong. Rec. H30877 (Sept. 16, 1976) (remarks of Rep. Rodino).

to United States interests,"[12] "can distort the competitive process by enabling the subsidized firm to submit a bid higher than other firms in the market, or otherwise change the incentives of the firm in ways that undermine competition"[13] post-merger. The 2022 Amendments require the Commission, with concurrence of the Assistant Attorney General, and in consultation with Chairperson of the Committee on Foreign Investment in the United States, the Secretary of Commerce, the Chair of the United States International Trade Commission, the United States Trade Representative, and heads of other appropriate agencies ("Relevant Agencies"), to promulgate a rule to require persons making an HSR Filing to disclose subsidies received from countries or entities that are strategic or economic threats to the United States. Congress identified those threats as "foreign entities of concern" as defined in section 40207 of the Infrastructure and Jobs Act, 42 U.S.C. 18741(a), and required the Commission to collect information about subsidies from these entities as part of HSR Filings.

After conducting its own internal diligence to draft a rule and in consultation with the Relevant Agencies on this topic, the Commission proposes amending § 801.1 to add proposed paragraphs (r)(1) and (2), which define "foreign entity or government of concern" and "subsidy," respectively.

1. Section 801.1(r)(1) Foreign Entity or Government of Concern

In the 2022 Amendments, Congress found that foreign subsidies are particularly problematic when granted by countries or entities that constitute a strategic or economic threat to U.S. interests. To identify such subsidies, the Commission proposes new rule § 801.1(r)(1). This proposed rule defines, in proposed subsection (i), subsidies that would have to be disclosed, per Congress' mandate, if received from a "foreign entity of concern" as the term is defined in section 40207 of the Infrastructure Investment and Jobs Act ("IIJ Act"), 42 U.S.C. 18741(a). The Commission therefore proposes adopting this definition in § 801.1(r)(1)(i).

The Commission recognizes, however, that the definition of a "foreign entity of concern" in the IIJ Act does not explicitly include foreign governments or government agencies. To the extent

that HSR filers have received any subsidy directly from the government of a country designated by 42 U.S.C. 18741(a)(5)(C), the Commission believes that including these subsidies would be consistent with Congress' mandate to capture information regarding subsidies when granted by entities posing a strategic and economic threat to the United States. Indeed, the Agencies' understanding of the subsidies' competitive significance would be incomplete without including subsidies granted by foreign governments or government agencies of foreign countries that are covered nations under 42 U.S.C. 18741(a)(5)(C). Therefore, the Commission proposes requiring persons making an HSR Filing to report subsidies received from governments (and their agencies) of foreign countries that are covered nations under 42 U.S.C. 18741(a)(5)(C) in proposed § 801.1(r)(1)(ii).

Finally, the Commission proposes that proposed §§ 801.1(r)(1)(i) and (ii) retain the references to the respective sections of the IIJ Act rather than incorporating the current text of these sections to assure that the proposed rule remains consistent with any subsequent amendments to these sections within the IIJ Act.

2. Section 801.1(r)(2) Subsidy

The 2022 Amendments found that "[f]oreign subsidies, which can take the form of direct subsidies, grants, loans (including below-market loans), loan guarantees, tax concessions, preferential government procurement policies, or government ownership or control, can distort the competitive process."[14] Thus, the 2022 Amendments require the Commission to collect information about such subsidies to enable the Agencies to determine whether the transaction, if consummated, would violate the antitrust laws. But the statute does not define the term "subsidy" and its specific definition has, in fact, been heavily debated and negotiated in both U.S. legislation and international treaties in other contexts. The Commission is mindful of the relevant caselaw and expertise of other U.S. agencies that have developed over decades and, after consultation with the Relevant Agencies on this topic, the Commission proposes the adoption of the definition of subsidies in Title VII of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. 1677(5)(B).

The Tariff Act definition of "subsidy" is consistent with the definition in the World Trade Organization's Agreement on Subsidies and Countervailing

Measures ("SCM"), to which the United States is a party.[15] The Commission believes that because this definition is found both in U.S. law and in the SCM, both U.S. and foreign filing parties, or the law firms that represent them, should be familiar with and able to apply. The Commission also believes this definition is consistent with the Congressional mandate in the 2022 Amendments.

The Commission thus proposes adopting this definition in § 801.1(r)(2) and that the proposed rule retain the reference to the Tariff Act definition rather than incorporating the current text of that section to assure that the proposed rule remains consistent with any subsequent amendments to the Tariff Act.

The incorporation of this proposed change into the Instructions is discussed below at III.E.1.

## II. Proposed Changes to Part 803

*A. Sections 803.2, 803.5, and 803.10: Adoption of Electronic Filing*

The Commission proposes amending §§ 803.2(e) and (f); 803.5(a)(1), (3), and (b); and 803.10(c)(1)(i) and (ii) to eliminate references to paper and DVD filings to physical offices. In March 2020, the COVID–19 pandemic and resulting closures of federal office buildings prevented the Commission and Assistant Attorney General from physically accepting HSR Filings, as had been the practice since the original adoption of the Rules in 1978. As a result, on March 17, 2020, the Agencies began accepting filings electronically.[16] Given the success of that system, the Commission proposes amending the Rules as noted above to adopt electronic filing and eliminate references to paper and DVD filings. This change benefits both the Agencies and filing parties by reducing reliance on the delivery and acceptance of paper filings or DVDs.

*B. Section 803.2: Requiring Separate Forms for Acquiring and Acquired Persons*

The Commission proposes amending § 803.2(a) and deleting § 803.2(b)(1)(v) so that filing persons that are both the acquiring and acquired person are required to make separate filings. Currently, the Rules, Instructions, and Form permit filers that are both an acquiring and an acquired person in a transaction to file only one Form. This

---

[12] Title II of the Merger Filing Fee Modernization Act of 2022, Public Law 117–329, Div. GG, sec. 201(a)(2) at 3826, 136 Stat. 4459.

[13] *Id.* at sec. 201(a)(1).

[14] *Id.*

[15] 19 U.S.C. 3511(d)(12).

[16] Press Release, Fed. Trade Comm'n, Premerger Notification Office Implements Temporary e-Filing System (March 13, 2020), *https://www.ftc.gov/news-events/news/press-releases/2020/03/premerger-notification-office-implements-temporary-e-filing-system.*

scenario arises most commonly when a seller will receive voting securities of the buyer as consideration for the sale of the target. In such transactions, both the acquisition of the target by the buyer and the acquisition of the buyer's voting securities by the seller may be reportable. Thus, the buyer and seller can each be an acquiring and an acquired person.

Although the Rules permit filers to use one Form for the two transactions in these cases, § 803.2(b)(1)(v) requires that separate responses be provided for Items 5 through 8, one set of responses as the acquiring person and one set as the acquired person. In the Commission's experience, filers that opt to combine the information on a single Form often do not include everything that is required, and these filings are, in fact, very confusing for the Agencies to review. In contrast, when filers choose to submit two separate Forms for such transactions, these filings provide all the required information and in a much clearer format. The Commission thus proposes amending § 803.2(a) and deleting § 803.2(b)(1)(v) to require acquiring persons and acquired persons to submit separate HSR Filings, one as the acquiring person and one as an acquired person, in instances where filers qualify as both. This proposed approach would make the Agencies' initial review much easier by more clearly separating information related to the acquiring person from the acquired person. No new information would be required, and technology allows parties to save copies of filings to reduce the need to input repetitive information.

### C. Section 803.5(b): Requiring Draft Agreements or Term Sheets

The Commission proposes amending § 803.5(b) to require filers who have not executed a definitive transaction agreement before making an HSR Filing to submit a draft agreement or term sheet that describes with sufficient detail the scope of the entire transaction that will be consummated after observing the waiting period required by the Act. Section 803.5(b) currently allows filers in any non-§ 801.30 acquisition to file on the basis of "a contract, agreement in principle or letter of intent to merge or acquire [that] has been executed" and an affidavit attesting to that execution as well as the good faith intention to complete the transaction. In permitting parties to file before the signing of a definitive agreement, the Commission has relied on the assumption that the filings would "contain sufficiently definitive information about the transaction to

permit accurate analysis." [17] In the Commission's experience, however, filings submitted on the basis of bare preliminary agreements, such as an indication of interest, non-binding letter of intent, or agreement in principle ("Preliminary Agreements"), typically do not meet this standard.

Often, Preliminary Agreements reflect only very early discussions between the parties, and since there is currently no obligation to file a draft or final agreement once the HSR Filing is submitted, the Agencies must spend time during the initial waiting period simply trying to discover the scope and timing of the transaction. Moreover, given the preliminary nature of such a filing, the parties have often not yet undertaken a robust analysis of the transaction and therefore have drafted few, if any, documents responsive to Items 4(c) or 4(d) of the current Form. Permitting parties to submit an HSR Filing prior to a complete substantive analysis of the transaction, and at times even before the parties have done diligence on rationales or justifications for the transaction, puts the Agencies at a distinct disadvantage during the initial waiting period in determining what the transaction is and whether it may violate the antitrust laws if consummated.

Additionally, HSR Filings made during the early phases of negotiations may be too uncertain to merit review. The original Statement of Basis and Purpose from 1978 ("1978 SBP") provides clear guidance that "[b]ecause of the time and resource constraints upon the agency staffs," the Agencies should not expend resources to review transactions so lacking in specifics that they could be considered merely "hypothetical." [18] Yet allowing for the submission of a filing on the basis of a Preliminary Agreement often triggers the use of limited resources for hypothetical transactions, first to discover the full range of potential viable transactions, and then to assess the competitive impact of those potential iterations.

The Commission therefore proposes amending § 803.5(b) to eliminate the ability to submit an HSR Filing on any Preliminary Agreement without providing a term sheet or draft agreement that reflects sufficient detail about the proposed transaction to allow the Agencies to understand the scope of the transaction and to confirm that the transaction is more than hypothetical. The Commission also proposes a corresponding change to the

Instructions, as noted at III.C.6. Because detailed term sheets or draft agreements are often prepared in the ordinary course of deal negotiations, the Commission does not expect this change would impose a significant burden on filing parties. However, the Commission recognizes that eliminating the parties' ability to make filings prior to the negotiation of such documents may change the timing of filing and would likely result in more robust filings that would take additional time to prepare. On balance, the Commission believes that this proposed change is consistent with the original intent of the Rules to prevent expending scarce Agency resources on hypothetical transactions and would allow the Agencies to focus on transactions definitive enough to permit accurate analysis.

### D. Section 803.8: Translation of Documents

The Commission proposes amending § 803.8 to require submission of English-language translations for all foreign-language documents submitted with the initial HSR Filing. Section 803.8(a) currently provides that parties need not translate foreign-language materials submitted with the initial filing, and that English-language outlines, summaries, extracts, or verbatim translations need only be provided if they already exist. Section 803.8(b), in contrast, has required since 1983 that all foreign-language documents responsive to a Second Request be provided with English translations. [19]

In the Commission's experience since the early 1980s when Rule 803.8 was first adopted, it is no longer enough to require translations of only those foreign-language documents submitted in response to Second Requests because today's HSR Filings quite frequently contain foreign-language materials. These materials typically include key documents, such as the transaction agreements submitted in response to current Item 3(b) of the Form, the relevant financials submitted in response to current Item 4(b), and the documents submitted in response to current Items 4(c) and 4(d) of the Form. Parties often submit foreign-language materials in their HSR Filings with no translation at all or with only rough English-language outlines, summaries, or extracts, which may not accurately and fully convey the contents of the foreign-language document. As a result, the Agencies must either obtain their

---

[17] 43 FR 33450, 33511 (July 31, 1978).
[18] *Id.* at 33510–511.

[19] The Commission proposed mandatory translation in 1981, 46 FR 38710 (July 29, 1981), and issued a final rule in 1983, 48 FR 34427 (July 29, 1983).

own translations of these documents or miss out on potentially critical information, leaving the Agencies at a disadvantage during their initial review. Given the wide variety of foreign languages the Agencies typically see, it would be very costly for the Agencies to retain translation services for each filing that may contain some foreign-language material. Further, obtaining translations adds significant delay within the already time-constrained initial waiting period and would not allow for filing parties to review the translations for errors. These translations may be especially important for those transactions that report foreign subsidies.

To address this issue, the Commission proposes combining §§ 803.8(a) and 803.8(b). Proposed § 803.8 would therefore be one paragraph requiring that verbatim English translations be provided with all foreign-language materials submitted as part of an HSR Filing or in response to a Second Request. For either an initial HSR Filing or in response to a Second Request, both the original document and the English translation would need to be submitted. Proposed § 803.8 would not require any particular method of translation but would specify that, whatever translation method the parties choose, all verbatim translations must be understandable, accurate, and complete. This proposed change would also be reflected in the Instructions, as specified below in III.A.4.

Although the Commission noted in its 1983 final rulemaking that requiring translations created a burden for filing parties,[20] the Commission now believes that translation tools available to the parties have become more abundant and that these tools provide many options for translation that should significantly reduce the burden of providing translations. Translations of foreign-language documents would greatly benefit the Agencies in allowing staff to know the content of responsive documents submitted in a foreign language. The Commission invites comment on whether there are categories of documents identified in this NPRM that would present a significant burden to translate and what other alternatives might achieve the Commission's goal of being able to understand and assess foreign-language documents while creating less burden for filing parties.

*E. Section 803.10: Commencement of Waiting Periods*

The Commission proposes amending § 803.10(c)(1)(i) to clarify when filings made electronically are to be credited as received by the Agencies. Specifically, the Commission proposes amending this rule to clarify that compliant filings will be credited as received on the date filed if: (i) the electronic submission is complete by 5:00 p.m. Eastern Time; and (ii) such date is not a Saturday, Sunday, legal public holiday (as defined in 5 U.S.C. 6103(a)), or the observed date of such legal public holidays.

These clarifications are consistent with current and historical practices. Of course, historically, the Rules did not need to specify this information, since the receipt of physical filings (either on paper or DVD) required the offices of the Assistant Attorney General and Commission to be open. But because electronic filing platforms can allow submission of filings even when Agency staff is not available to receive the filings, the proposed amendments make clear that filings are only credited as received during regular business hours on regular business days. These proposed changes would provide clarity and thus benefit both filing parties and the Agencies.

*F. Section 803.12: Information To Be Updated With Refiling*

The Commission proposes amending § 803.12(c) to specify which responses to the items in the proposed Instructions would need to be updated if the acquiring person chooses to withdraw its HSR Filing and refile it (an ''Updated HSR Filing''). The procedure for voluntary withdrawal and refiling permits the acquiring person to restart the initial waiting period, so long as no material changes have been made to the transaction, to provide the Agencies an additional 15 or 30 days (depending on the transaction type) to review the transaction without issuing a Second Request. If the Updated HSR Filing is received within two business days of withdrawal, no new fee is required, but filers currently must provide a new affidavit and certification and update current Item 4 of the Form to provide the Agencies with more recent information that is likely relevant to the continued review.

The Commission proposes eliminating the requirement to provide updated financials, currently required by Item 4(a) and (b), in the Updated HSR Filing. The Commission's experience has shown that, given that the withdraw and refile procedure is completed within approximately one month of the original filing, the financial documents required by Item 4(a) and (b) are rarely changed and therefore updating them is not essential in this phase of its investigation.

The Commission proposes requiring updated Transaction-Related Documents with the Updated HSR Filing, which, as discussed below in III.D.1.a., would comprise the current Item 4(c) and (d) documents subject to proposed modifications of the custodians and clarifications. Documents responsive to current Item 4(c) and (d) typically reflect the most relevant thinking of key individuals with knowledge of the transaction within the acquiring person and are required as part of an Updated HSR Filing. Therefore, the Commission believes these documents are essential to the Agencies' initial antitrust assessment of the transaction.

The Commission also proposes adding two new requirements for the Updated HSR Filing: updated transaction agreements and updated information about subsidies from Foreign Entities of Concern. Though the voluntary withdrawal and refiling process is only available if the transaction is materially the same, the Commission believes that the Agencies would benefit from having a complete understanding of all aspects of the status of and rationale for the transaction, including any changes that have occurred since the day the HSR Filing was submitted. Therefore, the Commission proposes requiring that the Updated HSR Filing include the latest version of the transaction agreements, including the most recent drafts, if a final version has not been executed. The Commission believes this proposed requirement would not impose a substantial burden, since this would be a limited set of documents that should be readily available to the acquiring person.

The Commission also proposes requiring that the Updated HSR Filing include updated information regarding Subsidies from Foreign Entities or Governments of Concern, which is discussed below at III.E.1. The Commission believes that most updated HSR Filings would reflect no new information related to subsidies given the short period of time since the original HSR Filing. However, if new information about subsidies from foreign entities of concern were to become available, the Commission believes that it would be consistent with Congressional intent for the Agencies to have access to this information.

---

[20] 48 FR 34427, 34440 (July 29, 1983).

**Proposed Changes to the Instructions**

**III. Part 803 Appendix A and Appendix B**

As mentioned above, the Agencies are developing an e-filing platform through which filers would submit information required by the HSR Rules via an online portal. As a result, this NPRM does not contain a new draft Form. Instead, this NPRM presents the information requirements as Instructions for collecting and submitting documents and information required by the HSR Rules. The proposed Instructions reorganize the information to reflect the planned layout of the e-filing platform in development, which would be described in any final rule. Prior to the implementation of the e-filing platform, the proposed Instructions contemplate filers would submit the proposed requests for information and narratives via uploads in a standard format such as PDF and Excel.

The proposed changes to the information that filing parties would be required to provide are detailed below. The Commission recognizes that, in total, these proposed changes would be significant and impose additional burden on some filing parties. Some proposed changes ask for additional information or documents that the Commission believes are in the possession of the filing persons in a form that could be readily uploaded into the e-filing platform. Other proposed changes would require filing parties to compile or generate the requested information specifically for the HSR Filing, such as items requesting narrative responses, which would involve additional effort. As explained below, the Commission has determined that the additional burden associated with these proposed changes is justified because the requested documentary material and information is necessary and appropriate for effective and efficient review of HSR Filings to determine within the initial waiting period whether the transaction may, if consummated, violate the antitrust laws.[21]

Based on the Agencies' experience conducting merger investigations, and as discussed above, the Commission believes that the limited information currently available to the Agencies in the HSR Filing is no longer sufficient to conduct an effective initial screening of the transaction for all types of competitive harm that may result from the transaction. The proposed set of reorganized revenue information, additional documents, and narrative

responses would create a much more complete, accurate, and robust basis on which to screen the transaction for the various potential competitive effects, including those that arise from non-horizontal transactions or combinations involving competing employers. These proposals would also provide a more reliable and robust set of information to determine when the transaction does not warrant an in-depth investigation, which often requires a substantial investment of time and resources for both the investigating agency and the merging parties. Based on the Agencies' experience in reviewing and challenging illegal mergers, the proposals target the information that is most relevant and readily available to filing persons and would require it to be presented in a coherent and organized way that will facilitate quick antitrust review by the Agencies during the initial waiting period. But the Commission welcomes comments on the burden associated with and the appropriate balance of having to provide information in the form of revenues, documents, and narratives as part of the proposed changes in this NPRM and invites alternative proposals that meet the objectives described below.

At their core, the proposed changes are motivated by the fundamental purpose of the HSR Act, which is to allow the Agencies, within a short period of time to review the information submitted with the Filing and identify potentially problematic transactions prior to consummation, and, where appropriate, initiate an in-depth review by issuing Second Requests. The fact that the Agencies must conduct their evaluation in an initial waiting period of 15 or 30 days, depending on the transaction type, means that the Agencies must have enough information to consider a wide range of potential effects on competition on an expedited basis. Based on the cumulative learning of the Commission and Assistant Attorney General over the course of decades of investigations, the Commission proposes requiring new information and narratives to address particular areas where the Agencies have found specific deficiencies in the type of information currently required by the Form. In addition, this NPRM would implement changes required by the 2022 Amendments, which are consistent with the need for sufficient information to screen for all types of competitive concerns.

Despite the added burden for filing persons, on balance, the Commission believes that the benefit to the Agencies' merger review would be significant and would help address information

asymmetries between Agency staff and the filing persons in the initial waiting period. The Agencies expend substantial resources during the initial waiting period to discover and confirm basic business information about the filing persons, information that is well-known to them but not to Agency staff and is not available from any other source. These information asymmetries have become more acute as deals and companies have become more complex. In the Commission's experience, the inefficiency created by information asymmetries can overwhelm the initial review process, especially when the volume of HSR reportable transactions is high.[22] The proposed changes would also benefit filing persons where information contained in an HSR Filing would demonstrate to the Agencies that the transaction at issue does not need further investigation. Indeed, both the Agencies and filing persons have an interest in ensuring that HSR Filings are robust enough for the Agencies to quickly identify transactions that do not require further investigation during the initial waiting period. It is the Commission's aim to be cognizant of all such interests in proposing the substantial changes contained in this NPRM.

For ease of reference, the Commission includes the following materials regarding the proposed changes in this NPRM:

• An outline of the reorganization contemplated in the proposed Instructions,
• A chart that identifies proposed new locations of the current Items of the Form including whether substantive changes are proposed, and
• A chart of proposed new categories of required information.

These materials appear immediately below.

Proposed Instructions Outline

• General Instructions and Information
• Ultimate Parent Entity Information
  ○ UPE Details
  ○ Organization Structure
• Transaction Information
  ○ Parties
  ○ Filing Fee
  ○ Transaction Details

---

[21] 15 U.S.C. 18a(d).

[22] The Agencies experienced a surge in HSR reportable transactions during 2021 and 2022. For instance, FY 2021 HSR reportable transactions were double those of FY 2020 (1,637 versus 3,520), and in FY 2022, reportable HSR transactions remained high, at over 3,200. The pace and volume of HSR filings (generally two filings per transaction) during that time (in addition to on-going merger investigations) required the Agencies to adjust their HSR review process, including suspending the granting of requests for early termination of the waiting period.

- ○ Transaction Description
  - ○ Joint Ventures
  - ○ Agreements and Timeline
- • Competition and Overlaps
  - ○ Business Documents
  - ○ Competition Analysis
  - ○ NAICS Codes

- ○ Controlled-Entity Overlaps
- ○ Minority-Held Entity Overlaps
- ○ Prior Acquisitions
- • Additional Information
  - ○ Subsidies from Foreign Entities or Governments of Concern
  - ○ Defense or Intelligence Contracts

- ○ Identification of Communications and Messaging Systems
- ○ Other Jurisdictions
- • Certification
- • Affidavits

## CROSS REFERENCE BETWEEN CURRENT FORM AND PROPOSED INSTRUCTIONS

| Current form item | New location | Substantive changes? |
|---|---|---|
| Fee Information | Transaction Information/Filing Fee | No. |
| Corrective Filing | Transaction Information/Transaction Details | No. |
| Cash Tender Offer | Transaction Information/Transaction Details | No. |
| Bankruptcy | Transaction Information/Transaction Details | No. |
| Foreign Jurisdictions | Additional Information/Other Jurisdictions | Yes. |
| Early Termination | Transaction Information/Transaction Description | No. |
| Item 1(a) | Ultimate Parent Entity Information/UPE Details | No. |
| Item 1(b) | Ultimate Parent Entity Information/UPE Details | No. |
| Item 1(c) | Ultimate Parent Entity Information/UPE Details | No. |
| Item 1(d) | Ultimate Parent Entity Information/UPE Details | No. |
| Item 1(e) | Ultimate Parent Entity Information/UPE Details | No. |
| Item 1(f) | Ultimate Parent Entity Information/Organization Structure | Yes. |
| Item 1(g) | Ultimate Parent Entity Information/UPE Details | No. |
| Item 1(h) | Ultimate Parent Entity Information/UPE Details | Yes. |
| Item 2(a) | Transaction Information/Parties | No. |
| Item 2(b) | Transaction Information/Transaction Details | No. |
| Item 2(c) | Transaction Information/Transaction Details | No. |
| Item 2(d) | Transaction Information/Transaction Details | No. |
| Item 3(a) (Entities) | Transaction Information/Parties | No. |
| Item 3(a) (Description) | Transaction Information/Transaction Description | Yes. |
| Item 3(b) | Transaction Information/Agreements and Timeline | Yes. |
| Item 4(a) | Ultimate Parent Entity Information/UPE Details | No. |
| Item 4(b) | UPE Information/UPE Details | No. |
| Item 4(c) | Competition and Overlaps/Business Documents | Yes. |
| Item 4(d) | Competition and Overlaps/Business Documents | Yes. |
| Item 5(a) | Competition and Overlaps/NAICS Codes | Yes. |
| Item 5(b) | Transaction Information/Joint Ventures | Yes. |
| Item 6(a) | Ultimate Parent Entity Information/Organization Structure | Yes. |
| Item 6(b) | Ultimate Parent Entity Information/Organization Structure | Yes. |
| Item 6(c)(i) | Competition and Overlaps/Minority-Held Entity Overlaps | Yes. |
| Item 6(c)(ii) | Competition and Overlaps/Minority-Held Entity Overlaps | Yes. |
| Item 7(a)–(d) | Competition and Overlaps/Controlled-Entity Overlaps | Yes. |
| Item 8(a) | Competition and Overlaps/Prior Acquisitions | Yes. |

## PROPOSED NEW REQUIREMENTS AND CATEGORIES OF INFORMATION

| Proposed new sections | Location |
|---|---|
| New Definitions | General Instructions and Information. |
| Document Log | General Instructions and Information. |
| Translations | General Instructions and Information. |
| Organization of Controlled Entities | Ultimate Parent Entity Information/Organization Structure. |
| Identification of d/b/a or f/k/a names | Passim. |
| Identification of Additional Minority Interest Holders | Ultimate Parent Entity Information/Organization Structure. |
| Narrative Describing Ownership Structure of the Acquiring and Acquired Entities | Ultimate Parent Entity Information/Organization Structure. |
| Organizational Chart for Funds and Master Limited Partnerships | Ultimate Parent Entity Information/Organization Structure. |
| Identification of Other Types of Interest Holders that May Exert Influence | Ultimate Parent Entity Information/Organization Structure. |
| Identification of Officers and Directors | Ultimate Parent Entity Information/Organization Structure. |
| Description of Acquiring Person | Ultimate Parent Entity Information/Transaction Details. |
| Narrative Describing Transaction Rationale | Ultimate Parent Entity Information/Transaction Details. |
| Diagram of the Transaction | Ultimate Parent Entity Information/Transaction Details. |
| Identification of Related Transactions | Ultimate Parent Entity Information/Transaction Details. |
| Expansion of Transaction Agreements to be Produced | Ultimate Parent Entity Information/Agreements and Timeline. |
| Production of other Agreements between the Acquiring and Acquired Persons | Ultimate Parent Entity Information/Agreements and Timeline. |
| Provision of a Transaction Timeline | Ultimate Parent Entity Information/Agreements and Timeline. |
| Production of Certain Documents of the Supervisory Deal Team Lead(s) | Competition and Overlaps/Business Documents. |
| Production of Certain Strategic Plans | Competition and Overlaps/Business Documents. |
| Production of Certain Drafts | Competition and Overlaps/Business Documents. |
| Organizational Chart of Authors and Certain Recipients of Documents | Competition and Overlaps/Business Documents. |
| Narrative Describing Horizontal Overlaps | Competition and Overlaps/Competition Analysis. |
| Narrative Describing Supply Relationships | Competition and Overlaps/Competition Analysis. |
| Narrative Describing Labor Markets | Competition and Overlaps/Competition Analysis. |

PROPOSED NEW REQUIREMENTS AND CATEGORIES OF INFORMATION—Continued

| Proposed new sections | Location |
|---|---|
| Identification of Minority Held Entities with Revenue Overlaps ............................... | Competition and Overlaps/Minority-Held Entity Overlaps. |
| Provision of Geolocation for Certain Locations of Operations ................................ | Competition and Overlaps/Controlled-Entity Overlaps. |
| Identification of Additional Prior Acquisitions .......................................................... | Competition and Overlaps/Prior Acquisitions. |
| Disclosure of Subsidies from Foreign Entities or Governments of Concern ........... | Additional Information. |
| Identification of Certain Defense or Intelligence Contracts .................................... | Additional Information. |
| Identification of Communications and Messaging Systems ...................................... | Additional Information. |
| Mandatory Disclosure of Foreign Filings ................................................................. | Additional Information. |
| Voluntary Waivers for International Competition Authorities ..................................... | Additional Information. |
| Voluntary Waivers for State Attorneys General ....................................................... | Additional Information. |
| Statement of Penalties for False Statements .......................................................... | Certification. |
| Prevention of Destruction of Documents ................................................................. | Certification. |

The following discussion of the proposed changes in this NPRM tracks the Proposed Instructions Outline above, explaining which information requirements are materially the same as those currently included in the Form and Instructions, which the Commission proposes changing, and which are proposed new categories of required information.

Throughout the proposed Instructions, references to paper and DVDs have been eliminated, as discussed in II.A. above.

*A. General Instructions and Information*

The Commission proposes creating a General Instructions and Information section within the proposed Instructions that would largely parallel the General section of the current Instructions but would be significantly reorganized. Within the proposed General Instructions and Information section, the Commission proposes substantive changes to the following sections: Filing Person, Definitions, Responses, and Translations, as detailed below.

1. Definitions and Explanation of Terms

The Commission proposes creating two new definitions and deleting an existing definition within the proposed Instructions.

a. Economic Research Service's (ERS's) Commuting Zones (CZ)

The Commission proposes adding a definition for Economic Research Service's Commuting Zones. As discussed below at III.D.2.c., the Commission proposes new questions that would require the submission of information about the filing person's employees to aid the Agencies' evaluation of the potential impact of proposed transactions on labor markets. These proposed questions would require data to be submitted using the Department of Agriculture's Economic Research Service Commuting Zones for the year 2000. These codes are available at *https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas/.*

b. North American Product Classification System (NAPCS) Data

The Commission proposes eliminating the reporting of 10-digit North American Product Classification System ("NAPCS") based codes, as discussed in more detail below at III.D.3. Thus, the Commission proposes deleting the NAPCS definition from the proposed Instructions.

c. Standard Occupational Classification

The Commission proposes adding a definition for Standard Occupational Classification. As discussed below at III.D.2.c., the Commission proposes new questions that would require the submission of information about the filing person's employees to aid the Agencies' evaluation of the impact of proposed transactions on competition for workers in labor markets. The proposed definition of Standard Occupational Classification ("SOC") would require filers to submit data by the first six digits of the relevant code, as published by the United States Bureau of Labor Statistics, available at *https://www.bls.gov/soc/2018/#classification.*

2. Filing

As discussed above at II.B., the Commission proposes amending § 803.2 and deleting § 803.2(b)(1)(v) to require filing persons to submit separate forms when filing as an acquiring and acquired person. The proposed Instructions would also reflect this proposed change.

3. Responses

The Commission proposes replacing the current Responses section with a new Responses section that would provide details on how to provide the information responsive to the proposed new questions. This would include eliminating instructions that are specific to filings made on paper or DVD, see above at II.A. The proposed revised Responses section would also describe the information that filing persons would need to provide in a log of responsive documents and narrative responses to be submitted with an HSR Filing. This information would generally be the same as the information currently required for documents submitted in response to Items 4(c) and 4(d) of the current Form, with two proposed expansions.

First, the Commission proposes requiring the filing person to identify the request(s) to which the document would be responsive. Though the proposed Instructions do not include item numbers at this time, indented and bolded headings in the proposed Instructions should each be considered a separate request. The Commission routinely requires this type of referencing for document submissions pursuant to compulsory process, including in response to a Second Request, and it is extraordinarily helpful in quickly identifying materials responsive to a specific request. This proposed requirement would allow the Agencies to understand the content of filings more quickly by providing a cross-reference between information and documents, facilitating a more efficient review.

Second, the Commission proposes modifying the requirements for identification of authors of documents prepared by third parties. For documents prepared by third parties at the request of a filing person, such as market studies, quality of earnings analyses, confidential information memoranda, management presentations, or board presentations, the Commission proposes that, in addition to providing the name of the third party that prepared the document, the filing person would be required to provide the name, title, and company of the individual within the filing person who supervised the preparation of the document or for whom the document

was prepared. Understanding who, within the filing person, was responsible for overseeing or receiving the work of outside consultants would materially assist the Agencies in identifying key decision-makers for the transaction. In the case of documents that were not commissioned by the filing person, such as subscription market reports, unsolicited banker's books, or documents received from the other filing person, the Commission proposes that the filing person would only be required to list the document title and name of the third party that prepared the document.

These proposed changes would allow the Agencies to quickly assess which documents were key to the decision to pursue the transaction and who within the filing person coordinated the assessment that resulted in that decision.

4. Translations

As noted above at II.D., the Commission proposes amending § 803.8 to require the filing person to submit English translations of all foreign-language documents. The proposed Instructions would also reflect this change.

*B. Ultimate Parent Entity Information*

The Commission proposes the creation of an Ultimate Parent Entity (UPE) Information section within the proposed Instructions. Currently, information about the structure of the acquiring and acquiring persons is required in various sections of the Form: Item 1 contains basic contact information; Item 2 identifies the ultimate parent entities; Item 3 identifies the acquiring and acquired entities; and Item 6 identifies certain controlled and minority-held entities, as well as certain minority holders of the filing person. The Commission proposes the reorganization, clarification, and expansion of these items to require additional information about the acquiring person and acquired entity(s) in order for the Agencies to receive a more complete picture of the scope of the operations of each, and to identify points of contact for questions about the HSR Filing or potential Second Requests, as well as key interest holders. These proposed changes, discussed below, would fall within the following proposed categories: UPE Details and Organization Structure.

1. UPE Details

The proposed UPE Details section within the proposed Instructions would contain most of the information currently required in Item 1 of the Form.

The Commission proposes adding a new Size of Person Stipulation item that would allow the filing person to stipulate that the size of person test is met, when applicable, making it easier for staff to determine that the size of person test is met and streamlining the review process as a result.

The Commission also proposes clarifying which financials are required from acquiring persons who are natural persons. As a result of feedback from filers over the years, the Commission is aware that this item causes confusion. The proposed language in the Instructions would make it clear that natural persons who are acquiring persons must include the annual reports and/or annual audit reports of (1) the acquiring entity(s) and any entity controlled by the natural person whose dollar revenues contribute to a NAICS overlap, and (2) the highest-level entity(s) the natural person controls. It is the intent of the Commission that the Instructions require this information from natural persons, and the proposed change would make that intent clear.

Finally, the Commission proposes requiring all filing persons to identify the person to whom Second Requests should be addressed. Current Item 1(g) requires the identification of two individuals to contact regarding the HSR Filing, and current Item 1(h) requires the identification of an individual located within the United States for the limited purpose of receiving a notice of a Second Request. But the Instructions currently limit application of Item 1(h) to filings made by foreign persons, so for U.S. filers, Second Requests are sent to the person identified in Item 1(g). The Commission now understands that U.S. filing persons sometimes have separate points of contact to answer questions regarding the HSR Filing as compared to questions regarding the receipt of Second Requests. Therefore, the Commission proposes requiring all filing persons to separately provide contacts for questions related to the HSR Filing and Second Requests.

These proposed changes would provide clarity for filing persons, and the Agencies would benefit from receiving more precise information about the UPE.

2. Organization Structure

The proposed Organization Structure section within the proposed Instructions would expand the required information about how the UPE is organized and the identity of other individuals and entities that may have influence over business decisions or access to confidential business information. The proposal

would require the identification of entities within the acquiring person or acquired entity, minority shareholders, and other non-controlling entities, and create new requirements to identify certain other interest holders that may exert influence, as well as officers, directors, and board observers.

a. Entities Within the Acquiring Person and Acquired Entity

The proposed Entities Within the Acquiring Person and Acquired Entity section would contain information currently required by Items 1(f) and 6(a) of the Form. Item 1(f) requires the identification of the acquiring entity(s) or acquired entity(s) (as appropriate). Item 6(a) requires the acquiring person to list all entities it controls with total assets of $10 million or more (though foreign entities with no sales into the United States may be omitted). The acquired person currently has the same obligation, but the scope is limited to the acquired entity(s); the acquired person is not required to provide information about entities that are not part of the transaction. The Commission proposes requiring additional information about the reported entities within the filing persons.

First, the Commission proposes requiring filing persons to organize the list of controlled entities by operating company or business. As filing persons have become more complex, an alphabetically or geographically organized list of the controlled entities, which is currently permitted by Item 6(a) of the Form, often does not provide the Agencies with a sufficient overview of the scope of the businesses that the acquiring person and acquired entity(s) control. Some filers currently organize the list of entities held by the acquiring person or acquired entity by operating company, and in the Commission's experience, this is a much more useful way to present the information. Understanding which companies are part of an operating group or portfolio company would allow staff to identify the actual market participants from among all legal entities. The Commission thus proposes requiring that lists of controlled entities be submitted in this manner to aid the Agencies' review during the initial waiting period.

Second, for each such operating company or business, the Commission proposes that filers identify the name(s) by which the company or business does business, as well as any name(s) by which it formerly did business within the three years prior to filing. While it remains important for the Agencies to receive legal entity names, these names

are often unrelated to the names used in the marketplace and may be unfamiliar to industry participants. Being able to connect the legal names to the "doing business as" and "formerly known as" names would greatly assist the Agencies in understanding the scope of the operations of the acquiring person and acquired entity and allow the identification of other public information about the entity during the initial waiting period.

b. Minority Shareholders and Other Non-Controlling Entities

The proposed Minority Shareholders and Other Non-Controlling Entities section would contain information currently required by Item 6(b) of the Form, which requires identification of holders of 5% or more, but less than 50%, of the acquiring UPE and acquiring entity by the acquiring person, and of the acquired entity(s) by the acquired person. In order to provide the Agencies with a more complete understanding of the individuals or entities that have significant investments in the filing persons, the Commission proposes amending the current Item 6(b) requirements and expanding them to require the identification of additional minority interest holders.[23]

The identification of certain minority holders of the filing persons has been required since the first iteration of the Form in 1978, though the level of detail that has been required has changed over time.[24] Prior to 2011, Item 6(b) only required the identification of holders of minority interests in voting securities. In 2011, Item 6(b) was amended to require the identification of holders of 5% or more but less than 50% of unincorporated entities.[25] The Commission, however, made an exception for limited partnerships and only required the identification of the general partner. At that time, the Commission understood that limited partners had no control over the operations of the fund or portfolio companies and therefore did not see them as essential to the Agencies' initial review.[26] Since that time, the Commission has come to understand that the Agencies would benefit from more complete information about all

minority holders of the filing parties, including the identification of limited partners. As a result, the Commission proposes collecting information about minority holders of all entities within the acquiring person that are related to the transaction and requiring the identification of certain limited partners.

The current limitation on providing minority holder information for only the acquiring ultimate parent entity and acquiring entity often prevents the identification of key interest holders. For example, co-investors often do not invest at the UPE or acquiring entity level but may hold a 5% or greater interest in an entity that is in between the UPE and the acquiring entity in the ownership structure. In particular, when funds make acquisitions, it can be the case that more than one fund may be substantively involved in the acquisition, using a variety of corporate or unincorporated entity types. The identification of not only the controlling person but also significant minority investors can be an important component of the Agencies' evaluation of the potential competitive effects of the transaction during the initial waiting period,[27] and obtaining a broader picture of relevant minority investments, where they exist, would aid the Agencies in their assessment of the nature of competitive decision-making within the relevant entity.

In the case of limited partnerships, Item 6(b) currently does not require the identification of limited partners, even if they hold 5% or more. At the time this item was adopted, the Commission understood that limited partners had no control over the operations of the fund or portfolio companies and therefore did not see them as essential to the Agencies' initial review.[28] However, after more than a decade, the Commission now believes that it is inappropriate to make generalizations regarding the role of investors in limited partnership structures. Identification of limited partners can provide valuable information about co-investors and lead to the identification of potentially problematic overlapping investments resulting from the transaction that could violate Section 7.[29] Thus, it is important that the Agencies know the identities of

limited partners to understand the transaction in its entirety and to uncover investment relationships that may have competitive significance.

Accordingly, for the acquiring person, the Commission proposes the reporting of certain minority holders of (1) the acquiring person, (2) any entity directly or indirectly controlled by the acquiring entity, (3) any entity that directly or indirectly controls the acquiring entity, and (4) any entity within the acquiring person that has been or will be created in contemplation of, or for the purposes of, effectuating the transaction. For entities affiliated with a master limited partnership, fund, or investment group, the "doing business as" or "street name" of that group would also be required.

Under these proposals, minority holders that would have to be reported would include all entities or individuals, including limited partners, that hold 5% or more of the voting securities or non-corporate interests of one of the identified entities. To be clear, the Commission proposes requiring limited partnerships to identify all holders of 5% or more, but less than 50%, to harmonize the requirement for limited partnerships with the requirements for limited liability companies and corporations. The requirement to identify the general partner of a limited partnerships would remain the same.

The Commission acknowledges that these proposed requirements may require significant additional information from investment entities, such as funds and master limited partnerships, for which organizational structures are often more complex. But the Commission believes that the disparate treatment of LLCs as compared to limited partnerships is no longer appropriate. Further, the complexity of these organizational structures makes it all the more important that the filing person provide this information with the HSR Filing. The complex structure of investment entities is not adequately captured by the current Form, and there is often no other source for Agencies to learn of these relationships. Though the introduction of the definition of "associate" in 2011[30] provides the Agencies with some valuable information with which to identify competitively significant relationships that exist through related holdings, it does not provide enough detail about all of the potential players involved in the structure of the acquiring person. As a result, the Commission believes that the

---

[23] The acquisition of a minority position may be reportable under the Act, and failure to make an HSR Filing and observe the waiting period may result in significant civil penalties. 15 U.S.C. 18a(g).

[24] See 43 FR 33450 (July 31, 1978); 52 FR 7066 (Mar. 6, 1987); 76 FR 42471 (July 19, 2011).

[25] 76 FR 42471 (July 19, 2011).

[26] Proposed Rules, 75 FR 57110, 57118 (Sept. 17, 2010), adopted in 2011, 76 FR 42471 (July 19, 2011).

[27] 43 FR 33450, 33531 (July 31, 1978).

[28] Proposed Rules, 75 FR 57110, 57118 (Sept. 17, 2010), adopted in 2011, 76 FR 42471 (July 19, 2011).

[29] See, e.g., In re Red Ventures Holdco and Bankrate, FTC Dkt. C–4627 (Nov. 3, 2017) (enforcement action involving overlapping limited partnership holdings); United States v. Dairy Farmers of Am., 426 F. 3d 850 (6th Cir. 2005) (DFA stakes in competitors Flav-O-Rich and Southern Belle violated Section 7).

[30] 76 FR 42471 (July 19, 2011).

proposed identification of all minority investors of 5% or more in entities related to the transaction would allow the Agencies to more quickly identify potential competitive issues related to these holdings during the initial waiting period.

To reduce the additional burden associated with these proposed changes, the Commission proposes limiting the information about minority holders collected from the acquired person. Currently, the acquired person must list certain minority interest holders of the acquired entity(s), but this requirement does not distinguish between minority holders that will be cashed out as a result of the transaction, and those that will continue investment after the transaction. On balance, the Commission believes that identifying only the minority holders that would continue to have an interest in the acquired entity(s), directly or indirectly, would provide the most relevant information to the Agencies during the initial waiting period. Therefore, the Commission proposes that the acquired person only be required to identify minority holders of the acquired entity(s) that will continue to hold interest in the acquired entity(s) or will acquire interests in any entity within the acquiring person as a result of the transaction. The Commission recognizes that in certain transactions to which § 801.30 applies, the acquired person might not have this information. In such cases, it would be permissible for the acquired person to indicate that the information is unknown.

c. Other Types of Interest Holders That May Exert Influence

The proposed Other Types of Interest Holders that May Exert Influence section would require the identification of entities or individuals that may have material influence on the management or operations of the acquiring person beyond those with the minority interests discussed above. Because these other interest holders retain the ability to influence decision-making by the acquiring person after the transaction, it is important for the Agencies to know about these relationships during the initial waiting period.

The Commission has long recognized the potential influence of minority holders and the possibility that they may seek to change competitive decisions of the target firm.[31] In the

1978 SBP, the Commission explained that competitors, customers, or suppliers holding a significant interest in one of the parties can raise antitrust concerns.[32] As originally conceived, minority holdings reported in Item 6 were designed to alert the Agencies to situations in which the potential antitrust impact of the transaction does not result solely or directly from the transaction itself, but may arise from direct or indirect shareholder relationships between the parties to the transaction.[33]

As entity structures have evolved and become more complex, the Commission now believes that relationships beyond those created by holding voting securities or non-corporate interests can give rise to similar and significant competitive concerns. For instance, some credit arrangements permit the creditor to exercise rights and influence similar to those of equity holders. Additionally, some equity interests that do not provide rights to vote for the board of directors can, nevertheless, provide rights to vote on or influence business practices of the company, including investments in future product or service lines. Further, contractual arrangements allowing individuals or entities to nominate directors or board observers have proliferated. In addition, some entities outsource the management of operations to third parties that do not beneficially own interests in the company. Each of these relationships can be relevant to understanding the transaction and its potential competitive effects. Without information about these relationships, the Agencies cannot easily identify those transactions where these relationships exist and may affect the competitive dynamics before and after the transaction.

As a result, the Commission proposes that the acquiring person identify certain individuals (other than employees of the acquiring person) or entities that, in relation to the acquiring entity or any entity it directly or indirectly controls or is controlled by, (i) provide credit; (ii) hold non-voting securities, options, or warrants; (iii) are board members or board observers, or have nomination rights for board members or board observers; or (iv) have agreements to manage entities related to the transaction. Credit relationships would be limited to creditors that have, or would have, in conjunction with or

result of the transaction, provided credit totaling 10% or more of the value of the entity in question. Holders of non-voting securities, warrants, or options would be limited to those the value of which equals or exceeds 10% of the entity or could be converted to 10% or more of the voting securities or non-corporate interests of the company.

The Commission recognizes that the compilation of this information would add to the burden of preparing an HSR Filing for an acquiring person with a complicated investment structure, but it is important that the HSR Filing contain this information because individuals or entities that fall into any of the four categories described above can have a material influence on the operations or strategy of the acquiring person. As with minority investors, these relationships can affect the competition analysis of the transaction, and the proposed identification of these individuals or entities would allow the Agencies to know the identity of those in a position to influence post-merger competition decisions.

d. Officers, Directors, and Board Observers

The proposed Officers, Directors, and Board Observers section would require the identification of the officers, directors, or board observers (or in the case of unincorporated entities, individuals exercising similar functions) of all entities within the acquiring person and acquired entity, as well as the identification of other entities for which these individuals currently serve, or within the two years prior to filing had served, as an officer, director, or board observer (or in the case of unincorporated entities, roles exercising similar functions). This information would allow the Agencies to know of existing, prior, or potential interlocking directorates and to assess the competitive implications of such relationships under both Sections 7 and 8 of the Clayton Act.[34]

Section 8 of the Clayton Act generally prohibits a person from serving as an officer or director of competing corporations, subject to certain categorical and de minimis exceptions. This section of the Clayton Act aims to prevent information sharing and coordination between competitors through a per se ban that prohibits the same individual from serving as an

---

[31] *See United States* v. *E.I. du Pont de Nemours & Co.,* 353 U.S. 568 (1957) (du Pont's 23% stake in General Motors violated Section 7 by giving it an advantage over other suppliers and thereby resulting in a substantial lessening of competition). In considering the proper remedy, the Supreme

Court found that divestiture of only voting rights was insufficient due to the on-going "special relationship" could still result in competitive harm. *United States* v. *E.I. du Pont de Nemours & Co.,* 366 U.S. 316, 332 (1961).

[32] 43 FR 33450, 33531–32 (July 31, 1978).

[33] *Id.* at 33531.

[34] Although Section 8 does not technically apply to unincorporated entities, information sharing and coordination can still raise concerns under Section 1 of the Sherman Act.

officer or director of two competing firms.[35]

In the Agencies' experience, many acquiring persons have board members who also serve on the boards of other companies. As a result, the Agencies often investigate existing board relationships as well as potential interlocks that would result from the transaction as part of its initial review. Section 8 bars interlocks that arise through rights to appoint board members to a competitor [36] or officers or directors serving on the boards of competing companies. Investment entities that acquire board seats across a diverse portfolio of companies may be particularly likely to encounter Section 8 compliance issues via a merger or acquisition.[37]

Currently, filers are not required to disclose the identity of the members of their boards of directors, and this makes it difficult for the Agencies to complete their assessment of potential Section 8 issues during the initial waiting period. Having information about potential interlocking directorates in the HSR Filing would allow the Agencies to take steps to prevent the sharing of board-level confidential information much more quickly. This information is also relevant to the competition analysis of the transaction, as well as concerns about potential gun-jumping, which may violate the Act or Section 1 of the Sherman Act.[38] This is particularly

important given that post-merger enforcement of Section 8's *per se* ban can be ineffective after the individual has been privy to the confidential business information of two competitors: Section 8 provides a one-year grace period to remedy an illegal interlock that arises after the individual is elected or chosen to be an officer or director.[39] Moreover, Section 8 does not provide for civil penalties or other monetary relief, only injunctions barring the individual from serving on the two boards.

Information about board observers can also be relevant to the Agencies' analysis of the proposed transaction. Board observers are not subject to the Section 8 ban on interlocking directorates, and yet may have access to the same materials that are shared with officers and directors. In December 2020, the Commission issued an advance notice of proposed rulemaking ("ANPRM") that, among other things, sought to gather information about sources of influence on corporate decision-making outside the scope of voting securities.[40] The Commission noted the possibility that there are ways to gain influence over a company other than through the acquisition of voting rights, for instance through board observers, and pointed to the increasing use of board observers as part of the governance structure. Because the acquisition of rights to be a board observer is not a reportable event under the HSR Act, the Commission sought information about whether having rights as a board observer provides opportunities to influence an issuer's business decisions.[41]

The Commission received two comments in response to the ANPRM that discuss the role of board observers, and each comment indicated that individuals serving as board observers typically receive the same information as the board of directors, although there may be ways to exclude them from reviewing privileged or competitively

sensitive information.[42] In the Commission's experience, board observers have become more prevalent and could be privy to the same information as members of the board. For that reason, information about who these individuals are and whether they also serve as officers, directors, or board observers with other companies is important for understanding other sources of influence on the company's competitive decision-making and whether such individuals could share information between competitors. The Commission believes that having this information available during the initial waiting period would permit the Agencies to take steps to minimize the sharing of information prior to consummation.

The Commission thus proposes that filing persons provide information about the officers, directors, and board observers (or in the case of unincorporated entities, individuals exercising similar functions) of the acquired entity(s) and entities within acquiring person(s), as applicable, for the prior two years, and for each individual, identify any other companies for which those individuals would serve or have served during the prior two years as officers, directors, or board observers. The Commission also proposes requiring the same information for the prospective officers, directors, or board observers of the acquired and acquiring entities after the transaction, as well as for any officers, directors, or board observers of new entities created as a result of the transaction (and, in each case, for unincorporated entities, individuals serving those functions). If it would be impossible to identify the specific officers, directors, and board observers, filers should describe who would have the authority to choose them. Information received through these proposals would help the Agencies identify individuals with the ability to participate in or influence competitively relevant decision-making related to the filing persons or with access to confidential business information, allowing the Agencies to engage in more effective enforcement of the antitrust laws. The Commission believes that this information should be known to or readily accessible by the filing parties, and in some cases already

---

[35] Like Section 7, Section 8 was designed to "nip in the bud incipient violations of the antitrust laws by removing the opportunity or temptation to such violations through interlocking directorates." *United States* v. *Sears, Roebuck & Co.,* 111 F. Supp. 614, 616 (S.D.N.Y. 1953).

[36] *See, e.g.,* Complaint, *United States* v. *CommScope Inc.,* 1:07–cv–2200 (D.D.C.) (Dec. 6, 2007) *https://www.justice.gov/atr/case-document/complaint-69* (alleging violations of Sections 7 and 8 where buyer also acquired rights to appoint members to the board of its competitor). See also Press Release, U.S. Dep't of Just., Tullett Prebon and ICAP Restructure Transaction after Justice Department Expresses Concerns about Interlocking Directorates, (Jul. 14, 2016). The Department of Justice has announced its intent to reinvigorate Section 8 enforcement, after seven directors resigned from corporate board positions. See Press Release, U.S. Dep't of Just., Justice Department's Ongoing Section 8 Enforcement Prevents More Potentially Illegal Interlocking Directorates (Mar. 9, 2023), *https://www.justice.gov/opa/pr/justice-department-s-ongoing-section-8-enforcement-prevents-more-potentially-illegal.*

[37] The Agencies also consider whether the acquiring person would be expanding into the business of the other company that shared a board member such that the two companies would have competing sales in excess of the de minimis amounts permitted by Section 8.

[38] Any sharing of competitive information between or among competitors, including during the pendency of merger review, that results in competitive harm may be a violation of Section 1 of the Sherman Act, or Section 5 of the FTC Act. Complaint, *United States* v. *Gemstar,* cv 1:03–00198 (D.D.C. 2003), *https://www.justice.gov/atr/case-*

*document/complaint-108;* Complaint, In re Insilco Corp., No. C–3783 (F.T.C. 1998), *https://www.ftc.gov/sites/default/files/documents/cases/1998/01/insilcocmp.pdf.*

[39] 15 U.S.C. 19(b).

[40] 85 FR 77042 (Dec. 1, 2020).

[41] "At the very least, board observers gain insight into an issuer's strategic decision-making, which is not only useful to the investor sponsoring the board observer, but may also be useful to competitors in the market, especially when those board observers also serve as officers or directors of a competitor. Companies likely benefit from interacting with board observers because company management can obtain additional investor insight without having to alter the composition or voting balance on the board." *Id.* at 77050.

[42] *See* Am. Bar. Ass'n, Comment on Hart-Scott-Rodino Coverage, Exemption, and Transmittal Rules ANPRM, 10–11 (Feb. 1, 2021), *https://www.regulations.gov/comment/FTC-2020-0086-0015;* Comput. & Commc'n Indus. Ass'n, Comment on Hart-Scott-Rodino Coverage, Exemption, and Transmittal Rules ANPRM, 11 (Jan. 26, 2021), *https://www.regulations.gov/comment/FTC-2020-0086-0002.*

collected as part of an incorporated entity's antitrust compliance program.

*C. Transaction Information*

The Commission proposes the creation of a Transaction Information section within the proposed Instructions. Currently, information about the transaction is required in several sections of the Form: the initial portion of the current Form requires information about the filing fee and whether early termination of the waiting period is requested; Item 2(a) requires identification of the ultimate parent entities of the acquiring and acquired persons; Item 2(b) identifies the type of transaction; Item 2(c) identifies the § 801.1(h) threshold that will be crossed; Item 2(d) seeks information about the percentage and value of the voting securities, non-corporate interests, and/or assets to be required; Item 3(a) asks for identification of the acquiring and acquired persons and entities, as well as a description of the transaction; Item 3(b) requires the listing and attaching of the most recent transaction agreement, or letter of intent; and Item 5(b) requires information about joint ventures and formations. The Commission proposes the reorganization, clarification, and expansion of these items to require information that will aid the Agencies in understanding the totality of the transaction during the initial waiting period. These proposed changes, discussed below, would require information about the transaction to be reported in the following proposed categories: Parties, Filing Fee, Transaction Details, and Transaction Description.

1. Parties

The proposed Parties section within the proposed Instructions would require the identification of the acquiring and acquired persons and the acquiring and acquired entities. This information is currently collected in Item 3(a) of the Form, and the Commission is not proposing any material changes to this requirement.

2. Filing Fee

The proposed Filing Fee section within the proposed Instructions would require identification of the total filing fee required for the transaction and information about the payment, including identification of the paying entity and the Electronic Wire Transfer confirmation number.[43] This

information is currently collected in the Fee Information section of the Form, and the Commission is not proposing any material changes to this requirement.

3. Transaction Details

The proposed Transaction Details section within the proposed Instructions would require the same information currently required by Items 2(b)–2(d) of the Form that detail whether the transaction involves the acquisition of voting securities, non-corporate interests or assets, and the approximate value of each, as well as whether a notification threshold is crossed. The Commission is not proposing any material changes to these requirements.

4. Transaction Description

The Commission proposes creating a Transaction Description section within the proposed Instructions to reorganize information currently required in the Transaction Description portion of Item 3(a) of the Form, and to expand the required information, as described below.

a. Business of the Acquiring Person

The Commission proposes requiring the acquiring person to describe its business operations. Currently, Item 3(a) of the Form requires filing persons to briefly describe the transaction, including whether assets, voting securities, or non-corporate interests (or some combination) are to be acquired. Filers must also describe the business operation being acquired or what the assets being acquired comprise.[44] Although this information helps the Agencies understand what is proposed to be acquired, it does not provide any insight into the full range of business operations or other entities involved in the transaction on the part of the acquiring person. In the Commission's experience, understanding the scope of the acquiring person's business operations is critically important to determining whether the transaction poses any potential competition concern. Although this information is well known to the acquiring person, it is often not easily or quickly collected and confirmed from public sources during the initial waiting period.

As a result, the Commission proposes requiring the acquiring person to briefly describe the business operations of all entities within the acquiring person to provide a clear overview of all aspects of the acquiring person's pre-transaction business to facilitate the Agencies' antitrust review during the initial

waiting period. Many businesses have pre-prepared descriptions of their operations for use in press releases, marketing materials, and investor materials. Unlike the requirement to describe the entities or assets to be acquired, which would apply to both the acquiring and acquired person, the requirement to describe business operations would be limited to the acquiring person.

b. Business of the Acquired Entity

As noted above, Item 3(a) of the Form requires filing parties to briefly describe the transaction, including whether assets, voting securities, or non-corporate interests (or some combination) are to be acquired. Filing persons must also describe the business operation being acquired or what the assets being acquired comprise. The Commission is not proposing any material changes to this requirement.

c. Non-Reportable UPE(s)

Item 2(a) of the Form currently requires the identification of any UPE that is not required to file, and the Commission is not proposing any material changes to this requirement.

d. Transaction Description

Item 3(a) of the Form currently requires a brief description of the transaction. The Commission is not proposing any material changes to this requirement.

e. Transaction Rationale

The Commission proposes adding a new requirement that filing persons provide a narrative that would identify and explain each strategic rationale for the transaction. As helpful as the documents responsive to current Items 4(c) and 4(d) of the Form can be, they do not always convey each filing person's cumulative views on the rationale(s) for the transaction. Indeed, such documents (when they are submitted and when they discuss rationales) often contain differing, and at times conflicting or mutually exclusive, statements regarding the transaction depending on when they were prepared or by whom. For example, different members of the deal team might have different perspectives on the potential motivations for the transaction at different times, and the submitted documents do not resolve the filing person's ultimate thinking regarding the topic. Since documents responsive to Items 4(c) and 4(d) do not consistently provide an overview of the rationale(s) for the transaction, it would be of immense value for the Agencies to have during the initial waiting period a

---

[43] If electronic wire transfers are not available to the filing party, the Instructions would continue to provide instructions for paying by check.

[44] 81 FR 60257 (Sept. 1, 2016).

statement that discusses each the strategic rationale(s) from the perspective of each filing person.

The Commission thus proposes that the acquiring and acquired person be required to submit a narrative describing all strategic rationales for the transaction, including, for example, those related to competition for current or known planned products or services that would or could compete with a current or known planned product or service of the other reporting person, expansion into new markets, hiring the sellers' employees (so-called acqui-hires), obtaining certain intellectual property, or integrating certain assets into new or existing products, services or offerings. The Commission also proposes that the filing person identify which documents submitted with the HSR Filing support the rationale(s) described in the narrative. This proposed requirement would help ensure that the provided narrative is grounded in the filers' ordinary-course documents and not mere advocacy designed to portray a favorable view of the transaction. Moreover, any cited documents that support the narrative would also provide additional context for the Agencies as they assess the parties' stated rationale(s) in relation to any potential competitive consequences of the transaction. Understanding the business reason(s) for pursuing the transaction can materially affect the course and direction of the Agencies' antitrust review during the initial waiting period.

### f. Transaction Diagram

The Commission proposes a new requirement that the filing persons provide a diagram of the deal structure along with a corresponding chart that would explain the relevant entities and individuals involved in the transaction. The brief narrative currently required in Item 3(a) of the Form does not require filers to explain all the relevant entities or identify steps involved in the transaction and their sequence. As a result, the Agencies frequently request a more detailed account of these steps during the initial waiting period, but these submissions are voluntary, not uniform in their detail, and often lack important aspects of the transaction that may bear on the competitive analysis and the determination of whether the transaction warrants in-depth review. In the Commission's experience, particularly in the case of complex or multi-step transactions, diagrams are generally more helpful than simple narratives in conveying the relationships of the relevant entities and the deal structure.

The Commission's proposal that filing persons submit a diagram of the deal structure along with a corresponding chart explaining the entities involved in the transaction would further assist the Agencies' conceptualization of the transaction and save considerable time in obtaining basic information about the entities involved and how the transaction would affect the operations of those entities. Such diagrams are often prepared by companies in the ordinary course of business for other purposes, such as for transaction diligence requirements.

### g. Related Transactions

While Item 3(a) of the current Form asks parties to indicate whether there are additional filings related to the transaction, filers sometimes overlook this requirement. The proposed Instructions would clarify that filing persons must identify related transactions. The proposed Instructions would also provide a list of common circumstances in which multiple filings are required to guide filing parties in their responses. These proposed changes would provide clarity for both filing persons and the Agencies.

### h. Early Termination

The proposed Early Termination section would ask whether the filing party requests early termination of the waiting period. This question is currently asked on page one of the Form, and the Commission is not proposing any material changes to this requirement.

### 5. Joint Ventures

The proposed Joint Ventures section within the proposed Instructions would require information about transactions structured as a joint venture or formation pursuant to §§ 801.40 or 801.50. This information is currently collected in Item 5(b) of the Form and requires information about the contributions each person will make to the entity, what consideration will be received, the business in which the new entity will engage, and an allocation of revenue to industry codes. As discussed in section III.A.1.b. above and III.D.3. below, the Commission is proposing eliminating the use of 10-digit NAPCS codes. Therefore, the Commission proposes also eliminating the requirement to identify the NAPCS codes in which the joint venture will derive revenue. The Commission is not proposing any other material changes to this requirement.

### 6. Agreements and Timeline

The proposed Agreements and Timeline section within the proposed Instructions would require filing persons to provide a term sheet or draft agreement that reflects sufficient detail about the proposed transaction to demonstrate the transaction is more than hypothetical, if a definitive agreement has not been executed, as described above in the proposed amendments to § 803.5(b) at II.C. In addition, the Commission proposes additional changes regarding which agreements must be submitted. These proposed changes, discussed below, include a requirement to submit the entirety of all agreements related to the transaction and a new requirement to submit other agreements between the filing persons that are not related to the transaction, as well as a timetable for the transaction.

### a. Transaction-Specific Agreements

The Commission proposes requiring that all transaction-specific agreements be submitted with HSR Filings. Currently, Item 3(b) of the Form requires the submission of all documents that constitute the agreement(s) among the acquiring person(s) and the person(s) whose assets, voting securities, or non-corporate interests are to be acquired, as well as agreements not to compete and other agreements between the parties. The production of schedules to agreements is not currently required, unless the schedules contain agreements.[45] In the Commission's experience, the structure of transactions has become increasingly complex, often comprising not only multiple agreements between the filing persons but agreements with third parties. Understanding the entirety of the transaction, including but not limited to non-competition and non-solicitation agreements and other agreements negotiated with key employees, suppliers, or customers in conjunction with the transaction, is crucial to determining the totality of the transaction and assessing during the initial waiting period the transaction's potential competitive impact. Moreover, schedules increasingly include descriptions of key terms and provisions.

The Commission thus proposes requiring filing persons to produce all agreements, inclusive of schedules, exhibits, and the like, that relate to the transaction, regardless of whether both parties to the transaction are signatories. It is the Commission's understanding

---

[45] 16 CFR 803 Appendix Notification and Report Form Instructions at page V.

that these documents are collected and are typically included in materials necessary for closing. Having a complete set of transaction-related agreements would provide the Agencies with a more complete understanding of the transaction under review.

b. Other Agreements Between the Parties

The Commission also proposes requiring filing persons to submit all agreements between any entity within the acquiring person and any entity within the acquired person in effect at the time of filing or within the year prior to the date of filing. Understanding the scope of any existing contractual relationships between the filers would materially assist the Agencies' review by revealing any business interactions or relationships that exist prior to the transaction and that may be affecting premerger competition. These might include licensing agreements, supply agreements, non-competition or non-solicitation agreements, purchase agreements, distribution agreements, or franchise agreements, among others. Understanding the full extent of the filing parties' existing contractual relationships would allow the Agencies to identify those relationships that contribute to the premerger competitive dynamics, which is material to assessing how the transaction may affect post-merger competition.

c. Timeline

The Commission also proposes that filing persons provide a narrative timeline of key dates and conditions for closing. Just as it is critical for the Agencies to understand the totality of the transaction during the initial waiting period, it is also critical to understand the timing of key milestones and the conditions to closing, which are often complex and not easily understood from the transaction documents themselves. The Agencies often cannot confirm basic deadlines for the transaction from the transaction documents and in those cases, the Agencies expend a great deal of time and effort to confirm with filers key dates, including the timing of pre-closing conditions, during the initial waiting period. Understanding deal timing is critical to each Agency's decisions regarding how to manage its merger workload on a priority basis, focusing available resources on those deals whose closing dates are imminent. This basic information about the timing of the transaction is not adequately captured in the current Form, and, to the extent the filing person knows at the time of the HSR Filing and can readily provide it, this information would help

the Agencies understand key deal milestones and better manage the timing and focus of the investigation during the initial waiting period.

*D. Competition and Overlaps*

The Commission proposes creating a Competition and Overlaps section within the proposed Instructions. This section would collect, in one place, information that reveals any existing business relationships between the filing persons that requires the Agencies to take a closer look to determine whether the transaction warrants an in-depth investigation, which is the primary purpose of premerger notification and review. Information collected in this section would include information and documents currently collected in several parts of the Form: in Items 4(c) and 4(d), which require the production of certain documents created in conjunction with the evaluation of the transaction; Item 5(a), which requires the allocation of revenue from U.S. operations to industry and product codes; Item 6(c), which identifies certain minority-held entities of the filer; Item 7, which provides information about industries in which the acquiring person and acquired entity both participate; and Item 8, which requires the identification of certain prior acquisitions made by the acquiring person. The Commission proposes expanding and reorganizing the information and requiring additional documents that would bear directly on the premerger competitive relationship between the filing persons. The proposed Competition and Overlaps section would provide a new source of relevant information related to horizontal overlaps, as well as new information about supply relationships and employees, which would enable us to Agencies to quickly identify and assess the potential impact of the transaction across many dimensions of competition. These proposed changes, discussed below, would be organized in the following proposed categories: Business Documents, Competition Analysis, NAICS Codes, Controlled-Entity Overlaps, Minority-Held Entity Overlaps, and Prior Acquisitions.

1. Business Documents

The proposed Business Documents section within the proposed Instructions would require the submission of documents currently required by Items 4(c) and 4(d) of the Form and additional categories of documents. The Commission's proposal for requiring additional documents is informed by a comparison of documents submitted by filing persons with the HSR Filing and

those submitted during the Agencies' in-depth investigations that are not required by the current Form but would have been highly probative to the initial antitrust assessment of the transaction during the initial waiting period. The specific types of proposed business documents are discussed below.

a. Transaction-Related Documents

The proposed Transaction-Related Documents section would comprise the same types of documents currently required by Item 4(c) of the Form, which the Commission proposes to expand to include documents prepared by or for the supervisory deal team leads, and Item 4(d), which the Commission proposes to clarify without material changes. The Commission also proposes requiring the submission of certain previous draft versions of these documents.

i. Documents Prepared by or for Officers, Directors, or Supervisory Deal Team Lead(s)

In the proposed Documents Prepared by or for Officers, Directors, or the Supervisory Deal Team Lead section, the Commission proposes expanding the scope of requested documents evaluating the transaction by adding a requirement to submit such documents prepared by or for the supervisory deal team lead(s). Currently, Item 4(c) requires filing persons to provide all studies, surveys, reports, plans, and analyses prepared by or for officers or directors to evaluate the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into products or geographic markets. These transaction-specific assessments of competition, past and future, provide the Agencies with invaluable insights into each party's view of how the transaction could change the competitive landscape and, most importantly, narrow the inquiry to particular markets and companies that each party believes to be its competitors. Since the beginning of the premerger notification program, 4(c) documents have been a key screening tool for the Agencies to identify those transactions that require more than a cursory review during the initial waiting period. The proposed section would retain the same definition of transaction-related documents to be submitted but add the supervisory deal team lead(s) to the list of individuals to whom this item would apply.

In some companies, an officer may lead the day-to-day activities of the deal team and would be considered the supervisory deal team lead, resulting in

no change to the documents currently required as part of Item 4(c) of the Form. But someone other than an officer or director often functionally leads the deal team. In the Commission's experience, in those cases, responses to current Item 4(c) often do not contain documents with sufficient information about the filing person's analysis of the competitive implications of the transaction to enable the Agencies to identify potentially problematic transactions. In fact, based on documents submitted in response to Second Requests, it is the Agencies' experience that individuals other than officers and directors are often the authors or recipients of documents that are otherwise responsive to Item 4(c) of the Form but are not required to be submitted with the HSR Filing because they were not prepared by or for an officer or director. These documents, typically in the possession of the supervisory deal team lead(s), often include information that would have been crucial to the Agencies' analysis of the transaction during the initial waiting period.

The Commission thus proposes that in addition to requiring documents prepared by or for officer and directors, filing persons must also submit these transaction-related documents prepared by or for supervisory deal team lead(s). Identification of any supervisory deal team lead would not be based upon title alone. The Commission proposes that the filing person determine the individual or individuals who functionally lead or coordinate the day-to-day process for the transaction at issue. A supervisory deal team lead need not have ultimate decision-making authority but would have responsibility for preparing or supervising the assessment of the transaction and be involved in communicating with the individuals, such as officers or directors, that have the authority to authorize the transaction. Any such individual(s) might be the leader(s) of an investment committee, tasked with heading the analysis of mergers and acquisitions, or otherwise given supervisory capacity over the flow of information and documents related to transaction.

The Commission believes this proposal strikes a balance between the interests of the Agencies and those of filing persons in requesting additional documents responsive to Item 4(c) of the Form. Requiring filing persons to include materials prepared by and for supervisory deal team lead(s) would allow the Agencies to receive additional key materials relevant to the analysis of the transaction without requiring

information from all deal team members, in light of the opportunity to obtain additional documents through the issuance of Second Requests.

### ii. Confidential Information Memoranda

The proposed Confidential Information Memoranda section would collect the information currently required by Item 4(d)(i) of the Form. The Commission is not proposing any material changes to this requirement.

### iii. Studies, Surveys, Analyses, and Reports

The proposed Studies, Surveys, Analyses, and Reports section would collect the information currently required by Item 4(d)(ii) of the Form. The Commission is not proposing any material changes to this requirement.

### iv. Synergies and Efficiencies

The proposed Synergies and Efficiencies section would collect the information currently required by Item 4(d)(iii) of the Form, and the Commission proposes to clarify that forward-looking analyses are responsive. Currently, Item 4(d)(iii) asks for all studies, surveys, analyses, and reports evaluating or analyzing synergies, and/or efficiencies prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) for the purpose of evaluating or analyzing the acquisition. The Commission proposes to specifically include a reference to models and financial projections to make clear that filers should submit forward-looking assessments of synergies or efficiencies. This information is especially important for screening the competitive impact of products or services not yet generating revenue but projected to do so. As before, financial models without stated assumptions would not need to be provided. For many transactions, especially those involving markets in which competition occurs via on-going innovative efforts, these forward-looking assessments will materially benefit the Agencies' identification of transactions that warrant in-depth review.

### v. Drafts

Along with expanding the required Transaction-Related Documents as described above, the Commission also proposes requiring the submission of drafts responsive to these requests. It has been a long-standing position of the Commission's PNO that the submission of draft versions of documents responsive to Item 4(c) or 4(d) is not required unless there is no final version, in which case the most recent draft has

been required, or unless a draft was sent to the board of directors. Under this guidance, if a draft version of a document is sent to the Board, it ceases to be a "draft" and must be submitted, even if a final version is also submitted. As a result, the Commission has not typically received many draft documents as part of HSR filings.

The Agencies routinely ask for and receive draft documents in response to Second Requests and, in the Agencies' experience, these drafts often reveal additional information about the transaction that would have been important to the Agencies' review during the initial waiting period, such as references to specific product markets or competitors that were removed in subsequent versions. In addition, these drafts can contain highly relevant, probative, or candid statements about the competitive impact not reflected in the final version of the document. In some cases, it appears that the draft documents have been edited to remove candid assessments of factors relevant to competition prior to circulation to officers or directors. In others, the dates of the documents suggest that otherwise responsive drafts were not finalized or shared with officers or directors until after making an HSR Filing.

The Commission therefore proposes clarifying in the Instructions that drafts of responsive transaction-related documents must be submitted if that document was provided to an officer, director, or supervisory deal team lead(s). This proposed change would ensure that the Agencies have access to documents that reflect pre-transaction assessments of business realities, as opposed to "sanitized" versions, to aid in their analysis during the initial waiting period. The addition of the supervisory deal team leader(s) to this requirement should capture draft materials important to managing the transaction but avoid the burden of having to submit prior versions that were not reviewed by senior managers or decision-makers. As stated elsewhere in this NPRM, the Commission aims to strike a balance between the Agencies' need to obtain material information about the transaction and the burden on filing parties, so the scope of this request is limited so as not to require filing parties to search numerous company personnel beyond officers, directors, and supervisory deal team lead(s).

The Commission recognizes that requiring draft transaction-related documents creates an additional burden for filing parties to collect and submit more documents to the Commission with their HSR filings and that, to some

degree, previous versions of submitted documents may contain repetitive information. Moreover, HSR filings that contain large document submissions could overwhelm the Agencies and undermine the goal of effective and efficient screening for transactions that require an in-depth investigation. For this reason, the Commission seeks comment on a potential alternate approach in which filing parties collect draft Transaction-Related Documents as part of preparing HSR filings but do not submit these documents until and unless agency staff reviewing the transaction requests the draft documents during the initial waiting period. In the event that agency staff requests the draft documents, the filing person would be required to submit them within 48 hours in order to retain the initial waiting period. The Commission invites comment on whether this alternative approach would reduce the burden for the parties and the Agencies compared with submitting all versions with the HSR Filing as described above, whether there are logistical issues with providing the collected draft documents within 48 hours, and the estimated volume of drafts collected.

b. Periodic Plans and Reports

The proposed Periodic Plans and Reports section would require filing persons to submit certain high-level strategic business documents that were not created in contemplation of the transaction but still contain information relevant to the antitrust analysis. As a result of decades of experience, the Agencies are aware that, as part of diligence for a potential transaction, companies often collect a targeted set of ordinary course documents that do not need to be submitted as part of an HSR Filing. Such documents typically include strategic plans and documents that are useful to those negotiating or evaluating the transaction because they discuss general market dynamics, competitors, or other potential mergers and acquisitions. The Commission understands that these documents are collected to provide key transaction decision-makers with the company's internal assessment of commercial realities of the premerger marketplace.

The Commission therefore proposes requiring certain plans and reports created in the ordinary course of business and not prepared solely for the purpose of evaluating the proposed transaction to be submitted as part of the HSR Filing. Periodic plans and reports created in the ordinary course of a company's business often contain detailed assessments of core business segments, markets, competitors, other

acquisition targets, and projections about future competitive dynamics— insights that have direct bearing on the Agencies' antitrust assessment of the transaction in the initial waiting period. The Commission proposes requiring the submission of semi-annual and quarterly plans and reports that discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and acquired entity, if those documents were shared with a chief executive of an entity involved in the transaction, or with certain individuals who report directly to a chief executive. The Commission also proposes requiring the submission of all plans and reports submitted to the board of directors (or, in the case of unincorporated entities, individuals exercising those functions) that discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and acquired entity.

These proposed new document requirements would be limited in certain specific ways to minimize the overall number of documents submitted with the HSR Filing. First, the new Periodic Plans and Reports section would not require documents that analyze "the potential for sales growth or expansion into product or geographic markets" as is required by current Item 4(c). Additionally documents responsive to this item would be limited to those prepared or modified within one year of the date of the HSR Filing. The Commission believes that the submission of a limited set of ordinary course business documents that were not prepared specifically to evaluate the transaction but discuss premerger and future competitive dynamics and strategies broadly would provide valuable insight and context for the transaction-related documents submitted with the HSR Filing. These ordinary course business documents are routinely submitted during in-depth investigations in response to Second Requests and routinely contain unique information about the state of premerger competition, which if available during the initial review period would help the Agencies determine if an in-depth review is warranted and if so, its proper scope.

The Commission is aware that this new requirement has the potential to result in the submission of a large number of documents for complex or large transactions. The Commission is also aware of the potential impact on the filing persons and on the Agencies of large document submissions. The Commission seeks to balance these

interests and invites comment on how or whether narrowing the set of custodians for periodic reports and plans, or any other proposed limits, would still generate information about the premerger state of competition that is not specific to the transaction while reducing any burden on filers and the Agencies.

Finally, the Commission notes that filing persons should not exchange additional information with respect to planned products or services to provide a response to this proposed requirement but should respond instead on the basis of regular diligence and the knowledge or belief of the filing person. The Commission recognizes that an acquired person would have limited information about the acquiring person's operations, including products under development, and the Commission does not intend these proposed changes to encourage additional information sharing of this type of information.

c. Organizational Chart of Authors

As the final part of its proposed Business Documents section, the Commission proposes requiring filing persons to identify the authors of all responsive documents submitted with the HSR Filing and to provide additional information about each individual. Given the short period of time for review during the initial waiting period, it is crucial for the Agencies to have a clear understanding of how authors of key documents fit into the organization or entities of each filing person to determine the importance and perspective of the responsive documents submitted with the HSR Filing and to identify key employees within the organizations. Thus, the Commission proposes requiring an organizational chart(s) that would reflect the position(s) within the filing person's organization held by identified authors, and for privileged documents, the recipients of each document submitted with the HSR Filing. The Commission also proposes requiring the filer to identify the individuals searched for responsive documents. It would be sufficient to indicate by notation on the organization chart(s) which individuals were searched.

Providing a chart will help contextualize reporting relationships, as well as the relative seniority, of the authors and recipients and allow the Agencies to more quickly assess which documents contain high-level assessments from key employees. The benefit of being able to identify important decision-makers within the filing person and having context for key documents would allow the Agencies to

quickly assess the probative value of the documents

## 2. Competition Analysis

The Commission proposes creating a new Competition Analysis section within the proposed Instructions. This proposed section would create new requirements for filing persons to provide narratives that would, among other things, describe their basic business lines and provide product or service information for all related entities; identify current and potential future horizontal overlaps and supply relationships between the filing persons; and provide information about their employees and what services these employees provide. These proposed narrative requests would provide the Agencies with crucial information about current and future competitive relationships between the filing parties, including whether they compete to hire employees, which is information that is not required by the current Form.

### a. Horizontal Overlap Narrative

The Commission proposes creating a new Horizontal Overlap Narrative section that would require each filing person to provide an overview of its principal categories of products and services (current and planned) as well as information on whether it currently competes with the other filing person. Such information is core to the Agencies' substantive antitrust analysis during the initial waiting period and is not readily accessible from sources other than the filers themselves. In drafting the Horizontal Overlap Narrative, each filing person would describe its current and planned principal categories of products and services in the way that those business lines are referred to in the company's day-to-day operations so that the Agencies could more readily understand the information in the context of current market realities. If any of the submitted documents support the information contained in the narrative, the filing person would also identify such documents.

The products or services offered by the filing persons that currently or potentially compete with each other are often referred to by antitrust professionals as "horizontal overlaps." The identification and assessment of such horizontal overlaps is an essential starting point for the Agencies' substantive review of any transaction to determine whether it has the potential to violate the antitrust laws. As discussed elsewhere, NAICS code reporting can result in underreporting of horizontal overlaps, and not every HSR

Filing contains 4(c) documents that could potentially reveal overlaps not identified by NAICS code reporting. In such cases, the HSR Filing does not contain basic screening information that the Agencies need to determine whether the transaction merits closer scrutiny during the initial waiting period. Premerger notification is intended to allow the Agencies to scrutinize any transaction that eliminates competition between existing or potential competitors, and it is important for every HSR Filing to identify any existing or potential horizontal overlap created by the transaction.

As a result, the Commission proposes that within the Horizontal Overlap Narrative, each filing person would be required to list each current or known planned product or service that competes with (or could compete with) a current or known planned product of the other filer. For each such overlapping product or service, the filing person would provide sales, customer information (including contacts), a description of any licensing arrangements, and any non-compete or non-solicitation agreements applicable to employees or business units related to the product or service.

The proposed requirement for this information about each filing person's market presence in overlapping products or services would enable the Agencies to quickly identify and assess the significance of the filers' respective businesses both in relative and absolute terms. Proposed customer information would enable the Agencies to understand the customer base of the overlapping businesses and to promptly conduct, at the beginning of the initial waiting period, further industry research with customers likely to be affected by the transaction or those who are particularly knowledgeable about the parties' business operations, relevant industry dynamics, and other market participants. Contacting customers to confirm basic market dynamics is a key step in the antitrust analysis conducted by Agency staff during the initial waiting period, and the parties are frequently asked to provide this information on a voluntary basis once one Agency has granted clearance to the other to conduct an initial investigation of the transaction. However, since this information is not compulsory, the Agencies do not always receive it in a timely fashion during the initial waiting period, hampering the ability of the Agencies to use that period to effectively screen for transactions that merit the issuance of Second Requests.

The proposed requirement to describe any licensing, non-compete, or non-

solicitation agreements involving overlapping products or services would enable the Agencies to assess specific categories of existing contracts that are likely to affect how the transaction will impact competition for those products or services. These existing relationships bear on premerger market conditions and may reflect that the filers already view themselves as competitors (in the case of non-compete or non-solicitation agreements) or as key trading partners (in the case of licensing agreements).

The Commission acknowledges the burden drafting the proposed Horizontal Overlap Narrative could create for some filers, especially for transactions involving close competitors with multiple overlapping product or service lines. But identifying those transactions that present broad and complex competition issues is a critical first step for the Agencies. Once identified, the Agencies must then properly manage their review, first determining which markets could be impacted by the transaction and then deciding which of those necessitate in-depth review. On balance, this proposed requirement would significantly improve the information available to the Agencies to identify any existing or potential horizontal overlap to assess the competitive implications of a transaction during the initial waiting period. The Commission notes that in the Agencies' experience, companies who are horizontal competitors prior to the transaction frequently assess the antitrust risk associated with the transaction prior to making an HSR Filing, and therefore the information required by this proposal may already be available, in whole or part, to include with the HSR Filing. Although the Agencies have not previously required this type of narrative to be submitted as part of the Form, other jurisdictions have required such narratives for many years.

### b. Supply Relationships Narrative

The Commission proposes creating a Supply Relationships Narrative section that would require each filing person to provide information about existing or potential vertical, or supply, relationships between the filing persons. A prior version of the Form required similar information about vertical vendor-vendee relationships, but the requirement was eliminated in 2001 because the type of information collected did not prove useful enough to the Agencies as a screen for potential non-horizontal relationships to justify

the burden of providing it at that time.[46] Based on the Agencies' experience investigating vertical mergers in the intervening decades, the Commission believes that the current proposal would provide sufficiently robust information to allow the Agencies to identify vertical and other non-horizontal issues, including those presented by diagonal mergers. Non-horizontal relationships can be hard to detect in certain sectors where supply chains are not well defined, for instance in the provision of services rather than physical products. The Agencies have an interest in knowing whether a transaction in which the filing persons operate in related markets would result in any change in market structure or incentives that might affect post-merger competition. Early identification of potential non-horizontal competitive issues is critical to determining whether further investigation is needed, as structural changes in these relationships require additional fact development to determine the nature and scope of potential non-horizontal competitive concerns, which can often be complex and unique. These issues are difficult to discern from the information currently required by the Form, and filing parties are in a unique position to identify existing or future non-horizontal business relationships between them.

The Commission thus proposes to collect, in a narrative response, information for related sales and purchases between the filing persons or with other companies that use the filing person's products, services, or assets to compete with the other filing person. Filing persons would report sales to the other filing person and to any other business that, to the best of the filing person's knowledge, uses its product, service, or asset as an input for a product or service that competes or is intended to compete with the other filing person's products or services. Filing persons would also provide information (including contact information and a description of the supply agreement) for other customers that use the product, service, or asset to compete with other filing person. Filing

persons would provide similar information for purchases made from the other filing person and from any other business that, to the best of the filing person's knowledge, competes with the other filing party to provide a substantially similar product, service, or asset. This information would allow the Agencies to identify whether the transaction would create opportunities for post-merger foreclosure of rivals arising from vertical or diagonal relationships.

The Commission acknowledges that this will increase the burden on filers whose transaction involves existing supply relationships or who supply or purchase from companies that compete with the other filing party. But the Commission believes that requiring filing parties to provide a narrative that reveals existing and potential supply relationships between the acquiring person and acquired entity is important for the Agencies because it would allow them to quickly identify those transactions that raise concerns about non-horizontal competitive effects.

c. Labor Markets Information

The Commission proposes creating a new Labor Markets section that would require each filing person to provide certain information about its workers in order to screen for potential labor market effects arising from the transaction. The Agencies have increasingly recognized the importance of evaluating the effect of mergers and acquisitions on labor markets and have stepped up efforts to identify and investigate potential labor market effects arising from reportable transactions. Transactions have been challenged on the basis that consummation would result in labor market harms,[47] and consent agreements have included provisions that stop the use of certain non-compete clauses that limit the ability of potential market entrants to hire key employees.[48]

In transactions that involve two firms that purchase labor from the same labor market(s), the Agencies consider whether the transaction may substantially lessen competition for buyers of labor services. Every firm competes for labor in at least one labor market and, more commonly, in multiple labor markets. Companies that compete in the same product market may also compete in the same labor market. Employers, however, may compete in the same labor market even when they do not compete in the same product or input market.

Yet the Form does not collect any information about employees that would allow the Agencies to conduct an initial screening for potential labor market effects, which has materially hampered their ability to protect employees from the harmful effects of mergers. To identify whether the filing persons compete to employ the same types of workers in a particular geographic area, the Commission proposes requiring certain information concerning each filing person's workers before the transaction and any plans that would affect workers post-consummation. This proposed section would identify potential labor market overlaps and allow the Agencies to engage with the filers on potential labor market issues during the initial waiting period.

i. Largest Employee Classifications

The Commission proposes creating a Largest Employee Classifications section that would serve as a screening tool based on the SOC system, developed by the Bureau of Labor Statistics, which classifies workers into occupational categories. Labor markets have two dimensions: the type or features of work performed, and the location of the work. Because describing every relevant feature of each job would be burdensome for parties, the Commission proposes requiring filing persons to classify their workers into occupational categories based on the SOC system, a widely used system for reporting worker statistics. While SOC categories do not always provide exact comparisons, SOC codes would nevertheless provide the Agencies with an objective classification standard which can be used as an initial screen for potential labor market overlaps. The use of these codes as a screening tool is not intended to endorse their use for any other purpose, such as defining a relevant labor market. To implement this proposed screening

---

[46] The Form originally required information about any vendor-vendee relationship between the reporting parties regarding manufactured product during the most recent year; this information was intended to help the Agencies identify supply relationships that could give rise to concerns about foreclosure or other competitive consequences of vertical integration. The Commission eliminated this requirement in 2001 because it was not effective in identifying vertical issues, not because vertical acquisitions present no potential competitive risks. 66 FR 8680, 8686–87 (Feb. 1, 2001). Since 2001, the Form has not collected specific information related to vertical relationships.

[47] Press Release, U.S. Dep't of Just., Justice Department Sues to Block Penguin Random House's Acquisition of Rival Publisher Simon & Schuster, (Nov. 2, 2021), *https://www.justice.gov/opa/pr/ justice-department-sues-block-penguin-random-house-s-acquisition-rival-publisher-simon. See also* Concurring Statement of Commissioner Slaughter and Chair Khan regarding *FTC and State of Rhode Island v. Lifespan Corporation and Care New England*, at 1–2 (Feb. 17, 2022), *https:// www.ftc.gov/system/files/ftc_gov/pdf/public_ statement_of_commr_slaughter_chair_khan_re_ lifespan-cne_redacted.pdf* (recommending including a count in the complaint that the proposed merger would have violated Section 7 of the Clayton Act in a relevant labor market).

[48] Press Release, Fed. Trade Comm'n, FTC Imposes Strict Limits on DaVita, Inc.'s Future Mergers Following Proposed Acquisition of Utah Dialysis Clinics (Oct. 25, 2021), *https:// www.ftc.gov/news-events/news/press-releases/2021/*

*10/ftc-imposes-strict-limits-davita-incs-future-mergers-following-proposed-acquisition-utah-dialysis.*

tool, the Commission proposes requiring filers to list their five largest categories of workers by the relevant 6-digit SOC classification and to provide the total number of employees for each 6-digit code identified.

### ii. Geographic Market Information for Each Overlapping Employee Classification

The Commission proposes creating a Geographic Market Information for Each Overlapping Employee Classification section that would serve as a screen for the geographic component of labor markets based on the United States Department of Agriculture's ERS system. The ERS commuting zones were designed to delineate local economies based on where people live and work.[49] Filers would be required to identify the top five largest 6-digit SOC codes in which both parties employ workers. This should provide enough information for the Agencies to use SOC classifications as an initial proxy for labor issues while balancing the burden on filers by limiting the request to their five largest categories of workers. Also, for each of the five largest SOC codes in which both parties employ workers, this section would require filing persons to list the overlapping ERS-defined commuting zone(s) from which the employees commute and the total number of employees within each commuting zone. This proposed requirement would be limited to overlapping geographies, expressed as commuting zones, to capture sufficient information to identify potential labor market concerns without requiring filing parties to provide a complete list of all commuting zones in which they have workers.

This information would represent a material improvement in the data available to the Agencies during the initial waiting period. By relying on existing metrics that are familiar to U.S. companies and by limiting the request to the top five SOC classifications, the Commission's intent is to minimize the burden on filers. Nonetheless, the Commission seeks comment on whether this information would be difficult or costly to collect, and any alternative means by which the Commission could screen HSR Filings for potential labor market overlaps, for example by collecting information on the number and types of workers employed at each of the filing person's facilities.

### iii. Worker and Workplace Safety Information

The Commission proposes creating a Worker and Workplace Safety Information section that would require filing persons to identify any penalties or findings that were issued against the acquiring person or acquired entity by the U.S. Department of Labor's Wage and Hour Division, the National Labor Relations Board, or the Occupational Safety and Health Administration during the five-year period before the filing. If a firm has a history of labor law violations, it may be indicative of a concentrated labor market where workers do not have the ability to easily find another job. The proposed five-year period limitation would capture the most relevant information for analysis during the initial waiting period while lessening the burden on filers to search through older files. This information is not always publicly available but is known to the filers and is relevant to identifying potential labor market effects.

### 3. NAICS Codes

The Commission proposes creating a NAICS section within the proposed Instructions. This section proposes changes to certain information currently required by Item 5(a) of the Form, which now asks filing persons to submit information regarding dollar revenues and lines of commerce with respect to operations conducted within the United States during the most recently completed fiscal year. This includes products manufactured in the United States, regardless of where they are sold, products manufactured outside the United States but sold into the United States or through a U.S. entity, and products or services derived from U.S. operations, whether sold to a U.S. or foreign customer.

The current version of Item 5 of the Form requires the reporting of revenue by industry and product codes developed by Census to track economic activity in the United States. Over the years, the Commission has revised Item 5 as it sought to balance the need to receive filing persons' revenue information with the burden on filers to provide that revenue information.[50] As

part of the redesign of the premerger notification process contemplated in this NPRM, the Agencies reviewed the totality of revenue information currently required in Item 5(a) to determine which information is especially valuable, which is due for an update, and which is not sufficiently reliable or needed to conduct a robust initial assessment of reported transactions. As a result, the Commission now believes that it can further revise revenue reporting requirements to make reported revenue information more informative for the Agencies and less burdensome for filing parties. The Commission thus proposes a substantively different approach to revenue information through six proposed changes. The Commission also proposes a ministerial change to adopt the 2022 version of the NAICS codes, which are the most recent released by Census. Through these proposed changes, the Commission would expand and clarify the industry and product codes that filing persons would have to report, as well as limit the requirements on how revenue must be reported.

First, the Commission proposes eliminating the requirement that filing persons provide the precise amount of revenue attributed to each NAICS code. The Commission intends for the proposed change to streamline revenue reporting for filers and result in figures that would be just as useful to the Agencies for identifying important business lines of each person. It is the Commission's understanding that many businesses do not maintain detailed revenue information by NAICS code in the ordinary course of business and generating this information can require great effort. In fact, even obtaining estimates of revenue to the nearest $100,000, as is currently required, can still be burdensome for filers. The Commission therefore proposes that filing persons would only need to estimate revenue at five levels: pre-revenue (for certain products and services, as described below); less than $10 million; between $10 million and $100 million; between $100 million and $1 billion; and more than $1 billion. The Commission anticipates these ranges would provide the Agencies with an important overview of the magnitude of revenue generated by particular products and services, an important factor in the analysis of transactions during the initial waiting period, while at the same time reducing the burden of reporting revenues for filers. The Commission welcomes comments on

---

[49] See U.S. Dep't of Agric., ERS Commuting Zones and Labor Market Areas, *https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas/*.

[50] See 43 FR 33450, 33520 (July 31, 1978) (revenue reporting based upon Standard Industrial Classification codes of the U.S. Bureau of the Census); 66 FR 35541 (July 6, 2001) (amending the Form and Instructions to report revenue by North American Industry Classification System codes of the U.S. Bureau of the Census); 76 FR 42471 (July 19, 2011) (elimination of the requirement to report "base year" data); 84 FR 30595 (June 27, 2019) (amending the Form and Instructions to report manufacturing revenue by North American Product

Classification System-based codes of the U.S. Bureau of the Census).

the proposed ranges, as well as other potential ways to capture the relative magnitude of the business of the acquiring person or acquired entity attributable to each NAICS code.

Second, the Commission proposes that NAICS codes be reported on a descriptive basis, encompassing all U.S. operations. Revenue reporting in Item 5(a) currently relies on the filing persons' ordinary course financial records. In the Commission's experience, reliance on these financial records often results in under-reporting or reporting in codes that may not actually be descriptive of the products or services provided. To address this issue, the Commission proposes requiring individuals familiar with the business operations of each operating company (or subdivision) to review the available NAICS codes to select the codes that would best describe the full line of products and services related to U.S. operations, regardless of whether the company tracks revenue by such codes in the ordinary course of business or relies on them for other reporting requirements. The Commission intends for this change to shift the collection of NAICS codes from how a company records revenue to align more closely with the full range of products and services offered. Because the Commission proposes to eliminate the requirement to specifically quantify the amount of revenue attributable to the codes, as described above, the Commission does not anticipate that this change will substantially increase the burden of collecting the information. Further, codes related to non-manufacturing activities estimated to have generated less than $1 million in the last fiscal year would not need to be listed, unless they overlap with a code reported by the other filing person.

Additionally, the Commission recognizes that some NAICS codes are imprecise, which can result in two filing persons engaged in similar businesses using different NAICS codes. Therefore, the Commission proposes that if more than one code might be appropriate, the filing persons would be required to list all the codes that describe the products or services offered and use end notes as needed to clarify selections and any potential overlap where the same revenues are reported in more than one NAICS code. This would assist the Agencies in understanding the businesses of the filing persons during the initial waiting period and address some of the shortcomings of NAICS code reporting.

Third, the Commission proposes changing how NAICS codes should be organized. Currently, filing persons

must aggregate revenue across all entities within the acquiring person or acquired entity. But often the acquiring person or acquired entity comprises multiple operating companies or units, which may be engaged in multiple lines of business. For example, large companies can contain multiple operating units or subsidiaries that do business under separate brands and offer diverse products or services. Similarly, funds that file as acquiring persons may control many different operating companies. The Commission thus proposes to require acquiring persons and acquired entities with more than one operating company or unit to identify which entity(s) derives revenue in each code. This proposed requirement would facilitate efficient review and quickly identify the operating company(s) that may or may not be relevant to the antitrust analysis. From this information, the Agencies could quickly identify which entity within the filing person has competing or related business activities with the other filing party.

Fourth, the Commission proposes requiring the reporting of certain NAICS codes for certain pipeline or pre-revenue products. Currently, filers are not required to provide information about products or services that did not derive revenue in the last fiscal year. Yet these pre-revenue or early revenue activities are often core to the transaction rationale and essential to understanding the potential competitive impact of the transaction during the initial waiting period. This information is known to the filing person and is not available from other sources, as it is typically highly sensitive. As a result, the Commission proposes adding a requirement for acquiring and acquired persons to report NAICS codes for certain pipeline or pre-revenue products. The acquiring person would be required to identify any NAICS codes for products and services under development if those codes would overlap with the codes for current or known pipeline products or services of the acquired entity(s). The acquired person would identify the NAICS codes that would apply to the products or services of the acquired entity(s) that are under development or pre-revenue and anticipated to have annual revenue totaling more than $1 million within the following two years. The Commission believes the benefit to the Agencies would be substantial and anticipates that the burden associated with the collection of these codes would be minimal, as identification of these products and services would likely be

completed during ordinary diligence. The Commission understands that the acquired person may have limited knowledge about the planned or under-development products of the acquiring person and does not intend the filing persons to divulge this information for the purpose of making an HSR Filing.

Fifth, the proposed NAICS code section would clarify that the acquired person must report the NAICS codes relevant to the acquired entity(s) at the time of closing. While most filers currently report in this manner, others have asserted that when an acquired entity is merely a shell at the time of the HSR Filing due to anticipated pre-consummation reorganization, no NAICS codes are required. This is not the intent of the revenue reporting requirements in the current Form, and the Commission proposes clarifying this issue by requiring NAICS reporting that reflects the operations of the acquired entity(s) upon consummation. This would provide clarity and make NAICS code reporting more reliable for both filing persons and the Agencies.

Finally, the Commission proposes eliminating the requirement for filing persons engaged in manufacturing to provide revenue by NAPCS-based codes. The requirement to allocate revenue to product codes dates from the promulgation of the Rules in 1978 and has been updated to reflect various product code formats implemented by Census over the years. The most recent Census industry code format is the 6-digit NAICS format.[51] Initially, Census also created 10-digit NAICS-based codes to provide more detail about the products within the 6-digit NAICS industry codes, and these were adopted by the Commission for use in HSR Filings in 2001.[52] In 2018, Census discontinued the use and updating of 10-digit NAICS-based codes in favor of 10-digit NAPCS-based codes. As a result, in 2019, the Commission amended the Form and Instructions to require use of the NAPCS-based codes for manufactured products.[53]

However, these new NAPCS-based codes have been less useful for the Agencies' analysis than the discontinued 10-digit NAICS-based codes and have created significant confusion for both filers and the Agencies. The NAICS-based system provided 6, 8, and 10-digit codes, with the description of the products becoming more precise as the number of

---

[51] NAICS Codes were first published in 1997 and first used in the HSR Form in 2001. *See* 66 FR 23561 (May 9, 2001).

[52] 66 FR 35541 (July 6, 2001).

[53] 84 FR 30595 (June 27, 2019).

digits in the code increased. But the 10-digit NAPCS-based codes created by Census correspond to a combination of former 8-digit and 10-digit NAICS-based manufactured product codes. As a result, some parties inadvertently report revenue using a NAPCS code that corresponds to an 8-digit NAICS code. When this happens, the Agencies lack the more granular and descriptive nature of the NAPCS-based codes that correlate to the former 10-digit NAICS-based code that would allow the Agencies to more accurately identify mergers of companies that produce similar types of products. Additionally, when one filing party uses a NAPCS-based code that corresponds to an 8-digit NAICS-based code and the other filing person uses a NAPCS-based code that corresponds to a 10-digit NAICS-based code, the filing may not properly capture codes in which both parties report revenues. This could result in filings that should report revenue overlap code(s) but do not, limiting the Agencies' ability to rely on the codes to conduct an initial screen for competitive overlaps.

Because the proposed Horizontal Overlap section of the proposed Instructions would require the identification of overlapping products or services, as discussed in III.D.2., the Commission believes that additional identification of products by NAPCS code would no longer be necessary. The elimination of NAPCS-based revenue reporting would lessen the burden on filers to collect and report these figures, which have become less useful to the Agencies as a tool for identifying horizontal overlaps.

4. Controlled-Entity Overlaps

The Commission proposes creating a Controlled-Entity Overlaps section within the proposed Instructions. This section would continue to require the submission of information currently required by Item 7 of the Form, such as the identification of certain entities within the filing person that derive revenue in the same NAICS codes as the other filing person and geographic information regarding the operations and sales of such entities, but the Commission proposes certain changes to what information would be collected and reported. As explained below, specific information related to entities controlled by the filing person is critical to the Agencies' initial antitrust review as it serves as the primary tool for identifying horizonal overlaps between the parties to the transaction and their controlled entities, especially for transactions involving a UPE with complex corporate structures and

multiple entities under its control. Compared to the current HSR Form, this proposed section would: (i) add a requirement to provide the name(s) by which entities have done business within the last three years, (ii) require the filing person to identify the overlapping entity within its own person, rather than the other filing person, (iii) update the NAICS codes that require geographic reporting at the street address level, (iv) require the identification of locations of franchisees for certain NAICS codes, and (v) add a requirement to provide geolocation data.

a. NAICS Overlaps of Controlled Entities

The Commission proposes that the new Controlled-Entity Overlaps section include the information currently required by Item 7(a), which requires the identification of the overlapping NAICS codes for the acquiring person (or an associate) and acquired entity, and Item 7(b), which requires the identification of the entities that derived revenue in overlapping NAICS codes within the UPE of the other filing person and, for the acquiring person, its associates. The Commission understands that filing persons often do not identify for the other filing person the entities that report in overlapping NAICS codes. Therefore, the Commission believes that it would be less of a burden for each filing person to only report entities within its own person that derive revenue in the overlapping NAICS codes. The Commission thus proposes requiring the acquiring person to identify the entity(s) within its own person that has operations in the same NAICS code as the acquired entity(s), and for the acquired person to identify the entity(s) within the acquired entity(s) that has operations in the same NAICS codes as the acquiring person. This proposed change would refine NAICS code reporting to provide the Agencies with a reliable source for identifying whether any entity within each filing person generates revenues in the same or related codes. As this information, unlike the current information required by Item 7(b), is known to the filing parties, the Commission anticipates that the burden of responding to this request will be diminished.

The Commission proposes two additional changes to the current requirements of Item 7(b). First, the Commission proposes requiring the identification of "doing business as" or "formerly known as" names used within the last three years by entities with U.S. operations in overlapping NAICS codes. This information would

allow the Agencies to more efficiently collect information about the overlapping entities in publicly available resources during the initial waiting period by connecting each entity with any name by which it is known to other market participants. This information is known to filers and limited to a three-year look back period.

In addition, the Commission proposes that filing persons be required to identify the entity(s) that have U.S. operations in the overlapping NAICS code(s). For acquiring persons, this would include entities controlled by associates that have U.S. operations in a NAICS code in which the acquired entity(s) report. Currently some filers voluntarily match the overlapping NAICS codes to the entities within the acquiring person (or its associates) or acquired entity. In the Commission's experience, this information aids the Agencies in quickly identifying the entities within the filing person that may be relevant to the competitive analysis during the initial waiting period.

b. Geographic Market Information

The Commission proposes creating a Geographic Market Information section to collect the information currently required by Items 7(c) and 7(d) of the Form, which require, for each overlapping NAICS code, the identification of geographic markets where the entities controlled by the acquiring person (and its associates) and the acquired entity(s) do business. The Commission proposes to modify these requirements by updating the NAICS industries in which street-level reporting is required, requiring geolocation information for these addresses, and requiring the reporting of franchisees' locations.

The Commission periodically reviews which NAICS codes require more granular street, city, and state address information and which NAICS codes need only be reported at the state level.[54] Recognizing the burden that providing the street-level address for each location of an entity can require, the Commission differentiates between (1) NAICS industry codes that either do not tend to involve small local or regional markets or involve local markets but nonetheless can adequately be reviewed if the parties specify only the state in which revenue is derived, and (2) those which do tend to involve local markets for which knowing the areas served by each filing person is important to identify locations where

---

[54] *See, e.g.,* 75 FR 57110 (Sept. 17, 2010), adopted by 76 FR 42471 (July 19, 2011).

both parties compete for sales (*i.e.,* geographic overlaps). As part of this proposed rulemaking, the Agencies have reviewed the list of NAICS industries for which such street-level information is required and have adjusted the list of sectors which, based on their experience, require more granular geographic information than state-level information. The Commission thus proposes updating the list of NAICS codes for which locations need only be identified at the state level and NAICS codes for which street-level information would be required.

The Commission proposes removing the Nondepository Credit Intermediation NAICS codes (codes beginning with 5222) from the list of codes for which street-level information is required. In the Agencies' experience, these industries tend not to be locally focused. Therefore, for these codes, the Commission proposes requiring filing persons to list only the states within which they conduct operations, rather than street address as is now required. This proposal should reduce the burden on those filing persons who report sales in these NAICS codes.

The Commission proposes that filers be required to provide street-level reporting for the following additional codes (codes with asterisks indicate that all NAICS codes that begin with the preceding numbers are included).

113*** Forestry and Logging
2211** Electric Power Generation, Transmission and Distribution
2212** Natural Gas Distribution
3115** Dairy Product Manufacturing
311611 Animal (except Poultry) Slaughtering
311613 Rendering and Meat Byproduct Processing
311615 Poultry Processing
31181* Bread and Bakery Product Manufacturing
321*** Wood Product Manufacturing
32221* Paperboard Container Manufacturing
324*** Petroleum and Coal Products Manufacturing
325110 Petrochemical Manufacturing
325130 Synthetic Dye and Pigment Manufacturing
325180 Other Basic Inorganic Chemical Manufacturing
325193 Ethyl Alcohol Manufacturing
325194 Cyclic Crude, Intermediate, and Gum and Wood Chemical Manufacturing
325199 All Other Basic Organic Chemical Manufacturing
325211 Plastics Material and Resin Manufacturing
3271** Clay Product and Refractory Manufacturing
3272** Glass and Glass Product Manufacturing
327310 Cement Manufacturing
327390 Other Concrete Product Manufacturing

42331* Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers
42333* Roofing, Siding, and Insulation Material Merchant Wholesalers
42344* Other Commercial Equipment Merchant Wholesalers
42345* Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers
42346* Ophthalmic Goods Merchant Wholesalers
42349* Other Professional Equipment and Supplies Merchant Wholesalers
4239** Miscellaneous Durable Goods Merchant Wholesalers
4241** Paper and Paper Product Merchant Wholesalers
4242** Drugs and Druggists' Sundries Merchant Wholesalers
42441* General Line Grocery Merchant Wholesalers
42442* Packaged Frozen Food Merchant Wholesalers
42451* Grain and Field Bean Merchant Wholesalers
42452* Livestock Merchant Wholesalers
4247** Petroleum and Petroleum Products Merchant Wholesalers
42448** Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers
42491* Farm Supplies Merchant Wholesalers
42495* Paint, Varnish, and Supplies Merchant Wholesalers
44911* Furniture Retailers
493*** Warehousing and Storage
54138* Testing Laboratories and Services
54194* Veterinary Services
562*** Waste Management and Remediation Services
7132** Gambling Industries
71394* Fitness and Recreational Sports Centers

These are codes that represent industries in which the Agencies often determine that competition occurs on a local or regional basis. For those codes that represent regional competition, the Commission believes that there would be few individual addresses that would need to be provided, and therefore the burden would not be significantly higher than reporting the overlaps at the state level. The Commission acknowledges that for those industries where competition occurs on a very localized level, for example where customers travel to the company's location to purchase goods or services, providing street-level revenue information can be challenging. However, because businesses often face different competitors in each of these markets, the Agencies have learned that businesses often track sales at the local level in the ordinary course of business for these sectors. Knowing where within a state the filer's facilities are located is an important screening tool for the Agencies to quickly identify existing and potential geographic overlaps, and that benefit justifies requiring street-level reporting for these NAICS codes.

Providing the Agencies with information to screen for geographic overlaps during the initial waiting period also benefits filing persons by reducing need to issue Second Requests to determine if there are such overlaps.

The Commission recognizes that providing the street address of tens, hundreds, or, in certain cases, thousands of locations can impose a burden on filers. Therefore, the Agencies have reviewed the NAICS codes closely to identify only those codes for which the Agencies would most benefit from street-level information. For these transactions that require more than a cursory review, attempts to collect this information from the parties during the initial waiting period slows down the review and delays the decision on whether an in-depth investigation of the transaction is needed. Further, the Commission believes that such information should be available in an accessible manner for most businesses that have a large number of facilities. Nonetheless, the Commission welcomes comments that identify, with rationales, NAICS codes that should either be added to or deleted from the list of codes for which state-level information is required.

The Commission also proposes requiring filers to report latitude and longitude information for street addresses so that the Agencies can easily and quickly use that information to populate mapping software and create maps to better identify possible geographic overlaps between the acquiring person and the acquired entity. Street addresses alone can be inadequate or inaccurate for isolating the exact location of facilities. Converting street addresses to coordinates is difficult due to abbreviations such as BLVD or ST, and street addresses often lack important information, such as South or North, or contain errors, such as mislabeling a Street address for an Avenue. Latitude and longitude information is unique, which reduces the likelihood of errors. Any errors in generating maps displaying the locations of the relevant facilities may affect screening for local markets, resulting in over- or under-identification of geographic overlaps. Since filing persons are familiar with the location of their own establishments, the Commission believes that they would be in best position to validate the accuracy of the locations through more precise latitude and longitude reporting.

The Commission also proposes requiring filers to list locations where franchisees of the acquiring or acquired person (as appropriate) generate revenue

in overlapping NAICS codes that require street-level reporting. Currently, there is no information submitted with the Form that allows the Agencies to begin this analysis for companies that do business through franchisees. Yet all company locations at issue in the transaction that generate revenues, both directly and indirectly through franchisees, must be accounted for when the Agencies analyze the existence and extent of competition between the filing persons. These proposed changes would provide the Agencies with all company locations to begin assessing geographic overlaps during the initial waiting period. Because franchisors must approve the location of franchisee operations and get regular sales reports from those operations, the Commission believes filers with these relationships will have this information about their franchisees.

### 5. Minority-Held Entity Overlaps

The Commission proposes creating a Minority-Held Entity Overlaps section within the proposed Instructions that would amend certain information that is currently required by Item 6(c) of the Form. Item 6(c) currently requires filing persons to list all of the entities in which the acquiring person and associates of the acquiring person, or the acquired entity (as appropriate), holds a minority interest of 5% or more. As originally proposed by the Commission in 2010, this item was intended to focus on only those minority-held investments that provide products or services that report in the same NAICS code as the other filing person, but in the final version of the rule, in order to limit burden, the Commission permitted filers to list all minority-held companies rather than limiting the list to those that created a NAICS code overlap.[55] However, in the Agencies' experience with information collected in Item 6(c), permitting parties to list all minority-held companies instead of only those that are in the same line of business or NAICS code has hindered the Agencies' ability to determine which entities may be relevant to the competitive analysis of the transaction during the initial waiting period. Unlike the filing persons, which have likely done diligence on the companies in which they invest, the Agencies have no basis to determine from the entire list of minority-held companies which ones have competitively significant relationships with the other filing person as this information is not available from any other source.

The Commission thus proposes eliminating the option to list all the minority-held entities of the acquiring person and its associates or acquired entity (as appropriate) and proposes once again to require identification of those that, to the filing person's knowledge or belief, would derive revenue in the same NAICS codes or have operations in the same industry as the other filing person. The Commission also proposes requiring filers to provide the names by which the listed entities do business. As noted above, the d/b/a or f/k/a names of the businesses are especially helpful to the Agencies in conducting additional research about the entities using public or third-party sources. These proposed changes would significantly assist the Agencies in determining which minority-held entities may be relevant to the competitive analysis of the transaction during the initial waiting period. In the Agencies' experience, there has been an increase in the number and type of companies in which the acquiring person and acquired entity have minority investments, and where they exist, understanding the business lines of these related companies can be important for determining any significant premerger competitive relationship between the filing persons that may be affected by the transaction. This is especially true where the important competitive relationship is not at the UPE level but arises from within the corporate structure or holdings of the filing persons. While the Commission recognizes that investors have more limited information regarding entities in which only a minority interest is held, the proposed Instructions would continue to permit filing persons to rely on their knowledge or belief. The Commission believes that filers have done some level of diligence to determine the business lines prior to investing in these entities, and should have some basis to identify overlaps.

### 6. Prior Acquisitions

The Commission proposes creating a Prior Acquisitions section within the proposed Instructions that would include the information currently required by Item 8 of the Form, as well as additional information. At present, Item 8 requires the acquiring person to identify all NAICS codes in which the acquiring person derived $1 million or more in revenue and the acquired entity(s) or assets also derived $1 million or more. For such codes, the acquiring person is required to report acquisitions made within the five years prior to filing that (i) resulted in control of entities that had net sales or total

assets of greater than $10 million in the year prior to acquisition, or (ii) was an acquisition of assets valued at or above the statutory size-of-transaction threshold. The Commission proposes expanding the scope of prior acquisitions that would be identified and making the requirement applicable to the acquired entity as well.

Information about prior acquisitions has always been important for the Agencies, allowing them to identify strategies to gain market share through acquisitions rather than internal expansion or more vigorous competition. Filers have been required to provide information about prior acquisitions from the beginning of the premerger notification program.[56] This information can be especially important in sectors where acquisitions are typically not HSR-reportable but nonetheless can cause competitive harm and alter the market dynamics for the reported transaction.[57] The Agencies have taken steps to address concerns about acquisition strategies that premerger review does not routinely capture. For instance, when the Commission identifies a company that has violated Section 7 and is engaging in a strategy of rolling up competitors, if it is likely that future acquisitions may not require an HSR Filing, the Commission may order the firm to provide prior notice or obtain prior approval for any future non-reportable acquisition.[58]

As the minimum threshold for making an HSR Filing has been adjusted over time (in accord with changes in gross national product)[59] from $50 million to its current $111 million, many acquisitions do not require premerger

---

[55] 75 FR 57110 (Sept. 17, 2010), adopted by 76 FR 42471 (July 19, 2011).

[56] 43 FR 33450, 33534 (July 31, 1978).

[57] See Press Release, Fed. Trade Comm'n, FTC Takes Second Action Against JAB Consumer Partners to Protect Pet Owners from Private Equity Firm's Rollup of Veterinary Services Clinics (June 29, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-takes-second-action-against-jab-consumer-partners-protect-pet-owners-private-equity-firms-rollup-of-veterinary-services-clinics.

[58] See Press Release, Fed. Trade Comm'n, FTC Imposes Strict Limits on DaVita Inc.'s Future Mergers Following Proposed Acquisition of Utah Dialysis Clinics (Oct. 25, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-imposes-strict-limits-davita-incs-future-mergers-following-proposed-acquisition-utah-dialysis; Press Release, Fed. Trade Comm'n, FTC Orders the Divestiture of Hundreds of Retail Stores Following 7-Eleven, Inc.'s Anticompetitive $21 Billion Acquisition of the Speedway Retail Fuel Chain (June 25, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-orders-divestiture-hundreds-retail-stores-following-7-eleven-incs-anticompetitive-21-billion.

[59] Section 7A(a)(2) of the Act requires the FTC to revise thresholds annually based on the change in gross national product, in accordance with 15 U.S.C. 19(a)(5).

notification, especially in certain sectors.[60] A recent Commission study revealed that five of the largest technology companies in the United States completed 819 acquisitions that were not reported to the Agencies over a ten-year period from 2010–2019.[61] The Commission has thus identified a need to know more during the initial waiting period about prior acquisitions that may raise concerns about the filings parties' acquisition or roll-up strategies.[62]

Acquisitions of small companies can cause harm, including in sectors where competition occurs on a local level. When the Agencies determine that a firm is violating Section 7 through a pattern of serial acquisitions that fuels consolidation by eliminating local competitors, they can seek to prevent future violations but this is often insufficient to prevent widespread harm.[63] A pattern of serial acquisitions may also affect competition among innovative firms by consolidating innovation efforts into the hands of market leaders or other firms attempting to control the pace or direction of innovation.[64] A history of acquisitions in the same or related business lines may be especially important information where market boundaries are fluid and firms engage in a significant number of nonreportable transactions. This is potentially true of both the acquiring person and the acquired entity. The Agencies endeavor to identify such strategies [65] but need more robust tools for identifying firms that are engaging in a strategy of consolidation through transactions that may violate Section 7.

Thus, the Commission proposes several changes to expand the requirements for information related to prior acquisitions beyond what is currently required by Item 8. First, the Commission proposes requiring both the acquiring person and the acquired entity to provide information about prior acquisitions. The purpose of collecting information on all prior acquisitions by both filers is to assist the Agencies in identifying a potential pattern of acquisitions in a particular industry that has contributed to a trend toward concentration or vertical integration that affects the competitive dynamics for the parties to the transaction, as well as the commercial realities of post-merger competition.[66]

Second, the Commission proposes extending the time frame to report on prior acquisitions from five to ten years because the current five-year requirement for prior acquisitions is often insufficient to meaningfully identify patterns of serial acquisitions or a trend toward concentration or vertical integration. In 1987, the Agencies changed the reporting time period from ten years to five years.[67] At the time, it was thought five years reporting of past acquisitions would be sufficient to put the Agencies on notice of possible trends towards consolidation in the affected industries.[68] But based on decades of experience since then, along with changes to the economy and the varied acquisition strategies of filing parties, the Commission believes ten years would once again provide for a better framework to allow the Agencies to engage in a more detailed consideration of how numerous past acquisitions, including those in related sectors, affect the competitive landscape of the current transaction under review.

Third, the Commission proposes eliminating the threshold for listing prior acquisitions, which currently limits reporting to only acquisitions of entities with annual net sales or total assets greater than $10 million in the year prior to the acquisition. Limiting the reporting requirement to acquisitions of entities with annual net sales or total assets over $10 million may not capture acquisitions of new entrants or other nascent competitors that, despite not yet having widespread commercial success, nonetheless are poised to affect competition among existing firms or disrupt market dynamics. In fact, the Commission's technology acquisition study revealed that between 39.3% and 47.9% of transactions were for target entities that were less than five years old at the time of their acquisition.[69] Given the relative nascency of these acquired companies, the Commission believes that excluding prior acquisitions of firms that have not yet had the chance to gain commercial traction to achieve $10 million in net sales or assets does not provide a comprehensive picture of each filer's acquisition strategy. Learning more about the existence and patterns of these additional past acquisitions by both the acquiring person and the acquired entity, including acquisitions of companies that had not yet generated revenue, would help the Agencies better identify during the initial waiting period transactions that may, on their own or as part of a pattern of serial acquisitions, violate the antitrust laws.

Fourth, the Commission proposes treating asset transactions involving the prior acquisition of substantially all of the assets of a business in the same manner as prior acquisitions of voting securities or non-corporate interests. Currently, Item 8 provides separate thresholds for acquisitions of control of entities and acquisitions of assets. This distinction, however, does not recognize that some asset transactions functionally reflect the acquisition of substantially all of the assets of an entity as opposed to the acquisition of a distinct asset such as a manufacturing plant or an exclusive license. Thus, the current rule treats acquisitions of an entity or business differently depending on the form of the agreement. The proposed Instructions would continue to require that the acquisition of a distinct asset be reported only if the then-in-place size-of-transaction threshold was exceeded, but they would also require that a prior acquisition involving substantially all of the assets be reported in the same manner as prior acquisitions involving

---

[60] See e.g., Thomas Wollmann, *How to Get Away With Merger: Stealth Consolidation and its Real Effects on US Healthcare* (Nat'l Bureau of Econ. Rsch., Working Paper 27274, 2021); Thomas Wollmann, Stealth Consolidation: Evidence from an Amendment to the Hart-Scott-Rodino Act, 1 Am, Econ, Rev.; Insights 77, (2019).

[61] Fed. Trade Comm'n, Non-HSR Reported Acquisitions by Select Technology Platforms 10–11 (2021).

[62] See, e.g., Gerry Hansell, Decker Walker, and Jens Kengelbach, "Lessons from Successful Serial Acquirers: Unlocking Acquisitive Growth," Boston Consulting Group (Oct. 1, 2014), *https://www.bcg.com/publications/2014/mergers-acquisitions-unlocking-acquisitive-growth;* Thomas Wollmann, Stealth Consolidation: Evidence from an Amendment to the Hart-Scott-Rodino Act, 1 Am, Econ, Rev.; Insights 77, (2019).

[63] Paul J. Eliason et al., *How Acquisitions Affect Firm Behavior and Performance: Evidence from the Dialysis Industry,* 135 Q. J. ECON. 221, 235 (2020). See Press Release, Fed. Trade Comm'n, FTC Imposes Strict Limits on DaVita Inc's Future Mergers Follow Proposed Acquisition of Utah Dialysis Clinics (Oct. 25, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-imposes-strict-limits-davita-incs-future-mergers-following-proposed-acquisition-utah-dialysis. See also* Martin Gaynor, Kate Ho, and Robert J Town, *The industrial organization of health-care markets,* J. of Econ. Literature, 53(2):235–284 (2015); Cory Capps, David Dranove, and Christopher Ody, "Physician Practice Consolidation Driven By Small Acquisitions, So Antitrust Agencies Have Few Tools To Intervene," Health Affairs (Sept. 1, 2017), *https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2017.0054.*

[64] Colleen Cunningham, Florian Ederer, and Song Ma, *Killer Acquisitions,* 129 J. of Pol. Econ., 649–702 (2021), *https://ssrn.com/abstract=3241707.*

[65] See e.g., Note by the United States, *Start-ups, killer acquisitions and merger control,* OECD DAF/COMP/WD (2020)23 (June 11, 2020), *https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/oecd-killer_acquisitions_us_submission.pdf.*

[66] 43 FR 33534 (July 31, 1978).

[67] 50 FR 38742, 38768 (Sept. 24, 1985).

[68] Id.

[69] Fed. Trade Comm'n, Non-HSR Reported Acquisitions by Select Technology Platforms 26 (2021). Note this percentage range could also be different (*i.e.,* lower or higher) as target entities in 13.4% of the transactions did not have founding dates located in the three databases.

**42204** **Federal Register** / Vol. 88, No. 124 / Thursday, June 29, 2023 / Proposed Rules

voting securities or non-corporate interests.

While the Commission expects that the expanded reporting requirements of past acquisitions would create additional burden for filing parties, the proposed Instructions would continue to limit the reporting to only acquisitions in industries for which the filers have reported horizontal overlaps, as identified by overlapping NAICS codes or in the filer's Horizontal Overlaps Narrative. This limitation still provides the Agencies with sufficient information to identify transactions that may further a trend toward concentration or patterns of acquisitions that may, alone or in combination, substantially lessen competition. Moreover, given the difficulties in determining the value of small or nascent companies, the Commission believes it would be less burdensome for filers to report all acquisitions rather than expend additional time in assessing their value in terms of net sales or assets. The Commission invites comment on ways to limit the burden and exclude de minimis acquisitions of no competitive significance while still capturing acquisitions of entities worth less than $10 million and allowing the Agencies to conduct a robust screening for acquisition strategies that further consolidation trends.

*E. Additional Information*

1. Subsidies From Foreign Entities or Governments of Concern

As discussed in I.A. above, the 2022 Amendments direct the Commission, with the concurrence of the Assistant Attorney General, and in consultation with the Relevant Agencies, to require persons making an HSR Filing to disclose information about foreign subsidies from countries or entities that threaten U.S. strategic or economic interests. Along with the proposed definitions discussed above, the Commission proposes changes to the Instructions to implement this mandate from Congress.

The Commission proposes creating a Subsidies from Foreign Entities or Governments of Concern section within the proposed Instructions. This proposed section would include three questions. The first proposed question would track the requirements and stated purpose of the 2022 Amendments by requiring the acquiring and acquired person (as appropriate) to identify and describe certain subsidies, as defined by proposed § 801.1(r)(2), received or that are anticipated to be received by any entity within its person from a foreign entity or government of concern, as

defined by proposed § 801.1(r)(1). Given the complexity of subsidies, the Commission proposes stating that the question should be answered upon the knowledge or belief of the filing person. This would relieve the filing person of the obligation to conduct a complex legal analysis. The filing person, however, must conduct good faith diligence.

In proposing this question, the Commission believes it is also consistent with Congressional intent to create reasonable limits to the required information on subsidies to benefit both the Agencies and filing parties. The Commission's proposed two-year limitation would identify the subsidies most likely to affect the Agencies' competitive analysis of a proposed transaction because those subsidies are most likely to affect current or future conduct of the parties. The Commission believes that this practical qualifier, coupled with the use of an existing definition of "subsidy," as discussed in I.A.2. above, would provide the Agencies with the most pertinent information for the analysis of proposed transactions, while reasonably limiting the information required from filing parties. The Commission seeks comment on the temporal limitation for subsidies, as well as whether a de minimis value should be set, and if so, what administrable levels might be appropriate.

The Commission believes that requiring information on countervailing duties [70] would be extremely useful in providing a complete picture of the potential impact of subsidies per Congress's mandate and screening for subsidies that bear on whether the transaction may violate the antitrust laws. Thus, the Commission's second proposed question would require the acquiring or acquired person (as appropriate) to identify any of its products produced in a country that is a covered nation under 42 U.S.C. 18741(a)(5)(C) that are subject to countervailing duties in any jurisdiction. The Commission would also ask the filing party to list the countervailing duty imposed and the

jurisdiction that imposed the duty. Such information about the countervailing duties and relevant products would help the Agencies determine in their initial analysis of a transaction whether subsidies from foreign entities or governments of concern might affect some aspect of competition in the future. The Commission believes that information about countervailing duties imposed by the United States should be readily available to filers because the Department of Commerce issues fact sheets that contain an overview of final subsidy findings and are available on its "recent case announcements" web page (*https://www.trade.gov/case-announcements-archives* (case announcements for the prior year)) and on the International Trade Commission's website (*https://legacy. trade.gov/enforcement/operations/ scope/index.asp* (older determinations)), and that information about countervailing duties imposed by other jurisdictions should be readily available to filing persons from similar sources as well.

The Commission's third proposed question would require the acquiring or acquired person (as appropriate) to identify, to its knowledge or belief, any of its products produced in whole or in part in a country that is a covered nation under 42 U.S.C. 18741(a)(5)(C) that are the subject of an investigation by any jurisdiction for potential countervailing duties. The Commission would also ask the filing person to list the jurisdiction conducting the investigation. Such information would help the Agencies identify products that may be subject to active subsidies and assist the Agencies in their assessment of the subsidies' impact on competition. It is the Commission's understanding, however, that the investigating agencies do not always inform all producers or market participants of an investigation; thus, the Commission proposes limiting the scope of this third question to the filing person's knowledge or belief. The Commission believes that limiting this reporting requirement to the knowledge or belief of the filing person would provide filers with enough flexibility to respond to the question and certify the HSR Filing without having to confirm with various relevant agencies that no such investigation exists.

The Congressional mandate to collect information about foreign subsidies is consistent with the Agencies' desire to better understand whether there are significant ties to individuals or entities that may affect the Agencies' assessment of the potential competitive risks associated with the transaction. For instance, a foreign government or entity

---

[70] Countervailing duties are duties intended to offset the price effect of significant foreign government subsidies on a product or good. In the United States, the International Trade Administration of the Department of Commerce investigates whether imported products are subject to significant foreign government subsidies. The amount of the subsidies that the foreign producer receives from its government is the basis for the rate by which the subsidy is offset, or "countervailed," through higher import duties enforced by U.S. Customs and Border Protection. *See, e.g.,* Int'l Trade Admin., *https://www.trade.gov/us-antidumping-and-countervailing-duties.*

could have a financial relationship that gives it the ability to sway the filing person to make different choices in the marketplace than it would without the subsidy. As discussed in III.B., Agencies would benefit from more complete information about individuals and entities, including governments, that have the ability to control or influence competitive decision making. The Commission believes that, taken together, information about minority holdings, individuals with influence, officers, directors, and board observers, as well as information about foreign subsidies may reveal significant constraints on the competitiveness of the affected company that should be taken into account during the Agencies' initial review.

## 2. Defense or Intelligence Contracts

The Commission proposes creating a Defense or Intelligence Contracts section within the proposed Instructions that would require filing persons to report certain contracts with defense or intelligence agencies. The Agencies regularly review filings from companies that supply the Department of Defense ("DoD") or the intelligence community ("IC") with products or services. During the initial waiting period, it is important for the Agency to quickly contact DoD and IC staff to collect key insights and information to prevent mergers that may have an anticompetitive impact on taxpayers through purchases made through DoD and IC programs. Yet without information about specific DoD or IC contracts or knowledge of which unit handles that contract, the Agencies often face difficulty and delay in identifying appropriate relevant personnel or stakeholders with knowledge of the contracts, programs, or products or services at issue. Such delays hinder the identification and evaluation of competition issues that would impact DoD or IC programs or budget during the initial waiting period.

The Commission thus proposes adding a requirement that both the acquiring and acquired person identify whether they have existing or pending defense or intelligence procurement contracts, as defined by 10 U.S.C. 101(a)(6) and 50 U.S.C. 3033(4), valued at $10 million or more, and provide identifying information about the award and relevant DoD or IC personnel. For filings from companies that supply DoD or the IC with products or services, this information would greatly enhance the Agencies' ability to identify and contact appropriate stakeholders within DoD or IC to seek their input as customers that might be impacted by the proposed transaction. This information is well

known to the companies that do business with these government entities.

## 3. Identification of Communications and Messaging Systems

In conjunction with the proposed requirement that filing persons certify they have taken steps to prevent destruction of relevant information, as discussed in III.F. below, the Commission also proposes that filers identify and list all communications systems or messaging applications on any device used by the acquiring or acquired person (as appropriate) that could be used to store or transmit information or documents related to its business operations. Companies have increasingly been relying on new forms of communication—beyond email and other traditional document formats—to engage in business discussions and make key operational decisions. These systems can encompass internal chat technologies (such as so-called ephemeral messaging) or document management systems, including where content exchanged between the individuals is automatically deleted.

In the Agencies' experience, these communications systems contain highly relevant information on the transaction itself, as well as on topics that are critical for the Agencies' assessment of the transaction such as competition, competitors, markets, customers, and industry characteristics. Company employees' more frequent use of these communications systems and messaging applications, particularly in lieu of other traditional forms of communication such as email, has meant that these systems and applications have become an important part of Agencies' investigations. Moreover, to the extent that these communications systems are being used to evade document retention and preservation requirements that exist for more traditional forms of communication, the Commission believes it is important for the parties to understand that their preservation and retention obligations apply to these systems as well. As yet, many parties do not appear to fully understand and/or comply with document preservation obligations for these new modalities. For these reasons, the Agencies would greatly benefit from having a complete and transparent picture of the filer's applicable communication systems at the filing stage. The Commission further believes that this information is readily available to the filing person and that identifying these systems in use by the company with the HSR Filing would impose minimal burden.

## 4. Other Jurisdictions

The Commission proposes creating a new Other Jurisdictions section within the proposed Instructions. This section proposes to amend the requirements concerning antitrust filings outside of the United States and add a voluntary waivers section to allow for the sharing of HSR information with other enforcers.

### a. Transactions Subject to International Antitrust Notification

The Commission proposes creating a Transactions Subject to International Antitrust Notification section that would require the identification of other jurisdictions that may be conducting a competition review. Currently, page one of the Form asks filing persons to voluntarily identify other jurisdictions where the transaction will trigger premerger notification under the laws of that jurisdiction. The Commission first proposed collecting information about filing in other jurisdictions in 1994, when it proposed a mandatory requirement.[71] In 1999, the Commission noted that it was still considering the proposals included in its 1994 proposed rulemaking.[72] The Commission then proposed a voluntary requirement in 2001[73] and the final rule was adopted in 2003.[74] The Commission now proposes making the disclosure of international filing obligations a mandatory requirement.

Since 2001, and certainly since 1994, merger enforcement by other competition authorities has become more robust as more jurisdictions have adopted competition laws that impose mandatory or voluntary premerger notification requirements. At the same time, a larger percentage of HSR-reportable transactions now involve companies with international reach. As a result, more transactions are likely to be subject to review in multiple jurisdictions around the world. Even though the number of transactions subject to premerger notifications in multiple jurisdictions has increased over the years, most filers do not voluntarily disclose on the Form that their transactions will be subject to non-U.S. notification requirements.

For many years, the Agencies have cooperated with numerous competition authorities on cases of common concern to help identify issues of common interest, gain a better understanding of relevant facts, and achieve, where possible, consistent or, at a minimum,

---

[71] 59 FR 30545, 30547 (June 14, 1994).
[72] 64 FR 1203 (Jan. 8, 1999).
[73] 66 FR 8680, 8684 (Feb. 1, 2001).
[74] 68 FR 2425, 2429 (Jan. 17, 2003).

non-conflicting outcomes. In order to fully benefit from inter-agency consultations, the Agencies need to know which foreign jurisdictions may also be evaluating the proposed transaction as early as possible. The delay associated with confirming whether there will be reviews or investigations by other competition authorities undermines effective cooperation during the initial waiting period, when sharing expertise and knowledge with other competition enforcers would be especially helpful in identifying which transactions need more in-depth review. Moreover, review by other jurisdictions can often affect the timing, pace, or ability to close the transaction, especially for jurisdictions that also require suspension of the transaction until the competition review is completed.

The Commission thus proposes a mandatory requirement to identify the jurisdictions where each filing person has already filed or is preparing notifications to be filed as well as a list of the jurisdictions where it has a good faith belief it will file. The Commission believes that upon execution of a definitive agreement, filers often know the jurisdictions where competition filings will be made. However, to account for the possibility that, at the time of the HSR Filing, parties may not have yet identified all the other jurisdictions where they will file, the proposed rule provides flexibility by stating that parties should respond based on their "good faith belief."

b. Voluntary Waivers for International Competition Authorities and State Attorneys General

The Commission proposes the creation of a voluntary waivers check box within an Other Jurisdictions section to allow filing persons to indicate that they agree to waive the confidentiality provisions of the Act, 15 U.S.C. 18a(h), for any jurisdiction identified by the filing person. As discussed above, transactions are often reviewed by non-U.S. competition authorities, or by one or more State Attorneys General. But the Act's confidentiality provision contains limits on disclosing material collected as part of the Agencies' HSR review of the transaction. As a result, merging parties and third parties waive statutory confidentiality protections so that the investigating Agency can share certain limited information with foreign or state competition authority counterparts, enabling the Agency to make more informed, consistent decisions, and

investigate the transaction more effectively, often expediting review.[75]

The Commission proposes amending the Instructions to allow filing persons to waive the confidentiality provision contained in the Act, 15 U.S.C. 18a(h), for any non-U.S. competition authorities or State Attorneys General they identify. Allowing filers to waive the confidentiality protections in the HSR Filing would provide an efficient mechanism for filers to consent to limited waivers of confidentiality at the outset to facilitate early cooperation among competition enforcers. The proposed voluntary waiver would allow the Agencies to disclose the existence of an HSR Filing and the information contained in the HSR filing, but only for those ex-U.S. competition authorities or State Attorneys General selected by the filing person. The Commission also proposes modifying the language that would inform filers about potential disclosures based on the waivers to track the language of the Act more closely. The waivers would be optional for the parties, but the Commission expects that some filers will benefit from providing these limited waivers of confidentiality.

*F. Certification*

The Commission proposes amending the language of the certification that filing persons must submit with HSR Filings to require affirmation that the filing person has taken the necessary steps to prevent the destruction of documents and information related to the transaction. When parties submit premerger notification filings, this triggers a Congressionally mandated initial phase investigation regarding the potential competitive effects of the proposed transaction. When making an HSR Filing, filers should be aware that the Agencies may, prior to the expiration of the initial waiting period, issue Second Requests to further investigate the proposed transaction.[76] If issued, a Second Request requires the recipient to produce documents and information relevant to the transaction. If, as part of a filing person's ordinary course business operations, relevant information is deleted or destroyed

during the initial waiting period, this could lead to a loss of information that may be critical to the investigating Agency and undermine its ability to conduct a full in-depth investigation pursuant to the Act to determine if the transaction is likely to violate Section 7 or any other antitrust law and to seek to prevent its consummation. Therefore, the Commission proposes adding to the certification an acknowledgement that the Agencies may require the submission of additional information or documents in response to a Second Request and a confirmation that the officer, director, or other individual described in § 803.6, as appropriate, has taken the necessary steps to prevent the destruction of documents and information related to the proposed transaction before the expiration of any waiting period. Such steps could include, for example, the suspension of auto-delete policies in place at any entity within the filing person.

The Commission also proposes the addition of language in the Instructions that would serve to remind filers that there are criminal penalties under other federal statutes that prohibit various deceptive practices aimed at frustrating or impeding the legitimate functions of government departments or agencies. In recent years, the Agencies have observed an increasing number of instances where, in the course of an investigation or later litigation challenging the transaction, the filing parties disclaim or modify statements or information submitted as part of the Form, notwithstanding numerous federal laws that prescribe criminal penalties for submitting false information to the government, including as part of an HSR Filing. While the Commission's proposed language does not intend to change any existing obligation to comply with other laws, it would provide notice to filers that the Commission takes those obligations seriously and may refer filers who do not comply with those obligations for potential criminal proceedings. The Commission does not expect this proposed reminder, which does not require any additional information or obligation, to result in additional burden for filing persons.

*G. Affidavit*

As discussed in the proposed changes to § 803.5(b) above at II.C., the Commission proposes requiring filings for transactions without definitive agreements to include a term sheet or draft agreement that describes with specificity the scope of the transaction that would be consummated. As a result, the Commission proposes that

---

[75] The Agencies have developed a model waiver of confidentiality for use in civil matters involving non-U.S. competition agencies that has been in use for 10 years. Similarly, the Agencies have developed a protocol for coordination in merger investigations with State Attorneys General. *See* Fed. Trade Comm'n, *https://www.ftc.gov/policy/international/international-competition/international-waivers-confidentiality-ftc-antitrust-investigations* and *https://www.ftc.gov/advice-guidance/competition-guidance/protocol-coordination-merger-investigations.*

[76] 15 U.S.C. 18a(e); 16 CFR 803.20.

parties making such filings attest in their affidavit that a term sheet or draft agreement that describes with specificity the scope of the transaction that will be consummated has been submitted with the executed letter of intent or agreement in principle.

**Severability**

Section 803.90 provides that, if any provision of the Rules (including the Form) or the application of any such provision to any person or circumstances is held invalid, the other provisions of the Rules and their application to other persons or circumstances shall be unaffected. This severability (or separability) provision would apply to any modifications of the HSR Filing requirements that the Commission adopts as final after issuing this NPRM and considering the public comments received. If a regulatory provision is severable, and one part of the provision is invalidated by a court, the court may allow the other parts of the provision to remain in effect.[77] When analyzing whether a provision is severable, courts consider both (a) the agency's intent and (b) whether severing the invalid parts of the provision would impair the function of the remaining parts.[78] The Commission is not proposing any changes to the severability provision in § 803.90 but is confirming its intent that, if a court were to invalidate any of the HSR requirements, including any modifications that the Commission finalizes at the end of the rulemaking proceeding, the other requirements would remain in effect.

**Communications by Outside Parties to Commissioners and Their Advisors**

Written communications and summaries or transcripts of oral communications respecting the merits of this proceeding, from any outside party to any Commissioner or Commissioner's advisor, will be placed on the public record. *See* 16 CFR 1.26(b)(5).

**Paperwork Reduction Act**

Under the Paperwork Reduction Act of 1995 ("PRA"), 44 U.S.C. 3501 *et seq.*, federal Agencies must obtain approval from the Office of Management and Budget ("OMB") for each collection of information they conduct or sponsor. The term "collection of information" means agency requests or requirements that members of the public submit reports, keep records, or provide

information to a third party. 44 U.S.C. 3502(3); 5 CFR 1320.3(c). The current rule contains various provisions that constitute information collection requirements as defined by 5 CFR 1320.3(c), the definitional provision within OMB regulations implementing the PRA. 44 U.S.C. chapter 35. The existing information collection requirements in the HSR Rules and Form have been reviewed and approved by OMB (OMB Control No. 3084–0005). The current clearance expires on February 28, 2026. Because the rule amendments proposed in this NPRM would change existing reporting requirements, the Commission will submit this notice of proposed rulemaking and the associated Supporting Statement to OMB for review under the PRA.

*Increased Time Collecting Data for and Preparing an HSR Filing*

The proposed amendments are primarily changes to the information reported on the Notification and Report Form and do not affect the reportability of a transaction. Thus, the same number of filings projected for fiscal year 2023 in the most recent Supporting Statement submitted to OMB and also appearing in the associated **Federal Register** publication[79] will be used for these burden hour calculations.

Some of the proposed changes are intended to reduce the burden of filing. The Commission anticipates that the proposals to report NAICS codes in ranges rather than by specific dollar amount would reduce the burden on almost all filers. Additionally, the proposed change to eliminate the requirement for filers that derive revenue from manufacturing operations to report NAPCS code revenues is also anticipated to reduce the burden for those filers. Finally, the Commission also proposes to limit the reporting of minority investors of the acquired entity.

Some of the proposed changes offer clarifications to the current rules and are unlikely to change the burden on filers. These include the proposed changes to eliminate references to paper and DVD filings (§§ 803.2, 803.5, and 803.10) and to specifically discuss the commencement of the waiting period (§ 803.10).

Certain proposed changes would require the acquiring person to collect and report information that the Commission believes is held in the acquiring person's ordinary course of business records. These include proposed requirements for the acquiring

person to describe its own business(es); report minority investors in additional entities related to the transaction; disclose relationships with individuals or entities that provide credit, hold non-voting securities, have the right to appoint board observers, or have management agreements with entities related to the transaction; and to identify members of boards of directors. Once collected, the Commission anticipates that the burden associated with some of these proposals will lessen for subsequent filings by the same acquiring person, as the information would only need to be updated.

Many of the proposed changes would increase the burden on all filers. These include new document collection requirements to produce transaction-related documents from supervisory deal team members; business documents that relate to competition topics but were not produced specifically for the transaction; drafts of responsive documents; other agreements between the acquiring and acquired persons, and to log the request to which documents are responsive. Additionally, the proposed requirements to provide narratives regarding transaction rationale, diagrams of the transaction, and organizational charts for custodians of documents would be applicable to all filers.

Some of the proposed changes would significantly increase the burden on only certain filers. These include those filers whose businesses have existing horizontal, non-horizontal, or labor market overlaps or relationships, with the largest burden falling on filers whose transaction involves many such relationships; transactions that involve a large number of foreign language documents; filing persons or transactions that have a complex structure; transactions that are filed on letters of intent or agreements in principle; and filing persons that receive subsidies from foreign entities of concern.

PNO staff canvassed current Agency staff who had previously prepared HSR filings while in private practice to estimate the projected change in burden due to the proposed amendments to the Instructions. All have considerable experience with the HSR rules and with preparing HSR Filings for the types of transactions that are most likely to be affected by the proposed changes.

These experts were asked to estimate the incremental increase in time to prepare HSR Filings, for both the company and its outside counsel, taking into account that transactions range in complexity—from relatively simple transactions with no overlaps and few

---

[77] *See, e.g., Davis Cnty. Solid Waste Mgmt.* v. *EPA,* 108 F.3d 1454, 1459 (D.C. Cir. 1997).

[78] *Id.* at 1460.

[79] 88 FR 3413, 3414 (Jan. 19, 2023).

documents (such as ones only involving executive compensation or other stock purchases by an individual), to moderately complex transactions (such as a fund buying or selling a portfolio company with limited overlaps) to very complex (for example, a strategic acquisition by a large company that sells many overlapping products in competition with the seller). The ranges from canvassed officials estimated that the proposed changes would result in approximately 12 to 222 additional hours per filing, depending on the complexity of the filing at issue. In the past five years, approximately 45% of filings had reported overlaps. To estimate an average number of additional hours, the Commission conservatively assumes that 45% of the filings may require an additional 222 hours to prepare and 55% may require an additional 12 hours to prepare. Thus, the Commission estimates an average of 107 additional hours (rounded to the nearest hour) will be allocated to non-index filings.[80] Added to the current estimate 37 hours,[81] the total estimated hours would be 144 per filing.

*Net Effect*

The proposed Rule and Notification and Report Form changes only affect non-index filings [82] which, for FY 2023, the FTC projects will total 7,096. As described above, the Commission estimates that he amendments to the HSR Rules and Notification and Report Form would increase the time required to prepare responses for non-index filings, with an estimated net increase of 107 hours per filing. Thus, the total estimated additional hours burden is 759,272 (7,096 non-indexed filing × 107 hours/each).

Applying the revised estimated hours, 759,272, to the previous assumed hourly wage of $460 for executive and attorney compensation, yields approximately $350,000,000 in labor costs. The amendments are expected to impose either minimal or no additional capital or other non-labor costs, as businesses subject to the HSR Rules generally have or obtain necessary equipment for other business purposes. Staff believes that the above requirements necessitate ongoing, regular training so that covered entities stay current and have a clear understanding of federal mandates, but that this would be a small portion of and subsumed within the ordinary training that employees receive apart from that associated with the information collected under the HSR Rules and the corresponding Instructions.

*Request for Comments*

The Commission invites comments on: (1) whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) ways to minimize the burden of these information collections on respondents.

Comments on the proposed reporting requirements subject to PRA review by OMB should additionally be submitted to *www.reginfo.gov/public/do/ PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function. The *reginfo.gov* web link is a United States Government website produced by OMB and the General Services Administration (GSA). Under PRA requirements, OMB's Office of Information and Regulatory Affairs (OIRA) reviews Federal information collections.

**Regulatory Flexibility Act**

The Regulatory Flexibility Act, 5 U.S.C. 601–612, requires that the agency conduct an initial and final regulatory analysis of the anticipated economic impact of the proposed amendments on small entities, except where the Commission certifies that the regulatory action will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605. Because of the size of the transactions necessary to invoke an HSR Filing, the premerger notification rules rarely, if ever, affect small entities.[83] The 2000 amendments to the Act exempted all transactions valued at $50 million or less, with subsequent automatic adjustments to take account of changes in Gross National Product resulting in a current threshold of $111 million.

Further, none of the proposed amendments expands the coverage of the premerger notification rules in a way that would affect small entities. Accordingly, the Commission certifies that these proposed amendments will not have a significant economic impact on a substantial number of small entities. This document serves as the required notice of this certification to the Small Business Administration.

**Invitation To Comment**

You can file a comment online or on paper. For the Commission to consider your comment, we must receive it on or before August 28, 2023. Write "16 CFR parts 801–803—Hart-Scott-Rodino Coverage, Exemption, and Transmittal Rules, Project No. P239300" on your comment. Your comment—including your name and your state—will be placed on the public record of this proceeding, including, to the extent practicable, on the *https:// www.regulations.gov/* website.

Because of the agency's security screening, postal mail addressed to the Commission will be subject to delay. We strongly encourage you to submit your comment online through *https:// www.regulations.gov/*. To ensure the Commission considers your online comment, please follow the instructions on the web-based form.

If you file your comment on paper, write "16 CFR parts 801–803—Hart-Scott-Rodino Coverage, Exemption, and Transmittal Rules, Project No. P239300" on your comment and on the envelope, and mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610, (Annex H), Washington, DC 20580. If possible, please submit your paper comment to the Commission by overnight service.

Because your comment will be placed on the publicly accessible website, *https://www.regulations.gov/,* you are solely responsible for making sure that your comment does not include any sensitive or confidential information. In particular, your comment should not contain sensitive personal information, such as your or anyone else's Social Security number; date of birth; driver's license number or other state identification number or foreign country equivalent; passport number; financial account number; or credit or debit card number. You are also responsible for making sure your comment does not include any sensitive health information, such as medical records or other individually identifiable health information. In addition, your comment should not include any "trade secret or

---

[80] Clayton Act section 7A(c)(6) and (c)(8) exempt from the requirements of the premerger notification program certain transactions that are subject to the approval of other agencies, but only if copies of the information submitted to these other agencies are also submitted to the FTC and the Assistant Attorney General. Thus, parties must submit copies of these "index" filings, but completing the task requires significantly less time than non-exempt transactions that require "non-index" filings. The proposed changes would not require any additional information from indexed filings.

[81] 88 FR 3413, 3414 (Jan. 19, 2023).

[82] Id.

[83] *See* 13 CFR part 121 (regulations defining small business size).

any commercial or financial information which . . . is privileged or confidential,"—as provided in Section 6(f) of the FTC Act, 15 U.S.C. 46(f), and FTC Rule 4.10(a)(2), 16 CFR 4.10(a)(2)—including, in particular, competitively sensitive information such as costs, sales statistics, inventories, formulas, patterns, devices, manufacturing processes, or customer names.

Comments containing material for which confidential treatment is requested must be filed in paper form, must be clearly labeled "Confidential," and must comply with FTC Rule 4.9(c), 16 CFR 4.9(c). The written request for confidential treatment that accompanies the comment must include the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. *See* FTC Rule 4.9(b). Your comment will be kept confidential only if the General Counsel grants your request in accordance with the law and the public interest. Once your comment has been posted publicly at *https:// www.regulations.gov/*—as legally required by FTC Rule 4.9(b), 16 CFR 4.9(b)—we cannot redact or remove your comment, unless you submit a confidentiality request that meets the requirements for such treatment under FTC Rule 4.9(c), 16 CFR 4.9(c), and the General Counsel grants that request.

Visit the Commission's website, *www.ftc.gov,* to read this publication and the news release describing it. The FTC Act and other laws that the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. The Commission will consider all timely and responsive public comments that it receives on or before August 28, 2023. For information on the Commission's privacy policy, including routine uses permitted by the Privacy Act, *see https://www.ftc.gov/ site-information/privacy-policy.*

**List of Subjects in 16 CFR Parts 801 and 803**

Antitrust.

For the reasons stated in the preamble, the Federal Trade Commission proposes amending 16 CFR parts 801 and 803 as set forth below:

## PART 801—COVERAGE RULES

■ 1. The authority citation for part 801 continues to read as follows:

**Authority:** 15 U.S.C. 18a(d).

■ 2. Amend § 801.1 by adding paragraph (r) to read as follows:

### § 801.1  Definitions

\*    \*    \*    \*    \*

(r)(1) *Foreign entity or government of concern.* The term *foreign entity or government of concern* means: (i) An entity that is a foreign entity of concern as that term is defined in section 40207 of the Infrastructure Investment and Jobs Act (42 U.S.C. 18741(a)(5)); or

(ii) A government, or an agency thereof, of a foreign country that is a covered nation as that term is defined in section 40207 of the Infrastructure Investment and Jobs Act (42 U.S.C. 18741(a)(5)(C)).

(2) *Subsidy.* The term *subsidy* has the meaning given the term in Part IV of Title VII of the Tariff Act of 1930 (19 U.S.C. 1677(5)(B)).

## PART 803—TRANSMITTAL RULES

■ 3. The authority citation for part 803 continues to read as follows:

**Authority:** 15 U.S.C. 18a(d).

■ 4. Amend § 803.2 by:
■ a. Redesignating paragraph (a) as (a)(1) and adding paragraph (a)(2);
■ b. Removing paragraph (b)(1)(v); and
■ c. Revising paragraphs (e) and (f). The revisions and additions read as follows:

### § 803.2  Instructions applicable to Notification and Report Form.

(a)(1) The notification required by the act shall be filed by the preacquisition ultimate parent entity, or by any entity included within the person authorized by such preacquisition ultimate parent entity to file notification on its behalf. In the case of a natural person required by the act to file notification, such notification may be filed by his or her legal representative: *Provided however,* That notwithstanding §§ 801.1(c)(2) and 801.2 *of this chapter,* only one notification shall be filed by or on behalf of a natural person, spouse and minor children with respect to an acquisition as a result of which more than one such natural person will hold voting securities of the same issuer.

*Example:*
Jane Doe, her husband, and minor child collectively hold more than 50 percent of the shares of family corporation F. Therefore, Jane Doe (or her husband or minor child) is the "ultimate parent entity" of a "person" composed to herself (or her husband or minor child) and F; see paragraphs (a)(3), (b) and (c)(2) of § 801.1 *of this chapter.* If corporation F is to acquire corporation X, under this paragraph only one notification is to be filed by Jane Doe, her husband, and minor child collectively.

(2) Persons that are both acquiring and acquired persons should submit separate forms, one as the acquiring person and one as the acquired person,

following the appropriate instructions for each.

\*    \*    \*    \*    \*

(e) For documents required by item 4(b) of the Notification and Report Form, a person filing the notification may, instead of submitting a document, provide a cite to an operative internet address directly linking to the document, if the linked document is complete and payment is not required to access the document. If an internet address becomes inoperative during the waiting period, or the document is otherwise rendered inaccessible or incomplete, upon notification by the Commission or Assistant Attorney General, the parties must make the document available to the agencies by either referencing an operative internet address where the complete document may be accessed or by providing electronic copies to the agencies as provided in § 803.10(c)(1) by 5 p.m. on the next regular business day. Failure to make the document available, by the internet or by providing electronic copies, by 5 p.m. on the next regular business day, will result in notice of a deficient filing pursuant to § 803.10(c)(2).

(f) Filings must comply with all format requirements set forth at the Premerger Notification Office pages at *https://www.ftc.gov.* The use of any format not specified as acceptable, or any other failure to comply with the applicable format requirements, shall render the entire filing deficient within the meaning of § 803.10(c)(2).

■ 5. Amend § 803.5 by revising paragraphs (a)(1), (3) and (b) to read as follows:

### § 803.5  Affidavits required.

(a)(1) *Section 801.30 acquisitions.* For acquisitions to which § 801.30 of this chapter applies, the notification required by the act from each acquiring person shall contain an affidavit attesting that the issuer or unincorporated entity whose voting securities or non-corporate interests are to be acquired has received written notice delivered to an officer (or a person exercising similar functions in the case of an entity without officers) by email, certified or registered mail, wire, or hand delivery, at its principal executive offices, of:

\*    \*    \*    \*    \*

(3) The affidavit required by this paragraph must have attached to it a copy of the written notice received by the acquired person pursuant to paragraph (a)(1) of this section.

(b) *Non-section 801.30 acquisitions.* For acquisitions to which § 801.30 of

this chapter does not apply, the notification required by the act shall contain an affidavit attesting that a contract, agreement in principle, or letter of intent to merge or acquire has been executed, and further attesting to the good faith intention of the person filing notification to complete the transaction. If a definitive agreement is not provided, the affidavit must attest that a term sheet or draft agreement that describes with specificity the scope of the transaction that will be consummated has been submitted with the executed letter of intent or agreement in principle.

■ 6. Revise § 803.8 to read as follows:

### § 803.8  Foreign language documents.

Documentary materials or information in a foreign language required to be submitted at the time of filing a Notification and Report Form and in response to a request for additional information or documentary material must be submitted with verbatim English language translations. All verbatim translations must be understandable, accurate, and complete.

■ 7. Amend § 803.10 by revising paragraphs (c)(1)(i) and (ii) to read as follows:

### § 803.10  Running of time.

\*    \*    \*    \*    \*

(c)(1)(i) The date of receipt shall be the date of electronic submission if such date is not a Saturday, Sunday, a legal public holiday (as defined in 5 U.S.C. 6103(a)), or a legal public holiday's observed date, and the submission is completed by 5:00 p.m. eastern time. In the event electronic submission is unavailable, the FTC and DOJ may designate procedures for the submission of the filing. Notification of the alternate delivery procedures will normally be made through a press release and, if possible, on the *https://www.ftc.gov* website.

(ii) Delivery effected after 5 p.m. eastern time on a business day, or at any time on any day other than a business day, shall be deemed effected on the next following business day. If submission of all required filings is not effected on the same date, the date of receipt shall be the latest of the dates on which submission is effected.

\*    \*    \*    \*    \*

■ 8. Amend § 803.12 by revising paragraph (c)(1)(iii) to read as follows:

### § 803.12  Withdraw and refile notification.

\*    \*    \*    \*    \*

(c) \*    \*    \*

(1) \*    \*    \* (iii) The resubmitted notification is recertified, and the submission, as it relates to Transaction-specific Agreements (including the latest drafts, if either agreements have not been signed), Transaction-Related Documents (including Documents Prepared by or for Officers, Directors or Supervisory Deal Team Leads; Confidential Information Memorandum; Studies, Surveys, Analyses, and Reports; Synergies and Efficiencies) and Subsidies from Foreign Entities of Concern in the Instructions, is updated to the date of the resubmission)

\*    \*    \*    \*    \*

■ 9. Revise Appendices A and B to part 803 to read as follows:

[INSERT GENERAL INSTRUCTIONS AND INFORMATION]

**Antitrust Improvements Act Notification for Certain Mergers and Acquisitions**

**General Instructions And Information**

These instructions specify the information that must be submitted pursuant to § 803.1(a) of the premerger notification rules, 16 CFR parts 801–803 ("the Rules"). Submitted materials must be provided to the Federal Trade Commission ("FTC") and to the Antitrust Division of the Department of Justice ("DOJ") (together, "the Agencies").

*Information*

The central office for information and assistance concerning the Rules is: Premerger Notification Office Federal Trade Commission, Room #5301, 400 7th Street SW, Washington, DC 20024, Phone: (202) 326–3100, Email: *HSRhelp@ftc.gov* for rules questions, *Premerger@ftc.gov* for filing information.

Copies of these Instructions, the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("the Act"), the Rules, **Federal Register** publications issuing the Rules and Rule amendments ("Statements of Basis and Purpose"), as well as information to assist in submitting the required information are available at the FTC's Premerger Notification Office ("PNO") *website.*

*Definitions and Explanation of Terms*

Unless otherwise indicated, the definitions provided in the Rules apply to these Instructions.

Dollar Values

All financial information should be expressed in millions of dollars rounded to the nearest hundred thousand.

Economic Research Service's Commuting Zones

When submitting information by the Economic Research Service's ("ERS's") Commuting Zones ("CZ"), refer to the U.S. Department of Agriculture's Economic Research Service Commuting Zones for the year 2000, available at *https://www.ers. usda.gov/data-products/commuting-zones-and-labor-market-areas/*.

Fee Information

The filing fee is based on the aggregate total value of assets, voting securities, and controlling non-corporate interests to be held as a result of the acquisition. Filing fee tiers are adjusted annually pursuant to 15 U.S.C. 18a(a)(note) based on the change in gross national product, in accordance with 15 U.S.C. 19(a)(5). For each fiscal year commencing after September 30, 2023, filing fees will increase by the percentage increase, if any, in the consumer price index ("CPI") over the CPI for the fiscal year ending September 30, 2022, pursuant to 15 U.S.C. 18a(a)(note). For current thresholds and fee information, see the *PNO website*.

North American Industry Classification System (NAICS) Data

When reporting information by 6-digit NAICS code, refer to the North American Industry Classification System—United States, 2022, published by the Executive Office of the President, Office of Management and Budget, available at *https:// www.census.gov/naics/*. This website also provides guidance in choosing the proper code(s).

Person Filing and Filing Person

The terms "person filing" or "filing person" mean the ultimate parent entity ("UPE"). See § 801.1(a)(3). The terms are used herein interchangeably.

Standard Occupational Classification

When reporting information by 6-digit Standard Occupational Classification ("SOC") code, refer to the 2018 SOC System, available at *https://www.bls.gov/soc/2018/ #classification*.

Thresholds

Notification thresholds are adjusted annually based on the change in gross national product, in accordance with 15 U.S.C. 19(a)(5). See § 801.1(h). The current threshold values can be found at *Current Filing Thresholds*.

Year

All references to "year" refer to calendar year. If data are not available on a calendar year basis, supply the requested data for the fiscal year reporting period that most nearly corresponds to the calendar year specified. References to "most recent year" mean the most recent calendar or fiscal year for which the requested information is available.

*Filing*

If the UPE is both an acquiring and acquired person, separate filings must be submitted, one as the acquiring person and one as the acquired person, following the appropriate instructions for each. See § 803.2(a)(2).

Filings should be submitted electronically consistent with the instructions on the PNO website. If the electronic submission platform is unavailable, the Agencies may announce sites for delivery through the media and, if possible, at the PNO website.

*Responses*

Items that require the submission of documents or narrative responses should be produced in (1) searchable PDF format from which text can be copied or (2) Excel formats.

All documents should be logged in an Excel File. The log should list all responsive

documents, regardless of whether the document is redacted or withheld for privilege. For each document, indicate:

1. The document number;

2. Request(s) to which the document is responsive;

3. Title;

4. Date;

5. Authors and job titles; and

6. Whether the document is privileged.

Indented and bolded headings in these Instructions should each be considered a separate request.

If a group of people prepared the document, list all the authors and their titles, identifying the principal authors. Alternatively, it is acceptable to indicate that the document was prepared under the supervision of the lead author and to provide the name and title of that author. If the filing person engaged a third party to prepare a document, provide the name of the third party, and the name, title, and company name for the individual within the filing person who supervised the creation of the document, or for whom the document was prepared. For materials received from a third party that was not engaged by the filing person, only the name of the third party is required.

If parties submit documents in addition to what is required, such documents should be identified as ''Voluntary''. *See* § 803.1(b).

Submit only one copy of identical responsive documents.

For each narrative response, indicate the document number for each document that supports the narrative and the request to which the narrative is responsive.

*Privilege*

For privileged documents, the filing person must also provide the following in the Responses log:

1. The privilege type (redacted or withheld);

2. The privilege claim;

3. Addressee(s) and all recipients, with company name and title, of the original and any copies;

4. Subject matter;

5. Document's present location; and

6. Who has control over it.

If a privileged document was circulated to a group, such as the board or an investment committee, the name of the group is sufficient, but the filing person should be prepared to disclose the names and titles/positions of the individual group members, if requested.

If the claim of privilege is based on advice from inside and/or outside counsel, the name of the inside and/or outside counsel providing the advice (and the law firm, if applicable) must be provided. If several lawyers participated in providing advice, identifying lead counsel is sufficient. In identifying who controls a document, the name of the law firm is sufficient.

*Translations*

Materials or information in a foreign language must be translated into English, with the English translation attached to the foreign language version. See § 803.8.

*Non-Compliance*

If unable to answer any item fully, provide such information as is available and a statement of reasons for non-compliance as required by § 803.3. If exact answers to any item cannot be given, enter best estimates and indicate the source or basis of such estimates. Add an endnote with the notation ''est.'' to any item where data are estimated.

*Limited Response*

Information need not be supplied regarding assets, voting securities, or non-corporate interests currently being acquired when their acquisition is exempt under the Act or Rules. See § 803.2(c).

**Ultimate Parent Entity Information**

*UPE Details*

Name

Provide the name, headquarters address, and website (if one exists) of the person filing notification. The name of the person filing is the name of the UPE. See § 801.1(a)(3).

Entity Type

Specify whether the UPE is a corporation, unincorporated entity, natural person, or other entity type (specify). See § 801.1.

Acquiring or Acquired Person

Indicate whether the filing is being made as an acquiring or acquired person.

Filing Made on Behalf of the UPE

If the filing is being made on behalf of the UPE by another entity within the same person that is authorized by the UPE to file the notification on its behalf pursuant to § 803.2(a), or filed pursuant to § 803.4 on behalf of a foreign person, provide the name and mailing address of the entity filing the notification on behalf of the UPE.

Contact Information

Provide the name and title, firm name, address, telephone number, and email address of two individuals (primary and secondary) to contact regarding the filing. See § 803.20(b)(2)(ii).

Second Request Contact Information

Provide the name, firm name, address, telephone number, and email address of an individual located in the United States designated for the limited purpose of receiving notice of the issuance of a request for additional information or documentary material. See § 803.20(b)(2).

Annual Reports and Financial Information

Central Index Key

Provide the names of all entities within the person filing the notification, including the UPE, that file annual reports (Form 10–K or Form 20–F) with the United States Securities and Exchange Commission, and provide the Central Index Key (CIK) number for each entity.

Annual Reports and Audit Reports

Provide the most recent annual reports and/or annual audit reports (or, if audited is unavailable, unaudited) of the person filing notification.

The acquiring person should also provide the most recent reports of the acquiring

entity(s) and any entity controlled by the acquiring person whose revenues contribute to a NAICS overlap or any overlap identified in the Horizontal Overlap Narrative.

The acquired person should also provide the most recent reports of the acquired entity(s).

Natural person UPEs should not provide personal balance sheets or tax returns. Natural person UPEs should instead provide the most recent reports for the highest-level entity(s) they control.

The person filing notification may incorporate a document responsive to this item by reference to an internet address directly linking to the document. See § 803.2(e).

Size of Person

If applicable, indicate whether the UPE stipulates that it meets the size of person test. See 15 U.S.C. 18a(a).

*Organization Structure*

If the acquisition includes only assets that do not comprise substantially all the assets of an operating unit, the acquired person should not complete the questions in this section. Otherwise, the acquired person must complete these questions for the portion of the transaction related to the voting securities, non-corporate interests, and assets that comprise substantially all the assets of an operating unit.

Entities Within the Acquiring Person and Acquired Entity

List the name, city, state/country, and zip code of all U.S. entities, and all foreign entities that have sales in or into the United States, that are included within the acquiring person, or acquired entity (as appropriate). Entities with total assets of less than $10 million may be omitted. Alternatively, the acquiring person or acquired entity (as appropriate) may report all entities within it. Also list all names under which the entities do business or have done business within the past 3 years (*e.g.*, d/b/a or f/k/a names).

The list of entities should be organized by operating company or operating business/unit (''top-level entity''), if applicable.

Minority Shareholders and Other Non-Controlling Entities

Acquiring Person

Provide a narrative response describing the ownership structure of the acquiring entity.

For transactions where a fund or master limited partnership is the UPE, also provide an organizational chart sufficient to identify and show the relationship of all entities that are affiliates or associates. See § 801.1(d).

Additionally, list the name, headquarters mailing address, and approximate percentage of holdings for any individual or entity that currently holds, or will hold as a result of the transaction, 5% or more but less than 50% of the voting securities or non-corporate interests of (1) the acquiring entity, (2) any entity directly or indirectly controlled by the acquiring entity, (3) any entity that directly or indirectly controls the acquiring entity, and (4) any entity within the acquiring person that has been or will be created in contemplation of, or for the purposes of, effectuating the transaction. Entities related

to master limited partnerships, funds, investment groups, or similar entities that do business under a common name should also have the d/b/a or ''street name'' of such group listed.

For limited partnerships, the general partner(s), regardless of percentage held, should also be listed.

If the identity of minority investors or percentage to be held is not finalized at time of filing, provide good faith estimates and explain.

Acquired Person

Provide a narrative response, describing the ownership structure of the acquired entity(s).

Additionally, list the name, headquarters mailing address, and approximate percentage held for any holders of 5% or more but less than 50% of (1) the acquired entity(s), and (2) any entity within the acquired entity(s), but only if such holder will continue to hold an interest (whether voting securities or non-corporate interests) in such entity(s), or will acquire an interest in any entity within the acquiring person as a result of the transaction.

For limited partnerships, the general partner(s), regardless of percentage held, should also be listed.

Other Types of Interest Holders That May Exert Influence

*For the Acquiring Person Only:* Identify every entity and individual (other than those employed by the acquiring person or an entity it controls) that, upon consummation or as a result of agreements related to consummation:

1. Provides, has provided (and still is a creditor), or will provide credit to the acquiring entity, an entity the acquiring entity directly or indirectly controls, or an entity that directly or indirectly controls the acquiring entity. Do not list individuals or entities if the amount of credit they have provided or will provide is less than 10% of the value of that entity;

2. Holds non-voting securities (including options or warrants) of the acquiring entity, an entity the acquiring entity directly or indirectly controls, or an entity that directly or indirectly controls the acquiring entity, where such non-voting securities are valued at more than 10% of that entity;

3. Is a board member or board observer or has the right to nominate or appoint a board member or board observer of the acquiring entity, an entity the acquiring entity directly or indirectly controls, or an entity that directly or indirectly controls the acquiring entity; or

4. Has an agreement to manage the acquiring entity, an entity the acquiring entity directly or indirectly controls, or an entity that directly or indirectly controls the acquiring entity.

For every individual or entity identified, provide the name, contact information, the percent of voting securities or non-corporate interests owned (if any), and a description of the relevant relationship(s) above.

Officers, Directors, and Board Observers

For each entity within the acquiring person or acquired entity (as applicable), list by

entity all current officers, directors, and board observers (or in the case of unincorporated entities, individuals exercising similar functions), as well as those who have served in the position within the past 2 years.

Additionally, list all individuals who will or are likely to serve as an officer, director, or board observer of an entity within the acquiring person as a result of or as contemplated by the transaction. Organize the response by entity and include entities that are not yet created but are expected to be created as a result of or as contemplated by the transaction. If the identities of the prospective officers, directors, and board observers are unknown, briefly describe who will have the authority to select them.

For each officer, director and board observer identified, list all other entities for which the individual serves, or has served within the last two years, as an officer, director, or board observer.

**Transaction Information**

*Parties*

List the name and mailing address of each acquiring and acquired person, and acquiring and acquired entity, whether or not required to file a notification. Do not list entities controlled by an acquired entity.

Acquiring UPE

Provide the name, headquarters address, and website (if one exists) of the acquiring person.

Acquiring Entity

If an entity other than the acquiring UPE is making the acquisition, provide the name, mailing address, and website of that entity.

Acquired UPE

Provide the name, headquarters address, and website (if one exists) of the acquired person.

Acquired Entity

If the assets, voting securities, or non-corporate interests of an entity other than the acquired UPE are being acquired, provide the name, mailing address, and website of that entity.

*Filing Fee*

Total Expected Filing Fee

Indicate the value of the total required fee for the transaction.

Parties Paying the Fee

Indicate which filing party(s) is paying the filing fee and, if applicable, whether the portion of the fee being paid by the filer is being paid by multiple entities associated with the filer. For each party paying a portion of the fee, provide the name of payer, the amount paid, the payment method, and the Electronic Wire Transfer (EWT) confirmation number or check number.

*Note on Paying by EWT:* In order for the FTC to track payment, the payer must provide information required by the Fedwire Instructions to the financial institution initiating the EWT. A template of the Fedwire Instructions is available at the PNO website on the *Filing Fee Information page.*

*Note on Paying by Check:* The FTC strongly discourages check payments. However, if an

EWT cannot be arranged, the FTC will accept a check, sent to Financial Operations. Cashiers' or certified checks are preferred. Make the check payable to the Federal Trade Commission and deliver to: Federal Trade Commission, Financial Operations Division, 600 Pennsylvania Ave., Drop H–790, Washington, DC 20580.

Please note that the waiting period may be delayed until the fee has been confirmed.

*Transaction Details*

801.30    Transaction:
Indicate whether the transaction is subject to § 801.30.

Transaction Type

Indicate whether the transaction is a(n):
• Acquisition of voting securities;
• Acquisition of non-corporate interests;
• Acquisition of assets;
• Merger (see § 801.2;
• Consolidation (see § 801.2);
• Formation of a joint venture, other corporation, or unincorporated entity (see §§ 801.40 and 801.50);
• Bankruptcy that is subject to Section 363(b) of the Bankruptcy Code (11 U.S.C. 363);
• Cash Tender Offer;
• Acquisition subject to § 801.31;
• Secondary acquisition subject to § 801.4;
• Acquisition subject to § 801.2(e); and/or
• Acquisition consummated in violation of the HSR Act.

Acquisition Details

Provide the requested information for the value and percentage of assets, voting securities, and non-corporate interests to be acquired. If a combination of assets, voting securities, and/or non-corporate interests are being acquired and allocation is not possible, note such information in an endnote.

For determining percentage of voting securities, evaluate total voting power per § 801.12.

For determining percentage of non-corporate interests, evaluate the economic interests per § 801.1(b)(1)(ii).
• State the value of voting securities already held by the acquiring person. See § 801.10.
• State the percentage of voting securities already held by the acquiring person. See § 801.10.
• State the total value of voting securities to be held by the acquiring person as a result of the acquisition. See § 801.10.
• State the total percentage of voting securities to be held by the acquiring person as a result of the acquisition. See § 801.12.
• State the value of non-corporate interests already held by the acquiring person. See § 801.10.
• State the percentage of non-corporate interests already held by the acquiring person. See § 801.1(b)(1)(ii).
• State the total value of non-corporate interests to be held by the acquiring person as a result of the acquisition. See § 801.10.
• State the total percentage of non-corporate interests to be held by the acquiring person as a result of the acquisition. See §§ 801.10 and 801.1(b)(1)(ii).
• State the value of assets to be held by the acquiring person as a result of the acquisition. See § 801.10.

• State the aggregate total value of assets, voting securities, and non-corporate interests of the acquired person to be held by the acquiring person as a result of the acquisition. See §§ 801.10, 801.12, 801.13 and 801.14.

Notification Threshold

This item should only be completed by the acquiring person when voting securities are being acquired. If more than voting securities are being acquired, respond to this item only regarding voting securities. Indicate the highest applicable threshold for which notification is being filed. See § 801.1(h).
• $50 million (as adjusted);
• $100 million (as adjusted);
• $500 million (as adjusted);
• 25% (if the value of voting securities to be held is greater than $1 billion, as adjusted);
• 50%;
• N/A.

Note that the 50% notification threshold is the highest threshold and should be used for any acquisition of 50% or more of the voting securities of an issuer, regardless of the value of the voting securities. For instance, an acquisition of 100% of the voting securities of an issuer valued in excess of $500 million (as adjusted) would cross the 50% notification threshold, not the $500 million (as adjusted) threshold.

*Transaction Description*

Business of the Acquiring Person

*Acquiring Person Only:* Describe the business operation(s) of all entities within the acquiring person.

Business of the Acquired Entity

Describe the business operation(s) being acquired. If assets, describe the assets and whether they comprise a business operation.

Non-Reportable UPE(s)

Provide the names of any non-reportable UPE(s).

Transaction Description

Briefly describe the transaction, indicating whether assets, voting securities, or non-corporate interests (or some combination) are to be acquired. Indicate what consideration will be received by each party and the scheduled consummation date of the transaction. Also identify any special circumstances that apply to the filing, such as whether part of the transaction is exempt under one of the exemptions found in Part 802.

If any attached transaction documents use code names to refer to the parties, provide an index identifying the codes.

Transaction Rationale

Identify and explain each strategic rationale for the transaction discussed or contemplated by the filing person, or any of its officers, directors, or employees. If the acquiring person is different from the UPE, submit an explanation for each entity. Identify each document produced in the filing that confirms or discusses the stated rationale(s).

Transaction Diagram

Submit a diagram of the transaction and provide a chart explaining the relationship between all entities and/or natural persons involved in the transaction.

Related Transactions

Indicate whether the transaction that is the subject of this filing has related filings because the transaction:
• Is a principal transaction that triggers one or more shareholder backside transactions;
• Is a shareholder backside transaction;
• Has more than one acquiring UPE;
• Has more than one acquired UPE;
• Has more than one reportable step;
• Is a joint venture;
• Is a consolidation;
• Is an exchange of assets; or
• Has other circumstance that requires more than one filing.

Provide additional details regarding the related transaction(s), such as party names and transaction numbers.

Early Termination

Indicate whether the filing person requests early termination. Notification of each grant of early termination will be published in the **Federal Register**, as required by 15 U.S.C. 18a(b)(2), and on the PNO website. Note that if either party in any transaction requests early termination, it may be granted and published.

*Joint Ventures*

See §§ 801.40 and 801.50.

Contributions

List the contributions that each person forming the joint venture corporation or unincorporated entity has agreed to make, specifying when each contribution is to be made and the value of the contribution as agreed by the contributors.

Consideration

Describe fully the consideration that each person forming the joint venture corporation or unincorporated entity will receive in exchange for its contribution(s).

Business Description

Describe generally the business in which the joint venture corporation or unincorporated entity will engage, including its principal types of products or activities, and the geographic areas in which it will do business.

NAICS Codes

Identify each 6-digit NAICS industry code in which the joint venture corporation or unincorporated entity will derive dollar revenues.

*Agreements and Timeline*

Transaction-Specific Agreements

Furnish copies of all documents that constitute the agreement(s) related to the transaction, including, but not limited to, exhibits, schedules, side letters, agreements not to compete or solicit, and other agreements negotiated in conjunction with the transaction.

Documents that constitute the agreement(s) (*e.g.,* Agreement and Plan of Merger, Letter of Intent, Purchase and Sale Agreement, Asset Purchase Agreement, Stock/Securities Purchase Agreement) must be executed,

while supporting agreements, such as employment agreements and agreements not to compete may be provided in draft form if that is the most recent version. If there is no definitive executed agreement, provide a copy of the most recent draft agreement or term sheet that provides sufficient detail about the scope of the entire transaction that the parties intend to consummate. See § 803.5.

Note that transactions subject to § 801.30 and bankruptcies under 11 U.S.C. 363(b) do not require an executed agreement. For bankruptcies, provide the order from the bankruptcy court.

Other Agreements Between the Parties

Provide all other agreements between the acquiring and acquired person, including but not limited to, non-compete or non-solicitation agreements, supply agreements, or licensing agreements including current agreements and those that expired, have terminated, or were canceled within one year of the filing.

Timeline

Provide a detailed timetable for the transaction, including when the signatories intend to consummate the transaction, or implement all closing conditions, integration, affiliation, or other purchase agreements, and any other important deadlines for closing or terminating the merger agreement. Identify all provisions in the agreement that govern the extension of these deadlines and explain the conditions for extending deadlines and how long they may be extended. Also, if applicable, provide a description of any fee or other consideration paid or to be paid at key dates of the transaction or upon closing, including but not limited to termination fees, break fees, ticking fees, and any other arrangement intended to serve in lieu of a break fee.

**Competition and Overlaps**

*Business Documents*

Transaction-Related Documents

Documents Prepared by or for Officers, Directors, or Supervisory Deal Team Lead(s)

Provide all studies, surveys, analyses, and reports prepared by or for any officer(s), director(s), or supervisory deal team lead(s) for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into product or geographic markets. For unincorporated entities, provide such documents prepared by or for individuals exercising similar functions as officers and directors, as well as the supervisory deal team lead(s).

Confidential Information Memoranda

Provide all confidential information memoranda prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) of the UPE of the acquiring or acquired person or of the acquiring or acquired entity(s) that specifically relate to the sale of the acquired entity(s) or assets. If no such confidential information memorandum exists, submit any document(s) given to any officer(s) or

director(s) of the buyer meant to serve the function of a confidential information memorandum. This does not include ordinary course documents and/or financial data shared in the course of due diligence, except to the extent that such materials served the purpose of a confidential information memorandum when no such confidential information memorandum exists.

Documents responsive to this item are limited to those produced within one year before the date of filing.

Studies, Surveys, Analyses, and Reports

Provide all studies, surveys, analyses and reports prepared by investment bankers, consultants, or other third party advisors (''third party advisors'') for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) of the UPE of the acquiring or acquired person or of the acquiring or acquired entity(s) for the purpose of evaluating or analyzing market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets that specifically relate to the sale of the acquired entity(s) or assets. This item requires only materials developed by third party advisors during an engagement or for the purpose of seeking an engagement.

Documents responsive to this item are limited to those produced within one year before the date of filing.

Synergies and Efficiencies

Provide all studies, surveys, analyses, models, and reports evaluating or analyzing synergies, financial projections, and/or efficiencies prepared by or for any officer(s) or director(s) (or, in the case of unincorporated entities, individuals exercising similar functions) for the purpose of evaluating or analyzing the acquisition. Financial models without stated assumptions need not be provided.

Drafts

For each responsive Transaction-Related Document, provide drafts of the document that were sent to an officer, director, or supervisory deal team lead(s).

Periodic Plans and Reports

Provide all semi-annual or quarterly plans and reports that were provided to the Chief Executive Officer (CEO) of the acquiring or acquired entity (as appropriate) and any entity that it controls or is controlled by and individuals who report directly to each such CEO (but excluding individuals responsible solely for environmental, tax, human resources, pensions, benefits, ERISA, or OSHA issues) that analyze market shares, competition, competitors, or markets pertaining to any product or service also produced, sold, or known to be under development by the other party (acquiring person or acquired entity as appropriate). Documents responsive to this item are limited to those prepared or modified within one year of the date of filing.

Provide all plans and reports (including semi-annual or quarterly) that were provided to the Board of Directors of the acquiring or acquired entity (as appropriate) and any entity that it controls or is controlled by that

analyze market shares, competition, competitors, or markets pertaining to any product or service also produced, sold, or known to be under development by the other party (acquiring person or acquired entity as appropriate). Documents responsive to this item are limited to those prepared or modified within one year of the date of filing.

Organizational Chart of Authors and Recipients

Provide an organizational chart(s) that identifies the position(s) held by authors, and for privileged documents, recipients, of all business documents submitted. Filing persons should indicate on the organizational chart(s) the individuals whose files were searched for documents responsive to these Instructions.

*Competition Analysis*

Horizontal Overlap Narrative

Describe each of the principal categories of products and services (as defined in the day-to-day operations) of the acquiring person or acquired entity (as applicable).

In addition, list and describe each of the current or known planned products or services of the acquiring person or acquired entity (as appropriate) that competes with (or could compete with) a current or known planned product or service of the other party (acquiring person or acquired entity as appropriate). Current or known planned products or services include those that the acquiring person or acquired entity researches, develops, manufactures, produces, sells, offers, provides, supplies, or distributes. For each such product or service listed, provide:

1. The sales (in units and dollars) for each of the past two fiscal years. For those products or services not generating revenue or whose performance is not measured by revenue in the ordinary course of business, provide projected revenue, estimates of the volume of products to be sold, time spent using the service, or any other metric by which the acquiring person or acquired entity (as appropriate) measures performance (*e.g.*, daily users, new signups).

2. A description of all categories of customers of the acquiring person or acquired entity (as appropriate) that purchase or use the product or service (*e.g.*, retailer, distributor, broker, government, military, educational, national account, local account, commercial, residential, or institutional), and an estimate of how much of the product or service each customer category purchased or used monthly for the last fiscal year. If no customers have yet used the product or service, provide the date that development of the product or service began; a description of the current stage in development, including any testing and regulatory approvals and any planned improvements or modifications; the date that development (including testing and regulatory approvals) was or will be completed; and the date that the product or service is expected to be sold or otherwise commercially launched.

3. Contact information (including individual's name, title, phone, and email) for the acquiring person's or acquired entity's (as appropriate) top 10 customers in the last

fiscal year (as measured in both units and dollars), and the top 10 customers for each customer category identified.

4. A description of any licensing arrangements.

5. A description, including duration, of any non-compete or non-solicitation agreement applicable to employees or business units related to the product or service.

Supply Relationships Narrative

*Related Sales:* List and describe each product, service, or asset (including data) that the acquiring person or acquired entity (as applicable) has sold, licensed, or otherwise supplied in the last two fiscal years (1) to the other party (acquiring person or acquired entity as appropriate), or (2) to any other business that, to the filing person's knowledge or belief, uses its product, service, or asset to compete with the other party's products or services, or as an input for a product or service that competes or is intended to compete with the other party's products or services.

For each product, service, or asset listed, provide:

1. The sales (in units and dollars and any other appropriate measure) for each of the past two fiscal years, separately to (1) the other party (acquiring person or acquired entity as appropriate) and (2) any other business that, to the filing person's knowledge or belief, uses its product, service, or asset to compete with the other party's products or services, or as an input for a product or service that competes or is intended to compete with the other party's products or services.

2. The top 10 customers (as measured in both units and dollars) of the acquiring person or acquired entity (as appropriate) that use the acquiring person's or acquired entity's (as appropriate) product, service, or asset to compete with the other party's (acquiring person or acquired entity as appropriate) products or services, or as an input for a product or service that competes or is intended to compete with the other party's products or services. For each such customer, provide contact information (including title, phone, and email) and a description of the acquiring person's or acquired entity's (as appropriate) supply or licensing agreement (or other comparable terms of supply).

*Related Purchases:* List and describe each product, service, or asset (including data) that the acquiring person or acquired entity (as appropriate) incorporates as an input into any product or service and that the acquiring person or acquired entity (as appropriate) has purchased, licensed, or otherwise obtained in the last two years (1) from the other party (acquiring person or acquired entity as appropriate) or (2) from any other business that, to the filing person's knowledge or belief, competes with the other party to provide a substantially similar product, service, or asset.

For each product, service, or asset listed, provide:

1. The purchased amount (in units and dollars and any other appropriate measure) for each of the last two fiscal years, separately for (1) the other party and (2) any other business that, to the filing person's

knowledge or belief, competes with the other party to provide a substantially similar product, service, or asset.

2. The top 10 suppliers (as measured in both units and dollars) for the associated input product, service, or asset, with contact information (including title, phone, and email) and a description of the acquiring person's or acquired entity's (as appropriate) purchase or licensing agreement (or other comparable terms of purchase).

Labor Markets Information

This section requests information about the largest categories of workers employed by the acquiring person or acquired entity (as appropriate) and the geographic area(s) where these employees work.

Largest Employee Classifications

Provide the aggregate number of employees of the acquiring person or acquired entity (as appropriate) for each of the five largest occupational categories (as categorized by the first six digits of the relevant SOC classifications).

Geographic Market Information for Each Overlapping Employee Classification

Indicate the five largest 6-digit SOC codes in which both parties (the acquiring person and the acquired entity) employ workers. For each overlapping 6-digit SOC code, list each ERS commuting zone in which both parties employ workers with the 6-digit classification and provide the aggregate number of classified employees in each ERS commuting zone.

Worker and Workplace Safety Information

Identify any penalties or findings issued against the filing person by the U.S. Department of Labor's Wage and Hour Division (WHD), the National Labor Relations Board (NLRB), or the Occupational Safety and Health Administration (OSHA) in the last five years and/or any pending WHD, NLRB, or OSHA matters.

For each identified penalty or finding, provide (1) the decision or issuance date, (2) the case number, (3) the JD number (for NLRB only), and (4) a description of the penalty and/or finding.

*NAICS Codes*

This item requests information regarding the industry categories of the acquiring person or acquired entity(s) or assets (as appropriate) of products and services that derived revenue in the last fiscal year, as well as for products or services in development that would create overlaps with the other party (acquiring person or acquired entity as appropriate).

NAICS Codes Describing U.S. Operations With Estimates of Revenue

Acquiring Person

Identify all 6-digit NAICS industry codes that describe the U.S. operations of the acquiring person, inclusive of all entities included within the acquiring person at the time the filing is made.

Responses must be organized by NAICS code in ascending order. For each code, provide the name of the operating entity(s) that derive(s) revenue in that code and the

estimated revenue range: less than $10 million; $10 million or more but less than $100 million; $100 million or more but less than $1 billion; or $1 billion or more. Identify each 6-digit NAICS code in which both the acquiring person and acquired entity(s) or assets derive revenue.

For products and services that derived revenue in the most recent fiscal year in a non-manufacturing NAICS code, if the revenue is estimated at less than one million dollars, that code may be omitted so long as the code does not overlap with a code in which the acquired entity(s) or assets derived revenue from U.S. operations.

Acquiring persons should also list all NAICS codes for products or services under development by the acquiring person that would overlap with the products or services of the acquired entity(s) or assets, inclusive of products or services that are known to be under development by the acquired entity(s) or assets. NAICS codes that reflect only these pipeline products or services should be identified as "pre-revenue."

If more than one NAICS code describes the same operations of the acquiring person, list each code, and provide an estimate of revenue, as described above. End notes may be used to clarify the selection of codes or potential overlaps.

Acquired Person

Identify all 6-digit NAICS industry codes that describe the U.S. operations of the acquired entity(s) or assets, inclusive of all entities and assets anticipated to be included within the acquired entity(s) or assets at the time the transaction will be consummated.

Responses must be organized by NAICS code in ascending order. For each code, provide the name of the operating entity(s) that derive(s) revenue in that code and the estimated revenue range: less than $10 million; $10 million or more but less than $100 million; $100 million or more, but less than $1 billion; or $1 billion or more. Identify each 6-digit NAICS code in which both the acquiring person and acquired entity(s) or assets derive revenue.

For products and services that derived revenue in the most recent fiscal year in a non-manufacturing NAICS code, if the revenue is estimated at less than one million dollars, that code may be omitted so long as the code does not overlap with a code in which the acquiring person derived revenue from U.S. operations.

Acquired persons should also list all NAICS codes for products or services under development by the acquired entity(s) or assets and expected to have annual revenue greater than $1 million within two years. NAICS codes that reflect only these pipeline products or services should be identified as "pre-revenue."

If more than one NAICS code describes the same operations of the acquiring entity(s) or assets, list each code, and provide an estimate of revenue, as described above. End notes may be used to clarify the selection of codes or potential overlaps.

No Revenue

If there is no revenue to report, explain why.

*Controlled-Entity Overlaps*

If, to the knowledge or belief of the person filing notification, the acquiring person, or any associate (see § 801.1(d)(2)) of the acquiring person, derived any amount of dollar revenues in the most recent year from operations:

1. In industries within any 6-digit NAICS industry code in which any acquired entity also derived any amount of dollar revenue in the most recent year; or

2. In which a joint venture corporation or unincorporated entity will derive dollar revenues;

then for each such 6-digit NAICS industry code follow the instructions below for this section.

Note that if the acquired entity is a joint venture, the only overlaps that should be reported are those between the assets to be held by the joint venture and any assets of the acquiring person or its associates not contributed to the joint venture.

If the acquiring person reports an associate overlap only, the acquired person does not need to respond to this section.

NAICS Overlaps of Controlled Entities

Acquiring Person

List the name of each entity within the acquiring person or associate of the acquiring person, that has U.S. operations in the same code as an acquired entity or assets. For each such entity, list the name(s) by which the entity does or has within the last 3 years done business, whether the listed entity is controlled by the filing person or an associate of the filing person, the overlapping NAICS code(s), NAICS description(s), and provide the appropriate Geographic Market Information, based upon the NAICS code. Organize responses by NAICS code.

Acquired Person

List the name of each entity within the acquired entity that has U.S. operations in the same code as the acquiring person. For each such entity, list the name(s) by which the entity does or has within the last 3 years done business, the overlapping NAICS code(s), NAICS description(s), and provide the appropriate Geographic Market Information, based upon the NAICS code. Organize responses by NAICS code.

Geographic Market Information

For each identified overlapping NAICS code, provide geographic information, as described below. Use the 2-digit postal codes for states and territories and provide the total number of states and territories at the end of the response.

Except in the case of those NAICS industries in the sectors, subsectors, and codes that require street-address level reporting, the person filing notification may respond with the word "national" if business is conducted in all 50 states.

State-Level Reporting

Manufacturing Industries

For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states in which, to the knowledge or belief of the person filing the notification, the products in that 6-digit

NAICS industry code produced by the person filing notification are sold without a significant change in their form (whether they are sold by the person filing notification or by others to whom such products have been sold or resold).

31**** through 33****   Manufacturing, *except:*

- 3115**   Dairy Product Manufacturing
- 311611   Animal (except Poultry) Slaughtering
- 311613   Rendering and Meat Byproduct Processing
- 311615   Poultry Processing
- 31181*   Bread and Bakery Product Manufacturing
- 321****   Wood Product Manufacturing
- 32221*   Paperboard Container Manufacturing
- 324***   Petroleum and Coal Products Manufacturing
- 3251**   Basic Chemical Manufacturing
- 325521   Plastics Materials and Resin Manufacturing
- 3271**   Clay Product and Refractory Manufacturing
- 3272**   Glass and Glass Product Manufacturing
- 3273**   Cement and Concrete Product Manufacturing

Wholesale Trade

For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states or, if desired, portions thereof in which the customers of the person filing notification are located.

42****   Wholesale Trade, *except:*

- 42331*   Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers
- 42333*   Roofing, Siding, and Insulation Material Merchant Wholesalers
- 42344*   Other Commercial Equipment Merchant Wholesalers
- 42345*   Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers
- 42346*   Ophthalmic Goods Merchant Wholesalers
- 42349*   Other Professional Equipment and Supplies Merchant Wholesalers
- 4239**   Miscellaneous Durable Goods Merchant Wholesalers
- 4241**   Paper and Paper Product Merchant Wholesalers
- 4242**   Drug and Druggists' Sundries Merchant Wholesalers
- 42441*   General Line Grocery Merchant Wholesalers
- 42442*   Packaged Frozen Food Merchant Wholesalers
- 42451*   Grain and Field Bean Merchant Wholesalers
- 42452*   Livestock Merchant Wholesalers
- 4247**   Petroleum and Petroleum Products Merchant Wholesalers
- 4248**   Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers
- 42491*   Farm Supplies Merchant Wholesalers
- 42495*   Paint, Varnish, and Supplies Merchant Wholesalers

Insurance Carriers

For the 6-digit NAICS code within the industry subsector listed below, list the state(s) in which the person filing notification is licensed to write insurance.

5241**   Insurance Carriers

Other NAICS Sectors

For each 6-digit NAICS code within the industry sector, subsector, or code listed below, list the states or, if desired, portions thereof in which the person filing notification conducts such operations.

11****   Agriculture, Forestry, Fishing, and Hunting, *except:*

- 113***   Forestry and Logging

21****   Mining, Quarrying, and Oil and Gas Extraction, *except:*

- 2123**   Nonmetallic Mineral Mining and Quarrying

2213**   Water, Sewage, and Other Systems
23****   Construction
44912*   Home Furnishing Retailers
4492**   Electronics and Appliance Retailers

48**** and 49****   Transportation and Warehousing, *except:*

- 493***   Warehousing and Storage

51****   Information, *except:*

- 512***   Motion Picture and Sound Recording Industries

5222**   Nondepository Credit Intermediation
523***   Securities, Commodity Contracts, and Other Financial Investments and Related Activities
5242**   Agencies, Brokerages, and Other Insurance Related Activities
525***   Funds, Trusts, and Other Financial Vehicles
531***   Real Estate
533***   Lessors of Nonfinancial Intangible Assets (Except Copyrighted Works)

54****   Professional, Scientific and Technical Services, *except:*

- 54138*   Testing Laboratories and Services
- 54194*   Veterinary Services

55****   Management of Companies and Enterprises
561***   Administrative and Support Services

61****   Educational Services
71****   Arts, Entertainment, and Recreation, *except:*

- 7132**   Gambling Industries
- 71394*   Fitness and Recreational Sports Centers

7212**   RV (Recreational Vehicle) Parks and Recreational Camps
7213**   Rooming and Boarding Houses, Dormitories, and Workers' Camps
8114**   Personal and Household Goods Repair and Maintenance
813***   Religious, Grantmaking, Civic, Professional, and Similar Organizations
814***   Private Households

Street-Level Reporting

For each 6-digit NAICS code within the industry sector, subsector, or code listed below, provide the street address, arranged by state, county and city or town, and latitude and longitude (each in degrees up to at least five decimal places) of each establishment from which dollar revenues were derived (either directly or by a franchisee) in the most recent year by the person filing notification.

113***   Forestry and Logging
2123**   Nonmetallic Mineral Mining and Quarrying

22****   Utilities, *except:*

- 2213**   Water, Sewage and Other Systems

3115**   Dairy Product Manufacturing
311611   Animal (except Poultry) Slaughtering
311613   Rendering and Meat Byproduct Processing
311615   Poultry Processing
31181*   Bread and Bakery Product Manufacturing
321***   Wood Product Manufacturing
32221*   Paperboard Container Manufacturing
324***   Petroleum and Coal Products Manufacturing
3251**   Basic Chemical Manufacturing
325521   Plastics Materials and Resin Manufacturing
3271**   Clay Product and Refractory Manufacturing
3272**   Glass and Glass Product Manufacturing
3273**   Cement and Concrete Product Manufacturing
42331*   Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers
42333*   Roofing, Siding, and Insulation Material Merchant Wholesalers
42344*   Other Commercial Equipment Merchant Wholesalers
42345*   Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers
42346*   Ophthalmic Goods Merchant Wholesalers
42349*   Other Professional Equipment and Supplies Merchant Wholesalers
4239**   Miscellaneous Durable Goods Merchant Wholesalers
4241**   Paper and Paper Product Merchant Wholesalers
4242**   Drug and Druggists' Sundries Merchant Wholesalers
42441*   General Line Grocery Merchant Wholesalers
42442*   Packaged Frozen Food Merchant Wholesalers
42451*   Grain and Field Bean Merchant Wholesalers
42452*   Livestock Merchant Wholesalers
4247**   Petroleum and Petroleum Products Merchant Wholesalers
4248**   Beer, Wine, and Distilled Alcoholic Beverage Merchant Wholesalers
42491*   Farm Supplies Merchant Wholesalers
42495*   Paint, Varnish, and Supplies Merchant Wholesalers

44**** and 45****   Retail Trade, *except:*

- 44912*   Home Furnishings Retailers
- 4492**   Electronics and Appliance Retailers

493***   Warehousing and Storage
512***   Motion Picture and Sound Recording Industries
521***   Monetary Authorities—Central Bank
5221**   Depository Credit Intermediation
5223**   Activities Related to Credit Intermediation
532***   Rental and Leasing Services
54138*   Testing Laboratories and Services
54194*   Veterinary Services
562***   Waste Management and Remediation Services
62****   Health Care and Social Assistance

7132**    Gambling Industries
71394*    Fitness and Recreational Sports Centers
72****    Accommodation and Food Services, except:
   7212**    RV (Recreational Vehicle) Parks and Recreational Camps
   7213**    Rooming and Boarding Houses, Dormitories, and Workers' Camps
811***    Repair and Maintenance, except
   8114**    Personal and Household Goods Repair and Maintenance
812***    Personal and Laundry Services

*Minority-Held Entity Overlaps*

This section requires the disclosure of holdings of 5% or more but less than 50% of certain entities that derive dollar revenues in any 6-digit NAICS code reported by the other person filing notification. Holdings in those entities that have total assets of less than $10 million may be omitted.

If NAICS codes are unavailable, holdings in entities that have operations in the same industry, based on the knowledge or belief of the filing person, should be listed. Holdings in those entities that have total assets of less than $10 million may be omitted.

Minority Holdings of Acquiring Person and Its Associates

If the acquiring person holds 5% or more but less than 50% of the voting securities of any issuer or non-corporate interests of any unincorporated entity that derived dollar revenues in the most recent year from operations in industries within any 6-digit NAICS code(s) reported by the acquired entity(s) or assets, provide such 6-digit NAICS code(s), the entity within the acquiring person that holds the minority interests, the name and d/b/a names (if known) of the minority held-entity, and percentage of voting securities or non-corporate interests held.

Additionally, based on the knowledge or belief of the acquiring person, for each associate (see § 801.1(d)(2)) of the acquiring person holding:
1. 5% or more but less than 50% of the voting securities or non-corporate interests of an acquired entity; and/or
2. 5% or more but less than 50% of the voting securities of any issuer or non-corporate interests of any unincorporated entity that derived dollar revenues in the most recent year from operations in industries within any 6-digit NAICS industry code in which the acquired entity(s) or assets also derived dollar revenues in the most recent year,

list the associate, the name and d/b/a names (if known) of the minority-held entity, and percentage of voting securities or non-corporate interests held.

Responses should be organized alphabetically by name of the entity in which minority interests are held.

The acquiring person may rely on its regularly prepared financials that list its investments, and those of its associates that list their investments, provided the financials are no more than three months old.

Minority Holdings of the Acquired Entity

If an acquired entity holds 5% or more but less than 50% of the voting securities of any issuer or non-corporate interests of any unincorporated entity that derived dollar revenues in the most recent year from operations in industries within any 6-digit NAICS industry code(s) reported by the acquiring person, provide such 6-digit NAICS code(s), the entity within the acquired entity that holds the minority interests, the name and d/b/a names (if known) of the minority-held entity, and percentage of voting securities or non-corporate interests held.

Responses should be organized alphabetically by the name of the entity in which minority interests are held.

*Prior Acquisitions*

This item should be completed for the acquiring person and the acquired entity, and pertains only to prior acquisitions of U.S. entities or assets and foreign entities or assets with sales in or into the U.S. that (i) derived revenue in an identified 6-digit NAICS industry code overlap *or* (ii) provided or produced a competitive overlap product or service as described in the Horizontal Overlap Narrative.

Identify all such acquisitions of entities or assets made within the ten years prior to filing in which (i) 50% or more of the voting securities of an issuer, (ii) 50% or more of non-corporate interests of an unincorporated entity, or (iii) all or substantially all the assets of an operating unit were acquired. Additionally, identify all such acquisitions of assets that did not constitute all or substantially all of an operating unit but were valued at or above the statutory size-of-transaction test at the time of their acquisition.

For each such acquisition, supply:
1. the 6-digit NAICS code(s) (by number and description) identified above in which the acquired entity derived dollar revenues, or the competitive overlap product(s) or service(s) provided;
2. the name of the entity from which the voting securities, non-corporate interests, or assets were acquired;
3. the headquarters address of that entity prior to the acquisition;
4. whether voting securities, non-corporate interests, or assets were acquired;
5. the consummation date of the acquisition; and
6. whether all or substantially all of the acquired voting securities, non-corporate interests, or assets are still held at the time of filing.

**Additional Information**

*Subsidies From Foreign Entities or Governments of Concern*

To the knowledge or belief of the filing person, within the two years prior to filing, has the acquiring or acquired person (as appropriate) received any subsidy (or a commitment to provide a subsidy in the future) from any foreign entity or government of concern (see § 801.1(r))? If yes, list each entity or government from which such subsidy was received and provide a brief description of the subsidy.

For products the acquiring or acquired person (as appropriate) produced in whole or in part in a country that is a covered nation under 42 U.S.C. 18741(a)(5)(C), is any product subject to countervailing duties imposed by any jurisdiction? If yes, list each product, the countervailing duty imposed, and the jurisdiction that imposed the duty.

To the knowledge or belief of the filing person, for products the acquiring or acquired person (as appropriate) produced in whole or in part in a country that is a covered nation under 42 U.S.C. 18741(a)(5)(C), is any product the subject of a current investigation for countervailing duties in any jurisdiction? If yes, list each product and the jurisdiction conducting the investigation.

*Defense or Intelligence Contracts*

Identify pending or active procurement contracts with the U.S. Department of Defense or any member of the U.S. intelligence community, as defined by 10 U.S.C. 101(a)(6) or 50 U.S.C. 3033(4) valued at $10 million or more. The acquiring person should limit its response to the acquiring entity and any entity within the acquiring person that directly or indirectly controls the acquiring entity. The acquired person should limit its response to the acquired entity(s) and/or assets. Include (1) the name of the entity within the filing person (2) the contracting office, as defined by 48 CFR 2.101(b); (3) the Contracting Office ID; (5) the Award ID; (5) and the NAICS code(s), if any, listed in the System for Award Management database.

*Identification of Communications and Messaging Systems*

List all communications systems or messaging applications on any device used by the acquiring or acquired person (as appropriate) that could be used to store or transmit business information or documents related to its business operations.

*Other Jurisdictions*

Transactions Subject to International Antitrust Notification

If, to the knowledge or belief of the filing person at the time of filing, a non-U.S. antitrust or competition authority has been or will be notified of the transaction, list the name of each such authority. Identify, to the knowledge or belief of the filing person at the time of filing, any jurisdiction where (1) a merger notification has been filed, (2) a merger notification is being prepared for filing, or (3) the parties have a good faith belief that a merger notification will be made, along with the dates of the filing or planned filing.

HSR Confidentiality Waiver for International Competition Authorities (VOLUNTARY)

Indicate whether the filing person agrees to waive the disclosure exemption contained in the Hart-Scott-Rodino Act, 15 U.S.C. 18a(h) to permit the DOJ and FTC to disclose to non-U.S. competition authority/authorities listed by the filing person below (1) the fact that a notification was filed, (2) the waiting period associated with the notification, and (3) information and documents filed with the notification. This waiver will not cover materials provided in response to a request for additional information issued pursuant to 15 U.S.C. 18a(e) and does not preclude the filing person from providing a full waiver as provided for under *FTC and DOJ practice as*

*reflected in the Model Waiver.* The filing person should list the jurisdictions to which the waiver applies. This item is voluntary.

HSR Confidentiality Waiver for State Attorneys General (VOLUNTARY)

Indicate whether the filing person agrees to waive the disclosure exemption contained in the Hart-Scott-Rodino Act, 15 U.S.C. 18a(h) to permit the DOJ and FTC to disclose to State Attorneys General listed by the filing person below (1) the fact that a notification was filed, (2) the waiting period associated with the notification, and (3) information and documents filed with the notification. This waiver will not cover materials provided in response to a request for additional information issued pursuant to 15 U.S.C. 18a(e) and does not preclude the filing person from providing a full waiver as provided for under *FTC and DOJ practice as reflected in the Model Waiver.* The filing person should list the jurisdictions to which the waiver applies. This item is voluntary.

**Certification**

See § 803.6 for requirements.

The certification must be notarized or use the language found in 28 U.S.C. 1746 relating to unsworn declarations under penalty of perjury.

Penalties for False Statements

Federal law provides criminal penalties, including up to twenty years imprisonment, for any person who knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence an ongoing or anticipated federal investigation (see, *e.g.,* Section 1519 of Title 18, United States Code.). It is also a criminal offense to knowingly make a false statement in a federal investigation, obstruct a federal investigation, or conspire to obstruct justice or obstruct or impede the lawful functioning of the government (see, *e.g.,* Sections 371, 1001, and 1505 of Title 18, United States Code).

Certification

This NOTIFICATION AND REPORT FORM, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Commission. Subject to the recognition that, where so indicated, reasonable estimates have been made because books and records do not provide the required data, the information is, to the best of my knowledge, true, correct, and complete in accordance with the statute and rules.

I acknowledge that the Commission or the Assistant Attorney General of the Antitrust Division of the Department of Justice may, prior to the expiration of the initial waiting period pursuant to 15 U.S.C. 18a, require the submission of additional information or documentary material relevant to the proposed transaction. I have taken the necessary steps to prevent the destruction of documents and information related to the proposed transaction before the expiration of any waiting period.

**Affidavits**

Affidavit(s) required by § 803.5 must be notarized or use the language found in 28 U.S.C. 1746 relating to unsworn declarations under penalty of perjury. If an entity is filing on behalf of the acquiring or acquired person, the affidavit must still attest to the good faith of the UPE.

In non-§ 801.30 transactions, the affidavit(s) (submitted by both persons filing) must attest that a definitive agreement to merge or acquire has been executed, or if a definitive agreement has not been executed, that a term sheet or draft agreement that describes with specificity the scope of the transaction that will be consummated has been submitted. The affidavit(s) must further attest to the good faith intention of the person filing notification to complete the transaction. (See § 803.5(b)).

In § 801.30 transactions, the affidavit (submitted only by the acquiring person) must attest:

1. That the issuer whose voting securities or the unincorporated entity whose non-corporate interests are to be acquired has received notice, as described below, from the acquiring person;

2. In the case of a tender offer, that the intention to make the tender offer has been publicly announced; and

3. The good faith intention of the person filing notification to complete the transaction.

Acquiring persons in § 801.30 transactions are also required to submit a copy of the notice received by the acquired person pursuant to § 803.5(a)(3) along with the filing. This notice must include:

1. The identity of the acquiring person and the fact that the acquiring person intends to acquire voting securities of the issuer or non-corporate interests of the unincorporated entity;

2. The specific notification threshold that the acquiring person intends to meet or exceed in an acquisition of voting securities;

3. The fact that the acquisition may be subject to the Act, and that the acquiring person will file notification under the Act;

4. The anticipated date of receipt of such notification by the Agencies; and

5. The fact that the person within which the issuer or unincorporated entity is included may be required to file notification under the Act. (See § 803.5(a)).

**Privacy Act Statement**

Section 18a(a) of Title 15 of the U.S. Code authorizes the collection of this information. Our authority to collect Social Security numbers is 31 U.S.C. 7701. The primary use of information submitted on this Form is to determine whether the reported merger or acquisition may violate the antitrust laws. Taxpayer information is collected, used, and may be shared with other agencies and contractors for payment processing, debt collection and reporting purposes. Furnishing the information on the Form is voluntary. Consummation of an acquisition required to be reported by the statute cited above without having provided this information may, however, render a person liable to civil penalties up to the amount listed in 16 CFR 1.98(a) per day.

We also may be unable to process the Form unless you provide all of the requested information.

**Disclosure Notice**

Public reporting burden for this report is estimated to vary from 20 to 382 hours per response, with an average of 144 hours per response, including time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this report, including suggestions for reducing this burden to:

Premerger Notification Office, Federal Trade Commission, Room #5301, 400 7th Street SW, Washington, DC 20024

and

Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503

Under the Paperwork Reduction Act, as amended, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The operative OMB control number, 3084–0005, appears within the Notification and Report Form and these Instructions.

By the direction of the Commission.

**April J. Tabor,**

*Secretary.*

[FR Doc. 2023–13511 Filed 6–28–23; 8:45 am]

**BILLING CODE 6750–01–P**