Exhibit 4

BR   **Business Roundtable**

1000 Maine Avenue, SW, STE 500
Washington, DC 20024
202.872.1260
brt.org

September 27, 2023

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Re:     Request for Comment on Notice of Proposed Rulemaking to Amend Premerger
Notification Rules Implementing the HSR Act
Docket No. FTC-2023-0040

Business Roundtable is an association of more than 200 chief executive officers (CEOs) of America's leading companies, representing every sector of the U.S. economy. Business Roundtable CEOs lead U.S.-based companies that support one in four American jobs and almost a quarter of U.S. GDP. The organization's mission is to promote a thriving U.S. economy and expanded opportunities for all Americans through sound public policies. With the aim of advancing that goal, we are pleased to submit these comments in response to the Federal Trade Commission's (FTC's) Notice of Proposed Rulemaking (NPRM) to amend the premerger notification rules that implement the Hart-Scott-Rodino Antitrust Improvements Act (HSR Act or the Act).[1]

Business Roundtable is concerned that the amendments add immense burdens to business and are designed to chill M&A activity generally, rather than to provide the FTC and Antitrust Division of the Department of Justice (together, "the Agencies") with the notice necessary to determine which transactions to investigate before closing. These amendments are not properly targeted in scope—they both exceed the statutory mandate of a "notification" scheme and fail to provide minimum justifications for imposing burdens required under both the Paperwork Reduction Act and the Administrative Procedure Act. The result would greatly increase the regulatory burden on transactions that are competitively neutral or beneficial, and would thus have the counterproductive effect of harming competition, the U.S. economy, and American workers. The regulation would be so burdensome as to exceed the balance that Congress struck in the scheme it created with the HSR Act, where notification may be followed by a request for additional information ("second request") in cases that warrant investigation.

---

[1] Press Release, FTC and DOJ Propose Changes to HSR Form for More Effective, Efficient Merger Review (June 27, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-doj-propose-changes-hsr-form-more-effective-efficient-merger-review. The docket is available at https://www.regulations.gov/document/FTC-2023-0040-0001. The Federal Register notice, from which we quote is at 88 Fed. Reg. 42178 (June 29, 2023), available at https://www.federalregister.gov/documents/2023/06/29/2023-13511/premerger-notification-reporting-and-waiting-period-requirements.

September 27, 2023
Page 2

Because the vast majority of transactions notified to the Agencies are competitively neutral or procompetitive[2], there is no question that the rulemaking would have an enormous chilling effect on beneficial economic activity. As a result, the burden is very high for the government to justify its need for the additional information required by the amended rules. This is a burden the FTC cannot meet because the existing scheme (or something much closer to it) provides the government with sufficient opportunity to identify and investigate potentially anticompetitive deals. The government should make only the amendments that are necessary to put the government on notice of the nature of a transaction. The statute allows for litigation-like discovery only once the Agencies make an affirmative request about a transaction that has been notified to it, which ensures that large burdens arise only for the transactions that the Agencies have determined may raise some likelihood of violating the antitrust laws.

This comment proceeds in three parts. ***First***, it sets out the legal requirements that the FTC must meet when promulgating amendments to the HSR rules and how the proposal falls short. This part shows how the amendments fail to accomplish any valid purpose under the antitrust laws that a significantly less burdensome scheme (including the existing scheme) could not achieve. ***Second***, it corrects the FTC's underestimate of burden, including with specific examples of provisions that are especially problematic. ***And third***, it discusses the broader costs to the U.S. economy of the proposed scheme, and how alternative approaches would minimize these costs.

    I.      The Proposal Is at Odds with Congress's Intent to Minimize Burden on Transactions that Do Not Raise Competitive Concerns.

Agencies may not promulgate rules that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"[3] or "in excess of statutory [] authority."[4] The proposed amendments would both (1) exceed the authority that Congress granted to the Agencies in promulgating rules about how companies should notify the government under the HSR Act, and (2) impose unjustified regulatory burden in violation of the Paperwork Reduction Act and the prohibition on arbitrary and capricious rulemaking. We proceed by discussing each set of requirements, and then turn to discussing how the proposed amendments burden M&A transactions without justification.

        a.    Intent of the HSR Act

---

[2] Of the 3,520 transactions reported in fiscal year 2021, the FTC and DOJ sought additional information in only 65 of them, less than 2% of reported transactions. Under this proposed rulemaking, 98% of the transactions that raised no competitive issues worth even investigating (no less challenging) would have been subject to extremely burdensome information requests appropriate only for the small percentage of deals that may raise competitive concerns.

[3] 5 U.S.C. §706(2)(A).

[4] *Id.* at §706(2)(C).

September 27, 2023
Page 3

Congress struck a careful balance between burden and need in the HSR Act.  The Act gives the Agencies an opportunity to detect and challenge problematic mergers before they are consummated, on the one hand, while minimizing the burden that might chill mergers, on the other.  The FTC's proposed amendments would destroy that balance, and therefore exceed the authority that Congress granted the FTC to promulgate rules to create a notification form.

First, the text of the statute (15 U.S.C. §18a) makes clear that the purpose of the initial HSR filing is to provide the government with "notification"; subsection (i)(2) explicitly clarifies that the notification scheme is not a substitute for issuing requests under the Antitrust Civil Process Act.  Subsection (d)(1) allows the FTC (with the concurrence of the Assistant Attorney General) to promulgate rules to specify how the "notification" is made, including which "documentary material and information" is "necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated violate the antitrust laws."

The explicit limitation to collect only what is "necessary and appropriate" is at odds with the interpretation that the Agencies may collect any material that might merely be helpful to an enforcement action.  Furthermore, the scheme was designed to ensure that the Agencies would err on the side of asking for less as part of the initial "notification." This is clear from Congress including a fallback: if the "notification" does not contain enough information in an individual case, then subsection (e) allows the Agencies to issue a request for additional information, without any prejudice to their review time.  Once the Agencies receive that additional information, they have a full 30 days to review the transaction (the same amount of time they have with the notification materials, if those materials were sufficient on their own).[5] The most recent amendment to the statute reinforces Congress's concern with overburden and delay.  In 2000, Congress added a requirement that the Agencies reform their merger review practices to ensure that they "eliminate unnecessary burden, remove costly duplication, and eliminate undue delay, in order to achieve a more effective and more efficient merger review process."[6]

The mandate to minimize burden is also apparent in the legislative history and from the scholarly writing at the time the HSR Act was passed.[7]  The Senate Report on the bill as it came out of committee indicated "The Committee believes that [the Act] represents a careful balancing of the need to detect and prevent illegal mergers and acquisitions prior to

---

[5] Note that in the original HSR Act of 1976, the waiting period was only 20 days after compliance with the request for additional information.  See Pub. L. No. 94–435, 90 Stat. 1383.  An amendment in 2000 extended the post-compliance waiting period to 30 days while at the same time creating an internal appeals procedure to ensure that requests for additional information were not "unreasonably cumulative, unduly burdensome, or duplicative." *See* District of Columbia Appropriations Act, 2001, Pub. L. No. 106–553, 114 Stat. 2762.

[6] 15 U.S.C. §18a(e)(1)(B) (2000).

[7] For a review of the legislative procedure leading to passage of the Act, *see* Irving Scher, *Emerging Issues Under the Antitrust Improvements Act of 1976*, 77 COLUM. L. REV. 679 (1977).

September 27, 2023
Page 4

consummation without unduly burdening business with unnecessary paperwork or delays."[8] The Committee's goal was to "neither deter nor impede consummation of the vast majority of mergers and acquisitions."[9]  First, Congress expected the HSR Act to apply to only about 150 of the largest transactions each year.[10]  Representative Rodino, one of the sponsors of the bill, also explained that even the "request for additional information" was not expected to create any significant burden or time delay because it was intended to capture only the documents and data that a company "already assembled" in the ordinary course of planning to do an M&A deal.[11]

Joe Sims, who was Deputy Assistant Attorney General in the Antitrust Division at the time the Act passed and while the implementing regulations were authored, has written about his experience of having been "deeply involved with the negotiations and deliberations on HSR, both on the Hill and within the Ford Administration."[12]  According to Sims, Congress's objective in 1976 was "advance notice to the agencies and production of a minimal amount of easily retrievable information for a small number of large mergers."[13]

Indeed, the Agencies understood Congress to be directing them to minimize the cost of compliance when the Act passed, and again when the Act was amended in 2000 to add the explicit instruction on reducing burden. The Agencies' first HSR report, which recounts efforts to promulgate implementing rules, explains that "the drafting of regulations implementing the Act involves the attempt to strike what is often a difficult balance between the need of the enforcement agencies for 'such documentary material and information relevant to a proposed

---

[8] S. Rep. No. 94-803, at 65 (1976).

[9] *Id.* at 65-66.

[10] H.R. Rep. No. 94-1373, at 11 (1976) (requirements intended to apply only to "the very largest corporate mergers-about the 150 largest out of the thousands that take place every year").

[11] 122 Cong. Rec. H10,293 (daily ed. Sept. 16, 1976) (remarks of Rep. Rodino) ("[P]lainly, Government requests for additional information must be reasonable. The House conferees contemplate that, in most cases, the Government will be requesting the very data that is already available to the merging parties, and has already been assembled and analyzed by them. If the merging parties are prepared to rely on it, all of it should be available to the Government. But lengthy delays and extended searches should consequently be rare. It was, after all, the prospect of protracted delays of many months – which might effectively "kill" most mergers – which led to the deletion, by the Senate and the House Monopolies Subcommittee, of the "automatic stay" provisions originally contained in both bills. To interpret the requirement of substantial compliance so as to reverse this clear legislative determination would clearly constitute a misinterpretation of this bill. In Sum, a government request for material of dubious or marginal relevance, or a request for data that could not be compiled or reduced to writing in a relatively short period of time, might well be unreasonable. In these cases, a failure to comply with such unreasonable portions of a request would not constitute a failure to 'substantially comply' with the bill's requirements.").

[12] Joe Sims & Deborah P. Herman, *The Effect of Twenty Years of Hart-Scott-Rodino on Merger Practice: A Case Study in the Law of Unintended Consequences Applied to Antitrust Legislation*, 29 J. Reprints Antitrust L. & Econ. 389 (2000).

[13] *Id.*

September 27, 2023
Page 5

acquisition as is necessary and appropriate to enable [them] to determine whether such acquisitions may, if consummated, violate the antitrust laws,' and the cost to the persons who must provide such information."[14]  The HSR report from 2001 explained "[t]he agencies are continuing their ongoing review of the HSR program in order to make it as minimally burdensome as possible without compromising the agencies' ability to investigate and interdict proposed transactions that may substantially lessen competition."[15]

Reading the text and history of the HSR Act together, it is clear that any implementing rule would exceed the statutory authority that Congress granted to the Agencies if it would, as this proposal does, transform the premerger "notification" form into a full-blown investigative demand that far exceeds the data that "has already been assembled and analyzed by [the merging parties]."[16]  The FTC admits that the increased burden will go far beyond that limitation by "requir[ing] filing parties to compile or generate the requested information specifically for the HSR Filing."[17]  The obligation to collect ordinary course documents that would not necessarily be presented to deal decisionmakers also raises questions about recordkeeping obligations, which are themselves a significant burden not contemplated in the NPRM.

Additionally, requests for information are not reasonable if they would materially delay a transaction beyond the 30 days that Congress was willing to pause transactions for agency consideration.  As we will explain below, the proposed amendments would very likely add significantly more than 30 days to a company's filing preparation time, which would have the effect of extending closing dates by an order of magnitude. It cannot be within the Agencies' discretion to more than double the delay that Congress imposed on a transaction without any particularized concern that the transaction warrants investigation.  Moreover, the greatly expanded scope and subjective nature of information called for by the amendments would threaten to undermine Congress's design by providing vast scope for the agencies to reject filings as deficient and increase effective waiting periods even further outside of the statutory framework.

In sum, the FTC is not free to ignore the mandate it has long understood as inherent to the scheme: it must keep regulatory burdens demands to those that are "necessary and

---

[14] Fed. Trade Comm'n, HSR Report, Annual Report to Congress for Fiscal Year 1977 (1977), https://www.ftc.gov/system/files/documents/reports/1st-report-fy-1977/1annrpt1977.pdf

[15] Fed. Trade Comm'n, HSR Report, Annual Report to Congress for Fiscal Year 2001 (2001), https://www.ftc.gov/sites/default/files/documents/reports/annual-report-congress-regarding-operation-hart-scott-rodino-premerger-notification-program/hsrarfy2001.pdf.

[16] 122 Cong. Rec. H10,293 (daily ed. Sept. 16, 1976), supra n.11.

[17] *See* Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42184 (proposed June 23, 2023).  See also *id.* at 42207 (describing that only "[c]ertain proposed changes" will require "the acquiring person to collect and report information that the Commission believes is held in the acquiring person's ordinary course of business records").

September 27, 2023

Page 6

appropriate"[18], including by distinguishing those mergers that warrant more extensive review, and excepting those that do not. Congress believed it was passing legislation to subject about 150 of the most impactful mergers per year to suspensory review with the HSR Act, and that "most" would not receive additional requests for information at all; so a new regulation that would subject more than 3,000 transactions[19] annually to an information-gathering exercise that "could not be compiled or reduced to writing in a relatively short time" would be out of step with Congress's intent by several orders of magnitude.[20]

### b. Limitations in the Paperwork Reduction Act and the Administrative Procedure Act

In addition to the limits placed on the FTC's authority to pause mergers for lengthy and burdensome data collection as part of premerger "notification" in the HSR Act itself, the FTC's authority is cabined by the Paperwork Reduction Act and the APA's prohibition on arbitrary and capricious agency action.

The Paperwork Reduction Act (PRA) instructs the Director of the Office of Management and Budget to "minimize the federal information collection burden," including when fulfilling the duty of reviewing and approving agency actions like the proposed amendments here.[21] The PRA

---

[18] 15 U.S.C. §18(a)(d)(1).

[19] In 2021, the most recent year for which statistics are available, the Premerger Notification Office received filings for 3,520 merger transactions. *See* FED. TRADE COMM'N, HSR REPORT, ANNUAL REPORT TO CONGRESS FOR FISCAL YEAR 2021 (2021), https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf.

[20] Where an administrative agency vastly exceeds the role that Congress likely had in mind, there are constitutional concerns as well, including principles raised under the "major questions doctrine" and the "nondelegation doctrine." We note these concerns for the record, but focus in this comment on explaining how the proposed amendments are needlessly burdensome. The decision to impose such burden would demonstrate that the agency had both usurped the authority to make "the basic and consequential tradeoffs. . . that Congress would likely have intended for itself," West Virginia v. EPA, 142 S. Ct. 2587, 2613 (2022) (citing W. Eskridge, *Interpreting Law: A Primer on How To Read Statutes and the Constitution* 288 (2016) ("Even if Congress has delegated an agency general rule-making or adjudicatory power, judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions.")), and had failed to follow an "intelligible principle" when Congress limited the agency's information request to that which is "necessary and appropriate." *See* J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928); Gundy v. United States, 139 S. Ct. 2116 (2019).

[21] 44 U.S.C. §3504(c). Under the PRA, the term "burden" means "time, effort, or financial resources expended by persons to generate, maintain, or provide information to or for a Federal agency, including the resources expended for—

    (A) reviewing instructions;

    (B) acquiring, installing, and utilizing technology and systems;

    (C) adjusting the existing ways to comply with any previously applicable instructions and requirements;

    (D) searching data sources;

September 27, 2023
Page 7

also requires agencies promulgating an information request to designate a Chief Information Officer that will review it and provide "a specific, objectively supported estimate of burden."[22] The agency must also certify that "each" collection of information is "necessary for the proper performance of the functions of the agency"; "is not unnecessarily duplicative of information otherwise reasonably accessible to the agency"; and "reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency."[23] There is a special provision to ensure that the agency exempts small businesses as appropriate, or reduces their burden commensurate with their size.[24]

The decision to require unnecessary information from the public would also be arbitrary and capricious under the APA. Arbitrary-and-capricious review requires that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[25] When, as here, the "justification" for a significant new burden on the public is that it is "necessary" for the government to fulfill its mission to review whether certain transactions violate the antitrust laws[26], then the agency should both accurately measure the burden, and also explain which transactions it would have been able to identify and challenge with the new rule that it could not under the existing rule.

Without considering the ways in which the existing rule was in fact deficient in practice, it is impossible for the FTC to judge whether the added burden will make any difference in the Agencies' enforcement mission. It is also impossible for commenters to explain how a less burdensome approach would address the situations where the Agencies believe they could

---

   (E) completing and reviewing the collection of information; and

   (F) transmitting, or otherwise disclosing the information."

44 U.S.C. §3502.

[22] 44 U.S.C. §3506(c)(1)(A).

[23] 44 U.S.C. §3506(c)(2).

[24] *Id.* Small business is defined by the Small Business Administration and varies by industry, but a "General Medical and Surgical Hospital" and a "Software Publisher," as two examples, would both be considered small businesses if they had average annual revenues of $47,000,000 or less. *See* 5 U.S.C. §601; 13 CFR §121.105 (2005); Size Standards Tool, SMALL BUSINESS ADMINISTRATION, https://www.sba.gov/size-standards/index.html (last visited 09/27/2023).

[25] Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016) (quoting Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983)).

[26] The FTC states that the added burden is justified because it "is necessary and appropriate for effective and efficient review of HSR Filings to determine within the initial waiting period whether the transaction may, if consummated, violate the antitrust laws." Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. at 42194. It also offers the vague statement: "Despite the added burden for filing persons, on balance, the Commission believes that the benefits to the Agencies' merger review would be significant and would help address information asymmetries between Agency staff and the filing person in the initial waiting period." *Id.* at 42184.

September 27, 2023
Page 8

have obtained a better result.  Moreover, if the FTC never considers, in a specific way, the magnitude of benefit to the enforcement mission, then it will never make an informed decision whether the vast burden was "justified" by the magnitude of the benefit.  The FTC is also required to articulate the magnitude of the benefit because it will allow a reviewing court to judge whether the agency used an appropriate methodology and was engaging in rational decision-making about whether the tradeoff between benefit and burden was an acceptable one.[27]  The NPRM explains the FTC's methodology in determining the <u>burden</u> of the rule, but it offers no similar explanation of how to think about the expected <u>benefits</u>.

c.    There Is No Evidence of Benefit to Justify the Extra Burden

The obvious alternative to the NPRM is for the Agencies to use their second request authority to collect the same information (when it is necessary) for any transaction that raises a particularized concern.[28]  The Agencies already have a process for noting that a transaction raises a particularized concern: they assign the transaction to one of the Agencies through a "clearance" process and the designated agency opens a preliminary investigation.  Approximately 15% of filed transactions in the period from 2001-2020 were subject to a preliminary investigation.[29]  Limiting burdensome requests to this group of transactions would yield all the benefits of the information that the FTC anticipates, but without a large portion of the costs.  The FTC has not explained why this approach, or another approach that quickly identifies transactions that raise competitive concerns and limits the information request to them, would not fulfill its purposes.  In general, the NPRM is unclear about what the FTC's purposes are.

The NPRM explains that there is much to do in the first 30-day waiting period[30], and suggests that the new information could help the Agencies formulate better, more targeted second

---

[27] City of Portland v. EPA, 507 F.3d 706, 713 (D.C. Cir. 2007) (noting that "we will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses"); Owner–Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 206 (D.C. Cir. 2007) (vacating regulatory provisions because the cost-benefit analysis supporting them was based on an unexplained methodology).

[28] The Agencies could also pass a rule adopting a "short form" process, similar to the one in Europe, to exempt transactions from the burdensome information collection as an initial matter. We discuss that possibility in more detail below.

[29] Logan Billman & Steven C. Salop, *Merger Enforcement Statistics: 2001-2020*, 85 ANTITRUST L. J. 1, 10-11 (2023), available at https://www.americanbar.org/digital-asset-abstract.html/content/dam/aba/publications/antitrust/journal/85/1/merger-enforcement-statistics-2001-2020.pdf.

[30] *See* Premerger Notification; Reporting and Waiting period Requirements, 88 Fed. Reg. 42179 (proposed June 29, 2023).

requests.[31]  However, that is exactly what the "voluntary access letter" (VAL) process has been used for[32], and it is in the parties' interest to cooperate with those VAL requests to the extent that they will lead to more targeted second requests.  The NPRM claims that the VAL process could be improved upon because parties do not have to comply with it, and because it takes staff resources and time to collect the information.[33]  However, it seems unlikely that sending the parties who have already been designated for a preliminary investigation a largely pre-formulated request uses more than a *de minimis* amount of staff time.  And in any event, the NPRM proposal would use significantly more staff time just to review the voluminous HSR filings for completeness, even in transactions where a preliminary investigation is not necessary.

In particular, the Agencies have pointed to no transactions where they would have drafted their second request differently if they were in possession of the information at issue.  That is likely because, when there was room to negotiate the parameters of a second request, the Agencies had at their disposal the sort of information that would be helpful to them, pursuant to the VAL process during the initial 30-day waiting period.  This process of parties cooperating with the Agencies prior to receiving a second request is so common, and understood to be in the parties' benefit, that many transactions "pull and refile" in order to continue the beneficial engagement for longer than the 30-day waiting period, prior to receiving a second request.[34]  Once again, though this engagement takes staff time, it would take far less time than the staff engagement with the voluminous and indiscriminate information required by the proposed HSR filing.

The NPRM suggests another rationale: that the contemplated information would help the Agencies identify problematic transactions that they missed, and which closed (either because a preliminary investigation was never opened at all, or because the preliminary investigation during the first 30-day waiting period with the existing HSR notification led the Agencies to

---

[31] *Id.* at 42180 (Current system results in "in-depth investigations that are either too broad or too narrow due to the insufficient detail about [the parties and their premerger relationship] that is currently provided in HSR filings.").

[32] *Id. See also* DEPT. OF JUSTICE, ANTITRUST DIVISION, MODEL VOLUNTARY REQUEST LETTER (Nov. 2018), https://www.justice.gov/atr/page/file/1111331/download (visited Sept. 26, 2023).

[33]  *Id.* (indicating that the amendments would "greatly enhance the Agencies' ability to complete the review of a reportable transaction in a short period of time . . . [and without] the need to rely on the voluntary submission of additional information by the parties and third-party industry sources during the initial waiting period.").  Note that nothing in proposal would (or could) change the Agencies' posture with respect to third-party industry sources.  Additionally, as discussed below, the Agencies have not pointed to evidence of that they have been unable to complete accurate substantive review in the statutorily required short period of time that they have, with the current version of the HSR filing.

[34] A survey by the American Bar Association, Antitrust Section, found that one-third of second requests were preceded by pulling and refiling. *See* Peter Boberg & Andrew Dick, *Findings from the Second Request Compliance Burden Survey*, 14 THE THRESHOLD 26 (2014), available at https://media.crai.com/wp-content/uploads/2020/09/16164357/Threshold-Summer-2014-Issue.pdf.

September 27, 2023
Page 10

believe, erroneously, that there were no competitive concerns worthy of a second request).[35] Again, the FTC has offered no specific examples.[36]  Given that every "missed" anticompetitive transaction would be quite easy to identify—the negative effects on competition would be apparent in the real world, and there would presumably be complainants who were harmed, and could testify to the effects—the FTC's failure to identify any such transactions must mean that there were none attributable to the failure to open a preliminary investigation or obtain sufficient information to decide whether to issue a second request.[37]  Indeed, the agencies can and do investigate and challenge transactions that are below the HSR reportability thresholds entirely.

The vast resources available to investigators, including the wealth of online materials that were not easily available when the HSR Act was passed (i.e., trade publications, SEC filings and shareholder presentations, and consumer- or trade partner-facing websites), nearly ensures that staff do not need the proposed additional information to decide with accuracy whether to open a preliminary investigation, engage in the VAL process, talk to market participants, and ultimately to issue a second request or take an enforcement action.  Indeed, due to the explosion in access to information since 1976, Agency staff members are probably far more informed than Congress ever envisioned was possible without a significant information request.

Indeed, it is clear that the Agencies already have sufficient tools to gather information on a wide variety of their antitrust theories because they have recently brought several cases

---

[35] *See* 88 Fed. Reg. 42179-80 (explaining "The Agencies have stepped up efforts to review transactions for *all* their potential competitive impacts," and justifying the proposed changes as "necessary and appropriate in order for the Agencies to vigorously enforce the nation's antitrust laws").

[36] The NPRM indicates that "sectors of the economy that rely on technology and digital platforms to conduct business" might rely more on M&A to grow, and cites an FTC study of non-reportable acquisitions by select tech companies, but that study is inapposite: it did not involve the types of transactions that would be covered by the proposed rule, and it did not identify any transactions in the tech sector that raised concerns under the antitrust laws.  88 Fed. Reg. 42179 & n.4.  This vague conclusory statement provides no justification for why the changing composition of the economy requires vastly more burdensome HSR filings than Congress and the Agencies anticipated when the Act was passed.

[37] One place to look for instances where the Agencies may claim that they "missed" a merger is by looking to their consummated merger challenges. The high-profile cases from the past few years (Facebook/Instagram, Facebook/WhatsApp, Google/DoubleClick) were not "missed" at the HSR stage – they were thoroughly investigated and the Agencies decided not to challenge them at the time of consummation.  *See* Complaint, *United States v. Google LLC*, Case No. 23-cv-00108, Dkt. No. 1 at 33 (E.D. Va. Jan. 24, 2023); Memorandum Opinion, *FTC v. Facebook, Inc.*, Case No. 20-cv-3590, Dkt. No. 90 at 32 (D.D.C. Jan. 11, 2022).  The relevant history of other consummated merger cases is not immediately apparent in the public record (i.e., whether they were below reporting thresholds or whether they were subject to investigation before close), but there were 44 such challenges in the period from 2001 to 2020.  *See* Logan Billman & Steven C. Salop, *Merger Enforcement Statistics: 2001-2020*, 85 ANTITRUST L.J. 1, 6 (2023) available at https://www.americanbar.org/digital-asset-abstract.html/content/dam/aba/publications/antitrust/journal/85/1/merger-enforcement-statistics-2001-2020.pdf. If the Agencies believe that any of these 44 are examples of "missing" problematic mergers due to the current HSR scheme, then they should explain the circumstances of those cases.

September 27, 2023
Page 11

challenging mergers under theories that did not correspond to a specific instruction or request in the initial HSR filing.  For instance, the Agencies have brought cases claiming harms to labor markets[38] and vertical theories of harm[39]—they were able to identify and gather information relevant to those theories despite the HSR form having no specific requirement that parties provide information in those areas.

To the extent that the FTC is pursuing these amendments to get additional time to review information from the merging parties, that is an unacceptable justification.[40]  It is probably true that the Agencies could see a "benefit" to their enforcement efforts on those transactions that they ultimately challenge if they were to start the whole review process with a trove of information that is akin to litigation discovery and could then spend the entire pendency of the second request compliance period and the 30-day review period following that to build a case using that information.  However, that scheme is obviously outside of Congress's statutory design.  Not only is it vastly overinclusive for deals that never would have been challenged and not designed to distinguish such deals, but Congress was willing to delay transactions by only 30 days for case preparation when the Agencies had in hand the sort of information that would allow them to judge whether or not a transaction would violate the antitrust laws.  Though it is possible the Agencies could, in some sense, "benefit" from more time, Congress struck a different balance.

What is more, even if you could debate whether there is any cognizable benefit to the Agencies of receiving additional information for some subset of potentially problematic transactions, there is no question that there is zero benefit to the Agencies from getting additional information in the vast majority of transactions where there are no competitive concerns.  The Agency heads have repeatedly made it clear that the overwhelming majority of filed transactions do not, and should not, receive "so much as a phone call" from the Agencies.[41]

---

[38] See *Justice Department Sues to Block Penguin Random House's Acquisition of Rival Publisher Simon & Schuster*, Dept. of Justice  (Nov. 2, 2021), https://www.justice.gov/opa/pr/justice-department-sues-block-penguin-random-house-s-acquisition-rival-publisher-simon.

[39] See United States v. AT&T, Inc., Case No. 18-5214, (D.C. Cir.) (2019); United States v. UnitedHealth Group, Inc., Case No. 1:22-cv-0481 (D.D.C.) (2022); In re Illumina, Docket No. 9401 (F.T.C. 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/d09401commissionfinalorder.pdf; In re Nvidia/Arm, Docket No. 9404 (F.T.C. 2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/D09404%20-%20COMMISSION%20ORDER%20DISMISSING%20COMPLAINT.pdf; Fed. Trade Comm'n v. Meta Platforms, Inc., Case No. 5:22-cv-04325-EJD (N.D. Cal. 2022), Fed. Trade Comm'n v. Microsoft, Case No. 23-cv-02880-JSC (N.D. Cal. 2023).

[40] It is unclear if the FTC intends this effect when it explains that the changes will help it "vigorously enforce the nation's antitrust laws," Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42180.

[41] Jonathan Kanter, Ass't Att'y Gen., Dept. of Justice, Remarks at the Georgetown Enforcement Symposium (Sept. 19, 2023), notes on extemporaneous remarks on file. *See also* The Economic Club of New York, *FTC Chair Lina M. Khan | Ensuring a Fair and Transparent Marketplace*, YouTube (July 24, 2013) https://www.youtube.com/watch?v=X7u3JwSfHZY ("Again, 98 percent of deals [are] going through without even a second question.  It's really an issue on the margins . . . .").

September 27, 2023
Page 12

This conclusion is crystal clear from the data: over the 20 year period from 2001 to 2020, there were 31,530 transactions notified to the Agencies pursuant to the HSR Act.[42]  Of these, 4,850 (15.4%) were "cleared" to an agency for further review under a preliminary investigation.[43]  That means that in 84.6% of transactions filed in the 20 year period, it was unlikely that the Agencies would have found any reason to utilize the extra information filed—the attorney resources needed to consider that information would have been deployed elsewhere on higher priority cases.  Moreover, this trend toward fewer matters with any investigation at all is increasing as more deals above the filing threshold are notified each year.[44]  Additionally, Agency officials have recently been trumpeting that their enforcement efforts (far from being stymied by the current notification form) are causing the trend to accelerate.  As AAG Jonathan Kanter recently put it, "We continue to see thousands of mergers per year.  The difference now is that fewer deals present violations of the law."[45]  If that is the case, then the justification for increasing burden on all filed deals has never been lower.

The data is also illustrative that the Agencies are already "overcollecting" information to a fairly substantial degree when they do open a preliminary investigation and assign staff to consider that information. When the staff used the VAL process or other information gathering techniques in the preliminary investigation phase, they found that a burdensome second request was not warranted 80.0% of the time—that is, only 969 of 4,850 preliminary investigations received a full-blown litigation-like request.[46]   And that is not because the Agencies are so resource-strapped that they are issuing second requests only when it is crystal clear there is a competitive concern.  When the Agencies issued a second request during this time period, the investigation led them to conclude that the transaction raised competitive concerns most of the time, but 274 of these 969 second request transactions had no further action (28.3%).[47]  This number roughly represents the rate at which the Agencies have "overcollected" under the current HSR scheme—28.3% of burdensome information requests go

---

[42] Logan Billman & Steven C. Salop, *Merger Enforcement Statistics: 2001-2020*, 85 ANTITRUST L. J. 1, 10-11 (2023), available at https://www.americanbar.org/digital-asset-abstract.html/content/dam/aba/publications/antitrust/journal/85/1/merger-enforcement-statistics-2001-2020.pdf.

[43] *Id.*

[44] *See* Fed. Trade Comm'n & Dept. of Justice, HART-SCOTT-RODINO ANNUAL REPORT, FISCAL YEAR 2021 (2021), https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf.

[45] Remarks of AAG Jonathan Kanter, Georgetown Enforcement Symposium (Sept. 19, 2023), https://www.justice.gov/opa/speech/assistant-attorney-general-jonathan-kanter-delivers-remarks-2023-georgetown-antitrusthttps://www.justice.gov/opa/speech/assistant-attorney-general-jonathan-kanter-delivers-remarks-2023-georgetown-antitrust.

[46] Logan Billman & Steven C. Salop, *Merger Enforcement Statistics: 2001-2020*, 85 ANTITRUST L. J. 1, 10-11 (2023), available at https://www.americanbar.org/digital-asset-abstract.html/content/dam/aba/publications/antitrust/journal/85/1/merger-enforcement-statistics-2001-2020.pdf.

[47] *Id.*

September 27, 2023
Page 13

to companies whose deal is procompetitive or competitively neutral.  Moreover, if the Agencies think they are undercollecting, they can use the current scheme to issue more second requests, including second requests that include information sought by the proposed HSR changes.  Despite all of this, the Agencies' plan to upend this entire scheme and issue highly burdensome requests on all transactions, around 96.9%[48] of which would not have warranted a second request under the current scheme, is arbitrary and capricious, and at odds with Congress's intent.

II.    The FTC Has Underestimated the Burden of Complying with the Proposed Rule

Though the proposed amendments are not justified even under the FTC's calculation of burden in the NPRM, that calculation of burden is materially flawed.  Given the significant complexity added by the proposed amendments, the FTC has underestimated the time and cost required to comply with the regulation.

First, the methodology for calculating burden—"PNO staff canvassed current Agency staff who had previously prepared HSR filings while in private practice to estimate the projected change in burden due to the proposed amendments to the Instructions"[49]—is biased and inaccurate.  There is no indication that Agency staff relied on any data when trying to create an estimate based on memories from past private practice. Additionally, the amount of burden from document requests is increasing all the time as methods of communication proliferate, and more sources of communication must be searched.  So, relying on staff whose only experience is in the past is likely to systematically undercount the burden.  Additionally, the relevant experience is not "preparing an HSR filing," but complying with a VAL or a second request.  Many of the amendments require narrative responses, document searches, and compilations of data that are much more comparable to those experiences.

Second, expressing the added burden in hours alone is flawed because part of what the HSR Act requires is minimizing the overall delay of transactions.  A significant portion of the length of preparing a VAL response or a second request is the time it takes to schedule meetings in advance, or to find and coordinate stakeholders at a company, in conjunction with their ordinary course responsibilities. There is significant "lost time" in coordinating that is not reflected in billable hours.  The burden (in terms of time) would be more accurately counted by a number of weeks that it would take to coordinate an effort to obtain information from inside a company, prepare it in the format required, and get confirmation of its accuracy.

It would likely delay a transaction an average of 2-3 months to collect the new information, even assuming multiple people work simultaneously to shepherd different aspects of the project (i.e., billing hours at once).  This estimate is consistent with practitioner surveys that

---

[48] Out of 31, 530 transactions, there were 969 second requests, which is equivalent to 3.1%.

[49] *See* Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed Reg. 42207 (Proposed June 23, 2023).

September 27, 2023
Page 14

have gathered information about second request response times. Two surveys, in 2013 and 2007, show the median length of time spent complying with a second request was 5.9 months and 7 months, respectively.[50] These median lengths are appropriately analogous because they involved investigations where some of the companies were not required to fully comply with the second request, and so the actual production of information was likely commensurate with the proposed changes.

The prior practitioner surveys on second request compliance also show significant deficiencies in the FTC's cost estimate: the median cost for both sides of a transaction complying was $4.3 million, with a range from $2 to 9 million (all in 2013 dollars). Importantly, compliance costs in those surveys included items the FTC failed to count in the cost: electronic review, data processing, and economist fees. Those estimates may even be low because they did not include the company's labor to assist outside advisors in preparation, which is a cost the FTC acknowledges should be included. Even still, this estimate of compliance costs from actual experience dwarfs the FTC's estimate of $49,324 per filing (or $98,647 per transaction, assuming the typical two filings per transaction), which is based only on a too-low estimate of hours, multiplied by a too-low "executive and attorney compensation" rate.[51] The $4.3 million per transaction is a much closer estimate to reality than the FTC's because it looks at actual expenditures in roughly analogous situations.

In addition to these overall problems and methodology issues, there are various specific costs, concerns, and complexities that the FTC's NPRM does not account for:

- There are significant costs associated with delaying a deal that will not ultimately be blocked, including the cost of securing financing over a longer period of time, and the cost of uncertainty to employees and business partners.

- Not all transactions that are notified pursuant to the HSR Act are publicly announced, and there are significant risks of an otherwise non-public deal becoming public from the requirement to submit customer and supplier contact information. Many companies maintain confidential relationships with customers and/or suppliers, so submitting their information would require disclosing the situation and risking the deal becoming public against the parties' wishes, and in tension with the design of the confidentiality provisions in the HSR

---

[50] *See* Peter Boberg & Andrew Dick, *Findings from the Second Request Compliance Burden Survey*, 14 THE THRESHOLD 26, 27 (2014), https://media.crai.com/wp-content/uploads/2020/09/16164357/Threshold-Summer-2014-Issue.pdf.

[51] *See* Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42208. One specific flaw to draw the Agencies' attention to is the hourly compensation number. We think the hourly rate that the FTC used—$460—likely does not account for the average billing rate of an expert antitrust attorney. Given the multiple complex issues going to substantive questions of antitrust law, companies will need to hire specialized antitrust counsel to comply with the proposed notification form. Even experienced associates that are part of specialized antitrust practices typically bill at rates at least twice as high as that estimate.

September 27, 2023
Page 15

Act.  Deals becoming public can hamper business planning when business partners want to delay signing contracts to see the outcome of the proposed transaction.

- The requirement to provide narratives for transaction rationale, horizontal overlaps, and supply relationships is duplicative of the document productions the proposal would also require. Moreover, summarizing the content of the documents is a subjective exercise that could give the Agencies grounds to declare a filing incomplete (see related concern below).

- The opportunity-cost to businesses of using employees for information requests, and to draft or review narrative responses is higher than the employee's hourly rate.  It is also unclear that the FTC's methodology of asking for Agency staff's experience in private practice even attempted to account for company employees' time dedicated to the collection and production process that would be required.

- Unlike with similar requests made as part of a second request or VAL, companies have no ability to consult with staff at the Agencies to get clarity on the most useful presentation of data or information, resulting in wasted effort and higher cost as compared to similar second requests.  Additionally, there is no internal petition process to reduce "unduly burdensome" aspects of the filing, as contemplated in 15 U.S.C. § 18a(e)(1)(B)

- Unlike with similar requests made as part of the second request process, there is no allowance for a company to "substantially" but not "fully" comply with the HSR notification.  This means the Agencies will be able to penalize companies for minor perceived failures and subject them to lengthy back-and-forth negotiations to come into compliance. This will also lead to companies over-collecting out of risk aversion when submitting initially (driving up burden and cost), and the Agencies will have more power to delay transactions, compounding the problems listed above.

- Though there may be economies of scale (or experience) with some of the categories of information request, small companies will not experience those economies, and as a result the burden will be especially high on them.

For some specific requests, the cost of providing the information far exceeds any benefit because the Agencies could not reasonably rely on the information to make substantive determinations under the antitrust laws.  For instance:

- The requirement to provide drafts of documents is extremely burdensome: modern word processing and productivity software can automatically save and store hundreds

September 27, 2023

Page 16

or thousands of drafts with very little difference in content, which differences may never be sent to any decisionmakers for consideration.  The NPRM is unclear on whether such automatically stored versions are "drafts" that must be produced.[52]  Even when changes are circulated for consideration, they often have no relevance to the subject matter sought under current Item 4(c) and (d) requirements (e.g., they could reflect changes in deal financing).  Producing drafts also requires making legally complex and time-consuming judgment calls about which edits reflect privileged advice.  This process will require the use of costly e-discovery tools and privilege logs that have not typically been used at the HSR stage.  Despite all these new costs, drafts have limited probative value because they can reflect inaccurate information that the company would not act on.  Sorting out the differences between drafts, or which draft is operative will require substantial Agency time that is very unlikely to assist in determining the competitive consequences of the transaction.

- The requirement to provide numerous new categories of documents such as periodic plans, reports, and contracts (as well as authors and job titles) imposes a significant new burden because many companies do not store documents in central locations from which they can easily be collected. Collecting this information requires company and counsel resources to locate the knowledgeable employees (who usually are not involved in transaction planning), to interview document custodians to try to reconstruct author information, and to cross-check other possible sources to ensure that the files are complete.  These documents have limited probative value (and may be outside the scope of the HSR statute) because, by the FTC's own definition, they are unrelated to the transaction.

- The cost of requiring parties to submit Item 4(c) and (d) documents prepared by or for "supervisory deal team leads" far outweighs any potential benefit.  The Agencies are already receiving materials that are prepared by or for officers or directors, who are the ultimate decisionmakers with respect to a transaction.  The documents of consequence to understand the transaction are those being prepared by or for officers and directors, who render decisions that reflect the company's position and plans.  Documents prepared by deal team leads, but which did not make it in front of officers or directors, are unlikely to reflect the most accurate information or conclusions that guide a company's actions.  Finally, the definition of the term "supervisory deal team leads" is ambiguous which will create compliance risk because companies will be forced to make difficult judgment calls as to whether an employee has had sufficient involvement in a transaction to qualify as a "supervisory deal team lead."[53]

---

[52] Any lack of clarity of this kind increases business uncertainty, the likely need for specialized counsel, and the risk of Agency staff extending the time for review by declaring a filing non-compliant.

[53] Again, any lack of clarity of this kind increases business uncertainty, the likely need for specialized counsel, and the risk of Agency staff extending the time for review by declaring a filing non-compliant.

September 27, 2023
Page 17

- The requirement to provide labor market data tracked to the USDA's "commuting zones and labor market areas" and the Bureau of Labor Statistics' "standard occupational classification" is extremely burdensome because companies do not typically keep HR data consistent with this format. Additionally, the data is not probative because (1) the commuting zones tool was last updated in 2012 and is identified by the USDA as "discontinued"; (2) companies do not think about their hiring pool (and competitors in the hiring process) according to these distinctions in the ordinary course, so they are unlikely to reveal anything about competitive conditions; and (3) courts have not used SOC codes or commuting zones as a proxy to measure substantive or geographic dimensions of competition for labor.

- The requirement to provide 5 years of data about penalties incurred from the DOL, NLRB, and OSHA would be extremely burdensome because companies do not typically keep aggregated data in this format. Additionally, this is government data that is available to the FTC, so asking for it does not comport with the requirements of the Paperwork Reduction Act. Additionally, the data is not probative because neither the Agencies nor courts have ever used it to prove market power in labor markets. Nor could the Agencies use the data to investigate the potentially "anticompetitive, unfair, and deceptive" labor practices of a company more generally.[54] Doing so would exceed the statutory authority of the HSR Act, which allows the Agencies to collect only information that is "relevant to a proposed acquisition" and which is necessary to determine whether "such acquisition" would violate the antitrust laws.[55]

III. Alternative Approaches Would Lessen Burden Substantially, in Line with Policy Goals that Are Important to the U.S. Economy

The consequence of the proposed amendments will be to place a regulatory tax on all M&A activity, which will disproportionately affect procompetitive and competitively neutral deals as well as small businesses. That is because the small portion of transactions that raise competitive concerns are already burdened with onerous information requests under the current system, and often price those regulatory delays and costs into their deals. Although some of the proposals in the NPRM request information that goes beyond information requested in a typical Second Request, this rule would not materially change the amount of information that those transactions produce to the Agencies. Procompetitive and competitively neutral deals, on the other hand, will feel the full effects of the time-and-cost tax. This tax is also regressive: smaller businesses, including startups looking to exit by acquisition,

---

[54] The FTC's recent memorandum of understanding with the Department of Labor suggests a broader investigative mission along these lines. *See* Press Release, Fed. Trade Comm'n, FTC, Department of Labor Partner to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices (Sept. 21, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/09/ftc-department-labor-partner-protect-workers-anticompetitive-unfair-deceptive-practices.

[55] 15 U.S.C. §18a(d)(1).

September 27, 2023
Page 18

are less likely to be equipped with legal teams and resources to handle this sort of information request. The regulatory transaction costs will also represent a larger portion of their deal values, meaning that they will be more likely to lose out on strategic deals or sales that reward their innovation and entrepreneurship.

This unnecessary threat to M&A activity is extremely concerning. As Business Roundtable has explained in several recent comments to the antitrust Agencies, M&A activity is an enormous engine of economic growth in the United States, benefiting businesses of all sizes and their customers.[56] U.S. companies are most competitive when they can exercise the free ability to put assets to their highest and best use, including to achieve economies of scale and other benefits of concentration; this tool is especially important for keeping U.S.-based companies competitive on the global stage with state-sponsored firms based in other parts of the world. M&A is also essential for a dynamic economy: new uses and combinations of assets, as well as innovative breakthroughs, constantly renew the intensity of competition to improve offerings to consumers. For example, a merger of established companies often creates benefits by allowing assets or products to be used together in ways that would have been hard to achieve through arm's-length contracts.[57] Also, the possibility of being acquired is an important incentive for innovative startup companies and the firms that financially support them (e.g., venture capital and private equity).[58] Empirical research has shown that reducing the likelihood

---

[56] Indeed, it is an axiom of industrial organization that the combination of complements into a single firm structure creates value for consumers. R.H. Coase, *The Nature of the Firm*, 4 ECONOMETRICA 386 (1937). *See also* Fed. Trade Comm'n, Conglomerate Effects of Mergers, OECD Competition Committee Meeting (June 4, 2020) contribution by the United States, https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/oecd-conglomerate_mergers_us_submission.pdf ("Mergers are one means by which firms can improve their ability to compete. It would be illogical, then, to prohibit mergers because they facilitate efficiency or innovation in production. Unless a merger creates or enhances market power or facilitates its exercise through the elimination of competition—in which case it is prohibited under Section 7—it will not harm, and more likely will benefit, consumers."); Competition Enforcement and Regulatory Alternatives – Note by the United States, OECD Competition Committee Meeting (June 7, 2021), ("Mergers may also generate efficiencies that produce non-price benefits, such as improved quality, enhanced service, new products, or stronger incentives and ability to engage in, or increase, innovative efforts. The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any market.").

[57] Courts have recognized this foundational principle. FTC v. H.J. Heinz Co., 246 F.3d 708, 720 (D.C. Cir. 2001) ("a merger's primary benefit to the economy is its potential to generate efficiencies"); St. Alphonsus Med. Ctr.–Nampa v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 789 (9th Cir. 2015) ("a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products"); ProMedica Health Sys., Inc. v. FTC, 749 F.3d 559, 571 (6th Cir. 2014) (same).

[58] *See* NVCA Yearbook, National Venture Capital Association (2020), https://nvca.org/wp-content/uploads/2021/03/NVCA-2021-Yearbook.pdf (the most common form of payout for entrepreneurs is acquisition, not IPO: from 2010 to 2020, the average annual ratio of acquisitions to IPOs for VC-backed companies was approximately 13:1); Amicus Curiae Brief of Pharmaceutical Research and Manufacturers of American, FTC v. Amgen Inc., Case No. 23-cv-3053, Dkt No. 143 Ex. A, at 1 (Aug. 25, 2023) ("[M]uch pharmaceutical innovation has been driven by startups and smaller companies. Though those small entities have been incubators for the

September 27, 2023
Page 19

of M&A transactions, as this regulatory tax would, will tend to stifle innovative efforts, especially of small companies.[59]  In order to maintain the dynamism that is central to a competitive economy, then, the Agencies should rethink this proposed rule that would chill mergers across the board.

The Agencies themselves have been strong proponents that competition authorities around the world should avoid unnecessary burdens in merger review.  As part of the International Competition Network ("ICN"), the FTC and DOJ published the Recommended Practices for Merger Notification and Review in order to better harmonize approaches across jurisdictions. There, the Agencies supported important principles that would be violated by this rule: "Because most transactions do not raise material competitive concerns, the initial notification should elicit the minimum amount of information necessary to initiate the merger review process."[60] Additionally, "[i]nitial notification requirements and/or practices should be implemented so as to avoid imposing unnecessary burdens on parties to transactions that do not present material competitive concerns."[61]  In addition to reducing unnecessary burden, "[m]erger reviews should be completed within a reasonable period of time" and that reasonable period should reflect "the competition issues raised."[62]  The Agencies have made filings to the same effect with the OECD, where they have recognized the need to minimize regulatory burden from merger review[63], and that smaller firms are more likely to be deterred by regulatory burden than larger firms[64].

---

discovery of innovative medicines, testing and development requires enormous financial resources that they may lack. The investment necessary to complete the development of those medicines and make them available to the patients who need them requires the involvement of established larger manufacturers. And without the prospect of acquisition to enable those larger manufacturers to complete the development of such medicines—and to permit those who financed early-stage development to recoup their own investments—innovation would be curtailed.")

[59] GORDON M. PHILLIPS & ALEXEI ZHDANOV, R&D AND THE INCENTIVES FROM MERGER AND ACQUISITION ACTIVITY, THE REVIEW OF FINANCIAL STUDIES (2012) (confirms the hypothesis that the "[p]ossibility of being acquired induces innovations efforts by large and small firms, but especially by the small firms").

[60] *Recommended Practices for Merger Notification and Review*, ICN, 15, https://www.ftc.gov/system/files/attachments/merger-workshop-competition-authorities-caribbean/rec-practices-merger-notification.pdf.

[61] *Id.*

[62] *Id.*

[63] Fed. Trade Comm'n & Dept. of Justice, Contribution from the United States, *Roundtable on Cross-Border Merger Control: Challenges for Developing and Emerging Economies* 6-7, n.24 (Feb. 3, 2011), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/1102crossbordermergercontrol.pdf (setting out the goal to "reduce burdens on merging parties").

[64] Fed. Trade Comm'n & Dept. of Justice, Contribution from the United Statse, *Challenges/Obstacles Faced By Competition Authorities in Achieving Greater Economic Development Through the Promotion of Competition* (Feb. 5, 2004), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2000-2009/2004-

September 27, 2023
Page 20

The ICN Recommended Practices set out alternatives that would be preferable to the proposed amendments, because they would allow for some tailoring of the burdensome information requests to follow a transaction's potential for anticompetitive consequences.  This includes a "short form" regime like the one used in Europe.  The ICN describes the recommended parameters:

> Alternative notification formats – different initial notification formats varying with the likely complexity of competitive analysis of the transaction; examples include: (a) advance ruling certificates, which enable the merging parties to use a simplified advance procedure instead of a formal notification; and (b) short and long form notification options, enabling the merging parties to elect to submit abbreviated information in transactions that do not present material competitive concerns.[65]

The Agencies have not demonstrated a need for additional information as compared to the current HSR scheme that already provides them litigation-like discovery whenever they decide a transaction warrants a second request.  But, if the FTC does plan to promulgate a final rule that increases the information requested with the notification form, it must lessen the burden on procompetitive and competitively neutral transactions, which it is in the regular habit of expeditiously identifying.  Minimizing the burden on these transactions will be procompetitive overall: it will ensure assets go to their highest and best use, instead of being mired in transaction costs, and it will promote innovation by reducing the obstacles to entrepreneurs receiving an appropriate return on substantial investment when they are acquired into firms that can leverage their work to improve offerings to customers.  This is a win for consumers and business alike.

IV.    Conclusion

The FTC's proposal is contrary to Congressional intent behind the HSR Act and violates the Paperwork Reduction Act and the Administrative Procedure Act. It would impose a substantial new tax on M&A transactions, the majority of which raise no competitive concerns, and without any justification. Business Roundtable urges the FTC to leave the HSR notification form unchanged (except as required by new legislation), or to require only minimal changes to provide basic information that companies could provide without legal counsel, judgment calls,

---

challenges_obstacles_faced_by_competition.pdf ("The resources committed to understanding a regulatory system and navigating its requirements are a tax that larger firms—especially incumbents with significant experience in the industry—can bear with lesser strain than smaller firms or new entrants. As the number and complexity of regulatory requirements that an entrepreneur must satisfy grows, the costs associated with entry also grow.")

[65] *Recommended Practices for Merger Notification and Review*, ICN, 16, https://www.ftc.gov/system/files/attachments/merger-workshop-competition-authorities-caribbean/rec-practices-merger-notification.pdf.

September 27, 2023
Page 21

new document collection burdens, or significant other work.  If the FTC does persist in pursuing significantly more information in the HSR notification form, then we urge it to (1) ensure all information requested is "relevant to a proposed acquisition" and "necessary and appropriate" to determine whether it violates the antitrust laws; and (2) differentiate transactions that raise no competitive concerns and provide a short form option or other way of reducing burdens appropriately.

Business Roundtable appreciates the opportunity to provide input during this process.  If you have any additional questions or would like to discuss these comments further, please contact Liz Dougherty, General Counsel and Corporate Secretary of Business Roundtable, at ██████████████████