# Exhibit 5



U.S. Chamber of Commerce

1615 H Street, NW
Washington, DC 20062-2000
uschamber.com

September 27, 2023

April Tabor, Secretary
Federal Trade Commission
Office of the Secretary,
600 Pennsylvania Avenue NW, Suite CC–5610, (Annex H),
Suite CC-5610 (Annex C)
Washington, DC  20580

**Re: Notice of Proposed Rulemaking, Federal Trade Commission; Premerger Notification; Reporting and Waiting Period Requirements (Matter No. P239300)**

Dear Ms. Tabor:

The U.S. Chamber of Commerce ("the Chamber") and its members appreciate the opportunity to comment on the Federal Trade Commission's ("FTC" or "the Commission") proposed changes to the Hart-Scott-Rodino Antitrust Improvements Act (the "HSR Act") Premerger Notification and Report Form (the "Form") and its associated instructions ("Instructions").

### Introduction and Summary of Comments

FTC Chair Lina Khan was recently asked about the benefits of allowing the free movement of capital through mergers and acquisitions and a "perception" that the FTC has become overtly hostile to merger activity.[1]  She responded:

> Just to put things in context, any given year the antitrust agencies get anywhere between 1,500 and 3,000 merger filings.  Of that number, 98 percent go through without even second questions being asked by the agencies so around two percent of all deals even get what's known as a Second Request, which is, you know, a set of questions so that we can do a deeper investigation.  And an even smaller fraction ultimately results in a legal challenge—so vast majority of deals still going through. . . . Again, 98 percent of deals [are] going through without even a second question.  It's really an issue on the margins . . . .[2]

We agree with Chair Khan's assessment that antitrust concerns are raised at the thin margin of M&A activity.  Yet, notwithstanding this fact that only a small fraction of reportable transactions raise competition concerns, through its Notice of Proposed Rulemaking ("NPRM")

---

[1] Lina M. Kahn, "Remarks of FTC Chair Lina M. Khan, Economic Club of New York," Interview by Peter Orszag (July 24, 2023), available at https://www.youtube.com/watch?v=X7u3JwSfHZY.
[2] *Id.*

the FTC is proposing a "comprehensive redesign of the premerger notification process"[3] that would impose alarming new costs and burdens on *all* reportable transactions—including the 98 percent of deals Chair Khan has conceded do not merit "even a second question" by staff at the FTC and the Department of Justice's Antitrust Division ("DOJ") (collectively, "the Agencies").[4]

The Chamber and its members have significant concerns regarding the unjustified new burdens these proposed changes would impose on the vast number of transactions that fail to raise even a specter of anticompetitive harm. In response to the NPRM, the Chamber engaged Professor Kothari to analyze the burdens the proposed changes would impose on filing parties. That analysis is attached to these comments. In evaluating the burden, he considered a recent survey conducted by the Chamber of antitrust practitioners regarding the NPRM's proposed changes, as well as the revised merger guidelines recently proposed by the Agencies.[5] Those survey responses overwhelmingly indicate that the FTC has vastly underestimated the burdens associated with the NPRM.

While some specific changes may be reasonably calibrated to achieve the federal antitrust agencies' legitimate enforcement objectives, overall, this radically re-imagined HSR regime represents an unwarranted transformation of the current HSR notification framework.

The following is a summary of the Chamber's concerns with the NPRM.  Each of these items is discussed in more depth in the Discussion section below:

I. **Certain changes in the NPRM, such as the addition of information about subsidies granted by certain foreign governments and the addition of a size-of-person stipulation, appear to be a reasonable exercise of the FTC's authority to adopt necessary and appropriate changes to improve enforcement efficiency within the current HSR framework.**

II. **Overall the NPRM is a vast overreach based on flawed, erroneous and unsubstantiated assumptions.**

   A. There is no basis for concluding (and none has been offered) that the Agencies are systematically "missing" anticompetitive transactions due to a deficiency in the requirements and scope of the current HSR Forms.

   ▪ With few exceptions (e.g., with respect to subsidies from foreign entities of concern), the current HSR Form requests sufficient information for the Agencies to determine which transactions may require deeper scrutiny.

---

[3] Premerger Notification; Reporting and Waiting Period Requirements, A Proposed Rule by the Federal Trade Commission (June 29, 2023) ("NPRM"), at 42180.
[4] Remarks of Lina M. Khan, Economic Club of New York (July 24, 2023).
[5] See U.S. Chamber of Commerce, HSR/Merger Guides Practiioner Survey (Sept. 19, 2003), https://www.uschamber.com/assets/documents/20230919-U.S.-Chamber-Antitrust-Survey.pdf

- Many already existing tools sufficiently enable the Agencies to review and challenge those very few transactions "at the margin" that actually raise antitrust concern. These include voluntary requests for information, requests for additional information and documentary materials ("Second Requests"), Civil Investigative Demands, "pulling and refiling" the HSR Form, timing agreements, and party engagement practices that have developed over time.

- Only about two percent of reported transactions are subject to Second Requests, and the FTC has pointedly not demonstrated that this statistic represents underenforcement.

B. Vibrant M&A helps to direct assets to higher valued uses and, thus, along with a reasonably balanced regulatory policy that targets only the small number of deals that raise legitimate antitrust concern, has contributed to a healthy and dynamic economy. The NPRM severely undermines this approach in an attempt to chill merger activity. Rather than serve as a tool to identify transactions with heightened antitrust risk, the HSR Form will be transformed into a far more significant regulatory tax on low-risk transactions. This will undoubtedly deter many lower profile deals that are the lifeblood of the economy.

- Although many elements of the NPRM appear aimed at discouraging Private Equity investments, there is simply no basis to conclude that PE deals, which often provide smaller, innovative companies with vital access to capital, are inherently anticompetitive, or even more anticompetitive than strategic acquisitions.

C. The FTC attempts to justify the expansion of information in the HSR by pointing to merger filing requirements in international jurisdictions, but foreign filing regimes that require substantial information up front to obtain approval are fundamentally different from the HSR regime put in place by Congress and thus do not serve as an appropriate model for the HSR Form and other aspects of the premerger notification process in the United States.

- The universe of reportable transactions in the EU is significantly smaller than the number of transactions required to be reported under the HSR Act. Moreover, although still inherently more burdensome than the current HSR process, the EU and other foreign filing regimes—unlike the NPRM—offer a "short form" option for transactions posing minimal risk to competition. And the EU is moving in the opposite direction of the NPRM. In fact, recent changes in the EU expand the types of cases

3

eligible for the short form procedure.[6]  The new rules under the EUMR also reflect an effort to *reduce* the amount of information required in all types of reportable transactions, not just the short form cases.  And the new Form CO was revised in an effort to reduce the amount of work involved in preparing the notification.[7]

- Legal systems outside the U.S. also do not offer the same due process guarantees as the U.S. and competition authorities are empowered to approve or disapprove transactions; the FTC and DOJ are not so empowered.

- Congress chose a fundamentally different approach to premerger review than that adopted by ex-U.S. regimes; the FTC lacks the authority to change that approach through a NPRM.

D. The NPRM dramatically underestimates the burden and costs that would result from the proposed changes. Although the NPRM estimates a staggering 400% increase in time to complete the average filing, the results of the Chamber's above-mentioned survey reveal an even more troubling degree of burden on filing parties, suggesting that the true cost of compliance with the proposed changes could be 5 times greater than the Agencies' estimates.

III. **The NPRM is not necessary or appropriate for identifying those few transactions that merit significant scrutiny.**

A. The proposed changes would impose extraordinary costs on all filers with speculative, if any, benefit to sound antitrust enforcement.

- Many categories of requests, while being costly and burdensome to collect, would provide little probative information for an initial screen, particularly given their application to all reportable transactions.

- Additionally, the proposed director and officer information requirements are disruptive to businesses and unrelated to FTC/DOJ's evaluation of mergers.  The proposed rules would require the identification of every officer, director or board observer of all entities within the acquiring party and acquired entity, as well as the identification of other entities for which those individuals currently serve, or in the past two years have served as an officer, director or board observer.  This requirement goes

---

[6] *See* Eur. Comm'n, "Commission Notice on a simplified treatment for certain concentrations under Council Regulation (EC) No 139/2004 on the control of concentrations between undertakings" (April 20,2023), *available at* https://ec.europa.eu/transparency/documents-register/detail?ref=C(2023)2401&lang=en.

[7] *See* Eur. Comm'm, "Commission Implementing Regulation (EU) /... implementing Council Regulation (EC) No 139/2004 on the control of concentrations between undertakings and repealing Commission Regulation (EC) No 802/2004 (April 20, 2023), *available at* https://ec.europa.eu/transparency/documents-register/detail?ref=C(2023)2400&lang=en.

beyond the bounds of merger control—from the FTC's guide to public comments, it appears this requirement is largely or possibly entirely about identifying potential Section 8 interlocking directorate issues. While the FTC argues that this information would provide the Agencies with insight into existing, prior or potential interlocking directorates to better assess their implications under Sections 7 and 8 of the Clayton Act, the proposed requirements would be unduly burdensome, have no bearing on the substantive analysis of transactions under Section 7, and would place companies in the uncomfortable position of requiring each of their directors, officers and board observers to disclose current and historical information that is otherwise irrelevant to assessing the proposed transaction under review.

B. Transforming every HSR filing into a mini-Second Request will neither increase efficiency, improve proper merger enforcement, nor reduce the burden on the Agencies or their staff.

▪ To the contrary, the deluge of documents and data called for by the NPRM, coupled with increased pre-filing interaction with the Agencies necessitated by adding open-ended and subjective requests, will arguably make it *more* likely that staff at the Agencies will "miss" truly anti-competitive transactions.

▪ Incredibly, the NPRM does not even acknowledge, let alone, explain how DOJ and FTC staff will grapple with the increased volume of materials without significant increases to the budgets and staffing levels of the Agencies—neither of which can occur without Congressional action.

▪ Additionally, the NPRM introduces uncertainty when it seeks to expand the scope of requested documents related to items 4(c) and 4(d) by adding a requirement that parties submit materials prepared by or for the supervisory deal team lead(s). As drafted, the NPRM does not clearly delineate which individual(s) would constitute a "supervisory deal team lead." Instead, the NPRM broadly describes this category to consists of the "individual or individuals who functionally lead or coordinate the day-to-day processes for the transaction at issue."[8] Without further clarity, such as definition could capture a company's entire corporate development team regardless of the titles or roles held by the team's members. The Chamber suggests clarifying that a "supervisory deal team lead" includes only the senior most member of the Corporate Development deal team responsible for driving the strategic vision and

---

[8] NPRM at 42194.

assessment of the deal, and who would not otherwise qualify as an Item 4(c) director or officer.

▪ Further, the NPRM would require filing parties to submit "draft" versions of any document that is responsive to Item 4(c) or 4(d) only if such drafts were provided to an officer, director, or supervisory deal team lead. While the FTC's rationale for wanting to review draft documents as opposed to only final versions is understandable, for companies that rely on collaborative, cloud-based software to create, share and edit documents, this proposal imposes significant burden and creates unnecessary confusion. In particular, the NPRM does not provide any guidance concerning what constitutes a "draft." As a result, in the context of a shared document, the NPRM's requirements could potentially capture hundreds of draft versions of the same item. Collecting all these versions would be unduly burdensome to produce at the initial filing stage as well as useless to the Agencies during the initial waiting period. Alternatively, the Chamber proposes that the FTC amend the NPRM to require only that the initial draft version of a 4(c) or 4(d) document submitted to an officer, director or supervisory team be produced. Under this approach, filers would not be expected to share incremental redlines between drafts.

## IV. Through its overreach, the NPRM would likely damage investment and capital flows, harming the U.S. economy, including workers and consumers.

A. The proposed changes would impose a stiff regulatory tax on all reported transactions, whether or not they raise legitimate antitrust concern. Of particular concern is the proposal that 4(c) documents include draft documents that are sent. In the typical internal evaluation of a transaction, many individuals may comment on a draft deal document or propose edits that do not reflect the final thoughts or analyses of the company, but rather a single individual's ideas. Requiring draft documents would stifle businesses' ability to openly debate plans, priorities and strategies, chilling open business discussion for fear of creating documents that do not reflect the final thoughts of the company.

B. The NPRM's proposed ten-year look back at all prior transactions would raise the cost of all reportable transactions *and* the costs associated with transactions deemed by Congress to be too small to warrant HSR notification.

C. The NPRM would likely inject significant new delay and uncertainty into the market.

- Given the subjective nature of many of the new requests and the language of the Certification form that officers must sign, many filers will feel compelled to seek assurance, prior to filing, that the Agencies will accept the sufficiency of their filing.

- For similar reasons, absent explicit authorization, many filers will be reluctant to indicate that a question does not apply to a transaction without blessing from the Agencies. These dynamics would effectively turn an administrative act—filing the HSR Form—into a complex regulatory process in and of itself, as is the case in other jurisdictions and serve as a backdoor means of extending the statutory 30-day waiting period under the HSR Act.

D. At the margin—and it could be a very large margin—the NPRM will be a drag on the economy by discouraging transactions that raise no genuine competition concerns and transactions that may even increase competition and efficiency to the benefit of consumers and workers.

V. **The NPRM is inconsistent with Congress' intent and expectation that the HSR Act would impose limited burden on most transactions.**

A. In enacting the HSR Act, Congress assured the public that the law would not unreasonably impede the market for corporate control; for the last 45 years, until now, that principle has been accepted by the Agencies and guided the promulgation of HSR regulations.

B. Congress recently considered the type of information collected with the HSR Form and focused its direction to the FTC on only a narrow category of information related to subsidies from foreign entities of control; the NPRM far exceeds anything contemplated by Congress.

C. The proposals conflict with the Williams Act timing conditions for cash tender offers.

VI. **The NPRM violates the law.**

A. It far exceeds the FTC's authority to adopt regulations that are "necessary and appropriate . . . to determine whether [an] acquisition may, if consummated, violate the antitrust laws."[9]

B. It would so radically transform the current HSR regulatory framework as to raise a question under the major questions doctrine; and

---

[9] HSR Act, 15 U.S.C. §18a(d)(1).

C.   It fails to satisfy the FTC's obligations under the Paperwork Reduction Act.

For all the foregoing reasons, the Chamber urges the Commission to withdraw or substantially revise the NPRM to better align with its legal authority and to ensure that its and the DOJ's efforts to enforce the antitrust laws promote competition and the free market, rather than harm and undermine it.

### Discussion

The current HSR Form, while already imposing a non-negligible cost and burden on filing parties, strikes a reasonable balance between burden on the parties and the enforcement needs of the Agencies—a balance that is consistent with Congressional intent and the Agencies' legal authority.  This balance helps guard against overly burdening capital markets and low-risk transactions while allowing Agency staff to focus scarce government resources on those limited number of transactions that raise actual potential concern.  Until now, it has broadly been accepted that the system was working as intended.

According to Commissioners Khan, Slaughter and Bedoya, the NPRM's sweeping overhaul is appropriate because though "[m]uch has changed in the 45 years since the HSR Act was passed," the HSR Form "has largely stayed the same."[10]  The reality is, however, that the Form, and the HSR process more generally, has changed in significant ways since 1976.  But in contrast to the NPRM, the most significant changes have been driven by Congress through the legislative process.  Most significantly, Congress has adjusted the filing thresholds to reduce the universe of reportable transactions, imposed filing fees, and, most recently, required submission of information on foreign subsidies.

At the same time, limiting the focus to the Form itself ignores how the merger notification process has evolved over time, including ways the Agencies have developed and refined various review practices.  For example, the introduction of voluntary access letters ("VALs"), the development of the "pull-and-refile" option, and the institutionalization of timing agreements have improved the FTC and DOJ's ability to efficiently identify and scrutinize the very small number of transactions that raise legitimate questions.

The drafters of the HSR Act appreciated the inevitability of economic growth and change, and they were attuned to the delicate balance of regulation and the necessity of providing space for businesses to realize their fullest potential.  The enviable vibrancy and dynamism of our economy is attributable in part to competition policies that, until now, have avoided steps that could discourage the free flow of capital absent a genuine threat to competition.  It is, thus, <u>not</u> at all self-evident how changes in the economy over the last 45

---

[10] Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya Regarding Proposed Amendments to the Premerger Notification Form and the Hart-Scott-Rodino Rules Commission File No. P239300 (June 27, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/statement_of_chair_khan_joined_by_commrs_slaughter_and_bedoya_on_the_hsr_form_and_rules_-_final_130p_1.pdf.

years justify a dramatic change to that policy approach and the regulatory balance struck by the current HSR Form.

I.    **Certain Proposed Changes Appear to be a Reasonable Exercise of the FTC's Prerogative to Propose Necessary and Appropriate Changes to Improve Enforcement Efficiency**

The Chamber recognizes the necessity and appropriateness of certain specific proposed changes in the NPRM.  For example, Congress recently amended the HSR Act to direct the FTC to require filers to disclose subsidies received from entities designated as "Foreign Entities of Concern."[11]  The portion of the NPRM proposing to add a Subsidies from Foreign Entities or Governments Concern section to the Instructions, including the Commission's "proposed two-year limitation," is reasonable and consistent with Congressional intent.[12]

Other changes appear to be reasonably designed to reduce the burden of filing, eliminate requirements that the Agencies have identified as less helpful than originally intended, provide potentially helpful clarification, or make interactions with the Agencies more efficient and less costly:

- Changes to Section 803.2 requiring the submission of separate forms where, based on the structure of a transaction, an entity is both an acquired and acquiring person;[13]

- Adding a Size of Person stipulation;[14]

- Clarifying what financial documents are required to be submitted by acquiring persons who are natural persons;[15]

- Eliminating the requirement to report manufacturing revenues at a granular level pursuant to existing Item 5(a);[16]

- Limiting information required to be reported by the acquired person pursuant to existing Item 6(b);[17] and

- Revising Item 3(a) to provide guidance on what are related transactions.[18]

The foregoing proposed changes appear to be consistent with striking a reasonable balance between providing the Agencies with information they need to perform a preliminarily

---

[11] Merger Filing Fee Modernization Act of 2022, Pub. L. 117-328, 136 Stat. 4459 (2022), Div. GG.
[12] NPRM at 42204.
[13] *Id.*
[14] *Id.* at 42187.
[15] *Id.*
[16] *Id.* at 42199.
[17] *Id.* at 42188.
[18] *Id.* at 42192.

assessment of the potential competitive implications of a transaction and the burden imposed on all reporting parties.

The NPRM also proposes changes to Sections 803.2, 803.5 and 803.10 that seem likely to promote efficiency and reduce unnecessary burden on filing parties and the Agencies. [19] Specifically, the FTC proposes "eliminat[ing] references to paper and DVD filings to physical offices" and adding an electronic filing requirement instead.[20]  While electronic filing is generally preferable and less burdensome to filing by paper or DVD, the Chamber notes that the platform is still under construction.[21]  As a result, before commenting on this proposal, filing parties still need additional information about the logistics of the "redesign[ed]" electronic filing system.  Before seeking to impose an e-filing requirement on all parties, the FTC should provide further details regarding the proposed user interface; the ability for users to collaborate on a single filing; the ability of users to save, review, and edit; and how filing persons will receive complete copies of filings as submitted.

## II.    Other Proposed Changes, which Would Radically Change the HSR Regulatory Framework, Rest on Flawed, Erroneous, and Unsubstantiated Assumptions.

Besides the handful of non-controversial changes just cited, the NPRM represents a radical and unwarranted transformation of the HSR process.  Turning every filing into a mini-Second Request response would radically change the regulatory balance currently in place, imposing enormous burdens on all filers, not just those handful that the Agencies have identified as potentially concerning from a competition perspective.

To justify such costly and sweeping changes to the filing process, the FTC must demonstrate that the additional information requested by the NPRM is necessary for the Agencies to obtain to enable staff to conduct an initial determination of a transaction's potential threat to competition.[22]  The FTC cannot meet this obligation with flawed, erroneous, and unsubstantiated assumptions:

- The NPRM and subsequent statements by FTC Commissioners have implied that the Agencies believe they are "missing" anticompetitive transactions due to knowledge gaps that could have been avoided if staff had access to the information demanded by the NPRM.[23]  However, the FTC has not provided *any* support for this proposition.

---

[19] *Id.* at 42181.

[20] *Id.*

[21] *Id.* at 42180 ("As the Agencies are currently working to complete an electronic filing (''e-filing'') platform, the exact structure of the redesign is unclear at this time").

[22] As described further in subsequent sections, it is doubtful that the FTC has the legal authority to initiate such changes absent additional legislation.

[23] *See, e.g.*, Lina M. Kahn, "Remarks of FTC Chair Lina M. Khan, Economic Club of New York;" Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya

- In some places, the NPRM goes even further by suggesting that some filers are actively concealing or obfuscating relevant information.[24] If true (although no examples or statistics are cited), this would be a legitimate concern for which some regulatory response would be appropriate.  But the Commission's proposed response imposes undue burdens on all filers for the supposed misdeeds of a few.  There are more reasonably-tailored solutions to perceived problems of gamesmanship.

- Similarly, the Commission's evident suspicion of M&A activity, particularly if private equity is involved in a deal, is unmoored from fact and logic.  There is broad agreement that the vast majority of reportable transactions do not pose a real threat to competition.  The FTC has provided no evidence that merger activity in today's economy should be viewed with heightened skepticism.  Given the integral role M&A plays in the modern economy, the NPRM must demonstrate that the benefits of expanding the HSR Form outweigh the costs to filers and the broader economy.  It does not.

- The FTC's reliance on foreign filing regimes, both for inspiration and as evidence that the burden of the NPRM will be slight, is profoundly misplaced.  The FTC fails to acknowledge the fundamental differences between foreign filing regimes and the HSR system, and that the identified "efficiencies" are only relevant to a small subset of filers.

- Finally, the FTC, relying on questionable data and unsupported analysis, drastically underestimates the costs and burden the NPRM would impose on filers *and the Agencies*.

### A.  There is no basis to conclude that the Agencies are systematically missing anticompetitive transactions due to deficiencies in the HSR Form.

There is no basis for concluding that the FTC and DOJ have systematically "missed" anticompetitive transactions—and the NPRM provides none.  Absent such a showing, there is simply no way to justify such a dramatic expansion in the information filers must provide the Agencies as part of the premerger notification process.

The Agencies' own statistics show that most transactions are not problematic and require no further review beyond the current HSR filing.  From 2012 to 2021, out of 18,873 transactions reported, only 518 received a Second Request based on information provided in

---

Regarding Proposed Amendments to the Premerger Notification Form and the Hart-Scott-Rodino Rules (June 27, 2023), available at:
https://www.ftc.gov/system/files/ftc_gov/pdf/statement_of_chair_khan_joined_by_commrs_slaughter_and_bedoya_on_the_hsr_form_and_rules_-_final_130p_1.pdf. "[T]he information currently collected by the HSR form is insufficient for our teams to determine, in the initial 30 days, whether a proposed deal may violate the antitrust laws," and relying on "third-party interviews and materials . . . can leave key gaps."
[24] NPRM at 42194; 42199.

the HSR Form or in submissions voluntarily provided by the parties and by third parties in response to VALs and other FTC requests.[25]  Of these, 53 resulted in a challenge, and 132 were abandoned by the parties in response to a likely challenge, with an additional 25 abandoned after a complaint was filed.[26]  During that same period, until the FTC suspended the practice of granting early termination requests in 2021,[27] the Agencies had granted more than 9,500 requests for early termination of the 30-day waiting period based on information provided in the HSR Form.

Even with a more aggressive enforcement posture, in 2021, one of the Agencies requested clearance to open an initial investigation of fewer than eight percent of all reported transactions, which demonstrates that the Agencies were able to identify a greater proportion of potentially problematic transactions using only information provided on the current HSR Form.  Staff found no need for even a preliminary investigation in over 92 percent of reported transactions.[28]  These statistics, reflecting enforcement decisions across three presidential administrations, are consistent with Chair Khan's recent assurance that 98 percent of transactions raise no antitrust issue.[29]

---

[25] Hart-Scott-Rodino Annual Report Fiscal Year 2021, Appendix A, *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf.

[26] *Id.*; Steven C. Salop & Logan Billman, *Merger Enforcement Statistics: 2001-2020*, GEORGETOWN UNI. L. CTR. (2022), at Table 3, https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=3493&context=facpub.

[27] Press Release, FTC, FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination (Feb. 4, 2021), available at https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-doj-temporarily-suspend-discretionary-practice-early-termination.

[28] Hart-Scott-Rodino Annual Report Fiscal Year 2021, Exhibit A, Table II, available at https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf.

[29] Lina M. Kahn, "Remarks of FTC Chair Lina M. Khan, Economic Club of New York," Interview by Peter Orszag (July 24, 2023), available at https://www.youtube.com/watch?v=X7u3JwSfHZY.



(Figure 2)

The NPRM has failed to identify a single transaction that it believes was systematically "missed" because of a deficiency in the requirements or scope of the current HSR Form or because it had insufficient time during the initial waiting period.  If the Agencies were "missing" transactions because of a lack of information provided through the current HSR Form, one would expect more frequent challenges to transactions where the waiting period was allowed to expire.  Further, each of the recently challenged consummated transactions was fully investigated following notification using the current HSR Form.  The original decisions not to challenge those transactions appear to have been a function of enforcement priorities and prosecutorial discretion during previous Administrations of both parties, rather than the fault of the current HSR Form.  There is no reason to believe the Agencies would have made different enforcement decisions had the proposed rules been in effect.

The Agencies have developed several efficient ways of utilizing the initial waiting period to identify those very few transactions that warrant further investigation without imposing a significant regulatory tax on *all* transactions.  For example, the Agencies have used VALs to request the voluntary submission of information and documents during the initial HSR waiting period.  The DOJ states on its website that these VALs "allow the Division to quickly assess the likelihood of anticompetitive harm from the transaction."[30]  The FTC admits on its website that it uses VALs to request the same types of documents and data the agencies now propose to require in an HSR filing.[31] Indeed, filing parties have significant incentives to respond quickly and

---

[30] *Frequently Asked Questions Voluntary Requests and Timing Agreements*, Dep't. of Justice Antitrust Division (Updated Nov. 2018), https://www.justice.gov/atr/page/file/1111331/download.

[31] *Guidance for Voluntary Submission of Documents During the Initial Waiting Period*, Federal Trade Comm'n, https://www.ftc.gov/enforcement/premerger-notification-program/hsr-resources/guidance-voluntary-submission-documents.

completely to a VAL to address staff questions and potentially obviate the need for or limit the scope of any Second Request.

In addition, filing parties and their counsel can typically anticipate if a transaction will raise significant competitive concerns at the Agencies. Increasingly, filing parties may voluntarily make presentations to the Agencies, and/or pull and refile an HSR filing to "reset the clock" for an additional 30 days to provide Agency staff with any additional information and time to conduct their preliminary investigations. Given the enormous delay and costs associated with Second Requests, parties are typically eager to cooperate fully with the Agencies during the preliminary investigation, lest the Agencies be forced to issue a Second Request to obtain additional information for staff to complete their review of a proposed transaction. Moreover, even when the Agencies do issue a Second Request, parties can address many staff questions and concerns through active engagement before and during the waiting period, which can often result in narrower, less burdensome Second Requests. For the Agencies, engaging in this iterative process before, and even after, issuing a Second Request is also beneficial, as it can make the process of reviewing transactions and assessing their potential impact on competition significantly more efficient.

Thus, from the perspective of both the parties and the Agencies, targeted use of a VAL is far more efficient and less burdensome than requiring *all* filers to provide, in the first instance, all the information called for by the NPRM. It also allows the Agencies to focus their attention and resources on those deals that may truly raise anticompetitive concerns, rather than being forced to sift through and review volumes of information for every single HSR filing. The Agencies have not explained why the current approach, which operates with far less burden on all involved, is not working, let alone why it should be replaced with one that may exponentially increase the amount of FTC and DOJ staff time spent reviewing materials associated with low-risk transactions.

Although the NPRM asserts that supposed increasing concentration in the U.S. economy "*may* reflect decreased competition" that has occurred despite the Agencies' merger enforcement efforts, it has not offered a scintilla of evidence to support this assertion or that the "problem" is an insufficient HSR Form. In fact, one of the academic sources cited by the NPRM concludes, based on an analysis of post-merger pricing data, that "it seems that the agencies were successful (on average) in identifying in the preliminary phase of the investigation which mergers were most likely to be anticompetitive—and issued Second Requests in those cases."[32] In other words, to the extent the Agencies have failed to block anticompetitive merger activity, it is not because "holes" in the Form resulted in staff having insufficient information to identify which transactions merited closer scrutiny.

---

[32] Keith Brand, Chris Garmon, Ted Rosenbaum, *In the Shadow of Antitrust Enforcement: Price Effects of Hospital Mergers from 2009–2016* (Feb. 24, 2023) (forthcoming in J.L. Econ.), at 31, available at SSRN: https://ssrn.com/abstract=4236952. Mr. Brand and Mr. Rosenbaum both currently work at the FTC's Bureau of Competition.

In fact, contrary to the FTC's sky-is-falling narrative, studies show that industrial concentration has been declining, rather than increasing, since 2017.[33]  Moreover, as the Agencies surely appreciate, market concentration, which is the focus of antitrust merger control, is different from industrial concentration, and, even then, the data show industrial concentration has been declining.[34]

The NPRM's assertion that labor's share of national income has fallen sharply since 2000 is similarly unavailing.  The very article cited by the FTC for this assertion itself undermines reliance on this assertion, noting the difficulty of measuring "labor share" and concluding that the explanation for any such decline is "elusive."[35]  There are many factors potentially contributing to a decline, including increased globalization and the rise of China and the changing composition of the work force.  Additionally, the authors specifically contradict the NPRM's assertion that concentration has increased due to suboptimal antitrust enforcement.  In addition to noting that an increase in concentration in particular industries "could easily reflect" technological developments, they cite data indicating that concentration in markets as defined for antitrust purposes is trending *downward*.  Nothing in the article even vaguely supports sweeping changes to the HSR framework or the burdensome new labor-related reporting requirements the changes would impose.

### B. Vibrant M&A is critical to a healthy and competitive U.S. economy and Private Equity Plays a Key Role in this merger activity.

The dynamism of the American free market economy has long been the envy of the world and continues to be the magnet that attracts talent and ideas from across the globe.  Key to this success is the ability of capital to flow freely and efficiently to higher valued assets in response to consumer demand.

M&A is crucial to a fast-paced economy.  It enables successful businesses to acquire market access, intellectual property, good will, and countless other valuable assets quickly—in service of competition—to deliver desirable products to American consumers.  Contrary to the claims of some, as discussed above, the U.S. economy is not overly concentrated, particularly compared to foreign economies.  Vibrant M&A activity, far from being anticompetitive, demonstrates the dynamism and robustness of competition in the United States today.

Private Equity ("PE") plays a pivotal role in the U.S. economy, encouraging M&A activity by providing vital access to capital, and allowing companies the ability to weather economic

---

[33] B. Kulick and A. Card, *Industrial Concentration in the United States: 2002-2017* (Mar. 2022), NERA Economic Consulting,  available at
https://www.nera.com/content/dam/nera/publications/2022/2022.03_CoC%20NERA%20Report_FINAL.pdf.
[34] *See, id.* at 5; 14-17; 23 ("[W]e find that the most recent data indicate that, overall, industrial concentration has been declining rather than increasing and that the economy was no more concentrated in 2017 than it was in 2002 . . .").
[35] *See, e.g.*, Gene M. Grossman and Ezra Oberfield, *The Elusive Explanation for the Declining Labor Share*, 14:1 Ann. Rev. Econ. 93-124 (2022) at 22.

downturns.[36]  Despite this fact, the NPRM directly targets PE transactions through its proposed changes, which would require substantial amounts of information on minority investors, including information on minority holders of *all entities* that directly or indirectly control or are controlled by the acquiring entity, with no exceptions for limited partners.[37]  It would also require the disclosure of all stakeholders that may "exert influence" over the entities, such as creditors, board observers, or non-voting security holders of the acquiring entity.[38]  Additionally, the NPRM would also introduce burdensome requirements to identify all transactions in the last 10 years where the acquired entity sold products in identified areas of overlap, regardless of the size of the transaction.[39]  These proposals are a blatant attempt to raise the costs of, or ultimately discourage, PE deals, even though there is no basis for concluding that PE acquisitions are inherently more anticompetitive or less efficient than strategic acquisitions. The FTC, certainly, has not provided any evidence from which one can draw such a conclusion. In fact, except in the uncommon circumstance where a PE portfolio company has an overlap with the target, PE deals are unlikely to trigger concerns under the substantive antitrust laws.

The drafters of the HSR Act took care to ensure that the premerger notification process would not "unduly burden . . . business with unnecessary paperwork and delays," and aimed to develop a merger notification regime that would "neither deter nor impede consummation of the vast majority of mergers and acquisitions."[40]  The NPRM has utterly ignored this concern.

### C.  Foreign filing regimes are fundamentally different from the premerger notification process established by the HSR Act.

The FTC attempts to justify the dramatic increase in burden on filing parties by stating, first, that "many of the transactions that are investigated by the Agencies are also investigated by another jurisdiction" and, second, that most "international jurisdictions have merger filing forms that ask filers to provide significantly more information that their staff considers relevant to the competition analysis."[41]

With respect to the first point, besides offering no support for its assertion that "many" transactions investigated by the Agencies are also investigated by another jurisdiction, a more relevant question is how many transactions *notified* under the HSR Act are also required to be notified in another jurisdiction.  We suspect that the answer to that question is "very few." Certain transactions, like those for exclusive patent licenses which have U.S. notification requirements, do not require notification outside the U.S.[42]  The fact that some small number of parties may also be required to provide some of the information the NPRM proposes to collect

---

[36] Makan Delrahim, *Antitrust Attacks on Private Equity Hurt Consumers*, WALL STREET J. (July 31, 2022), https://www.wsj.com/articles/antitrust-attacks-on-private-equity-hurt-consumers-lina-khan-ftc-recession-competition-management-expertise-capital-11659271442.
[37] NPRM at 42212.
[38] *Id.*
[39] NPRM at 42203.
[40] S. REP. No. 94-803, pt. 1, at 65-66 (1976).
[41] NPRM at 42180.
[42] Premerger Notification; Reporting and Waiting Period Requirements, 78 Fed. Reg. 68705 (Nov. 15, 2013).

in filings in other jurisdictions offers no comfort for the vast number of transactions that do <u>not</u> require merger control filings outside the United States.

Nor is the second point availing.  Foreign merger control regimes that require substantial information up front for all reportable transactions are fundamentally different from the HSR regime put in place by Congress and do not serve as an appropriate model for several reasons.

For example, a comparison to filing-form requirements outside the U.S. fails to consider that the universe of notifiable transactions required to be notified in most other jurisdictions is significantly smaller than in the United States.  For example, despite receiving more filings than average, the European Commission received only 405 merger notifications in 2021[43] compared to 3,520 in the U.S.[44]  Germany, the country with the second-most reported filings, still received fewer than a third of the total filings received by the Agencies in 2021.[45] Even if all of the EU filings were also filed in the US, which is not the case, the percentage of double filings is very low.

Foreign regimes, such as the EU, have much higher thresholds than the HSR, which reduces the number of filing parties each year.  The EU also allows certain merging parties to notify their transaction via a simplified merger notification (a "short form"), which allows filing parties to provide a less comprehensive filing in instances where the transaction raises little risk of an anticompetitive effect.[46]  The NPRM proposes no such short form filing, despite the International Competition Network recommending that all competition enforcement authorities allow for an abbreviated form in their notification systems.[47]  Additionally, the EU is actually moving in the opposite direction of the NPRM.  In fact, recent changes in the EU expand the types of cases eligible for the short form procedure.[48]  The new rules under the EUMR also reflect an effort to *reduce* the amount of information required in all types of reportable

---

[43] *See* Eur. Comm'n "statistics on Merger Cases" (March 5, 2021) https://competition-policy.ec.europa.eu/mergers/statistics_en

[44] Hart-Scott-Rodino Annual Report Fiscal Year 2021, Exhibit A, Table I, available at https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf. *Note:* White & Case statistics represent the calendar year 2021, while the FTC statistics are reported for fiscal year 2021.

[45] *Global Antitrust Merger StatPak*, WHITE & CASE LLP (as of July 18, 2023), https://www.whitecase.com/publications/insight/antitrust-merger-statpak-global#:~:text=HSR%20premerger%20notification%20filings%20in,in%20March%20and%20April%202023.

[46]  *See* Eur. Comm'n, "Commission Notice on a simplified procedure for treatment of certain concentrations under Council Regulation (EC) No 139/2004 (2013/C 366/04)" (April 20, 2023), available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32023R0914&qid=1683710227250. It is worth noting that while the NPRM seeks to expand the information required in an HSR filing, the EC's simplification measure, passed in 2023, aims to *reduce* the burdens on filing-parties for unproblematic transactions. *See also*, Alex Bagley, *Lawyers welcome "major reform" of EU's simplified merger regime*, GLOB. COMPETITION REV. (Apr. 20, 2023), available at https://globalcompetitionreview.com/article/lawyers-welcome-major-reform-of-eus-simplified-merger-regime.

[47] "In order for merging parties to anticipate the review time frame, jurisdictions should make eligibility criteria for abbreviated initial review periods publicly available." ICN, *Recommended Practices for Merger Notification and Review Procedures Working Group Comments* (May 2017) at 11, https://www.internationalcompetitionnetwork.org/wpcontent/uploads/2018/09/MWG_NPRecPractices2018.pdf

[48] *See* Eur. Comm'n, "Commission Notice on a simplified treatment for certain concentrations under Council Regulation (EC) No 139/2004 on the control of concentrations between undertakings" (April 20, 2023), *available at* https://ec.europa.eu/transparency/documents-register/detail?ref=C(2023)2401&lang=en.

transactions, not just the short form cases.  And the new Form CO was revised in an effort to reduce the amount of work involved in preparing the notification.[49]

While an unnamed official authorized to speak on behalf of the Agency has said that filing parties will be able to select "not applicable" for filing requirements that do not apply to their transaction, there is no current guidance on when or how parties will be able to utilize this option, and under what circumstances the Agencies will allow filing parties to do so.[50] The Chamber welcomes the addition of an option for parties to select "not applicable" for filing requirements and urges the Agencies to provide clear instructions on when and how parties may be able to utilize this option.

Absent explicit guidance to that effect, parties are not likely to report "not applicable" for a particular response because doing so could imperil their filing by providing an opportunity for the Agencies to reject their submission on completeness grounds.  If rejected, the 30-day clock would restart, or, if the parties close, they will face a daily fine. Consequently, there will be significant pressure, at least initially, for parties to engage with the Agencies to get their approval on any potential "not applicable" response to the expanded HSR Form.  In any event, on the face of the NPRM, it seems unlikely that the most burdensome data and information requirements would be subject to any kind of "opt out," and any effort to secure Agency approval for such a response will require time and effort well beyond the current Form's demands.

Comparisons to foreign filing requirements also fail to consider the fundamentally different approach to merger review applied in those jurisdictions.  For instance, despite the use of a short form, the EU process still frontloads the burden of the merger review process much more significantly than the current process in the United States.  Historically, the Agencies have avoided this approach, recognizing that only a small fraction of reportable transactions merit the level of invasive scrutiny associated with a Second Request.  Thus, until the NPRM, the Agencies—as Congress intended—have implemented a system that ratchets up the burden on filing parties commensurate with a transaction's perceived antitrust risk.  Evidently, as demonstrated by the decision to develop an even more abbreviated process for certain filers, the EU has recognized the need to further minimize the burden inherent in the front-loaded approach.

---

[49] *See* Eur Comm'n, "Commission Implementing Regulation (EU) /... implementing Council Regulation (EC) No 139/2004 on the control of concentrations between undertakings and repealing Commission Regulation (EC) No 802/2004" (April 20, 2023), *available at* https://ec.europa.eu/transparency/documents-register/detail?ref=C(2023)2400&lang=en.

[50] Ilana Kowarski, *Comment: US seeking more information in merger notifications partly to ease regulators' work*, MLEX (July 28, 2023), (https://content.mlex.com/#/content/1489126/comment-us-seeking-more-information-in-merger-notifications-partly-to-ease-regulators-work?referrer=email_instantcontentset&paddleid=201&paddleaois=2000;2003).

Foreign legal systems also may not have the same fundamental due process protections as exist in the United States.[51]  Often, foreign competition authorities are empowered with the authority to approve or disapprove transactions, subject to judicial review after the fact.[52]  The opposite is true in the United States.   If the Agencies believe a transaction is anticompetitive, they must prove their case in federal court, which will determine whether or not the parties are permitted to close their transaction.[53]  In some cases, foreign competition authorities are required to provide a reasoned explanation for their decisions *not to challenge* a proposed transaction,[54] while the FTC and DOJ need only justify their decisions to oppose a transaction.

Moreover, the HSR Act, unlike the EU's process, has no estoppel or finality benefit, meaning that the Agencies are free to challenge a deal at any point after the HSR waiting period closes.  The Agencies frequently remind parties of this fact with so-called "close-at-your-peril" letters."  Third parties with antitrust standing (including States) can also file suit to challenge a deal regardless of the outcome of the Agencies' decision at the conclusion of the HSR process.

To that end, it is also important to note that the increased burdens imposed by the NPRM will not take place in a vacuum.  Several states have adopted, or are considering legislation, that would require parties to produce all HSR materials to state-level officials.[55]  These changes will necessarily result in state antitrust enforcers becoming more involved in the HSR process as it unfolds in real time.  When paired with the NPRM, these state laws will likely magnify the burdens associated with the expanded form, especially if the NPRM prompts filers

---

[51] *See* U.S. Chamber of Commerce, *International Competition Policy Expert Group Report and Recommendations* (March 2017) https://www.uschamber.com/regulations/international-competition-policy-expert-group-report-and-recommendations, *see also* Prepared Statement of the Federal Trade Commission Before the United States House of Representatives Committee on the Judiciary, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, on "International Antitrust Enforcement: China and Beyond" (June 7, 2016).

[52] *See* Council of the Eur. Union, "Council Regulation No. 1/2023, 2003 O.J. (L 1)" (Dec. 16,2002), available at https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=celex%3A32003R0001.  In the EU, EC decisions and procedural determinations are subject to judicial review by the General Court and by the Court of Justice if the parties choose to appeal. *See* Eur. Comm'n, "*Competition: Merger control procedures*" (July 2013), available at https://competition-policy.ec.europa.eu/system/files/2021-02/merger_control_procedures_en.pdf.

[53] Although the FTC may choose to challenge a transaction through an administrative proceeding, the Commission usually seeks to obtain a court order enjoining the transaction from closing during the pendency of that proceeding and it often abandons its challenge if it has failed to obtain a court-ordered injunction.  DOJ has no administrative proceeding; its sole route to challenge a transaction is through the courts.  Additionally, when DOJ challenge a transaction in court, it routinely insists on an additional new round of discovery under the Federal Rules of Civil Procedure on top of the information obtained as part of the Second Request.

[54] For example, the United Kingdom's Competition and Markets Authority ("CMA") issues final reports on transactions, even when it does not believe the transaction will result in a substantial lessening of competition. By contrast, the U.S. antitrust agencies do not typically publish such closing memos.

[55] The Uniform Law Commission is considering a proposal that would recommend each state seek production of all premerger filings.  The most recent draft of ULC recommendations has proposed the "Antitrust Pre-Merger Notification Act," which would create a "mechanism for AGs to receive access to HSR filings at the same time as the federal agencies . . . . Under the Act, [parties completing the Form] must provide their HSR filing (both the basic form and the additional documentary material) to the AG contemporaneously with their federal filing." See draft Antitrust Pre-Merger Notification Act, Uniform Law Commission (June, 29, 2023).

[55] NPRM 42180.

to engage in lengthy pre-filing interaction with the Agencies *and* interested state attorneys general.

Additionally, economies outside the U.S. are less dynamic overall, with weaker capital flows and less M&A.  The Agencies should take care when looking for inspiration abroad, lest they make the mistake of adopting a foreign enforcement practice likely to unnecessarily stifle M&A and the broader economy.  Congress chose a fundamentally different approach to premerger notification and review than those adopted by foreign regimes.  Consequently, it is up to Congress—not the FTC—to decide to make such a fundamental change in a nearly half-century long approach to pre-merger filings.

As explained further below, while other countries have chosen to strike the balance in a different way, Congress wanted the Agencies to enforce the antitrust laws in the premerger context without overly burdening companies and the economy.  The Agencies cannot circumvent the legislative process through rulemaking, particularly with proposals that are so contrary to the legislative intent of the HSR Act.

### D.  The NPRM dramatically underestimates compliance costs.

The HSR Form envisioned by the NPRM will be a windfall for the antitrust bar.  The sprawling, open-ended nature of some of the requests, many of which have little or no relevance to a given transaction, will necessitate increased pre-filing interaction.  Regardless of the transaction's risk profile, filers will need the assistance of experienced antitrust counsel when drafting narrative responses and completing the rest of the enlarged HSR Form.  Thus, for transactions where there is a low probability of a Second Request, the increased burden imposed by the NPRM will be especially significant—and particularly unjustified.

According to the FTC's estimates, parties currently spend an average of 37 hours completing an HSR filing.[56]  By their own overly conservative estimation, the Agencies now essentially seek to quadruple the burden for all transactions, estimating that the average filing would take 144 hours to complete under the proposed changes.[57] This corresponds to the equivalent of more than two-and-a-half weeks of additional effort by a full-time worker simply to prepare the form—a burden that will hit large and small businesses alike.

Despite predicting a nearly 400% increase in the hours needed to complete the HSR filing, the Commission concludes that the NPRM's proposed changes represent a minimal burden for most filers.  The FTC's basis for this conclusion is wholly unsupported.  Notably, the FTC fails to provide an explanation of the Commission's methodology in determining the average preparation time.  The NPRM notes only that it relied on the estimations of staff who "previously prepared HSR filings in private practice."[58]  Beyond stating that staff took "into

---

[56] *Id.* at 42208.
[57] *Id.*
[58] *Id.* at 42207.

account that transactions range in complexity"[59] when providing estimates, the NPRM provides little insight into how staff evaluated the differences in impact across deals.

The Chamber conducted a survey of 70 antitrust practitioners that asked them questions about the proposed revisions to the HSR Form.  The survey was conducted from mid-August through early September 2023.[60]   Nearly 80% of those surveyed had been involved with more than 50 merger transactions in their career, with 60% of those surveyed having been involved in more than 100 deals.  It is also worth noting that nearly 40% of those surveyed had previously worked at one or both of the Agencies.

Overall, practitioners soundly rejected the utility of the NPRM's proposed changes to the HSR Form. The Chamber also commissioned Professor Kothari, an outside expert, to conduct further analysis of the proposed rule and the findings point out myriad shortcomings with the cost-benefit analysis contained in the NPRM. Professor Kothari's report, which is attached to these comments, also used the Chamber's survey data to better estimate the costs of the proposed form. The Professor's projections suggest that the true cost of the proposed changes may be nearly five times greater than the NPRM suggests. For example, as discussed in his assessment, the NPRM focuses on only the aggregate estimated cost to filing parties and the receiving Agencies, but completely fails to consider the indirect costs to the economy that will surely result when parties are discouraged from pursuing clearly nonproblematic deals because of the incredible time and monetary burdens the NPRM's proposed changes would impose on all transactions. Additionally, the NPRM fails to identify, let alone quantify, any economic benefits to filing parties, the Agencies, or the overall economy that would be capable of offsetting the costs the NPRM's proposals would impose.

Given the breadth of deals, the differing nature of the companies involved in filings, their record keeping and document policies, and the varying structures of the organizations, the NPRM's estimates almost certainly severely underestimate the time burden that many filing parties would incur.  Several elements in the NPRM, in particular, are certain to increase legal fees and other costs significantly, as well as to increase the burden on filing company personnel to identify, collect and produce responsive materials. In addition, these elements will increase the burden on Agency staff reviewing the information, and the additional information is not likely to be any more informative to the Agencies than the information already required under the current HSR Form.  To cite a few notable examples, the NPRM proposes:

- **Requiring filers to provide final and *draft* versions of Item 4 documents prepared for officers, directors, and "supervisory deal team leads," as opposed to only final versions or those prepared by or for officers or directors.**[61]  Such a requirement will likely force companies to forensically search for, and retain, all

---

[59] *Id.*
[60] See U.S. Chamber of Commerce, HSR/Merger Guides Practitioner Survey (Sept. 19, 2003), available at https://www.uschamber.com/assets/documents/20230919-U.S.-Chamber-Antitrust-Survey.pdf.
[61] *Id.* at 42193-42194.

versions of documents, whether they indicate the fully formed opinions of the filing company or gained the approval of senior management. The instructions do not provide a clear definition of who qualifies as a supervisory deal team lead or of what a draft is, resulting in subjective assessments and uncertainty for filing parties. Moreover, this proposal fails to account for the fact that many companies make use of modern, online collaboration tools that enable multiple users to edit and comment on the same document, often at the same time, to enhance efficiency. Typically, each individual change is not saved in these systems. The NPRM put companies at risk of inadvertently failing to save drafts simply by using the functionality of the most modern collaboration tools.

- **Requiring filers to provide ordinary course, periodic plans and reports as Item 4 documents.**[62] Such a requirement will likely force companies to conduct a forensic search for all documents prepared by or for a CEO, and for effectively all of the CEO's direct reports.[63] Further, these documents are not transaction-related, and the entire set of documents identified in the proposal are unlikely to be collected during the diligence process. The instructions do not provide a clear definition of "semi-annual and quarterly" or "plans and reports," resulting in uncertainty and compliance risks for filing parties.

- **Requiring filers to provide a narrative description of all strategic rationales for the transaction, with citations to documents in the filing that support the responses.**[64] At present, the burden of drafting narrative responses regarding a proposed transaction is limited to filers responding to a Second Request. Low-risk filers, in contrast, are currently spared the extensive legal fees associated with drafting such narratives. By forcing all filers to submit narratives in the first instance, and to prepare and submit documents not normally created in the ordinary course, the FTC is essentially imposing a significant new transaction tax.

- **Requiring filers to provide narrative descriptions of the "current and future competitive relationships between the filing parties," including "horizontal overlaps and supply relationships between the filing persons."**[65] Completing the proposed Competition Analysis section, regardless of the transaction's risk profile from a competition perspective, will require earlier and more extensive engagement with antitrust counsel. And in some instances, again regardless of

---

[62] *Id.* at 42195.

[63] The exclusion of certain direct reports to the CEO is unlikely to limit the universe of potential Item 4 custodians because the reality is that very few direct reports to a CEO are *solely* responsible "for environmental, tax, human resources, pensions, benefits, ERISA, or OSHA issues." The Chamber is unaware of an organization structure that typically has an individual solely responsible for pensions or solely responsible for OSHA issues reporting directly to the CEO. Even if the Agencies expanded the qualifier to exclude direct reports "primarily" responsible for these subjects, this could exclude, at most, one individual who may have responsibility over all "human resources, pensions, benefits, ERISA, or OSHA issues." *Id.* at 42214.

[64] *Id.* at 42191.

[65] *Id.* at 42196.

the risk profile, filers may also need to retain economic experts and other consultants in order to adequately describe the parties' relationships.

- **Requiring filing companies to submit several individual and entity organization charts not kept in the ordinary course of business.**[66]  The FTC proposes that, if they do not already exist, filers be required to create custom organizational charts showing "the position(s) within the filing person's organization held by identified authors, and for privileged documents, the recipients of each document submitted with the HSR Filing."[67]  The NPRM would also require the filing parties to use the chart to identify the individuals searched for responsive documents.[68] Additionally, the NPRM would require filing parties to submit a diagram of the deal structure " along with a corresponding chart that would explain the relevant entities and individuals involved in the transaction."[69] Finally, for transactions where a fund or master limited partnership is the ultimate parent entity, the filing companies would have to "identify and show the relationship of all entities that are affiliates or associates."[70]  While such a request may be understandable in the context of a Second Request, for the vast majority of reportable transactions, the FTC will derive little benefit from receiving such information.

- **Requiring the suspension at the time of an HSR filing of any auto-delete policies in place for an entire entity within a filing person.**[71]  This requirement raises confidentiality concerns and possibly requires conduct that could violate the securities laws governing the treatment of material, nonpublic information if a party must coordinate with a broad group of personnel to ensure information is preserved before the transaction at issue has been announced. This concern arises both for deals that have not been made public, as well as for deals that have not been announced to all employees across a company. Additionally, the Commission does not acknowledge, let alone estimate, the potential expense or resources required by companies to retain documents outside of the ordinary company policies.  Imposing this requirement on top of existing retention obligations, such as the duty to retain documents when litigation is anticipated, is unnecessary and unwarranted.

- **Requiring the identification of communications systems and messaging applications on any device used or that could be used to store or transmit information or documents related to its business operations.**[72]  The Commission "believes that this information is readily available to the filing

---

[66] *Id.* at 42195.
[67] *Id.*
[68] *Id.*
[69] *Id.* at 42192; 42213.
[70] *Id.* at 42211.
[71] *Id.* at 42206.
[72] *Id.* at 42205.

person and that identifying these systems in use by the company with the HSR Filing would impose minimal burden."[73]  This belief is wrong.  Identification of communications and messaging systems could potentially require companies to conduct surveys and interviews with individual employees to comply with such a requirement.  Further, the definition of what qualifies as one of these communications and messaging systems needs to be articulated more clearly.

- **Requiring filers to submit all other agreements between the parties and their affiliates.**  The Commission fails to appreciate the large number and types of ordinary-course agreements that two parties to a transaction may have, completely unrelated to the transaction at issue.  These may include purely commercial agreements, agreements in irrelevant lines of commerce, agreements involving non-US businesses, and other types.  For conglomerates and multi-nationals, this burden is all the greater since copies of such agreements may be stored in different procurement and contract-management systems (or paper files) housed in different business units and even other countries.

- **Requiring filers to submit Periodic Plans and Reports not considered in the instant transaction**.  The NPRM requires submission of "semi-annual or quarterly plans submitted to senior management and all "plans and reports" submitted to the Board of Directors discussing competition-related issues in *any* line of business where the two parties compete—including business units entirely unrelated to the transaction.  For companies that compete in multiple lines of business, this will require collection of reams of irrelevant information.  And for transactions involving a specific asset between parties who operate in a single sector, this could require collection of virtually all Board updates.

- **Requiring filers filing on a letter of intent to submit additional documents that would introduce increased burden and delay.[74]**  The NPRM would require parties filing on an "executed letter of intent or agreement in principle" to additionally "attest in their affidavit" that they have submitted "a term sheet or draft agreement that describes with specificity the scope of [the proposed transaction]."  The NNPRM offers no evidence that such filers do not already provide sufficient information for the Agencies to complete an initial antitrust review.  This proposal would introduce unnecessary inefficiencies and would chill especially time-sensitive transactions.

- **Requiring filing companies to provide full English-language translations for all foreign-language documents produced in connection with an HSR filing.[75]**  This will dramatically increase the time and expense required to complete the filing

---

[73] *Id.*
[74] NPRM at 42206-07.
[75] *Id.* at 42182.

when a foreign entity is involved in a transaction.  For transactions that raise no concerns, filers will be forced to incur these costs to translate documents that are not necessary for the Agencies to complete their analysis and may not even be fully reviewed by Agency staff.

Beyond noting that translation tools are "more abundant" today,[76] the NPRM provides no estimation of the potential time or costs for filing parties to provide such translations, nor does the FTC address or consider the potential risks that parties would incur were they to rely on economical "translation tools," as the FTC suggests, rather than professional translation services.[77]

Collectively, these and other proposed changes to the HSR Form will impose substantial new costs on all transactions, whether or not they present a significant potential risk to competition.

### III.    The NPRM Would Impose Extraordinary Costs with Only Speculative, if any, Benefits to the Agencies.

Agency leadership frequently notes that staff are stretched thin and "outmatched" by private parties.[78]  And yet, the FTC is now proposing new requirements that will result in a deluge of new information and documents.  Worse yet, the overwhelming majority of the new material received by the Agencies under the NPRM would relate to deals that do not require any additional scrutiny.  In effect, the NPRM would require parties to reportable transactions to create "haystacks" of data, information, and documents, which the Agencies will now have to search to discover the same "needles" they now find under the much simpler, less burdensome pre-merger regime.

The NPRM also suggests that front-loading the HSR process will make merger review more "efficient," but no evidence is cited to support this contention.  Given the length of time it typically takes the Agencies to evaluate the information collected during a Second Request, it is unclear how the Agencies plan to collect and evaluate all the new information demanded by the NPRM within the 30-day review window proscribed by the HSR Act.  With respect to DOJ and

---

[76] *Id.* at 42183.

[77] *Id.*

[78] *See, e.g.*, Testimony of the Federal Trade Commission Before the House Committee on Appropriations Subcommittee on Financial Services and General Government, United States House of Representative at 2-3 (April 27, 2023), available at:
https://www.ftc.gov/system/files/ftc_gov/pdf/p210100houseappropriationstestimonyfy2024.pdf. "Despite this increase, an FTE level of 1,380 is still approximately just 80% of what it was at the beginning of 1980, while the nation's GDP has increased six-fold since then. Demands on the Commission continue to grow as we review corporate mergers, conduct more complex and expensive litigation, receive consumer complaints, try to stay abreast of transformative technological and market changes, and respond to burgeoning requests for research and investigation of various economic sectors. These factors have underscored both the importance of our work and the critical need for additional resources."

FTC staff, common sense suggests that the NPRM will have the opposite impact than what the NPRM predicts.

Finally, the NPRM is infused with suggestions that parties are "gaming" the HSR process by intentionally hiding information or miscoding revenue. The only cited basis for these suggestions is that the Commission sometimes feels it discovers more fulsome information in the course of a Second Request. The NPRM offers no specifics, and the Chamber is unaware of any enforcement action by the Agencies against parties who willfully concealed information. Even assuming such situations occur, there are more narrowly tailored remedies to address them than imposing further up-front burdens on all filers.

**A. The Proposed Revisions would request information unnecessary for an initial review of a transaction's potential competition concerns.**

Given the significant costs already imposed on filers seeking to comply with the current HSR Form, the NPRM's plans to expand it are inappropriate, especially considering that Chair Khan herself has acknowledged that only a small fraction of reportable transactions raise antitrust concerns.[79] In fact, the FTC's frank acknowledgement of the limited probative value of the additional information that would be provided by the expanded Form suggests that, if implemented, the NPRM's demands may amount to a violation of due process by creating an unjustified and significant additional burden upon filers.

Many of the new requirements in the NPRM are wholly inconsistent with the HSR Act's directive that the FTC require filers to provide only "such documentary material and information . . . as is *necessary* and *appropriate*" for the Agencies "to determine whether such acquisition may, if consummated, violate the antitrust laws."[80] For example, the NPRM would require parties to gather, review, and produce data, documents, and information without any connection to the transaction being notified, such as draft documents not ultimately relied upon by the decision-makers at the filing entity, supplier relationships with no connection to the notified transaction, and irrelevant data concerning agreements with employees, commuting zones, and labor category codes so broad as to be entirely useless to any form of factual analysis. The amount of information sought by the Form, and the burden to collect it, are not at all proportional to the utility of the information to the Agencies.

Below are some of notable examples of information demands that would provide little or no probative information for an initial review of the transaction, particularly given their applicability to *all* reportable deals:

**_Substantial expansion of Item 4 documents._** The NPRM would substantially expand the category of documents responsive to current Item 4 to include draft documents, as well as final documents "prepared by or for the supervisory deal team lead(s)."[81] With the expansion of

---

[79] Remarks of Lina M. Khan, Economic Club of New York (July 24, 2023).
[80] 15 US.C. §18a (d)(1).
[81] NPRM at 42193.

Item 4 document custodians and the inclusion of draft documents, the number of documents submitted with each filing may increase tenfold or greater.[82]  As noted in Section II. D, companies will incur significant time and costs to ensure all of these "draft" Item 4 documents are identified, collected, logged, and submitted with the filing.  However, the Agencies do not provide any support that they are missing anticompetitive transactions because they do not currently receive drafts, and it is unclear how this deluge of documents will help the agencies identify the small percentage of transactions that may raise concerns.  Indeed, Staff will need to sift through tens if not hundreds more documents for every single deal on the off chance that a draft contains "non-sanitized" language—which may very well be hyperbolic or inaccurate given its later removal—that indicates to Staff a transaction may be problematic when Staff would have otherwise not intervened.

At the same time, the FTC separately explains that a transaction rationale narrative is necessary because "[a]s helpful as the documents responsive to current Items 4(c) and 4(d) of the Form can be, they do not always convey each filing person's cumulative views on the rationale(s) for the transaction."[83]  The FTC explains that "such documents (when they are submitted and when they discuss rationales) often contain differing, and at times conflicting or mutually exclusive, statements regarding the transaction depending on when they were prepared or by whom."[84]  But this disconnect between Item 4 documents and the filing parties' "cumulative views" regarding the transaction is likely to be even greater if parties also produce draft documents and documents prepared by or for "supervisory deal team leads," all of which may never actually be shared with an entity's officers or directors.  The balance currently struck by Item 4(c) appropriately focuses the Agencies' resources on reviewing the final documents actually considered by senior management, not the input of every junior staffer whose work was revised, updated, corrected, or jettisoned before a document reached the actual decisionmakers.

As the FTC acknowledges, the "Agencies routinely ask for and receive" draft documents and those involving "supervisory deal team leads" via Second Requests, and they can continue to do so for deals that require further investigation.[85]  For most transactions, there are no competitive concerns, and so the burden for the parties to identify, collect, log, and submit these greatly expanded Item 4 documents (and the burden on Staff to review the onslaught of documents) through the initial HSR filing greatly outweighs any perceived benefits.

---

[82] The NPRM does not provide a definition for what constitutes a separate "draft" that must be provided.  Is a separate draft each version of the document as determined by version numbers in a document management system?  Is a new "draft" created each time any user makes a single modification regardless of how minor to the document?  Is it something else?  This lack of clarity may create questions as to what needs to be collected and submitted and whether an Item 4 submission is complete, which in turn will likely lead to increased involvement by outside counsel and even greater costs.

[83] NPRM at 42191

[84] *Id.*

[85] *Id.* at 42194.

The NPRM would also include an expansion of the category of documents responsive to current Item 4, which would require filing persons to submit certain high-level strategic business documents that were not created in contemplation of the transaction.  Documents created in contemplation of the transaction provide the most probative information for the Agencies to assess the potential impact of the transaction.  The Agencies have the ability to request ordinary course strategic business documents through the VAL process or through a Second Request.  As discussed above, the vast majority of reportable transactions do not require more.

The NPRM's alternative proposal to have parties only submit drafts within 48 hours, if requested, does not alleviate the burden and cost of gathering those additional materials, nor does it reduce the risk that the expanded universe of Item 4 documents will lead to inaccurate assessments.

**_Periodic Plans and Reports._**  In addition to the significant expansion of Item 4 documents, the NPRM would also require filers to identify and provide certain periodic plans and reports provided to the Board, CEO, and other leaders.  These reports would not be limited to those "created in contemplation of the transaction" but would require the disclosure of ordinary course documents that "analyze market shares, competition, competitors, or markets pertaining to any product or service also produced, sold, or known to be under development by the other party."[86]  The identification and submission of these documents will add even more time and costs to the filing process.  Moreover, ordinary course plans and reports provided to the Board or company leaders are unlikely to contain _only_ information about the specific product(s) or service(s) offered by the other party.  Especially for large multinational companies or other entities that offer a variety of products or services, such documents likely include information on a range of topics and business lines that are wholly unrelated to the transaction.  Moreover, this irrelevant information may be highly sensitive – financial forecasts, personnel matters, operational strategies.  The FTC states that these documents are often submitted in Second Requests, but it does not explain that the Agencies are missing anticompetitive transactions because these reports and plans are not part of the initial HSR filing.[87]  Most deals do not raise competitive concerns – even those with horizontal overlaps.[88]  For deals that do not raise concerns, the Agencies should not have unfettered access to a party's highly sensitive information that is unrelated to the transaction.

The Chamber believes that these reports and plans should not be required as part of the initial HSR filing as the burden and sensitivity of the information outweigh any perceived benefits.  However, if this instruction remains, then filers should be permitted to redact

---

[86] _Id._ at 42195, 42214.
[87] _Id._ at 42195.
[88] The FTC explains that 45% of deals report overlaps, but Second Requests are only issued in 2% of transactions. _Id._ at 42208; Lina M. Kahn, "Remarks of FTC Chair Lina M. Khan, Economic Club of New York," Interview by Peter Orszag (July 24, 2023), available at https://www.youtube.com/watch?v=X7u3JwSfHZY.

information that is unrelated to the transaction (in addition to privileged information) as is currently the practice with board minutes.[89]

_**Narratives.**_  The NPRM would require the filing parties to take on the burden of preparing several narratives describing "horizontal" overlaps, the ownership structures of the acquiring and acquired entities, the transaction rationale, supply relationships, and labor markets. Identification and compilation of this information will require a level of antitrust analysis for even deals that raise no antitrust concerns.  And given the subjective[90] nature of these requests, filers will likely need to incur the burden of hiring experienced antitrust counsel to negotiate with Agency staff so that the filers and the Agencies can come to an agreement concerning what kind of response will satisfy the new HSR Form's demands.  The requirement to prepare new materials for the Form that are not kept in the ordinary course runs afoul of Congressional intent.[91]

The NPRM seeks to justify this radical expansion of the Form by arguing that similar narratives are required in other jurisdictions.[92]  Congressional intent, however, cannot be evaded by such an argument.  This argument also ignores the fact that, in a given year, only a fraction of filers seek approval in foreign jurisdictions.

The requested narratives open the door to disagreement and protracted negotiation with the Agencies.  Unlike the current Form's requests, which are focused on seeking objective, factual responses, the NPRM would require filers to make judgments about matters such as all competitive relationships (horizontal and vertical) of the filing parties.[93]  How often will the Agencies be satisfied with the filers' self-assessment of the relevant markets and their competitors?  Is it contemplated that filers would need to iterate draft filings over a period of potentially months, as is the practice in the EU and China?  Given these uncertainties and the language required in the Certification under 16 CFR 803.6, filers will feel the need to involve antitrust counsel more often and at much deeper levels, even for deals that clearly raise no antitrust concerns, just to improve the likelihood that the narratives are drafted to the Agencies'

---

[89] _See, e.g._, Checklist for Submitting an HSR Filing, available at <u>Checklist for Submitting an HSR Filing | Federal Trade Commission (ftc.gov)</u>; Informal Interpretation 2105006, available at <u>2105006 Informal Interpretation | Federal Trade Commission (ftc.gov)</u>.

[90] The NPRM would require filers to describe aspects of markets relevant to their proposed transaction as either "horizontal" or "vertical."  Meanwhile, AAG Kanter himself has questioned whether those distinctions are even reflective of contemporary market circumstances, noting that the dichotomy is "formalistic" and "not everything neatly presents always as vertical or horizontal."  _See_ Remarks of Jonathan Kanter, "Competition Policy, Corporate Concentration & Freedom of Thought: Approaching the Draft Merger Guidelines," The Federalist society (July 20, 2023), <u>https://fedsoc.org/events/national-press-club-event</u>.

[91] "Congress also intended that the reports would consist of data and documents reasonably available to reporting companies."  42 Fed. Reg. 39,040 (Aug. 1, 1977) at 39,043.

[92] NPRM at 42180.

[93] NPRM at 42193.

liking.  This new paradigm surely will be a boon to antitrust lawyers, but otherwise will function as an additional tax across the national economy.

**_Prior Acquisitions._**  The NPRM would require that parties provide information on _all_ prior acquisitions "in which (i) 50% or more of the voting securities of an issuer, (ii) 50% or more of non-corporate interests of an unincorporated entity, or (iii) all or substantially all the assets of an operating unit were acquired" (including those that fell below the HSR reporting thresholds) over the past 10 years and would apply this requirement to both buyer and seller.[94]  This doubles the look-back period currently requested by the Form and dispenses with the current criteria used to limit the scope of the look-back period to transactions above certain minimum thresholds. These changes would require filing parties to collect information about and report a large volume of immaterial transactions (including stock or asset purchases of a de minimis dollar value) over the last decade.

The NPRM seeks to justify this incredibly burdensome demand by arguing it would help the Agencies assess concentration and trends toward consolidation.[95]  However, if a company has a market share the Agencies believe provides a basis for closer scrutiny, the information provided under the current Form is already sufficient for the Agencies to make that determination.  While transactions are always subject to an enforcement action if the Agencies determine, through investigation, that there may be anticompetitive conduct occurring, the NPRM's look-back expansion, if adopted, would invite the Agencies to scrutinize long-ago consummated deals, including non-reportable deals that the Act's notification requirements were never intended to capture.  This would expose established businesses to uncertainty every time they seek to complete an efficient transaction and would likely chill acquisition plays and the related venture capital sector crucial to highly innovative and dynamic industries.  The NPRM is silent regarding any of these impacts, but the changes are clearly designed to have a chilling effect, particularly on private equity firms.  Unfortunately, the NPRM does not appreciate how much damage to the broader economy such punitive measures would have. We believe the effort that would be required to track this historical information far outweighs the potential benefit that information about immaterial prior acquisitions could bring to the DOJ/FTC's evaluation of a merger.  As such, we would propose removing the 10-year time frame extension from the proposed rules regarding "Prior Acquisitions" and keeping intact the existing monetary thresholds for listing prior acquisitions.

**_Supply Relationships._**  The NPRM would seek substantial information concerning the vertical relationships of the filing parties.  These new requests present a significant burden and are not necessary at the early stage of premerger notification filings; rather, such requests are more appropriate for a Second Request once the Agencies have determined that the transaction

---

[94] NPRM at 42217.
[95] NPRM at 42203.

in question genuinely raises vertical foreclosure concerns, for example.[96] In addition, if the parties to a transaction have an existing supply relationship, their Item 4(c) and 4(d) documents would very likely note that fact.  Under the new request, parties will incur increased filing expenses as they involve expert lawyers and economists to prepare this information, information which requires the parties to characterize the nature of their business relationships with other parties.  For the vast majority of filers, vertical concerns will not be a feature of their transactions, but all parties nonetheless will face increased burdens to ensure appropriate compliance with these new questions.

_**Minority Interests.**_  The NPRM would require extensive information on minority shareholders of any entities that control or are controlled by the acquiring entity, if they hold over 5% or the voting securities or non-corporate interests, removing the exception for limited partners.  This could in many cases require information on minority investors whose interests are wholly unrelated to the notified transaction.  Gathering such information would present a substantial burden, particularly on PE firms with multiple portfolio companies, which would require an extensive search of all investors across companies, regardless of their involvement in the transaction.

In addition to increasing the cost-related burden of HSR compliance for PE firms, the requirement to disclose limited partners will significantly impact deal volume and fundraising for such firms. For example, many limited partnerships (LPs) are required by agreement to remain passive, so their disclosure would not further the Agencies' analysis but may leave LPs uninterested in investments that would potentially require disclosure of their involvement. The risk that LPs would refrain from investing to avoid disclosure in potential HSR filings is unwarranted given the total lack of probative value provided by information about their identity.

While the Chamber appreciates that the Commission has attempted to minimize burden by only requiring information on those minority investors that will continue to hold an interest in the acquired entity, this proposed limitation is insufficient when there is no clear connection between the minority investors of portfolio companies and a specific transaction.  Simply put, such information is not relevant to an antitrust evaluation for most deals and the materials submitted with the current HSR Form suffice to indicate when there is need for the Agencies to issue a VAL or Second Request to seek such information.

---

[96] _See_ Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 755c (online ed. May 2023).  There is no presumption in the law that vertical deals of any description threaten to reduce competition.  Indeed, they are often procompetitive.  _Id._ ("Vertical integration is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets.")  Even now, the Agencies challenge very few vertical transactions, and the courts generally have not been receptive to those challenges.

_**Officers, Directors, and Board Members.**_  The NPRM would require parties to provide information on officers, directors, and board representatives; again, the burden to gather this information is likely significant relative to its limited probative weight.  The NPRM would require filers to obtain and report information plainly irrelevant to the filing party, such as all other boards that a board member or observer serves or _has served_ on in the last two years.[97]  If the Agencies have particularized concern about how the composition of a company's board or its corporate officers impact competition in markets relevant to a transaction under review, a VAL offers the appropriate tools for seeking such information.  Aside from the disproportionate burden of this proposed request, the Agencies also lack the authorization under the HSR Act to seek this information as part of the HSR Form.  Information concerning corporate officers primarily concerns enforcement under Section 8 of the Clayton Act,[98] as opposed to enforcement of Section 7,[99] which is the only provision of the Clayton Act the Agencies may enforce through the HSR Form's information requests.

The requirement to collect information on directors and officers will be especially burdensome on companies that do business abroad via foreign affiliates that make no sales in or into the US.  For a large multinational, this could require collection of information on dozens or hundreds of individuals associated with affiliates operating outside of US markets and in countries where there is no per se ban on interlocks.

Moreover, to the extent obtaining particularized information regarding a filer's officers and board members is necessary for the Agencies to complete its initial assessment of a transaction's potential to threaten competition, there is no compelling argument for requiring filers to also provide this information regarding board members, observers, and individuals with rights to nominate a board member or observe for _other_ entities, regardless of whether that entity directly or indirectly controls, or is controlled by, the acquiring party.  And (as discussed

---

[97] In one paragraph of the Supplementary Information, the NPRM requires that the parties "identify any other _companies_ for which those individuals would serve or have served." NPRM at 42190 (emphasis added).  In a different paragraph in the Supplementary Information as well as the Instructions, the NPRM informs filers to provide a list of the "other _entities_" that the individual has served.  _Id._ at 422189, 42212 (emphasis added).  If this requirement remains, then the FTC should clarify which types of "companies" or "entities" should be listed.  The definition of "entity" under the HSR Regulations is broad and includes "any natural person, corporation, company, partnership, joint venture, association, joint-stock company, trust, estate of a deceased natural person, foundation, fund, institution, society, union, or club."  16 C.F.R. 801.1(a)(2).  As such, this proposed Instruction could be interpreted to require the provision of information regarding affiliations with non-commercial entities and/or with entities joined by the officer, director, or board member for personal reasons (_e.g._, the board of a religious organization, the board of a local fundraising organization, the board of a performing arts club, etc.), but this type of information should be excluded because it is personally invasive and has no probative value under the antitrust laws.
[98] Section 8 prohibits directors and officers from serving simultaneously on the boards of competitors, subject to limited exceptions.
[99] Section 7 prohibits acquisitions of stock and assets where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." The HSR Act was adopted to provide the Agencies time to seek information concerning the likelihood that a proposed transaction would "substantially lessen competition" in violation of Section 7 of the Clayton Act. Aside from Section 7, no other section of the Clayton Act is referenced by the HSR Act.

above), the NPRM offers no evidence that the Agencies have systematically missed anticompetitive interlocks because the parties did not report extensive officer- and director-related information in their HSR Forms.  When the FTC successfully reached a consent order with Quantum Energy Partners and EQT Corporation to prevent an interlocking directorate arrangement,[100] such data was of course not reported on the HSR Form, nor would it have been useful if it had been.  Finally, to the extent the NPRM requires this information to be current as of the date of each filing, the Agencies provide no compelling argument for requiring this information to be gathered at the time of each filing rather than on annual basis, as is required for revenue breakdowns by NAICS codes under Item 5.

For multinational companies, the proposed requirement to provide information for "each entity within the acquiring person" is particularly onerous.[101]  Large global companies may have hundreds of subsidiaries across the world, each of which has "officers" to satisfy local legal requirements.  Most of these sister subsidiaries and their officers will not be involved in the deal, the acquiring entity, or the newly acquired entity.  They sell unrelated products and/or in unrelated countries, and they have no influence or decision-making authority over the acquiring person or entity.  The collection of this information for unrelated entities will impose significant time and cost burdens on the acquirer and will flood Staff with a list of hundreds or thousands of irrelevant names that will not help in analyzing whether the transaction raises antitrust concerns.  The limited or likely nonexistent probative value is greatly outweighed by the burden to filing parties (and the Agencies' own Staff).

***Organizational Charts for Individuals.***  The NPRM would require filing parties to submit organizational charts for individuals who are (i) authors of Item 4 documents, (ii) recipients of privileged documents, and (iii) individuals searched for responsive documents.[102]  The proposal to submit organizational charts for multiple individuals is unnecessary, burdensome, and in certain instances privileged.  For authors of Item 4 documents, the NPRM would require an organizational chart that "would reflect the position(s) within the filing person's organization held by identified" yet filing persons are already required to supply each author's title in the Item 4 index; the org chart of Item 4 authors will offer no additional information or benefit for the agencies.  Further, the agencies claim to want organizational charts "to determine the importance and perspective of the responsive documents submitted with the HSR Filing" but Item 4 documents, by their own definition, are necessarily the most important documents within an organization. The requirement to identify recipients of privileged documents is unnecessary as well: the agencies do not separately justify the need for this request, and the information included in a filing persons statement of reasons for noncompliance already

[100] Press Release, FTC Acts to Prevent Interlocking Directorate Arrangement, Anticompetitive Information Exchange in EQT, Quantum Energy Deal (Aug. 16, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/08/ftc-acts-prevent-interlocking-directorate-arrangement-anticompetitive-information-exchange-eqt.
[101] NPRM at 42212.
[102] *Id.* at 42195.

provides the agencies enough information to challenge any privilege claim. Finally, the requirement for filing parties to identify individuals searched for responsive documents is a request for information that many filing parties would claim is privileged, particularly given that the Agencies are requiring a litigation hold with HSR filings that puts filing parties in a litigation posture.

_**Labor Data.**_  The NPRM provides no evidence to establish why it is necessary and appropriate for the Form to seek the requested labor data at the outset rather than for the Agencies to seek targeted information on labor-related questions under a VAL or Second Request in transactions where labor markets are possibly relevant. This unjustified increase in filing burden demands an explanation given the irrelevance of this information to most filings. For example, certain categories of transactions such as an acquisition of a license, or of an officer's vesting of stock valued at over $111.4 million are unlikely to raise any labor issues at all.

Additionally, the NPRM fails to explain how the requested information would even help the Agencies to determine whether there is harm to competition in particular labor markets. As Judge Easterbrook (joined by Judge Wood) recently noted, "[t]he mobility of workers—both from one employer to another and from one neighborhood to another" means that labor markets must be broadly defined, both in terms of economic sector and geography. _Deslandes v. McDonald's USA, LLC_, No. 22-cv-2333, 2023 WL 5496957, at *1 (7th Cir. Aug. 25, 2023) ("People entering the labor market can choose where to go—and [a single type of business is] one of many options").

 The data sought by the proposed rules defines labor markets imprecisely at best. For example, the NPRM's plan to have parties submit standard occupational classification ("SOC") codes—which are very broad—is not supported by any argument as to how that information would provide an adequate screen for the type of work employees actually perform,[103] and thus the NPRM does not indicate how that data would help the Agencies assess whether a notified transaction raises competition concerns, let alone merits a Second Request.

Similarly, the NPRM offers no explanation for how the Agencies believe requesting commuter zone data—another wholly new request under the NPRM—is adequate or even useful for assessing the geographic dimension of a labor market. In addition to the absence of any explanation of how such data is necessary and appropriate, the utility of such data appears to be dubious at best in many industries, considering the contemporary prevalence of remote work. For markets where remote working is common, employers are not constrained by

---

[103] _See, e.g._, the SOCs for technology focused job roles. Options for such occupations include "Computer Programmer," "Software Developer," and "Software Quality Assurance Analysts and Testers." How are tech companies engaged in a transaction expected to assess potential overlaps with the relevant SOC terms that are potentially vastly over and under inclusive?  For a more detailed analysis of the limited utility associated with reliance on SOCs, see Daniel J. Gilman, "Antitrust at the Agencies Roundup: Kill All the Widgets Edition," (August 4, 2023), https://truthonthemarket.com/.

commutes when they compete for talent.  At the very least, these details suggest the NPRM is overbroad when it seeks such information from *all* filing parties.  By failing to account for the contemporary availability of remote work, the NPRM also seems out of touch with today's business realities, contrary to the supposed objective of the NPRM to align the Form and Instructions with the "modern economy."

If labor information about workers' ability to have potential employers compete for their skills and services in the relevant market or industry is probative to the Agencies' assessment of a transaction, the burden of any related requests is more appropriate as part of a VAL or Second Request.  And (as discussed above), the NPRM offers no evidence that the Agencies have systematically missed anticompetitive effects on labor because the parties did not report extensive employee-related data in the HSR Form.  When the DOJ successfully blocked proposed Penguin Random House/Simon & Schuster merger on a labor theory, such data was not reported on the HSR Form, nor would it have been useful if it had.[104]

The NPRM's citation to *FTC and State of Rhode Island v. Lifespan Corporation and Care New England* also fails to support the proposal's sweeping information requests concerning labor-related market information. The FTC's complaint in Lifespan/Care New England did not even include allegations concerning any alleged labor market; rather, the concurring statements of Commissioners Khan and Slaughter simply indicated they would have supported such claims, but their statement redacts the analysis the Commissioners argue they believed would have supported such a claim.[105] The statement thus has no value as a supporting document for the NPRM's proposals; without being able to assess the analysis prepared by FTC staff, the commenting public cannot respond to the merits of the citation.

"Workers' share of national income"[106] and other labor issues, such as workplace safety, also lie far outside the FTC's competence or statutory mission and are irrelevant to a merger analysis.  Depending on the industry, this request could be highly burdensome and the NPRM presents no reasoning to establish a correlation between the industries for which collection of this information will be most burdensome and those industries that will exhibit potential antitrust concerns to justify such a burden.  For example, more labor-intensive industries may have a higher volume of OSHA issues than large technology businesses.  Moreover, the NPRM's speculation about a correlation between employer monopsony power and OSHA violations has

---

[104] *United States v. Bertelsmann SE & Co. KGaA*, No. 21-cv-2886, 2022 WL 16949715 (D.D.C. Nov. 15, 2022). It is also important to note that the DOJ's challenge to this transaction focused on the deal's ability to enhance monopsony power in a nationwide market for publishing rights from leading authors, not a localized labor market based on SOC codes or a commuting zone-based market definition limited only to a specific geographic area.

[105] *See* Concurring Statement of Commissioner Slaughter and Chair Khan regarding FTC and State of Rhode Island v. Lifespan Corporation and Care New England, at 1–2 (Feb. 17, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/public_statement_of_commr_slaughter_chair_khan_re_lifespan-cne_redacted.pdf. "In addition to supporting the allegations of competitive harm in these markets, we write separately to note that we also would have supported an allegation that the effect of the proposed transaction may be to substantially lessen competition in a relevant labor market in violation of the Clayton Act. Staff's analysis found that [redacted]."

[106] NPRM at 42179.

no grounding in case law or even academic literature but is rather a purely theoretical, experimental metric the FTC is seeking to impose for the first time. In fact, at least one analysis has found that OSHA violations are more prevalent in unconcentrated industries.[107] The absence of proven utility for such data, not to mention the potential for it to raise flags in innocuous transactions while missing them in others that may indeed warrant closer scrutiny, indicates the burden of this request simply cannot be justified. If the dynamics of the relevant labor market(s) are driving a transaction under review, the documents currently requested under the Form are an adequate tool for the Agencies to identify a need for closer scrutiny of labor-related issues.

The NPRM also is silent on how current the requested labor market information must be. To the extent the NPRM suggests the labor market information needs to be updated for each filing, there is no compelling argument for requiring such labor-related information be gathered at the time of each filing rather than on an annual basis, as is required for revenue breakdowns by NAICS codes under Item 5.

Finally, even if the agencies could show that some mergers may lead to harm in specialized job markets in local areas, such as potentially in the case of certain healthcare and hospital mergers, it would be more efficient and appropriate to limit labor data requests in merger filings to the specific types of localized employment and industries where competitive harm may be plausible, rather than using merger filings to conduct research projects or fishing expeditions to study hypothetical effects in every possible labor market or industry.[108]

**_Information regarding non-parties._** The NPRM would require the acquiring party to disclose a range of details about individuals not employed by the acquiring party or by an entity it directly or indirectly controls, including providers of credit, holders of non-voting securities, options and warrants, and entities that have nomination rights for board members or board observers.[109] The FTC minimizes the burden of collecting this information by focusing solely on repeat filers, theorizing that "[o]nce collected, . . . the burden associated with some of these proposals will lessen for subsequent filings by the same acquiring person, as the information would only need to be updated."[110] This prediction completely ignores the impact on one-off and infrequent filers and the fact that updating information may involve the same amount of work as compiling it in the first place where creditors and holders of non-voting securities, options and warrants change over time. Moreover, this new requirement is at odds with the

---

[107] Justin Hurwitz, A Bad Merger of Process and Substance: Changing the Merger Guidelines and Premerger Review Form, NETWORK L. REV. (Sept. 11, 2023), available at: https://www.networklawreview.org/hurwitz-mergerguidelines/ ("[T]he relevance of information such as OSHA complaints to antitrust considerations—not even merger-related considerations—is dubious: the majority of OSHA complaints are found in largely unconcentrated, construction-related and similar industries.").

[108] Indeed, the legislative history of the HSR Act indicates Congress did not intend for information collected through HSR filings to serve as an "economic database for generalized research." Rather, the information provided by filers of the Form is only supposed to assist the Agencies with "evaluating the legality of particular transactions." See 42 Fed. Reg. 39040 (Aug. 1, 1977) at 39042-43.

[109] NPRM at 42211-12.

[110] Id. at 422207.

balance that Congress struck in adopting Section 8. Though obviously concerned about the influence that outside parties might have on a company, Congress ultimately adopted a bright-line prohibition focused only on director and officer interlocks.

***Customer contact information.*** In addition to the narratives described above, the NPRM would require contact information for customers and supply relationships. For the vast majority of HSR reportable transactions, this information is not required for the Agencies to determine whether a transaction may be anticompetitive and requires a Second Request. Requiring this information in the HSR Filing effectively requires filing parties to make transactions public, at least to entities whose identities are disclosed in those lists, thereby increasing the risk of leaks to the public. Often, there are legitimate business reasons not to make a transaction public at the time of filing. For those transactions where contact information may be necessary for the Agencies' competition assessment, the Agencies can use the VAL process to obtain the information.

***Communications and messaging systems.*** The identification of communications and messaging systems would likely impose a heavy burden on filers and the information is not relevant in any way to the Agencies' assessment of whether a transaction may be anticompetitive.

**B. Transforming every HSR filing into a mini-Second Request will not increase efficiency, nor reduce the burden on the Agencies or their staff.**

As discussed in greater detail below, the drafters of the HSR Act intended the Form and Instructions to impose no greater burden on filing parties than was necessary to facilitate the Agencies' timely and accurate screening of a proposed transaction's impact on competition.[111] Despite claims by the Agencies that the proposed changes to the HSR Form will provide for more "effective, efficient merger review,"[112] there is no evidence that the NPRM will make premerger review more efficient, and indeed, experience with the current Form indicates the opposite. As it stands now, 98 percent of all filings are permitted to close without receiving a Second Request. Of the two percent of notified transactions that do receive a Second Request, only half will face an eventual challenge by one of the Agencies. This certainly does not indicate a need for drastic expansion of the HSR Form, nor does it suggest that drastically altering the Form will make the Agencies more efficient in their efforts to process premerger filings. In fact, when announcing suspension of the practice of early termination of the HSR waiting period, the Agencies themselves noted that the move was being taken in part due to "the unprecedented volume of HSR filings" that staff was having to process.[113]

---

[111] *See* Section VI, *infra*.
[112] Press Release, "FTC and DOJ Propose Changes to HSR Form for More Effective, Efficient Merger Review," Fed. Trade Comm'n, (June 27, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-doj-propose-changes-hsr-form-more-effective-efficient-merger-review?utm_source=govdelivery.
[113] Press Release, "FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination," Fed. Trade Comm'n, (Feb. 4, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-doj-temporarily-suspend-discretionary-practice-early-termination.

Clearly, under present conditions, the Agencies do not have the capacity to review all the information the NPRM seeks to request.  Without drastic expansion of the Agencies and the Premerger Notification Office ("PNO"), there simply will not be sufficient personnel to process HSR filings and render timely and sound assessments of the materials received from filing parties.  This raises the prospect that the deluge of filed materials could make it *more likely* that a genuinely concerning transaction will be overlooked by the Agencies.

The breadth of questions in the proposed HSR Form that require subjective interpretation will further increase burden on the parties and the Agencies and increase the time for reviewing all mergers.   For example, before they can even submit their fillings and receive assignment to either the FTC or DOJ, parties may have to negotiate with the PNO regarding which questions are relevant to their transaction and which questions can be responded to within a reasonable period of time in light of logistical issues, such as whether the requested information is even in the possession, custody, or control of filing parties. Parties will have to engage further with PNO and Agency staff about their narrative responses to ensure they are sufficient in the Agencies' view or risk their filing being bounced because the transaction will not be able to receive assignment to one of the Agencies until such details are sorted, the substantive staffs of both Agencies will likely have to be involved in the pre-filing interactions because the "subjective" descriptions will have to satisfy the eventual investigating staffs, not the staff of the PNO.  Clearly, therefore, far from making the HSR review process more efficient, the NPRM would introduce new *inefficiencies* for filers and the Agencies alike.

Both the subjective nature of the much of the NPRM's new requirements and the unavoidable fact that filers will need to rely extensively on third parties to gather the NPRM's demanded information are especially concerning considering the NPRM would require that the signatory of the Form certify, under the penalty of perjury, that all contents in the filing are "true, correct and complete to the best of" the signatory's knowledge.[114] Filers of any government form are of course always on notice of an obligation to complete the form truthfully to the best of their ability; however, the NPRM's proposal seems to be seeking to impose a heightened level of liability for potential non-compliance with the Form—something normally only reserved for the Second Request atmosphere where particularized concern has been raised concerning a potential transaction.  The NPRM provides no justification for applying such a standard to *all* HSR filings in the first instance.  Demanding such a certification from HSR signatories is unreasonable and opens them up to unacceptable degrees of liability when, under the NPRM's proposed questions, signers of the Form would be asked to certify highly technical analyses concerning economics and antitrust law.  Indeed, how can a non-lawyer or non-economist signatory ever certify to the best of her knowledge that a proposed market definition, for example, is true, correct, and complete?  Even among practicing lawyers and economists, such definitions can be in dispute.

If the lawyers and economists at the Agencies happen to disagree with the signatory's offered market definition, may the Agencies bring an action for perjury against the signatory? For example, the Agencies often adopt narrow market definitions when identifying a market

---

[114] NPRM at 42218.

relevant to a proposed transaction.[115]  What if the parties view the market differently or simply do not notice a niche submarket the Agencies happen to identify?  Additionally, under the NPRM's proposed certification standard, at what point must the Agencies decide whether they accept the answers underlying the certification?  Will the Agencies have the authority under the NPRM's certification to determine months after the filing that they disagree with the parties, allowing them to bounce the filing and to force the parties to start over?  Given the certification and the highly subjective and complex nature of the narratives the NPRM would require filers to submit, how prejudicial will a party's initial understanding of the competitive dynamics described in the narratives be against potential revisions if the party's understanding of the market(s) evolves in the context of a potential challenge? Once certified, will filers have any freedom to amend their initial descriptions as submitted in the narratives? Finally, what if the Agencies determine a mistake or omission was made by one of the many third parties necessarily relied upon by the filer to gather information required by the Form? Would such a scenario be grounds for a fine against the filer or a bounce of the full filing? Without clarification and fundamental revision, the certification demanded by the NPRM raises significant questions that indicate the proposed requirement is highly inappropriate.

### IV.    The Proposed Rules Are Improperly Vague

The proposed rules are extremely vague concerning multiple critical details, some of which have already been described.  Such vagueness will sap the resources of filing parties and the Agencies to work out clarifications, will put filers at risk of inadvertent violations, and will subject the Form and Instructions themselves to potential court challenge.  A few notable examples of the NPRM's unacceptably vague provisions include:

- Transaction Description: Filers must identify "each strategic rationale for the transaction discussed or contemplated" by the filing person, its officers, directors, or employees.  Beyond the impossibility of identifying everything that its staff "discussed," it is unclear what standard filers should use to assess whether any of the identified individuals "contemplated" a particular rationale.

- Supervisory Deal Team Lead: The NPRM would require parties to submit documents prepared by or for "supervisory deal team lead(s)."  Nowhere in the NPRM is "supervisory deal team lead" clearly defined.  Instead, the NPRM offers only a broad description— "individuals who functionally lead or coordinate the day-to-day processes for the transaction at issue."[116]  Such a description could potentially describe a company's entire development team.

---

[115] *See FTC et al. v. Sysco Corporation et al.* (D.D.C 2015). In this merger challenge, the FTC successfully offered a market definition for "broadline distribution services" that indicated concentrated, local markets based on a definition that excluded other methods of food distribution. The parties, in contrast, argued they competed with a much broader array of diversified food distributors.

[116] NPRM at 42194.

- <u>NAICS Codes</u>: The NPRM would require filers to identify all codes that "describe" the products or services at issue. Many codes are so broad and disconnected from the modern economy that it is sometimes difficult to determine whether a particular code applies.

- <u>Pipeline or Pre-Revenue Products</u>: The NPRM requests NAICS codes for the acquiror's products "under development" that would overlap with products "known to be under development" by the acquired person. There is no clear standard provided for what "under development" means or what/how much information the acquiring person must have to "know" about the target's product pipeline.

- <u>Defense Contracts</u>: The rules would require reporting on defense contracts "valued at $10 million or more," but it is unclear what method of valuation is to be used, particularly for open-ended supply contracts.

**V.      The Proposal Would Damage Investment and Capital Flows.**

The free flow of capital is crucial to the American economy's ability to maximize value for consumers and workers by yielding the most innovative products and ensuring the efficient use of limited resources. Businesses and consumers make rational choices to maximize their well-being and the free market functions best when companies can generally acquire and sell assets to improve their efficiency and offerings as they compete head on with others to secure a profitable consumer base. Sound antitrust policy aims to protect the environment for such a free market by policing conduct, such as monopolization, that seeks profit while trying to avoid such a process of merit-based competition. The NPRM, however, intends to go well beyond a limited law enforcement approach and would impose a burden on the free flow of capital so significant that it would thwart the natural functions of a healthy free market, subsequently throwing the mechanisms that allow businesses to respond to supply and demand out of alignment, all to the grave detriment of both entrepreneurs and consumers.

**A.      The proposal would hinder investment in startups.**

As Congress drafted the HSR Act, it was acutely aware of the potential for the premerger notification process to frustrate the beneficial operations of the free market. One iteration of the Act would have imposed an automatic temporary restraining order on transactions subject to the premerger filing requirement.[117] This provision, however, was stripped from the legislation following DOJ testimony predicting that imposing an automatic stay would "operate as a severe disincentive to mergers generally."[118]

---

[117] 122 CONG. REC. 17268 (1976) (statement of Sen. Byrd).
[118] S. REP. No. 94-803, pt. 2, at 213 (1976).

What Congress quickly came to understand when drafting the HSR Act, the Agencies seem to have forgotten today.  Merger activity is not presumptively illegal under the antitrust laws, nor has Congress directed the Agencies to proceed from the presumption that transactions above the notification threshold set by the HSR Act are likely anticompetitive.[119]

Just as the NPRM has failed to appreciate the significance of the increased burden it would cause, the FTC is either oblivious to—or perhaps hopes to facilitate—the negative impact on capital investment and dealmaking overall that would result from the NPRM's adoption. Multiple elements of the NPRM would have a chilling effect on acquisitions that raise no genuine competitive concerns, hindering the free flow of capital and slowing economic growth without enhancing competition.

The far-reaching and extensive look-back period (applied both to buyer and seller), for example, could discourage venture capital investment in startups.[120]  A prominent portion of the start-up community relies on fundraising for novel ideas based on acquisition plays.  Often, innovative and exciting ideas (especially in technology and healthcare/pharmaceuticals) may offer great promise but present scaling challenges that would threaten to leave them without access to capital investment.  However, many financial backers of such projects recognize that such an asset may be attractive to an established platform that may see value in integrating the startup's innovation into its larger suite of offerings.  Many startups raise money because of such a paradigm—the value proposition to investors is that the startup will be acquired. However, with the NPRM's proposed look-back period, and the FTC's apparent confidence that it can reliably identify nascent competitors in dynamic markets, large companies could be hesitant to purchase scrappy startups and the investors who fund them in their early days will begin to apply different risk profiles to such investments.  Such a lookback could also discourage PE firms from taking risks on smaller acquisitions.  PE firms can provide critical access to credit, but increasing the burdens of the HSR Form could lead them to become much more selective in their acquisitions, thereby depriving startups of crucial access to capital.  This would kill innovation, harm consumers and workers, and undermine Congressional efforts to facilitate access for small businesses to opportunity and capital.

**B.    The likely delays the NPRM would cause increase the perilousness of the already fragile pre-closing period.**

The increased burden caused by the NPRM's additional information requests will not only increase the costs for the filing parties, but it will also extend the time required for parties to make initial filings after definitive agreements are reached.  Consequently, it is reasonable to

---

[119] Indeed, as noted further below, the legislative history clearly indicates that the opposite.

[120] Ravi Sinha, Brendan Rudolph & Alex Vasaly, "Merger Enforcement Considerations: Implications for Venture Capital Markets and Innovation," American Bar Association, Antitrust Law Section, (June 30, 2023), https://www.americanbar.org/groups/antitrust_law/resources/magazine/2023-june-merger-enforcement-considerations/. "Foreclosing or reducing the likelihood of certain M&A exits, all else equal, would disincentivize VCs and other early-stage investors from backing future startups. This would make it more difficult for future startups to gain necessary early-stage funding, which in turn could lower employment at (and the number of) startup firms, thereby generally stifling future innovation."

expect that the NPRM will significantly increase the time between signing and closing. If the effect of the NPRM's changes is to create the need for pre-filing interaction with the Agencies, the delay would be even greater. With each new increase in the period before signing and closing comes the introduction of increased risk that the deal in question will not close.

Even if the additional time imposed by the NPRM does not undermine a transaction, the extended time between contract execution and closing would still delay the ability of the transacting parties to realize the increased revenue and efficiencies of the merged firm they are seeking to form. The costs of delay can be significant, especially when parties raise capital to execute an acquisition and must carry the interest associated with any such financing strategies while their deal is left languishing in limbo as regulatory clearance alone stands in the way of closing. Even under the current Form and Instructions, in times of high interest rates, the costs associated with the financial strategies often used to execute an acquisition may lead parties to abandon transactions that do not receive timely approval from the Agencies.

As noted above, the NPRM would require parties to collect and review information not previously relevant to dealmaking, as well as create detailed narrative responses. At the same time, the NPRM offers no guidance as to what may constitute a filing deficiency in relation to the various new requirements, nor does it address what updates must be provided concerning non-material changes that may occur after filing the HSR Form. "Material" is also nowhere defined in the NPRM. In defending the NPRM, the FTC official "who asked not to be named but who was authorized to speak on behalf of the agency," said it will be "possible for merging parties with simple transactions that don't have any antitrust issues to respond 'non-applicable' when asked questions that don't apply to their situations."[121] But the NPRM is silent about this possibility and many filers will be reluctant to omit such responses without assurances from the Agencies. Furthermore, it strikes the Chamber as an exercise in bad governance for an FTC spokesperson to propose that parties will be permitted to take an action that is nowhere specified in the NPRM, meanwhile, as had been noted, certification of a response deemed incomplete could significant ramifications for filers. The suggestion of a "non-applicable" option seems to be a persuasive strategy the Commission is employing to alleviate concerns about the NPRM's drastic proposals, but if such an option is going to be available to filers, it should have been spelled out in the NPRM submitted to the public for review. That being said, with greater clarity of the rules concerning the use of a possible "non-applicable" box, the Chamber would welcome such an option because it would ostensibly reduce burdensome and unnecessary reporting requirements.

All these uncertainties speak to the potential for delays to accumulate while parties simply attempt to make the initial premerger filing before any clock has even started to run for the review. As Jack Sidorov—the DOJ's former primary expert on premerger notification law, procedures, and policies under the Act—has noted, the NPRM "raises the risk that forms will be

---

[121] Ilana Kowarski, *Comment: US seeking more information in merger notifications partly to ease regulators' work*, MLex, Jul. 28, 2023, (https://content.mlex.com/#/content/1489126/comment-us-seeking-more-information-in-merger-notifications-partly-to-ease-regulators-work?referrer=email_instantcontentset&paddleid=201&paddleaois=2000;2003).

marked incomplete, postponing the start of the pre-merger waiting period and creating a bottleneck in the deal review process."[122]  Currently, it typically takes filing parties anywhere from one to four weeks, or more, to prepare and submit a compliant HSR Form, while the prefiling period in the European Union can run for six months or more. Such potentially drawn-out pre-closing periods impose enormous risk profiles on deals where they may not have existed previously and may result in significant damage to transaction valuations, all to the detriment of shareholders, consumers, and workers.

## VI.    The NPRM Would Violate the Congressional Intent of the Hart-Scott-Rodino Act.

### A.  Congress intended for the Act's scope and burden to be limited.

The HSR Act, it bears repeating, is not an approval statute.[123]  When it adopted the Act, Congress did not intend for the FTC to sign off on all proposed deals; instead, the HSR Form and Instructions were intended to create a tool to assist the Agencies in their efforts to determine if a particular deal warranted closer antitrust scrutiny.  As the FTC itself explained during the rulemaking process for the current Form, "[t]he information requested by the proposed Form is necessary to a determination whether to issue a request for additional information, and what information to request at that time."[124]  The burden of compliance was to be imposed on only the most economically significant transactions, and care was taken not to impose "undue and unnecessary burden on business."[125]  Indeed, the lawmakers who drafted and adopted the Act recognized that if its requirements "were imposed on every merger, the resulting added reporting burdens might more than offset" the enforcement benefits.[126]

According to Rep. Peter W. Rodino (D-NJ), one of the HSR Act's principal sponsors, the premerger notification requirement would capture only "[g]iant corporations," and "the terms of the bill are such that it will reach only about the largest 150 mergers a year."[127]  While the reach was intended to be limited, Representative Rodino also stressed the burden of the request itself would not demand from filing parties anything other than documents that were normally prepared in the ordinary course of their businesses; even Second Requests would only seek "the very data that is already available to the merging parties and has already been assembled and analyzed by" the parties.[128]  Senators who supported the legislation also

---

[122] *Id.* Comments of Jack Sidorov.

[123] Congress understood that the notification requirements of the HSR Act would not capture every proposed transaction; instead, the HSR Act imposed the notification burden on what Congress thought were the most economically significant transactions. *See* S. Rep. No. 94-1284 at 67.

[124] The FTC further noted that "[t]he legislative history suggests that Congress did not intend these reports to be vehicles to amass an economic data base for generalized research[.]" *See* 42 Fed. Reg. 39,040 (Aug. 1, 1977) at 39,042.

[125] S. Rep. No. 94-803 at 66. The Senate noted that it believed the HSR Act "represent[ed] a careful balancing of the need to detect and prevent illegal mergers and acquisitions prior to consummation without unduly burdening business with unnecessary paperwork or delays," in part because the final HSR Act adopted provisions and exemptions, leading those who voted for its passage to feel that it struck the right balance and "w[ould] neither deter nor impede consummation of the vast majority of mergers and acquisitions." *See* S. Rep. No. 94-1284 at 66.

[126] H.R. REP. No. 94-1373, at 11 (1976).

[127] 121 CONG. REC. 8143 (1975); 122 CONG. REC. 25052 (1976).

[128] 122 CONG. REC. 30,876–77 (1976) (remarks of Rep. Rodino).

believed the HSR Act would not "unduly burden business with unnecessary paperwork and delays," as well as "neither deter nor impede consummation of the vast majority of mergers and acquisitions."[129]

Contrary to Congress's clear intent, the proposed changes call for a dramatic increase in the amount of complex information required of filing parties, while also leaving certain broad requests loosely defined.  For example, the NPRM calls for all documents analyzing the acquisition prepared for or by "Supervisory Deal Team Leads,"[130] but does not clearly define what constitutes such a team lead.  The NPRM notes that such leads need not "have ultimate decision-making authority but would have responsibility for preparing or supervising the assessment of the transaction and be involved in communicating with the individuals, such as officers or directors, that have the authority to authorize the transaction."[131]  Such obscure guidance leaves considerable room for interpretation as to which individuals at the company constitute a "Supervisory Deal Team Lead," and could significantly broaden the scope of individuals whose documents would need to be retained, reviewed, and collected.  This uncertainty would create substantial risk for inadvertent deficiencies, as the Agencies have the discretion to make sweeping determinations over which employees qualify for the designation, leaving room for them to declare a filing deficient if it later claims that additional individuals should have received the designation.  Without clear guidance, filing parties are subject to the second guessing of the Agencies over their determinations, with little recourse if the Agencies deem the filing the deficient, despite a party's best efforts to gather the necessary information.

Potentially even more in conflict with Congress's original vision for the HSR Act is the Agencies' ability to seek fines from the filing parties for noncompliance, even if such noncompliance is inadvertent and relatively minor.  Given the subjective and open-ended nature of many of the proposed changes, there is likely to be serious confusion among filing parties concerning their obligations, including what level of detail the Agencies expect filers to provide for certain responses.  If such confusion leads to a party's filing being deemed inadequate in some way, however, it could be subject to civil penalties, which today are over $50,000 per day for each violation.  Those who drafted the HSR Act to improve Agency enforcement without "unduly burdening business with unnecessary paperwork and delays" would hardly approve of such significant financial penalties for the kind of inadvertent filing deficiencies that are likely to occur in the face of the NPRM's many new and inadequately defined requests.

Equally out of step with any imaginable version of the what the drafters of the HSR Act intended is the FTC's proposed changes to the Form's certification language—which the NPRM acknowledges serves no legal purpose other than as a "reminder" to filers that the FTC "may refer filers who do not comply . . . for potential criminal proceedings."[132]  This proposal appears to suggest that filers should fully expect a harsh and punitive response to filing errors.  To

---

[129] S. Rep No. 94-803 at 65-66 (1976).
[130] NPRM at 42213.
[131] *Id.*
[132] *Id.* at 42206.

buttress this section, the NPRM makes vague reference to a supposed uptick of instances in which "filing parties disclaim or modify statements or information submitted as part of the Form" once the Agencies launch an investigation or sue to block the transaction, but the FTC does not cite any specific examples in which this has occurred, indicate whether the modifications were material, or suggest that the Agencies had any reason to believe that the parties intended to deceive the Agencies.

Both the increased breadth and subjectivity introduced to the HSR Form by the NPRM's proposals raise significant concerns that the HSR process will devolve into months long back-and-forth with Agency staff, akin to the process in some foreign jurisdictions and thoroughly misaligned with Congressional intent. Given the broad discretion to determine whether a filing is compliant, there is also a risk that the Agencies could use stalling tactics to delay commencement of the 30-day waiting period required by the HSR Act. Such discretion clearly allows for potential abuse if the Agencies can continuously reject filings in order to expand the waiting period and gain more investigative time before having to issue a Second Request.

### B. Congress has repeatedly sought to limit the scope and burden of the premerger notification process.

Congress originally considered and rejected a provision of the HSR Act that would have empowered the FTC to promulgate rules that could have been used to adjust the notification requirement thresholds down to capture smaller transactions, concluding instead that "the coverage of [HSR] should be decided by Congress."[133] Congress has not wavered from this position, acting only intermittently to make modifications to its provisions focused on the filing threshold,[134] filing fees,[135] and the recent instruction to the FTC to include questions concerning information on subsidies received from certain foreign governments or entities deemed by Congress to be strategic or economic threats to the United States.

In the 47 years since the HSR Act's initial passage, Congress has not once indicated the HSR Form reflected the wrong presumptions concerning antitrust enforcement or failed to capture deals that should have received scrutiny. To the contrary, in 2000, Congress moved the filing threshold upwards after determining that too many businesses were required to report their proposed deals.[136] The 2000 reforms came after legislation in 1990 imposed the first filing

---

[133] 122 CONG. REC. 30877 (1976).

[134] The 21st Century Acquisition Reform and Improvement Act, Department of Commerce, Justice, State, and the Judiciary, and Related Agencies Appropriations Act, FY 2001, Pub. L. No. 106-553, § 630, 114 Stat. 2762, 2762A-108–111 (2000) (codified as amended at 15 U.S.C. §§ 18a & 18a note), the 2000 HSR Amendments substantially increased the size-of-transaction filing threshold, from $15 million to $50 million. provided that all thresholds would be adjusted annually for changes in Gross National Product (GNP) beginning in 2005, AMC at 157-58.

[135] Merger Filing Fee Modernization Act of 2021. Senate Bill S. 228 (amendment to the HSR Act).

[136] The 2000 changes to the filing thresholds, partially adjusting for inflation since 1976, reduced the number of notifications by approximately 50 percent. See AMC at 152 and U.S. Dep't of Justice & Federal Trade Comm'n, Annual Report to Congress Regarding the Operation
of the Hart-Scott-Rodino Premerger Notification Program for Fiscal Year 2000, at tbl.II (2001) [hereinafter DOJ/FTC FY2000 HSR Report] (reporting that 47.3 percent of reported transactions were valued at less than $50 million). All filing thresholds are adjusted annually in accordance with changes in the Gross National Product (GNP).

fees required under the HSR Act.  As part of the 2000 legislation, Congress also directed both the FTC and DOJ to conduct one-time internal reviews of the HSR Form process, "implement reforms . . . in order to eliminate unnecessary burden, remove costly duplication, and eliminate undue delay;" the legislation also required the Agencies to report back to Congress on their findings and efforts to improve efficiency.[137]  Commenting on the 2000 bill, Senator Orrin Hatch (R-UT) noted the reforms would provide "regulatory and financial relief for companies" and would "ensure that the Antitrust Division and the FTC efficiently allocate[d] their finite resources to those transactions that truly deserve antitrust scrutiny."[138]

In its 2007 Report and Recommendations to Congress, the Antitrust Modernization Commission, a bipartisan group of expert practitioners and academics assembled pursuant to Congress's Antitrust Modernization Commission Act of 2001, also concluded that "the existing pre-merger review system under the HSR Act is achieving its intended objectives of providing a more effective means for challenging mergers raising competitive concerns before their consummation and protecting consumers from anticompetitive effects," noting that there was "no need for comprehensive reform."[139]  The Commission's close study of the HSR pre-merger review system ultimately concluded that "systemic change or major modifications" were not necessary.[140]

The message from Congress over the life of the HSR Form and Instructions is clear. When Congress drafted the Act, as when it has reformed it, the efforts were focused on limiting the burden of its requirements and ensuring its demands seek only the information the Agencies actually require to be able to conduct informed antitrust assessments, and nothing more.

### C.  The proposals conflict with the Williams Act's timing conditions for cash tender offers.

The information-collection demands of the NPRM conflict with certain securities laws and regulations.  In particular, the NPRM conflicts with the Williams Act,[141] which seeks to balance the interests of a target's shareholders with those of the acquiror by providing a framework for cash tender offers.  Because cash tender offers are often hostile, a target understandably may not want to make an HSR filing if doing so would start the waiting period. Appreciating this feature of cash tender offers, Congress drafted the Act to stipulate that for such deals, the HSR waiting period begins with the filing of the HSR Form by the acquiring

---

[137] Report of the Antitrust Modernization Committee ("AMC") at 158. The Committee noted that "[o]ne significant change [adopted after the review] required the agencies to designate a senior official to hear appeals from merging parties regarding the burden of second requests."
[138] 145 CONG. REC. S13974 (1999) (statement of Sen. Hatch).
[139] AMC at 158.
[140] Id.
[141] The Williams Act refers to 1968 amendments to the Securities Exchange Act of 1934 regarding tender offers. See 16 C.F.R. § 801.30(2) (The acquired person shall file the notification required by the act, in accordance with these rules, no later than 5 p.m. Eastern Time on the 15th (or, in the case of cash tender offers, the 10th) calendar day following the date of receipt, as defined by § 803.10(a), by the Federal Trade Commission and Assistant Attorney General of the notification filed by the acquiring person. Should the 15th (or, in the case of cash tender offers, the 10th) calendar day fall on a weekend day or federal holiday, the notification shall be filed no later than 5 p.m. Eastern Time on the next following business day").

company and the waiting period is to last for fifteen rather than thirty days.[142]  As Representative Rodino himself explained, efforts to delay agency approval of a transaction would "give the target firm plenty of time to defeat the offer, by abolishing cumulative voting, arranging a speedy defensive merger, quickly incorporating in a state with an antitakeover statute, or negotiating costly lifetime employment contracts for incumbent management."[143]  Furthermore, as Representative Rodino explained, the longer a target can delay a deal by withholding its HSR filing, "the more the target's stock may be bid up in the market, making the offer more costly – and less successful."[144]  The drafters of the HSR Act did not want it to facilitate any such gamesmanship.

Changes to the HSR Form and Instructions that result in delays to the approval of cash tender offers may therefore infringe upon the balance of interests Congress intended to accomplish with the Williams Act and with the timing provisions directly established in the HSR Act.  Specifically, the NPRM would require the buyer to describe details about the target that would require the target's cooperation—something not likely available in the context of a hostile acquisition offer.  The conflict here is one that the FTC simply must address before implementing any changes to the HSR Form and Instructions.

### D. The proposal conflicts with the Regulatory Flexibility Act

In 1980, Congress adopted the Regulatory Flexibility Act ("RFA") to improve the balance of federal regulation and the needs and capabilities of small businesses.[145]  Under the RFA, Congress established that "when adopting regulations to protect the health, safety and economic welfare of the Nation, Federal agencies should seek to achieve statutory goals as effectively and efficiently as possible without imposing unnecessary burdens on the public."[146]  Chief among such efforts is a requirement that regulatory burden be applied proportionately to the resources of the burdened parties.  The RFA's statutory findings note that "failure to recognize differences in the scale and resources of regulated entities" adversely "affect[s] competition in the marketplace, discourage[s] innovation and restrict[s] improvements in productivity," while also creating "entry barriers in many industries and discourage[ing] potential entrepreneurs from introducing beneficial products."[147]  The RFA additionally notes that "treating all regulated businesses, organizations, and governmental jurisdictions as

---

[142] 15 U.S.C. § 18a(b)(1) ("The waiting period required under subsection (a) shall (A) begin on the date of the receipt by the Federal Trade Commission and the Assistant Attorney General . . . of (i) the completed notification required under subsection (a), or (ii) if such notification is not completed, the notification to the extent completed and a statement of the reasons for such noncompliance, from both persons, or, in the case of a tender offer, the acquiring person; and (B) end on the thirtieth day after the date of such receipt (or in the case of a cash tender offer, the fifteenth day), or on such later date as may be set under subsection (e)(2) or (g)(2).").

[143] 122 Cong. Rec. H102904 (Sept. 16, 1976) (statement of Rep. Rodino); *See* also 43 Fed. Reg. 33,450 (Jul. 31, 1978) at 33484.

[144] *Id.*

[145] RFA, Pub L. No. 96-354, 94 Stat. 1164 (1980) (codified as amended at 5 U.S.C. §§601–12).  The RFA was amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No 104-121, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, and the Small Business Jobs Act of 2010, Pub. L. No. 111-240.

[146] RFA, Pub. L. No. 96-354, 94 Stat. 1164, §2.

[147] *Id.*

equivalent may lead to inefficient use of regulatory agency resources, enforcement problems and, in some cases, to actions inconsistent with . . . legislative intent."[148]

The NPRM would clearly violate the RFA by failing to account for the application of increased filing demands across *all* parties that must file the HSR Act, especially considering the FTC has admitted that only two percent of notified transactions even present the prospect of antitrust concern. At a minimum, the RFA requires that the FTC consider a short form for the many smaller businesses engaged in transactions that only just clear the threshold requiring HSR notification. Not only does the NPRM fail to apply regulatory burden proportionately under the RFA, comments from AAG Kanter suggest the Agencies anticipate that larger, frequent filers of the HSR form will experience a lower burden under the NPRM than smaller first-time filers that do not already have their M&A conduct on file with the Agencies.[149] There are many reasons to believe such a presumption is flawed considering the significant volume of information that frequent filers will not be able to recycle; indeed, many of the most burdensome changes proposed by the NPRM would require work product prepared specifically for the HSR filing. Nonetheless, AAG Kanter's comments demonstrate how significantly the NPRM strays in spirit from the objectives of the RFA.

## VI.    The Proposed Rule Changes Violate the Law.

### A.    The proposed changes far exceed what is necessary and appropriate for the Agencies to fulfill their statutory duty under the HSR Act.

The HSR Act provides that the notification required by the Act "be in such form and contain such documentary material and information relevant to a proposed acquisition *as is necessary and appropriate* to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws."[150]

As explained above, the NPRM in its current form far exceeds what can reasonably be deemed necessary and appropriate for the Agencies to identify the very small percentage of

---

[148] *Id.*

[149] As AAG Kanter has noted, the proposed Form would "actually [be] quite burdensome" for an initial filer, but as parties make more filings they will be able to recycle past submissions to the Agencies. See Khushita Vasant and Chris May, "Old HSR merger filing form created 'strain,' 'inefficiency' at US DOJ, FTC, Kanter says," MLex.com (Aug. 3, 2023, https://content.mlex.com/#/content/1490301/old-hsr-merger-filing-form-created-strain-inefficiency-at-us-doj-ftc-kanter-says?referrer=email_instantcontentset&paddleid=201&paddleaois=2000;2003. In fact, the NPRM estimates its burdens by factoring "indexed" vs. "non-indexed" considerations into its assessment for the time required to make a filing under the proposals. See NPRM at 42208.

[150] 15 U.S.C. §18a(d) ("The Federal Trade Commission, with the concurrence of the Assistant Attorney General . . . (1) shall require that the notification required under subsection (a) be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the Federal Trade Commission and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws; and (2) may (A) define the terms used in this section; (B) exempt, from the requirements of this section, classes of persons, acquisitions, transfers, or transactions which are not likely to violate the antitrust laws; and (C) prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section.").

notifiable transactions that genuinely raise competitive concern.  The NPRM does not even attempt to show how the substantial additional burden it intends to impose on the vast majority of lawful transactions is necessary to increase the effectiveness of merger enforcement.  The NPRM fails to establish that current practices have resulted in systematic under-detection of potentially problematic transactions, fails to explain how specific burdensome information is necessary to identify whether a transaction raises genuine antitrust concern warranting further investigation, and fails to consider how the HSR Form could be improved without imposing undue burden on the ninety-eight percent of transactions that merit no extensive investigation.  Instead, given the insufficient factual basis underlying the NPRM, the proposed rules appear to be an arbitrary or capricious imposition of a regulatory tax on and impediment to competitively benign and beneficial transactions. Therefore, were the NPRM to be enacted as written, it would likely violate the Administrative Procedures Act (APA).
[151] If challenged under the APA, a court would assess whether the final rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[152] To conduct this assessment, a court will consider whether the Commission "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[153] Given the wholly unjustified burden the NPRM would impose and the clear indications from Congress over the last four and a half decades that indicate a contrary vision for the HSR Act's intended economic impact, the NPRM's proposed changes to the HSR Form and Instructions would likely run afoul of the APA.

## B.  Major Questions Doctrine

The legislative history of the HSR Act clearly establishes that Congress did not authorize the FTC to use its "necessary and appropriate" authority to impose the kind of regulatory burden envisioned by the NPRM.  To the contrary, as explained above, Congress wished to limit the burden of compliance with the HSR Form to the transactions most likely to warrant antitrust scrutiny, and even for parties required to make a filing, the burden was intended to be limited to information required by the Agencies to conduct an initial screen for antitrust concerns.  In the time since the HSR Form and Instructions were first implemented in 1978, Congress has not identified any need to adopt fundamental alternations to them; indeed, Congress at various

---

[151] 5 U.S.C. § 706. The APA was enacted amid concern that the growth of the administrative state would continue without limitation. The Statute was enacted in 1946 to standardize the administrative rulemaking process and to establish federal court oversight of all agency actions. *See* Final Report of Attorney General's Committee on Administrative Procedure (1941), available at http://library.law.fsu.edu/Digital-Collections/ABA-AdminProcedureArchive/pdfdownload/1941introduction.pdf; *see also* George Shepard, Fierce Compromise: The Administrative Procedure Act Emerges from New Deal Politics, 90 Nw. U. L. Rev. 1557 (1996).

[152] See 5 U.S.C. § 706, Scope of Review. If enacted and challenged as abuse of regulatory authority, the APA explains that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

[153] *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 658 (2007).

times has acted to *reduce* the Form's burden.[154]  Congress's consistent attempts to limit the burden faced by filing parties demonstrates how out of step the NPRM is with Congressional intent.  The fundamental changes the NPRM seeks to impose—and their likely economic impact—have no "clear congressional authorization" and are, therefore, without a basis in law.

As previously noted, the NPRM would require filers to provide new information concerning officers, directors, and advisory boards. The Agencies are seeking such information to facilitate enforcement of Section 8 of the Clayton Act.[155] However, Congress did not intend for the HSR Act to serve as a Section 8 enforcement tool; rather, the legislative history clearly indicates the HSR Form and Instructions were implemented to improve the Agencies' abilities to enforce Section 7 of the Clayton Act (and, relatedly, Sections 1 and 2 of the Sherman Act).[156] The HSR Form is not a tool available to the Agencies for general enforcement of the antitrust laws, but is rather focused on a screening process to help the Agencies determine which notified deals merit closer scrutiny under Section 7's prohibition against transactions that would tend to substantially lessen competition. The NPRM's effort to have the HSR Form seek information on board composition is one of the proposal's many demands that would exceed what is necessary and appropriate for the Agencies to gather under the HSR Act.

When an administrative agency seeks to exercise authority in a manner that promises to have the kind of substantial economic impact the NPRM would cause, the agency must be able to identify clear authorization from Congress.  Therefore, aside from its efforts to enforce a statutory provision not authorized by the HSR Act, the NPRM's significant regulatory burden and the delays to all notified transactions that would result signal an attempt by the FTC to exercise authority it does not have.

The authority to set the holistic reach of the premerger notification requirements remains a power of Congress; however, the NPRM would usurp that power.  For example, the NPRM's above-noted plans to expand the reach of the Form's requests related to previous, unreportable transactions would significantly expand the breadth and depth of the Act's burden.  As previously noted, the proposed changes demand a record of "all" transactions during the 10 years prior to a notified transaction, with no value limitation.[157] Therefore, not only does the NPRM diverge from Congress's original intent to limit the burden of the HSR Form

---

[154] As Senator Hatch noted, the 2000 reforms were implemented to provide "regulatory and financial relief for companies." 145 CONG. REC. S13974 (1999).

[155] NPRM at 42189-90.

[156] The HSR Act was adopted to provide the Agencies time to seek information concerning the likelihood that a proposed transaction would "substantially lessen competition" in violation of Section 7 of the Clayton Act. Aside from Section 7, no other section of the Clayton Act is referenced by the HSR Act. Nothing in the Congressional Record indicates the HSR Act's drafters envisioned that it would serve as a tool to enforce Section 8, nor does the NPRM provide any citation to support the argument that changes to the HSR Form purportedly designed to advance enforcement of Section 8 are a necessary and appropriate exercise of rulemaking authority under the Act.

[157] NPRM at 42204. "[T]he Commission believes it would be less burdensome for filers to report all acquisitions rather than expend additional time in assessing their value in terms of net sales or assets;" "The Commission proposes expanding the scope of prior acquisitions that would be identified and making the requirement applicable to the acquired entity as well."

to the transactions most likely to rase antitrust concern, it also encroaches upon Congress's exclusive legislative power.

The Supreme Court has repeatedly noted that an administrative agency's "assertions of 'extravagant statutory power over the national economy'" may only derive from "clear congressional authorization."[158]  The implications of the NPRM for the national economy thus raise "major questions" of economic significance that only Congress may answer.[159]  Without clear Congressional authorization otherwise, the Supreme Court has held courts must presume Congress has not chosen to delegate such significant power.[160] Since the HSR Act does not authorize the FTC to impose the kind of unjustified burden and subsequent economic impact that would occur were the NPRM to become a final rule, a court challenge to the rule's legality seems likely to succeed.

## C.  The NPRM Fails to Satisfy Paperwork Reduction Act Requirements

The Paperwork Reduction Act ("PRA") was adopted to manage and reduce the total paperwork burden the federal government imposes on private businesses and citizens.[161] Approval by the Office of Management and Budget ("OMB") is predicated on a government agency's need for the information to be collected and the total burden imposed on the entities required to maintain and submit information and the agency that processes the information.[162] The OMB assesses the total burden of the collection against its usefulness to the requesting agency to ensure the burden is balanced with the "practical utility" of the information to be collected.

The NPRM provides an insufficient basis for the OMB to conduct the informed and accurate assessment required by the PRA.  In the first instance, while conceding that many of the proposed changes would increase the burden on all filers, the NPRM has wholly failed to demonstrate that the additional burden is necessary or appropriate or that the FTC has made a serious effort to strike an appropriate balance between burden and utility. Indeed, the FTC has failed to demonstrate in any serious way that the NPRM will improve the ability of the Agencies to identify problematic mergers. The NPRM thus fails to articulate any measurable benefits beyond flimsy speculations against which the OMB may assess the substantial increase in burden the NPRM would impose across the economy and the Agencies.

Second, the NPRM's estimate of the additional time and costs that would be imposed is woefully inadequate.  The FTC purports to have relied on an informal survey of FTC staff who had previously prepared HSR filings while in private practice to evaluate the NPRM's potential

---

[158] *See W. Virginia v. Env't Prot. Agency*, 142 U.S. 2587, 2609 (2022).
[159] *Id.* The Supreme Court applies the major questions doctrine when "agencies [are] asserting highly consequential power beyond what Congress could reasonably be understood to have granted."
[160] *See Id.* at 2607, quoting *United States Telecom Assn. v. FCC*, 855 F.3d 381, 419. "We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'"
[161] The Paperwork Reduction Act of 1980, 94 Stat. 2815 (1980), Pub. L. No. 96-511 (codified as amended at 44 U.S.C. §§3501–21.).
[162] 44 U.S.C. §3502(3); 5 C.F.R. §1320.3(c).

burden.  The NPRM provides no information about how many FTC staff were surveyed, the number, size, or types of transactions they handled, their level of access to or familiarity with relevant information, or the methodology they employed to estimate the additional burden likely to be imposed.  Notably, before issuing the NPRM, the FTC evidently did not consult with antitrust practitioners—except those currently employed by the Agencies.

In addition, while the NPRM estimates that "only" 45 percent of filings involve companies with horizontal overlaps that would give rise to "significantly" increased burden, it fails to recognize that the proposed changes are not restricted only to transactions involving horizontal overlaps, but also to vertical and "diagonal" mergers.  The NPRM's calculation with respect to 55 percent of transactions is thus likely too low even given the rest of the FTC's approach.

For purposes of the PRA, the NPRM's burden estimations are not credible or useful due to other flaws, including:

- A failure to provide a breakdown of the burden associated with producing additional information for each specific change;

- A failure to account for the increased burden placed on acquisition targets (in particular the requirement that under the NPRM they would also have to prepare vast reporting on previous acquisitions);

- A failure to adequately account for the personnel costs and time associated with the efforts businesses will have to go through to gather the NPRM's requested documents and information that are not kept in the ordinary course of business;

- A failure to adequately account for the legal and other expert fees that filers are likely to incur when preparing the NPRM's newly requested narrative responses and handling the necessary privilege reviews and related logging efforts required to comply with the NPRM's expanded documentary requests;

- A failure to account for the increased vendor fees that parties will incur to implement and administer the vast document holds that will be necessary to gather and maintain (and, in certain cases, translate) the universe of files potentially responsive to the Form's demands;

- A failure to quantify the additional time and expense the NPRM would impose on parties filing on a letter of intent by requiring that they also submit draft agreements or term sheets for the notified transaction;[163] and

- Failure to anticipate the NPRM's impact on the Agencies.  As noted above, the NPRM does not acknowledge or account for the impact of likely organizational

---

[163] NPRM at 42206-07.

changes, the required increased staffing, or even the potential demands for additional resources placed on Congress that the Agencies may make while seeking to implement the NPRM's new reporting regime.

**Conclusion**

For all foregoing reasons, the Chamber recommends that the Commission withdraw the NPRM or engage in a thorough revision of its proposals before issuing a new proposed rule for public comment.

Sincerely,

Sean Heather
Senior Vice President
International Regulatory Affairs & Antitrust
U.S. Chamber of Commerce

Attached: Annex Professor Kothari Analysis