# Exhibit 6

**The US Antitrust Agencies' NPRM re**

**Additional Information Requirements for HSR Filings**

**REPORT OF PROFESSOR S.P. KOTHARI**

September 26, 2023

**Table of Contents**

I.    Executive Summary ................................................................................................ 1

II.   Qualifications As An Expert .................................................................................. 2

III.  The Proposed Rule Will Have The Effect Of Expanding And Front-Loading Information Sought From The Parties Which Will Likely Delay And/Or Discourage HSR Filings ................ 3

   A.  The Motivation for the Proposed Rule Is Not Connected to the Evidence .......................... 3

   B.  The Additional Information Requirements ................................................... 5

   C.  Costs, Burden, and Uncertainty of Narrative Information .................................... 6

IV.   The Vast Majority Of Reported Transactions Do Not Raise Competitive Concerns That Warrant Submission Of The Additional Information .................................. 8

   A.  Most Transactions Do Not Raise Sufficient Concern to Request Additional Information Beyond the Current HSR Filing .................................... 8

   B.  Most Transactions Do Not Raise Questions Sufficient For Even A Preliminary Investigation .................................................................. 9

   C.  Small Transactions Are Numerous and Have Low Likelihood of Raising Competitive Concerns .................................................................. 10

   D.  Agencies Are Unlikely to Review the Additional Information Under the Proposed Rule  12

V.    The Proposal To Seek Additional Information From Both Parties May Be Unduly Burdensome, Especially For Smaller Target Firms .................................... 13

VI.   The Agencies Significantly Underestimate The Additional Monetary Cost To Parties .... 14

   A.  The Agencies' Estimate .................................................................... 14

   B.  Estimated Additional Monetary Costs .................................................... 17

      1.    Costs of Outside Counsel .................................................... 18

      2.    Costs of Internal Personnel.................................................... 19

      3.    Other External Costs.................................................... 19

      4.    Total Additional Monetary Costs and Filing Burden ................................ 20

      5.    Agency Costs to Review Additional Information .................................... 22

   C.  Costs to the Economy Exceed the Direct Monetary Costs.................................... 23

      1.    Burdens to Private Equity Investors .................................... 26

      2.    Officers, Directors, and Board Observers .................................... 28

      3.    Disclosure of Limited Partners .................................... 29

VII.  Conclusion........................................................................................ 29

## I.    EXECUTIVE SUMMARY

1.  On June 27, 2023, the FTC and DOJ announced a Notice for Proposed Rulemaking (NPRM) regarding changes to the Hart-Scott-Rodino (HSR) form.[1] The NPRM proposes to expand radically the information that merging parties have to submit at the time of HSR filing. The vast majority of mergers that are notified to the Antitrust Agencies do not involve competitive concerns and are allowed to proceed without even a preliminary investigation. Yet the proposed rule, if enacted, would require every single HSR notification to be accompanied with the additional information, to be separately submitted by each merging party. The direct monetary cost of the additional burdens on merging parties could reach $1 to $2 billion or more. The Agencies also do not consider indirect costs, such as the potential negative impact of the additional monetary burden, potential delays, and uncertainty on the level of value-creating M&A activity.

2.  The FTC purports to provide an estimate of the additional costs to parties for providing this information. The FTC's estimates are based on outdated and biased or unsupported figures and grossly underestimate the likely actual cost of complying. A survey of antitrust practitioners and company counsel indicates that the actual cost is likely to be between four and five times the FTC's estimate. This would be in addition to the non-pecuniary costs of delay that will be created by having to gather and provide the information as well as to engage with the Agencies pre-HSR to ensure that the filing will not be deemed deficient. The proposal would have an especially disproportionate effect on small transactions which typically involve companies that do not have the resources to comply with the proposed information burden.

3.  Remarkably, the Agencies offer no evidence that these types of additional information would enable them to identify competitively problematic transactions that they might somehow have missed in the past. The Agencies also do not have the

---

[1] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178, available at https://www.federalregister.gov/documents/2023/06/29/2023-13511/premerger-notification-reporting-and-waiting-period-requirements.

manpower to review this additional information within the 30-day statutory time limit for deciding whether a merger warrants a Second Request. The rule, if enacted, would institutionalize the gathering of a vast amount of information at the time of HSR filing with little purpose. Nevertheless, the new information would require dozens of new Agency staff just to read the submissions.

4.  Mergers and acquisitions lead to the allocation of economic resources to their most efficient use and thus serve as an important engine of economic growth. The FTC's proposal would have the effect of deterring or significantly raising the cost of merger activity. The proposed rule would thus have the ultimate effect of acting as a clog on economic growth without serving any beneficial purpose for merger enforcement.

## II.    QUALIFICATIONS AS AN EXPERT

5.  I specialize in the areas of accounting, economics, and finance as they relate to business analysis, valuation, financial disclosures, and compensation, among other areas. I have senior executive experience in government, academia, and industry, with expertise in strategic and policy issues, securities regulation, auditing, and corporate governance. I have been on the faculty of the Massachusetts Institute of Technology ("MIT") Sloan School of Management since 1999. I currently hold the Gordon Y. Billard Professorship of Accounting and Finance. In addition to my faculty duties, I have also held the positions of Deputy Dean, Faculty Director of the MIT-India Program, and Head of the Department of Economics, Finance, and Accounting at MIT. From 2018 to 2019, while at MIT, I co-chaired the Board of Governors of Asia School of Business, Kuala Lumpur.

6.  My most recent experience outside academia was at the U.S. Securities and Exchange Commission as the Chief Economist and Director of the Division of Economic and Risk Analysis. In this role, I led 160 economists and data scientists focused on U.S. securities regulation, domestic and international prudential regulation, and data analytics. During 2008 and 2009, I was the global head of equity research for Barclays Global Investors (acquired by BlackRock) and spearheaded the firm's active equity quant research for a $100 billion portfolio and a team of 50 PhDs globally.

## III.    THE PROPOSED RULE WILL HAVE THE EFFECT OF EXPANDING AND FRONT-LOADING INFORMATION SOUGHT FROM THE PARTIES WHICH WILL LIKELY DELAY AND/OR DISCOURAGE HSR FILINGS

### A.    The Motivation for the Proposed Rule Is Not Connected to the Evidence

7.    The primary motivation offered by the Agencies for proposing changes to the HSR notification form is that there has been significant growth in sectors of the economy that rely on "technology and digital platforms" to conduct business.[2]  The Agencies state that in these sectors, relationships between the merging parties are sometimes neither horizontal, nor vertical, as they operate in adjacent spaces.  Such mergers can allegedly lead to a lessening of "potential competition" that could have stemmed from the likelihood that one party could have entered the space of the other in the future but for the merger.

8.    To the extent that the Agencies seek to use the additional information to identify problematic mergers that they feel they may have missed, the Agencies do not report having undertaken any kind of retrospective studies that identified how many, or which, mergers slipped through the cracks because of the alleged deficiencies of the HSR form.  To our knowledge, in recent years the Agencies have challenged several mergers after they were consummated. However, we are not aware of any additional mergers that would have been blocked by the Agencies before consummation had the Proposed Rule been part of the HSR requirement.  Some of the mergers that the Agencies ultimately challenged were non-reportable and the Agencies learned about them only after they were consummated.[3] The extent of information involved in an HSR filing is moot for these mergers. (Filing thresholds are set by Congress each year.)

---

[2]  Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42179.

[3]  Examples include FTC and State of Idaho v. St. Luke's Health Sys., Ltd., 1:12-cv-00560-BLW-REB (D. Id. filed March 13, 2013), available at https://www.ftc.gov/opa/2013/03/stluke.shtm; U.S. v. Bazaarvoice, Inc., C13-0133 (N.D. Cal., filed Jan. 10, 2013), available at https://www.justice.gov/atr/public/press_releases/2013/291185.htm; U.S. and State of New York v. Twin America LLC, 12 CV 8989 (S.D.N.Y., filed Dec. 11, 2012), available at https://www.justice.gov/atr/public/press_releases/2012/290136.htm; In the Matter of Polypore International, Inc., Docket No. 9327 (Complaint issued Sept. 10, 2008), available at https://www.ftc.gov/enforcement/cases-andproceedings/cases/2013/12/polypore-international-inc-corporation-matter.

9. The second type of mergers that the Agencies are seeking to unwind after consummation is the group of mergers that were notified to the Agencies, received lengthy investigations including the issuance of Second Requests, and initially unchallenged.[4] For these second category of mergers, the proposed additional information sought at the time of filing was requested and reviewed by the Agencies during the course of the investigations.  In other words, the second category of mergers did not fall through the cracks but were identified as raising potential concerns and thoroughly investigated anyway, regardless of what information may not have been available at the time of HSR filing.

10. Similarly, to the extent that the Agencies may believe that certain industries have gotten "over-concentrated" as a result of mergers and acquisition activity, the Agencies have not reported the nature of such industries or explained which mergers have caused them to get over-concentrated.  (The merger guidelines identify market concentration using the Herfindahl-Hirschman Index.)

11. While the scope of additional information listed in the NPRM would be burdensome for any merger that triggers  an HSR filing, they are particularly burdensome for two types of transactions.  The first type are transactions involving private equity or financial firms.  The additional information pertinent to such transactions that are proposed to be sought includes information such as limited partnerships, roll-up of prior acquisitions, and identities of members of boards of directors, past and present. The second type are acquisitions involving large technology firms that rely on acquisitions of smaller innovative firms to add features to their product/service offerings to consumers. For such acquisitions, the burden is associated with information that will allow the Agencies to review an acquisition in the broader context of all prior acquisitions made by the buyer.

---

[4] A prominent example is the acquisition of Instagram by Facebook (Meta), and the acquisition of WhatsApp by Facebook (Meta).  See First Amended Complaint for Injunctive and Other Equitable Relief, Federal Trade Commission, plaintiff v. Facebook, Defendant (available at https://www.ftc.gov/system/files/documents/cases/ecf_75-1_ftc_v_facebook_public_redacted_fac.pdf).

**B.    The Additional Information Requirements**

12. The Proposed Rule seeks several additional types of new information beyond the existing HSR filing.  These include the following, although there are many other new information requirements.

- Expansion of required regular course of business documents like Strategic and Marketing Plans.[5] Notably, this includes draft versions of these and other transaction-related documents.[6]

- List of minority shareholders of both the buyer and target firms.[7] This includes information on investment funds' limited partners with more than 5% and less than 50% interest in the fund or acquiring entity (whereas previously limited partners were not required to be disclosed).[8]

- All prior acquisitions of both the buyer and target firms for the past 10 years without the prior reporting threshold of $10 million annual net sales or net assets.[9]

- All director, officer, or board observer positions over the two years prior to filing of any individual who is a director, officer or board observer in the acquiring entities, acquired entities, or is expected to be a director, officer or board observer of the post-merger firm.[10]

- The Agencies propose adding a section to the filing requiring a competitive analysis of each party.[11] This would include separate narrative descriptions of any horizontal overlaps, vertical supply relationships, and labor markets

---

[5] See e.g., proposed "Periodic Plans and Reports" section.  Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42195.

[6] See e.g., proposed "Periodic Plans and Reports" section.  Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42194.

[7] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42188.

[8] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42188.

[9] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42203.

[10] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42189-42190.

[11] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42196-198.

information such as skill types of employees, where they live, and other occupational safety information with respect to both current and planned future products of both the buyer and target.

- Notably, each of the additional information requirements would now be imposed on both the buyer and target firms.

## C.    Costs, Burden, and Uncertainty of Narrative Information

13. The horizontal and vertical narratives requirement frontloads analysis and information that is typically provided by the Parties after the issuance of a Second Request. [12] The practice of requesting the information at a later stage of an investigation reflects decades of practical experience of the Agencies relating to the timeliness and necessity of information, which makes the investigative process efficient for both the Agencies and the Parties. Parties have a great incentive to provide Agencies with sufficient information promptly to avoid regulatory delay and the issuance of a Second Request. The requirement that such information be provided at the time of filing HSR upends a time-tested process.

14. Under the current merger review process, once an HSR is filed, the Agencies take what is referred to as a "quick look" to assess whether the merger warrants the opening of a preliminary investigation.  As is described later, over 90 percent of HSR filings do not lead to a preliminary investigation.  If an Agency does open a preliminary investigation, it sometimes reaches out to inform the Parties. A few things take place during the initial 30-day waiting period.  In some cases, the Agency issues a voluntary access letter ("VAL") which asks for some additional information from the Parties, as for example, most recent strategic plans, list of top 20 customers during the last 3 years, and win/loss data if customers of the Parties make their purchase decisions through competitive bidding.  The Parties, at their own discretion, sometimes make a presentation that walks the Agencies through the transaction rationale and broad arguments as to why there is no risk of anti-competitive effects from the proposed transaction.  Sometimes, if there is not enough time to undertake

---

[12] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42196-198.

these activities, the Parties voluntarily "pull and refile" the HSR to give an extra 30 days to the Agency to complete its preliminary investigation.

15. If the Agency, after completing its preliminary investigation, believes that the merger poses competitive risks, then it issues a Second Request. As explained later, this occurs in just 3 percent of HSR filings. The Second Request asks for, among other things, each Party's organization chart, detailed data on sales, costs, and any competitive intelligence maintained by the Parties in the regular course of their business.  While the Parties comply with the Second Request, or shortly afterwards, the Parties engage the Agencies with economic analysis as to why any horizontal overlap or vertical relationships should not create anti-competitive effects.  This involves rigorous market definition, identification of market participants, and rigorous analysis of why the merger might create efficiencies that are otherwise not attainable.

16. The horizontal overlap and vertical supply relationship narratives that the FTC proposes be filed at the time of the HSR filing would require all of the post Second Request effort to be undertaken at the outset – for all mergers, most of which do not raise concern sufficient during the "quick look" for even a preliminary investigation and, thus, not even lead to the issuance of a Second Request.  These analyses involve significant amounts of time of Parties' business executives who provide the necessary information, and that of the Parties' outside counsel and economists. The additional information requirements will not only create costs that are borne by all Parties even in cases where no further investigation would have occurred, but they also delay the filing of HSRs.  The additional information requirements also will create the risk that the Parties' narratives – prepared in haste and without knowing where the Agencies will ultimately focus their investigative efforts – might inadvertently provide information that is of no value to the Agencies.

17. Taken together, the proposed changes requiring additional information create costs, burdens, and uncertainty that will likely delay or discourage transactions that would have been made under the current system.

IV. **THE VAST MAJORITY OF REPORTED TRANSACTIONS DO NOT RAISE COMPETITIVE CONCERNS THAT WARRANT SUBMISSION OF THE ADDITIONAL INFORMATION**

A. **Most Transactions Do Not Raise Sufficient Concern to Request Additional Information Beyond the Current HSR Filing**

18. Each year, the agencies receive over two thousand HSR filings for reportable transactions, yet only a very small number of these filings raise questions sufficient for the agencies to issue a Second Request for further information. During the 21 years 2001 to 2021, roughly 35,000 transactions were reported averaging roughly 1,700 per year.[13] That number has risen somewhat in more recent years and has averaged over 2,200 during 2017 to 2021.

19. Yet, few of these HSR filings have raised sufficient concern to warrant the issuance of a Second Request. In fact, such concerns are rare. Across the tens of thousands of filings 2001 through 2021, the agencies have issued a Second Request in just over 1,000 transactions, or about 3 percent of the HSR filings; the remainder did not raise any competitive concerns to warrant even a rudimentary scrutiny. As shown in Figure 1, the portion of HSR filings that received a Second Request has varied over time. Yet they show no systemic change from remaining highly infrequent and rare each year. The average for the past decade roughly matches that of the entire two-decade period.

---

[13] These figures reflect the 97 percent of reported transactions for which the FTC or DOJ could have issued a Second Request. Some other transactions might be incomplete, abandoned, or otherwise not satisfy the criteria where a Second Request could be issued. See HSR Transactions Filings and Second Requests by Fiscal Year, available at https://www.ftc.gov/policy-notices/open-government/data-sets; and Hart-Scott-Rodino Annual Report 2021, https://www.ftc.gov/reports/hart-scott-rodino-annual-report-fiscal-year-2021.

*Figure 1*



Note: Figures reflect percentages of reported transactions for which the FTC/DOJ could have issued a Second Request.
Sources: HSR Transactions Filings and Second Requests by Fiscal Year; Hart-Scott-Rodino Annual Report 2021.

**B.    Most Transactions Do Not Raise Questions Sufficient For Even A Preliminary Investigation**

20. When HSR filings are received, the antitrust agencies use an internal process called "clearance" to determine whether the FTC or DOJ will conduct a preliminary investigation to review the submitted information. An agency seeks clearance for a specific transaction when staff raises questions sufficiently serious to warrant a preliminary investigation.

21. Clearance is rare.  During fiscal 2017 to 2021, clearance was sought in less than 8 percent of transactions.[14] In most cases, the agencies showed no interest in even a preliminary investigation of the information submitted in the HSR filing.

---

[14] Clearance was sought in 950 of the total 11,043 transactions. Hart-Scott-Rodino Annual Reports Fiscal Years 2017 to 2021.

C. **Small Transactions Are Numerous and Have Low Likelihood of Raising Competitive Concerns**

22. While knowing that just 3 percent of transactions receive a Second Request already seems low, this figure still overstates the likelihood of competitive concerns for the majority of transactions. This is because the likelihood of a competitive concern is not the same for all transactions. Such concerns are very uncommon for small and even midsize transactions. Yet, these transactions account for the majority of all reported transactions. These transactions are less likely to raise concerns sufficient for clearance for a preliminary investigation and also are less likely to still raise competitive concerns even after such investigation to be issued a Second Request.

23. As shown in Figure 2, between 2017 and 2021, over one third of reported transactions were valued under $200 million.  Less than 5 percent of these transactions sparked concerns for clearance and only 0.9 percent of these smaller transactions were issued a Second Request.

*Figure 2*



Note: Figures are based on the 11,043 transactions reported for FY2017 through FY2021.
Sources: Hart-Scott-Rodino Annual Reports Fiscal Years 2017 to 2021.

24. Even midsized transactions are less likely to raise competitive concerns. Midsize transactions valued between $200 million and $1 billion accounted for over half of all reported transactions yet received clearance for preliminary investigation in less than 8 percent of transactions and were issued a Second Request in less than 2.5 percent of cases. Only large transactions valued above $1 billion were more likely to be issued a Second Request.

25. Given that the vast majority of transactions have not raised concerns to warrant a preliminary investigation let alone a Second Request, most of the costs associated with the additional burdens of the Proposed Rule are potentially little more than wasted activity.

### D.    Agencies Are Unlikely to Review the Additional Information Under the Proposed Rule

26. Currently, the Agencies do not conduct even a preliminary investigation of the information already provided in the vast majority of HSR filings.[15]  They do not have the resources to conduct preliminary investigations on all of the average 2,200 HSR filings received each year 2017 to 2021.[16]  This will not improve with additional information.

27. The agencies have limited staff to review transaction filings and many of the staff are already tasked with duties other than review of filings.  The FTC has roughly 380 attorneys, economists, and support staff in its Bureau of Competition and Bureau of Economics.[17]  The DOJ Antitrust Division has 412 attorneys.[18] Many of these are support staff, research and policy staff, or senior management so that far less than the 792 total staff are available for review of initial filings. If this limited staff is increasingly dedicated to the review of extensive new information, the agencies will necessarily reduce support for investigation of the 3 percent of transactions that warrant such investigation.

28. Instead of leading to further deeper initial review of HSR filings, the additional information burden for all HSR filings will likely end up in the warehousing of information by the Agencies that are neither necessary for the Agencies to undertake their enforcement duty, nor likely to ever be reviewed.  Thus, the Agencies' mission of enforcing the competition laws is unlikely to be better served by seeking this additional information at the time of HSR filings.

---

[15] As noted before, the agencies sought clearance for a preliminary investigation in less than 8 percent of transactions during fiscal years 2017 to 2021.  See Hart-Scott-Rodino Annual Reports Fiscal Years 2017 to 2021.

[16] Fiscal year 2021 had over 3,400 filings.  To the extent this may indicate an upward trend in filings, the agencies are not even prepared to review the extensive new information requested by the Proposed Rule imposed on all transactions.

[17] This includes 300 lawyers and support staff at the Bureau of Competition and 80 PhD-holding economists at the Bureau of Economics. See Bureau of Competition, https://www.ftc.gov/about-ftc/bureaus-offices/bureau-competition; and Careers in the FTC Bureau of Economics, https://www.ftc.gov/about-ftc/bureaus-offices/bureau-economics/careers-ftc-bureau-economics.

[18] This reflects the FY2022 budgeted positions. See FY 2023 Budget Summary, https://www.justice.gov/file/1489426/download.

## V.     THE PROPOSAL TO SEEK ADDITIONAL INFORMATION FROM BOTH PARTIES MAY BE UNDULY BURDENSOME, ESPECIALLY FOR SMALLER TARGET FIRMS

29. Small target firms are likely to be most greatly burdened by the proposed changes. They tend to have fewer available resources to assemble information, yet the same new information requirements as far larger firms. The additional compliance burden could be very significant relative to the value of many small target firms or to investment funds involved in smaller transactions.

30. Being able to sell to a Buyer that can commercialize the product or services developed by a start-up is an important source of entrepreneurial motivation.  In fact, selling can move a business toward its long-term goals and allows a smooth transition to a new phase after current ownership leaves, whether this involves re-imagining business direction or leadership or pivoting to meet new challenges. Often entrepreneurs and innovators develop the company itself as the product to be sold and becomes their time and investment exit strategy.  It is estimated that as few as one in thirty companies are developed for IPO rather than for acquisition.[19]

31. A significant proportion of HSR filings involve the acquisition of small firms (say, tech start-ups) that lack the resources necessary to comply with the additional information proposed to be sought by the Agencies.  As shown in Figure 2, over one third of HSR filings are for transactions valued below $200 million.  These firms could be an order of magnitude smaller than the large transactions.  Yet, the burden under the Proposed Rule is likely not an order of magnitude smaller.

32. The burdensome proposed filing requirements will ultimately discourage innovative activity that is undertaken by small firms and consequently reduce the pace of economic growth in the United States.

---

[19] Why Founders Are Afraid to Talk About Exit Strategies, Harvard Business Review, August 18, 2022, https://hbr.org/2022/08/why-founders-are-afraid-to-talk-about-exit-strategies.

VI.    **THE AGENCIES SIGNIFICANTLY UNDERESTIMATE THE ADDITIONAL MONETARY COST TO PARTIES**

33. The NPRM presents the Agencies' estimates for time and cost burdens for filers that are substantially understated and exclude many areas of costs.  In particular, the Agencies have only provided incomplete estimates of costs associated with the Parties' information burden.  The Agencies have not included estimates of the additional costs to the Agencies in their own work and decision-making from receiving and reviewing information that has a low likelihood of being useful. Moreover, the Agencies have not accounted for the opportunity costs that the extensive review of the additional information would place on the Agencies' potentially justified review of transactions that are more likely to result in a Second Request.

34. The Proposed Rule will likely impose billions of dollars of additional monetary costs each year. In addition to those costs, the Proposed Rule will likely discourage pro-competitive entrepreneurial and innovative activity. These costs are not accounted for in the Agencies' analysis of the Proposed Rule.

A.    **The Agencies' Estimate**

35. The Agencies' estimate of the monetary burden on the Parties is based on a simple calculation of (a) estimated additional hours of preparation time multiplied by (b) the assumed hourly cost of personnel that would undertake the collection and production of such information. Based on canvassing Agency staff that have previously prepared an HSR filing in private practice, the Agencies estimate that the current filings require approximately 37 hours to complete including internal personnel and outside counsel.[20]  The Agencies then estimate that the proposed changes to initial filings would increase the requirement by an average 107 hours for a total of 144 hours.

36. The additional hours estimate was prepared by the FTC Premerger Notification Office (PNO).[21] The NPRM describes that the PNO canvassed current Agency staff

---

[20] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42208.

[21] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42208.

who had previously worked in private practice collecting data for initial filings. The NPRM does not describe a formal survey process or scientific approach for these estimates.[22] There is no assurance that respondent Agency attorneys had prior practice experience that is representative of the entire population of transactions that will be affected by the Proposed Rule. There are many notable deficiencies not limited to the following.[23] There is no assurance of sample size validity and indeed that sample size is not disclosed. There is no assurance that respondents' private practice experience is either recent or relevant. By definition, respondents' prior experience does not include assembly of the new types of information anticipated by the Proposed Rule. Finally, the NPRM does not account for the potential bias of respondents, who now wish to see this information but are not the ones responsible for providing it.

37. The additional hours estimate relies on arbitrary and speculative assumptions that cannot be called "conservative." Notably, as the NPRM describes, HSR filings can range in complexity from relatively simple transactions currently requiring few documents in the filing to more complex ones involving large transactions, many products, or other complex interactions.[24] The NPO canvass found that the Proposed Rule could add between 12 additional hours for so-called simple transactions to 222 hours for a more complex one.[25] Given this wide range, the NPRM uses an

---

[22] While the current NPRM does not disclose how the PNO arrived at its estimate of the additional hours the Proposed Rule would require, the estimate that current filings require approximately 37 hours to complete is likely from a very limited sample. Twelve years ago in July 2011, the FTC reported in a prior NPRM that the PNO "canvassed eight practitioners from the private bar" to arrive at an estimate of 37 hours to complete an HSR filing. See Premerger Notification; Reporting and Waiting Period Requirements, 76 FR 4 at 42479

[23] The PNO's sampling method is known as "convenience sampling" (i.e., sample selected based on being readily available, rather than from being representative of the relevant population). The Reference Manual on Scientific Evidence cautions that "special precautions" are required to reduce the likelihood of bias in convenience samples that quantitative values from such samples should be viewed as "rough indicators" rather than precise quantitative estimates. Shari Seidman Diamon, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition*, The National Academies Press, 2011, 361-423.

[24] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42207-208.

[25] It is not clear whether the 12 hour and 222 hour estimates are each statistical averages, or represent the range within the responses obtained by the NPO's canvass. For a convenience sample such the NPO's canvass, the Reference Guide on Survey Research cautions that a wide interval in sample data "may be a useful indication of the limited value of the estimate." Shari Seidman Diamon, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Third Edition*, The National Academies Press, 2011, 361-423 at 383.

assumption based on filings made under the current rules.  The NPRM assumes that, because 45 percent of current filings have no reported overlaps, 45 percent of filings under the Proposed Rule would have only the lower 12-hour additional hours requirement.  The remaining 55 percent or filings are assumed to be more complex and require 222 hours of additional filing burden.  Taken together, the range of additional hours and the proportions of transactions assumed simple or more complex result in an average calculated additional number of hours per filing of 107 hours.[26]

38. There is no empirical basis for these assumptions.  Among other things, it simply assumes that what makes a transaction "complex" under the current rules would apply to the Proposed Rule. Yet, the proportion of transactions that are moderately to highly complex would likely rise given the many new types of information that must be gathered and analyzed for an initial filing.

39. The Agencies forecast that the 107 hours of additional time burden from the Proposed Rule will result in 759,000 total additional hours devoted by filers in Fiscal 2023, assuming an expected 7,096 relevant filings that year.[27] Since the Proposed Rule has filing requirements from both the acquiring and acquired entities, the expected 7,096 filings is effectively double the expected number of transactions.  Notwithstanding the methodological deficiencies that lead to substantial understatement, the Agencies' estimates reflect nearly 1 million more hours of filing burdens each year on U.S. transactions.

40. The Agencies calculate the monetary cost of the additional filing hours by assuming a $460 hourly cost of attorney time.[28] This figure lacks empirical or other basis and is far from a reasonable estimate of the actual costs that would be incurred. The FTC first assumed the $460 rate in its 2013 proposed rule, without any supporting research

---

[26] This reflects the weighted average where 45 percent of transactions are assumed simple and require 12 additional hours, while the remaining 55 percent of transactions are more complex and require 222 hours.  Specifically, 107 hours equals 45% times 12 hours plus 55% times 222 hours.

[27] The Agencies expect the Proposed Rule to affect non-index filings, of which they expect 7,096 in Fiscal 2023. Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42208.

[28] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42208.

or data.[29]  For the 2023 Proposed Rule, the Agencies did not update the rate for inflation or other factors that would cause the rate to change.  Based on adjusting for inflation alone, the $460 per hour cost should be adjusted upward by over 30 percent.[30]  There is reason to believe that the relevant legal costs would have grown faster than inflation, so a 30% increase in the hourly rate due to price inflation alone is likely to significantly underestimate the relevant increase in hourly rates.[31]  Further, to the extent some of the additional information requires expertise or qualifications not currently needed for existing disclosures (e.g., additional time by senior executives or consultants and economists), there is further reason to assume the relevant rate is significantly higher than $460 per hour.

41. Even assuming the Agencies' hourly rate and additional filing time, the additional hours devoted by filers in Fiscal 2023 would cost them almost $350 million.[32]  Even taking the Agencies' figures, the Proposed Rule would result in hundreds of millions of dollars in additional costs.  Since these costs are borne across all transactions, they are predominantly borne by the vast majority of transactions that had little to no likelihood of raising competitive concerns and not the few transactions that would subsequently be issued a Second Request even under the current rules.

**B.    Estimated Additional Monetary Costs**

42. The Proposed Rule requires far more information and many new types of information not previously requested from either party. Gathering and providing the additional information is likely to involve several types of professionals including the Parties' attorneys, company executives, and outside vendors such as data search and

---

[29] See Premerger Notification; Reporting and Waiting Period Requirements, 78 FR 68705 at 68712.

[30] The Consumer Price Index, a measure of the buying power of past and present dollars, increased 30.6 percent from 2013 to the second quarter of 2023.  See Consumer Price Index, 1913-, Minneapolis Federal Reserve, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913-.

[31] Survey data from legal recruiting firm Major, Lindsey & Africa estimate average law firm partner compensation grew over 56% from 2013 to 2021 (based on 2014 and 2022 surveys).  Additional data on "big law" associated compensation shows first-year associate compensation grew 38% from 2013 to 2022 while eighth-year associate compensation grew 56%.  Sources: Major, Lindsey & Africa LLC Partner Compensate Surveys 2014 and 2022; https://www.biglawinvestor.com/biglaw-salary-scale/.

[32] This reflects $460 per hour times 107 additional hours per filing times 7,096 expected relevant filings in Fiscal 2023, which totals $349,265,120.

production companies. The Agencies' estimates do not account for all of these professionals needing to contribute.

43. During mid-August to early-September 2023, the United States Chamber of Commerce conducted a survey to provide a more comprehensive and reliable estimate of the additional costs associated with the Proposed Rule beyond the costs of the current rules.[33] Survey respondents were in-house and external counsel that have typically worked on dozens of proposed transactions over their careers.[34] Over one-third of respondents previously worked at the DOJ or FTC in a capacity involved with merger review. The survey asked respondents the amounts of time and costs to prepare information to submit as part of an initial transaction filing under the current rules and the Proposed Rule.

44. The survey identified several sources of additional costs associated with filings under the proposed Rule. These include outside counsel, internal personnel, and other external costs. The survey additionally asked for estimates of the additional costs borne by the Agencies for the time required to review the newly expanded filings.

1. **Costs of Outside Counsel**

45. The time and cost of outside counsel is included in the Agencies' estimates but are substantially understated. Survey respondents estimate that outside counsel currently spends an average of 54.3 hours per transaction preparing and submitting information for an initial filing. Filing under the Proposed Rule is expected to add 140.3 hours so that the average time to outside counsel time would rise to 194.6 hours. The additional hours are needed not only because the Proposed Rule asks for a greater volume of information, but it also asks for narrative descriptions of the parties and products.

46. Outside counsel can be costly especially as the filings become more expansive. Respondents estimate that the average billable hour for outside counsel is $936 per

---

[33] See U.S. Chamber HSR/Merger Guides Practitioner Survey, September 19, 2023, available at https://www.uschamber.com/finance/antitrust/antitrust-experts-reject-ftc-doj-changes-to-merger-process.

[34] The average respondent has worked on over 80 proposed transactions during work in one of the agencies or working outside.

hour.  This value may be on the low side given the time commitment of some senior counsel on the back-and-forth and drafting of narrative parts of the new information requirements.  Moreover, higher hourly rates for outside counsel will be particularly the case for acquirers and targets who lack relevant in-house legal staff. Thus, the survey's results suggest that the additional outside counsel cost of filing under the Proposed Rule would average roughly $131,342. [35]

### 2.  Costs of Internal Personnel

47. Internal personnel are ultimately the source of the information in the filing. Typically, executives, senior managers, in-house counsel, and sometimes company founders take on the roles of point persons for assembling the required information. They must take time from the duties that operate the business to attend interviews with counsel, assemble information, and iterate on how the filing is prepared. Survey respondents estimate that the current filing requires 30.4 hours of time from internal personnel.  This would rise by 101.6 hours to 131.9 hours under the proposed Rule.

48. It is difficult to estimate the value of the lost time used in assembling the transaction filing.  The cost of lost time is not simply a wage rate. The company incurs an opportunity cost of lost time from its executives as business decisions are not being made. To be conservative, if internal personnel time were valued at the same rate as outside counsel, the additional cost of filing under the Proposed Rule would average approximately $95,055.[36]

### 3.  Other External Costs

49. Transaction filings often incur other external costs beyond the outside counsel. In addition to outside counsel, these external costs could include economic consultants, investment bankers, and data vendors.[37] The additional information under the proposed Rule includes many areas requiring specialized consultants and executives. These contributors to the company's filing may cost much more than those assisting

---

[35] This reflects the 140.3 additional hours times $936 per hour.

[36] This reflects the 101.6 additional hours times $936 per hour.

[37] Survey respondents were not asked to break out the additional external costs by category.

in the current, simpler filing requirements. Survey respondents estimate that these external costs currently can total $79,569 on an average filing. After excluding the outside counsel costs that are separately provided by the survey, the other external costs for a filing average $28,744.[38]

50. Respondents estimate that the additional information requirements of the Proposed Rule would raise external costs by $234,259 to $313,828 on an average filing. Excluding outside counsel costs, the additional external costs per filing would be $102,917.[39]

4. **Total Additional Monetary Costs and Filing Burden**

51. Each of the types of filing costs identified in the survey exceed the estimates provided the Agencies and the total is over six times their estimates. Figure 3 summarizes the estimates of filing costs provided by the Agencies and the survey respondents. The Agencies estimate the total filing cost under the Proposed Rule would be $66,240. The survey results show that the actual average cost would be $437,314, nearly seven times the Agencies' estimate. Both the Agencies and the survey find that the proposed Rule will increase filing costs to roughly four times their current levels.

---

[38] Based on the survey results, the average current outside counsel cost per filing is $50,825 reflecting 54.3 hours at an average $936 per hour. The other external costs of $28,744 are the $79,569 total external cost minus the $50,825 for outside counsel.

[39] The calculation is similar to that for the current external cost of filing. Based on the survey results, the average additional outside counsel cost per filing is $132,292 reflecting 141.3 additional hours at an average $936 per hour. The additional other external costs of $88,843 are the $221,136 additional total external costs minus the $132,292 additional cost for outside counsel.

*Figure 3*

**Monetary Costs Associated with Transaction Filing**

| | | Current Filings [a] | Additional Burden [b] | Proposed Rule [c]=[a]+[b] | Ratio Proposed to Current [d]=[c]/[a] |
|---|---|---|---|---|---|
| **Agencies' Estimate per Filing** | [1] | $ 17,020 | $ 49,220 | $ 66,240 | 3.9 |
| **Survey Results per Filing** | | | | | |
| Internal Personnel | [2] | $ 28,431 | $ 95,055 | $ 123,486 | 4.3 |
| External Outside Counsel | [3] | $ 50,825 | $ 131,342 | $ 182,167 | 3.6 |
| External Other Costs (e.g., consultants) | [4] | $ 28,744 | $ 102,917 | $ 131,661 | 4.6 |
| Total Costs per Filing | [5]=[2]+[3]+[4] | $ 108,001 | $ 329,314 | $ 437,314 | 4.0 |
| *Ratio of Survey Results to Agencies' Est.* | [6]=[5]/[1] | 6.3 | 6.7 | 6.6 | |
| | | | | | |
| **Expected Total Relevant Filings in FY2023** | [7] | 7,096 | | | |
| **Estimated Total Costs for FY2023** | | | | | |
| Agencies' Estimate | [8]=[1]x[7] | $ 121 million | $ 349 million | $ 470 million | |
| Conservative Estimate | [9]=[5]x[7]/2 | $ 383 million | $ 1,168 million | $ 1,552 million | |
| Primary Estimate | [10]=[5]x[7] | $ 766 million | $ 2,337 million | $ 3,103 million | |

Sources: NPRM, 88 FR 42178 at 42208; and U.S. Chamber of Commerce survey.

52. These estimates reflect the costs to just one average filing. As noted earlier, the Agencies estimate there will be 7,096 relevant filings in Fiscal 2023. This includes filings from each of the acquirer and acquired entity so that the 7,096 filings reflect 3,548 transactions. If each of the 7,096 filings results in the estimated $329,314 additional cost, the additional costs associated with the Proposed Rule would cost filers in Fiscal 2023 over $2.3 billion.[40] It is possible the acquired entity filing may entail a lower average cost, for example, due to sharing of information gathering between the acquiring and acquired entities. Even if one were to be overly conservative by ignoring the burden on the acquired entity, the 3,548 transactions would still result in the Proposed Rule costing filers in Fiscal 2023 almost $1.2 billion.[41] Figure 4 provides a comparison of the Agencies' estimates of the total monetary costs and the estimates based on the U.S. Chamber's survey of practitioners. The total monetary costs expected by practitioners far exceed the

---

[40] This reflects $329,314 in additional cost per filing, as shown in Figure 3, times 7,096 expected relevant filings in Fiscal 2023, which totals $2,336,810,381.

[41] This reflects $329,314 in additional cost per filing, as shown in Figure 3, times 3,548 expected transactions in Fiscal 2023, which totals $1,168,405,190.

additional costs estimated by the Agencies, even before consideration of indirect costs discussed elsewhere in this report. The vast majority of these costs would be borne by transactions that had little to no likelihood of raising competitive concerns and not the few transactions that would subsequently be issued a Second Request even under the current rules.

*Figure 4*



### 5.    Agency Costs to Review Additional Information

53. The Proposed Rule does not include estimates of the costs to the Agencies themselves to review the new information. Survey respondents with prior Agency experience involved with merger review estimate that the Proposed Rule would result in an additional 24.9 hours of Agency staff effort to review each filing. Given the expected 7,096 relevant filings in Fiscal 2023, the additional time would result in over 177,000

additional hours for staff. This is equivalent to roughly 100 full-time attorneys working on nothing but initial filings.[42]

54. The Agencies are unlikely to have 100 idle attorneys available for dedicated review of initial filings. The DOJ and FTC have fewer than 800 attorney and economist staff in total. The Proposed Rule would require one-eighth of all activity at the Agencies to be devoted to reviewing the additional information. Of course, as noted earlier, the Agencies may be unlikely to actually review the additional information in the majority of cases. If so, the costs on the Agencies would be lower but the cost burden on filing parties would be no lower for preparation of expanded filings the Agencies may not intend to review (i.e., there would be substantial cost to filers with no possible benefit to the Agencies if they do not even review the information).

**C.    Costs to the Economy Exceed the Direct Monetary Costs**

55. The analysis of the costs and benefits of the Proposed Rule has focused on the monetary burden. However, one must also consider the broader costs on innovation and entrepreneurial activity. The expectation that any transaction would entail greater cost and uncertainty can lead business to rethink potential transactions. When once a transaction would have been beneficial, it would now be fraught with risk and costs. The filing cost analysis ignores that the Proposed Rule's additional burdens to the economy dissuade potential transactions from occurring.

56. The additional information burden of the Proposed Rule will result in longer times preparing the more complex filings ultimately delaying transactions. The monetary cost analysis ignores the cost of added regulatory approval delay to the firms in the transaction.  For example, the parties must delay the realization of business synergies and improvements. The delay is not only from added filing preparation but also the evaluation period after filing. Currently, there is a 30-day statutory requirement, but the additional data burdens may lead to more extensions beyond the initial 30 days

---

[42] This assumes the average Agency attorney reviews filings for roughly 1,800 hours per year.

than there otherwise would be. Delays could kill deals and lead parties to abandon transactions.[43]

57. The Proposed Rule will result in increased uncertainty in several ways. An advisory committee to the DOJ has identified that regulatory delays such as additional filing requirements create uncertainty because "delay breeds uncertainty in product, labor, and capital markets, enabling competitors to raid customers and staff."[44] Moreover, there is additional uncertainty for potential filers arising from the Agencies turning away from the decades of practice under the current rules. Regulatory uncertainty arising from new burdens imposed by the Proposed Rule can have substantial impact on the level of merger and acquisitions activity. For example, a 2018 paper published in the Journal of Financial Economics found that a one standard deviation increase in regulatory policy uncertainty is associated with a 6.6 percent decrease in aggregate M&A deal value and a 3.9 percent decrease in the number of transactions during the next 12 months.[45] Other academic papers have found similar results.[46] Of course, the effects may be greater if they are longer lasting. The Proposed Rule is not just a temporary increase in uncertainty.

58. Mergers and acquisitions have been shown to improve efficiency and contribute significantly to economic output. For example, using the plant-level data, a 2013 paper published in the Journal of Finance shows that acquired plants gain in productivity more than the non-acquired plants.[47] The gain in productivity is higher

---

[43] For example, a DOJ-created advisory committee reported that "Mergers are almost always time sensitive; delays may prove fatal to a transaction…" See International Competition Policy Advisory Committee, Final Report to the Attorney General and Assistant Attorney General for Antitrust, 2000, Chapter 3, https://www.justice.gov/atr/final-report

[44] See International Competition Policy Advisory Committee, Final Report to the Attorney General and Assistant Attorney General for Antitrust, 2000, Chapter 3, https://www.justice.gov/atr/final-report

[45] Bonaime, A, Gulen, H., and Ion, M. Does policy uncertainty affect mergers and acquisitions? Journal of Financial Economics, 129(3), September 2018, 531-558.

[46] For example, a 2016 paper in the Review of Financial Studies found a strong negative link between various measures of uncertainty and M&A deal activity. One key source of this uncertainty arises from market changes occurring during delays in consummating the transaction. V. Bhagwat et al., The real effects of uncertainty on merger activity, Review of Financial Studies, 29(11), 2016, 3000-3034.

[47] Maksimovic, V., Phillips, G., & Yang, L. "Private and public merger waves." *The Journal of Finance*, 2013, 68(5), 2177-2217.

when there are more frequent M&A transactions and when the buyer's valuation is high.  Similarly, research analyzing changing ownership of U.S. power plants found that acquisitions reallocate assets to more productive uses (high productivity firms buy under-performing assets from low productivity firms and then make the acquired assets more productive after acquisition).[48] Another 2021 paper published in the Review of Economic Studies shows that the mergers and acquisitions contribute 14% to the overall output of the economy and 4% to the overall consumption in the economy.[49] This contribution is driven by the reallocation of resources and new entrepreneurship.

59. Mergers and acquisitions have also been shown to incentivize R&D spending and innovation.  For example, a 2013 paper published in the Review of Financial Studies shows that successful innovation makes smaller firms attractive acquisition targets.[50] Thus, potential M&A activity provides incentives to small firms to invest in R&D and innovate more when they know they can later sell out to larger firms.

60. Another study published by the US Chamber of Commerce and NERA Economic Consulting found no evidence that merger activity leads to reduced innovative activity.[51]  In fact, the study found a strong positive and statistically significant relationship where mergers cause, to a great extent, subsequent increased R&D expenditure and patent applications.

61. Given the importance of M&A activity to the economy, potential delay and discouragement of acquisition transactions caused by the combination of increased monetary compliance as well as indirect costs (such as opportunity costs of

---

[48] Mert Demirer, Ömer Karaduman, "Do Mergers and Acquisitions Improve Efficiency: Evidence from Power Plants."  Working paper, January 13, 2022.

[49] David, J. M. "The aggregate implications of mergers and acquisitions." *The Review of Economic Studies*, 2021, 88(4), 1796-1830.

[50] Phillips, G. M., & Zhdanov, A. "R&D and the incentives from merger and acquisition activity." *The Review of Financial Studies*, 2013, 26(1), 34-78.

[51] Kulick, R, & Card, A. "Mergers, Industries, and Innovation: Evidence from R&D Expenditure and Patent Applications." NERA Economic Consulting and U.S. Chamber of Commerce, February 2023, available at https://www.uschamber.com/finance/antitrust/mergers-industries-and-innovation-evidence-from-r-d-expenditure-and-patent-applications.

executives' time, potential transaction delay, and additional regulatory uncertainty) would, to the extent M&A activity were curtailed at the margin, adversely affect innovation, entrepreneurship, and the economy in general.  Event studies of acquisition announcements have shown that acquisitions result in statistically significant increases in the combined market value of the acquirer and target.[52]  Thus, any discouragement of transactions would lead to a significant loss of value creation.

62.  Even where M&A activity is not curtailed, potential delay may have significant economic costs.  Given that many transactions are pursued for the purposes of realization of efficiencies or productivity improvements, any delays would lead to some lost post-acquisition gains.  For example, if an acquisition were expected to result in post-closing cost savings of $12 million per year, a one-month delay would result in the loss of $1 million in costs that could have been avoided.

63.  The Agencies do not present any analysis of countervailing benefits to competition from the Proposed Rule. As noted elsewhere, the Agencies do not present evidence that the current filing fails to screen transactions where competitive concerns should be raised. They thus have not provided a systematic rationale for why a more extensive information burden should be imposed on all transactions to result in the same challenges otherwise captured by the current VAL and Second Request procedure.

1.  **Burdens to Private Equity Investors**

64.  The US private equity (PE) sector provides economic benefits to the US economy both directly and indirectly through backing businesses. In 2022, the US PE sector directly generated $1.7 trillion of US Gross Domestic Product ("GDP"), which is about 6.5% of the total US GDP. The sector directly employed 12 million workers paying them $1 trillion in wages and benefits in 2022. The US PE sector provided indirect benefits to the US economy through backing mostly small businesses.  In 2022, PE-backed small businesses employed a total of 1.4 million workers in the US.

---

[52] Robert F. Bruner, "Does M&A Pay? A Survey of Evidence for the Decision-Maker," *Journal of Applied Finance*, Spring/Summer 2002, 48-68.

These workers earned $135 billion in wages and benefits and generated a total of $240 billion of US GDP in 2022.[53]

65. PE investment helps in increasing competition in the marketplace and improve consumer welfare. For example, PE often acquires carveouts (non-core assets of a company which are under-utilized and/or must be divested in order for other mergers to be approved by regulators). PE investments in carveouts often create independent companies with new management, and steps in to fund and grow the carveout.[54] Funding the carveouts has resulted in creation of over 4,000 new companies and an investment of over $700 billion over the past decade.[55]

66. Another example is add-on acquisitions which can create significant efficiency gains in cost-intensive industries. Evidence suggests that such strategies are concentrated in more fragmented and competitive industries such as insurance where more than 400,000 brokers and agencies compete. As a result, it is less likely that consolidation will lead to anticompetitive effects in those industries. In those add-on acquisitions, the PE investments lower costs and improves the operations of the portfolio company which benefits all stakeholders including consumers.[56] The add-on acquisitions, in particular, will suffer from informational burden under the additional information requests given the volume of smaller transactions (many of which might previously have been below the reporting threshold) for such a PE strategy.

67. The reallocation of resources via PE investment has been shown to improve innovation. One study using the data for 19 industries in 52 countries shows that PE investment improves productivity, employment, and capital expenditures of competing public firms in the same industry.[57] Another study using data from PE

---

[53] Ernst and Young, Economic contribution of the US private equity sector in 2022, Prepared for the American Investment Council, April 2023.

[54] AIC and Pitchbook "Diamonds in the Rough. How PE breathes new life into unloved businesses," September 2022.

[55] AIC and Pitchbook "Diamonds in the Rough. How PE breathes new life into unloved businesses," September 2022.

[56] AIC and Pitchbook, "Building Competition. How buy-and-build helps the American economy," February 2023.

[57] Aldatmaz, S., & Brown, G. W. (2020). Private equity in the global economy: Evidence on industry spillovers. Journal of Corporate Finance, 60, 101524.

backed leveraged buyouts in UK shows that PE investment increases innovative output (measured by patents) after the deal.[58]

68. Venture capital (VC) is a form of PE. Unlike PE in general, VC tends to invest in smaller companies and entrepreneurs at an earlier stage in development. Such companies are often not yet profitable or have established sales. VC investors can help small companies minimize risk and avoid the mistakes of many startups. The VC investors often actively lend experience and help these small companies find opportunities.

69. Certain of the additional information requirements in the proposed rulemaking will be particularly burdensome to PE and VC firms, as described below. The additional burdens may discourage some PE and VC activity. This may be particularly the case for funds with larger portfolios of smaller targets, general partners managing multiple investment funds, or newly emerging funds with limited back-office infrastructure to track and manage the additional information disclosure requirements. To the extent that smaller, emerging investment managers are disproportionately burdened by the expanded disclosure requirements, competition within the fund management industry may be negatively impacted. If smaller fund managers are more likely to forego transactions, larger fund managers will have less competition for its investment choices and would be able to attract capital from investors more easily with any diminished capability for smaller or emerging managers to compete.

## 2. Officers, Directors, and Board Observers

70. The NPRM proposes that all proposed officers, directors, and board observers would be required to disclose all other entities for which each individual had served as an officer, director, or board observer within two years of filing.[59] The Agencies justify this request for purposes of knowing existing, prior, or potential interlocking directorates. Such information is likely to be a significant burden to PE and VC

---

[58] Amess, K., Stiebale, J., & Wright, M. (2016). The impact of private equity on firms' patenting activity. European Economic Review, 86, 147-160.

[59] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42189.

managers, whose members often serve as directors on many firms within the investment firm's portfolio, and whose board memberships may change rapidly with changes in a fund's portfolio holdings.

3. **Disclosure of Limited Partners**

71. The NPRM proposes to require disclosure of limited partners with between 5% and 50% interest in funds making reportable acquisitions.[60] The Agencies' justification for this requirement is that "after more than a decade, the Commission now believes it is inappropriate to make generalizations regarding the role of investors in limited partnerships structures" (where, previously, it was understood that limited partners had no control over operations of a fund or its portfolio companies). Further, the Agencies argue limited partner information "can provide valuable information about co-investors and lead to identification of potentially problematic overlapping investments resulting from the transaction that could violate Section 7."

72. Notably, the Agencies do not argue that limited partners exercise any control over operations of the fund or its portfolio companies, and arguably by definition, limited partners are precluded from exercising any operational control. This information requirement will be burdensome to funds which may have significant confidentiality agreements in place with investors, and where the potential of such disclosures may discourage certain investors from making investments that would lead to exceeding the 5% reporting threshold, thus making fundraising more difficult. Furthermore, the Agencies have not demonstrated that there has been any failure to identify "potentially problematic overlapping investments" through Second Requests or other means of obtaining information after an initial filing.

## VII.   CONCLUSION

73. The Proposed Rule will lead to substantial additional direct monetary costs for HSR filers that could total over $2 billion. These additional costs will be borne by all filers, not just the very small fraction the Agencies identify each year for further investigation. The Proposed Rule will also lead to further costs to the economy

---

[60] Premerger Notification; Reporting and Waiting Period Requirements, 88 FR 42178 at 42188.

beyond the direct monetary costs, including burdens on innovation and entrepreneurial activity as well as additional costs on the Agencies themselves to review the new information.  The benefits to consumers are likely to be limited due to the small percentage of filings that progress to a preliminary investigation, let alone those that ultimately result in an enforcement action. The Agencies have not demonstrated there will be benefits to consumers in excess of the additional direct monetary and other economic burdens imposed.


_____

S.P. Kothari

September 26, 2023