# Exhibit 8

# Dechert LLP Comments:

# Proposed Amendments to the Premerger Notification Rules under the HSR Act

**16 CFR Parts 801–803—Hart-Scott-Rodino Coverage, Exemption, and Transmittal Rules**
**Project No. P239300**

**September 25, 2023**



## TABLE OF CONTENTS

Introduction ............................................................................................................ 1

I.     Several Proposals Exceed the Agencies' Authority or Lack a Sufficient Basis under the HSR Act ................................................................................... 1

    A.    Officers, Directors, and Board Observers ............................................ 1

    B.    Labor Markets Information .................................................................. 3

II.    The Expanded Document Requirements Are Excessive and Vague ........................... 5

    A.    Supervisory Deal Team Leads .............................................................. 5

    B.    Draft Documents .................................................................................. 6

    C.    Certification ......................................................................................... 7

III.   New Disclosure Requirements Would Chill Private Capital Markets, Harming Small Businesses, Workers, and Consumers ................................................ 8

    A.    Identification of Limited Partners ........................................................ 9

    B.    Increased Disclosure of Other Minority Holders ............................... 11

    C.    Privacy Concerns for Fund Investors ................................................ 12

    D.    The Burdens of Additional Information Gathering Will Fall Disproportionately On Private Investment Firms ............................... 13

    E.    Impact on Small Businesses, Workers, and Consumers ..................... 13

Conclusion ............................................................................................................ 15

i

**Introduction**

Dechert LLP submits these comments to the proposed rulemaking on Hart-Scott-Rodino ("HSR") premerger notification changes, announced by the U.S. Federal Trade Commission ("FTC") and the Antitrust Division of the U.S. Department of Justice ("DOJ") (collectively, the "agencies") on June 27, 2023.[1]  The views expressed herein are those of Dechert based on our experience representing a broad range of clients; however, these comments are not being submitted on behalf of any company or organization.

Dechert commends the agencies on their efforts to modernize the HSR filing process. However, we believe that some of the proposals exceed the agencies' authority to implement rules pursuant to the HSR Act to assess the competitive impact of reported transactions. Furthermore, many of the proposals in the Notice of Proposed Rulemaking create significant additional burdens for all filers, including parties to transactions that pose no harm to competition.  Certain of the current proposals are too vague, overbroad, or lacking in probative value.  Finally, the proposals—particularly those that appear targeted at private investment firms—are likely to chill private investment across the board, potentially harming small businesses, workers, and consumers.

## I.      Several Proposals Exceed the Agencies' Authority or Lack a Sufficient Basis under the HSR Act

The agencies are seeking to add substantial reporting requirements to the HSR form that exceed the agencies' authority under the HSR Act and/or lack a sufficient basis under the Act. These new obligations relate to board interlocks and labor issues that exceed the scope of the HSR Act.  With these proposed requirements, the agencies seek information that goes not to whether a transaction may violate Section 7 – the proper focus under the HSR Act – but rather to whether the merging companies may be in violation of the antitrust laws more generally for conduct separate from the reported transaction.

### A.      Officers, Directors, and Board Observers

The proposed rules include a new requirement for merging companies to identify all current officers, directors, and board observers for each entity within the acquiring person and the acquired entity, as well as those who have served in the applicable position within the past two years.[2]  This proposal also applies to individuals exercising similar functions in unincorporated entities.[3]  In addition, for each officer, director, and board observer identified, the merging companies are required to identify all other entities for which the individual serves, or has served within the last two years, as an officer, director, or board observer.[4]

---

[1] Fed. Trade Comm'n, *FTC and DOJ Propose Changes to HSR Form for More Effective, Efficient Merger Review* (June 27, 2023), https://www.ftc.gov/news-events/press-releases/2023/06/ftc-doj-propose-changes-hsr-form-more-effective-efficient-merger-review.

[2] Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42178, 42212 (June 29, 2023).

[3] *Id.*

[4] *Id.*

1

### D.    The Burdens of Additional Information Gathering Will Fall Disproportionately On Private Investment Firms

Many of the additional burdens that would be imposed on filing parties across the board if the agencies' proposals are adopted will only be compounded when the filer holds interests in many companies across a variety of industries, as is often case when the acquiring person is a financial sponsor like a private investment fund.  Because of the nature of their business, such filers must rely on personnel at the companies they invest in to gather the required information.  The addition of new information requirements that apply to all companies within an acquiring person – such as detailed director and officer information going back two years, or labor markets data as discussed above– not only imposes significant additional burden and costs on such filers but are overbroad and unnecessary to the analysis of the competitive impact of the transactions at hand.

Take, for example, the proposal that each filing party provide an exhaustive list of alternative NAICS codes that could apply to each product or service offered, even when there is no overlap.  This proposed requirement will be extremely difficult to comply with when relying on personnel at various operating companies that have varying familiarity with the NAICS system.  The agencies are underestimating the additional burdens implicated by such changes in the aggregate.  Moreover, there are more efficient ways of gathering information that would be relevant to the competitive analysis of the notified transaction.  For example, if the concern is that the agencies are missing potential overlaps because parties are selecting different codes for competing products, that concern can be more effectively addressed in the new Horizontal Overlap Narrative that the agencies propose to require.

Here again it is key to remember that the proposed rules would impose broad disclosure requirements regardless of whether the requested information is relevant to any specific antitrust concern.  This imposes substantial and unwarranted new costs on private investment firms with broader investment portfolios that are likely to raise fewer antitrust concerns.  These up-front costs are likely to discourage investment by private investment firms in smaller businesses with less upside potential, and they also may make private investment firms that raise no potential competition concerns appear less favorable as buyers than strategic buyers that can more quickly collect the information required to complete an HSR filing.

### E.    Impact on Small Businesses, Workers, and Consumers

The proposed rules for heightened disclosure of limited partner and minority holder interests purport to be evenhanded.  The agencies' proposal depicts the changes as just an effort "to harmonize the requirement for limited partnerships with the requirements for limited liability companies and corporations."[61]  But the proposed rules fail to consider how expansive disclosure requirements will handicap the smaller private investment firms that cannot guarantee their investors' privacy as compared with big public companies and large investment firms where individual investors are less likely to cross the five percent threshold requiring disclosure.  The proposed rules also fail to address the significantly higher burdens that would be imposed on private investment firms than other businesses by broad new disclosure requirements across the

---

[61] Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. at 42188.

board.  These changes will impact the ability of smaller private investment firms to raise funding which, in turn, will have a negative impact on small businesses, workers, and consumers.

To understand the impact of these changes, it is first necessary to understand the role that private capital markets play in support of small businesses.[62]  Of course, all businesses require capital to sustain and grow their operations.[63]  Yet small businesses and large businesses obtain capital in different ways.  At a high level, "small businesses generally only have access to private equity and debt markets, whereas large businesses have access to public markets."[64]  This distinction is key.  Public companies can raise capital from public securities offerings; by contrast, small businesses obtain external finance "almost exclusively" from private markets.[65]  Public companies similarly have access to bank or commercial lending, whereas "bank or commercial finance company lending would typically not be available to small businesses until they achieve a level of production where their balance sheets reflect substantial tangible business assets that might be pledged as collateral, such as accounts receivable, inventory, and equipment."[66]  Private capital markets can be key to helping these small businesses survive and thrive until they have matured to the point where public capital markets and commercial finance options are available.  Chilling private capital markets will make it more difficult for small businesses to keep their doors open.

It is also important to understand what is at stake.  Small businesses collectively contribute much to the modern economy.  In brief: "Small businesses are an essential part of the American economy, and core to the financial security of our middle class.  There are 56 million workers employed at firms with fewer than 50 employees, representing 45 percent of all private-sector jobs in the first quarter of 2022."[67]  Small businesses are even more critical in rural counties, where they operate 84.8 percent of establishments and account for 54.3 percent of employment.[68]  The funding that private investment firms are able to provide can allow companies to grow organically by acquiring new equipment, investing in new technologies, or hiring more employees.  In some cases, private investment firms may ensure continuity for

---

[62] The precise definition of small business may vary by industry.  *See generally* U.S. Small Business Admin., *Table of Size Standards* (Mar. 17, 2023) (providing small business definitions by NAICS code based on firm revenue and employment ranging from $1 million to over $40 million and 100 to 1,500 employees), https://www.sba.gov/sites/sbagov/files/2023-06/Table%20of%20Size%20Standards_Effective%20March%2017%2C%202023%20%282%29.pdf.

[63] Michael J. McManus, *Dissecting Access to Capital*, U.S. Small Business Admin. (Sep. 2017), https://advocacy.sba.gov/wp-content/uploads/2019/06/Capital_Access_Fact_Sheet_FINAL.pdf.

[64] Allen N. Berger & Gregory F. Udell, *The Economics of Small Business Finance: The Roles of Private Equity and Debt Markets in the Financial Growth Cycle*, 22 J. OF BANKING & FIN. 613, 626 (1998).

[65] *Id.*

[66] *Id.* at 623-24.

[67] White House, *Investing in America Means Investing in America's Small Businesses* (May 1, 2023), https://www.whitehouse.gov/cea/written-materials/2023/05/01/investing-in-small-businesses/.

[68] Daniel Wilmoth, Ph.D., *Small Business Facts: Small Business in Rural Areas*, U.S. Small Business Admin. (Aug. 2023), https://advocacy.sba.gov/wp-content/uploads/2023/08/Fact-Sheet-Small-Business-in-Rural-Areas-508c.pdf.

founder-led businesses.  Private investment firms can be a vital lifeline to keeping these businesses operating.

Consumers benefit from private capital markets as well.  Private investment firms contribute to the growth of smaller businesses, delivering more competition that benefits consumers.  In addition, private capital markets are more willing to invest capital in so-called "[h]igh risk-high growth" startups and businesses with high upfront development costs that drive innovation that benefits consumers and drives further competition.[69]

Private investment firms can be particularly impactful in helping put small businesses on an even playing field with larger public companies.  "Unlike publicly traded firms," one recent study notes, "private firms cannot generally issue equity to raise capital needed to finance investment and may become financially constrained when they reach their debt capacities."[70] That study found "consistent evidence of a large and rapid increase in sales growth after private firm buyouts," explaining that "relaxing financing constraints and facilitating growth are an important source of value creation in private firm buyouts."[71]  In other words, by providing a capital bridge to small businesses, private investment firms enable small businesses to catch up to big businesses benefiting from better access to capital.

The agencies should keep in mind these benefits from private capital markets when considering imposing any heightened disclosure requirements for limited partners and minority holders.  Small businesses already find it difficult enough to obtain necessary capital today. Pushing privacy-conscious investors to public companies or larger investment firms does not serve the interests of small businesses or their workers, nor does it further the competition and innovation that ultimately benefits consumers.

## Conclusion

We hope that the agencies will thoughtfully consider the concerns raised in these comments.  In our view, many of the agencies' proposals require significant refinement for the HSR process to function as intended rather than become a veritable minefield in the eyes of even the most well-intentioned filing parties.  As the agencies recognize, "[i]nformation submitted as part of the HSR premerger notification process is a key starting point, and the information contained in the HSR Filing should be sufficient to allow the agencies to conduct a thorough but quick evaluation of whether the proposed transaction is one that requires more in-depth investigation through the issuance of Second Requests."[72]  The level of proposed disclosure is unnecessary for carrying out the purposes of the HSR Act.

---

[69] Berger & Udell, *supra* note 64 at 615, 622-24.

[70] Jonathan B. Cohn, Edith S. Hotchkiss, & Erin M. Towery, *Sources of Value Creation in Private Equity Buyouts of Private Firms*, REV. OF FIN. 257, 283 (2022)

[71] *Id.* at 259.

[72] Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. at 42179.