# Exhibit 9



ATTORNEYS AT LAW
WASHINGTON HARBOUR
3000 K STREET, N.W.
SUITE 600
WASHINGTON, D.C. 20007-5109
202.672.5300 TEL
202.672.5399 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
202.945.6083
ehaas@foley.com

VIA ELECTRONIC FILING

September 21, 2023

April J. Tabor
Secretary
Federal Trade Commission
600 Pennsylvania Ave NW
Suite CC-5610 (Annex C)
Washington DC 20580

Re: **16 C.F.R. Parts 801-803—Hart-Scott-Rodino Coverage, Exemption, and Transmittal Rules, Project No. P239300**

Dear Secretary Tabor:

Foley & Lardner LLP ("Foley & Lardner" or "we") is pleased to submit the following comments to the Federal Trade Commission (the "Commission" and, together with the Department of Justice Antitrust Division, the "Agencies'") regarding the proposed revisions to the Hart-Scott-Rodino ("HSR") Coverage, Exemption, and Transmittal Rules, Project No. P239300 (the "Proposed Rulemaking"), published in the *Federal Register* on June 29, 2023 (the "NPRM").[1]

Foley & Lardner is a law firm with over 1,000 attorneys across four countries, including 22 offices in the United States. In May 2023, *The American Lawyer* reported Foley & Lardner to be the 47th largest law firm in the United States based on revenue. Among many other services, Foley & Lardner's Antitrust & Competition practice group routinely prepares premerger notification filings for clients under the HSR Act. We also regularly represent clients in Agency reviews of mergers and acquisitions, both during initial thirty-day HSR waiting periods as well as in more fulsome, "Second Request" investigations. Our clients have included public and private companies, nonprofits, insurance carriers, startups, natural persons, trusts, family offices, and private equity funds, both foreign and domestic. We have particular focuses on the manufacturing, healthcare, life sciences, innovative technology, and energy sectors.

We begin with some general observations about the HSR Act before we turn to our specific comments on the Proposed Rulemaking. For the Agencies' benefit, our specific comments follow the order of the "Proposed Instructions Outline" sections of the NPRM and the subsections within.[2] Finally, these comments are solely our own. No client has engaged or compensated us to

[1] Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42,178 (June 29, 2023).

[2] 88 Fed. Reg. at 42,184-86.

AUSTIN
BOSTON
CHICAGO
DALLAS
DENVER
DETROIT
HOUSTON
JACKSONVILLE
LOS ANGELES
MADISON
MEXICO CITY
MIAMI
MILWAUKEE
NEW YORK
ORLANDO
SACRAMENTO
SALT LAKE CITY
SAN DIEGO
SAN FRANCISCO
SILICON VALLEY
TALLAHASSEE
TAMPA
WASHINGTON, D.C.
BRUSSELS
TOKYO

4875-6554-8654.1



prepare these comments, and the views expressed herein do not necessarily reflect those of our clients.

**1. Opening Comments**

We appreciate that the Agencies are undertaking a comprehensive review of the HSR Act's premerger filing requirements. There is no doubt that the HSR system can be improved, and we are grateful that the Proposed Rulemaking finds ways to reduce certain filing burdens, most notably by streamlining the revenue reporting requirements.

Before we turn to our specific comments, we offer three observations about the HSR premerger notification process generally. First, the current HSR system does an exceptionally good job of providing the Agencies the information they need to screen for potentially anticompetitive mergers. The NPRM does not identify a single transaction whose competitive effects the Agencies may have ever missed due to any shortcomings in the current HSR system. This is not surprising, because false negatives under the current HSR system are exceedingly rare. Dating back to 2000, we are aware of only seven HSR-reportable transactions the Agencies have challenged after the expiration of the waiting period.[3] In four of those seven transactions, notwithstanding the expiration of the HSR waiting period, the Agencies successfully identified potential competitive issues and opened an investigation before the acquisition closed.[4] In the fifth transaction, the buyer's HSR form allegedly omitted required documents and thus was deficient, prompting a $4 million civil penalty.[5] In the sixth transaction—a merger between hospitals located seven miles from each other—the geographic overlap would have been self-evident from the HSR filing, but then-prevailing economic theory predicted no competitive effects. Finally, in the seventh case, two large merging parties had a $20 million overlap that may have slipped through the HSR cracks. Therefore, dating back to 2000, we are aware of only a single instance where a requirement to provide additional information in the HSR filing might conceivably have made a difference to the

---

[3] The transactions that we are aware of are *Facebook/Instagram*, *Facebook/WhatsApp*, *Chicago Bridge & Iron/Pitt-Des Moines*, *Deere/Precision Planting*, *Hearst/Medi-Span*, *Evanston Northwestern/ENH Medical*, and *Parker-Hannifin/CLARCOR*.

[4] In *Facebook/Instagram*, the Commission conducted a Second Request, but ultimately allowed the transaction to close. In *Facebook/WhatsApp*, the Commission reportedly conducted a preliminary investigation, leading to a warning letter from the Bureau of Consumer Protection. In *Chicago Bridge & Iron/Pitt-Des Moines*, the Commission opened its investigation approximately one week after the expiration of the HSR waiting period, before the transaction had closed. And in *Deere/Precision Planting*, the Department of Justice challenged the transaction before it had closed, and the parties ultimately abandoned the transaction.

[5] In *Hearst/Medi-Span*, the acquiring entity allegedly failed to submit relevant Item 4(c) documents and subsequently provided an amended HSR filing to include the required documents. The acquiring person agreed to pay a civil penalty of $4 million and ultimately divested the acquired business and paid $19 million in disgorgement.



Agencies. But there have been 39,962 Second Request-eligible HSR filings made since FY2000.[6] Thus, by our count, the current HSR system's "false negative" rate is just 0.0025%.

Second, for all its success in giving the Agencies an effective screen, the overwhelming majority of transactions subject to HSR review pose no competitive issues whatsoever. In FY2021, the most recent year for which data is publicly available, the Agencies received HSR filings for 3,413 Second Request-eligible transactions.[7] Out of these, the Agencies issued Second Requests in 65—a rate of 1.9%. Over a longer timespan, covering the ten-year period from FY2012 through FY2021, the Agencies received a total of 18,873 Second Request-eligible HSR filings, and issued Second Requests in 518 of them—a rate of 2.7%.[8] Thus, as Chair Khan put it in a recent interview, "we're really talking about a very, very, very, *very* small slice of overall deal activity that ends up being affected by merger investigations and merger enforcement."[9] Also notably, out of these same 18,873 Second Request-eligible HSR filings from FY2012-FY2021, the Agencies granted "early termination" in 9,682 of them—a rate of 51%, which undoubtedly would have been higher but for the current moratorium on early termination grants. In short, any effort the Agencies undertake to reform the HSR reporting requirements must recognize the reality that the overwhelming majority (over 97%) of HSR-reportable transactions are determined not to warrant an in-depth investigation, and that a majority (at least 51%) are so plainly nonproblematic that the Agencies can clear them on cursory review.

Third, some parts of the current HSR form can be very burdensome to address. These filings sometimes take *hundreds* of hours to prepare. But with some hard work and the assistance of experienced HSR counsel, the current HSR form can generally be completed without jeopardizing the timing or success of the transaction. This is important, because a large number of HSR filings are made by relatively small companies. Companies with as little as $22.3 million in total assets can be required to make HSR filings.[10] HSR filings are routinely made by companies in bankruptcy,[11] by nonprofits,[12] and by myriad companies with limited budgets and a need to close their deal quickly. HSR filings can even be required in transactions like open-market purchases, where the acquired

---

[6] The historical numbers provided in these comments are taken from "Appendix A" to the Agencies' *Hart-Scott-Rodino Annual Reports* to Congress for Fiscal Years 2021, 2011, and 2002.

[7] A "Second Request-eligible" HSR filing means an HSR filing where an Agency is authorized to request additional information. For example, HSR filings for transactions that were subsequently found to be non-reportable are excluded from this category.

[8] This rate has been remarkably consistent over time. Measured back to FY2000, the Agencies have received a total of 39,692 Second Request-eligible HSR filings, but have issued Second Requests in 1,139 of them—a rate of 2.9%.

[9] *See* "FTC chair Lina Khan discusses need for regulations on big business," CBS NEWS (July 27, 2003), at 6:30, *available at* https://www.youtube.com/watch?v=8R9H7Pf6bKI.

[10] *See* 15 U.S.C. § 18a(a)(2)(B); Revised Jurisdictional Thresholds, 88 Fed. Reg. 5,004 (Jan. 26, 2023).

[11] *See generally* 11 U.S.C. § 363(b)(2).

[12] *See generally* 16 C.F.R. § 801.2(f)(3).

side may otherwise have no involvement in the transaction, may not benefit from the transaction, and only learns of its obligation to file HSR upon being notified by the buyer.[13] All of these companies need the HSR process to be timely, efficient, and achievable without unnecessarily bringing large numbers of people "under the tent" for an important, nonpublic deal.[14]

In sum, where the current HSR system falls short is not in its 0.0025% rate of false negatives, but in its 97% rate of false positives—the overwhelming majority of HSR-reportable transactions that are either competitively harmless or affirmatively procompetitive, but nevertheless are burdened by HSR's costs. We respectfully submit that the Agencies should focus any HSR reform efforts on reducing these false positives. One such area on which to focus is the Agencies' invitation to "exempt, from the requirements of [the HSR Act], classes of persons, acquisitions, transfers, or transactions which are not likely to violate the antitrust laws."[15] The Agencies also should resume the heretofore longstanding practice of granting early termination for transactions the Agencies determine to be nonproblematic.[16]

Instead, the NPRM proposes to expand the burdens of all HSR filings by a factor of almost four (in the Commission's estimate, which we consider low). Therefore, while we see the potential value of some elements of the Proposed Rulemaking, there are many parts that would significantly increase the complexity, expense, and burden of HSR filings, requiring information that no reasonable company maintains in the ordinary course of business, and which in some respects may exceed the burdens required to comply with a Second Request, potentially undermining the speed and confidentiality of important deals. All in an effort to make "more effective [and] efficient"[17] a program that already works 99.9975% of the time.

---

[13] *See generally* 16 C.F.R. §§ 801.30 & 803.5(a).

[14] In the case of publicly traded companies, risks of insider trading or deal rumors heighten these concerns about bringing individuals "under the tent" about a potential transaction.

[15] 15 U.S.C. § 18a(d)(2)(B). The Statement of Chair Khan, joined by Commissioners Slaughter and Bedoya, regarding the Proposed Rulemaking comments that "[t]he House Report for the HSR Act estimated that the statute would 'requir[e] advance notice' for approximately 'the largest 150 mergers annually.' Today, the agencies often receive more than 150 filings per month." *Statement of Chair Lina M. Khan, Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya, Regarding Proposed Amendments to the Premerger Notification Form and the Hart-Scott-Rodino Rules*, Commission File No. P239300 (June 27, 2023).

[16] *See generally* 15 U.S.C. § 18a(b)(2). On February 4, 2021, the Agencies announced a "temporary suspension" of the practice of granting early termination for HSR waiting periods. *See* Press Release, *FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination* (Feb. 4, 2021). The press release cited three factors to justify the suspension—the "transition to the new Administration," the "unprecedented volume of HSR filings for the start of a fiscal year," and the "pandemic"—and stated that the suspension was anticipated to be "brief." It is now over two-and-a-half years later, and all three factors cited in the press release have long ago subsided.

[17] Fed. Trade Comm'n, Press Release, "FTC and DOJ Propose Changes to HSR Form for More Effective, Efficient Merger Review" (June 27, 2023).