# Exhibit 10



**IN-HOUSE COMPETITION LAWYERS ASSOCIATION**

**COMMENT TO FEDERAL TRADE COMMISSION**

**CONCERNING PROPOSED REVISIONS TO HART SCOTT RODINO ACT**

**PREMERGER NOTIFICATION FORM AND ASSOCIATED INSTRUCTIONS**

September 27, 2023

## I. Introduction

The In-House Competition Lawyers Association ("ICLA") appreciates this opportunity to share its views with the Federal Trade Commission ("FTC") and the Antitrust Division of the Justice Department ("Division").[1] ICLA is an informal association of in-house competition lawyers with more than 500 members across the globe. The Association does not represent companies but is made up of individuals who are in-house experts in competition law. This paper represents the position of ICLA and does not necessarily represent the views of each of its individual members or of their employers.

As specialist counsel in antitrust and competition law for companies with global operations, ICLA members have direct experience in merger control proceedings in jurisdictions across the world. Just as the FTC notes in its Notice of Proposed

---

[1] The FTC and the Division are referred to collectively in this Comment as "the Agencies".

Rulemaking[2] (the "NPRM") that the reforms the Commission proposes are informed by its perception of the relative informational requirements imposed by the current HSR form and instructions and merger notification forms required in other jurisdictions,[3] ICLA's Comment is informed by the experiences of its members with merger control regimes and processes around the world, including the European Union, the United Kingdom, Canada, Japan, Korea, China, Brazil, and India.

For ICLA members, the impact of the changes proposed in the NPRM will be substantial. ICLA members are directly involved in the collection and review of data and documents submitted to enforcement agencies today when the companies that employ them notify proposed mergers and other notifiable transactions. Perhaps more than any other group of individuals, ICLA's members will shoulder the significant new burdens regarding the collection and review of data and documents, the preparation of narrative responses, and the other additional requirements that the NPRM contemplates. We note in this regard that an HSR filing is only one of what may be a dozen or more competition notifications that ICLA members must prepare for a particular transaction, and that when our companies engage in transactions that require

---

[2] The NPRM is available at www.ftc.gov/system/files/ftc_gov/pdf/p239300_proposed_amendments_to_hsr_rules_form_instructions_2023.pdf (reviewed September 18, 2023). As the NPRM was not paginated, a paginated version (with page numbers and section headings inserted) is attached to this Comment for ease of reference.

[3] E.g., NPRM at 8:

> As compared to the Form, most international jurisdictions have merger filing forms that ask filers to provide significantly more information that their staff considers relevant to the competition analysis, including details about the transaction's structure and rationale, horizontal overlaps, vertical and other relationships, and more detailed sales data. Importantly, many other jurisdictions rely on narrative responses from the parties that contain basic information about business lines or company operations, and several require the parties to self-report overlaps.

HSR filings, we must also submit numerous notifications required under other regulatory regimes, including foreign direct investment.

## II.     General Comments

ICLA welcomes the efforts made in the NPRM to modernize the HSR notification process.  Both the long-overdue effort to introduce electronic filing of the HSR form and attachments and the changes to relieve some of the burden of allocating revenue information into often imprecise and overlapping North American Industrial Classification System ("NAICS") codes[4] are welcome developments.  We commend the Commission for taking a fresh look at the more archaic aspects of the current form and instructions, as well as the needlessly difficult process of submitting hard-copy notifications.

However, ICLA is concerned with other aspects of the reforms proposed in the NPRM.  Those unprecedented changes will create extraordinary compliance burdens for each of the thousands of transactions that result in HSR notifications, including the overwhelming majority that do not raise competition concerns that merit investigation by the US Agencies.  In this regard, we note that, according to the Agencies most recent report on HSR enforcement, in no year in the period from 2012 through 2021 did more than 3.7 percent of notified transactions result in the issuance of a Second Request. [5]

---

[4] NPRM at 71 (Section III.D.3).

[5] Antitrust Division and Federal Trade Commission, 2021 Hart-Scott-Rodino Annual Report at 5 (https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf ) (reviewed September 20, 2023) (hereinafter "*2021 HSR Report*") (reviewed September 20, 2023).

Only 7.9 percent of all reported transactions even resulted in one or the other Agency seeking clearance.[6]

If adopted, the changes to the HSR Form and Instructions set out in the NPRM will require the diversion of significant company resources.  We encourage the drafters of the NPRM to consider carefully whether the hundreds or thousands of hours of additional time company management and counsel will need to spend to assemble and review the categories of documents that the NPRM would require notifying parties to submit is justified in the context of the great majority of HSR notifications that do not raise competition concerns.  We note as well that, based on our experience, the additional resources that will be required are far in excess of what the FTC projects in the NPRM.[7]  In a global economy that requires companies to do business through complex corporate structures, we fear that the additional burden resulting from the envisaged notification obligations will exceed the benefits to the merger review process of providing investigating staffs with additional information on which to base the initial decision as to whether a notified transaction merits further investigation.

In addition to the huge increase in management and counsel time, compliance with the additional requirements to collect and produce documents and information, and to prepare narrative responses, will necessarily cause notifying parties to increase their already significant spending on external counsel, who will be needed to assist with

---

[6] 2021 HSR Report at Exhibit A, Table II.  We appreciate that one response the Agencies might have is that if the Agencies had the benefit of more information from notifying parties, they might seek clearance to review more notified transactions.  But even if one were to assume that the historical percentage of transactions as to which either agency seeks clearance is *half* of what an optimal rate would be, that would still mean that approximately 84 percent of reported transactions would be cleared without either Agency engaging in any substantive investigation.

[7] NPRM at 103-104.

the increased demands of creating the merger notification form and the voluminous attachments contemplated by the NPRM. The proposed changes are also very likely to delay merger notifications significantly, possibly by several months. This will delay the time when consumers can begin to enjoy the benefits to pricing and innovation of the great majority of notified transactions that the Agencies decline to investigate after reviewing the parties' filings.

We would also encourage the Agencies to consider the time and expense that they will incur in reviewing the additional materials notifying parties would be required to submit. We recognize the demands on the time of agency personnel, and note that our experience suggests that staffs may find it difficult to review the volume of materials they receive today within the initial waiting period. Requiring the production of additional materials that investigating staff are unable to review as they decide what transactions merit further investigation benefits neither notifying parties or the cause of more effective merger enforcement.

ICLA members appreciate that initial merger notification under the current HSR notification regime imposes fewer burdens on notifying parties than the initial notifications in, for example, the EU or UK. However, the NPRM's theme of emulating the requirements imposed on merging parties in jurisdictions outside the US reveals a selective focus on the volume of information required by the initial notification form while ignoring other equally significant differences between the notification regimes in the US, EU, UK, and other jurisdictions. We discuss several of these differences below.

(a)     *Volume of Notifications.*  The NPRM ignores key differences between the structure of merger review in the US and merger review in the EU and elsewhere. The US has generally used thresholds for when notifications are required that have resulted in more notifications than are submitted under other merger control regimes. For

example, in federal fiscal years (October 1-September 30) of the years 2017 to 2021, the number of transactions reported under HSR were:[8]

| Year | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| Transactions | 2,052 | 2,111 | 2.089 | 1,637 | 3,520 |

By contrast, in the same period (calendar years 2017-2021), the number of cases notified to DG-Competition ("DG-Comp") in a calendar year never exceeded 414.[9] The NPRM proposes to institute a more EU-like notification regime, with significantly increased burdens relative to what information merging parties need to provide. Indeed, in a number of respects the additional information that the NPRM would require go beyond similar requirements in the EU or UK.[10] But in the US, the increased burdens the NPRM would impose would apply to each submitter of each one the much larger number of merger notifications that the relatively modest HSR thresholds generate.

---

[8] *2021 HSR Report* at 2 (Figure 1).

[9] https://competition-policy.ec.europa.eu/mergers/statistics_en (reviewed September 18, 2023). The figures are as follows: 2017 – 380 cases; 2018 – 414 cases; 2019 – 382 cases; 2020 – 361 cases; 2021 – 405 cases.

In 2021 the gross domestic product of the EU was $16.64 trillion (https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=EU), versus $23.32 trillion for the US (https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=US). Thus, in 2021, the US economy was 40.1 percent larger than the EU economy, but the US Agencies received 769 percent more merger notifications than DG-Comp did (3520 vs. 405).

[10] To pick one example, there is nothing in the current EU or UK merger notification regimes that requires notifying parties to disclose information about their workplace safety records. *Cf.* NPRM at 69-70 (Section III.D.2.c.iii.).

(b)     *Simplified Procedures.*  We also note that the significant burden associated with a full merger notification in the EU is substantially mitigated by the existence of a simplified procedure that includes an abbreviated notification form.[11]  The availability of a simplified procedure calibrates the quality and quantity of information the agencies require to assess mergers with certain characteristics (which renders those transactions unlikely to be problematic).  In 2021, of the 405 notifications submitted to DG-Comp, 309 (76.3 percent) were submitted using the simplified procedure.  Similar "fast track" merger reviews exist in Brazil and China.[12]

The NPRM, by contrast, contemplates a one-size-fits-all approach that would expose the great majority of notifying parties to disproportionate and unnecessary burdens.  Each of the several thousand transactions notified in a typical year will require at least two merger notifications (from each of the parties to the transaction) that complies with the burdensome requirements contemplated by the NPRM.

(c)     *Pre-notification Consultations.*  Another significant difference between the merger notification regime under HSR and the EU or UK is that parties notifying transactions in the EU or UK typically engage in extensive pre-notification discussions with the merger staffs at DG-Comp or the Competition and Markets Authority ("CMA") before they submit their merger notifications.  In the experience of ICLA members, those discussions can extend for months before the final notification is submitted where

---

[11] Commission Notice on a simplified procedure for treatment of certain concentrations under Council Regulation (EC) No 139/2004, Regulation(2013/C 366/04) (https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52013XC1214(02)) (reviewed September 18, 2023).

[12] Brazil: CADE Resolution 33/22 (https://www.in.gov.br/web/dou/-/resolucao-cade-n-33-de-14-de-abril-de-2022-394063356); China: Yong Bai and Dayu Man, *Merger Control in China, A Practical Guide.* Thompson Reuters Practical Law (May 23, 2023) at 10-11 (https://www.cliffordchance.com/content/dam/cliffordchance/briefings/2023/06/merger_control_in_china_a_practical_guide%20_june2023.pdf) (reviewed September 18, 2023).

the agencies believe that the notified transaction may raise competition concerns. Pre-notification consultations often include the submission of serial drafts of notification forms containing the various narrative responses required, for example, in a Form CO that the FTC wishes to emulate.[13] The pre-notification process can also lead investigating staffs to require more detail in some areas of a merger notification and less detail in others, which helps conserve agency resources by allowing staffs to focus in on areas of greatest interest. The NPRM, by contrast, seems to contemplate that every notifying party will respond completely to every one of the burdensome information requests it contains.

Pre-notification consultation for particular cases is a feature that is absent today from the HSR merger review process. Indeed, in the context of the inter-agency clearance process the Antitrust Division and FTC use to decide among themselves which will take the lead in reviewing a newly notified transaction, notifying parties do not know which agency will be reviewing their transaction until *after* they have made their HSR filings and the 30-day review clock begins to run.[14] In any event, the introduction of such pre-notification phase would require the Agencies to greatly expand their staffs hire hundreds of additional based on the current volume of notifications they receive each year.

---

[13] NPRM at 8 ("Importantly, many other jurisdictions rely on narrative responses from the parties that contain basic information about business lines or company operations, and several require the parties to self-report overlaps.").

[14] *Cf.* Antitrust Division Manual (5th edition 2018; https://www.justice.gov/sites/default/files/atr/legacy/2015/05/13/atrdivman.pdf ) at III-10 and III-11 (requiring FTC clearance before the Antitrust Division can begin an investigation.

(d) *Market Definition Precedent.* In the European Union, for example, DG-Comp's practice of publishing detailed opinions at the end of merger cases has resulted in a body of agency guidance regarding market definitions in specific industries that helps ICLA members and the external counsel they instruct prepare narrative responses to questions in the EU's merger notification forms regarding market definition. Because the US Agencies rarely issue guidance on market definition issues raised by specific transactions they review, notifying parties will not have the benefit of the agencies' thoughts on industry market definition as they respond, for example, to the NPRM's requirement that notifying parties provide a narrative describing horizontal overlaps.[15]

(e) *Remedies for Non-compliance.* A final difference relates to the remedial structure for perceived violations of notification requirements under Hart Scott Rodino versus the remedial structure under merger notification regimes outside the US. The NPRM will move US merger notification from a system where merging parties provide a smaller amount of objectively verifiable information to a system where merging parties provide a far larger amount of information that is more subjective, in particular the various narrative responses regarding the business of the acquiring party,[16] business

---

[15] NPRM at 62-65 (Section III.D.2.a).

[16] NPRM at 45-46 (Section III.C.4.a)

of the acquired entity,[17] description of the transaction,[18] rationale for the transaction,[19] horizontal overlaps,[20] and supplier relationships.[21]

Each one of the narratives the NPRM contemplates may generate disagreements between agency personnel and the merging parties regarding the accuracy or completeness of the information provided. At present, a powerful remedial tool the agencies have is to retroactively declare a notification to be incomplete and to reject it, effectively restarting the clock on the merger review. For deals with financing contingencies that need to be satisfied in a limited time period, the delay caused by rejecting a filing can cause a transaction to fail or require re-negotiation that may impact the parties' shareholders and employees.[22] In other jurisdictions where notification regimes today involve the merging parties responding to questions that call for narratives, the agencies sometimes "stop the clock" on their time-bound reviews in the first phase of the merger review process until merging parties provide required information.[23] Such a "day for day" delay provides a much more proportional remedy

---

[17] NPRM at 46 (Section III.C.4.b)

[18] NPRM at 46-47 (Section III.C.4.d)

[19] NPRM at 47-48 (Section III.C.4.e)

[20] NPRM at 62-65 (Section III.D.2.a)

[21] NPRM at 65-66 (Section III.D.2.b)

[22] For a recent example of a renegotiation unfavorable to a seller driven by delays in deal approval, see Paul Sawers, "Amazon Lowers iRobot Purchase Price by 15% Amid Regulatory Delays, TechCrunch (July 25, 2023) (https://techcrunch.com/2023/07/25/amazon-lowers-its-irobot-purchase-price-by-15-amid-regulatory-scrutiny) (reviewed September 18, 2023).

[23] European Union Merger Regulation (January 29, 2004), Article 10(4) (https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32004R0139); UK CMA, A Quick Guide to UK Merger Assessment (March 18, 2021) at § 2.6 (noting CMA's authority to "stop the clock" on merger reviews where information the agency has requested remains outstanding.

for perceived non-compliance. Unfortunately, it is not a remedy the US agencies are free to use in a system where the time frames for merger review are prescribed by statute.[24]

The requirements in the notification form are an important aspect of a merger control regime, but what the form requires from merging parties cannot be isolated from other aspects of the regime. The NPRM seeks to graft a significant expansion of the information that the HSR notification form seeks onto the existing US review process, characterized by low thresholds (and numerous notifications), infrequent pre-notification consultations, and a remedial structure that is limited to the remedy of rejecting notifications, which is disproportionate to the kinds of disagreements between staff and notifying parties that may arise from the proposal to increase reliance on narrative answers. We respectfully suggest that the FTC take a more measured approach to improve the current HSR notification form in a way that is consistent with other aspects of US merger control.

### III.   Specific Comments

In the remainder of the comment, we address specific aspects of the NPRM and discuss potential concerns they raise. Where appropriate, we suggest alternatives.

*(a)   Translation Requirements (Section II.D).* The NPRM will significantly expand the scope of internal documents that notifying parties provide. Two provisions of the NPRM, in particular, will drive this expansion. The first is the requirement to

---

[24] 15 USC §18a(b)(1)(B) (initial 30-day waiting period); 15 USC §18a(e)(2) (waiting period in the event a request for additional information issues).

"semi-annual and quarterly plans and reports that discuss market shares, competition, competitors, or markets of any product or service that is provided by both the acquiring person and the acquired entity"[46] is helpful, it will require notifying parties to self-assess what products and services overlap, an issue as to which the views of the notifying parties and the views of agency staff sometimes diverge.

(m)     *Organization Charts (Section III.D.1.c):*  As with other proposed requirements set out in the NPRM, the proposal to require notifying parties to submit organization charts would impose on all notifying parties a requirement that today typically is first communicated in an access letter issued by Agency staff in the small percentage of notified transactions that prompts an investigation,[47] or in preparation for the negotiation of a custodial search group for the production of documents in response to a second request.  It is unclear why organization charts will assist investigating staffs to reach an initial view as to whether a particular notified transaction merits further review, as distinct from identifying potential custodians and understanding reporting relationships between them.

(n)     *Horizontal Overlap Narrative and Supply Relationships Narrative (Sections III.D.2.a and III.D.2.b):*  As noted previously (see page 10), the addition of these two required narratives and several others contemplated in the NPRM will change the nature of the HSR notification from a document that seeks objective data to one that requires notifying parties to describe subjectively aspects of their businesses and the transaction.  Particularly given the absence of (indeed, impossibility of) extensive pre-notification consultations between the merging parties and agency staff of the kind that

---

[46] *NPRM* at 59.

[47] See *FTC Access Letter Description*, *supra* n. 39.

| | | |
|---|---|---|
| ICLA Comment re Hart Scott Rodino NPRM | September 27, 2023 | Page 22 |

is common in the European Union and the UK, we fear that disagreements may emerge between notifying parties and staff as to whether particular narratives are accurate and complete. This will be especially true in what may be the several years between when the changes contemplated in the NPRM are first implemented and when a sufficient body of informal agency guidance and experience of notifying parties and their advisors leads to expertise in the private bar regarding how to prepare the various narratives to the satisfaction of the Agencies. It will be difficult for companies like those that employ ICLA members, which may notify reportable transactions once every few years, to build internal expertise in preparing the required narrative.

We also note that much of the information that the NPRM proposes must be included in the Horizontal Overlap Narrative, for example "sales [and] customer information (including contacts)"[48] is information that today is typically sought in an access letter that staff may issue during the initial review period.[49] Requiring customer contact information, which is not always readily available within companies, for every merger notification, including the great majority that do not result in any substantive investigation, will impose a significant new burden on notifying parties.

We agree with the statement in the NPRM that "[c]ontacting customers to confirm basic market dynamics is a key step in the antitrust analysis conducted by Agency staff during the initial waiting period."[50] Our experience with transactions that the Agencies choose to investigate confirms that notifying parties "are frequently asked to provide this information on a voluntary basis once one Agency has granted

---

[48] NPRM at 63.

[49] See *FTC Access Letter Description*, *supra* n. 39.

[50] NPRM at 63.

clearance to the other to conduct an initial investigation of the transaction."[51]  But the fact that the Agencies often seek information at the start of their investigations is not a reason to mandate that every notifying party undertake the significant time and expense associated with collecting that information and including it in a narrative response.  This is particularly true given the wide net that the HSR notification regime casts (see page 6, above) and the numerous transactions that require notifications but do not lead to any substantive investigation.

(o)     *Labor Markets Information (Section II.D.2.c)*:  As with other new requirements to provide information contemplated in the NPRM, the requirement to provide extensive information about employment will impose significant new burdens that may not be justified by any improvement in the effectiveness of merger enforcement.  We note, first, that the requirement to classify workers by SOC[52] is imposed regardless of whether the merging parties in fact employ workers in the same geographic areas in the United States.  For example, SOC and ERS information would be required in a merger between electric utilities that employ line repair personnel in different regions of the country, or geographically distant hospital chains that employ nurses in different metropolitan areas.  Perhaps a better approach would be to ask notifying parties to identify locations where they have significant numbers of employees and only require additional information where there are geographic overlaps.

---

[51] NPRM at 64.

[52] NPRM at 68.