# Exhibit 12



September 27, 2023

Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue NW
Suite CC-5610 (Annex H)
Washington, DC 20580

Re:   National Retail Federation Comments to Notice of Proposed Rulemaking Regarding HSR Act Reporting:  16 CFR parts 801–803—Hart-Scott-Rodino Coverage, Exemption, and Transmittal Rules, Project No. P239300

Dear Sir or Madam:

The National Retail Federation (the "NRF") offers the following comments on the Federal Trade Commission's Notice of Proposed Rulemaking regarding Premerger Notification; Reporting and Waiting Period Requirements published on June 27, 2023 (the "NPRM").

I.   **Introduction**

The NRF has represented retail businesses for over a century.  Retail is the nation's largest private-sector employer, contributing $3.9 trillion to annual GDP and supporting one in four U.S. jobs, accounting for 52 million working Americans.  Throughout its history, NRF has been a voice for every retailer and every retail job, educating, inspiring and communicating the powerful impact retail has on local communities and global economies.

The retail industry is intensely competitive.  Included among the members of the NRF are large international companies, small, locally owned businesses, and everything in between.  They rise or fall based on their ability to make products available to US consumers at low prices.  Many are investing significantly in improving their products and their ability to deliver those products as quickly and inexpensively as possible.  Across the board, the goal is to meet the needs and desires of customers in order to grow their businesses.

Because of the competitiveness of the retail space, the NRF's members face consistent pressure to drive down costs, improve efficiency, and deliver better and more innovative products to their customers.  In this environment, small changes to a business's cost structure or its ability to execute on its strategic objectives can result in substantial negative consequences:  lost business, damaged reputation, loss of investor confidence, and inhibition of future opportunities, to name a few.  This environment depends on appropriate enforcement of antitrust law to maintain the right balance.  Too little enforcement could allow some companies to gain an unfair advantage to the detriment of others.  Too much enforcement risks driving up compliance costs and hindering legitimate efforts to compete.

For many NRF members, one of the primary places where they deal with antitrust law directly is in the context of merger and acquisition activity that requires notification under the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act").[1]  For these companies, transactions are often an ongoing, critical

---

[1] 15 U.S.C. § 18a.

component of remaining competitive.  Many of these deals are procompetitive or competitively neutral.  For example, they might be a means of expanding into a new geography or being able to offer customers a complementary product or service.  On the other hand, a transaction might be a means of divesting a business outside of a company's core strategic focus to another party that will be able to breathe in new life and enhance the business's competitiveness.  While it is always important to ensure that antitrust laws prevent significant anticompetitive transactions, most transactions in the retail sector (and elsewhere) are not anticompetitive, and over-enforcement or unduly burdensome reporting requirements would significantly delay or prevent activity that would benefit NRF members and their customers.  Ensuring a proper balance between regulatory oversight and the time and expense of regulatory compliance is critical to the ongoing health of this critical component of US commerce.

With these principles in mind, the NRF is concerned that the NPRM would result in a burdensome reframing of antitrust premerger notification in the United States.  To wit, the NPRM seeks to impose substantial additional costs on merging parties, in terms of both time and money.  Because the existing HSR Act notification process has been effective at preserving competition, and because the burdens under the NPRM would disproportionately disadvantage many of NRF's members, the NRF urges the FTC to reconsider its course and avoid substantial deviation from the current premerger notification program that more proportionately allows for antitrust enforcement.

II.     **Existing HSR reporting requirements appropriately balance the need for antitrust review and the benefits of economic activity**

HSR is a notice statute.  It strikes a balance between providing the government with information to enforce the antitrust laws properly and avoiding undue burdens on legitimate merger and acquisition activity.  The Act was not intended to require careful government scrutiny of *each and* every transaction.  As Congress recognized in 1976, and as the FTC has consistently understood since then, such an approach would unnecessarily weigh down the economy while simultaneously requiring enormous commitments of time and resources by agency staff.

This Congressionally designed balancing is evident in the structure of the HSR Act itself.  While the antitrust laws apply to all transactions, irrespective of size, the HSR Act only requires mandatory notification of transactions meeting certain thresholds.  It also provides a mechanism that allows the government to grant "early termination" of the mandatory waiting period where competitive effects are clearly unlikely.  The reason is clear – there is an intent to balance the burden placed on deal activity against the likelihood that a given transaction may result in anticompetitive consequences.  And worth noting is the fact that, in striking that balance, the US system is already far more conservative than many of its international counterparts.  The US receives mandatory notices of many times more transactions that those reviewed in other major jurisdictions – a point addressed in more detail below.

Furthermore, the HSR Act's intention to appropriately balance interests between business and enforcement is evident from the enumeration of various exemptions from notification requirements.  These exemptions recognize that some transactions are less likely to impact competition than others, and therefore codify a balancing that excludes notification requirements where anticompetitive effects are unlikely, such as where an acquisition is taking place in the ordinary course of business or acquisitions made solely for the purpose of investment.[2]  Moreover, Congress invited the FTC to promulgate additional regulations exempting transaction that are "not likely to violate the antitrust laws."[3]  This invitation, focused on "likelihood," demonstrates a key principle that HSR Act implementation should be carefully calibrated to be no broader than necessary to permit effective enforcement.

The proposed regulations entirely upend this balance.  Specifically, the proposed rules are contrary to the language and purpose behind the HSR Act and boast of no legitimate justification.  As described below, the proposed rules in the NPRM would result in hundreds of hours of additional work for every

---

[2] *See* 15 U.S.C. § 18a(c).
[3] 15 U.S.C. § 18a(d)(2)(B).

transaction, even by the FTC's own calculations. The scope of the potential impact is immense. In 2021, the most recent year that the FTC and DOJ have published figures, the DOJ and FTC reviewed 3,520 transactions (receiving 7,002 filings).[4] The NPRM estimates that the burden of the additional requirements will be an average of 107 hours per filing, meaning that the additional economic cost on the private sector, had these regulations been in effect in 2021, would have been roughly 750,000 hours. This calculation does not take into account the heightened burden on DOJ and FTC staff who must review the additional information. It also does not account for any chilling effect that these additional burdens may have on merger and acquisition activity more generally.

The significant increase in burden proposed by the NPRM is not based on any demonstrable failing of the existing system to appropriately identify anticompetitive transactions. Rather, the reporting requirements currently in place already act as a very broad screening mechanism. This is evident in the fact that of the transactions notified in Fiscal Year 2021, the FTC and DOJ opened preliminary investigations in only 7.9%, and only 1.9% resulted in a second request.[5] In other words, 98% of the transactions reviewed by the FTC and DOJ in the most recent fiscal year did not trigger a need for deep scrutiny.

The NPRM suggests that anticompetitive mergers are going undetected, and that requiring additional disclosures will allow staff to identify and act against these deals. If this were the case, one would expect to see the FTC and DOJ bringing a significant number of merger challenges following the closing of these transactions, when they begin to produce anticompetitive consequences. However, such "post-consummation" challenges remain extremely uncommon. One study looking at merger enforcement from 2001 to 2020 identified only 46 post-consummation challenges over this period – averaging 2-3 per year.[6] Many of these deals were not subject to HSR reporting, including because they fell below the statutory size thresholds. This strongly suggests that, at least for reported transactions, there is no obvious shortcoming in the information provided by filing parties that is resulting in approval of problematic transactions.

The NRF recognizes the value of the HSR Act and the importance of preventing anticompetitive mergers. Historically, the HSR Act has struck the right balance between providing for review and avoiding unnecessary impediments to economic activity. Any amendments to the implementing regulations that would substantially alter the balance are unnecessary and will have a significant negative impact on NRF's members.

III. **The NPRM is arbitrary and capricious because it imposes burdens that vastly outweigh any potential benefit to the antitrust review process**

While the NPRM as a whole sets forth an unnecessary rewriting of the HSR Act notification process, several of the changes are particularly problematic in terms of their scope and burden. One of the primary problems with the NPRM is that it applies broad obligations on filing parties without regard to whether those obligations are likely to serve any benefit to the FTC and DOJ in identifying problematic transactions. Indeed, there is no attempt in the NPRM to limit increased obligations to particular types of transactions or lessen burdens where anticompetitive effects would be facially implausible. In addition, there does not appear to be any attempt in the NPRM to limit additional requests based on the balancing of burden and potential benefit. These factors leave the NPRM open to challenge as arbitrary and capricious.

    (A) **Lack of a "Short Form" or Abbreviated Filing Would Impose Unreasonable Costs on Most Transactions**

---

[4] Federal Trade Commission and Department of Justice, Hart-Scott-Rodino Annual Report for Fiscal Year 2021, Appendix A.
[5] *Id.*
[6] Logan Billman and Steven C. Salop, Merger Enforcement Statistics: 2001-2020, available at https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=3493&context=facpub.