# Exhibit 13

# NATIONAL VENTURE CAPITAL ASSOCIATION'S COMMENTS TO THE FEDERAL TRADE COMMISSION'S NOTICE OF PROPOSED RULEMAKING

*Premerger Notification; Reporting and Waiting Period Requirements*

Submitted to the Federal Trade Commission

September 27, 2023

Cooley LLP
1299 Pennsylvania Ave., Ste. 700
Washington, D.C. 20004

*On behalf of National Venture Capital Association*

I.     Introduction

The National Venture Capital Association ("NVCA") appreciates the opportunity to present our views to the Federal Trade Commission ("FTC") in response to the FTC's Notice of Proposed Rulemaking ("Notice of Proposed Rulemaking" or "Notice"), published June 29, 2023.[1]

NVCA is the nonprofit trade association that supports the U.S. venture capital ("VC") community in fermenting the formation and growth of emerging, innovative companies and continuing to advance the U.S.'s stature as the best place in the world for entrepreneurs to launch a high-growth company.  NVCA convenes VC investors, entrepreneurs, and industry partners to shape public policy priorities, to develop new industry initiatives, and to provide premier research. These comments reflect significant input from our members.

NVCA serves hundreds of VC members as they take on significant risk investing in emerging companies, many of which do not succeed, and supporting the nation's entrepreneurial talent in turning ideas and basic research into products and services that have transformed the world. NVCA members invest across various capital stages (i.e., from seed to growth equity) and in critical areas of our economy, such as life sciences and cutting-edge high-tech industries like information technology, blockchain, and cybersecurity. Two relatively recent examples of companies that have been backed by venture capital are Moderna, which developed an FDA approved COVID-19 vaccine, and Zoom, which enabled video communication during the pandemic.

Venture capitalists ("VCs") build companies that would not otherwise have access to capital through traditional financing (e.g., bank loan). In its simplest form the company begins as just an entrepreneur with an idea expressed as a business plan. In other situations, VCs provide capital to growth stage companies. In both situations, the investment is high risk. In 2022 alone, 16,464 U.S.-based VC-backed companies received $240.9 billion in funding. These investments are essentially illiquid, do not bear any financial return unless the companies can successfully exit through an IPO or an M&A event, and many never provide any return if the company fails.

Importantly, venture investing creates millions of jobs – fueling employment opportunities for Americans across the U.S. economy.  VCs make high-risk, long-term equity investments into innovative young companies to help them expand workforces, conduct critical research and build out new facilities, among other long-term value growth activities. More information about NVCA and its members can be found on NVCA's website here.

NVCA and its members have a significant interest in the subject matter of the Notice. While NVCA very much appreciates the FTC's efforts to update and improve the HSR Rules and Regulations (the "Rules"), NVCA has a strong conviction that certain aspects of the proposed amendments, if implemented, would have a material, negative impact on the venture capital ecosystem, including reducing the competitiveness of U.S. entrepreneurs, and hindering the ability of U.S. startup companies to attract venture capital. Negative impact on the venture

---

[1] Fed. Trade Comm'n, Notice of Proposed Rulemaking, 88 Fed. Reg. 42,178 (June 29, 2023), https://www.federalregister.gov/documents/2023/06/29/2023-13511/premerger-notification-reporting-and-waiting-period-requirements.

ecosystem would certainly have a material, negative impact on the U.S. economy, including the labor market.

We respectfully urge the FTC to be mindful of the important role of VC in the U.S. before implementing changes to the Rules that would have such damaging consequences, especially when it is unclear that changes to the Rules, at least as applied to VCs, would yield any benefit to the agencies' initial review of reportable transactions. NVCA is particularly concerned that the proposed amendments would result in minimal, if any, improvement to the FTC's ability to carry out its mission under the HSR Act, particularly as applied to VCs.

NVCA and its legal counsel, Cooley LLP, stand ready to assist the FTC in the FTC's further assessment of these issues and potential means of mitigating negative consequences that we discuss below.

II.   **FTC's Proposed Changes to the Premerger Notification Requirements Will Vastly Increase Time, Cost and Burden to Invest in Start-Up Companies, Making It Harder for Such Companies to Obtain the Funding They Need, Without Any Meaningful Benefits to the Agencies' Initial Competitive Analysis of VC Financings**

The FTC's Notice proposes to substantially increase the amount of information parties notifying a transaction under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act") would need to gather and provide to the FTC and the Department of Justice ("DOJ"). As currently drafted, the FTC's proposal effectively requires transacting parties to produce documents and information that today are only required if the agencies issue a Second Request for Additional Information ("Second Request"), in matters that "require a more in-depth investigation."[2] According to information published by the FTC, Second Requests are issued in only about 2% to 3% of all transactions notified, indicating that a relatively low percentage of notified transactions actually require a more in-depth investigation.[3]

Indeed, historically, the FTC and DOJ have granted "early termination" in approximately 80% of those transactions requesting it and approximately 60% of all notified transactions,[4] indicating that the vast majority of notified transactions do not raise competitive concerns – although NVCA understands that the early termination program is currently suspended. To NVCA's knowledge, HSR filings submitted by VCs were often granted early termination, as those VC filings plainly did not present antitrust concerns.

The FTC's proposed additional information includes, but is not limited to, numerous categories of information such as:

- Details about investment vehicles, corporate relationships and the structure of entities involved;

---

[2] Notice at 42,178.
[3] U.S. Fed. Trade Comm'n and U.S. Dep't of Justice, Hart-Scott-Rodino Annual Report Fiscal Year 2021 at 5, https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf.
[4] *Id.* at Appendix A.

2

- A more extensive disclosure of minority holdings, including limited partners in partnerships and minority holders of any entities within the control chain of the acquiring entity;

- A more extensive production of transaction-related documents (including drafts) and ordinary course business documents (e.g., describing market conditions) collected from a broad range of individuals at each notifying party;

- Details regarding previous acquisitions (including transactions that were not required to be notified to the agencies under the HSR Act);

- Identification of all officers, directors and board observers of the acquiring person and acquired entity to assist the agencies in identifying interlocking directorates;

- Information to assess the potential impact of the transaction on labor markets, including questions about the merging parties' employees and the services employees perform; and

- Identification of penalties or findings issued against the filer by the Department of Labor, National Labor Relations Board or the Occupational Safety and Health Administration ("OSHA") during the previous five years.

We explain below why this proposal would result in tangible harms to capital markets for venture-backed companies in the U.S. by increasing the time and cost for VCs to invest in such companies, without any offsetting benefit to the FTC and DOJ. NVCA further notes that there are alternative approaches that address these issues without many of the significant downsides identified below.

### A.   The Role of VC Funding in the Start-Up Ecosystem

Start-up companies and other small businesses are an economic backbone of this country—their role in job growth and innovation is well documented. In particular, smaller companies are well-positioned to pursue disruptive innovations and be open to the risks associated with experimentation. Startups are also critical not only to economic growth, but also job creation – the Federal Reserve Bank of Richmond for example, cites a paper finding that more than 15 percent of aggregate job creation is attributable to startups alone.[5]

VCs' focus on providing critical capital across various capital stages to innovative companies through minority investments. VCs also leverage their expertise to provide valuable strategic direction, such as with respect to hiring, human resources, marketing, enterprise sales, and raising additional funds to maximize chances of success for the companies in which they invest. While VCs frequently do continue to acquire shares in the companies they fund through multiple financing rounds, this is typically to demonstrate support for the company and provide much-needed capital, and virtually never is to build up equity with the ultimate goal of acquiring the company. VCs typically exit the investment once the business has advanced beyond its early growth phase, such as upon an acquisition, post-IPO, or—in many cases—at bankruptcy. NVCA

---

[5] Chen Yeh, Economic Brief No. 23-06 Why Are Startups Important for the Economy?, Federal Reserve Bank of Richmond (Feb. 2023), https://www.richmondfed.org/publications/research/economic_brief/2023/eb_23-06.

estimates that most VCs exit their investments holding an approximate 15% - 25% stake in a company, and rarely hold a stake of 50% or more. Furthermore, start-ups are inherently a risky business – according to NVCA's estimates, more than 90% of startups ultimately fail.[6] Few public or private entities outside of VCs, with their large and diversified revenue streams, have the capability and willingness to assume the risk of betting on numerous early-stage growth companies in the face of such large failure rates.

VC funding therefore plays a critical role in providing the financing needed for start-ups to continue pursuing innovative ideas, and has proven to be incredibly successful. Research suggests that venture capital-backed companies account for 41% of total US market capitalization and 62% of US public companies' R&D spending.[7]

The recent capital markets environment has been particularly challenging for startups, with high inflation, rising interest rates, and an unstable labor market all being contributing factors.[8] As a result, NVCA has observed deal activity drop by a significant margin in 2022 compared to 2021.[9] Speedy and certain access to VC funding has therefore become more important to startups now more than ever.

> **B.   The Current Information Required in the Premerger Notification Form Is Sufficient to Assess Whether Venture Financings Potentially Violate the Antitrust Laws**

Minority investments by VCs are inherently procompetitive because they enable new companies to develop innovative products that benefit consumers and disrupt the competitive landscape. Notably, the legislative history of the Clayton Act "reflects an underlying policy of broad support for investment through stock purchases, when such purchases are not part of an effort to control or influence management of the firm," as well as efforts to "minimize the impact of merger review on capital markets."[10]

Despite the focus of the antitrust laws on acquisitions aimed at controlling or influencing the managing of the acquired firm and not mere venture financings, many such financings still trigger a technical obligation to file a report under the HSR Act because they meet the relevant "size of transaction" and "size of persons" thresholds. While financing rounds supporting the growth of innovative startups were never the intended focus, the burden imposed by the current premerger notification form is relatively manageable. The FTC's proposed additional information burden would significantly delay or in some cases prohibit the completion of these

---

[6] Jeff Farrah, Restrictions on acquisitions would stifle the US startup ecosystem, not rein in big tech, nvca.org (May 19, 2021), https://nvca.org/restrictions-on-acquisitions-would-stifle-the-us-startup-ecosystem-not-rein-in-big-tech/.
[7] Will Gornall, Iyla A. Strebulaev, The Economic Impact of Venture Capital: Evidence from Public Companies (June 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2681841.
[8] NVCA, NVCA 2023 Yearbook: U.S. ViC. Fundraising Reaches new Heights Amid Industry Challenges (Mar. 22, 2023), https://nvca.org/press_releases/nvca-2023-yearbook-u-s-vc-fundraising-reaches-new-heights-amid-industry-challenges/.
[9] *Id.*
[10] Hearing on Common Ownership by institutional investors and its impact on competition – Note by the United States, Directorate for Financial and Enterprise Affairs Competition Committee (Dec. 6, 2017), https://one.oecd.org/document/DAF/COMP/WD(2017)86/en/pdf.

financing rounds, counterproductively throwing sand in the gears of our nation's innovation engine.

### C. The Proposed Changes Would Vastly Increase the "HSR Tax" on VCs, Resulting in Reduced Investment in U.S. Emerging, Venture-Backed Companies, Fewer Jobs and Less Innovation

Under Section (d) of the HSR Act, the FTC is limited to requiring the production of information that is "relevant to a proposed acquisition as is necessary and appropriate . . . to determine whether such acquisition may, if consummated, violate the antitrust laws."[11] As former FTC Commissioner Noah J. Phillips correctly observed elsewhere, obligations under the HSR Act are "not supposed to be a tax" or a "monitoring system for equity investments generally." Rather, it should only "effectuate its purpose: helping the Agencies spot transactions likely to violate the antitrust laws, so that [the FTC and DOJ] can stop or remedy them prophylactically."[12]

The proposed Notice implies that the various changes would not impose a "substantial burden" on filing parties. But the new rules would, in fact, substantially increase the burden and make it more challenging for our nation's most innovative young companies to raise capital in a timely manner, especially in light of the fact that such financings almost never raise even a remote possibility of competitive concern. This would be contrary to one of the stated goals of the FTC by the FTC Chair, which is to "promot[e] fair competition. An essential part of that is ensuring that small businesses and entrepreneurs have a fair shot in the marketplace."[13]

For one, the proposed amendments would delay access to critical capital from VCs to early-stage growth companies, and others at various stages of their life-cycle, that often desperately need it as quickly as possible. VC financings for early-stage growth companies typically move very quickly (so-called "venture speed"). In the context of early-stage growth companies, financings are often critical inflection points and can be life-or-death events for the company that make the difference between making payroll or not. In these situations, the investment can (and needs to) come together in a matter of days. Delays of even a day or two can cause significant issues, and delays of several weeks can result in a business failing.

NVCA estimates that 3-6 weeks is a normal window from execution of the term sheet to closing. This timeline often compresses over time—financings in later rounds and at higher valuations (i.e., the ones more likely to exceed the size of transaction threshold) can go from term sheet to closing in less than a week, and typically close in less than 3 weeks. But, by the FTC's own estimates, the proposed rulemaking would result in up to 200 additional hours to prepare the requisite filings at an added cost of $200-400k per transaction.[14] In other words, at a time when startups face a historically challenging liquidity environment, the new rules would add a month

---

[11] 15 U.S.C. § 18a(d)(1).
[12] Statement of Commissioner Noah Joshua Phillips, Hart-Scott-Rodino Act Premerger Notification Notice of Proposed Rulemaking & Advanced Notice of Proposed Rulemaking, Matter No. P110014 at 2 (Sept. 18, 2020), https://www.ftc.gov/system/files/documents/public_statements/1580699/p110014hsrrulesphillipsstatement_0.pdf.
[13] Remarks of Chair Lina M. Khan as Prepared for Delivery, Small Business Majority Event on Non-Compete Agreements at 1 (Apr. 13, 2023) (emphasis added), https://www.ftc.gov/news-events/news/speeches/remarks-chair-lina-m-khan-small-business-majority-event-non-compete-agreements.
[14] Notably, this number is disputed by independent analysts as a gross underestimate of the time and cost that will actually be incurred by filers.

of delay or more to acquisition closing timelines and significant additional expense to prepare and file the new forms, even for VC financings that do not remotely pose any substantive antitrust concerns.

Even in less dire circumstances, delays can result in anticompetitive effects. VC financings involve the company selling a piece of itself (equity in return for capital), and for obvious reasons company founders and early-stage investors seek to retain as much ownership as possible. Thus, companies typically do not raise money just in case they need it in the future—they raise it because they need it imminently and often for a specific purpose (e.g., an R&D project or covering payroll). Given this dynamic, increased burdens on the ability for early-stage growth companies to raise and access capital on a timely basis can challenge growth plans, such as new hiring, expanding into new product lines, research and development, launching clinical trials, etc. The increased disclosure burden will in particular cause the greatest pain for the smallest transactions, where the higher costs will represent a larger share of the deal value and may disincentivize the investment from the start.

      **D.**   **Given the Limited Competitive Concerns Arising from VC Financings, the Additional Information Required by the FTC's Proposal is Unnecessary and Would Substantially Increase Time, Cost and Burden on VCs and Venture-Backed Companies for Virtually No Offsetting Benefit to the Agencies**

Although the FTC cites various reasons for seeking substantial additional information from filing parties, it is not clear how certain information will assist the agencies in assessing the competitive effects of a transaction. Just one example is the request for filers to classify all their employees based on the Standard Occupational Classification system categories, provide information on the distribution of employees across commuting zones, and offer details regarding the filer's history of OSHA complaints, none of which clearly relate to how a proposed transaction may raise competitive concerns. These requests are burdensome because the information sought is not something companies keep in the ordinary course of business and will take substantial time to compile for the notification. Thus, the collection and provision of this information does not appear "necessary and appropriate . . . to determine whether such acquisition may, if consummated, violate the antitrust laws."[15] For those reasons, it is also unclear what the FTC and DOJ staff will actually do with that information if they receive it, as the information does not fit into the competitive effects framework set out in the agencies' current or proposed Merger Guidelines.

Likewise, the collection and provision of all drafts of documents responsive to Item 4 can provide little or no incremental value to the competitive analysis, and yet will require substantial time and costs by parties attempting to comply with this requirement. The agencies' apparent concern is that earlier drafts could potentially provide more probative comments that are omitted in the final version of a document. However, it is more likely that earlier drafts include inaccuracies removed in subsequent iterations, and it is unclear how the agencies–who based on comments from the FTC Chair are already overwhelmed in efforts to review the volume of filings currently received–will be able to process in the HSR waiting period the additional volume of documents required to comply with this new request. Thus, the time and cost imposed

---

[15] 15 U.S.C. § 18a(d)(1).

on filers to comply with this request, and the time and cost imposed on the agencies to review these documents, does not appear commensurate to any benefit the government may receive through the receipt of such documents.

The FTC Chair argues that "many of the updates in the proposal are consistent with data already collected by antitrust authorities around the world."[16] But those jurisdictions typically have different thresholds that, as a result, impose filing requirements on only a small number of transactions that are more likely to raise competitive concerns. The European Commission, for example, receives only about 10% of the number of filings made in the US every year. In the US, there were 3,250 HSR notifications submitted in FY2021, all of which would be subject to the increased costs and burdens associated with the proposed changes. Imposing higher informational requirements on all US notified transactions than other jurisdictions impose on fewer transactions (and those more likely to raise competitive concerns) is no less than an admission that the requirements will substantially increase cost and time burden on transactions less likely to raise competitive concerns.

### III.     The FTC's Concerns Can Be Addressed Through Other, Less Burdensome Alternatives for VC Investments

To the extent that the FTC has concerns about the competitive effects of a particular VC financing, it already has ample tools available to seek additional information. As recognized by the Notice, the FTC can always seek such information from the parties on a voluntary basis. The FTC alleges that "the Agencies do not always receive it in a timely fashion during the initial waiting period, hampering the ability of the Agencies to use that period to effectively screen for transactions that merit the issuance of Second Requests."[17] However, the Notice fails to recognize that the agencies can always (and have successfully done so in the past) encourage the prompt provision of voluntary information in order to avoid the issuance of a Second Request. Parties frequently decide to "pull and refile" to provide the agencies additional time to review any voluntary information they receive in order to avoid the issuance of a Second Request. And ultimately, the agencies retain the ability to issue Second Requests compelling the provision of additional information under Section (e) of the HSR Act.[18]

Also, as discussed in Section II.B above, VC financings do not typically pose even a remote possibility of competitive concerns. Therefore, to the extent the FTC believes this information is required to assess the competitive effects of other types of transactions, we respectfully suggest that the FTC consider limitations that would apply to exempt VC financings from the proposed amendments.

To the extent that the FTC still feels the need to compel additional information short of a Second Request, other jurisdictions also often allow submission of a "short form filing" for transactions that meet the statutory thresholds but do not raise substantive concerns. The short form filing is

---

[16] Comm'r Lina M. Khan, FTC Chair Lina Khan on Proposed Amendments to Premerger Notification Form and Hart-Scott-Rodino Rules, clsbluesky.law.columbia.edu (June 30, 2023), https://clsbluesky.law.columbia.edu/2023/06/30/ftc-chair-lina-khan-on-proposed-amendments-to-premerger-notification-form-and-hart-scott-rodino-rules/.
[17] Notice at 42,196.
[18] 15 U.S.C. 18a(e)(1)(A).

intended to determine quickly, usually within 25 days, whether the proposed transaction raises any serious competition concerns that merit a more in-depth investigation. The FTC can consider reviewing the information gathered by these short form filings to determine to what extent the FTC and DOJ do not collect such information and determine whether it would be reasonable for the agencies to collect similar information.

***

Ultimately, NVCA asserts it is important to understand that the U.S. venture capital industry is fuel for startups that challenge incumbents, create more jobs and benefit American consumers. New company formation is what has caused the U.S. economy to be the most dynamic in the world. It is critical that all policymakers, including the FTC and DOJ, enable investment in new technologies and companies so that the U.S. can retain its global leadership position.

In summary, the imposition of an increasingly costly and time-consuming notification process will have a chilling effect on VCs investments, and a chilling effect on the businesses in which they invest.  Notably, the rulemaking suggests that it will take up to 200 additional hours to prepare the filings with an added cost of $200,000 to $400,000 per transaction.  While large established businesses can potentially bear such an increased financial and administrative burden, this will have an outsized effect on smaller businesses with more limited resources.

If VC-backed companies must allocate substantial human resources to navigate the regulatory landscape, those personnel are diverted from focusing on the company's core operations and strategic planning. This burden, time and effort could otherwise be spent on activities that drive growth and innovation.

Similarly, the increased costs will strain VC-backed companies that typically operate at a loss. The costs associated with compliance, such as legal fees and administrative costs, will divert capital from productive investments such as research and development, hiring, and infrastructure upgrades that are critical for startups and small businesses. Such additional costs could even compel such companies to establish themselves offshore, in countries with more favorable regulatory environments.  This would, of course, result in an obvious loss to the United States of jobs and tax revenue, as well as the loss of potential investment and economic growth.

To NVCA's knowledge, we are unaware of any HSR filing submitted on behalf of a VC that has resulted in a Second Request investigation or enforcement action by the FTC or DOJ. Not one. To that end, we welcome the FTC's continued dialog to help us understand how VC investments raise antitrust concerns that warrant this increased burden.

NVCA appreciates the opportunity to provide these comments, and the FTC's time and attention to consideration of our views, and looks forward to further engagement on this and other topics.