Exhibit 14

SUBMISSION

OF

WACHTELL, LIPTON, ROSEN & KATZ

TO THE

FEDERAL TRADE COMMISSION

AS TO

REQUEST FOR COMMENT ON
16 CFR PARTS 801-803—HART-SCOTT-RODINO COVERAGE,
EXEMPTION, AND TRANSMITTAL RULES
[PROJECT NO. P239300]

September 26, 2023

### COMMENT TO
### THE FEDERAL TRADE COMMISSION
### ON PROPOSED AMENDMENTS TO
### THE HART-SCOTT-RODINO ACT

On behalf of Wachtell, Lipton, Rosen & Katz, we respectfully submit this Comment in response to the Federal Trade Commission's June 29, 2023 Notice of Proposed Rulemaking (the "2023 NPRM")[1] and related proposed changes to the Premerger Notification and Report Form (the "HSR Form").

The Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), is a discrete statute designed to give the antitrust agencies—*i.e.*, the Commission and the Antitrust Division of the U.S. Department of Justice—pre-closing notification of certain transactions in support of the agencies' mission to enforce Section 7 of the Clayton Act ("Section 7"). The HSR Act did not amend the substance of Section 7, nor did it change the antitrust agencies' burden of proof under Section 7.

The HSR Form is intended to alert the agencies of the proposed transaction and to provide the agencies with information that is "necessary and appropriate" to identifying those transactions which may violate Section 7, while balancing the cost and burden on pro-competitive transactions. For transactions that warrant additional scrutiny or where more information is needed, the HSR Act authorizes the agencies to request additional documentary material and information (a "Second Request").

The 2023 NPRM and proposed changes and additions to the HSR Form, if promulgated, would expand the antitrust agencies' powers beyond the statutory confines of the HSR Act as delimited by Congress. Certain proposed changes have no relation to the proposed transaction or its potential impact on competition. Others seek information in pursuit of theories of harm under Section 7 with limited, if any, legal support, and shift the evidentiary burden to filing parties to demonstrate and document a *lack* of any competitive concern. And none are sufficiently justified in view of the immense cost and delay these proposed changes would impose on filing parties. We submit that such changes are outside the Commission's statutory authority under the HSR Act.

We respectfully request that the Commission consider this Comment and tailor any changes or additions to the HSR Form consistent with its statutory mandate.

---

[1] Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42178 (June 29, 2023).

## I.    The Commission's rulemaking authority under the HSR Act is limited.

The Commission's rulemaking authority with respect to the HSR Form is limited by the terms of the HSR Act.  Such rulemaking must be "consistent with the purposes" of the HSR Act and the information requested on the HSR Form must be "relevant to a proposed acquisition" and must be "necessary and appropriate" to evaluating whether the notified transaction may violate Section 7.[2]

The purpose of the HSR Act is "to amend the federal anti-merger law, Section 7 of the Clayton Antitrust Act (15 U.S.C. §18) by establishing premerger notification and waiting requirements for corporations planning to consummate very large mergers and acquisitions."[3]  The Act is thus procedural and does not substantively expand the antitrust laws.[4]  The HSR Act also does not change the agencies' burden of proof under Section 7 to show, by a preponderance of the evidence, that a proposed transaction is likely to substantially lessen competition or tend to create a monopoly in violation of Section 7.[5]

Congress made clear that the purpose of the HSR Act was *not* to provide the agencies with an investigatory tool to suss out other non-transaction related antitrust violations:  It is "not the committee's intention that these new antitrust tools be *misused* by allowing the accumulation of 'dossiers' on businesses for general enforcement purposes."[6]  Instead, the HSR Act was concerned only with the potential for acquisitions to violate Section 7.[7]

---

[2] The Clayton Act, 15 U.S.C. §18a(d) (emphases added).

[3] H.R. REP. NO. 94-1373, at 5 (1976).  Section 7 makes illegal those acquisitions "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.

[4] *See* 2023 NPRM at 42178 (describing the HSR Form as a procedural tool); Mergers and Acquisitions; Proposed Rulemaking, 41 Fed. Reg. 55488, 55488 (Dec. 20, 1976) ("The amendment to the Clayton Act does not change the standards to be used in determining the legality of mergers and acquisitions."); H.R. REP. NO. 94-1373, at 6 (1976) (The HSR Act "in no way alters the substantive legal standard of Section 7 [of the Clayton Act]:  That statute's longstanding prohibitions against acquisitions that may substantially lessen competition or tend to create a monopoly, remain unaffected by this measure. . . ."); 122 CONG. REC. 17,261 (1976) (statement of Sen. Bellmon) (The HSR Act "is intended to aid antitrust enforcement against illegal mergers.  It would not change rules of legality, but it would change procedures."); 122 CONG. REC. 25,050 (1976) (statement of Rep. McClory) ("The bill simply establishes a procedure through which the Government is notified in advance of mergers between companies of certain sizes . . . . This bill does not change the substance of the merger law at all"); 122 CONG. REC. 16,938 (1976) (statement of Sen. Kennedy) ("Title V amends the Clayton Act to provide for a . . . notification to the antitrust authorities prior to consummation of very large mergers and acquisitions. . . . The title does not change the substantive standards by which the legality of mergers is judged.").

[5] *See supra* note 4.  *See, e.g., United States* v. *Sungard Data Sys.*, 172 F. Supp. 2d 172, 180 (D.D.C. 2001) (describing agency's burden of proof under Section 7); *United States* v. *H.R. Block*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011) (same).

[6] 122 CONG. REC. 25055 (1976) (emphasis added).

[7] *See supra* note 3; *see also* H.R. REP. NO. 94-1373, at 11 (1976) (statement of Rep. Rodino) (The purpose of the HSR Act is to provide the antitrust agencies with "advance notice, together with specific economic data on the merger."); *id.* (stating intent of the HSR Act was to give the agencies an opportunity to conduct an "expeditious and effective premerger proceeding[]," thus avoiding the "burdensome divestiture trials" that had historically accompanied Section 7 enforcement actions).

Congress also recognized that the HSR Act would impose costs and burdens on filing parties and significantly limited the scope of the HSR Act in view of these concerns.[8]  The HSR Act was limited to transactions of a certain size, reaching only the largest mergers "*most likely* to 'substantially lessen competition'"[9] and excluded others that "pose no anticompetitive threats under Section 7."[10]  Congress recognized that "smaller, illegal mergers may still be consummated, despite passage of this bill,"[11] and balancing the competing policy considerations, chose not to reach these mergers so as not to chill the many procompetitive transactions that would otherwise be affected.

Congress also limited the information that the Commission could request on the HSR Form to only that which is "necessary and appropriate."[12]  The terms "necessary" and "appropriate" do not give the agencies free rein to define the scope of their statutory powers.[13]  Rather, the Commission must show that the "benefits" of a rule "reasonably outweigh its costs."[14]  This analysis is further informed by the rest of the HSR Act's statutory text.[15]  Importantly, the HSR Act provides that at the end of an initial waiting period, the agencies may "require the

---

[8] *See* H.R. REP. NO. 94-1373, at 10 (1976) (noting that the "costs and burdens" imposed by the reporting requirements should not "offset the decrease in burdensome divestiture trials."); 122 CONG. REC. 25,055 (1976) (expressing desire to limit the burden on "beneficial, procompetitive mergers."); 122 CONG. REC. 28,422 (1976) (statement of Sen. Hruska) ("Federal Trade Commission Chairman Engman . . . said: 'If we had to conduct full investigation of all mergers exceeding the $100 million assets or sales test that is contained in the bill, the fruits of our efforts might not be worth the cost.'").

[9] H.R. REP. NO. 94-1373, at 11 (1976) ("History, Background, and Need") (emphasis added).

[10] H.R. REP. NO. 94-1373, at 5 (1976) ("Summary of Reported Bill").  *See* 15 U.S.C. § 18a(c) (exempting, *inter alia*, (1) acquisitions of goods or realty made in the ordinary course of business; (2) acquisitions of bonds, mortgages, deeds of trust or other obligations which are not voting securities; and (3) acquisitions of less than 10 percent of the outstanding voting securities of an issuer solely for the purposes of investment).

[11] H.R. REP. NO. 94-1373, at 11  (1976) ("History, Background, and Need").  *See also id.* (statement by Rep. Rodino) ("[T]he terms of the bill are such that it will reach only about the largest 150 mergers a year.").  In 2000, and consistent with this original concern, Congress amended the HSR Act to increase the monetary threshold over which transactions are notifiable.  Congress anticipated that the increase would reduce the number of mergers subject to the HSR Act by "approximately 50 percent."  H.R. Rep. No. 106-1005, at 198 (2000).

[12] 15 U.S.C. § 18a(d).

[13] *See New York Stock Exch.* v. *SEC*, 962 F.3d 541, 555-56 (D.C.C. 2020) (noting that the SEC's authority to implement regulations necessary or appropriate in furtherance of the Exchange Act "does not empower the agency to pursue rulemaking that is not otherwise authorized" and that the SEC had no "authority to promulgate a 'one-off' regulation like Rule 610T that imposes significant, costly and disparate regulatory requirements merely to secure information that may or may not indicate to the SEC whether there is a problem worthy of regulation.  If agencies were allowed to regulate in this way, absent delegated authority from Congress, the ramifications would be extraordinary.").

[14] *Mexican Gulf Fishing Co.* v. *U.S. Dep't of Commerce*, 60 F.4th 956, 965 (5th Cir. 2023) (citing *Nat'l Grain & Feed Assn.* v. *OSHA*, 866 F.2d 717, 733 (5th Cir. 1988) (demanding cost-benefit analysis for rulemaking limited by standard of "reasonably necessary or appropriate" and concluding that final rule issued by the National Marine Fisheries Service that required charter boat owners to install a GPS device at a cost of $3,000, with an additional $40 to $75 per month in service fees, outweighed the agency's justification noting that the agency "fails to connect the GPS-tracking requirement with any legitimate conservation purpose."); *see also Michigan* v. *EPA*, 576 U.S. 743, 759 (2015) ("The Agency must consider cost – including, most importantly, cost of compliance – before deciding whether regulation is appropriate and necessary.").

[15] 15 U.S.C. § 18a(d) ("consistent with the purposes of this section").  *Cf.  Alabama Ass'n of Realtors* v. *Dept. of Health & Hum. Servs.*, 141 S. Ct. 2485, 2488 (2021) (concluding that broad grant of authority must be read in context of other statutory language limiting administrative powers to regulate activity that directly, not indirectly, related to statutory mandate).

submission of additional information or documentary material relevant to the proposed acquisition,"[16] *i.e.*, a Second Request.  As the Commission has previously and correctly noted, the HSR Act does not contemplate the HSR Form eliciting "*all* potentially relevant information relating to an acquisition," because "[r]elevant information not specifically requested by any of the items on the form may be obtained . . . by means of a request for additional information."[17] This bifurcated structure is critical as the vast majority of transactions do not raise issues or concerns under Section 7:  over the last five fiscal years for which the Commission has provided data, the agencies have issued Second Requests in only *2.4 percent* of filings.[18]  By the same token, from fiscal years 2017 to 2020, the agencies issued early termination of the HSR waiting period *over 75 percent* of the time a request for early termination was made.[19]

Finally, the HSR Act and the accompanying rules and regulations contemplate that filing parties can file an HSR Form on as little as 10-days' notice,[20] which necessarily limits the type and breadth of information that the Commission can demand of parties on the HSR Form.  This time frame is consistent with Congress's expectation that "'in most cases, the Government will be requesting the very data that is already available to the merging parties, and has already been assembled and analyzed by them.'"[21]

As discussed in greater detail below, the 2023 NPRM is different in scale, scope and kind to any prior changes to the HSR Form and is inconsistent with the HSR Act's text and purpose.

---

[16] 15 U.S.C. § 18a(e)(1).

[17] Premerger Notification; Reporting and Waiting-Period Requirements, 43 Fed. Reg. 33450, 33520 (July 31, 1978) (emphasis added); *see also* H.R. REP. NO. 94-1373, at 11 (1976) ("History, Background, and Need") (HSR Form is intended to aid the agency in quickly identifying "problem areas."); Notification and Report Form for Certain Mergers and Acquisitions Under the Antitrust Improvements Act, 55 Fed. Reg. 31372 (Aug. 2, 1990) ("The Form is not intended to elicit all potentially relevant information relating to an acquisition.  Completion of the Form by all parties required to file ordinarily will permit both agencies to determine whether the waiting period should be allowed to expire or be terminated upon request, or whether a request for additional information should be made."); Notification and Report Form for Certain Mergers and Acquisitions Under the Antitrust Improvements Act, 60 Fed. Reg. 40704 (Aug 9, 1995) (same); Premerger Notification; Reporting and Waiting Period Requirements, 70 Fed. Reg. 77312 (Dec. 30, 2005) ("The Form is not designed to elicit all potentially relevant information relating to a transaction; rather, the information requested assists the Commission and the Assistant Attorney General in determining whether to open an investigation or, alternatively, whether to grant a request for early termination of the waiting period or to allow the waiting period to expire if no such request has been made.").

[18] *See* Lina Khan, Chair, FTC & Jonathan Kanter, Assistant Atty. Gen. , DOJ Antitrust Div., Hart-Scott-Rodino Annual Report Fiscal Year 2021, at Appendix A, https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf (the "2021 Annual Report") (270 Second Requests out of 11,043 filings for which a Second Request could be issued).

[19] 2021 Annual Report at Appendix A (4,358 early terminations granted out of 5,692 requests for early termination). In 2021, the agencies announced that the premerger notification office would no longer grant early termination.  *See* Press Release, FTC, *FTC, DOJ Temporarily Suspend Discretionary Practice of Early Termination* (Feb. 4, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-doj-temporarily-suspend-discretionary-practice-early-termination.  These fiscal year data have thus not been included.

[20] In the context of tender offers and other acquisitions of voting securities from third parties, the HSR Act provides that the initial waiting period under the HSR Act begins on the date the acquiring person submits its HSR Form.  15 U.S.C. § 18a(b)(A)(ii).  The acquiring person must notify the acquired party that it has submitted an HSR Form, and the acquired person must submit its own HSR From within only 15 days.  16 C.F.R. § 801.30(b)(2); *see also* 15 U.S.C. § 18a(A).  For cash tender offers that time period is even shorter—the acquired party must file its HSR Form in only 10 days.  16 C.F.R. § 801.30(b)(2).

[21] 2023 NPRM at 42180 n.11 (quoting 122 CONG. REC. H30877 (Sept. 16, 1976) (remarks of Rep. Rodino)).

## II.    The 2023 NPRM, if promulgated, is an impermissible exercise of the Commission's rulemaking authority under the HSR Act.

Under the APA, federal courts have the authority to review final agency action.[22]  The starting point for analysis under the APA is always the relevant enabling statute.[23]  The Supreme Court is clear:  "Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'"[24]

The HSR Act is a discrete, procedural statute and the HSR Form thereunder can require only that information which is "consistent with the purposes" of the Act, "relevant" to a notifiable transaction, and "necessary and appropriate" to assess whether such transaction violates Section 7.[25]  When, as here, Congress's intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[26]

Courts must also set aside final agency action that is found to be "arbitrary, capricious, an abuse of direction, or otherwise not in accordance with law."[27]  Agencies must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[28]  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the project, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[29]

As discussed in greater detail below, many of the proposed changes, if promulgated, would exceed the Commission's statutory authority under the HSR Act.  Moreover, the Commission provides thin justification for these proposed changes, stating that macroeconomic trends demand more aggressive and broader antitrust enforcement.  But that is not a valid justification in support of HSR rulemaking.

We discuss each of these deficiencies in detail below.

---

[22] 5 U.S.C. § 706.

[23] *See Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

[24] *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2609 (2022) (internal citations omitted).

[25] 15 U.S.C. §18a(d).

[26] *Chevron*, 467 U.S. at 842-43.

[27] 5 U.S.C. § 706(2).  *See Judalang* v. *Holder*, 565 U.S. 42, 52 n.7 (2011) (noting *Chevron* "step two" and arbitrary and capricious review under the Administrative Procedures Act is often "the same").  If the Supreme Court overrules *Chevron*, *see Loper Bright Enterprises* v. *Raimondo*, 45 F.4th 359 (D.C. Cir. 2022), *cert. granted in part*, 143 S. Ct. 2429 (U.S. 2023), the statutory analysis as articulated in this Comment is broadly applicable to the 2023 NPRM as the proposed changes are, *inter alia*, not "necessary and appropriate."

[28] *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 213 (2016) ("One basic procedural requirement of administrative rulemaking is that an agency must give adequate reasons for its decisions.").

[29] *Motor Vehicle Mfrs Ass'n*, 463 U.S. at 43.

filing party would be required to submit as a "draft." In a Second Request, these nuances are discussed between the party and agency staff and tailored to the specific scenario, sometimes over the course of several weeks, including sometimes lengthy discussions with the parties' information technology teams. Such bespoke discussions, however, are not feasible for *every* reportable transaction. Thus the overly broad proposed requirement would make it nearly impossible for filing parties to comply with certainty and would provide the agencies a potential avenue to impermissibly extend the statutory waiting period. Any documentary requirement included in the HSR Form must provide clear, objective standards that allow filing parties to comply with certainty.

(b)    <u>Periodic Plans and Reports</u>

The 2023 NPRM also calls for the provision of "certain high-level strategic business documents that were not created in contemplation of the transaction," including semi-annual or quarterly plans and reports that were provided to the chief executive, "certain individuals who report directly to a chief executive," or the Board of Directors of a filing party, "that analyze market shares, competition, competitors, or markets pertaining to any product or service also produced, sold, or known to be under development by the other party" that were created or modified "within one year of the [HSR] filing."[56]

Ordinary course documents, by definition, are not prepared in relation to the transaction under review and thus are arguably outside the scope of the statutory mandate as they do not relate to the "proposed acquisition."[57]

The Commission fails to provide a fact-based explanation for why ordinary course documents *not* used to evaluate or analyze the transaction are necessary and appropriate for their initial analysis under the HSR Act. The 2023 NPRM simply states, without support, that such ordinary course documents "are useful to those negotiating or evaluating the transaction" because they "provide key transaction decision-makers with the company's internal assessment of commercial realities of the premerger marketplace."[58] Yet the existing HSR Form already requires filing parties to provide documents specifically used by key decisionmakers for analyzing the transaction, which *includes* any ordinary course documents used or relied upon by officers or directors in evaluating the transaction. The Commission fails to explain what additional information these other ordinary course documents—which were *not* used by key decisionmakers in connection with the transaction—would provide about the transaction that is necessary to the agencies' review such to warrant the heavy burden this request would impose on filing parties in every transaction.

Under the current framework, the agencies have ample opportunity to obtain ordinary course documents as part of their investigation if they determine such information is necessary. The 2023 NPRM acknowledges these documents are "routinely submitted" in a Second Request, underscoring the agencies' ability to receive these types of documents in transactions that are

---

[56] 2023 NPRM at 42195, 42214.
[57] 15 U.S.C. §18a(d). Notably, the Commission's inaugural proposed rulemaking in 1976 included a request for historical documents, but nonetheless still limited those document requests to those that related to the transaction. Mergers and Acquisitions; Proposed Rulemaking, 41 Fed. Reg. 55488, 55497 (Dec. 20, 1976).
[58] 2023 NPRM at 42195.

more likely to raise Section 7 issues.[59]  The agencies may also request, and often receive, ordinary course documents on a voluntary basis during the initial waiting period, a long-established practice that has facilitated the efficient processing of transactions.[60]  Those targeted voluntary requests are often focused on particular overlaps and are typically much narrower and less burdensome—in terms of both search scope and the type of documents requested—than the proposed requirement.  In view of this long-standing agency practice of issuing voluntary requests, the Commission has failed to provide an adequate justification for why it must now impose this burdensome document request for all filing parties.

The Commission also underestimates the burden that this request would place on both filing parties and the agencies.  The 2023 NPRM implies, without supporting evidence, that this requirement will be easy for a filing party to comply with because "as part of diligence for a potential transaction [such documents are] often collect[ed]."[61]  In our experience, that is not the case for most transactions that require an HSR filing.  Gathering these documents would add significant additional time needed to prepare the HSR Form—well beyond the 10 to 15 days contemplated by Congress—and likely contain information largely irrelevant to the agencies' analysis of whether a transaction is likely to violate Section 7.

The Commission recognizes that the broad scope of the proposed requirement would likely generate a significant number of documents,[62] many of which would not be relevant to the antitrust agencies' Section 7 mandate.  In addition to the burden on the filers, the deluge of documents has the potential to frustrate the antitrust agencies' ability to quickly screen transactions to determine which ones warrant an in-depth investigation.[63]  That *every* transaction will be required to provide this information, even though the vast majority do not pose competitive issues, creates inefficiencies for the antitrust agencies and is contrary to Congress's intent that "the premerger data sought by the Government can be compiled rapidly."[64]

The 2023 NPRM seeks comment on whether limitations on custodians or otherwise would still generate information about the state of competition that is "not specific to the transaction" while reducing the burden on filing parties.  While we disagree that the additional documentary requirement is necessary or appropriate under the HSR Act, to the extent that it is retained in the Commission's final rules, the Commission should tailor the requirements to clarify that it is limited only to the filing party's products and services in the United States and that filing parties need produce only documents, or portions thereof, that discuss specifically identified subject matter (*e.g.*, "market shares, competition, or competitors").  A limitation to Board materials, excluding documents created for the chief executive officer and her direct reports, would also lessen the burden on filing parties, while also providing the Commission an opportunity to review certain ordinary course documents discussing products which may be at issue.  Even with such tailoring, however, we do not believe such a requirement is relevant to the Commission's

---

[59] 2023 NPRM at 42195.

[60] Filing parties have strong incentives to comply with voluntary requests promptly in order to avoid a Second Request.

[61] 2023 NPRM at 42195.

[62] *See* 2023 NPRM at 42195 (acknowledging that this process "has the potential to result in the submission of a large number of documents").

[63] 2023 NPRM at 42195.

[64] 122 Cong. Rec. 30,876 (1976) (statement of Rep. Rodino).

analysis of a notified transaction and thus is still overly burdensome relative to the limited benefit it would provide the antitrust agencies.

### 3. Narratives

The 2023 NPRM includes proposed changes that will require filing parties to provide detailed narratives on horizontal overlaps and supply relationships that effectively amount to a requirement that filing parties provide a complete competitive assessment of the proposed transaction. Such a far reaching request goes well beyond the scope of the HSR Act and impermissibly attempts to shift the burden of proof under Section 7 from the agencies to the filing parties. The proposed requirements also require information and detail that most filing parties could not reasonably compile in 10 or 15 days, as contemplated by the structure of the HSR Act.[65] Moreover, the highly subjective nature of the proposed narrative requirements would make it nearly impossible for filing parties to have certainty that their HSR filing is complete. As the Commission notes in the 2023 NPRM, during the initial waiting period, the FTC's Premerger Notification Office staff ("PNO Staff") "must review each HSR filing to ensure it complies with the HSR Rules."[66] As written in the 2023 NPRM, the narrative requirements would likely take significant PNO Staff resources to determine whether transacting parties complied and could require multiple iterations before the PNO Staff were satisfied that a filing was complete. Such subjectivity would provide the Commission an avenue to extend its review of a transaction beyond the statutory waiting period mandated by Congress.

### (a) Horizontal Overlap

The 2023 NPRM proposes to require that filing parties list "each current or known planned product or service that competes with (or could compete with) a current or known planned product of the other filer."[67] Such an exercise goes to the core of the substantive antitrust analysis and is often a critical component of what the agencies must prove when seeking to challenge a transaction under Section 7.[68] As an initial matter, whether certain products and services compete with each other requires defining the relevant market—both at the product level and the geographic level.[69] Parties in antitrust litigation, including merger challenges, often disagree as to the appropriate market definition and even whether certain products compete with each other. The relevant product market—and whether the merging parties' products compete in said market—is often outcome determinative in Section 7 merger challenges.[70] Whether two products *could* compete is an even more highly fact intensive and complicated question that the agencies must prove when seeking to challenge a merger under Section 7.[71]

---

[65] *See supra* discussion notes 20-21.

[66] 2023 NPRM at 42178-79.

[67] 2023 NPRM at 42190.

[68] *See, e.g., United States* v. *Baker Hughes, Inc.*, 908 F.2d 981, 982 (D.D.C. 1990); DOJ & FTC, Horizontal Merger Guidelines (Aug. 19, 2010).

[69] *See, e.g., Brown Shoe Co.* v. *United States*, 370 U.S. 294, 336 (1962); *United States* v. *Marine Bancorporation*, 418 U.S. 602, 618 (1974).

[70] *See, e.g., United States* v. *United States Sugar Corp.*, 73 F.4th 197 at 204-06 (3rd Cir. 2023); *FTC* v. *Staples, Inc.*, 970 F. Supp 1066, 1073 (D.D.C. 1997).

[71] *See, e.g., FTC* v. Meta *Platforms*, 2023 WL 2346238, at *22-25; *United States* v. *Falstaff Brewing Corp.*, 410 U.S. 526, 534-36 (1973).

Here, the Commission proposes to require that transacting parties make affirmative statements regarding market definition and the current and potential competitiveness of their respective product portfolios at the outset. This proposed requirement abrogates the Commission's responsibilities by pushing the burden on the parties—the antitrust agencies have the burden of proposing "the proper relevant market" when seeking to challenge a potential transaction, the parties do not bear that burden.[72] Requiring certified statements by filing parties at the outset of an investigation that go to the core of what the agencies must prove if they sought to challenge a transaction goes far beyond the statutory scope of the HSR Act.[73]

In addition to identifying competitive overlaps for the agencies, the proposed rule requests extensive information about any potential overlapping product or service including "sales, customer information (including contacts), a description of any licensing arrangements, and any non-compete or non-solicitation agreements applicable to employees or business units related to the product or service."[74] Such information is neither necessary nor appropriate to the agencies' initial assessment of a potential transaction.

As the Commission notes, contacting customers is often a critical investigatory tool, but only after "one Agency has granted clearance to the other to conduct an initial investigation of the transaction."[75] Parties often voluntarily provide such customer information when requested during the initial investigatory phase—when the request is tailored to the specific investigation. Such information, however, is not requested for the vast majority of transactions where the agencies do not open an investigation. Requiring customer contact information for all transactions would impose significant additional burden on the transaction parties and—especially in non-public transactions—raises significant confidentiality concerns as the agencies may not disclose non-public information obtained through the HSR process.[76] The Commission fails to articulate a clear reason why such information would be "necessary and appropriate" for all transactions.

The Commission provides even less rationale for its proposed requirement to "describ[e] any licensing arrangements, and any non-compete or non-solicitation agreements" related to the products or services.[77] Such information is unrelated to the specific proposed acquisition and thus beyond the scope of the HSR Act. The Commission also fails to articulate how such information may be relevant to the Section 7 analysis of whether the effect of a proposed transaction "may be substantially to lessen competition."

While evident that the proposed requirements would place a heavy burden on filing parties, the 2023 NPRM is noticeably light on detail as to what, exactly would be required of the parties to

---

[72] *See United States Sugar Corp.*, 73 F.4th at 203-04.

[73] *See West Virginia* v. *EPA*, 142 S. Ct. at 2608-07 ("Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted.") (internal quotations and citation omitted).

[74] 2023 NPRM at 42196.

[75] 2023 NPRM at 42196.

[76] *See* 15 U.S.C. §18a(h) ("Any information or documentary material filed . . . pursuant to [an HSR filing] shall be exempt from disclosure . . . and no such information or documentary material may be made public, except as may be relevant to any administrative or judicial action or proceeding.").

[77] 2023 NPRM at 42196.

provide a compliant response. Such vagueness creates significant ambiguity that will impose additional burden on the PNO Staff reviewing submissions, as well as uncertainty for transacting parties. As noted above, introducing broad narrative requirements with subjective completion standards creates significant risk that the Commission will seek to extend its statutory review period by rejecting filings as incomplete for vague, subjective reasons. At minimum, the Commission needs to provide clear, objective standards for identifying and discussing horizontal overlaps that do not shift to filing parties the agencies' burden of proof under Section 7.

(b)    *Supply Relationships*

The 2023 NPRM also adds a new requirement under the HSR Form that filing parties "provide information about existing or potential vertical, or supply, relationships between the filing persons."[78] As the Commission notes, the antitrust agencies had previously required similar information, but, in 2001, eliminated the requirement. The 2001 Commission determined that such information was not necessary for the agencies to learn about transactions that present vertical concerns. The 2001 Commission also recognized that the vendor-vendee reporting requirement placed a heavy burden on vendees, "particularly large diversified persons that may purchase from other filing persons a wide variety of manufactured products through numerous subsidiaries and divisions," that outweighed its probative value.[79]

The 2023 NPRM provides no reason why its current proposal, which places an even greater burden on filing parties, is now necessary. The pre-2001 HSR Form required filing parties to indicate if they had a vendor-vendee relationship with any other filing party and for the vendee to list the products purchased from the other party (and total amounts) for the most recent year.[80] By contrast, the 2023 NPRM proposes to require not just information about the filing parties' relationship, but also for vendors to provide "information (including contact information and a description of the supply agreement) for other customers that use the product, service or asset to compete with other filing person[s]" and for vendees to provide "similar information for purchases made from the other filing person and any other business that . . . competes with the other filing party to provide substantially similar product, service, or asset."[81] Such information about sales to and purchases from non-transacting parties has limited, if any, relevance to the proposed acquisition and is thus outside the scope of the HSR Act.

Moreover, as with the horizontal overlap narrative, the proposal requires notifying parties to take certified positions about relevant markets and competition that go to the core of what the agencies must prove in a Section 7 merger challenge. The supplier request goes even further in requiring one filing party to make an assessment with respect to the competitors (and potential future competitors) of the other filing party, information that many filing parties would not be in a position to know at the time of filing. Such information also goes well beyond what is typically relevant in a Section 7 merger challenge. Viable non-horizontal theories of harm are notably rare under Section 7.[82] Requiring extensive information on supplier relationships in

---

[78] 2023 NPRM at 42196.

[79] Premerger Notification; Reporting and Waiting Period Requirements, 66 Fed. Reg. 8680, 8686 (Feb. 1, 2001).

[80] Premerger Notification; Reporting and Waiting Period Requirements, 43 Fed. Reg. 33450, 35560 (Jul. 31, 1978).

[81] 2023 NPRM at 42197.

[82] *See United States* v. *AT&T, Inc.,* 310 F. Supp. 3d 161, 193-94 (D.D.C. 2018), *aff'd sub nom. United States* v. *AT&T, Inc.,* 916 F.3d 1029 (D.C. Cir. 2019) ("Things are made more difficult still by the lack of modern judicial

-16-

every HSR Form turns the notification process into a wide exploratory net for the agencies and goes well beyond what is "necessary and appropriate . . . to determine whether such acquisition may, if consummated, violate the antitrust laws."[83]

Aside from the lack of statutory authority for such a request, the proposed requirements place an enormous burden on filing parties and add significant preparatory time that is not contemplated by the HSR Act. The Commission has utterly failed to articulate a clear reason why such information is necessary and appropriate to determine whether transactions may violate Section 7. At minimum when challenging a vertical merger the antitrust agencies must prove that one party has "substantial market power" in at least "one product or distribution level."[84] The agencies do not need information regarding the vendor-vendee relationship to assess this threshold question, and few transactions involve "substantial market power" such that it would be worth the significant burden the proposed requirement would impose on filing parties, or the agencies effort to review such information in every transaction. For those few instances, the agencies have ample tools to obtain the necessary information for their review, including through voluntary requests during the initial waiting period, the Second Request process, and third-party inquiries and documentary requests.[85]

Like the proposal on horizontal overlaps, the proposed supply narrative lacks detail regarding what objectively measurable information would be required. The 2023 NPRM would require information for two fiscal years, and provides no *de minimis* threshold requirement. The pre-2001 HSR Form by contrast required information for only the most recent year, only for transactions between the filing parties, and only if the product bought or sold generated revenue of $1 million or more.[86] As the 2001 Commission noted when it eliminated the requirement, this discrete vendor-vendee reporting requirement placed significant burden on filing parties. If the Commission determines that vendor-vendee information is necessary—in addition to articulating clear reasons as to why it reached that conclusion—it must provide clear, objective guidance for filing parties similar to what was required pre-2001. Moreover, the Commission cannot require information that would make filing parties conduct the substantive antitrust analysis for the agencies—the burden of proving potential harm under Section 7 remains with the agencies.

### 4.    Officers, Directors, and Board Observers

The 2023 NPRM proposes additions to the HSR Form which would require filing parties to provide specific information regarding officers, directors and board observers, past, present and

---

precedent involving vertical merger challenges—a dearth of authority that is unsurprising, considering that the Antitrust Division apparently has not tried a vertical merger case to decision in four decades." (emphasis omitted)).
[83] 15 U.S.C. § 18a(d).
[84] *Auburn News Co.* v. *Providence Journal Co.*, 659 F.2d 273, 278 (1st Cir. 1981).
[85] *See* David T. Scheffman & Richard S. Higgins, *Vertical Mergers: Theory and Policy*, 12 Geo. Mason L. Rev. 967, 973 (2004) ("Vertical mergers that have a significant potential for being anticompetitive (and unfortunately, many more) will necessarily stimulate complaints by competitors and customers at one or both levels.").
[86] Prior to eliminating the vendor-vendee reporting requirement, the Commission considered raising the *de minimis* threshold to $5 million. *See* Premerger Notification; Reporting and Waiting Period Requirements, 59 Fed. Reg. 30545, 30554 (June 14, 1994) ("[T]he Commission's experience in reviewing filings and investigating proposed transactions in recent years has indicated that acquisitions in which either party makes product purchases from the other party under $5 million rarely, if ever, present risk of vertical foreclosure or increased vertical integration in a given industry.").

future.  The Commission reasons that the fact that filing parties are not required to disclose these details in the HSR Form "makes it difficult for the Agencies to complete their assessment of potential Section 8 issues during the initial waiting period."[87]  In addition, the Commission "believes that having this information available during the initial waiting period would permit the Agencies to take steps to minimize the sharing of information prior to consummation" in potential violation of Sherman Act Section 1.[88]

These proposed changes fall outside the Commission's statutory mandate.  The HSR Act was not intended as a tool to identify prior or future violations of Clayton Act Section 8 or Sherman Act Section 1, but instead a limited tool to assist the agencies in identifying and challenging prior to consummation those transactions most likely to violate Section 7.  Moreover, Section 8 of the Clayton Act explicitly provides a one-year grace period where the violation resulted from "any change in the . . . affairs of such corporation from whatever cause," encompassing changes resulting from M&A activity.[89]  The proposed addition of the "Officers, Directors, and Board Observers" section to the HSR Form is thus not relevant, necessary or appropriate in view of the Commission's limited statutory mandate.

The 2023 NPRM's request for board information going back two years is particularly irrelevant to the Section 7 analysis and adds significant cost and burden to filing parties.  The request requires filing parties to compile a dossier for the agencies on officers, directors and board observers (or in the case of unincorporated entities, individuals exercising similar functions) for the filing person and *all entities* within the filing persons.  As a practical matter, this could require filing parties to identify such roles for dozens, or in some cases, hundreds of subsidiaries, including non-operational subsidiaries that nonetheless have boards as a matter of corporate formality.  This information may be difficult to identify as it is not always accurately and consistently maintained in the ordinary course of business.  In addition, minor changes to these board roles due to employee departures are likely not tracked in the ordinary course such that recounting changes at every point in time over the last two years could be incredibly difficult and time consuming to reconstruct.

  **B.**  **The proposed changes impose significant additional and unnecessary costs to filing parties inconsistent with the purpose of the HSR Act.**

In passing the HSR Act, Congress sought to balance the costs and challenges of post-merger litigation to "unscramble" otherwise combined firms with the costs and burden a premerger notification regime would impose on all filing parties and procompetitive transactions.[90]  The 2023 NPRM tips the scales far beyond what Congress could have intended[91] and no subsequent amendments to the HSR Act have indicated a contrary intent or balancing.

The Commission estimates the proposed changes will result in approximately 12 to 222 additional hours per filing, an average of 107 additional hours per filing, and an additional

---

[87] 2023 NPRM at 42190.
[88] 2023 NPRM at 42190.
[89] 15 U.S.C. § 19(b).
[90] *See supra* discussion notes 8-11.
[91] *See supra* discussion notes 20-21.

approximately $100,000 of labor costs per filing (acquired and acquiring).[92]  The Commission further estimates that it currently takes, on average, 37 hours to prepare a filing, meaning that the 2023 NPRM will increase the expected filing time by an average of 290 percent, and, according to the Commission's estimates, by 600 percent for 45 percent of filings.

These estimates are not based on any empirical data or discussions with current practitioners, and we submit that the *actual* current and future costs of complying with the current and proposed HSR regulations, respectively, are and will be much higher than the estimates.  The Commission notes that it "canvassed current Agency staff who had previously prepared HSR filings while in private practice to estimate the projected change in burden. . . . All have considerable experience with the HSR rules and with preparing HSR Filings for the types of transactions that are most likely to be affected by the proposed changes."[93]  This experience may be relevant in estimating the time it takes to file the HSR Form in its present form, but is of no relevance in determining the added cost and burden of the wholly different and new information requested under the 2023 NPRM.  In order to assess the true cost of the NPRM's proposed changes, the Commission must empirically survey the antitrust bar and the merger and acquisition community;[94] that task should be undertaken by the Bureau of Economics and recirculated as a supplement to the NPRM before any rule change is made final.

The 2023 NPRM, for example, requires filing parties to categorize its employees based on SOC categories and commuting zones.  This is a completely new filing requirement and no prior experience filing an HSR Form could inform the time necessary to collect and confirm these data.  As described in greater detail above, we expect this request will be incredibly burdensome on filing parties and add little value to whether a transaction is likely to substantially lessen competition under current Section 7 law.

The 2023 NPRM also requests that parties provide narrative descriptions of their businesses and of the relevant product and geographic markets.  This requirement is similarly novel.  The pre-notification processes associated with the international regimes the Commission points to as support for its proposed changes, which do require narrative responses, often take two to three months for simple transactions and substantially longer for complex transactions.  This time frame is much longer than the statutory waiting period contemplated under the HSR Act.  Moreover, based on our experience working with counsel in Europe, Asia, and elsewhere, such narrative notifications take significantly longer than 49 hours for simple cases and 259 additional hours for complex cases estimated by the Commission.  As discussed below, it is notable that these international regimes the Commission references require affirmative *approval* from the reviewing agencies.  The HSR Act is a pre-notification regime—it is not necessary, appropriate,

---

[92] The Commission estimates that the changes will result in 107 additional hours per filing at an estimated rate of $460/hour, which equates to approximately $50,000 additional cost per filing party.  *See* 2023 NPRM at 42208.  As a filing typically requires both an acquiring and acquired side filing, the additional cost burden by the Commission's calculation is approximately $100,000.

[93] 2023 NPRM at 42207.

[94] The U.S. Chamber of Commerce conducted a recent survey of 70 antitrust practitioners.  Based on that survey, the U.S. Chamber of Commerce estimates that the proposed HSR Form will take on average 327 hours and over 30 days to complete, representing "roughly $2.3 billion in additional [annual] costs borne by transactions that do not raise any anticompetitive concerns."  Sean Heather, U.S. Chamber of Commerce, *Antitrust Experts Reject FTC/DOJ Changes to Merger Process* (Sept. 19, 2023), https://www.uschamber.com/finance/antitrust/antitrust-experts-reject-ftc-doj-changes-to-merger-process.

or within the statutory bounds of the HSR Act to require filers undergo a notification burden similar to these international pre-approval regimes.

The 2023 NPRM also requires filing parties to submit other novel information that is often not maintained in the ordinary course of business or created in the course of a deal negotiation and therefore adds particular burden and cost to filing parties, including:

- A structure chart of subsidiaries by operating company. Certain companies may maintain this information in the ordinary course of business, but many do not or have limited organizational charts for certain business units. Even when these are maintained in the ordinary course of business, they are generally not up-to-date and it can take significant time and diligence to confirm that the organizational chart reflects the present business organization;

- List of all creditors and holders of non-voting securities for the acquiring person and all entities it controls and for any entity that controls the acquiring entity. Business units can have significant autonomy in obtaining credit or issuing non-voting securities and that information is not generally centrally maintained or tracked by the acquiring person;

- List of each officer, director, and board observer (or individual exercising similar functions) for the last two years for the filing person and each entity within it, as discussed above;

- Description of the acquiring person's business operations and all entities within it. Companies may have several dozen subsidiaries and written descriptions as to each of the respective business operations is not information readily maintained in the ordinary course of business and could be incredibly burdensome to collate;

- Description of all strategic rationales for the transaction. Although filing parties often have a preliminary perspective on a deal's strategic rationale, not all strategic rationales may have been identified or articulated at signing or even shortly after signing. Requiring submission of all strategic rationales under certification that such representations are "true, correct, and complete" presents unique challenges, as often certain rationales or the particularities or details of those rationales are only discovered in the course of additional post-signing diligence;

- Diagram of the transaction structure and steps, together with a chart explaining the entities involved in the transaction;

- Organizational chart of authors for each document produced together with the HSR Form, as well as for each individual whose files were searched for documents. In our experience, many filing parties do not maintain organizational charts in the ordinary course—and such charts rarely, if ever, include directors. Such charts would need to be constructed manually. This would be an exceptionally time-consuming exercise, particularly given that many filing parties have tens of thousands of employees, spread around the world, most of whom would be unrelated to the produced documents and transaction;

- List of and the specific details relating to prior acquisitions from the last 10 years; and[95]

- List of all existing or pending defense or intelligence procurement contracts, including information about the award and relevant government personnel.  Due to confidentiality concerns and restrictions, particularly with respect to classified contracts, these data are often not centrally maintained and may not be known, even among senior leadership.

The additional time and cost associated with creating these new materials is not offset by the limited efficiency gains the Commission purports as justification for these requests.  To the contrary, overwhelming the agencies' staff with significantly more information and documents for every transaction will likely delay and possibly impede the agencies' ability to quickly "detect [and] investigate larger mergers of questionable legality[.]"[96]  The proposed additions and changes in the 2023 NPRM thus fail to rise to the level of "necessary and appropriate" as required by the HSR Act.

**C.     The Commission provides limited and deficient justification for the proposed changes to the HSR Form.**

The 2023 NPRM proposes sweeping changes to an HSR Form that has remained largely unchanged since 1978 and supports the proposed changes with reasons that have questionable statutory bases.  The Commission fails to adequately describe how the proposed changes are relevant to the agencies' Section 7 review of the transaction, why such changes are necessary and appropriate—particularly in view of the agencies' ability to issue Second Requests—and how these purported improvements to the review process offset the significant and additional burden that filing parties will bear as a result of the proposed changes.  Indeed, the Commission fails to point to a single instance when the lack of certain information now requested under the 2023 NPRM resulted in a failure by the agencies to issue a Second Request or otherwise hampered their ability to enforce Section 7.  These failures are fatal to any final rule the Commission may attempt to implement.[97]

We consider the Commission's stated justifications below, none of which is consistent with the HSR Act's mandate.

*1.     Technology and Digital Platforms*

The Commission cites "tremendous growth in sectors of the economy that rely on technology and digital platforms to conduct business," as a justification for the 2023 NPRM, noting that

---

[95] The Commission previously acknowledged the additional burden this request placed on filing parties when it reduced the request from ten to five years in 1987 (a decision which this Commission now reverses).  *See* Premerger Notification; Reporting and Waiting Period Requirements, 52 Fed. Reg. 7066, 7078 (Mar. 6, 1987) ("This change should significantly reduce the burden of this item because it will cut in half the number of years that parties will have to search for information about prior acquisitions and because it should be easier for companies to identify more recent acquisitions.").

[96] H.R. REP. NO. 94-1373, at 11 (1976).

[97] *See Encino Motorcars*, 579 U.S. at 212 ("Where the agency has failed to provide even a minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."); *cf. Mexican Gulf Fishing Co.*, 60 F.4th at 974 (concluding final rule was arbitrary and capricious because it failed to provide fair notice, requiring reporting of a different category of data than had been described in the proposed rule).

"mergers and acquisitions in these sectors present a unique challenge for the Agencies."  It further notes that "[i]n these sectors, some transactions involve firms whose premerger relationship is not clearly horizontal or vertical; rather merger activity in these sectors increasingly involves firms in related business lines where the Agencies must closely examine the potential for direct competition in the future."[98]  The Commission, however, does not specify what information and, in particular, which proposed changes to the HSR Form will aid the agencies in better evaluating these sectors or harm to potential competition from related businesses in these sectors.  Nor does the Commission justify why perceived gaps of information with respect to these sectors warrant changes to the HSR Form applicable to *all* filing parties, including the vast majority whose businesses lie outside of these sectors.[99]

Notably, technology and digital platforms and their potential for competitive harm have been discussed at length for over a decade, including in a 2018 Supreme Court decision, *Ohio* v. *American Express*, 200 U.S. 321 (2018), and in more recent Section 7 cases including *United States* v. *Sabre Corp.*, 452 F. Supp. 3d 97 (D. Del. 2020) and *Federal Trade Commission* v. *Microsoft Corp.*, 2023 WL 4443412 (N.D. Cal. July 10, 2023).  None of these cases suggest gaps in the current HSR Form, and the proposed changes to the HSR Form do not appear to address or directly relate to the competition issues presented in these and other technology and digital platform cases.

The HSR Form is also an inappropriate tool to identify potential competition concerns.  Congress's directive is clear—the HSR Act and the HSR Form are not intended to capture all transactions that may violate Section 7, but only those most likely to violate Section 7.[100]  Given the limited and largely unsuccessful Section 7 jurisprudence relating to potential competition,[101] the Commission fails to articulate why collecting information on related businesses, particularly given the additional burden such requests impose on filing parties, is necessary, appropriate, and consistent with the intent of the HSR Act.

---

[98] 2023 NPRM at 42179.

[99] *See* 2021 Annual Report at 6-7 (HSR filings involving targets that derived most of their revenue in information technology sectors represented less than 10 percent of all HSR filings made in fiscal year 2021).

[100] *See supra* discussion notes 8-11.

[101] The potential competition concern as articulated by the Commission—a concern relating to potential for direct competition in the future—has not been recognized by the Supreme Court as a valid basis for a Section 7 violation. *United States.* v. *Marine Bancorporation*, 418 U.S. 602, 624-25 (1974) (The potential-competition doctrine, as recognized by the courts, focuses "on the likely effects of the premerger position of the acquiring firm on the fringe of the target market" and where "the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior. . . . The Court has not previously resolved whether the potential-competition doctrine proscribes a market extension merger solely on the ground that such a merger eliminates the prospect for long-term deconcentration of an oligopolistic market that in theory might result if the acquiring firm were forbidden to enter except through a de novo undertaking or through the acquisition of a small existing entrant"); *FTC* v. *Procter & Gamble Co.*, 386 U.S. 568, 581 (1967) (concluding that the FTC had demonstrated "that the existence of Procter at the edge of the industry exerted considerable influence on the market").  *See also FTC* v. *Meta Platforms Inc.*, 2023 WL 2346238, at *20 (N.D. Cal. Feb. 3, 2023); *FTC* v. *Steris Corp.*, 133 F. Supp. 3d 962, 966 (N.D. Ohio 2015) (entertaining but ultimately denying the FTC's claim based on its potential entrant doctrine).

To the extent that the Commission's concerns relate to specific sectors of the economy, information requests should apply only to filing parties in such sectors,[102] avoiding the burden and cost on all other industries, and should be limited to only what is necessary and appropriate to assist the Commission in preliminarily identifying those transactions for which issuance of a Second Request is necessary.

## 2.    Other Parties and Transactions

The Commission further reasons that "[t]ransaction structures have evolved to include not only the Ultimate Parent Entity (UPE) and its acquiring entity, but also other entities within the acquiring person. . . . [T]hese investors could have a direct role in effectuating the transaction. . . . Individuals or entities other than . . . those directly involved in the transaction may be able to exert influence over the transaction. . . . The existence of subsidies or loans, among other means, may subject the buyer to additional pressures from individuals or entities not directly a party to the reportable transaction."[103]

To address this alleged gap, the 2023 NPRM proposes a series of changes to assist in identifying any and all persons and entities that may touch a transaction, directly or indirectly.[104] Yet it is unclear, and the Commission fails to describe, how this information will assist the agencies in determining whether the transaction for which a filing is made may violate Section 7.

Information regarding minority interests of filing persons and minority shareholders of filing persons has been collected as part of the HSR Form since its inception in 1978.[105] We are not aware of a single agency challenge to a proposed transaction filed pursuant to the HSR Act where data on minority interests or minority shareholdings ultimately supported a Section 7 challenge where such interest was not itself reportable.[106]

The 2023 NPRM expands the existing filing requirement to even more attenuated relationships and interests (*e.g.*, limited partners, creditors, acquirers of non-voting securities) that are even

---

[102] *See Pharm. Research & Mfrs. of America* v. *FTC*, 790 F.3d 198 (D.C. Cir. 2015) (upholding lower court decision that the FTC may issue rulemaking pursuant to the HSR Act that targets a particular industry over trade association's challenge of FTC final rulemaking).

[103] 2023 NPRM at 42179.

[104] The 2023 NPRM add several new sections to capture these relationships including the "Identification of Additional Minority Interest Holders," "Narrative Describing Ownership Structure of the Acquiring and Acquired Entities," "Organizational Chart for Funds and Master Limited Partnerships," and "Identification of Other Types of Interest Holders that May Exert Influence." *See* 2023 NPRM at 42185.

[105] Premerger Notification; Reporting and Waiting-Period Requirements, 43 Fed. Reg. 33450, 33531-32 (July 31, 1978).

[106] The 2023 NPRM cites *United States* v. *E.I. du Pont*, 353 U.S. 586 (1957) for the proposition that minority holders may attempt to change the competitive decisions of a target firm. In that case, du Pont had acquired a 23 percent equity interest in General Motors—well in excess of the five percent threshold in the HSR Form—for $49 million— – which, had the investment been made in 1978, would have rendered it an HSR reportable transaction. *Id*. at 602. *Cf.* Premerger Notification; Reporting and Waiting Period Requirements, 85 Fed. Reg. 77053, 77058 (Dec. 1, 2020) ("Except for a few instances when a shareholder backside acquisition of 10% or less of an issuer's voting securities was linked to a larger transaction that presented competitive concerns, the Commission has not sought to block any acquisition of 10% or less of an issuer's voting securities.") (citing *In the Matter of Time Warner*, 123 F.T.C. 171 (Feb. 3, 1997) available at https://www.ftc.gov/sites/default/files/documents/cases/1997/02/c3709.do.pdf).

less likely to result in a substantial lessening of competition. The proposed changes seek information regarding transactions Congress *explicitly exempted* from the scope of the HSR Act because they "pose no anticompetitive threats under Section 7," including acquisitions of debt, non-voting securities, and passive equity interests.[107]

With respect to limited partners, the Commission stated in a 2011 rulemaking that limited partners had no control over the operation of the fund or portfolio companies and that their identities therefore were not necessary to the agencies' initial review.[108] The 2023 NPRM acknowledges this reversal, but simply notes that "[s]ince that time, the Commission has come to understand that the Agencies would benefit from more complete information about all minority holders of the filing parties," and that "it is important that the Agencies know the identities of limited partners . . . to uncover investment relationships that may have competitive significance."[109] The Commission, however, fails to articulate what new information has come to light to justify the reversal, why five percent is the relevant threshold for reportability, and how this information will ultimately aid the agencies in evaluating whether a transaction is likely to violate Section 7.

Given such information provides little to no probative value in determining whether a proposed transaction violates Section 7, the 2023 NPRM additions requiring disclosure of these potentially interested parties are neither necessary nor appropriate and do not outweigh the substantial burden such additions would place on filing parties.[110]

### 3.    Enforcement Policy

The Commission further justifies the proposed changes to the HSR Form by noting:

> Another factor that has an impact on the complexity of premerger review is that consistent with the law and binding judicial precedent, the Agencies have stepped up efforts to review transactions for all their potential competitive impacts. The Agencies are responding to evidence that the U.S. economy is becoming increasingly concentrated overall.[111]

The Commission's effort to step up antitrust enforcement and review transactions for all their potential competitive impacts does not change the Commission's statutory mandate under the

---

[107] H.R. REP. NO. 94-1373, at 5 (1976) ("Summary of Reported Bill").

[108] Premerger Notification; Reporting and Waiting Period Requirements, 75 Fed. Reg. 57110, 57118 (Sept. 17, 2010), adopted in 2011 by Premerger Notification; Reporting and Waiting Period Requirements, 76 Fed. Reg. 42471 (July 19, 2011).

[109] 2023 NPRM at 42188.

[110] *Cf.* Premerger Notification; Reporting and Waiting-Period Requirements, 52 Fed. Reg. 7095, 7097 (Mar. 6, 1987) ("Since the Commission is not aware of any transaction to date that violated the antitrust laws but was not reported under the premerger notification program because the acquisition vehicle was not a controlled entity, it seems inappropriate to employ an approach that is likely to require notifications for a host of competitively insignificant transactions.").

[111] 2023 NPRM at 42179.

HSR Act.  As the Supreme Court recently articulated, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends."[112]

The HSR Act is not a substantive statute; it did not, does not, and cannot change the legal standard under Section 7.[113]  Nor does the HSR Act give the agencies carte blanche to search for violations of any law; the Act demands that any inquiry relate to whether a notified transaction violates Section 7.[114]

### 4.    *International Agencies*

The Commission specifically cites how other *non-U.S.* regimes operate as a justification for why the HSR Form must change.   Specifically, the Commission refers to international jurisdictions that:

> ask filers to provide significantly more information that their staff considers relevant to the competition analysis, including details about the transaction's structure and rationale, horizontal overlaps, vertical and other relationships, and more detailed sales data. Importantly, many other jurisdictions rely on narrative responses from the parties that contain basic information about business lines or company operations, and several require the parties to self-report overlaps.[115]

This is inapt as other regimes operate under a completely different statutory scheme and mandate that is unrelated to the Commission's authority under the HSR Act.  Premerger filings with the European Commission, for example, are required only in change-of-control transactions or where certain strategic governance rights are obtained.  As a result, the European Commission typically reviews around 300 transactions a year[116] compared to the over 3,000 transactions reviewed annually pursuant to the HSR Act.[117]

Most critically, the EU's statutory scheme is an approval regime, not a premerger notification regime.  Once a transaction has been approved by the European Commission, it is immune from further Commission scrutiny or challenge.  In contrast, transactions that have been cleared by the U.S. antitrust agencies under the HSR Act remain subject to potential future scrutiny and challenge under Section 7.  The European Commission also has the ability to unilaterally suspend or prohibit transactions without needing to obtain an injunction from a court.[118]  By contrast, U.S. antitrust agencies do not have the ability to preliminarily enjoin a transaction. Congress considered, and firmly rejected, legislation that would have allowed the antitrust agencies to obtain an automatic stay of a transaction without any proof or offer of proof that the

---

[112] *Alabama Ass'n of Realtors* v. *Dept of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021).

[113] *See supra* discussion note 4.

[114] *See supra* discussion notes 6-7.

[115] 2023 NPRM at 42180.

[116] Fact Sheet, Euro. Comm'n, *Competition: Merger Control Procedures* (July 2013), https://competition-policy.ec.europa.eu/system/files/2021-02/merger_control_procedures_en.pdf.

[117] 2023 NPRM at 42184 n.22.

[118]  Council Regulation 139/2004 of Jan. 20, 2004, *Control of Concentrations Between Undertakings*, 2004 O.J. (L 24/1) 34, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32004R0139.

transaction violates Section 7, noting that "[s]uch arbitrary and absolute enforcement agency power to stop and kill business transactions which are not inherently unlawful is at war with the most fundamental traditions of our jurisprudence."[119]  The 2023 NPRM's attempt to replicate the more searching premerger approval regimes in other jurisdictions ignores these critical facts.

\*       \*       \*

We thank the Commission for considering these comments.  Please do not hesitate to contact Christina Ma, Katharine Haigh or Emily Samra at Wachtell, Lipton, Rosen & Katz ███████ ███ if you have any questions.

Respectfully submitted,

Wachtell, Lipton, Rosen & Katz

---

[119] 122 CONG. REC. 16911, 16928-39 (1976) (discussing amendment 1724 deleting provisions that would have allowed the antitrust agencies to obtain an automatic stay of transactions pursuant to an earlier version of the HSR Act); *id*. at 16930 ("Title V would vest in the Justice Department and the FTC an unjustifiable and destructive regulatory authority and veto over the process of capital allocation."); *id*. ("I believe that we are setting a precedent here if we enact this title that would be infinitely dangerous in allocating to appointed officials the ability to interfere and halt any private transaction without any reference without any real obligation to establish that the transaction would result in a breach of the law."); 122 CONG. REC. 17268-73 (1976) (proposed compromise, amendment no. 1701 to H.R. 8532, which included deletion of automatic stay provisions); *id*. at 17,571 (Amendment No. 1701 to H.R. 8532 was voted on and agreed to).