Exhibit 15



# **A** N T I T R U S T
# **M** O D E R N I Z A T I O N
# **C** O M M I S S I O N

## **R E P O R T   A N D**
## **R E C O M M E N D A T I O N S**

A P R I L   2 0 0 7

Deborah A. Garza   *Chair*
Jonathan R. Yarowsky   *Vice-Chair*
Bobby R. Burchfield
W. Stephen Cannon
Dennis W. Carlton
Makan Delrahim
Jonathan M. Jacobson
Donald G. Kempf, Jr.
Sanford M. Litvack
John H. Shenefield
Debra A. Valentine
John L. Warden



April 2, 2007

## To the President and the Congress of the United States:

Three years ago, as authorized by statute, this Commission undertook a comprehensive review of U.S. antitrust law to determine whether it should be modernized. It is our pleasure to present the results of that effort, the enclosed Report and Recommendations of the Antitrust Modernization Commission ("Report").

This Report is the product of a truly bipartisan effort. The members of the Commission were appointed by the President and the respective majority and minority Leadership of the House of Representatives and Senate with the goal of ensuring "fair and equitable representation of various points of view in the Commission."[1] In fact, the Commissioners represented a diversity of viewpoints, which were fully and forcefully expressed during many hours of hearings and thoughtful deliberation. As one Commissioner has said, the Commission's recommendations were "fashioned on the anvil of rigorous discussion and debate." The Commission also endeavored at every turn to obtain a diversity of views from the public. In the end, the Commission was able to reach a remarkable degree of consensus on a number of important principles and recommendations.

First, the Report is fundamentally an endorsement of free-market principles. These principles have driven the success of the U.S. economy and will continue to fuel the investment and innovation that are essential to ensuring our continued welfare. They remain as applicable today as they ever have been. Free trade, unfettered by either private or governmental restraints, promotes the most efficient allocation of resources and greatest consumer welfare.

Second, the Report judges the state of the U.S. antitrust laws as "sound." Certainly, there are ways in which antitrust enforcement can be improved. The Report identifies several. A few Commissioners have greater concerns about aspects of current enforcement, as expressed in their separate statements. On balance, however, the Commission believes that

---

[1] Antitrust Modernization Commission Act of 2002, Pub. L. No. 107-273, § 11054(h), 116 Stat. 1856, 1857 (2002).

i

U.S. antitrust enforcement has achieved an appropriate focus on (1) fostering innovation, (2) promoting competition and consumer welfare, rather than protecting competitors, and (3) aggressively punishing criminal cartel activity, while more carefully assessing other conduct that may offer substantial benefits. The laws are sufficiently flexible as written, moreover, to allow for their continued "modernization" as the world continues to change and our understanding of how markets operate continues to evolve through decisions by the courts and enforcement agencies.

Third, the Commission does not believe that new or different rules are needed to address so-called "new economy" issues. Consistent application of the principles and focus noted above will ensure that the antitrust laws remain relevant in today's environment and tomorrow's as well. The same applies to different rules for different industries. The Commission respectfully submits that such differential treatment is unnecessary, whether in the form of immunities, exemptions, or special industry-specific standards.

That does not mean the Commission sees no room for improvement. To the contrary, the Commission makes several recommendations for change. A few of these recommendations call for bold action by Congress that likely will require considerable further debate. We look forward to that debate.

The following summarizes some of the more significant changes the Commission recommends.[2]

## Substantive Antitrust Standards (Mergers and Monopoly)

The Commission does not recommend legislative change to the Sherman Act or to Section 7 of the Clayton Act. There is a general consensus that, while there may be disagreement about specific enforcement decisions, the basic legal standards that govern the conduct of firms under those laws are sound.

The Commission nevertheless makes several recommendations in the area of merger enforcement. The purpose of these recommendations is to ensure that policy is appropriately sensitive to the needs of companies to innovate and compete while continuing to protect the interests of U.S. consumers. In particular, the Commission urges that substantial weight be given to evidence demonstrating a merger will achieve efficiencies, including innovation-relat-

---

[2] Although many recommendations garnered unanimous or nearly unanimous support, not all Commissioners fully agreed with all recommendations. Differences are identified in the text of the Report and in some instances are discussed in separate Commissioner statements. Recommendations with the support of at least seven Commissioners are reported as recommendations of the Commission. With respect to 96 percent of the recommendations, at least nine Commissioners agreed in whole or in part with the recommendations. Approximately 57 percent of the recommendations were unanimous.

ed efficiencies. The Commission also recommends that the federal enforcement agencies continue to examine the basis for, and efficacy of, merger enforcement policy. We urge the agencies to further study the economic foundations for merger enforcement policy, including the relationship between market performance and market concentration and other factors. We also recommend increased retrospective study of the effects of decisions to challenge or not challenge specific transactions. Such empirical evidence, although difficult to gather, is critical to an informed and effective merger policy.

With respect to monopoly conduct, the Commission believes U.S. courts have appropriately recognized that vigorous competition, the aggressive pursuit of business objectives, and the realization of efficiencies are generally not improper, even for a "dominant" firm and even where competitors may lose. However, there is a need for greater clarity and improvement to standards in two areas: (1) the offering of bundled discounts or rebates, and (2) unilateral refusals to deal with rivals in the same market. Clarity will be best achieved in the courts, rather than through legislation. The Commission recommends a specific standard for the courts to apply in determining whether bundled discounts or rebates violate antitrust law.

## Repeal of the Robinson-Patman Act

The Commission recommends that Congress finally repeal the Robinson-Patman Act (RPA). This law, enacted in 1936, appears antithetical to core antitrust principles. Its repeal or substantial overhaul has been recommended in three prior reports, in 1955, 1969, and 1977. That is because the RPA protects competitors over competition and punishes the very price discounting and innovation in distribution methods that the antitrust laws otherwise encourage. At the same time, it is not clear that the RPA actually effectively protects the small business constituents that it was meant to benefit. Continued existence of the RPA also makes it difficult for the United States to advocate against the adoption and use of similar laws against U.S. companies operating in other jurisdictions. Small business is adequately protected from truly anticompetitive behavior by application of the Sherman Act.

## Patents and Antitrust

Patent protection and the antitrust laws are generally complementary. Both are designed to promote innovation that benefits consumer welfare. In addition, a patent does not necessarily confer market power. Nevertheless, problems in the application of either patent or antitrust law can actually deter innovation and unreasonably restrain trade. Many of the Commission's recommendations relating to the Sherman Act address the antitrust side of the balance. On the patent side, the Commission urges Congress to give serious consideration to recent recommendations by the Federal Trade Commission (FTC) and National

Academy of Sciences designed to improve the quality of the patent process and patents. The Commission also recommends that the joint negotiation of license terms within standard-setting bodies ordinarily should be treated under a rule of reason standard, which considers both potential benefits of such joint negotiation to avoid "hold up" and the possibility that such joint negotiation might suppress innovation.

## Improving the Enforcement Process

To be effective, any enforcement regime must be clear, fairly administered, and not unreasonably burdensome. Several of the Commission's recommendations are designed to improve current processes to better meet these goals.

*Eliminate Inefficiencies Resulting from Dual Federal Enforcement.* Except in the area of criminal enforcement (which is the responsibility of the Justice Department), federal antitrust law is enforced by both the Justice Department (DOJ) and the FTC. Both agencies, for example, are equally authorized to review mergers under the Hart-Scott-Rodino Act (HSR Act), which essentially requires all mergers valued at above $59.7 million to be notified to the agencies and suspended until the expiration or termination of certain waiting periods. The Commission does not believe it would be feasible or wise to eliminate the antitrust enforcement role of either agency at this time. However, we make a number of recommendations designed to eliminate inconsistencies and problems that may result from dual enforcement.

*Merger Clearance.* The agencies have done a good job minimizing problems that can result from dual enforcement. But there is room for improvement that can only be achieved with the help of Congress. At the time of her confirmation, the current head of the FTC was asked to agree not to pursue a global merger clearance agreement between the agencies. The Commission calls on the appropriate congressional committees to revisit that position and authorize the DOJ and the FTC to implement a new merger clearance agreement based on the principles of the 2002 clearance agreement between the agencies. It is bad government for mergers to be delayed by turf battles between the agencies. Such battles undermine confidence in government, damage agency staff morale, and potentially delay the realization of significant merger efficiencies without good reason. The Commission recommends that Congress revise the HSR Act to require the DOJ and the FTC to resolve all clearance requests under the HSR Act within a short period of time after the parties report their transaction.

The Commission also recommends changes to ensure that mergers are treated the same no matter which agency reviews them. Specifically, the Commission recommends that Congress amend Section 13(b) of the FTC Act to prohibit the FTC from pursuing administrative litigation in HSR Act merger cases. The Commission further recommends that the FTC

adopt a policy that when it seeks to block a merger in federal court, it will seek both preliminary and permanent relief in a combined proceeding where possible.

*Improve the HSR Act Pre-Merger Review Process.* The DOJ and FTC should continue to pursue reforms to their internal review processes that will reduce unnecessary burden and delay. The Commission also makes a number of specific recommendations designed to reduce the burden of HSR merger reviews and increase the transparency of government enforcement. For example, the Commission recommends that the agencies update their Merger Guidelines to explain how they evaluate non-horizontal mergers as well as a proposed merger's potential impact on innovation competition. The Commission also recommends that the agencies issue statements explaining why they have declined to take enforcement action with respect to transactions raising potentially significant competitive concerns.

*Improve Coordination Between State and Federal Enforcement.* State and federal enforcement can be strong complements in achieving optimal enforcement. But the existence of fifty independent state enforcers on top of two federal agencies can, at times, also result in uncertainty, conflict, and burden. The Commission encourages state and federal enforcers to coordinate their activities to seek to avoid subjecting businesses to multiple, and potentially conflicting, proceedings. We make a number of specific recommendations in this regard. In addition, the Commission believes States should continue to focus their efforts primarily on matters involving localized conduct or competitive effects. In addition, state and federal agencies should work to harmonize their substantive enforcement standards, particularly with respect to mergers.

*De-link Agency Funding and HSR Act Filing Fees.* HSR Act filing fees are used to fund DOJ and FTC antitrust enforcement activity. These fees are a tax on mergers, the vast majority of which are not anticompetitive. They do not accurately reflect costs to the government of reviewing a given filing, nor do they confer a benefit on notifying parties. But they set a precedent for other countries with merger control regimes. In the past, moreover, dips in merger activity (and filing fees) have threatened to affect the level of appropriations available for critical agency activities. The Commission recommends that Congress de-link agency funding from HSR Act filing fee revenues.

## Private Litigation

Uniquely in the United States, private litigation has been a key part of antitrust enforcement. Under current rules, private plaintiffs are entitled to recover three times their actual damages, plus attorneys' fees. Defendants are jointly and severally liable for alleged conspiracies. There is no right of contribution among defendants. There is also only a limited right of claim reduction when one or more defendants settle. The combined effect of these

rules is that one defendant can be liable for nearly all of the damages caused by an antitrust conspiracy. Defendants thus face significant pressure to settle antitrust claims of questionable merit simply to avoid the potential for excessive liability. While the rules can maximize deterrence and encourage the resolution of claims through quick settlement, they can also overdeter conduct that may not be anticompetitive.

The Commission recommends no change to the fundamental remedial scheme of the antitrust laws: the treble damage remedy and plaintiffs' ability to recover attorneys' fees. On balance, the current scheme appears to be effective in enabling plaintiffs to pursue litigation that enhances the deterrence of unlawful behavior and compensates victims. However, the Commission recommends that Congress enact legislation that would permit non-settling defendants to obtain a more equitable reduction of the judgment against them and allow for contribution among non-settling defendants.

**Indirect and Direct Purchaser Litigation.** There are different rules at the federal level and among the states as to whether both direct purchasers of price-fixed goods or services and indirect purchasers may sue to recover damages. Under federal law, only direct purchasers can sue (this is commonly known as the rule of *Illinois Brick*). Defendants cannot argue that direct purchasers have "passed on" any amount of the overcharge to indirect purchasers (this is commonly known as the rule of *Hanover Shoe*). In thirty-six states and the District of Columbia, however, indirect purchasers can sue under state law providing that *Illinois Brick* does not apply to state court actions.

As a result, there is typically a morass of litigation in various state and federal courts relating to a single alleged conspiracy. Injured parties are treated differently depending on where they reside and defendants are subject to suit in multiple jurisdictions. In addition, federal *Illinois Brick/Hanover Shoe* policy provides a "windfall" to purchasers who have passed on an overcharge, while depriving any recovery at all to purchasers who actually bear the overcharge. Such a system that compensates the uninjured and denies recovery to the injured seems fundamentally unfair. The Class Action Fairness Act may ameliorate some of the administrative issues caused by conflicting federal and state rules by facilitating the removal of state actions to a single federal court for pre-trial proceedings. However, that Act applies only to pre-trial proceedings and does nothing to address the fairness issues associated with current federal policy. The Commission believes it is time to enact comprehensive legislation reforming the law in this area.

The Commission recommends that Congress overrule the Supreme Court's decisions in *Illinois Brick* and *Hanover Shoe* to the extent necessary to allow both direct and indirect purchasers to recover for their injuries. Other aspects of the Commission's recommendation are designed to ensure that damages would not exceed the overcharges (trebled) paid by direct purchasers, that the full adjudication of such claims occurs in a single federal

forum, and that current class action standards would continue to apply to the certification of direct purchasers regardless of differences in the degree to which overcharges may have been passed on to indirect purchasers.

## Criminal Penalties

There is a strong consensus worldwide favoring vigorous enforcement against cartels. Cartels offer no benefit to society and invariably harm consumers. Sentencing and fines under the Sherman Act are generally determined by the courts based on guidance in the Sentencing Guidelines issued by the U.S. Sentencing Commission. The Sentencing Guidelines employ a proxy of harm from cartels based on twenty percent of the volume of commerce affected. This twenty percent proxy is based on an assumed average overcharge of ten percent, which is doubled to account for dead-weight loss to society. The Commission recommends that the Sentencing Commission evaluate whether it remains reasonable to assume an overcharge of ten percent (*i.e.*, whether it should it be higher or lower) and the difficulty of proving actual gain or loss in lieu of using a proxy. It also recommends that the Sentencing Guidelines be amended to make explicit that the twenty percent proxy may be rebutted by proof by a preponderance of evidence that the actual amount of overcharge was higher or lower where a difference is material.

## International Antitrust

The United States was once the only major country actively enforcing a comprehensive set of antitrust laws. Today, more than 100 countries have adopted competition laws. On the one hand, this development has helped the United States in its fight to stamp out international cartels. It has also benefited world trade by opening up markets to competition. On the other hand, the proliferation of competition authorities has increased the risk of burden, inconsistency, and even conflict. There is some concern about the potential effect on U.S.-based companies of differences in the way that other countries treat so-called dominant firm behavior and the exploitation of rights in intellectual property.

The Commission recommends a number of steps to address these concerns. First, "as a matter of priority" the DOJ and the FTC should study and report to Congress on the possibility of developing a centralized international pre-merger notification system that would ease the burden of companies engaged in cross-border transactions. Second, the DOJ and the FTC should seek procedural and substantive convergence around the world on sound principles of competition law. Third, the United States should pursue bilateral and multilateral cooperation agreements with more of its trading partners. These agreements should explicitly recognize that conflicting antitrust enforcement can impede global trade, investment, and

consumer welfare. They should also promote comity by providing for the exercise of deference where appropriate, the harmonization of remedies, consultation and cooperation, and benchmarking reviews. Fourth, the DOJ and the FTC should be provided with direct budgetary authority to provide antitrust technical assistance to other countries for the purpose of enhancing convergence and cooperation.

Cooperation from other countries can be essential to punishing international cartels that exact hundreds of millions of dollars from U.S. consumers. But the United States has had limited success in entering Antitrust Mutual Assistance Agreements (AMAAs) with other countries. Many believe this is because U.S. law appears to require that those nations agree to allow the United States to use confidential information obtained under such agreements for non-antitrust enforcement purposes. The Commission recommends that Congress amend the International Antitrust Enforcement Assistance Act to clarify that it does not require such a commitment as the cost of entering into an AMAA.

Finally, the Commission recommends that, as a general principle, purchases made outside the United States from sellers outside the United States should not give rise to a cause of action in U.S. courts. The Commission was split as to whether this principle should be codified through amendment to the Foreign Trade Antitrust Improvements Act.

### Immunities and Exemptions

Free-market competition is the foundation of our economy, and the antitrust laws stand as a bulwark to protect free-market competition. Nevertheless, we have identified thirty statutory immunities from the antitrust laws. The Commission is skeptical about the value and basis for many, if not most or all, of these immunities. Many are vestiges of earlier antitrust enforcement policies that were deemed to be insufficiently sensitive to the benefits of certain types of conduct. Others are fairly characterized as special interest legislation that sacrifices general consumer welfare for the benefit of a few. Congress is currently considering the repeal of several immunities, including those covering the business of insurance and international shipping conferences. The Commission strongly encourages such review.

The Commission believes that statutory immunity from the antitrust laws should be disfavored. Immunities should rarely (if ever) be granted and then only on the basis of compelling evidence that either (1) competition cannot achieve important societal goals that trump consumer welfare, or (2) a market failure clearly requires government regulation in place of competition. The Commission recommends a framework for such a review and recommends that Congress consult with the DOJ and FTC about the likely competitive effects of existing and proposed immunities. In those rare instances in which Congress does grant an immunity, the Commission recommends (1) that the immunity be as limited in scope as

possible to accomplish the intended objective, (2) that it include a sunset provision pursuant to which the immunity would terminate at the end of a specified period unless renewed, and (3) that the FTC, in consultation with the DOJ, report to Congress on the effects of the immunity before any vote on renewal.

The judicial state action doctrine immunizes private action undertaken pursuant to a clearly articulated state policy deliberately intended to displace competition. In addition, the state must provide sufficient "active supervision" to ensure that conduct is truly a manifestation of state policy rather than private interests. A recent report by the FTC staff raises concern that courts have been applying the doctrine without sufficient care to ensure that private anticompetitive conduct has actually been authorized by the state pursuant to a clear policy to displace competition. The Commission agrees that courts should adhere more closely to Supreme Court state action precedents. It recommends that the doctrine should *not* apply where the effects of conduct are not predominantly intrastate. In addition, the doctrine should equally apply to governmental entities when they act as participants in the marketplace.

## Regulated Industries

During the early part of the 20th century, several industries—including electricity, natural gas, telecommunications, and transportation—were thought to be natural monopolies or at risk of "excessive competition." Since then, however, technological advancement and changed economic precepts have led to substantial deregulation. The unleashing of competition in these industries has greatly increased efficiency and provided substantial benefits to consumers. The Commission believes the trend toward deregulation should continue.

Antitrust enforcement is an important counterpart to deregulation. Where government regulation does exist, the antitrust laws should continue to apply to the maximum extent consistent with the regulatory regime. Ideally, statutes should clearly state whether, and to what extent, Congress intended to displace the antitrust laws, if at all. The courts, of course, should interpret antitrust "savings clauses" to give full effect to congressional intent that the antitrust laws continue to apply. Where there is no antitrust savings clause, the courts should imply immunity from the antitrust laws only where there is a clear repugnancy between those laws and the regulatory scheme.

The filed-rate doctrine prohibits private treble damage actions alleging that industry rates approved by a regulator resulted from unlawful collusion. Today, however, few filed rates are actually reviewed by regulators for their reasonableness. In 1986, the Supreme Court opined that a number of factors appeared to undermine the continued validity of the filed-

rate doctrine,[3] but concluded that it was for Congress to make that determination. The Commission believes it is time for Congress to reevaluate the filed-rate doctrine and consider overruling it where a regulator no longer specifically reviews and approves proposed rates agreed to among an industry.

The DOJ and FTC review mergers pursuant to the HSR Act, applying the same standards across all industries. In several industries, however, the DOJ and the FTC share merger review authority with a regulatory agency that reviews the merger under a "public interest" standard. Review by two different government agencies can impose substantial and duplicative costs. It can also lead to conflict. The Commission recommends that the DOJ or the FTC should have full antitrust merger enforcement authority with respect to regulated industries. In addition, Congress should review whether separate review under a public interest standard is needed to protect particular interests that cannot be adequately protected under application of an antitrust standard.

*     *     *

The federal antitrust laws are more than 115 years old. Although the free-market principles on which they stand remain a rock-solid foundation, the world, our economy, and our understanding of how markets work have changed substantially. For that reason, we believe it was a wise decision to authorize this Commission to assess those laws and whether the policies developed to enforce them are serving the nation well.

The almost constitutional generality of the central provisions of the antitrust laws has provided the needed flexibility to adjust to new developments. In this sense, "antitrust modernization" has occurred continuously. But, even so, the interplay of statutes, enforcement activity, and court decisions has suggested a substantial number of areas that the Commission believes can be improved.

The issues the Commission examined are complex. Reasonable minds can, and likely will, differ on many of the Commission's findings and recommendations. But we hope this Report will prompt an important national conversation on those recommendations that will result in the adoption of many, if not all, of them.

*Deborah A. Garza*

Deborah A. Garza
*Chair*

*Jonathan R. Yarowsky*

Jonathan R. Yarowsky
*Vice-Chair*

---

[3]  Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 423–24 (1986).

# Chapter II.B
# The Hart-Scott-Rodino Act Pre-Merger Review Process

## 1. INTRODUCTION

The passage of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act) marked one of the most significant changes to federal merger enforcement since enactment of the Clayton Act in 1914.[1] Before enactment of the HSR Act, it was more difficult for the agencies to investigate and challenge mergers before they had been consummated. Even when these lawsuits were successful, it was difficult to fashion relief that was effective in eliminating the anticompetitive effects that resulted from the merger. Effective relief proved especially challenging in cases brought after the merger had been consummated, because in most instances it would require recreating a company, or significant parts of one, to replace the competitor that the merger had eliminated.

Under the HSR Act, parties to mergers subject to the Act must file a notification form with the Federal Trade Commission (FTC) and the Antitrust Division of the Department of Justice (DOJ). The parties may not complete their transaction until the expiration of a thirty-day waiting period, which permits the FTC or the DOJ to investigate whether the transaction may substantially lessen competition in violation of Section 7 of the Clayton Act.[2] The investigating agency may extend the waiting period in order to conduct a more detailed investigation by issuing a request for additional information, commonly called a "second request." The second request requires the parties to supply detailed information regarding the transaction and its possible competitive effects. The parties must also observe a second thirty-day waiting period after fulfilling this request, during which the agency must decide whether to challenge the transaction in court.[3]

Under this system, the agencies are able to challenge mergers before they are consummated, and seek injunctions blocking the merger, partial divestitures that would adequately address the competitive concerns, or other appropriate relief. Since Fiscal Year 2001 (FY2001), the FTC and the DOJ have blocked or obtained relief in nearly 165 mergers that they concluded would harm competition and consumers, or approximately 1.8 percent of all transactions notified pursuant to the HSR Act during that period.[4]

Although the HSR Act is widely recognized as having made merger enforcement far more effective, some concern has been expressed over costs it imposes. First, some believe that the second request process has become unduly expensive and burdensome, both in the cost of providing requested information and in the length of time for resolution. Second, some believe that the HSR reporting requirements cover a significant number of transactions that

pose no competitive problems, imposing unnecessary costs, including preparing the filing, filing fees, and a thirty-day delay in completing the transaction.

Both the coverage and cost of complying with the HSR Act have grown beyond that originally expected by Congress. The reach of the Act was limited in recognition that, if its requirements "were imposed on every merger, the resulting added reporting burdens might more than offset" the enforcement benefits.[5] At the time the Act was passed, Congress expected that only about 150 very large transactions would be reported each year.[6] Instead, there have been nearly 1000 filings annually since the program began, reaching a high of 4749 in 2000.[7] Congress's recent changes to the filing thresholds, partially adjusting for inflation since 1976, reduced the number of notifications by approximately 50 percent.[8] Many of the transactions notified are quickly assessed as not likely to lessen competition substantially. For example, in FY2006, of the 1746 transactions notified, the government granted early terminations for 1098 (62.9 percent), extensively investigated only 45 (2.6 percent), and ultimately brought only 29 HSR Act enforcement actions (1.7 percent).[9] This broad coverage, however, ensures that the agencies are aware of nearly every transaction that has the potential to cause competitive harm.

Congress also assumed that the burden and cost of supplying documents and information in response to second requests would be modest and not time-consuming, as the responsive information would largely be contained in materials that the parties had already assembled.[10] Since 1976, however, merger analysis has become more complex, as the agencies have moved away from concentration thresholds in favor of a more flexible analysis that aims toward greater accuracy. As a result, today a second request can impose sizable burdens, including expenditures of several million dollars for attorneys' fees and production of tens of millions of pages of documents and tens of gigabytes of electronic data. One estimate places the current cost of responding to a second request investigation at between $5 million and $10 million.[11] The time needed for review of a transaction and receipt of approval from the agency now can be six months or longer.[12] The agencies maintain that they need this time and volume of information to accurately assess a merger's likely effects; others are skeptical.

Since 1990, acquiring parties must pay filing fees in connection with their notification. These fees, which range up to $280,000 for the largest transactions, supply a substantial part of the funding for the FTC and the Antitrust Division of the Department of Justice. Since 1996, at least 79 percent of the Antitrust Division's budget has been funded with filing fee revenue; for FY2000–FY2003, filing fee revenue fully funded the Antitrust Division's budget.[13] Between 32 and 59 percent of the FTC's appropriations, which also support its consumer protection mission, have come from filing fees each year since FY2001.[14]

The United States is one of approximately seventy jurisdictions, including the European Union and Canada, with a merger review system.[15] Most of these jurisdictions also require parties to notify transactions and observe waiting periods before closing to provide enforcers

an opportunity to challenge the proposed merger before consummation.[16] Each jurisdiction that requires a filing imposes costs on a proposed transaction. Nonetheless, a recent broad survey concluded that the external costs to the merging parties subject to a second request investigation in the United States (including payments for attorneys, economists, and document production) were at least double that of any other jurisdiction.[17]

In light of the concerns about the burdens imposed by the HSR Act, the Commission studied the HSR Act pre-merger notification system as a whole, paying specific attention to pre-merger filing requirements, the second request process employed by the FTC and the DOJ, the costs the current system imposes, and the benefits of more effective merger enforcement that the HSR Act brings.

Based on its study of the issues, the Commission makes the following recommendations.

---

**27.** No changes are recommended to the initial filing requirements under the Hart-Scott-Rodino Act.[*]

**28.** Congress should de-link funding for the Federal Trade Commission and the Antitrust Division of the Department of Justice from Hart-Scott-Rodino Act filing fee revenues.[†]

**29.** The Federal Trade Commission and the Antitrust Division of the Department of Justice should continue to pursue reforms of the Hart-Scott-Rodino Act merger review process to reduce the burdens imposed on merging parties by second requests.

**30.** The Federal Trade Commission and the Antitrust Division of the Department of Justice should systematically collect and record information regarding the costs and burdens imposed on merging parties by the Hart-Scott-Rodino Act process, to improve the ability of the agencies to identify ways to reduce those costs and burdens and enable Congress to perform appropriate oversight regarding enforcement of the Hart-Scott-Rodino Act.

---

[*] Commissioners Garza, Kempf, and Warden do not join this recommendation.

[†] Commissioners Carlton and Jacobson do not join this recommendation.

31. The agencies should evaluate and consider implementing several specific reforms to the second request process.

   31a. The agencies should adopt tiered limits on the number of custodians whose files must be searched pursuant to a second request.[*]

   31b. The agencies should in all cases inform the merging parties of the competitive concerns that led to a second request.[†]

   31c. To enable merging companies to understand the bases for and respond to any agency concern, the agencies should inform the parties of the theoretical and empirical bases for the agencies' economic analysis and facilitate dialogue including the agency economists.

   31d. The agencies should reduce the burden of translating foreign-language documents.

   31e. The agencies should reduce the burden of requests for data not kept in the normal course of business by the parties.

---

[*] Commissioners Burchfield, Carlton, and Garza do not join this recommendation.

[†] Commissioners Burchfield, Cannon, Carlton, Litvack, and Yarowsky do not join this recommendation.

## 2. BACKGROUND

### A. The Purpose and Mechanics of the Hart-Scott-Rodino Act

Prior to enactment of the HSR Act, the U.S. government had limited ability to stop an anti-competitive merger. To the extent the government had notice of a transaction, it had limited practical ability to obtain sufficient information to challenge it prior to its consummation.[18] Post-merger challenges, moreover, could take years—five to six on average.[19] As a result, even where the government ultimately prevailed, it was often unable to obtain effective relief.[20] It could neither fully compensate society for the interim loss of competition, nor fully restore a competitive market structure, particularly if the companies had already integrated their productive assets, or "scrambled the eggs."[21]

Congress addressed these issues by enacting the HSR Act. The stated purpose of the Act was "to provide advance notification to the antitrust authorities of very large mergers prior to their consummation, and to improve procedures to facilitate enjoining illegal mergers before they [were] consummated."[22] Under the HSR Act, before consummating certain mergers and acquisitions, parties must file a notification with both the DOJ and the FTC.[23]

The HSR Act applies to transactions that exceed certain size-of-company and size-of-transaction thresholds and that have a significant nexus to U.S. commerce.[24] Currently, to be subject to the HSR Act, one of the acquired or acquiring persons must have at least $119.6 million in annual net sales or total assets, and the other must have at least $12 million in annual net sales or total assets.[25] The value of the transaction must be greater than $59.8 million.[26] The acquiring person must pay a filing fee, which depends on the value of the transaction and ranges from $45,000 to $280,000.[27] All filing thresholds are adjusted annually in accordance with changes in the Gross National Product (GNP).[28]

The HSR Act filing provides certain basic information about the transaction and the companies (for example, their affiliates, major shareholders, revenues, and the industries and geographic areas in which the operate, by North American Industry Classification System code (NAICS codes)), and includes documents prepared by or for directors or board-appointed officers of the companies in connection with the transaction that address competitive issues.[29] The parties are not required to provide any additional information about the extent to which they do or do not compete or the transaction's potential impact on competition.

After filing, the parties must observe a thirty-day waiting period (fifteen days for cash tender offers) to allow the government time to make an initial determination as to whether to allow the transaction to proceed or to conduct a more extensive investigation.[30] The initial thirty-day waiting period may be terminated early if the parties so request and the government determines there are no material competitive issues, or may simply be allowed to expire.[31] In either case, the parties may then close their transaction. Alternatively, the government can extend the waiting period by issuing a request for additional information, which has come to be called a "second request." [32] If a second request is issued, the par-

ties may not close their transaction until thirty days (ten days for cash tender offers) after they both have "substantially complied" with the second request.[33] During that second thirty-day period the government must decide whether to allow the transaction to close, seek to block it in court, or negotiate to place conditions on it that resolve competitive concerns.

## B. Actual Practice

For the vast majority of transactions, the agencies grant early termination of the initial thirty-day waiting period or simply permit the waiting period to expire without conducting any formal investigation. For example, of the 1746 transactions notified in FY2006, 62.9 percent received early termination.[34] Only 2.6 percent of these transaction received second requests.[35] As Table A shows, these figures have been consistent from year to year.

**Table A: HSR Act Enforcement Activity**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| **Transactions Reported** | 2237 | 1142 | 968 | 1377 | 1610 | 1746 |
| **Clearance not Sought or Investigation Closed During Initial Waiting Period** | 2167 | 1093 | 933 | 1342 | 1560 | 1702 |
| **Early Termination Granted** | 1603 | 793 | 606 | 943 | 997 | 1098 |
| **Second Request Issued** | 70 | 49 | 35 | 35 | 50 | 45 |
| **HSR Act Merger Enforcement Actions** | 42 | 28 | 33 | 17 | 16 | 29 |
| **Non-HSR Act Merger Enforcement Actions** | 13 | 5 | 3 | 5 | 2 | 3 |

**Notes:** HSR Act Merger Enforcement Actions: Enforcement actions are reported by the fiscal year in which the action was brought, regardless of when the investigation that led to the action was opened. FTC enforcement actions include Part II consents made public for comment, FTC authorization to file motions for preliminary or permanent injunction, FTC issuance of Part III complaints, and transactions that were abandoned or withdrawn for antitrust concerns that arose during the course of investigations. DOJ enforcement actions include complaints filed (whether litigated or settled), transactions that were abandoned or subject to a fix-it-first remedy, and certain bank divestitures pursuant to regulatory orders. Figures do not include merger enforcement actions in which the court found in favor of defendants (1 in 2002; 2 in 2004).

Non-HSR Merger Enforcement Actions: Both the DOJ and the FTC also bring enforcement actions challenging mergers that are not reportable under the HSR Act. For example, the DOJ has brought enforcement actions in banking mergers that are not reportable. Both agencies have brought actions in mergers that were below the reporting thresholds.

Source: FTC/DOJ Data Submission, at chart D.[40]

If one of the agencies decides that the transaction may raise material competitive concerns, it seeks clearance from the other agency to investigate.[36] In that event, the agency may request that the parties voluntarily provide additional information. The only way under the HSR Act that the government can prevent the parties from closing their transaction after

thirty days is to issue a "second request."[37] However, in order to provide the government with additional time for investigation without the issuance of a second request, an informal practice has developed by which parties voluntarily withdraw their HSR filing and re-file it to start another thirty-day waiting period.[38] (Withdrawing does not guarantee that a second request will not issue.) Although the Commission understands from anecdotal evidence that increasing use has been made of this "pull and re-file" strategy to extend the initial thirty-day waiting period,[39] neither the FTC nor the DOJ has systematically tracked the number of transactions for which this has been done.

Issuing a second request enables the government to conduct a further examination of the competitive effects of a proposed transaction based on information and documents provided by the merging parties, their competitors, and customers. In addition to seeking the voluntary provision of information by competitors and customers, the agencies have the ability to compel information through the use of a subpoena or civil investigative demand. The agencies also have the ability to compel testimony from the merging parties and others through depositions (in the case of the DOJ) or investigational hearings (in the case of the FTC).[41] In this sense, the second request process resembles discovery in civil litigation, although it is not supervised by a court or governed by the Federal Rules of Civil Procedure.

The parties may not close their transaction until they both have substantially complied with the second request.[42] An officer of each company is required to certify substantial compliance.[43] If the government disputes substantial compliance, it has the option to go to court to enjoin the transaction until substantial compliance has been achieved.[44] In the history of the HSR Act, there have been only three occasions on which the FTC voted to authorize the filing of a complaint and motion seeking such an injunction.[45] Otherwise, the parties and government generally informally resolve their differences. The 2000 HSR Amendments, discussed below, required the FTC and the DOJ to establish formal internal processes for resolving such disputes, which they have adopted.[46]

If the agency determines that the effect of the transaction may be substantially to lessen competition, the agency can challenge the transaction in court.[47] Before seeking an injunction in court, however, the investigating agency may negotiate with the merging parties to reach a consent decree that obligates the merging parties to divest assets or agree to other relief that resolves the agency's concerns about the merger's competitive effects.

## C. Recent Reforms by Congress and the Agencies

In 2000 Congress enacted the 21st Century Acquisition Reform and Improvement Act (2000 HSR Amendments) to address concerns about the growing scope and burden of the HSR Act.[48] These amendments had two principal components.

First, the 2000 HSR Amendments substantially increased the size-of-transaction filing threshold, from $15 million to $50 million. This amendment had the effect of reducing the number of transactions for which filings were required by about half.[49] The amendments also

provided that all thresholds would be adjusted annually for changes in Gross National Product (GNP) beginning in 2005.[50]

Second, the 2000 HSR Amendments made several changes regarding the second-request process. One significant change required the agencies to designate a senior official to hear appeals from merging parties regarding the burden of second requests.[51] The amendments also directed both agencies to conduct one-time internal reviews of the HSR Act process, "implement reforms . . . in order to eliminate unnecessary burden, remove costly duplication, and eliminate undue delay," and report back to Congress within 180 days.[52] Both the FTC and the DOJ reported to Congress in 2001, describing their reviews of the second request process and reforms they implemented.[53]

Both the FTC and the DOJ have continued to reform their pre-merger review processes. Each announced further reforms in 2006.[54]

## 3. RECOMMENDATIONS AND FINDINGS

Overall, the existing pre-merger review system under the HSR Act is achieving its intended objectives of providing a more effective means for challenging mergers raising competitive concerns before their consummation and protecting consumers from anticompetitive effects.[55] Although efforts must continue to reduce the cost and burden the system imposes on merging parties, there is no need for comprehensive reform.[56]

The costs the HSR Act imposes are not insignificant; while very small relative to the total value of the transactions reviewed, their magnitude remains of concern to many. First, the current notification system imposes costs—filing fees and a thirty-day waiting period—on a large number of merging parties whose transactions do not pose competitive problems. Second, the second-request process imposes very large, and in some cases unnecessary, burdens on parties to provide information to the agencies.

Effective prevention of anticompetitive mergers is an important policy objective. Nonetheless, mergers are often beneficial to consumers and businesses, offering procompetitive efficiencies that will benefit both.[57] Imposing unnecessary burdens on such transactions wastes resources and may, in the extreme case, inhibit beneficial conduct. The pre-merger review process should aim to strike a balance that enables effective merger enforcement while avoiding the imposition of excessive costs on the parties and the economy.

Based on its assessment of the operation of the HSR pre-merger review system, the Commission does not recommend systemic change or major modifications. Although the system is not perfect, alternative approaches do not appear to be more suitable and would impose their own sets of costs. For example, the Commission does not recommend adoption of a markedly different approach, such as that used in the European Union or Canada.[58] Indeed, there was minimal call for the Commission to recommend such alternatives.[59]

Rather, comments generally focused on reducing the burdens imposed by making modifications to the current process.

The Commission considered a variety of possible reforms to the current HSR system. First, the Commission considered changes to the initial filing process. As explained below, the Commission does not recommend any changes to the filing thresholds. The Commission does recommend that agency funding no longer be linked to filing fees. Second, the Commission considered numerous possible reforms to the second request process. Overall, it concludes that the second request process can impose sizable burdens on merging parties in terms of expense and delay that should be reduced wherever possible. It commends the agencies for the various reforms they have adopted to reduce second request burdens, and urges them to take steps to reduce those burdens further as well as implement mechanisms to measure burdens and track progress. The Commission recommends several specific reforms for the agencies to evaluate and, if appropriate, refine and implement.[60]

## A. Pre-Merger Filing Requirements

> **27.** **No changes are recommended to the initial filing requirements under the Hart-Scott-Rodino Act.**[*]

Although the number of transactions reviewed has increased over time (largely due to the fact that the dollar thresholds remained constant while the dollar value of merger activity increased markedly),[61] the increase in the filing thresholds in 2000 significantly reduced the number of covered transactions.[62] If the $50 million size-of-transaction threshold had been in place for FY2000 (the last full year under the original thresholds), only 2502 transactions would have been reported in that year, rather than the 4749 actually notified, representing a decrease of 47 percent.[63] The 2000 HSR Amendments thus significantly addressed concerns that the HSR Act thresholds were "too low and capture[d] too many lawful transactions."[64]

Even with this significant reduction in coverage, and annual adjustments to accommodate GNP growth, it is clear that the vast majority of transactions reported raise no competitive issues.[65] This is particularly true for smaller transactions, which are less likely to be subject to challenge, or even extensive review, than transactions with large dollar values. Over the past five years, as Table B shows, the FTC or the DOJ issued a second request in 1.3

---

[*] Commissioners Garza, Kempf, and Warden do not join this recommendation. They believe that the filing thresholds should be increased in light of the significant number of transactions at the lower end of the thresholds that receive early termination and the few such transactions that either receive a second request or are subject to an enforcement action by the agencies.

percent of transactions valued between $50 million and $100 million, as compared with 11.1 percent of transactions over $1 billion. Similarly, they brought enforcement actions in less than 1 percent of mergers valued below $100 million, but 7.7 percent of mergers worth over $1 billion. Nevertheless, small transactions regularly account for a fair percentage of investigative activity. Between FY2002 and FY2006, 31 of the 214 second requests issued by the agencies (14.5 percent) were related to mergers valued between $50 million and $100 million.[66]

**Table B: Second Requests and Enforcement Actions by Size of Transaction FY2002–2006**

| Transaction Size | Second Requests | | Enforcement Actions | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| $50M–$100M | 31 | 1.3% | 14 | 0.4% |
| $100M–$150M | 20 | 1.9% | 12 | 1.1% |
| $150M–$200M | 19 | 2.9% | 9 | 1.4% |
| $200M–$300M | 19 | 2.4% | 10 | 1.3% |
| $300M–$500M | 18 | 2.4% | 14 | 1.9% |
| $500M–$1000M | 37 | 6.4% | 22 | 3.8% |
| Over $1000M | 70 | 11.1% | 49 | 7.7% |
| Total | 214 | 3.1% | 130 | 1.9% |

**Notes:** "Enforcement actions" are defined in same manner as described in Table A, and do not include enforcement actions brought against mergers that were not reportable under the HSR Act.

"Percent" is the percentage of all transactions notified within each size range that resulted in a second request or an enforcement action.

Source: FTC/DOJ Data Submission, charts E1–E3.

The FTC's and the DOJ's enforcement efforts suggest that relatively small transactions can pose competitive problems, and that the pre-merger filing requirements facilitate review of these transactions. The recent adjustments to the thresholds adopted by Congress in 2000 reduced the number of filings considerably, and the evidence has not persuaded the Commission that further increases are currently warranted.[67] The Commission believes that the provisions for regular adjustments to the thresholds for increases in GNP should remain in place.

Although no change to the thresholds is currently recommended, Congress should continue to monitor the operation of the system, and periodically reevaluate whether it should

adjust the size-of-transaction threshold to ensure that the number of smaller transactions actually reviewed and challenged by the agencies justifies the filing burdens imposed on those transactions.

> **28.** **Congress should de-link funding for the Federal Trade Commission and the Antitrust Division of the Department of Justice from Hart-Scott-Rodino Act filing fee revenues.**[*]

Revenues the antitrust agencies receive from HSR Act filing fees are evenly divided and credited to the appropriations for the Antitrust Division of the DOJ and the FTC.[68] As a result, filing fees significantly reduce the amounts that Congress appropriates from general revenues to fund the agencies' enforcement programs.[69] Indeed, in some recent years, the Antitrust Division has been funded entirely from filing-fee revenue.[70] Prior to FY 1990, there were no filing fees; Congress instituted a $20,000 filing fee in 1990 and began to fund both agencies' operations in part with the fee receipts. Congress increased the filing fees in the 2000 HSR Amendments, with fees ranging from $45,000 to $280,000, depending on the size of the transaction.[71] Congress enacted this increase largely to offset the reduction in fee receipts resulting from increasing the size-of-transaction threshold and thereby preserve agency funding.[72]

The agencies should be funded fully from general revenues, and should not have their funding linked to HSR filing fees.[73] The existing linkage has at least the potential to expose funding of other agency enforcement efforts—including criminal and civil non-merger efforts—to the risk that merger activity (and therefore filing fee revenues) will fall.[74] Furthermore, merging parties should not have to shoulder the burden of paying a large portion of the cost of antitrust enforcement generally.[75] Indeed, the fees Congress has imposed effectively tax mergers, the vast majority of which are procompetitive or competitively neutral.[76] Other countries may follow this example and use fees to finance various activities.[77] Moreover, because a large majority of filings impose negligible review costs on the agencies, filing fees do not accurately reflect the burden imposed on the government by a given filing.[78]

---

[*] Commissioners Carlton and Jacobson do not join this recommendation.

Commissioner Carlton believes that filing fees are equivalent to a user fee that is appropriately linked to agency funding.

Commissioner Jacobson believes that funding from HSR Act filing fees lessens the politics associated with funding the nation's antitrust function. Without the significant revenues from HSR filing fees, the agencies will be increasingly vulnerable to political pressures to appease various constituencies to ensure they get the funds they need.

This recommendation is not a call for reduced antitrust enforcement or reduced funding for the antitrust agencies. The Commission recognizes the importance of antitrust enforcement to promoting consumer welfare, efficiency, and innovation. It urges Congress to fund the antitrust agencies solely from general revenues.[79]

## B. The Second Request Process

> **29.** The Federal Trade Commission and the Antitrust Division of the Department of Justice should continue to pursue reforms of the Hart-Scott-Rodino Act merger review process to reduce the burdens imposed on merging parties by second requests.

A second request is the principal formal mechanism through which the agencies can obtain the information they need to perform a detailed assessment of a proposed merger's likely impact on competition. The second request process must provide the agencies with sufficient information in a timely fashion to enable them to determine whether to challenge an anticompetitive merger in court. The challenge facing the agencies is implementing an approach that strikes an appropriate balance between the likely benefit of requested information to their review and the cost it will impose on the merging parties. While additional information may potentially be helpful to an investigation, requests should be limited to avoid situations in which "the cost of supplying much of the information . . . is disproportionate to its probative value."[80]

The second request process can impose immense burdens on parties, both in terms of delaying transactions and forcing parties to expend significant resources to supply requested information. Indeed, commenters and witnesses uniformly expressed concern over the excessive cost and delay associated with the second request process.[81] The American Bar Association Section of Antitrust Law (ABA Antitrust Section) reported a "consensus in the private bar that second requests are unduly burdensome."[82] Furthermore, the 2000 Report of the International Competition Policy Advisory Committee (ICPAC) observed that "[m]any business groups and practitioners . . . perceive the second request process to be 'unduly burdensome.'"[83] Agency witnesses agreed as well that decreasing the burdens imposed by second requests is an important goal.[84] Indeed, reviewing a response to a second request imposes considerable burdens on the government;[85] FTC Chairman Deborah Platt Majoras has expressly stated that recent reforms at the FTC are intended to reduce the costs faced by parties *and* the agencies.[86]

The burdens of second requests are high and increasing.[87] The cost of responding to a typical second request includes outside counsel fees, payments for processing electronic

documents and photocopying, and economists' fees.[88] Indirect costs, such as employee time and opportunity cost, are difficult to quantify but are nonetheless very significant.[89] The ABA Antitrust Section cited reports that compliance with a second request typically takes six months and costs $5 million, while the reviews in more complex investigations can take eighteen months and cost the merging parties up to $20 million.[90]

Most of the Commission's evidence on burden, however, is anecdotal. The primary empirical study available to the Commission at the outset of its work was performed by PricewaterhouseCoopers in June 2003 under the sponsorship of the American Bar Association and the International Bar Association.[91] PricewaterhouseCoopers collected information on sixty-two transactions requiring multijurisdictional filing and reviews.[92] The sample thus focused on large international transactions subject to review by multiple jurisdictions.[93] The study found a "relatively small, regressive tax on mergers" and "significant delays in the multi-jurisdictional merger review process."[94] The study also found that the U.S. second request process is by far the most costly in the world, imposing twice the external costs (including payments for attorneys, economists, and document productions) than do second-phase investigations in the European Union.[95]

To supplement this information, the Commission sought data on the burden imposed by second requests from the public. No individual firms or companies provided data on burdens they had experienced. Although companies did not provide information directly to the Commission about the burden imposed by second requests, the ABA Antitrust Section provided the Commission with the aggregated results of a survey it conducted on burdens.[96] The figures for the delays and burdens imposed by second requests obtained through the survey are generally consistent with other anecdotal evidence, as shown in Table C. For example, on average, second request investigations took seven months and resulted in median compliance costs of $3.3 million. In addition, the median values for these data illustrate some of the specific burdens involved in complying with second requests: electronic document production of 583,000 pages of email and 555,000 pages of other documents; 275 pages of interrogatory responses; 13 gigabytes of electronic data; $2.4 million in fees for attorneys; and $300,000 in fees for economists. However, the survey's value is limited by the fact that it is based on a non-scientific, self-selected sample of only twenty-three total responses, and only a subset of these included information on each specific question. Moreover, the median values of most measures of burden were much lower than the means, suggesting that the average (*i.e.*, mean) values may be influenced by a few very high observations.

**Table C: Burdens Imposed by Second Requests**

| Measure of Burden<br>*(number of responses providing numerical data)* | Mean Value | Median Value |
|---|---|---|
| Length of investigation, in months (from HSR Act filing to close or agency action) (22) | 7 | 7 |
| Number of custodians searched (23) | 126 | 94 |
| Pages of e-mail produced (7) | 1,566,867 | 582,913 |
| Pages of electronic documents produced (other than e-mail) (6) | 5,411,437 | 554,870 |
| Pages of documents produced in hard copy (20) | 1,515,662 | 544,516 |
| Pages of interrogatory responses produced (18) | 872 | 275 |
| Electronic data produced in response to the interrogatories (in gigabytes) (6) | 20 | 13 |
| Total costs of compliance with second request (18) | $5,194,196 | $3,300,000 |
| Cost of economists (fees) (9) | $1,116,349 | $300,000 |
| Cost of attorneys/paralegals (fees) (13) | $4,361,604 | $2,424,803 |
| Costs of duplication/reproduction of documents and information (13) | $714,047 | $100,787 |

Source: Letter from Joseph Angland to the Antitrust Modernization Commission Re: Data Regarding the Burden Involved in Responding to HSR Second Request Investigations (Feb. 22, 2007).

The Commission also sought data on second request burden from the agencies. The agencies do not systematically track the number of documents or the amount of data produced by parties in response to second requests.[97] However, they do track the length of second request investigations. For both agencies, the length of second request investigations averaged about six months from the opening of the investigation in FY2005.[98] The length of investigations resulting in no enforcement action decreased significantly between FY2000 and FY2005, dropping from 312 days to 168 days for the FTC, and from 184 days to 163 days for the DOJ.[99] Investigations resulting in enforcement actions generally took longer—208 days for the FTC and 260 days for the DOJ in FY2005—and the length of these investigations decreased for the FTC but not the DOJ over the same period.[100]

It appears clear from the evidence available to the Commission that the second request process imposes significant costs on the merging parties in a substantial number of cases. However, the Commission is concerned that the lack of reliable quantitative information on the extent and nature of the problem may inhibit the ability of the agencies and Congress to identify and implement improvements, and recommends efforts to improve data collection below.

There are a number of reasons for the sizable costs imposed by second requests in some merger investigations. Merger investigations pose considerable challenges for the agencies. The issues are complex, and decisions must be made on a tight time frame. The second request must be issued early in the investigation and is the agencies' only opportunity to obtain documents and data, other than by consent of the parties, prior to challenging the merger in court.[101] Moreover, merging parties have no incentive voluntarily to provide the agencies with information that would suggest the transaction might be anticompetitive. Accordingly, the agencies cannot simply rely on the parties to provide all significant information and instead must actively seek the information they need. As a result, cooperation by the parties in meeting the agencies' needs is likely to be important to reducing the burdens imposed by second requests.[102]

The agencies' need for information to assess the impact of a merger has expanded as antitrust analysis has evolved over the past thirty years from a reliance on structural presumptions that mergers that increased concentration above certain thresholds were unlawful, to a more complex and fact- and data-intensive analysis.[103] The agencies must consider a variety of complex issues, including entry barriers and efficiencies. Moreover, the agencies increasingly rely on econometric assessments in evaluating mergers, and direct analysis of likely competitive impacts.[104]

The problem of increasingly extensive production requirements has been compounded by an "explosion" in the number of documents retained by companies in electronic format in recent years.[105] Some commentators have reported a ten-fold increase in the volume of documents collected per employee due to electronic documents.[106] As a result, the "search and production of electronic files has become the most expensive and burdensome part of most second request productions."[107] The agencies' need for increased production of data has also increased costs, especially because firms retain more data due to technological advances.[108] Data production costs are further increased by the need to re-process data for an agency—for example, to produce the information in a particular common format.[109] The agencies' review efforts are also negatively affected by these developments, because the production of massive amounts of data and documents also make it more difficult for staff to find and review relevant data.[110]

Unfortunately, agencies may face internal pressures that discourage staff from limiting the scope of second requests and may restrict the systematic reforms they adopt.[111] The agencies are generally reluctant to forgo the possibility of obtaining relevant information, even where it may not improve their ability to assess the competitive impact of the merger. As one witness observed, from the agency staff perspective, "[i]t is easy to take the view that more is better when it comes to obtaining information," since limitations "pose risks . . . without, from the government's perspective, much apparent downside."[112] For example, a large percentage of email that is responsive to a second request typically comes from lower-level employees, and arguably is not likely to produce insights regarding competitive

effects beyond information also stored centrally or available in management files.[113] Moreover, such evidence may provide relatively little useful information on the market and economic characteristics most relevant to merger assessment. The agencies' use of the second request process to obtain evidence to support seeking a preliminary injunction can exacerbate this tendency towards over-inclusiveness.[114] This, however, is counter to the intended purpose of the HSR Act process, which aims to provide the agency only with the information they need to determine whether to bring a court challenge.[115] The agencies may later obtain further discovery—governed by a district court and the rules of civil procedure—if the agency brings a challenge in court.

There are limited formal constraints on the agencies' tendencies to seek more information, due to the largely regulatory nature of the HSR Act process.[116] The parties' need to obtain the fastest possible resolution makes it extremely unlikely that they will request that a court review agency decisions regarding second request breadth or compliance.[117] The delay, uncertainty, and potential bar that a challenge would cause leads the parties to meet almost any agency demand in order to avoid going to court. Although the agencies have created formal internal checks, as required by the 2000 HSR Amendments, some commenters and witnesses questioned the efficacy of these internal review mechanisms.[118] The limited set of overall constraints has led some critics to assert that the agencies may use the second request "to essentially create the automatic stay of a transaction" and to "create a whole new discovery mechanism, unconstrained by the Federal Rules."[119]

Over the last several years, the agencies have engaged in various initiatives to reduce the burdens imposed by HSR Act review.[120] Both agencies adopted a number of specific reforms during 2006 (including limitations on the number of employees whose files must be searched for a second request, discussed more fully below).[121] Some of these reforms appear to have had modest success in reducing the length of second request investigations—in investigations in which no enforcement action was brought the length has decreased markedly over the past five years.[122] The 2006 reforms occurred too recently to have yet had a measurable effect.

The Commission commends the agencies for undertaking reforms, and for their continuing efforts, in collaboration with the antitrust bar, business community, and public, to reduce the burdens resulting from HSR Act review and second requests. The Commission encourages both agencies to fulfill their commitment to conduct an "ongoing assessment of the HSR Act program to increase accessibility, promote transparency, and reduce the burden on the filing parties without compromising the agencies' ability to investigate and interdict transactions that may substantially lessen competition."[123] Overall, the Commission shares FTC Chairman Majoras's view that the FTC's most recent reforms should be "the start rather than the end."[124]

> **30.** The Federal Trade Commission and the Antitrust Division of the Department of Justice should systematically collect and record information regarding the costs and burdens imposed on merging parties by the Hart-Scott-Rodino Act process, to improve the ability of the agencies to identify ways to reduce those costs and burdens and enable Congress to perform appropriate oversight regarding enforcement of the Hart-Scott-Rodino Act.

There is little question that second requests have the potential to impose significant costs on the merging parties. The evidence of those costs is largely anecdotal, however, with little systematic quantitative information on the burdens second requests impose. The agencies are in the best position to collect such information. For example, the agencies could compile information about the volume of data and documents (or electronic "bytes") the parties produce in each investigation.[125] Information about the overall length of investigations, and the number of investigational hearings or depositions taken,[126] are valuable but do not provide a complete pictures of the burden involved in an investigation.

The absence of reliable data about investigational burdens makes it difficult to evaluate accurately the actual burdens imposed by HSR Act investigations. Such data could be used to confirm the anecdotal evidence that costs are high, or might show that the limited evidence overstates the typical burden. Equally important, comprehensive data provide a baseline by which to measure improvements through process reforms introduced by the agencies or to help identify "best practices" in merger review.[127] (In addition, data relevant to other aspects of the HSR Act process, such as information regarding delays from clearance decisions, would also help identify areas where delays and costs could be most effectively reduced.[128]) Finally, systematic data collection would assist congressional committees in exercising their oversight responsibilities regarding merger enforcement under the HSR Act by the FTC and the DOJ.

The agencies should improve and increase their systematic collection of data relating to the length, costs, and burdens of their investigations under the HSR Act. The agencies should collaborate on developing consistent measures and definitions to ensure that the data applicable to each agency are comparable, so that data can be aggregated or compared to see whether one agency has developed a more effective approach for reducing burdens. The Commission believes the development of improved data collection systems will not unduly burden the FTC and the DOJ. On the contrary, once institutionalized, the collection of such information is likely to become a routine part of each investigation that takes minimal additional time to compile. The benefits it can bring, however, to improved understanding of the costs and burdens of the HSR Act and areas for further reform are likely to be substantial.

> ### 31.  The agencies should evaluate and consider implementing several specific reforms to the second request process.

The Commission has identified several additional ways to streamline the second request process. The Commission recommends one specific reform to the second request process, and identifies four additional specific areas in which it recommends that the agencies evaluate current practices to determine whether further improvements can be made. These potential reforms recognize the need to maintain an appropriate balance between the burdens imposed by second requests and the need of the agencies to review a merger adequately. Overall, the reforms offered for the agencies' consideration could help reduce burdens on parties without materially impairing the ability of the agencies to determine whether a merger will cause anticompetitive effects. Other than with respect to the specific reform, the Commission has described the contours of these reforms in general terms, leaving it to the agencies to determine the best method of implementation in light of their substantial experience.[129] (To the extent these reforms require legislative change, the Commission recommends that Congress enact any legislation necessary for the agencies to implement these proposed reforms.)

The Commission's identification of these five possible reforms is not intended to be exhaustive. On the contrary, there are likely numerous other ways in which the agencies could reduce the costs and burdens of second requests. The Commission, however, leaves it to the agencies, and their collective expertise, to identify areas for further reducing costs and how best to implement appropriate reforms.

*1. Recommended Specific Reform*

> ### 31a.  The agencies should adopt tiered limits on the number of custodians whose files must be searched pursuant to a second request.*

One of the principal sources of burden from a second request is the volume of electronic and paper documents that must be searched and produced. This burden is related to the number of custodians whose files must be searched for responsive information.[130] Several witnesses and commenters before the Commission suggested that custodian limits could

---

* Commissioners Burchfield, Carlton, and Garza to not join this recommendation.

Commissioner Carlton does not join this recommendation because he would not eliminate the provisions in the agencies' existing custodial limits that require the parties to enter into timing agreements or other scheduling conditions.

significantly reduce unnecessary burden in second requests without prejudice to the government's ability to obtain material information.[131] Indeed, limiting the number of persons subject to search in a second request is consistent with discovery limits imposed by procedural rules governing civil litigation.[132]

Recognizing these principles, the FTC and the DOJ recently adopted custodian search limits, capping the number of employees whose files must be searched for a second request to thirty to thirty-five for the DOJ and thirty-five for the FTC, subject to certain exceptions.[133] These limits do not vary depending on the size of the transaction,[134] and may be exceeded upon authorization by senior agency personnel.[135] Both agencies require that the parties provide documents and personnel to assist the agencies in determining which employees files should be searched, and do not extend the limits to company or "central" files.[136] Moreover, to obtain the benefit of these limits, the parties must agree to certain provisions extending the length of the investigation.[137] The FTC requires that the parties agree to delay certifying substantial compliance until thirty days after producing the required materials (or to a "rolling production"), and agree to a joint scheduling order containing at least a sixty-day discovery period in the event of a court challenge.[138] The DOJ requires that parties enter into a "Process and Timing Agreement" that, among other things, affords sufficient time for post-complaint discovery in the event of litigation, indicating that "four to six months is generally necessary."[139]

The Commission endorses the concept of custodian limits but recommends several modifications. Under the Commission's approach: (1) merging companies could opt into presumptive custodian-search limits at the time they file the HSR Act notification; (2) companies opting in would provide detailed organization charts with the HSR Act filing and commit to make company representatives immediately available to discuss them; (3) the limit on the number of custodians would vary based on the size of the transaction; and (4) the presumptive limit could be exceeded for cause with the agreement of the merging companies or with the approval of the Assistant Attorney General or FTC Chairman, as appropriate. (The complete description is set forth in Annex A.) The Commission's approach would not require the merging companies to commit to an extension of the statutory time periods of the HSR Act or any other timing agreements as a condition of limiting the number of custodians, as the current FTC and DOJ limits require.

*Filing Option and Organizational Charts.* The parties could choose to have the limits apply by checking a box on the HSR form, rather than when the second request issues, as under the existing agency approaches.[140] The parties would also be required to provide complete and accurate organizational charts at the time of the initial HSR filing, and to make a responsible officer available to explain the charts. This will allow the agency to begin its inquiry immediately. In addition, by making the election at the filing stage, the parties will provide the agencies with an indication that they believe the agencies may scrutinize the transaction.

*Sliding Scale Limits.* The agencies would establish limits on the number of custodians to be searched based on the size of the transaction, with the limits ranging between fifteen and thirty-five employees. A single limit has the potential to impose a proportionately larger burden on small transactions than on large transactions. Furthermore, the cost savings a sliding scale affords to smaller transactions should outweigh any increased complexity of such an approach.[141] Moreover, to the extent that lower limits would prevent thorough investigations, the agency could exceed the limits in appropriate cases.

*Case-by-Case Increases in Limits.* An agency may need to increase the number of custodians to search in some investigations to enable staff to conduct an adequate investigation (for example, when there are numerous product or geographic markets).[142] Accordingly, under the Commission's proposed approach, agency staff may seek to exceed the custodian limit where they deem it necessary to conduct an adequate investigation. They may do this either by obtaining the consent of the parties or by seeking certification from the Assistant Attorney General or Chairman of the FTC of his or her good-faith belief that the additional materials are needed. Because such exceptions should be granted sparingly, the Commission recommends that only the head of the investigating agency be permitted to make the formal certification of the need to expand the search.

*No Agreement on Time Limits.* The Commission's proposal does not include a provision requiring the parties to agree to a thirty-day extension of the second thirty-day waiting period after certifying substantial compliance, a stipulated period for post-complaint discovery, or other scheduling requirements, as both the current FTC and DOJ approaches do. Requiring the parties to agree to extensions of the waiting period is unnecessary and effectively amounts to an administrative amendment of the second thirty-day waiting period established by Congress. The thirty-day waiting period, in conjunction with the investigation period, should be adequate time for the agencies to decide whether to challenge a merger and to prepare a filing for a preliminary injunction; if it is not, the agencies should seek statutory change in Congress. Furthermore, parties should not be required to stipulate to a discovery schedule in order to avail themselves of the custodian limit. If the agencies challenge a transaction in court, the district court in its sound discretion can be relied upon to provide a sufficient period for any additional discovery the agencies need.

### 2. Additional Areas for Possible Reform

The Commission also identifies four specific areas in which further reform may be appropriate. The first two concern the transparency of the agencies' review process, particularly their economic and competitive analyses. The second two are areas in which the costs imposed by the second request may be particularly large relative to their benefits. The Commission recommends that the agencies examine how they could make further improvements in these areas, and take action as appropriate.

> **31b.** The agencies should in all cases inform the merging parties of the competitive concerns that led to a second request.*

The Commission understands that the agencies' staffs frequently discuss their competitive concerns and possible second request modifications with the parties shortly after the second request.[143] Based on comments submitted to the Commission, it appears that this may not occur in all cases or such discussions may not always fully reflect an agency's competitive concerns.[144] Such explanations can facilitate substantive discussions between the parties and agencies, as well as enable the parties to make better assessments of the information that would be most useful to the agencies. Furthermore, a systematic requirement to provide such an explanation may impose discipline on the second request itself, by clarifying the areas in which information is needed. The Commission therefore recommends that the agencies institutionalize this practice by specifically committing to provide information to merging parties regarding the agencies' competitive concerns shortly after issuing a second request.

> **31c.** To enable merging companies to understand the bases for and respond to any agency concern, the agencies should inform the parties of the theoretical and empirical bases for the agencies' economic analysis and facilitate dialogue including the agency economists.

The Commission understands that the agencies currently promote discussions between agency economists and the parties' economists as part of their efforts to ensure transparency and promote efficient merger review.[145] Several witnesses and commenters before the Commission advised that there should be greater transparency concerning the government's economic analysis. Merging companies are often limited in their ability to evaluate and critique the economic models being developed by agency economists, for example, because of concerns regarding the confidentiality of third-party information.[146] In addition, agency staff may be reluctant to reveal their preliminary analysis if the government may have to litigate with the parties.[147]

Current merger analysis relies heavily on econometric analysis and is highly sensitive to the assumptions, techniques, and data used. Specifying, testing, and refining econometric models to reflect actual industry circumstances are best served if the agencies' economists and the parties' economists can discuss alternative modeling approaches and economet-

---

* Commissioners Burchfield, Cannon, Carlton, Litvack, and Yarowsky do not join this recommendation.

ric testing.[148] Particularly given the reality that most merger challenges are not litigated, the search for the right resolution would be facilitated by open discussion. The Commission accordingly recommends that the agencies devise additional means through which the agency's economists can have frank and open discussions with the merging parties of the economic analysis being used.

> **31d.** The agencies should reduce the burden of translating foreign-language documents.

The burden of translating into English foreign-language documents submitted in response to a second request can be particularly onerous in some transactions.[149] This burden should not be imposed on parties except where the documents are likely to be relevant to evaluating the competitive concerns, and even then only to the extent necessary to conduct an adequate investigation.[150] Although the agencies often limit translation requirements to certain key foreign-language documents, the standard second request contains no such limits and requires translation of all documents.[151] The Commission therefore recommends that the agencies consider institutionalizing reforms to limit the burden of translating documents. For example, it may be possible to require summaries of documents rather than full translations,[152] or to limit translation mandates to documents of "key corporate decision makers" and those relating to businesses or product lines most relevant to the competitive concern.[153]

> **31e.** The agencies should reduce the burden of requests for data not kept in the normal course of business by the parties.

Requests for data that are not kept in the ordinary course of business can be extraordinarily burdensome, since supplying such data may require the parties to incur great expense in engaging experts and information technology personnel.[154] The Commission recognizes the agencies have taken steps to reduce the burden of data requests, including efforts to understand the types of data the parties keep and the formats in which it is kept.[155] The Commission recommends that the agencies give further attention to taking steps, including formalizing policies, to reduce the burden imposed by requests for data that is not kept in the normal course of business by the parties (or which is kept in a form different from that requested).

# ANNEX A

## HSR ACT CUSTODIAN SEARCH LIMIT

1. The HSR Act Report Form will be modified to include a box labeled "Optional custodian limitation for potential additional request for information." If the notifying party checks this box, the procedures set forth below will apply. If, however, the box is not checked, any additional request for information may proceed without the limitations set forth below, consistent with current practice.

2. A party electing the custodian limitation option must (1) provide or create, and submit with the form, complete and accurate organization charts (or equivalent materials that allow staff to identify the party's employees and their positions), and (2) provide the name, and make available for interview, a responsible officer to explain the organization charts, the roles of the listed personnel, and the location of company records. The officer designated should be the senior person within the organization most familiar with these issues. If necessary, more than one such person should be made available.

3. If the notifying party has complied with paragraph 2 above, then, depending on the dollar size of the transaction, the reviewing agency will be limited to requiring a search of documents in the files of fifteen employees (at the low end) to thirty-five employees (at the high end).

4. If the agency staff believe that the files of custodians in excess of the numbers set forth in paragraph 3 are required to pursue their investigation, staff should first notify the affected party of the total number custodians whose files it seeks and request the party's consent. If consent is not provided within two business days, staff may seek materials from additional custodians only upon the personal approval and certification of a good faith belief that the additional materials are needed by, as the case may be, the Chair (or Acting Chair) of the Federal Trade Commission or the Assistant Attorney General (or Acting Assistant Attorney General) in charge of the Antitrust Division of the Department of Justice.

## Notes

1 Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1383 (codified as amended at 15 U.S.C. § 18a).

2 15 U.S.C. § 18a(b).

3 *Id.* § 18a(e).

4 *See* Part 2.B of this Section, Table A. In addition, the agencies blocked or obtained relief in thirty-one mergers that were not reportable under the HSR Act. *See id.*

5 H.R. REP. NO. 94-1373, at 11 (1976).

6 Representative Rodino estimated that the HSR Act "will reach only about the largest 150 mergers a year." 122 CONG. REC. 25,052 (1976) (remarks of Rep. Rodino); *see also* H.R. REP. NO. 94-1373, at 11.

7 *See* Part 2.B of this Section, Table A; Dep't of Justice & Federal Trade Comm'n, Annual Report to Congress Regarding the Operation of the Hart-Scott-Rodino Premerger Notification Program for Fiscal Year 2005, at app. A (2006) [hereinafter DOJ/FTC FY2005 HSR Report]; Dep't of Justice & Federal Trade Comm'n, Annual Report to Congress Regarding the Operation of the Hart-Scott-Rodino Premerger Notification Program for Fiscal Year 1997, at app. A (1998); Dep't of Justice & Federal Trade Comm'n, Annual Report to Congress Regarding the Operation of the Hart-Scott-Rodino Premerger Notification Program for Fiscal Year 1988, at app. A (1989).

8 *See* U.S. Dep't of Justice & Federal Trade Comm'n, Annual Report to Congress Regarding the Operation of the Hart-Scott-Rodino Premerger Notification Program for Fiscal Year 2000, at tbl.II (2001) [hereinafter DOJ/FTC FY2000 HSR Report] (reporting that 47.3 percent of reported transactions were valued at less than $50 million).

9 *See* Part 2.B of this Section, Table A.

10 122 CONG. REC. 30,876–77 (1976) (remarks of Rep. Rodino) (second requests would call for "the very data that is already available to the merging parties and has already been assembled and analyzed by" the parties).

11 Steven C. Sunshine & David P. Wales, Statement at AMC Merger Enforcement Hearing, at 4 (Nov. 17, 2005) [hereinafter Sunshine & Wales Statement].

12 *Id.* (approval for transactions receiving second requests took an average of 7.8 months for the FTC and 5.7 months for the DOJ in 2005); Merger Streamlining Group, Public Comments Submitted to AMC, at 6 (Feb. 6, 2006) [hereinafter Merger Streamlining Group Comments] (reporting that the second request process often takes half a year); American Bar Association, Section of Antitrust Law, Public Comments Submitted to AMC Regarding Hart-Scott-Rodino Second Request Process, at 4 (Dec. 7, 2005) [hereinafter ABA Comments re HSR].

13 Dep't of Justice, Antitrust Div., Appropriation Figures for the Antitrust Division, Fiscal Years 1903–2007 (updated Jan. 2007), *available at* http://www.usdoj.gov:80/atr/public/10804a.htm.

14 Data on FTC Appropriations (on file with AMC).

15 James R. Atwood, Statement at AMC International Antitrust Hearing, at 3 (Feb. 15, 2006) (estimating that "approximately 70 [countries] provide for merger pre-notification and/or review"); International Competition Network, Report on the Costs and Burdens of Multijurisdictional Merger Review, at 4 (Nov. 2004), *available at* http://www.internationalcompetitionnetwork.org/media/archive0611/costburd.pdf (estimating that about 75 jurisdictions have merger review laws).

16 Randolph W. Tritell, Ass't Dir. for Int'l Antitrust, Federal Trade Comm'n, Int'l Aspects of U.S. Merger Review Policy, ABA International Section Lunch Program, at 2 (Feb. 28, 2001), *available at* http://www.ftc.gov/bc/international/docs/tritell_intaspectsmergreview.pdf.

[17] PricewaterhouseCoopers, *A Tax on Mergers? Surveying the Time and Costs to Business of Multi-jurisdictional Merger Reviews*, at 42 (July 2003) [hereinafter PwC Survey]; *id.* at 18 (defining costs covered in survey); Merger Streamlining Group Comments, at 6 (citing PwC Survey).

[18] *See* S. Rep. No. 94-803, at 61 (1976) ("Presently, the Government can stop few illegal mergers before they take place."); *see also* H. Rep. No. 94-1373, at 8 (the absence of pre-closing notification requirements "meant that many large and illegal mergers have been successfully consummated in recent years, before the government had any realistic chance to challenge them"); William J. Baer, *Reflections on 20 Years of Merger Enforcement Under the Hart-Scott-Rodino Act*, 65 Antitrust L.J. 825, 828–29 (1997) [hereinafter Baer, *Reflections on 20 Years of Merger Enforcement*].

[19] *See* Kenneth G. Elzinga, *The Antimerger Law: Pyrrhic Victories?*, 12 J.L. & Econ. 43, 52 (1969) [hereinafter Elzinga, *Antimerger Law*]; Baer, *Reflections on 20 Years of Merger Enforcement*, at 828–31.

[20] *See* Elzinga, *Antimerger Law*, at 47–54; S. Rep. No. 94-803, at 61. In one extreme case, a 1955 acquisition involving companies engaged in printing color comic supplements for newspapers was challenged by the DOJ in 1960. After the trial court dismissed the complaint in 1970, the Supreme Court held that the acquisition violated Section 7 and ordered the trial court to fashion relief in 1971. The trial court ordered divestiture in 1973, but by that time no interested buyer could be found. *See* United States v. Greater Buffalo Press, Inc., 327 F. Supp. 305 (W.D.N.Y. 1970) (dismissing complaint), *rev'd*, 402 U.S. 549 (1971), *on remand to* 1973 WL 833 (W.D.N.Y.) (ordering divestiture).

[21] *See* H.R. Rep. No. 94-1373, at 7–11.

[22] S. Rep. No. 94-803, at 61.

[23] A summary describing the main aspects of the program relevant to the Commission's study may be found in American Bar Association, Section of Antitrust Law, Antitrust Law Developments 388–96 (6th ed. 2007). For a more detailed discussion of the merger review process, see American Bar Association, Section of Antitrust Law, The Merger Review Process: A Step-by-Step Guide to Federal Merger Review 22–31 (3d ed. 2006) [hereinafter ABA, Merger Review Process].

[24] 15 U.S.C. § 18a(a).

[25] *Id.*; 72 Fed. Reg. 2693 (Jan. 22, 2007) (setting new filing thresholds based on change in GNP).

[26] 15 U.S.C. § 18a(a); 72 Fed. Reg. 2693 (Jan. 22, 2007).

[27] Act of Dec. 21, 2000, Pub. L. No. 106-553, § 630, 114 Stat. 2762, 2762A-108 to 111. These fee thresholds are also adjusted for changes in GNP. *See* 72 Fed. Reg. 2693 (Jan. 22, 2007) ($45,000 for transactions valued at less than $119.6 million; $125,000 for transactions valued between $119.6 million and $597.9 million; and $280,000 for transactions valued at $579.9 million or more).

[28] 15 U.S.C. § 18a(a)(2).

[29] 16 C.F.R. § 803, app. (2006), Notification and Report Form for Certain Mergers and Acquisitions.

[30] 15 U.S.C. § 18a(b)(1)(B).

[31] *Id.* § 18a(b)(2).

[32] *Id.* § 18a(e).

[33] *Id.* § 18a(e)(2). In the case of a cash tender offer, only the acquiring party is required to certify substantial compliance. *Id.*

[34] *See* Table A.

[35] *Id.*

[36] *See* Chapter II.A of this Report regarding the merger clearance process.

[37] 15 U.S.C. § 18a(e)(2); *see also* ABA, Merger Review Process, at 136–42.

[38] The FTC Premerger Notification Office has an informal policy under which the acquiring party can avoid paying a second filing fee and producing certain other additional information with the filing if re-filing is completed within two days. *See generally* ABA, Merger Review Process, at 141.

39 *See* Cecile Kohrs Lindell, *Companies are Trying to Beat the Antitrust Clock*, DAILY DEAL (Feb. 6, 2007) (reporting that companies are more frequently opting to pull and re-file their HSR notifications, and describing two recent examples).

40 Letter from Marion Bruno and J. Robert Kramer II to Andrew Heimert re AMC Data Request (Nov. 22, 2006, revised Feb. 8, 2007 & Mar. 7, 2007) [hereinafter FTC/DOJ Data Submission] chart D.

41 Federal Trade Comm'n's Rules of Practice, 16 C.F.R. § 2.8 (2006); Order No. 753–77, 42 Fed. Reg. 56,730 (Oct. 28, 1977).

42 15 U.S.C. § 18a(e)(2).

43 16 C.F.R. § 803.6 (2006).

44 15 U.S.C. § 18a(g)(2).

45 *See* FTC v. Blockbuster, Inc., Civ. No. 1:05CV00463 (D.D.C. 2005); FTC v. McCormick & Co., 1988 WL 43791, at *1 (D.D.C. Apr. 26, 1988); FTC v. Dana Corp., No. CA-3-81-0003-H (N.D. Tex. 1981).

46 15 U.S.C. § 18a(e)(B)(i).

47 *Id.* § 18.

48 Department of Commerce, Justice, State, and the Judiciary, and Related Agencies Appropriations Act, FY 2001, Pub. L. No. 106-553, § 630, 114 Stat. 2762, 2762A-108 to 111 (2000) (codified as amended at 15 U.S.C. §§ 18a & 18a note).

49 *See* DOJ/FTC FY2000 HSR REPORT, at tbl.II (reporting that 47.3 percent of reported transactions were valued at less than $50 million).

50 15 U.S.C. § 18a(a)(2). Adjustments were first made in FY2005 and are now made annually.

51 *Id.* § 18a(e)(1)(B)(i) ("The assistant attorney general and the Federal Trade Commission shall each designate a senior official who does not have direct responsibility for the review of any enforcement recommendation under this section concerning the transaction at issue, to hear any petition filed by such person. . . ."). It also increased the second waiting period from twenty to thirty days. *Id.* § 18a(e)(2).

52 *Id.* § 18a(e)(1)(B)(iii)-(v).

53 Federal Trade Comm'n, Report to Congress Regarding Merger Review Procedures (June 19, 2001), *available at* http://www.ftc.gov/os/2001/06/hsrreport.htm [hereinafter FTC Report to Congress re Merger Review Procedures]; Dep't of Justice, Antitrust Div., Report to Congress Regarding Merger Review Procedures (June 19, 2001), *available at* http://www.usdoj.gov/atr/public/guidelines/8550.pdf.

54 Deborah Platt Majoras, Reforms to the Merger Review Process (Feb. 16, 2006), *available at* http://www.ftc.gov/os/2006/02/mergerreviewprocess.pdf [hereinafter FTC 2006 Merger Process Reforms]; Deborah Platt Majoras, Statement at AMC Barnett/Majoras Hearing, at 11 (Mar. 21, 2006) [hereinafter Majoras Statement] (summarizing reforms); Dep't. of Justice, Antitrust Div., Background Information on the 2006 Amendments to the Merger Review Process Initiative (Dec. 14, 2006) [hereinafter DOJ Background on 2006 Merger Process Initiative Amendments], *available at* www.usdoj.gov/atr/public/220241.htm; Dep't of Justice, Antitrust Div., Merger Review Process Initiative (revised, Dec. 14, 2006) [hereinafter DOJ Revised Merger Process Initiative], *available at* www.usdoj.gov/atr/public/220237.htm.

55 *See* J. Robert Kramer II, Statement at AMC Merger Enforcement Hearing, at 2–3 (Nov. 17, 2005) [Kramer Statement] (before the HSR Act, the DOJ could not effectively detect and challenge anticompetitive mergers; pre-merger review effectively protects consumers from anticompetitive mergers); Baer, *Reflections on 20 Years of Merger Enforcement*, at 834.

56 *See, e.g.*, Merger Enforcement Transcript at 203 (Whitener) (Nov. 17, 2005) ("[I]n the main, it's a system that works well."); *id.* at 201 (Kramer) (HSR process is "successful from any global view"); Wayne D. Collins, Statement at AMC Merger Enforcement Hearing, at 2 (Nov. 17, 2005) (HSR Act provides "an adequate statutory framework for merger review," and the U.S. agencies "have done many things very well, [though] there is significant room for further improvement"); U.S. Chamber of Commerce, Public Comments Submitted to AMC (Nov. 8, 2005), at 14–15 [hereinafter U.S. Chamber of Commerce Comments] (prais-

ing agencies for reducing the number of second requests); *see also* INTERNATIONAL COMPETITION POLICY ADVISORY COMMITTEE, FINAL REPORT TO THE ATTORNEY GENERAL AND ASSISTANT ATTORNEY GENERAL FOR ANTITRUST 139 n.127 (2000) [hereinafter ICPAC REPORT] (observing that "business and bar association representatives who appeared before the Advisory Committee emphasized that the U.S. review process is 'fundamentally sound'").

[57] *See, e.g.*, Thomas O. Barnett, Statement at AMC Barnett/Majoras Hearing, at 7 (Mar. 21, 2006) [hereinafter Barnett Statement] (mergers can "generate procompetitive benefits, such as lower costs and increased innovation"); Susan A. Creighton, Statement at AMC Merger Enforcement Hearing, at 1 (Nov. 17, 2005) [hereinafter Creighton Statement] (merger review process may impose costs on transactions that are largely or wholly beneficial to consumers). *See generally* Chapter I.B of this Report regarding substantive merger law.

[58] *See, e.g.*, Merger Enforcement Trans. at 234–35 (Whitener) (arguing against adopting the European approach to merger review in the United States); Merger Enforcement Trans at 235–36 (Wales) (arguing that U.S. system relies more on "objective facts"); ABA Comments re HSR, at 13 (declining to recommend adoption of a "Form CO-like submission").

[59] *See, e.g.*, International Chamber of Commerce, Public Comments Submitted to AMC, at 2 (Sept. 5, 2005) [hereinafter ICC Comments] (commending the E.U. and Canadian approaches to structuring the second request review period); Merger Streamlining Group Comments, at 8–10 (noting that second phase investigations in Canada and the European Union imposes fewer burdens on parties and suggesting reforms analogous to features of those systems).

[60] *See generally* Majoras Statement, at 10 ("[t]he agencies can implement such flexible revisions readily through changes to their internal procedures" while "crafting the revisions [to merger review procedures] through more static legislation presents substantial challenges"); Barnett/Majoras Transcript at 24 (Barnett) (Mar. 21, 2006) (merger review process reform is "an issue that I do not believe can be fixed legislatively. It's a very fact-specific, very process-specific issue, and the agencies are focused on it and, I think, have made progress."); Barnett Statement, at 7–9.

[61] *See* ICPAC REPORT, at 127 (stating that, as of 2000, HSR filings had "increased significantly since the HSR Act was enacted" due to increased merger activity and the failure to adjust the thresholds).

[62] *See* Table A; U.S. Chamber of Commerce Comments, at 13 (the "upward revision in the filing threshold has dramatically reduced the number of filings").

[63] *See* DOJ/FTC FY2000 HSR Report, at tbl.II (reporting that 47.3 percent of reported transactions were valued at less than $50 million).

[64] ICPAC REPORT, at 126 (emphasis omitted).

[65] U.S. Chamber of Commerce Comments, at 13.

[66] *See* Table B.

[67] *See* ICC Comments, at 2; ABA Comments re HSR, at 14. One commenter did suggest that action be taken to reduce the number of filings further. U.S. Chamber of Commerce Comments, at 13.

[68] *See* Pub. L. No. 101-162, § 605, 103 Stat. 988, 1031 (1989) ("Fees collected for [HSR filings] shall be divided evenly between and credited to the appropriations, Federal Trade Commission, 'Salaries and Expenses' and Department of Justice, 'Salaries and Expenses, Antitrust Division.'") (codified as amended by Pub. L. No. 101-302, Title II, 104 Stat. 213, 217 (1990) at 15 U.S.C. § 18a note).

[69] Dep't of Justice, Antitrust Div., Appropriation Figures for the Antitrust Division, Fiscal Years 1903–2007 (updated Jan. 2007), *available at* http://www.usdoj.gov:80/atr/public/10804a.htm; Data on FTC Appropriations (on file with AMC).

[70] Dep't of Justice, Antitrust Div., Appropriation Figures for the Antitrust Division, Fiscal Years 1903–2007 (updated Jan. 2007), *available at* http://www.usdoj.gov:80/atr/public/10804a.htm.

71 Act of Dec. 21, 2000, Pub. L. No. 106-553, § 630, 114 Stat. 2762, 2762A-108 to 111. Congress also raised the filing fee, in 1994, to $45,000 per transaction. Act of Aug. 26, 1994, Pub. L. No. 103-317, Title I, 108 Stat. 1724, 1739.

72 146 Cong. Rec. S10921 (daily ed. Oct. 10, 2000) (statement of Sen. Leahy) ("the appropriations to these agencies usually corresponds to the level of the fees collected," and the "bill authorizes the collection of sufficient fees to be revenue neutral"); 146 Cong. Rec. S11240 (daily ed. Oct. 27, 2000) (statement of Sen. Kohl) ("In order to assure that this reform is revenue neutral [for the agencies], we have worked with the Appropriations Committee to ensure that this bill raises the filing fees for the largest trans-actions.").

73 Sunshine & Wales Statement, at 10; Business Roundtable, Public Comments Submitted to AMC, at 15 (Nov. 5, 2005) [hereinafter Business Roundtable Comments]; U.S. Chamber of Commerce Comments, at 16; ICC Comments, at 2.

74 ICPAC Report, at 129; *Antitrust Enforcement Agencies: The Bureau of Competition of the Federal Trade Commission and the Antitrust Division of the Department of Justice, Hearing Before the Committee on the Judiciary House of Representatives*, 106th Cong. 209 (2000) (prepared statement of Jim Rill, Co-Chair, International Competition Policy Advisory Committee) [hereinafter Rill/ICPAC Statement].

75 *See* 146 Cong. Rec. S11240 (daily ed. Oct. 27, 2000) (statement of Sen. Kohl) ("Of course, in a per-fect world, we wouldn't finance the Antitrust Division and the FTC on the backs of these filing fees.").

76 U.S. Chamber of Commerce Comments, at 16 ("As presently structured and applied, the fees represent nothing less than a tax imposed on parties that are forced to comply with the Hart-Scott-Rodino pre-merg-er scheme . . . ."); PwC Survey, at 4.

77 *See* Business Roundtable Comments, at 15.

78 U.S. Chamber of Commerce Comments, at 13 ("These [HSR] fees bear no relationship to the costs incurred in reviewing the average filing (since the vast majority of filings are cleared without any sub-stantive review) and cannot be justified as a reasonable user charge."); Sunshine & Wales Statement, at 10.

79 *See* ICPAC Report, at 129 ("[F]iling fees should be delinked from funding for the agencies, but . . . any efforts to do so must occur in an environment where sufficient funds are assured from other sources."); Rill/ICPAC Statement, at 209.

80 William Blumenthal, *Overenforcement in the Hart-Scott-Rodino Second Request Process*, in Malcolm B. Coate & Andrew N. Kleit, The Economics of the Antitrust Process 26 (2003) [hereinafter Blumenthal, *Overenforcement in the HSR Second Request Process*]; *see also* Mark D. Whitener, Statement at AMC Merger Enforcement Hearing, at 3 (Nov. 17, 2005) [hereinafter Whitener Statement] ("The cost, delay and disruption to business operations associated with a typical second request are disproportionate to the benefits to the government's enforcement mission, and they are increasing.").

81 *See, e.g.*, Business Roundtable Comments, at 11; ICC Comments, at 11 (many ICC members have report-ed that overly broad second requests are being issued); ABA Comments re HSR, at 3; Whitener Statement, at 6 ("Second request responses have transmogrified into even more massive efforts that typically entail several million dollars in direct costs, and result in the collection, review and production of not hundreds but thousands of boxes of documents (or their electronic equivalent) as well as com-plex and costly data responses."); U.S. Chamber of Commerce Comments, at 14 ("The incredible bur-den of responding to Second Requests is well-known to any firm that has survived the ordeal. It is not unusual for companies caught up in the process to produce millions of documents and spend similar amounts in order to comply with agency demands."); Sunshine & Wales Statement, at 2.

82 ABA Comments re HSR, at 3.

83 ICPAC Report, at 138 (footnote omitted).

84 Majoras Statement, at 10–13; Barnett Statement, at 7–8; Kramer Statement, at 2; Creighton Statement, at 1–2.

85 *See* Merger Enforcement Trans. at 285 (Kramer); id. (Creighton).

86 *See* Majoras Statement, at 10 (reforms will reduce costs to parties and agencies).

87 *See, e.g.*, Whitener Statement, at 5 ("From the merging parties' perspective, the costs of complying with a second request in terms of time, money and disruption are enormous. . . . The delays alone, to say nothing of the costs, usually are enough to make litigation infeasible."); ICC Comments, at 1, 4 ("the cost, burden . . . involved in HSR review appear to have increased dramatically" and the second request process is "unduly burdensome") (quoting ICPAC REPORT, at 137); ABA Comments re HSR, at 1–2 (despite prior reform efforts, "the expense and burden of second request compliance has steadily increased and is becoming untenable"); Business Roundtable Comments, at 11 ("The issuance of a Second Request dramatically increases the cost, delay, and burden for both the agencies and the parties. . . . Second Requests are overbroad and require parties to produce an extraordinary amount of documents and data, far beyond the scope of information that is 'readily available.'").

88 *See, e.g.*, ABA Comments re HSR, at 9 (stating that parties that must comply with second requests "incur a variety of very substantial costs," including lawyers, economists, computer/data processing vendors, copy vendors, the opportunity costs of employee time, and the cost of delay in consummating the transaction.); Sunshine & Wales Statement, at 4.

89 *See* ABA Merger Comments re HSR, at 9; PwC Survey, at 5.

90 ABA Comments re HSR, at 4 (citing Cecile Kohrs Lindell, *Majoras Hopes to Streamline Reviews*, Daily Deal (May 11, 2005)); *see also* Sunshine & Wales Statement, at 4 (approval for transactions receiving second requests took an average of 7.8 months for the FTC and 5.7 months for the DOJ in 2005); *cf.* Barnett Statement, at attachment 5 (citing average duration of approximately four months for matters that the DOJ does not challenge in court).

91 PwC Survey, at 4.

92 *Id.* at 12–13.

93 *Id.* at 44.

94 *Id.* at 42.

95 *Id.*

96 Letter from Joseph Angland to the Antitrust Modernization Commission Re: Data Regarding the Burden Involved in Responding to HSR Second Request Investigations (Feb. 22, 2007) [hereinafter Angland Letter].

97 FTC/DOJ Data Submission (attachment: Questions to be Answered with Data from the FTC and/or the DOJ, at 2).

98 *Id.* at charts H1–H2.

99 *Id.*

100 *Id.*; *see also* Barnett Statement, at 8–9, attachments 4–5 (reporting reductions in the length of second request investigations and the percentage of initial investigations resulting in second requests).

101 *See* American Bar Association, Section of Antitrust Law, *The State of Federal Antitrust Enforcement—2001*, at 29–30.

102 *See* Deborah Platt Majoras, FTC Chairman, Reflections on My First Year, Remarks Before the 2005 ABA Annual Meeting, at 10 (Aug. 6, 2005) ("[I]f we do not have a reasonable level of assurance that parties are dealing in good faith, new rules and process reforms will be, I fear, dead-on-arrival."); *see also* Whitener Statement, at 11–12; Merger Enforcement Trans. at 224–25 (Creighton) ("[C]ooperation by the parties really is indispensable for us to be able to engage in any kind of meaningful reduction in the number of custodians searched.").

103 FTC 2006 Merger Process Reforms, at 2, 6; Majoras Statement, at 10; Creighton Statement, at 2–3 (emphasizing the impact of "increasing sophistication of substantive merger analysis" and "increasing use of data-dependant economic analysis"); International Bar Association, Public Comments Submitted

to AMC Regarding Merger Enforcement, at 25 (Oct. 26, 2005) [hereinafter IBA Comments] ("U.S. merger review has come a long way and now involves detailed and sophisticated microeconomic analysis of a merger's likely impact on prices and markets.").

104 *See, e.g.*, Whitener Statement, at 6 (agencies and courts "rely more heavily on econometric analysis of business data").

105 *See, e.g.*, Creighton Statement, at 2 (due to increased use of electronic storage, "the number of documents that need to be searched and produced has grown exponentially"); FTC 2006 Merger Process Reforms, at 2 ("advances in technology—from the copy machine to e-mail—have resulted in companies' producing and retaining substantially more documents"); Kramer Statement, at 9 (the proliferation of electronic documents makes second request reform "more urgent").

106 Scott Sher & Daryl Teshima, *e-Normous: The Increasing Burden Associated with Electronic Document Production in Second Request Investigations*, ANTITRUST SOURCE, at 1 (Nov. 2005), *available at* www.wsgr.com/PDFSearch/sher1105.pdf [hereinafter Sher & Teshima, *e-Normous*] ("The volume of electronic documents . . . is overwhelming and increasing at a rate that puts Moore's Law to shame.").

107 American Bar Association, Section of Antitrust Law, *The State of Federal Antitrust Enforcement—2004*, at 42 [hereinafter ABA, *The State of Federal Antitrust Enforcement—2004*].

108 *See* Whitener Statement, at 6 (agencies and courts "rely more heavily on econometric analysis of business data," and companies in turn collect more data that the agencies can request); IBA Comments re Merger Enforcement, at 25 (noting an increase in the need for data and the sources of data).

109 *See* ABA Comments re HSR, at 2 (The cost and length of time required to comply is primarily due to volume of (primarily electronic) documents and data being produced pursuant to second requests. Corporations store and retain more, and the agencies more regularly require the manipulation and production of such data.); Sher & Teshima, *e-Normous*, at 8.

110 Merger Enforcement Trans. at 285 (Kramer); *id.* (Creighton).

111 *See* Blumenthal, *Overenforcement in the HSR Second Request Process*, at 23–24.

112 *See* Whitener Statement, at 4–5; *see also* ABA, *State of Federal Antitrust Enforcement—2004*, at 41 (efforts to "discover[] every conceivable, potentially relevant fact" can "result[] in the type of massive, overbroad and unduly burdensome requests that are issued too often").

113 *See* Sher & Teshima, *e-Normous*, at 12.

114 IBA Comments re Merger Enforcement, at 30 (arguing that "[t]he Agencies' desire to collect all the evidence that may be required in litigation . . . increases the cost of the Second Request Process").

115 *See* Sunshine & Wales Statement, at 2 (HSR was intended to give the agencies "the time and the basic information needed to determine whether to institute a merger enforcement action in federal court").

116 *See generally* Sunshine & Wales Statement, at 1; William J. Kolasky & James W. Lowe, *The Merger Review Process at the Federal Trade Commission: Administrative Efficiency and the Rule of Law*, 49 ADMIN. L. REV. 889, 889–93 (1997) [hereinafter Kolasky & Lowe, *Merger Review Process*].

117 *See* Joe Sims & Deborah P. Herman, *The Effect of Twenty Years of Hart-Scott-Rodino on Merger Practice: A Case Study in the Law of Unintended Consequences Applied to Antitrust Legislation*, 65 ANTITRUST L.J. 865, 868–69 (1997) [hereinafter Sims & Herman, *Effect of Twenty Years of Hart-Scott-Rodino*]; Sunshine & Wales Statement, at 1; Kolasky & Lowe, *Merger Review Process*, at 893 (time-sensitive nature of transactions generally leads parties to avoid litigation "wherever possible").

118 *See, e.g.*, Business Roundtable Comments, at 14 ("The internal appeals process at both agencies has proved to be useless."); ABA Comments re HSR, at 11 (in five years "the agencies have not, and, perhaps, cannot, create a credible internal second request appeals process"); Whitener Statement, at 13.

119 Sims & Herman, *Effect of Twenty Years of Hart-Scott-Rodino*, at 881. The authors contend that the agencies disregarded the clear intent of the HSR Act when they decreed that "[a]nything less than a complete response is not substantial compliance" and that the waiting period does not run until the agencies deter-

mine substantial compliance. *Id.* at 881 & n.58 (quoting Federal Trade Comm'n, Statement of Basis and Purpose, 43 Fed. Reg. 33,450, 33,508, 33,550 (July 31, 1978) (internal quotations omitted)).

[120] For descriptions of specific initiatives, see Kramer Statement, at 7–15 (describing various initiatives taken by DOJ over the past ten years); Barnett Statement, at 8–9 (focusing on the Division's 2001 Merger Review Process initiative); Majoras Statement, at 10; Barnett/Majoras Trans. at 11–12 (Majoras); ABA Comments re HSR, at 5.

[121] The agencies also adopted several other reforms that help reduce burdens, but that are not addressed by the Commission in this Report. FTC 2006 Merger Process Reforms, at 19–30; DOJ Background on 2006 Merger Process Initiative Amendments, at 13–15.

[122] FTC/DOJ Data Submission, at Charts H1–H2.

[123] DOJ/FTC FY2005 HSR Report, at 17–18; DOJ Background on 2006 Merger Process Initiative Amendments, at 1 (the "amendments are part of the Division's ongoing effort to reduce merger review burdens while preserving its ability to conduct thorough investigations and successfully challenge anticompetitive transactions.").

[124] Majoras Statement, at 12.

[125] FTC/DOJ Data Submission (attachment: Questions to be Answered with Data from the FTC and/or the DOJ, at 2).

[126] *Id.* at charts I1–I3.

[127] For example, the agencies do not currently track which types of employees are most likely to be the source of documents that prove most useful in investigations. FTC/DOJ Data Submission (attachment: Questions to be Answered with Data from the FTC and/or the DOJ, at 3).

[128] *See* Chapter II.A of this Report regarding dual federal enforcement, which describes the limited data on length of delays resulting from clearance disputes.

[129] *See* Majoras Statement, at 10 ("The agencies can implement such flexible revisions readily through changes to their internal procedures" while "crafting the revisions [to merger review procedures] through more static legislation presents substantial challenges"); Barnett/Majoras Hearing Trans. at 24 (Barnett) (merger review process reform is "an issue that I do not believe can be fixed legislatively. It's a very fact-specific, very process-specific issue, and the agencies are focused on it and, I think, have made progress."); Barnett Statement, at 7–9.

[130] ABA Comments re HSR, at 10 ("[L]imiting the number of custodians is probably one of the most effective ways to reduce the burden of compliance."); FTC 2006 Merger Process Reforms, at 12 (noting "the strong relationship between search group size and investigation cost"); Merger Enforcement Trans. at 224 (Creighton) ("[T]wo of the really key variables . . . are the time period and, even more importantly, the number of custodians that we review."); Whitener Statement, at 8 ("The number of people who are subject to the search is critical . . . ."); ABA, *State of Federal Antitrust Enforcement—2004*, at 42; *see also* Angland Letter, at chart 1 (comparing the total cost of compliance and the number of custodians searched).

[131] Whitener Statement, at 9–10; ABA Comments re HSR, at 10; FTC 2006 Merger Process Reforms, at 12.

[132] IBA Comments, at 28.

[133] *See, e.g.*, FTC 2006 Merger Process Reforms, at 9 (referring to a presumption of searching thirty-five custodians); DOJ Background on 2006 Merger Process Initiative Amendments, at 9 (referring to thirty-custodian cap on searches).

[134] FTC 2006 Merger Process Reforms, at 12–13.

[135] *Id.* at 13 (limit may be exceeded if authorized by the Director of the Bureau of Competition); DOJ Background on 2006 Merger Process Initiative Amendments, at 9 (limit may be exceeded if authorized by the Section Chief responsible for the investigation).

[136] FTC 2006 Merger Process Reforms, at 9–10, 13–14, 17–18; DOJ Background on 2006 Merger Process Initiative Amendments, at 10–12.

[137] FTC 2006 Merger Process Reforms, at 10, 15–19; DOJ Background on 2006 Merger Process Initiative Amendments, at 11.

[138] FTC 2006 Merger Process Reforms, at 10, 15–19.

[139] DOJ Background on 2006 Merger Process Initiative Amendments, at 11; DOJ Revised Merger Process Initiative, at 7.

[140] The agencies could retain their existing custodial limit programs for instances in which the parties do not elect this option using the HSR Act notification form.

[141] But see FTC 2006 Merger Process Reforms, at 12 (the FTC considered but rejected "establishing a range of presumptive custodial limits" tied to the size of the transaction, due to the "complexity of such an approach").

[142] See FTC 2006 Merger Process Reforms, at 13; DOJ Background on 2006 Merger Process Initiative Amendments, at 12.

[143] See, e.g., DOJ Revised Merger Process Initiative, at 2–3 (stating that "[e]arly substantive consultations are strongly encouraged . . . . [for] both the Division and the parties to present their preliminary views on the transactions," including identification of all "critical or potentially dispositive issues"); FTC Report to Congress re Merger Review Procedures (generally within five days of issuing a second request, FTC staff will invite the parties "to discuss the second request and the competitive issues raised by the proposed transaction, to the extent then known").

[144] See, e.g., ICC Comments, at 4 (at the beginning of a second stage review, the reviewing agency should give the parties, orally or in writing, "a short but clear statement of the competitive concerns that cause the agency to undertake further investigation"); Business Roundtable Comments, at 14; IBA Comments re Merger Enforcement, at 29.

[145] See, e.g., DOJ Revised Merger Process Initiative, at 3–5; Federal Trade Comm'n, Best Practices for Data, and Economics and Financial Analyses in Antitrust Investigations, at 1–2, available at www.ftc.gov/be/ftcbebp.pdf.

[146] See Merger Enforcement Trans. at 278–79 (Creighton) (data sharing raises substantial difficulties); see also id. at 66, 74–75 (Willig) (discussing problems of data confidentiality in related context).

[147] See Merger Enforcement Trans. at 152–53 (Rule) (recounting instance in which the agency economists declined to reveal their models due to the possibility of litigation); cf. id. at 153 (Heyer) (noting that such events may occur but that cooperation is usually good).

[148] Two witnesses considered allowing staff to discuss the specifications of the models (and resulting estimates) with the parties' economists, but not the underlying data. Merger Enforcement Trans. at 277–79 (Kramer, Collins); id. at 151–52 (Heyer) (describing efforts to share data with parties).

[149] ICC Comments, at 6; Business Roundtable Comments, at 12; see also ICPAC REPORT, at 141–42; Letter from Roxanne C. Busey to Joseph Simons re Merger Review Process, at 17 (Aug. 6, 2002) (translation requirements can be "extremely expensive" and "potentially cripple a transaction in terms of time and expense").

[150] See Busey Letter, at 17–18 (suggesting an approach to balance the costs and benefits of requiring transaction of non-English documents).

[151] ABA, MERGER REVIEW PROCESS, at 171; id. at app. 19, at 19-18 (Model Second Request); Casey R. Triggs, Effectively Negotiating the Scope of Second Requests, 13 ANTITRUST, Summer 1999, at 36, 39.

[152] See ICC Comments, at 6 (encouraging the Commission to explore how the practice of providing summaries of documents, and limiting production of full translations, can reduce the burden on the parties).

[153] See Business Roundtable Comments, at 13–14.

[154] *See, e.g.,* ABA Comments re HSR, at 4 (providing data in a different format from that maintained by the company in the ordinary course of business can be especially burdensome, difficult, time consuming, and expensive); U.S. Chamber of Commerce Comments, at 15 (recommending a reduction in the "number and scope of interrogatory requests calling for the submission of financial/economic data not kept in the ordinary course of business"); Business Roundtable Comments, at 13 ("[r]equests for econometric data not kept in the ordinary course of business should not be standard" but rather determined by agency management).

[155] *See, e.g.,* FTC 2006 Merger Process Reforms, at 22–23 (providing for improved communication regarding data needs and negotiation of data requests, including an opportunity for parties to meet with senior management about a request).