# Exhibit 19



# Hart-Scott-Rodino
### Premerger notification Program

## Introductory Guide I

# What is the Premerger Notification Program?
## An Overview

### Revised March 2009

ftc.gov/bc/hsr    **FTC** Premerger Notification Office    (202) 326-3100

# AN OVERVIEW

*Guide I* is the first in a series of guides prepared by the Federal Trade Commission's Premerger Notification Office ("PNO"). It is intended to provide a general overview of the Premerger Notification Program (the "Program") and to help the reader in determining which types of business transactions are reportable under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a (§ 7A of the Clayton Act or "the Act"). *Guide I* describes the basic reportability requirements and how the program works. It also provides a list of alternative information sources to assist you in deciding whether or not you need to file. This Guide will introduce you to certain terminology and concepts regarding the Act and the Premerger Notification Rules (the "Rules"), 16 C.F.R. Parts 801, 802 and 803. Additional information can be obtained on the Federal Trade Commission's website at http://www.ftc.gov/bc/hsr.

Other Guides in this series provide more detailed information. Guide II explains in greater detail certain terms used in the Act and the Rules, and analyzes a hypothetical transaction to determine whether it is reportable and Guide III contains "A Model Request for Additional Information and Documentary Material (Second Request)."

The Guides are not intended to address specific proposed transactions. If you are analyzing a transaction, we suggest that you not only consult the Act, the Rules, and the other Guides in this series, but also the additional material referenced in Section XII of this Guide. If you have specific questions not addressed in these reference sources, call the PNO between the hours of 8:30AM and 5:00PM, Monday through Friday, except holidays, at (202) 326-3100.

## I. INTRODUCTION

The Act requires that parties to certain mergers or acquisitions notify the Federal Trade Commission and the Department of Justice (the "enforcement agencies") before consummating the proposed acquisition. The parties must wait a specific period of time while the enforcement agencies review the proposed transaction. The Program became effective September 5, 1978, after final promulgation of the Rules.[1]

The Program was established to avoid some of the difficulties and expense that the enforcement agencies encounter when they challenge anticompetitive acquisitions after they have occurred. In the past, the enforcement agencies found that it is often impossible to restore competition fully once a merger takes place. Furthermore, any attempt to reestablish competition after the fact is usually very costly for the parties and the public. Prior review under the Program enables the Federal Trade Commission ("FTC" or the "Commission") and the Department of Justice ("DOJ") to determine which acquisitions are likely to be anticompetitive and to challenge them at a time when remedial action is most effective.

In general, the Act requires that certain proposed acquisitions of voting securities, non-corporate interests ("NCI") or assets be reported to the FTC and the DOJ prior to consummation. The parties must then wait a specified period, usually 30 days (15 days in the case of a cash tender offer or a bankruptcy sale), before they may complete the transaction. Much of the information needed for a preliminary antitrust evaluation is included in the notification filed with the agencies by the parties to proposed transactions and thus is immediately available for review during the waiting period.

Whether a particular acquisition is subject to these requirements depends upon the value of the acquisition and the size of the parties, as measured by their sales and assets. Small acquisitions, acquisitions involving small parties and other classes of acquisitions that are less likely to raise antitrust concerns are excluded from the Act's coverage.

If either agency determines during the waiting period that further inquiry is necessary, it is authorized by Section 7A(e) of the Clayton Act to request additional information or documentary materials from the parties to a reported transaction (a "second request"). A second request extends the waiting period for a specified period, usually 30 days (ten days in the case of a cash tender offer or a bankruptcy sale), after all parties have complied with the request (or, in the case of a tender offer or a bankruptcy sale, after the acquiring person complies). This additional time provides the reviewing agency with the opportunity to analyze the submitted information and to take appropriate action before the transaction is consummated. If the reviewing agency believes that a proposed transaction may violate the antitrust laws, it may seek an injunction in federal district court to prohibit consummation of the transaction.

---

[1] The Premerger Notification Rules are found at 16 C.F.R. Parts 801, 802 and 803. The Rules also are identified by number, and each Rule beginning with Rule 801.1 corresponds directly with the section number in the C.F.R. (so that Rule 801.40 would be found in 16 C.F.R. § 801.40). In this Guide, the Rules are cited by Rule number.

The Program has been a success. Compliance with the Act's notification requirements has been excellent, and has minimized the number of post-merger challenges the enforcement agencies have had to pursue. In addition, although the agencies retain the power to challenge mergers post-consummation, and will do so under appropriate circumstances, the fact that they rarely do has led many members of the private bar to view the Program as a helpful tool in advising their clients about particular acquisition proposals.

The Rules, which govern compliance with the Program, are necessarily technical and complex. We have prepared Guide I to introduce some of the Program's specially defined terms and concepts. This should assist you in determining if proposed business transactions are subject to the requirements of the Program.

## II.     DETERMINING REPORTABILITY

The Act requires persons contemplating proposed business transactions that satisfy certain size criteria to report their intentions to the enforcement agencies before consummating the transaction. If the proposed transaction is reportable, then both the acquiring person and the person whose business is being acquired must submit information about their respective business operations to the enforcement agencies and wait a specific period of time before consummating the proposed transaction. During that waiting period, the enforcement agencies review the antitrust implications of the proposed transaction. Whether a particular transaction is reportable is determined by application of the Act, the Rules, and formal and informal staff interpretations.

As a general matter, the Act and the Rules require both acquiring and acquired persons to file notifications under the Program if all of the following conditions are met:

1. As a result of the transaction, the acquiring person will hold an aggregate amount of voting securities, NCI and/or assets of the acquired person valued in excess of $200 million (as adjusted)[2], regardless of the sales or assets of the acquiring and acquired persons[3]; or

2. As a result of the transaction, the acquiring person will hold an aggregate amount of voting securities, NCI and/or assets of the acquired person valued in excess of $50 million (as adjusted) but at $200 million (as adjusted) or less; and

---

[2] The 2000 amendments to the Act require the Commission to revise certain thresholds annually based on the change in the level of gross national product. A parenthetical "(as adjusted)" has been added where necessary throughout the Rules (and in this guide) to indicate where such a change in statutory threshold value occurs. The term "as adjusted" is defined in subsection 801.1 (n) of the Rules and refers to a table of the adjusted values published in the Federal Register notice titled "Revised Jurisdictional Thresholds for Section 7A of the Clayton Act." The notice contains a table showing adjusted values for the rules and is published in January of each year.

[3] *See* § 7A(a)(2) of the Act.

3.      One person has sales or assets of at least $100 million (as adjusted); and

4.      The other person has sales or assets of at least $10 million (as adjusted).

### A.    Size of Transaction Test

The first step is to determine what voting securities, NCI, assets, or combination thereof are being transferred in the proposed transaction. Then you must determine the value of the voting securities, NCI, and/or assets as well as the percentage of voting securities and NCI that will be "held as a result of the acquisition." Calculating what will be held as a result of the acquisition (referred to as the "size of the transaction") is complicated and requires the application of several rules, including Rules 801.10, 801.12, 801.13, 801.14 and 801.15. Generally, the securities and/or NCI held as a result of the transaction include those that will be acquired in the proposed transaction, as well as any voting securities and/or NCI of the acquired person, or entities within the acquired person, that the acquiring person already holds. Assets held as a result of the acquisition include those that will be acquired in the proposed transaction as well as certain assets of the acquired person that the acquiring person has purchased within the time limits outlined in Rule 801.13.[4]

If the value of the voting securities, NCI, assets or combination thereof exceeds $200 million (as adjusted) and no exemption applies, the parties must file notification and observe the waiting period before closing the transaction.

If the value of the voting securities, NCI, assets or combination thereof exceeds $50 million (as adjusted) but is $200 million (as adjusted) or less, the parties must look to the size of person test.

### B.    Acquiring and Acquired Persons/Acquired Entity

The first step in determining the size of person is to identify the "acquiring person" and "acquired person." "Person" is defined in Rules 801.1(a)(1) and is the "ultimate parent entity" or "UPE" of the buyer or seller. That is, it is the entity that ultimately controls the buyer or seller.[5] The "acquired entity" is the specific entity whose assets, NCI or voting securities are being acquired. The acquired entity may also be its own UPE or it may be an entity within the acquired person.

Thus, in an asset acquisition, the acquiring person is the UPE of the buyer, and the acquired person is the UPE of the seller. The acquired entity is the entity whose assets are being acquired. In a voting securities acquisition, the acquiring person is the UPE of the buyer, the acquired person is the UPE of the entity whose securities are being bought, and the acquired entity is the

---

[4] The Rules on when to aggregate the value of previously acquired voting securities and assets with the value of the proposed acquisition are discussed in greater detail in Guide II.

[5] *See* "control" under 801.1(b).

issuer of the securities being purchased. In an acquisition of NCI, the acquiring person is the UPE of the buyer, the acquired person is the UPE of the entity whose NCI are being bought, and the acquired entity is the entity whose NCI are being acquired. Oftentimes the acquired person and acquired entity are the same.

In many voting securities acquisitions, the acquiring person proposes to buy voting securities from minority shareholders of the acquired entity, rather than from the entity itself (tender offers are an example of this type of transaction). These transactions are subject to Rule 801.30, which imposes a reporting obligation on the acquiring person and on the acquired person, despite the fact that the acquired person may have no knowledge of the proposed purchase of its outstanding securities.[6] For this reason, the Rules also require that a person proposing to acquire voting securities directly from shareholders rather than from the issuer itself serve notice on the issuer of the shares to ensure the acquired person knows about its reporting obligation.[7]

### C. Size of Person Test

Once you have determined who the acquiring and acquired persons are, you must determine whether the size of each person meets the Act's minimum size criteria. This "size of person" test generally measures a company based on the person's last regularly prepared annual statement of income and expenses and its last regularly prepared balance sheet.[8] The size of a person includes not only the entity that is making the acquisition or whose assets or securities are being acquired, but also the UPE and any other entities the UPE controls.[9]

If the value of the voting securities, NCI, assets or combination thereof exceeds $50 million (as adjusted) but is $200 million (as adjusted) or less, the size of person test is met, and no exemption applies, the parties must file notification and observe the waiting period before closing the transaction.

### D. Notification Thresholds

An acquisition that will result in a buyer holding more than $50 million (as adjusted) worth of the voting securities of another issuer crosses the first of five staggered "notification thresholds."[9] The rules identify four additional thresholds: voting securities valued at $100 million (as adjusted) or greater but less than $500 million (as adjusted); voting securities valued at $500 million (as adjusted) or greater; 25 percent of the voting securities of an issuer, if the 25 percent (or any amount above 25% but less than 50%) is valued at greater than $1 billion (as adjusted);

---

[6] *See* Rule 801.1; Rule 801.30.

[7] *See* Rule 803.5.

[8] *See* Rule 801.11.

[9] *See* Rule 801.1(a)(1).

and 50 percent of the voting securities of an issuer if valued at greater than $50 million (as adjusted).

The thresholds are designed to act as exemptions to relieve parties of the burden of making another filing every time additional voting shares of the same person are acquired. As such, when notification is filed, the acquiring person is allowed one year from the end of the waiting period to cross the threshold stated in the filing.[10] If within that year the person reaches the stated threshold (or any lower threshold), it may continue acquiring voting shares up to the next threshold for five years from the end of the waiting period.[11] For example, if you file to acquire $100 million (as adjusted) of the voting securities of Company B and cross that threshold within one year, you would be able to continue to acquire voting securities of Company B for a total of five years without having to file again so long as your total holding of Company B's voting securities did not exceed either $500 million (as adjusted) or 50 percent, *i.e.*, additional notification thresholds. Once an acquiring person holds 50 percent or more of the voting securities of an issuer, all subsequent acquisitions of securities of that issuer are exempt.[12]

These notification thresholds apply only to acquisitions of voting securities. The 50 percent threshold is the highest threshold regardless of the corresponding dollar value.

  **E.**  **Exempt Transactions**

In some instances, a transaction may not be reportable even if the size of person and the size of transaction tests have been satisfied. The Act and the Rules set forth a number of exemptions, describing particular transactions or classes of transactions that need not be reported despite meeting the threshold criteria.[13] For example, certain acquisitions of assets in the ordinary course of a person's business are exempted, including new goods and current supplies (*e.g.*, an airline purchases new jets from a manufacturer, or a supermarket purchases its inventory from a wholesale distributor).[14] The acquisition of certain types of real property also would not require notification. These include certain new and used facilities, not being acquired with a business, unproductive real property (*e.g.*, raw land), office and residential buildings, hotels (excluding hotel casinos), certain recreational land, agricultural land and retail rental space and warehouses.[15] In addition, the acquisition of foreign assets would be exempt where the sales in or

---

[10] *See* Rule 803.7.

[11] *See* Rule 802.21.

[12] *See* § 7A(c)(3) of the Act, 15 U.S.C. § 18a(c)(3).

[13] *See* § 7A(c) of the Act, 15 U.S.C. § 18a(c), and Part 802 of the Rules, 16 C.F.R. Part 802.

[14] *See* Rules 802.1(b) and 802.1(c).

[15] *See* Rules 802.2(c) - (h).

into the U.S. attributable to those assets were $50 million (as adjusted) or less.[16] Once it has been determined that a particular transaction is reportable, each party must submit its notification to the FTC and the DOJ. In addition, each acquiring person must pay a filing fee to the FTC for each transaction that it reports (with a few exceptions, *see* IV below).

## III. THE FORM

The Notification and Report Form ("the Form") solicits information that the enforcement agencies use to help evaluate the antitrust implications of the proposed transaction. Copies of the Form, Instructions, and Style Sheet are available from the PNO, (202) 326-3100, as well as the FTC website at http://www.ftc.gov/bc/hsr.

### A. Information Reported

In general, a filing party is required to identify the persons involved and the structure of the transaction. The reporting person also must provide certain documents such as balance sheets and other financial data, as well as copies of certain documents that have been filed with the Securities and Exchange Commission. In addition, the parties are required to submit certain planning and evaluation documents that pertain to the proposed transaction.

The Form also requires the parties to disclose whether the acquiring person and acquired entity currently derive revenue from businesses that fall within any of the same industry and product North American Industry Classification System ("NAICS") codes,[17] and, if so, in which geographic areas they operate. Identification of overlapping codes may indicate whether the parties engage in similar lines of business. Acquiring persons must also describe certain previous acquisitions in the last five years of companies or assets engaged in businesses in any of the overlapping codes identified. Please note that an acquiring person must complete the Form for all of its operations; an acquired person, on the other hand, must limit its response in Items 5 through 7 to the business or businesses being sold and does not need to answer Item 8.[18] In addition, the acquired person does not need to respond to Item 6 in a pure asset transaction.

---

[16] *See* Rules 802.50 and 802.51.

[17] For information concerning NAICS codes *see* the *North American Industry Classification System, 2002*, published by the Executive Office of the President, Office of Management and Budget and available from the National Technical Information Service, 5285 Port Royal Road, Springfield VA 22161 (Order Number PB 2002-101430) or online at http://www.ntis.gov/search/product.aspx?ABBR=PB2002101430; and The *2002 Economic Census Numerical List of Manufactured and Mineral Products* published by Bureau of the Census, available from the Government Printing Office or online at http://www.census.gov/prod/ec02/02numlist/m31r-nl.pdf. Information regarding NAICS also is available at the Bureau of the Census website at http://www.census.gov/epcd/www/naics.html.

[18] *See* 803.2(b).

### B. Contact Person

The parties are required to identify an individual (listed in Item 1(g) of the Form) who is a representative of the reporting person and is familiar with the content of the Form. This contact person is, in most cases, either counsel for the party or an officer of the company. This person must be available during the waiting period.

### C. Certification and Affidavits

Rule 803.5 describes the affidavit that must accompany certain Forms. In transactions where the acquiring person is purchasing voting securities from non-controlling shareholders, only the acquiring person must submit an affidavit. The acquiring person must state in the affidavit that it has a good faith intention of completing the proposed transaction and that it has served notice on the acquired person as to its potential reporting obligations.[19] In all other transactions, each of the acquired and acquiring persons must submit an affidavit with their Forms, attesting to the fact that a contract, an agreement in principle, or a letter of intent has been executed and that each person has a good faith intention of completing the proposed transaction. These required statements govern when the parties may make a premerger notification filing. The affidavit is intended to assure that the enforcement agencies will not be presented with hypothetical transactions for review.[20]

Rule 803.6 provides that the Form must be certified and the rule specifies who must make the certification.[21] One of the primary purposes of the certification is to preserve the evidentiary value of the filing. It also is intended to place responsibility on an individual to ensure that information reported is true, correct, and complete. Both the certification and the affidavit must be notarized, or may be signed under penalty of perjury.[22]

---

[19] See Rule 803.5(a)(i)(I) through (vi) for the full requirements of such notice. In tender offers, the acquiring person also must affirm that the intention to make the tender offer has been publicly announced. See Rule 803.5(a)(2).

[20] *See* Statement of Basis and Purpose to Rule 803.5, 43 Fed. Reg. 33510-33511 (1978).

[21] The certification may be signed by a general partner of a partnership; an officer or director of a corporation; or, in the case of a natural person, the natural person or his/her legal representative.

[22] 28 U.S.C. § 1746 allows use of the following statement in lieu of a notary's jurat: "I declare (or certify, verify or state) under penalty of perjury *under the laws of the United States of America* that the foregoing is true and correct. Executed on (date) [and] (Signature)." The italicized text is necessary only if signed outside the territorial United States.

### D.  Voluntary Information

The rules provide that reporting persons also may submit information that is not required by the Form.[23]  If persons voluntarily provide information or documentary material that is helpful to the competitive analysis of the proposed transaction, the enforcement agencies' review of a proposed transaction may be more rapid.  However, voluntary submissions do not guarantee a speedy review.  Voluntary submissions are included in the confidentiality coverage of the Act and the Rules.

### E.  Confidentiality

Neither the information submitted nor the fact that a notification has been filed is made public by the agencies except as part of a legal or administrative action to which one of the agencies is a party or in other narrowly defined circumstances permitted by the Act.[24]  However, in response to inquiries from interested parties who wish to approach the agencies with their views about a transaction, the agencies may confirm which agency is handling the investigation of a publicly announced merger.[25]  The fact that a transaction is under investigation also may become apparent if the agencies interview third parties during their investigation.

### F.  Filing Procedures

The parties should complete and return the original and one copy of the Form, along with one set of documentary attachments, to the Premerger Notification Office, Bureau of Competition, Room 303, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, D.C. 20580.  Three copies of the Form, along with one set of documentary attachments, should be sent to the Department of Justice, Antitrust Division, Office of Operations, Premerger Notification Unit, 950 Pennsylvania Avenue, NW, Room 3335, Washington, DC  20530 (for non-USPS deliveries, use zip code 20004).

## IV.  THE FILING FEE

In connection with the filing of a Form, Congress also mandated the collection of a fee from each acquiring person.  The filing fee is based on a three-tiered system that ties the amount paid to the total value of the voting securities, NCI or assets held as a result of the acquisition:[26]

---

[23] *See* Rule 803.1(b).

[24] *See* Section 7A(h) of the Act.

[25] A publicly announced merger is one in which a party to the merger has disclosed the existence of the transaction in a press release or in a public filing with a governmental body.

[26] The filing fee thresholds are adjusted annually for changes in the GNP during the previous year.  The fees themselves are not adjusted.

| VALUE OF VOTING SECURITIES, NCI OR ASSETS TO BE HELD | FEE AMOUNT |
|---|---|
| greater than $50 million (as adjusted) but less than $100 million (as adjusted) | $45,000 |
| $100 million (as adjusted) or greater but less than $500 million (as adjusted) | $125,000 |
| $500 million (as adjusted) or greater | $280,000 |

For transactions in which more than one person is deemed to be the acquiring person, each acquiring person must pay the appropriate fee (except in consolidations and in transactions in which there are two acquiring persons that would have exactly the same responses to Item 5 of the Form).[27] In addition, an acquiring person will have to pay multiple filing fees if a series of acquisitions are separately reported.[28]

The filing fee must be paid at the time of filing to "The Federal Trade Commission" by electronic wire transfer, bank cashier's check or certified check. Rule 803.9 contains specific instructions for payment of the filing fee. In addition, information is available at http://www.ftc.gov/bc/hsr/filing2.htm.

## V. THE WAITING PERIOD

After filing, the filing parties must then observe a statutory waiting period during which they may not consummate the transaction. The waiting period is 15 days for reportable acquisitions by means of a cash tender offer, as well as acquisitions subject to certain federal bankruptcy provisions, and 30 days for all other types of reportable transactions.[29] The waiting period may be extended by issuance of a request for additional information and documentary material.[30] Any waiting period that would end on a Saturday, Sunday or legal public holiday will expire on the next regular business day.

### A. Beginning of the Waiting Period

In most cases, the waiting period begins after both the acquiring and acquired persons file completed Forms with both agencies. However, for certain transactions in which a person buys

---

[27] For example, if two separate UPEs jointly control an acquisition vehicle and own no other entities, their Item 5 responses would be identical.

[28] *See* Rule 803.9(a) - (c).

[29] *See* Rule 803.10; 11 U.S.C. § 363(b)(2), as amended (1994).

[30] *See* Section VIII(C), *infra*.

voting securities from persons other than the issuer (third party and open market transactions), the waiting period begins after the acquiring person files a complete Form. In a reportable joint venture formation, the waiting period begins after all acquiring persons required to file submit complete Forms.[31] It is important to note that failure to pay the filing fee or the submission of an incorrect or incomplete filing will delay the start of the waiting period.[32]

### B. Early Termination

Any filing person may request that the waiting period be terminated before the statutory period expires. Such a request for "early termination" will be granted only if (1) at least one of the persons specifies it on the Form; (2) all persons have submitted compliant Forms; and (3) both antitrust agencies have completed their review and determined not to take any enforcement action during the waiting period.[33]

The PNO is responsible for informing the parties that early termination has been granted. The Act requires that the FTC publish a notice in the Federal Register of each early termination granted. Moreover, grants of early termination also appear on the FTC's website at http://www.ftc.gov/bc/earlyterm/index.html.

When it's requested, early termination is granted for most transactions. On the average, requests for early termination are granted within two weeks from the beginning of the waiting period. In any particular transaction, however, the time that it takes to grant a request for early termination depends on many factors, including the complexity of the proposed transaction, its potential competitive impact, and the number of filings from other parties that the enforcement agencies must review at the same time.

## VI. REVIEW OF THE FORM

Once a Form has been filed, the enforcement agencies begin their review. The FTC is responsible for the administration of the Program. As a result, the PNO determines whether the Form complies with the Act and the Rules.

The Form is assigned to a member of the PNO staff to assess whether the transaction was subject to the reporting requirements and whether the Form was completed accurately. If the filing appears to be deficient, the staff member will notify the contact person as quickly as possible so that errors can be corrected. It is important to correct the errors as soon as possible because the waiting period does not begin to run until the Form is filled out accurately, all required

---

[31] The joint venture entity does not file. *See* Rule 802.41.

[32] *See* Rules 803.3 and 803.10(a).

[33] *See* Formal Interpretation 13 issued August 20, 1982.

information and documentary material are supplied and payment of the filing fee is received.[34]

When the PNO determines that the Forms comply with all filing requirements, letters are sent to the parties identifying the beginning and ending of the waiting period, as well as the transaction number assigned to the filing. The conclusion that the parties have complied with the Act and the Rules may be modified later, however, if circumstances warrant.

## VII.   ANTITRUST REVIEW OF THE TRANSACTION

Initially, both agencies undertake a preliminary substantive review of the proposed transaction. The agencies analyze the filings to determine whether the acquiring and acquired firms are competitors, or are related in any other way such that a combination of the two firms might adversely affect competition. Staff members rely not only on the information included on the Form but also on publicly available information. The individuals analyzing the Form often have experience either with the markets or the companies involved in the particular transaction. As a result, they may have industry expertise to aid in evaluating the likelihood that a merger may be harmful.

If, after preliminary review, either or both agencies decide that a particular transaction warrants closer examination, the agencies decide between themselves which one will be responsible for the investigation. Only one of the enforcement agencies will conduct an investigation of a proposed transaction. Other than members of the PNO, no one at either agency will initiate contact with any of the persons or any third parties until it has been decided which agency will be responsible for investigating the proposed transaction.[35] This clearance procedure is designed to minimize the duplication of effort and the confusion that could result if both agencies contacted individual persons at different times about the same matter. The clearance decision is made pursuant to an agreement that divides the antitrust work between the two agencies.

Of course, any interested person, including either of the parties, is free to present information to either or both agencies at any time. However, if the clearance decision has not yet been resolved, the person must make a presentation, or provide written information or documents, to both agencies. If you are representing a party that wishes to make a presentation, or provide written information or documents, you may inform the PNO of that fact; the PNO will let staff attorneys at both agencies who are reviewing the matter know that persons wish to come in and make a presentation, or provide written information or documents.

---

[34] For transactions in which a person buys voting securities from someone other than the issuer (third party and open market transactions), the waiting period begins after the acquiring person submits a complete and accurate Form. An incorrect or incomplete Form from the acquired person will not stop the running of the waiting period. However, the acquired person still is obligated to correct any deficiencies in its filing.

[35] Staff at either agency may initiate contact with a person prior to the resolution of which agency will handle the matter by first notifying the other agency and offering the other agency the opportunity to participate.

## VIII.   SECOND REQUESTS

Once the investigating agency has clearance to proceed, it may ask any or all persons to the transaction to submit additional information or documentary material to the requesting agency. The request for additional information is commonly referred to as a "second request."[36] As discussed above, although both agencies review each Form submitted to them, only one agency will issue second requests to the parties in a particular transaction.

### A.   Information Requested

Generally, a second request will solicit information on particular products or services in an attempt to assist the investigative team in examining a variety of legal and economic questions. A typical second request will include interrogatory-type questions as well as requests for the production of documents. A model second request has been produced jointly by the FTC and DOJ for internal use by their attorneys and is contained in *Guide III*. Because every transaction is unique, however, the model second request should be regarded only as an example.

### B.   Narrowing the Request

Parties that receive a second request and believe that it is broader than necessary to obtain the information that the enforcement agency needs are encouraged to discuss the possibility of narrowing the request with the staff attorneys reviewing the proposed transaction. Often, the investigative team drafts a second request based only on information contained in the initial filing and other available material. At this point, the investigative team may not have access to specific information about the structure of the company or its products and services. By meeting with staff, representatives of the company have an opportunity to narrow the issues and to limit the required search for documents and other information. If second request modification issues cannot be resolved through discussion with staff, the agencies also have adopted a formal internal appeals process that centralizes in one decision maker in each agency the review of issues relating to the scope of and compliance with second requests.[37]

The enforcement agency issuing the second request may have determined that certain data sought in the request can resolve one or more issues critical to the investigation. In such a situation, the agency's staff may suggest use of the informal "quick look" procedure. Under the quick look, the staff will request the parties to first submit documents and other information, which specifically address the critical issues (*e.g.,* product market definition or ease of entry). If the submitted information resolves the staff's concerns in these areas, the waiting period will be terminated on a *sua sponte* basis and the parties will not have to expend the time and cost of responding to the full second request. Of course, if the submitted information does not resolve the staff's concerns on determinative issues, then the parties will need to respond to the full

---

[36]   *See* Rule 803.20(a)(1) for the identities of persons and individuals that are subject to such request.

[37]   *See* 66 Fed. Reg. 8721-8722, February 1, 2001.

second request.

### C. Extension of the Waiting Period

The issuance of a second request extends the statutory waiting period until 30 days (or in the case of a cash tender offer or certain bankruptcy filings,[38] 10 days) after both parties are deemed to have complied with the second request (or in the case of a tender offer and bankruptcy, until after the acquiring person has complied).[39] During this time, the attorneys investigating the matter may also be interviewing relevant parties and using other forms of compulsory process to obtain information.

The second request must be issued by the enforcement agency before the waiting period expires. If the waiting period expires and the agencies have not issued a second request to any person to the transaction, then the parties are free to consummate the transaction. The fact that the agencies do not issue second requests does not preclude them from initiating an enforcement action at a later time.[40] All of the agencies' other investigative tools are available to them in such investigations.[41]

## IX. AGENCY ACTION

After analyzing all of the information available to them, the investigative staff will make a recommendation to either the Commission or the Assistant Attorney General (depending on which agency has clearance).

### A. No Further Action

If the staff finds no reason to believe competition will be reduced substantially in any market, it will recommend no further action. Assuming that the agency concurs in that recommendation, the parties are then free to consummate their transaction upon expiration of the waiting period. As with a decision not to issue a second request, a decision not to seek injunctive relief at that time does not preclude the enforcement agencies from initiating a post-merger enforcement action at a later time.

### B. Seeking Injunctive Relief

If the investigative staff believes that the transaction is likely to be anticompetitive, it may recommend that the agency initiate injunction proceedings in U.S. district court to halt the

---

[38] See 11 U.S.C. § 363(b), as amended (1994).

[39] *See* § 7A(e) of the Act.

[40] *See* § 7(A)(i)(1) of the Act.

[41] *See* § 7(A)(i)(2) of the Act.

acquisition. If the Commission or the Assistant Attorney General concurs in the staff's recommendation, then the agency will file suit in the appropriate district court. If it is a Commission case, the FTC is required to file an administrative complaint within twenty days (or a lesser time if the court so directs) of the granting of its motion for a temporary restraining order or for a preliminary injunction.[42] The administrative complaint initiates the FTC's administrative proceeding that will decide the legality of the transaction. If it is a DOJ case, the legality of the transaction is litigated entirely in district court.

### C. Settlements

During an investigation, the investigative staff may, if appropriate, discuss terms of settlement with the parties. The staff of the FTC is permitted to negotiate a proposed settlement with the parties; however, it must then be presented to the Commission, accepted by a majority vote, and placed on the public record for a notice and comment period before it can be made final. A proposed settlement negotiated by DOJ staff must be approved by the Assistant Attorney General and also placed on the public record for a notice and comment period before it will be entered by a district court pursuant to the provisions of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h).

## X. FAILURE TO FILE

### A. Civil Penalties

If you consummate a reportable transaction without filing the required prior notification or without waiting until the expiration of the statutory waiting period, you may be subject to civil penalties. The Act provides that "any person, or any officer, director or partner thereof" shall be liable for a penalty of up to $16,000 a day for each day the person is in violation of the Act. The enforcement agencies may also obtain other relief to remedy violations of the Act, such as an order requiring the person to divest assets or voting securities acquired in violation of the Act.[43]

### B. Reporting Omissions

If you have completed a transaction in violation of the Act, it is important to bring the matter to the attention of the PNO and to file a notification as soon as possible. Even a late filing provides information to the enforcement agencies that assists them in conducting antitrust screening of transactions and antitrust investigations. The parties should include a letter with the notification from an officer or director of the company explaining why the notification was not filed in a timely manner, how and when the failure was discovered, and what steps have been taken to prevent a violation of the Act in the future. The letter should be addressed to the Deputy Director, Bureau of Competition, Federal Trade Commission, 600 Pennsylvania Ave., NW,

---

[42] FTC Act Section 13(b).

[43] *See* § 7A(g) of the Act, as amended by the Debt Collection Improvements Act of 1996, Pub. L. No. 104134 (Apr. 26, 1996); 61 Fed. Reg. 54548 (Oct. 21, 1996); 61 Fed. Reg. 55840 (Oct. 29, 1996).

Washington DC 20580.

### C. Deliberate Avoidance

The Rules specifically provide that structuring a transaction to avoid the Act does not alter notification obligations if the substance of the transaction is reportable.[44]  For example, the agencies will seek penalties where the parties split a transaction into separate parts that are each valued below the current filing threshold in order to avoid reporting the transaction, but the fair market value of the assets being acquired is actually above the threshold.[45]

## XI. OTHER GUIDES IN THIS SERIES

Guide I is the first in a series of guides prepared by the PNO.  Others include:

Guide II: *To File Or Not To File -- When You Must File a Premerger Notification Report Form*, which explains certain basic requirements of the program and takes you through a step-by-step analysis for determining whether a particular transaction must be reported.

Guide III: *A Model Request for Additional Information and Documentary Material (Second Request)*, which contains materials designed for the attorneys of the antitrust enforcement agencies in preparing requests for additional information.  It is included in this series to provide an example of what you might expect if either enforcement agency issues a second request.

## XII. OTHER MATERIALS

To make effective use of these guides, you must be aware of their limitations.  They are intended to provide only a very general introduction to the Act and Rules and should be used only as a starting point.  Because it would be impossible, within the scope of these guides, to explain all of the details and nuances of the premerger requirements, you must not rely on them as a substitute for reading the Act and the Rules themselves.  To determine premerger notification requirements, you should consult:

1. Section 7A of the Clayton Act, 15 U.S.C. § 18a, as amended by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. 94-435, 90 Stat. 1390, and amended by Pub. L. No. 106-553, 114 Stat. 2762.

2. The Premerger Notification Rules, 16 C.F.R. Parts 801 – 803. (2008).

3. The Statement of Basis and Purpose for the Rules, 43 Fed. Reg. 33450 (July 31, 1978); 48 Fed. Reg. 34428 (July 29, 1983); 52 Fed. Reg. 7066

---

[44]  *See* Rule 801.90.

[45]  *See, e.g., United States v. Sara Lee Corp.*, 1996-1 Trade Cas. (CCH) ¶ 71,301 (D.D.C. 1996).

    (March 6, 1987); 52 Fed. Reg. 20058 (May 29, 1987); 61 Fed. Reg. 13666 (March 28, 1996); 66 Fed. Reg. 8680 (February 1, 2001); 66 Fed. Reg. 23561 (May 9, 2001); 66 Fed. Reg. 35541 (July 6, 2001); 67 Fed. Reg. 11898 (March 18, 2002); 67 Fed. Reg. 11904 (March 18, 2002); 68 Fed. Reg. 2425 (January 17, 2003); 70 Fed. Reg. 4987 (January 31, 2005); 70 Fed. Reg. 11502 (March 8, 2005); 70 Fed. Reg. 73369 (December 12, 2005); 71 Fed. Reg. 35995 (June 23, 2006).

  4. The formal interpretations issued pursuant to the Rules, compiled in 6 Trade Reg. Rep. (CCH) at ¶ 42,475.

It is advisable to check the Federal Register for more recent Rules changes that have not yet been incorporated into the Code of Federal Regulations or these guides.  For an up-to-date list of Federal Register notices related to the Statement of Basis and Purpose, see http://www.ftc.gov/bc/hsr/basispurp.shtm.  For other HSR-related rulemakings, see http://www.ftc.gov/bc/hsr/rulemaking.shtm.  Amendments and formal interpretations, as well as the other material referenced above, are available on the Premerger Notification Office website at http://www.ftc.gov/bc/hsr.

There are also non-governmental publications that, while not officially endorsed by the FTC, contain useful compilations of materials relevant to the Program:

  1. Commerce Clearing House's *Trade Regulation Reporter* reprints the Act, the Rules, the Form, and the Formal Interpretations.

  2. The American Bar Association's Section of Antitrust Law publishes a *Premerger Notification Practice Manual (2007 Edition)* that provides a collection of informal interpretations of the PNO.

  3. A loose-leaf treatise by Axinn, Fogg, Stoll and Prager, *Acquisitions under the Hart-Scott-Rodino Antitrust Improvements Act* (published by Law Journal SeminarsPress), explains requirements of the Form, the Rules, and the Act, and includes a discussion of the legislative history of the Act.

Finally, if you have questions about the program or a particular transaction not answered by the Commission's HSR website, the staff of the PNO is available to assist you.  The PNO answers thousands of inquiries each year and is prepared to provide prompt informal advice concerning the potential reportability of a transaction and completion of the Form.  For general questions, contact the PNO at (202) 326-3100.