**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 6:25-cv-9-JDK |
| | § | |
| FEDERAL TRADE COMMISSION, et al., | § § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This case challenges a 2024 rule promulgated by the Federal Trade Commission. The rule significantly expands the amount of documentary material and information that merging companies must include in a premerger notification to the agency. Premerger Notification; Reporting and Waiting Periods Requirements, 89 Fed. Reg. 89,216 (Nov. 12, 2024) (hereinafter, "the Final Rule" or "the Rule").

Plaintiffs challenge the Final Rule as unlawful under the Administrative Procedure Act ("the APA"). Plaintiffs first claim that the Rule exceeds the FTC's statutory authority because the information requested by the Rule is not "necessary and appropriate," as the statute requires. Additionally, Plaintiffs argue that the Final Rule was the product of arbitrary and capricious rulemaking. Specifically, Plaintiffs contend that the FTC failed to show that the Rule's benefits outweigh its costs and failed to explain why the agency rejected less burdensome alternatives.

1

The parties cross-moved for summary judgment.  The FTC for its part defends the Rule on both grounds.  It also challenges the parties' standing.  On the merits, the agency claims that the information sought by the Final Rule is both necessary and appropriate to determine whether a proposed transaction would violate the antitrust laws.  And the FTC defends its rulemaking, explaining that it considered the costs and benefits and reasonably rejected the alternatives.

For the reasons set forth below, the Court grants Plaintiffs' motion and denies the FTC's cross-motion.  On standing, Plaintiffs have properly shown that they are associations representing members who face imminent injury because of the Final Rule.  Plaintiffs also succeed on the merits.  First, the Final Rule exceeds the FTC's statutory authority because the agency has not shown that the Rule's claimed benefits will "reasonably outweigh" its significant and widespread costs.  *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 965 (5th Cir. 2023).  Though the FTC asserts that the Rule will detect illegal mergers and save agency resources, the FTC fails to substantiate these assertions.  The Final Rule is therefore not "necessary and appropriate," and the statute "does not authorize [the FTC] to promulgate [the Final Rule]."  *Id.*

The Final Rule is also arbitrary and capricious for largely the same reason: the FTC "failed to consider an important aspect of the problem," namely that the Rule's benefits "bear a rational relationship" to its costs.  *Id.* at 973.  The FTC also did not adequately explain its rejection of less costly and burdensome alternatives.

Accordingly, the Court vacates and sets aside the Final Rule.

## I.

In 1978, acting under congressional authority, the FTC promulgated a rule requiring certain information from merging parties that was "necessary and appropriate" to enforce the antitrust laws.  Forty-six years later, the FTC determined that the old form was outdated and issued the Final Rule that is the subject of this case.

**A.    The Statute.**    In 1976, Congress enacted the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a ("HSR Act").  The HSR Act requires parties to certain mergers and acquisitions to file a "premerger notification" with the FTC and the Department of Justice thirty days before finalizing the transaction.  *Id.* § 18a(a)–(b).  The purpose of the requirement is to detect "illegal mergers and acquisitions prior to consummation without unduly burdening business with unnecessary paperwork or delays."  S. Rep. No. 94-803, at 65 (1976).

The HSR Act authorizes the FTC to specify the "documentary material and information" to be submitted with the premerger notification.  15 U.S.C. § 18a(d)(1).  Specifically, the FTC "shall require that the notification . . . be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the [FTC and DOJ] to determine whether such acquisition may, if consummated, violate the antitrust laws."  *Id.*  If an agency determines during the thirty-day period that a particular transaction needs further scrutiny, then the agency may "require the submission of additional information or documentary material."  *Id.* § 18a(e).  This broader "Second Request"

generally applies only to a small subset of transactions that pose a potential antitrust concern.  89 Fed. Reg. at 89,216.

**B.    The 1978 Rule.**  In 1978, the FTC published the first premerger notification "Form."  *See* Premerger Notification; Reporting and Waiting Period Requirements, 43 Fed. Reg. 33,450, 33,519 (July 31, 1978).  The Form required parties to submit:

> The identities of the persons involved and the type of acquisition (item 1); A description of the voting securities or assets to be acquired and of the means by which the acquisition is to be carried out (item 2); The percentage and total dollar amount of the assets and voting securities of the acquired person to be held by the acquiring person as a result of the acquisition (item 3); Copies of various SEC filings [and] Annual reports and financial statements of the reporting person, as well as studies or analyses of the acquisition (item 4); A listing of dollar revenues derived by the reporting person, broken down separately by industry, product class and product (item 5); Information about the entities included within the reporting person, as well as information about the shareholders of the reporting Person and the shareholdings of the reporting person in other persons (item 6); Geographic market information relating to industries in which the reporting person and another party to the acquisition both derived dollar revenues (item 7); Information about revenues resulting from certain vendor-vendee relationships existing between the reporting person and another party to the acquisition (item 8); [and] Any other recent acquisitions by the acquiring person in an industry from which both it and the acquired person derive dollar revenues (item 9).

*Id.* at 33,520.

This Form, with only minor adjustments, has governed mergers and acquisitions for nearly fifty years.  43 Fed. Reg. at 89,257.  Over the years, the FTC and DOJ have repeatedly stated that the Form was "highly effective" in "giving the government the opportunity to investigate and challenge mergers."  Docket No. 44, Ex. 17 at 28 (Fed. Trade Comm'n & U.S. Dep't of Justice, *Annual Report Fiscal Year*

4

*2001* (corrected April 2008)).    Indeed, from 2001 to 2020, only about 3% of transactions submitting Forms triggered a Second Request for additional information.  Logan Billman & Steven C. Salop, *Merger Enforcement Statistics: 2001-2020*, 85 ANTITRUST L.J. 1 (2023).

Although the agencies now claim the Form fails to provide sufficient information, a significant criticism of the Form was that it was too burdensome and costly and applied to too many transactions.  146 Cong. Rec. 24,253 (2000) (statement of Sen. Hatch).  As a result, Congress amended the HSR Act in 2000 to raise the dollar thresholds for filing a premerger notification and indexed them to economic growth.  Pub. L. No. 106-553, § 630, 114 Stat. 2762 (2000).

C.    **The 2024 Rule.**  In 2023, the FTC proposed dramatically expanding the Form by requiring thirty-four new categories of information.  Premerger Notification; Reporting and Waiting Period Requirements, 88 Fed. Reg. 42,178, 42,185-42,186 (June 29, 2023).  According to the FTC, the Form no longer served its purposes in "the economy of 2024."  89 Fed. Reg. at 89,216.  The FTC argued that "profound changes" in corporate structures, business competition, mergers, and investment strategies had "rendered the Form's focus on traditional corporate structures outdated" and left agencies "unable to determine which entities or individuals will be making competitive decisions post-merger."  *Id.* at 89,217.

Hundreds of commenters responded, urging the FTC to withdraw or rewrite the proposed rule.  One commenter noted that the new rule would "treat all reportable transactions as deserving of an extensive degree of disclosure and scrutiny far in

excess of any actual competitive risks they pose" and "establish a presumption that M&A activity is inherently dubious." Nat'l Ass'n of Mfrs., *Comment Letter on Proposed Rule* (September 28, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0700. Another commenter noted that the new requirements in the proposed rule exceeded even what the agencies typically request in an informal investigation. Nat'l Council of Farmer Coops., *Comment Letter on Proposed Rule* (August 8, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0496. Still another questioned what benefits the proposed rule would provide when "[t]he Agencies have not identified any transactions as raising competition issues that would have only made clear if the Proposed Rules were implemented." Mo. Chamber of Com. and Indus., *Comment Letter on Proposed Rule* (September 26, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0660. Others argued that the proposed rule violated the HSR Act and its mandate for a "balance between providing the government with information to enforce the antitrust laws properly and avoiding undue burdens on legitimate merger and acquisition activity." Nat'l Retail Fed'n, *Comment Letter on Proposed Rule* (September 27, 2023), https://www.regulations.gov/comment/FTC-2023-0040-0679.

On October 10, 2024, the FTC adopted the Final Rule at issue here. 89 Fed. Reg. at 89,394. Although the Final Rule pared back the categories of new information required by filers, it substantially modified the Form, requiring approximately twenty (rather than thirty-four) new categories of information and documents:

> Translations, Changes to Identification of Additional Minority Interest Holders, Organization of Controlled Entities, Description of Ownership

Structure, Organizational Chart (if it exists), Identification of Certain officers and Directors, Description of Business of the Acquiring Person, Transactions Subject to International Antitrust Notification, Transaction Rationale, Transaction Diagram (if one exists), Competition Documents from Supervisory Deal Team Lead, Plans and Reports, Transaction Agreements, Other Agreements Between the Parties, Overlap Description, Supply Relationship Description, Geographic market Information (new organization, street-level reporting, and reporting of francisees [sic]), Limiting Minority-Held Entity Identification to Overlaps, Prior Acquisitions, Subsidies from Foreign Entities or Governments of Concern, Defense or Intelligence Contracts.

*Id*. at 89,264 (Figure 3: Applicability of Significant Updated and New Information Requirements); *see also id.* at 89,277. The FTC also revised the estimated time to comply with the new Rule. According to the agency, the Final Rule would take an average of 105 hours for financial institutions to complete, 89 Fed. Reg. at 89,333, lower than the proposed rule's estimate of 144 hours, 88 Fed. Reg. at 42,208, but still nearly triple that of the prior Form's average time of 37 hours, *id*.

**D.    This Lawsuit.** On January 10, 2025, Plaintiffs Longview Chamber of Commerce, Chamber of Commerce of the United States of America, American Investment Council, and Business Roundtable challenged the Final Rule under the APA, 5 U.S.C. §§ 701, *et seq*. Docket No. 27. The FTC thereafter moved to dismiss the Longview Chamber for lack of subject matter jurisdiction and to transfer the case to the U.S. District Court for the District of Columbia. Docket No. 30. Before the Court had an opportunity to rule on the FTC's motion, Plaintiffs filed a motion for summary judgment. Docket No. 44. The FTC then cross-moved for summary judgment, again challenging the Longview Chamber's standing, among other issues. Docket No. 57.

This Memorandum Opinion addresses the summary judgment motions. Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

As explained further below and as the parties agreed, this Opinion moots the FTC's other pending motions (Docket Nos. 23, 30, and 53). Those motions are therefore denied as moot.

## II.

The FTC argues that Plaintiffs lack standing to challenge the Final Rule. First, the FTC claims that Plaintiffs' only evidence of standing is inadmissible. Alternatively, the FTC argues, Plaintiffs' evidence is insufficient to establish the Longview Chamber's standing. Both arguments fail.

### A.

Plaintiffs bear the burden to establish standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 242 & n.3 (2006). Here, Plaintiffs have submitted declarations of individuals who are officers in each of the Plaintiff associations. Docket No. 44, Ex. A–D. Each declarant attests that he or she is an officer of the association and has personal knowledge that many of the association's members "regularly enter into merger[s], acquisition[s], or other transactions that meet or exceed the size thresholds

for filing a premerger notification form under the HSR Act and will be subject to the requirements of the Rule." Docket No. 44, Ex. D ¶¶ 1, 2, 5; *see also id.* Ex. A ¶¶ 1, 2, 7; *id.* Ex. B ¶¶ 1, 2, 4; *id.* Ex. C ¶¶ 1, 2, 9. The declarants further state that these members "are harmed by the Rule" in part by making it "far more costly for [the association's] members to consummate such deals." Docket No. 44, Ex. D ¶ 13; *see also id.* Ex. A ¶ 12; *id.* Ex. B ¶ 9; *id.* Ex. C ¶ 13. The declarations easily satisfy Federal Rule of Civil Procedure 56(c)(4), which requires that a declaration in support of summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). *See, e.g.*, *Chamber of Com. of the U.S. v. CFPB*, 691 F. Supp. 3d 730, 738 (E.D. Tex. 2023); (relying on similar declarations to find that an associational plaintiff has standing to challenge agency action).

The FTC nevertheless argues that the declarations are not competent summary judgment evidence because they "rely on inadmissible hearsay" by the associations' members. Docket No. 57 at 9. The factual statements in a declaration at summary judgment, however, "need only be capable of being 'presented in a form that would be admissible in evidence'" at trial. *See Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017) (citing FED. R. CIV. P. 56(c)). "This flexibility allows the court to consider the evidence that would likely be admitted at trial—as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant—without imposing on parties the time and expense

it takes to authenticate everything in the record." *Id*. Here, the most obvious way to make this testimony admissible would be for the unnamed members themselves to testify at trial, as Plaintiffs propose. Docket No. 62 at 2–3; *see, e.g., Hargiss v. Princeton Excess & Surplus Lines Ins. Co.*, 2023 WL 11886895, at *4 (W.D. La. Dec. 8, 2023) (finding that a declaration with hearsay is permissible summary judgment evidence because the hearsay could be admissible at trial through testimony). Because there is "nothing to compel a conclusion" that these unnamed members would be incapable of testifying, the declarations are admissible for the purpose of summary judgment. *Maurer*, 870 F.3d at 384.

The FTC also argues that the declarations are not "based on the declarants' personal knowledge." Docket No. 57 at 8. But each declarant expressly states that the declaration "is based upon my personal knowledge and belief and/or upon [the declarant's] review of [the association's] business records." Docket No. 44, Ex. A ¶ 2; *id*. Ex. B ¶ 2; *id*. Ex. C ¶ 2; *id*. Ex. D ¶ 2. This is all that is needed to satisfy Rule 56(c)(4). *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 544 n.13 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009). Further, and in any event, each declaration sets forth information that is reasonably within the declarant's position or "sphere of responsibility," which is sufficient for a finding of personal knowledge. *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005). For example, Kelly Hall states that she is the President of the Longview Chamber of Commerce, "oversee[s] all of the Longview Chamber's operations," and represents and advocates for the Longview

Chamber's members on a variety of issues, including antitrust enforcement.  Docket No. 44, Ex. D ¶¶ 1, 3.  Hall's testimony about transactions by members of the Longview Chamber is thus within her personal knowledge for purposes of summary judgment.  *See, e.g., Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 111 n.10 (1st Cir. 2006) (finding that declarations from the president of a trade association came from personal knowledge because of the president's position).

## B.

The FTC alternatively argues that the Longview Chamber's evidence, even if admissible, "does not establish that [the] Longview Chamber has associational standing."  Docket No. 57 at 10.  The Court disagrees.

An association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Here, the FTC primarily challenges the first requirement, arguing that "the alleged injury to [the] Longview Chamber's members is speculative."  Docket No. 57 at 11.  In particular, the FTC argues, the evidence showing that some members of the Longview Chamber "'plan' or 'expect[] to enter into' HSR-reportable transactions in the 'foreseeable future' or 'by the end of 2025'" is "insufficient to demonstrate standing."  *Id.*

11

The FTC misunderstands both the law and the evidence. The injury-in-fact standard requires an injury to have three elements. First, the injury must be "concrete, meaning that it must be real and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Second, the injury must be "particularized" and not a "generalized grievance." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Third, the injury must be actual or imminent, not speculative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). To satisfy this last requirement for imminent injury, a plaintiff needs more than "allegations of possible future injury" or "a highly attenuated chain of possibilities"; rather, an imminent injury means one that is "certainly impending." *Clapper*, 568 U.S. at 410; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" (quoting *Clapper*, 568 U.S. at 414 n.5)); *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (adopting the "substantial risk" standard for imminence). Further, where a party is an "object of the action . . . at issue," there is "little question" that the party has standing to challenge it. *E.g., Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025).

The Longview Chamber's evidence satisfies the imminent-injury requirement. The key declaration states that members of the Longview Chamber "regularly enter into merger[s], acquisition[s], or other transactions that meet or exceed the size thresholds for filing a merger notification form under the HSR Act, including members for which M&A activity is a regular and consistent feature of their business

model." Docket No. 44, Ex. D ¶ 5. In fact, "Longview Chamber members have already engaged in HSR-reportable transactions this year." *Id.* As objects of the Final Rule, there is "little question" that these members have standing. *Diamond Alt. Energy*, 606 U.S. at 114. Further, "consistent with their past levels of deal activity, members of the Longview Chamber also plan to engage in HSR-reportable transactions in the forthcoming months." Docket No. 44, Ex. D ¶ 5. The declaration then provides details about five specific members who have already engaged in HSR-reportable transactions this year and plan to continue engaging "in a similar level of HSR-reportable activity going forward," including "at least one more HSR-reportable transaction this year." *Id.* ¶¶ 5–11. All of this is sufficient to show a substantial risk of future harm. *See, e.g., Driehaus*, 573 U.S. at 161–62 (concluding that a pro-life organization sufficiently established impending harm because it had made pro-life statements in past elections and planned to make them in the upcoming election year); *Barilla v. City of Houston*, 13 F.4th 427, 432–33 (5th Cir. 2021) (concluding that a street performer sufficiently established impending harm because he had previously performed on a street and stated that he planned to perform again on the same street). *Cf. Lujan*, 504 U.S. at 558 (concluding that an association lacked standing where the evidence showed only that members "intend[ed]" to visit Sri Lanka "in the future" to see endangered species imperiled by the regulation).

The FTC also argues that this case "is not germane to the Longview Chamber's interests." Docket No. 57 at 13. Germaneness, however, is not a high bar for associational standing. Rather, "the germaneness requirement is 'undemanding' and

requires 'mere pertinence' between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2nd Cir. 2006)).  And here, the Longview Chamber has established that its purpose is to "advocate for policies that promote economic development and job creation," including by "challenging harmful and misguided federal regulations."  Docket No. 44, Ex. D ¶ 3.  The Longview Chamber has also demonstrated that the Final Rule would harm its members and the local economy.  *Id.* ¶¶ 13–15.  This satisfies the "pertinence" between the lawsuit and the Longview Chamber's purpose.  *E.g., Tex. Med. Bd.*, 627 F.3d at 550 n.2.

Finally, the FTC contends that the Longview Chamber fails to establish standing because the key declaration identifies the affected members pseudonymously.  Docket No. 57 at 12 (citing *Summers v. Earth Island Inst.*, 55 U.S. 488, 498–499 (2009)).  The FTC misreads *Summers*.  As the Fifth Circuit has explained, "*Summers* only requires that the plaintiff allege that there is a specific injured member. . . . Alleging that a specific member exists does not require naming that member."  *Nat'l Infusion Ctr. v. Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024) (citations omitted); *see also CFPB*, 691 F. Supp. 3d at 738.

\* \* \*

The FTC's standing argument thus fails as a matter of law.

14

### III.

Plaintiffs argue that the Final Rule exceeds the FTC's statutory authority under the HSR Act.  Docket No. 44 at 11.  According to Plaintiffs, "the HSR Act forbids the FTC from demanding materials that would impose substantially more costs on filing parties to compile and produce than are justified by any benefit to the antitrust agencies' initial evaluation of the transaction."  *Id*.  Because the FTC "never performed the required cost-benefit analysis," Plaintiffs contend, the Final Rule is unlawful and should be set aside under the APA.  *Id*. at 11–12.  As explained below, the Court agrees.

The APA requires courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).  "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  "Agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Inhance Techs., LLC v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024); *see also Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 615 (E.D. Tex. 2021) ("[B]efore promulgating rules or regulations pursuant to a statute, agencies must demonstrate a clear 'textual commitment of authority' in the language Congress enacted." (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))).

After reviewing the governing statute, the Court concludes that the HSR Act requires that the benefits of the Final Rule reasonably outweigh its costs. The Court then determines that the Rule fails to satisfy this statutory requirement.

### A.

The FTC claims authority for the Final Rule from Section 18(a) of the HSR Act. That provision states that the FTC "shall require that the [premerger] notification . . . be in such form and contain such documentary material and information relevant to a proposed acquisition as is *necessary and appropriate* to enable the [FTC and DOJ] to determine whether such acquisition may, if consummated, violate the antitrust laws." 15 U.S.C. § 18a(d)(1) (emphasis added). Additionally, the statute permits the FTC and DOJ to "define the terms used in this section," "exempt from the requirements of this section [those mergers] which are not likely to violate the antitrust laws," and "prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section." 15 U.S.C. § 18a(d)(2)(A)–(C).

The key phrase at issue is "necessary and appropriate." Plaintiffs argue that this phrase "constrains the FTC's authority, prohibiting it from demanding certain documents or information from all HSR filers if doing so would impose significant costs while doing comparatively little to enable the agency to determine whether to issue a Second Request." Docket No. 44 at 12. The FTC, on the other hand, argues that "necessary and appropriate" is a "capacious standard" giving the agency "broad

discretion" to determine what information to require in a premerger notice—without conducting a cost-benefit analysis.  Docket No. 57 at 16.

Precedent supports Plaintiffs on this point.  In *Michigan v. EPA*, the Supreme Court interpreted the term "appropriate and necessary" in a statute permitting the EPA to promulgate emissions regulations for power plants.  576 U.S. 743, 752 (2015).  Although the term "appropriate" is "capacious" and "leaves agencies with flexibility," "[r]ead naturally in the present context," "the phrase 'appropriate and necessary' requires at least some attention to cost."  *Id*.  "One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."  *Id*.  "In addition, 'cost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost."  *Id*.  Indeed, "[n]o regulation is 'appropriate' if it does significantly more harm than good."  *Id*.  Accordingly, the Court held, the EPA's regulation was unlawful because the agency had "deemed cost irrelevant to the decision to regulate power plants."  *Id*. at 760.

A few years later, the Fifth Circuit interpreted the phrase "necessary and appropriate" in the Magnuson-Stevens Act, Pub. L. No. 94-265, § 1852, 90 Stat. 331 (1976).  The provision there authorized the Department of Commerce to promulgate regulations "necessary and appropriate for the conservation and management of the fishery."  *Mexican Gulf Fishing*, 60 F.4th at 965.  "As an initial matter," the Fifth Circuit began, "the adjectives *necessary* and *appropriate* limit the authorization contained in this provision."  *Id*.  "For this reason, the rule is authorized by the

Magnuson-Stevens Act only if it is necessary and appropriate, which at a minimum requires that its benefits reasonably outweigh its costs." *Id.* (citing *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d. 717, 733 (5th Cir. 1988)). Additionally, "a necessary-and-appropriate condition requires more than just consideration of financial costs." *Id.* at 966. It also requires an analysis of "any disadvantage" that could be deemed a cost. *Id.* (quoting *Michigan v. EPA*, 576 at 752).

Applying that standard to the relevant regulation, the Fifth Circuit found that the rule exceeded Commerce's statutory authority. The rule required fishing vessels to keep expensive GPS-tracking equipment to verify whether a vessel was at the dock or "whether a fishing trip was taken, and the length of that trip." *Id.* at 965. Although a "strict cost-benefit analysis is not required," the court held, the rule was unlawful because the agency "failed to show that the GPS-tracking requirement is necessary and appropriate for the conservation and management of the fishery." *Id.* at 966. Installing the equipment would cost $3,000 with additional monthly service fees—significant costs for small businesses operating on thin margins. *See id.* at 965. And, yet, there was "[n]ext to nothing" in benefits. *Id.* Information about vessel location was the only cited benefit, and "the Government already has this information" from less-costly reporting requirements. *Id.* at 966. Accordingly, the court concluded, "the Act does not authorize [the agency] to promulgate the GPS-tracking requirement." *Id.*

The FTC contends that *Michigan v. EPA* and *Mexican Gulf Fishing* are distinguishable because the statutes in those cases authorized the agencies to issue

a rule only if it was necessary and appropriate. Docket No. 57 at 19. Whereas here, the FTC argues, the HSR Act "requires" the FTC to issue a rule and permits the agency the flexibility to determine whether the rule is "necessary and appropriate," "even if the costs outweigh the benefits." *Id.* (citing 15 U.S.C. § 18a(d)(1)). According to the FTC, the HSR Act falls under the handful of "settings in which the phrase 'appropriate and necessary' does not encompass cost." *Id.* (quoting *Michigan*, 576 U.S. at 752). The Court is unpersuaded. Nothing in *Michigan v. EPA* nor *Mexican Gulf Fishing* draws the distinction urged by the FTC here. Rather, in both cases the courts interpreted the phrase to be a limit on agency authority, "which at a minimum requires that [the rule's] benefits reasonably outweigh its costs," *Mexican Gulf Fishing*, 60 F.4th at 965. *See also Michigan v. EPA*, 576 U.S. at 752. Further, in any event, in *Mexican Gulf Fishing*, one of the catch-all provisions authorizing the rule explicitly required the agency to regulate, yet the Fifth Circuit made no note of this distinction in analyzing the meaning of "necessary and appropriate." *See* 16 U.S.C. § 1853 (a)(1)(A); *id.* § 1853 (b)(14); *Mexican Gulf Fishing*, 60 F.4th at 965–66.

In sum, the HSR Act requires that any benefits to the FTC in mandating additional information in the premerger notice "reasonably outweigh" the costs. *Mexican Gulf Fishing*, 60 F.4th at 965.

## B.

Plaintiffs argue that the FTC failed to conduct any cost-benefit analysis and that the Final Rule therefore exceeds the FTC's statutory authority. "[T]he FTC never determined . . . that obtaining the newly mandated materials would be helpful

enough to the decision to issue a Second Request that they were worth the additional burden on thousands of annual HSR filers." Docket No. 44 at 15. The FTC counters that, even though it believed a cost-benefit analysis was unnecessary, the agency nevertheless weighed the costs and benefits and determined that the Final Rule was worth the additional burden on filers. Docket No. 57 at 17. Again, Plaintiffs have the better argument. Even assuming that the FTC's discussion of costs and benefits constituted a cost-benefit analysis, the Court finds that the agency failed to show that the benefits of the Final Rule reasonably outweighed its costs.

Start with costs. *See Mexican Gulf Fishing*, 60 F.4th at 965. The FTC concedes that the costs to comply with the Final Rule are roughly triple the costs to comply with the previous Form. 89 Fed. Reg. at 89,333. While the prior Form took an average of 37 hours to complete, 88 Fed. Reg. at 42,208, the FTC expects that the Final Rule's new form will require 105 hours, 89 Fed. Reg. at 89,333. Estimating an hourly rate of $583 for "executive and attorney compensation," the Office of Management and Budget determined that each filing under the Final Rule would cost $39,644 (68 hours X $583) more than the cost to complete the prior Form. *Id*. With 3,515 HSR filings in Fiscal Year 2023, OMB determined that the overall additional burden to comply with the Final Rule would be 239,020 hours (3,515 filings X 68 additional hours per filing) and would cost approximately $139.3 million (239,020 hours X $583 per hour). *Id*.[1]

---

[1] Plaintiffs dispute OMB's estimate. Docket No. 44 at 20–21. Plaintiff U.S. Chamber of Commerce estimated the cost of complying with the FTC's *proposed* rule (which included more requirements than the Final Rule). The U.S. Chamber concluded that the FTC's proposed rule would add approximately 242 hours to the average transaction, Docket No. 44, Ex. 6 ¶¶ 45–48, far more than

And yet, the benefits of the Final Rule identified by the FTC are illusory or, at least, unsubstantiated. These claimed benefits can be divided into two main categories: (1) detecting additional harmful mergers and (2) saving the FTC the time and cost of obtaining more information during the premerger screening process.[2]

---

OMB's estimate of 107 additional hours for the proposed rule, *id.* ¶ 35. Although the U.S. Chamber acknowledges that the Final Rule has fewer requirements than the proposed rule, the Chamber contends that the removed requirements alone cannot explain the significant disparity between the Chamber's estimate (an increase of 241 hours) and OMB's estimate (an increase of only 68 hours). Docket No. 44. at 21. The Court need not decide this dispute, however, because even using OMB's lower cost estimate, the Court concludes that the costs outweigh the FTC's claimed benefits.

[2] The FTC lists the benefits of the Final Rule as the following:

    (1) the non-consummation of harmful mergers that otherwise would not have been caught during premerger screening, whose harm continues unless and until the merger is unwound and competition in the affected market is restored, if it can be restored at all;

    (2) the reallocation of staff hours from attempting to collect additional necessary information from the parties on a voluntary basis and reduced uncertainty that delay and insufficiency create for resource allocation decisions;

    (3) the reallocation of staff hours from collecting additional necessary information from third parties regarding the parties' business operations;

    (4) the reduction in burden required for third parties to respond to the Agencies' outreach to provide information known to the filing parties, but not currently required by the Form;

    (5) improvements in premerger screening through

        (i) more accurate identification of transactions requiring in-depth review;

        (ii) the reduction in the number of HSR Filings withdrawn and refiled for the purpose of allowing Agency staff to collect and review more information from the parties;

        (iii) reduction in delays associated with HSR Filings, including those that are withdrawn and refiled but do not receive Second Requests;

        (iv) the narrowing of issues required to properly focus any in-depth review, including through the issuance of more targeted and less burdensome Second Requests;

        (v) the reduction in the number of Second Request investigations that do not ultimately result in enforcement or voluntary restructuring; and

    (6) a more efficient allocation of resources devoted to merger enforcement, including by avoiding expensive and time-consuming litigation to unwind consummated mergers that cause harm but were not identified under the current rules.

89 Fed. Reg. at 89,252.

1.    As to the first category, preventing illegal mergers is certainly a benefit. But the FTC has not shown that the Final Rule's new form would prevent any illegal mergers not already prevented by the previous Form.  In fact, although repeatedly asked, counsel for the FTC could not identify a single illegal merger in the forty-six-year history of the prior Form that the Final Rule's new form would have prevented. The FTC offers evidence that premerger enforcement is needed, 89 Fed Reg. at 89,2220, and that the prior Form did not request all the information available to the parties in acquisitions, 89 Fed. Reg. at 89,233.  But none of this demonstrates that the Final Rule's new form will detect illegal mergers more effectively than the prior Form, as the FTC claims.  The FTC also argues that firms "structure their deals to avoid premerger review," Docket No. 57 at 29, but the agency fails to explain how the Final Rule would eliminate that problem, especially since the reporting thresholds are unchanged.  *See* 89 Fed. Reg. at 89,264 ("[N]othing in the final rule changes which acquisitions are subject to premerger review.").

The FTC relies heavily on a study of hospital mergers that were submitted for premerger review, co-authored by two economists at the FTC's Bureau of Economics. 89 Fed Reg. at 89,221 (citing Keith Brand et al., *In the Shadow of Antitrust Enforcement: Price Effects of Hospital Mergers from 2009–2016*, 66 J. L. Econ. 639 (2023)).  Per the FTC, the study identified certain hospital mergers that were subject to the premerger notification process that later had anticompetitive effects (i.e., price increases).  The FTC suggests that the prior Form failed to provide the agency with "sufficient information to trigger additional investigations that could have blocked

22

these harmful mergers before they were consummated." Docket No. 57 at 29 (quoting 89 Fed. Reg. at 89,221). But the study itself also stated that the FTC issued Second Requests in reviewing these problematic mergers, which means that the prior Form worked as it should have—triggering additional review by the agency. Brand, *supra*, at 662. The failure of the agency to prevent the mergers therefore had nothing to do with the Form's alleged deficiencies but rather with "[in]sufficient resources to challenge th[os]e mergers," "evidence [being] too weak," or plain error. *Id*. at 662–63.

The FTC also repeatedly cites its own "experience and expertise" in concluding that the Final Rule's new form will detect unlawful mergers. 89 Fed. Reg. at 89,217. The FTC claims that it "compared documentary material and information [the FTC and DOJ have] received over the years" and identified information that, if the agencies had at the beginning of previous investigations, "would have changed the Agencies' decision whether and how to investigate reportable transactions." *Id*. But the FTC fails to substantiate this claim. Nor does the agency provide any specifics. It does not identify the mergers, does not state what information it lacked, and does not say whether the agency would have approved the mergers or not.

The FTC asserts that requiring evidence of a past illegal merger is "an insanely lofty standard." Docket No. 57 at 30. But it's the FTC's own standard. The agency claimed that the Final Rule was necessary to detect "harmful mergers that otherwise would not have been caught during premerger screening." 89 Fed. Reg. at 89,252. Meanwhile, for years, until August 2024, the FTC's own online guide to the HSR program declared that the "Program [using the prior Form] has been a success" and

23

"has minimized the number of post-merger challenges the enforcement agencies have had to pursue." *See* Docket No. 44, Ex. 19 at 2 (Fed. Trade Comm'n, *What is the Premerger Notification Program? An Overview* (Mar. 2009)); Docket No. 27 ¶ 5. With this record, it's not "insanely lofty" to ask the agency to identify at least one "harmful merger" that the prior Form failed to detect. As the Supreme Court recently held, an agency should at least have "evidence to support [its] findings." *Loper Bright Ents. v. Raimondo*, 603 U.S. 369, 387 (2024). After all, "courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action." *Loper Bright*, 603 U.S. at 387 (quoting 5 U.S.C. § 706).

Although a "strict cost-benefit analysis is not required," *Mexican Gulf Fishing*, 60 F.4th at 965, the FTC's vague and conclusory assertions about preventing illegal mergers does not justify the significant costs of the Final Rule's new form—costs to be borne by thousands of annual HSR filers. *See Mexican Gulf Fishing*, 60 F.4th at 965–66 (holding that the agency's claim that GPS-trackers would provide necessary information was insufficient to justify the cost of the trackers because the claim was conclusory and unsubstantiated); *see also Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 587 F. Supp. 3d 428, 460 (E.D. La. 2022), *rev'd*, 60 F.4d 956 (5th Cir. 2023) (quoting the agency's claims that the requested information was required to improve management of fisheries and facilitate enforcement of the Magnuson-Stevens Act).

**2.** The FTC's second category of claimed benefits is saving the agency time and resources in obtaining more information during the premerger screening process. 89 Fed. Reg. at 89,252. Saving resources is also, undoubtedly, a benefit. But the

FTC's resource-savings argument is limited to a small subset of HSR filers, and the agency again fails to show how that limited benefit reasonably outweighs the significant costs on the thousands of other annual filers.

As an initial matter, the FTC's resource-savings justification suffers from many of the same flaws as its detecting-illegal-mergers argument: it is conclusory, lacks specifics, and is unsubstantiated. *See, e.g.*, *id.* at 89,252–54; *id.* at 89,269–70. It is also underwhelming. By the FTC's own estimate, approximately 92% of HSR-reported mergers do not require any investigation or additional requests by the agency. Docket No. 44, Ex. 23 at T1(Fed. Trade Comm'n & U.S. Dep't of Justice, *Hart-Scott-Rodino Annual Report Fiscal Year 2021*). Indeed, the FTC opens an investigation in only 8% of HSR-reported mergers, and even fewer—3%—receive Second Requests from the agency. *Id.*; *see* Billman & Salop*, Merger Enforcement Statistics: 2001-2020*, 85 ANTITRUST L.J. 1, 10 (2023) (finding that from 2001 to 2020, only about 3% of HSR-reportable transactions received a Second Request). And yet, the agency justifies the Final Rule on the time and resources saved in only the few mergers that receive a closer look. The FTC claims that the new form will allow it to more quickly conclude investigations, 89 Fed. Reg. at 89,252, and will permit more targeted Second Requests, which will save the agency both time and resources, *id.* In conclusion, the FTC asserts, the new form will lead to "an overall reduction in the number of staff hours spent collecting additional information from all sources, including the parties, as well as a reduction in associated burdens of reviewing and processing that information." *Id.*

The problem for the FTC is that the Final Rule's new form imposes costs on *all filers*—including the 92% for which the new form will provide the agency with little or no benefit.  And even the benefit in 8% of the transactions is unclear.  The FTC does not argue that the new form would eliminate or substantially curtail investigations or Second Requests.  Nor does the agency attempt to specify or substantiate how exactly the new form will save time and resources.  A typical explanation is that the Final Rule will allow the agencies to "narrow[] the scope of their investigations in some cases, and in others, reduce[] the need to conduct a more burdensome in-depth investigation by issuing Second Requests."  *See, e.g.*, 89 Fed. Reg. at 89,217.  This does not satisfy *Mexican Gulf Fishing*'s standard, which requires the agency to show "at a minimum" that the new rule will provide a "meaningful benefit," one that "reasonably outweigh[s] its costs."  F.4th at 965–66.

The FTC argues that "it is appropriate to shift some of this information-gathering burden to the merging parties and away from other market participants—including customers who may suffer harm if the merger is consummated—who currently absorb this burden due to deficiencies in the existing HSR Form."  89 Fed. Reg. at 89,253.  But as noted above, the agency has provided no evidence that any deficiencies in the prior Form resulted in illegal mergers that the new form would prevent.  Such cost-shifting, moreover, would hardly keep the form "as minimally burdensome as possible without compromise the agencies' ability to investigate and interdict proposed transactions."  Docket No. 44, Ex. 17 at 29.

\* \* \*

To be sure, the FTC made more of an effort to consider costs and benefits than the agencies in *Michigan v. EPA* and *Mexican Gulf Fishing*. But the lack of specifics and evidence here prevents the Court from concluding that the claimed benefits of the Final Rule reasonably outweigh its significant costs, as required by the HSR Act. *See, e.g., Mexican Gulf Fishing*, 60 F.4th at 965–66; *Tex. Indep. Ginners Ass'n v. Marshall*, 630 F.2d 398, 411 (5th Cir. 1980) (citing *Am. Petroleum Inst. v. OSHA*, 581 F.2d 493, 503 (5th Cir. 1978)) (holding that the agency's "estimate of the anticipated cost and expected benefit of the proposed regulations are factual findings that must be supported by substantial evidence in the record."); *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a statutorily mandated factor was considered is not a substitute for considering it.").

The Court thus concludes that the Final Rule is unlawful because it exceeds the FTC's statutory authority. 5 U.S.C. § 706(2)(C).

## IV.

Plaintiffs also argue that the Final Rule should be vacated because it is the product of arbitrary and capricious rulemaking in violation of the APA. Docket No. 44 at 19–20. Specifically, Plaintiffs contend that the FTC "failed to show that the Rule's benefits are worth the immense new costs on every HSR filer," *id*. at 20, and "gave no reasoned explanation for rejecting less burdensome alternatives," *id.* at 27.

The APA instructs courts to "hold unlawful and set aside" rules that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also ExxonMobil Pipeline Co. v. U.S. Dept. of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) ("Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." (citation modified)). "In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Texas v. EPA*, 983 F.3d 826, 835 (5th Cir. 2020) (quoting *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Court addresses each of Plaintiffs' arguments in turn.

## A.

First, the cost-benefit analysis. Docket No. 44 at 20–24. Plaintiffs argue that the FTC "unreasonably understated the costs of the Rule" while "unreasonably overstat[ing] the benefits." *Id.* at 20, 23. The Court agrees.

"[A] regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem'" which "includes, of course, considering the costs and benefits associated with the regulation." *Mexican Gulf Fishing*, 60 F.4th at 973 (quoting *State Farm*, 463 U.S. at 43)). "[A]s part of the cost-benefit analysis, the agency must identify benefits that 'bear a rational relationship to the . . . costs imposed.'" *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) (quoting *Mexican Gulf Fishing*, 60 F.4th at 973). The Court must consider whether an agency

"examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 513 (2009) (quotation omitted). The Court also must ensure that the agency "has acted within a zone of reasonableness," but "may not substitute its own policy judgment for that of the agency." *Prometheus*, 592 U.S. at 423.

Plaintiffs' argument succeeds for the same reason that the necessary-and-appropriate provision does not authorize the Final Rule: the FTC "failed to demonstrate that it would obtain meaningful benefits" from the new form. *Mexican Gulf*, 60 F.4th at 973 (holding that the GPS-tracking requirement was arbitrary and capricious "for the same reason that the necessary-and-appropriate provisions do not authorize [the tracking requirement]"). The FTC lacks any evidence that the Final Rule would detect illegal mergers more effectively than the prior Form. And it failed to show that the claimed benefit of saving time and resources reasonably outweighs the Final Rule's significant costs. Thus, the Rule is arbitrary and capricious because its benefits do not "bear a rational relationship" to its costs. *Id.*

### B.

Plaintiffs also argue that the FTC failed to properly consider less burdensome alternatives offered in comments to the Final Rule. Specifically, Plaintiffs contend that the FTC dismissed "more targeted tools" like voluntary requests for reasons that were "irrational, contrary to the evidence, or both." Docket No. 44 at 27–28. The FTC claims that it fully considered the alternatives and rejected them because they would

29

create further delays or shift more costs to the investigated parties.  Docket No. 57 at 33–37.

"[A]n agency must consider and explain its rejection" of "'significant and viable' and 'obvious' alternatives."  *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 1984)); *see also Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984) ("It is well established that an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." (citing *State Farm,* 463 U.S. at 47–53; *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C. Cir. 1983))).  "An agency's failure to respond meaningfully to [alternatives] raised by a party renders its decision arbitrary and capricious."  *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001)).  So too is an "artificial narrowing of options" by the agency by responding to alternatives with "a recital of conclusions, not facts" and a "conclusion with little supporting rationale visible."  *Pillai v. CAB*, 485 F.2d 1018, 1027 (D.C. Cir. 1973).

The FTC's main complaint with the suggested alternatives is that they did not "address the information deficiencies . . . with the current information requirements." 89 Fed. Reg. 89,248-89,249.  The FTC claims that alternatives like voluntary submissions and more targeted Second Requests are not comparable because the agencies first need the information provided by the new form before they can

determine which transactions require additional information.  *Id.* at 89,247-89,249. But once again, the FTC does not substantiate this claim.  The agency does not specify what information was lacking in the prior Form that the Final Rule would now provide—or what transactions the prior Form allowed to proceed that the Final Rule would flag as problematic.  As discussed above, the FTC cannot show that a single illegal merger occurred due to "information deficiencies" in the old Form.  *See supra* Section III.B.1.

The FTC also argues that the proposed alternatives are "extremely costly" compared to the Final Rule.  The FTC points to a 2014 report by the American Bar Association estimating that Second Requests cost recipients an average of $4.3 million and 7.9 additional months to conclude the premerger approval process.  *Id.* at 89,247.  But the agency fails to explain why imposing these costs on a small subset of filers is a more "costly" alternative than tripling the costs of every HSR-reportable transaction for all filers.   Nor does it explain why voluntary disclosures *before* a Second Request would also be unacceptable.

The Court thus concludes that the FTC's rejection of the alternatives was based on improper reasoning and that the agency failed to consider an "important aspect of the problem."  *State Farm*, 463 U.S. at 43; *see also Canadian Ass'n of Petroleum Producers*, 254 F.3d at 222 (finding that agency acted in an arbitrary and capricious manner when its reasoning for rejecting an alternative was "not wholly accurate" math); *Pillai*, 485 F.2d at 1027 (finding that agency's rejection of

alternatives was arbitrary and capricious when the agency's reasoning relied on "unsupported conclusions" and "sheer faith in the [agency's] 'expertise.'").

* * *

The FTC's failure to apply reasoned decision-making provides a second and independent basis to hold unlawful and set aside the Final Rule under the APA. 5 U.S.C. § 706(2)(A).

<strong>V.</strong>

Having determined that the Rule violates the APA, the Court considers the proper remedy.  Plaintiffs ask for "universal vacatur" of the Rule.  Docket No. 44 at 30; Docket No. 62 at 25.  The FTC states that the Rule is "ill-suited for universal relief" because "hundreds of parties have already sought premerger review . . . using the new form."  Docket No. 57 at 39.  Additionally, the FTC asks that any vacatur be limited to "members of the plaintiff associations who have demonstrated that they have standing."  *Id.* at 38.

"Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."  *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022).  And vacatur under the APA is "not party-restricted."  *Career Colls. and Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).  "'When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Id.* (quoting *Harmon v. Thornburgh*, 978 F.2d 484, 495 n.21 (D.C. Cir. 1989).  As such, the Fifth Circuit has repeatedly rejected government efforts to limit

relief to the parties and has upheld universal vacatur as the appropriate remedy in APA cases. *See, e.g., id.*; *Career Colls. and Schs. of Tex*, 98 F.4th at 255; *Tex. Med. Ass'n v. U.S. Dep't of Health and Hum. Servs.*, 110 F.4th 762, 779–80 (5th Cir. 2024).

Though vacatur is the "default rule," *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), courts may deviate based on two equitable interest factors: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). Considering these factors here, the Court concludes that the appropriate remedy is vacatur.

First, the seriousness of the Final Rule's deficiencies makes it unlikely that the FTC can justify its decision on remand. In fact, the FTC has said nothing to suggest otherwise, noting instead that it would be an "insanely lofty and impossible standard" to require the agency to identify problematic transactions that the prior Form failed to detect. Docket No. 57 at 30. Without an "explanation as to how [the FTC] could correct the Final Rule's conflicts with the statute on remand," this factor thus weighs against the FTC. *Tex. Med. Ass'n*, 110 F.4th at 779 (citation modified).

Second, the Court finds that vacatur would not be unduly disruptive. The FTC argues that the Final Rule is already in effect and that merging parties would be forced to "scrap the time and money spent on preparing the new form and pivot[] to the old form, which included requirements that are not part of the new form." Docket

No. 57 at 39.  But the existence of some costs to some parties is not unduly disruptive. *See Texas*, 20 F.4th at 1000.  Vacatur here would not be unduly disruptive, moreover, because the old Form—used for forty-six years—certainly "provide[s] a sufficient framework" for mergers to be processed.  *Tex. Med. Ass'n v. U.S. Dep't of Health and Hum. Servs.*, 587 F.Supp.3d 528, 549 (E.D. Tex. 2022).

With no reason to depart from the default rule, the Court finds that vacatur of the Rule and remand is the proper remedy.

## VI.

In sum, the Court holds that (1) Plaintiffs have standing to challenge the FTC's Final Rule, (2) the Rule conflicts with the unambiguous terms of the Act, (3) the Rule is the product of arbitrary and capricious decision-making, and (4) vacatur and remand is the proper remedy.

Accordingly, the Court **GRANTS** Plaintiffs' motion for summary judgment (Docket No. 44), **DENIES** the FTC's cross-motion for summary judgment (Docket No. 57), and **ORDERS** that the Rule be vacated.  The Court further **DENIES AS MOOT** the FTC's motions to dismiss (Docket Nos. 23, 30) and motion to stay (Docket No. 53).

Finally, the Court **STAYS** the applicability of this order for seven days to allow the FTC time to seek emergency relief from the United States Court of Appeals for the Fifth Circuit.

So **ORDERED** and **SIGNED** this **12th** day of **February, 2026.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

34